No. 23-1380

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

Rocky Mountain Gun Owners, *et al.,*
*Plaintiffs-Appellants*,

v.

Jared S. Polis, in his official capacity
as Governor of the State of Colorado*,*
*Defendant-Appellee*,

---

Appeal from the United States District Court
for the District of Colorado
No. 1:23-cv-2563-JLK (Hon. John L. Kane)

---

**APPELLANTS' OPENING BRIEF**

---

Oral Argument Requested

---

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Phone: (303) 205-7870
Email: barry@arringtonpc.com

D. Sean Nation
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
Phone: (303) 292-2021
Email: snation@mslegal.org

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .......................................................... i

TABLE OF AUTHORITIES......................................................... iii

I.    Statement Regarding Oral Argument ............................................ 1

II.   Jurisdictional Statements ................................................. 1

    A.    The District Court Possessed Subject Matter Jurisdiction Over the Dispute................................................................... 1

    B.    This Court Possesses Appellate Jurisdiction Over the Dispute. 2

    C.    Appellants Timely Appealed. ............................................ 2

III.  Statement of the Issues Presented for Review............................. 2

IV.   Statement of the Case .................................................. 3

V.    Statement of the Argument ............................................. 5

VI.   Standard of Review..................................................... 9

VII.  Argument .............................................................. 11

    A.    The Waiting Period Act Implicates the Text of the Second Amendment. ..................................................... 12

        i.    Obtaining a firearm is necessarily protected by the Second Amendment............................................ 12

        ii.   The District Court Mis-Framed the Right at Issue, and Improperly Discounted Appellants' Interest in Obtaining a Purchased Firearm.................................... 22

    B.    The District Court Erred by Concluding that the Act is a Presumptively Lawful Commercial Regulation................. 25

C.     The Waiting Period Act is Not in Line with the Nation's Historical Tradition of Firearms Regulation. ..................................... 30

    i.     Impulsive gun violence was a known problem to the Founders, but there is no "distinctly similar" analogue to the Waiting Period Act ................................................................... 31

    ii.     Laws related to intoxicated individuals are not historical analogues ................................................................. 33

    iii.     Licensing regimes are not an historical analogue to an arbitrary waiting period. ........................................................ 37

    iv.     Merely analogizing to the practical time that it took to obtain a gun at the founding is not consistent with *Bruen*'s demand for an historical legal analogue ..................................... 40

D.     Appellants are Suffering Irreparable Harm. ....................... 42

E.     The District Court Erred by Engaging in Improper Means-End Reasoning with Respect to the Balance of Harms and the Public Interest. ................................................................. 43

VIII.  Conclusion ................................................................... 45

CERTIFICATE OF COMPLIANCE ...................................... 46

CERTIFICATE OF ELECTRONIC FILING ......................... 47

CERTIFICATE OF SERVICE ............................................. 48

ATTACHMENT 1: District Court Order Denying Motion for Preliminary Injunction, Filed on November 13, 2023 (11/13/2023) ............... 49

# TABLE OF AUTHORITIES

<u>Case(s)</u>                                                                                                          <u>PAGE</u>

*Am. C.L. Union of Kansas & W. Missouri v. Praeger*,
   815 F. Supp. 2d 1204 (D. Kan. 2011)...................................................... 10

*Antonyuk v. Chiumento*,
   89 F.4th 271 (2d. Cir. 2023) ................................................................. 29

*Awad v. Ziriax*,
   670 F.3D 1111 (10th Cir. 2012) ............................................................ 44

*Baird v. Bonta*,
   81 F.4th 1036 (9th Cir. 2023) ............................................................... 36

*Connecticut Citizens Defense League, Inc. v. Thody*,
   2023 WL 2687446 (D. Conn. 2023)....................................................... 18

*Defense Distributed v. Bonta*,
   2022 WL 15524977 (C.D. Cal. 2022) .................................................... 20

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ................................................... 19, 20, 21, 25

*Dobbs v. Jackson Women's Health Org.*,
   142 S. Ct. 2228 (2022) .......................................................................... 12

*Elrod v. Burns*,
   427 U.S. 347 (1976) .............................................................................. 42

*Ezell v. City of Chi.*,
   651 F.3d 684 (7th Cir. 2011)................................................................. 17

*Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*,
   916 F.3d 792 (10th Cir. 2019) ......................................................... 41, 43

*Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*,
   5 F.4th 407 (4th Cir. 2021) ................................................................... 27

*Jackson v. City & Cnty. of San Francisco*,
   746 F.3d 953 (9th Cir. 2014) ................................................................ 20

*Kev, Inc. v. Kitsap County*,
   793 F.2d 1053 (9th Cir. 1986) ................................................................ 12

*Little v. Jones*,
   607 F.3d 1245 (10th Cir. 2010) ........................................................ 9

*Luis v. United States*,
   578 U.S. 5 (2016) ................................................................ 18

*Maryland Shall Issue, Inc. v. Moore*,
   86 F.4th 1038 (4th Cir. 2023) ........................................................ 8, 15

*McRorey v. Garland*,
   2023 WL 5200670 (N.D. Tex., 2023)................................................ 17

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
   597 U.S. 1 (2022) .................. 5, 7, 15, 16, 17, 21, 25, 30, 31, 32, 34, 36, 41, 43

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................ 9

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*,
   389 F.3d 973 (10th Cir. 2004) ................................................ 11

*Obergefell v. Hodges*,
   576 U.S. 644 (2015) ................................................................ 19

*Pavan v. Smith*,
   582 U.S. 563 (2017) ................................................................ 19

*Planned Parenthood Arizona, Inc. v. Humble*,
   753 F.3d 905 (9th Cir. 2014) ................................................ 12

*Range v. Attorney General*,
   69 F.4th 96 (3rd Cir. 2023) ................................................ 27, 35

*Rocky Mountain Gun Owners v. Board of County Commissioners of Boulder County*,
   2022 WL 4098998 (D. Colo., 2022)................................................ 26

*Rocky Mountain Gun Owners v. Polis*,
   2023 WL 5017257 (D. Colo., 2023)................................................ 4, 9

*Rocky Mountain Gun Owners v. Polis*,
  2023 WL 5017253 (D. Colo., 2023) .......................................... 13, 15, 18, 26

*RoDa Drilling Co. v. Siegal*,
  552 F.3d 1203 (10th Cir. 2009) ............................................... 10

*Schrier v. University of Colo.*,
  427 F.3d 1253 (10th Cir. 2005) ............................................... 10

*Silvester v. Becerra*,
  138 S. Ct. 945 (2018) ............................................................. 18

*Teixeira v. Cnty. of Alameda*,
  873 F.3d 670 (9th Cir. 2017) .................................................. 17, 20

*Teter v. Lopez*,
  76 F.4th 938 (9th Cir. 2023) ................................................... 1

*United States v. Alston*,
  2023 WL 4758734 (E.D.N.C., 2023) ...................................... 18, 36

*United States v. McCane*,
  573 F.3d 1037 (10th Cir. 2009) ............................................... 30

*Verlo v. Martinez*,
  820 F.3d 1113 (10th Cir. 2016)................................................ 42

*Vincent v. Garland*,
  80 F.4th 1197 (10th Cir. 2023) ............................................... 28, 30

*Westar Energy, Inc. v. Lake*,
  552 F.3d 1215 (10th Cir. 2009) ............................................... 9

*Winter v. NRDC*,
  555 U.S. 7 (2008) .................................................................. 9

**STATUTES**

18 U.S.C. § 922(d) .................................................................... 28

28 U.S.C. § 1292(a)(1).............................................................. 2

28 U.S.C. § 1331 ...................................................................... 1

28 U.S.C. § 1343(a)(3) ................................................................. 1

28 U.S.C. § 1343(a)(4) ................................................................. 1

28 U.S.C. § 2201 ......................................................................... 1

28 U.S.C. § 2202 ......................................................................... 1

42 U.S.C. § 1983 ......................................................................... 1

42 U.S.C. § 1988 ......................................................................... 1

Colo. Rev. Stat. § 18-12-115(1)(a)(I) ...................................... 14, 23

Colo. Rev. Stat. § 18-12-115 ...................................................... 2

Colo. Rev. Stat. § 18-12-106 .................................................... 33

Colo. Rev. Stat. § 4-2-101 ........................................................ 24

Colo. Rev. Stat. § 4-2-401 ........................................................ 24

Colo. Rev. Stat. § 18-12-115(2)(b) .......................................... 16

Colo. Rev. Stat. § 18-12-115(1)(a) ...................................... 22, 38

Kan. Stat. Ann. § 21-6332 ........................................................ 33

N.M. Stat. Ann. § 30-7-4 .......................................................... 33

Okla. Stat. Ann. tit. 21, § 1289.9 ............................................ 33

Utah Code Ann. § 76-10-528 .................................................. 34

Wyo. Stat. Ann. § 23-3-307 ...................................................... 34

## OTHER AUTHORITIES

11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed. 1998) ............................................................ 42

**RELATED CASES:**   None.

## I.    Statement Regarding Oral Argument

Oral argument is desired in this appeal because it will assist the appellate court in determining how the district court erred in denying preliminary injunction.

## II.    Jurisdictional Statements

### A.    The District Court Possessed Subject Matter Jurisdiction Over the Dispute.

The District Court had original jurisdiction over this action under 28 U.S.C. § 1331, because the action arises under the Constitution and laws of the United States. The District Court also had jurisdiction under 28 U.S.C. § 1343(a)(3) and (a)(4) and 42 U.S.C. § 1983, since this action seeks to redress the deprivation, under color of the laws, ordinances, regulations, customs and usages of the State, of rights, privileges or immunities secured by the United States.

Appellants' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorney fees is authorized by 42 U.S.C. § 1988.

No party has contested jurisdiction below.[1]

Additionally, Appellee has waived sovereign immunity for the purpose of

---

[1] Nor has any party contested standing, since Appellants properly state an injury in fact which can be redressed by an opinion in their favor. *See Teter v. Lopez*, 76 F.4th 938, 945 (9th Cir. 2023) (a limitation on the Second Amendment-protected "ability to acquire arms" suffices to establish standing); *id.* at 946 (exact dates for "the acquisition and possession of butterfly knives" were not required, even in a pre-enforcement challenge).

Appellants' effort to seek prospective relief. App. Vol. 3 at 743. ("That waiver is sufficient for these proceedings, so I do not analyze whether the Eleventh Amendment applies.").

**B.     This Court Possesses Appellate Jurisdiction Over the Dispute.**

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1), because the District Court issued an order denying Appellants' motion for preliminary injunction.

**C.     Appellants Timely Appealed.**

The District Court denied a motion for the entry of a preliminary injunction on November 13, 2023. *See* App. Vol. 3 at 737. Appellants timely filed a notice of appeal on December 4, 2023. *See* App. Vol. 3 at 783.

**III.     Statement of the Issues Presented for Review**

**A.     Did the District Court err in holding that the Waiting Period Act, Colo. Rev. Stat. § 18-12-115 (the "Act")—which mandates an arbitrary 72-hour waiting period prior to taking possession of a firearm after a seller has initiated background check—does not even implicate the text of the Second Amendment of the United States Constitution?**

**B.     Did the District Court err in holding that the Waiting-Period Act is a presumptively lawful Commercial Sales Regulation under the Second Amendment of the United States Constitution?**

**C.     Did the District Court err in holding that the Waiting Period Act is in**

line with the nation's historical tradition of firearms regulation?

**D.**    Did the District Court err in holding that Appellants suffer no irreparable harm from the failure to enter a preliminary injunction?

**E.**    In balancing the equities, did the District Court err by engaging in improper means-end testing to deny Appellants' Preliminary Injunction Motion?

## IV.    Statement of the Case

For over 150 years, Colorado had no statute that imposed a post-background check waiting period on the purchases of firearms. That changed in 2023, when the Waiting Period Act was enacted. Appellants seek to preliminarily enjoin that new law, which for 3 days directly prevents a purchaser from possessing the firearm that they have already paid for, legally acquired, and own.

Plaintiffs-Appellants Alicia Garcia and Rocky Mountain Gun Owners ("RMGO") are Colorado residents. They are ordinary, law-abiding, adult citizens who are detrimentally affected by the Waiting Period Act. Ms. Garcia's unchallenged testimony is that her business is impacted as a firearms instructor and range safety officer, who regularly purchases firearms. App. Vol. 2 at 516 (Preliminary Injunction Transcript, Vol. 1, 16:4-2:24). The District Court found that Ms. Garcia had standing to bring her claim for a preliminary injunction. App. Vol. 3 at 741.

Taylor Rhodes, Executive Director of Rocky Mountain Gun Owners, testified that RMGO's members, himself included, were burdened by the Waiting Period Act. App. Vol. 2 at 527 (Preliminary Injunction Transcript, Vol. 1, 29:25-33:24). The District Court, having already determined that Ms. Garcia had standing, did not reach a conclusion as to whether RMGO possessed standing. App. Vol. 3 at 741.

Before the Waiting-Period Act took effect on October 1, 2023, Appellants filed a separate case challenging the Waiting Period Act. *See RMGO v. Polis*, No. 23-cv-01076-PAB-NRN (Filed Apr. 28, 2023). In ruling on the Motion for Preliminary Injunction in that case, Chief Judge Brimmer found that Plaintiffs could not move to enjoin the Act before it was enforced. *See Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01076-PAB-NRN, 2023 WL 5017257, at *5 (D. Colo. Aug. 7, 2023). Appellants then diligently brought this challenge once the Waiting Period Act went into effect on October 1, 2023, seeking a temporary restraining order and preliminary injunction that very day.

Colorado's new waiting period is triggered by the firearms seller's initiation of either a state or federal background check, and is unrelated to whether the individual who has purchased and acquired title to the firearm poses any individualized or genuine safety concerns. It is also unrelated to any licensing scheme.

Instead, the arbitrary waiting period simply demonstrates the state's hostility

to the Second Amendment, and to private firearm ownership more generally. At the preliminary injunction hearing, Colorado and its experts conceded that there is no history or tradition of imposing arbitrary waiting periods—of any length—on the acquisition of firearms in the United States.[2] Instead, Colorado relied on a historical practice of preventing sales of firearms to intoxicated individuals, and to licensing regimes.

## V.    Statement of the Argument

Despite the poor historical analogues to the Waiting Period Act, the District Court declined to enjoin the challenged law. But that decision is erroneous under *New York State Rifle & Pistol Association, Inc. v. Bruen,* 597 U.S. 1 (2022). In *Bruen*, the Supreme Court held that means-ends scrutiny is inappropriate in cases implicating the Second Amendment's right to keep and bear arms. *Id.* at 19 ("*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context."). Instead, courts just put the government to the burden of proof, and insist that the government "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* And where a "general societal problem" persisted in the 18th century, the government has an even higher burden still—to identify a "distinctly

---

[2] The state's expert witness, Randolph Roth, testified that "it wouldn't have crossed the minds of the Founders to pass such a law." ER 679 (Vol. 3 190:21-22).

similar" analogue. *Id.* at 26.

The Court in *Bruen* further clarified that, in any event, the "remote resemblen[ce]" of an historical law is insufficient to suffice as a historical analogue. *Id.* at 30. And it expressed grave concern that if courts gave too much weight to an historical law that merely resembled a modern law, such a practice would "risk endorsing outliers that our ancestors would never have accepted." *Id.* (bracket omitted); *see id.* at 31 (rejecting the idea that a statute could prohibit firearms in <u>all</u> places of public congregation merely by relying on an historical statute addressing <u>certain</u> places of public congregation); *Id.* at 112 (Breyer, J., dissenting) ("[T]he Court offers many and varied reasons to reject potential representative analogues, but very few reasons to accept them.").[3]

Put simply, the question in this case is whether the original public meaning of the Second Amendment is consistent with a statute that prohibits all law-abiding,

---

[3] Notably, the dissenters in *Bruen* fairly read the majority's rejection of several proposed historical analogues to severely narrow the breadth of what states would be able to use as a potential "historical analogue" in future cases. *See id.* at 122 (Breyer, J., dissenting) ("[T]he Court's refusal to credit the relevance of East New Jersey's law on this basis raises a serious question about what, short of a 'twin' or a 'dead ringer,' qualifies as a relevant historical analogue."); *id.* at 129 ("In each instance, the Court finds a reason to discount the historical evidence's persuasive force. Some of the laws New York has identified are too old. But others are too recent. Still others did not last long enough. <u>Some applied to too few people</u>. Some were enacted for the wrong reasons. Some may have been based on a constitutional rationale that is now impossible to identify. Some arose in historically unique circumstances. <u>And some are not sufficiently analogous to the licensing regime at issue here</u>.") (emphasis added).

responsible citizens who have fully passed all background checks from obtaining a firearm that they have already legally purchased until the expiration of a 3-day period.

The government will certainly contend that an historical analogue need not necessarily be a "dead ringer" or "historical twin" in order to suffice under *Bruen*. That is true, as far as it goes. Yet in conducting the analysis regarding historical analogues, *Bruen* commands courts to, at a minimum, consider the "how and why" of a potential historical analogue, with respect to whether it relates to a challenged modern firearm regulation. *Id.* at 29. Here, neither the "how" nor the "why" of the District Court's chosen historical analogues is remotely similar to the Waiting Period Act. Instead, they serve as a mere fig leaf for Colorado's policy preferences.

If Colorado had enacted a law requiring a 3-day waiting period for bookstores to deliver all purchased books purchased from bookstores, there is little doubt that a Court would reject such a limitation as unconstitutional. Without more, this Court may determine that Appellants are likely to prevail on the merits. *See Bruen*, 597 U.S. at 24 ("This Second Amendment standard accords with how we protect other constitutional rights."); *id.* at 70 ("The constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.") (cleaned up).

Indeed, the logic of a recent opinion from the Court of Appeals for the Fourth

Circuit contradicts the District Court's decision, in the context of a Maryland statute that involved a waiting period. *See Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038 (4th Cir. 2023), *reh'g en banc granted*, No. 21-2017 (L), 2024 WL 124290 (4th Cir. Jan. 11, 2024).[4] Appellants therefore ask this Court to enjoin the Waiting Period statute during the pendency of the District Court case.

Respectfully, the District Court abused its discretion by making at least five legal errors. First, the District Court erred by ruling that the Waiting Period Act did not even implicate the text of the Second Amendment. Second, the District Court erred by ruling that the Waiting Period Act is a mere commercial regulation that is presumptively constitutional, even after *Bruen*. Third, the District Court compounded its error by (a) not finding an historic law "distinctly similar" to the Waiting Period Act; and (b) holding that two historical precedents—one that disarmed intoxicated persons and one related to licensing regimes—were analogous to the Waiting Period Act, and were thus part of the history and tradition of firearms regulation. Fourth, the District Court erred by failing to appropriately consider the irreparable harm done to Appellants by violating their constitutional rights. Finally,

---

[4] While the Fourth Circuit sitting en banc may ultimately hold that the Panel erred in its conclusion, Appellants rely on *Maryland Shall Issue*'s underlying logic, which closely tracks *Bruen*. 86 F.4th 1038, 1042 ("Maryland's law fails the new *Bruen* test. As we will explain, Plaintiffs have shown that Maryland's handgun-licensure law regulates a course of conduct protected by the Second Amendment, and Maryland has not established that the law is consistent with our Nation's historical tradition.").

in balancing the equities regarding whether to enjoin the law, the District Court erred by engaging in impermissible means-ends testing that the Supreme Court explicitly forbade in *Bruen*. *See, e.g.*, App. Vol. 3 at 777 ("With a statistically rigorous study quantifiably illustrating the public safety benefits of a firearm waiting period, I weigh this against the purported harms the Plaintiffs would suffer.").

## VI.  Standard of Review

Courts of Appeal review the denial of a preliminary injunction for abuse of discretion. *See Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010). A district court abuses its discretion by denying a preliminary injunction based on an error of law. *See Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009).

Under the traditional four-prong test for a preliminary injunction, the party moving for an injunction must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the movant if an injunction is not entered; (3) that the harm alleged by the movant outweighs any harm to the non-moving party; and (4) an injunction is in the public interest. *See, e.g., Winter v. NRDC*, 555 U.S. 7, 20 (2008). When the government is the party opposing an injunction, the third and fourth elements merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Both Appellants here challenged the law before it went into effect. That challenge was denied in *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01076-PAB-NRN, 2023 WL 5017257 (D. Colo. Aug. 7, 2023), with the District Court in

that case ruling in part that a pre-enforcement challenge could not go forward. *Id.* at *4 (Plaintiff Garcia could not establish that she was likely to be prosecuted under the Waiting Period Act, and therefore could not bring a pre-enforcement challenge).

On the effective date of the Waiting Period Act, Appellants once again challenged the law. Now, Appellee advances the argument that Appellants are seeking to disrupt the status quo, and thus must be held to a higher standard when seeking a preliminary injunction.

In truth, however, Appellants desire to preserve the status quo, as it existed prior to their constitutional rights being violated. They filed suit before the statute was effective, and were dismissed; then they filed suit on the exact effective date of the statute, seeking to enjoin it immediately. It would be odd to say that Appellants are the ones trying to upset the status quo, or somehow sat on their rights.

To be clear, the goal of a preliminary injunction is to preserve the status quo pending trial. *See RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1208-09 (10th Cir. 2009). The Tenth Circuit has been clear that the "status quo" is the last uncontested status between the parties before the dispute arose. *See Schrier v. University of Colo*., 427 F.3d 1253 (10th Cir. 2005) ("Dr. Schrier's request that he be <u>reinstated</u> as Chair seeks to <u>preserve</u> rather than disturb the status quo…") (emphasis added).

In the context of a constitutional challenge to a newly enacted statute, "the last uncontested status between the parties before the dispute arose would be that which

10

existed prior to the challenged statute taking effect." *Am. C.L. Union of Kansas & W. Missouri v. Praeger*, 815 F. Supp. 2d 1204, 1208 (D. Kan. 2011) (citing *Schrier*). As four judges of this Court stated when sitting en banc: "When a statute is newly enacted, and its enforcement will restrict rights citizens previously had exercised and enjoyed, it is not uncommon for district courts to enjoin enforcement pending a determination of the merits of the constitutional issue*." O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1018 (10th Cir. 2004) (en banc) (McConnell, J., concurring), *cert. granted sub nom on other grounds, Gonzales v. O Centro Espirita Beneficiente Uniao Do Vegetal*, 544 U.S. 973 (2005). That makes sense analytically. Otherwise, every appeal of a denial of a preliminary injunction would be automatically "disfavored," given that the "status quo" changed in the interim period between the filing of the suit and the appeal. And otherwise, it would prejudice individuals like Ms. Garcia, who tried to bring a pre-enforcement challenge with respect to the Waiting Period Act, but were dismissed.

## VII. Argument

The Second Amendment protects the lawful keeping and bearing of arms in the same manner as the First Amendment protects the right to speak, associate, or worship. Yet the State of Colorado burdens the rights protected by the Second Amendment by mandating an arbitrary three-day waiting period after a background check has been initiated to obtain a firearm. This waiting period is odious to the

Constitution because it has no historical analogue at the adoption of the Second Amendment. No court would ever find that a three-day waiting period to speak or worship to be constitutional. This Court should thus reverse the District Court's Order and enter an injunction against Colorado's Waiting Period Act. [5]

**A.    The Waiting Period Act Implicates the Text of the Second Amendment.**

The District Court first erred by holding that Waiting Period Act did not implicate the plain text of the Second Amendment. App. Vol. 3 at 750. It held that because the Second Amendment protects only keeping and bearing arms, there is nothing about obtaining a firearm that implicates the text. App. Vol. 3 at 752. ("[T]he purchase and delivery of an object (here, a firearm) is not an integral element of keeping (i.e., having) or bearing (i.e., carrying) that object."). It also mis-framed the right at issue here as the right to "immediate" possession of a firearm without delay. Neither course was appropriate.

**i. Obtaining a firearm is necessarily protected by the Second Amendment.**

It is readily apparent that in order to "keep" or bear" arms, one must have the

---

[5] Note that "waiting periods" on the exercise of other constitutional rights are often viewed skeptically by courts. *See, e.g.*, *Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 916 (9th Cir. 2014) (Arizona law that delayed the ability to obtain an abortion was unconstitutional) (abrogated by *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022)); *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1060 (9th Cir. 1986) (striking down a 5-day waiting period between the filing an exotic dancer's permit and the granting of a license).

ability to obtain a firearm. The right to obtain a firearm therefore necessarily implicates the text of the Second Amendment. *Accord Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01077-PAB, 2023 WL 5017253 (D. Colo. Aug. 7, 2023), *12-13 (collecting cases) ("<u>The Court agrees with the Individual Plaintiffs that the Second Amendment includes the right to acquire firearms</u> and, therefore, protects the Individual Plaintiffs' proposed conduct.") (emphasis added).

Indeed, literally every rationale cited by the Colorado State Legislature and the State's experts involves trying to reduce the alleged danger of an individual "keeping" or "bearing" an arm while they are in an impulsive state. As just a handful of examples:

- Legislative Declaration 1(f) states: "One study estimates that mandatory waiting periods <u>to receive firearms</u> led to a 7 to 11 percent reduction in suicides by firearm; the study also suggests that <u>delaying the purchase of firearms</u> by a few days reduces firearm homicides by approximately 17 percent." (emphasis added). App. Vol. 1 at 033.

- Legislative Declaration 2(a) states: "<u>Delaying immediate access</u> to firearms by establishing a waiting period for receipt of firearms can help prevent impulsive acts of firearm violence, including homicides and suicides." (emphasis added). App. Vol. 1 at 034.

- The State's opposition to Appellants' Motion below opens by

13

acknowledging the purpose of the law: "Some of those deaths, both by homicide and suicide, are caused by individuals <u>going out and purchasing a gun to immediately use</u> in a moment of passion. App. Vol. 1 at 050 (emphasis added).

- At the hearing below, the State explained why it would be calling Professor Poliquin as an expert: "Professor Poliquin will show that waiting period laws significantly reduce both firearm homicide and suicide." App. Vol. 2 at 509.

- And Randolph Roth, another state expert, testified that the 3-day waiting period is "mostly intended to prevent suicides." App. Vol. 3 at 658.

The Act is very clearly a regulation of firearms. The law is triggered by the purchase of a firearm and is a ban on the "delivery" of that firearm to its lawful purchaser. *See* C.R.S. § 18-12-115(1)(a)(I). Its exact goal is to regulate when a Colorado citizen can obtain a firearm for which they are a "purchaser." *See* App. Vol. 1 at 034. ("Therefore, the general assembly declares that: (a) Delaying immediate access to firearms by establishing <u>a waiting period for receipt of firearms</u> can help prevent impulsive acts of firearm violence, including homicides and

14

suicides.") (emphasis added).[6]

The Court of Appeals for the Fourth Circuit recently addressed this issue, and reached an eminently logical similar conclusion:

> But, on its face, the challenged law says nothing about whether Plaintiffs may "keep" or "bear" handguns. It only restricts Plaintiffs' ability to "purchase, rent, or receive" them. § 5-117.1(c). How, then, does the law regulate the right to keep and bear arms?
>
> The answer is not complicated. If you do not already own a handgun, then the only way to "keep" or "bear" one is to get one, either through sale, rental, or gift. And the challenged law cuts off all three avenues...
>
> …
>
> But even though Maryland's law does not prohibit Plaintiffs from owning handguns at some time in the future, it still prohibits them from owning handguns now.

*Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1043 (4th Cir. 2023), *reh'g en banc granted*, No. 21-2017 (L), 2024 WL 124290 (4th Cir. Jan. 11, 2024) (emphasis in original).

---

[6] It is undisputed that Appellant Garcia is a responsible individual who is a law-abiding adult American citizen. And that Appellant Rocky Mountain Gun Owners is an association whose members are responsible individuals who are law-abiding adult American citizens. Appellants are therefore part of "the people" protected by the Second Amendment. *See Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01077-PAB, 2023 WL 5017253, *11 (D. Colo. Aug. 7, 2023) ("[A]n interpretation of 'the people' in the Second Amendment should begin with the assumption that every American is included.") ("*RMGO I*"); *accord Bruen*, 597 U.S. at 31-32 ("It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects.").

The Fourth Circuit's conclusion is both intuitive and, as a factual matter, true. The only way to "keep" or "bear" a firearm is to obtain one, generally through purchase. Yet like the challenged Maryland statute, the Colorado statute forecloses nearly all legal avenues to obtain a non-antique firearm in less than 3 days, other than exceedingly narrow circumstances that are subject entirely to chance. *See* App. Vol. 1 at 057.[7]

Even the District Court slipped up at least once, acknowledging that the Waiting Period Act is a "burden on the right of armed self-defense," although it declined to enjoin that burden. *See* App. Vol. 3 at 770 ("But the Waiting-Period Act and the intoxication laws both work to prevent individuals in a temporary impulsive state from irresponsibly using a firearm. They "impose a comparable <u>burden on the right of armed self-defense</u>.") (internal citation omitted) (emphasis added).

Appellee also asserted below that Appellants do not have an interest covered by the text of the Second Amendment, because Appellants seek to have instantaneous access to a firearm. But that, too, is erroneous. The Second Amendment's plain text applies to "an individual's conduct" of *obtaining* a firearm. *See Bruen*, 597 U.S. at 32 ("[T]he 'textual elements' of the Second Amendment's

---

[7] For instance, Colo. Rev. Stats. § 18-12-115(2)(b) permits a member of the Armed Forces Member who will be deployed in the next 30 days to transfer a firearm to various relatives and individuals with whom the seller has a significant personal bond.

operative clause—'the right of the people to keep and bear Arms, shall not be infringed'—guarantee[s] the individual right to <u>possess</u> and carry weapons <u>in case of confrontation</u>.") (emphasis added, cleaned up).

It is indisputable that the right to possess arms cannot be exercised unless individuals have the right to obtain them, in the same sense that the right to publish a newspaper is meaningless without the right to obtain paper or ink. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("The core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms.") (*quoting Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011)); *Bruen*, 597 U.S. at 71 ("New York's proper-cause requirement violates the Fourteenth Amendment in that <u>it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms</u>.").

Obtaining a firearm in case of a "confrontation" is clearly a Second Amendment-protected right. Colorado's argument, by contrast, would prove far too much; nearly any interest can be defined so narrowly as to undermine its validity. Does a plaintiff have a right to purchase a Glock on a Tuesday from a store in downtown right before a major holiday? If taken down to a granular level of abstraction, litigants will always be able to do injustice to valid constitutional rights. Instead, the appropriate question is whether Appellants have a Second Amendment-protected right to obtain a firearm.

Courts that have addressed this issue since *Bruen* uniformly hold the same. *See, e.g., McRorey v. Garland*, No. 7:23-cv-00047-O, 2023 WL 5200670, *3 (N.D. Tex. Aug. 14, 2023) ("Plaintiffs have sufficiently shown that their conduct is covered by the Second Amendment, leaving only the question of whether the Government can justify [waiting time connected to background checks] with the requisite historical analogues."); *United States v. Alston*, No. 5:23-CR-00021-FL-RN-1, 2023 WL 4758734, *8 (E.D.N.C., Jul 28., 2023) ("As a logical matter, it is impossible to 'keep' or 'bear' arms without first receiving them. If the Second Amendment protects the possession and use of firearms, it must also protect their acquisition—otherwise, the Amendment would protect nothing at all."); *accord Connecticut Citizens Defense League, Inc. v. Thody*, — F. Supp. 3d —, 2023 WL 2687446, *12 (D. Conn. Mar. 28, 2023) (plaintiffs' claim for declaratory relief that they were entitled to "obtain" a firearm was moot in light of *Bruen*, which unequivocally protected that right); *RMGO*, 2023 WL 5017253, at *13 ("The Court has found that the Individual Plaintiffs' proposed course of conduct, purchasing firearms for self-defense in the home, is covered by the plain text of the Second Amendment."); *see also Silvester v. Becerra*, 138 S. Ct. 945 (2018) (Mem.) (Thomas, J., dissenting from denial of certiorari) (stating that a Ninth Circuit decision upholding a 10-day waiting period was "symptomatic of the lower courts'

18

general failure to afford the Second Amendment the respect due an enumerated constitutional right.").

And it is intuitive that Constitutional rights necessarily protect "those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment); *see also Pavan v. Smith*, 582 U.S. 563, 566 (2017) (summarily reversing the Arkansas Supreme Court's conclusion that *Obergefell v. Hodges*, 576 U.S. 644 (2015), protected only same-sex marriage, and therefore did not protect same-sex couples' rights to be named on their children's birth certificates). Under *Bruen*'s rationale, obtaining a firearm is naturally considered "individual conduct" that is protected by the Second Amendment, in the sense that one cannot keep or bear an arm "in case of a confrontation" that an individual does not obtain, despite having purchased it and being otherwise entitled to it.

Moreover, as an analytical matter, it would be absurd to conclude that an individual may keep and bear arms "in case of a confrontation"—including in situations where known imminent danger is present—but has no right to obtain that firearm in the first place. The phrase "keep arms" in the Second Amendment means "possessing arms." *See District of Columbia v. Heller*, 554 U.S. 570, 583 (2008). An individual cannot possess something "in case of a confrontation" that must be held for days by another person. Thus, because the Waiting Period Act prohibits

Coloradans from obtaining (*e.g.*, possessing) arms that they have already legally acquired, it burdens their Second Amendment right to keep arms.

Below, Appellee cited *Defense Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022 WL 15524977 (C.D. Cal. 2022), which holds that *Bruen* does not encompass any Second Amendment "penumbra" that extends to protecting the self-manufacture of firearms. See *Defense Distributed* at *4; *id.* at 3 ("AB 1621 has nothing to do with 'keeping' or 'bearing' arms."). But *Defense Distributed* involved certain milling machines, and the ancillary tools necessary to build a firearm. The court, moreover, did not hold that the text of the Second Amendment is never implicated by an individual who wants to obtain a firearm. Nor could it have. California is in the Ninth Circuit, and that Court has held on multiple occasions that the Second Amendment extends to the acquisition of arms. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) and *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014) ("Thus the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them.") (internal quotation marks omitted). And in *Heller*, the Court went out of its way to criticize a District of Columbia law that related to "obtaining" a gun. *See Heller*, 554 U.S. at 631 ("The District law, by contrast, far from imposing a minor fine, threatens citizens with a year in prison (five years for a second violation) for even <u>obtaining</u> a gun in the first place.") (emphasis added).

Appellee also contended below that Appellants' Second Amendment rights have not been infringed because the Waiting Period Act does not technically apply to all arms transfers. The point of that argument seems to be that unless the government completely obliterates a person's Second Amendment rights, it has not infringed those rights. That is not correct. *Bruen*, for instance, did not ask whether New York completely obliterated the Second Amendment right to carry a firearm. *Bruen*, 597 U.S. at 16 (describing both plaintiffs as having the right to carry a firearm for target shooting and hunting, and even noting that one plaintiff was permitted to carry a firearm to and from work, while neither was allowed to carry a firearm for general self-defense purposes).

Instead, the Court asked only whether the Second Amendment's text covered "carrying handguns publicly for self- defense." *Bruen*, 597 U.S. at 31. Thus, even though New York did not completely bar the practice of carrying firearms, but instead subjected it to a discretionary licensing regime, the text of the Second Amendment was nevertheless implicated. In this case, the waiting period does not apply to all avenues for the acquisition of firearms, only the most important one— purchase and obtaining. *Cf. Heller*, 554 U.S. at 629 (leaving options open in one area "is no answer" to closing them in another). This burden on Plaintiffs' right to keep and bear arms thus certainly implicates the text of the Second Amendment.

### ii. The District Court Mis-Framed the Right at Issue, and Improperly Discounted Appellants' Interest in Obtaining a Purchased Firearm.

Below, Appellee attempted to elide this conclusion by mis-framing the individual conduct here as the right to "immediate acquisition" of a firearm. But that is a sleight of hand. First, as a factual matter, the premise is off. The Waiting Period Act does not prevent Coloradans from purchasing arms, or "acquiring" them in the legal sense of ownership. Instead, it bars Coloradans from obtaining arms that they have already acquired legal rights to. In other words, Colo. Rev. Stats. § 18-12-115(1)(a) states that after title to a firearm has passed to the buyer, the person who has already purchased the firearm is not entitled to take possession of her property. Instead, the statute requires the seller to maintain possession of the buyer's property during the waiting period.

Nor have Appellants ever asserted that they are entitled to "immediate acquisition" of firearms. Background checks take time, obviously. Instead, Appellants contend that they are entitled to obtain a firearm without being unconstitutionally and arbitrarily delayed. Nothing more.

In an effort to discount Appellants' interest in the case, the District Court went out of its way to review and rely on the Colorado Uniform Commercial Code. The District Court asserted that technically, Appellants are not deprived of anything by waiting 3 days to obtain the firearm that they paid money for, because they don't

own the firearm in question yet; until delivery has occurred, no "sale" has been completed, in the District Court's eyes. App. Vol. 3 at 752. ("[Purchasers do not acquire title until they receive possession of the subject firearm.").] That logic has several flaws.

First, and most obviously, by the time that the waiting period has begun, the commercial transaction has been completed already: money has been exchanged, and ownership of a firearm has passed title. *See* C.R.S. § 18-12-115(1)(a)(I) (referring to a "background check of the purchaser," not at the previous point of sale) (emphasis added). Still, the District Court characterized the sale of the firearm as "inchoate," since the seller had not delivered the firearm to the purchaser. The District Court is incorrect. Once a purchaser passes their background check and pays the Federal Firearms Licensee ("FFL") the purchase price of the firearm, it becomes theirs. The FFL selling the firearm cannot sell it to anyone else without violating federal law. 27 CFR § 478.124 (tying background check to serial number of the firearm). The FFL must retain the firearm for 72 hours from the initiation of the background check, but the firearm legally and truly belongs to the purchaser.

Second, as described in the Waiting Act Period law itself, it imposes a restriction on the "receipt" of a firearm, not on the sale or ownership of a firearm. App. Vol. 1 at 034 ("Waiting period for firearms sales—background check required—penalty—exceptions.") (emphasis added); *see id.* ("It is unlawful for

anyone who <u>sells</u> a firearm … to <u>deliver</u> the firearm to the purchaser until the later in time occurs …") (emphasis added). Even the Colorado Legislature did not seriously believe that an "inchoate" sale only occurred at the conclusion of the waiting period. To the contrary, it is an arbitrary waiting period on obtaining an already-purchased and owned firearm, imposed by the state on the "purchaser."

Third, even the Colorado Uniform Commercial Code, which the District Court relied upon, undermines the idea that physical delivery of property is necessary before a contract for sale can be formed or completed. *See* Colo. Rev. Stats. § 4-2-101 (Uniform Commercial Code—Sales) (Comment) ("The legal consequences are stated as following directly from the contract and action taken under it without resorting to the idea of when property or title passed or was to pass as being the determining factor."). And the same section addresses that a sale may of course occur when something is intangible, and thus may <u>never</u> actually be physically delivered. *Id.* ("The purpose is to avoid making practical issues between practical men turn upon the location of an intangible something, the passing of which no man can prove by evidence and to substitute for such abstractions proof of words and actions of a tangible character."). Parties can of course fully agree that title passes before any physical delivery occurs. *See* Colo. Rev. Stats. § 4-2-401 (providing for explicit agreement that physical delivery is not necessary to finalize a sale). Here, the transaction is appropriately seen as such an agreement.

**B.     The District Court Erred by Concluding that the Act is a Presumptively Lawful Commercial Regulation.**

The District Court did not construe the Waiting Period Act as a restriction on when a purchaser who has already paid and acquired legal ownership could obtain their firearm, but rather as merely a commercial restriction on the firearms seller. It therefore concluded that the Act was "presumptively permissible" as a mere regulation on the commercial sale of firearms. App. Vol. 3 at 749.; *see District of Columbia v. Heller*, 554 U.S. 570, 627 (2008) (noting that the decision did not invalidate "conditions and qualifications on the commercial sale of arms.").

But the waiting period is not truly part of any commercial transaction. It is not a "condition" on whether a firearms dealer may sell a firearm. It has nothing to do with the "qualifications" of a firearms dealer to sell firearms. It serves no commercial purpose. The Act merely targets the "delivery" of a firearm to a customer after a purchase, not on the underlying "sale" of that firearm. As noted above, Colorado itself emphasizes that the benefit of its statute is preventing the misuse of the firearm by the purchaser—not a need for merchants to have more time to conduct background checks or engage in other relevant commercial activity.

And consistent with these interests, the government's experts repeatedly emphasized the purported benefits that would come from restricting an individual's right to use a firearm. *See, e.g.*, App. Vol. 3 at 658; App. Vol. 3 at 659; *accord* App. Vol. 3 at 626 ("[G]uns are a problem."). By contrast, Colorado's experts did not

articulate the market benefits deriving from ensuring that firearms dealers complied with appropriate commercial "conditions and qualifications." *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring). It would be odd to say that a 3-day waiting period on a purchaser obtaining a firearm is genuinely aimed at restricting the merchant, in the same way that a regulation barring an ink merchant from selling to a book publisher would obviously be directed at the publisher, not the ink merchant itself.

Worse, casting a broad regulation on obtaining a firearm as a mere commercial regulation would open the door to myriad efforts to skirt *Bruen*. What commercial purpose does it serve to force a merchant to wait 3 days before delivering a firearm that has already been paid for to someone? Numerous restrictions on the owner of a firearm can easily be morphed into a restriction on a firearms seller.

Indeed, under the District Court's rationale, Colorado could impose 100-year waiting periods before a seller may "deliver" a firearm to its rightful owner. Or Colorado could bar sellers from delivering any firearm whatsoever to 18-20 year olds. *See contra RMGO*, 2023 WL 5017253, *12-13 (collecting cases) ("The Court agrees with the Individual Plaintiffs that the Second Amendment includes the right to acquire firearms and, therefore, protects the Individual Plaintiffs' proposed conduct.") (emphasis added). These laws would be "presumptively constitutional," subject to a challenger's ability to rebut the presumption.

Or suppose that all firearms sellers had to deliver a purchased firearm a minimum of 200 miles from the purchaser's primary residence. Or that sellers could sell only those magazines that hold one round each. *See contra Rocky Mountain Gun Owners v. Board of County Commissioners of Boulder County*, No. 1:22- cv-02113-CNS-MEH, 2022 WL 4098998, *1 (D. Colo. Aug. 30, 2022) (enjoining Boulder County's ordinance prohibiting the "sale and purchase of assault weapons, large capacity magazines, and trigger activators."). And *Bruen* itself would serve little purpose under the District Court's theory: states could make an end-run around the Second Amendment by simply prohibiting firearms sellers from delivering firearms, bullets, or other materiel to individuals who have concealed carry licenses.

The Court of Appeals for the Fourth Circuit addressed and rejected a similar argument in the context of 18-20 year olds, distinguishing laws that regulate sellers from laws whose true impact is on purchasers. *See Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 416 (4th Cir. 2021) (*vacated as moot*, 34 F.4th 14 F.4th 322) ("A condition or qualification on the sale of arms [by sellers] is a hoop someone must jump through to <u>sell</u> a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records.") (original emphasis). By contrast, restrictions that operate as a flat bar on a purchaser's right to <u>obtain</u> a gun are not "conditions and qualifications on the sale of arms." This Court ought to reach the same conclusion here.

As the Court may be aware, there is a percolating Circuit split on whether non-violent felons may have a constitutional right to lawfully possess firearms after *Bruen*. *Compare, e.g.*, *Range v. Attorney General*, 69 F.4th 96 (3rd Cir. 2023) (accepting such an argument for an individual who lied on a food-stamp application) with *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023) (rejecting the argument for an individual convicted of bank fraud). But if the District Court is correct, the government has an easy way out of the Circuit split: it may simply amend 18 U.S.C. § 922(d) to state a blanket ban on firearms dealers being able to <u>sell</u> a firearm to any purchaser who has been convicted of a felony. Such a "commercial regulation" would seemingly be presumptively constitutional, and likely pass muster in the District Court's eyes.

Even taking the District Court on its terms, it does not articulate how a "presumptively lawful" restriction on commercial activity can be nevertheless subject to rebuttal. At one point, the District Court states that all that is necessary to rebut the presumption is to establish "that the plain text of the Second Amendment covers the immediate receipt of a purchased firearm." App. Vol. 3 at 758. If that is true, however, then the District Court's analysis has little force: the presumed constitutionality of a commercial regulation may apparently be rebutted merely by establishing that the Second Amendment covers the conduct of the plaintiff in question. Here, that is exactly what Appellants contend above: they are entitled to

28

obtain a firearm that they have already purchased, and not wait an arbitrary amount of time afterward before receiving it.

In other parts of the District Court's opinion, it states that a presumptively lawful regulation may only be subject to constitutional challenge if it is "abusive." App. Vol. 3 at 757., n. 11. While the District Court did not articulate what an "abusive" regulation includes, it certainly ought to include a law that regulates firearms sellers as a mere pretext to impair the right to obtain a firearm on the part of an individual. *Accord Antonyuk v. Chiumento*, 89 F.4th 271, 316 (2d. Cir. 2023) ("Likewise, a licensing decision that uses 'good moral character' as a smokescreen to deny licenses for impermissible reasons untethered to dangerousness, such as the applicant's lifestyle or political preferences, would violate the Constitution by relying on a ground for disarmament for which there is no historical basis.") (emphasis added).

In sum, the Act is not a presumptively lawful commercial regulation like maintaining purchase records or requiring certain storage facilities for dealers. Instead, it is an arbitrary limitation on Coloradans' right to keep and bear arms. Even if it were presumptively constitutional, however, that presumption has been rebutted because the regulation, to the extent it regulates anything "commercial," operates solely as a restriction on an individual purchase. As such, it runs afoul of the Second Amendment, is abusive, and should be enjoined.

The Tenth Circuit's decision in *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023), does not affect this analysis. *Vincent* involved whether an individual with a felony conviction had established that *Bruen* had "indisputably and pellucidly abrogate[d] our precedential opinion" in *United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009), which had previously upheld restrictions on felons that barred the possession of firearms. The Tenth Circuit declined to make such a finding, noting that *Bruen* offered clear signals that felon-in-possession restrictions were still constitutional. *Vincent*, 80 F.4th at 1202 ("*Bruen*'s language thus could support an inference that the Second Amendment doesn't entitle felons to possess firearms."). Nothing in *Vincent* related to waiting-period laws. Indeed, in a concurrence, Judge Bacharach wrote that the case could potentially be resolved merely because the Appellant was not necessarily a member of "the people" under the Second Amendment. *Id.* at 1203 (Bacharach, J., concurring). It therefore bears no relevance to the question of whether a 3-day waiting period is in fact a commercial regulation.

### C.     The Waiting Period Act is Not in Line with the Nation's Historical Tradition of Firearms Regulation.

The District Court began its analysis with a lengthy criticism of the *Bruen* standard, yet claimed that it would faithfully apply *Bruen*. App. Vol. 3 at 760., n. 13. Respectfully, it is clear that the District Court did not closely track *Bruen*. Most notably, the Court all but concedes that the Act is not in line with the Nation's historical tradition of firearms regulation, but waves that inconvenient fact away by

holding that the Founding Fathers simply did not conceive that waiting periods would one day become necessary. The state's expert witness, Randolph Roth, testified that "it wouldn't have crossed the minds of the Founders to pass such a law." App. Vol. 3 at 687. (Vol. 3 190:21-22). And that is not because the Founders were unfamiliar with impulsive violence as the District Court assumes. Humans are, unfortunately, a violent species and have been since the dawn of mankind. The Founders opted to protect the right of the people to keep and bear arms in response to that well-known problem. *Bruen*, 597 U.S. at 26 ("[I]f earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.").

*Bruen* instructs courts to look to the Founding Era for historical analogues. 597 U.S. at 51, 60. And the Record clearly establishes that the first waiting period law was enacted in 1923. App. Vol. 3 at 759. But the District Court looked to other, less relevant, "historical precedents" in order to deny Appellants' Motion for Preliminary Injunction. *Id*. Those included laws related to intoxicated individuals, and laws related to licensing regimes.

> i.  **Impulsive gun violence was a known problem to the Founders, but there is no "distinctly similar" analogue to the Waiting Period Act.**

The District Court concluded that gun violence was rare during the Founding Era. But that is unsupported by the record evidence. *See, e.g.*, App. Vol. 2 at 331-2

(describing violence committed "by roving bands of Tories or Patriots during the revolution"). Indeed, it belies reason to suggest that impulsive gun violence was so non-existent that Americans had no conception of it. *See* App. Vol. 2 at 335 (pistols, folding knives, dirk knives, and Bowie knives were used "to ambush both ordinary citizens and political rivals, to bully or intimidate law-abiding citizens, and to seize the advantage in first fights"). But the fact that <u>no</u> legislatures from 1776 to 1923 enacted a waiting period, even as a partial response to impulsive gun violence, speaks volumes.

> Still, the District Court held:

> Overall, the evidence shows that firearms were not as readily available for purchase and that impulsive gun homicides were much less prevalent at the time of the founding and in the century that followed. Thus, it is logical that waiting-period laws were not adopted during that period.

App. Vol. 3 at 765. But this analysis is off. The question is not whether impulsive gun homicides were "less prevalent" than they are today; it is whether they were a known "general societal problem." *Bruen*, 597 U.S. at 27 ("The District in *Heller* addressed a perceived societal problem—firearm violence in densely populated communities—and it employed a regulation—a flat ban on the possession of handguns in the home—that the Founders themselves <u>could have adopted</u> to confront that problem.") (emphasis added).

> The Court erred in relying on its own finding that impulsive gun violence was

less "prevalent" at the Founding than in the modern era. That is simply not the test. Impulsive gun violence was a known issue, both at the time of the Founding and during the Nineteenth Century, including before and after the Civil War. However, even Colorado's expert acknowledged, perhaps accidentally, that a law requiring a citizen to wait to receive a firearm they had already purchased "wouldn't have crossed the minds of the Founders." App. Vol. 3 at 687. But that concession is fatal. Because the Founders would never have passed a waiting period law, despite knowing about the general societal problem of impulsive gun violence, the Waiting Period Act should be enjoined, without further analysis.

> ii.    **Laws related to intoxicated individuals are not historical analogues.**

Even if this Court is inclined to let Colorado assert that it may analogize to historical laws that are not "distinctly similar" to the Waiting Period Act, Appellee still fails to satisfy B*ruen*.

First, the District Court erred by holding that laws related to bans on intoxicated individuals purchasing firearms are historical analogues to the Waiting Period Act. They are not. Instead, those laws do have clear, other, analogues: precisely the modern laws *prohibiting intoxicated persons* from being armed. *See, e.g.*, Colo. Rev. Stat. § 18-12-106 (prohibiting "possession [of] a firearm while the person is under the influence of intoxicating liquor or of a controlled substance"); K.S.A. 21-6332; NM Stat § 30-7-4 (2021); 21 OK Stat § 1289.9 (2022); UT Code §

76-10-528 (2022); and Wyo. Stat. § 23-3-307. But the analogy to the Waiting Period Act fails for several analytical reasons.

First, and most obviously, the Waiting Period Act applies to every Colorado purchaser, not just a sub-class of people who exhibit a quality—drunkenness—that bears on a definitive connection to dangerous. [8] Second, a law prohibiting an intoxicated individual from purchasing a gun is of course designed to prevent someone who cannot operate a gun responsibly—due to their impaired judgment and function—from obtaining one. But an individual subject to the Waiting Period Act may be an entirely responsible law-abiding adult citizen (like Appellants); indeed, the individual may have passed multiple background checks in a matter of hours. Yet they must nevertheless sit and wait for the clock to tick. Third, an individual who is intoxicated, but who exigently needs a firearm for self-defense, has an obvious course of action: sober up as soon as possible. By contrast, Colorado citizens have no good option to bypass the 3-day waiting period, even if they have actual knowledge of an imminent threat to their health and safety. Fourth, laws prohibiting intoxicated individuals from purchasing a firearm have a logical and sensible end-point—when the individual is no longer drunk. By contrast, the Waiting Period Act has a completely arbitrary end-point—whenever the 3-days period runs.

---

[8] At most, the government's analogy would be directed at a prohibition on a firearms dealer selling to a customer who exhibits individualized signs of suicidal ideation or an interest in revenge, not the whole of the public.

All of these are reasons why Colorado has failed to establish that the Waiting Period Act is "a distinctly similar historical regulation" to intoxication laws. *See Bruen*, 597 U.S. at 27. Yet the District Court ignored these major differences, and nevertheless held that these laws were similar to the "why" motivating the Act—to reduce impulsive uses of firearms. App. Vol. 3 at 770. ("But the Waiting-Period Act and the intoxication laws both work to prevent individuals in a temporary impulsive state from irresponsibly using a firearm. They 'impose a comparable burden on the right of armed self-defense."). Both the Act and the District Court assume that every purchaser of a firearm is in a "temporary impulsive state" that is similar to being intoxicated. There is simply no evidence in the record that allows the District Court to make that assumption.

And in response to the idea that the Waiting Period Act applies to all Colorado citizens, regardless of whether they pose any danger comparable to an actively-intoxicated person, the District Court stated: "The intoxication laws prevented *all* individuals from becoming intoxicated and engaging in the prohibited conduct." App. Vol. 3 at 770. (emphasis in original). But that is a category error. A law that prohibits an individual drunk person from doing something is not an analogue to a law that prohibits all people from doing that thing, regardless of their sobriety. *See, e.g.*, *Range v. Attorney General*, 69 F.4th 96, 104-05 (3rd Cir. 2023) (rejecting a long history of disarming violent felons as sufficiently analogous to disarming an

individual who merely lied on a food-stamp application); *Alston*, 2023 WL 4758734, at *13 (rejecting an analogy between restrictions on possession of a firearm for "lunatics" and "vagrants" to modern users of controlled substances, since "the laws seek to remedy different problems and target different subsects of the people").

Indeed, the District Court's logic would entail that a law forbidding known dangerous fugitives from possessing firearms is the equivalent of a generally applicable waiting period law for all citizens, because both laws apply to <u>all</u> people, in that the antecedent statute applies to all people who are both fugitives and "engaging in the prohibited conduct." Even *Bruen* itself would come out the other way, under the District Court's analysis—New York would simply need to analogize its generally applicable regulations to laws where intoxicated people were not allowed to openly carry firearms.

Other Courts, by contrast to the District Court, have more faithfully applied the *Bruen* standard when evaluating historical analogues. Circuit Courts have recognized that "the *Bruen* standard for identifying a closely analogous historical regulation is a demanding one." *Baird v. Bonta*, 81 F.4th 1036, 1046 (9th Cir. 2023); *see id.* at 1047 ("California must identify a historical analogue that curtails the right to peaceably carry handguns openly for self-defense to a comparable degree, with a comparable severity, and with a <u>comparable blanket enforcement</u> to California's open-carry ban.") (emphasis added).

36

And to be clear, Colorado has never contended that impulsivity was not a "general societal problem" in the 18th century, such that the Founders had no concept of people acting rashly with firearms. But that fact alone is essentially dispositive, because "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a <u>distinctly similar</u> historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26 (emphasis added). Here, the armed-while-intoxicated laws that the District Court identified addressed a specific issue—the problem of intoxicated people using firearms. Those laws, of course, still exist. But they are not analogous to all other laws involving impulsivity.

In sum, the historical analogues used by the District Court addressed a different "why" (the use of arms by intoxicated persons) and a different "how" (criminal penalties) than the Waiting Period Act. The laws are not sufficiently similar to show a history and tradition of firearms regulation like the Act.

### iii.    Licensing regimes are not an historical analogue to an arbitrary waiting period.

The District Court found that:

> although these licensing laws are not implemented in the same way that a waiting period is, they are a secondary, but proper, analogue because they support that the Founders and Reconstruction generation would have accepted a modest delay on the delivery of a firearm in order to ensure that those receiving a firearm are law-abiding, responsible citizens.

37

App. Vol. 3 at 770-1. While the District Court cited footnote 9 of the *Bruen* decision, it did not engage in any historical analysis of licensing regimes at the Founding, or at the time of the Civil War. That is because general licensing regimes did not exist at either time.

To be sure, there were licensing regimes for disfavored minority groups such as free blacks, Native Americans, and religious minorities, but not for the entire population. App. Vol. 2 at 325. (Roth), App. Vol. 2 at 448 (Cramer). Perhaps wishing to avoid the racist and nativist origins of gun control in the United States, the District Court simply ignored that history altogether.

The District Court then stated:

> That is the purpose of Colorado's Waiting-Period Act. The Act provides time for a background check to be completed. See Colo. Rev. Stat. § 18-12-115(1)(a) (defining the waiting period as the longer of "[t]hree days after a licensed gun dealer has *initiated* a background check" or until "[t]he seller has obtained approval for the firearm transfer from the bureau after it has completed any background check required by state or federal law" (emphasis added)).

App. Vol. 3 at 771. But the "how" and the "why" between a licensing regime and a waiting period are vastly different. As Appellee's arguments and evidence showed, along with the District Court's prior statement, the Act was intended to be a "cooling off" period. It was not designed to ensure that purchasers of firearms did not have

criminal records, or other traits that posed a specific danger.[9]

Indeed, as a facial matter, a 3-day waiting period is untethered to the length of time that a background check process takes. The evidence in the record shows that background checks take minutes to hours, not days. App. Vol. 2 at 526.; App. Vol. 2 at 547. The FBI's National Instant Criminal Background Check System (NICS) was implemented in 1998 after the passage of the Brady Bill in 1993. As its name implies, it is intended to be "instant," and does not take days in the ordinary course. Colorado, additionally, has its own state-based background check system. A purchaser must pass both checks to purchase a firearm in Colorado. But never once has Colorado alleged that the 3-day waiting period is connected to a need to further vet purchasers of firearms, or to engage in a further evaluation of information revealed during a background check.

The record evidence establishes that the Waiting Period Act requires a purchaser to pass an instant background check, a state background check, and then also wait at least 72 hours after the background checks are initiated before obtaining their firearm. If the District Court were right, the waiting period at issue under

---

[9] Just two pages before the District Court wrote that background check regimes and waiting periods are historically analogous, it criticized the argument that background checks have any tangible effect on impulsive gun violence rates. [ER 819 ("[T]here was testimony that pre-purchase background checks for firearms may have no statistically significant effect on reducing gun violence.").] It is difficult to see how the "why" of the two statutes could be analogous in one section of the opinion, when the District Court had just rejected the overlap in the prior section.

Colorado law would be only as long as the background check process takes.

>    **iv.     Merely analogizing to the practical time that it took to obtain a gun at the founding is not consistent with *Bruen*'s demand for an historical legal analogue.**

Though not explicitly stated as a historical analogue that the Court was relying on, the logistical and manufacturing times to acquire and possess a firearm are very much the mise-en-scène of the District Court's Order. App. Vol. 3 at 761 ("The Governor has shown, however, that impulsive gun homicide was not prevalent during the Founding Era or Early National Period and that instituting waiting periods would not have been a logical measure until at least the end of the nineteenth century."). The Court repeatedly referred to the notion that the Founding Fathers might have to travel days to a city to acquire and possess a firearm, and that no "Guns-R-Us" existed at the time of the Founding. App. Vol. 3 at 753.

But the evidence in the record shows that at the time of the Founding, particularly in large cities, individuals were able to purchase and obtain a firearm immediately if they went to a general store or gunsmith. App. Vol. 2 at 414-28 (citing numerous ads during the 1780, 1790s, and the first decade of the 19th century for gunsmiths in Boston, New York City, Philadelphia, Baltimore, Charleston, and Cleveland, among others.) The Governor's expert witnesses do not deny this, though they contend that because a person may have had to travel to a larger city, they could not have necessarily obtained a firearm immediately. (Obviously that wouldn't be

true for the significant number of people who actually lived in those cities). Even if taken as true, however, it is of no moment. There were both guns for purchase and impulsive people at the forming of the Republic. Yet there were no laws requiring that a firearms seller intentionally withhold delivery of a firearm that was already purchased, for some arbitrary period of time. Once again, the absence of any similar regulation is fatal to Colorado's position.

Moreover, while Colorado overstates the historical delays in obtaining a firearm, App. Vol. 2 at 418-28, such delays are also irrelevant to the inquiry that courts must conduct under *Bruen*. The government gets no special deference under *Bruen* because technology has changed over time—semi-automatic rifles did not exist at the Founding, but no one argues that the government can enact a flat ban on semi-automatic weapons because they <u>would have</u> been banned, if the Founders had only known about them at the Founding. Appellee cites no case for the proposition that *Bruen* must take account of merely <u>factually</u> analogous circumstances where an individual was similarly unable to defend itself, because he had to wait a while to obtain a gun; instead, *Bruen* takes account only of <u>legal</u> analogues. *Bruen*, 597 U.S. 24 ("The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm <u>regulation</u>.") (emphasis added).

The Founders were explicit in their rights and guarded them jealously, fighting a Revolutionary War, establishing the Articles of Confederation, and later the Constitution in order to "secure the Blessings of Liberty to ourselves and our Posterity." The Founders could not have foreseen the morass of social media, but we do not limit the First Amendment in new or novel situations. Similarly, the Founders sought to secure an individual right to keep and bear arms. The Waiting Period Act burdens that liberty.

### D.     Appellants are Suffering Irreparable Harm.

Rights deferred are rights denied. This Court has repeatedly held that when a government denies an individual's constitutional rights, the harm is irreparable. *See Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019) ("What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial. Any deprivation of any constitutional right fits that bill."); *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) (*quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Accordingly, "[w]hen an alleged deprivation of a constitutional right is involved, ... most courts hold that no further showing of irreparable injury is necessary." *See* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed. 1998).

The District Court rejected these cases, and instead held that because the Appellants likely have other firearms available to them, they will not suffer any

injury. That line of reasoning is improper. A court may not discount the constitutional injury to a plaintiff merely because that plaintiff has appropriately planned to mitigate the consequences of such an injury through other means. If that were the law, a court could decline to enjoin a restriction on a newspaper entity that clearly violated the First Amendment, merely because the plaintiff had a large social media presence that would also work to effectively distribute its message. As this Court said in *Free the Nipple*, "*any* deprivation of *any* constitutional right" is an irreparable injury. Violations of the Second Amendment are no different than violations of any other constitutional right.

### E. The District Court Erred by Engaging in Improper Means-End Reasoning with Respect to the Balance of Harms and the Public Interest.

In considering the final two preliminary injunction issues—balancing of the harms and the public interest—the District Court erred by engaging in the sort of means-end reasoning that *Bruen* explicitly forbade. 597 U.S. at 17-18. In a footnote, the District Court acknowledged that the Second Amendment was itself already the product of balancing harms and the public interest, but then hand-waved that away by claiming that because self-defense is the core Second Amendment concern, and because Appellants could already defend themselves, the balance of equities tipped against them.

But *Bruen* instructs Courts to consider whether there is *any* burden on the Second Amendment, not just on an individual's self-defense. *Accord Free the Nipple*, 916 F.3d at 806 (placing the "right to bear breasts in public" above maintaining a democratically enacted law because "'being required to wait to bare their breasts in public' deprives the Plaintiffs of a constitutional right, while the City has no interest in keeping an unconstitutional law on the books."); *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) ("[W]hen the law that voters wish to enact is likely unconstitutional, their interests do not outweigh Mr. Awad's in having his constitutional rights protected.").

Moreover, the District Court relied on the State's expert witness, Christopher Poliquin, to conclude that the Preliminary Injunction may lead to 100 fewer deaths via firearm. App. Vol. 3 at 775-76. But this reasoning is precisely the sort means-ends justification that *Bruen* forbade. 597 U.S. at 17-18; *see id.* at 26 ("The Second Amendment is the very product of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense. It is this balance—struck by the traditions of the American people—that demands our unqualified deference.") (internal quotation marks omitted).

Yet the District Court put Appellants' constitutional rights on one side, and the State's purported expert on the other, and expressly balanced them against each

44

other. That is no longer permissible when courts are considering the scope of the Second Amendment.

## VIII.  Conclusion

The District Court made numerous errors in denying Appellants' Motion for a Preliminary Injunction. As demonstrated above, the Waiting Period Act is a burden on Coloradans' Second Amendment rights, and is not in line with the history or tradition of firearms regulations in the United States. Indeed, Colorado was a state for 147 years before the state government sought to impose a waiting period for firearms purchases (and indeed at a time of historically low gun violence). This Court should reverse the District Court, and enjoin the Waiting Period Act while this case proceeds in District Court.

DATED this 30th day of January 2024.

Respectfully submitted,

*/s/ D. Sean Nation*
D. Sean Nation
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
Tele: (303) 292-2021
Fax:  (877) 349-7074
E-mail: snation@mslegal.org

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

This motion complies with the requirements of the Fed. R. App. P. 27(d) and Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 10,310 words.

This motion also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

DATED this 30th day of January 2024:

*/s/ D. Sean Nation*
D. Sean Nation

## CERTIFICATE OF ELECTRONIC FILING

In accordance with this Court's CM/ECF User's Manual and Local Rules, I hereby certify that the foregoing has been scanned for viruses with Sentinel One, updated January 30, 2024, and is free of viruses according to that program.

In addition, I certify that all required privacy redactions have been made and the electronic version of this document is an exact copy of the written document to be filed with the Clerk.

DATED this 30th day of January 2024.

*/s/ D. Sean Nation*
D. Sean Nation

## CERTIFICATE OF SERVICE

I certify that on January 30th, 2024, I caused the foregoing to be filed through the Court's CM/ECF system, with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit through the Court's CM/ECF system.  I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system and that a PDF copy of this motion will be emailed to opposing counsel immediately after it is filed.

DATED this 30th day of January 2024.

/s/ D. Sean Nation
D. Sean Nation

*Counsel for Appellants*

# ATTACHMENT 1:
## *District Court Order Denying Preliminary Injunction Filed November 13, 2023 (11/13/2023)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-02563-JLK

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 2)

---

Kane, J.

      In this suit based on the Second Amendment to the United States Constitution, Plaintiffs Rocky Mountain Gun Owners and Alicia Garcia challenge a newly effective Colorado statute regulating the commercial sale of firearms. The statute mandates that sellers wait a minimum of three days between initiating a background check and delivering a firearm to a purchaser, with certain exceptions. *See* Colo. Rev. Stat. § 18-12-115. Presently before me is Plaintiffs' Motion for Preliminary Injunction (ECF No. 2), seeking an order preliminarily enjoining enforcement of that statute.[1] I find Plaintiffs have failed to demonstrate they are entitled to the extraordinary relief requested and, therefore, deny their Motion.

---

[1] Plaintiffs' Motion originally sought a Temporary Restraining Order and Preliminary Injunction. However, I previously found that Plaintiffs had not demonstrated an ex parte temporary restraining order was warranted and ordered that we would proceed on Plaintiffs' request for a preliminary injunction alone. *See* Order Re: Mot. for Temporary Restraining Order at 2, ECF No. 11.

# I. BACKGROUND

## A. The Second Amendment

The Second Amendment to the U.S. Constitution was ratified in 1791. In full, it states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment was made applicable to the states with the ratification of the Fourteenth Amendment in 1868. *See McDonald v. City of Chi.*, 561 U.S. 742, 750 (2010).

Fifteen years ago, in *District of Columbia v. Heller*, the Supreme Court announced that "the Second Amendment conferred an individual right to keep and bear arms," of which a "central component" is self-defense.[2] 554 U.S. 570, 595, 599, 628 (2008). Based on that conclusion, the Court held "that the District[ of Columbia's] ban on handgun possession in the home violate[d] the Second Amendment." *Id.* at 635. The Court clarified that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or *laws imposing conditions and qualifications on the commercial sale of arms*." *Id.* at 626–27 (emphasis added). The Court described these measures as "presumptively lawful." *Id.* at 627 n.26; *see also id.* at 635 (referring to "those regulations of the right that [it] describe[s] as permissible" and indicating that "there will be time enough to expound upon the historical justifications for the exceptions [it] ha[s] mentioned"). It "repeat[ed] those assurances" two years later in *McDonald v. City of Chicago*, 561 U.S. at 786.

---

[2] Despite the use of the term "conferred," the Court in *Heller* determined that the Second Amendment codified a preexisting right. *Heller*, 554 U.S. at 592 ("We look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right."); *id.* at 599, 603; *see also Bruen*, 142 S. Ct. at 2127, 2130, 2135, 2138, 2145.

Last year, in *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Court built on its holding in *Heller* and declared that the "Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home" as well. 142 S. Ct. 2111, 2122 (2022). At issue in *Bruen* was the constitutionality of New York State's "may-issue" licensing regime, which required applicants to demonstrate a special need for self-defense in order to publicly carry a handgun. *Id.* at 2122-24.

Before resolving that question, *Bruen* imparted the test courts should apply in determining whether a firearm regulation is permissible under the Second Amendment. The *Bruen* test is "rooted in the Second Amendment's text, as informed by history." *Id.* at 2127. The Court explained: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30. And the court must consider "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.* at 2131-32 (quoting *Heller*, 554 U.S. at 631). This inquiry "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.* at 2133.

Following that standard, the Court conducted a lengthy review of the historical record compiled in the case and concluded there was no historical "tradition of broadly prohibiting the public carry of commonly used firearms for self-defense" nor one "limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense." *Id.* at 2138. The Court consequently held that New York State's licensing regime violated the Constitution. *Id.* at 2122, 2156. Significantly, three of the justices from the majority indicated that the decision was

not disturbing what was stated in *Heller* regarding presumptively lawful regulatory measures. *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring); *id.* at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*, 554 U.S. at 626–627, and n.26); *see also id.* at 2189 (Breyer, J., dissenting, joined by Sotomayor and Kagan, J.J.).

**B. The Colorado Statute**

On April 28, 2023, Defendant Jared Polis, the Governor of the State of Colorado, signed into law House Bill 23-1219, An Act Concerning Establishing A Minimum Three-Day Waiting Period Prior to the Delivery of a Purchased Firearm (the "Act" or "Waiting-Period Act"). The Act became effective on October 1, 2023. In passing the Act, the General Assembly declared that "[d]elaying immediate access to firearms by establishing a waiting period for receipt of firearms can help prevent impulsive acts of firearm violence, including homicides and suicides." H.B. 23-1219, 74th Gen. Assemb., Reg. Sess. (Colo. 2023). Pursuant to that purpose, the Act makes it illegal for any person who sells a firearm "to deliver the firearm to the purchaser until the later in time occurs:

(I)  Three days after a licensed gun dealer has initiated a background check of the purchaser that is required pursuant to state or federal law; or

(II)  The seller has obtained approval for the firearm transfer from the bureau after it has completed any background check required by state or federal law.

Colo. Rev. Stat. § 18-12-115(1)(a). The waiting period does not apply to:

(1)  The sale of antique firearms;

(2)  A sale by a person in the armed forces, who is soon to be deployed outside the United States, to a member of his or her family, as defined in the statute; or

(3)  "A firearm transfer for which a background check is not required pursuant to state or federal law."

*Id.* § 18-12-115(2). Violation of the Act by a firearm seller constitutes a civil infraction for which a fine may be imposed. *Id.* § 18-12-115(1)(b).

### C. Plaintiffs

Plaintiff Rocky Mountain Gun Owners ("RMGO') is a nonprofit organization that seeks to defend the right of "law-abiding" individuals to keep and bear arms. At least one of its members, its executive director, Taylor Rhodes, has been affected by the Act. Prelim. Inj. Hr'g Tr. at 29-30, 35. Mr. Rhodes purchased two firearms recently, and because he was out of town when the waiting period expired for one of them, he was unable to pick up that firearm until about eight days later. *Id.* at 30-33.

Plaintiff Alicia Garcia is a firearms instructor and range safety officer and frequently acquires firearms. *Id.* at 16. She reviews firearms and teaches people how to use them safely via social media. *Id.* She has recently purchased multiple firearms and had to spend additional hours driving because she had to return to stores after the waiting periods expired. *Id.* at 17-20. She also hoped to attend an out-of-state shotgun shoot, which would have provided her with business opportunities, but she was unable to obtain a shotgun in time for the event due to the waiting period. *Id.* at 19-22.

Before the Waiting-Period Act took effect on October 1, 2023, Plaintiffs filed a separate case asserting the same claims as they do here. *See RMGO v. Polis*, No. 23-cv-01076-PAB-NRN, ECF No. 1. In ruling on Plaintiffs' Motion for Preliminary Injunction in that case, Chief Judge Brimmer found Plaintiffs lacked standing to move to enjoin the Act before it was enforced. *RMGO v. Polis*, No. 23-cv-01076-PAB-NRN, 2023 WL 5017257, at *5 (D. Colo. Aug. 7, 2023). Specifically, Chief Judge Brimmer concluded RMGO had not identified any individual members

of the organization who were affected by the Act and thus had not met their burden to establish standing. *Id.* at *3. As for Ms. Garcia, he determined that she could not show a credible threat of prosecution, which was necessary for her to have standing to challenge the Act before it took effect. *Id.* at *4.

The Governor here does not contest Plaintiffs' standing. However, like Chief Judge Brimmer, I must ensure that jurisdiction is proper. Federal courts lack jurisdiction when plaintiffs cannot meet their burden to establish standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559-561 (1992). For plaintiffs to meet that burden, they must first demonstrate that they have suffered an "injury in fact," that is "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (citation and quotation marks omitted). Then, plaintiffs must show a causal connection between the injury and the challenged conduct and a likelihood that the injury will be redressed by a favorable decision. *Id.* at 560-61. Ms. Garcia testified that she has, on two occasions, had to make additional trips to obtain firearms and has missed out on business opportunities. Prelim. Inj. Hr'g Tr. at 19-22. She has been impacted by the Act's waiting period and will be in the near future. *Id.* at 17-22. She has shown an injury in fact that is fairly traceable to implementation of the Act and that would likely be redressed by a favorable decision here. Therefore, Ms. Garcia has established that she has standing to seek the relief requested. Because I find Ms. Garcia has standing, I need not consider whether RMGO does. *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986).[3]

---

[3] I note, however, that RMGO's case for standing is less developed. The organization is clear that it "asserts representational standing" on behalf of its members. Mot. for Prelim. Inj. at 2, ECF No. 2. The Complaint and Motion for Preliminary Injunction allege that three members of RMGO have or will be affected by the Act. Compl. ¶ 1, ECF No. 1; Mot. for Prelim. Inj. at 2. Those individuals are identified by their initials alone "for the sake of their privacy." *Id.*; Compl. ¶ 1. Plaintiffs make no effort to demonstrate that those individuals' privacy interests outweigh the public's interest in proceedings that are public and open. Nor do Plaintiffs provide affidavits or

The Governor, against whom Plaintiffs' claims are asserted, contends that he is entitled to immunity in this case under the Eleventh Amendment to the U.S. Constitution but agrees to waive his immunity "for the purpose of defending the Act from Plaintiffs' claims for declaratory and injunctive relief . . . only in this case, only in his official capacity, and only for prospective relief." Resp. to Mot. for Prelim. Inj. at 4 n.2, ECF No. 18. That waiver is sufficient for these proceedings, so I do not analyze whether the Eleventh Amendment applies.

## D.  Expert Opinions

With his Response to Plaintiffs' Motion for Preliminary Injunction, the Governor filed the declarations of two experts—Randolph Roth (ECF No. 18-10) and Robert Spitzer (ECF No. 18-3), who both provided opinions on the Nation's history of regulating firearms. The Governor's Response also included an article titled "Handgun Waiting Periods Reduce Gun Deaths" that was co-authored by Christopher Poliquin (ECF No. 18-2). I held a two-day hearing on Plaintiffs' Motion at which Clayton Cramer[4] testified as an expert witness for Plaintiffs and Professors Roth and Poliquin testified as experts for the Governor. I indicated at the hearing that I would allow the witnesses' testimony and later determine what weight to give their opinions.

Professor Roth received his bachelor's degree in History from Stanford University in 1973 and his doctorate degree in History from Yale University in 1981. He has taught courses in history, the social sciences, and statistics and is presently an Arts and Sciences Distinguished

---

testimony from those RMGO members, as is customarily required for representational standing. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Additionally, there are no allegations that any identified member of RMGO, including Mr. Rhodes, will suffer harm during the period when a preliminary injunction would be in effect.

[4] I note that Professor Cramer's 67-page Declaration (ECF No. 24) was not filed with Plaintiffs' Motion or Reply in Support of their Motion. It, along with Plaintiffs' Witness List, was filed two-days before the preliminary-injunction hearing.

Professor of History and Sociology at The Ohio State University. He has written a book, *American Homicide*, and has published essays on the history of violence and the use of firearms in the United States. Most of his work has been peer-reviewed. Prelim. Inj. Hr'g Tr. 112-13. He has "dedicated [his] career to understanding why homicide rates rise and fall over time, in hopes of understanding why the United States—which, apart from the slave South, was perhaps the least homicidal society in the Western world in the early nineteenth century—became by far the most homicidal, as it remains today." Roth Decl. ¶ 11, ECF No. 18-10. In this case, he was asked to provide "opinions on the history of homicides and mass murders in the United States, with special attention to the role that technologies have played in shaping the character and incidence of homicides and mass murders over time, and the historical restrictions that local and federal authorities have imposed in response to new technologies that they deemed particularly lethal, prone to misuse, and a danger to the public." *Id.* ¶ 10.

In his Declaration, Professor Roth opined that "[p]ublic officials today are confronting a criminological problem that did not exist in the Founding Era, nor during the first century of the nation's existence." *Id.* ¶ 48. He described how homicide rates were relatively low early on in our Nation's history and that "the impact of firearms on the homicide rate was modest, even though household ownership of firearms was widespread." *Id.* ¶¶ 14-15; Prelim. Inj. Hr'g Tr. at 118, 120. Professor Roth believes "the evidence . . . shows that the availability of guns and changes in firearms technology, especially the emergence of modern breechloading firearms in the mid-nineteenth century, and of rapid-fire semiautomatic weapons and extended magazines in the late twentieth century, have pushed the homicide rate in United States well beyond what it would otherwise have been." Roth Decl. ¶ 12. Yet, he clarified that "firearms are not the fundamental reason why we became a violent society compared to other affluent societies."

Prelim. Inj. Hr'g Tr. at 128. Professor Roth's research has shown the fundamental reasons are "our failures of nation building, our political instability, our lack of faith and trust in our government, [and] our lack of fellow feeling among ourselves." *Id.* at 129.

I find the opinions Professor Roth provided to be thoughtful and reliable. He did not oversell the role of firearms in the history of homicide in the United States, and he was committed to precision and accuracy.

Professor Spitzer received his doctorate degree in Government from Cornell University in 1980. He is a Distinguished Service Professor of Political Science, Emeritus at the State University of New York at Cortland and was a visiting professor at Cornell University for thirty years. He has written six books and more than 100 articles, papers, and essays on gun policy. In this case, the Governor asked him "to render an opinion on the history of firearms restrictions as they pertain to modern waiting periods." Spitzer Decl. at 1, ECF No. 18-3. Professor Spitzer provided a Declaration containing his opinions but did not testify at the preliminary injunction hearing.

In his Declaration, Professor Spitzer noted that "[g]un purchase waiting periods as they are understood and implemented today did not exist early in the country's history." *Id.* at 4. According to Professor Spitzer, this is because, in addition to the low rates of homicide and seldom use of firearms for homicide in the Federal era, "[r]apid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century" and "no organized system of gun background checking could feasibly exist until the modern era." *Id.* at 4-5. As an analogue for waiting-period laws, Professor Spitzer pointed to historical regulations pertaining to firearms and intoxication, based on the theory that these regulations "avoided or thwarted 'heat of the moment' gun acquisition or use by the intoxicated, when they would be much more likely to act

rashly, impulsively, and with diminished judgment." *Id.* at 6. For another analogue, he looked to historical laws for weapons licensing and permitting, opining that they "operate in a similar manner to modern waiting periods" since "licensing contemplates the passage of some period of time (even if brief) between the time the application or permission to do something is submitted . . . and the license or permission is granted." *Id.* at 15-16. Professor Spitzer reviewed relevant laws in the United States from the early 1600s through the early 1900s and included as two exhibits to his Declaration the text of the intoxication laws and the licensing laws he discusses. *See* Exhibit C: Intoxication/Weapons Laws, ECF No. 18-6; Exhibit E: License & Licensing Laws, ECF No. 18-8.

Professor Spitzer is certainly qualified to provide the opinions set out in his Declaration. I find his presentation of the relevant laws to be helpful in evaluating the Nation's historical tradition of firearm regulation, and I consider his explanation for the absence of waiting-period laws earlier in American history along with the evidence from the other experts.

Christopher Poliquin is an assistant professor of strategy at the University of California at Los Angeles. Poliquin has a doctorate in Business Administration from Harvard Business School and an undergraduate degree in Philosophy, Politics, and Economics from the University of Pennsylvania. He has also served as a teaching fellow in the economic analysis of public policy at Harvard's John F. Kennedy School of Government. His background is in empirical, statistical analysis of public policy. One such area of research led him to co-author the article mentioned above, "Handgun Waiting Periods Reduce Gun Deaths," a quantitative, multivariable assessment of American handgun waiting period laws. This study, published in the Proceedings of the National Academy of Sciences, a peer-reviewed multidisciplinary scientific journal, found that waiting-period laws had a statistically significant causal effect on reducing homicides (by 17%)

and suicides (by 7 to 11%). The Governor called Professor Poliquin to testify on this research and its results. I find his testimony on this topic to be salient and completely credible.

Professor Cramer has undergraduate and master's degrees in History from Sonoma State University. While his trade has been software engineering, he has written numerous books on firearms, both historical and advocacy based. Professor Cramer has been an adjunct professor at Boise State University and ITT Technical Institute in Boise and currently is an adjunct professor teaching history courses at the College of Western Idaho. Plaintiffs called Professor Cramer to testify on the historical treatment of firearms, specifically firearm technology, availability, and regulation.

I do not give any weight to Professor Cramer's opinions regarding legal standards or application of the law, as he is not qualified to provide these opinions.[5] I likewise do not consider his many opinions that are irrelevant to the present facts, that are unsupported, or that relate to opinions not provided by Professors Roth and Spitzer in this case. Otherwise, I assess Professor Cramer's criticism of the opinions of Professors Roth and Spitzer.[6] Although it might be

---

[5] Although he is not a lawyer, Professor Cramer commented repeatedly on the legal meaning and application of precedent. *See, e.g.*, Prelim. Inj. Hr'g Tr. at 47 (offering opinions on the legal relevance of post-1868 statutes); *id.* at 51 (speaking to the propriety of considering the regulatory purpose of the Waiting-Period Act). Professor Poliquin, on the other hand, was appropriately reluctant to do so. *See id.* at 215 ("Q. And do you have an opinion as to whether it's appropriate to consider the effects of the law in light of the Supreme Court's decision in *Bruen*? A. I can't speak to that. I don't have a law degree, and wouldn't speak to that, no.").

[6] Another observation I make about Professor Cramer's Declaration is the prevalence of ad hominem attacks aimed at Professor Spitzer. *See, e.g.*, Cramer Decl. ¶ 55, ECF No. 24 ("[H]istorians and most other *serious* social scientists are wary of single-factor explanations of why things happen when people are involved."); *id.* ¶ 57 (claiming that Professor Spitzer's work would "earn him a poor grade in a freshman history class, or a criminology class, or a biology class"); *id.* ¶ 87 (asserting that Professor Spitzer is "no 'expert'"); *id.* ¶ 94 (insinuating that Professor Spitzer is "lazy"). Those attacks make Professor Cramer's opinions less persuasive, not more. Like his ad hominem attacks, his other antagonistic and inflammatory language undermines his credibility. *See, e.g., id.* ¶ 46 ("If I wanted to buy a scary black rifle . . . ."); *id.* ¶ 75 ("The same public safety argument Professor Spitzer advances for waiting periods would also

reasonable to question whether Professor Cramer is sufficiently qualified under Federal Rule of

Civil Procedure 702 to provide that criticism, the Supreme Court has relied on his historical

analysis on multiple occasions. *See McDonald*, 561 U.S. at 773; *Heller*, 554 U.S. at 588. With

respect, I find his testimony had significant shortcomings in persuasiveness and credibility.

## II. PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 24 (2008). When presented with a motion for a preliminary injunction, courts in the Tenth Circuit consider whether: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the threatened injury to the movant outweighs the injury facing the opposing party under the injunction; and (4) the injunction is adverse to the public interest. *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). It is the movant's burden to establish by a preponderance of the evidence that these factors weigh in favor of an injunction. *Citizens Concerned for Separation of Church & State v. City of Denver*, 628 F.2d 1289, 1299 (10th Cir. 1980).

The Tenth Circuit has instructed that "injunctions that disrupt the status quo are disfavored and 'must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course.'" *Beltronics*, 562 F.3d at 1070 (quoting *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005)). The status

---

work for ignoring the protections of . . . freedom of religious worship (which would allow religions, *some* of whose adherents have a poor record of confusing runways with office buildings) . . . .").

quo[7] is the "last peaceable uncontested status existing between the parties before the dispute developed." *Id.* at 1070-71 (quoting *Schrier*, 427 F.3d at 1260). When the plaintiff seeks a preliminary injunction that disrupts that status quo, the district court may not grant it "unless the plaintiff 'make[s] a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms.'" *Id.* at 1071 (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004) (en banc)). The Governor is correct that, because Plaintiffs seek to enjoin a law that is in effect, the injunction they seek would disrupt the status quo and is thus disfavored. Nevertheless, I find, even if the injunction were not disfavored, the applicable factors would weigh against granting it.

## III. ANALYSIS

### A. Likelihood of Success on the Merits

After examining the language of the Second Amendment using the Supreme Court's analysis in *Heller*, I find, for the purposes of Plaintiffs' Motion, that the plain text does not cover the waiting period required by the Act. This conclusion is bolstered by the fact that the Act is a regulation on the commercial sale of firearms and thus is presumptively permissible. However, even if the waiting period implicated the plain text of the Second Amendment, the evidence before me establishes that the Act is consistent with the Nation's historical tradition of firearm regulation. Plaintiffs, therefore, have not carried their burden to show they are likely to succeed on the merits of their claims.

---

[7] "Status quo" in this sense is short for "status quo ante bellum," or "the state of things before the war." *Status quo*, Black's Law Dictionary (4th ed. 1951). The "ante bellum" is generally omitted and, as a result, sometimes forgotten. But what is relevant is the status quo before the war began, or for these purposes, before the lawsuit was filed. Immediately before Plaintiffs filed their suit, the Waiting-Period Act was in effect, and so that is the status quo ante bellum.

### 1. Plain Text of the Second Amendment

The first consideration under the *Bruen* test is whether the "plain text" of the Second Amendment covers the particular conduct such that the Constitution presumptively provides protection. *See Bruen*, 142 S. Ct. at 2126, 2129-30. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them . . . ." *Heller*, 554 U.S. at 634-35. As a result, the analysis is "focused on the 'normal and ordinary' meaning of the Second Amendment's language" at the relevant time. *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 576–77, 578). The "[n]ormal meaning . . . excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation." *Heller*, 554 U.S. at 576–77.

Plaintiffs contend that the words "keep" and "bear" in the Second Amendment are implicated by the waiting period required by the Act. In *Heller*, the Supreme Court examined the "normal meaning" of those words at the time of the Nation's founding, reviewing definitions from contemporaneous dictionaries. As the Court explained, the 1773 edition of Samuel Johnson's Dictionary of the English Language "defined 'keep' as, most relevantly, '[t]o retain; not to lose,' and '[t]o have in custody.'" *Id.* at 582 (quoting 1 Dictionary of the English Language 1095 (4th ed.) (reprinted 1978)). And Webster's 1828 American Dictionary of the English Language "defined it as '[t]o hold; to retain in one's power or possession.'" *Id.* (quoting N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)). Based on those definitions, the Court concluded "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id.* The Court then turned to the word "bear" and determined that it means to "carry." *Id.* at 584. The Court clarified that, when "bear" is "used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose—confrontation."

14

*Id.* So, putting all the pieces together, the Court found that the text of the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

From this reading of the plain text, it is clear the relevant conduct impacted by the waiting period—the receipt of a paid-for firearm without delay—is not covered. Still, Plaintiffs attempt to equate the words "obtain" and "possess." Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 11 ("The Second Amendment's plain text applies to 'an individual's conduct' of obtaining a firearm. *See Bruen*, 142 S. Ct. at 2134 ('[T]he "textual elements" of the Second Amendment's operative clause—"the right of the people to keep and bear Arms, shall not be infringed"—guarantee[s] the individual right to possess and carry weapons in case of confrontation.') (emphasis added, cleaned up)."). But these terms are not equivalent. To "keep," under the definitions provided in *Heller*, meant to retain an object one already possessed. It did not mean to receive a newly paid-for item, and it certainly did not mean to receive that item without delay. Likewise, "hav[ing] weapons" indicates the weapons are already in one's possession, not that one is receiving them.

Under Plaintiffs' theory, the Waiting-Period Act prevents people "from obtaining possession of their firearm that they have already acquired." Mot. for Prelim. Inj. at 6; *see also* Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 13 ("In other words, C.R.S. § 18-12-115(1)(a)(I) states that after title to a firearm has passed to the buyer, the person who has already purchased the firearm is not entitled to take possession of her property."); *id.* ("HB23-1219 prohibits Coloradans from obtaining (e.g., possessing) arms that they have already legally acquired . . . ."). Plaintiffs advocate that, "[b]y the time that the waiting period has begun, the commercial transaction has been completed already: money has been exchanged, and ownership

of a firearm has passed title." *Id.*, ECF No. 21 at 11; *see also* Mot. for Prelim. Inj. at 3.[8]

Plaintiffs' interpretation of the commercial transaction is incorrect. The Colorado Uniform

Commercial Code provides that a "'sale' consists in the passing of title from the seller to the

buyer for a price," Colo. Rev. Stat. § 4-2-106, and "[u]nless otherwise explicitly agreed, title

passes to the buyer at the time and place at which the seller completes his performance with

reference to the physical delivery of the goods." *Id.* § 4–2–401. Thus, absent any agreement or

term to the contrary, purchasers do not acquire title until they receive possession of the subject

firearm.[9] Up to that point, the sale is inchoate, and purchasers have not "acquired" the firearm.

Plaintiffs additionally argue that "when a person has been deprived of possession of a

firearm they have acquired, they cannot carry it." Mot. for Prelim. Inj. at 6. This argument fails

for the same reasons.

The relevant conduct is, therefore, not covered by the plain meaning of the terms "keep"

or "bear" in the Second Amendment. Seemingly recognizing this fact, Plaintiffs contend that

"[t]he right to 'keep' arms necessarily implies the right to possess arms one has acquired." *Id.* at

5. But the purchase and delivery of an object (here, a firearm) is not an integral element of

keeping (i.e., having) or bearing (i.e., carrying) that object. Rather, purchase and delivery are one

means of creating the opportunity to "have weapons." The relevant question is whether the plain

text covers that specific means. It does not.

---

[8] Plaintiffs imply that purchasers must wait at least three days after paying to purchase a firearm. However, nothing in the record indicates whether a purchaser can initiate a background check before commencing the purchase of or paying for a firearm.

[9] Only once the property is delivered can a purchaser evaluate the condition of the property and seek a refund or substitution if it is damaged, broken, or otherwise defective. This illustrates that a sale cannot be complete until a purchaser receives the property and has the opportunity to inspect it.

Even if purchasing a firearm could be read into the terms "keep" or "bear," receipt of a firearm *without any delay* could not be, as the Founders would not have expected instant, widespread availability of the firearm of their choice. The parties dispute this fact, but I find the expert opinions of Professors Spitzer and Roth on this topic to be convincing.

In his Declaration, Professor Spitzer asserted that "No 'Guns-R-Us' outlets existed in the 1600s, 1700s, or most of the 1800s." Spitzer Decl. at 4. He explained that "[r]apid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get." *Id.* Consistent with Professor Spitzer's observations, Professor Roth testified that, in 1792, "production rates [of firearms] were far lower than they are today," so individuals might have had "to wait a few weeks to get [a firearm]." Prelim. Inj. Hr'g Tr. at 156.

In an effort to disprove those opinions, Professor Cramer surveyed excerpts from various advertisements for gunsmiths and gun retailers from 1728 to 1837. Cramer Decl. ¶¶ 15-22, 25-33. Professor Cramer did not, however, undertake to count the number of gun retailers in the United States in 1791, Prelim. Inj. Hr'g Tr. at 72-73, and he acknowledged that "[i]t is hard to use th[e] fragmentary advertising as persuasive proof." Cramer Decl. ¶ 45. The advertisements show that guns were being made and sold during the period addressed. But they also indicate that oftentimes a wait would be involved, for example, when guns were being imported and would arrive at irregular intervals, when firearms were being sold on a single date in the future, or a gunsmith was offering to fabricate firearms for purchasers. *See, e.g.*, *id.* ¶¶ 17, 19, 21-22, 29. For the stores with inventory in stock, no conclusion can be drawn regarding the general quantity, type, or desirability of the available firearms.

Professor Cramer also pointed to the 1810 "haphazard and incomplete" manufacturing census, showing that there were "117 'Gun manufactories' in the U.S., 37 gunsmiths (a severe undercount . . .), and 42,853 firearms manufactured." *Id.* ¶ 35. His analysis of this data states that "[t]he *minimum* 1810 U.S. production rate was 592 guns per 100,000 people" and, "[b]y comparison, in 1969, U.S. production and importation of firearms was 2,605 guns per 100,000 people." *Id.* ¶ 37. Without additional evidence, he goes on to state: "The 1810 manufacturing census is unquestionably incomplete in a way that the 1969 manufacturing records are not; it is likely that the *actual* number of guns manufactured in 1810 would raise the per capita rate close to 1969 levels." *Id.* ¶ 37. I find this latter opinion to be unsupported, only marginally relevant, and inconsistent with the record, including the statement from Professor Cramer's own Declaration that, "[d]espite the growth of large industrial facilities for the manufacture of arms in the post Civil War era, the cottage industry remained a primary source of weapons until well after 1870." *Id.* ¶ 39 (quoting James Whisker, The Gunsmith's Trade 67 (1992)). Ultimately, the opinions of Professors Spitzer and Cramer are credible and establish that individuals in the Founding Era would not have understood the purchase of firearms to include a right to receive a firearm without any delay.

Plaintiffs point to a handful of cases they claim support their argument that the purchase of a firearm is covered by the Second Amendment. These decisions predate *Bruen*, rely on cases predating *Bruen*, and/or conduct no analysis of the text. *See, e.g.*, *Miller v. Bonta*, No. 19-cv-01537 BEN (JLB), 2023 WL 6929336, at *6, 8 (S.D. Cal. Oct. 19, 2023) (relying on *Renna v. Becerra*, 535 F. Supp. 4d 931, 940 (S.D. Cal. 2021), and *Teixeira v. Cnty. of Alameda*, 837 F.3d 670, 677 (9th Cir. 2017 (en banc), but later concluding: "Plaintiffs are law-abiding citizens who want to possess (or keep) and carry (or bear), firearms like the AR-15 rifle that are commonly-

owned for lawful purposes. The conduct is covered by the plain text of the Second

Amendment."); *McRorey v. Garland*, No. 7:23-cv-00047-O, 2023 WL 5200670, *3 (N.D. Tex.

Aug. 14, 2023) (finding "Plaintiffs have sufficiently shown that their conduct is covered by the

Second Amendment" without performing an analysis of the plain text); *Connecticut Citizens Def.*

*League, Inc. v. Thody*, No. 3:21-cv-1156 (OAW), 2023 WL 2687446, *12 (D. Conn. Mar. 28,

2023) (dismissing as moot the plaintiffs' claim for "declaratory judgment confirming that they

have an individual right to 'obtain, possess, and carry firearms'" because, "[i]n *Bruen*, the

Supreme Court held that the Second Amendment's plain text guarantees to individuals a right to

carry a firearm in public for self-defense," and "grant[ing] a declaratory judgment confirming an

individual right to carry would be to reiterate what the Supreme Court of the United States

already has found"). Moreover, the Supreme Court has made clear that "[c]ourts are . . . entitled

to decide a case based on the historical record compiled by the parties." *Bruen*, 142 S. Ct. at

2130 n.6

 The record presently in front of me conclusively shows that the plain text of the Second

Amendment does not cover the conduct at issue, and consequently, Plaintiffs have not

demonstrated they are likely to succeed on the merits of their claims.


### 2.  Presumptive Lawfulness of Commercial Sale Regulations

 This conclusion is reinforced by the fact that the Waiting-Period Act regulates the

commercial sale of firearms. As stated in *Heller*, "laws imposing conditions and qualifications on

the commercial sale of arms" are "presumptively lawful." *Heller*, 554 U.S. at 626–27 and n. 26;

*see also McDonald*, 561 U.S. at 786 (confirming that it was not casting doubt on these regulatory

measures); *Bruen*, 142 S Ct. at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.)

(quoting *Heller*, 554 U.S. at 626−627, and n.26). The Court, in *Heller*, indicated that there is a historical justification for that presumption. *Heller*, 554 U.S. at 635. It is not immediately clear whether that historical justification would be based on a determination that the plain text of the Second Amendment does not cover the conduct or on a finding that laws imposing conditions or qualifications on the commercial sale of firearms are consistent with the Nation's historical tradition of firearm regulation. Some courts have understood the presumption to be warranted because the conduct is not covered by the plain text of the Second Amendment. *See, e.g.*, *United States v. Price*, 635 F. Supp. 3d 455, 459 (S.D. W. Va. 2022) ("This makes sense because commercial regulations that apply only to manufacturers and sellers do not implicate an individual's right of possession."); *United States v. Marique*, 647 F. Supp. 3d 382, 385 (D. Md. 2022) (quoting *Price*, 635 F. Supp. 3d at 459). I am inclined to agree and, for that reason, view the presumption as supporting my analysis of the plain text above.

*Bruen* did not call into question that some regulatory measures are presumptively lawful, as first indicated in *Heller*. In fact, in *Bruen*, the Court adopted similar guidance for "shall-issue" licensing regimes, noting that nothing in its "analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which a general desire for self-defense is sufficient to obtain a [permit]." 142 S. Ct. at 2138 n.9 (internal quotation marks and citation omitted). The Court reasoned:

> Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry. [*Heller*, 554 U.S. at 635]. Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' *Ibid*. . . . That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry."

*Id.* The Court implied these "shall-issue" regimes are constitutional unless they are abusive, which resembles the presumption articulated in *Heller*.

The Tenth Circuit's recent opinion in *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023), also lends support for the conclusion that *Heller*'s presumptively lawful measures withstood *Bruen*. In *Vincent*, the Tenth Circuit found *Bruen* "didn't appear to question the constitutionality of longstanding prohibitions on possession of firearms by convicted felons." *Id.* at 1201. The Tenth Circuit ultimately held in *Vincent*, *id.* at 1202, that "*Bruen* did not indisputably and pellucidly abrogate" its earlier precedential opinion in *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009), which concluded that the federal ban on felons' possession of firearms was constitutional based on the language in *Heller*.[10] The assessment in *Vincent* applies equally to the other categories of presumptively lawful regulations identified in *Heller*, including laws imposing conditions and qualifications on the commercial sale of arms.

Colorado's Waiting-Period Act regulates only the sale, and specifically sellers, of firearms. *See* Colo. Rev. Stat. § 18-12-115(1). The Act does not apply to anyone who does not "sell[] a firearm." *See* Resp. to Mot. for Prelim. Inj. at 8 (quoting Colo. Rev. Stat. § 18-12-115(1)(a)). Because it imposes a condition on the commercial sale of a firearm, the Act is presumptively lawful under *Heller*,[11] and as explained above, Plaintiffs have failed to rebut that

---

[10] In his concurrence in *McCane*, Judge Tymkovich explained that language in *Heller*, although dicta, is binding. *McCane*, 573 F.3d at 1047 (Tymkovich, J., concurring).

[11] Plaintiffs find this to be "silly" and an "absurd proposition." Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 9-10. They posit that, if waiting-period laws constitute regulations on the commercial sale of firearms that are presumptively lawful, states would be authorized to enact 100-year waiting periods. *Id.*, ECF No. 21 at 10. But, by "presumptively lawful," the connotation is plain: it is a presumption, not a guarantee. Abusive regulations may still be subject to constitutional challenges.

presumption by demonstrating that the plain text of the Second Amendment covers the immediate receipt of a purchased firearm.

### 3. Nation's Historical Tradition of Firearm Regulation

Even if the plain text of the Second Amendment were implicated, however, I find, on the record before me, that the Waiting-Period Act would not violate the Constitution. When the Second Amendment covers the at-issue conduct, the state must justify the regulation "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. As Plaintiffs repeatedly emphasized and the Supreme Court has made clear, the constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 2156 (quoting *McDonald*, 561 U.S. at 780). Instead, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626); *see also Heller*, 554 U.S. at 595 ("Of course the right was not unlimited, just as the First Amendment's right of free speech was not.").[12]

---

[12] As Judge Wood explained in comparing limitations on the First Amendment in her dissent in *Atkinson v. Garland*:

> The Second Amendment's history and tradition are steeped in a rich regulatory background. For what it is worth, I would say exactly the same thing about the First Amendment, which the Court has often equated to the Second Amendment. Although Justice Hugo Black was famous for taking a strict view of the First Amendment, insisting that the words "NO LAW" with which it begins meant literally "NO LAW," the truth is that the First Amendment has always been circumscribed by limiting principles. The Supreme Court understands that a person cannot shout "FIRE" in a crowded theater, see *Schenck v. United States*, 249 U.S. 47 (1919); that "fighting words" are not protected, see *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942); that a person who credibly issues a verbal threat to kill the President may be prosecuted, see *Rankin v. McPherson*, 483 U.S. 378 (1987); that obscenity and child pornography do not qualify as protected speech,

Because, as the parties agree, no law requiring a waiting period was enacted in the United

States until 1923, I must consider "whether 'historical precedent' from before, during, and even

after the founding evinces a comparable tradition of regulation." *Bruen*, 142 S. Ct. at 2131-32

(quoting *Heller*, 554 U.S. at 631). *Bruen* explained this inquiry as follows:

> In some cases, [it] will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

> * * *

> [O]ther cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution—and a Second Amendment— "intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch v. Maryland*, 4 Wheat. 316, 415, 4 L.Ed. 579 (1819) (emphasis deleted). Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.

> * * *

> [H]istory guide[s] our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a

---

see *Miller v. California*, 413 U.S. 15 (1973) (obscenity), *New York v. Ferber*, 458 U.S. 747 (1982) (child pornography); and that the First Amendment did not totally displace common-law libel and slander, see *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).

70 F.4th 1018, 1029–30 (7th Cir. 2023) (Wood, J., dissenting).

distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar." C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993). And because "[e]verything is similar in infinite ways to everything else," *id.*, at 774, one needs "some metric enabling the analogizer to assess which similarities are important and which are not," F. Schauer & B. Spellman, Analogy, Expertise, and Experience, 84 U. Chi. L. Rev. 249, 254 (2017). For instance, a green truck and a green hat are relevantly similar if one's metric is "things that are green." See *ibid.* They are not relevantly similar if the applicable metric is "things you can wear."

While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense. As we stated in *Heller* and repeated in *McDonald*, "individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald*, 561 U.S. at 767, 130 S.Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783); see also *id.*, at 628, 128 S.Ct. 2783 ("the inherent right of self-defense has been central to the Second Amendment right"). Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are " '*central*' " considerations when engaging in an analogical inquiry. *McDonald*, 561 U.S. at 767, 130 S.Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783).

To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson*, 9 F.4th 217, 226 (CA3 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* at 2131-33 (footnote omitted).[13]

---

[13] While I perform the analysis as instructed, I have reservations that turning to a particular historical era should dispositively determine how we conceive of and defend certain rights. The first is practical; I am a judge and not an historian. *See Atkinson*, 70 F.4th at 1028–29 (Wood, J., dissenting) ("Only a professional historian would know how to evaluate often-conflicting claims about the social, cultural, and legal landscape of an earlier period, and that person likely would not jump to any conclusions without devoting significant time to an evaluation of original sources."). The second is that this approach can be self-defeating. Since *Bruen* instructs me to consider the historical evidence the parties present and argue, it is not inconceivable that the parties would present historical accounts inconsistent with the holdings of *Bruen*, *Heller*, or

*An Unfamiliar Problem*

Plaintiffs argue that this is a straightforward case like *Heller* and *Bruen* since "the problem of impulsive gun violence dates from the invention of guns." Mot. for Prelim. Inj. at 8. They claim that the "complete absence of similar Founding-era regulations addressing a problem that was familiar to the Founders means the []Act is 'inconsistent with the Second Amendment.'" *Id.* at 9 (quoting *Bruen*, 142 S. Ct. at 2131). The Governor has shown, however, that impulsive gun homicide was not prevalent during the Founding Era or Early National Period and that instituting waiting periods would not have been a logical measure until at least the end of the nineteenth century.

Professor Roth persuasively opined that "[p]ublic officials today are confronting a criminological problem that did not exist in the Founding Era, nor during the first century of the nation's existence." Roth Decl. ¶ 48. Professor Roth explained:

> In the eighteenth century, . . . . laws restricting the use or ownership of firearms by colonists of European ancestry were rare, for two reasons. First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in

---

*McDonald*. *See Bruen*, 142 S. Ct. at 2130 n.6 ("Courts are . . . entitled to decide a case based on the historical record compiled by the parties."); *see also* Stephen R. Munzer and James W. Nickel, *Does the Constitution Mean What It Always Meant?*, 77 Colum. L. Rev. 1029, 1033 (1977) ("[I]t should be noted that there is a special danger in allowing a controversial case to turn on an historical claim if the claim is not beyond dispute. Since good historical research is not within the competence of most judges, the antecedent probability of mistakes is high. This increases the chances that professional historians will challenge and refute the Court's reading of history, thus undermining the basis, or ostensible basis, for the decision."). There are other reasons to disfavor this approach, but the last I will note is that it presupposes the success—let alone consensus—that the Founders held during America's fledgling years as a new nation. *See* Larry D. Kramer, *The Supreme Court 2000 Term Foreword: We the Court*, 115 Harv. L. Rev. 4, 12 (2001) ("The American people learned a great deal during the early years of their Republic--including that many of their most cherished beliefs and firmly held ideas were either wrong or unworkable (which makes one wonder why any sensible person, even a lawyer, would privilege the speculative writings of the 1780s over the hard-earned experience of subsequent decades."). With those concerns in the background, I don my historian hat and endeavor to follow the standard as prescribed.

patriotic fellow feeling within the British empire, and greater trust in government.
. . . Second, the impact of firearms on the homicide rate was modest, even though
household ownership of firearms was widespread.

*Id.* ¶¶ 14-15 (footnotes omitted). Regarding waiting-period laws specifically, Professor Spitzer

reasoned that they did not exist because, in addition to the low homicide rates and use of firearms

for homicide in the colonies, "[r]apid, convenient gun sales processes did not exist in the U.S.

until the end of the nineteenth century," and "no organized system of gun background checking

could feasibly exist until the modern era." Spitzer Decl. at 4-5.

The Governor emphasizes that waiting-period laws were unnecessary before the early

twentieth century "because a waiting period inherent in the acquisition of firearms already

existed for many Americans." Resp. to Mot. for Prelim. Inj. at 16.  As was discussed above, I

find the opinions of Professors Roth and Spitzer on the availability of firearms for purchase

throughout the Nation's history to be compelling. Even after ordering firearms via postal mail

became possible in the 1870s and 1880s, purchasers still had to wait several days before

receiving them. *See* Spitzer Decl. at 4-5; Prelim. Inj. Hr'g Tr. at 75-76. In contrast, "in the

modern era, gun and ammunition purchases can be made easily and rapidly from tens of

thousands of licensed gun dealers, private sales, gun shows, and through internet sales." Spitzer

Decl. at 4, ECF No. 18-3 (footnote omitted).

I am likewise persuaded by Professor Roth's research on homicide rates and his opinion

that homicide rates during the late Colonial Period into the early National Period were fairly low

compared to today's rates. Prelim. Inj. Hr'g Tr. at 118, 120. Professor Cramer challenged

Professor Roth's conclusions. However, his discussion was based on data from Professor Roth's

book or his submissions in other cases, not his Declaration in this case. *See* Cramer Decl. ¶¶ 63-64, 124-25, 135; Prelim. Inj. Hr'g Tr. at 52-53.[14]

Of the relatively small number of homicides committed in the late Colonial Period into the early National Period, Professor Roth determined that only 10 to 15 percent of both domestic and nondomestic homicides were committed with a firearm. Roth Decl. ¶ 15; Prelim. Inj. Hr'g Tr. at 119. He offered an explanation for why this was the case:

> Firearm use in homicides was generally rare because muzzle-loading firearms, such as muskets and fowling pieces, had significant limitations as murder weapons in the colonial era. They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology; and with the exception of

---

[14] Professor Cramer additionally sought to undermine Professor Roth's opinion that the United States has become by far the most homicidal society in the Western world since the nineteenth century. In his Declaration, Professor Cramer stated: "In 2019, the U.S. had a reported murder rate of 5.0/100,000. Because 73.7% of U.S. murders are committed with firearms, this suggests that the actual U.S. murder rate (after adjusting for firearms murders initially reported as, but later determined not to be, murder) is really 3.72/100,000." Cramer Decl. ¶ 128. Professor Cramer indicated that his calculation is of the adjusted "U.S. murder rate" and then compared his calculated rate to the rates from certain European countries (including Ukraine, Latvia, Lithuania, Moldova, and Montenegro). *Id.* ¶¶ 128-29. Professor Cramer did not show his work, but from the information he provided, his analysis seems unsound. There are three variables in his equation for adjusted "U.S. murder rate": the 2019 U.S. reported murder rate (5.0/100,000), the 2019 percentage of those homicides in which firearms were used (73.7%), and a 1989 percentage of the firearms-related homicides that were "justifiable or excusable" (6%). If one multiplies these anachronistic values, the result is the supposed rate of justifiable, firearms-related homicides, or 0.22 per 100,000 people. If that number is subtracted from the U.S. reported murder rate, the result is the actual U.S. murder rate (with all weapons or means and not including justifiable, firearms-related homicides), or 4.78 murders per 100,000 people. That number could be used to compare with the murder rates in other countries (although it would still contain justifiable or excusable murders perpetrated without a firearm). In contrast, if one is seeking the U.S. firearms-related murder rate (not including justifiable, firearms-related homicides), one would multiply the first two inputs above together, but instead of using 6% for the third, would substitute 94%. The result would be 3.68 murders per 100,000 people. Absent some showing of arithmetic or other methodology, I cannot ascertain how Professor Cramer arrived at a "U.S. murder rate" of 3.72 per 100,000 people or how he determined that representation is analogous to the overall murder rate from other countries. It appears he did not compare apples to apples, and this discrepancy, among others, calls into question his opinions. Additionally, Professor Roth explained that the Federal Bureau of Investigation statistics cited by Professor Cramer are unreliable because there are "tremendous gaps" in the reporting records. Prelim. Inj. Hr'g Tr. at 120.

> a few double-barreled pistols, they could not fire multiple shots without reloading. They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat. They had to be reloaded manually to enable the firing of another shot, which was a time-consuming process that required skill and experience. And more important, muzzle-loading firearms could not be used impulsively unless they were already loaded for some other purpose. It took at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand.

Roth Decl. ¶ 16 (footnotes omitted); *see also* Prelim. Inj. Hr'g Tr. at 122-23. Professor Roth described how, in certain periods and locations in the U.S., homicide rates increased and the proportion of homicides committed with firearms increased as well. Roth Decl. ¶ 18 ("When homicide rates were high among unrelated adults in the early and mid-seventeenth century, colonists went armed to political or interpersonal disputes, so the proportion of homicides committed with firearms was at that time 40 percent and rose even higher in contested areas on the frontier." (footnotes omitted)). He clarified that homicides of Native Americans and enslaved persons also frequently occurred with firearms. *Id.* But Professor Roth stated: "Otherwise, . . . colonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training." *Id.*

Professor Roth commented that weapons were often kept unloaded, but he qualified this general trend by noting that people who lived on the frontier where there was a constant threat of attack "tried to keep [firearms] loaded as long as they could, and they put [them] in the driest, warmest place they could, over the mantle, to have [them] ready." Prelim. Inj. Hr'g Tr. at 122-23. Professor Cramer disagreed that individuals generally kept firearms unloaded. He cited anecdotal evidence of four people who died accidentally from firearms being kept loaded, as well as a 1782 Massachusetts fire-prevention statute that provided any loaded firearms kept inside could be seized. Cramer Decl. ¶¶ 66-73, 149-56. The statute cuts both ways. It seems to indicate that in

some locales, individuals were required to keep their firearms unloaded, and thus were less likely to use them for impulsive homicides. In any event, Professor Cramer's scant evidence is insufficient to call into doubt Professor Roth's well-reasoned opinion.

Professor Cramer also sought to contradict Professor Roth's opinions regarding the availability of repeating firearms and the accuracy of firearms during the Founding Era. Professor Cramer stressed that pepperboxes, an early multi-shot firearm, existed by the end of eighteenth century, and individuals would carry a brace of pistols, meaning a pair of pistols, that they could use in succession. *Id.* ¶¶ 74, 146; Prelim. Inj. Hr'g Tr. at 54-55, 58. He could not provide information on how common pepperboxes were, though. *Id.* at 84. Professor Roth testified that they were very rare and that he could not think of a single homicide he had studied that was committed with a pepperbox. *Id.* at 132-33. Regarding the accuracy of firearms at the time, Professor Cramer pointed to the capabilities of riflemen in the Revolutionary era. Cramer Decl. ¶¶ 139-145. Professor Roth did not deny the accuracy of rifled muskets but noted that few people actually had them. Prelim. Inj. Hr'g Tr. at 130. He acknowledged, though, that the firearms generally possessed were accurate enough to be lethal at short range. *Id.* at 131.

Overall, the evidence shows that firearms were not as readily available for purchase and that impulsive gun homicides were much less prevalent at the time of the founding and in the century that followed. Thus, it is logical that waiting-period laws were not adopted during that period. Professors Roth and Spitzer also make a strong case that, as firearm technology and production progressed and gun violence increased, laws regulating firearms, including waiting-period laws, were enacted in response.[15]

---

[15] *See* Roth ¶ 34 ("[T]he proportion of homicides committed with firearms—overwhelmingly, concealed revolvers—reached today's levels by the 1920s, ranging from a median of 56 percent in New England and over 70 percent in the South and West. And that is why every state in the

29

Since the Waiting-Period Law is a "modern regulation[] that w[as] unimaginable at the founding," I must reason by analogy and "determin[e] whether a historical regulation is a proper analogue" for, or "relevantly similar" to, the Act. *Bruen*, 142 S. Ct. at 2133. In doing so, I focus on "how and why the regulations burden a law-abiding citizen's right to armed self-defense," and look for a "historical analogue"—not a "twin." *Id.* The Governor and Professor Spitzer point to two types of historical analogues: laws involving intoxicated persons and licensing regimes.

*Laws Related to Intoxication as Analogues*

The aim of the Waiting-Period Act is to "help prevent impulsive acts of firearm violence, including homicides and suicides." H.B. 23-1219, 74th Gen. Assemb., Reg. Sess. (Colo. 2023). The Governor alleges that "[s]tates have long regulated the possession, use, and sales of arms to intoxicated persons, laws which are designed to avoid such impulsive violence." Resp. to Mot. for Prelim. Inj. at 14. Professor Spitzer opined that "old intoxication laws avoided or thwarted 'heat of the moment' gun acquisition or use by the intoxicated, when they would be much more likely to act rashly, impulsively, and with diminished judgment" and those purposes "mimic the purpose of modern waiting periods." Spitzer Decl. at 6.[16] In Professor Spitzer's view, laws

---

Union restricted the right to carrying certain concealable weapons."); *id.* ¶ 47 ("Because of the threats these new technologies posed for public safety, public officials widened their regulatory focus beyond concealed and concealable weapons. States began imposing waiting period laws to prevent individuals from acquiring firearms in a fit of anger."); Spitzer Decl. at 4-5 ("The rise of handgun mail order purchasing through such companies as Montgomery Ward and Sears in the 1870s and 1880s brought cheap handguns to buyers' doors. When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous anti-gun carry restrictions in the late 1800s and early 1900s.).

[16] Professor Cramer calls the comparison between intoxication regulations and the Act a "warped analogy." Prelim. Inj. Hr'g Tr. at 41. He takes issue with Professor Spitzer's insinuation that gun purchasers might act "rashly, impulsively, and with diminished judgment." Cramer Decl. ¶¶ 109-11. Professor Cramer asks: "What evidence is there that purchasing a firearm is done 'rashly, impulsively, and with diminished judgment . . .'? I know that I have never done so." *Id.* ¶ 111.

pertaining to firearms and intoxication mimicked waiting periods because they "interrupt[ed] gun access only temporarily, as is the case with waiting periods." *Id.*

The Governor, through Professor Spitzer, provided the following laws as relevant, historical examples of regulations pertaining to firearms and intoxication.[17]

- In 1623, 1631, and 1632, Virginia enacted measures "directing that '[n]o commander of any plantation, shall either himself or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments.'" *Id.* at 9; Exhibit C: Intoxication/Weapons Laws at 34.

- In 1655, a Virginia law made individuals subject to fines for "'shoot[ing] any guns at drinking,' though the law carved out two special occasions for regulatory exemption: 'marriages and funerals only excepted.'" Spitzer Decl. at 9-10; Exhibit C: Intoxication/ Weapons Laws at 34.[18]

- In 1868, Kansas passed a law stating:

   Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other

---

But Professor Cramer misunderstands Professor Spitzer's argument. It is not about an individual's state of mind when the gun is purchased; it is about his or her state of mind if or when the firearm is later used. Similarly, the implication is not that an intoxicated individual impulsively purchases a firearm; it is that the intoxicated individual would impulsively use the firearm.

[17] Professor Cramer generally criticizes Professor Spitzer for not including the full text of the statutes referenced and for inaccurately citing them, *see* Cramer Decl. ¶¶ 86, 88, 91, 95, 96, but Professor Spitzer included as exhibits to his Declaration lists of the text of the statutes he references, *see* Exhibit C: Intoxication/Weapons Laws; Exhibit E: License & Licensing Laws. Professor Cramer admits he did not review the exhibit to Professor Spitzer's Declaration containing the intoxication and weapons laws. Prelim. Inj. Hr'g Tr. at 77-78.

[18] Professor Cramer testified that the 1655 law was related to protecting the colonists' system for warning of attacks by Native Americans, Prelim. Inj. Hr'g Tr. at 43, but I do not see how that undercuts the fact that the law regulates the use of firearms in circumstances in which individuals were thought to be more disposed to shoot their guns.

deadly weapon, shall be subject to arrest upon the charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.

*Id.* at 6.[19]

- In 1878,[20] Mississippi enacted a measure making it unlawful to "sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described [pistols, various knives etc.], or any pistol cartridge . . . ." *Id.* at 10-11. The state enacted similar laws in 1880 and 1908. *Id.* at 11-12.

- In 1883, a Wisconsin law made it "unlawful for any person in a state of intoxication to go armed with any pistol or revolver." *Id.* at 35-36.

- In 1879, Missouri passed a law stating:

    "If any person . . . shall have or carry [any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon] upon or about his person when intoxicated or under the influence of intoxicating drinks, . . . he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

---

[19] Professor Cramer claims in relation to the Kansas statute that "[e]xamining the actual primary source shows that Spitzer has misrepresented the statute." Cramer Decl. ¶ 97. Professor Cramer points instead to an 1865 Kansas prohibition statute and emphasizes that it is not about firearms. *Id.* ¶¶ 97-98. But Professor Cramer is the one who misrepresents the statute. Professor Spitzer's text is correct, and it is a statute criminalizing the carrying of a pistol or other deadly weapon while under the influence of intoxicating drink. *See An Act to prevent the carrying of Deadly Weapons*, 7th Legislature, Reg Session 25, § 2 (Kan. 1867).

[20] Although Professor Cramer insists that all post-1868 evidence is irrelevant under *Bruen*, *see, e.g.*, Cramer Decl. ¶ 99; Prelim. Inj. Hr'g Tr. at 47, the Supreme Court has instructed that this evidence may be considered unless it conflicts with earlier evidence, *see Bruen*, 142 S. Ct. at 2127-2128; 2136-37, 2154, and n.28. Nothing in the record indicates the later regulations here conflict with any earlier tradition.

*Id.* at 13. The state enacted a similar statute in 1883, *id.* at 14, and several other like regulations were adopted by counties, cities, and towns in Missouri before the turn of the century, *id.* at 13-16; Spitzer Decl. at 12.

- In 1888, a law in Maryland provided:

> Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, . . . and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found . . . .

Exhibit C: Intoxication/Weapons Laws at 7.

- In 1893, Rhode Island enacted a similar statute that made a person subject to fines and penalties if arrested "for being drunk or disorderly" and found to "have concealed upon his person any of the weapons mentioned." *Id.* at 32.[21]

These measures are sufficient to show that our Nation had a historical tradition of regulating the carrying and use of firearms by intoxicated individuals. Plaintiffs do not seem to dispute this determination, but instead focus on whether those regulations are "relevantly similar" to the Waiting-Period Act. *See Bruen*, 142 S. Ct. at 2132. For the purposes of this proceeding, I hold that they are.

Plaintiffs contend the "why" justifying those regulations and "how" their aims are accomplished differ from those of the Waiting-Period Act. Plaintiffs assert: "[E]very person to

---

[21] The Governor also cites measures limiting the sale of alcohol near armed militiamen that he alleges were enacted "to avoid impulsive violence by armed men." Resp. to Mot. for Prelim. Inj. at 14. I am not persuaded that these regulations are proper analogues because they do not involve the regulation of firearms.

whom the Act applies has *passed* a background check and is therefore presumably not a threat to anyone. That is, after all, the purpose of background checks." Mot. for Prelim. Inj. at 9. Plaintiffs' assumption is not a given. Indeed, in this case, there was testimony that pre-purchase background checks for firearms may have no statistically significant effect on reducing gun violence. *See* Prelim. Inj. Hr'g Tr. at 217-18. I am not suggesting that all individuals who seek to purchase a firearm are a threat. But the Waiting-Period Act and the intoxication laws both work to prevent individuals in a temporary impulsive state from irresponsibly using a firearm. They "impose a comparable burden on the right of armed self-defense." *Bruen*, 142 S. Ct. at 2133.

Plaintiffs are adamant that "a law specifically targeted at an obviously dangerous situation is not analogous to a law that sweeps up everyone." Mot. for Prelim. Inj. at 10; Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 19. Perhaps the state could impose a more narrowly tailored requirement, but that is not the inquiry here. The intoxication laws prevented *all* individuals from becoming intoxicated and engaging in the prohibited conduct. They did not apply only to those people who would have certainly used a firearm irresponsibly while intoxicated. Despite Plaintiffs' arguments, the "how" and the "why" of the intoxication laws and the Waiting-Period Act are sufficiently similar to demonstrate that the Act is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

*Licensing as an Analogue*

In addition, Professor Spitzer details the longstanding history of firearm licensing regimes in the United States and contends "historical licensing and permitting laws did, and do, operate in a manner similar to modern waiting periods." Spitzer Decl. at 15. I find that, although these licensing laws are not implemented in the same way that a waiting period is, they are a

34

secondary, but proper, analogue because they support that the Founders and Reconstruction generation would have accepted a modest delay on the delivery of a firearm in order to ensure that those receiving a firearm are law-abiding, responsible citizens.

Because the Supreme Court in *Bruen* indicated that there is a sufficient historical basis for "shall-issue" licensing regimes, I do not detail the history of the Nation's licensing laws here. *See* 142 S. Ct. at 2138 n.9. Waiting periods are similar to "shall-issue" licensing regimes in that they require that an action be taken—delivery of the purchased firearm—after a defined requirement is met—the passage of at least three days. Additionally, waiting-period laws, like "shall-issue" licensing laws, "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right[s]." *Id.* (quoting *Heller*, 554 U.S. at 635). The Court in *Bruen*, noted that "shall-issue" licensing regimes are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). That is the purpose of Colorado's Waiting-Period Act. The Act provides time for a background check to be completed. *See* Colo. Rev. Stat. § 18-12-115(1)(a) (defining the waiting period as the longer of "[t]hree days after a licensed gun dealer has *initiated* a background check" or until "[t]he seller has obtained approval for the firearm transfer from the bureau after it has completed any background check required by state or federal law" (emphasis added)). And the waiting period works to ensure that the individual to whom the firearm is delivered is a "responsible citizen." *See, e.g.*, Prelim. Inj. Hr'g Tr. at 201 (evincing that "imposing a handgun waiting period results in about a 17 percent reduction in gun homicides, and a 7 to 11 percent reduction in gun suicides").

The Court in *Bruen* did not rule out "constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny

ordinary citizens their right to public carry." *Bruen*, 142 S. Ct. at 2138 n.9. The record is devoid of any evidence that the waiting period here is being "put toward abusive ends." 142 S. Ct. at 2138 n.9.

In *Bruen*, the Court "acknowledge[d] that 'applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins.'" 142 S. Ct. at 2134 (quoting *Heller*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). This is not a straightforward case—during the Founding Era and the century that followed, firearm access and technology, along with violent crime, was drastically different and a waiting period for firearm purchases would have been unnecessary. With that in mind, evaluation of the analogues presented is unsurprisingly difficult. Nonetheless, I find the Governor has provided a sufficient record to conclude that our Nation's historical tradition of firearm regulation is consistent with the Waiting-Period Act.

In sum, Plaintiffs have failed to show that they are likely to succeed on the merits of their claims because the record before me establishes the Second Amendment does not cover the at issue conduct, the Act is presumptively lawful, and even if the Act implicated the Second Amendment, the Nation's historical tradition of firearm regulation would permit it.

**B. Irreparable Harm**

Plaintiffs also fail to demonstrate that they will experience irreparable harm if the injunction is denied. Because I find they have not shown they are likely to succeed on the merits

of their claims, the potential violation of their Second Amendment rights does not establish they will be irreparably harmed absent issuance of the injunction.[22]

Regarding specific harms, the named individual Plaintiff—Ms. Garcia—testified that the firearm waiting period impacted her in two ways. First, she was unable to conduct her business as a firearms instructor and range safety officer because she spent the better part of a day driving to a specific firearms vendor several hours away.[23] Second, she reserved and paid for travel and lodging for a shotgun shoot in Virginia, which she is now not going to attend because she could not obtain a new shotgun in time. Prelim. Inj. Hr'g Tr. at 21. The event would have been "very, very important and impactful to [her] career" because it would have been the first time a big production would have had her name on it and would have given her exposure to people in the industry. *Id*. at 21-22. Taylor Rhodes, the Executive Director of RMGO, echoed Ms. Garcia that the waiting period imposes a "massive burden on certain people that want to give businesses around the state business." *Id*. at 32. He also described how he, a member of RMGO, had recently purchased a firearm, and because he was traveling when the waiting period expired, he was unable to pick up his firearm for about eight days. *Id.* at 30-33. Neither Ms. Garcia nor Mr. Rhodes testified that they or any RMGO members would be unable to defend themselves due to

---

[22] I recognize that the Tenth Circuit has, in recent history, used broad language presuming irreparable harm when any constitutional violation is found. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019) ("What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial. Any deprivation of any constitutional right fits that bill."). And, while at least one Court of Appeals has specifically found irreparable harm should be presumed for Second Amendment violations as it often is for First Amendment violations, *see Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011), I am not so sure, especially where, as here, the record is not clear on the extent to which the "central component" of the Second Amendment—self-defense—would be implicated, *see Bruen*, 142 S. Ct. at 2133.

[23] On cross-examination, Plaintiff Garcia disclosed the probable existence of alternative, closer firearms vendors. Prelim. Inj. Hr'g Tr. at 25-26.

the waiting period. Ms. Garcia's possession of numerous other firearms (ten to twenty by her account) supports the inference that her ability to defend herself with a firearm would not be hampered by the waiting period. *See id.* at 23-24.

As the Supreme Court has repeatedly emphasized, "individual self-defense is 'the central component' of the Second Amendment." *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. at 767); *see also Heller*, 544 U.S. at 599. Plaintiffs have alleged no harm associated with the right of self-defense.[24] The harm alleged by Ms. Garcia pertains only to her time and business opportunities. Here, those are quintessential compensable harms, i.e, not irreparable. Plaintiffs have not demonstrated they will suffer irreparable injury if the injunction is denied.

## C. Balance of Harms and the Public Interest

The last factors to be considered in evaluating a request for a preliminary injunction are the so-called "balance of harms"—whether the threatened injury to the movant outweighs the injury facing the opposing party under the injunction—and the public interest. Generally, when the government opposes a motion for a preliminary injunction, the public interest and the harm to the government merge such that the harms to be balanced are the threatened injury to the plaintiff and the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

In its Motion, Plaintiffs' analysis of the balance of harms and public interest focuses exclusively on how the State does not have any "interest in enforcing a law that is likely

---

[24] Plaintiffs' Reply in Support of their Motion cites hypothetical "situations where a purchase [sic] knows that an imminent confrontation may occur" to justify interpreting the Second Amendment to require that individuals be able to obtain firearms without delay. Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 13.  Plaintiffs presented no evidence that related harm would exist or the extent to which it would exist as a consequence of the waiting period being in place.

constitutionally infirm." Mot. for Prelim. Inj. at 15 (quoting *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010)). Plaintiffs' approach has two problems. The first is that I already found Plaintiffs have failed to demonstrate the Waiting-Period Act is constitutionally infirm. The second is that it is a reductive interpretation of the law[25] and allots me no discretion to observe how the parties might be affected by the granting or absence of urgent court intervention.[26]

Conversely, the Governor made efforts to illustrate the concrete public interest at stake: citizens' lives. He presented expert testimony from Professor Poliquin based on an empirical study he authored that was published in a peer-reviewed journal.[27] Professor Poliquin's study

---

[25] Reducing the analysis for preliminary injunctions into a simple inquiry on the merits is antithetical to the equitable nature of such relief. As I quoted at the hearing:

> "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims."

*Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944), *see also Lemon v. Kurtzman* 411 U.S. 192, 200 (1973) ("In constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable."); *Brown v. Board of Education*, 349 U.S. 294, 300 (1955) ("Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.")

[26] In *Bruen*, the Supreme Court stated: "The Second Amendment 'is the very product of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 142 S. Ct. at 2118 (quoting *Heller*, 554 U.S. at 635). On first glance, it might seem that statement dictates the outcome for any balance of harms analysis where a violation of the Second Amendment is likely. The specific language, however, indicates that the right to use arms *for self-defense* must be implicated, and again, Plaintiffs have presented no related evidence. Moreover, in proceedings in equity, the public interest consideration is that of today's public, not the frozen-in-time interest of the very different society that existed at the time of our Nation's founding.

[27] The value of submitting research for peer review before other specialists in the same field is not lost on me. Indeed, it is an explicit factor in *Daubert* hearings that has helped define the scope of presumed expertise for a proffered witness. *See, e.g.*, *Arkansas River Power Auth. v. Babcock & Wilcox Power Co.*, No. 14-cv-00638-CMA-NYW, 2016 WL 9734684, at *4 (D.

concluded that "imposing a handgun waiting period results in about a 17 percent reduction in

gun homicides, and a 7 to 11 percent reduction in gun suicides," which the Governor argued

"would translate to over 100 lives saved" during the applicability of a preliminary injunction in

this case. Prelim. Inj. Hr'g Tr. at 201, 233. Professor Poliquin's study accounted for multiple

different factors, including policy changes across multiple states and demographic variance.

 Plaintiffs responded to this evidence through expert testimony of their own.[28] Professor

Cramer opined that, based on his review of California crime statistics and state-implemented

adjustments to firearm waiting periods, either no causality should be inferred from the correlative

increase of murder rate with length of waiting period, or the causal relationship does exist but

flows in the opposite direction to what Professor Poliquin concludes. While Professor Cramer

admits he is not a statistician and has not received formal training as such, he nevertheless insists

that his analysis of California's murder rate against handgun waiting-period length undermines—

or "it should certainly make us skeptical" of—claims that a reduction in homicides can be

causally attributed to the existence or increased length of firearm waiting periods. Cramer Decl. ¶

178. Professor Poliquin correctly explained that there are at least two immediate methodological

errors made in reaching this conclusion. *See* Prelim. Inj. Hr'g Tr. at 210-12. First, there is no

control group used to show the effects of a community adopting a waiting period after not having

one. *See id.* at 210-11. And, second, there is no attempt to reckon with other factors that may

---

Colo. Oct. 24, 2016) (noting lesser reliability of "calculations [that] were self-generated and had
not been peer -reviewed").

[28] The specific analysis of the Governor's witness, Professor Poliquin, is not directly rebutted by
Professor Cramer since the latter did not review the former's work. *See* Prelim. Inj. Hr'g Tr. at
88. However, Professor Cramer did present his analysis on California's waiting period, which he
believes suggests a contrary conclusion. *See* Cramer Decl. ¶¶ 176-82.

influence murder rates in California during the observed period (e.g. national criminal trends) or to quantitatively explain why these factors are not present. *See id.* at 211-12.[29]

Professor Cramer further critiques Professor Poliquin's study by claiming that suicide reduction would be an unlikely result from instituting a waiting period because people intent on killing themselves would find an alternate means if they could not legally procure a firearm. Professor Poliquin testified that, although he "would expect a reduction in gun-related suicides," he was "slightly less confident in that prediction based on the results of [his] study." *Id*. at 213. Nevertheless, the statistical certainty with which Professor Poliquin makes that qualified prediction can be measured, tested, and verified. By contrast Professor Cramer does not support his skepticism with any specific evidence.

With a statistically rigorous study quantifiably illustrating the public safety benefits of a firearm waiting period, I weigh this against the purported harms the Plaintiffs would suffer. Even accepting the harm Plaintiffs describe as entirely true, it is not remotely close. For the sake of

---

[29] Professor Cramer suggests that California is "very nearly a perfect example of a laboratory for waiting period" because interstate firearms trafficking is illegal under 18 U.S.C. § 922 and violence is largely concentrated in urban areas that are far from the state's borders. *See* Cramer Decl. ¶ 175. Again, there are at least two problems here. The first is that he provides no discussion or evidence of how enforcement of anti-trafficking laws has prevented the illegal import of firearms into California. By contrast, his testimony that "most firearms are acquired by felonious practices," such as theft or sales by "unscrupulous gun dealers who are actually violating federal law" would seem to suggest illegal firearm sales pervade America despite legal restrictions. Prelim. Inj. Hr'g Tr. at 48-49. In any event, Professor Cramer cites no data for this contrary proposition either. He does, however, refer to a single incident of mass firearm theft, which ironically took place in Los Angeles County, California. *Id*. at 49. The second problem is that Professor Cramer baldly opines that "most of California's murders happen in a small number of urban counties that are at least six to eight hours driving time from other states," without any further development or corroboration. Cramer Decl. ¶ 175. I am left not knowing if a bare majority of crime occurs in these far-flung urban areas, leaving comparably—albeit measurably less—homicidal rural areas with easy access to out-of-state firearms.

clarity, saving approximately one hundred people in Colorado this year outweighs the aggregate harm of minimal expenditures of time and sacrificed business opportunities.

## V. CONCLUSION

Accordingly, Plaintiffs have failed to show the applicable factors weigh in favor of preliminarily enjoining enforcement of the Waiting-Period Act. Their Motion for Preliminary Injunction (ECF No. 2) is, therefore, DENIED.

DATED this 13th of November, 2023.

_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE