No. 23-1380

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

Rocky Mountain Gun Owners and Alicia Garcia
Plaintiffs-Appellants,

v.

Jared Polis, in his official capacity as Governor of the State of Colorado,
Defendants-Appellees.

On Appeal from the United States District Court for the District of Colorado
No. 23-cv-02563-JLK, The Honorable John L. Kane

## APPELLANT'S APPENDIX VOLUME I

Barry K. Arrington
ARRINGTON LAW FIRM
4195 Wadsworth Boulevard
Wheat Ridge, CO 80033
(303) 205-7870
E-mail: Barry@arringtonpc.com

D. Sean Nation
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
E-mail: snation@mslegal.org

*Attorneys for Plaintiffs-Appellants*

# APPENDIX INDEX

*Rocky Mountain Gun Owners and Alicia Garcia v. Jared Polis, in his official capacity as Governor of the State of Colorado*

*No. 23-1380*

District Court Docket. Case No. 1:23-cv-02563-JLK
(D. Colo.) ............................................................. App. 001

Plaintiff's Complaint
(ECF No. 1) ........................................................... App. 007

Motion for Temporary Restraining Order and Preliminary Injunction
(ECF No. 2) ........................................................... App. 015

Exhibit A: An Act Concerning Establishing a Minimum Three-Day Waiting
Period Prior to the Delivery of a Purchased Firearm
(ECF No. 2-1) ......................................................... App. 033

Declaration of Alicia Garcia
(ECF No. 2-2) ......................................................... App. 036

Declaration of Taylor Rhodes
(ECF No. 2-3) ......................................................... App. 038

Proposed Temporary Restraining Order
(ECF No. 2-4) ......................................................... App. 040

Notice of Related Case
(ECF No. 3) ........................................................... App. 042

Order Re: Motion for Temporary Restraining Order and for Preliminary
Injunction
(ECF No. 11) .......................................................... App. 043

Joint Motion to Reschedule Preliminary Injunction Hearing
(ECF No. 14) .......................................................... App. 045

Notice of Related Case
(ECF No. 16) .......................................................... App. 047

The Governor's Opposition to Plaintiffs' Motion for Preliminary
Injunction [Doc. 2]
(ECF No. 18)........................................................................ App. 050

HB 23-1219
(ECF No. 18-1) .................................................................... App. 070

Article entitled: Handgun Waiting Periods Reduce Gun Deaths
(ECF No. 18-2) .................................................................... App. 075

Spitzer Declaration
(ECF No. 18-3) .................................................................... App. 079

Exhibit A to Spitzer Declaration – Spitzer CV
(ECF No. 18-4) .................................................................... App. 111

Exhibit B to Spitzer Declaration – Table of Intoxication/Weapons Laws
(ECF No. 18-5) .................................................................... App. 162

Exhibit C to Spitzer Declaration – Text of Intoxication/Weapons Laws
(ECF No. 18-6) .................................................................... App. 164

Exhibit D to Spitzer Declaration – Table of Weapons Licensing Laws
(ECF No. 18-7) .................................................................... App. 200

Exhibit E to Spitzer Declaration – Text of License and Licensing Laws
(ECF No. 18-8) .................................................................... App. 204

APPEAL,JD1

# U.S. District Court - District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:23-cv-02563-JLK

Rocky Mountain Gun Owners et al v. Polis
Assigned to: Judge John L. Kane
Case in other court:  Tenth Circuit, 23-01380
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 10/01/2023
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Rocky Mountain Gun Owners**

represented by **Brian A. Abbas**
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227
303-292-2021
Email: babbas@mslegal.org
*ATTORNEY TO BE NOTICED*

**Donald Sean Nation**
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227
303-292-2021
Email: snation@mslegal.org
*ATTORNEY TO BE NOTICED*

**William Edward Trachman**
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227
303-292-2021
Fax: 303-292-1980
Email: wtrachman@mslegal.org
*ATTORNEY TO BE NOTICED*

**Barry Kevin Arrington**
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, CO 80033
303-205-7870
Email: barry@arringtonpc.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alicia Garcia**

represented by **Brian A. Abbas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**App. 001**

Donald Sean Nation
(See above for address)
*ATTORNEY TO BE NOTICED*

William Edward Trachman
(See above for address)
*ATTORNEY TO BE NOTICED*

Barry Kevin Arrington
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Jared S. Polis**
*in his official capacity as Governor of the State of Colorado*

represented by  **Grant T. Sullivan**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720-508-6349
Fax: 720-508-6038
Email: grant.sullivan@coag.gov
*TERMINATED: 12/26/2023*

**Matthew John Worthington**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720-508-6124
Email: matt.worthington@coag.gov
*ATTORNEY TO BE NOTICED*

**Michael T. Kotlarczyk**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720-508-6187
Fax: 720-508-6041
Email: mike.kotlarczyk@coag.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 10/01/2023 | 1 | COMPLAINT against Jared S. Polis (Filing fee $ 402,Receipt Number ACODC-9322326)Attorney Barry Kevin Arrington added to party Alicia Garcia(pty:pla), Attorney Barry Kevin Arrington added to party Rocky Mountain Gun Owners(pty:pla), filed by Rocky Mountain Gun Owners, Alicia Garcia.(Arrington, Barry) (Entered: 10/01/2023) |

**App. 002**

| 10/01/2023 | 2 | MOTION for Temporary Restraining Order by Plaintiffs Alicia Garcia, Rocky Mountain Gun Owners. (Attachments: # 1 Ex A Act, # 2 Garcia Declaration, # 3 Rhodes Declaration, # 4 Proposed Order (PDF Only))(Arrington, Barry) (Entered: 10/01/2023) |
|---|---|---|
| 10/01/2023 | 3 | NOTICE OF CASE ASSOCIATION by Barry Kevin Arrington on behalf of Alicia Garcia, Rocky Mountain Gun Owners (Arrington, Barry) (Entered: 10/01/2023) |
| 10/01/2023 | 4 | SUMMONS REQUEST as to Jared S. Polis re 1 Complaint, by Plaintiffs Alicia Garcia, Rocky Mountain Gun Owners. (Arrington, Barry) (Entered: 10/01/2023) |
| 10/01/2023 | 5 | Case assigned to Judge John L. Kane and drawn to Magistrate Judge Scott T. Varholak. Text Only Entry (ccuen, ) (Entered: 10/02/2023) |
| 10/02/2023 | 6 | SUMMONS issued by Clerk. (ccuen, ) (Entered: 10/02/2023) |
| 10/02/2023 | 7 | NOTICE of Entry of Appearance by Michael T. Kotlarczyk on behalf of Jared S. PolisAttorney Michael T. Kotlarczyk added to party Jared S. Polis(pty:dft) (Kotlarczyk, Michael) (Entered: 10/02/2023) |
| 10/02/2023 | 8 | NOTICE of Entry of Appearance by Grant T. Sullivan on behalf of Jared S. PolisAttorney Grant T. Sullivan added to party Jared S. Polis(pty:dft) (Sullivan, Grant) (Entered: 10/02/2023) |
| 10/03/2023 | 9 | MINUTE ORDER. On October 1, 2023, Plaintiffs filed a Notice of Related Case 3 , listing two cases in front of Chief Judge Brimmer (Nos. 23-cv-01076-PAB-NRN & 23-cv-01077-PAB-NRN). In those related cases, Defendant previously filed a Notice of Three Related Cases, which includes an additional case before Judge Gallagher (No. 22-cv-01866-GPG-SKC). When this case was assigned to me, I followed the procedure set out in D.C.COLO.LCivR 3.2(d). Based on the requisite conferral and the present filings in the implicated cases, it was determined that the facts and claims of the cases are not sufficiently related to warrant special assignment or transfer of this case. Ordered by Judge John L. Kane on 10/3/2023. Text Only Entry (jlksec) (Entered: 10/03/2023) |
| 10/04/2023 | 10 | NOTICE of Entry of Appearance by William Edward Trachman on behalf of Alicia Garcia, Rocky Mountain Gun OwnersAttorney William Edward Trachman added to party Alicia Garcia(pty:pla), Attorney William Edward Trachman added to party Rocky Mountain Gun Owners(pty:pla) (Trachman, William) (Entered: 10/04/2023) |
| 10/04/2023 | 11 | ORDER re: 2 Motion for Temporary Restraining Order and for Preliminary Injunction. Plaintiffs' request for a temporary restraining order is **DENIED**, and we will proceed on Plaintiffs' Motion for a preliminary injunction alone. Governor Polis is **DIRECTED** to file a Response to Plaintiffs' Motion for Preliminary Injunction on or before **October 17, 2023**. Any Reply in Support of the Motion is due on or before **October 20, 2023**. A preliminary injunction hearing is set for two days beginning at **9:30 a.m. on October 24, 2023** in Courtroom A 802. By Judge John L. Kane on 10/4/2023. (jtorr, ) (Entered: 10/04/2023) |
| 10/04/2023 | 12 | NOTICE of Entry of Appearance by Matthew John Worthington on behalf of Jared S. PolisAttorney Matthew John Worthington added to party Jared S. Polis(pty:dft) (Worthington, Matthew) (Entered: 10/04/2023) |
| 10/04/2023 | 13 | WAIVER OF SERVICE Returned Executed by Rocky Mountain Gun Owners, Alicia Garcia. Jared S. Polis waiver sent on 10/4/2023, answer due 12/4/2023. (Arrington, Barry) (Entered: 10/04/2023) |
| 10/05/2023 | 14 | Joint MOTION to Continue *and Reschedule Preliminary Injunction Hearing* by Plaintiffs Alicia Garcia, Rocky Mountain Gun Owners. (Arrington, Barry) (Entered: 10/05/2023) |
| 10/05/2023 | 15 | ORDER granting 14 Joint Motion to Reschedule Preliminary Injunction Hearing. The preliminary injunction hearing set to begin October 24, 2023, is VACATED AND RESET |

| | | |
|---|---|---|
| | | to October 26, 2023, at 9:30 a.m. before Judge John L. Kane in Courtroom A802 on the 8th Floor of the Alfred A. Arraj U.S. Courthouse, 901 19th Street, Denver, Colorado. Ordered by Judge John L. Kane on 10/5/2023. Text Only Entry(jlksec) (Entered: 10/05/2023) |
| 10/05/2023 | 16 | NOTICE OF CASE ASSOCIATION *of Related Case* by Grant T. Sullivan on behalf of Jared S. Polis (Sullivan, Grant) (Entered: 10/05/2023) |
| 10/11/2023 | 17 | NOTICE of Entry of Appearance by Brian A. Abbas on behalf of Alicia Garcia, Rocky Mountain Gun OwnersAttorney Brian A. Abbas added to party Alicia Garcia(pty:pla), Attorney Brian A. Abbas added to party Rocky Mountain Gun Owners(pty:pla) (Abbas, Brian) (Entered: 10/11/2023) |
| 10/17/2023 | 18 | BRIEF in Opposition to 2 MOTION for Temporary Restraining Order *and for Preliminary Injunction* filed by Defendant Jared S. Polis. (Attachments: # 1 Exhibit 1, HB 23-1219, # 2 Exhibit 2, Handgun Waiting Periods Reduce Gun Deaths, # 3 Exhibit 3, Spitzer Declaration, # 4 Exhibit 4, Ex. A to Spitzer Dec: CV, # 5 Exhibit 5, Ex. B to Spitzer Dec: Table of Intoxication/Weapons Laws, # 6 Exhibit 6, Ex. C to Spitzer Dec: Text of Intoxication/Weapons Laws, # 7 Exhibit 7, Ex. D to Spitzer Dec: Table of Weapons Licensing Laws, # 8 Exhibit 8, Ex. E to Spitzer Dec: Text of License and Licensing Laws, # 9 Historical Waiting Period Laws, # 10 Exhibit 10, Roth Declaration, # 11 Exhibit 11, Ex. A to Roth Dec: CV)(Kotlarczyk, Michael) (Entered: 10/17/2023) |
| 10/18/2023 | 19 | NOTICE of Entry of Appearance by Donald Sean Nation on behalf of All Plaintiffs Attorney Donald Sean Nation added to party Alicia Garcia(pty:pla), Attorney Donald Sean Nation added to party Rocky Mountain Gun Owners(pty:pla) (Nation, Donald) (Entered: 10/18/2023) |
| 10/20/2023 | 20 | Unopposed MOTION for Leave to *Testify Remotely at Hearing on Preliminary Injunction* by Defendant Jared S. Polis. (Sullivan, Grant) (Entered: 10/20/2023) |
| 10/20/2023 | 21 | REPLY to Response to 2 MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Plaintiffs Alicia Garcia, Rocky Mountain Gun Owners. (Nation, Donald) (Entered: 10/20/2023) |
| 10/23/2023 | 22 | ORDER granting 20 The Governor's Unopposed Motion to Permit Remote Witness Testimony at Hearing on Preliminary Injunction. The witnesses will be allowed to testify via remote means. Counsel are directed to contact my Courtroom Deputy via email (Bernique_Abiakam@cod.uscourts.gov) for instructions on how to proceed with the VTC and to test the equipment prior to the hearing. The attached instructions as well as tips should be reviewed prior to the hearing. Ordered by Judge John L. Kane on 10/23/2023. (Attachments: # 1 Tips for Remote Log In)(jlksec) (Entered: 10/23/2023) |
| 10/24/2023 | 23 | NOTICE of Supplemental Authorities re: 2 MOTION for Temporary Restraining Order by Plaintiffs Alicia Garcia, Rocky Mountain Gun Owners (Attachments: # 1 Exhibit 1 Decision in Miller v. Bonta)(Nation, Donald) (Entered: 10/24/2023) |
| 10/24/2023 | 24 | DECLARATION of *Clayton Cramer* by Plaintiffs Alicia Garcia, Rocky Mountain Gun Owners. (Nation, Donald) (Entered: 10/24/2023) |
| 10/24/2023 | 25 | Exhibit List *Unified Exhibit List* by Plaintiffs Alicia Garcia, Rocky Mountain Gun Owners. (Nation, Donald) (Entered: 10/24/2023) |
| 10/24/2023 | 26 | Witness List *for October 26, 2023 Hearing* by Defendant Jared S. Polis. (Kotlarczyk, Michael) (Entered: 10/24/2023) |
| 10/24/2023 | 27 | Witness List *Plaintiffs' Witness List* by Plaintiffs Alicia Garcia, Rocky Mountain Gun Owners. (Nation, Donald) (Entered: 10/24/2023) |

**App. 004**

| 10/26/2023 | 28 | MINUTE ENTRY for Motion Hearing proceedings held before Judge John L. Kane on 10/26/2023. ORDERED: Todays Preliminary Injunction hearing shall continue on Monday, October 30, 2023, at 9:30 a.m. Court Reporter: Kevin Carlin. (babia) (Entered: 10/26/2023) |
|---|---|---|
| 10/30/2023 | 29 | MINUTE ENTRY for Motion Hearing proceedings held before Judge John L. Kane on 10/30/2023 re 2 MOTION for Temporary Restraining Order filed by Rocky Mountain Gun Owners, Alicia Garcia. Taking under advisement 2 Motion for TRO. Court Reporter: Kevin. (babia) (Entered: 10/30/2023) |
| 11/08/2023 | 30 | TRANSCRIPT of Preliminary Injunction Hearing held on 10/26/2023 before Judge Kane. Pages: 1-194. **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (kcarl, ) (Entered: 11/08/2023) |
| 11/08/2023 | 31 | TRANSCRIPT of Preliminary Injunction Hearing held on 10/30/2023 before Judge Kane. Pages: 195-239. **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (kcarl, ) (Entered: 11/08/2023) |
| 11/13/2023 | 32 | ORDER Denying 2 Motion for Preliminary Injunction. Plaintiffs have failed to show the applicable factors weigh in favor of preliminarily enjoining enforcement of the Waiting-Period Act. Their Motion for Preliminary Injunction (ECF No. 2 ) is, therefore, DENIED. ORDERED by Judge John L. Kane on 11/13/2023.(angar, ) (Entered: 11/13/2023) |
| 12/04/2023 | 33 | ANSWER to 1 Complaint, by Jared S. Polis.(Kotlarczyk, Michael) (Entered: 12/04/2023) |
| 12/04/2023 | 34 | NOTICE OF APPEAL as to 32 Order on Motion for TRO, by Plaintiffs Alicia Garcia, Rocky Mountain Gun Owners (Filing fee $ 605, Receipt Number ACODC-9423913) (Arrington, Barry) (Entered: 12/04/2023) |
| 12/05/2023 | 35 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 34 Notice of Appeal filed by Rocky Mountain Gun Owners, Alicia Garcia to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: # 1 Preliminary Record and Docket Sheet)(angar, ) (Entered: 12/05/2023) |
| 12/06/2023 | 36 | USCA Case Number 23-1380 for 34 Notice of Appeal filed by Rocky Mountain Gun Owners, Alicia Garcia. (angar, ) (Entered: 12/07/2023) |
| 12/20/2023 | 37 | LETTER TO USCA and all counsel certifying the record is complete as to 34 Notice of Appeal. A transcript order form was filed stating that the necessary transcript(s) is already on file. (Appeal No. 23-1380) Text Only Entry. (jtorr, ) (Entered: 12/20/2023) |

**App. 005**

| 12/20/2023 | 38 | MINUTE ORDER. An answer having been filed, this matter is ready for a scheduling conference. Counsel shall consult Judge Kane's Pretrial and Trial Procedures Memorandum, available on the court's website, www.cod.uscourts.gov, under "Judicial Officers," "Senior Article III Judges," and call in JOINTLY the week of December 26, 2023, to set a date and time for the conference, 303-844-6118. Ordered by Judge John L. Kane on 12/20/2023. Text Only Entry (jlksec) (Entered: 12/20/2023) |
| 12/22/2023 | 39 | MOTION to Withdraw as Attorney by Defendant Jared S. Polis. (Sullivan, Grant) (Entered: 12/22/2023) |
| 12/26/2023 | 40 | MINUTE ORDER granting 39 Motion to Withdraw as Counsel of Record. Attorney Grant T. Sullivan is withdrawn and his NEFs terminated. By Judge John L. Kane on 12/26/2023. Text Only Entry(norlin, ) (Entered: 12/26/2023) |
| 12/28/2023 | 41 | MINUTE ORDER SETTING SCHEDULING CONFERENCE. This case is set for a Scheduling Conference at 1:30 p.m. on Wednesday, February 21, 2024, before Judge John L. Kane in Courtroom A802 on the 8th Floor of the Alfred A. Arraj U.S. Courthouse, 901 19th Street, Denver, Colorado. The parties shall prepare and file a Stipulated Scheduling and Discovery Order on or before Wednesday, February 14, 2024. See instructions for proper formatting of this order in Judge Kane's Pretrial and Trial Procedures Memorandum, available on the court's website at http://www.cod.uscourts.gov/Home.aspx (Select Judge Kane under "Judicial Officers," "Senior Article III Judges"). A form of order is also available on the website, and the parties' proposed Scheduling Order should follow the example provided, which is different from those used by magistrate and other judges of this court. Judge Kane requests that an editable version of the Stipulated Scheduling Order be emailed to chambers as well, at Kane_Chambers@cod.uscourts.gov. Counsel and pro se litigants shall read and strictly adhere to all instructions in the Judge's Pretrial and Trial Procedures Memorandum. Particular attention is called to Part III, regarding motions for summary judgment. Ordered by Judge John L. Kane on 12/28/2023. Text Only Entry (jlksec) (Entered: 12/28/2023) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/30/2024 09:59:02 | | |
| **PACER Login:** | nicoletaylor2022 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-02563-JLK |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-2563**

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

     Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

     Defendant.

---

## COMPLAINT

---

Plaintiffs Rocky Mountain Gun Owners ("RMGO") and Alicia Garcia ("Garcia") submit the following Complaint.

### I.  INTRODUCTION

This action is a challenge to the constitutionality of C.R.S. § 18–12–115 (the "Waiting Period Act" or the "Act") enacted by the Colorado General Assembly and signed by Governor Polis on April 28, 2023. The Act is effective October 1, 2023. The Act makes it unlawful for any person who sells a firearm to a purchaser to deliver the purchaser's property to her until three days after the seller has initiated a background check, even if a clean background check comes back immediately. As such, it is unconstitutional under the Second Amendment to the United States Constitution as made applicable to the states by the Fourteenth Amendment.

**App. 007**

## II.  PARTIES

1.      Plaintiff RMGO is a nonprofit organization. RMGO seeks to defend the right of all law-abiding individuals to keep and bear arms. RMGO has members who reside in Colorado who desire to exercise their Second Amendment right to purchase a firearm without having their right burdened by arbitrary, unnecessary, burdensome and useless delays. RMGO represents the interests of these members. Specifically, RMGO represents the interests of those members who are affected by the Waiting Period Act's unconstitutional burden on the Second Amendment rights of law-abiding citizens who purchase firearms. It is these members' present intention and desire to lawfully purchase firearms for lawful purposes, including self-defense in their home, and they desire to do so without arbitrary, unnecessary, burdensome and useless delays. These members are precluded from purchasing a firearm without arbitrary, unnecessary, burdensome and useless delays by the Waiting Period Act. The following three persons (whom, for the sake of their privacy, are identified by initials) have or will suffer the harm described above: B.R., J.H., and S.H.

2.      Plaintiff Garica is an adult law-abiding citizen of Colorado. She is affected by the Waiting Period Act's unconstitutional burden on the Second Amendment rights of law-abiding citizens who purchase firearms. On October 1, 2023, Garcia went to Triple J Armory for the purpose of acquiring a new lever action .357/.38 Special Henry rife. She filled out all of the necessary paperwork for her background check. She passed the background check and paid the purchase price for her firearm. At this point, title to the firearm transferred to her. Garcia requested J.D. Murphree (the

**App. 008**

owner of Triple J Armory) to deliver the firearm to her. Mr. Murphree refused to do so. Garcia asked why Triple J Armory was holding onto her property and refusing to deliver it to her. Mr. Murphree responded that he was required to do so because of the Waiting Period Act. Garcia asked if Triple J Armory disputed that title to the firearm had passed to her, and Mr. Murphree assured her that it did not. Garcia Garcia asked Mr. Murphree if there were any reason other than the requirements of the Waiting Period Act why she could not receive her property and take it with her. Mr. Murphree said there was none. The Waiting Period Act's requirements were the only reason he would not deliver the property to her. Garcia is employed in the firearms industry and as such she purchases firearms frequently. Accordingly, even if she receives delivery of her firearm described above while this action is pending, this matter will not be moot. She will purchase another firearm in the near future and when she does so, she will be subjected to the same unconstitutional burden.

3.      Defendant Jared S. Polis is the Governor of the State of Colorado.  This action is brought against him in his official capacity.  The Colorado Constitution states that the "supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed." Colo. Const. Art. IV, § 2. Colorado has long recognized the practice of naming the governor, in his official role as the state's chief executive, as the proper Defendant in cases where a party seeks to enjoin state enforcement of a statute, regulation, ordinance, or policy. *See Developmental Pathways v. Ritter*, 178 P.3d 524, 529 (Colo. 2008). The Governor, in his official capacity, possesses sufficient authority to enforce (and control the enforcement of) the

**App. 009**

complained-of statute. *Cooke v. Hickenlooper*, 2013 WL 6384218, at *8 (D. Colo. Nov. 27, 2013), *aff'd in part sub nom. Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537 (10th Cir. 2016).

4.     Defendant is or will enforce the unconstitutional provisions of the Act against Plaintiffs under color of state law within the meaning of 42 U.S.C. § 1983.

## III.  JURISDICTION AND VENUE

5.     The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331, because the action arises under the Constitution and laws of the United States.  The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, ordinances, regulations, customs and usages of the State, of rights, privileges or immunities secured by the United States.

6.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

7.     Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## IV.  GENERAL ALLEGATIONS

8.     The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed."  U.S. CONST. amend. II; *see also D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*,

561 U.S. 742 (2010); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.

Ct. 2111 (2022).

9.      The right to keep and bear arms recognized in the Second Amendment is

made applicable to the states by the Fourteenth Amendment.  *McDonald*, supra.

10.     HB23-1219 states in relevant part:

> (1)(a) It is unlawful for any person who sells a firearm, including a licensed gun dealer as defined in section 18–12–506(6), to deliver the firearm to the purchaser until the later in time occurs:
>
> (I) Three days after a licensed gun dealer has initiated a background check of the purchaser that is required pursuant to state or federal law; or
>
> (II) The seller has obtained approval for the firearm transfer from the bureau after it has completed any background check required by state or federal law.

11.     In *Bruen*, the Court held: "We reiterate that the standard for applying the

Second Amendment is as follows: When the Second Amendment's plain text covers

an individual's conduct, the Constitution presumptively protects that conduct. The

government must then justify its regulation by demonstrating that it is consistent

with the Nation's historical tradition of firearm regulation." *Id.*, 142 S. Ct. at 2129-

30.

12.     Plaintiffs desire to obtain possession of firearms they have purchased for

lawful purposes (including defense of their homes). The Waiting Period Act prohibits

Plaintiffs from doing so without being subjected to an arbitrary, unnecessary,

burdensome and useless delay. The right to "keep" arms necessarily implies the right

to possess arms one has acquired. After all, "keep" means to possess or "have

weapons." *Heller*, 554 U.S. 570, 582 (2008). And "bear" means to "carry" (*id*. at 584),

**App. 011**

and when a person has been deprived of possession of a firearm they have acquired, they cannot carry it. Therefore, because the Second Amendment's plain text covers Plaintiffs' conduct – i.e., possessing bearable arms – "the Constitution *presumptively* protects that conduct." *Id*., 142 S. Ct. at 2126 (emphasis added). Plaintiffs have met their burden under *Bruen*, and the Waiting Period Act is presumptively unconstitutional.

13.     Since the Second Amendment presumptively protects Plaintiffs' conduct, the State must justify the Act by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. But it is impossible for the State to meet this burden because there is no such historical tradition of firearms regulation in this Nation. See David B. Kopel, Complete Colorado, *Kopel: Colorado bill forcing delay of firearms acquisition on shaky constitutional ground*, available at: https://bit.ly/43bEKvD (March 1, 2023). This article sets forth the written testimony of Law Professor David B. Kopel (whose work was cited favorably in *Bruen*) on the bill that would become the Act, which was submitted to the Colorado House of Representatives State, Civic, Military & Veterans Affairs Committee. Professor Kopel's exhaustive historical research led him to conclude that there is no historical tradition supporting firearm purchase waiting periods. Indeed, the earliest waiting period law was enacted in 1923.

14.     In summary, the plain text of the Second Amendment covers Plaintiffs' conduct. Therefore, the Waiting Period Act is presumptively unconstitutional. The

**App. 012**

State is unable to rebut this presumption because the Act is not consistent with Nation's historical tradition of firearm regulation. Therefore, Act is unconstitutional.

## V. FIRST CLAIM FOR RELIEF
### Right to Keep and Bear Arms
### U.S. Const., amends. II and XIV

15.    Paragraphs 1-14 are realleged and incorporated by reference.

16.    The Waiting Period Act burdens the right of residents of the State, including Plaintiffs, in exercising their right to keep and bear arms protected by the Second Amendment.  There are significant penalties for violations of the law.

17.    These restrictions infringe Plaintiffs' rights guaranteed by the Second Amendment, which is applicable to Colorado by the Fourteenth Amendment.

18.    The Act's prohibitions arbitrarily delay the right of law-abiding citizens to purchase arms even if they immediately pass all required background checks and even if they desire to purchase an arm for the purpose of self-defense in the home, where Second Amendment protections are at their zenith.

19.    The State cannot meet its burden of justifying these restrictions on the Second Amendment right of the People by demonstrating that they are consistent with this Nation's historical tradition of firearm regulation.

## VI.  PRAYER FOR RELIEF

Plaintiffs pray that the Court:

20.    Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Waiting Period Act is unconstitutional on its and face or as applied;

**App. 013**

21.     Enter a TRO and preliminary and permanent injunctive relief enjoining Defendant and his officers, agents, and employees from enforcing the Waiting Period Act;

22.     Award remedies available under 42 U.S.C. § 1983 and all reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988, or any other applicable law;

23.     Grant any such other and further relief as the Court may deem proper.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
(303) 205-7870
Email: barry@arringtonpc.com

**App. 014**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-2563**

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

## MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION

---

Plaintiffs move the Court to enter a Temporary Restraining Order and a Preliminary Injunction. As grounds for this motion, they state:

### I. INTRODUCTION

This action is a challenge to the constitutionality of C.R.S. § 18–12–115 (the "Waiting Period Act" or the "Act") enacted by the Colorado General Assembly and signed by Governor Polis on April 28, 2023. The Act is effective October 1, 2023. The Act makes it unlawful for any person who sells a firearm to a purchaser to deliver the purchaser's property to her until three days after the seller has initiated a background check, even if a clean background check comes back immediately. As such, it is unconstitutional under the Second Amendment to the United States Constitution as made applicable to the states by the Fourteenth Amendment. HB23-

1

1219 is the bill that became the Waiting Period Act. A copy of HB23-1219 is attached as Exhibit A.

## II. FACTS

1.     Plaintiff RMGO is a nonprofit organization. Declaration of Taylor Rhodes, ¶ 3. RMGO seeks to defend the right of all law-abiding individuals to keep and bear arms. *Id*. RMGO has members who reside in Colorado who desire to exercise their Second Amendment right to purchase a firearm without having their right burdened by arbitrary, unnecessary, burdensome and useless delays. *Id*.  RMGO represents the interests of these members. *Id*. Specifically, RMGO represents the interests of those members who are affected by the Waiting Period Act's unconstitutional burden on the Second Amendment rights of law-abiding citizens who purchase firearms. *Id*. It is these members' present intention and desire to lawfully purchase firearms for lawful purposes, including self-defense in their home, and they desire to do so without arbitrary, unnecessary, burdensome and useless delays. Rhodes Dec., ¶ 4. These members are precluded from purchasing a firearm without arbitrary, unnecessary, burdensome and useless delays by the Waiting Period Act. *Id*. The following three persons (whom, for the sake of their privacy, are identified by initials) have or will suffer the harm described above: B.R., J.H., and S.H. *Id*. RMGO asserts representational standing.

2.     Plaintiff Garica is an adult law-abiding citizen of Colorado. Declaration of Alicia Garcia, ¶ 2. She is affected by the Waiting Period Act's unconstitutional burden on the Second Amendment rights of law-abiding citizens who purchase firearms. *Id*.

**App. 016**

On October 1, 2023, Garcia went to Triple J Armory for the purpose of acquiring a new lever action .357/.38 Special Henry rife. Garcia Dec., ¶ 3. She filled out all of the necessary paperwork for her background check. *Id*. She passed the background check and paid the purchase price for her firearm. *Id*. At this point, title to the firearm transferred to her. *Id*. Garcia requested J.D. Murphree (the owner of Triple J Armory) to deliver the firearm to her. *Id*. Mr. Murphree refused to do so. *Id*. Garcia asked why Triple J Armory was holding onto her property and refusing to deliver it to her. *Id*. Mr. Murphree responded that he was required to do so because of the Waiting Period Act. *Id*. Garcia asked if Triple J Armory disputed that title to the firearm had passed to her, and Mr. Murphree assured her that it did not. Garcia Dec., ¶ 4. Garcia asked Mr. Murphree if there were any reason other than the requirements of the Waiting Period Act why she could not receive her property and take it with her. *Id*. Mr. Murphree said there was none. *Id*. The Waiting Period Act's requirements were the only reason he would not deliver the property to her. *Id*. Garcia is employed in the firearms industry and as such she purchases firearms frequently. Garcia Dec., ¶ 5. Accordingly, even if she receives delivery of her firearm described above while this action is pending, this matter will not be moot. *Id*. She will purchase another firearm in the near future and when she does so, she will be subjected to the same unconstitutional burden. *Id*.

3.     Defendant Jared S. Polis is the Governor of the State of Colorado. This action is brought against him in his official capacity. The Colorado Constitution states that the "supreme executive power of the state shall be vested in the governor, who shall

**App. 017**

take care that the laws be faithfully executed." Colo. Const. Art. IV, § 2. Colorado has long recognized the practice of naming the governor, in his official role as the state's chief executive, as the proper Defendant in cases where a party seeks to enjoin state enforcement of a statute, regulation, ordinance, or policy. *See Developmental Pathways v. Ritter*, 178 P.3d 524, 529 (Colo. 2008). The Governor, in his official capacity, possesses sufficient authority to enforce (and control the enforcement of) the complained-of statute. *Cooke v. Hickenlooper*, 2013 WL 6384218, at *8 (D. Colo. Nov. 27, 2013), *aff'd in part sub nom. Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537 (10th Cir. 2016).

4.    Defendant is or will enforce the unconstitutional provisions of the law against Plaintiffs under color of state law within the meaning of 42 U.S.C. § 1983.

### III. STANDARD FOR OBTAINING RELIEF

To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). The requirements for issuance of a TRO are essentially the same as those for a preliminary injunction order. *See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018).

### IV. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

**A.        The Legal Framework of Second Amendment Challenges**

The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed."  U.S. CONST. amend. II; *see also D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  The right to keep and bear arms recognized in the Second Amendment is made applicable to the states by the Fourteenth Amendment. *McDonald, supra*. In *Bruen*, the Court set forth the following standard for resolving Second Amendment challenges: "We reiterate that the standard for applying the Second Amendment is as follows: [1] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. [2] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*, 142 S. Ct. at 2129-30.

**B.        The Plain Text Covers Plaintiffs' Conduct**

Plaintiffs desire to obtain possession of firearms they have purchased for lawful purposes (including defense of their homes). The Waiting Period Act prohibits Plaintiffs from doing so without being subjected to an arbitrary, unnecessary, burdensome and useless delay. The right to "keep" arms necessarily implies the right to possess arms one has acquired. After all, "keep" means to possess or "have weapons." *Heller*, 554 U.S. 570, 582 (2008). And "bear" means to "carry" (*id*. at 584),

**App. 019**

and when a person has been deprived of possession of a firearm they have acquired, they cannot carry it.

The State has previously argued for the proposition that the Second Amendment's plain text does not extend to the acquisition of firearms. This is not correct for two reasons. First, the Waiting Period Act does not prevent anyone from "acquiring" an arm. It prevents them from obtaining possession of their firearm that they have already acquired. For example, as described above, the seller did not dispute that title to Garia's firearm had passed to her. He was just unable to deliver it to her because of the prohibitions of the Act. Secondly, even if the Act prohibited acquisition of an arm (as opposed to possessing an arm that has already been acquired), the text would nevertheless apply. Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). The right to keep and bear arms obviously implies the right to acquire them. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("The core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms."), *quoting Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011).

The State has also argued that Plaintiffs' Second Amendment rights have not been infringed because the law does not apply to *all* arms transfers. The point of the State's argument seems to be that unless it completely obliterates a person's Second Amendment rights, it has not even infringed on those rights. This is not correct. *Bruen* did not require a law to completely obliterate the Second Amendment right to

6

**App. 020**

implicate the text. Instead, the Court asked only whether the Second Amendment's text covered "carrying handguns publicly for self- defense." *Bruen*, 142 S Ct. at 2134. Thus, even though New York did not completely bar the practice but instead subjected it to a discretionary licensing regime, the text was nevertheless implicated. In this case, the Waiting Period Act does not apply to all avenues for the acquisition of firearms, only the most important one – purchase from a commercial gun seller. This burden on Plaintiffs' right to keep and bear arms certainly implicates the text of the Second Amendment. *Cf. Heller*, 554 U.S. at 629 (leaving options open in one area "is no answer" to closing them in another).

In summary, the Second Amendment's plain text covers Plaintiffs' conduct – i.e., possessing bearable arms. Accordingly, "the Constitution presumptively protects that conduct." *Id.*, 142 S. Ct. at 2126 (emphasis added). Plaintiffs have met their burden under *Bruen's* step one. The Waiting Period Act is presumptively unconstitutional.

### C. The Act is Not Consistent with the Nation's History and Tradition of Firearms Regulation

The State may attempt to rebut the presumption of unconstitutionality by demonstrating that the Act is consistent with the Nation's historical tradition of firearm regulation. But it is impossible for the State to meet this burden. *See* David B. Kopel, Complete Colorado, *Kopel: Colorado bill forcing delay of firearms acquisition on shaky constitutional ground* (available at https://bit.ly/43bEKvD, last visited October 1, 2023). Professor Kopel (whose work was cited favorably in *Bruen*) performed exhaustive historical research, which led him to conclude that there is no

App. 021

historical tradition supporting firearm purchase waiting periods. Specifically, Professor Kopel found that there were no waiting periods to acquire firearms or other arms anywhere in the United States before 1900. *Id.,* § B. The first waiting period law was enacted in California in 1923, a one-day wait for handgun sales. *Id., citing* §§ 10–11, 1923 Cal. Stat. at 701. A minority of other states enacted handgun waiting period laws in the 1920s and 1930s. *Id.* Under *Bruen,* laws from the 1920s are far too late to offer any insight on the original public meaning of the Second Amendment. *Bruen,* 142 S. Ct. 2154, n. 28 ("As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.").

"In some cases, [the historical] inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen,* 142 S. Ct. at 2131. In *Heller,* D.C.'s flat ban on the possession of handguns was a regulation the Founders themselves could have adopted to confront the social problem D.C. identified, i.e. handgun violence in urban areas. *Bruen,* 142 S. Ct. at 2131. And since none of the Founding era regulations identified by D.C. was analogous to its ban, the ban was unconstitutional.

The State has identified impulsive gun violence as the problem it seeks to address. *See* Sec. 1(2)(a) of HB23-1219. But the problem of impulsive gun violence dates from the invention of guns, and the Founders themselves could have adopted

**App. 022**

regulations to confront this problem. Thus, the Waiting Period Act addresses a general societal problem that has persisted since long before the 18th century. The fact that there is a complete absence of similar Founding-era regulations addressing a problem that was familiar to the Founders means the Waiting Period Act is "inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

The State has nevertheless argued that even though there were no waiting period laws in the Founding era, the Act is analogous to historical regulations relating to intoxicated persons. *Bruen* points to two metrics that are important in determining whether a historical regulation is analogous to a challenged regulation. Those are the "how and why of the regulations." *Id.*, 142 S. Ct. at 2133. The State's reliance on regulations of intoxicated person manifestly fails the "why" metric. Regulations of intoxicated persons are justified because those persons are obviously a danger to themselves and to others. That is the "why" justifying the regulations. But the Waiting Period Act temporarily deprives everyone of their arms without any inquiry, much resolution, of the question of whether a particular person poses a threat to anyone. Indeed, every person to whom the Act applies has *passed* a background check and is therefore presumably not a threat to anyone. That is, after all, the purpose of background checks. Thus, regulations of intoxicated persons are of no relevance in this case.

In *United States v. Connelly*, 2023 WL 2806324 (W.D. Tex. 2023), the plaintiffs challenged a statute that prohibited users of intoxicants from possessing firearms (even when they were not actually intoxicated). The court held the law

**App. 023**

violated the plaintiffs' Second Amendment rights. In doing so, the court rejected many of the proposed analogues advanced the State. The court held the laws were not analogous because the historical laws prevented individuals from using firearms while actively intoxicated, while the challenged statute prevented users of intoxicants from possessing firearms altogether. *Id.*, *7. The court held that prohibiting someone who has used drugs in the last year from keeping arms for self-defense is not analogous to preventing people from shooting their guns while intoxicated. *Id. A fortiori*, a law that prevents law-abiding citizens who are not even suspected of having done nothing wrong from possessing the arms they have acquired is not analogous to a law that bans people from shooting guns while intoxicated.

The State has argued that the intoxicated person laws are analogous to the Waiting Period Act because the statute prevents impulsive firearms violence by "someone not thinking clearly." If the Act were limited to firearm purchasers for whom there was some reason to believe they might not be thinking clearly, the State might have a point. But it is not. Instead, with respect to the overwhelming number of law-abiding citizens affected by the Act, there will be no reason to think they are impaired at all. Thus, a law specifically targeted at an obviously dangerous situation is not analogous to a law that sweeps up everyone, including a teetotaler who has never had a drink in her life. The laws identified by the State banned selling arms to obviously intoxicated persons. If the Waiting Period Act imposed a waiting period on sales to obviously intoxicated persons, it would be analogous to

those historical laws. It does not, and for that reason it is not analogous to the historical laws identified by the state.

## D.   Interest Balancing is Not Appropriate in the Second Amendment Context

The State has previously pointed to the fact that, in the Colorado legislature's opinion, waiting periods for firearm purchases promote the important governmental interest of public safety. In other words, the Colorado legislature believes the means it has chosen (an arbitrary waiting period for the acquisition of firearms by law-abiding citizens) promotes an important end (public safety). This means-end argument is irrelevant to the resolution of Plaintiffs' Second Amendment challenge. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129 (2022) (repeatedly and emphatically rejecting means-end analysis in the Second Amendment context).

## E.   The Act Is Not a Regulation of Commercial Sales

The State has argued that the Waiting Period Act is a "presumptively lawful" regulation of commercial sales under *Heller*. This is not correct. First, as this Court has recently held, the State has misunderstood *Heller*. "[T]he Court disagrees with the Governor's reading of *Heller* as exempting certain types of regulations at the first step of the *Bruen* test. *Bruen* does not suggest that a different test applies to certain categories of laws or regulations." *Rocky Mountain Gun Owners v. Polis*, 2023 WL 5017253, at *13 (D. Colo. Aug. 7, 2023). "Rather, *Bruen* is clear that the government must justify the constitutionality of *any law* regulating conduct covered by the plain text of the Second Amendment." *Id*. (emphasis added). Second, as in

11

**App. 025**

*RMGO*, the State will not be able to show that the Act falls into the category of commercial regulations described by *Heller* in the first place. "Regulations of the commercial sale of arms have been described as 'condition[s] or qualification[s]' that 'affect[ ] only those who regularly sell firearms.' RMGO, at *14, (*quoting United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016)). The Waiting Period Act does not impose obligations on sellers as a regulation of commercial activity. Rather, the General Assembly specifically stated that the Act is directed at purchasers, and Act imposes duties on sellers not as a means of regulating their commercial activity but as a means of regulating *purchasers*. In the legislative findings section of HB23-1219, the General Assembly declared that the purpose of the Act was to "[delay] immediate access to firearms by establishing a waiting period for receipt of firearms [which] can help prevent impulsive acts of firearm violence, including homicides and suicides."[1] The legislature was not concerned about firearms violence by firearm sellers.[2] The purpose of the Act is to deprive a purchaser of possession of her property during the three-day waiting period.

### F.   *Silvester* Has Been Abrogated by *Bruen*

The State has cited *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016), for the proposition that waiting periods are constitutional under the Second Amendment, even though it admitted that *Silvester's* central holding was implicitly abrogated by *Bruen*. *Silvester* assumed that the waiting period implicated the text of the Second Amendment. *Id*., 826 F.3d at 826-27. But it nevertheless upheld the law under

---

[1] See the HB-1219, 2. A copy is attached as Exhibit A.
[2] After all, it required sellers to maintain possession of the arms during the waiting period.

intermediate scrutiny because it believed the California legislature's policy objectives were reasonable. *Id*. at 829. The Court never attempted to ground its decision in the Nation's historical tradition of firearms regulation. This is exactly the sort of analysis that *Bruen* repeatedly and emphatically rejected.

### G. The Act Applies *only* to Law-Abiding Citizens

The Second Amendment "elevates above all other interests" the right of law-abiding citizens to use arms for self-defense. *Bruen*, 142 S. Ct. at 2131. Because of this, the Act is particularly suspect because, by definition, it burdens the rights of *only* law-abiding citizens. The law states that a firearms seller may not deliver an arm to a buyer until three days after the buyer has passed a background check. C.R.S. § 18-12-115(1)(a). In other words, the waiting period applies only after the buyer has already proved they are a law-abiding citizen. Thus, the Act imposes a particular burden on Second Amendment rights.

### H. Practical Impediments to Firearm Delivery Are Not the Same as Legal Impediments

The State has previously cited *Silvester's* observation that in colonial days practical transportation issues sometimes imposed delays on the delivery of firearms. The point of this observation is unclear. As *Silvester* itself noted, these delays were not caused by government regulations. 843 F.3d at 827. Thus, such practical delays were not analogous to HB23-1219.

### I. Conclusion

In summary, Plaintiffs have met their burden under *Bruen's* "plain text" step. The plain text of the Second Amendment covers their conduct (i.e., acquiring arms

for lawful purposes). The Waiting Period Act burdens Plaintiff's rights under the plain text and is therefore presumptively unconstitutional. The State cannot carry its burden under *Bruen's* "history and tradition" step, because there is no 18th-century (or even 19th-century) history or tradition of forcing people who are not even suspected of any wrongdoing to wait to exercise their right to possess arms they have acquired. Accordingly, the State will not be able to rebut the presumption of unconstitutionality, and Plaintiffs will prevail on the merits.

## V. THE REMAINING FACTORS FAVOR ENTRY OF INJUNCTIVE RELIEF

### A.    Plaintiffs Have Suffered Irreparable Harm

Plaintiffs have established that they will prevail on the merits of their constitutional claim. Violation of constitutional rights per se constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (loss of constitutional freedom "for even minimal periods of time" unquestionably constitutes irreparable injury). Recently, the Ninth Circuit applied the *Elrod* principle in the Second Amendment context. *Baird v. Bonta,* 2023 WL 5763345, at *3 (9th Cir. Sept. 7, 2023). In *Baird*, the court held that in cases involving a Second Amendment claim, a likelihood of success on the merits usually establishes irreparable harm. *Id.*, at *9. Moreover, such a likelihood, "strongly tips the balance of equities and public interest in favor of granting" an injunction. *Id. See also Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (also applying principle in Second Amendment context); and *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805 (10th Cir. 2019) ("Most courts consider the infringement of a constitutional right enough and require no

further showing of irreparable injury."); *Aposhian v. Barr*, 958 F.3d 969, 990 (10th Cir. 2020) (collecting cases).

**B.    The Balance of Harms and Public Interest Factors Support Entry of Injunctive Relief**

Finally, the balance of harms and public interest factors[3] favor injunctive relief. A plaintiff's likelihood of success on the merits of a Second Amendment claim tips the merged third and fourth factors decisively in his favor, because "public interest concerns are implicated when a constitutional right has been violated, [and] all citizens have a stake in upholding the Constitution." *Baird v. Bonta*, 2023 WL 5763345, at *4 (9th Cir. Sept. 7, 2023) (internal citation and quotation marks omitted; cleaned up). In *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010), the Tenth Circuit held that when applying these factors courts must be mindful that even if a state is pursuing a legitimate goal (in that case deterring illegal immigration), it has no interest in doing so by unconstitutional means, because a state "does not have an interest in enforcing a law that is likely constitutionally infirm." *Id*. "Moreover, the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law." *Id*. (internal quotation marks and citation omitted). *See also Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001) (public interest favors preliminarily enjoining state statutes likely to be held unconstitutional).

---

[3] These factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**App. 029**

Defendants may argue the Waiting Period Act furthers an important governmental interest. But even if the Act did further an important policy goal, that fact would be irrelevant under *Bruen*. Indeed, the government's argument is in effect a backdoor means-end test of the type rejected by *Bruen*. 142 S. Ct. at 2129 (rejecting means-end scrutiny in Second Amendment cases). "[T]he government may not simply posit that the regulation promotes an important interest [such as public safety]. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*, 142 S. Ct. 2126. *Bruen's* rejection of means-end scrutiny would be nullified if courts were to eschew such scrutiny while examining the merits of a Second Amendment claim, only to bring such scrutiny right back in when determining whether to grant a remedy for a constitutional violation. Moreover, "[w]hile the public has an interest in enforcing laws that promote safety or welfare, the public has no cognizable interest in enforcing laws that are unconstitutional. Indeed, the public interest is best served by preventing an unconstitutional enforcement." *Midwest Title Loans, Inc. v. Ripley*, 616 F. Supp. 2d 897, 908 (S.D. Ind. 2009), *aff'd sub nom. Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010) (cleaned up) (*citing Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)).

## IV.    A Bond is not Necessary

Courts in the Tenth Circuit have wide discretion under Rule 65(c) in determining whether to require security and may, therefore, impose no bond requirement. *New Mexico Cattle Growers' Ass'n v. United States Forest Serv.*, 2023

16

**App. 030**

WL 2185698, at *3 (D.N.M. Feb. 22, 2023) (internal citations and quotation marks omitted). A bond is unnecessary in a case that seeks to enforce a constitutional right against the government. *Rocky Mountain Gun Owners v. Polis*, 2023 WL 5017253, at *20 (D. Colo. Aug. 7, 2023). Therefore, Plaintiffs respectfully request that no bond requirement be imposed.

## VI. CONCLUSION

For the foregoing reasons, plaintiffs respectfully request the Court to enter a temporary restraining order and an order preliminary enjoining enforcement of the Waiting Period Act.

*/s/ Barry K. Arrington*

_____

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice:  (303) 205-7870
Email:  barry@arringtonpc.com

## CERTIFICATE OF NOTICE TO
## THE OFFICE OF THE ATTORNEY GENERAL

On October 1, 2023, undersigned counsel emailed a copy of the Complaint and this motion to the following members of the Attorney General's Second Amendment team:

Leeann Morrill, First Assistant Attorney General
Grant T. Sullivan, Assistant Solicitor General
Emily B. Buckley, Senior Assistant Attorney General
Michael Kotlarczyk, Senior Assistant Attorney General
Peter G. Baumann, Senior Assistant Attorney General
Matthew J. Worthington, Assistant Attorney General
Daniel R. Magalotti, Assistant Attorney General Fellow

at the following email addresses:

**App. 031**

leeann.morrill@coag.gov
grant.sullivan@coag.gov;
emily.buckley@coag.gov
mike.kotlarczyk@coag.gov;
peter.baumann@coag.gov
matt.worthington@coag.gov
daniel.magalotti@coag.gov

/s/ Barry K. Arrington
_____

Barry K. Arrington

**App. 032**

**EXHIBIT A**

**AN ACT CONCERNING ESTABLISHING A MINIMUM THREE–DAY WAITING PERIOD PRIOR TO THE DELIVERY OF A PURCHASED FIREARM.**

Be it Enacted by the General Assembly of the State of Colorado:

SECTION 1. Legislative declaration. (1) The general assembly finds and declares that:

(a) In 2020, according to the Centers for Disease Control and Prevention, firearm-related injury was among the five leading causes of death for people ages 1 to 44 in the United States;

(b) From 2014 to 2019, the number of firearm-related deaths in Colorado was greater than the number of deaths due to motor vehicle crashes, opioid overdoses, HIV, and colon cancer. Among firearm-related deaths, more than 75 percent were caused by intentional self-harm or suicide and more than 20 percent were as a result of assaults or homicides.

(c) In 2021, Colorado had its highest number of homicides by discharge of a firearm since 2000. There were 274 homicides by firearm in Colorado in 2021, and the age group with the highest rate of firearm homicide victims was people ages 15 to 24, with 74 deaths.

(d) In 2020, Colorado had the seventh highest suicide rate in the United States; in 2021, there were 740 suicides by firearm in Colorado, which was more than half of all suicides in the state;

(e) Nationwide, from 2000 to 2018, rural suicide rates were higher than urban suicide rates, and although suicide rates increased in both rural and urban areas during that period, since 2007, rural suicide rates increased at a greater rate than in urban areas;

(f) One study estimates that mandatory waiting periods to receive firearms led to a 7 to 11 percent reduction in suicides by firearm; the study also suggests that delaying the purchase of firearms by a few days reduces firearm homicides by approximately 17 percent; and

(g) The Colorado bureau of investigation employs and trains personnel to process background checks, in accordance with section 24–33.5–424(7)(b)(IV)(C), Colorado Revised Statutes.

**App. 033**

(2) Therefore, the general assembly declares that:

(a) Delaying immediate access to firearms by establishing a waiting period for receipt of firearms can help prevent impulsive acts of firearm violence, including homicides and suicides; and

(b) The establishment of a waiting period is a matter of mixed state and local concern because the state has an interest in preventing suicides and homicides, and local governments are equipped to determine the length of waiting periods best suited for their jurisdictions.

SECTION 2. In Colorado Revised Statutes, add 18–12–115 as follows:

18–12–115. Waiting period for firearms sales—background check required—penalty—exceptions. (1)(a) It is unlawful for any person who sells a firearm, including a licensed gun dealer as defined in section 18–12–506(6), to deliver the firearm to the purchaser until the later in time occurs:

(I) Three days after a licensed gun dealer has initiated a background check of the purchaser that is required pursuant to state or federal law; or

(II) The seller has obtained approval for the firearm transfer from the bureau after it has completed any background check required by state or federal law.

(b) A person who violates this subsection (1) commits a civil infraction and, upon conviction thereof, shall be punished by a fine of five hundred dollars; except that for a second or subsequent offense, the fine shall be not less than five hundred dollars and not more than five thousand dollars.

(2) This section does not apply to:

(a) The sale of an antique firearm, as defined in 18 U.S.C. sec. 921(a)(16), as amended, or a curio or relic, as defined in 27 CFR 478.11, as amended;

(b) The sale of a firearm by a person serving in the armed forces of the United States who will be deployed outside of the United States within the next thirty days to any family member, including:

(I) Regardless of age, a biological, adopted, or foster child; a stepchild or legal ward; a child of a domestic partner; a child to whom the seller stands in loco parentis; or a person to whom the seller stood in loco parentis when the person was a minor;

2

**App. 034**

(II) A biological, adoptive, or foster parent; a stepparent or legal guardian of the seller or seller's spouse or domestic partner; or a person who stood in loco parentis when the seller or seller's spouse or domestic partner was a minor child;

(III) A person to whom the seller is legally married under the laws of any state or a domestic partner of a seller;

(IV) A grandparent, grandchild, or sibling, whether a biological, foster, adoptive or step relationship, of the seller or seller's spouse or domestic partner; or

(V) As shown by the seller, any other individual with whom the seller has a significant personal bond that is or is like a family relationship, regardless of biological or legal relationship; or

(c) A firearm transfer for which a background check is not required pursuant to state or federal law.

(3) Pursuant to the authority granted in section 29–11.7–103, a local government may enact an ordinance, regulation, or other law concerning a waiting period.

SECTION 3. Act subject to petition—effective date—applicability. (1) This act takes effect October 1, 2023; except that, if a referendum petition is filed pursuant to section 1(3) of article V of the state constitution against this act or an item, section, or part of this act within the ninety-day period after final adjournment of the general assembly, then the act, item, section, or part will not take effect unless approved by the people at the general election to be held in November 2024 and, in such case, will take effect on the date of the official declaration of the vote thereon by the governor.

(2) This act applies to offenses committed on or after the applicable effective date of this act.

Approved April 28, 2023.

**App. 035**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

## DECLARATION OF ALICIA GARCIA

---

1.     My name is Alicia Garcia. I am over the age of 21 and have personal knowledge of the matters set forth in this Declaration.

2.     I am a law-abiding citizen of Colorado. I am affected by the C.R.S. § 18–12–115 (the "Waiting Period Act" or the "Act"). In particular, I am affected by the Act's unconstitutional burden on the Second Amendment rights of law-abiding citizens who purchase firearms.

3.     On October 1, 2023, I went to Triple J Armory for the purpose of acquiring a new lever action .357/.38 Special Henry rifle. I filled out all of the necessary paperwork for my background check. I passed the background check and paid the purchase price for my firearm. At this point, title the firearm transferred to me. I requested J.D. Murphree (the owner of Triple J Armory) to deliver the firearm to me. Mr. Murphree refused to do so. I asked why Triple J Armory was holding onto

1

**App. 036**

my property and refusing to deliver it to me. Mr. Murphree responded that he was required to do so because of the Waiting Period Act.

4.     I asked if Triple J Armory disputed that title to the firearm had passed to me, and Mr. Murphree assured me that it did not. I asked Mr. Murphree if there were any reason other than the requirements of the Waiting Period Act why I could not receive my property and take it with me. Mr. Murphree said there was none. The Waiting Period Act's requirements were the only reason he would not deliver the property to her.

5.     I am employed in the firearms industry and as such I purchase firearm frequently. Accordingly, even if I receive delivery of my firearm described above while this action is pending, this matter will not be moot. I will purchase another firearm in the near future and when I do, I will be subjected to the same unconstitutional burden described above.

I, Alicia Garcia, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that I have reviewed the foregoing, that I am competent to testify in this matter, and that the facts contained therein are true and correct.

Alicia Garcia
Date: October 1, 2023

2

**App. 037**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No.**

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

## DECLARATION OF TAYLOR RHODES

---

    1.    My name is Taylor Rhodes.  I am over the age of 21 and have personal knowledge of the matters set forth in this Declaration.

    2.    I am the Executive Director of Plaintiff Rocky Mountain Gun Owners ("RMGO").

    3.    RMGO is a nonprofit organization. RMGO seeks to defend the right of all law-abiding individuals to keep and bear arms. RMGO has members who reside in Colorado who desire to exercise their Second Amendment right to purchase a firearm without having their right burdened by arbitrary, unnecessary, burdensome and useless delays. RMGO represents the interests of these members.  Specifically, RMGO represents the interests of those members who are affected by C.R.S. § 18–12–115 (the "Waiting Period Act"), in particular, the Waiting Period Act's

1

unconstitutional burden on the Second Amendment rights of law-abiding citizen who purchase firearms.

4.    It is these members' present intention and desire to lawfully purchase firearms for lawful purposes, including self-defense in their home, and they desire to do so without arbitrary, unnecessary, burdensome and useless delays. These members are precluded from purchasing a firearm without arbitrary, unnecessary, burdensome and useless delays by HB23-1219. The following three persons (whom, for the sake of their privacy, are identified by initials) have or will suffer the harm described above: B.R., J.H., and S.H.

I, Taylor Rhodes, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that I have reviewed the foregoing, that I am competent to testify in this matter, and that the facts contained therein are true and correct.

_____
Taylor Rhodes
Date:  October 1, 2023

**App. 039**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No.**

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

_____

**TEMPORARY RESTRAINING ORDER**

_____

     1.     The Court GRANTS the motion for a temporary restraining order filed by Plaintiffs against Defendant.

     2.     The Court **ENTERS** this Temporary Restraining Order on October ___, 2023 at _____ __.M.  Fed. R. Civ. P. 65(b)(2).

     3.     The Court **ENJOINS** Defendants from enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with the C.R.S. § 18–12–115 (the "Waiting Period Act")

     4.     Plaintiffs have shown they will likely succeed on the merits of their claims. Unless the Court enters this Temporary Restraining Order, Plaintiffs will suffer irreparable harm. The balance of interests and the public interest favor entering this order.

**App. 040**

5.      Plaintiffs will not be required to post a security bond because enjoining the Defendant from prohibiting Plaintiffs' exercise of their Second Amendment rights does not interfere with the Defendant's rights.

Fed. R. Civ.P. 65(c).

October  __, 2023 at _____ __.M..

                                          BY THE COURT


                                          _____
                                          United States District Court Judge

**App. 041**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-2563**

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

## NOTICE OF RELATED CASE

---

      Plaintiffs notify the Court of the following related cases:

      1. *Rocky Mountain Gun Owners, et al. c. Polis*, Civil Action No. 23-cv-1076-PAB-NRN. This case was between the same parties and concerned the same matter. The case was dismissed without prejudice on August 11, 2023.

      2. *Rocky Mountain Gun Owners, et al. c. Polis*, Civil Action No. 23-cv-1077-PAB-NRN. This case was filed on the same day as the above case and involved similar claims against the same defendant.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
(303) 205-7870
Email:  barry@arringtonpc.com

1

**App. 042**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-02563-JLK

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

**ORDER RE: MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND FOR PRELIMINARY INJUNCTION (ECF NO. 2)**

---

Kane, J.

      This matter is before me on the Motion for Temporary Restraining Order and for Preliminary Injunction (ECF No. 2) filed by Plaintiffs Rocky Mountain Gun Owners and Alicia Garcia. Federal Rule of Civil Procedure 65 sets out the requirements for issuing a temporary restraining order ex parte. The Rule states:

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
>
> > (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>
> > (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1). Here, the declaration from Ms. Garcia that is attached to the Motion does not show she will experience irreparable injury if Defendant Jared S. Polis is given the opportunity to be heard in opposition. In accordance with the challenged statute, Colorado

1

**App. 043**

Revised Statutes § 18-12-115, Ms. Garcia is presently able to receive delivery of the firearm she previously purchased. The timing of any potential future harm is uncertain, as she avers only that she will purchase another firearm in the "near future." Garcia Decl. ¶ 5, ECF No. 2-2.[1]

Because Plaintiffs have not demonstrated an ex parte temporary restraining order is warranted, Governor Polis should receive notice of Plaintiffs' Motion and be provided an opportunity to respond. "When the opposing party actually receives notice of the application for a restraining order, the procedure that is followed does not differ functionally from that on an application for a preliminary injunction . . . ." 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2951 (3d ed. 2023). Thus, Plaintiffs' request for a temporary restraining order is DENIED, and we will proceed on Plaintiffs' Motion for a preliminary injunction alone.

Governor Polis is DIRECTED to file a Response to Plaintiffs' Motion for Preliminary Injunction on or before October 17, 2023. Any Reply in Support of the Motion is due on or before October 20, 2023. A preliminary injunction hearing is set for two days beginning at 9:30 a.m. on October 24, 2023.

DATED this 4th of October, 2023.

_John L. Kane_
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE

---

[1] Plaintiffs' attorney has certified that he emailed attorneys at the Colorado Attorney General's Office a copy of the Complaint in this case and Plaintiffs' Motion, and two of those attorneys entered their appearances in the case 48 hours ago. Still, Plaintiffs have not shown a basis for issuing a temporary restraining order before the Governor has an opportunity to be heard in opposition.

App. 044

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-2563-JLK**

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

     Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

     Defendant.

---

**JOINT MOTION TO RESCHEDULE
PRELIMINARY INJUNCTION HEARING**

---

     Plaintiffs and Defendant, by their respective counsel, jointly move the Court to reschedule the two-day preliminary injunction hearing currently set to begin on October 24, 2023. As grounds for this motion the state:

     1.     On October 4, 2023, the Court entered an order setting this matter for a two-day hearing on Plaintiffs' Motion for Preliminary injunction to begin on **October 24, 2023 at 9:30 a.m.**

     2.     Both counsel for Plaintiffs and counsel for Defendants have scheduling conflicts on those two days. In addition, counsel have conferred and determined that one day is more than sufficient for a preliminary injunction hearing in this matter.

     3.     Accordingly, Plaintiffs and Defendants respectfully request the Court to reschedule the preliminary injunction hearing to *either* October 26 or October 27.

**App. 045**

Dated October 5, 2023

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
(303) 205-7870
Email:  barry@arringtonpc.com


William Edward Trachman
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
303-292-2021
Fax: 303-292-1980
wtrachman@mslegal.org

*Attorneys for Plaintiffs*

PHILIP J. WEISER
Attorney General

*/s/ Michael T. Kotlarczyk*
_____
Grant Sullivan, Assistant Solicitor General
Michael T. Kotlarczyk, Senior Assistant Attorney General
Matthew J. Worthington, Assistant Attorney General
1300 Broadway, Denver, CO 80203
Telephone: (720) 508-6152
Email: grant.sullivan@coag.gov; mike.kotlarczyk@coag.gov;
matt.worthington@coag.gov

*Attorneys for Defendant Jared Polis, in his official capacity as Governor of the State of Colorado*

**App. 046**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-02563-JLK

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

## NOTICE OF RELATED CASE

---

      This Court entered a minute order on October 3, 2023 [Doc. 9] that identified three other Second Amendment cases in this district and concluded that the cases are not sufficiently related to warrant special assignment or transfer under D.C.COLO.LCivR 3.2. To fully comply with the local rule, Defendant identifies a fourth case not mentioned in the Court's minute order, *Colorado State Shooting Ass'n v. Polis*, No. 23-cv-1998-KAS (D. Colo.), which was filed on August 7, 2023. In that case, Defendant previously filed a notice of related case identifying *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01076-PAB-NRN.

      Like this case, *Colorado State Shooting Ass'n* is in its early stages and Defendant has not yet filed a responsive pleading. Based on the Court's analysis in its minute order, Defendant does not believe that *Colorado State Shooting Ass'n* is a related case that requires special assignment or transfer. Defendant simply alerts the Court to its pendency in an abundance of caution.

**App. 047**

Respectfully submitted this 5th day of October, 2023.

PHILIP J. WEISER
Attorney General

*/s/ Grant T. Sullivan*

GRANT T. SULLIVAN
Assistant Solicitor General
MICHAEL KOTLARCZYK
Senior Assistant Attorney General
Public Officials Unit | State Services Section
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO 80203
Telephone:  720.508.6349
grant.sullivan@coag.gov

*Attorney for Defendant Jared Polis, in his official capacity as Governor of the State of Colorado*
*Counsel of Record

**App. 048**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 5, 2023, I served a true and complete copy of the foregoing **NOTICE OF RELATED CASE,** upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Blvd
Wheat Ridge, CO 80033
barry@arringtonpc.com

*/s/ Leslie Bostwick*

**App. 049**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-02563-JLK

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

**THE GOVERNOR'S OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION [DOC. 2]**

---

      More Coloradans die from firearms than from car crashes or opioid overdoses. Some of those deaths, both by homicide and suicide, are caused by individuals going out and purchasing a gun to immediately use in a moment of passion. To reduce these avoidable deaths, Colorado enacted a three-day waiting period between purchasing and delivery of a commercially sold firearm. A study has found that such waiting periods can reduce firearm homicides and suicides between 7 and 17 percent. In Colorado, this translates to saving over a hundred lives every year.

      Plaintiffs seek to preliminarily enjoin this law. But they cannot meet their burden to justify this extraordinary remedy. The plain text of the Second Amendment covers the possession ("keep") and carrying ("bear") of arms. A waiting period affects neither right. Plaintiffs seek to read an implied right-to-acquire firearms on demand into the Second Amendment, but the Supreme Court has expressly limited the Amendment's scope to its plain text and that text has never been understood to include an immediate right to acquire. The Court has also clarified that

**App. 050**

the Second Amendment does not preclude governments from enacting laws in areas they have historically regulated, including commercial sales. And even if Colorado's waiting period law impacted Second Amendment interests, laws aimed at preventing impulsive use of firearms to protect public safety are nothing new in our nation's history and so are consistent with the Amendment. Plaintiffs' motion for preliminary injunction should be denied.

## BACKGROUND

### A.    HB 23-1219.

On April 28, 2023, the Governor signed House Bill 23-1219 into law. *See* Ex. 1. The Act makes it unlawful for any person who sells a firearm to deliver it for three days or until the required background checks are complete, whichever is later. *See id.* § 2 (codified at Colo. Rev. Stat. § 18-12-115).[1] A seller who violates the waiting period commits a civil infraction that carries a fine but no imprisonment. *See id.* The Act does not regulate purchasers. There are exceptions to the waiting period, including for firearm transfers that do not require a background check. *See id.* This includes, among other things, gifts between immediate family members and certain temporary transfers of firearms. *See* Colo. Rev. Stat. § 18-12-112(6). The Act took effect on October 1, 2023. Ex. 1, § 3.

In enacting the law, the Colorado General Assembly found that "[d]elaying immediate access to firearms by establishing a waiting period for receipt of firearms can help prevent impulsive acts of firearm violence, including homicides and suicides." *Id.* § 1(2)(a). The General

---

[1] Plaintiffs erroneously state that under the Act, "a firearms seller may not deliver an arm to a buyer until three days after the buyer has *passed* a background check." Doc. 2 at 13 (emphasis added). The three-day period is triggered when the seller initiates the background check. § 18-12-115(1)(a)(I).

Assembly recognized that Colorado has recently seen peaks in its firearm-related homicides and that Colorado ranks seventh nationally in terms of suicide by firearm. *Id.* § 1(1)(c), (d). The Act cites a study finding that mandatory waiting periods have led to a 7 – 11% reduction in firearm-related suicides and a 17% reduction in firearm homicides. *Id.* § 1(1)(f); *see also* Ex. 2 (Michael Luca et al., *Handgun Waiting Periods Reduce Gun Deaths*, 46 Proc. of the Nat'l Acad. of Sci. 114 (2017)).

By passing HB 23-1219, Colorado joined 11 other states that require waiting periods for commercial firearms sales. Colorado's three-day waiting period is the shortest of any state that has a waiting period. Florida, Illinois, and Vermont also have three-day waiting periods. *See* Fla. Stat. § 790.0655(1)(a); 720 Ill. Comp. Stat. 5/24-3(A)(g); Vt. Stat. Ann. tit. 13, § 4019a. Several states have longer waiting periods. *See* Minn. Stat. § 624.7132 (eff. 8/1/23) (30 days for handguns, assault weapons); Haw. Rev. Stat. § 134-2(a), (e) (14 days for all firearms); Wash. Rev. Code § 9.41.092(2) (10 business days for semiautomatic rifles; Cal. Penal Code § 26815(a) (10 days for all firearms); D.C. Code § 22-4508 (10 days for all firearms); R.I. Gen. Laws § 11-47-35(a)(1), -35.2(a) (7 days for all firearms); Md. Code Ann., Pub. Safety, § 5-123(a) (7 days for regulated firearms); N.J. Stat. Ann. § 2c:58-2(a)(5)(a) (7 days for handguns).

### B.    Procedural background.

Plaintiffs Alicia Garcia and Rocky Mountain Gun Owners filed a separate, prior lawsuit on the day the Act was signed. *See Rocky Mountain Gun Owners v. Polis*, No. 23-cv-1076-PAB-NRN. They moved for a preliminary injunction on June 7, 2023. Chief Judge Brimmer denied their motion for preliminary injunction on August 7. *See id.*, 2023 WL 5017257 (D. Colo. Aug. 7, 2023). The Court concluded that neither plaintiff had shown they possessed "standing to move

App. 052

to enjoin HB 23-1219 before it is enforced" because they had neither a present injury nor a credible threat of future enforcement since the law only proscribes the conduct of sellers, not purchasers. *Id.* at *5. Plaintiffs voluntarily dismissed their complaint a few days later.

On October 1, the day the law went into effect, Plaintiffs refiled their suit and simultaneously moved for a temporary restraining order and preliminary injunction. *See* Doc. Nos. 1 & 2. The Court denied their request for an ex parte temporary restraining order and set the matter for a preliminary injunction hearing. Doc. No. 11.[2]

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" granted only where a plaintiff establishes a "clear and unequivocal" right to relief. *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). To meet its burden, a plaintiff must establish (1) a substantial likelihood of success on the merits, (2) irreparable injury if the preliminary injunction is denied, (3) that the threatened injury outweighs the injury caused by the injunction, and (4) that an injunction is not adverse to the public interest. *Free the Nipple-Ft. Collins v. City of Ft. Collins*, 916 F.3d 792, 797 (10th Cir. 2019). The last two factors merge when the defendant is the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

---

[2] The Governor, sued here in his official capacity, enjoys 11th Amendment immunity from any claims for prospective relief because he does not "have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (quotations omitted); *see also Ex parte Young*, 209 U.S. 123, 157 (1908). However, for the purpose of defending the Act from Plaintiffs' claims for declaratory and injunctive relief, the Governor agrees to waive his sovereign immunity and consents to be sued in this Court, only in this case, only in his official capacity, and only for prospective relief. *See MCI Telecomms. Corp. v. Pub. Serv. Comm'n of Utah*, 216 F.3d 929, 935 (10th Cir. 2000) ("[A] state may waive its sovereign immunity by consenting to suit in federal court.").

**App. 053**

"Typically, a preliminary injunction serves the limited purpose of preserving the status quo ante in order to prevent irreparable harm until a court can make a final decision on the merits." *Lopez v. Griswold*, No. 22-cv-00247-JLK, 2022 WL 715122, at *3 (D. Colo. Mar. 10, 2022) (footnote omitted). To that end, "injunctions that disrupt the status quo are disfavored and must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Beltronics USA*, 562 F.3d at 1070-71 (quotations omitted). Here, because Plaintiffs seek to enjoin a law that currently applies throughout Colorado, they seek a disfavored injunction that would disrupt the status quo. Accordingly, Plaintiffs "must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016) (quotations omitted).

## ARGUMENT

**I.      Plaintiffs cannot show a likelihood of success on the merits under *Bruen*'s two-step approach.**

### A.      The framework from *Heller, McDonald*, and *Bruen*.

In 2008, the Supreme Court held "that the Second Amendment conferred an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). But "[o]f course, the right [is] not unlimited." *Id.* "[I]ndividual self-defense is 'the central component' of the Second Amendment." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599) (emphasis omitted). Accordingly, the *Heller* Court acknowledged that it should not be read to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the

5

**App. 054**

commercial sales of arms." *Heller*, 554 U.S. at 626-27; *accord McDonald*, 561 U.S. at 786. Such laws are "presumptively lawful regulatory measures." *See Heller*, 554 U.S. at 627 n.26.

Last year, the Court established a two-step framework to resolve Second Amendment challenges in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). At the first step, the Court considers whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2129-30. If it does, the Second Amendment "presumptively protects that conduct." *Id.* The burden then falls on the government at the second step to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

Three justices concurred specifically in *Bruen* to emphasize the continuing validity of the presumptively lawful category of regulatory measures, including "laws imposing conditions and qualifications on the commercial sale of arms." *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*, 554 U.S. at 626-27); *see also id.* at 2157 (Alito, J., concurring) (*Bruen* did not "disturb[] anything that we said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns") (citation omitted). The Tenth Circuit recently affirmed that *Bruen* did not implicitly overturn the presumptively lawful category and that presumptively lawful regulations are valid without analyzing the historical tradition of firearm regulation. *Vincent v. Garland*, 80 F.4th 1197, 1201-02 (10th Cir. 2023) (affirming law barring felons from possessing firearms).

**B.** **The Second Amendment's plain text does not cover Colorado's waiting period law.**

Plaintiffs are unlikely to succeed on the merits because their claim fails at *Bruen* step one, for two independent reasons. First, because the law regulates only sales of firearms, it is a

6

**App. 055**

commercial regulation of firearms, a category of regulation that a majority of the Supreme Court and the Tenth Circuit have recognized is presumptively lawful. Second, Plaintiffs' claims concern their ability to acquire guns without delay, which falls outside the scope of the Second Amendment's plain text.

> **1. The Act is "presumptively lawful" because it regulates "the commercial sale of arms."**

Plaintiffs' challenge fails at *Bruen*'s first step because, as a regulation on commercial firearm sales, the Act is a "presumptively lawful" firearm regulation. *Heller*, 554 U.S. at 627 n. 26. "*Bruen*, *McDonald*, and *Heller* preserved the idea that the government could '[impose] conditions and qualifications on the commercial sale of arms.'" *United States v. Marique*, --- F. Supp. 3d ---, 2022 WL 17822443, at *2 (D. Md. 2022) (quoting *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring)). This "makes sense because commercial regulations that apply only to manufacturers and sellers do not implicate an individual's right of possession." *Id.* (quoting *United States v. Price*, No. 2:22-cr-00097, 2022 WL 6968457, at *2 (S.D. W. Va., Oct. 12, 2022)); *see also United States v. Tilotta*, No. 3:19-cr-04768-GPC, 2022 WL 3924282, at *6 (S.D. Cal. Aug. 30, 2022) ("the natural reading of 'keep and bear arms' does not include the ability to sell or transfer firearms unrestricted").

The Act does not regulate Plaintiff Garcia's conduct or any other firearm owner's conduct. *See Rocky Mountain Gun Owners*, 2023 WL 5017257, at *4 ("Ms. Garcia does not intend to sell a firearm. Plaintiffs make no claim that Ms. Garcia could be prosecuted under" the Act) (citation omitted). Instead, the Act makes it a civil infraction for a firearms *seller* to deliver a firearm before the end of the waiting period. Colo. Rev. Stat. § 18-12-115(1). But it does not regulate the possession of a firearms owner. In a pre-*Bruen* challenge to California's ten-day

**App. 056**

waiting period, one Ninth Circuit judge found that this issue was dispositive: "As a longstanding qualification on the commercial sale of arms under [*Heller*], a ten-day waiting period is presumptively lawful." *Silvester v. Harris*, 843 F.3d 816, 829 (9th Cir. 2016) (Thomas, C.J., concurring). Chief Judge Thomas noted that "[o]n its face, California's waiting period law is a condition or qualification on the sale of guns: It imposes a brief delay—to permit compliance with background check requirements and provide a 'cooling off' period—as a prerequisite to acquiring a gun." *Id.* at 830.[3] The same is true here.

Further establishing that the Act regulates commercial sales, and does not infringe on Plaintiffs' rights, it exempts non-commercial transactions from the waiting period. The law applies only to those who "sell[] a firearm." Colo. Rev. Stat. § 18-12-115(1)(a). It does not apply to anyone who doesn't sell a firearm. It also expressly exempts a "firearm transfer for which a background check is not required pursuant to state or federal law," *id.* (§ 18-12-115(2)(c)), which includes:

- A bona fide gift between immediate family members (§ 18-12-112(6)(b));

- An intestate transfer or transfer through a will (§ 18-12-112(6)(c));

- A temporary transfer in the transferee's home if needed for self-protection (§ 18-12-112(6)(d));

- A temporary transfer while hunting (§ 18-12-112(6)(e)(III));

- A temporary transfer of up to 72 hours (§ 18-12-112(6)(h)).

---

[3] The Ninth Circuit panel upheld California's waiting period law under the intermediate scrutiny standard courts applied before *Bruen*, after "assum[ing], without deciding, that the regulation . . . is not the type of regulation that must be considered presumptively valid." *Id.* at 826-27.

8

**App. 057**

Plaintiffs argue that it is not a commercial regulation because "the Act is directed at purchasers," Doc. 2 at 12, but this is wrong for two reasons. First, this is an incorrect reading of the Act. By its plain text, the Act only regulates sellers. Colo. Rev. Stat. § 18-12-115(1)(a). Second, even under Plaintiffs' reading of the law, the Act is a commercial regulation because it regulates *purchasers*. Not all acquirers of guns—and certainly not all owners of guns—acquire their firearms through a purchase. Only those who do are affected by the Act. The Act thus does not implicate an individual's right to keep and bear arms and is instead a presumptively lawful "condition[] and qualification[] on the commercial sale of arms." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-27).

Finally, Plaintiffs argue that *Bruen* abrogated the "presumptively lawful" category of firearms regulations. *See* Doc. 2 at 11-12. Not so. As the Tenth Circuit recently recognized, "six of the nine Justices pointed out that *Bruen* was not casting any doubt" on the presumptively lawful category. *Vincent*, 80 F.4th at 1201.[4] The Tenth Circuit in *Vincent* thus upheld the federal ban on felons' possession of firearms based on its prior precedent and the continued validity of *Heller*'s presumptively lawful category, without requiring the government to make any showing of historical analogues. *See id.* at 1202. And just as felon-in-possession bans remain presumptively lawful, so, too, does regulation of commercial activity like HB 23-1219.

---

[4] The Tenth Circuit's opinion in *Vincent* reaffirming the presumptively lawful category postdates the district court order Plaintiffs cited that calls that category into question. *See Rocky Mountain Gun Owners v. Polis*, No. 23-cv-1077-PAB, 2023 WL 5017253, at *13 (D. Colo. Aug. 7, 2023).

**App. 058**

2. **Colorado's waiting period law does not implicate the plain text of the Second Amendment because it does not affect Plaintiffs' rights to "keep and bear Arms."**

HB 23-1219 is a regulation on the commercial sales of firearms that does not implicate the plain text of the Second Amendment. Plaintiffs have not cited any court that has held the Second Amendment's right "to keep and bear Arms" covers a plaintiff's desire for on-demand firearm acquisition. Nor has the Supreme Court so held. *Heller* held the Second Amendment was understood to guarantee a right "to keep and bear Arms" unconnected with militia service based on the historical understanding of those terms. 554 U.S. at 581. *Bruen* held the Second Amendment prohibits laws requiring gun owners to demonstrate a special need to obtain a license to carry a firearm in public. 142 S. Ct. at 2135. Notably, *Bruen* clarified that "shall-issue" licensing regimes, including those that require background checks and firearm safety courses that inevitably cause some delay, were constitutional absent some evidence the statute was being put to "abusive ends" to "deny ordinary citizens their right to public carry." 142 S. Ct. at 2138 n.9. HB 23-1219's waiting period is now part of Colorado's "shall-issue" regime enacted to legitimately reduce deaths caused by heat-of-the-moment firearm purchases. *See* Ex. 1, § 1(2)(a).

Nor have Plaintiffs separately established that the Second Amendment's text protects a right to on-demand gun acquisition. The Act does not plausibly infringe on Plaintiffs' right to "bear Arms." That phrase "has a meaning that refers to carrying for a particular purpose—confrontation." *Heller*, 554 U.S. at 584; *see also Bruen*, 142 S. Ct. at 2134–35 (holding the word "'bear' naturally encompasses public carry"). The Act plainly doesn't affect this right.

Plaintiffs primarily argue that the Act infringes their right to "keep Arms." *See* Doc. 2 at 5-6. But that right is focused on possession: historically, "'[k]eep arms' was simply a common

10

**App. 059**

way of referring to possessing arms[.]" *Heller*, 554 U.S. at 583. Unlike the laws at issue in *Heller* and *McDonald*, which precluded individuals from keeping handguns in their homes, the Act does not make possession of any firearm illegal. No Coloradans will be deprived of their firearms by the Act. It places no limits or regulations on the firearms that are kept by an individual. Instead, it merely delays delivery of firearms to reduce firearm-related suicides and crimes of passion.

Plaintiffs have not met their burden to show the words "to keep and bear arms" were originally understood to guarantee a right to on demand firearm acquisition, for three reasons. *See Heller*, at 576–77 (courts give words their "[n]ormal meaning . . . [as] known to ordinary citizens in the founding generation."); *see also id.* at 634-35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."). First, Plaintiffs have presented no historical analysis or evidence demonstrating that the words "to keep and bear arms" were publicly understood to guarantee a right to on-demand gun purchases. Having failed to establish that the Amendment was originally so understood, Plaintiffs would instead turn *Bruen* on its head by requiring the State to show a historical restriction on the right at *Bruen*'s second step before they have even shown the right ever existed.

Second, there was no understanding at the time of the founding or Reconstruction that the Second Amendment guaranteed a right to immediately acquire commercially sold firearms. As Professor Robert Spitzer notes:

> No "Guns-R-Us" outlets existed in the 1600s, 1700s, or most of the 1800s. Rapid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get. . . . When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous anti-gun carry restrictions in the late 1800s and early 1900s.

**App. 060**

Ex. 3 at 4-5; *accord Silvester*, 843 F.3d at 827 ("There is . . . nothing new in having to wait for the delivery of a weapon. Before the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one. As a purely practical matter, delivery took time."). In other words, "[t]hough delay has not always been associated with government regulation, the ability to immediately exercise Second Amendment rights has no foundation in history." *Silvester*, 843 F.3d at 831 (Thomas, C.J., concurring).

Additionally, many states and localities enacted licensing requirements for owning or discharging firearms in the 18th and 19th centuries. *See* Ex. 3 at 16-17 (at least 29 states had licensing requirements for weapons ownership; at least 26 states had licensing requirements for firearms discharging). And "licensing by its nature thwarts any ability to acquire or use firearms on demand." *Id.* at 16. So even if the Second Amendment protects some right to acquire firearms, it has never protected a right to acquire firearms without delay. Plaintiffs argue that because the waiting period applies after a firearms purchase is made, it interferes with their possession of firearms. Doc. 2 at 5-6. But because the right to keep arms has never included the right to immediately acquire possession of new firearms, Plaintiffs have failed to show that the Act infringes on any right historically understood to be covered by the Second Amendment

Third, Plaintiffs fail to meet their burden to demonstrate their conduct is covered by the "plain text" of the Act. Instead, they assert that "[t]he right to 'keep' arms necessarily *implies* the right to possess arms one has acquired." Doc. 2 at 5. (emphasis added).  However, a right to possess something (to "keep" it) is not the same as the right to acquire it, let alone the right to acquire it without delay. *See, e.g.*, *United States v. 12 200-Ft. Reels of Super 8mm Film*, 413 U.S. 123 (1973) (right to possess obscene materials did not extend to right to import those same

App. 061

materials, even when sought only for personal possession). A delay in exercising a right is therefore not an unconstitutional infringement of that right. To the contrary, "[t]he Supreme Court has permitted waiting periods of varying duration in several other constitutional contexts, including before obtaining a marriage license, and permits for gathering to protest or parade." *Silvester*, 843 F.3d at 832 (Thomas, C.J., concurring).

Moreover, Plaintiffs' implied-rights argument is contrary to *Bruen* and *Heller*. The Court was clear: courts must determine whether "the Second Amendment's *plain text* covers an individual's conduct." *Bruen*, 142 S. Ct. at 2129-30 (emphasis added). Plaintiffs' focus on implied rights necessarily disregards the actual text of the Second Amendment and its scope as revealed by historical understandings. Nowhere in the Court's Second Amendment jurisprudence has it sanctioned such a disregard for the Amendment's plain text or the creation of implied rights. *See, e.g.*, *Bruen*, 142 S. Ct. at 2127 ("In *Heller*, we began with a 'textual analysis' focused on the 'normal and ordinary' meaning of the Second Amendment's language.") (quoting *Heller*, 554 U.S. at 576-77). Accordingly, Plaintiffs' argument that the Second Amendment "implicitly includes the right to acquire" firearms "is quite-clearly not a 'plain text' analysis, required under *Bruen*." *See Def. Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022). Here, by labeling the so-called "right to acquire" firearms an "implie[d] right," Plaintiffs concede that the right is not found in the plain text of the Second Amendment. This dooms their claim under *Bruen*.

**App. 062**

**C.** **Even if the Act implicated Plaintiffs' Second Amendment interests, it is consistent with the Nation's historical tradition of firearm regulation and so is constitutional.**

Because "the plain text of the Second Amendment does not cover" the waiting period on sellers imposed by the Act, "the government need not provide historical evidence that the regulation is consistent with the Nation's history of firearms regulation." *Tilotta*, 2022 WL 3924282, at *6. If, however, the Court proceeds to the second step of *Bruen*, Plaintiffs are not substantially likely to succeed on their challenge because Colorado's waiting period law "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

To meet its burden at this stage, the government does not need to identify a historic law that is a "dead ringer." *Id*. at 2133. Due to "unprecedented societal concerns" and "dramatic technological changes," "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132. Instead, the Governor must demonstrate only that the Act has "a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133.

The United States has a long history of firearms regulation targeted at "prevent[ing] impulsive acts of firearm violence," the focus of Colorado's waiting period law. Ex. 1, § 1(2)(a). Specifically, States have long regulated the possession, use, and sales of arms to intoxicated persons, laws which are designed to avoid such impulsive violence. As far back as 1655, Virginia made it an offense to "shoot any guns at drinking." Ex. 6 (1655 Va. Acts 401, Acts of Mar. 10, 1655, Act XII). Much of the firearms regulation of the Revolutionary era focused on militias, and states frequently imposed limitations on the availability of alcohol near armed militiamen to avoid impulsive violence by armed men. *See, e.g.*, *id.* (An Act for Establishing a

14

**App. 063**

Militia in this Government (Del., 1756) (barring officers from holding company meetings within "half a mile of any Inn or Tavern")); *id.* (An Act for Regulating the Militia of the Province of Maryland (Md. Gen. Assembly, L.H.J. Liber No. 48, May 22, 1756) (barring the sale of liquor near militia training grounds)).

In the 19th century, some laws barred the sales of firearms to intoxicated persons. *See id.* (1878 Gen. Laws Miss. 175 ("[I]t shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any [concealable] weapon . . . , or any pistol cartridge.")). Other jurisdictions went even farther and banned not just the sale but the carrying of firearms while intoxicated, directly implicating the right to "bear arms." *See, e.g.*, *id.* (2 Gen. Stats. of Kan. 353 (1868) ("[A]ny person under the influence of intoxicating drink . . . who shall be found within the limits of this state carrying on his person a pistol, bowie knife, dirk, or other deadly weapon, shall be subject to arrest[.]")); *id.*, (1883 Mo. Laws 76 (making it a criminal offense "[i]f any person . . . shall carry concealed any kind of [firearm] upon or about his person when intoxicated or under the influence of intoxicating drinks")). Notably, the Kansas law was passed in 1868, the same year the Fourteenth Amendment was ratified. *See State v. Christen*, 958 N.W.2d 746, 766 (Wis. 2021) (Hagerdon, J., concurring). "The temporal connection between this prohibition on armed intoxication and the Fourteenth Amendment's ratification is strong evidence that the Second Amendment, particularly as incorporated against the states, was not originally understood to preclude states from criminalizing armed intoxication." *Id.*

In considering these historic analogues, the Court should look at "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at

15

**App. 064**

2133. The "why" for these laws targeting arms and intoxication are aimed at the same evil sought to be avoided by waiting period laws—"that the intoxicated would be much more likely to act rashly, impulsively and with diminished judgment—i.e., in the heat of the moment. These purposes mimic the purpose of modern waiting period laws." Ex. 3 at 15. As the Act states, "establishing a waiting period for receipt of firearms can help prevent impulsive acts of firearm violence." Ex. 1, § 1(2)(a). And the "how" of these laws are either the same as waiting period laws—targeting sales of such arms—or are even more directly targeted at the bearing of arms by making any such carrying while intoxicated a crime. Thus, while the laws around arms and intoxication are not historical twins for waiting periods, they were animated by the same rationale and are analogous.

Waiting period laws themselves have been around for 100 years. *See, e.g.*, Ex. 9 (1923 Cal. Laws 695, 696, ch. 339 §§ 2, 10; 1923 Conn. Laws 3707, ch. 252, § 7; 1923 N.D. Laws 379, ch. 266 § 10). But this does not mean that guns were available on demand to Americans in the 1790s and later. Instead, different "societal concerns" and "dramatic technical changes" made the primary justification for waiting periods—to avoid crimes of passion—largely unnecessary around the time of the nation's founding. *Bruen*, 142 S. Ct. at 2132. This is for two reasons.

First, as noted above, firearms were not universally available on demand in the 1790s due to the lack of stores and licensing requirements. The lack of waiting period laws before the early 20th century does not show that Americans could buy and take possession of a gun whenever they wanted. Rather, it shows that such laws were unnecessary because a waiting period inherent in the acquisition of firearms already existed for many Americans. *See supra* at I.B.2.

16

**App. 065**

Second, there was less need for a cooling off period at the time of the nation's founding because firearms were not—unlike today—the weapon of choice for homicide. Overall homicide rates were low, and only 10-15% of homicides were committed with a firearm. Ex. 10 (Dec. of R. Roth) ¶ 15. That's not surprising because the common firearms at the time were poorly suited for a crime of passion. They were generally muzzle-loading, required a great deal of labor to load, often misfired, and could only shoot one shot without reloading. *Id.* ¶ 16. Homicide was much more frequently committed "with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives." *Id.* ¶ 17. Plaintiffs' assertion—without any evidence—that "the problem of impulsive gun violence dates from the invention of guns" and was a "general societal problem that has persisted since long before the 18th century," Doc. 2 at 8-9, is thus contradicted by Professor Roth's declaration. *Id.*

In short, the "impulsive acts of firearm violence" the Act seeks to prevent were not a societal problem at the founding. Ex. 1, § 1(2)(a). Today, by contrast, firearms are among the five leading causes of death for people between the ages of 1 and 44. *Id.* § 1(1)(a). To the extent that firearms were used in impulsive violent crimes, the practical limitations on the availability of firearms for purchase and the ability of America's rural population to immediately access those firearms made the risk that someone would run out and purchase a gun in a fit of anger minimal. Considered together, these factors make it unsurprising that waiting period laws did not exist. Rather, "unprecedented societal concerns" and "dramatic technological changes" prompted States to adopt waiting period laws beginning 100 years ago. *Bruen*, 142 S. Ct. at 2132.

**App. 066**

II. **Plaintiffs will not suffer irreparable harm without an injunction.**

Plaintiffs' motion also fails because they cannot show irreparable harm in the absence of an injunction. "To constitute irreparable harm, an injury must be certain, great, actual, and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quotation omitted). Plaintiffs must show that "the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (quotations omitted).

Plaintiffs assert that "[v]iolation of constitutional rights per se constitutes irreparable injury." Doc. 2 at 14. But Plaintiffs bear the burden to make it "clear [] that [constitutional] interests were either threatened or in fact being impaired at the time relief was sought." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). They cannot do so, for two reasons. First, for all the reasons given above, the Act does not burden Plaintiffs' right to "keep and bear arms." *See Free the Nipple*, 916 F.3d at 806 (in constitutional claims, the irreparable injury and likelihood-of-success factors largely collapse). That right has never been understood to confer an immediate right to acquire arms. Second, as the Court previously noted, Ms. Garcia has only stated an intent to purchase another firearm in the "near future," so the timing (or existence) of any potential future harm is uncertain and may not be affected by a preliminary injunction at all. *See* Doc. 11.

III. **The public interest favors public safety over Plaintiffs' desire for guns on demand.**

Finally, the public interest favors denying the preliminary injunction. For one, Colorado's elected officials are in a better position than Plaintiffs or the Court to determine the public interest. *See, e.g.*, *Fish*, 840 F.3d at 755 ("our democratically elected representatives are in a better position than this Court to determine the public interest").

**App. 067**

More fundamentally, there is an overwhelming public interest in preventing gun deaths. Colorado's elected officials, relying on social science data and reflecting the will of their constituents, passed the Act to address this scourge. Colorado is experiencing increasing rates of firearm homicides and high levels of firearm suicides. Ex. 1 § 1(1). More people die in Colorado from firearms than from car crashes or opioid overdoses. *Id.* One study has found that mandatory waiting periods have led to a 7-11% reduction in firearm suicides and a 17% reduction in firearm homicides. *Id.*; *see also* Ex. 2. A comparable effect in Colorado would save more than a hundred lives annually. Plaintiffs would ignore this data and the will of Colorado's voters, based on a preliminary record without discovery. The interest of the public is adamantly to the contrary.

## CONCLUSION

Plaintiffs' motion for preliminary injunction should be denied.

Dated: October 17, 2023

PHILIP J. WEISER
Attorney General

*/s/ Michael T. Kotlarczyk*
*Grant T. Sullivan*, Assistant Solicitor General
*Michael T. Kotlarczyk*, Senior Assistant Attorney General
*Matthew J. Worthington*, Assistant Attorney General
1300 Broadway, Denver, CO 80203
Telephone: (720) 508-6349; -6187; -6124
Email: grant.sullivan@coag.gov;
mike.kotlarczyk@coag.gov; matt.worthington@coag.gov

*Attorneys for Defendant Jared Polis*
*Counsel of Record

**App. 068**

## **EXHIBIT LIST**

Ex. 1: HB 23-1219
Ex. 2: Handgun Waiting Periods Reduce Gun Deaths
Ex. 3: Spitzer Declaration
Ex. 4: Exhibit A to Spitzer Declaration – Spitzer CV
Ex. 5: Exhibit B to Spitzer Declaration – Table of Intoxication/Weapons Laws
Ex. 6: Exhibit C to Spitzer Declaration – Text of Intoxication/Weapons Laws
Ex. 7: Exhibit D to Spitzer Declaration – Table of Weapons Licensing Laws
Ex. 8: Exhibit E to Spitzer Declaration – Text of License and Licensing Laws
Ex. 9: Historical Waiting Period Laws
Ex. 10: Roth Declaration
Ex. 11: Exhibit A to Roth Declaration – Roth CV

App. 069



HOUSE BILL 23-1219

BY REPRESENTATIVE(S) Froelich and Amabile, Bacon, Boesenecker, Brown, deGruy Kennedy, Dickson, Epps, Garcia, Gonzales-Gutierrez, Hamrick, Herod, Jodeh, Joseph, Kipp, Lindsay, Lindstedt, Mabrey, McCormick, Michaelson Jenet, Ortiz, Parenti, Ricks, Sirota, Story, Willford, Woodrow, Bird, Daugherty, English, Mauro, Snyder, Titone, Valdez, Velasco, Weissman, McCluskie, Duran;
also SENATOR(S) Sullivan and Hansen, Cutter, Fields, Gonzales, Jaquez Lewis, Kolker, Mullica, Bridges, Buckner, Coleman, Danielson, Exum, Ginal, Marchman, Moreno, Winter F., Zenzinger, Fenberg.

CONCERNING ESTABLISHING A MINIMUM THREE-DAY WAITING PERIOD PRIOR TO THE DELIVERY OF A PURCHASED FIREARM.

*Be it enacted by the General Assembly of the State of Colorado:*

**SECTION 1. Legislative declaration.** (1) The general assembly finds and declares that:

(a) In 2020, according to the Centers for Disease Control and Prevention, firearm-related injury was among the five leading causes of death for people ages 1 to 44 in the United States;

Capital letters or bold & italic numbers indicate new material added to existing law; dashes through words or numbers indicate deletions from existing law and such material is not part of the act.

(b)   From 2014 to 2019, the number of firearm-related deaths in Colorado was greater than the number of deaths due to motor vehicle crashes, opioid overdoses, HIV, and colon cancer. Among firearm-related deaths, more than 75 percent were caused by intentional self-harm or suicide and more than 20 percent were as a result of assaults or homicides.

(c)   In 2021, Colorado had its highest number of homicides by discharge of a firearm since 2000. There were 274 homicides by firearm in Colorado in 2021, and the age group with the highest rate of firearm homicide victims was people ages 15 to 24, with 74 deaths.

(d)   In 2020, Colorado had the seventh highest suicide rate in the United States; in 2021, there were 740 suicides by firearm in Colorado, which was more than half of all suicides in the state;

(e)   Nationwide, from 2000 to 2018, rural suicide rates were higher than urban suicide rates, and although suicide rates increased in both rural and urban areas during that period, since 2007, rural suicide rates increased at a greater rate than in urban areas;

(f)   One study estimates that mandatory waiting periods to receive firearms led to a 7 to 11 percent reduction in suicides by firearm; the study also suggests that delaying the purchase of firearms by a few days reduces firearm homicides by approximately 17 percent; and

(g)   The Colorado bureau of investigation employs and trains personnel to process background checks, in accordance with section 24-33.5-424 (7)(b)(IV)(C), Colorado Revised Statutes.

(2)   Therefore, the general assembly declares that:

(a)   Delaying immediate access to firearms by establishing a waiting period for receipt of firearms can help prevent impulsive acts of firearm violence, including homicides and suicides; and

(b)   The establishment of a waiting period is a matter of mixed state and local concern because the state has an interest in preventing suicides and homicides, and local governments are equipped to determine the length of waiting periods best suited for their jurisdictions.

PAGE 2-HOUSE BILL 23-1219

App. 071

SECTION 2. In Colorado Revised Statutes, **add** 18-12-115 as follows:

**18-12-115. Waiting period for firearms sales - background check required - penalty - exceptions.** (1) (a) IT IS UNLAWFUL FOR ANY PERSON WHO SELLS A FIREARM, INCLUDING A LICENSED GUN DEALER AS DEFINED IN SECTION 18-12-506 (6), TO DELIVER THE FIREARM TO THE PURCHASER UNTIL THE LATER IN TIME OCCURS:

(I) THREE DAYS AFTER A LICENSED GUN DEALER HAS INITIATED A BACKGROUND CHECK OF THE PURCHASER THAT IS REQUIRED PURSUANT TO STATE OR FEDERAL LAW; OR

(II) THE SELLER HAS OBTAINED APPROVAL FOR THE FIREARM TRANSFER FROM THE BUREAU AFTER IT HAS COMPLETED ANY BACKGROUND CHECK REQUIRED BY STATE OR FEDERAL LAW.

(b) A PERSON WHO VIOLATES THIS SUBSECTION (1) COMMITS A CIVIL INFRACTION AND, UPON CONVICTION THEREOF, SHALL BE PUNISHED BY A FINE OF FIVE HUNDRED DOLLARS; EXCEPT THAT FOR A SECOND OR SUBSEQUENT OFFENSE, THE FINE SHALL BE NOT LESS THAN FIVE HUNDRED DOLLARS AND NOT MORE THAN FIVE THOUSAND DOLLARS.

(2) THIS SECTION DOES NOT APPLY TO:

(a) THE SALE OF AN ANTIQUE FIREARM, AS DEFINED IN 18 U.S.C. SEC. 921 (a)(16), AS AMENDED, OR A CURIO OR RELIC, AS DEFINED IN 27 CFR 478.11, AS AMENDED;

(b) THE SALE OF A FIREARM BY A PERSON SERVING IN THE ARMED FORCES OF THE UNITED STATES WHO WILL BE DEPLOYED OUTSIDE OF THE UNITED STATES WITHIN THE NEXT THIRTY DAYS TO ANY FAMILY MEMBER, INCLUDING:

(I) REGARDLESS OF AGE, A BIOLOGICAL, ADOPTED, OR FOSTER CHILD; A STEPCHILD OR LEGAL WARD; A CHILD OF A DOMESTIC PARTNER; A CHILD TO WHOM THE SELLER STANDS IN LOCO PARENTIS; OR A PERSON TO WHOM THE SELLER STOOD IN LOCO PARENTIS WHEN THE PERSON WAS A MINOR;

(II) A BIOLOGICAL, ADOPTIVE, OR FOSTER PARENT; A STEPPARENT OR

PAGE 3-HOUSE BILL 23-1219

App. 072

LEGAL GUARDIAN OF THE SELLER OR SELLER'S SPOUSE OR DOMESTIC PARTNER; OR A PERSON WHO STOOD IN LOCO PARENTIS WHEN THE SELLER OR SELLER'S SPOUSE OR DOMESTIC PARTNER WAS A MINOR CHILD;

(III)  A PERSON TO WHOM THE SELLER IS LEGALLY MARRIED UNDER THE LAWS OF ANY STATE OR A DOMESTIC PARTNER OF A SELLER;

(IV)  A GRANDPARENT, GRANDCHILD, OR SIBLING, WHETHER A BIOLOGICAL, FOSTER, ADOPTIVE OR STEP RELATIONSHIP, OF THE SELLER OR SELLER'S SPOUSE OR DOMESTIC PARTNER; OR

(V)  AS SHOWN BY THE SELLER, ANY OTHER INDIVIDUAL WITH WHOM THE SELLER HAS A SIGNIFICANT PERSONAL BOND THAT IS OR IS LIKE A FAMILY RELATIONSHIP, REGARDLESS OF BIOLOGICAL OR LEGAL RELATIONSHIP; OR

(c)  A FIREARM TRANSFER FOR WHICH A BACKGROUND CHECK IS NOT REQUIRED PURSUANT TO STATE OR FEDERAL LAW.

(3)  PURSUANT TO THE AUTHORITY GRANTED IN SECTION 29-11.7-103, A LOCAL GOVERNMENT MAY ENACT AN ORDINANCE, REGULATION, OR OTHER LAW CONCERNING A WAITING PERIOD.

**SECTION 3.   Act subject to petition - effective date - applicability.** (1)  This act takes effect October 1, 2023; except that, if a referendum petition is filed pursuant to section 1 (3) of article V of the state constitution against this act or an item, section, or part of this act within the ninety-day period after final adjournment of the general assembly, then the act, item, section, or part will not take effect unless approved by the people at the general election to be held in November 2024 and, in such case, will take effect on the date of the official declaration of the vote thereon by the

PAGE 4-HOUSE BILL 23-1219

App. 073

governor.

(2)  This act applies to offenses committed on or after the applicable effective date of this act.


_____
Julie McCluskie
SPEAKER OF THE HOUSE
OF REPRESENTATIVES

_____
Steve Fenberg
PRESIDENT OF
THE SENATE


_____
Robin Jones
CHIEF CLERK OF THE HOUSE
OF REPRESENTATIVES

_____
Cindi L. Markwell
SECRETARY OF
THE SENATE


APPROVED Friday April 28th 2023 at 9:30 Am
(Date and Time)

_____
Jared S. Polis
GOVERNOR OF THE STATE OF COLORADO


PAGE 5-HOUSE BILL 23-1219

**App. 074**



# Handgun waiting periods reduce gun deaths

Michael Luca[a,1], Deepak Malhotra[a], and Christopher Poliquin[a]

[a]Harvard Business School, Boston, MA 02163

Edited by Philip J. Cook, Duke University, Durham, NC, and accepted by Editorial Board Member Kenneth W. Wachter September 21, 2017 (received for review December 3, 2016)

Handgun waiting periods are laws that impose a delay between the initiation of a purchase and final acquisition of a firearm. We show that waiting periods, which create a "cooling off" period among buyers, significantly reduce the incidence of gun violence. We estimate the impact of waiting periods on gun deaths, exploiting all changes to state-level policies in the Unites States since 1970. We find that waiting periods reduce gun homicides by roughly 17%. We provide further support for the causal impact of waiting periods on homicides by exploiting a natural experiment resulting from a federal law in 1994 that imposed a temporary waiting period on a subset of states.

gun policy | gun violence | waiting period | injury prevention

More than 33,000 people die in gun-related incidents each year in the United States, accounting for as many deaths as motor vehicle accidents (1). This is concerning both in absolute terms and in comparison to other developed countries, all of which have lower rates of gun violence (2). For example, if the United States could lower its firearm death rate to that of Finland (the high-income country with the second highest rate), roughly 20,000 fewer people would die from guns every year. However, there has been no meaningful reduction in the US firearm-related death rate for more than a decade. Moreover, evidence about which policies would be effective at reducing violence remains limited (3), and the types of bills that are enacted depend on the political party in power (4).

One avenue for reducing gun deaths is to draw on insights from behavioral economics and psychology, which suggest that delaying gun purchases, even for a short time, might be an effective policy tool. Visceral factors, such as anger or suicidal impulses, can spur people to inflict harm on others or themselves, but tend to be transitory states (5, 6). For example, Card and Dahl (7) find that there is a 10% increase in domestic violence following an upset loss of the local National Football League team. Moreover, behaviors triggered by such visceral states can be contrary to longer term self-interest (5, 6).

Delaying a gun purchase could create a "cooling off" period that reduces violence by postponing firearm acquisitions until after a visceral state has passed. Increasing the time it takes to acquire a gun might also close the window of opportunity for would-be perpetrators of violence to use their weapons. Finally, a mandatory delay has the potential to deter purchases among people who have malevolent, but temporary, motivations for owning a firearm.

This article explores the impact of "waiting period" laws on firearm-related homicides and suicides using 45 y of data on law changes and mortality at the state level in the United States. A waiting period is a mandatory delay between the purchase and delivery of a gun; it requires purchasers to wait, typically between 2 and 7 d, before receiving their weapons. We exploit plausibly exogenous temporal and geographic variation in waiting period laws to implement a difference-in-differences approach that identifies the causal impact of waiting periods on homicides and suicides.

We find that waiting periods cause large and statistically significant reductions in homicides. Point estimates using our full 45-y sample and all waiting period changes imply a 17% reduction in gun homicides. We provide further evidence of a causal relationship between waiting periods and lower homicide rates based on a natural experiment in which federal law imposed waiting periods on a subset of states. Estimates from this analysis

also suggest that waiting periods reduce gun homicides by 17%. The results of both analyses confirm a large and robust effect of waiting periods on homicides. We also find a negative effect of waiting periods on suicides, but the magnitude and statistical significance of the suicide effect vary across model specification.

## Data and Research Design

We construct a panel of every change to waiting period laws in the United States between 1970 and 2014, which we obtained from state statutes and session laws. We combine these changes with annual data on firearm-related deaths from the Centers for Disease Control and Prevention. Fig. 1 shows the number of states with waiting periods over time. Overall, 44 states (including the District of Columbia) have had a waiting period for at least some time between 1970 and 2014. Exploiting the significant geographic and temporal variation in the adoption of waiting periods, we implement a difference-in-differences framework to estimate the causal impact of waiting periods on gun deaths. Essentially, we compare changes in firearm-related deaths within states that adopted waiting periods with changes in firearm-related deaths in other states. We control for changing economic and demographic factors that may be correlated with higher levels of gun violence or with the decision of lawmakers to adopt policies that delay gun purchases.

To support our causal interpretation, we then restrict the analysis to the period from 1990 to 1998, during which federal policy forced many states to implement waiting periods. The Brady Handgun Violence Prevention Act (hereinafter "Brady Act"), which went into effect in February 1994, required background checks on handgun purchases from licensed firearm dealers and created a 5-d waiting period to allow sufficient time for the check. Although it was a federal policy, the Brady Act only created new waiting periods for 19 states, since some states already required a background check and waiting period, and some implemented an "instant check" system that allowed for nearly immediate background checks (thereby obviating the need for a waiting period). We provide further details regarding the Brady Act and affected states in *Identifying Policy Changes* and *Materials and Methods*.

**Significance**

Waiting period laws that delay the purchase of firearms by a few days reduce gun homicides by roughly 17%. Our results imply that the 17 states (including the District of Columbia) with waiting periods avoid roughly 750 gun homicides per year as a result of this policy. Expanding the waiting period policy to all other US states would prevent an additional 910 gun homicides per year without imposing any restrictions on who can own a gun.

Author contributions: M.L., D.M., and C.P. designed research, performed research, analyzed data, and wrote the paper.

The authors declare no conflict of interest.

This article is a PNAS Direct Submission. P.J.C. is a guest editor invited by the Editorial Board.

This is an open access article distributed under the PNAS license.

[1]To whom correspondence should be addressed. Email: mluca@hbs.edu.

This article contains supporting information online at www.pnas.org/lookup/suppl/doi:10.1073/pnas.1619896114/-/DCSupplemental.

See Commentary on page 12097.

**App. 075**

SEE COMMENTARY



**Fig. 1.** States with handgun waiting periods and background checks on dealer sales from 1970 to 2015. Many states were required to implement these policies during the Brady interim period between February 1994 and November 1998 (shaded gray). Following prior research (8), Alabama and Ohio are coded as not requiring background checks after the Supreme Court's decision in *Printz v. United States*. Not all states had waiting periods during the Brady interim period because they implemented or already had an instant background check system that obviated the need for a waiting period to investigate gun buyers.

## Results

We begin by examining the effect of waiting periods across the full sample period from 1970 to 2014. The results of Table 1 show that waiting periods are associated with a 17% reduction in gun homicides. This effect is equivalent to ~36 fewer gun homicides per year for a state with an average number of gun deaths. Waiting periods also lead to a 7–11% reduction in gun suicides (depending on the control variables used in the specification), which is equivalent to 22–35 fewer gun suicides per year for the average state. The results in Table 1 use a log-linear specification; we

**Table 1.   Effects of handgun waiting periods and background checks on violence, 1970–2014**

| Type of violence | 1970–2014 | | 1977–2014 |
| --- | --- | --- | --- |
| | (1) | (2) | (3) |
| All homicide | | | |
|    Waiting period | −0.127 (0.059)** | −0.137 (0.059)** | −0.132 (0.050)** |
|    Background check | | 0.049 (0.082) | 0.025 (0.081) |
| Gun homicide | | | |
|    Waiting period | −0.188 (0.077)** | −0.187 (0.086)** | −0.186 (0.071)** |
|    Background check | | −0.004 (0.103) | 0.022 (0.107) |
| Non-gun homicide | | | |
|    Waiting period | −0.016 (0.051) | −0.048 (0.060) | −0.035 (0.037) |
|    Background check | | 0.153 (0.076)** | 0.036 (0.057) |
| All suicide | | | |
|    Waiting period | −0.047 (0.021)** | −0.070 (0.023)*** | −0.024 (0.011)** |
|    Background check | | 0.113 (0.061)* | 0.023 (0.020) |
| Gun suicide | | | |
|    Waiting period | −0.097 (0.034)*** | −0.120 (0.031)*** | −0.074 (0.017)*** |
|    Background check | | 0.111 (0.073) | 0.029 (0.028) |
| Non-gun suicide | | | |
|    Waiting period | −0.017 (0.038) | −0.058 (0.059) | −0.006 (0.033) |
|    Background check | | 0.199 (0.072)*** | 0.084 (0.031)** |

Coefficients represent the effects of waiting periods and background checks on the natural logarithm of deaths per 100,000 adult residents. All models include state and year fixed effects. Models 1–2 include only the policy variables shown. Model 3 follows the specification of Ludwig and Cook (8) and includes alcohol consumption, poverty, income, urbanization, black population, and seven age groups. Model 3 uses fewer years of data due to missing control variables in earlier years. Summary statistics for all variables are included in Table S1. The 1970–2014 period includes 2,295 state-year observations; the model for gun homicides omits three state-years, and the model for non-gun homicides omits two state years because the death count was zero and the model is specified with a logged dependent variable. Similarly, the 1977–2014 period includes 1,938 state-years, but omits two state-years for gun homicides and one state-year for non-gun homicides. SEs, shown in parentheses, are clustered by state. Alternative model specifications presented in Tables S7 and S8 are not logged and include all state-years. *$P < 0.10$; **$P < 0.05$; ***$P < 0.01$.

**App. 076**

present models with state-specific trends, models linear in the rate of violence, and Poisson models as part of Tables S3 and S5. The conclusion that waiting periods reduce gun homicides is robust across all specifications. The conclusion regarding suicides is robust to all specifications except those that include state-specific, linear trends (Table S3). Both conclusions are robust across models with and without controls for state-level economic and demographic changes. We also investigate the robustness of the results to the exclusion of individual states in Fig. S1.

To further support the hypothesis that waiting periods lead to a reduction in gun homicides, we then focus on a natural experiment created by the Brady Act, a federal law that forced some states to adopt new waiting period and background check policies between 1994 and 1998. Ludwig and Cook (8) also use the Brady Act to study whether background checks and waiting periods affect violence. They compare "Brady states" that were subject to the Brady Act with "Brady-exempt states" that were not. However, some states that were classified as Brady states already had waiting periods and background checks before the Brady Act, and other states chose to implement an "instant" background check system instead of requiring a waiting period. As a result, the coding of Brady states in the study by Ludwig and Cook (8) fails to consider all states that had preexisting waiting periods. In contrast, we precisely code which states had waiting periods (before 1994) and which implemented waiting periods only because of the Brady Act. In total, our coding differs from theirs for 16 states. This additional accuracy allows us to assess the causal impact of waiting periods resulting from the Brady Act. The full list of differences between our coding and prior research, along with supporting citations, can be found in Table S4.

We find that waiting periods led to large and statistically significant reductions in gun violence (Table 2) during the Brady interim period. Specifically, the results of column 3 of Table 2 show that waiting periods implemented during the Brady interim years resulted in a 17% reduction in gun homicides. This is equivalent to roughly 39 fewer homicides per year for the average state. There was also a 6% reduction in gun suicides (i.e.,

17 fewer suicides per year for the average state). Both results are robust across models with and without controls for state-level economic and demographic changes. Notably, exploiting the Brady Act as a natural experiment produces similar estimates as the longer sample period from 1970 to 2014.

Tables 1 and 2 also show that waiting periods have no significant effect on non-gun homicides, suggesting that people subject to waiting period laws do not substitute other means of committing homicide. This is consistent with other research (9) finding no increase in non-gun homicides in response to policies restricting access to firearms. Results for non-gun suicides, however, are less clear; some specifications suggest partial substitution toward non-gun methods of suicide in response to handgun waiting periods.

## Discussion

Our results show that waiting periods reduce gun homicides. Waiting periods for gun purchases are supported not only by the American Medical Association but also by a majority of Americans and a majority of gun owners (10, 11). Our point estimates, based on 45 y of data, suggest that the 17 states (including the District of Columbia) with waiting periods as of 2014 avoid ~750 gun homicides. Expanding the waiting period policy to states that do not currently have it would prevent an additional 910 gun homicides per year. Waiting periods would therefore reduce gun violence without imposing any restrictions on who can own a gun.

## Materials and Methods

Our main specifications are of the form:

$$r_{it} = \alpha_i + \lambda_t + \beta W_{it} + \gamma B_{it} + \delta' X_{it} + \epsilon_{it},$$

where $r_{it}$ is the natural logarithm of the rate of violence (homicides or suicides) per 100,000 adult residents, $W_{it}$ is an indicator for handgun waiting periods and $B_{it}$ is an indicator for whether background checks are required for dealer handgun sales. We include an indicator variable for background checks on handgun purchases from licensed firearm dealers because a major source of policy variation in our dataset (the Brady Act) also affected

**Table 2. Effects of handgun waiting periods and background checks on violence, 1990–1998**

| Type of violence | Brady period, 1990–1998 | | |
| --- | --- | --- | --- |
| | (1) | (2) | (3) |
| All homicide | | | |
|     Waiting period | −0.073 (0.084) | −0.130 (0.077)* | −0.145 (0.060)** |
|     Background check | | 0.091 (0.064) | 0.010 (0.053) |
| Gun homicide | | | |
|     Waiting period | −0.103 (0.093) | −0.179 (0.087)** | −0.181 (0.068)** |
|     Background check | | 0.120 (0.080) | 0.033 (0.065) |
| Non-gun homicide | | | |
|     Waiting period | −0.019 (0.068) | −0.035 (0.064) | −0.072 (0.050) |
|     Background check | | 0.025 (0.044) | −0.043 (0.039) |
| All suicide | | | |
|     Waiting period | −0.016 (0.021) | −0.022 (0.023) | −0.036 (0.020)* |
|     Background check | | 0.009 (0.022) | −0.007 (0.019) |
| Gun suicide | | | |
|     Waiting period | −0.039 (0.024) | −0.053 (0.028)* | −0.066 (0.021)*** |
|     Background check | | 0.023 (0.028) | −0.003 (0.024) |
| Non-gun suicide | | | |
|     Waiting period | 0.050 (0.021)** | 0.035 (0.022) | 0.018 (0.022) |
|     Background check | | 0.024 (0.023) | 0.009 (0.018) |

Coefficients represent the effects of waiting periods and background checks on the natural logarithm of deaths per 100,000 adult residents. All models include state and year fixed effects. Models 1–2 include only the policy variables shown. Model 3 follows the specification of Ludwig and Cook (8) and includes alcohol consumption, poverty, income, urbanization, black population, and seven age groups. Summary statistics for all variables are included in Table S2. The sample includes 459 state-year observations for all models. SEs, shown in parentheses, are clustered by state. *$P < 0.10$; **$P < 0.05$; ***$P < 0.01$.

App. 077

SEE COMMENTARY

background check policies. As seen in Tables 1 and 2, the estimated impact of background checks depends on model specification. We also incorporate time-varying state-level control variables that may influence rates of gun violence (8), $X_{it}$, including alcohol consumption, poverty, income, urbanization, black population, and seven age groups. Summary statistics for these variables are included in Tables S1 and S2. The $\alpha_i$ and $\lambda_t$ parameters represent state and year fixed effects. These fixed effects control for stable, state-specific factors affecting violence and time-varying factors that affect all states identically. It is impossible to control for all time-varying, state-specific factors that affect gun violence. For example, policing tactics, drug use, and environmental factors such as lead exposure might not have changed uniformly across states over time and may also affect violence. However, the consistency between our estimates during the short (Brady interim) period and the longer period (including all waiting period changes since 1970) supports our interpretation of the results. The model parameters are estimated via least squares weighted by state population. We then calculate the percentage effect of waiting periods on violence using the estimator described by Kennedy (12).

We code a state as having a waiting period if it imposes any mandatory delay on the purchase of a handgun or has a permitting system for dealer and private sales. (In Table S5, we estimate models with a separate control variable for handgun permit systems and show that the effect of waiting periods is not limited to states with permitting systems.) Currently, 10 states and the District of Columbia impose an explicit waiting period on handgun

sales, and an additional five states have permitting systems for private and dealer sales that result in a delay of firearm purchases. Forty-four states have had a handgun waiting period at some point since 1970, although 19 implemented the policy only due to the Brady Act's interim provisions, in effect from February 1994 to November 1998. These provisions required local law enforcement agencies to conduct background checks on handgun purchases from licensed firearm dealers and required a 5-d waiting period to conduct the check. Some states already required background checks and/or waiting periods before the Brady Act, and were therefore not affected by the new law, but other states were forced to adopt a new waiting period due to the federal policy change. When the permanent provisions of the Brady Act took effect on November 30, 1998, the federal waiting period requirement was replaced with an instant background check system [the National Instant Criminal Background Check System (NICS)]. As a result, many states discarded their waiting periods after 1998 because the NICS eliminated the need for a waiting period to investigate purchasers' backgrounds. We use the subset of waiting period changes that resulted from the Brady Act as a natural experiment to provide further support for our analysis of the full sample period from 1970 to 2014.

Although nine states have also had a waiting period on long-guns (i.e., rifles and shotguns) sometime since 1970, we focus on handgun waiting periods because handguns account for 70–80% of firearm homicides (13) and because a major source of variation in our data, the Brady Act's interim period, only affected handgun sales.

1. National Center for Health Statistics, Centers for Disease Control and Prevention (2015) About Compressed Mortality, 1999-2014. CDC WONDER Online Database. Available at wonder.cdc.gov/cmf-icd10.html. Accessed August 5, 2016.
2. Grinshteyn E, Hemenway D (2016) Violent death rates: The US compared with other high-income OECD countries, 2010. *Am J Med* 129:266–273.
3. Sacks CA (2015) In memory of Daniel–Reviving research to prevent gun violence. *N Engl J Med* 372:800–801.
4. Luca M, Malhotra D, Poliquin C (2017) The impact of mass shootings on gun policy. Harvard Business School NOM Unit Working Paper No. 16-126. Available at dx.doi.org/10.2139/ssrn.2776657. Accessed October 1, 2016.
5. Loewenstein G (1996) Out of control: Visceral influences on behavior. *Organ Behav Hum Decis Process* 65:272–292.
6. Loewenstein G, Lerner JS (2002) The role of affect in decision making. *Handbook of Affective Sciences*, eds Davidson RJ, Scherer KR, Goldsmith HH (Oxford Univ Press, Oxford), pp 619–642.
7. Card D, Dahl GB (2011) Family violence and football: The effect of unexpected emotional cues on violent behavior. *Q J Econ* 126:103–143.
8. Ludwig J, Cook PJ (2000) Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. *JAMA* 284:585–591.
9. Raissian KM (2016) Hold your fire: Did the 1996 Federal Gun Control Act expansion reduce domestic homicides? *J Policy Anal Manage* 35:67–93.
10. American Medical Association (2016) AMA Expands Policy on Background Checks, Waiting Periods for Gun Buyers. Available at https://perma.cc/CNE4-FEQ9. Accessed October 28, 2016.
11. Sides J (December 23, 2012) Gun owners vs. the NRA: What the polling shows. Washington Post, Wonkblog. Available at https://perma.cc/HCC9-4DY5. Accessed October 28, 2016.
12. Kennedy P (1981) Estimation with correctly interpreted dummy variables in semilogarithmic equations. *Am Econ Rev* 71:801.
13. Planty M, Truman J (2013) Firearm Violence, 1993-2011 (US Department of Justice, Washington, DC), NCJ 241730. Available at https://www.bjs.gov/index.cfm?iid=4616&ty=pbdetail. Accessed October 18, 2016.
14. Wolfers J (2006) Did unilateral divorce laws raise divorce rates? A reconciliation and new results. *Am Econ Rev* 96:1802–1820.
15. Webster D, Crifasi CK, Vernick JS (2014) Effects of the repeal of Missouri's handgun purchaser licensing law on homicides. *J Urban Health* 91:293–302.
16. Rudolph KE, Stuart EA, Vernick JS, Webster DW (2015) Association between Connecticut's permit-to-purchase handgun law and homicides. *Am J Public Health* 105:e49–e54.
17. Lott JR, Jr, Mustard DB (1997) Crime, deterrence, and right-to-carry concealed handguns. *J Legal Stud* 26:1–68.
18. Ludwig J (1998) Concealed-gun-carrying laws and violent crime: Evidence from state panel data. *Int Rev Law Econ* 18:239–254.
19. Ayres I, Donohue JJ, III (2002) Shooting down the 'more guns, less crime' hypothesis. *Stanford Law Rev* 55:1193–1312.
20. Manski CF, Pepper JV (2017) How do right-to-carry laws affect crime rates? Coping with ambiguity using bounded-variation assumptions. *Rev Econ Stat*, 10.1162/REST_a_00689.
21. Solon G, Haider SJ, Wooldridge JM (2015) What are we weighting for? *J Hum Resour* 50:301–316.
22. Federal Register 59 (1994). Available at https://www.gpo.gov/fdsys/pkg/FR-1994-07-22/html/94-17819.htm. Accessed June 29, 2016.
23. Manson DA, Gilliard DK, Lauver G (1999) Presale Handgun Checks, the Brady Interim Period, 1994-98 (US Department of Justice Bureau of Justice Statistics Bulletin, Washington, DC), NCJ 175034. Available at https://www.bjs.gov/content/pub/pdf/phc98.pdf. Accessed June 29, 2016.
24. Vernick J, Hepburn L (2003) State and federal gun laws. *Evaluating Gun Policy: Effects on Crime and Violence*, eds Ludwig J, Cook PJ (The Brookings Institution, Washington, DC), pp 345–402.
25. U.S. Department of Justice Bureau of Justice Statistics (1996) Survey of State Procedures Related to Firearm Sales (US Department of Justice Bureau of Justice Statistics Bulletin, Washington, DC), NCJ 160763. Available at https://www.bjs.gov/index.cfm?ty=pbdetail&iid=1067. Accessed August 2, 2014.
26. Carroll CA, Jr (January 27, 1994) South Carolina Executive order no. 94-03. Available at hdl.handle.net/10827/1350. Accessed June 14, 2017.

ECONOMIC SCIENCES

App. 078

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-02563-JLK

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

     Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

     Defendant.

---

### DECLARATION OF ROBERT SPITZER

I, Robert Spitzer, pursuant to 28 U.S.C. § 1746, do depose and state as follows:

I have been asked to render an opinion on the history of firearms restrictions as they pertain to modern waiting periods.

This declaration is based on my own research, knowledge, and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

I have been retained by the Office of the Attorney General of the State of Colorado to render expert opinions in this case. I am being compensated at a rate of $750 per hour for testimony and $500 per hour for all other services.

### BACKGROUND AND QUALIFICATIONS

I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland. I was also a visiting professor at Cornell University for thirty years. I am currently an Adjunct Professor at the College of William and Mary School of Law. I earned my Ph.D. in Government from Cornell University. I reside in Williamsburg, Virginia. A copy of my curriculum vitae is attached to this Declaration.

1

**App. 079**

I have been studying, teaching, and writing about gun policy for over thirty years.  My first publication on the subject appeared in 1985.  Since then, I have published six books and over one hundred articles, papers, and essays on gun policy.  My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues.  My book, *The Politics of Gun Control,* has been in print since its initial publication in 1995.  It examines firearms policy in the United States through the lenses of history, law, politics, and criminology.  The eighth edition of the book was published in 2021 by Routledge Publishers.  My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with the study of historical gun laws.  I am frequently interviewed and quoted in the national and international media on gun-related matters.  For over twenty years, I have been a member of the National Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun Violence).

I have provided written testimony as an expert witness in *Worman v. Healey*, No. 1:17-10107-WGY (D. Mass.), which concerned the constitutionality of Massachusetts' restrictions on assault weapons.  I have co-authored amicus briefs in numerous cases, including *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003); *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, 556 U.S. 848 (2009); *McDonald v. Chicago*, U.S. Supreme Court, 561 U.S. 742 (2010); *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011); and *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069 (2012). I have been invited to submit written testimony and serve as an expert witness in the following cases, in addition to this one:  *Hanson v. District of Columbia*, No. 1:22-cv-02256 (D.D.C.); *Brumback v. Ferguson*, No. 22-cv-3093 (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Miller v. Bonta*, No. No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Fouts v. Bonta*, 19-cv-1662 (S.D. Cal.); *Rupp v. Bonta*, 17-cv-00746 (C.D. Cal.); *Gates et al. v. Polis*, No. 1:22-cv-01866 (D. Colo.); *Oakland Tactical Supply LLC v. Howell Township*, No.: 18-cv-13443 (E.D. Mich.); *State v. Misch*, No. 173-2-19 Bncr (Vt. Super.

**App. 080**

Ct. Bennington County); *National Association for Gun Rights, Inc. v. City of Highland Park*, 22-cv-4774 (N.D. Ill.); *National Association for Gun Rights & Capen v. Campbell*, No. 22-cv-11431 (D. Mass.); *Abbott et al. v. Connor*, No. 20-00360 (D. Haw.); *National Association for Gun Rights v. Shikada*, No. 1:22-cv-00404 (D. Haw.); *Santucci v. Honolulu*, No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Shikada*, No. 1:22-cv-00323 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Lopez*, No. 1:22-CV-00404 (D. Haw.); *Abbot v. Lopez*, No. 20-00360 (D. Haw.); *Santucci v. City & County of Honolulu* , No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Lopez*, No. 1:22-cv-00323 (D. Haw.); *Baird v. Bonta*, 19-cv-00617 (E.D. Cal.); *Nichols v. Newsom*, 11-cv-9916 (C.D. Cal.); *Delaware State Sportsmen's Association, Inc. v. Delaware Department Of Safety And Homeland Security*, No. 1:22-cv-00951(D. Del.); *Mark Fitz, Grayguns, Inc. v. Rosenblum*No. 22-cv-01859 (D. Ore.); *Harrel v. Raoul*, No. 23-141, (S.D. Ill.); *Mitchell, et al. v. Atkins, et al.*, 19-cv-5106 (W.D. Wash.); *Keneally et al., v. Raoul, et al.*, 23-cv-50039 (N.D. Ill.); *McGregor v. County of Suffolk*, 2:23-cv-01130 (E.D.N.Y.); *Lane v. James*, 22-cv-10989 (S.D.N.Y.)*; Rocky Mountain Gun Owners, et. al. v. The Town of Superior*, 22-cv-02680 (D. Colo.); *Wiese v. Bonta*, 17-cv-00903 (E.D. Cal.); *Harrel v. Raoul*, Case No. 23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, No. 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, 23-cv-209-RJD (S.D. Ill.); *Federal Firearms Licensees of Illinois v. Pritzker*, 23-cv-215-NJR (S.D. Ill.); *Herrera v. Raoul*, 23-cv-532 (N.D. Ill.); *Banta v. Ferguson*, 23-cv-00112 (E.D. Wash.); *Hartford v. Ferguson*, 23-cv-05364 (W.D. Wash.).

I have also presented written testimony to the U.S. Congress on "The Second Amendment: A Source of Individual Rights?" submitted to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington, D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on Federal Lands, the

**App. 081**

U.S. House of Representatives, Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

## SUMMARY OF OPINIONS

### I.  INTRODUCTION

This Declaration examines two types of historical weapons regulations that are similar to the modern regulatory technique of waiting periods: laws relating to weapons and intoxication, and licensing laws. After discussing waiting periods, the similarities of each type will be examined in turn.

### II.  GUN PURCHASE WAITING PERIODS

Gun purchase waiting periods as they are understood and implemented today did not exist early in the country's history. Yet no special wisdom is required to discern why. Three important differences between early America and the modern era explain why.

First, in the modern era, gun and ammunition purchases can be made easily and rapidly from tens of thousands of licensed gun dealers,[1] private sales, gun shows, and through internet sales. This modern sales system was key to the enactment of waiting periods. No "Guns-R-Us" outlets existed in the 1600s, 1700s, or most of the 1800s. Rapid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get. As Kennett and Anderson note, "By the 1880s gunmaking had completed the transition from craft to industry."[2] The rise of handgun mail

---

[1] As of 2021, there were over 52,900 dealer licensees and over 7,000 licensed pawnbrokers. http://www.atf.gov/about/foia/ffl-list.html; "Gun Dealers," Giffords Law Center, https://giffords.org/lawcenter/gun-laws/policy-areas/gun-sales/gun-dealers/#footnote_1_5597.
[2] Lee Kennett and James LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 97.

**App. 082**

order purchasing through such companies as Montgomery Ward and Sears in the 1870s and 1880s brought cheap handguns to buyers' doors.[3] When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous anti-gun carry restrictions in the late 1800s and early 1900s.[4]

Second, no organized system of gun background checking could feasibly exist until the modern era. In fact, the contemporary uniform federal background check system with a five business day waiting period was established by the Brady Handgun Violence Prevention Act in 1993 (although the waiting period was phased out in 1998 and replaced with an instant background check system).[5] As of today ten states plus D.C. have waiting period laws ranging in length from three to 14 days.[6] By its nature, a gun waiting period simply delays an otherwise lawful purchase for sound two reasons: to complete a proper background check to insure that the individual is not among those not qualified to have a gun; and to provide a cooling off period for those who seek to obtain a gun impulsively for homicidal or suicidal reasons.[7]

Third, as Randall Roth reports, homicide rates in the colonies and early Federal era were generally low, and when homicides occurred, guns were seldom used because of the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy. More

---

[3] Kennett and Anderson, *The Gun in America,* 99-100. Sears ended handgun catalog sales in 1924, and other companies followed as pressure for government intervention rose. (194)

[4] Robert J. Spitzer, "Gun History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80(2017): 59-60, 63-67.

[5] 107 Stat. 1536. Robert J. Spitzer, *The Politics of Gun Control,* 9th ed. (NY: Routledge, 2024), 221-28.

[6] "Waiting Periods," Giffords Law Center, https://giffords.org/lawcenter/gun-laws/policy-areas/gun-sales/waiting-periods/. Minnesota enacted a law that provides for a 30 day waiting period for the purchase of handguns and assault weapon purchases from dealers, to take effect as of August 1, 2023.

[7] E.g. Michael Luca, Deepak Malhotra, and Christopher Poliquin, "Handgun waiting periods reduce gun deaths," *PNAS* 114(October 16, 2017): 12162-12165, https://www.pnas.org/doi/full/10.1073/pnas.1619896114

**App. 083**

specifically, muzzle loading firearms were problematic as implements for murder: they did not lend themselves to impulsive use unless already loaded (and it was generally unwise to leave them loaded for extended periods because their firing reliability degraded over time). Nearly all firearms at the time were single shot weapons, meaning that reloading time rendered them all but useless if a second shot was needed in an interpersonal conflict.[8]

Beyond these considerations, waiting periods can only exist through the interdiction of the government, or dealers, or both. Given the logical absence of modern waiting periods earlier in American history, are there similar, analogous historical gun laws? The answer is found below.

## III.  GUNS AND INTOXICATION

An interesting, instructive, and analogous historical parallel to waiting periods is gun laws pertaining to alcohol use and intoxication. These measures mimicked waiting periods because, for the most part, they prevented gun acquisition or use only for the period of time of actual intoxication (leaving aside those individuals for which chronic intoxication was a more-or-less permanent condition). When a person became sober, the intoxication barrier disappeared. Because intoxication is by its nature temporary, it interrupts gun access only temporarily, as is the case with waiting periods. Moreover, old intoxication laws avoided or thwarted "heat of the moment" gun acquisition or use by the intoxicated, when they would be much more likely to act rashly, impulsively, and with diminished judgment. These purposes also mimic the purpose of modern waiting periods.

---

[8] Randolph Roth, *American Homicide* (Cambridge, MA: Belknap Press, 2012), 61-144, 216-21; Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms?* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116-17. See also Roger Lane, *Murder in America* (Columbus, OH: Ohio State University Press, 1997), 344-45.

**App. 084**

It is no crime to be intoxicated from alcohol consumption—a fact no less true today than hundreds of years ago. Similarly, the purchase of alcohol for those eligible to drink is and has been perfectly legal, with the exception of the Prohibition period in the 1920s. When alcohol consumption is combined with other activities or circumstances, however, it has been and is subject to a variety of regulatory measures, including state sanctions, such as those arising from operating a motor vehicle while under the influence of alcohol. When inebriation ends, drivers may resume driving, subject to any restrictions imposed by the government for prior instances of driving while drunk, such as license suspension for a fixed period.

That aside, the government has long imposed a wide range of regulatory measures pertaining to the adverse consequences of alcohol consumption (including but not limited to those pertaining to weapons), including "pricing and taxation measures, regulating the physical availability of alcohol, restricting alcohol marketing, education and persuasion strategies, drink-driving countermeasures, modifying the drinking context, and treatment and early intervention."[9] Interestingly, nearly all of these types of measures date back hundreds of years,[10] despite changing social attitudes about alcohol and drinking.

In the century and a half before the American Revolution, "the colonists of North America tended to regard heavy drinking as normal"[11] as such beverages "were considered important and invigorating foods, whose restorative powers were a natural blessing."[12] Reliance

---

[9] Thomas F. Babor, et al., *Alcohol: No Ordinary Commodity: Research and Public Policy,* 3rd ed. (NY: Oxford University Press, 2023), Ch. 1, p. 9.
[10] "History and Culture of Alcohol and Drinking: 17th Century," in Scott C. Martin, *The SAGE Encyclopedia of Alcohol* (Thousand Oaks, CA: SAGE Publications, Inc. 2015), 669-72.
[11] "Alcohol in America: Taking Action to Prevent Abuse," National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK217463/
[12] Paul Aaron and David Musto, "Temperance and Prohibition in America: A Historical Overview," in *Alcohol and Public Policy: Beyond the Shadow of Prohibition,* Mark H. Moore and Dean R. Gerstein, eds. (Washington, D.C.: National Academies Press, 1981), 131

**App. 085**

on alcoholic beverages was also common because of the baneful health effects of drinking contaminated water. Despite the normality of heavy drinking, drunkenness was also recognized even in this early period as a problem to be "condemned and punished."[13] During this period, the adverse consequences of excessive drinking were mitigated to a significant degree because it largely occurred through community taverns where social pressures and a system of tavern licensing, dating to the 1600s, that encouraged "responsible oversight"[14] by tavern owners.

The post-Revolution period, however, witnessed a dramatic change in alcohol products as cheaper and more abundant distilled spirits, like domestic whiskey, exploded in production and demand. As production and consumption skyrocketed, earlier safeguards declined, and public drunkenness became much more common.[15] Coinciding with these changes, attitudes began to change as well, as alcohol came to be thought of increasingly as "an addicting and even poisonous drug," the excessive consumption of which led to a host of familial, behavioral, social, and other problems.[16] This growing societal awareness of the adverse consequences of alcohol consumption gave rise to the temperance movement and the Anti-Saloon Leagues of the nineteenth and early twentieth centuries, culminating in the adoption of the Eighteenth (Prohibition) Amendment to the Constitution in 1919, only to be repealed by the Twenty-first Amendment in 1933.

Remarkably, despite the greater indulgence of drinking alcohol to excess in the colonial and early Federal periods, laws restricting or punishing the handling, carrying, or use of firearms while intoxicated appeared among the very earliest weapons regulations. From the 1600s through

---

[13] Aaron and Musto, "Temperance and Prohibition in America," 132.
[14] Aaron and Musto, "Temperance and Prohibition in America," 133.
[15] Aaron and Musto, "Temperance and Prohibition in America," 134-36.
[16] "Alcohol in America"; W.J. Rorabaugh, *The Alcohol Republic* (NY: Oxford University Press, 1979), 125-46.

the early 1900s, at least 30 states regulated, restricted, and punished inebriation in connection with the ownership or use of weapons. These regulations included at least 20 states that criminalized the carrying or use of firearms when intoxicated. At least 15 states regulated the commercial sale or distribution of alcohol when firearms were also present; at least 2 states barred gun sales to those who were intoxicated; at least 6 states enacted laws prohibiting drunkenness in connection with militia activity; and one state (Arizona) barred guns to Native Americans if intoxicated (see Exhibit B and C).

To parse the data chronologically, in the 1600s, at least 3 states (which at the time were colonies) enacted 7 such laws; in the 1700s at least 7 states enacted 9 laws; in the 1800s at least 19 states enacted 28 laws; and in the 1900s at least 15 states enacted 32 laws (note that some states enacted laws across more than one century; see Exhibits B and C). As noted, a number of these measures appeared very early in the Nation's history, punctuating the country's enduring struggle with "demon rum."

In 1623, 1631, and again in 1632, for example, Virginia enacted measures all directing that "[n]o commander of any plantation, shall either himself or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments."[17] One presumes that the expenditure of powder pertained both to firearms discharges and perhaps to the separate ignition of gun powder. Most important, however, is that the actions under regulation were barred when "drinking" was involved. In a 1655 Virginia law, more general alcohol-fueled revelry was subject

---

[17] 1623 Va. Acts 127 Acts of March 5th, 1623, 29; 1631 Va. Acts 173, Acts of February 24th, 1631, Act L; 1632 Va. Acts 198, Acts of September 4th, 1632, Act XLIV.

**App. 087**

to fines for any who would "shoot any guns at drinking," though the law carved out two special occasions for regulatory exemption: "marriages and funerals only excepted."[18]

In 1636 Rhode Island enacted a measure to punish any who would engage in "shooting out any gun . . . drinking in any tavern alehouse . . . on the first day of the week more than neccesity requireth." Any who did so would find themselves in the stocks or fined five shillings.[19] In 1663 Massachusetts criminalized any on board of ships docked at any colonial harbor where those on board would "be drunk within their vessels by day or night" and "shoot off any gun after the daylight is past, or on the sabbath day." The fine was a substantial twenty shillings for every gun so fired.[20] In 1750 Pennsylvania enacted a law "For Suppressing Idleness, Drunkenness, And Other Debaucheries" that punished with "penalties and forfeitures" any who fired guns or set off fireworks without a special license to do so.[21]

Such measures proliferated in the nineteenth and early twentieth centuries, most commonly as a bar to weapons carrying or discharging. For example, the Tennessee legislature granted a locality the authority to penalize "shooting and carrying guns" along with drinking in 1825.[22] In 1865, Kansas enacted a law to punish any found to carry a deadly weapon while "under the influence of intoxicating drink."[23] Nevada enacted measures in 1881 and 1885 that

---

[18] 1655 Va. Acts 401, Acts of March 10, 1655, Act XII. Early in the country's history, alcoholic beverages played an especially important role in marrying and burying. Eric Burns, *The Spirits of America* (Philadelphia, PA: Temple University Press, 2004), 16-17.

[19] 1636-1748 R.I. Pub. Laws 31, At A General Assembly Held For Rhode Island Colony At Newport 6th of May, 1679. 1636.

[20] The Charters and General Laws Of The Colony And Province Of Massachusetts Bay Page 190, Image 197 (1814) available at The Making of Modern Law: Primary Sources. 1663.

[21] 1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries.

[22] 1825 Tenn. Priv. Acts 306, An Act to Amend an Act Passed at Murfreesboro, October 20, 1821, Incorporating Winchester and Reynoldsburgh, ch. 292.

[23] The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory

**App. 088**

punished any who discharged firearms in various public spaces while "under the influence of liquor."[24] An 1883 Wisconsin law made it "unlawful for any person in a state of intoxication, to go armed with any pistol or revolver."[25] In 1878, 1880, and 1908, Mississippi enacted laws that made it illegal "to sell to any minor or person intoxicated" any pistol or other named weapon[26] (minors and those intoxicated were more than occasionally treated together within these laws[27]). In 1907 Arizona found it necessary to enact a law making it "unlawful for any constable or other peace officer in the Territory of Arizona, while under the influence of intoxicating liquor of any kind, to carry or have on his person a pistol, gun, or other firearm."[28]

The state of Missouri must have felt its population to have been greatly abused by the intersection of guns and alcohol: in 1879 and again in 1883, the state enacted a law to fine or imprison any who carried concealed or brandished "any kind of fire arms" or other listed

---

of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources.

[24] 1881 Nev. Stat. 19-20, An Act to Prohibit the Use of Firearms in Public Places, ch. 7, § 1; David E. Aily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1076, Image 1084 (1885) available at The Making of Modern Law: Primary Sources. An Act to Prohibit the Use of Firearms in Public Places, § 1.

[25] 1883 Wis. Sess. Laws 290.

[26] 1878 Miss. Laws 175-76, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, §§ 2-3; Josiah A.Patterson Campbell, The Revised Code of the Statute Laws of the State of Mississippi: With References to Decisions of the High Court of Errors and Appeals, and of the Supreme Court, Applicable to the Statutes Page 776-777, Image 776-777 (1880) available at The Making of Modern Law: Primary Sources; Laws regulating carrying and brandishing firearms, who can own them, where they can be brought, etc., Ch. 20, §§ 293-300, in The Charter and Code of the Ordinances of Yazoo City (1908).

[27] E.g. William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources. Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864.

[28] 1907 Ariz. Sess. Laws 15, An Act to Prohibit Officers from Carrying Firearms While Under the Influence of Liquor and for Other Purposes, ch. 16, § 1.

**App. 089**

weapons "when intoxicated or under the influence of intoxicating drinks."[29] Not content with these two state laws, at least 20 similar laws were also enacted in Missouri between 1873 and 1917 that applied to counties, cities, and towns (see Exhibits B and C).

A Maryland state law from 1884 pertaining to Baltimore said that anyone found to be "drunk or disorderly" who was also carrying a concealed pistol or other weapon was subject to confiscation of the weapon and a fine.[30] Rhode Island enacted a similar law—fine plus weapon confiscation—in 1893.[31] An 1899 South Carolina law said that "any person who shall engage in any boisterous conduct, under the influence of intoxicating liquors" who discharged a firearm of any kind near a road would be subject to a fine and jail.[32] A 1909 Idaho law criminalized anyone who "shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks."[33]

While the focus of these laws was those who had weapons while drinking or drunk, another type of law appeared early: that restricting the sale or distribution of alcohol in the proximity of those with firearms. A 1679 Massachusetts law prohibited bringing or selling "any wine, strong liquor, cider, or any other inebriating drinckes, excepting beere of a penny a-quart"

---

[29] MO. REV. STAT. § 1274 (1879), reprinted in 1 The Revised Statutes of the State of Missouri 1879 224 (John A. Hockaday et al. eds. 1879); 1883 Mo. Laws 76, An Act to Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.

[30] John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein Page 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources. 1884.

[31] General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 1010, Image 1026 (1896) available at The Making of Modern Law: Primary Sources. 1893.

[32] 1899 S.C. Acts 97, An Act to Prevent Drunkeness And Shooting Upon The Highway, No. 67, § 1.

[33] 1909 Id. Sess. Laws 6, § 1.

**App. 090**

on and in the proximity of militia training days unless they were licensed to do so "from the hands of two magistrates" or the commanding military officer then present.[34] In 1746 New Jersey enacted a law penalizing anyone who would "presume to sell any strong Liquor. . . in such Days or Times. . . at the Place of Mustering or Training [of militias], or within a Mile thereof. . . ."[35] Similarly, a 1756 Delaware law forbade militia companies from meeting within a half mile of any inn or tavern. It also punished any attempting to sell "any strong liquor" in a booth or tent in proximity of a militia training area.[36] Also in 1756, Maryland enacted a similar measure to penalize attempts to sell "strong liquor" at the time and location of militia musters.[37] Pennsylvania enacted the same type of measure in 1780.[38] Such measures extended into the nineteenth century.[39]

---

[34] Order p[ro]hibbiting retayling strong drinckes at traynings, Boston, May 28th, 1679. Beer had a lower alcohol content than other alcoholic beverages.

[35] An Act for better settling and regulating the Militia of this Colony of New-Jersey, for the repelling Invasions, and Suppressing Insurrections and Rebellions. Passed May 8, 1746. Section 3. Officers and Soldiers to behave well while under Arms; and, Section 23. Penalty on selling strong Liquor near the mustering Place.

[36] An Act for Establishing a Militia in this Government (Delaware, 1756).

[37] An Act for Regulating the Militia of the Province of Maryland (MD General Assembly, Lower House, L.H.J. Liber No. 48, Assembly Proceedings, May 22, 1756).

[38] An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania (20 March, 1780), § 57, Penalty on Officers Misbehaving while on Parade; § 60, Rules and regulations, 12th rule.

[39] Acts & Resolves of Vermont, 25, no. 24, An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15 (1852); An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops, §10, Acts & Resolves of the General Assembly of the State of Rhode Island (1853); Temporary Buildings within One Mile of Muster Field, Used for Sale of Intoxicating Liquors, May Be Removed, Acts and Resolves of Maine, Ch. 265 "An Act to Organize and Discipline the Militia," §73 (1856); 1859 Conn. Acts 62, Temporary Erections for Sale of Liquors or Gaming, Near Parade Ground, May Be Abated as Nuisances. In Public Acts Passed by the General Assembly of the State of Connecticut, Ch. 82, §5; Amendments to Militia Regulations, Ohio Senate Bill No. 7, § 1, in The State of Ohio: General and Local Acts Passed, and Joint Resolutions Adopted by the Sixty-Seventh General Assembly at Its Regular Session (1886); Selling Liquors on Camp Grounds Prohibited, § 22 of Chapter 102—An Act to Revise, Amend, and Codify the Statutes Relative to the Militia in Acts and Resolutions Passed at the Regular Session of the Twenty-Sixth General Assembly of the State of Iowa (1896).

These laws restricting the civilian commercial sale of alcohol all pertained to their proximity to militia/military activity. Aside from these laws, colonies and then states also enacted laws that directly restricted or punished drunkenness among militia ranks[40] for the obvious reason that excessive alcohol consumption undermined military order, morale, and effectiveness.[41] To be sure, alcohol was also very much a part of soldiering during this time. For example, General George Washington "insisted on alcohol for his men"[42] during the Revolutionary War, but like any good commander he wanted to tightly control its dissemination and consumption. The normal daily alcohol ration for Washington's men was four ounces.[43] Despite the efforts to control quantity, drunkenness was a serious and chronic problem among the militias throughout the existence of the old militia system.[44]

A Chicago, Illinois ordinance from 1851 imposed a series of strict and wide-ranging regulations concerning licensing for the storage, transport, and handling of gun powder and gun cotton that included this prohibition: "no permit shall be granted to any retailer of intoxicating

---

[40] E.g. An Act for regulating and ordering the Troops that are, or may be raised, for the Defence of this Colony, Article 19 (11 May, 1775); An Act For the better ordering of the Militia of this Province §19 Savannah, GA (25 March, 1765); An Act for Regulating the Militia of the Province of Maryland (MD General Assembly, Lower House, L.H.J. Liber No. 48, Assembly Proceedings, May 22, 1756); An Act to regulate the Militia of the Common-Wealth of Pennsylvania, §§ IX-X (1777); An Act for the Regulation of the Militia of this State (South Carolina) § 5 Regulations for the government of the militia, Rule 7 (1782).

[41] This concern is reflected in Frederick William Baron von Steuben, *Baron von Steuben's Revolutionary War Drill Manual* (NY: Dover Publications, 1985; first pub. 1779, rev'd. 1794), 82, 105.

[42] Burns, *The Spirits of America*, 16.

[43] Burns, *The Spirits of America,* 16. During the terrible winter at Valley Forge, Pa., of 1777-78, Washington doubled the daily alcohol ration for the men to eight ounces.

[44] Spitzer, *The Politics of Gun Control*, 40-41, 46-49; "The Militia System," *The Advocate of Peace (1837-1845)* 6(November/December 1845): 133-35, https://www.jstor.org/stable/pdf/27888661.pdf?refreqid=excelsior%3Aca7db5c5969e023981868 e0b56120741&ab_segments=&origin=&initiator=&acceptTC=1

**App. 092**

liquors or to any intemperate person."[45] St. Paul, Minnesota enacted a similar measure in 1858.[46] Delaware enacted laws in 1911 and 1919 that made it "unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges."[47]

As this account demonstrates, laws enacted to keep those who were intoxicated from weapons possession or use because of the universal understanding that the intoxicated would be much more likely to act rashly, impulsively, and with diminished judgment—i.e., in the heat of the moment. These purposes are analogous to the purpose of modern waiting periods.

## III.  HISTORICAL WEAPONS LICENSING LAWS

Weapons licensing or permitting was a widespread and varied regulatory tool utilized in America. By one definition, licensing is the "permission by competent authority to do an act which, without such permission, would be illegal. . . ."[48] Despite the difference of hundreds of years, licensing in early America functioned largely in the way it functions today.

While different in its particulars, historical weapons licensing and permitting laws did, and do, operate in a manner similar to modern waiting periods, in that they are predicated on a process whereby a license applicant provides or submits some kind of information which is then judged to be acceptable or not. If the judgment is affirmative, the license is granted. By its

---

[45] George Manierre, The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois Page 123-125, Image 131-133 (1851) available at The Making of Modern Law: Primary Sources.

[46] The Charter and Ordinances of the City of St. Paul, (To August 1st, 1863, Inclusive,) Together with Legislative Acts Relating to the City. Page 166-167, Image 167-168 (1863) available at The Making of Modern Law: Primary Sources. 1858.

[47] Vol. 26 Del. Laws 28, 28- 29 (1911); Vol. 30 Del. Laws 55, 55-56 (1919).

[48] Henry C. Black, *Black's Law Dictionary,* 6th ed. (St. Paul, MN: West Publishing, 1991), 634.

**App. 093**

nature, then, licensing contemplates the passage of some period of time (even if it be brief) between the time the application or permission to do something is submitted (such as a hunting license) and the license or permission is granted. In addition, licensing generally represented a more mature and nuanced form of regulation that in many instances succeeded or supplemented more rigid but less complicated laws (see discussion below). The same might be said of modern waiting periods. In addition, licensing by its nature thwarts any ability to acquire or use firearms on demand.

State and local laws encompassing the licensing, permitting, or registration of dangerous weapons and substances date to the 1700s and became more wide-ranging and widespread in the 1800s and early 1900s. These laws mostly pertained to those weapons that posed a threat to public safety: concealable weapons, including handguns, fighting knives, various types of clubs, and explosives (ranging from firecrackers to gun powder to nitroglycerine after its invention).

At least 29 states enacted 61 licensing requirement laws for individuals as a pre-requisite for their weapons ownership during this time (see Exhibits D and E); 17 of those states did so in the 1800s. At least 26 states enacted laws to regulate firearms discharging through licensing, with 13 of those states doing so from the 1700s up to the start of the Civil War, and another 20 states doing so between the end of the Civil War and 1900 (some states enacted laws in both periods). At least 12 states licensed hunting with firearms from the post-Civil War period through the early 1900s. At least 21 states licensed the commercial sale, transport, or firing of weapons at locations like shooting galleries. At least 21 states licensed the possession, handling, or transport of gunpowder and other explosives. At least 15 states required those selling or otherwise providing weapons to individuals to record and keep information pertaining to the buyers of weapons.

**App. 094**

At least 14 states imposed licensing requirements on marginalized groups (variously including Native Americans, felons, non-citizens, non-state residents, or minors). In the pre-Civil War period, at least 12 states imposed licensing on enslaved persons or free Blacks.

Most weapons licensing laws pertaining to weapons carrying, discharge, commercial sales, and gunpowder licensing generally were applied to populated areas, since misuse of weapons posed a far greater risk to public safety in areas where larger numbers of people lived in close proximity to each other.

These licensing categories were instances where the prevailing legal standard had been to ban the activity or practice outright—banning concealed carrying, banning weapons discharge in cities and towns, banning weapons from marginalized groups, etc. The governing units enacting licensing for these activities were now allowing firearms or other dangerous weapons or substances to be used or possessed with the granting of a license to do so, when their possession or use would otherwise be subject to criminal penalties. The proliferation of licensing represented in most instances a new and more mature form of government regulation of the activities in question.

With regard to concealed carry of pistols and other dangerous weapons, for example, from the 1700s through the early 1900s virtually every state in the country restricted or criminalized such carrying.[49] With the spread of licensing requirements in the post-Civil War nineteenth century, however, governing units were now allowing legal weapons carrying, subject to the review criteria as conducted by local officials who were empowered to grant carry licenses. The criteria for the granting of these licenses were generally highly discretionary for the individuals

---

[49] Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80 (2017): 63-67.

**App. 095**

or bodies granting them. In some laws, no criteria were specified; in others, the criteria were vague or broad, but often included wording that the applicants must be persons of good character or sound judgment, again emphasizing the determinative judgment of those granting the licenses. They usually set a time limit for permits, ranging from a month to a year (see below).

Regarding hunting licenses, many earlier laws criminalized various hunting practices, dating back to the 1600s, for reasons related to protection of private property and lands, conservation, and safety.[50] The hunting related laws listed here are all instances where hunting was allowed through permitting by a government entity, meaning that the permits or licenses could be withdrawn if the licensees violated whatever rules the laws imposed (such as hunting out of season). Licensing related to Indigenous people, enslaved persons, and free persons of color is discussed in more detail below. All of these types of laws are detailed in Exhibits D and E.

## A.     Licensing of Weapons Carrying or Possession

In 1871, Missouri enacted a measure to license the otherwise illegal practice of concealed carrying of handguns and other named weapons, including "any other dangerous or deadly weapon" in St. Louis by means of "written permission from the Mayor."[51] St. Louis enacted its own municipal version of this law in 1892.[52] A similar measure was enacted for Kansas City,

---

[50] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 73-74.

[51] Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871).

[52] The Municipal Code of St. Louis (St. Louis: Woodward 1901), p.738, Sec. 1471. 1892; Chapter 18. Of Misdemeanors, Sec. 1471.

**App. 096**

Missouri, in 1880.[53] Jersey City, New Jersey enacted a licensing scheme in 1871 for concealed weapons carrying of pistols and other dangerous weapons, defined in the law as "any gun, pistol, cannon, or fowling piece or other fire-arms. . . ."[54]  As this wording makes clear, this extended to long guns as well (a fowling piece is a long-barreled shotgun for shooting small animals[55]). Jersey City's 1873 law laid out a broadly discretionary set of criteria for granting licenses, described below (as determined by the city's municipal court), that bears great similarity to contemporary gun licensing schemes:

> The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper.[56]

The Jersey City ordinance added that carry permits would not be granted "to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control."[57]

Hyde Park, Illinois enacted a similar licensing law for concealed weapons carrying, including handguns, in 1876. In this instance, the licenses were granted "by written permission

---

[53] An Ordinance in the Revision of the Ordinances Governing the City of Kansas (Kansas City, MO; Isaac P. Moore's Book and Job, 1880), p. 264, Sec. 3. 1880; Chapter XXXIV. Public Safety, Sec. 3.

[54] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 46, Image 46 (1874) available at The Making of Modern Law: Primary Sources. 1871.

[55] https://www.thefreedictionary.com/fowling+piece.

[56] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources. 1873.

[57] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871.

**App. 097**

of the Captain of Police."[58] Evanston, Illinois's concealed carry licensing law of 1893 granted licensing issuance authority to the city mayor.[59]

New York City criminalized the carrying of "a pistol of any description concealed on his person" in 1881 but provided for a legal carry license exception:

> Any person, except as provided in this article, who has occasion to carry a pistol for his protection, may apply to the officer in command at the station-house of the precinct where he resided, and such officer, if satisfied that the applicant is a proper and law abiding person, shall give said person a recommendation to the superintendent of police, or the inspector in command at the central office in the absence of the superintendent, who shall issue a permit to the said person allowing him to carry a pistol of any description.[60]

This provision also allowed for non-residents who had occasional business in the city to apply for permits as well. An 1884 New York state law barred the carrying or possession of named weapons, including fighting knives and types of clubs, from those under eighteen, unless they possessed a license to do so. Licenses could only be granted for up to one year and were subject to revocation "at the pleasure of the mayor."[61] A year later, the law was extended to all

---

[58] Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources. 1876. Misdemeanors, § 39.

[59] George W. Hess, Revised Ordinances of the City of Evanston : Also Special Laws and Ordinances of General Interest Page 131-132, Image 143-144 (1893) available at The Making of Modern Law: Primary Sources.

[60] Elliott Fitch Shepard, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their Authority Page 214-215, Image 214-215 (1881) available at The Making of Modern Law: Primary Sources.

[61] George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources. 1884.

App. 098

cities in the state and included "any pistol or other firearms of any kind."[62] (This would have included long guns as it did not specify only concealed carry.) In 1891, the state extended permitting to Buffalo covering handguns and other dangerous weapons.[63]

Wheeling, West Virginia enacted a law in 1881 making it "unlawful for any person to carry" various named weapons, including a "colt" revolver, or to "carry about his person, hid from common observation" any pistol or other named weapon without a permit from the mayor.[64] Under the heading "License," an 1882 law applying to St. Paul, Minnesota criminalized any concealed weapons carrying, absent such licensing.[65]

An 1888 Salt Lake City, Utah ordinance barred the carrying of "any concealed weapon" unless the person obtained a permit from the city mayor.[66] New Haven, Connecticut enacted a similar anti-carry law in 1890, extending to pistols, unless the person first obtained a permit either from the mayor or police superintendent.[67] Oakland, California enacted a similar law in 1890 making it unlawful "to wear or carry concealed about his person" a pistol or other listed weapon unless the person obtained a permit from the mayor. The permit was good for up to a

---

[62] George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5. Fourth Edition Page 298, Image 824 (1885) available at The Making of Modern Law: Primary Sources.

[63] 1891 N.Y. Laws 129, 177, An Act to Revise the Charter of the City of Buffalo, ch. 105, tit. 7, ch. 2, § 209.

[64] Laws and Ordinances for the Government of the City of Wheeling, West Virginia (Wheeling, WV: W. Va. Printing 1891), p.206, SEC. 14. 1881.

[65] W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources. 1882.

[66] The Revised Ordinances of Salt Lake City, Utah, Chapter XXVI, Misdemeanors, p. 283 Sec. 14 (1888), Dangerous and Concealed Weapons. SEC. 14.

[67] Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources.

**App. 099**

year, and could be granted to "any peaceable person whose profession or occupation may require him to be out at late hours of the night to carry a concealed deadly weapon upon his person."[68] The California cities of Stockton (1891)[69] and Fresno (1896)[70] did the same.

A law passed by the U.S. Congress in 1892 for the District of Columbia criminalized the concealed carry of "any deadly or dangerous weapons," including pistols, unless granted a permit by a judge of the police court "for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof. . . ."[71] Florida's 1893 law made it "unlawful to carry or own a Winchester or other repeating rifle or without first taking out a license from the County Commissioner. . . ." In addition, the law specified that the applicant "shall give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the County Commissioners," along with "a record of the name of the person taking out such license, the name of the maker of the firearm so licensed to be carried and the caliber and number of the same."[72]

Montana enacted a wide-ranging state licensing law in 1895 that threatened imprisonment and fines for anyone "who brings into this state an armed person or armed body of

---

[68] Fred L. Button, ed., General Municipal Ordinances of the City of Oakland, California (Oakland, CA; Enquirer, 1895), p. 218, Sec. 1, An Ordinance to Prohibit the Carrying of Concealed Weapons, No. 1141. 1890.

[69] Charter and Ordinances of the City of Stockton (Stockton, CA: Stockton Mail Printers and Bookbinders, 1908), p. 240, Ordinance No. 53. 1891.

[70] L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.

[71] Washington D.C. 27 Stat. 116 (1892), CHAP. 159.

[72] 1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, chap. 4147, §§ 1-4.

**App. 100**

men for the preservation of the peace or the suppression of domestic violence, except at the solicitation and by the permission of the legislative assembly or of the governor. . . ."[73]

A state law in Nebraska granted the mayor of Lincoln the authority to issue concealed carry weapons licenses good for a year "at his pleasure" in 1895.[74] The city of Spokane, Washington criminalized the concealed carrying of "either a revolver, pistol or other fire-arms" unless persons obtained a "special written permit from the Superior Court" to do so.[75] Milwaukee, Wisconsin enacted a permitting system in 1896 for persons to carry otherwise barred various dangerous weapons including "any pistol or colt" if the city police chief granted a license if "it is necessary for the personal safety of such person or for the safety of his property or of the property with which he may be entrusted, to carry such weapon." The chief could also "revoke such permit at any time."[76]

In the twentieth century, permitting accelerated, spread, and broadened. In 1905 New Jersey enacted a state law licensing concealed weapons carrying for a year "unless sooner revoked by the officer or body granting the same."[77] Licensing was extended to long guns—

---

[73] Decius Spear Wade, The Codes and Statutes of Montana. In Force July 1st, 1895. Including the Political Code, Civil Code, Code of Civil Procedure and Penal Code. As Amended and Adopted by the Fourth Legislative Assembly, Together with Other Laws Continued in Force Page 873, Image 914 (Vol. 2, 1895) available at The Making of Modern Law: Primary Sources. 1895. Crimes Against the Public Peace, § 759.

[74] 1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47.

[75] Rose M. Denny, ed., The Municipal Code of the City of Spokane, Washington (Spokane, WA; W.D. Knight, 1896), p. 309-10, Ordinance No. A544, Sec. 1. 1895.

[76] Charles H. Hamilton, ed., The General Ordinances of the City of Milwaukee to January 1, 1896: With Amendments Thereto and an Appendix (Milwaukee, WI: E. Keough, 1896), pp.692-93, Sec. 25. Chapter XX. Misdemeanors. Section 25.

[77] 1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.

**App. 101**

machine guns and automatic rifles—in New Jersey in 1927[78] and 1934.[79] (A number of the 32 states that enacted anti-machine gun laws in the 1920s and 1930s made exceptions for possession via licensing.) In 1906 a Massachusetts state law noted that prosecution for carrying "a loaded pistol or revolver" did not apply to those with a license.[80] It extended licensing to a variety of guns in 1927.[81] In 1908 Virginia enacted a dangerous weapons concealed carry permit law, with permits granted for one year "upon a written application and satisfactory proof of the good character and necessity of the applicant to carry concealed weapon."[82] It extended the permitting process in 1926.[83] Georgia enacted a detailed handgun permitting system in 1910.[84] Thereafter, permitting was enacted in states (not including those that enacted permitting in the 1800s, most of which also enacted permitting laws in the 1900s as well) including Hawaii,[85] Indiana,[86]

---

[78] 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

[79] 1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

[80] 1906 Mass. Acts 150, ch. 172, An Act to Regulate by License the Carrying of Concealed Weapons.

[81] 1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123).

[82] 1908 Va. Laws 381, An Act To Amend And Re-Enact Section 3780 Of The Code In Relation To Carrying Concealed Weapons, § 3780.

[83] 1926 Va. Acts. 285-87, CHAP. 158.

[84] Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d). 1910.

[85] 1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), §§ 10-11, § 17; 1933 Haw. Sess. Laws 39, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 8, 10-16.

[86] 1925 Ind. Acts 495, 495-98.

**App. 102**

Michigan,[87] New Hampshire,[88] North Carolina,[89] North Dakota,[90] Ohio,[91] Oregon,[92] Pennsylvania,[93] Rhode Island,[94] and South Carolina.[95]

The existence and functioning of old licensing laws makes clear that the government had every right to take whatever time it felt was needed to complete the licensing process, consistent with its police powers. The historical realities of licensing provide no notion nor inclination that there was anything resembling a "right" to obtain or use firearms on demand.

## B.    Permits for Firearms Discharge or Use of Explosives

As noted above, at least 26 states enacted licensing mechanisms to allow firearms and like discharges under certain circumstances. Generally speaking, firearms and discharge licensing pertained to any firearm, not just handguns. From the 1700s to 1860, at least 13 states enacted discharge licensing authority to local officials. The earliest were in Pennsylvania. In 1713, Philadelphia penalized various activities in the city including "firing a Gun without

---

[87] 1925 Mich. Pub. Acts 47, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 7; 1927 Mich. Pub. Acts 888-89, 91, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, §§ 3, 9.

[88] 1923 N.H. Laws 138.

[89] 1919 N.C. Sess. Laws 397-99, Pub. Laws, An Act to Regulate the Sale of Concealed Weapons in North Carolina, ch. 197, §§1, 5.

[90] 1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5; 1923 N.D. Laws 379, 380-82 ch. 266; 1925 N.D. Laws 216–17, Pistols and Revolvers, ch. 174, § 2; 1931 N. D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.

[91] 1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

[92] 1913 Or. Laws 497; 1917 Or. Sess. Laws 804-808; 1925 Or. Laws 468, 469-471.

[93] 1929 Pa. Laws 777; 1931 PA. Laws 498, No. 158.

[94] 1927 (January Session) R.I. Pub. Laws 256.

[95] 1934 S.C. Acts 1288.

**App. 103**

license."[96] An act pertaining to the entire colony from 1721 imposed "penalties and forfeitures" to anyone who engaged in various activities including firing "any gun or other fire arm" or selling or setting off various types of fireworks "without the governor's special license."[97] Another Philadelphia ordinance to prevent "mischief [that] may happen by shooting of guns" or setting off fireworks, criminalized such activities unless individuals first obtained a "governor's special license."[98] A 1750 law did the same for the District of Southwark,[99] as did a colony-wide law also in 1750.[100] In 1824, permission from the president of the board of commissioners was required for anyone seeking to test through firing any gun, cannon, or similar weapons in certain sections of Philadelphia.[101]

Charleston, South Carolina enacted an ordinance in 1802 similar to those of Philadelphia where Commissioners of the Streets would grant a license for gun firing and fireworks "at times of public rejoicing" and at specified locations.[102] New Hampshire enacted a discharge permit

---

[96] Pennsylvania Archives. Selected And Arranged From Original Documents In The Office Of The Secretary Of The Commonwealth, Conformably To Acts Of The General Assembly, February 15, 1851, & March 1, 1852 Page 160, Image 162 (1852) available at The Making of Modern Law: Primary Sources. 1713.

[97] Act of 26th August 1721. [An Act of 9th of February, 1750-51], § 1.

[98] John C. Lowber, Ordinances of the Corporation of the City of Philadelphia; to Which are Prefixed, the Original Charter, the Act of Incorporation, and Other Acts of Assembly Relating to the City; with an Appendix, Containing the Regulation of the Bank of the River Delaware, the Portraiture of the City, as Originally Laid Out by the Proprietor, &c. &c. Page 15-16, Image 18-19 (1812) available at The Making of Modern Law: Primary Sources. 1721.

[99] Ordinances of the Corporation of the District of Southwark and the Acts of Assembly Relating Thereto Page 49, Image 47 (1829) available at The Making of Modern Law: Primary Sources. 1750.

[100] 1750 Pa. Laws 208.

[101] An Act of Incorporation for that Part of the Northern Liberties, Lying between the Middle of Sixth Street and the River Delaware, and between Vine Street and Cohocksink Creek, with Ordinances for the Improvement of the Same Page 51, Image 52 (1824) available at The Making of Modern Law: Primary Sources. 1824.

[102] Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a

**App. 104**

system for Portsmouth in 1823.[103] New York State enacted a law in 1824 that allowed the Schenectady mayor or other city officials to grant permission for discharge of any gun or various fireworks.[104] Marietta, Ohio enacted a discharge licensing law in 1823 because of concern that "the quiet of any of the inhabitants may be disturbed, or their lives and safety endangered."[105] New London, Connecticut singled out "some public day of review" in an 1835 law as a permissible reason for issuing a discharge permit,[106] and New Haven enacted a similar law in 1845.[107] The same was enacted for Quincy, Illinois in 1841,[108] Jeffersonville, Indiana in 1855,[109] and Richmond, Virginia in 1859.[110] Another 20 states enacted such laws from the end of the Civil War up to the end of the 1800s (not including states that enacted laws both before and after the Civil War: Alabama, Arkansas, California, Colorado, Louisiana, New Jersey, Oregon, Texas,

---

Resolution of the Council Page 289, Image 299 (1802) available at The Making of Modern Law: Primary Sources. 1802.

[103] 1823 N.H. Laws 73-74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.

[104] Laws of the State of New-York, Relating to the City of Schenectady: And the Laws and Ordinances of the Common Council of the City of Schenectady Page 58, Image 58 (1824) available at The Making of Modern Law: Primary Sources.

[105] The Act of Incorporation, and the Ordinances and Regulations of the Town of Marietta, Washington County, Ohio Page 17-18, Image 17-18 (1837) available at The Making of Modern Law: Primary Sources. 1823.

[106] The By-Laws of the City of New London, with the Statute Laws of the State of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855) available at The Making of Modern Law: Primary Sources. 1835.

[107] 1845 Conn. Acts 10, An Act Prohibiting the Firing of Guns and Other Fire Arms in the City of New Haven, chap. 10.

[108] Samuel P. Church, The Revised Ordinances of the City of Quincy, Ill. to Which are Prefixed the Charter of the City of Quincy, and the Amendment Thereto Page 47, Image 47 (1841) available at The Making of Modern Law: Primary Sources. 1841.

[109] W. G. Armstrong, The Ordinances and Charter of the City of Jeffersonville Page 15-17, Image 15-17 (1855) available at The Making of Modern Law: Primary Sources. 1855.

[110] The Charters and Ordinances of the City of Richmond, with the Declaration of Rights, and Constitution of Virginia Page 227, Image 274 (1859) available at The Making of Modern Law: Primary Sources. 1859.

**App. 105**

Vermont, Washington State, West Virginia, Wisconsin, and Wyoming). Most of them applied to specified cities and towns within their states (see Exhibits D and E).

## C.    Commercial Licensing

As noted, a total of at least 21 states enacted commercial licensing laws with 16 states doing so throughout the 1800s, and 9 states doing so in the early 1900s (some states enacted laws in both centuries). The earliest commercial licensing law was an 1814 Illinois measure that made it unlawful for whites to engage in commercial activities with Native Americans for guns, knives, tomahawks, or other items, unless they first obtained a license from the governor.[111] A century later, a Chicago ordinance imposed a licensing requirement both on persons or entities to sell concealable weapons, and also a licensing requirement to those seeking to buy them.[112] An 1854 law for San Francisco, California licensed commercial shooting galleries.[113] Indeed, at least 10 of the states in this category enacted shooting gallery licensing requirements. This historical evidence is consistent with the notion that the government can regulate the commercial activity of selling weapons.

## D.  Licensing Restrictions on Gunpowder

Gunpowder was widely and extensively regulated in the colonies and states. In fact, with one exception, every state in the country enacted one or more gunpowder laws from the

---

[111] An Act concerning the Kaskaskia Indians, in Nathaniel Pope, Laws of the Territory of Illinois (1815). 1814. This law is placed under this category because it pertained to white settler commerce; it was not a law that licensed Natives to engage in commerce.

[112] Samuel A. Ettelson, Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916 Page 458-459, Image 458-459 (Vol. 7, 1916) available at The Making of Modern Law: Primary Sources. 1914.

[113] Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council Page 220, Image 256 (1854) available at The Making of Modern Law: Primary Sources. 1854.

**App. 106**

seventeenth century through the start of the twentieth century.[114] One element of this regulation was gunpowder licensing; at least 21 states enacted such licensing from the 1700s through the early 1900s.

### E.   Weapons Sellers Recording Purchases

Aside from direct licensing of weapons purchasers by a government official or entity, at least 15 states required those who sold or otherwise transferred guns (mostly handguns) or other weapons to others to record information about the buyer, with that information to be maintained and subject to possible later examination. This regulatory mechanism put the burden of information collection and maintenance on the seller or dealer, rather than directly on the government, though it served the same purpose: to acquire and maintain information about those who obtained the weapons in question and when, for future reference or inspection by government officials or others. In some instances these requirements existed along with direct governmental licensing.

In 1885, Illinois enacted this registration requirement for weapons dealers:

All persons dealing in deadly weapons, hereinbefore mentioned, at retail within this State shall keep a register of all such weapons sold or given away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is purchased or obtained. The said register shall be in the following form. [Form of Register] Said register is to be kept open for inspection of the public. . . .[115]

---

[114] Mark Anthony Frassetto, "The Duty to Bear Arms: Historical Militia Law, Fire Prevention Law, and the Modern Second Amendment" (January 12, 2022), 8, in *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society* (eds. Jacob Charles, Joseph Blocher & Darrell Miller) (Oxford University Press, Forthcoming), Available at SSRN: https://ssrn.com/abstract=4007491 or http://dx.doi.org/10.2139/ssrn.4007491; Saul Cornell and Nathan DeDino, "A Well Regulated Right: The Early American Origins of Gun Control," *Fordham Law Review* 73(2004): 510.

[115] Merritt Starr & Russell H. Curtis, Annotated Statutes of the State of Illinois in Force (1885), Criminal Code Ch. 38, para. 90.

**App. 107**

With minor variations, this law was typical of such requirements. For example, a 1911 Colorado law offered this detailed set of instructions:

> Every individual, firm or corporation engaged . . . in the- retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and, if residing in a city, the street and number therein where he resides; the make, calibre and finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record-book shall be open at all times to the inspection of any duly authorized police officer.[116]

A 1911 New York law required every person selling any handgun to maintain a register "at the time of sale, the date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or other firearm, together with the calibre, make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm."[117] The purchaser also had to produce a permit at the time of the transaction, with the seller to note the permit information. Regulations being placed on the sellers of weapons are a historic normality.

## F.    Licensing Pertaining to Named Groups

The licensing of "Named Groups" referenced in Exhibit D includes the granting of weapons licenses to non-state residents, non-citizens, minors, felons, the intoxicated (who stood to lose their licenses), and Native Americans/Indigenous people.  Licensing the sale of weapons to Native Americans might seem paradoxical, since white leaders fought protracted conflicts with Natives from the 1600s through the end of the nineteenth century. But whites also traded arms with Natives throughout this entire period, as they sought profitability, access to highly

---

[116] 1911 Colo. Sess. Laws 408, Section 3.
[117] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2.

**App. 108**

desired goods made available by Indians, and security alliances with some Indians through the supplying of weapons. This steady and enduring trade revealed "the high degree of interdependence between Indians and Euro-Americans."[118]

As for licensing related to enslaved persons and free persons of color (listed separately in Exhibit D), it is well understood that white racist regimes before the Civil War were frantic to keep weapons out of the hands of enslaved persons. The laws listed here, however, are all instances when enslaved persons or free persons of color were allowed to have possession of weapons under listed, restricted circumstances through licensing in the pre-Civil War era. Some whites who owned enslaved persons sought the convenience of allowing the enslaved to carry weapons for hunting or other purposes designated by, and often under the supervision of, the white owners.

The fact that groups treated as marginalized in prior centuries—especially African Americans and Native Americans—were authorized to gain even limited access to dangerous weapons through licensing may seem incompatible with an otherwise racist tradition aimed at subjugating these groups, but such measures reflect the fact that it was in the interest of whites to allow weapons acquisition to these groups under limited circumstances.

## IV.  CONCLUSION

Gun purchase waiting periods are an artifact of the modern era, with roots in American history and tradition. While the idea of waiting periods as a public policy tool was, unnecessary and beyond the reach of the immature and undeveloped American nation-state, American society

---

[118] David J. Silverman, *Thundersticks* (Cambridge, MA: Harvard University Press, 2016), 15-16 and passim.

**App. 109**

instead adapted to the realities of firearms purchasing at that time. As Jacob Charles has argued, the fact that our ancestors were silent on some question or issue should not bestow "historical silence" with "explanatory power" over current policymaking.[119] There is no reason to believe that the absence of firearm purchase waiting periods early in American history somehow means that our ancestors would have disapproved of such a policy option. Far from it, especially considering the inherently modest nature of waiting periods. Intoxication laws and licensing laws both utilized the passage of time, whether to ward off intoxicated individuals or to conduct a licensing process, to improve the likelihood that those who ought not to have ready access to firearms do not obtain that access.

When our ancestors in the colonial, post-colonial, and developmental periods of the seventeenth, eighteen, and nineteenth centuries encountered social, behavioral, and other problems with respect to firearms, they responded with public policy techniques appropriate to their time, place, and circumstances. The examples pertaining to alcohol consumption and weapons licensing are two such examples that are analogous to modern waiting period laws.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 16th day of October, 2023.

Robert Spitzer

---

[119] Jacob D. Charles, "The Dead Hand of a Silent Past: Bruen, Gun Rights, and the Shackles of History" (January 23, 2023). *Duke Law Journal*, Vol. 73 (forthcoming), Pepperdine University Legal Studies Research Paper No. 2023/7, Available at SSRN: https://ssrn.com/abstract=4335545 or http://dx.doi.org/10.2139/ssrn.4335545).

**App. 110**

**EXHIBIT A**

July 2023

**<u>Curriculum Vitae</u>**

**Robert J. Spitzer**

**Distinguished Service Professor, Emeritus
SUNY Cortland**

<u>Address</u>:      5333 Center St.
                Alexandria, VA  23188
                (607) 423-1781
                Robert.spitzer@cortland.edu; robertjspitzer53@gmail.com
                https://sites.google.com/site/robertspitzercortland/


<u>Education</u>:     A.B. (Political Science), <u>summa cum laude</u>, SUNY College at Fredonia, 1975.
                M.A. Cornell University, 1978.
                Ph.D. Cornell University, 1980.


<u>Positions Held</u>:

    Affiliated Scholar, Government Department, College of William and Mary, 2023-present.
    Adjunct Professor, College of William and Mary School of Law, Spring 2023-present.
    Department Chair, SUNY Cortland, 2008-2020.
    Interim Department Chair, SUNY Cortland, 2004-2005.
    Distinguished Service Professor, SUNY Cortland, 1997-2021.
    Visiting Professor, Cornell University, Spring, 2009, Spring 1993; Summers 1980, 1988-
        1990, 1992-2017.
    Professor, SUNY Cortland, 1989 to 1997.
    Continuing Appointment, SUNY Cortland, 1986.
    Associate Professor, SUNY Cortland, 1984 to 1989.
    Department Chair, SUNY Cortland, 1983 to 1989.
    Visiting Professor, SUNY College of Technology, Utica-Rome, Graduate Division, 1985,
        1986, 1988.
    Copy Editor, <u>Administrative Science Quarterly</u>, 1982 to 1983.
    Adjunct Professor, Tompkins-Cortland Community College, 1982-83.
    Assistant Professor, SUNY Cortland, 1979 to 1984.
    Instructor, Cornell University, 1979.
    Instructor, Eisenhower College, 1978-1979.

1

**App. 111**

Research Assistant, Theodore J. Lowi and Benjamin Ginsberg, 1976-1978.
Reporter (Stringer), Buffalo Courier-Express; Dunkirk Evening Observer, 1974-75.


Honors:

Fellow, the Royal Society for Arts, Manufactures and Commerce (RSA), London, England, 2020.

Founding member, Regional Gun Violence Research Consortium, coordinated with the Rockefeller Institute of Government. Consortium of gun policy experts from eight states to advance research on gun policy, 2018-present.

Member, SUNY Research Council, an advisory council to the SUNY Board of Trustees, SUNY System Administration, campus leadership teams, and the leadership team of the Research Foundation (RF) for SUNY, 2018-2021.

Member, Scholars Strategy Network, 2015-present. Created to improve public policy and strengthen democracy by connecting scholars and their research to policymakers, citizens associations, and the media.

Winner, Pi Sigma Alpha (the national political science honors society) Chapter Advisor of the Year Award for 2013.

Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2010.

Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2005.

Winner, State University of New York's Chancellor's Excellence in Scholarship and Creative Activities Award, 2003.

SUNY Cortland Nominee, National Scholar Competition of the Honor Society of Phi Kappa Phi, 1994-95.

Winner, New York State/United University Professions Excellence Award, 1991, for "outstanding professional performance and superior service."

Member, New York State Commission on the Bicentennial of the U.S. Constitution, 1986-1990.

Member, New York State Ratification Celebration Committee for U.S. Constitution Bicentennial, 1987-88.

Member, National Bicentennial Competition on the Constitution and the Bill of Rights, 1987-1991.

Who's Who in the World, 1996.

Dictionary of International Biography, 1995.

Who's Who in the East, 1995-96; 1997-98

Ex officio member, Cortland County Bicentennial Committee, 1987-89.

Chair, SUNY Cortland Bicentennial Committee, 1987-89.

Phi Eta Sigma, SUNY Cortland, 1994.

Phi Kappa Phi, SUNY Cortland, 1990.

Men of Achievement (1986)

Contemporary Authors, vol. 112 (1985) and subsequent updates.

International Authors and Writers Who's Who, 1985-present.

**App. 112**

International Who's Who in Education, Winter 1985-86.
Herbert H. Lehman Graduate Fellowship, 1975-79.
Who's Who Among Students in American Universities and Colleges, 1974-75.
Phi Beta Kappa Club, SUNY College at Fredonia, 1975.
Phi Alpha Theta (History), SUNY College at Fredonia, 1974.
Phi Mu Alpha Sinfonia, (Music), SUNY College at Fredonia, 1973.

Research Fellowships and Projects:

Individual Development Awards, SUNY Cortland, 2001, 2003, 2005, 2006, 2007, 2008, 2009, 2014, 2017, 2020.
Title "F" Leave with pay, Spring 1994.
Professional Development and Quality of Working Life Award, 1989, 1993, 1998, 1999.
National Endowment for the Humanities (NEH) Research Grant for Study of the Constitution, 1986. Project Proposal: "The Presidential Veto: Constitutional Antecedents and Modern Applications."
SUNY Cortland Faculty Research Program Grant, "The Presidential Veto, 1986.
Consultant for Reporting Research Corporation, "Quality of Earnings Report," Thornton L. O'Glove, author; research on presidential veto use, 1984-1987.
SUNY University Awards Program Research Fellowship, "The Right to Life Party and New York State Politics, 1983.
SUNY Cortland Faculty Research Program Fellowship, "New York State Parties and Politics," 1980.

Publications and Papers:

Books:

The Presidency and Public Policy:  The Four Arenas of Presidential Power (University, AL:  The University of Alabama Press, 1983).  A study of the President's relations with Congress in the making of domestic policy.  Revised version of doctoral dissertation.

The Right to Life Movement and Third Party Politics (Westport, CT: Greenwood Press, 1987).  A study of the New York multi-party system, single-issue third parties, and the state-based Right to Life Party.

The Presidential Veto:  Touchstone of the American Presidency (Albany, NY: SUNY Press, 1988), with a foreword by Louis Fisher. A study of the constitutional antecedents and modern applications of the veto power. Published as part of SUNY Press Series on Leadership, edited by Barbara Kellerman.

App. 113

Editor, <u>The Bicentennial of the U.S. Constitution:  Commemoration and Renewal</u> (Cortland, NY: SUNY Cortland, 1990). A compendium of articles based on presentations given at SUNY Cortland pertaining to the Constitution's Bicentennial.  Contributors include Senator Daniel Patrick Moynihan, Theodore J. Lowi, Judith A. Best, and Robert Spitzer.

<u>President and Congress:  Executive Hegemony at the Crossroads of American Government</u> (New York: McGraw-Hill; and Temple University Press, 1993). Published simultaneously by co-publishing agreement in paper by McGraw-Hill, and hardcover by Temple. An analytic survey and critique of presidential-congressional relations. Received Honorable Mention for the Richard Neustadt Award for Best Book on the Presidency for 1993.

Editor, <u>Media and Public Policy</u> (New York: Praeger, 1993). Published in Praeger's Political Communications Series, edited by Robert E. Denton, Jr. A collection of original essays dealing with various aspects of media's impact on public policy. Contributors include Doris Graber, Julio Borquez, Wenmouth Williams, Marion Just, Ann Crigler, Michael Hawthorne, Dean Alger, Jerry Medler, Michael Medler, Montague Kern, Robert Sahr, Holli Semetko, Edie Goldenberg, Patrick O'Heffernan, and Robert Spitzer.

<u>The Politics of Gun Control</u> (New York: Chatham House, 1995; 2nd edition, 1998; 3rd edition, CQ Press, 2004; 4th ed. 2008; 5th ed., Paradigm/Routledge Publishers 2012; 6th ed., Routledge, 2015, 7th ed., 2018; 8th ed. 2021; 9th ed. 2024). A comprehensive political and policy analysis of the gun issue that applies policy theory to the key elements of the gun debate, including analysis of the Second Amendment, cultural-historical factors, interest group behavior, criminological consequences, legislative and executive politics.

Editor, <u>Politics and Constitutionalism: The Louis Fisher Connection</u>, (Albany, NY: SUNY Press, 2000). A collection of original essays inspired by the works of Louis Fisher. Contributors include Neal Devins, Nancy Kassop, Dean Alfange, David Adler, Loch Johnson, Michael Glennon, Louis Fisher, and Robert Spitzer. Published as part of the SUNY Press Book Series on American Constitutionalism. Nominated by SUNY Press for the 2001 Silver Gavel Award of the American Bar Association.

<u>The Right to Bear Arms: Rights and Liberties Under the Law</u> (Santa Barbara, CA: ABC-CLIO, 2001). An extensive analysis of the Second Amendment "right to bear arms" from legal, historical, and political perspectives. Published as part of the "America's Freedoms" Series edited by Donald Grier Stephenson.

<u>Essentials of American Politics</u>, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 2002; 2nd edition, 2006). A synthetic, analytic look at American government and politics.

**App. 114**

The Presidency and the Constitution: Cases and Controversies, co-authored with Michael A. Genovese (NY: Palgrave/Macmillan, 2005). A combination of analysis and cases examining the courts' view of presidential power.

Saving the Constitution from Lawyers: How Legal Training and Law Reviews Distort Constitutional Meaning (New York: Cambridge University Press, 2008). A sweeping indictment of the legal community when it enters into the realm of constitutional interpretation.

We the People: Essentials Edition, co-authored with Benjamin Ginsberg, Theodore Lowi, Margaret Weir, Caroline Tolbert, Andrea Campbell (W.W. Norton, 7th ed. 2009; 8th ed. 2011; 9th ed., 2013; 10th ed. 2015; 11th ed. 2017; 12th ed. 2019; 13th ed. 2021; 14th ed. 2023).

Gun Control: A Documentary and Reference Guide (Westport, CT: Greenwood Publishing Group, 2009). A combination of analysis, commentary, and original historical and contemporary documents pertaining to the gun issue published in Greenwood's Documentary and Reference Series.

The Gun Debate: An Encyclopedia of Gun Rights and Gun Control, co-authored with Glenn Utter (Grey House Publishers, 2011; third edition 2016). An A-Z compendium of gun issues.

Guns across America: Reconciling Gun Rules and Rights (New York: Oxford University Press, 2015; revised paperback ed. 2017); revised paperback edition published 2017. Argues that our understanding of the gun issue as it has evolved in the U.S. is upside down, looking at gun law history, the Second Amendment, stand your ground laws, and New York State gun laws.

The Gun Dilemma: How History Is Against Expanded Gun Rights (New York: Oxford University Press, 2023). Argues that the courts are ushering in a new era of expanded gun rights, despite the fact that such a movement is contrary to our gun history by examining assault weapons, ammunition magazines, silencers, gun brandishing, and the Second Amendment sanctuary movement.

Book Series Editor, Series on American Constitutionalism, SUNY Press, 1996-present. Books include:
> Daniel Hoffman, Our Elusive Constitution, (1997)
> Martin Sheffer, God and Caesar: Belief, Worship, and Proselytizing Under the First Amendment, (1999)
> Daniel Levin, Representing Popular Sovereignty: The Constitution in American Political Culture, (1999)
> Robert Spitzer, ed., Politics and Constitutionalism, (2000)

Laura Langer, <u>Judicial Review in State Supreme Courts</u> (2002)

Ian Brodie, <u>Friends of the Court</u> (2002)

Samuel Leiter and William Leiter, <u>Affirmative Action in Antidiscrimination Law and Policy</u> (2002)

Artemus Ward, <u>Deciding to Leave: The Politics of Retirement from the United States Supreme Court</u> (2003)

James T. McHugh, <u>Ex Uno Plura: State Constitutions and Their Political Cultures</u> (2003)

Stephen Newman, ed., <u>Constitutional Politics in Canada and the United States</u> (2004).

Stephen Kershnar, <u>Justice for the Past</u> (2004)

Timothy R. Johnson, <u>Oral Arguments and Decision Making on the U.S. Supreme Court</u> (2004).

Christopher P. Banks, David B. Cohen, and John C. Green, eds., <u>The Final Arbiter: The Consequences of Bush v. Gore for Law and Politics</u> (2005)

Kenneth D. Ward and Cecilia R. Castillo, eds., <u>The Judiciary and American Democracy: Alexander Bickel, the Countermajoritarian Difficulty, and Contemporary Constitutional Theory</u> (2005).

G. Alan Tarr and Robert F. Williams, eds., <u>State Constitutions for the Twenty-first Century: The Politics of State Constitutional Reform</u> (2006).

Frank P. Grad and Robert F. Williams, <u>State Constitutions for the Twenty-first Century: Drafting State Constitutions, Revisions, and Amendments</u> (2006).

G. Alan Tarr and Robert F. Williams, eds., <u>State Constitutions for the Twenty-first Century: The Agenda of State Constitutional Reform</u>, 3 vols. (2006).

Cary Federman, <u>The Body and the State: Habeas Corpus and American Jurisprudence</u> (2006).

Christopher S. Kelley, ed., <u>Executing the Constitution: Putting the President Back into the Constitution</u> (2006).

David Fagelson, <u>Justice as Integrity: Tolerance and the Moral Momentum of Law</u> (2006).

Christopher Shortell, <u>Rights, Remedies, and the Impact of State Sovereign Immunity</u> (2008).

Robert Blomquist, <u>The Quotable Judge Posner</u> (2010).

Kirk A. Randazzo, <u>Defenders of Liberty or Champions of Security?</u> (2010).

Pamela Corley, <u>Concurring Opinion Writing on the U.S. Supreme Court</u> (2010).

Samuel Leiter and William Leiter, <u>Affirmative Action in Antidiscrimination Law and Policy</u> (2nd ed. 2010).

Julia R. Azari, et al., eds., <u>The Presidential Leadership Dilemma</u> (2013).

Stephen A. Simon, <u>Universal Rights and the Constitution</u> (2014).

Kirk A. Randazzo and Richard W. Waterman, <u>Checking the Courts</u> (2014).

Anthony Maniscalco, <u>Public Spaces, Marketplaces, and the Constitution</u> (2015).

Goirgi Areshidze et al., eds., <u>Constitutionalism, Executive Power, and the Spirit of Moderation</u> (2016).

**App. 116**

Peter J. Galie, et al., eds., New York's Broken Constitution (2016).
Robert J. Hume, Ethics and Accountability on the U.S. Supreme Court (2017).
Michael A. Dichio, The U.S. Supreme Court and the Centralization of Federal Authority (2018).
Clyde H. Ray, John Marshall's Constitutionalism (2019).
Daniel P. Franklin, et al., The Politics of Presidential Impeachment (2020).
Robert M. Howard, et al., Power, Constraint, and Policy Change: Courts and Education Finance Reform (2021).
Mark C. Dillon, The First Chief Justice (2022).

Book Series Editor, Presidential Briefing Books, Routledge, 2015-present.
Mary Stuckey, Political Rhetoric (2015)
Michael A. Genovese, Presidential Leadership in an Age of Change (2015)
Christopher Fettweis, Making Foreign Policy Decisions (2016)
Nancy Maveety, Picking Judges (2016)
Richard S. Conley, Presidential Relations with Congress (2017)
Andrew L. Stigler, Governing the Military (2019)
Graham G. Dodds, The Unitary Presidency (2020)

Member, Board of Editors for the Encyclopedia of Guns in American Society, 2 vols. (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011). Winner of the Booklist Editors' Choice Award for 2003, American Library Association.

Member, Board of Editors, Issues: Understanding Controversy and Society, ABC-CLIO, 2011-2016.

Book Chapters:

"Third Parties in New York," in Governing New York State (formerly New York State Today), ed. by Robert Pecorella and Jeffrey Stonecash (Albany, N.Y.:  SUNY Press, 1984, 1989, 1994, 2001, 2006). Chapter revised for second, third, fourth, and fifth editions.

"Gun Control: Constitutional Mandate or Myth," in Social Regulatory Policy: Recent Moral Controversies in American Politics, ed. by Raymond Tatalovich and Byron Daynes (Boulder, CO:  Westview Press, 1988), 111-141.

"The President's Veto Power," in Inventing the American Presidency: Early Decisions and Critical Precedents, ed. by Thomas Cronin (Lawrence, KA:  University Press of Kansas, 1989), 154-179.

**App. 117**

"President and Congress," in <u>The CQ Guide to the Presidency</u>, ed. by Michael Nelson (Washington, D.C.:  Congressional Quarterly, Inc., 1989; revised for 2nd ed., 1996 and 3rd ed. 2002; 4th ed. 2007; 5th ed. 2012).

Nineteen entries in <u>Encyclopedia of American Political Parties and Elections</u>, ed. by L. Sandy Maisel (New York:  Garland Pub., 1991): American Labor Party, Benjamin Bubar, closed primary, Conservative Party, cross-endorsement rule, Free Soil Party, Greenback Party, Liberal Party, Liberty Party, John V. Lindsay, Allard K. Lowenstein, open primary, Right to Life Committee, Right to Life Party, Prohibition Party, Alex Rose, split ticket voting, telethons, Mary Jane Tobin.

Author of "Thought Boxes" for Theodore J. Lowi and Benjamin Ginsberg, <u>American Government: Freedom and Power</u> (NY: W.W. Norton, 1990, 1992, 1994, 1996, 1998); 50 for 1st ed.; 30 additional for 2nd ed., 45 additional for 3rd ed.; 29 for 4th ed., 26 for 5th.

"Executive Vetoes," in <u>Encyclopedia of the American Legislative System</u>, ed. by Joel Silbey (NY:  Charles Scribner's Sons, 1993).

"The Conflict Between Congress and the President Over War," in <u>The Presidency and the Persian Gulf War</u>, ed. by Marcia Whicker, Raymond Moore, and James Pfiffner (New York:  Praeger, 1993).

"Is the Separation of Powers Obsolete?" in <u>The Presidency Reconsidered</u>, ed. by Richard W. Waterman (Itasca, IL: F.E. Peacock, 1993); also in <u>Understanding the Presidency</u>, ed. by James Pfiffner and Roger Davidson (NY: Longman, 1997; 2nd ed. 2000; 3rd ed. 2002; 4th ed. 2006).

Seven entries in the <u>Encyclopedia of the American Presidency</u>, ed. by Leonard W. Levy and Louis Fisher (NY: Simon and Schuster, 1994), including "Council on Environmental Quality," "Office of Intergovernmental Relations," "Presentation Clause," "Signing Statements," "Item Veto," "Pocket Veto," "Regular Veto".

Two entries in the <u>Encyclopedia of the United States Congress</u>, ed. by Donald C. Bacon, Roger H. Davidson, and Morton Keller (NY: Simon and Schuster, 1994), including "Separation of Powers" and "Presidential Veto".

"The President, Congress, and the Fulcrum of Foreign Policy," in <u>The Constitution and the Conduct of American Foreign Policy</u>, ed. by David Gray Adler, with an introduction by Arthur Schlesinger, Jr. (Lawrence, KS: University Press of Kansas, 1996), 85-113.

"Resources Development in the EOP," in <u>The Executive Office of the President</u>, ed. by Harold Relyea (Westport, CT: Greenwood Press, 1997).

**App. 118**

"Council on Environmental Quality," in the <u>Oxford Historical Guide to American Government</u> (NY: Oxford University Press, 1997).

"From Presidential Shield to 'Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," in <u>Liberty Under Law</u>, ed. by Kenneth Grasso and Cecilia R. Castillo (Lanham, MD: University Press of America, 1997; 2nd ed. 1998).

"Multi-Party Politics in New York," in <u>Multi-Party Politics and American Democracy</u>, ed. by Paul Herrnson and John Green (Rowman & Littlefield, 1997; revised for second edition, 2002).

Author of "Cultures" and "Debates" boxes for Benjamin Ginsberg, Theodore Lowi, and Margaret Weir, <u>We the People</u> (NY: W.W. Norton, 1997, 1999). 19 for 1st ed.; 17 for 2nd ed.

"Gun Control: Constitutional Mandate or Myth?" in <u>Moral Controversies in American Politics</u>, ed. by Raymond Tatalovich and Byron Daynes (NY: M.E. Sharpe, 1998; 2005; 2010), 164-195. Revised for new editions.

"The Right to Life Party" and related entries in <u>The Encyclopedia of American Third Parties</u>, ed. by Immanuel Ness and James Ciment (NY: M.E. Sharpe, 2000).

"New York, New York: Start Spreadin' the News," in <u>Prayers in the Precincts</u>, ed. by John Green, Mark Rozell, and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000).

"The Clinton Crisis and Its Consequences for the Presidency," in <u>The Clinton Scandal and the Future of American Politics</u>, ed. by Mark Rozell and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000), 1-17.

"Saving the Constitution from Lawyers," in <u>Politics and Constitutionalism</u>, ed. by Spitzer (Albany, NY: SUNY Press, 2000).

"Gun Control and Policy" and "Veto Power" for the <u>Encyclopedia of American Political History</u>, ed. by Paul Finkelman (Washington, D.C.: Congressional Quarterly, 2000).

"Article I, Section 7," in <u>The Constitution and Its Amendments</u>, ed. by Roger Newman (NY: Macmillan, 2001).

"Lost and Found: Researching the Second Amendment," in <u>The Second Amendment in Law and History</u>, ed. by Carl Bogus (NY: The New Press, 2001), 16-47.

"Veto Power" in <u>The Oxford Companion To United States History</u> ed. by Paul Boyer

**App. 119**

(NY: Oxford University Press, 2001).

"The Independent Counsel and the Post-Clinton Presidency" in <u>The Presidency and the Law: The Clinton Legacy</u>, ed. by David Adler and Michael Genovese (Lawrence, KS: University Press of Kansas, 2002), 89-107.

"The Veto King: The 'Dr. No' Presidency of George Bush," in <u>Honor and Loyalty: Inside the Politics of the Bush White House</u>, ed. by Leslie Feldman and Rosanna Perotti (Westport, CT: Greenwood Press, 2002), 233-53.

Fifty-two entries in the <u>Encyclopedia of Guns in American Society</u>, ed. by Gregg Lee Carter (Santa Barbara, CA: ABC-CLIO, 2003; 2nd ed. 2011; 3rd ed. 2023): including AWARE, assault weapons, Assault Weapons ban of 1994, automatic weapons laws, background checks, Brady Law, Harlon Carter, Eddie Eagle, Federation for NRA, Firearms Owners Protection Act of 1986, NRA-ILA, LSAS, Licensing, MMM, MAVIA, National Board for the Promotion of Rifle Practice, National Guard, NRA, NRA PVF, Presser v. Illinois, Quilici v. Morton Grove, Safety Courses, SAS, semiautomatic weapons, speedloaders, Turner Diaries, Waiting Periods.

Nine entries for the <u>Encyclopedia of the American Presidency</u>, ed. by Michael Genovese (NY: Facts on File, 2004): Edward Corwin, Council on Environmental Quality, Gramm-Rudman-Hollings, Persian Gulf War, legislative veto, presentation clause, item veto, pocket veto, veto.

"Third Parties," "Presidents," and "The Right to Life Party" for <u>The Encyclopedia of New York State</u>, ed. by Peter Eisenstadt (Syracuse: Syracuse University Press, 2004).

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," <u>Transformed By Crisis: The Presidency of George W. Bush and American Politics</u>, ed. by Jon Kraus, Kevin McMahon, and David Rankin (NY: Palgrave Macmillan, 2004), 141-165.

"The Presidential Veto Is An Effective Tool for Governing," in <u>Debating the Presidency</u>, Robert P. Watson and David Freeman, eds. (Dubuque, IA: Kendall/Hunt, 2005).

"Veto: The Power to Say 'No,'" in <u>Thinking About the Presidency</u>, ed. by Gary L. Gregg (Lanham, MD: Rowman & Littlefield, 2005).

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," <u>Executing the Constitution</u>, ed. By Chris Kelley (Albany: SUNY Press, 2006), 109-126.

"Gun Violence and Gun Control," in <u>Social Issues in America: An Encyclopedia</u>, 8 vols., ed. By James Ciment (NY: M.E. Sharpe, 2006).

**App. 120**

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," <u>The Presidency and the Challenge of Democracy</u>, ed. By Michael Genovese and Lori Cox Han (New York: Palgrave Macmillan, 2006), 93-117.

"Right to Bear Arms," <u>Encyclopedia of American Civil Liberties</u>, 4 vols., ed. By Paul Finkelman (NY: Routledge, 2006).

"Gun Violence is a Serious Problem," <u>Gun Violence: Opposing Viewpoints</u>, Margaret Haerens, ed. (New York: Thomson Gale, 2006).

"The Commander-in-Chief Power in the George W. Bush Administration," <u>Presidential Power in America</u>, ed. By Lawrence R. Velvel (Andover, MA: Doukathsan Press, 2007).

"Presidential Veto" and "Gun Control," <u>Encyclopedia of American Government and Civics</u> ed. Michael Genovese and Lori Cox Han (New York: Facts-on-File, 2008).

"Gerald R. Ford," <u>Encyclopedia of Political Communication</u> ed. By Lynda Lee Kaid and Christina Holtz-Bacha (Thousand Oaks, CA: Sage Pubs., 2008).

"Leading Elite Opinion: Law Reviews and the Distortion of Scholarship," in <u>Leadership at the Crossroads</u>, Vol 2, "Leadership and Politics," ed. By Michael Genovese and Lori Cox Han (Westport, CT: Praeger, 2008).

"Gun Control Policy," in <u>Encyclopedia of Issues in U.S. Public Policy</u>, ed. By Mark Rushefsky (Farmington Hills, MI: Gale Publishing, 2009).

"'Hot' and 'Not-So-Hot' Buttons in the 2008 Presidential Election," in <u>Winning the Presidency 2008</u>, William Crotty, ed. (Boulder, CO: Paradigm Publishers, 2009).

"Resolved, that the President Should Not be Given a Line Item Veto," in <u>Debating Reform: Conflicting Perspectives on How to Fix the American Political System</u>, Richard Ellis and Michael Nelson, eds. (Washington, D.C.: CQ Press, 2010; revised for 2nd ed. 2013).

"Looking Through the Other End of the Telescope: Playing in Lowi's Arenas," in <u>Political Science as Public Philosophy: Essays in Honor of Theodore J. Lowi</u>, Benjamin Ginsberg and Gwendolyn Mink, eds. (New York: W.W. Norton, 2010).

"Why Do Americans Love Guns So Much, and Does Everyone Own One?" <u>You Asked: 20 Questions About America</u>, U.S. Department of State, 2010.

"Liberals and the Presidency," <u>Contending Approaches to the American Presidency</u>,

**App. 121**

Michael Genovese, ed. (Washington, DC: CQ Press, 2011).

"Is the Constitutional Presidency Obsolete?" <u>The American Presidency in the 21st Century</u>, Charles Dunn, ed. (Lexington: University Press of Kentucky, 2011).

"Gun Control," in <u>Governing America</u>, ed. By Paul Quirk and William Cunion (New York: Facts on File, 2011).

"Stricter Gun Laws are Reasonable and Sensible," for <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011. Web. 28 September.

"Gun Control," <u>Encyclopedia of Applied Ethics</u>, 2nd ed., Vol. 2, Ruth Chadwick, ed. (San Diego: Academic Press/Elsevier, 2012), 538-44.

"Hot Button Issues in the Presidential Campaign: 47% Yes, Guns No?" <u>Winning the Presidency 2012</u>, William J. Crotty, ed. (Boulder, CO: Paradigm Publishers, 2013).

"Meaning of the Second Amendment: The Motives Behind the Second Amendment: Federalism and Military Preparedness." <u>American Government</u>. ABC-CLIO, 2013. Web. September 10.

"Clinton and Gun Control: Boon or Bane?" <u>A True Third Way? Domestic Policy and the Presidency of William Jefferson Clinton</u>, Richard Himmelfarb, ed. (New York: Nova Publishers, 2014), 81-92.

"Gun Control," <u>American Governance</u>, 5 vols. Stephen L. Schechter, ed. (Detroit: Macmillan, 2016).

"John Tyler and the Constitution," <u>American Presidents and the Constitution</u>, Ken Gormley, ed. (New York: New York University Press, 2016).

"The Unitary Executive and the Bush Presidency," <u>The George W. Bush Presidency</u>, Meena Bose, ed. (New York: Nova Publishers, 2016).

"Stricter Gun Laws are Reasonable and Sensible," <u>Gun Control in the United States: A Reference Handbook</u>, Gregg Lee Carter, ed. (Santa Barbara, CA: ABC-CLIO, 2017).

"Gun Policy Research: Personal Reflections on Public Questions," <u>Guns: Interdisciplinary Approaches to Politics, Policy, and Practice</u>, Jennifer Carlson, Kristin Goss and Harel Shapira, eds. (New York: Routledge, 2019).

"Conclusion: The Five Rules of Trump," <u>Presidential Leadership and the Trump Presidency: Executive Power and Democratic Governance</u>, Charles Lamb and Jacob

**App. 122**

Neiheisel, eds. (New York: Palgrave Macmillan, 2020).

"Looking Down the Barrel of the 2020 Elections," The 2020 Presidential Election: Key Issues and Regional Dynamics, Luke Perry, ed. (New York: Palgrave Macmillan, 2022).

"Gun Policy and Politics in America," Developments in American Politics 9, Gillian Peele, Bruce Cain, Jon Herbert, Andrew Wroe, eds. (Palgrave/Macmillan, 2022).

"To Brandish or Not to Brandish: The Consequences of Gun Display," New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society, Joseph Blocher, Jacob Charles, and Darrell A.H. Miller, eds. (NY: Oxford University Press, forthcoming).

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today" and "US tragedies from guns have often – but not always – spurred political responses," The Conversation on Guns, James A. Densley, ed. (Baltimore: Johns Hopkins University Press, 2023, forthcoming).


Articles:

"Jamestown:  Anatomy of an All-American City," Sunday Buffalo Courier Express Magazine, August 24, 1975.

"The Democratic National Telethons: Their Successes and Failures," with John W. Ellwood, The Journal of Politics, 41 (August, 1979): 828-864.

"The Presidency and Public Policy: A Preliminary Inquiry," Presidential Studies Quarterly, 9 (Fall, 1979): 441-457.

"Presidential Policy Determinism: How Policies Frame Congressional Responses to the President's Legislative Program," Presidential Studies Quarterly, 13 (Fall, 1983): 556-574.

"A Political Party is Born: Single-Issue Advocacy and the Election Law in New York State," National Civic Review, 73(July/August, 1984): 321-328.

"More Parties Mean Better Parties," Party Line, 17 (September 1984).

"Shooting Down Gun Myths," America, June 8, 1985, pp. 468-69.  Reprinted in: the Des Moines Register, October 24, 1985; Criminal Justice, ed. by Susan Bursell (St. Paul, MN: Greenhaven Press, 1986); U.S. News and World Report educational study unit on Gun Control, April/May, 1987; Gun Control, ed. by Robert Emmet Long (New York: H.W.

**App. 123**

Wilson Co., 1989); and <u>The Informed Argument</u>, 2nd ed., 3rd ed., Robert K. Miller, ed. (NY:  Harcourt, Brace, Jovanovich, 1989, 1992).

"The Item Veto: A Bad Idea That Lives On," <u>America</u>, June 15, 1985.

"The Item Veto Reconsidered," <u>Presidential Studies Quarterly</u> 15(Summer, 1985): 611-17.

"Promoting Policy Theory:  Revising the Arenas of Power" <u>Policy Studies Journal</u>, 15 (June 1987), 675-89. Reprinted in <u>Public Policy Theories, Models, and Concepts</u>, ed. by Daniel C. McCool (Prentice-Hall, 1995).

"A Course Module:  The Politics of Abortion," <u>NEWS for Teachers of Political Science</u>, 53 (Spring, 1987).

"But for A Single Vote...," <u>New York Delegate</u>, July, 1987. Abridged version appeared on editorial page of the <u>Rochester Times Union</u>, 2/10/87.

"Multi-Party Politics in New York: A Cure for the Political System?", <u>Election Politics</u>, 5 (Summer, 1988): 14-16.

"From Complexity to Simplicity: More on Policy Theory and the Arenas of Power," <u>Policy Studies Journal</u>, 17 (Spring, 1989): 529-36.

"Complexity and Induction: Rejoinder to Kellow," <u>Policy Studies Journal</u>, 17(Spring, 1989): 547-49.

"Liberalism and Juridical Democracy," <u>PS:  Political Science and Politics</u>, 23(December 1990): 572-74.

"Presidential Prerogative Power: The Case of the Bush Administration and Legislative Powers," <u>PS:  Political Science and Politics</u>, 24 (March 1991): 38-42.

"Separation of Powers and the War Power," <u>Oklahoma City University Law Review</u>, 16, 2(Summer 1991): 279-293.

"The Disingenuous Presidency: Reagan's Veto and the `Make-My-Day' President," <u>Congress and the Presidency</u>, 21 (Spring, 1994): 1-10.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," <u>Pace Law Review</u>, 15, 1 (Fall 1994), 111-39.

"Can 3.5 Million Americans Be Wrong?" <u>The Spectator</u>, May 27, 1995, 12-13.

App. 124

"The Constitutionality of the Presidential Line-Item Veto," Political Science Quarterly, 112 (Summer, 1997): 261-84.

"The Item Veto Dispute and the Secular Crisis of the Presidency," Presidential Studies Quarterly, 28 (Fall 1998): 799-805.

"Clinton's Impeachment Will Have Few Consequences for the Presidency," PS: Political Science and Politics, 32 (September 1999).

"The Gun Dispute," American Educator, 23 (Summer 1999): 10-15.  Reprinted in Annual Editions: Criminal Justice (Dushkin/McGraw-Hill, 2000); and in Criminology (Dushkin/McGraw-Hill, 2001).

"The Changing Face of Gun Politics," Congress Monthly, September/October 2000.

"Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review 76 (2000): 349-401. Cited in 2002 by the U.S. Court of Appeals for the Ninth Circuit, Silveira v. Lockyer (312 F.3d 1052; 2002); 2002 U.S. App. LEXIS 24612.

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," Presidential Studies Quarterly 31 (December 2001), 721-34.

"The Second Amendment 'Right to Bear Arms' and the Emerson Case," St. John's Law Review 77 (Winter 2003): 1-27.

"Gun Laws and Policies: A Dialogue," Focus on Law Studies 18(Spring 2003): 1-17.

"Don't Know Much About History, Politics, or Theory," Fordham Law Review 73 (November 2004), 721-30.

"Seven Modest Tips on Publishing," PS: Political Science and Politics 38(October 2005): 746-47.

"Re-Examining the War Power," with Michael Genovese, The PRG Report 30(Fall 2005).

"Tactics, Turnout, and Timing in the Elections of 2004," with Glenn Altschuler, American Literary History 19(Spring 2007): 108-19.

"Reducing Firearm Violence: A Research Agenda," co-authored, Injury Prevention 13 (April 23, 2007), 80-84.

**App. 125**

"Why History Matters: Saul Cornell's Second Amendment and the Consequences of Law Reviews," <u>Albany Government Law Review</u> 1(Spring 2008): 312-53.

"Saving the Presidency From Lawyers," <u>Presidential Studies Quarterly</u> 38(June 2008): 329-46.

"Still Saving the Constitution from Lawyers: A Response," <u>Gonzaga Law Review</u> 46(December 2010/11): 103-16.

"Gun Law, Policy, and Politics," <u>Government, Law and Policy Journal</u> 14(Summer 2012): 57-64.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," <u>Presidential Studies Quarterly</u> 42(September 2012): 637-55.

"Gun Laws," <u>New York State Bar Association Journal</u> 84(July/August 2012), 35-42.

"Misfire in the 2012 Election," <u>Presidents and Executive Politics Report</u> 35(Fall 2012).

"Writing the Gun Debate," <u>Los Angeles Review of Books</u>, February 10, 2013.

"A Historical Look at Gun Control in America," <u>WCNY Magazine</u>, May/June 2013.

"What's Old Is New Again: Political Science, Law, and Constitutional Meaning," <u>PS: Political Science and Politics</u> 46(July 2013): 493-97.

"Separating Truth and Myth in the American Gun Debate," <u>The Islamic Monthly</u>, Fall 2013.

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," <u>White House Studies</u> 12(October 2013): 125-46.

"A Look at the 2014 Elections," <u>WNCY Magazine</u>, March/April 2014.

"New York State and the New York SAFE Act: A Case Study in Strict Gun Laws," <u>Albany Law Review</u>, 78 (2014/2015): 749-87.

"The Unitary Executive and the Bush Presidency," <u>Social Science Docket</u>, 15(Summer-Fall 2015).

"Gun Rights, Tyranny, and Rebellion: John Locke, the American Constitution and the Right to Bear Arms," <u>The Critique</u> (July/August 2016).

**App. 126**

"Gun Law History in the United States and Second Amendment Rights," <u>Law and Contemporary Problems</u> 80, 2(2017): 55-83.

"Researching Gun Policy: Futile or Feasible?" <u>Items: Insights from the Social Sciences</u>, Social Science Research Council, October 17, 2018.

"Effective Gun Regulation Can Be Compatible with Gun Rights," <u>The Regulatory Review</u>, University of Pennsylvania Program on Regulation, November 6, 2018.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," <u>Law and Contemporary Problems</u> 83, 3(2020): 231-55.


<u>Op-Ed Articles</u>

"Court Rulings on 2nd Amendment:  No Individual Right to Keep Arms," <u>Des Moines Register</u>, October 24, 1985.

"Gun Control and Pressure Politics," <u>Syracuse Post-Standard</u>, November 30, 1985.

"Pocket Vetoes and Abuse of Power," <u>Rochester Times Union</u>, January 7, 1987.

"But for One Vote, a Different Nation," <u>Rochester Times Union</u>, February 10, 1987.

"Reagan's Veto: It's Mostly Show and Not Much Go," <u>Rochester Times Union</u>, September 14, 1987.

"The Great Gun Fallacy," <u>Syracuse Post-Standard</u>, March 30, 1989.

"Four Cases on Right to Bear Arms," <u>Syracuse Post-Standard</u>, April 22, 1989.

"Don't Start Line-Item Veto," <u>Syracuse Post-Standard</u>, May 9, 1990.

"Clinton Must Balance Activism, Congress' Constitutional Power," <u>Syracuse Post-Standard</u>, January 21, 1993.

"More Permits Mean Less Crime, But Not in Cities," <u>Los Angeles Times</u>, February 19, 1996.

"Door No. 1: Muskets? Or Door No. 2: Free Speech?" <u>Christian Science Monitor</u>, September 19, 1997.

"Assault Weapons Ban," <u>Christian Science Monitor</u>, April 16, 1998.

App. 127

"As a National Candidate, Pataki Faces Big Hurdles," <u>Syracuse Post-Standard</u>, February 10, 1999.

"Gun Industry Doesn't Know What's Good for It: Regulation," <u>Syracuse Post-Standard</u>, April 20, 1999.

"The Gun Saga in Congress," <u>Intellectual Capital</u>, 4 (May 13-20, 1999).

"Hidden Gun Control or Consumer Protection?" <u>Intellectual Capital</u>, 4 (June 10-17, 1999).

"Welcome to Soviet – er, New York – Politics," <u>Intellectual Capital</u> 5(February 10-17, 2000).

"Gun Control After Columbine," <u>Intellectual Capital</u> 5(April 20-27, 2000).

"Good May Come From Shooting Tragedies," <u>The Catholic Review</u>, March 30, 2000.

"Why Would Anyone Want the Job Now?" <u>Chicago Tribune</u>, November 15, 2000.

"The Supreme Court, Bush, and the Election of the Century," <u>Syracuse Post-Standard</u>, December 18, 2000.

"Ashcroft Playing Politics With the Right to Bear Arms," <u>Syracuse Post-Standard</u>, June 12, 2001.

"Exposure Erodes Clout of NRA," <u>Columbus Dispatch</u>, April 24, 2003.

"Hazing Scandals," <u>Syracuse Post-Standard</u>, November 6, 2003.

"Endorsement Fever," with Glenn Altschuler, <u>Syracuse Post-Standard</u>, February 18, 2004.

"NRA Loses Its Political Firepower," <u>Los Angeles Times</u>, April 12, 2004. Also in the <u>Deseret News</u>.

"A 'Tortured' Interpretation of the President's Vast Powers," <u>Syracuse Post-Standard</u>, June 18, 2004.

"Clearing the Air," <u>Syracuse Post-Standard</u>, August 4, 2004.

"Why Gun Ban Died Quietly," <u>San Jose Mercury News</u>, Sunday "Perspectives,"

**App. 128**

September 19, 2004.

"To Pledge or Not to Pledge," Christian Science Monitor, August 18, 2005. Also published in the Deseret News, Sacramento Bee, the Fresno Bee, the Modesto Bee, the Ithaca Journal, the Johnstown Breeze, Yahoo.com, and World News Network (wn.com), among others.

"Can He Hear You Now? The Defense of Bush's Domestic Spying is Nothing But Static," Syracuse Post-Standard, January 29, 2006.

"Working Hard to Misconstrue the 2nd Amendment," History News Network (www.hnn.us), March 12, 2007.

"Teens With AK-47 Not Exercising a 'Right,'" Syracuse Post-Standard, January 3, 2008.

"Is Bush Inventing Another Constitutional Power?" History News Network (www.hnn.us) January 7, 2008.

"The 'Pocket Veto' Peril," Los Angeles Times, January 8, 2008. Reprinted in the St. Louis Post-Dispatch, St. Paul Pioneer Press, Wilmington Star News (NC), News and Observer (NC), The Morning Call (Pa.), Contra Costa Times (CA), the Sun News (FL), The Vindicator, among others.

"Democrats Can Prevent Catastrophe and Hillary Should Help," with Glenn Altschuler, Cleveland Plain Dealer, February 15, 2008.

"Trouble Ahead?" with Glenn Altschuler, Syracuse Post-Standard, February 15, 2008.

"Saving the Constitution from Lawyers, Parts I, II, III," The Faculty Lounge (www.thefacultylounge.org), April 16, 19, 22, 2008.

"Saving the Constitution from Lawyers," History News Network (www.hnn.us), June 9, 2008.

"Heller's Manufactured Gun Rights Can Be Traced to a Flawed Law Review Article," History News Network (www.hnn.us), June 30, 2008.

"Lincoln, FDR, Bush: Which Doesn't Belong?" History News Network (www.hnn.us), January 12, 2009.

"Early Voting for New York Elections," Cortland Standard, May 27, 2009.

"A Better Way to Run Our Elections," Syracuse Post Standard, June 3, 2009.

App. 129

"Senate 'Resolution,'" with Glenn Altschuler, The Huffington Post (www.huffingtonpost.com), posted December 22, 2009.

"Pres. Obama: Don't Make This Veto Mistake," The Huffington Post (www.huffingtonpost.com), posted January 4, 2010.

"Upset About a Census of People? How About a Census of Guns?" The Huffington Post (www.huffingtonpost.com), posted April 1, 2010.

"Bart Stupak's First 'Profiles in Courage' Moment," The Huffington Post (www.huffingtonpost.com), posted April 10, 2010.

"Are These Guys Really Militias?" *The Huffington Post* (www.huffingtonpost.com), posted April 20, 2010.

"Incorporating Guns?" *The Huffington Post*, posted June 29, 2010.

"Why Gun Ruling is a Teachable Moment," CNN.COM, June 30, 2010.

"Why Obama Must Embrace the Veto Strategy," *The Huffington Post*, posted January 5, 2011.

"A Sensible Approach to Guns, From NY to Arizona," *Syracuse Post Standard,* January 16, 2011.

"Double Congress's Pay," *The Huffington Post*, January 18, 2011.

"Campuses Just Say 'No' to Guns," *The Huffington Post*, February 27, 2011.

"Obama, War Powers, and Yoo," *The Huffington Post*, March 29, 2011.

"I'm Not a Candidate, but I Play One on TV," with Glenn Altschuler, *The Huffington Post*, April 11, 2011.

"The Constitution We Nearly Had," *The Huffington Post,* September 15, 2011.

"Libya and Iraq: A Stop and Think Moment," *The Huffington Post,* October 24, 2011.

"The GOP and Presidential Power," *The Huffington Post,* January 3, 2012.

"The Disappearing Faculty," *The Huffington Post,* February 1, 2012.

**App. 130**

"The 'Good-Guy-Bad-Guy' Myth Laid Bare," *The Huffington Post*, March 28, 2012.

"The NRA's Silent Motive," *Salon*, April 3, 2012.

"Why We've Learned Nothing from Watergate," *The Huffington Post,* June 20, 2012.

"The NRA's 'Fast and Furious' Gun Walking,' *The Huffington Post,* June 29, 2012.

"Not so Fast: House Committee Wrong on Gun-Running Story," *Syracuse Post-Standard,* July 4, 2012.

"Aurora Won't Change Anything," *Salon,* July 23, 2012.

"Not in New York," *Syracuse Post-Standard* Sunday Opinion, July 29, 2012.

"Sex, Politics, and the Porn Star DA," *The Huffington Post*, November 20, 2012.

"Who Gets Guns," *The Blue Review* (thebluereview.org), December 19, 2012.

"Five Myths About Gun Control," *The Washington Post*, Sunday Outlook Section, December 23, 2012.

"Government can Improve Gun Records," *The Hill,* January 15, 2013.

"Doing Nothing on US Gun Laws No Longer an Option," *The Independent* (Britain), January 17, 2013.

"The President's Need for Speed," *The New York Daily News,* January 17, 2013.

"No Need for Panic," *Cortland Standard*, March 28, 2013.

"From *Duck Dynasty* to the *Ivory Tower*," *The Huffington Post*, September 3, 2013.

"A History Lesson for Foes of N.Y. Gun Law," *New York Daily News,* January 3, 2014.

"History Shows Gun Laws Were Common in U.S.," *Syracuse Post-Standard,* January 7, 2014.

"An Assault Weapons Gambit Backfires," *New York Daily News,* April 9, 2014.

"Sensible Regulation of Guns is Necessary," *Rochester Democrat and Chronicle,* April 13, 2014.

**App. 131**

"Cortland Can Help Shine Light on Crimes," *Syracuse Post Standard,* April 27, 2014.

"The Jets, Michael Vick and a College Dilemma," *The Huffington Post,* April 28, 2014.

"Obama's Executive Orders: Can We Talk?" *The Huffington Post,* November 18, 2014.

"Leading By Veto," *Los Angeles Times,* February 3, 2015.

"How Obama Can Use Veto Power Without Being President No," *Syracuse Post Standard,* February 8, 2015.

"Stand Your Ground Makes No Sense," *New York Times,* May 4, 2015.

"Gun Laws are as Old as Gun Ownership," *ACS Blog*, American Constitution Society, May 18, 2015.

"Why Are Assault Weapon Sales Jumping? Because They're Fun," *Los Angeles Times,* June 12, 2015.

"Guns Were Much More Strictly Regulated in the 1920s and 1930s than They Are Today," *History News Network,* June 14, 2015. Also in *Time Magazine*, June 15, 2015.

"Why Assault Rifle Sales Are Booming," *Chicago Tribune,* June 15, 2015.

"Think the Charleston shooting will lead to new gun control laws? It won't." *Washington Post,* June 18, 2015.

"The Politics of the Fourth of July from Musical Theatre," *Huffington Post,* June 29, 2015.

"Flanagan's Gun Permit, and Mine," *N.Y. Daily News,* August 31, 2015.

"Why the Oregon Shooting Likely Won't Change Anything," *U.S. News and World Report,* October 2, 2015.

"Obama's Guantanamo Paradox," with Chris Edelson, *U.S. News and World Report,* November 30, 2015.

"Arming Everyone is Not the Answer," *N.Y. Daily News,* December 6, 2015.

"Why Guns for all Is Not a Good Idea," *Syracuse Post-Standard,* December 13, 2015.

"President Obama's Recent Vetoes Were Unconstitutional. Congress Should Sue Him."

**App. 132**

*Washington Post,* December 30, 2015.

"Obama Should be Sued over Unconstitutional Vetoes," *Syracuse Post-Standard,* January 1, 2016.

"Nutty Gun Rhetoric Meets Reality," *U.S. News and World Report,* January 7, 2016.

"Anti-Fluoride Advocate No Expert," *Cortland Standard,* February 16, 2016.

"What the Orlando Shooting Shows About the Importance of Gun Laws," *Washington Post*, June 14, 2016.

"Orlando Shooting: Reaction from Cortland Gun Law Expert," *Syracuse Post Standard,* June 19, 2016.

"Even in the Wild West, There Were Rules About Carrying Concealed Weapons," *Los Angeles Times,* June 19, 2016.

"Here's What it Would Take for the U.S. to Ban Assault Weapons Again," *MarketWatch,* June 24, 2016.

"Political Gridlock, Past and Present," *Washington Times,* in conjunction with the National Constitutional Literacy Campaign, September 12, 2016.

"Guns Return to American Elections," *US Election Analysis 2016: Media, Voters and the Campaign*, Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 18, 2016.

"Gun Rules and Rights: Where's the Problem?" Guns Issue, CLOG, 2017.

"Why Congress Will Let Trump Keep Business Ties—for Now," *Syracuse Post Standard,* January 15, 2017.

"Why There Will Be No Trump Impeachment Now—Even Though There Should Be," *Huffington Post,* January 18, 2017.

"The NRA Wants to Suppress One of Guns' Most Important Safety Features," *Washington Post*, January 23, 2017; *Chicago Tribune*, January 24, 2017.

"Trump's Tax Returns and Tax Reform: Can We Get Both?" *Syracuse Post Standard,* April 16, 2017.

**App. 133**

"Armed Private Militias like Charlottesville's Offend the Founding Fathers' Intent," *NY Daily News,* August 16, 2017.

"Private Militias and Gun Rights," *Syracuse Post Standard,* August 20, 2017.

"Americans Used to Be Good at Gun Control. What Happened?" *New York Times,* October 3, 2017.

"An American Standoff," *New York Daily News,* October 8, 2017.

"Laws We Used to Have on the Books Could Have Prevented the Florida School Shooting," *Washington Post,* February 15, 2018.

"The NRA's Journey from Marksmanship to Political Brinkmanship," *The Conversation,* February 23, 2018.

"How to Keep the Deadliest Guns Out of Dangerous Hands," *New York Daily News,* March 5, 2018.

"You Can Report a Bad Driver; Why Not an Angry Gun Owner?" *Syracuse Post Standard,* March 11, 2018.

"Here's What Trump Doesn't Know about Knives, Guns and Murder," *Washington Post,* May 9, 2018.

"'Stand Your Ground' Laws Have Failed to Stem Crime or Improve Safety," Rockefeller Institute of Government, June 4, 2018.

"What's Behind NRA TV's Grotesque Take on 'Thomas & Friends,'" *CNN.com,* September 13, 2018.

"The Gun Safety Issue is Actually Helping Democrats," *New York Times,* November 12, 2018.

"Impeachment: Be Careful What You Ask For," *Syracuse Post Standard,* December 30, 2018.

"Why the Supreme Court Will Almost Surely Strike Down New York City's Gun Law," *New York Daily News,* January 24, 2019.

"Why 'Vice' Deserves an Oscar," *Los Angeles Times,* February 7, 2019.

App. 134

"One Year Later: Parkland Shifted the Politics of Guns," *Syracuse Post Standard,* February 17, 2019.

"There's No Second Amendment Right to Large-Capacity Magazines," *New York Times,* August 6, 2019.

"Can the NRA Survive its Current Crisis?" *History News Network*, hnn.us, August 11, 2019.

"Trump Should Seize This Pivotal Moment and Stop Waffling on Gun Control," *CNN.com,* August 24, 2019.

"One Gun Policy Idea We Can Agree On: Magazine Regulation," *Second Thoughts,* The Center for Firearms Law at Duke University, October 10, 2019.

"William Barr's Upside-Down Constitution," *History News Network,* December 1, 2019.

"Gun Rights Sanctuaries Threaten Law and Order," *Syracuse Post Standard,* February 2, 2020.

"Why Are People Bringing Guns to Anti-quarantine Protests? To Be Intimidating," *Washington Post,* April 27, 2020.

"The NRA is Doomed. It Has Only Itself to Blame." *Washington Post,* August 8, 2020.

"Guns Don't Belong Near Polling Places. Right Wingers Want Them There Anyway." *Washington Post,* September 30, 2020.

"President Trump's Record on Promises: Did He Keep Them?" *Syracuse Post Standard,* October 1, 2020.

"Originalism, Shot Full of Holes: A Primer for Amy Coney Barrett," *New York Daily News,* October 14, 2020.

"Guns and the 2020 Elections," *US Election Analysis 2020,* Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 15, 2020.

"Capitol Riot a Fitting End to Trump Presidency Built on Lies," *Syracuse Post-Standard,* January 8, 2021.

"The Problem with a Self-Pardon," *History News Network,* January 14, 2021.

**App. 135**

"The Supreme Court's intent isn't concealed: Conservatives are hell bent on expanding gun rights," *NY Daily News,* April 26, 2021.

"Expert Opinion: The Coming Collision of Gun Laws and Rights," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 10, 2021.

"The NRA could be winning its long game even as it appears to be in dire straits," *The Conversation,* November 24, 2021.

"Texas and New York: A Tale of Two State Gun Laws," *New York Daily News*, January 25, 2022.

"Despite Tragedy, College Campuses Remain Safe," *Virginia Daily Press/Virginian-Pilot,* February 8, 2022.

"Sandy Hook-Remington gun marketing settlement shows how to fight gun companies," *NBC THINK,* February 19, 2022.

"The Sandy Hook-Remington Settlement: Consequences for Gun Policy," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, March 21, 2022.

"Study of US Government Requires Examination of Conflict," *Virginia Daily Press/Virginian-Pilot,* May 1, 2022.

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today," *The Conversation,* May 25, 2022.  150

"The NRA wasn't always opposed to gun restrictions," *Chicago Sun-Times,* May 27, 2022.

"Originalism, History, and Religiosity are the Faults of Alito's Reasoning in *Dobbs*," *History News Network,* May 29, 2022.

"US tragedies from guns have often – but not always – spurred political responses," *The Conversation,* June 8, 2022.

"How the Supreme Court rewrote history to justify its flawed gun decision," *NBC THINK,* June 23, 2022.

"The Road Ahead for Gun Laws in New York State," *New York Daily News*, June 28, 2022.

26

**App. 136**

"Understanding the New Gun Policy Collision," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, July 12, 2022.

"Guns at voting sites have long sparked fears of intimidation and violence – yet few states ban their presence," *The Conversation,* November 2, 2022.

"Guns at voting sites have long sparked fears of intimidation, violence," *Syracuse Post-Standard,* November 4, 2022.

"What our past tells us about young people and guns," *The Hill,* March 28, 2023.

"Stand-Your-Ground, the Castle Doctrine, and Public Safety," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 3, 2023.

"For Most of U.S. History We've Had Both Gun Rights and Gun Regulations," *TIME.com,* June 6, 2023.

"Is domestic abuse really protected by the Second Amendment?" *The Hill,* July 14, 2023.


Testimony, Briefs, and Reports:
"Report of a Survey of Contributors to the Democratic Telethon," A Report to the Democratic National Committee, Washington, D.C., January 1974.

"Election Laws, Registration and Voting:  Some Recommendations," Testimony presented before the New York State Assembly Committee on Election Law, Albany, N.Y., May 15, 1980.

"New York's Multi-Party System," a presentation given before members of the Mexican and Canadian Parliaments at the Rockefeller Institute for Governmental Studies, Albany, N.Y., October 29, 1982.

"Comments and Recommendations on `The New York State Assembly: The Need for Improved Legislative Management,'" co-authored with Henry Steck, prepared for the New York State Assembly Republican Study Group, September, 1985.

"Registration, Voting, and the New York Election Law," Testimony presented before the Governor's Task Force to Encourage Electoral Participation, World Trade Center, New York City, December 21, 1987.

"The Pocket Veto and Sine Die Adjournments," Testimony presented to the Rules Committee, Subcommittee on the Legislative Process, House of Representatives, Washington D.C., July 26, 1989.

App. 137

"Issues Pertaining to the Pocket Veto," Testimony presented to the Judiciary Committee, Subcommittee on Economic and Commercial Law, House of Representatives, Washington, D.C., May 9, 1990.

"The Stealth Veto: Does the President Already Possess Item Veto Powers?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, U.S. Senate, Washington, D.C., June 15, 1994.

"The Hidden History of the Second Amendment," The National Press Club, Washington, D.C., May 12, 1998.

"The Second Amendment: A Source of Individual Rights?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998.

"The Gun Industry: The NRA's Silent Partner," National Press Briefing, Atlanta, GA, February 2, 1999.

"Program Review: SUNY Oswego Political Science Department," prepared as part of the department's review and assessment process, March 2001.

Meeting on Executive Order 13233, pertaining to presidential records access, hosted by Alberto Gonzales, Office of Legal Counsel, the White House, Washington, D.C., December 7, 2001.

Article ("Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review, 2000) cited as controlling authority by the U.S. Court of Appeals, Ninth Circuit, in the case of *Silveira v. Lockyer* (312 F.3d 1052; 9th Cir. 2002); 2002 U.S. App. LEXIS 24612.

Coauthor, *amicus curiae* brief in the case of *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003).

White House meeting on changing standards regarding FOIA requests, access to Executive Branch documents, and presidential library design, hosted by White House Counsel Alberto Gonzales and White House Staff Secretary Brett Kavanaugh, Washington, D.C., July 17, 2003.

Invited participant and panelist, "National Research Collaborative Meeting on Firearms Violence," hosted by the Firearm and Injury Center at the University of Pennsylvania, and the Joyce Foundation, Philadelphia, PA, June 15-17, 2005.

App. 138

Program Review Report, SUNY Geneseo Political Science Department, March, 2009.

Coauthor with Louis Fisher, *amicus curiae* brief in the case of *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, filed March 25, 2009; case decided June 8, 2009 (556 U.S. 848; 2009).

Testimony on bills to enact early voting and other state voting reform measures before the New York State Senate Standing Committee on Elections, Syracuse, NY, May 14, 2009.

Co-author, *amicus* brief in the cases of *NRA v. City of Chicago* and *McDonald v. Chicago*, U.S. Supreme Court, argued March 2, 2010, decided June 28, 2010, 561 U.S. 742 (2010).

Consultant for plaintiffs in *Conservative Party of New York and Working Families Party v. NYS Board of Elections* (10 Civ. 6923 (JSR)), 2010, U.S. District Court for the Southern District of New York.

Co-author, *amicus* brief in the case of *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011).

Co-author, *amicus* brief in the case of *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069, 2012.

Invited panelist and contributor to conference and report, Institute of Medicine and the National Research Council of the National Academies, "Committee on Priorities for a Public Health Research Agenda to Reduce the threat of Firearm-Related Violence," National Academies Keck Center, 500 Fifth St., NW, Washington, DC, April 23, 2013.

"Perspectives on the 'Stand Your Ground' Movement," Testimony submitted to the U.S. Senate Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Human Rights, Hearing on "'Stand Your Ground' Laws: Civil Rights and Public Safety Implications of the Expanded Use of Deadly Force," Washington, D.C., October 29, 2013.

Testimony on the Hearing Protection Act to deregulate gun silencers submitted to the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Federal Lands, for Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

Expert testimony submitted for the State of Massachusetts, Office of Attorney General, in the case of *Worman v. Baker,* No. 1:17-cv-10107-WGY, United States District Court for the District of Massachusetts, submitted September 15, 2017, challenging Massachusetts

state assault weapons restrictions. In 2019 the U.S. Court of Appeals for the First Circuit upheld the Massachusetts law (922 F.3d 26).

Member, Regional Gun Violence Research Consortium Organizing Committee, a Task Force organized by NY Governor Andrew Cuomo and the State Department of Education to research and investigate the causes of gun violence in a multi-state effort. February 2018.

Program Review Report, SUNY New Paltz Political Science and International Relations Departments, April 2019.

Consultant on Facebook policies and actions regarding gun issues, Quonundrums Market Research for Facebook, August 17, 2021.

Several of my publications cited in the case ruling of *Duncan v. Bonta,* U.S. Court of Appeals for the Ninth Circuit, November 30, 2021.

Papers and Presentations (not including those given on the Cortland campus):

"The President as Policy-Maker:  The Arenas of Presidential Power from 1954 to 1974," American Political Science Association, Washington, D.C., August 28-31, 1980.

"The Right-to-Life Movement as a Third Party:  The Policy Environment and Movement Politics," American Political Science Association, New York City, September 3-6, 1981. Reprinted by Rockefeller Institute for Governmental Studies Working Papers, Vol. I, No. 4, September, 1982.

"Viable Democracy or the French Fourth Republic:  Multi-Party Politics in New York," New York State Political Science Association, Albany, April 6, 1984.

"The Right-to-Life Movement as Partisan Activity," American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

"Biting the Bullet:  Gun Control and Social Regulation," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

"The Presidential Veto," Northeastern Political Science Association, Boston, MA, November 13-15, 1986.

"Perspectives on the Presidential Veto Power:  Antecedents and Evolution," Bicentennial Conference on the Presidency, co-sponsored by the Center for the Study of the Presidency, the Chautauqua Institution and Gannon University, Erie, PA, April 24-26,

**App. 140**

1987.

"The Transformation of a Kingly Power:  The Presidential Veto, Past and Present," American Political Science Association, Chicago, IL, September 3-6, 1987.

"The Pocket Veto:  Expanding Presidential Prerogatives Through the Back Door," American Political Science Association, Washington, D.C., September 1-4, 1988.

"Liberalism and Juridical Democracy; or What's Interesting About Interest Group Liberalism," Western Political Science Association, Newport Beach, CA., March 22-24, 1990.

"Separation of Powers and the War Power," presentation sponsored by the Federalist Society, Cornell University School of Law, April 20, 1990.

"Is the Separation of Powers Obsolete?  An Inquiry into Critiques of the Congressional-Presidential Balance of Power," American Political Science Association, Washington, D.C., August 29-September 1, 1991.

"Hate Speech and the College Campus," conference on Two Hundred Years of Free Expression, SUNY Oneonta, October 2-3, 1992.

"From Presidential Shield to `Go Ahead, Make My Day':  The Presidential Veto and the Constitutional Balance of Power," featured paper presenter for Fall 1992 Symposium on American Constitutionalism, Southwest Texas State University, San Marcos, TX, October 30, 1992.

"The Reagan Presidency and the Veto Power: Symbols and Actions of the `Make-My-Day' President," Southern Political Science Association, Savannah, GA, November 3-6, 1993.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," conference on academic Freedom and Tenure, sponsored by New York City Bar Association and Pace University Law School, New York City, March 8, 1994.

"`It's My Constitution, and I'll Cry If I Want To': Constitutional Dialogue, Interpretation, and Whim in the Inherent Item Veto Dispute, " American Political Science Association, Chicago, August 31-September 3, 1995. Winner, 1996 Presidency Research Group Founders' Award for Best Paper on the Presidency presented at the 1995 APSA. Paper received mention in the <u>Washington Post</u>, September 24, 1995.

"Guns and Violence," presentation before Bryn Mawr Presbyterian Church Task Force on Violence, Bryn Mawr, PA, October 8, 1995.

"Guns, Militias, and the Constitution," Distinguished Lecture Series, Utica College, Utica NY, March 26, 1996.

"The Right to Bear Arms: A Constitutional and Criminological Analysis of Gun Control," the Cornell University School of Law, October 8, 1996.

"The Veto King: The `Dr. No' Presidency of George Bush," Conference on the Presidency of George Bush, Hofstra University, Hempstead, NY, April 17-19, 1997.

"Saving the Constitution from Lawyers," American Political Science Association, Washington, D.C., August 28-31, 1997.

"Revolution, the Second Amendment, and Charlton Heston," Gettysburg College, Gettysburg, PA, October 30, 1997.

"Recent Developments in The Politics of Gun Control," Gettysburg College, Gettysburg, PA, November 10, 1998.

"The Second Amendment, Disarmament, and Arms Control," Communitarian Summit, the Washington National Airport Hilton, Arlington, VA, February 27-28, 1999.

"The Argument Against Clinton's Impeachment," Hyde Park Session, American Political Science Association, Atlanta, September 2-5, 1999.

"Gun Politics After Littleton," Gettysburg College, Gettysburg, PA, November 9, 1999.

"Lost and Found: Researching the Second Amendment," Symposium on "The Second Amendment: Fresh Looks," Chicago-Kent Law School and the Joyce Foundation, Chicago, April 28, 2000.

"The Independent Counsel and the Presidency After Clinton," American Political Science Association, Washington, D.C., August 31-September 3, 2000.

"From Columbine to Santee: Gun Control in the 21st Century," Idaho State University, Pocatello, Idaho, April 19, 2001.

"Gun Control in the New Millennium," Gettysburg College, Gettysburg, PA, November 13, 2001.

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," A Presidency Transformed By Crises: The George W. Bush Presidency, SUNY Fredonia, NY, October 17-18, 2002.

App. 142

"Gun Control and the Bush Presidency," Gettysburg College, Gettysburg, PA, November 21, 2002.

"The Ashcroft Justice Department and the Second Amendment," American Bar Association Annual Meeting, San Francisco, August 8-11, 2003.

"The Bush Presidency and 9/11," Keynote Address, Conference on 9/11, Cazenovia College, NY, September 11, 2003.

"Report of the National Task Force on Presidential Communication to Congress," co-author, Tenth Annual Texas A&M Conference on Presidential Rhetoric, George Bush Presidential Library and Conference Center, College Station, TX, March 4-7, 2004.

"Don't Know Much About History, Politics, or Law: Comment," Conference on The Second Amendment and the Future of Gun Regulation, co-sponsored by the Fordham School of Law, the Second Amendment Research Center, and the John Glenn Institute for Public Service and Public Policy of the Ohio State University, April 13, 2004, New York City.

"Bush vs. Kerry: Election of the Century?" Colgate University, Hamilton, NY, October 20, 2004.

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," a paper presented at a Conference on "Is the Presidency Dangerous to Democracy?", Loyola Marymount University, Los Angeles, CA, February 7, 2005.

Participant, "The Wheler Family Address on International Relations," Academic Conference on World Affairs, Cazenovia College, Cazenovia, NY, September 9, 2005.

"What Ever Happened to Gun Control?", Gettysburg College, Gettysburg, PA, November 1, 2005.

"Clinton and Gun Control: Boon or Bane?" a paper presented at the 11th Presidential Conference on William Jefferson Clinton, Hofstra University, Hempstead, NY, November 10-12, 2005.

"George W. Bush and the Unitary Executive," Keynote Address for "Quest," SUNY Oswego Scholars Day, April 19, 2006.

"Resolving Conflict with Intractable Foes:  The Lessons of International Relations Theory Applied to the Modern Gun Control Debate," Bryant University, Smithfield, RI, April 24, 2006.

"The Unitary Executive and the Commander-in-Chief Power," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

"The 2006 Elections," LeMoyne College, Syracuse, NY, November 29, 2006.

"In Wartime, Who Has the Power?" Symposium on Presidential Power and the Challenge to Democracy, Idaho State University, Pocatello, ID, April 26, 2007.

"Saul Cornell's Second Amendment: Why History Matters," Conference on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law, and Public Policy, Albany Law School, Albany, NY, October 18-19, 2007.

"Gun Control and the 2008 Elections," Third Annual Harry F. Guggenheim Symposium on Crime in America, John Jay College, New York City, December 3-4, 2007.

"The Post-Cold War Vice Presidency," Cornell Adult University, Cornell University, Ithaca, NY, July 31, 2008.

"Is the Presidency Constitutional?" Roundtable panel on Restoring the Constitutional Presidency, APSA, Boston, August 28-31, 2008.

"The Future of the American Presidency," Board of the Bristol Statehouse, Bristol, RI, November 30, 2008.

"Is the Constitutional Presidency Obsolete? The Future of the American Presidency," Symposium on The Future of the American Presidency, Regent University, Virginia Beach, VA, February 6, 2009.

"The Failure of the Pro-Gun Control Movement," SUNY Oneonta, March 19, 2009.

"The Post-Bush Presidency and the Constitutional Order," American Political Science Association, Toronto, Canada, September 3-6, 2009.

"Inventing Gun Rights: The Supreme Court, the Second Amendment, and Incorporation," SUNY Geneseo, March 24, 2010.

"Intelligence Don't Matter," Keynote Address to Phi Kappa Phi Induction Ceremony, SUNY Cortland, April 17, 2010.

"The Law and Politics of Gun Control after Tucson," 6th Annual Harry Frank

App. 144

Guggenheim Symposium on Crime in America, conference on "Law and Disorder: Facing the Legal and Economic Challenges to American Criminal Justice," John Jay College of Criminal Justice, CUNY, New York City, January 31-February 1, 2011.

"Looking Ahead to the 2012 Elections," Tompkins County Democratic Committee, Ithaca, NY, August 7, 2011.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," American Political Science Association, Seattle, WA, September 1-4, 2011.

"Gun Control and the Second Amendment," OASIS Conference, Syracuse, NY, October 3, 2011

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," conference on "Change in the White House? Comparing the Presidencies of George W. Bush and Barack Obama," Hofstra University, Hempstead, NY, April 19, 2012.

"Watergate After 40 Years: Dick Cheney's Revenge," American Political Science Association, New Orleans, LA, August 30-September 2, 2012.

"The Media, American Elections, and Democracy," OASIS, Syracuse, NY, October 22, 2012.

"Hot Button Issues in the 2012 Presidential Campaign," Hiram College Conference on the 2012 Elections, Hiram, Ohio, November 15-17, 2012.

"Gun Legislation and Obstacles to Effective Gun Control," Metropolitan Black Bar Association, New York City Bar Association, November 29, 2012.

"Guns and America," Syracuse University, Syracuse, NY, February 19, 2013.

"The Constitution Between Opponents," conference on "The State of the Presidency," Andrus Center for Public Policy, Boise State University, Boise, ID, February 28, 2013.

"Gun Policy at a Crossroads," Thursday Morning Roundtable, Syracuse, NY, March 7, 2013.

"Gun Policy Cycles and History," Pediatric Grand Rounds at the Upstate Golisano Children's Hospital, Syracuse, NY, March 13, 2013.

"Gun Law and the Constitution," Monroe County Bar Association, Rochester, NY, March 21, 2013.

**App. 145**

"The Architecture of the Gun Control Debate," Goldfarb Center for Public Affairs, Colby College, Waterville, ME, April 2, 2013.

"The Campbell Debates: This Assembly Supports the NY SAFE Act," Syracuse University, April 5, 2013.

"What has Sandy Hook Changed? The Evolving Gun Debate," Reisman Lecture Series, Cazenovia College, Cazenovia, NY, April 17, 2013.

"Gun Policy Change: Infringing Rights, or Following History?" Jefferson Community College, Watertown, NY, April 18, 2013.

"Under the Gun," Conference on "Gun Violence, Gun Laws, and the Media," Center on Media, Crime and Justice, John Jay College of Criminal Justice, New York, May 14-15, 2013.

"Five Myths of the Gun Debate," Lawman of the Year, Cortland County Lawman Committee, Cortland, NY, May 20, 2013.

"Gun Law History," Sterling Historical Society, Sterling, NY, June 27, 2013.

"Analyzing the New York SAFE Act," League of Women Voters Forum, Cortland, NY, September 12, 2013.

"Constitution Day, the Second Amendment, and Guns," OASIS, Syracuse, NY, September 16, 2013.

"The Second Amendment and Guns in America," Values, Arts, and Ideas Series Constitution Day Speaker, Manchester University, North Manchester, Indiana, September 17, 2013.

"Live By History, Die By History: The Second Amendment, Heller, and Gun Policy," Georgetown University, Washington, DC, October 18, 2013.

"American Gun Policy," "Gun Violence: A Comparative Perspective," and "American History and Foreign Policy, 1960-1990," King's College, London, England; Southbank Centre, "Superpower Weekend," November 8-11, 2013.

"Gun Politics and the Electoral Process," Oneida County Women's Democratic Club and County Committee, Utica, NY, November 17, 2013.

"The Second Amendment and the Hidden History of Gun Laws," Institute for Legislative

App. 146

Studies, University of North Carolina, Greensboro, NC, November 20-21, 2013.

"The Future of Gun Regulation After Newtown," Fordham University, New York, NY, January 21, 2014.

"The 2014 Elections: The End of the Obama Era?" 22nd Annual Chautauqua, Homer, NY, August 3, 2014.

"New York State and the NY SAFE Act: A Case Study in Strict Gun Laws," conference on "A Loaded Debate: The Right to Keep and Bear Arms in the 21st Century," Albany Law School, Albany, NY, October 9, 2014.

"Is Gun Control Un-American or at Least Unconstitutional?" Temple Concord, Syracuse, NY, October 14, 2014.

"The American Gun Debate is Under Water," TEDxCortland Talk, Hathaway House, Solon, NY, October 25, 2014.

"The Unitary Executive and the Bush Presidency," Conference on the Presidency of George W. Bush," Hofstra University, Hempstead, NY, March 24-26, 2015.

"Assessing the Obama Presidency," Western Political Science Association, Las Vegas, NV, April 1-3, 2015.

"Gun Laws, Gun Policies, and the Second Amendment," Central New York Council of the Social Studies Professional Development Day Conference, Carnegie Conference Center, Syracuse, NY, October 20, 2015.

"The 2016 Elections," The Cornell Club of Cortland County, November 17, 2015, Cortland, NY.

"Gun Law History in the U.S. and Second Amendment Rights," Conference on The Second Amendment: Legal and Policy Issues, New York University Law School and the Brennan Center for Justice, New York City, April 8, 2016.

"The Presidential Elections," The Century Club, June 7, 2016, Syracuse, NY.

"The 2016 Elections," Chautauqua, August 3, 2016, Homer, NY.

"The 2016 Elections" Cortland Rotary, Cortland, N.Y. September 20, 2016.

"The 2016 Elections," Cortland Community Roundtable, October 6, 2016.

**App. 147**

"TrumPocalypse 2016," Finger Lakes Forum, Geneva, N.Y., October 16, 2016.

"The 2016 Elections," Homer Congregational Church, Homer, N.Y., October 30, 2016.

"Had Enough? Only Five More Days," OASIS, November 3, 2016, Syracuse, N.Y.

"Guns for Everyone?" OASIS, November 14, 2016, Syracuse, N.Y.

"College and Life: Really the Same," SUNY Cortland Commencement Address, May 14, 2017.

"Sizing Up the Trump Presidency," Cortland County Democratic Party, June 1, 2017.

"Understanding Impeachment," Ladies Literary Society, Lafayette, NY, June 7, 2017.

"Guns Across America," Ithaca College, Ithaca, NY, September 21, 2017.

Guest panelist, "Gun Studies Symposium," University of Arizona, Tucson, AZ, October 20, 2017.

"Gun Policy and Schools After Parkland," SUNY Student Assembly Annual Conference, Syracuse, NY, April 7, 2018.

"Gun Laws, History, and the Second Amendment: What Does the Constitution Allow?" Clemson University, SC, April 17, 2018.

"Gun Violence and the History of Gun Laws," League of Women Voters of Tompkins County, Ithaca, NY, May 23, 2018.

"The Unknown History of Gun Laws in America," Madison-Chenango Call to Action, Hamilton, NY, June 20, 2018.

"It's All Academic: The Meaning of the Second Amendment Versus Heller," Conference on "The Second Amendment: Its Meaning and Implications in Modern America," Lincoln Memorial University School of Law, Knoxville, TN, January 18, 2019.

"Mulling Over the Mueller Report," Indivisible Cortland County, Homer, NY, June 15, 2019.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Symposium on Gun Rights and Regulation Outside the Home, Duke University, Durham, NC, September 27, 2019.

**App. 148**

"Gun Policy 101: What Policymakers and the Public Need to Know," Rockefeller Institute of Government, Albany, NY, October 1, 2019.

Guest expert, Federalist Society Teleforum on *New York State Rifle and Pistol Association v. NYC,* November 22, 2019.

"To Brandish or Not to Brandish: The Consequences of Gun Display," Duke University Law School Conference on Historical Gun Laws, June 19, 2020 (virtual).

"The 2020 Elections," Cortland Country Club, October 14, 2020.

Panelist, "Gun Law, Politics, and Policy," Midwest Political Science Association, Chicago, April 14-17, 2021 (virtual).

"Gun Violence," Beaches Watch, Florida, August 4, 2021 (virtual).

"Challenging Conversations: Gun Control," Lockdown University (virtual), April 5, 2022.

"Scholars' Circle: Gun Control," June 30, 2022 (virtual).

"Gun Rules and Regulations," Clubhouse AverPoint, July 2, 2022 (virtual).

"A Nation in Crisis: Are Guns the Problem?" Center for Ethics and Human Values' Civil Discourse Forum, The Ohio State University, Columbus, OH, September 23, 2022.

"Explaining the 2022 Midterm Elections," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 13, 2022.

"The Gun Rights 2.0 Movement: Public Policy Consequences," 2022 National Research Conference on Firearm Injury Prevention, Omni Shoreham Hotel, Washington, D.C., November 29-December 1, 2022.

"Gun Law History in America," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., February 16, 2023.

"The Obama Presidency and Gun Policy," Paper Presented for Hofstra University's 13th Presidential Conference on The Barack Obama Presidency, Hempstead, NY, April 19-21, 2023.

"Gun Law History and Virginia," League of Women Voters, Williamsburg, Va., June 22, 2023.

**App. 149**

2023 Cooper-Walsh Colloquium, *Public Health, History, and the Future of Gun Regulation After Bruen,* Fordham University School of Law, October 12-13, 2023.

Panel Participation:

Discussant, "Historical Transformations of Political Institutions in the U.S.," Social Science History Association, Rochester, N.Y., November 7-9, 1980.

Chair, "The Political Economy of Single Issue Movements," 1981 American Political Science Association, New York City, September 3-6.

Discussant, "New York Republicans:  An Emerging Majority Party?", New York State Political Science Association, Albany, N.Y., April 2-3, 1982.

Round table panel member, "Perspectives on the Reagan Administration," New York State Political Science Association, New York, N.Y., April 8-9, 1983.

Discussant, "Toward a Theory of the Chief Executive," 1983 American Political Science Association, Chicago, Ill., September 1-4, 1983.

Chair and Discussant, "Political Parties and Party Organization," 1984 American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

Discussant, "Reforming the Presidential Selection Process," New York State Political Science Association, New York, N.Y., April 25-26, 1985.

Chair, "Theoretical Approaches to Policy Concerns," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "Perspectives on Presidential Influence," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "The Item Veto," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Chair, "Mobilizing Interests on National Policies," American Political Science Association, Washington, D.C., August 28-31, 1986.

Discussant, "The News Media and American Politics," American Political Science Association, Washington, D.C., August 28-31, 1986.

Chair, "Perspectives on the Bicentennial of the U.S. Constitution," New York State Political Science Association, New York City, April 3-4, 1987.

Discussant, "The Presidency in Comparative Perspective," and "Media and Models of Public Policy-Making," American Political Science Association, Atlanta, Aug. 31 - Sept. 3, 1989.

Discussant, "Presidents and Economic Interests," American Political Science Association, Washington, D.C., August 29 - September 1, 1991.

Panel Chair, "The Presidential Role in Policy Making," American Political Science Association, Chicago, September 3-6, 1992.

Discussant, "Presidential Influence on Congress," American Political Science Association, Washington, D.C., September 2-5, 1993.

Discussant, "Bureaucratic Politics," Southern Political Science Association, November 3-6, 1993.

Discussant, "The President's Extra-Constitutional Power," American Political Science Association, New York City, September 1-4, 1994.

Discussant, "Roundtable on the President and Congress in a Republican Age," Western Political Science Association, San Francisco, March 14-16, 1996.

Chair, "Militias, the Second Amendment, and the State: Constitutional, Social, and Historical Implications," American Political Science Association, San Francisco, August 29-September 1, 1996.

Chair, "Roundtable on Teaching the Presidency," American Political Science Association, August 29-September 1, 1996.

Chair, "The Constitutionalism and Presidentialism of Louis Fisher," American Political Science Association, Washington, D.C., August 28-31, 1997.

Chair, "The President as Legislative Leader," American Political Science Association, Boston, September 3-6, 1998.

Chair, Roundtable on "Memo to the President," American Political Science Association, Atlanta, September 2-5, 1999.

Discussant, "Firearms in the U.S.," Midwest Political Science Association, Chicago, April 27-30, 2000.

Chair and discussant, Roundtable on "Is the Presidency Changed?" APSA, San

**App. 151**

Francisco, August 30-September 2, 2001.

Chair and discussant, "Presidential Use of Strategic Tools," APSA, Boston, August 29 - Sept. 1, 2002.

Discussant, "Executing the Constitution," APSA, Boston, August 29 - Sept. 1, 2002.

Chair, "Marketing the President," APSA, Philadelphia, August 28-31, 2003.

Discussant, "Media Coverage of the Presidency," APSA, Philadelphia, August 28-31, 2003.

Chair and discussant, "Does Presidential Leadership in Foreign Policy Matter?" APSA, Chicago, September 2-5, 2004.

Roundtable member, "The Ins and Outs of Obtaining a Book Contract," APSA, Chicago, September 2-5, 2004.

Discussant, "Presidential Power: Lessons From the Past," APSA, Washington, D.C., September 1-4, 2005.

Chair and Discussant, "The Unitary Executive in a Separated System," APSA, Philadelphia, August 31-September 3, 2006.

Panel chair, "The Culpability of Congress," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

Panel chair, "Keeping the Modern Presidency in Check and Balance," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Presidential Endings: George W. Bush and the Final Two Years," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Staffing and Decisionmaking in the White House," APSA, Boston, August 28-31, 2008.

Panel Chair, "Early Assessments of the Obama Presidency," APSA, Washington, D.C., September 2-5, 2010.

Discussant, "Historical Perspectives on the Presidency," APSA, Chicago, August 29-Sept. 1, 2013.

App. 152

Discussant, "Politics and Presidential Travel," APSA, Washington, D.C., August 27-31, 2014.

Discussant, "The Obama Presidency and Constitutional Law," APSA, San Francisco, Sept. 3-6, 2015.

Discussant, "Presidents, the Courts and the Law," APSA, Philadelphia, Sept. 1-4, 2016.

Discussant, "Executive Power and Democratic Functioning in the Trump Era," APSA, Boston, MA, August 30-September 2, 2018.

Panel chair, "Assessing the Presidency of Donald Trump," APSA, Washington, DC, August 29-September 1, 2019.

Roundtable, "Gun Law, Politics, and Policy," Midwest Political Science Association, April 17, 2021 (virtual).

Roundtable, "Guns and the Political Moment: Political Violence, Self-Defense, and Reckoning with Race," Midwest Political Science Association, Chicago, April 7, 2022.

Book Reviews:

The American Presidency, by Richard M. Pious, reviewed in The Journal of Politics, November, 1979.

The Politics of Mistrust, by Aaron Wildavsky and Ellen Tenenbaum, reviewed in Administrative Science Quarterly, December, 1981.

Review essay, The President as Policymaker, by Laurence E. Lynn and David DeF. Whitman, review essay in Administrative Science Quarterly, March, 1982.

PL94-142:  An Act of Congress, by Erwin L. Levine and Elizabeth M. Wexler, reviewed in the American Political Science Review, June, 1982.

Pure Politics and Impure Science, by Arthur M. Silverstein, reviewed in Administrative Science Quarterly, June, 1984.

Review essay, The President's Agenda, by Paul Light, reviewed in Administrative Science Quarterly, September, 1984.

The Evolution of American Electoral Systems, by Paul Kleppner, et al., reviewed in the American Political Science Review, December, 1983.

43

**App. 153**

A Case of Third Party Activism, by James Canfield, reviewed in Perspective, July-August, 1984.

Winners and Losers:  Campaigns, Candidates and Congressional Elections, by Stuart Rothenberg, reviewed in the American Political Science Review, December, 1984.

The Political Presidency, by Barbara Kellerman, reviewed in Perspective, January-February, 1985.

Presidents and Promises, by Jeff Fishel, reviewed in the American Political Science Review, December, 1985.

The Elections of 1984, ed. by Michael Nelson, reviewed in Perspective, May/June, 1985.

Economic Conditions and Electoral Outcomes, by Heinz Eulau and Michael S. Lewis-Beck, reviewed in Perspective, May/June, 1986.

Presidential Transitions:  Eisenhower Through Reagan, by Carl M. Brauer, in Perspective, January/February, 1987.

Religion and Politics in the United States, by Kenneth D. Wald, in Journal for the Scientific Study of Religion, September, 1988.

Abortion and Divorce in Western Law, by Mary Ann Glendon, in The Annals of the American Academy of Political and Social Science, September, 1988.

The American Political Economy, by Douglas Hibbs, in Perspective, Spring, 1988.

God in the White House, by Richard G. Hutcheson, Jr., in Perspective, Fall, 1988.

The Reagan Legacy, Charles O. Jones, ed., in Social Science Quarterly, June, 1989.

Dilemmas of Presidential Leadership From Washington Through Lincoln by Richard Ellis and Aaron Wildavsky, in Perspective, September, 1989.

Taming the Prince by Harvey Mansfield, Jr., in Governance, April, 1990.

Public Policy and Transit System Management, ed. by George M. Guess, in Perspective, Spring, 1991.

The Myth of Scientific Public Policy, by Robert Formaini, in Perspective, Winter, 1992.

**App. 154**

The Bush Presidency: First Appraisals, ed. by Colin Campbell and Bert Rockman in Public Administration Review, May/June, 1992.

The Illusion of a Conservative Reagan Revolution, by Larry Schwab, in Policy Currents, May, 1992.

The Vital South: How Presidents Are Elected, by Earl Black and Merle Black, in Perspective, Fall, 1993.

The Presidential Pulse of Congressional Elections, by James E. Campbell, in The Journal of American History, March, 1995.

Out of Order, by Thomas Patterson, in Presidential Studies Quarterly, Summer, 1994.

Congress, the President, and Policymaking, by Jean Schroedel, in the American Political Science Review, December, 1994.

The President and the Parties, by Sidney Milkis, in Governance, January 1995.

The Myth of the Modern Presidency, by David K. Nichols, PRG Report, Spring, 1995.

The End of the Republican Era, by Theodore Lowi, The Journal of American History, December, 1995.

Strategic Disagreement: Stalemate in American Politics by John B. Gilmour, in Governance (9), 1996.

Rivals For Power: Presidential-Congressional Relations, by James Thurber, in American Political Science Review, March, 1997.

American Presidential Elections, ed. by Harvey Schantz, in Perspectives, Spring 1997.

The Power of Separation by Jessica Korn, in Congress & the Presidency, Spring 1997.

Strong Presidents by Philip Abbott, in Perspective, Fall 1997.

Other People's Money: Policy Change, Congress, and Bank Regulation, by Jeffrey Worsham, in Perspectives, Spring 1998.

A Third Choice, in Journal of American History, December 1998.

Politics, Power and Policy Making: The Case of Health Care Reform in the 1990s, by Mark Rushefsky and Kant Patel in Perspectives, Winter 1999.

**App. 155**

The Paradoxes of the American Presidency, by Thomas Cronin and Michael Genovese, for the American Political Science Review, March 1999.

Republic of Denial, by Michael Janeway, for Perspectives, Spring 2000.

The Art of Political Warfare, by John Pitney, Rhetoric and Public Affairs, Summer 2001.

Arming America, by Michael Bellesiles, Congress Monthly, January/February 2002.

Gun Violence in America by Alexander DeConde, Law and Politics Book Review, August 2001; also in Historynewsnetwork.org, 8/01.

Presidents as Candidates, by Kathryn D. Tenpas, in Rhetoric and Public Affairs, Spring 2002.

The Trouble With Government, by Derek Bok, Perspectives, Spring 2002.

King of the Mountain, by Arnold M. Ludwig, Rhetoric and Public Affairs, Winter 2002.

Power, the Presidency, and the Preamble, by Robert M. Saunders, Presidential Studies Quarterly, December 2002.

Presidents, Parliaments, and Policy, ed. by Stephen Haggard and Mathew McCubbins, Perspectives, Winter 2003.

The Modern American Presidency, by Lewis L. Gould, Rhetoric and Public Affairs.

Watergate: The Presidential Scandal that Shook America, by Keith W. Olson, Perspectives,  Summer 2003.

The Militia and the Right to Arms, or, How the Second Amendment Fell Silent, by H. Richard Uviller and William G. Merkel, Journal of American History, March 2004.

Power Without Persuasion: The Politics of Direct Presidential Action, by William G. Howell, Perspectives on Politics, June 2004.

The George W. Bush Presidency: An Early Assessment, ed. By Fred Greenstein, Perspectives, Spring 2004.

The Invention of the United States Senate, by Daniel Wirls and Stephen Wirls, Perspectives, Summer 2004.

**App. 156**

The Mythic Meanings of the Second Amendment, by David C. Williams, Law and Politics Book Review, April 2004.

Empowering the White House, by Karen M. Hult and Charles E. Walcott, Rhetoric and Public Affairs, Fall 2005.

Defining Americans:  The Presidency and National Identity, by Mary E. Stuckey, Perspectives, Spring 2005.

Presidential Leadership: Rating the Best and Worst in the White House, ed. By James Taranto and Leonard Leo, Rhetoric and Public Affairs, Summer 2006.

A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America, by Saul Cornell, American Journal of Legal History, October 2006.

The Founders' Second Amendment: Origins of the Right to Bear Arms, by Stephen Halbrook, Law and Politics Book Review 18(October 2008).

Out of the Shadow: George H.W. Bush and the End of the Cold War, by Christopher Maynard, Journal of American History (September 2009).

Guns, Democracy, and the Insurrectionist Idea, by Joshua Horwitz, Law and Politics Book Review 19(June 2009).

Talking Together, by Lawrence Jacobs, Fay Lomax Cook, and Michael Delli Carpini, dailykos.com, posted June 20, 2009, with Glenn Altschuler.

Accidental Presidents, by Philip Abbott, Presidential Studies Quarterly, June 2010.

The Co-Presidency of Bush and Cheney, by Shirley Anne Warshaw, Congress and the Presidency, 2010.

Crisis and Command: The History of Executive Power from George Washington to George W. Bush, by John Yoo, Presidential Studies Quarterly (December 2010).

Declaring War: Congress, the President, and What the Constitution Does Not Say, by Brien Hallett, Law and Politics Book Review 22(November 2012).

Congress vs. the Bureaucracy: Muzzling Agency Public Relations, by Mordecai Lee, The Journal of American History (December 2012).

Arming and Disarming, by R. Blake Brown, Law and History Review (November 2013).

App. 157

Reclaiming Accountability: Transparency, Executive Power, and the U.S. Constitution, by Heidi Kitrosser, Congress and the Presidency 42(2015).

The Six-Shooter State: Public and Private Violence in American Politics by Jonathan Obert and The Lives of Guns ed. by Jonathan Obert, Andrew Poe and Austin Sarat, Perspectives on Politics 17(September 2019).

The Toughest Gun Law in the Nation by James B. Jacobs and Zoe Fuhr, Criminal Law and Criminal Justice Books, March 2020.

Warped Narratives: Distortion in the Framing of Gun Policy by Melissa K. Merry, Perspectives on Politics 18(September 2020).

The Uses and Misuses of Politics: Karl Rove and the Bush Presidency by William G. Mayer, Presidential Studies Quarterly (December 2022).


Selected Media Appearances/Quotations:

NBC's "Today Show"; ABC's "Good Morning America" and "Network Nightly News"; PBS's "News Hour"; CNN's "Lou Dobbs," "NewsStand," "CNN & Co." CNN's HLN, and "Insight"; CNBC's "Upfront Tonight"; MSNBC's "Countdown with Keith Olbermann," "All In With Chris Hayes," "Ali Velshi," "Fresh Air With Terry Gross," "The Diane Rehm Show," 1A with Joshua Johnson, NPR; NHK Television (Japan); CGTN (China), documentary films "Guns and Mothers" (PBS, 2003), "Under the Gun" (Katie Couric Film Company, Epix, 2016), "The Price of Freedom" (Flatbush Pictures/Tribeca Films, 2021). Quoted in or by the New York Times, the Washington Post, Time Magazine, Newsweek, Der Spiegel (Germany), USA Today, the Los Angeles Times, the Wall Street Journal, the Christian Science Monitor, the Boston Globe, the Chicago Tribune, the Philadelphia Inquirer, the Miami Herald, Houston Chronicle, the St. Louis Post-Dispatch, San Francisco Chronicle, the Dallas Morning News, the Baltimore Sun, the Detroit Free Press, the Seattle Post-Intelligencer, Newsday, the Denver Post, Kansas City Star, Dallas News, Pittsburgh Post-Gazette, New Orleans Times Picayune, Orlando Sentinel, Columbus Dispatch, Buffalo News, San Jose Mercury News, Albany Times-Union, St. Petersburg Times, Arkansas Democrat-Gazette, Newark Star-Ledger, Bergen Record, Congress Daily, The Hill, CQ Report, Rolling Stone, The Nation, Ladies Home Journal, the National Journal, The Spectator, Legal Times, Financial Times, Toronto Globe, al Jazeera, Reuters, Bloomberg News, Knight Ridder, AP, Gannett, Newhouse, Scripps Howard, McClatchy, Hearst, the BBC (Britain), CBC (Canada), the Voice of America, Radio Free Europe, ABC News Online, Fox News Online, National Public Radio, CBS Radio, media outlets in South Korea, India, Brazil, Denmark, Spain, France, Norway, Germany.

**App. 158**

Regular panelist on "The Ivory Tower," a weekly public affairs program broadcast on WCNY-TV, Syracuse, NY, from 2002-2021. A half hour discussion of the week's events conducted by five academics from area colleges.

Professional Associations:

Scholars Strategy Network.
American Political Science Association.
Center for the Study of the Presidency.
Presidents and Executive Politics Section (formerly the Presidency Research Group), APSA; served on Governing Board of PRG, 1991 to 2003.
New York Political Science Association.
Pi Sigma Alpha.
Phi Kappa Phi.

Teaching Areas:

American Government:  courses taught include Law and Politics, Introduction to American Government, The Legislative Process, Political Parties and Social Movements, The American Presidency, Media and Politics, Gun Control Politics and Policy, State and Local Government, Abortion Politics, Elections and American Politics, Media and War, internships in Washington, D.C., Albany, and Cortland County, Seminars on the Decline of Parties and Third Parties, American Institutions, Current Developments in American Politics, and Introduction to College Life.

Public Policy:  courses taught include Politics and Policy, Introduction to Public Policy, Gun Policy.  Areas of interest include policy theory, policy formation and decisionmaking, and policy implementation.

Teaching-Related Awards:

Three-time recipient of the SUNY Cortland Student Government Association Outstanding Faculty Award (the "DiGiusto Award"), 1987, 1991, and 2003, for "Outstanding Service to Students."  (The only faculty member ever to win this award more than once.)

Other Professional Activities

**App. 159**

External Reviewer, University of Michigan-Dearborn, Project to Expand Promotion and Tenure Guidelines (PTIE) to Inclusively Recognize Innovation and Entrepreneurial Impact, 2021.

Member, Howard Penniman Graduate Scholarship Selection Committee, Pi Sigma Alpha, 2018.

Member, Advisory Board of Pi Sigma Alpha Undergraduate Journal of Politics, 2014-2016.

Executive Council, Pi Sigma Alpha National Board, 2014-18.

Fund and organizing leader for American Political Science Association's new Distinguished Teaching Award, 2011-12.

Chair, Presidency Research Group Task Force on Membership and Recruitment, 2007-08.

Chair, Richard E. Neustadt Award Committee for Best Book on the Presidency published in 2005, Presidency Research Group, 2006.

President, Presidency Research Group, American Political Science Association, 2001-2003; Vice-President 1999-2001.

Chair, Best Paper Award Committee, Presidency Research Group, American Political Science Association, for 1991 and 1992 conferences.

Member, Governing Board of the Presidency Research Group of the American Political Science Association, 1991-2003.

Editor, PRG Report, 1993-1997.

Board of Editors, State University of New York Press, 1993-1996; 1997-2000. Board Chair, 1998-2000.

Member, Leonard D. White Award Committee for Best Dissertation in Public Administration, American Political Science Association, 1995.

Conference Organizing Committee, "Presidential Power: Forging the Presidency for the 21st Century," Columbia University, November 15-16, 1996.

Chair, E.E. Schattschneider Award Committee, best doctoral dissertation in American Politics, American Political Science Association, 1997.

Secretary/Treasurer, Presidency Research Group, 1997-99.

Book and article reviews for Houghton Mifflin, Cengage Learning, Random House, McGraw-

**App. 160**

Hill, St. Martins, W.W. Norton, Oxford University Press, Cambridge University Press, University of Chicago Press, University of California Press, Princeton University Press, Cornell University Press, UNC Press, Pearson Longman, Allyn & Bacon, Palgrave/Macmillan, University of New Mexico Press, Texas A&M University Press, Chatham House, CQ Press, HarperCollins, SUNY Press, Thompson Wadsworth, University of Michigan Press, University of Missouri Press, Westview Press, Brooking Institution, Rowman and Littlefield, Routledge, University of Alabama Press, <u>American Political Science Review</u>, <u>PS</u>, <u>Comparative Politics</u>, <u>American Journal of Political Science</u>, <u>Policy Studies Journal</u>, <u>Policy Studies Review</u>, <u>Political Science Quarterly</u>, the <u>Journal of Politics</u>, <u>Western Political Quarterly</u>, <u>Polity</u>, <u>Social Science Quarterly</u>, <u>Political Behavior</u>, <u>American Politics Quarterly</u>, <u>Political Communication</u>, <u>Legislative Studies Quarterly</u>, <u>Government and Policy</u>, <u>Congress and the Presidency</u>, <u>Social Science Journal</u>, <u>Journal of Policy History</u>, <u>Political Research Quarterly</u>, <u>Presidential Studies Quarterly</u>, <u>Politics and Policy</u>, and the National Science Foundation.


<u>Selected Community Service</u>

Administrative Law Judge/Hearing Officer for Cortland County Board of Health, 1994-present; for Tompkins County, 1997-present; for Chenango County, 1997-present; for Madison County, 2006-2021.

Member, City of Cortland Planning Commission, 2009-2012.

Chair, SUNY Press Board of Editors, 1998-2000 (board member 1993-96, 1997-2000).

Board President, Cortland County Arts Council, 1989-1990 (board member, 1987-1990).

Chair, Homer Zoning Board of Appeals, 1995-1997; board member 1988-1997.

Board member, Cortland County Landmark Society, 1989-1995.

Chair, Planning Committee on Codes and Safety for the village of Homer's (N.Y.) Odyssey 2010 Project, 1996.

App. 161

**EXHIBIT B**

**INTOXICATION/WEAPONS LAWS**

| STATE | NO CARRY/ USE INTOX | ALCOHOL BUSINESS/ SALES | NO GUN SALE TO DRUNKS | MILITIA/ MILITARY/ POLICE | NAMED GROUPS |
|---|---|---|---|---|---|
| Alabama | | | | | |
| Alaska | | | | | |
| Arizona | 1907 | 1901 guns/saloons | | | 1901 Natives |
| Arkansas | | | | | |
| California | | | | | |
| Colorado | | | | | |
| Connecticut | | 1859 | | 1775 | |
| Delaware | | 1756 | 1911,1919 | | |
| District of Columbia | | | | | |
| Florida | | | | | |
| Georgia | | | | 1765,1903 | |
| Hawaii | | | | | |
| Idaho | 1909 | | | | |
| Illinois | | 1851 | | | |
| Indiana | 1921 | | | | |
| Iowa | | 1896 | | | |
| Kansas | 1868 | | | | |
| Kentucky | | | | | |
| Louisiana | | | | | |
| Maine | | 1856 | | | |
| Maryland | 1884,1927 | 1756 | | (1756) | |
| Massachusetts | 1663,1891 1891,1902 1903 | 1679 | | | |
| Michigan | 1931 | | | | |
| Minnesota | | 1858 | | | |
| Mississippi | | | 1878,1880, 1908 | | |
| Missouri | 20 laws* | 1923 | | | |
| Montana | | | | | |
| Nebraska | | | | | |
| Nevada | 1881,1885 (discharge) | | | | |
| New Hampshire | | | | | |

**App. 162**

| | | | | | |
|---|---|---|---|---|---|
| New Jersey | 1916 (hunting) | 1746 | | | |
| New Mexico | | | | | |
| New York | | | | | |
| North Carolina | | | | | |
| North Dakota | 1921 | | | | |
| Ohio | | 1886 | | | |
| Oklahoma | 1890,1891 | | | (1890), (1891) | |
| Oregon | | | | | |
| Pennsylvania | 1750 | 1875 | | 1777,1780 | |
| Rhode Island | 1636,1893, 1893 | 1853 | | | |
| South Carolina | 1899,1900 | | | 1782 | |
| South Dakota | | | | | |
| Tennessee | 1825 | | | | |
| Texas | | | | | |
| Utah | 1925 | | | | |
| Vermont | | 1852 | | | |
| Virginia | 1623,1631, 1632,1655 | | | | |
| Washington State | | | | | |
| West Virginia | 1925 | | | | |
| Wisconsin | 1883 | | | | |
| Wyoming | | | | | |
| TOTAL STATES | 20 | 15 | 2 | 6 | 1 |
| TOTAL LAWS | 52 | 15 | 5 | 9 | 1 |

SOURCE: https://firearmslaw.duke.edu/repository/search-the-repository/. A total of 30 states in this table enacted some kind of law designed to sever the link between alcohol/inebriation and weapons.

*Of the 20 Missouri laws that criminalized the carrying or possession of weapons while intoxicated, two of them (1879 and 1883) were state laws. The rest (1873, 1881, 1890, 1894, 1898, 1900, 1902, 1903, 1903, 1903, 1903, 1907, 1907, 1908, 1908, 1910, 1910, and 1917) all applied to counties, cities, and towns.

**App. 163**

## EXHIBIT C

## INTOXICATION/WEAPONS LAWS

### ARIZONA

Laws regulating the sale of firearms to minors and Native Americans, Title 10, §§ 342 & 362 of AZ Penal Code in The Revised Statutes of Arizona Territory (1901).
"Sec. 342. Any person who shall sell or give to any minor under the age of fourteen years, or to any person for the use of such minor, any firearms, or toy pistols from which dangerous and explosive substances may be discharged, shall be deemed guilty of a misdemeanor."…
"Sec. 362. Any person who sells, gives, rents, barters or furnishes any rifles, carbines, pistols or revolvers, or any ammunition or cartridges for rifles, carbines, pistols or revolvers, or any shot larger in size than standard number six (6) shot, or any spirit, malt or vinous liquor, to Indians, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be punished by imprisonment in the county jail not less than one or more than six months, or by a fine not less than fifty dollars or more than three hundred dollars, or by both such imprisonment and fine."
1901, AZ, Title 10, §§ 342 & 362 of the AZ Penal Code

1901 Ariz. Acts 1252, Crimes and Punishments, §§ 387 and 391.
§ 387 If any person shall go into church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind or into a ball room, social party or social gathering, to any election precinct, on the day or days of any election, where any portion of the people of this territory are collected to vote at any election, or to any other place where people may be assembled to minister, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie knife or any other kind of knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty or more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person. § 391: It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted in a conspicuous place in his bar room, or reception room . . . a plain notice to travelers to divest themselves of their weapons in accordance with section 382 of this act, and the sheriffs of the various counties shall notify the keeprs of hotels, boarding houses and drinking saloons, in their respoective counties, of their duties under this law, and if after such notificiation any keeper of a hotel, boarding house or drinking saloon shall fail to keep notices posted, as required by this act, he shall, on conviction thereof before a justice of the peace, be fined in the sum of five dollars, to go to the county treasury.

1907 Ariz. Sess. Laws 15, An Act to Prohibit Officers from Carrying Firearms While Under the Influence of Liquor and for Other Purposes, ch. 16, § 1.
It shall be unlawful for any constable or other peace officer in the Territory of Arizona, while under the influence of intoxicating liquor of any kind, to carry or have on his person a pistol, gun, or other firearm, or while so intoxicated to strike any person, or to strike at any person with a pistol, gun or other firearm . . .

**App. 164**

## CONNECTICUT

An Act for regulating and ordering the Troops that are, or may be raised, for the Defence of this Colony, Article 19 (11 May, 1775).

"That whatsoever Commissioned Officer shall be found drunk on his Guard, Party, or other Duty under Arms, shall be cashiered for it: Any Non-Commissioned Officer or Soldier, so offending, shall suffer such Punishment as shall be ordered by the Sentence of a Regimental Court-Martial."

1775, CT, Act for Regulating and Ordering the Troops that are, or May be Raised, Art. 19 Connecticut, At a General Assembly of the Governor and Company of the English Colony of Connecticut, in New-England in America, Holden at Hartford, in Said Colony, on the Second Thursday of May, in the 15th Year of the Reign of His Majesty George the Third, King of Great-Britain, &C. A.D. 1775. An Act for Regulating and Ordering the Troops That Are, or May Be Raised, for the Defence of This Colony (New London, Conn.: Timothy Green printer to the governor and Company, 1775), 11. Article 19.

1859 Conn. Acts 62, Temporary Erections for Sale of Liquors or Gaming, Near Parade Ground, May Be Abated as Nuisances. In Public Acts Passed by the General Assembly of the State of Connecticut, Ch. 82, §5 (1859).

"Sec. 5. If any booth shed, tent, or other temporary erection, within one mile of any military parade-ground, muster-field or encampment, shall be used and occupied for the sale of spirituous or intoxicating liquor, or for the purpose of gambling, the officer commanding said parade-ground, muster-field or encampment, the sheriff or deputy-sheriff of the county, or any justice of the peace, selectman, or constable of the town in which such booth, shed, tent, or other temporary erection is situated, upon having notice or knowledge that the same is so used or occupied, shall notify the owner or occupant thereof to vacate and close the same immediately; and, if said owner or occupant shall refuse or neglect so to do, said commanding officer, sheriff, deputy-sheriff, justice of the peace, selectman or constable, may forthwith abate such booth, shed, tent, or other such temporary erection, as a nuisance, and may pull down or otherwise destroy the same, with the assistance of any force, civil or military."

1859, CT, Temporary Erections for Sale of Liquors or Gaming, Near Parade Ground, May Be Abated as Nuisances

Public Acts Passed by the General Assembly of the State of Connecticut, May Session, 1859 (Hartford, CT: Day & Clark State Printers, 1859), 62. Ch. 82 An Act in Addition to and in Alteration of "An Act for Forming and Conducting the Military Force," §5 Temporary Erections for Sale of Liquors or Gaming, Near Parade Ground, May Be Abated as Nuisances. Approved 24 June, 1859.

## DELAWARE

An Act for Establishing a Militia in this Government (Delaware, 1756)

"And be it further enacted by the authority Aforesaid that no Captain or other Officer shall Appoint any place of Meeting for his Company (town Companys only Excepted) within the Distance of half a mile of any Inn or Tavern under the Penalty of Forty Shillings for every such Offence and that no person or persons shall presume to keep a Booth or tent or expose to sale at or Bring on any Pretence whatsoever any strong Liquor to such place of Meeting under the Penalty or Forty shillings for every such offence."

**App. 165**

1756, DE, An Act for Establishing a Militia in this Government
The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 3 (Washington, D.C.: Government Printing Office, 1947), 13.

Vol. 26 Del. Laws 28, 28- 29 (1911)
Section 3. It shall be unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons, made especially for the defense of one's person.

Vol. 30 Del. Laws 55, 55-56 (1919)
Section 222. It shall be unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made for the defense of one's person.
It shall be the duty of any person or persons, firm, company or corporation desiring to engage in the business aforesaid, to keep and maintain in his place of business at all times a book which shall be furnished him by the Clerk of the Peace of the County wherein he does business, in which said book lie shall enter the date of the sale, the name and address of the person purchasing any such deadly weapon, the number and kind of deadly weapon so purchased, the color of the person so purchasing the same, and the apparent age of the purchaser, and the names and addresses of at least two freeholders resident in the County wherein the sale is made, who shall positively identify the purchaser before the sale can be made; Provided, that no clerk, employee or other person associated with the seller shall act as one of the identifying freeholders. This book shall at all times be open for inspection by any Judge, Justice of the Peace, Police Officer, Constable, or other Peace Officer of this State.

## <u>GEORGIA</u>

An Act For the better ordering of the Militia of this Province §19 Savannah, GA (25 March, 1765).
"And be it further Enacted, by the authority aforesaid, That in case any person who shall be obliged to bear arms, whilst the regiment, troop, or company, to which he shall belong, shall be under arms, or in array, shall neglect or refuse to fire his gun not exceeding six times each muster day, or shall wilfully neglect or refuse to do his duty, or to obey the other lawful commands of his officer, or if any such militia-man be drunk at the time of his exercising, the majority of the officers of the troop or company to which such person belongs, if the offence shall be committed in a single troop or company, or any two field officers of the regiment to which such person shall belong, if the offence shall be committed in a regiment, shall have full power and authority to inflict on the person so offending any pecuniary mulct not exceeding ten shillings Sterling[.]"
1765, GA, An Act for the Better Ordering of the Militia of this Province, §19
The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest

**App. 166**

Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 4 (Washington, D.C.: Government Printing Office, 1947), 60.

1903 Ga. Laws 71, An Act for the Protection of the Officers and Employees of the Georgia Penitentiary at the Various Camps throughout the State, and for all other purposes, § 1.
Be it enacted by the General Assembly of the State of Georgia, and it is hereby enacted by authority of the same, That from and after the passage of this Act it shall be unlawful for any person in the State of Georgia to come inside of the guard-lines established, with gun, pistol or any other weapon, or any intoxicating liquors without the knowledge and consent of the deputy wardens in charge.

## IDAHO

1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1.
If any person . . . or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor under the age of sixteen (16) years any such weapon, without the consent of the parent or guardian of such minor, he shall upon conviction, be punished by a fine of not less than twenty-five dollars ($25.00) nor more than two hundred dollars ($200.00), or by imprisonment in the county jail for a period of not less than twenty (20) nor more than sixty (60) days, or by both such fine and imprisonment: Provided, however, that it shall be a good defense to the charge of carrying such concealed weapons if the defendant shall show that he has been threatened with great bodily harm or had good reason to carry the same in the necessary defense of his person, family home or property.

## ILLINOIS

George Manierre, The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois Page 123-125, Image 131-133 (1851) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Chicago: Regulating the Keeping and Conveying Gun Powder and Gun Cotton; § I. (Be it ordained by the Common Council of the city of Chicago) That no person shall keep, sell, or give away gun powder or gun cotton in any quantity without permission of the common council or mayor in writing, signed by the mayor and clerk and sealed with the corporate seal, under a penalty of twenty-five dollars for every offence. § II. All applications for permits shall be addressed to the common council or mayor in writing, signed by the applicant. Not exceeding four permits shall be granted in any block. When the number of applications in any block shall at any time exceed the number to be granted, the requisite number shall be chosen by ballot. When issued the clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business and date of permit. Persons to whom permits may be issued shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gun powder or gun cotton than fifty pounds at one

time, and the same shall be kept in tin canisters or cases containing not to exceed thirteen pounds each, and in a situation remote from fires or lighted lamps, candles or gas from which they may be easily removed in case of fire. Nor shall any person sell or weigh any gun powder or gun cotton after the lighting of lamps in the evening, unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business with the words "gun powder and gun cotton" painted or printed theron in large letters. A violation of any clause of this section shall subject the offender to a fine of not less than ten dollars nor exceeding one hundred dollars. § III. No person shall convey or carry any gun or carry any gun powder or gun cotton, (exceeding one pound in quantity), through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the gun powder or gun cotton be secured in tight cases or kegs well headed and hooped, and put into and entirely covered with a leather bag or case, sufficient to prevent such gun powder or gun cotton from being spilled or scattered under a penalty of one hundred dollars. IV. No vessel, laden in whole or in part with gun powder or gun cotton, shall land at, or make fast to any dock or wharf upon the Chicago river, or either branch thereof, between the south line of the school section and Chicago avenue, or to discharge such gun powder or gun cotton within said limits. If any master, or owner of any vessel, or other person shall violate any provision of this section, he shall be subject to a fine of not less then twenty-five dollars and not exceeding one hundred dollars. § V. The mayor shall have power to cause any vessel to be removed form the limits mentioned in the previous section, to any place beyond the same, by a written order, which shall be executed by the marshal or some other member of the police. If any person shall neglect or refuse to obey such order, or shall resist any officer in the execution of the same, he shall be subject to a penalty of one hundred dollars. § VI. Al permissions granted under this ordinance shall expire on the tenth day of June each year. And no permit shall be granted to any retailer of intoxicating liquors or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit so issued. § VII. It shall be the duty of the officers of the police department, fire-wardens, and firemen, to report all violations of this ordinance which may come to the knowledge of the city attorney for prosecution.

## INDIANA

1921-23 Ind. Acts 108, Intoxicating Liquor—Transportation—Penalty, ch. 34, § 1. 1921
. . . That any person who shall transport intoxicating liquor in any wagon, buggy, automobile, water or air craft, or other vehicle or who shall transport intoxicating liquor in any such vehicle when such vehicle is not owned by said person, or without the consent of the owner of such vehicle, or when such vehicle is mortgaged property, or who shall transport intoxicating liquor in any such vehicle if there be in, or upon such vehicle or upon any person therein any firearms or guns, shall be guilty of a felony and upon conviction shall be imprisoned not less than one year nor more than two years and fined in a sum not exceeding one thousand dollars ($1,000).

## IOWA

Selling Liquors on Camp Grounds Prohibited, § 22 of Chapter 102—An Act to Revise, Amend, and Codify the Statutes Relative to the Militia in Acts and Resolutions Passed at the Regular Session of the Twenty-Sixth General Assembly of the State of Iowa (1896).

**App. 168**

"Sec. 22. Any person who shall trespass on the encampment grounds, or the camp grounds of the guard in active service, or interrupt, molest, or interfere with any member of the guard in the discharge of his duties, or sell any malt, spirituous, or other intoxicating liquors within one mile of such encampment or camp, except under permit issued by the district or superior court, shall be guilty of a misdemeanor, and the commanding officer of such force may order the arrest of such person and cause him to be delivered to a peace officer or magistrate as soon as practicable."

1896, IA, An Act to Revise, Amend, and Codify the Statutes Relative to the Militia, § 22
Acts and Resolutions Passed at the Regular Session of the Twenty-Sixth General Assembly of the State of Iowa, Begun January 13 and Ended April 11, 1896 (Des Moines, IA: F.R. Conaway, 1896), 104. Chapter 102—An Act to Revise, Amend, and Codify the Statutes Relative to the Militia, § 22. Approved April 10, 1896.

## KANSAS

The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources.

Crimes and Punishments, § 282. Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon, shall be subject to arrest upon the charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.

## MAINE

Temporary Buildings within One Mile of Muster Field, Used for Sale of Intoxicating Liquors, May Be Removed, Acts and Resolves of Maine, Ch. 265 "An Act to Organize and Discipline the Militia," §73 (1856).

"Sect. 73. The mayor and aldermen of any city, or the selectmen of any town, upon complaint made to them under oath, that the complainant has reason to believe that any booth, shed, or other temporary erection, situated within one mile of any muster field, is used and occupied for the sale of spirituous or fermented liquors, or for the purpose of gaming for money, or other property, may, if they consider the complaint well founded, order the owner or occupant thereof to vacate and close the same immediately ; and if the owner or occupant shall refuse or neglect so to do, the said mayor and aldermen or selectmen may forthwith abate such booth, shed or other temporary erection, as a nuisance, and pull down or otherwise destroy the same in any manner they may choose, or through the agency of any force, civil or military, which they may see fit to employ."

1856, ME, Temporary Buildings within One Mile of Muster Field, Used for Sale of Intoxicating Liquors, May Be Removed
Acts and Resolves Passed by the Thirty-Fifth Legislature of the State of Maine, A. D. 1856 (Augusta, ME: 1856), 97. Ch. 265 An Act to Organize and Discipline the Militia, §73 Temporary

Buildings within One Mile of Muster Field, Used for Sale of Intoxicating Liquors, May Be Removed. Approved 9 April, 1856.

## MARYLAND

An Act for Regulating the Militia of the Province of Maryland (MD General Assembly, Lower House, L.H.J. Liber No. 48, Assembly Proceedings, May 22, 1756)
"And be it Enacted by the Authority aforesaid that any Person of the Militia who shall get drunk on any Muster-day before or at Muster shall forfeit the Sum of Ten Shillings Current Money and any Person who shall presume to vend Sell or Dispose of any Strong Liquor at any Place of training or at any other Place within Five Miles of any Place of training to any Person belonging to the Militia on any Muster day except between the Time of Discharge from such Training for that day and the Sun sitting thereof Such Person so vending selling or disposing of Such Strong Liquors Shall forfeit and pay the Sum of Five Pounds Current Money And no Person other than a licenced Ordinary Keeper shall vend Sell or dispose of any Strong Liquors to any Person whatever at such Time and Place aforesaid even between the Hours aforesaid under the Penalty of Five Pounds Current Money for every Such Offence and it Shall and may be lawfull for the Commanding Officer of the Party at such Muster and he is hereby directed and required to order the Strong Liquors of the Person so offending to be Siezed and Destroyed Provided always that nothing herein contained shall be construed to extend to any Merchant or licenced Ordinary-Keeper who shall vend Sell or Dispose of any Strong Liquors in his or her House the same not being to any Person of the Militia or any for the Use of Such Person[.]"
1756, MD, Proceedings and Acts of the General Assembly, 1755-1756, An Act for regulating the Militia of the Province of Maryland
The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 5 (Washington, D.C.: Government Printing Office, 1947), 92-93.

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein Page 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources. 1884
City of Baltimore, § 742. Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall be taken before any of the police justices of the peace of the said city, and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found, which said fine shall be collected as other fines are now collected; provided, however, that the provisions of this section shall not apply to those persons who, as conservators of the peace are entitled or required to carry a pistol or other weapon as a part of their official equipment.

1927 Md. Laws 156, § 388-B.

That no person, persons house, company, association or body corporate, shall deposit, keep or have in his, her, their or its possession any spirituous or fermented liquors, or intoxicating drinks of any kind whatsoever, or any article used or sold as a beverage in the composition of which, whiskey, brandy, high wines or alcoholic, spirituous or fermented liquors shall be an ingredient or ingredients, in any automobile or other vehicle in which any device for the prevention or arrest or apprehension of said motor vehicle, or the occupants thereof of the type commonly known as a smoke screen is carried, whether the said device be attached as a part of said motor vehicle in which any gun, pistol, revolver, rifle machine gun, or other dangerous or deadly weapon of any kind whatsoever is carried, whether in said automobile or vehicle, or on the person of any occupant of the same.

## MASSACHUSETTS

The Charters And General Laws Of The Colony And Province Of Massachusetts Bay Page 190, Image 197 (1814) available at The Making of Modern Law: Primary Sources. 1663 Colony Laws. § 4. Be it also enacted by the authority of this court, that no masters of ships, or seamen, having their vessels riding within any of our harbors in this jurisdiction, shall presume to drink healths, or suffer any healths to be drunk within their vessels by day or night, or to shoot off any gun after the daylight is past, or on the sabbath day, on penalty for every health twenty shillings, and for every gun so shot twenty shillings.

Order p[ro]hibiting retayling strong drinckes at traynings, Boston, May 28th, 1679
"… it is ordered by this Court and the authority thereof, that henceforth no person whatsoeuer shall presume to bring into the feild and sell by retayle vpon such occasions [i.e., militia training days] any wine, strong liquor, cider, or any other inebriating drinckes, excepting beere of a penny a-quart, vnless he or they so doing haue license from the hands of two magistrates, or the cheife military officer or officers in the feild[.]"
1679, MA, Order p[ro]hibiting retayling strong drinckes at traynings

Report of the Board of Park Commissioners of the City of Springfield, Mass., Park Ordinances (1891)
The Board of Park Commissioners of the City of Springfield, by virtue of its authority to make Rules for the use and government of the Public Parks of said city, and for breaches of such rules to affix penalties, hereby ordains that within the Public Parks, except with prior consent of the Board, it is forbidden: . . .
3. To throw stones, balls, or other missiles; to discharge or carry firearms, firecrackers, torpedoes, or fireworks; to make fires; to play musical instruments; to have any intoxicating beverages; to sell, offer, or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions; to play games of chance, or to have possession of instruments of gambling; to make orations, harangues, or loud outcries; to enter into political canvassing of any kind; to utter profane, threatening, abusive, or indecent language, or to do any obscene or indecent act; to bathe or fish; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

**App. 171**

Third Annual Report of the Park Commissioners of the City of Lynn for the year ending December 20, 1891, at 23, Ordinances

The Board of Park Commissioners of the City of Lynn , by virtue of its authority to make rules for the use and government of the Public Parks of said City, and for breaches of such rules to affix penalties, hereby ordains that within the limits of Lynn Woods, Meadow Park and Oceanside, except with the prior consent of the Board, it is forbidden: . . .

3. To throw stones or other missiles; to discharge or carry firearms, except by members of the police force in the discharge of their duties; to discharge or carry fire – crackers, torpedoes or fireworks; to make fires; to have any intoxicating beverages; to sell, to offer or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions; to play games of chance, or have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language, or to do any obscene or indecent act; to bathe or fish; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

Office of Park Commission, New Bedford, Mass., Park Ordinances (1902)

September 1, 1902. The Board of Park Commissioners of the City of New Bedford, by virtue of its authority to make rules for the use and government of the public parks of said city, and for breaches of such rules to affix penalties, hereby ordain that within the public parks and commons of the city, except with prior consent of the Commissioners, all persons are hereby forbidden: . . .

3. To throw stones, balls or other missiles; to discharge or carry firearms, firecrackers, torpedoes or fireworks; to make fires, to play musical instruments; to have for sale or otherwise any intoxicating liquors or beverages; to sell or offer for sale any goods or wares; to post or display signs, placards, flags or any advertising devices whatsoever; to play games of chance or to have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language; to make orations or loud outcries; to in any manner annoy other visitors.

Rules and Regulations Governing the Public Parks within the City of Lowell,, at 58 (1903)

The Board of Park Commissioners of the City of Lowell, by virtue of its authority to make rules and regulations for the use and government of the Public Parks and Commons of said City, and to fix penalties for breaches of rules and regulations, hereby ordains that, within such Public Parks and Commons, except by and with the consent of the Board: . . .

3. It is forbidden to throw stones, balls or other missiles; to discharge or carry firearms, fire crackers, torpedoes or fire-works; to make fires; to have any intoxicating beverages; to sell, offer or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions; to play games of chance, or to have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language, or to commit any obscene or indecent act; to solicit the acquaintance of, or to follow, or in any way annoy visitors to said Parks and Commons.

## MICHIGAN

1931 Mich. Pub. Acts 671, The Michigan Penal Code, ch. 36, §237.

Possession or use of fire-arm by person under influence of liquor or drug–Any person under the influence of intoxicating liquor or any exhilarating or stupefying drug who shall carry, have in

possession or under control, or use in any manner or discharge any fire-arm within this state, shall be guilty of a misdemeanor.

## MINNESOTA

The Charter and Ordinances of the City of St. Paul, (To August 1st, 1863, Inclusive,) Together with Legislative Acts Relating to the City. Page 166-167, Image 167-168 (1863) available at The Making of Modern Law: Primary Sources. 1858
Ordinances of the City of St. Paul, An Ordinance to Regulate the Sale of Gunpowder, § 1. No person shall keep, sell or give away gunpowder or guncotton in any quantity without first having paid into the City Treasurer the sum of five dollars, and obtain from the Common Council a permission in writing, signed by the Mayor and Clerk, and sealed with the corporate seal, under a penalty not exceeding fifty dollars, for every offence, provided any person may keep for his own use not exceeding one pound of powder or one pound of gun cotton, at one and the same time. § 2. All applications for permits shall be addressed to the Common Council, in writing, signed by the applicant. Not exceeding four permits shall be granted in any one block; when the number of applications in any block shall at any time exceed the numbers to be granted, the requisite number shall by chosen by ballot. When issued, the Clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business, and date of permits. Persons to whom permits may be issued, shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gunpowder or guncotton than fifty pounds at one time, and the same shall be kept in tin canisters or cans, or kegs securely looped and headed, containing not to exceed twenty-five pounds each and in a situation remote from fires or lighted lamps, candles or gas, from which they may be easily removed in case of fire. Nor shall any person sell or weigh any gunpowder or guncotton, after the lighting of lamps in the evening, unless in sealed canisters or cans. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business, with the word "gunpowder" painted or printed thereon in large letters. Any person violating any clause of this section, shall, upon conviction therof be punished by a fine of not less than ten, nor more than one hundred dollars. § 3. No person shall convey or carry any gunpowder or guncotton, exceeding (one pound in quantity) through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the said gunpowder or guncotton be secured in tight cans or kegs well headed and hooped, sufficient to prevent such gunpowder or guncotton from being spilled or scattered, under a penalty of fifty dollars. § 4. All permissions granted under this ordinance shall expire on the second Tuesday of May in each year; and no permit shall be granted to any retailer of intoxicating liquors, or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit which may be issued.

## MISSISSIPPI

1878 Miss. Laws 175-76, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, §§ 2-3.
§ 2. It shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described [pistols, various knives etc.], or any pistol cartridge, and on conviction shall be punished by a fine not exceeding two hundred dollars, and if the fine and

costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court, not exceeding six months. § 3. Any father, who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed, in whole or in part, any weapon of the kind or description in the first section of this act described [pistols, knives, etc.], shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor under the direction of the board of supervisors or of the court.

Josiah A.Patterson Campbell, The Revised Code of the Statute Laws of the State of Mississippi: With References to Decisions of the High Court of Errors and Appeals, and of the Supreme Court, Applicable to the Statutes Page 776-777, Image 776-777 (1880) available at The Making of Modern Law: Primary Sources. 1880

Carrying Concealed Weapons, § 2986. It shall not be lawful for any person to sell to any minor or person intoxicated knowing him to a minor or in a state of intoxication, any weapons of the kind or description in the foregoing section described, or any pistol cartridge and on conviction he shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court not exceeding six months. § 2987. Any father who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed, in whole or in part, any person of the kind or description in the forgoing section described, shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor as provided in the proceeding section. § 2988. Any student of any university, college, or school, who shall carry concealed, in whole or in part, any weapon of the kind or description in the foregoing section described, or any teacher, instructor or professor who shall knowingly, suffer or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a misdemeanor and on conviction be fined not exceeding three hundred dollars, and if the fine and costs are not paid, be condemned to hard labor as above provided.

Laws regulating carrying and brandishing firearms, who can own them, where they can be brought, etc., Ch. 20, §§ 293-300, in The Charter and Code of the Ordinances of Yazoo City (1908).

"Deadly weapons; carrying of concealed.

Sec. 293. Any person who carries concealed, in whole or in part, any bowie knife, dirk knife, butcher knife, pistol, brass or metallic knuckles, slungshot, sword, or other deadly weapon of like kind or description, shall be guilty of a misdemeanor, and, on conviction, shall be punished by a fine of not less than twenty-five dollars nor more than one hundred dollars, and all costs, or be imprisoned in the county jail not more than ninety days, or both, in the discretion of the court. Weapon forfeited.

Sec. 294. Upon the conviction of any person under the preceding section, the weapon shown in such case to have been carried concealed, in whole or in part, shall be forfeited to the state, and shall be delivered to the sheriff of Yazoo county, who shall forthwith publicly destroy the same. The same; not applicable to certain persons.

Sec. 295. Any person indicted or charged for a violation of the last section may show as a defense—

**App. 174**

(a) That he was threatened, and had good and sufficient reason to apprehend a serious attack from an enemy, and that he did so apprehend; or

(b) That he was traveling and was not a tramp, or was setting out on a journey, and was not a tramp; or

(c) That he was a peace officer or deputy in the discharge of his duties; or

(d) That he was at the time in the discharge of his duties as a mail carrier; or

(e) That he was at the time engaged in transporting valuables for an express company or bank; or

(f) That he was in lawful pursuit of a felon.

And the burden of proving either of said defenses shall be on the accused.

Dealers to keep record of cartridges and weapons sold.

Sec. 296. Every merchant or dealer or pawnbroker that sells bowie knives, dirk knives, pistols, brass or metallic knuckles, or slungshots, or pistol or rifle cartridges, shall keep a record of all sales of such weapons and cartridges sold, showing the description of the weapon and kind and caliber of cartridges so sold, the name of the purchaser, and the description of weapons and the quantity of cartridges and date of sale. This record to be opened to public inspection at any time to persons desiring to see it. The dealer who violates this section shall be guilty of a misdemeanor, and upon conviction, shall be fined not less than seven dollars and fifty cents nor more than twenty-five dollars.

The same; and cartridges not sold to infant or drunk person.

Sec. 297. It shall not be lawful for any person to sell, give, or lend to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any deadly weapon, or other weapon the carrying of which concealed is prohibited, or pistol cartridge; and, on conviction thereof, he shall be punished by a fine of not less than twenty-five dollars nor more than two hundred dollars, or imprisoned not exceeding ninety days, or both.

The same; father not to suffer infant son to have or carry.

Sec. 298. Any father who shall knowingly suffer or permit any son under the age of sixteen years to have or to own, or to carry concealed, in whole or in part, any weapon the carrying of which concealed is prohibited, shall be guilty of a misdemeanor, and, on conviction, shall be fined not less than twenty dollars nor more than two hundred dollars, or may be imprisoned not more than sixty days in the county jail, or both.

The same; pupil in any public school not to have, etc.

Sec. 299. Any student or pupil in any public school of this city, who shall carry into such school any weapon of the kind mentioned or described in section 293, concealed, in whole or in part, or any professor, teacher, or instructor in such school who shall knowingly suffer or permit any such weapon to be carried into such school, concealed, as aforesaid, shall be guilty of a misdemeanor, and, on conviction thereof in the city court, shall be punished as provided in section 293.

The same; exhibiting in rude, angry, or threatening manner, etc.

Sec. 300. If any person, having or carrying any dirk, dirk knife, sword, sword-cane, or any deadly weapon, or other weapon the carrying of which concealed is prohibited, shall, in the presence of three or more persons, exhibit the same in a rude, angry, or threatening manner, not in necessary self-defense, or shall in any manner unlawfully use the same in any fight or quarrel, the person so offending, upon conviction thereof, shall be fined in any sum not less than seven dollars and fifty cents nor more than five hundred dollars, or be imprisoned not exceeding ninety days, or both. In prosecutions under this section, it shall not be necessary for the affidavit or

indictment to aver, nor for the city to prove on the trial, that any gun, pistol, or other firearm was charged, loaded, or in condition to be discharged."

Edwin Ruthven Holmes, ed., The Charter and Code of the Ordinances of Yazoo City, Mississippi (Yazoo City, MS: The Council of Yazoo City, 1908), 172-175. Chapter 20—Misdemeanors, §§ 293-300. Undated.

## MISSOURI

1873 Mo. Laws 328, An Act to Incorporate The Town Of Moberly, art. III, § 1, pt. 15.

To . . . punish . . . any person who shall threaten, quarrel, challenge or fight within said city, or any person who shall be found intoxicated, who shall carry concealed deadly weapons in said city, or any person who shall be found guilty of a misdemeanor, and to define what acts shall constitute a misdemeanor.

MO. REV. STAT. § 1274 (1879), reprinted in 1 The Revised Statutes of the State of Missouri 1879 224 (John A. Hockaday et al. eds. 1879).

1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.

If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

J. H Johnston, The Revised Charter and Ordinances of the City of Boonville, Mo. Revised and Collated, A.D.1881 Page 91, Image 91 (1881) available at The Making of Modern Law: Primary Sources.

Offences Affecting the Public Peace § 6. If any person shall carry concealed upon or about his person any pistol, revolver, dirk, dagger, slungshot, knuckles of metal, or other deadly or dangerous weapon, within said city, or shall, in the presence of any one, exhibit such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person while intoxicated, he shall upon conviction thereof be fined not less than five nor more than ninety dollars: Provided, That nothing herein contained shall prevent any police officer, or any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace or make arrests, from carrying such weapons in the necessary discharge of his duty.

**App. 176**

1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.

If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, etc., Ch. 17, §§ 160-164 in General Ordinances of the Town of Columbia. 1890

"Sec. 160. Any person who shall fire or discharge, or who shall cause the same to be done by any person under his authority or control, any gun, pistol, cannon, anvil, or any device or contrivance, charged with any explosive, shall be deemed guilty of a misdemeanor and on conviction be fined not less than ten dollars for each offense.

Sec. 161. Any person who shall ignite or explode any explosive compound, or suffer the same to be done by any person under his control, or who shall fire, or cause to be fired or exploded, or suffer the same to be done by any person under his control, any fire cracker, or crackers, Roman candles, rockets, torpedoes, squibs, or any other kind of fireworks whatever, shall be deemed guilty of a misdemeanor and on conviction be fined not less than five dollars for each offense.

Sec. 162. Any person who shall be guilty of carrying concealed upon or about his person any pistol, bowie knife, dirk, dagger, slung shot, or other deadly or danger-ous weapon, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than twenty-five nor more than one hundred dollars for every such offense.

Sec. 163. Any person who shall go into any church, or place where people have assembled for religious wor-ship; or into any school room, or place where people are assembled for educational, literary or social purposes; or into any court room, during the sitting of court, or to any election precinct on any election day; or into any other public assemblage of persons met for any lawful purpose, other than for military drill, or meetings, called under the militia laws of this state, carrying concealed or in sight upon or about his person, any fire arms or other deadly or dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than one hundred nor more than one hun-dred and fifty dollars for ever such offense.

Sec. 164. Any person who shall be guilty of exhibit-ing any fire arms, or other deadly or dangerous weapon in a rude, angry, or threatening manner; or who shall carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, shall be deemed guilty of a misdemeanor, and shall upon conviction be fined not less than fifty dollars for every such offense.

**App. 177**

Provided, that the three last preceding sections shall not apply to police officers, nor to any officer whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to any posse when lawfully summoned and on duty; nor shall sec-tion 162 apply to persons moving or traveling peaceably through the state."

1890, MO, Ch. 17—Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, etc., §§ 160-164

General Ordinances of the Town of Columbia, in Boone County, Missouri, Revised, Published and Promulgated by Authority of the Board of Trustees of Said Town, in the Year 1890: To Which Are Appended the Provisions of the State Constitution Respecting Municipal Corporations; Also the General and Special Charters of Said Town (Columbia, MO: Statesman Book and Job Office, 1890), 34-35. Chapter 17—Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, etc., §§ 160-164. Passed May 22, 1890.

The Revised Ordinances of the City of Huntsville, Missouri, of 1894. Collated, Revised, Printed and Published by Authority of the Mayor and Board of Aldermen of the City of Huntsville, Missouri, Under an Ordinance of the Said City, Entitled: "An Ordinance in Relation to Ordinances, and the Publication Thereof." Approved on the 11th Day of June, 189 Page 58-59, Image 58-59 (1894) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Huntsville, An Ordinance in Relation to Carrying Deadly Weapons, § 1. If within the city any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on an election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under militia law of the state, having upon or about his person any kind of fire arms, bowie-knife, dirk, dagger, sling-shot, or other deadly weapon or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, he shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than five nor more than one hundred dollars, or by imprisonment in the city prison not exceeding thirty days nor less than five days or by both such fine and imprisonment; provided, the Mayor may grant permission to any person to discharge gun, pistol or other firearms under the proper circumstances shown to him. § 2. The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to exercise process or warrants, or to suppress breaches of the peace or to make arrests, nor to persons moving or travelling peaceably through this state; and it shall be good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his home, person or property.

Carrying Deadly Weapons, Discharging Fire-Arms, etc., Ch. 12, Art. 3, §§ 50-52, in The Revised Ordinances of the City of Bloomfield (1898).

"Sec. 50. Carrying Deadly Weapons, etc.—If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place, within this city, where people are assembled for religious worship, or into any school room or place where people are assembled in this city, for educational, or social purposes, or to any election precinct, in this

**App. 178**

city on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons, in this city, met for any lawful purpose other than for malitia [sic] drill, or meeting called under the militia laws of this State, having upon or about his person any kind of firearms, bowieknife [sic], dirk, dagger, slung shot or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than fifty nor more than two hundred dollars, or by imprisment [sic] in the city calaboose, or city jail not less than five days nor more than six months, or by both such fine and imprisonment.

Sec. 51. Above Section Not to Apply to Certain Officers:—The next proceeding section shall not apply to any police officer in this city, or to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this State, and it shall be a good defense to the charge of carrying any such weapon if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property.

Sec. 52. Discharging Fire-Arms Prohibited, When.—It shall be unlawful for any person in this city, except he be a police officer of this city or other officer in the discharge of his official duty, to discharge or fire off any gun, pistol or fire-arms of any description within the corporate limits of this city, and every person violating this section, shall, upon conviction, be deemed guilty of a misde-meanor and punished by a fine of not less than five nor more than twenty dollars, or by imprisonment in the city calaboose not exceed-ing twenty days."

A law forbidding weapons in certain places, sales of weapons to minors, etc., Ch. 45—Misdemeanors, § 32, in General Ordinances of the City of Brookfield Linn County, Missouri (1900).

"Sec. 32. Carrying Concealed Weapons.—If any person shall, with-in this city, carry concealed upon or about his person, any deadly or dan-gerous weapon, or shall go into any church or place where people have as-sembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct, on any election day, or into any court room dur-ing the sitting of court, or into any other public assembly of persons met for any lawful purpose other than military drill, or meeting called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, sling shot or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon, in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxi-cated or under the influence of intoxicating drinks, or shall directly or indirectly, sell or deliver, loan or barter, to any minor any such weap-on, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor and upon conviction shall be fined not less than ten nor more than one hundred dollars, or be im-prisoned in the city jail not less than five nor more than thirty days."

Chas. K. Hart, ed., General Ordinances of the City of Brookfield Linn County, Missouri, to Which Are Prefixed a Copy of the Record in the Matter of Changing the City of Brookfield from a Fourth Class to a Third Class City, of the Ordinance Fixing the City Limits, a List of City Officers, and to Which is Added the Ordinance Ordering Publication Thereof (Brookfield, MO: The Gazzette, 1900), 116. Chapter 45—Misdemeanors, § 32. Undated.

**App. 179**

Not to Carry Weapons Concealed; Where; nor Sell to Minors, etc., Ch. 43, An Ordinance in Relation to Dangerous and Deadly Weapons, §§ 1-3, in The Revised Ordinances of the City of Pattonsburg, Missouri (1902).

"An Ordinance in Relation to Dangerous and Deadly Weapons.

Be it ordained by the Board of Aldermen of the City of Pattonsburg, as follows:

Sec. 1. Not to Carry Weapons Concealed; Where; nor Sell to Minors.—Any person, who shall, within the corporate limits of the City of Pattonsburg, carry concealed upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct, on any election day, or into any court room during the setting of court, or into any other public assemblage of persons met for any lawful purpose, other than for militia drill or meetings called under the militia law of the state of Missouri, having upon or about his person any kind of firearms, bowie knife, dirk, dagger, slung shot or other deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the in-fluence of intoxicating drinks, or shall directly or indirectly, sell or deliver, loan or barter to any minor, any such weapon, without the consent of the parent or guardian of such minor, shall, upon conviction, be fined in any sum not less than twenty-five nor more than one hundred dollars.

Sec. 2. Section One Not to Apply to Whom; Defense.—Section one of this chapter shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this state, and it shall be a good defense to the charge of carrying such weapons, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property.

Sec. 3. Toy Pistols Not to Be Carried; Where; Penalty.—Any person, who shall, within the corporate limits of said city, be found upon any street or alley, or upon premises not his own, without license from the owners or occupants thereof, having upon or about his person any kind of toy pistol which may be used for the purpose of discharging any missile by force of gun powder, or explosive caps, or exploding percussion caps or powder, shall, upon conviction, be fined in any sum not less than one nor more than one hundred dollars.

Approved April 7th, 1902."

The Pattonsburg Board of Aldermen, eds., The Revised Ordinances of the City of Pattonsburg, Missouri, a City of the Fourth Class: Embracing All the Ordinances of General Application, Together With the Rules and Order of Business Adopted by the Board of Aldermen of Said City (Pattonsburg, MO: Pattonsburg Call Print, 1902), 108-109. Chapter 43—Concealed Weapons, An Ordinance in Relation to Dangerous and Deadly Weapons, §§ 1-3. Approved April 7, 1902.


Chapter 16—Misdemeanors, § 11—Carrying Concealed Weapons, in, Charter and Revised Ordinances of the City of Glasgow, Howard County, Missouri (1903).

"Sec. 11. Carrying concealed weapons.— If any person shall in this city carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school- room or place where the people are assembled for educational, literary or social purposes, or to any election precinct on any elec-tion day, or into any court-room during the sitting of court, or into any other public

assemblage of persons met for any lawful pur-pose other than for militia drill, or meeting called under militia law of this state, having upon or about his person any kind of fire- arms, bowie knife, dirk, dagger, slung-shot or other deadly weap-on, or shall, in the presence of one or more person, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxi-cated, or under the influence of intoxicating drinks, or shall, di-rectly or indirectly, sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than fifty nor more than one hundred dollars: Provided this section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to sup-press breaches of the peace, or to make arrests." Charter and Revised Ordinances of the City of Glasgow, Howard County, Missouri (Glasgow, MO: Glasgow Missourian Print, 1903), 64-65. Chapter 16—Misdemeanors, § 11—Carrying Concealed Weapons. Approved May 5, 1903.

Laws concerning carrying weapons in certain places, sales of weapons to minors, etc., Chapter 21—Misdemeanors, § 162, in Revised Ordinances of the City of Hamilton, Cauldwell County, Missouri (1903).
"Sec. 162. Any person who shall carry concealed upon or about his person any deadly or dangerous weap-on, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educa-tional, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose, other than for malitia [sic] drill, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, sling shot or oth-er deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall, di-rectly or indirectly, sell or deliver, loan or barter, to any minor any such weapon without the consent of the par-ent or guardian of such minor, he shall be deemed guilty of a misdemeanor: Provided, however, that this section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or to make arrests, nor to persons moving or traveling peaceably through the state. And it shall be a good defense to the charge of carrying such weapon if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property."
S. M. Young, ed., Revised Ordinances of the City of Hamilton, Cauldwell County, Missouri, 1903 (S. L., Hamiltonian Print, 1903), 57-58. Chapter 21—Misdemeanors, § 162. In Force March 9, 1903.

Laws that prohibit carrying concealed weapons, bringing weapons to certain places, and selling weapons to minors, Revised Ordinance No. 16, §§ 44-45, in The Revised Ordinances of the City of Maryville (1903).
"Sec. 44. Carrying Concealed Weapons.—If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people are assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purpose, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for

**App. 181**

any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire-arms, bowie knife, dirk, dagger, slung-shot or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor and upon conviction thereof be fined not less than ten nor more than one hundred dollars.

Sec. 45. Above Section Not to Apply to Certain Officers.—The next preceding section shall not apply to police officers, or any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this state, and it shall be a good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property."

The Revised Ordinances of the City of Maryville 1903 to Which Is Prefixed Charter of Cities of the Fourth Class under Revised Statues of Missouri of 1899 and Amendments Thereto (Maryville, MO: Maryville Tribune, 1903), 148-149. Revised Ordinance No. 16, Offenses against Good Order and Public Peace, §§ 44-45. Passed & Approved June 1, 1903.

Ordinances that prohibit carrying concealed weapons, bringing weapons to certain places, and firing weapons, Ch. 23, Art. 1, Ord. No. 2019, §§ 75-76 in Revised and Republished Ordinances of The City of Joplin, Missouri (1903).

"Sec.75. CARRYING CONCEALED WEAPONS.—If any person shall, in the City of Joplin, carry concealed upon or about his person, any deadly or dangerous weapon or shall go into any church or place where people have assembled for religious worship, or into a school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings, called under the militia law of this State, having upon or about his person any kind of fire-arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall, in the presence of one or more persons exhibit any such weapon, in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon without the consent of parent or guardian of said minor, any such person shall be deemed guilty of a misdemeanor, and upon conviction, shall be punished by a fine of not less than fifty dollars, nor to exceed two hundred dollars, or by imprisonment in the city prison not less than five days, nor more than six months, or by both such fine and imprisonment; Provided, that this section shall not be so construed as to apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace or make arrests; nor to persons moving or traveling peacefully through this State, and it shall be a good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property.

Sec. 76. DISCHARGE OF FIRE-ARMS IN THE CITY.—Any person who shall, in this city, without sufficient or reasonable cause, discharge any revolver, pistol, gun or other fire-arm

shall be deemed guilty of a misdemeanor, and be fined in a sum of not less than five dollars, nor more than fifty dollars for each shot discharged."

1903, Joplin, MO, Ch. 23, Art. 1, Ord. No. 2019, §§ 75-76

Revised and Republished Ordinances of The City of Joplin, Missouri: Revision of 1903 Together with the Provisions of the Constitution of the State of Missouri Affecting Municipal Corporations and their Charters, also Extracts of the Statutes of the State Affecting Cities, Towns and Villages of all Classes (Joplin, MO: Pratt Printing House, 1904), 201. Chapter 23, Misdemeanors and Police Regulations, Article I—Misdemeanors, Ordinance No. 2019—An Ordinance Defining Certain Offenses Against the Peace and Good Order of the City, and Prescribing the Punishment Therefor, §§ 75-76. Approved October 17, 1903.

Deadly Weapons Concealed, Etc., & Shooting Firearms, Ch. 30, §§ 184-185, in Revised Ordinances City of Sarcoxie, Jasper County, MO (1907).

"Sec. 184—Deadly Weapons Concealed, Etc. If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meeting called under the militia law of this State, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung shot or other deadly weapons, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any  such weapon without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor and upon conviction be punished by a fine of not less than fifty [$50.00] dollars nor more than two hundred [$200.00] dolars, or by imprisonment in the city jail not less than five days nor more than six months, or by both such fine and imprisonment. Provided, that this section shall not apply to persons moving or traveling peaceably through this state, nor to persons who have been threatened with great bodily harm or had good reason to carry the same in the necessary defense of themselves, home or property, nor to any police officer, or person whose duty it is to execute process or warrants, or to suppress breaches of the peace or make arrests.

Sec. 185—Shooting Firearms. No person in this city shall discharge any gun, pistol or other fire-arms, or explode any detonating material, and any person so offending shall be deemed guilty of a mis-demeanor, but this section shall not apply to any officer in the discharge of his duty nor to the operator or workman in any mine, nor to persons properly using any lawful target gun in any licensed shooting gallery."

Revised Ordinances City of Sarcoxie, Jasper County, MO, Printed and Published by Authority of the Mayor and Board of Aldermen of the City of Sarcoxie, Jasper County, Missouri. Revision of 1907 (Sarcoxie, MO: Record Power Job Print, 1907), 46-47. Chapter 30—Misdemeanors, §§ 184-185. Undated.

An Ordinance Concerning Misdemeanors, §§ 14-15, in General Ordinances of the City of New Franklin (1907).

"Sec. 14. If any person shall carry concealed upon or about his person any deadly or dangerous weapon or shall go into any church or place where people are assembled for religious worship or into any school room or place where people are assembled for educational, literary or social purpose or to any election precinct on any election day or into any court room during the sitting of the court or into any other public assemblage of persons met for any lawful purpose, other than for militia drills or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie-knife, dirk, dagger, slung-shot or other deadly weapon or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks he shall upon conviction be punished by a fine not less than fifty nor more than two hundred dollars or by imprisonment in the City prison or work house not less than five days nor more than six months or by both such fine and imprisonment.

Sec. 15. The next preceding section shall not apply to police officers nor to any officer or person whose duty it is to execute process or warrants or to suppress breaches of the peace or make arrests nor to persons moving or traveling peaceably through this state and it shall be a good defence to the charge of carrying such weapon if the defendant shall show that he has been threatened with great bodily harm or had good reason to carry the same in the necessary defense of his person, home or property."

Carrying Concealed Weapons, No. 36, Art. 6, § 3, in The Charter and Revised Ordinances of the City of Palmyra, Missouri (1908).
"Sec. 3. If any person in this city shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under the militia law of this State, having upon or about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating, drinks, or shall directly or indirectly, sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than fifty nor more than one hundred and fifty dollars."

Full Text (Subscription Required): The Making of Modern Law
The Charter and Revised Ordinances of the City of Palmyra, Missouri: To Which are Prefixed the Provisions of the State Constitution Affecting Municipal Corporations and Statutory Laws Affecting Cities under Special Charter (Palmyra, MO: Sosey Bros., 1908), 216. No. 36—An Ordinance in Relation to Misdemeanors, Article 6—Offences Against Official Authority, § 3— Carrying Concealed Weapons. Approved July 2, 1908.

A law regulating the carrying of weapons in Slater, MO, Ch. 19, § 231, in Revised Ordinances of the City of Slater, Saline County, Missouri (1908).
"Sec. 231. If any person shall, within the City limits, carry concealed upon or about his person any dangerous or deadly weapon, or shall go into any church or place where people have

assembled for religious worship, or into any school room or place where people have assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meeting called under the militia law of this state, having upon or about his person any fire arms, bowie-knife, dirk, dagger, slung shot or other deadly weapon or shall, in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than fifty nor more than two hundred dollars. The foregoing provisions of this section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this state, and it shall be a good defense to the charge of carrying such weapon if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, his home or property." Revised Ordinances of the City of Slater, Saline County, Missouri, of 1908: Revised, Printed and Published in Pursuance of an Ordinance Duly Passed by the Board of Aldermen of Said City and Approved by the Mayor of Said City on the 24th Day of August, 1908, Which Ordinance Is Numbered 575 and Entitled, An Ordinance Relating to the Revision of the Ordinances (Slater, MO: Rustler, 1908), 104-105. Chapter 19—Miscellaneous Offenses, § 231. Undated.

Ordinances that prohibit carrying concealed weapons, bringing weapons to certain places, and selling weapons to minors, Ch. 21, Art. 1, §§ 329-330, in, The Revised Ordinances of the City of Bevier, Missouri (1910).
"Sec. 329, Carrying Deadly Weapons, etc.—
If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school-room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose, other than for militia drill, or meetings called under the militia law of this state, having upon or about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than ten nor more than one hundred dollars, or by imprisonment in the city jail not less than five days nor more than six months, or by both such fine and imprisonment. (§ 16, Ord. 109.)
Sec. 330. Above Section Not to Apply to Certain Officers.— The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through the state, and it shall be a good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or

had good reason to carry the same in the necessary defense of his person, home or property. (17, Ord. 109.)"
E. Francis, ed., The Revised Ordinances of the City of Bevier, Missouri, of 1903 (No Publication Information), 104-105. Chapter 21—Misdemeanors, Article 1—Offenses Against Public Order and Peace, §§ 329-330. Undated.

A law regulating weapons: carrying concealed or in certain places, brandishing, and sales to minors, Ordinance No. 31, § 10, in Revised Ordinances of the City of Richmond, Missouri (1910).
"If any person shall carry, concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room where people have assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the setting of court, or into any other public assemblage of persons met for lawful purpose, other than for military drill or meetings called under the militia law of this state, having upon or about his person, any kind of fire-arms, bowie knife, dirk, dagger, slung shot or other deadly weapon, or shall, in the presence of one or more persons, exhibit such weapon in a rude, angry and threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drink, or shall directly or indirectly loan or barter to any minor, any such weapon without the consent of the parent or guardian of such minor, he shall upon conviction be punished by a fine of not less than fifty dollars nor more than one hundred dollars, or by imprisonment in the city prison not less than five days nor more than six months, or by both such fine and imprisonment."
Revised Ordinances of the City of Richmond, Missouri: 1910-1911 (Richmond, MO: The Conservator Print, 1911), 130-131. Ordinance No. 31—An Ordinance in Relation to Public Peace and Order, § 10. Approved December 21, 1910.

Joplin Code of 1917, Art. 67, § 1201. Weapons; Deadly. 1917
If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state.

**App. 186**

1923 Mo. Laws 241-42, An Act to Provide the Exercise of the Police Powers of the State by and through Prohibiting the Manufacture, Possession, Transportation, Sale and Disposition of Intoxicating Liquors. . .§ 17.

Any person, while in charge of, or a passenger thereon, who shall carry on his person, or in, on, or about, any wagon, buggy, automobile, boat, aeroplane, or other conveyance or vehicle whatsoever, in, or upon which any intoxicating liquor, including wine or beer, is carried, conveyed or transported in violation of any provision of the laws of this state, any revolver, gun or other firearm, or explosive, any bowie knife, or other knife having a blade of more than two and one-half inches in length, any sling shot, brass knucks [sic], billy, club or other dangerous weapon, article or thing which could, or might, be used in inflicting bodily injury or death upon another, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by the imprisonment in the state penitentiary for a term of not less than two years. Provided, that this section shall not apply to any person or persons transporting intoxicating liquor for personal use and not for sale in violation of law. Provided, that this section shall not apply to any person or passenger who did not know that such vehicle or conveyance was being used for unlawful purposes.

## **NEVADA**

1881 Nev. Stat. 19-20, An Act to Prohibit the Use of Firearms in Public Places, ch. 7, § 1.

Any person in this State, whether under the influence of liquor or otherwise, who shall, except in necessary self-defense, maliciously, wantonly or negligently discharge or cause to be discharged any pistol, gun or any other kind of firearm, in or upon any public street or thoroughfare, or in any theater, hall, store, hotel, saloon or any other place of public resort, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by imprisonment in the County Jail for a term not less than two nor more than six months, or by a fine not less than one hundred nor more than five hundred dollars, or by both such fine and imprisonment; provided, that no Sheriff, Deputy Sheriff, Marshal, Constable, Deputy Constable or other peace officer shall be held to answer under the provisions of this Act for discharging firearms in the lawful pursuance of his or their duty.

David E. Aily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1076, Image 1084 (1885) available at The Making of Modern Law: Primary Sources.

[An Act to Prohibit the Use of Firearms in Public Places, § 1.Any person in this state, whether under the influence of liquor or otherwise, who shall, except I necessary self-defense, maliciously, wantonly or negligently discharge or cause to be discharged any pistol, gun or any other kind of firearm, in or upon any public street or thoroughfare, or in any theatre, hall, store, hotel, saloon or any other place of public resort, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by imprisonment in the county jail for a term not less than two nor more than six months, or by a fine not less than one hundred nor more than five hundred dollars, or by both such fine and imprisonment: provided that no Sheriff, Deputy Sheriff, Marshal, Constable, Deputy Constable, or other peace officer shall be held to answer under the provisions of this Act for discharging firearms in the lawful pursuance of his or their duty.]

## **App. 187**

**NEW JERSEY**

An Act for better settling and regulating the Militia of this Colony of New-Jersey, for the repelling Invasions, and Suppressing Insurrections and Rebellions. Passed May 8, 1746. Section 3. Officers and Soldiers to behave well while under Arms; and, Section 23. Penalty on selling strong Liquor near the mustering Place

"3. And be it further Enacted by the Authority aforesaid, That no Officer shall beat or abuse any of the Soldiers whilst under Arms on any such Days of Training as aforesaid : But if any Soldier shall, during that Time, use any reproachful or abusive Language towards any of his superior Officers, or shall quarrel himself, or promote any Quarrel amongst his Fellow-Soldiers, or appear in Arms disguised in Liquor, it shall and may be lawful for the Captain or Commanding Officer to disarm such Soldier at the Head of his Company, and to set a Centinel over him during the Time of the Company's being in Arms and no longer, or to fine him in Manner and Form aforesaid, as the said Captain or Commanding Officer in his Discretion shall think proper."

"23. And be it further Enacted by the Authority aforesaid, That no Innholder, or any other Person or Persons whatsoever, without Leave from the Captain or Commanding Officer for the Time being, shall presume to sell any strong Liquor to any of the Persons so listed, in such Days or Times that they are obliged to appear in Arms at the Place of Mustering or Training, or within a Mile thereof, until after they are dismissed for that Day ; and every Person or Persons so selling strong Liquor, contrary to the Directions of this Act shall forfeit the Sum of Three Pounds, to be recovered by any Person that will sue for the same, before any Justice of the Peace ; the one Half to such Person as will prosecute the same to Effect, the other Half to be applied for purchasing the Arms and Ammunitien aforesaid."

1746, NJ, An Act for better settling and regulating the Militia of this Colony of New-Jersey, for the repelling Invasions, and Suppressing Insurrections and Rebellions

The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 8 (Washington, D.C.: Government Printing Office, 1947), 25-26, 31.


1916 N.J. Laws 275-76, An Act to Prohibit Any Person from Going into the Woods or Fields with a Gun or Other Firearm when Intoxicated, or under the Influence of any Drug or Intoxicating Liquor, ch. 130, §§ 1-2.

1. It shall be unlawful for any person to go into the woods or fields at any time with a gun or firearm when intoxicated or under the influence of any drug or drugs or of intoxicating liquor. 2. Any person violating any of the provisions of this act shall be liable to a penalty of fifty dollars for each offense, to be sued for and recovered in the manner provided and by the persons authorized to sued for and recover penalties. . . . Upon the conviction of any person for violating the provisions of this act, the license to hunt and fish of such person issued to him . . . shall become void, and the justice of the peace, District Court judge, or police magistrate before whom such conviction is had, shall take from the person so convicted the license, mark the same "revoked" and send it to the Board of Fish and Game Commissioners. If such conviction is reversed on appeal the license shall be restored to the defendant. Any license to hunt or fish issued to any person convicted of a violation of this act during the calendar year in which such offense occurred shall be null and void.

## NORTH DAKOTA

1921 N.D. Laws 173, An Act to Prohibit Intoxicating Liquors and Beverages and Property Intended for Manufacture of Same; Prohibiting the Transportation of Liquor . . . , ch. 97, § 13. Provided, however, that if the evidence in such case convinces the court that the person convicted of transporting intoxicating liquors in violation of this Act, was in charge of and used any wagon, buggy, automobile, water or aircraft, or other vehicle or conveyance not owned by him, or without permission of the owner, or when such vehicle or conveyance so sued was mortgaged property, or if there be in or upon such conveyance so used or upon any person therein any firearms, or guns, he shall be deemed guilty of a felony, and be punished by imprisonment in the penitentiary not less than six months and not more than five years.

## OHIO

Amendments to Militia Regulations, Ohio Senate Bill No. 7, § 1, in The State of Ohio: General and Local Acts Passed, and Joint Resolutions Adopted by the Sixty-Seventh General Assembly at Its Regular Session (1886).
"…Or, if any person shall temporarily erect any stand, booth, or other structure for the purpose of exposing for sale, giving, bartering, or otherwise dispose of any spirituous or other intoxicating liquors whatsoever, at or within a distance of one mile from any such parade or encampment, he may be put immediately under guard, and kept at the discretion of the commanding officer, and such commanding officer may turn over such person to any police officer or constable of the city, township or town wherein such duty, parade or drill, encampment or meeting is held, for examination or trial before any court of justice having jurisdiction of the place."
1886, OH, Amendments to Militia Regulations, Senate Bill No. 7, § 1
The State of Ohio: General and Local Acts Passed, and Joint Resolutions Adopted by the Sixty-Seventh General Assembly at Its Regular Session Begun and Held in the City of Columbus January 4, 1886, vol. 83 (Columbus, OH: Myers Brothers, 1886), 100. Senate Bill no. 7, An Act to Amend Sections 3033, 3034, 3036, 3037, 3038, 3039, 3041, 3042, 3043, 3044, 3045, 3046, 3047, 3048, 3049, 3050, 3051, 3052, 3054, 3055, 3056, 3057, 3058, 3059, 3963, 3064, 3067, 3068, 3069, 3070, 3071, 3074, 3076, 3078, 3079, 3080, 3081, 3082, 3083, 3084, 3085, 3104 and 3105 of the Revised Statutes of Ohio, and to Repeal Sections 3035, 3060, 3061, 3062, 3065 and 3066, § 1, Amending § 3079 of Chapter 4—Uniforms, Drill, and Pay. Passed April 28, 1886.

## OKLAHOMA

1890 Okla. Laws 495, art. 47
Sec. 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.
Sec. 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

## App. 189

Sec. 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.

Sec. 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under to other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

Sec. 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while traveling or removing from one place to another, and not otherwise.

. . .

Sec. 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

Ch. 25—Crimes & Punishment, Art. 47—Concealed Weapons, §§ 1-10 in The Statutes of Oklahoma (1890).

"Sec. 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

Sec. 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

Sec. 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.

Sec. 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

Sec. 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.

Sec. 6. Any person violating the provisions of any one of the foregoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent conviction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

**App. 190**

Sec. 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

Sec. 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

Sec. 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

Sec. 10. Any person violating the provisions of section seven, eight or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three not more than twelve months."

1891, OK, Ch., 25—Crimes & Punishment, Art. 47—Concealed Weapons, §§ 1-10
Will T. Little, L G. Pitman, and R. J. Barker, The Statutes of Oklahoma 1890: Compiled under the Supervision and Direction of Robert Martin, Secretary of the Territory, by Will T. Little, L G. Pitman and R. J. Barker, from the Laws Passed by the That Legislative Assembly of the Territory (Guthrie, OK: The State Capital Printing Co., 1891), 495-496. Chapter 25—Crimes & Punishment, Article 47—Concealed Weapons, §§ 1-10. Undated.

Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory) Page 495-496, Image 511-512 (1891) available at The Making of Modern Law: Primary Sources.

Concealed Weapons, § 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided. §2. It shall be unlawful for any person in this territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided. § 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person. § 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise. §6. Any person violating the provisions of any one of the forgoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent conviction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less

**App. 191**

than thirty days nor more than three months or both, at the discretion of the court. § 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article. § 8. It shall be unlawful for any person in this territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man. § 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise. § 10. Any person violating the provisions of section seven, eight, or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three nor more than twelve months.

Leander G Pitman The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory) Page 496, Image 512 (Guthrie, 1891) available at The Making of Modern Law: Primary Sources.
Crimes and Punishment. § 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

## PENNSYLVANIA

1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries
That if any persons or persons whatsoever, within any county town, or within any other town or borough, in this province, already built and settled, or hereafter to be built and settled . .. shall fire any gun or other fire-arm, or shall make or cause to be made, or sell or utter, or offer or expose for sale, any squibs, rockets or other fire-works, … within any of the said towns or boroughs without the Governor's special license for the same, every such person or persons, so offending shall be subject to the like penalties and forfeitures, and to be recovered in like manner, as in and by an act, passed in the eighth year of the reign of King George the first, entitled, An act for preventing accidents that may happen by fire, are directed to be levied and recovered.

An Act to regulate the Militia of the Common-Wealth of Pennsylvania, §§ IX-X (1777).
"IX. Any officer or private man found drunk when under arms, shall be suspended from doing duty in the battalion, company or troop on that day, and be fined at the discretion of a General or Regimental Court-Martial.
X. Whatever centinel shall be found sleeping or drunk on his post, or shall leave it before he is regularly relieved, shall be fined at the discretion of a Court-Martial."

**App. 192**

1777, PA, An Act to regulate the Militia of the Common-Wealth of Pennsylvania, § 9-10
The Selective Service System, Backgrounds of Selective Service: Military Obligation. The
American Tradition a Compilation of the Enactments of Compulsion from the Earliest
Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation
1789, Ed. Arthur Vollmer, vol. 2 pt. 11 (Washington, D.C.: Government Printing Office, 1947),
38.

An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania (20 March,
1780), § 57, Penalty on Officers Misbehaving while on Parade; § 60, Rules and regulations, 12th
rule.
§ 57 "…and if any non-commissioned officer or private shall, on any occasion of parading the
company to which he belongs, appear with his arms and accoutrements in an unfit condition, or
be found drunk or shall disobey orders or use any reproachful or abusive language to his officers
or any of them ; or shall quarrel himself, or promote any quarrel among his fellow soldiers, he
shall be disarmed and put under guard, by order of the commanding officer present, until the
company is dismissed, and shall be fined in any sum not exceeding the price of ten day's [sic]
labour, nor less than one day's labour.
§ 60 "12th. No company or battalion shall meet at a tavern on any of the days of exercise, nor
shall march to any tavern before they are discharged ; and any person who shall bring any kind
of spiritous liquor to such place of training shall forfeit such liquors so brought for the use of the
poor belonging to the township where such offender lives."
1780, PA, An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania § 57 &
§ 60
Thomas McKean, The Acts of the General Assembly of the Commonwealth of Pennsylvania
Carefully Compared with the Originals : And an Appendix Containing the Laws Now in Force,
Passed between the 30th Day of September 1775, and the Revolution : Together with the
Declaration of Independence, the Constitution of the State of Pennsylvania, and the Articles of
Confederation of the United States of America (Philadelphia, PA: Francis Bailey, in Market-
Street, 1782), 365-366; 368. An Act for the Regulation of the Militia of the Commonwealth of
Pennsylvania: § 57, Penalty on Officers Misbehaving while on Parade; § 60, Rules and
regulations, 12th rule. Passed 20 March, 1780.
See also, The Selective Service System, Backgrounds of Selective Service: Military Obligation.
The American Tradition a Compilation of the Enactments of Compulsion from the Earliest
Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation
1789, Ed. Arthur Vollmer, vol. 2 pt. 11 (Washington, D.C.: Government Printing Office, 1947),
97; 100.

1875 Pa. Laws, no. 52, § 1, AN ACT To prevent the sale of intoxicating liquors, and for the
preservation of order at soldiers' encampments or re-unions
"Section. Be it enacted &c., That it shall not be lawful for any person or persons to erect, place or
have any booth, stall, tent, carriage, boat, vessel, or any other place whatever, for the purpose of
selling, giving, or otherwise disposing of any spirituous, vinous or malt liquors, or cider, or any
fermented liquors whatsoever, or any admixtures thereof, or any liquid compounded or
composed, in whole or part, of alcohol, or any other intoxicating drink whatever, (except as
hereinafter excepted,) within three miles of the place of holding any soldiers' encampment or re-
union in this state, during the time of holding such encampment or re-union."

**App. 193**

1875, PA, AN ACT To prevent the sale of intoxicating liquors, and for the preservation of order at soldiers' encampments or re-unions
Laws of the General Assembly of the State of Pennsylvania Passed at the Session of 1875 (Harrisburg, PA: B.F. Meyers, State Printer, 1875), 48.

## RHODE ISLAND

1636-1748 R.I. Pub. Laws 31, At A General Assembly Held For Rhode Island Colony At Newport 6th of May, 1679. 1636
That if any person or persons shall presume to sport game or play at any manner of game or games or shooting out any gun or shall set tipling & drinking in any tavern alhouse ordinary or vitling house on the first day of the week more than neccesity requireth and upon examination of the fact it shall be judged by any Justice of the Peace and the Person or Persons so offending as aforesaid. Upon conviction before one Justice of Peace Shall by the said Justice of the Peace be sentenced for every the aforesaid offences to set in the stocks three hours or pay five shillings in money for the use of the poor of the town or place where the offence was committed.

An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops, §10, Acts & Resolves of the General Assembly of the State of Rhode Island (1853).
"It shall be the duty of any mayor, alderman, city marshal, city or town sergeant, constable or police officer, of any city or town, if he shall have information that any ale, wine, rum, or other strong or malt liquors, or any mixed liquors as aforesaid, are kept for sale or sold in any tent, shanty, hut or place of any kind for selling refreshments in any public place, on or near the ground of any cattle show, agricultural exhibition, military muster or public occasion of any kind, to search such suspected place, and if such officer shall find upon the premises any ale, wine, rum, or other strong or malt liquors, or any mixed liquors as aforesaid, he shall seize them and apprehend the keeper or keepers of such place, and take them with the liquors and the vessels containing them, so found and seized, forthwith or as soon as may be convenient, before some justice of the peace, or court exercising the jurisdiction of at justice of the peace, of the town where found, and thereupon such officer shall make a written complaint under oath, and subscribed by him, to such justice or court, that ale, wine, rum, or other strong or malt liquors, or mixed liquors, a part of which is ale, wine, rum, or other strong or malt liquors, was found in the possession of such keeper or keepers, in a tent, shanty, hut, or place for selling refreshments, and upon proof that said liquors are either ale, wine, rum, or other strong or malt liquors, or mixed liquors as aforesaid, that they were found in the possession of the accused, in a tent, shanty or other place as aforesaid, for sale, he or they shall be sentenced to imprisonment in the county jail of the same county for twenty days, and the liquor and vessels so seized shall be dealt with, by order of such justice or court, as provided in the ninth section of this act. But from the sentence and order of said justice or court as aforesaid, the defendant may appeal to the Court of Common Pleas next to be holden in the same county after ten days; in the same manner, and upon the same terms and conditions and with the like effect, as prescribed in section 6th of this act. And in case of such appeal, if the final decision shall be against the appellant, sentence as aforesaid shall be passed upon him by the appellate court, and the liquor and vessels seized as aforesaid shall be dealt with as aforesaid."
Full Text: HeinOnline (subscription required)

**App. 194**

Acts & Resolves of the General Assembly of the State of Rhode Island and Providence Plantations Passed January, A. D., 1853, Being the Adjournment of the October Session; with the Roll of Members, and the Reports Ordered to Be Published (Providence, RI: Sayles, Miller & Simons, 1853), 238-239. An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops, §10. Passed at the January Session, 1853.

General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 1010, Image 1026 (1896) available at The Making of Modern Law: Primary Sources. 1893
Offences Against Public Policy, § 25. Whenever any person shall be arrested charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall have concealed upon his person any of the weapons mentioned in section twenty-three, such person, upon complaint and conviction, in addition to the penalties provided in section twenty-four, shall be subject to a fine of not less than five dollars nor more than twenty-five dollars, and the confiscation of the weapon so found.

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, § 1. No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his person: Provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. § 2. Any person convicted of a violation of the provisions of section 1 shall be fined not less than twenty dollars nor more than two hundred dollars, or be imprisoned not less than six months nor more than one year. § 3. Whenever any person shall be arrested charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall have concealed upon his person any of the weapons mentioned in section 1, such person, upon complaint and conviction , in addition to the penalties provided in section 2, shall be subject to a fine of not less than five dollars nor more than twenty five dollars, and the confiscation of the weapon so found.

## SOUTH CAROLINA

An Act for the Regulation of the Militia of this State (South Carolina) § 5 Regulations for the government of the militia, Rule 7 (1782).
"Any officer or private who shall be found drunk on guard, or at any other time of duty, if an officer, be cashiered and turned into the ranks, or receive such other punishment as the court shall inflict ; if a non-commissioned officer or private, he shall be confined til sober, and serve ten days longer than he was otherwise liable to."
1782, SC, An Act for the Regulation of the Militia of this State
The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 13 (Washington, D.C.: Government Printing Office, 1947),

**App. 195**

96. An Act for the Regulation of the Militia of this State (SC, 1782), § 5 Regulations for the government of the militia, Rule 7.

1899 S.C. Acts 97, An Act To Prevent Drunkeness And Shooting Upon The Highway, No. 67, § 1
§ 1. Be it enacted by the General Assembly of the State of South Carolina, That any person who shall engage in any boisterous conduct, under the influence of intoxicating liquors, or while feigning to be under the influence of such liquors, or without just cause or excuse, shall discharge any gun, pistol or other firearms while upon or within fifty yards of any public road, except upon his own premises, shall be guilty of a misdemeanor, and upon conviction thereof shall pay a fine of not more than one hundred dollars or be imprisoned for not more than thirty days.

1900 S.C. Acts 449, An Act to amend an act entitled "An Act to Prevent Drunkenness and Shooting upon the Highway": § 1.
§ 1. . . That any person who shall, without just cause or excuse, or while under the influence, or feigning to be under the influence of intoxicating liquors, engage in any boisterous conduct, or who shall, without just cause or excuse, discharge any gun, pistol or other firearm while upon or within fifty yards of any public road or highway, except upon his own premises, shall be guilty of a misdemeanor, and, upon conviction thereof, shall pay a fine of not more than one hundred dollars, or be imprisoned for not more than thirty days.

## TENNESSEE

1825 Tenn. Priv. Acts 306, An Act to Amend an Act Passed at Murfreesboro, October 20, 1821, Incorporating Winchester and Reynoldsburgh, ch. 292.
§ 3. Be it enacted, That said mayor and aldermen may, and shall, have power and authority to make any rules and laws regulating the police of said town and the inhabitants thereof, to restrain and punish drinking, gaming, fighting, breaking the sabbath, shooting and carrying guns, and enact penalties and enforce the same, so that they do not conflict or violate the constitution of this State, and are consistent with the laws of this state.

## UTAH

Utah 1925, Chapter 21
Utah in 1925 passed an act punishing the use of firearms by persons in the pursuit of any "kind of birds or animals" while under the influence of liquor. Joseph P. Chamberlain, "Current Legislation," 11 A.B.A.J., 598 (Sept. 1925).

## VERMONT

Acts & Resolves of Vermont, 25, no. 24, An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15 (1852).
"Sec. 15. It shall be the duty of any sheriff, sheriff's deputy, constable, selectman, or grand juror, if he shall have information that any intoxicating liquor is kept or sold in any tent, shanty, hut or place of any kind for selling refreshments in any public place, except dwelling houses, on or near the ground of any cattle show, agricultural exhibition, military muster or public occasion of any

**App. 196**

kind, to search such suspected place without warrant, and if such officer shall find upon the premises any intoxicating liquor, he shall seize and apprehend the keeper or keepers of such place, and take them, with the liquor so found and seized, forthwith, or as soon as conveniently may be, before some justice of the peace of the town in which the same was found ; and thereupon such officer shall make a written complaint under oath, and subscribed by him, to such justice ; and upon proof that such liquor is intoxicating, that the same was found in the possession of the accused, in a tent, shanty, or other place as aforesaid, he or they shall be sentenced to imprisonment, in the county jail of the county where such offence was committed, for thirty days, and the liquor so seized shall be destroyed by order of said justice, as provided in the twelfth section of this act ; and if any person, apprehended under this section and sentenced as aforesaid, shall claim an appeal, before his appeal is allowed, he shall recognize, with good and sufficient sureties, in the sum of one hundred dollars, that he will prosecute his said appeal to effect, and pay all fines and costs, and suffer such penalty as may be awarded against him. And if he is convicted upon such appeal, he shall, in addition to the penalty imposed by such justice, pay a fine of ten dollars to the town where said liquor was seized as aforesaid. And any person resisting an officer in the execution of his duties under this or any other section of this act, shall be liable to the same penalties as are provided by law for resisting a sheriff in the execution of legal process."

1852, VT, An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15 The Acts and Resolves Passed by the General Assembly of the State of Vermont at the October Session, 1852 (Montpelier, VT: E. P. Walton & Son, 1852), 25. Acts & Resolves 25, no. 24 – An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15. Approved 23 Nov., 1852.

## VIRGINIA

1623 Va. Acts 127 Acts of March 5th, 1623
29. That no commander of any plantation do either himselfe or suffer others to spend powder unnecessarily in drinking or entertainments, &c.
https://archive.org/details/statutesatlargeb01virg

1631 Va. Acts 173, Acts of February 24th, 1631, Act L
No commander of any plantation, shall either himselfe or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments. (edited for clarity).
https://archive.org/details/statutesatlargeb01virg

1632 Va. Acts 198, Acts of September 4th, 1632, Act XLIV
No commander of any plantation, shall either himselfe or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments. (edited for clarity).
https://archive.org/details/statutesatlargeb01virg

1655 Va. Acts 401, Acts of March 10, 1655, Act XII
What persons or persons soever shall, after publication hereof, shoot any guns at drinking (marriages and funerals only excepted) that such person or persons so offending shall forfeit 100 lb. of tobacco to be levied by distress in case of refusal and to be disposed of by the militia in ammunition towards a magazine for the county where the offence shall be committed.

## App. 197

https://archive.org/details/statutesatlargeb01virg/page/402/mode/2up?q=401

**WEST VIRGINIA**

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a.

Section 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court; and it shall be the duty of the prosecuting attorney in all cases to ascertain whether or not the charge made by the grand jury is the first or second offense, and if it shall be the second offense, it shall be so stated in the indictment returned, and the prosecuting attorney shall introduce the record evidence before the trial court of said second offense, and shall not be permitted to use his discretion in charging said second offense nor in introducing evidence to prove the same on the trial; provided, that boys or girls under the age of eighteen years, upon the second conviction, may, at the discretion of the court, be sent to the industrial homes for boys and girls, respectively, of the state. Any person desiring to obtain a state license to carry any such weapon within one or more counties in this state shall first publish a notice in some newspaper, published in the county in which he resides, setting forth his name, residence and occupation, and that on a certain day he will apply to the circuit court of his county for such state license; and after the publication of such notice for at least ten days before said application is made and at the time stated in said notice upon application to said court, it may grant such person a license in the following manner, to-wit: The applicant shall file with said court his application in writing, duly verified, which said application shall show: First: That said applicant is a citizen of the United States of America. Second: That such applicant has been a bona fide resident of this state for at least one year next prior to the date of such application, and of the county sixty days next prior thereto. Third: That such applicant is over twenty-one years of age; that he is a person of good moral character, of temperate habits, not addicted to intoxication, and has not been convicted of a felony nor of any offense involving the use on his part of such weapon in an unlawful manner. . . .

**WISCONSIN**

Arthur Loomis Sanborn, Supplement to the Revised Statutes of the State of Wisconsin, 1878, Containing the General Laws from 1879 to 1883, with the Revisers' Notes to the Statutes of 1878 and Notes to Cases Construing and Applying These and Similar Statutes by the Supreme Court of Wisconsin and the Courts of Other States Page 848, Image 890 (1883) available at The Making of Modern Law: Primary Sources. 1883.

Offenses Against Lives and Persons of Individuals, § 3. It shall be unlawful for any person in a state of intoxication to go armed with any pistol or revolver. Any person violating the provisions

**App. 198**

of this act shall be punished by imprisonment in the county jail not exceeding six months, or by fine not exceeding one hundred dollars.

1883 Wis. Sess. Laws 290
Section 1. It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or other public police officers, to take from any minor, any pistol or revolver, found in his possession. Section 2. It shall be unlawful for any dealer in pistols or revolvers, or any other person, to sell, loan, or give any pistol or revolver to any minor in this state. Section 3. It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver. Any person violating the provisions of this act, shall be punished by imprisonment in the county jail not exceeding six months, or by fine not exceeding one hundred dollars ($100).

**App. 199**

**EXHIBIT D**

**TABLE OF WEAPONS LICENSING LAWS\***

| STATE | CARRY OR HAVE | FIRE OR DISCHARGE PERMIT | HUNT SPORT | COMMERCIAL WEAPON SALE FIRE TRANSPORT | GUNPOWDER EXPLOSIVES LICENSING | SELLER REGISTERS BUYER | NAMED GROUPS | PRE-CIVIL WAR BLACKS | REG TAX |
|---|---|---|---|---|---|---|---|---|---|
| Alabama | | 1879 | | 1892, 1898 | | | | 1805 | 1867 |
| Alaska | | | | | | | | 1838 | |
| Arizona | | | | | | | | | |
| Arkansas | | 1871 | | 1882 | | | | | |
| California | 1890, 1891, 1896, 1917, 1923 | 1869 | | 1854 | 1883, 1889 | 1917,1923, 1931 | | | |
| Colorado | | 1875 | | | | 1911 | | | |
| Connecticut | 1890, 1923 | 1835, 1845, 1869, 1877 | | 1923 | 1775, 1827, 1874, 1901, 1909 | | 1665 | | |
| Delaware | | | | 1911 | 1911 | 1911 | 1909 | 1797, 1832, 1841, 1843 | |
| District of Columbia | 1892, 1932 | | | | | | | | |
| Florida | 1893, 1931 | | | 1887, 1895 | | | 1847 | | |
| Georgia | 1910 | | | 1902 | | | | 1768 | |

**App. 200**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Hawaii | 1925, 1927, 1933 | | 1870, 1933 | 1927, 1933 | | 1927,1933, 1933 | | | |
| Idaho | | | | | | | | | |
| Illinois | 1876, 1893, 1914, 1917, 1931 | 1841, 1869 | | 1814, 1914 | 1851, 1869 | 1885 | | | |
| Indiana | 1925 | 1855 | | 1895, 1925 | 1847 | | 1925 | | |
| Iowa | | 1853, 1880 | | 1887 | 1873 | | | | |
| Kansas | | | | | | | | | |
| Kentucky | | | | | 1864, 1874 | | | | |
| Louisiana | | 1870 | | 1857 | | | | 1848 | |
| Maine | | | | | 1848, 1873, 1874 | | | | |
| Maryland | | | 1876, 1882 | | | | 1882 | 1806 | |
| Massachusetts | 1906, 1927 | | | | 1651, 1895, 1898 | | 1769,1884 1922 | | |
| Michigan | 1925, 1927 | 1848, 1895 | | | | 1913,1925, 1927 | | | |
| Minnesota | 1882 | 1858 | | | 1858, 1889 | | | | |
| Mississippi | | | | 1906 | | | | 1804 | 1867 |
| Missouri | 1871, 1880, 1892, 1921 | 1843, 1894 | | 1888, 1921 | 1899 | 1921 | 1844 | 1818, 1854 | |
| Montana | 1895 | | | | | 1918 | 1913 | | |
| Nebraska | 1895 | | | | 1869 | | | | |
| Nevada | | | | | | | | | |

**App. 201**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| New Hampshire | 1917, 1923 | 1823, 1870 | | | 1820 | | 1917, 1923 | | |
| New Jersey | 1873, 1905, 1927, 1934 | 1871 | 1902 | | | | 1914, 1916 | | |
| New Mexico | | | 1915 | | | | | | |
| New York | 1881, 1885, 1891 | 1824, 1881, 1898 | 1923 | | 1885, 1890, 1903 | 1911 | 1680,1884 1885,1911, 1923 | | |
| North Carolina | 1919 | | | 1919 | | 1919 | | 1840 | 1909 |
| North Dakota | 1915, 1923, 1925, 1931 | | | | | 1923 | | | |
| Ohio | 1933 | 1823, 1855, 1856 | | | 1835,1878, 1884,1889, 1900,1902 | | | | |
| Oklahoma | | | | 1890 | | | | | |
| Oregon | 1898, 1913, 1917, 1925 | 1868, 1879 | | | 1872 | 1913,1917 | | | |
| Pennsylvania | 1929, 1931 | 1713,1721, 1721,1750, 1750,1824 | | | | | 1763,1903 | | |
| Rhode Island | 1927 | | 1907 | | 1821, 1902 | | | | |
| South Carolina | 1934 | 1802 | | 1890, 1893 | | | | 1740 | 1923 |
| South Dakota | | | 1899 | | | | | | |
| Tennessee | | | | 1863, 1879 | | | | | |
| Texas | | 1898 | 1919 | 1872,1880, | | | | | |

**App. 202**

|  |  |  |  | 1899 |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|
| Utah | 1888 |  | 1905 |  | 1875 |  | 1850,1905 |  |  |
| Vermont |  | 1890, 1895 | 1908 |  | 1891,1894 |  |  |  |  |
| Virginia | 1908, 1926 | 1859 |  |  |  | 1926 |  | 1792, 1805, 1806 | 192 6 |
| Washington State | 1895 | 1890 |  | 1892 | 1881,1881, 1883 |  | 1911 |  |  |
| West Virginia | 1881, 1925 | 1875 | 1909 | 1876 |  | 1925 |  |  |  |
| Wisconsin | 1896 | 1888 |  |  | 1888 |  |  |  |  |
| Wyoming |  | 1893 | 1899, 1913 |  |  | 1933 | 1915 |  |  |
| TOTAL STATES | 29 | 26 | 12 | 21 | 21 | 15 | 14 | 11 | 5 |
| TOTAL LAWS | 62 | 45 | 15 | 31 | 44 | 22 | 24 | 17 | 5 |

*Source: https://firearmslaw.duke.edu/repository/search-the-repository/

**App. 203**

# EXHIBIT E

# LICENSE AND LICENSING LAWS

## ALABAMA

Harry Toulmin, A Digest of the Laws of the State of Alabama : Containing the Statutes and Resolutions in Force at the End of the General Assembly in January, 1823. To which is Added an Appendix; Containing the Declaration of Independence; the Constitution of the United States; the Act authorizing the People of Alabama to form a Constitution and State Government; and the Constitution of the State of Alabama Page 627, Image 655 (1823) available at The Making of Modern Law: Primary Sources. 1805
Negroes and Mulattoes, Bond and Free – 1805, Chapter I, An Act respecting Slaves. – Passed March 6, 1805: Sec. 4. And be it further enacted, that no slave shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, except the tools given him to work with, or that he is ordered by his master, mistress, or overseer, to carry the said articles from one place to another, but all and every gun , weapon, or ammunition, found in the possession or custody of any slave, may be seized by any person, and upon due proof made thereof, before any justice of the peace of the county or corporation where such seizure shall be made, shall, by his order, be forfeited to the seizer, for his own use; and moreover, every such offender shall have and receive, by order of such justice, any number of lashes, not exceeding thirty-nine, on his bare back for every such offense : Provided nevertheless, That any justice of the peace may grant, in his proper county, permission in writing to any slave, on application of his master or overseer, to carry and use a gun and ammunition within the limits of his said master's or owner's plantation, for a term not exceeding one year, and revocable at any time within such term, at the discretion of the said justice, and to prevent the inconveniences arising from the meeting of slaves.

[REGULATORY TAX] The Revised Code of Alabama Page 169, Image 185 (1867) available at The Making of Modern Law: Primary Sources. 1867
Taxation, § 10. On All pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and such tax must be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment when demanded by the assessor, such pistols, revolvers, bowie knives, or knives of like description, must be seized by him, and unless redeemed by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same must be sold at public outcry before the court house door, after five days notice; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, must be paid over to the person from whom the said pistol, revolver, bowie knife, or knife of like description, was taken, and the net amount collected by him must be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto.

**App. 204**

J. M. Falkner, The Code of Ordinances of the City Council of Montgomery, with the Charter Page151, Image 151 (1879) available at The Making of Modern Law: Primary Sources. 1879 [Ordinances of the City of Montgomery,] § 449. Any person who fires or discharges, or causes to be fired or discharged, any pistol, gun, cannon, anvil, or anything of like kind or character; or who lets off or discharges any rocket, fire-crackers, squib or other fire-works, without first having obtained permission of the Mayor, who shall designate the place where such firing may be done, must, on conviction, be fined not less than one nor more than one hundred dollars.

William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, Entitled "An Act to Adopt a Code of Laws for the State Alabama" with Such Statutes Passed at the Session of 1896-97, as are Required to be Incorporated Therein by Act Approved February 17, 1897; and with Citations to the Decisions of the Supreme Court of the State Construing or Mentioning the Statutes Page 1137, Image 1154 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources. 1892
[License Taxes; From Whom and For What Business Required; Prices; County Levy,] Taxation, § 27. For dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars. Any cartridges, whether called rifle or pistol cartridges, or by any other name, that can be used in a pistol, shall be deemed pistol cartridges within the meaning of this subdivision. Any person or firm who orders for another, or delivers any cartridges within this state, shall be deemed a dealer under this provision.

1898 Ala. Acts 190, An Act To Amend The Revenue Laws Of The State Of Alabama, pt. 66-67. 66th. For dealers in pistol, bowie or dirk knives, whether principal stock in trade or not, one hundred dollars. 67th. For wholesale dealers in pistol or rifle cartridges in towns or cities of twenty thousand or more inhabitants, ten dollars. In all other places, five dollars: Provided, That the wholesale dealers license shall entitle them to sell at retail.

## ARKANSAS

Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A. D. 1837, in the Year of Our Independence the Sixty-second, and of the State of Second Year Page 587, Image 602 (1838) available at The Making of Modern Law: Primary Sources. 1838
Negroes and Mulattoes, § 17. No free negro shall be suffered to keep or carry any gun or rifle, or weapon of any kind, or any ammunition without a license first had and obtained, for that purpose, from some justice of the peace of the county in which such free negro or mulatto resides, and such license may be granted and revoked by any justice of the peace of the county. §18. Every gun, rifle, or weapon of any kind, or ammunition, found in the possession or custody of any free negro or mulatto, not having a license as required by the preceding section, may be seized by any person, and upon due proof thereof made before some justice of the peace of the county in which such seizure was made, shall by order of such justice be forfeited to the use of the person making the seizure, and such justice shall also impose a fine on such negro or mulatto, for the use of the county, not exceeding twenty dollars.

**App. 205**

George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City Page 231, Image 231 (1871) available at The Making of Modern Law: Primary Sources. 1871
[Offenses Affecting the Public Safety, § 288. No person shall fire or discharge any cannon, gun, fowling piece, pistol, or fire-arms, of any description, or fire, explode, or set off any squibs, cracker, or other thing containing powder or other combustible or explosive material, without permission from the may which permission shall limit the time of such firing, and shall be subject to be revoked by the mayor at any time after it has been granted. Any violation hereof shall subject the party to a fine of not less than two nor more than ten dollars.]

John H. Herry, Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of the State of Arkansas; General Incorporation Laws; and All Acts of the General Assembly Relating to the City; in Force March 10, 1882 Page 149, Image 334 (1882) available at The Making of Modern Law: Primary Sources. 1882
[Ordinances of the] City of Little Rock, [§ 344. That it shall be unlawful for any person to engage in, exercise or pursue any of the following avocations or business without first having obtained and paid for a license therefor from the proper city authorities the amount of which licenses are hereby fixed as follows, to wit: . . . ]§ 27. Shooting galleries, or pistol galleries, $25 per annum, in advance.

## CALIFORNIA

Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council Page 220, Image 256 (1854) available at The Making of Modern Law: Primary Sources. 1854
Ordinances of the [City of San Francisco], § 13. Every person, house, or firm engaged in keeping a pistol or rifle shooting gallery, shall pay for a license to carry on the same, the sum of ten dollars per quarter, in addition to the amount of the powder license.

General orders of the Board of Supervisors providing regulations for the government of the City and County of San Francisco. 1869
[Discharge of Cannon: Permit to be given by Mayor, and filed in office of Chief of Police. Discharge of Fire Arms prohibited within certain limits.]Sec. 22. No person shall discharge any cannon within that portion of this city and county lying between Larkin and Ninth Streets and the outer line of the streets forming the water-front, except by special permission, in writing, from the Mayor, which permit shall designate the time and particular locality of the firing, and the number of discharges which are authorized. A copy of such permit shall be filed by the person obtaining the same, in the office of the Chief of Police, at least two hours before the time of such firing; and the person or persons engaged in the discharge of such cannon, shall, on the demand of any citizen or peace officer, exhibit the permit by which such firing is authorized; and no person shall discharge any fire-arm of any other description in that portion of the city and county bounded by Devisadero, Ridley, Market, and Ninth streets, and the outer line of the streets forming the water-front, or within three hundred yards of any public highway, or upon any ground set apart as a cemetery, or public square, or park, or within three hundred yards of any dwelling-house. But this section shall not be construed so as to prohibit any person from

**App. 206**

shooting destructive animals within or upon his own inclosure. Any person who shall violate any of the provisions of this section shall be deemed guilty of a misdemeanor; and upon conviction thereof, shall be punished by a fine of not less than one hundred dollars, or by imprisonment in the county jail out more than thirty days.

1883 Cal. Stat. 156, § 153.
The Municipal Council shall provide by ordinance, for the payment into a "Fireman's Charitable Fund" of such city, or city and county, of all moneys received for licenses for the storage, manufacture, or sale of gunpowder, blasting powder, gun cotton, fireworks, nitro-glycerine, dualine, or any explosive oils or compounds, or as a municipal tax upon the same; also all fines collected in the police court for violations of fire ordinances.

Nathan Newmark, The Political Code of the State of California. As Enacted in 1872, and Amended in 1889. With Notes and References to the Decisions of the Supreme Court Page 963 (1889) available at The Making of Modern Law: Primary Sources. 1889
[Political Code of the State of California,] Charitable Fund, §153. The Municipal Council shall provide, by ordinance, for the payment into a "Fireman's Charitable Fund" of such city, or city and county, of all moneys received for licenses for the storage, manufacture, or sale of gunpowder, blasting powder, gun cotton, fireworks, nitro-glycerine, dualine, or any explosive oils or compounds, or as a municipal tax upon the same; also, all fines collected in the Police Court for violations of fire ordinances. Said fund shall be under the direction and control of and subject to such regulations as may be prescribed by the Board of Fire Commissioners.

Fred L. Button, ed., General Municipal Ordinances of the City of Oakland, California (Oakland, CA; Enquirer, 1895), p. 218, Sec. 1, An Ordinance to Prohibit the Carrying of Concealed Weapons, No. 1141. 1890
Section 1 . It shall be unlawful for any person in the City of Oakland, not being a public officer or a traveler actually engaged in making a journey, to wear or carry concealed about his person without a permit, as hereinafter provided, any pistol, slung-shot, brass or iron knuckles, sand club, dirk or bowie knife, or iron bar or other dangerous or deadly weapon, or any sling or other contrivance by which shot or other missiles are or may be hurled or projected. A written permit may be granted by the Mayor for a period of not to exceed one year to any peaceable person whose profession or occupation may require him to be out at late hours of the night to carry a concealed deadly weapon upon his person.

Charter and Ordinances of the City of Stockton (Stockton, CA: Stockton Mail Printers and Bookbinders, 1908), p. 240, Ordinance No. 53. 1891
Be it ordained by the City Council of the City of Stockton as follows:
One-Concealed Weapons, Burglars' Tools.
Section 1. It shall be unlawful and a misdemeanor: 1. For any person not being a peace officer or actually prosecuting a journey to or from the town, city or county of his residence, to wear or carry concealed about his person any pistol, dirk, bowie-knife, slungshot, sand-club, metallic knuckles or any other deadly or dangerous weapon, except he first have a written permit to so do from the Mayor of the City of Stockton.

**App. 207**

L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources. 1896

Ordinances of the City of Fresno, § 8. Any person excepting peace officers and travelers, who shall carry concealed upon his person any pistol or firearm, slungshot, dirk or bowie-knife, or other deadly weapon, without a written permission (revocable at any time) from the president of the board of trustees, is guilty of a misdemeanor.

1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, §§ 3-4.

SEC. 3. Every person who carries in any city, city and county, town or municipal corporation of this state any pistol, revolver, or other firearm concealed upon his person, without having a license to carry such firearm as hereinafter provided in section six of this act, shall be guilty of a misdemeanor, and if he has been convicted previously of any felony, or of any crime made punishable by this act, he is guilty of a felony.

SEC 4. The unlawful possessing or carrying of any of the instruments, weapons, or firearms enumerated in section one to section three inclusive of this act, by any person other than those authorized and empowered to carry or possess the same as hereinafter provided, is a nuisance, and such instruments, weapons or firearms are hereby declared to be nuisances, and when any of said articles shall be taken from the possession of any person the same shall be surrendered to the magistrate before whom said person shall be taken, except that in any city, city and county, town or other municipal corporation the same shall be surrendered to the head of the police force, or police department thereof. The officers to whom the same may be so surrendered, except upon certificate of a judge of a court of record, or of the district attorney of any county that the preservation thereof is necessary or proper to the ends of justice, shall proceed at such time or times as he deemds proper, and at least once in each year to destroy or cause to be destroyed such instruments, weapons, or other firearms in such manner and to such extent that the same shall be and become wholly and entirely ineffective and useless for the purpose for which it was manufactured.

SEC 6. It shall be lawful for the board of police commissioners, chief of police, city marshal, town marshal, or other head of the police department of any city, city and county, town, or other municipal corporation of this state, upon proof before said board, chief, marshal or head, that the person applying therefor is of good moral character, and that good cause exists for the issuance thereof, to issue to such person a license to carry concealed a pistol, revolver or other fire-arm; provided, however, that the application to carry concealed such firearm shall be filed in writing and shall state the name and residence of the applicant, the nature of applicant's occupation, the business address of applicant, the nature of the weapon sought to be carried and the reason for the filing of the application to carry the same.

1923 Cal. Stat. 696, An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person; To Prohibit the

**App. 208**

Manufacture, Sale, Possession or Carrying of Certain Other Dangerous Weapons Within this State; To Provide for Registering All Sales of Pistols, Revolvers or Other Firearms Capable of Being Concealed Upon the Person; To Prohibit the Carrying of Concealed Firearms Except by Lawfully Authorized Persons; To Provide for the Confiscation and Destruction of Such Weapons in Certain Cases; To Prohibit the Ownership, Use or Possession of Any of Such Weapons by Certain Classes of Persons; To Prescribe Penalties for Violations of This Act and Increased Penalties for Repeated Violations Hereof; To Authorize, In Proper Cases, The Granting of Licenses or Permits to Carry Firearms Concealed Upon the Person; To Provide for Licensing Retail Dealers in Such Firearms and Regulating Sales Thereunder; And To Repeal Chapter One Hundred Forty-Five of California Statutes of 1917, Relating to the Same Subject, ch. 339, § 3, 8.

Sec. 2. On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person. The terms "pistol," "revolver," and "firearms capable of being concealed upon the person" as used in this act shall be construed to apply to and include all firearms having a barrel less than twelve inches in length. Any person who shall violate the provisions of this section shall be guilty of a felony and upon conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.

Sec. 3. If any person shall commit or attempt to commit any felony within this state while armed with any of the weapons mentioned in section one hereof or while armed with any pistol, revolver or other firearm capable of being concealed upon the person, without having a license or permit to carry such firearm as hereinafter provided, upon conviction of such felony, he shall in addition to the punishment prescribed for the crime of which he has been convicted, be punishable by imprisonment om a state prison for not less than five nor more than ten years…

Sec. 8. It shall be lawful for the sheriff of a county, and the board of police commissioners, chief of police, city marshal, town marshal, or other head of the police department of any city, city and county, town, or other municipal corporation of this state, upon proof before said board, chief, marshal or other police head, that the person applying therefor is of good moral character, and that good cause exists for the issuance thereof, to issue such person a license to carry concealed a pistol, revolver or other firearm for a period of one year from the date of such license…

1923 Cal. Stat. 698–99, An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person; To Prohibit the Manufacture, Sale, Possession or Carrying of Certain Other Dangerous Weapons Within this State; To Provide for Registering All Sales of Pistols, Revolvers or Other Firearms Capable of Being Concealed Upon the Person; To Prohibit the Carrying of Concealed Firearms Except by Lawfully Authorized Persons; To Provide for the Confiscation and Destruction of Such Weapons in Certain Cases; To Prohibit the Ownership, Use or Possession of Any of Such Weapons by Certain Classes of Persons; To Prescribe Penalties for Violations of This Act and Increased Penalties for Repeated Violations Hereof; To Authorize, In Proper Cases, The Granting of Licenses or Permits to Carry Firearms Concealed Upon the Person; To Provide for Licensing Retail Dealers in Such Firearms and Regulating Sales Thereunder; And To Repeal Chapter One Hundred Forty-Five of California Statutes of 1917, ch. 339, § 8.

**App. 209**

Sec. 8. It shall be lawful for the sheriff of a county, and the board of police commissioners, chief of police, city marshal, town marshal, or other head of the police department of any city, city and county, town, or other municipal corporation of this state, upon proof before said board, chief, marshal or other police head, that the person applying therefor is of good moral character, and that good cause exists for the issuance thereof, to issue such person a license to carry concealed a pistol, revolver or other firearm for a period of one year from the date of such license…

1931 Cal. Stat. 2317, An Act to Control and Regulate the Possesion, Sale and Use of Pistols, Revolvers and Other Firearms Capable of Being Concealed Upon the Person, ch. 1098, §9. Every person in the business of selling, leasing, or otherwise transferring a pistol, revolver or other firearm, of a size capable of being concealed upon the person, whether such seller, lessor or transferor is a retail dealer, pawnbroker, or otherwise, except as hereinafter provided, shall keep a register in which shall be entered the time of sale, the date of sale, the name of the salesman making the sale, the place where sold, the make, model, manufacturer's number, caliber, or other marks of identification on such pistol, revolver or other firearm. Such register shall be prepared by and obtained from the state printer and shall be furnished by the state printer to such dealers on application at a cost of three dollars per one hundred leaves in triplicate . . . [t]he purchaser of any firearm capable of being concealed upon the person shall sign, and the dealer shall require him to sign his name and affix his address to said register in triplicate, and the salesman shall affix his signature in triplicate as a witness to the signature of the purchaser. . . [t]his section shall not apply to wholesale dealers in their business intercourse with retail dealers.

## <u>COLOLRADO</u>

Thomas M. Patterson, The Charter and Ordinances of the City of Denver, as Adopted Since the Incorporation of the City and Its Organization, November, 1861, to the First Day of February, A.D., 1875, Revised and Amended, Together with an Act of the Legislature of the Territory of Colorado, in Relation to Municipal Corporations, Page 78, Image 78 (1875) available at The Making of Modern Law: Primary Sources. 1875
[City of Denver,] Charter and Ordinances: Offenses Affecting Public Safety, § 1. If any person shall, within this city, fire or discharge any cannon, gun, fowling piece, pistol or fire arms of any description, or fire, explode or set off any squib, cracker, or other thing containing powder or other combustible or explosive material, without permission from the Mayor (which permission shall limit the time of such firing, and shall be subject to be revoked by the Mayor or City Council at any time after the same has been granted), every such person shall, on conviction, be fined in a sum not less than one dollar and not exceeding one hundred dollars: Provided, that no permission shall be granted to any person or persons to hold or conduct any shooting match or competitive trial of skill with fire arms within the limits of this city.

1911 Colo. Sess. Laws 408
Section 3. Every individual, firm or corporation engaged, within this commonwealth, in the-retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and., if residing in a city, the street and number therein where he resides; the make, calibre and

**App. 210**

finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record- book shall be open at all times to the inspection of any duly authorized police officer.

Section 4. Every individual, firm or corporation fail- ng to keep the record provided for in the first section of this act, or who shall refuse to exhibit such record when requested by a police officer, and any purchaser, lessee or exchanger of a pistol or revolver, who shall, in connection with the making of such record, give false information, shall be guilty of a Misdemeanor, and shall, upon conviction, be punished by a fine of not less than twenty-five, nor more than one hundred dollars, or by imprisonment in the county jail for a term not exceeding one year, or by both such fine and imprisonment.

## CONNECTICUT

The Public Records Of The Colony Of Connecticut, Prior To The Union With New Haven Colony, May, 1665 Page 79, Image 91 (1850) available at The Making of Modern Law: Primary Sources. 1665

It is ordered, that no man within this Jurisdiction shall directly or indirectly amend, repair, or cause to be amended or repaired, any gun small or great belonging to any Indian, nor shall endure the same, nor shall sell or give to any Indian, directly or indirectly, any such gun or gunpowder, or shot, or lead, or mold, or military weapons, or armor, nor shall make any arrow heads, upon pain of a ten pound fine for every offense at least, nor sell nor barter any guns, powder, bullets or lead, whereby this order might be evaded, to any person inhabiting out of this Jurisdiction, without license of this or the particular court, or some two magistrates, upon pain of ten pound for every gun, five pound for every pound of powder, 40s for every pound of bullets or lead, and so proportionately for any greater or lesser quantity.

The Public Records Of The Colony Of Connecticut. Hartford, 1890 Page 190-192, Image 194-196, available at The Making of Modern Law: Primary Sources. 1775

An Act for Encouraging the Manufacture of Salt Petre and Gun Powder. . .Be it enacted, That no salt petre, nitre or gun-powder made and manufactured, or that shall be made and manufactured in this Colony, shall be exported out of the same by land or water without the license of the General Assembly or his Honor the Governor and Committee of Safety, under the penalty of twenty pounds for every hundred weight of such salt petre, ntire or gun-powder, and proportionately for a greater or lesser quantity so without license exported; to be recovered by bill, plaint, or information, in any court of record in this Colony by law proper to take cognizance thereof. . . Be it further enacted by the authority aforesaid, That no powder-mill shall be erected in this Colony for the manufacture of gun-powder without the license of the general assembly, or in their recess the Governor and Council, first had and obtained under the penalty of thirty pounds for every such offence; to be recovered as the other forgoing personalities in this act are above directed to be recovered.

Charter and By-Laws of the City of New Haven, November, 1848 Page 48-49, Image 48-49 (1848) available at The Making of Modern Law: Primary Sources. 1827

A By-Law Relative to the Storage and Sale of Gunpowder. Be it ordained by the Mayor, Aldermen, and Common Council of the city of New Haven, in Court of Common Council

assembled, 1st. That hereafter no person or persons shall, within the limits hereafter described, either directly or indirectly, sell and deliver any gunpowder, or have, store, or keep any quantity of gunpowder greater than one pound weight, without having obtained a license for that purpose from said Court of Common Council, in the manner herein prescribed. Provided, that nothing in this by-law contained shall be construed to prevent any person or persons from having or keeping in his or their possession, a greater quantity of powder than one pound weight, during any military occasion or public celebration, while acting under any military commander, and in obedience to his orders, or under permission and authority therefor, first had and obtained of the Mayor or some one of the Aldermen of said city. Provided also, That any person or persons purchasing gunpowder, shall be allowed between the rising and setting of the sun, sufficient time to transport the same from any place without said limits, through said limits to any place without the same. 2d. The Court of Common Council aforesaid, shall have power, on application to them made, to grant and give any meet person or persons a license to sell gunpowder, and for that purpose to have, store, and keep gunpowder in quantity not exceeding at any one time seven pounds weight, and that well secured in a tin canister or canisters, and at such place or places within said limits and for such term of time, not exceeding one year, as said Court shall deem fit; which license shall be signed by the Clerk of said Court, and shall be in the form following, viz — Whereas the Mayor, Aldermen, and Common Council of the City of New Haven, in Court of Common Council convened, have approved of ___, as a suitable and proper person to keep, store, and sell gunpowder within the City of New Haven: We do therefore give license to said ____, to sell gunpowder at (describe the place) and for the purpose aforesaid, to have, keep, and store in said building any quantity of gunpowder not exceeding at any one time seven pounds weight, until the ___ day of ___. Dated, Signed per order, A.B., Clerk. For which license the person receiving the same shall pay the City Clerk twenty-five cents; and the same shall be by said Clerk recorded at full length. And before any license shall be given as aforesaid, the person or persons receiving the same shall pay to the Clerk aforementioned, for the use of said city, a sum after the rate of five dollars per annum. 3d. Before any shall proceed to sell or to store or keep gun-powder by virtue of any such license so given as aforesaid, such person shall put in a conspicuous place upon the front part of the building in which such powder is to be stored or sold, a sign, with the following words plainly and legibly inscribed thereon, viz., "Licensed to keep Powder," and shall continue the same during the time he shall keep, store, or sell gunpowder in said building. 4th section repealed. 5th. That no person or persons shall put or receive or have any quantity of gunpowder on board of any steamboat, for transportation therein in any of the waters within the limits of said city. 6th. If any person shall sell, keep, or store any gunpowder within the limits aforesaid, contrary to the true intent and spirit of this by-law, or without complying with all the pre-requisites enjoined thereby; or if any person or persons shall put or receive, or have on board of any steamboat for transportation on any of the waters within the limits of said city, any quantity of gunpowder, such person or persons shall forfeit and pay the sum of thirty-four dollars, one half to him who shall give information, and the other half to the use of the city.

The By-Laws of the City of New London, with the Statute Laws of the State of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855) available at The Making of Modern Law: Primary Sources. 1835
Chapter 26. A ByLaw in relation to the Firing of Guns and Pistols, within the limits of the city of New-London, and making parents and guardians, and masters, liable for breaches of by-laws by

minors and apprentices. Be it ordained by the mayor and aldermen, and common council and freemen of the city of New-London, That no gun or pistol shall be fired at any time within the limits of said city, unless on some public day of review, and then by order of the officers of the military companies of said city, or by permission of the mayor, or one of the aldermen of said city; and whosoever shall fire any gun or pistol, contrary to the form and effect of this by-law, shall for every such offence, forfeit and pay the sum of two dollars, to be recovered by due process in any court in said city, proper to try the same. § 2. And whereas the firing of guns and pistols, crackers, or other fire works is most frequently done by apprentices and minors under age, who are unable to pay the forfeiture incurred by the by-law of this city – be it also ordained that where any minor or apprentice shall be guilty of any breach of the by-laws relating to the firing of guns, pistols, crackers, or other fire-works, the parent, guardian, or master of such minor or apprentice, shall be liable to pay the forfeitures incurred by said by-law, and the same shall be recoverable of any parent, guardian or master, by action of debt brought on said by law, before any court in said city proper to try the same. And it shall be the duty of the city attorney and lawful for any other person to prosecute for said penalty; and one-half of said penalty shall go to the informer, or the person prosecuting for the same, and the other half to the use of the city.

1845 Conn. Acts 10, An Act Prohibiting the Firing of Guns and Other Fire Arms in the City of New Haven, chap. 10.
[E]very person who shall fire any gun or other fire-arm of any kind whatever within the limits of the city of New Haven, except for military purposes, without permission first obtained from the mayor of said city, shall be punished by fine not exceeding seven dollars, or by imprisonment in the county jail not exceeding thirty days.

Charles L. Upham, The Charter and By-Laws of the City of Meriden. With Extracts from the Public and Private Acts of the State of Connecticut, Applicable to the City of Meriden; Together with Certain Votes of the Common Council; the Rules and Regulations of the Board of Water Commissioners, and of the Police Department; and the Rules of Order of the Common Council of the City of Meriden Page 135, Image 140 (1875) available at The Making of Modern Law: Primary Sources. 1869
A by-law concerning the discharge of fire-arms and fire-works [, City of Meriden, Conn.], § 1. Be it enacted by the Court of Common Council of the City of Meriden, § 1. That no person shall discharge any pistol, gun, cannon, or other fire-arm of any sort or description, within the limits of said city, unless on occasion of some public festivity, and then by permission of the mayor or one of the aldermen of said city, or unless on occasion of military exercises and parade, and then by order of some military officer; and whoever shall discharge any pistol, gun, cannon, or other fire-arm of any sort, contrary to the form and effect of this by-law, shall, for every such offense, forfeit and pay, for the use of the treasury of said city, a fine of five dollars.

Charter and Ordinances of the City of Bridgeport: as Amended and Adopted Page 194 (1874) available at The Making of Modern Law: Primary Sources. 1874
An Ordinance Relative to Gunpowder and Explosive Substances. Be it ordained by the Common Council of the City of Bridgeport, § 1. No person shall have, or keep for sale or for any other purpose, within the limits of this city, any quantity of gunpowder or gun-cotton, exceeding one pound in weight; no person shall have, keep for sale, use, or other purpose, within the city limits, any quantity of nitro-glycerine, or other explosive substances or compounds exceeding six

**App. 213**

ounces, without special license thereof from the common council. No person shall transport any gunpowder through said city without a permit first had and obtained from the fire marshal, and in accordance with such rules and regulations as may be established by said fire marshal. No person shall, within said city, place, receive, or have any gunpowder on board of any steamboat used for the carrying of passengers, with intent to transport the same therein.

J. M. Meech, Charter and Revised Ordinances of the City of Norwich With the Amendments Thereto, and Statutes of the State Relating to Municipal Corporations, in Force January 1st, 1877 Page 178, Page 185 (1876) available at The Making of Modern Law: Primary Sources. 1877 Ordinances of Norwich. § 15. No person or persons shall fire any swivel, musket, fowling-piece, pistol, or other gun of any description within said city at a less distance than fifty rods from any dwelling house, or public highway, or street without written permission from the Mayor or one of the aldermen of said city; and every person so offending shall, for every such offence, forfeit and pay for the use of said city the sum of three dollars: Provided always, that nothing herein contained shall be construed to extend to the members of any military company when under the command of any military officer, not to prevent the firing of any gun or guns for the destruction of any noxious birds or animals by any person or persons upon his or their premises.

Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources. 1890
Good Order and Decency § 192. Every person who shall carry in said City, any steel or brass knuckles, pistol, or any slung shot, stiletto or weapon of similar character, or shall carry any weapon concealed on his person without permission of the Mayor or Superintendent of Police in writing, shall, on conviction, pay a penalty of not less than five, nor more than fifty dollars for every such offense.

1901 Conn. Pub. Acts 602, § 20.
The warden and burgesses, when assembled according to law, shall have power to make, alter, repeal, and enforce such bylaws, orders, ordinances, and enactments as they deem suitable and proper, not inconsistent with this resolution or contrary to the laws of this state or of the United States, for the following purposes: . . . to license, regulate, or prohibit the manufacture, keeping for sale, or use of fireworks, torpedoes, firecrackers, gunpowder, petrolemn, dynamite, or other explosive or inflammable substance, and the conveyance thereof through any portion of the borough . . . .

1923 Conn. Acts 3707, An Act Concerning the Possession Sale and Use of Pistols and Revolvers, ch. 252, §2.
No person shall advertise, sell, deliver, offer or expose for sale or delivery or have in his possession with intent to sell or deliver any pistol or revolver at retail without having a permit therefor issued as hereinafter provided.

1930 Conn. Stat. 903, Dealing in Explosives; License., ch. 147, § 2644. 1909
No person shall manufacture, store, sell, or deal in gunpowder or any material or compound . . . unless he shall first obtain from the commissioner of state police or the fire marshal of the town

**App. 214**

where such business is conducted a written license therefor . . . which license shall specify the building where such business is to be carried on or such material deposited or used.

1923 Conn. Pub. Acts 3707, An Act Concerning the Possession, Sale and Use of Pistols and Revolvers, ch. 252, § 2, 3.

No person shall advertise, sell, deliver, offer or expose for sale or delivery or have in his possession with intent to sell or deliver any pistol or revolver at retail without having a permit therefor issued as hereinafter provided.

The chief of police or, where there shall be no chief of police, the warden of the borough of the first selectman of the town, as the case may be, may, upon the application of any person, issue a permit in such form as may be prescribed by the superintendent of state police for the sale at retail of pistols and revolvers within the jurisdiction of the authority issuing such permit. Upon the application of any person having a bona fide residence or place of business within the jurisdiction of any such authority or, upon the application of any bona fide resident of the United States having a permit or license to carry any firearm issued by the authority of any state or sub-division of the United States, such chief of police, warden or selectmen may issue a permit to such person to carry a pistol or revolver within the jurisdiction of the authority issuing the same, provided such authority shall find that such applicant intends to make no use of the pistol or revolver thereunder other than a proper use and that such person is a suitable person to receive such permit. The superintendent of state police may, upon application, issue to any holder of any permit to carry any pistol or revolver hereinbefore provided for, a permit to carry a pistol or a revolver within the state . . . .

Sec. 5. No sale of any pistol or revolver shall be made except in the room, store or place described in the permit for the sale of pistols and revolvers, and such permit or a copy thereof certified by the authority issuing the same shall be exposed to view within the room, store or place where pistols or revolvers shall be sold or offered or exposed for sale, and no sale or delivery of any pistol or revolver shall be made unless the purchaser or person to whom the same is to be delivered shall be personally known to the vendor of such pistol or revolver or the person making delivery thereof or unless the person making such purchase or to whom delivery thereof is to lic made shall provide evidence of his identity. The vendor of any pistol or revolver shall keep a record of every pistol or revolver sold in a book kept for that purpose, which record shall be in such form as shall be prescribed by the superintendent, of state police and shall include the date of the sale, the caliber, make, model and manufacturer's number of such pistol or revolver and the name, address and occupation of the purchaser thereof, which record shall be signed by the purchaser and by the person making the sale, each in the presence of the other, and shall be preserved by the vendor of such pistol or revolver for a period of at least six years.

Sec. 7. No person, firm or corporation shall sell at retail, deliver or otherwise transfer any pistol or revolver to any alien, nor shall any person deliver any pistol or revolver at retail except upon written application therefor and no sale or delivery of any pistol or revolver shall be mode upon the date of the filing or receipt of any written application for the purchase thereof, and when any pistol or revolver shall b delivered in connection with the sale or purchase, such pistol or revolver shall be enclosed in a package, the paper or wrapping of which shall be securely fastened, and no pistol or revolver when delivered on tiny sale or purchase shall be loaded or contain therein any gunpowder or other explosive or any bullet, ball or shell. Upon the delivery of any pistol or revolver the purchaser shall sign in triplicate a receipt for such pistol or revolver which shall contain the name, address and occupation of such purchaser, the date of sale, caliber,

**App. 215**

make, model and manufacturer's number and a general description thereof. One of such triplicate receipts shall, within twenty-four hours thereafter, be forwarded by the vendor of such pistol or revolver to the superintendent of state police and one to the authority issuing the permit for the sale of such pistol or revolver and the other shall be retained by such vendor for at least six years. Sec. 8. No person shall make any false statement or give any false information connected with any purchase, sale or delivery of any pistol or revolver, and no person shall sell, barter, hire, lend, give or deliver to any minor under the age of eighteen years any pistol or revolver.

## DELAWARE

1797 Del. Laws 104, An Act For the Trial Of Negroes, ch. 43, §6.
And be it further enacted by the authority aforesaid, That if any Negro or Mulatto slave shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same, and be convicted thereof before a magistrate, he shall be whipped with twenty-one lashes, upon his bare back.

1832 Del. Laws 208, A Supplement to an Act to Prevent the Use of Firearms by Free Negroes and Free Mulattoes, and for Other Purposes, chap. 176, § 1.
. . . it shall not be lawful for free negroes and free mulattoes to have, own, keep or possess any gun, pistol, sword or any warlike instruments whatsoever: Provided however, that if upon application of any such free negro or free mulatto to one of the justices of the peace of the county in which such free negro or free mulatto resides, it shall satisfactorily appear upon the written certificate of five or more respectable and judicious citizens of the neighborhood, that such free negro or free mulatto is a person of fair character, and that the circumstances of his case justify his keep and using a gun, then and in every such case it shall and may be lawful for such justice to issue a license or permit under his hand and authorizing such free negro or free mulatto to have use and keep in his posession a gun or fowling piece.

1841 Del. Laws 430, An Act Concerning Fees, ch. 368, § 1.
Justices of the Peace shall receive . . . For licenses to negroes to keep a gun, twenty five cents.

9 Del. Laws 552 (1843), A Further Supplement To An Act Entitled "An Act To Prevent The Use Of Fire-arms By Free Negroes And Free Mulattoes And For Other Purposes, § 1. 1843
That the proviso in the first section of the act to which this is a further supplement, and all and every the provisions of the said act, or any other supplemental act thereto, which authorizes the issuing, by a justice of the peace, of a license or permit to a free negro or free mulatto to have, use and keep in his possession, a gun or fowling piece, be and the same are hereby repealed, made null and void.

1909 Del. Laws 577, House Joint Resolution Providing for Increase in Non-Resident Gunners License Fee, ch. 271.
Whereas, there are numerous gunners from other States who make it a practice to gun in this State, and under existing laws a license fee of Five Dollars is collected from them. And Whereas, our neighboring States charge non-resident gunners a license fee of more than Five Dollars. Therefore be it resolved by the Senate and House of Representatives of the State of Delaware in

**App. 216**

General Assembly met: That from and after the passage of this Resolution up to and including April 30th, 1911, all non-resident gunners shall be required to pay a license fee of Ten Dollars per annum, said license fee to be collected in the same manner and by the same agency as non-resident gunners' licenses are now collected.

Vol. 26 Del. Laws 28, 28- 29 (1911)

Section 1. That from and after the first day of June, in the year of our Lord, one thousand nine hundred and eleven, it shall be unlawful for any person or persons, firm, company or corporation, to sell, or expose to sale, any pistol or revolver, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made especially for the defense of one's person, without first having obtained a license therefor, which license shall be known as "Special License to Sell Deadly Weapons;" provided, however, that this provision shall not relate to toy pistols, pocket knives, or knives used in the domestic household, or surgical instruments or tools of any kind.

Section 2. Any person or persons, firm, company or corporation, desiring to engage in the business of selling revolvers, pistols, or revolver or pistol cartridges, stilettos, steel or brass knuckles, or other weapons made for the defense of one's person, shall, after the above mentioned date, apply to the Clerk of the Peace of the County in which it is desired to conduct such business and shall obtain a license therefor, for which he, they, or it shall pay the sum of twenty-five dollars, which said license shall entitle the holder thereof to conduct said business for the term of one year from its date.

Section 3. It shall be unlawful for any person or per- sons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons, made especially for the defense of one's person.

Section 4. It shall be the duty of any person or persons, firm, company or corporation, desiring to engage in the business aforesaid, to keep and maintain in his place of business at all times, a book which shall be furnished him by the Clerk of the Peace of the County wherein he does business in which said book he shall enter the date of the sale, the name and address of the person purchasing any such deadly weapon, the number and kind of deadly weapon so pur- chased, the color of the person so purchasing the same, and the apparent age of the purchaser; and no sale shall be made weapon, etc. until the purchaser has been positively identified. This book shall at all times be open for inspection by any Judge, Justice of the Peace, Police Officer, Constable, or other Peace Officer of this State.

## DISTRICT OF COLUMBIA

Washington D.C. 27 Stat. 116 (1892)

CHAP. 159.–An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles.

**App. 217**

SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of a misdemeanor, and upon conviction thereof shall, for the first offense, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall be paid to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such fine and imprisonment, in the discretion of the court: Provided, That the officers, non-commissioned officers, and privates of the United States Army, Navy, or Marine Corps, or of any regularly organized Militia Company, police officers, officers guarding prisoners, officials of the United States or the District of Columbia engaged in the execution of the laws for the protection of persons or property, when any of such persons are on duty, shall not be liable for carrying necessary arms for use in performance of their duty: Provided, further, that nothing contained in the first or second sections of this act shall be so construed as to prevent any person from keeping or carrying about his place of business, dwelling house, or premises any such dangerous or deadly weapons, or from carrying the same from place of purchase to his dwelling house or place of business or from his dwelling house or place of business to any place where repairing is done, to have the same repaired, and back again: Provided further, That nothing contained in the first or-second sections of this act shall be so construed as to apply. to any person who shall have been granted a written permit to carry such weapon or weapons by any judge of the police court of the District of Columbia, and authority is hereby given to any such judge to grant such permit for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof; and further, upon the filing with such judge of a bond, with sureties to be approved by said judge, by the applicant for such permit, conditioned to the United States in such penal sum as said judge shall require for the keeping of the peace, save in the case of necessary self defense by such applicant during the continuance of said permit, which bond shall be put in suit by the United States for its benefit upon any breach of such condition.

SEC. 3. That for the second violation of the provisions of either of the preceding sections the person or persons offending shall be proceeded against by indictment in the supreme court of the District of Columbia, and upon conviction thereof shall be imprisoned in the penitentiary for not more than three years.

SEC. 4. That all such weapons as hereinbefore described which may be taken from any person offending against any of the provisions shall, upon conviction of such person, be disposed of as may be ordered by the judge trying the case, and the record shall show any and all such orders relating thereto as a part of the judgment in the case.

SEC. 5. That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months. No person shall engage in or conduct  the business of selling, bartering, hiring, lending, or giving any weapon or weapons of the kind hereinbefore named without having previously obtained from the Commissioners of the District of Columbia a special license authorizing the conduct of such business by such person, and the said Commissioners are hereby authorized to grant such license, without fee therefor, upon the filing with them by the applicant therefor of a bond with sureties, to be by them approved, conditioned in such penal sum as they shall fix to the United States for

**App. 218**

the compliance by said applicant with all the provisions of this section; and upon any breach or breaches of said condition said said bond shall be put in suit by said United States for its benefit, and said Commissioners may revoke said license. Any person engaging in said business without having previously obtained said special license shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to pay a fine of not less than one hundred dollars nor more than five hundred dollars, of which one half shall be paid to the informer, if any, whose information shall lead to the conviction of the person paying said fine. All persons whose business it is to sell barter, hire, lend or give any such weapon or weapons shall be and they hereby, are, required to keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon or weapons, which register shall be subject to the inspection of the major and superintendent of Metropolitan Police of the District of Columbia, and further to make a weekly report, under oath to said major and superintendent of all such sales, barterings, hirings, lendings or gifts. And one half of every fine imposed under this section shall be paid to the informer, if any, whose information shall have led to the conviction of the person paying said fine. Any police officer failing to arrest any person guilty in his sight or presence and knowledge, of any violation of any section of this act shall be fined not less than fifty nor more than five hundred dollars.

SEC 6. That all acts or parts of acts inconsistent with the provisions of this act be, and the same hereby are, repealed.

Washington D.C. 47 Stat. 650, 651-652 (1932)

CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business-within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the

**App. 219**

District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

SELLING TO MINORS AND OTHERS

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

## **FLORIDA**

Leslie A. Thompson, A Manual or Digest of the Statute Law of the State of Florida, of a General and Public Character, in Force at the End of the Second Session of the General Assembly of the State, on the Sixth Day of January, 1847 Page 547, Image 582 (1847) available at The Making of Modern Law: Primary Sources. 1847

For the Prevention of Indians Roaming at Large Throughout the State, § 1. From and after the passage of this act, if any male Indian of the years of discretion, venture to roam or ramble beyond the boundary lines of the reservations, which have been assigned to the tribe or nation to which said Indian belongs, it shall and may be lawful for any person or persons to apprehend, seize, and take said Indian, and carry him before some Justice of the Peace, who is hereby authorized, empowered, and required, to direct (if said Indian have not a written permission from the agent to do some specific act) not exceeding thirty-nine stripes, at the discretion of the Justice, to be laid on the bare back of said Indian; moreover, to cause the gun of said Indian (if he has one) to be taken from him, and deposited with the colonel of the county, or captain of the district, in which said Indian may be taken, subject to the order of the superintendent of Indian Affairs.

1887 Fla. Laws 164-165, An Act to Establish the Municipality of Jacksonville Provide for its Government and Prescribe it's jurisdiction and powers, chap. 3775, § 4.

The Mayor and City Council shall within the limitations of this act have power by ordinance to . . . regulate and license the sale of firearms and suppress the carrying of concealed weapons.

1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, chap. 4147, §§ 1-4. 1898

§ 1. That in each and every county of this State, it shall be unlawful to carry or own a Winchester or other repeating rifle or without first taking out a license from the County Commissioner of the respective counties, before such persons shall be at liberty to carry around with him on his person and in his manual possession such Winchester rifle or other repeating rifle. § 2. The County Commissioners of the respective counties in this State may grant such licenses at any regular or special meeting. § 3. The person taking out such license shall give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the County Commissioners, and at the

same time there shall by kept by the County Commissioners granting the same a record of the name of the person taking out such license, the name of the maker of the firearm so licensed to be carried and the caliber and number of the same. § 4. All persons violating the provisions of Section 1 of this Act shall be guilty of a misdemeanor, and on conviction shall be fined not exceeding one hundred dollars or imprisonment in the county jail not exceeding sixty days.

1895 Fla. Laws 14
Fourteenth. No merchant, store-keeper or dealer shall keep for sale or sell pistols, Springfield rifles, repeating rifles, bowie knives or dirk knives, without first paying a license tax of ten dollars; Provided, Said pistols, Springfield rifles, repeating rifles, bowie knives or dirk knives, shall not be sold to minors. Every violation of this paragraph shall be punished by a fine of fifty dollars, or by imprisonment in the county jail not more than six months.

1931 Fla. Laws 2069, § 7.
The village shall have the following rights and powers . . . To license, tax, regulate, or prohibit, within the village or any part thereof . . . explosives, guns, pistols and other weapons . . . .

## **GEORGIA**

A Digest of the Laws of the State of Georgia. From Its First Establishment as a British Province down to the Year 1798, Inclusive, and the Principal Acts of 1799: In Which is Comprehended the Declaration of Independence; the State Constitutions of 1777 and 1789, with the Alterations and Amendments in 1794. Also the Constitution of 1798 Page 153-154, Image 160-161 (1800) available at The Making of Modern Law: Primary Sources. 1768
Laws of Georgia, An Act to amend and Continue "An Act for the Establishing and Regulating Patrols, and for Preventing any Person from Purchasing Provisions or any Other Commodities from, or Selling Such to any Slave, Unless Such Slave Shall Produce a Ticket from His or Her Owner, Manager or Employer . . . Be it enacted, That immediately from and after passing of this act, it shall not be lawful for any slave, unless in the presence of some white person, to carry or make use of fire arms, or any offensive weapon whatsoever, unless such slave shall have a ticket or license in writing from his master, mistress, or overseer, to hunt and kill game, cattle, or mischievous birds or beasts of prey, and that such license be renewed every week, or unless there be some white person of the age of sixteen years or upwards in the company of such slave when he is hunting or shooting, or that such slave be actually carrying his master's arms to or from his master's plantation by a special ticket for that purpose, or unless such slave be found in the day-time, actually keeping off birds within the plantation to which such slave belongs, loading the same gun at night, within the plantation to which such slave belongs, loading the same gun at night, within the dwelling house of his master, mistress or white overseer: Provided always, That no slave shall have liberty to carry any gun, cutlass, pistol, or other offensive weapon, abroad at any time between Saturday evening after sunset and Monday morning before sun rise, notwithstanding a license or ticket for so doing. II. And be it further enacted, That in case any or either of the patrols, established or to be established within this province, by virtues of the said act, on searching and examining any negro house for offensive weapons, fire arms and ammunition, shall find any such, or in case any person shall find any slave using or carrying fire arms or other offensive weapons, contrary to the intent and meaning of this act, such patrol, or person or persons, may lawfully seize and take away such offensive weapons, fire arms, and

**App. 221**

ammunition, but before the property thereof shall be vested in the person or persons who shall seize the same, such person or persons shall, within three days next after such seizure, go before a justice of the peace, and shall make oath of the manner of taking thereof, and if such justice of the peace, after such oath made, or upon due examination, shall be satisfied that the said fire arms, offensive weapon, or ammunition, shall have been seized according to the directions, and agreeable to the true intent and meaning of this act, the said justice shall, by certificate under his hand and seal, declare them forfeited, that the property is lawfully vested in the person or persons who seized the same.

1902 Ga. Laws 434-35, § 16.
Be it further enacted by the authority aforesaid, That the mayor and aldermen of the said city of Forsyth shall have full power to license, regulate and control by ordinance all . . . gun shops, dealers in guns or pistols . . . .

Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d). 1910
§ 348 (a). Carrying pistols without license. [It shall be unlawful for any person to have or carry about his person, in any county in the State of Georgia, any pistol or revolver without first taking out a license from the ordinary of the respective counties in which the party resides, before such person shall be at liberty to carry around with him on his person, or to have in his manual possession outside of his own home or place of business: Provided that nothing in this law shall be construed to alter, affect, or amend any laws now in force in this State relative to the carrying of concealed weapons on or about one's person, and provided further, that this shall not apply to sheriffs, deputy sheriffs, marshals, or other arresting officers of this State or United States, who are now allowed, by law, to carry revolvers; nor to any of the militia of said State while in service or upon duty; nor to any students of military colleges or schools when they are in the discharge of their duty at such colleges.] § 348 (b). License, how obtained. [The ordinary of the respective counties of this State in which the applicant resides may grant such license, either in term time or during vacation, upon the application of party or person desiring to apply for such license; provided applicant shall be at least eighteeen years old or over, and shall give a bond payable to the Governor of the State in the sum of one hundred dollars, conditioned upon the proper and legitimate use of said weapon with a surety approved by the ordinary of said county, and the ordinary granting the license shall keep a record of the name of the person taking out such license, the name of the maker of the fire-arm to be carried, and the caliber and number of the same.] § 348 (c). Fee for license. [The person making such application and to whom such license is granted, shall pay to the ordinary for granting said license the sum of fifty cents, which license shall cover a period of three years from date of granting same.] § 348 (d). Punishment. [Any person violating any of the provisions of the three preceding sections shall be punished as for a misdemeanor, as prescribed in section 1065 of this Code.]

## HAWAII

1870 Haw. Sess. Laws 26, An Act to License the Carrying of Fowling Pieces and Other Firearms, chap. 20, §§ 1 to 3.

Lawrence McCully, Compiled Laws of the Hawaiian Kingdom Page 539, Image 545 (1884) available at The Making of Modern Law: Primary Sources. 1870

An Act to License the Carrying of Fowling Pieces and Other Fire-Arms. Whereas, the Act for the protection of Kolea or Plover and other useful birds, approved on the 20th day of April, A.D. 1859, has proved ineffectual for the purposes intended thereby, and Whereas, The general and indiscriminate use of fire-arms, which are frequently used for the destruction of useful, imported and migratory insectivorous birds and their progeny, is an injury to the agricultural and pastoral interests of this Kingdom, therefore, Be it Enacted by the King and Legislative Assembly of the Hawaiian Islands in the Legislature of the Kingdom assembled: § 1. That the Minister of the Interior may at any time license for a term of one year, any applicant for such license, to use and carry fire-arms for sporting purposes, in the District of Kona, Island of Oahu, on receiving for such license the sum of five dollars. § 2. Any person in said district who shall use or carry for sporting purposes, any gun, carbine, rifle, pistol, or other fire-arms, without having at first obtained a license as hereinbefore provided, shall, upon conviction therefor, before any police or district justice, be fined in a sum not to exceed fifty dollars for every such offense, and in default of payment of such sum, shall be imprisoned at hard labor, until such fine and costs are paid, according to law. § 3. All such licenses shall be signed by the Minister of the Interior, numbered according to their respective dates and impressed with the seal of his department, and no such license shall be transferable.

Revised Laws of Hawaii 1925, 791-92 (1925).

Section 2137. Form or report. It shall be the duty of the sheriff to prepare and furnish to all persons applying therefor [meaning applying under Section 18 of 1927 Haw. Sess. Laws 209-217], proper blanks upon which such information shall be furnished, in the following form: [requiring name of owner, name of possessor, number, description, makers name, factory number, and number disposed of and date].

1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), §§ 10-11, § 17.

Section 1. Definitions. "Pistol" or "revolver" as used in this Act, means any firearm with barrel less than twelve inches in length. "Crime of Violence", as used in this Act means any of the following crimes, namely, murder, manslaughter, rape, mayhem, assault to do great bodily harm, robbery, larceny, burglary and house-breaking. Section 2. Committing crime when armed. If any person, when armed with a pistol or revolver, shall commit or attempt to commit an act constituting a crime of violence, he may in addition to the punishment otherwise provided for the crime, be punished by imprisonment for not more than one year or by a fine of not more than one thousand dollars ($1,000.00) or by both; provided, that the act aforesaid be one which is capable of being committed or facilitated by means of a pistol or revolver. Section 3. Being armed prima facie evidence of intent. In the trial of a person for committing or attempting to commit a crime of violence, the fact that he was armed with a pistol or revolver and had no license to carry the same, shall be prima facie evidence of his intention to commit said crime of violence; provided, that the criminal act committed or attempted be one which is capable of being committed or facilitated by means of a pistol or revolver.

**App. 223**

Section 5. Carrying or keeping small arms by unlicensed persons. Except as otherwise provided in Sections 7 and 11 hereof in respect of certain licensees, no person shall carry, keep, possess, or have under his control a pistol or revolver; provided, however, that any person who shall have lawfully acquired the ownership or possession of a pistol or revolver may, for purposes of protection and with or without a license, keep the same in the dwelling house or business office personally occupied by him, and, in case of an unlawful attack upon any person or property in said house or office, said pistol or revolver may be carried in any lawful, hot pursuit of the assailant.

Section 6. Exceptions. The provisions of the preceeding section shall not apply to marshals, sheriffs, prison or jail wardens or their deputies, policemen, mail carriers, or other duly appointed law enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States, or of the National Guard, when on duty, or of organizations by law authorized to purchase or receive such weapons from the United States or this territory, or to officers or employees of the United States authorized by law to carry a concealed pistol or revolver, or to duly authorized military organizations when on duty, or to the members thereof when at or going to or from their customary places of assembly, or to the regular and ordinary transportation of pistols or revolvers as merchandise, or to any person while carrying a pistol or revolver unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

Section 9. Transfers regulated. No person shall transfer by way of sale, gift, loan or otherwise, a pistol or revolver unless the prospective transferee, when he applies for the transfer, presents a permit duly granted under Section 2141 of the Revised Laws of Hawaii 1925; nor shall he make such transfer unless the transferee be a person in respect of whom there is no reasonable cause, known to the transferor, for believing that such transferee has committed or attempted, or has been convicted of committing or attempting, a crime of violence. No seller shall in any event deliver a pistol or revolver on the day when the application to purchase and the statement hereinafter mentioned shall be made. When delivered, said pistol or revolver shall be securely wrapped and shall be unloaded. Before a delivery be made the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, race, nationality, color and place of birth, the date of sale, the caliber, make, model, and manufacturer's number of the weapon, and stating that he has never been convicted of a crime of violence. The seller shall promptly sign and forward by registered mail one copy thereof to the treasurer of the territory, and one copy thereof to the sheriff of the county or city and county of which the seller is a resident, and shall retain the other copy for six years. A statement shall be deemed promptly forwarded if it is forwarded within seven days, unless a shorter time is provided therefor in regulations established by the Governor.

Section 10. Dealers to be licensed. No retail dealer or selling agent shall sell or otherwise transfer, or expose for sale or transfer, or have in his possession with intent to sell, or otherwise transfer, any pistol or revolver without being licensed as hereinafter provided.

Section 11. Dealers' Licenses; by whom granted, and conditions thereof. The duly constituted licensing authorities of any political subdivision of this territory may grant licenses in form prescribed by the treasurer of the territory, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political subdivision, pistols and revolvers, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

**App. 224**

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol or revolver shall be delivered unless the purchaser either is personally known to the seller or shall present clear evidence of his identity.

4. The seller shall faithfully comply with the requirements of Section 9 hereof and with all other provisions of this Act and of Chapter 128, Revised Laws of Hawaii 1925. A copy of the statement required by Section 9 hereof shall be entered by the seller in a book of record to be kept in his place of business and to be always open to the inspection of the officers and authorized representatives of the territorial government, including the police. Said book shall be preserved for six years.

5. No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed in any part of said premises where it can readily be seen from the outside.

No license to sell at retail shall be granted to anyone except as provided in this section.

Section 12. False information forbidden. No person shall, in purchasing or otherwise securing delivery of a pistol or revolver, or in applying for a license to carry the same, give false information or offer false evidence of his identity.

Section 17. Penalties. Any violation of any provision of this Act shall constitute an offense punishable by a fine of not more than one thousand dollars ($1,000.00) or imprisonment for not more than one year, or both.

Section 25. Section 2143 of the Revised Laws of Hawaii 1925, is hereby amended by inserting, after the first sentence in said section ["The permit mentioned in section 2141 shall not be issued to any alien until the applicant has filed with the sheriff or a deputy sheriff of the county or city and county a request in writing, signed by two responsible citizens requesting that such permit be issued, and recommending and vouching for the applicant."], the following: "The request aforesaid shall include (1) an expression of the belief of such citizens that the applicant has never committed or attempted a crime of violence, as that phrase is defined in the Small Arms Act; that he has never been convicted thereof anywhere and that he is not likely to commit or attempt any such crime and (2) a brief statement of the facts relating to the age, character, nativity and personal history of the applicant, insofar as these facts are within the personal knowledge of such responsible citizens. Such facts as are within the personal knowledge of one of them, only, shall be included in a supplemental written statement signed by the person having such knowledge." [The rest of Section 2143 reads: "Aliens obtaining a permit as prescribed by the above section shall be required to secure an annual license from the treasurer of the county or city and county, and to pay to the treasurer an annual license tax of five dollars; provided, however, that to aliens who must necessarily use fire-arms in carrying on their business, such as rice planting, such license shall be issued free of charge upon a certificate from the sheriff of the county or city and county in which they carry on such business to the effect that the fire-arms and ammunition mentioned in their permit are necessary to the conduct of their business."]

Section 26. Section 2146 of the Revised Laws of Hawaii 1925, is hereby amended to read as follows: "Section 2146. Penalties. Any person who shall be found in the possession of any firearm or firearms or any ammunition without having complied with the provisions of this chapter, or who shall fail to give, file or forward required information, reports or statements, or who shall otherwise violate the provisions of this chapter in matters not covered by Section 2142 hereof, shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be fined by

**App. 225**

the court of appropriate jurisdiction in a sum of not more than five hundred dollars ($500.00). Any person, firm, corporation, copartnership, failing to file any information herein required to be filed, shall be deemed guilty of a misdemeanor and upon conviction shall be fined by the court of appropriate jurisdiction not more than five hundred dollars ($500.00).

The divulging of official information recorded or on file in a public office shall be punishable in like manner; provided, however, that where the information divulged has not tended, or been designed to encourage, or to render formidable armed resistance to the law, the fine shall not exceed twenty-five dollars ($25.00)."

1933 Haw. Sess. Laws 36-37, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 3.

Every person residing or doing business or temporarily sojourning within the Territory on the effective date of this Act who possesses a firearm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, not already registered in the name of the present possessor, or who possesses ammunition of any kind or description, except shotgun ammunition, shall, within ten days of said effective date, register the same with the chief of police of the city and county of Honolulu or the sheriff of the county, other than the city and county of Honolulu, wherein is his place of business, or if there be no place of business, his residence, or if there be neither place of business nor residence, his place of sojourn. Every person arriving in the Territory after the effective date of this Act, who brings with him firearms or ammunition of the type and description set out in this section, shall register the same in similar manner within forty-eight hours after arrival. The registration shall be on such forms as may be designated by the bureau of crime statistics and shall include a description of the class of firearm or firearms and ammunition owned by him, or in his possession, together with the name of the maker and the factory number, if known or ascertainable, and the source from which possession was obtained. Within sixty days after the effective date of this Act, the chief of police of the city and county of Honolulu and the sheriffs of the several counties, other than the city and county of Honolulu, shall furnish the bureau of crime statistics a record of all registrations now on file in their respective offices. Within ten days after the end of each month the chief of police of the city and county of Honolulu and the sheriffs of the several counties, other than the city and county of Honolulu, shall furnish to the bureau of crime statistics duplicate copies of all registrations made during the preceding month. No fee shall be charged for such registration. Any person who fails to comply with the provisions of this section shall he punished by a fine of not more than two hundred and fifty dollars ($250.00).

1933 Haw. Sess. Laws 37-38, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 4.

§ 4. No person residing or doing business or temporarily sojourning within the Territory shall take possession of any fire arm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, registered under prior Acts or unregistered, or of any ammunition of any kind or description, except shotgun ammunition, either through sale, gift, loan, bequest, or otherwise, whether procured in the Territory or imported by mail, express, freight, or otherwise, until he shall first have procured from the chief of police of the city and county of Honolulu or the sheriff of the county, other than the city and county of Honolulu, wherein is his place of business, or if there be no place of business, his residence, or if there be neither place of business nor residence, his place of sojourn, a permit to acquire as prescribed

**App. 226**

herein. The chief of police of the city and county of Honolulu or the sheriffs of the several counties, other than the city and county of Honolulu, are hereby authorized, within their discretion, to issue permits, within their respective jurisdictions, to acquire rifles, pistols, and revolvers to citizens of the United States, of the age of twenty years or more, and to duly accredited official representatives of foreign nations. Permits to acquire ammunition for rifles, pistols and revolvers acquired prior to the effective date of this Act and registered in accordance with the provisions hereof, may be granted persons [sic] of the age of twenty years or more irrespective of citizenship. Permits to acquire shotguns may be granted to persons of the age of sixteen years or more, irrespective of citizenship. Applications for such permits shall be signed by the applicant upon forms to be specified by the bureau of crime statistics, and shall be signed by the issuing authority. One copy of such permit shall be retained by the issuing authority, as a permanent official record. Such permit shall be void unless used within ten days after the date of issue. In all cases where possession is acquired from another person in the Territory the permit shall be signed in ink by the holder thereof and shall thereupon he delivered to and taken up by the person selling, loaning, giving or delivering the firearm or ammunition, who shall make entry thereon setting forth in the space provided therefor the name of the person to whom the firearm or ammunition was delivered, and the make, style, caliber, and number, as applicable. He shall then sign it in ink and cause it to he delivered or sent by registered mail to the issuing authority within forty-eight hours. In case receipt of such firearms or ammunition is had by mail, express, freight, or otherwise, from sources outside the Territory, the person to whom such permit has been issued, shall make the prescribed entries thereon, sign in ink, and cause it to be delivered or sent by registered mail to the issuing authority within forty-eight hours after taking possession of the firearms or ammunition. No person shall sell, give, loan, or deliver into the possession of another any firearm or ammunition except in accordance with the Provisions of this section. Any person acquiring a firearm or ammunition under the provisions of this section shall, within five days of acquisition, register same in the manner prescribed by Section 3 of this Act. No fee shall be charged for permits under this section. Any person who violates any provision of this section shall be punished by a fine of not more than five hundred dollars ($500.00) or imprisonment for not more than one year, or by both.

1933 Haw. Sess. Laws 38, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 5. 1933
Any person who has procured a hunting license under the provisions of Sections 2028-2032, inclusive, of the Revised Laws of Hawaii 1925, as amended, shall, while actually engaged in hunting or while going to or from the place of hunting, be authorized to carry and use any lawfully acquired rifle or shotgun and suitable ammunition therefor.

1933 Haw. Sess. Laws 39, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 8, 10-16.
§ 8. In an exceptional case, when the applicant shows good reason to fear injury to his person or property, the chief of police of the city and county of Honolulu or the sheriff of a county, other than the city and county of Honolulu, may grant a license to a citizen of the United States or a duly accredited official representative of a foreign nation, of the age of twenty years or more, to carry concealed on his person within the city and county or the county in which such license is granted, a pistol or revolver and ammunition therefor. Unless renewed, such license shall automatically become void at the expiration of one year from date of issue. No such license shall

**App. 227**

issue unless it appears that the applicant is a suitable person to be so licensed, and in no event to a person who has been convicted of a felony, or adjudged insane, in the Territory or elsewhere. All licenses to carry concealed weapons heretofore issued shall expire at midnight on the effective date of this Act. No person shall carry concealed on his person a pistol or revolver or ammunition therefor without being licensed so to do under the provisions of this section. For each such license there shall he charged a fee of ten dollars ($10.00), which shall be covered into the treasury of the city and county or the county in which such license is granted. Any person violating this section shall be punished by a fine of not more than one thousand dollars ($1,000.00) or by imprisonment for not more than one year, or by both.

1933 Haw. Special Sess. Laws 117, An Act . . . Regulating The Sale, Transfer And Possession Of Certain Firearms, Tear Gas And Ammunition: § 2.
Except as permitted under the provisions of this Act, no person, firm or corporation shall own, possess, sell, offer for sale or transport any firearm of the kind commonly known as a machine gun or any shell cartridge or bomb containing or capable of emitting tear gas or any other noxious gas. Provided, however, that nothing in this Act contained shall prohibit the sale to, purchase by, or possession of such firearms by any city and county, county, territorial or federal officer where such firearms are required for professional use in the discharge of his duties, nor to the transportation of such firearms for or on behalf of police departments and members thereof, sheriffs, or the military or naval forces of this Territory or of the United States and "Provided, further that nothing in this Act shall prohibit police departments and members thereof, sheriffs, or the military or naval forces of the territory or of the United States from possessing or transporting such shells, cartridges or bombs for professional use in the discharge of their duties. "The term 'shell, cartridge or bomb', as used in this Act shall be construed to apply to and include all shells, cartridges, or bombs capable of being discharged or exploded through or by the use of percussion caps, fuses, electricity, or otherwise, when such discharge or explosion will cause or permit the release or emission of tear gases. The term 'machine gun' as used in this Act shall be construed to apply to and include machine rifles, machine guns and submachine guns capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical device."

## ILLINOIS

An Act concerning the Kaskaskia Indians, in Nathaniel Pope, Laws of the Territory of Illinois (1815). 1814
That it shall not be lawful for any person whatever without license from the Governor or some sub-agent appointed by him to purchase or receive by gift or other wise of any of the before mentioned Indians, any horse, mare, gun, tomohawk, knife, blanket, shrouding, calico, saddle, bridle, or any goods wares or merchandize whatever, that all such sales or gifts shall be considered as fraudulent on the part of the buyer or receiver and that any white person or free person of coulour whatever so buying or receiving any such articles of any one of those Indians shall be liable to pay a fine of twenty dollars to be recovered before a justice of the peace . . . ."

Samuel P. Church, The Revised Ordinances of the City of Quincy, Ill. to Which are Prefixed the Charter of the City of Quincy, and the Amendment Thereto Page 47, Image 47 (1841) available at The Making of Modern Law: Primary Sources. 1841

[An Ordinance Regulating the Police of the City of Quincy], § 5. Be it further ordained by the City Council of the City of Quincy, That no person shall, within the limits of said city, fire or discharge any cannon, musket, rifle, fowling piece, or other fire arms, or air-gun, except in cases of necessity, or in the performance of a public or lawful act of duty, or discharge or set of any cracker, rocket, torpedo, squib, or other fire works, within the limits of said city, without permission first obtained from the Mayor or one of the Aldermen, or Marshal of said city; and every person so offending shall forfeit and pay, for the use of said city, not less than one dollar, nor more than three dollars, for every such offense.

George Manierre, The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois Page 123-125, Image 131-133 (1851) available at The Making of Modern Law: Primary Sources. 1851

Ordinances of the City of Chicago: Regulating the Keeping and Conveying Gun Powder and Gun Cotton; § I. (Be it ordained by the Common Council of the city of Chicago) That no person shall keep, sell, or give away gun powder or gun cotton in any quantity without permission of the common council or mayor in writing, signed by the mayor and clerk and sealed with the corporate seal, under a penalty of twenty-five dollars for every offence. § II. All applications for permits shall be addressed to the common council or mayor in writing, signed by the applicant. Not exceeding four permits shall be granted in any block. When the number of applications in any block shall at any time exceed the number to be granted, the requisite number shall be chosen by ballot. When issued the clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business and date of permit. Persons to whom permits may be issued shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gun powder or gun cotton than fifty pounds at one time, and the same shall be kept in tin canisters or cases containing not to exceed thirteen pounds each, and in a situation remote from fires or lighted lamps, candles or gas from which they may be easily removed in case of fire. Nor shall any person sell or weigh any gun powder or gun cotton after the lighting of lamps in the evening, unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business with the words "gun powder and gun cotton" painted or printed theron in large letters. A violation of any clause of this section shall subject the offender to a fine of not less than ten dollars nor exceeding one hundred dollars. § III. No person shall convey or carry any gun or carry any gun powder or gun cotton, (exceeding one pound in quantity), through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the gun powder or gun cotton be secured in tight cases or kegs well headed and hooped, and put into and entirely covered with a leather bag or case, sufficient to prevent such gun powder or gun cotton from being spilled or scattered under a penalty of one hundred dollars. IV. No vessel, laden in whole or in part with gun powder or gun cotton, shall land at, or make fast to any dock or wharf upon the Chicago river, or either branch thereof, between the south line of the school section and Chicago avenue, or to discharge such gun powder or gun cotton within said limits. If any master, or owner of any vessel, or other person shall violate any provision of this section, he shall be subject to a fine of not less then twenty-five dollars and not exceeding one hundred dollars. § V. The mayor shall have power to cause any vessel to be removed form the limits

**App. 229**

mentioned in the previous section, to any place beyond the same, by a written order, which shall be executed by the marshal or some other member of the police. If any person shall neglect or refuse to obey such order, or shall resist any officer in the execution of the same, he shall be subject to a penalty of one hundred dollars. § VI. Al permissions granted under this ordinance shall expire on the tenth day of June each year. And no permit shall be granted to any retailer of intoxicating liquors or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit so issued. § VII. It shall be the duty of the officers of the police department, fire-wardens, and firemen, to report all violations of this ordinance which may come to the knowledge of the city attorney for prosecution.

James M. Cunningham, The City Charter and the Revised Ordinances of the City of Peoria, Illinois; Also, the Original City Charter, and the Several Amendments Thereto, and the State Laws Relating to the City or Specially Affecting Its Interests; Together with the Rules of Order and Business for the Government of the City Council. Arranged, Revised, and Published, Under the Authority of the City Council, in the Year 1869 Page 254, Image 284 (1869) available at The Making of Modern Law: Primary Sources. 1869
Revised Ordinances [of the City of Peoria: Public Safety and Convenience], § 1. That it shall not be lawful for any person in said city, without permission from the mayor or superintendent of police, to fire or discharge any cannon, musket, rifle, fowling-piece, pistol, or other fire-arms or air guns, except it is done in cases of necessity, or in the performance of a public act of lawful duty, or by military companies when on parade or in the discharge of duty; and every person violating the provisions of this section shall, on conviction, forfeit and pay not less than one dollar nor more than one hundred dollars for every offense.

Revised Ordinances of the City of Galesburg, the Charter and Amendments, State Laws Relating to the Government of Cities and Appendix Page 122-123, Image 127-128 (1869) available at The Making of Modern Law: Primary Sources. 1869
Revised Ordinances [of Galesburg, Ill.], Gunpowder-Fires, Fire-Arms, § 1. The keeping for sale or selling gunpowder, without a license therefor, is prohibited, and no license shall be issued allowing the keeping in store more than twenty-five pounds of gun powder at any one time, unless kept in some secure magazine or fire-proof powder house, located at least one hundred feet from any other occupied building, and when kept in a store or place for retail it shall be kept in tin or other metallic canisters or cases, and in a part of the building remote from any fire, lamp, candle or burning matter liable to produce explosion, and whoever shall violate this section, or any provision of it, shall be subject to a penalty of twenty dollars. § 2. Each person licensed to sell gunpowder shall keep a sign, with the words "Gunpowder for Sale," in plain letters, in some conspicuous place in the front of the building where such powder is kept. And no sales of gunpowder, except in unopened cans shall be sold after night, and any person convicted of violation of any of the provisions of this section shall be subject to a penalty of ten dollars. § 3. Whoever shall bring or cause to be brought into the city any gunpowder concealed in any box or other package, or in any package marked as containing other articles, in which such powder is contained, shall be subject to a penalty of twenty-five dollars. §4. The carrying gunpowder through the streets or other public places, in a careless or negligent manner, or the remaining with such powder in any place longer than necessary for the transportation of the same from one place to another, shall subject the party offending to a penalty of not less than five dollars. . .

**App. 230**

Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources. 1876 Misdemeanors, § 39. No person, except peace officers, shall carry or wear under their clothes, or concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie-knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except by written permission of the Captain of Police.

Merritt Starr & Russell H. Curtis, Annotated Statutes of the State of Illinois in Force (1885), Criminal Code Ch. 38, para. 90.
All persons dealing in deadly weapons, hereinbefore mentioned, at retail within this State shall keep a register of all such weapons sold or given away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is purchased or obtained. The said register shall be in the following form. [Form of Register] Said register is to be kept open for inspection of the public, and all persons who may wish to examine the same may do so at all reasonable times during business hours. A failure to keep such register, or to allow an examination of the same, or to record therein any sale or gift of a deadly weapon, or the keeping of a false register, shall be a misdemeanor, and shall subject the offender to a fine of not less than twenty-five dollars ($25) nor more than two hundred dollars ($200).

George W. Hess, Revised Ordinances of the City of Evanston : Also Special Laws and Ordinances of General Interest Page 131-132, Image 143-144 (1893) available at The Making of Modern Law: Primary Sources. 1893
Concealed Weapons, §531. It shall be unlawful for any person within the limits of the city of Evanston to carry or wear under his clothes or concealed about his person, any pistol, colt or slung shot, cross knucklet, or knuckles of lead, brass or other metal, or bowie knife, dirk, dagger, or any other dangerous or deadly weapon. . . § 537. The Mayor may grant to so many and such persons as he may think proper, licenses to carry concealed weapons, and may revoke any and all such licenses at his pleasure. § 538. Applications for such licenses shall be made to the city clerk, and when granted, the applicant therefor shall pay to the said clerk, for the use of the city, the sum of two dollars. § 539. Every such license shall state the name, age and occupation and residence of the person to whom it is granted.

Samuel A. Ettelson, Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916 Page 458-459, Image 458-459 (Vol. 7, 1916) available at The Making of Modern Law: Primary Sources. 1914
Ordinance of May 25, 1914, § 4a. It shall be unlawful for any person, firm or corporation to sell, barter or give away to any person within the City of Chicago, any pistol, revolver, derringer, bowie knife, dirk or other weapon of like character which can be concealed on the person, except to licensed dealers and to persons who have secured a permit for the purchase of such articles from the general superintendent of police as hereinafter required; provided, this section shall not apply to sales made of such articles which are delivered or furnished outside the City of Chicago. § 5. It shall be unlawful for any person to purchase any pistol, revolver, derringer, bowie knife,

**App. 231**

dirk or other weapon of like character, which can be concealed on the person, without first securing from the General Superintendent of Police a permit so to do. Before any such permit is granted, an application in writing shall be made therefor, setting forth in such application the name, address, age, height, weight, complexion, nationality and other elements of identification, of the person desiring such permit, and the applicant shall present such evidence of good character as the General Superintendent of Police in his discretion may require. § 6. It shall be the duty of the General Superintendent of Police to refuse such permit to (a) All persons having been convicted of any crime. (b) all minors. "Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the General Superintendent of Police to grant such permit, upon the payment of a fee of one dollar. § 8. Any person, firm or corporation violating any of the provisions of this ordinance, shall be fined not less than Fifty Dollars ($50.00) nor more than Two hundred Dollars ($200.00) for each offense, and every purchase, sale or gift of any weapon mentioned in this ordinance shall be deemed a separate offense.

Samuel Irwin, Reports of Cases At Law And In Chancery 566 (vol. #278, Chicago, Ill, 1917). 1917
It shall be the duty of the general superintendent of police to refuse such permit to (a) all persons having been convicted of any crime; (b) all minors. Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the general superintendent of police to grant such permit upon the payment of a fee of one dollar.

1931 Ill.Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4.
Every manufacturer or merchant shall keep a register of all machine guns manufactured or handled by him. This register shall show the date of the sale, loan, gift, delivery or receipt of any machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received, and the purpose for which the person to whom the machine gun was sold, loaned, given or delivered, purchased or obtained said machine gun. Upon demand, every manufacturer or merchant shall permit any sheriff or deputy sheriff, or any police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register herein required and all written permits to purchase or possess a machine gun, which he has retained and filed in his place of business for inspection by such officer.

## INDIANA

1847 Ind. Acts 93, An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory Thereto Into One Act, and to Amend the Same, chap 61, § 8, pt. 4.
To regulate and license, or provide by ordinance for regulating and licensing . . . the keepers of gunpowder and other explosive compounds . . . .

W. G. Armstrong, The Ordinances and Charter of the City of Jeffersonville Page 15-17, Image 15-17 (1855) available at The Making of Modern Law: Primary Sources. 1855

**App. 232**

Ordinances [of Jeffersonville], § 3, Pt. 11. It shall also be a nuisance and unlawful . . . To discharge or cause to be discharged any fire arms, squibs, bombs or fire works of any kind without license being first obtained therefor.

Revision of 1895. The General Ordinances of the City of Indianapolis. Containing also, Acts of the Indiana General Assembly so far as they Control Said City, to which Prefixed a Chronological Roster of Officers from, 1832 to 1895 and Rules Governing the Common Council Page 290-291, Image 372-373 (1895) available at The Making of Modern Law: Primary Sources. 1895

Laws and Ordinances [of the City of Indianapolis], An Ordinance Licensing Rifle and Pistol Practice in the City of Indianapolis, § 1. Be it ordained by the Common Council and Board of Aldermen of the City of Indianapolis, That it shall hereafter be unlawful for any person to conduct or carry on any shooting gallery or room where rifle or pistol shooting is practiced, in the City of Indianapolis, without first having procured a license so to do, as hereinafter provided. § 2. A license fee of twenty-five dollars for six months and fifty dollars for one year shall be paid by the person conducting such business. Upon the payment of twenty-five dollars to the City Treasurer by any person desiring to carry on such a gallery or room, the City Treasurer shall issue to him a receipt therefor, designating therein what said money is paid for; and upon the surrender thereof to the City Clerk [Comptroller] that officer shall issue to such person a license for the said term of six months; and likewise, upon the payment of fifty dollars, a license for one year shall issue. The Clerk [Comptroller] shall be entitled to charge one dollar for the issue of every such license. Said license shall be in the usual form. § 3. Any person opening or carrying on such a gallery or room without such license shall be fined in any sum not exceeding fifty dollars; and every day's continuance shall constitute a spate offense.

1925 Ind. Acts 495, 495-98
Pistols and Revolvers Defined.
SECTION 1. Be it enacted by the general assembly of the State of Indiana, That the term "pistol or revolver," as used in this act, shall be construed as meaning any firearm with a barrel less than twelve inches in length.
Crime-Committing When Armed With Pistol or Revolver.
SEc. 2. If any person shall, within the State of Indiana, commit or attempt to commit a crime, when armed with a pistol or revolver, and having no permit to carry the same, he shall, in addition to the punishment provided for the crime, be guilty of a felony and shall be punished by imprisonment for not less than one year and not more than five years.
Subsequent Offenses.
SEc. 3. The judge shall have the power to sentence any person who may be convicted for a second or third, or other subsequent offense under section 2 of this act, to double or triple the penalty imposed thereby.
Felony-Conviction For-Prohibited From Possessing Pistol.
SEC. 4. No person who has been convicted of a felony committed against the person or property of another shall own or have in his possession or under his control, within the State of Indiana, a pistol or revolver. A violation of this section shall constitute a felony and be punishable by imprisonment for not less than one year, and not more than five years.
Pistol or Revolver-Possession Without Permit.

App. 233

SEc. 5. No person shall carry, within the State of Indiana, a pistol or revolver concealed in any vehicle or upon his person, except in his dwelling house or place of business, without a permit therefor as hereinafter provided. Violations of this section shall constitute a misdemeanor and be punished by a line of one hundred dollars ($100.00), to which may be added imprisonment for not more than one year, and upon conviction the pistol or revolver shall be confiscated and destroyed by the sheriff on order of the court.

Persons Exempt From Act.

SEc. 6. The provisions of the preceding section shall not apply to marshals, sheriffs, deputy sheriffs, policemen or any other duly appointed peace officers, nor the pistols or revolvers of any bank, trust company, or common carriers, or to the officers or employes of any bank, trust company, or common carriers, while such officers or employes are guarding money or valuables within the line of their duties as such employes, nor to the regular and ordinary transportation of pistols or revolvers as merchandise, nor to members of the army, navy, or marine corps or the mail service of the United States, or the national guard, when on duty, or organizations by law authorized to purchase or receive such weapons from the United States, or the State of Indiana, nor to duly authorized military or civil organizations when parading, nor to the members thereof when at .or going to or from their customary places of assembly.

Permits-Clerk of Circuit Court-Application-Form Fee.

SEC. 7. The clerk of any circuit court of the State of Indiana, shall, upon application of any citizen having a bona fide residence or place of business within the State of Indiana, or of any person having a bona fide residence or place of business within the United States, and a permit to carry a firearm concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a permit to such citizen to carry a pistol or revolver within the State of Indiana, during the period of one year or until revoked, as herein provided. Such application for permit Shall be signed by two resident householders and freeholders of the county in which the applicant lives, and it shall appear from such application that the applicant is a suitable person to be granted a

permit under the law. The permit shall be in duplicate, in form to be prescribed by the adjutant general of the State of Indiana, and shall bear the name, address, description and signature of the applicant and reason given for desiring a permit. The original thereof shall be delivered to the applicant, the duplicate shall be preserved for six years by the clerk of the circuit court issuing the same. For each permit so issued, the applicant shall pay the sum of one dollar ($1.00).

Minors-Sale of Pistols or Revolvers to Prohibited.

SEc. 8. Any person or persons who shall, within the State of Indiana, sell, barter, hire, lend, or give to any minor under the age of twenty-one years, any pistol or revolver shall be deemed guilty of a misdemeanor and shall upon conviction thereof be fined not more than one hundred dollars ($100.00), or be imprisoned for not more than three months, or both, except for uses as hereinbefore provided.

Sale of Pistols and Revolvers-Record-Penalty.

SEc. 9. No person shall within the State of Indiana sell, deliver or otherwise transfer a pistol or revolver to a person who he has reasonable cause to believe either is not a citizen or has been convicted of a felony against the person or property of another, nor in any event shall he deliver a pistol or revolver on the day of the application for the purchase thereof, and when delivered said pistol or revolver shall be securely wrapped and shall be unloaded. Before a delivery be made, the purchaser or his duly authorized agent and the seller or his duly authorized agent shall in the presence of each other sign in duplicate a statement containing the purchaser's full name,

**App. 234**

age, dress, place of birth, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, forward by registered mail, to the clerk of the circuit court of the county in which the seller resides, one copy thereof and shall retain the other copy for six years. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall constitute a misdemeanor and shall be punished by a fine of not less than one hundred dollars ($100.00), or by imprisonment for not more than one year, or by both such fine and imprisonment.

Pistols and Revolvers-Sale Without License.

SEC. 10. Whoever, within the State of Indiana, without being licensed as hereinafter provided, sells, delivers, transfers, advertises, or exposes for sale, or has in his possession with intent to sell, pistols or revolvers, shall be deemed guilty of a felony and upon conviction thereof shall be punished by imprisonment for not less than one year nor more than two years.

Dealers' Licenses-Conditions on Which Sold-Record Advertisement.

SEC. 11. The clerk of the circuit court of any county may grant licenses, to any reputable, established dealer, on forms to be prescribed by the adjutant general, permitting the licensee to sell at retail within the State of Indiana pistols and revolvers, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol or revolver shall be delivered: (a) On the day of the application for the purchase, and when delivered shall be unloaded and securely wrapped; nor, (b) Unless the purchaser either is personally known to the seller or shall present clear evidence of his identity; nor, (c) If the seller has reasonable cause to believe that the purchaser is an unnaturalized foreign-born person or has been convicted of a felony against the person or property of another.

4. A true record, in duplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which shall be prescribed by the adjutant general and shall be signed by the purchaser and by the person effecting the sale, and in the presence of each other, and shall include the date of sale, the caliber, make, model, and manufacturer's number of the weapon, the name, address, age, place of birth, nationality of the purchaser. One copy of said record shall,

within seven days, be forwarded by registered mail to the clerk of the circuit court of the county in which the seller resides, and the other copy shall be retained by the seller for six years.

5. No pistol or revolver, or placard advertising the sale thereof, or imitation thereof, shall be displayed in any part of said premises where it can readily be seen from the outside.

False Information.

SEC. 12. If any person in purchasing or otherwise securing delivery of a pistol or revolver or applying for a permit to carry same within the State of Indiana shall give false information or offer false evidence of his identity he shall be deemed guilty of a felony and upon conviction shall be punished by imprisonment for not less than one year nor more than five years.

Obliteration of Make, Model, Number-Penalty.

SEC. 13. No person shall within the State of Indiana, change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any pistol or revolver. Possession of any such firearms upon which the same shall have been changed,

**App. 235**

altered, removed, or obliterated, shall be prima facie evidence that such possessor has changed, altered, removed, or obliterated the same. Violations of this section shall be a misdemeanor and shall be punished by imprisonment for not less than six months nor more than one year.

Felony-Possession of Revolver Prima Facie Evidence.

SEC. 14. In the trial of a person charged with committing or attempting to commit a felony against the person or property of another while armed with a pistol or revolver, without having a permit to carry such firearm as hereinbefore provided, the fact that such person was so armed shall be prima facie evidence of his intent to commit such felony.

Weapons Exempt.

SEC. 15. This act shall not apply to antique pistols or revolvers incapable of use as a deadly weapon.

Prior Licenses.

SEC. 16. Any or all licenses heretofore issued to carry or possess revolver or pistol shall be revoked and rendered null and void on and after thirty days from the taking effect of this act.

Revocation of License.

SEC. 17. Hereafter in any court of record upon trial of any person for a penal offense, and upon a showing that such person is not a fit person to carry concealed weapons, the court may enter an order revoking such person's license to carry concealed weapons and such fact shall be communicated to the public officer issuing the same.

Licensed Dealers-Statement–Penalty.

SEC. 17 1/2. It shall be unlawful from and after the taking effect of this act, for any person, firm or corporation to receive or have in his or its possession within the State of Indiana any pistol or revolver purchased or acquired after the taking effect of this act, except a licensed dealer, who shall not have signed and forwarded to the clerk of the county in which he resides the statements provided for in section 9 of this act, before or at the time of taking possession of such pistol or revolver. Whoever shall violate the provisions of this section of this act shall be deemed guilty of a misdemeanor and shall upon conviction thereof be- fined not more than $100, to which may be added imprisonment for not more than sixty days.

Repeal.

SEC. 18. All laws and parts of laws in conflict herewith are hereby repealed.

Unconstitutional Provisions.

SEC. 19. If any provision or section of this act shall be held void or unconstitutional, all other provisions and all other sections of this act, which are not expressly held to be void or unconstitutional, shall remain in full force and effect.


## IOWA

John F. Dillon, The Revised Ordinances of the City of Davenport, Revised and Digested by Order of the City Council, Containing the Original and Amended City Charters, with Notes and References to Judicial Decisions Page 145, Image 145 (1866) available at The Making of Modern Law: Primary. 1855

[Ordinances of Davenport Iowa,] Chapter 19, An Ordinance to Prohibit the Discharge of fire-arms, fire-crackers, and rockets within the city, § 1. No person shall discharge any gun, pistol or other fire-arms, or use or discharge any fire-crackers, rockets, or any other description of fire-works, within the limits of said city, without permission in writing from the Mayor. § 2. Any

person violating any provision of this ordinance, shall pay a fine of not less than two dollars nor more than ten dollars for each offense.

The Code: Containing All the Statutes of the State of Iowa, of a General Nature, Passed at the Adjourned Session of the Fourteenth General Assembly Page 76-77, Image 88-89 (1873) available at The Making of Modern Law: Primary Sources. 1873
Cities and Incorporated Towns, Powers, § 456. They shall have power to prevent injury or annoyance from anything dangerous offensive or unhealthy, and to cause any nuisance to be abated; to regulate the transportation and keeping of gunpowder or other combustible, and to provide or license magazines for the same; to prevent and punish fast or immoderate riding through the streets; to regulated the speed of trains and locomotives on railways running over the streets or through the limits of the city or incorporated town by ordinance, and enforce the same by a fine not exceeding one hundred dollars: to establish and regulate markets; to provide for the measuring or weighing of hay, coal, or any other article of sale; to prevent any riots, noise, disturbance, or disorderly assemblages; to suppress and restrain disorderly houses, houses of ill fame, billiard tables, nine or ten pin alleys, or tables and ball alleys, and to authorize the destruction of all instruments or devices used for purposes of gaming, and to protect the property of the corporation and its inhabitants and to preserve peace and order therein.

E. E. Aylesworth, Compiled Ordinances of the City of Council Bluffs; Containing the Original and Amended City Charter, with Statutes, Notes and References to Judicial Decisions Page 175, Image 175 (1880) available at The Making of Modern Law: Primary Sources. 1880
[Ordinances of the] City of Council Bluffs, [Misdemeanors,] § 16. Whoever shall discharge any cannon, gun, pistol or other fire-arms in or across any street or other public place, or in or across any private lot, tract of land or other place not of his own property, without first obtaining a permit to do so from the Mayor of the city, if in a public place, or from the owner of the lot or land if in a private place, shall be deemed guilty of misdemeanor, and on conviction thereof shall be punished by a fine of not less than three nor more than thirty dollars.

Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 168-169, Image 171-172 (1887) available at The Making of Modern Law: Primary Sources. 1887
Ordinances, City of Council Bluffs, Shooting Gallery, § 5. No person shall carry on or take part in carrying on any pistol gallery or shooting gallery without license therefor from said city, and the charge for such license shall be ten dollars per month, or fifty dollars per annum. §6. No licensee or his employee, or any person in charge of any pin alley, ball alley, pistol gallery or shooting gallery, shall at any time, without gain or profit, permit or allow any minor to be or remain in or about the same to play thereat, under penalty of the same fine and forfeiture as set forth in section 2 of this chapter.

## KENTUCKY

Charter of the City of Covington, and Amendments Thereto up to the Year 1864, and Ordinances of Said City, and Amendments Thereto, up to the Same Date Page 148-149, Image 148-149 (1864) available at The Making of Modern Law: Primary Sources. 1864

Ordinances of the City of Covington, An Ordinance Regulating the Sale of Powder in the City of Covington, § 1. Be it ordained by the City Council of Covington, That it shall not be lawful for any person or persons to erect, within the limits of the corporation, any powder magazine, or any other building for the purpose of storing gun powder in greater quantities than is hereinafter specified; and any person violating the provision of this section, shall, on conviction before the Mayor, forfeit and pay a fine of one hundred dollars, and ten dollars for every twenty-four hours said building shall be used or occupied for the storage of more than twenty-five pounds of powder. § 2. Be it further ordained, That it shall not be lawful for any person to keep, in storage or for sale, more than one hundred pounds of powder in any one house in said city, at any one time: and that amount, or any part thereof, shall be securely and carefully kept, and closed up in a good and sufficient safe, so that it can not by any means be exposed. A violation of this section shall subject the person to a fine, on conviction, of five dollars for every offense. § 3. Be it further ordained, That no person or persons shall sell, or keep for sale, in said city, any gun powder without having first obtained a permission so to do from the Mayor of said city, who shall, before said license is granted, be fully assured and satisfied that the applicant has good and sufficient safes to keep powder in, in conformity with the second section of this ordinance; and when the Mayor is satisfied that the license may be granted, without too much risk to the community at large, he shall issue said license to the applicant, upon his paying into the City Treasury the sum of twenty dollars for one year's license, and to the Mayor fifty cents, and to the City Clerk twenty-five cents, for their certificates. Any person who shall sell any gun powder in said city from and after the passage of this ordinance, without having first obtained a license therefor, shall, for each and every offense, forfeit, pay, on conviction, the sum of five dollars and costs.

1874 Ky. Acts 327, An Act to Revise and Amend the Charter of the City of Newport, § 6. To prohibit the manufacture of gunpowder or other explosive, dangerous, or noxious compounds or substances in said city, and to regulate their sale and storage by license.

## **LOUISIANA**

John C. White, Digest of the Laws and Ordinances of the Parish of East Feliciana, Adopted by the Police Jury of the Parish Page 68, Image 70 (1848) available at The Making of Modern Law: Primary Sources. 1848
[Ordinances of the Parish of East Feliciana,] Of Slaves, § 5. No slave shall carry a gun to hunt, except on the plantation of his master or mistress; nor then unless accompanied by the overseer or some other free white member of the family, or has a written permit from his owner or overseer, which permit shall state for what said slave is hunting: Any person having the charge of slaves, who shall permit this section to be violated, shall pay a fine of twenty dollars, for the use of the parish, upon information to any Justice, whose duty it is to take cognizance of the case.

Henry Jefferson Leovy, The Laws and General Ordinances of the City of New Orleans, Together with the Acts of the Legislature, Decisions of the Supreme Court, and Constitutional Provisions, Relating to the City Government. Revised and Digested, Pursuant to an Order of the Common Council Page 242, Image 268 (1857) available at The Making of Modern Law: Primary Sources. 1857

**App. 238**

[Ordinances of the City of New dueOrleans,] Revenue – Taxes and Licenses, § No. 680. Every keeper of a pistol gallery, the whole tax being levied on each and every gallery, sixty dollars.

Henry Jefferson Leovy, The Laws and General Ordinances of the City of New Orleans, Together with the Acts of the Legislature, Decisions of the Supreme Court. And Constitutional Provisions Relating to the City Government. Revised and Digested, Pursuant to an Order of the Common Council Page 257, Image 257 (1870) available at The Making of Modern Law: Primary Sources. 1870
[Ordinances of the City of New Orleans,] Offences and Nuisances, § 635. No person shall fire or discharge any gun, pistol, fowling piece or fire-arms, within the limits of the city, or set fire to, or discharge any rocket, cracker, squib or serpent, or shall throw any lighted rocket, cracker, squib or serpent, within the limits of the city, without the license of the common council; Provided, that nothing herein contained shall apply to military reviews or to the lawful use of weapons in self defense.


**MAINE**

The Revised Ordinances of the City of Portland, 1848 Page 22, Image 22 (1848) available at The Making of Modern Law: Primary Sources.
[Ordinances of the City of Portland,] Of Gunpowder, § 1. No person not licensed to keep and sell gunpowder shall keep or have in his shop, store, dwelling house or other tenement, at any one time, a larger quantity of gunpowder than one pound. § 2. No person licensed to keep and sell gunpowder shall have or keep in his store, shop, dwelling house or in any other tenement or place whatever at any one time, a larger quantity of gunpowder then twenty-five pounds. § 3. Every person licensed to keep and sell gunpowder shall provide himself with a strongly made copper chest or box with a copper cover well secured, with hinges and a lock of the same material, and the keg or canister in which said powder may be, shall be kept in said copper chest or box, which shall at all times be placed near the outer door of the building in which it is kept, in convenient place to remove in case of fire. § 4. No person shall haul unto, or lay at any wharf in the city, any vessel having on board a quantity of gunpowder exceeding twenty-five pounds, or receive gunpowder on board exceeding twenty-five pounds, without first having obtained a permit from the mayor and aldermen, and said permit shall designate the wharf at which said powder may be landed, or received on board.

The Charter, Amendments, and Acts of the Legislature Relating to the Municipal Court, and the Ordinances of the City of Lewiston, Together with the Boundaries of the Several Wards, Regulations Respecting Gunpowder, and an Abstract of the Laws Relating to the Powers and Duties of Cities and Towns Page 43, Image 43 (1873) available at The Making of Modern Law: Primary Sources. 1873
Regulations Relating to Gunpowder, § 1. No person shall keep or have in any shop, store, dwelling house or tenement, in the city of Lewiston, at any one time a larger quantity of gun-powder than one pound, unless he is licensed by the mayor and aldermen to keep and sell gunpowder, or except as hereinafter provided. § 2. It shall not be lawful for any person or persons to sell any gunpowder which may at the time be within said city, in any quantity, by wholesale or retail, without having first obtained from the mayor and aldermen a license to sell

**App. 239**

gunpowder, and every license shall be written or printed, and duly signed by the mayor, on a paper upon which shall be written or printed a copy of the rules and regulations established by the city relative to keeping, selling and transporting gunpowder within said city; and every such license shall be in force one year from the date thereof, unless revoked by the mayor and aldermen; but such license may, prior to its expiration, be renewed by an endorsement thereon by the mayor, for the further term of one year, and so from year to year, provided, always, that it may at any time be rescinded or revoked by the mayor and aldermen, for good and sufficient reasons. § 3. Every person who shall receive a license to sell gunpowder, as aforesaid, shall pay for the same to the treasurer of the city the sum of three dollars, and for each renewal of the same, the sum of one dollar.

A.G. Davis, City Clerk, Charter and Ordinances, and Rules and Orders of the City Council. Revised February 1874 Page 52, Image 53 (1874) available at The Making of Modern Law: Primary Sources. 1874
City Ordinances, § 4. No person shall haul unto, or lay at any wharf in the city, any vessel having on board more than twenty-five pounds of gun-powder, nor discharge or receive on board exceeding that quantity, without having first obtained from the Mayor a permit therefor, designating the wharf at which said powder may be landed or received on board.

## MARYLAND

1806 Md. Laws 44, An Act To Restrain The Evil Practices Arising From Negroes Keeping Dogs, And To Prohibit Them From Carrying Guns Or Offensive Weapons, ch. 81
…it shall not be lawful for any negro or mulatto within this state to keep any dog, bitch or gun , except he be a free negro or mulatto, and in that case he may be permitted to keep one dog, provided such free negro or mulatto shall obtain a license from a justice of the peace for that purpose, and that the said license shall be in force for one year, and no longer, and if any dog or bitch owned by any negro, not possessed of such license, shall be seen going at large, it shall be lawful for any person to kill the same, and in case of any suit instituted therefor, the person or persons killing the said dog or bitch may plead the general issue, and give this act in evidence. II. …it shall not be lawful for any free negro or mulatto to go at large with any gun, or other offensive weapon; and in case any free negro or mulatto shall be seen going at large carrying a gun, or other offensive weapon, he shall be liable to be carried before any magistrate, in virtue of a warrant to be issued by any justice of the peace, directed to a constable of the county, and on conviction of having violated the provisions of this section of the act, such offender shall thereupon forfeit, to the use of the informant, such gun, or other offensive weapon, which shall thus have been found in his or her possession, and be subject to the payment of the costs which shall have accrued in such prosecution; provided, that nothing in this act shall extend to prevent any free negro or mulatto from carrying a gun, or other offensive weapon, who shall, at the time of his carrying the same, have a certificate from a justice of the peace, that he is an orderly and peaceable person, which certificate shall be in force for one year from the date thereof and no longer.

Lewis Mayer, Revised Code of the Public General Laws of the State of Maryland, with the Constitution of the State Page 173, Image 202 (1879) available at The Making of Modern Law: Primary Sources. 1876

**App. 240**

Wild Fowl and Game, § 23. The clerk of the Circuit Court for Harford county, and the clerk of the Circuit Court for Cecil county, shall upon the application of any resident of the State of Maryland, being the owner of any sink-box, craft or sneak-boat, such as is allowed by this act to be used and employed in shooting at wild water fowl therefrom; and giving satisfactory evidence to said clerk that the said applicant is a resident of the State of Maryland, and is the bona fide owner of the sink-box, craft, or sneak-boat, grant a license under the seal of his court, to such applicant to gun after and shoot at wild water-fowl from such sink-box or sneak-boat northward of the line named and described in first section of this act from the first day of November in each and every year to the thirty-first day of March next succeeding thereafter in each and every year; provided that such license shall not authorize any person using such sink-box or sneak-boat to gun after or shoot at wild water-fowl therefrom within a less distance than half a mile from any shore in Harford or Cecil County, or southward of the line particularly described in the first section of this act.

1882 Md. Laws 257, An Act to . . . Exempt All That Portion of the Waters of the Chesapeake Bay Lying Northward of a Certain Line Therein Described from the Operation and Effect of Sections One and Three . . ., ch. 180, § 8
. . . the special police appointed by this act are authorized to arrest any person or persons who may be discovered in the act of hunting or shooting crippled ducks, or in purloining ducks that have been killed by other persons having a proper license to shoot, as well as other persons violating the provisions of this section, and upon conviction thereof before any justice of the peace of Cecil or Harford Counties, the license of such persons or persons shall be revoked, and such persons or persons, whether licensed or not, shall be fined not less than twenty dollars for each offense, and shall forfeit the boat and gun or guns, and material so employed in violation of the provisions of this section, which boat and gun or guns, and material shall be sold, and the proceeds of such fine and sale, after the costs of prosecution have been paid, shall go to the officer or officers making the arrest. . .

1882 Md. Laws 656
Section 1. Be it enacted by the General Assembly of Maryland, That it shall be unlawful for any person or persons within the State of Maryland to manufacture or sell, barter or give away the cartridge toy pistol to any one whomsoever Sec. 2. Be it enacted, That it shall be unlawful for any person, be he or she licensed dealer or not, to sell, barter or give away any firearm whatsoever or other deadly weapons, except shotgun, fowling pieces and rifles, to any person who is a minor under the age of twenty-one years. Any person or persons violating any of the provisions of this act shall, on conviction thereof, pay a fine of not less than fifty nor more than two hundred dollars, together with the cost of prosecution, and upon failure to pay said fine and cost, be committed to jail and confined therein until such fine and costs are paid, or for the period of sixty days, whichever shall first occur.

## **MASSACHUSETTS**

William Henry Whitmore, The Colonial Laws of Massachusetts: Reprinted From the Edition of 1672, with the Supplements Through 1686: Containing Also, a Bibliographical Preface and Introduction, Treating of All the Printed Laws From 1649 to 1686: Together with the Body of

**App. 241**

Liberties of 1641, and the Records of the Court of Assistants, 1641-1644 Page 126, Image 330 (1890) available at The Making of Modern Law: Primary Sources. 1651 Prescriptions, (1651) § 2. And it is further ordered; that no person (except for the defence of themselves and their vessels at Sea) shall transport any gunpowder out of this jurisdiction, without license first obtained from some two of the Magistrates, upon penalty of forfeiting all such powder as shall be transporting or transported, or the value thereof.

A Collection Of Original Papers Relative To The History Of The Colony Of Massachusetts-Bay Page 492, Image 497 (1769) available at The Making of Modern Law: Primary Sources. 1769 Laws of the Colony of Massachusetts, That notwithstanding the ancient law of the country, made in the year 1633, that no person should sell any arms or ammunition to any Indian upon penalty of 10l. for every gun, 5l. for a pound of powder, and 40s. for a pound of shot, yet the government of the Massachusetts in the year 1657, upon the design to monopolize the whole Indian trade did publish and declare that the trade of furs and peltry with the Indians in their jurisdiction did solely and properly belong to their commonwealth and not to every indifferent person, and did enact that no person should trade with the Indians for any fort or peltry, except such as were authorized by the court, under the penalty of 100l. for every offence, giving liberty to all such as should have license from them to sell, unto any Indian, guns, swords, powder and shot, paying to the treasurer 3d. for each gun and for each dozen of swords; 6d. for a pound of powder and for every ten pound of shot, by which means the Indians have been abundantly furnished with great store of arms and ammunition to the utter ruin and undoing of many families in the neighboring colonies to enrich some few of their relations and church members.

The Revised Ordinances of 1885, of the City of Boston, as Passed and Approved December 14, 1885. (With Amendments Thereto, Passed and Approved, to May 1, 1886): Being the Ninth Revision. To Which are Added the Revised Standing Regulations of the Board of Aldermen. 9th Rev. Page 172, Image 182 (1886) available at The Making of Modern Law: Primary Sources. 1884 Ordinances of the City of Boston. Of Fire-Arms, Bonfires, and Brick-Kilns. § 4. No person shall sell to any child under the age of sixteen years without the written consent of a parent or guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component part, or any gun, pistol, or other mechanical contrivance arranged for the explosion of such cartridge, or of any fulminate. But the provisions of this section shall not apply to paper caps of which the only component parts are chlorate of potash and sulphide of antimony, nor to any appliance for exploding the same. The provisions of this section shall be inserted in every license granted for the sale of gunpowder.

Revised Ordinances of 1892, of the City of Boston, and the Revised Regulations of 1892, of the Board of Aldermen of the City of Boston, Being the Eleventh Revision, Third Edition, Containing All Ordinances Passed Between March 3, 1892, and February 1, 1895, and All Regulations of the Board of Aldermen Passed Between July 22, 1892, and February 1, 1895 Page 115, Image 129 (1895) available at The Making of Modern Law: Primary Sources. 1895 Ordinances of Boston, Prohibitions and Penalties, § 91. No person shall manufacture or sell, or expose for sale, any guncotton, nitro-glycerine, or any compounds of the same, nor any fulminate or substance, except gunpowder, intended to be used by exploding or igniting it, in order to produce a force to propel missiles, or to rend substances apart, except in accordance with a

**App. 242**

permit from the board of fire commissioners; nor shall any person send or carry through the public streets any such substance, except in the manner and in the quantities allowed by statute or ordinance.

Revised Ordinances of the City of Woburn. Revised Woburn, Massachusetts Page 91 Image 91 (1898) available at The Making of Modern Law: Primary Sources. 1898
License to Sell Gunpowder in the City of Woburn. No person shall sell any gunpowder within the city, without such license. Every license shall be in force one year from the date thereof; provided, that any license may be rescinded by the City Council, at their discretion. § 3. Every person so licensed shall keep a sign over and outside of the principal entrance from the street of the building in which the powder is kept, in which shall be printed in capitals the words: "License to keep and sell gunpowder" § 4. The city clerk shall keep a record of all licenses, and of the places designated therein, which places shall not be changed, unless by consent of the City Council, in writing. Every person who receives a license shall sign his name to a copy of the rules prescribed in this chapter, as evidence of his assent thereto. §5. The provisions of the foregoing four sections shall not apply or extend to the keeping or storing of metallic cartridges in fire proof magazines, nor to cartridge manufacturers, so long as they shall keep their powder in canisters, as prescribed in section one, and in fire proof magazines, located and built to the satisfaction of the City Council so long as such manufacturers allow no more than one hundred pounds of gunpowder in any magazine, or five pounds of gunpowder not made into cartrdiges, in any workshop at any one time.

1906 Mass. Acts 150, ch. 172, An Act to Regulate by License the Carrying of Concealed Weapons
Section 2. Whoever, except as provided by the laws of this Commonwealth, carries on his person a loaded pistol or revolver, without authority or permission as provided in section one of this act, or whoever carries any stiletto, dagger, dirk-knife, slung-shot or metallic knuckles, shall upon conviction be punished by a fine of not less than ten nor more than one hundred dollars, or by imprisonment for a term not exceeding one year, or by both such fine and imprisonment.

1922 Mass. Acts 563, ch. 485, An Act Relative to the Sale and Carrying of Firearms, ch. 485, § 8 (amending § 130)
§ 8 (amending § 130). Whoever sells or furnishes to a minor under the age of fifteen, or to an unnaturalized foreign born person who has who has not a permit to carry firearms under section one hundred and thirty-one, any firearm, air gun or other dangerous weapon or ammunition therefor shall be punished by a fine of not less than ten nor more than fifty dollars, but instructors and teachers may furnish military weapons to pupils for instruction and drill.

1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123)
In sections one hundred and twenty-two to one hundred and twenty-nine, inclusive, "firearms" includes a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel, not including any revolving, detachable or magazine breach, does not exceed twelve inches, and a machine gun, irrespective of the length of the barrel. Any gun of small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by

**App. 243**

gas action or recoil action, shall be deemed to be a machine gun for the purposes of said sections, and of sections one hundred and thirty–one and one hundred and thirty one B. . . § 2. . . Eighth, That no pistol or revolver shall be sold, rented or leased to a person who has not a permit, then in force, to purchase, rent or lease the same issued under section one hundred and thirty-one A, and that no machine gun shall be sold, rented or leased to a person who has not a license to possess the same issued under section one hundred and thirty-one. . .

## MICHIGAN

The Revised Charter and Ordinances of the City of Detroit Page 150, Image 151 (1848) available at The Making of Modern Law: Primary Sources. 1848
[Ordinances of Detroit,] Prevention of Fires, § 9. No person shall fire or set off any squib, cracker, gunpowder or fire works, or fire any gun or pistol in any part of this city, unless by written permission of the Mayor or two Aldermen, which permission shall limit the time of such firing, and shall be subject to be revoked at any time by the Common Council; and any person or persons violating any of the provisions of this section, shall forfeit the penalty of five dollars for each and every offence. § 10. Every person firing a cannon within this city, unless by permission of the Mayor or two Aldermen, shall forfeit the penalty of twenty-five dollars: Provided, that nothing in this or the preceding section shall be construed to prohibit any military company from firing any gun or cannon when authorized by their commanding officer or officers.

1895 Mich. Local Acts 596, § 44
SEC. 44.  No person shall fire or discharge any gun or pistol firearms or fireworks. or carry firearms, or throw stones or other missiles within said park or boulevard, nor shall any person fire, discharge or set off any rocket, cracker, torpedo, squib or other fireworks or things containing any substance of any explosive character on said park or boulevard, without the permission of said commissioners, and then only under such regulations as they shall prescribe.

1913 Mich. Pub. Acts 472, An Act Providing for the Registration of the Purchasers of Guns, Pistols, Other Fire-arms and Silencers for Fire-arms and Providing a Penalty for Violation, § 1-2. Every person, firm or corporation engaged in any way or to any extent in the business of selling at retail guns, pistols, other fire-arms and silencers for fire-arms shall keep a register in which shall be entered the name, age, occupation and residence (if residing in the city with the street number of such residence) of each and every purchaser of such guns, pistols, other fire-arms or silencers for fire-arms together with the number or other mark of identification, if any, on such gun, pistol, other fire-arms or silencer for firearms which said register shall be open to the inspection of all peace officers at all times. § 2. Every person violating any of the provisions of this act shall be deemed guilty of a misdemeanor and shall upon conviction be subject to a fine of not more than fifty dollars or to imprisonment in the county jail for not more than ten days or to both such fine and imprisonment in the discretion of the court.

1925 Mich. Pub. Acts 473, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 2-4.
§ 2. Any person who shall commit or attempt to commit a felony when armed with a pistol, revolver or gun, as defined in section one, shall, in addition to the punishment provided for

**App. 244**

committing the crime, be punished by imprisonment for not less than two nor more than five years within the discretion of the court. § 3. The court shall have power to sentence any person who may be convicted of a second offense to double the addition penalty imposed under section two thereof for carrying such concealed weapon without a license. § 4. In the trial of a person for the commission of murder, assault with intent to do great bodily harm, robbery, larceny, or any attempt to commit any of such offenses, the fact that he was armed with a pistol, revolver or gun as herein defined and had no permit to carry the same, shall be prima facie evidence of his intention to commit the crime with which he is charged[.]

No person shall carry a pistol, revolver or gun concealed on or about his person or in any vehicle owned or operated by him, except in his dwelling house, place of business or on his premises, without a license therefor, as hereinafter provided. The provisions of this section, however, shall not apply to the regular and ordinary transportation of pistols, revolvers or guns as merchandise, or to any member of the army, navy or marine corps of the United States, or to the national guard when on duty, or organizations by law authorized to purchase or receive such weapons from the United States or from this state, nor to duly authorized military organizations when on duty, nor to the members thereof when going to or returning from their customary places of assembly, nor to wholesale or retail dealers therein, nor to peace officers of the state.

1925 Mich. Pub. Acts 47, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 7.

No person shall deliver or otherwise transfer a pistol, revolver or gun as defined in this act, to a person unless it be securely wrapped and unloaded. Before the same is delivered to the purchaser, he shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, nationality, the date of sale, the caliber, make, model and manufacturer's number of the weapon. The seller shall, within thirty days thereafter, sign and mail by registered letter one copy thereof to the secretary of state, one copy to the chief of police of the city or village in which the same was sold or to the sheriff of the county of which the seller is a resident and shall retain the other copy. This section shall not apply to sales at wholesale. Any person convicted of wilfully violating the provisions of this section shall be punished by a fine of not less than one hundred dollars or by imprisonment of not more than one year or by both such fine and imprisonment in the discretion of the magistrate.

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.

It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1927 Mich. Pub. Acts 891, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 9.

**App. 245**

SEC. 9. On or before the first day of November, nineteen hundred twenty-seven, any person within this state who owns or has in his possession a pistol as defined in this act, shall, if he reside in an incorporated city or an incorporated village having an organized police department, present such weapon for safety inspection to the commissioner or chief of police of such city or village; if such person reside in a part of the county not included within the corporate limits of such city or village he shall so present such pistol for safety inspection to the sheriff of such county. Any person owning or coming into possession of a pistol after the first day of November, nineteen hundred twenty-seven, shall forthwith present such pistol for safety inspection in the manner provided in this section. A certificate of inspection shall thereupon be issued in triplicate on a form provided by the commissioner of public safety, containing the name, age, address, description and signature of the person presenting such pistol for inspection, together with a full description thereof; the original of such certificate shall be delivered to the registrant; the duplicate thereof shall be mailed to the commissioner of public safety and field and indexed by him and kept as a permanent official record for a period of six years, and the triplicate of such certificate shall be retained and filed in the office of said sheriff, or commissioner or chief of police, as the case may be. The provisions of this section shall not apply to wholesale or retail dealers in firearms or to collections of pistols kept solely for the purpose of display, as relics, souvenirs, curios or antiques, nor to weapons heretofore registered under the provisions of section eleven of act number three hundred thirteen of the public acts of nineteen hundred twenty-five. Any person who fails to comply with the provision of this section shall be guilty of a misdemeanor and shall be punished by a fine not exceeding one hundred dollars or imprisonment in the county jail not exceeding ninety days, or by both such fine and imprisonment in the discretion of the court.

## MINNESOTA

Henry John Horn, The Charter and Ordinances of the City of St. Paul, Together with Legislative Acts Relating to the City, and the State Constitution, in an Appendix Page 113, Image 114 (1858) available at The Making of Modern Law: Primary Sources. 1858
Revised Ordinances [of the City of St. Paul], An Ordinance to Restrain the Use of Fire Arms and the Exhibition of Fire Works. The Common Council of the City of Saint Paul do ordain as follows: § 1. It shall not be lawful for any person to fire or discharge any cannon, gun, fowling piece, pistol or fire arms of any description, or fire, explode or set off any squib, cracker or other thing containing powder or other combustible or explosive material, or to exhibit any fire works or make or exhibit any bonfire, within the limits of said city, without permission from the Common Council or written permission from the Mayor, which permission shall limit the time of such firing, and shall be subject to be revoked by the Common Council at any time after it has been granted. §2. Any person violating any provision of this ordinance, shall on conviction thereof, be punished by a fine not exceeding one hundred dollars.

The Charter and Ordinances of the City of St. Paul, (To August 1st, 1863, Inclusive,) Together with Legislative Acts Relating to the City. Page 166-167, Image 167-168 (1863) available at The Making of Modern Law: Primary Sources. 1858
Ordinances of the City of St. Paul, An Ordinance to Regulate the Sale of Gunpowder, § 1. No person shall keep, sell or give away gunpowder or guncotton in any quantity without first having paid into the City Treasurer the sum of five dollars, and obtain from the Common Council a

**App. 246**

permission in writing, signed by the Mayor and Clerk, and sealed with the corporate seal, under a penalty not exceeding fifty dollars, for every offence, provided any person may keep for his own use not exceeding one pound of powder or one pound of gun cotton, at one and the same time. § 2. All applications for permits shall be addressed to the Common Council, in writing, signed by the applicant. Not exceeding four permits shall be granted in any one block; when the number of applications in any block shall at any time exceed the numbers to be granted, the requisite number shall by chosen by ballot. When issued, the Clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business, and date of permits. Persons to whom permits may be issued, shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gunpowder or guncotton than fifty pounds at one time, and the same shall be kept in tin canisters or cans, or kegs securely looped and headed, containing not to exceed twenty-five pounds each and in a situation remote from fires or lighted lamps, candles or gas, from which they may be easily removed in case of fire. Nor Nor shall any person sell or weigh any gunpowder or guncotton, after the lighting of lamps in the evening, unless in sealed canisters or cans. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business, with the word "gunpowder" painted or printed thereon in large letters. Any person violating any clause of this section, shall, upon conviction therof be punished by a fine of not less than ten, nor more than one hundred dollars. § 3. No person shall convey or carry any gunpowder or guncotton, exceeding (one pound in quantity) through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the said gunpowder or guncotton be secured in tight cans or kegs well headed and hooped, sufficient to prevent such gunpowder or guncotton from being spilled or scattered, under a penalty of fifty dollars. § 4. All permissions granted under this ordinance shall expire on the second Tuesday of May in each year; and no permit shall be granted to any retailer of intoxicating liquors, or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit which may be issued.

W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources. 1882
Concealed Weapons – License, § 1. It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon. § 2. Any such weapons or weapons, duly adjudged by the municipal court of said city to have been worn or carried by any person, in violation of the first section of this ordinance, shall be forfeited or confiscated to the said city of St. Paul, and shall be so adjudged. § 3. Any policeman of the city of St. Paul, may, within the limits of said city, without a warrant, arrest any person or persons, whom such policeman may find in the act of carrying or wearing under his clothes, or concealed about their person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon, and detain him, her or them in the city jail, until a warrant can be procured, or complaint made for the trial of such person or persons, as provided by the charter of the city of St. Paul, for other offenses under said charter, and for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to, as such

**App. 247**

person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889 Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources. 1888.
Making, Selling, etc., Dangerous Weapons, § 333. A person who manufactures, or causes to be manufactured, or sells, or keeps for sale, or offers or gives or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles, or who, in any city of this state, without the written consent of a magistrate, sells or gives any pistol or fire-arm to any person under the age of eighteen years, is guilty of a misdemeanor. Carrying, using, etc., certain Weapons, § 334. A person who attempts to use against another, or who, with intent so to use, carries, conceals, or possesses any instrument or weapon of the kind commonly known as a slung-shot, sand-club, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon, is guilty of a misdemeanor.

Harry Toulmin, Ordinances of the City of Saint Paul, from May, 1887, to July, 1889 Page 90, Image 90 (1889) available at The Making of Modern Law: Primary Sources. 1889
Ordinances of the City of St. Paul, [Establishing and Fixing the License to be Paid to the City of St. Paul for Conducting, Managing or Carrying on Either or any of the Different Branches of Business Hereinafter Mentioned and Limiting the Duration Thereof, and Also Repealing Certain Ordinances Herein Named,] § 2. The different and various kinds of business, employments and avocations for which licenses are hereby fixed and established, and the sum and amount of the license for each separate one are as follows, to wit: Gun powder ……………..$15.00.

## **MISSISSIPPI**

1804 Miss. Laws 90-91, An Act Respecting Slaves, § 4.
[Slaves not to carry offensive or defensive weapons]. [N]o Slave shall keep or carry any gun, powder, shot, club or other weapon whatsoever offensive or defensive, except tools given him to work with, or that he is ordered by his master, mistress or overseer to carry the said articles from one place to another, but all, and every gun, weapon or ammunition found in the possession or custody of any slave, may be seized by any person, and upon due proof thereof made before any justice of the peace of the county or corporation, where such seizure shall be made, by his order, be forfeited to the seizer for his own use; and moreover, every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty nine, on his bare back for every such offence: Provided nevertheless, That any justice of the peace may grant, in his proper county, permission in writing, to any slave, on application of his master, or overseer to carry and use a gun and ammunition within the limits of his said master's or owner's plantation, for a term not exceeding one year, and recoverable, at any time within such term, at the discretion of said justice.

[REGULATORY TAX] 1867 Miss. Laws 327-28, An Act To Tax Guns And Pistols in The County Of Washington, ch. 249, § 1.
[A] tax of not less than five dollars or more than fifteen dollars shall be levied and assessed annually by the board of Police of Washington county upon every gun and pistol which may be

**App. 248**

in the possession of any person in said county, which tax shall be payable at any time on demand, by the Sheriff, and if not so paid, it shall be the duty of the Sheriff to forthwith distrain and seize such gun or pistol, and sell the same for cash at the door of the Court House, after giving ten days notice by advertisement, posted in front of said Court House, and out of the proceeds of such sale, there shall be paid the amount of such tax and the cost of sale, and if any surplus remains, it shall be paid to the owner of such gun or pistol. The amount of the tax so assessed and collected, shall be paid to the county Treasurer, and shall constitute a part of the bridge fund of said county.

1906 Miss. Laws 367, Privilege Taxes, ch. 114, § 3887.
Dealers in Deadly Weapons: On each person or firm dealing in pistols, dirk knives, sword canes, brass or metallic knuckles, or other deadly weapons (shotguns and rifles excepted) – 100.00. And which shall be in addition to all and any other taxes or privileges paid. On each firm or dealer selling air guns, target or flobert rifles (and this shall apply even if the same has a license to sell merchandise, pistols or cartridges) – $25.00.

## MISSOURI

Henry S. Geyer, A Digest of the Laws of Missouri Territory. Comprising: An Elucidation of the Title of the United States to Louisiana:-Constitution of the United States:-Treaty of Session:- Organic Laws:-Laws of Missouri Territory, (Alphabetically Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates Page 374, Image 386 (1818) available at The Making of Modern Law: Primary Sources. 1818
Slaves, § 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offence. § 4. Every free negro or mulatto, being a housekeeper may be permitted to keep one gun, powder and shot; and all negroes or mulattoes bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder shot and weapons, offensive and defensive, by license from a justice of the peace of the district [county] wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes or of the owners of such as are slaves.

Adam B. Chambers, The Revised Ordinances of the City of Saint Louis, Revised and Digested by the Fifth City Council during the First Session, Begun and Held in the City of St. Louis, on the Second Monday of May, A. D. 1843. with the Constitutions of the United States and the State of Missouri, and the City Charter Page 304, Image 305 (1843) available at The Making of Modern Law: Primary Sources. 1843
[Ordinances of Kansas City,] Misdemeanors, § 10. Every person who shall discharge any cannon or other ordinance, or fire off any carbine, fusil, rifle, musket, gun, pistol, or other arms, or set off any squib or cracker, or fly any kite in the air, within the city, shall be deemed guilty of a misdemeanor. This section shall not apply to the firing of salutes by any military corps, or to the

firing of salutes upon any occasion of general public interest. Provided, such firing be caused by persons, associations or companies, volunteers or otherwise, who may be engaged in lawful celebrations of public rejoicings, or in the lawful military exercises of said companies or volunteers; nor to prevent any manufacturer from trying or proving the articles manufactured by him within the limits of the city, provided the same be done without danger or injury to the neighborhood. § 11. Every person who shall fire any heavy cannon, or set off any rockets or fire works, or illuminate in any unusual manner any house or building, without first having obtained written permission from the Mayor, specifying the time and place, when and where the same shall be allowed, shall be deemed guilty of a misdemeanor.

1844 Mo. Laws 577, An Act To Restrain Intercourse With Indians, ch. 80, § 4.
No person shall sell, exchange or give, to any Indian, any horse, mule, gun, blanket, or any other article or commodity whatever, unless such Indian shall be traveling through the state, and leave a written permit from the proper agent, or under the direction of such agent in proper person.

1854 Mo. Laws 1094, An Act Concerning Free Negros and Mulattoes, ch. 114, §§ 2-3.
§ 2. No free negro or mulatto shall be suffered to keep or carry any firelock, or weapon of any kind, or any ammunition, without license first had and obtained for the purpose, from a justice of the peace of the county in which such free negro or mulatto resides, and such license may be revoked at any time by the justice granting the same or by any justice of the county. § 3. Any gun, firelock, or weapon of any kind, or any ammunition, found in the possession of any free negro or mulatto not having a license, as required by the last preceding section, may be seized by any person, and upon due proof thereof, before any justice of the peace of the county in which such seizure shall have been made, shall be forfeited by order of such justice, to the person making the seizure, for his own use.

Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871) available at The Making of Modern Law: Primary Sources. 1871
Ordinances of the City of St. Louis, Misdemeanors, § 9. Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol, or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the Mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offence. § 10. Nothing in the preceding section shall be so construed as to prevent any United States, State, county or city officer, or any member of the city government, from carrying or wearing such weapons as may be necessary in the proper discharge of his duties.

An Ordinance in the Revision of the Ordinances Governing the City of Kansas (Kansas City, MO; Isaac P. Moore's Book and Job, 1880), p. 264, Sec. 3. 1880
Chapter XXXIV. Public Safety. . . .
Sec. 3. No person shall, in this city, wear under his clothes or concealed about his person, any pistol or revolver, except by special permission from the Mayor; nor shall any person wear under

**App. 250**

his clothes, or concealed about his person, any slung-shot, cross knuckles, knuckles of lead, brass or other metal, or any bowie knife, razor, billy, dirk, dirk-knife or dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon. Any person, violating any provision or requirement of this section, shall be deemed guilty of a misdemeanor, and, upon conviction thereof before the City Recorder, shall be fined not less than fifty dollars nor more than five hundred dollars : Provided, however, That this section shall not be so construed as to prevent any United States, State, County or City officer, or any member of the City government, from carrying such weapons as may be necessary in the proper discharge of his duties.

Henry Smith Kelley, Laws Applicable to and Governing the City of Saint Joseph, Mo., As a City of the Second Class, Contained in the Revised Statutes of 1879, and Subsequent Legislative Enactments; Also the General Ordinances Now in Force, Revised and Made to Conform to the Laws Governing Such Cities Page 192, Image 222 (1888) available at The Making of Modern Law: Primary Sources. 1888
General Ordinances [of the City of St. Joseph], [Amusement-Shows,] Shooting Gallery; license for. — § 3. No person shall carry on or take part in carrying on, any pistol gallery or shooting gallery, without a license therefor from said city; and the charge for such license shall be five dollars per month.

The Municipal Code of St. Louis (St. Louis: Woodward 1901), p.738, Sec. 1471. 1892
Chapter 18. Of Misdemeanors.
Sec. 1471. Concealed weapons – carrying of, prohibited.
Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offense.

The Revised Ordinances of the City of Huntsville, Missouri, of 1894. Collated, Revised, Printed and Published by Authority of the Mayor and Board of Aldermen of the City of Huntsville, Missouri, Under an Ordinance of the Said City, Entitled: "An Ordinance in Relation to Ordinances, and the Publication Thereof." Approved on the 11th Day of June, 189 Page 58-59, Image 58-59 (1894) available at The Making of Modern Law: Primary Sources. 1894
Ordinances of the City of Huntsville, An Ordinance in Relation to Carrying Deadly Weapons, § 1. If within the city any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under militia law of the state, having upon or about his person any kind of fire arms, bowie-knife, dirk, dagger, sling-shot, or other deadly weapon or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, he shall be deemed guilty of a

**App. 251**

misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than five nor more than one hundred dollars, or by imprisonment in the city prison not exceeding thirty days nor less than five days or by both such fine and imprisonment; provided, the Mayor may grant permission to any person to discharge gun, pistol or other firearms under the proper circumstances shown to him. § 2. The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to exercise process or warrants, or to suppress breaches of the peace or to make arrests, nor to persons moving or travelling peaceably through this state; and it shall be good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his home, person or property.

Francis M. Wilson, The Revised Statutes of the State of Missouri, 1899. To This Volume are Annexed the Acts of Congress in Relation to the Election of United States Senators, in Relation to Fugitives from Justice, Concerning Naturalization and the Authentication of Public Records; an Appendix Containing the Scheme and Charter of and Laws Specially Applicable to the City of St. Louis and the Acts Establishing the Criminal Court of the Fifteenth Circuit, the Criminal Court of Jackson County, the Criminal Court of Buchana County, the Criminal Court of Greene County, the Louisiana Court of Common Pleas, the Hannibal Court of Common Pleas, the Cape Girardeau Court of Common Pleas and the Sturgeon Court of Common Pleas. Revised and Promulgated by the Fortieth General Assembly Page 1752, Image 645 (Vol. 2, 1899) available at The Making of Modern Law: Primary Sources. 1899
[Permit to Keep Explosives, § 7457. No person, corporation or joint-stock company shall, on and after ten days after this article shall take effect, have retain or keep in his possession or under his or her control, nor sell, give away or in any manner or way dispose of dynamite, giant powder, nitro-glycerine or any explosive substance, except gunpowder and blasting powder for ordinary purposes, without first obtaining a permit authorizing the same from the clerk of the county court, or mayor of the city of St. Louis, in whichever county or city such applicant may desire to do such business, nor without first making and delivering the affidavit required by the next succeeding section of this article.]

1921 Mo. Laws 691, 692
Section 1. Pistol, revolver or firearms to be plainly marked. No wholesaler or dealer therein shall have in his possession for the purpose of sale, or shall sell, any pistol, revolver, or other firearm of a size which may be concealed upon the person, which does not have plainly and permanently stamped ,upon the metallic portion thereof, the trademark or name of the maker, the model and the serial factory number thereof, which number shall not be the same as that of any other such weapon of the same model made by the same maker, and the maker, and no wholesale or retail dealer therein shall have in his possession for the purpose of sale, or shall sell, any such weapon unless he keep a full and complete record of such description of such weapon, the name and address of the person from whom purchased and to whom sold, the date of such purchase or sale, and in the' case of retailers the date of the permit and the name of the circuit clerk granting the same, which record shall be open to inspection at all times by any police officer or other peace officer of this state.
Sec. 2. Shall secure permit to acquire weapon.-No person, other than a manufacturer or wholesaler thereof to or from a wholesale or retail dealer therein, for the purposes of commerce, shall directly or indirectly buy, sell, borrow, loan, give away, trade, barter; deliver or receive, in

**App. 252**

this state, any pistol, revolver or other firearm of a size which may be concealed upon the person, unless the buyer, borrower or person receiving such weapon shall first obtain and deliver to, and the same be demanded and received by, the seller, loaner, or person delivering such weapon, within thirty days after the issuance thereof, a permit authorizing such person to acquire such weapon. Such permit shall be issued by the circuit clerk of the county in which the applicant for a permit resides in this state, if the sheriff be satisfied that the person applying for the same is of good moral character and of lawful age, and that the granting of the same will not endanger the public safety. The permit shall recite the date of the issuance thereof and that the same is invalid after thirty days after the said date, the -name and address of the person to whom granted and of the person from whom such weapon is to be acquired, the nature of the transaction, and a full description of such weapon, and shall be countersigned by the person to whom granted in the presence of the circuit clerk. The circuit clerk shall receive therefor a fee of $0.50. If the permit be used, the person receiving the same shall return it to the circuit clerk within thirty days after its expiration, with a notation thereon showing the date and manner of the disposition of such weapon. The circuit clerk shall keep a record of all applications for such permits and his action thereon, and shall preserve all returned permits. No person shall in any manner transfer, alter or change any such permit or make a false notation thereon or obtain the same upon any false representation to the circuit clerk granting the same, or use or attempt to use a permit granted to another.

Sec. 3. Weapons must be stamped.-No person within this state shall lease, buy or in anywise procure the possession from any person, firm or corporation within or without the state, of any pistol, revolver or other firearm of a size which may be concealed upon the person, that is not stamped as required by section 1 of this act; and no person shall buy or otherwise acquire the possession of any such article unless he shall have first procured a written permit so to do from the circuit clerk of the county in which such person resides, in the manner as provided in section 2 of this act.

Sec. 4. Manufacture not prohibited.-Nothing herein contained shall be considered or construed as forbidding or making it unlawful for a dealer in or manufacturer of pistols, revolvers or other firearms of a size which may be concealed upon the person, located in this state, to ship into other states or foreign countries, any such articles whether stamped as required by this act or not so stamped.

## MONTANA

Decius Spear Wade, The Codes and Statutes of Montana. In Force July 1st, 1895. Including the Political Code, Civil Code, Code of Civil Procedure and Penal Code. As Amended and Adopted by the Fourth Legislative Assembly, Together with Other Laws Continued in Force Page 873, Image 914 (Vol. 2, 1895) available at The Making of Modern Law: Primary Sources. 1895 Crimes Against the Public Peace, § 759: Every person who brings into this state an armed person or armed body of men for the preservation of the peace or the suppression of domestic violence, except at the solicitation and by the permission of the legislative assembly or of the governor, is punishable by imprisonment in the state prison not exceeding ten years and by a fine not exceeding ten thousand dollars.

1913 Mont. Laws 53, An Act to Provide that Aliens Shall Pay a Gun License, and Providing a Penalty for Failure to Obtain License; to Provide for and Regulate the Duties of the Game and

Fish Warden and His Deputies, and to Provide for the Disposition of the Fines so Collected, ch. 38, § 1.

There is hereby created a gun license for aliens. No person not a bona fide citizen of the United States shall own or have in his possession, in the State of Montana, any gun, pistol or other firearm without first having obtained from the Game and Fish Warden a license therefor, which said license shall cost the owner of said firearm the sum of Twenty-five ($25) Dollars, and shall expire one year from date of issuance thereof; provided, however, that this section shall not apply to one who has obtained the Twenty-five ($25) Dollar hunting license required by the laws of Montana; provided, further, that the provisions of this section shall not apply to any alien who is a bona fide resident of the State of Montana and the owner of not less than one hundred and sixty acres of land therein, nor shall it apply to any settler on the public lands of the State of Montana who shall have begun to acquire land under the laws of the United States by filing thereon, nor shall it apply to persons engaged in tending or herding sheep or other animals, held in herd.

1918 Mont. Laws 6-7,9, An Act Entitled "An Act Providing for the Registration of All Fire Arms and Weapons and Regulating the Sale Thereof and Defining the Duties of Certain County Officers and Providing Penalties for a Violation of the Provisions of This Act," ch. 2, §§ 1, 3, 8.
§ 1. Within thirty days from the passage and approval of this Act, every person within the State of Montana, who owns or has in his possession any fire arms or weapons shall make a full, true, and complete verified report upon the form hereinafter provided to the sheriff of the County in which such person lives, of all fire arms and weapons which are owned or possessed by him or her or are in his or her control, and on sale or transfer into the possession of any other person such person shall immediately forward to the sheriff of the County in which such person lives the name and address of that purchaser and person into whose possession or control such fire arm or weapon was delivered. § 3. Any person signing a fictitious name or address or giving any false information in such report shall be guilty of misdemeanor, and any person failing to file such report as in this Act provided, shall be guilty of a misdemeanor. § 8. For the purpose of this Act a fire arm or weapon shall be deemed to be any revolver, pistol, shot gun, rifle, dirk, dagger, or sword.

## NEBRASKA

1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47.
The City Council shall have power to license all . . . vendors of gunpowder[.]

1895 Neb. Laws 210, Laws of Nebraska Relating to the City of Lincoln, An Ordinance Regulating and Prohibiting the Use of Fire-arms, Fire-works and Cannon in the City of Lincoln . . . Prescribing Penalties for Violation of the Provisions of This Ordinance, and Repealing Ordinances in Conflict Herewith, Art. XVI, § 6.
The Mayor may grant to so many and such persons as he may think proper, licenses to carry concealed weapons, and may revoke any and all of such licenses at his pleasure. Every such license shall state the name, age, occupation, and residence, of the person to whom granted, and shall be good for one year. A fee of fifty cents shall be paid therefor to the City Treasurer, and by him placed in the police fund.

**App. 254**

**NEW HAMPSHIRE**

1820 N.H. Laws 274-76, An Act to Provide for the Appointment of Inspectors and Regulating the Manufacture of Gunpowder, ch. 25, §§ 1-9.

§ 1. [T]he Governor . . . is hereby authorized to appoint an inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state, and such other places as may by him thought to be necessary[.] § 2. [F]rom and after the first day of July next, all gunpowder which shall be manufactured within this state shall be composed of the following proportions and quality of materials . . . § 3. It shall be the duty of each of said inspectors to inspect, examine and prove all gunpowder which after the first day of July shall not be deposited at any publick [sic] powder magazine, or manufactory of this state . . . § 4. [N]o gunpowder within this state shall be considered to be of proof unless one ounce thereof, placed in a chamber of a four and an half inch howitzer, with the howitzer elevated so as to form an angle of forty-five degrees with the horizon, will, upon being fired throw a twelve pound shot seventy-five yards at the least. § 5. [W]henever any of said inspectors shall discover any gunpowder, deposited at any public powder magazine, or any other place within this state, which is not well manufactured or which is composed of impure materials . . . the inspector in such case, shall mark each cask containing such impure, ill manufactured, or deficient gunpowder, with the word "Condemned" on both heads of the cask . . . § 6. [I]f any person shall knowingly sell any condemned gunpowder . . . every such person, so offending, shall forfeit and pay not less than two hundred nor more than five hundred dollars . . . § 7. [E]ach inspector . . . be sworn to the faithful and impartial discharge of the duties of his office, and each inspector shall be allowed one cent for each pound of gunpowder, by him examined, inspected and proved . . . to be paid by the owner or owners of the gunpowder. § 8. [I]f any manufacturer of gunpowder shall sell or dispose of, or shall cause or permit to be sold or disposed of, or shall export or cause to be exported withou the limits of this state, any powder of his manufacture, before the same has been inspected and marked agreeably to the provisions of this act, he shall forfeit and pay the sum of fifty cents for every pound of powder so sold, disposed of, or exported, to be recovered in the manner provided in the sixth section of this act. § 9. [I]f any person with within this state . . shall knowingly sell, expose, or offer for sale, within this state, any gunpowder which is not well manufactured, or which is composed of impure materials, and which shall not be composed of the proof herein before required, shall forfeit and pay not less than five dollars nor more than fifty dollars for each and every offence, to be recovered in the manner provided in the sixth section of this act.

1823 N.H. Laws 73-74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.

That if any person or persons shall within the compact part of the town of Portsmouth, that is to say, within one mile of the courthouse, fire or discharge any cannon, gun, pistol or other fire arms, or beat any drum, (except by command of a military officer, having authority therefor) or fire or discharge any rockets, squibs, crackers, or any preparation of gunpowder, (except by the permission of the police officers, or of a major part of them first had in writing) . . . every such person, for every such act shall be taken and deemed to be an offender against the police of Portsmouth, and shall be liable to the penalties hereinafter expressed.

The Charter, with Its Amendments and the General Ordinances of the City of Dover Page 32, Image 32 (1870) available at The Making of Modern Law: Primary Sources. 1870 General Statutes [Ordinances of the City of Dover, [New Hampshire] Offences Against the Police of Towns,] § 5. No person shall, within the compact part of any town, fire or discharge any cannon, gun, pistol, or other fire-arms, or beat any drum, except by command of a military officer having authority therefor, or fire or discharge any rockets, squibs, crackers, or any preparation of gunpowder, except by permission of a majority of the police officers or selectmen in writing, or make any bonfire, or improperly use or expose any friction matches, or knowingly raise or repeat any false cry of fire.

1917 N.H. Laws 727-28, An Act for the Regulation of the Sale and Use of Explosives and Firearms, ch. 185, §§ 1-3, 6.

§ 1. No person shall manufacture, sell, or deal in firearms or in gunpowder, dynamite, nitro-glycerine, or other form of high explosive, unless he shall first obtain, from the selectmen of the town or the chief of police of the city where such business is to be conducted, a written license therefor, and no person shall conduct such business within the state but outside the limits of any organized town or city, unless he shall first obtain such license from the county commissioners of the county in which such business is to be conducted; which license shall specify the building where such business is to be carried on or material deposited or used. § 2. No such licensed person shall sell or deliver firearms to any person not a citizen of the United States, unless he shall have legally declared his intention of becoming a citizen, or any such explosive material or compound to any person, except upon presentation of a permit such as is hereinafter provided for, nor unless satisfied that the same is to be used for a lawful purpose. § 3. Every person so licensed shall keep, on blanks to be furnished by the secretary of state, a record of the names and residences of all persons to whom he shall sell or deliver firearms or any such explosive material or compound, the purpose of which the same is to be used¸ the date of sale, the amount paid, the date of the purchaser's permit, the name and title of the person by whom the permit was issued, and, within five days after such sale or delivery, shall file such record thereof with the clerk of the city or town wherein he sale or delivery was made, or with the county commissioners in case of sales or deliveries within the state, but outside the limits of any organized city or town. The records thus filed shall at all times be open to the inspection of the police departments, or other public authorities. He shall also affix to the receptacle containing such explosive material or compound a label with the name of the compound, his own name, and the date of sale.

§ 6. No person not a citizen of the United States or one who has legally declared his intention of becoming such a citizen shall have in his possession any firearm or firearms of whatsoever kind or description unless he has a written permit to have such possession issued and signed as hereinafter provided. Any such person desiring to possess a firearm or firearms for any lawful purpose shall first make written application to the chief of police or selectmen of the town wherein he resides . . . stating the purposes for which the possession of the firearm or firearms is desired and a description of the firearm or firearms. The applicant shall also state his full name, occupation, place of residence and if in a city the street and number. If such chief of police or selectmen or county commissioners are satisfied that the applicant intends to use the firearm or firearms in a lawful manner and as set forth in his application, a permit shall be issued, signed by the chief of police of the city, a selectmen of the town, or county commissioners, as the case may be, giving to the applicant the right to have in his possession such firearm or firearms. The holder of any such permit shall keep the permit on his person at all times when he is in possession of the

**App. 256**

firearm or firearms as authority for such possession and shall exhibit the same when so requested by any person.

1917 N.H. Laws 728-29, An Act for the Regulation of the Sale and Use of Explosives and Firearms, ch. 185, § 6.

No person not a citizen of the United States or one who has legally declared his intention of becoming such a citizen shall have in his possession any firearm or firearms of whatsoever kind or description unless he has a written permit to have such possession issued and signed as hereinafter provided. Any such person desiring to possess a firearm or firearms for any lawful purpose shall first make written application to the chief of police or selectmen of the town wherein he resides . . . stating the purposes for which the possession of the firearm or firearms is desired and a description of the firearm or firearms. The applicant shall also state his full name, occupation, place of residence and if in a city the street and number. If such chief of police or selectmen or county commissioners are satisfied that the applicant intends to use the firearm or firearms in a lawful manner and as set forth in his application, a permit shall be issued, signed by the chief of police of the city, a selectmen of the town, or county commissioners, as the case may be, giving to the applicant the right to have in his possession such firearm or firearms. The holder of any such permit shall keep the permit on his person at all times when he is in possession of the firearm or firearms as authority for such possession and shall exhibit the same when so requested by any person.

1923 N.H. Laws 138

SECTION 1. Pistol or revolver, as used in this act shall be construed as meaning any firearm with a barrel less than twelve inches in length.

SECT. 2. If any person shall commit or attempt to commit a crime when armed with a pistol or revolver, and having no permit to carry the same, he shall in addition to the punishment provided for the crime, be punished by imprisonment for not more than five years.

SECT. 3. No unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another shall own or have in his possession or under his control a pistol or revolver, except as hereinafter provided. Violations of this section shall be punished by imprisonment for not more than two years and upon conviction the pistol or revolver shall be confiscated and destroyed.

SECT. 4. No person shall carry a pistol or revolver concealed in any vehicle or upon his person, except in his dwelling house or place of business, without a license therefor as hereinafter provided. Violations of this section shall be punished by a fine of not more than one hundred dollars or by imprisonment not exceeding one year or by both fine and imprisonment.

SECT. 5. The provisions of the preceding sections shall not apply to marshals, sheriffs, policemen, or other duly appointed peace and other law enforcement officers, nor to the regular and ordinary transportation of pistols or revolvers as merchandise, nor to members of the army, navy, or marine corps of the United States, nor to the national guard when on duty, nor to organizations by law authorized to purchase or receive such weapons, nor to duly authorized military or civil organizations when parading, or the members thereof when at or going to or from their customary places of assembly.

SECT. 6. The selectmen of towns or the mayor or chief of police of cities may, upon application of any person issue a license to such person to carry a loaded pistol or revolver in this state, for not more than one year from date of issue, if it appears that the applicant has good reason to fear

**App. 257**

an injury' to his person or property or for any other proper purpose, and that he is a suitable person to be licensed. The license shall be in duplicate and shall bear the name, address, description, and signature of the licensee. The original thereof shall be delivered to the licensee, the duplicate shall be preserved by the selectmen of towns and the chief of police of the cities wherein issued for a period of one year.

SECT. 7. Any person or persons who shall sell, barter, hire, lend or give to any minor under the age of twenty-one years any pistol or revolver shall be deemed guilty of a misdemeanor and shall upon conviction thereof be fined not more than one hundred dollars or be imprisoned not more than three months, or both. This section shall not apply to fathers, mothers, guardians, administrators, or executors who give to their children, wards, or heirs to an estate, a revolver.

SECT. 8. No person shall sell, deliver, or otherwise transfer a pistol or revolver to a person who is an unnaturalized foreign-born person or has been convicted of a felony against the person property of another, except upon delivery of a written permit to purchase, signed by the selectmen of the town or the mayor or chief of police of the city. Before a delivery be made the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, sign and forward to the chief of police of the city or selectmen of the town one copy thereof and shall retain the other copy for one year. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall be punished by a fine of not more than one hundred dollars or by imprisonment for not more than one year, or by both such fine and imprisonment.

SECT. 9. Whoever, without being licensed as hereinafter provided, sells, advertises, or exposes for sale, or has in his possession with intent to sell, pistols or revolvers, shall be punished by imprisonment for not more than two years.

SECT. 10. The selectmen of towns and the chief of police of cities may grant licenses, the form of which shall be prescribed by the secretary of state, effective for not more than one year from date of issue, permitting the licensee to sell at retail pistols and revolvers subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol or revolver shall be delivered (a) to a purchaser not personally known to the seller or who does not present clear evidence of his identity; nor (b) to an unnaturalized foreign-born person or a person who has been convicted of a felony and has no permit as required by section 8 of this act.

A true record, in duplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which shall be prescribed by the secretary of state and shall be signed by the purchaser and by the person effecting the sale, and shall include the date of sale, the caliber, make, model, and manufacturer's number of the weapon, the name, address, and nationality of the purchaser. One copy of said record shall, within seven days, be forwarded to the selectmen of the town or the chief of police of the city and the other copy retained for one year.

SECT. 11. If any person in purchasing or. otherwise securing delivery of a pistol or revolver shall give false information or offer false evidence of his identity he shall be punished by imprisonment punished, for not more than two years.

SECT. 12. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any pistol or revolver. Possession of any such firearms upon which the same shall have been changed, altered, removed, or obliterated, shall be presumptive evidence that such possessor has changed, altered, removed or obliterated the same. Violations of this section shall be punished by a fine of not more than two hundred dollars or by imprisonment for not more
than one year, or both.

SECT. 13. All licenses heretofore issued within the state permitting the carrying of pistols or revolvers upon the person shall expire at midnight of July 31, 1923.

SECT. 14. This act shall not apply to antique pistols or revolvers incapable of use as such.

SECT. 15. All acts and parts of acts inconsistent herewith are hereby repealed, and this act shall take effect upon its passage.

## **NEW JERSEY**

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 46, Image 46 (1874) available at The Making of Modern Law: Primary Sources. 1871
[Ordinances of Jersey City, NJ, In Relation to the Sidewalks, Public Grounds and Streets in Jersey City,] § 26. No person shall, within this city, fire or discharge any gun, pistol, cannon, or fowling piece or other fire-arms, unless in defense of his property or person; nor let off any squibs, crackers or other fireworks, unless by permission of the city authorities, under the penalty of ten dollars for each and every offense; provided, however, that this section of the ordinance shall not apply to the Fourth of July.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources. 1873
An Ordinance In Relation to the Carrying of Dangerous Weapons. The Mayor and Aldermen of Jersey City do ordain as follows: § 1. That with the exceptions made in the second section of this ordinance, no person shall, within the limits of Jersey City, carry, have or keep on his or her person concealed, any slung-shot, sand-club, metal knuckles, dirk or dagger not contained as a blade of a pocket knife, loaded pistol or other dangerous weapon. § 2. That policemen of Jersey City, when engaged in the performance of police duty, the sheriff and constables of the County of Hudson, and persons having permits, as hereinafter provided for, shall be and are excepted from the prohibitions of the first section of this ordinance. § 3. The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper. All applications for permits shall be made in open court, by the applicant in person, and in all cases the court shall require a

**App. 259**

written endorsement of the propriety of granting a permit from at least three reputable freeholders; nor shall any such permit be granted to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control . Permits shall not be granted for a period longer than one year, and shall be sealed by the seal of the court. The possession of a permit shall not operate as an excuse unless the terms of the same are strictly complied with. In cases of emergency, permits may be granted by a single Justice of the Municipal Court, or by the Chief of Police, to be in force not longer than thirty days, but such permit shall not be renewable. §4. That no person shall, within the limits of Jersey City, carry any air gun or any sword cane. § 5. The penalty for a violation of this ordinance shall be a fine not exceeding fifty dollars, or imprisonment in the city prison not exceeding ten days, or both fine and imprisonment not exceeding the aforesaid amount and time, in the discretion of the court.

1902 N.J. Laws 780, An Act to Require Non-residents to Secure Licenses before Hunting or Gunning within the State of New Jersey and Providing Penalties for Violation of Its Provisions, ch. 263, § 1.
Every non-resident of this state shall be required to take out a license before he shall begin hunting or gunning in this state, which license the several county clerks of this state, and each of them, are hereby authorized and required to issue upon the payment by the applicant of a license fee of ten dollars, and an issuance fee of fifty cents to the county clerk issuing the same; such license shall be a certificate of permission to hunt and gun within the state of New Jersey and shall include the name, age and place of residence and business of the applicant with his description as nearly as may be[.]

1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.
Any person who shall carry any revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor or any knife with a blade of five inches in length or over concealed in or about his clothes or person, shall be guilty of a misdemeanor, and upon conviction thereof shall be punishable by a fine not exceeding two hundred dollars or imprisonment at hard labor, not exceeding two years, or both; provided, however, that nothing in this act shall be construed to prevent any sheriff, deputy sheriff, police officer, constable, state detective, member of a legally organized detective agency or any other peace officer from carrying weapons in the discharge of his duty; nor shall this act apply to any person having a written permit to carry such weapon, firearm, stiletto, razor, dagger or knife, from the mayor of any city, borough or other municipality, having a mayor, or from the township committee or other governing body of any township or other municipality not having a mayor, which permits such officers and governing bodies are hereby authorized to grant; said permits shall be issued at the place of residence of the person obtaining the same and when issued shall be in force in all parts of the state for a period of one year from date of issue unless sooner revoked by the officer or body granting the same; and provided further, that nothing contained herein shall prevent any person from keeping or carrying about his or her place of business, dwelling house or premises any such weapon, firearm, stiletto, dagger, razor or knife, or from carrying the same from any place of purchase to his or her dwelling house, or place of business, or from his or her dwelling house or place of business to any place where repairing is done to have the same repaired and returned; and provided further, that nothing in this act shall be construed to make it unlawful for

**App. 260**

any person to carry a gun, pistol, rifle or other firearm or knife in the woods or fields or upon the waters of this state for the purpose of hunting; a fee of twenty-five cents may be lawfully charged by such officer or body granting such permit.

1914 N.J. Laws 65, Supplement to an Act Entitled "An Act to License Citizens of this State to Hunt and Pursue Wild Animals and Fowl," ch. 43, § 1.
No license to hunt, pursue or kill with a gun or any fire-arm any of the game birds¸ wild animals or fowl of this State, shall be issued to any person under the age of fourteen years, and if any applicant for license shall misrepresent his age he shall be liable to a penalty of twenty dollars, to be sued for and recovered as other penalties under the fish and game laws.

1916 N.J. Laws 275-76, An Act to Prohibit Any Person from Going into the Woods or Fields with a Gun or Other Firearm when Intoxicated, or under the Influence of any Drug or Intoxicating Liquor, ch. 130, §§ 1-2.
1. It shall be unlawful for any person to go into the woods or fields at any time with a gun or firearm when intoxicated or under the influence of any drug or drugs or of intoxicating liquor. 2. Any person violating any of the provisions of this act shall be liable to a penalty of fifty dollars for each offense, to be sued for and recovered in the manner provided and by the persons authorized to sued for and recover penalties. . . . Upon the conviction of any person for violating the provisions of this act, the license to hunt and fish of such person issued to him . . . shall become void, and the justice of the peace, District Court judge, or police magistrate before whom such conviction is had, shall take from the person so convicted the license, mark the same "revoked" and send it to the Board of Fish and Game Commissioners. If such conviction is reversed on appeal the license shall be restored to the defendant. Any license to hunt or fish issued to any person convicted of a violation of this act during the calendar year in which such offense occurred shall be null and void.

1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.
1. The term "machine gun or automatic rifle," as used in this act, shall be construed to mean any weapon, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second. 2. Any person who shall sell, give, loan, furnish or deliver any machine gun or automatic rifle to another person, or any person who shall purchase, have or possess any machine gun or automatic rifle, shall be guilty of a high misdemeanor; provided, the provisions of this section shall not apply to any person who has procured and possesses a license to purchase, have and possess a machine gun or automatic rifle as hereinafter provided for; nor to the authorized agents and servants of such licensee; or to the officers and members of any duly authorized military organization; nor to the officers and members of the police force of any municipality, nor to the officers and members of the State Police force; nor to any sheriff or undersheriff; nor to any prosecutor of the pleas, his assistants, detectives and employees.

1927 N.J. Laws 742
    No retail dealer shall sell or expose for sale, or have in his possession with intent to use, any of the firearms or instruments enumerated in section one hereof without being licensed as hereafter

**App. 261**

provided. The Common Pleas judge of any court of this State, by the Secretary of State, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political-division, pistols or revolvers, subject to the follow-ing conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building or buildings designated in the license.

2. The license or a copy thereof certified by the issuing authority shall be displayed in a conspicuous place on the premises where it can be easily read.

3. No pistol or revolver, or imitation thereof, or placard advertising the sale thereof, shall be placed in any window or in any part of said premises where it can be readily seen from the outside.

4. No pistol or revolver shall be delivered (a) unless the purchaser shall have obtained a permit to purchase days shall have elapsed after the application for the permit; (c) unless the purchaser either is personally known to the seller or shall present evidence of his identity; (d) unless the pistol or revolver shall be unloaded and securely wrapped; provided, however, a permit to cover a pistol or revolver shall, for the purposes of this section and of section nine of this act, be equivalent to a permit to purchase a pistol or revolver. 5. A true record of every pistol shall be made in a book kept for the purpose, the form of which shall be prescribed by the Secretary of State and shall be personally signed by the person effecting the sale, and shall contain the date of the sale, the calibre, make, model, and manufacturer's number of the weapon, and the name, address and permit number of the purchaser.

Any person who shall knowingly sell any of the firearms or instruments enumerated in section one hereof to a minor under the age of eighteen years, or to a person not of sound mind, or to a drug addict, or to a person who has been convicted of committing or attempting to commit any of the crimes enumerated in section two hereof when armed with any of the firearms or instruments enumerated in section one hereof, shall he guilty of misdemeanor.

No person shall sell a pistol or revolver to another person unless the purchaser has first secured a permit to purchase or carry a pistol or revolver. No person of good character and who is of good repute in the community in which he lives, and who is not subject to any of the disabilities set forth in other sections of this act, shall be denied a permit to purchase a pistol or revolver. The judge of any court within this State (except, however, justices of the peace), the sheriff of a county or the chief of police of a city, town or municipality shall upon application issue-to any person qualified under the provisions of this section a permit to purchase a pistol or revolver, and the Secretary of State shall have concurrent jurisdiction to issue such permit in any case, notwithstanding it has been refused by any other licensing official, if in his opinion the applicant is qualified.

Applications for such permits shall be in form as prescribed by the Secretary of State and shall set forth the name, residence, place of business, age, occupation, sex, color, and physical description of the applicant, and shall state whether the applicant is a citizen, and whether he has ever been convicted of any of the crimes enumerated in section two hereof as defined in this act. Such application shall he signed by the applicant and shall contain as reference the names and addresses of two reputable citizens personally acquainted with him. Application blanks shall be obtainable from the Secretary of State and from any other officers authorized to grant such permit.. and may be obtained from licensed retail dealers. The application, together with a fee of fifty cents. shall be delivered or forwarded to the licensing authority who shall investigate the same, and unless food cause for the denial thereof shall appear, shall rant said permit within seven days from the date of the receipt of the application. The permit shall be in form prescribed

**App. 262**

by the Secretary of State and shall be issued to the applicant in triplicate. The applicant shall deliver to the seller the permit in triplicate and the seller shall indorse on the back of each copy the make, model, calibre and serial number of the pistol or revolver, sold tinder the permit. One copy shall then be returned to the purchaser with the pistol or revolver, one copy shall be kept by the seller as a permanent record, and the third copy shall be forwarded by the seller within three days to the Secretary of State. If the permit is not granted, the fee shall be returned to the applicant.

All fees for permits shall be paid into the general fund of the State if the permit be issued by the Secretary of State; to the municipality if the permit be issued by a municipal officer; in all other instances to the general fund of the county wherein the officer acts or the licensee resides or does business.

A person shall not be restricted as to the number of pistols or revolvers he may purchase, if he applies for and obtains permits to purchase the same, but only one pistol or revolver shall be purchased or delivered on each permit.

1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

1. A gangster is hereby declared to be an enemy of the state. 2. Any person in whose possession is found a machine gun or a submachine gun is declared to be a gangster; provided, however, that nothing in this section contained shall be construed to apply to any member of the military or naval forces of this State, or to any police officer of the State or of any county or municipality thereof, while engaged in his official duties. 3. Any person, having no lawful occupation, who is apprehended while carrying a deadly weapon, without a permit so to do and how has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster. 4. Any person, not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster; provided, however, that nothing in this section contained shall in any wise be construed to include any participant or sympathizer in any labor dispute. 5. Any person convicted of being a gangster under the provisions of this act shall be guilty of a high misdemeanor, and shall be punished by a fine not exceeding ten thousand dollars ($10,000.00), or by imprisonment not exceeding twenty years, or both.

## NEW MEXICO

1915 N.M. Law 153, An Act to Amend Sections . . . of Chapter 85 of the Laws of 1912 Relative to the Protection of Game and Fish, ch. 101, §7.

. . . No person shall at any time shoot, hunt or take in any manner any wild animals or birds or game fish as herein defined in this state without first having in his or her possession a hunting license as hereinafter provided for the year in which such shooting, fishing or hunting is done. The presence of any person in any open field, prairie or forest, whether enclosed or not with traps, gun or other weapon for hunting, without having in possession a proper hunting license as herein provided, shall be prima facie evidence of the violation of this section.

## NEW YORK

App. 263

The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775 Inclusive Page 40-41, Image 62-63 (1896) available at The Making of Modern Law: Primary Sources. 1680. Laws of the Colony of New York, Indians. No person shall sell, give or barter directly or indirectly any gun or guns, powder, bullet, shot, lead nor any vessel or burthen, or row boat, canoes only excepted without license first had and obtained under the governors hand and seal to any Indian whatsoever, nor to any person inhabiting out of this Government, nor shall amend or repair any gun belonging to any Indian, nor shall sell any armor or weapons, upon penalty of ten pounds for every gun, armor, weapon, vessel, or boat so sold given or bartered, five pounds for every for every pound of powder, and forty shillings for every pound of shot or lead and proportionately for any greater or lesser quantity.

Laws of the State of New-York, Relating to the City of Schenectady: And the Laws and Ordinances of the Common Council of the City of Schenectady Page 58, Image 58 (1824) available at The Making of Modern Law: Primary Sources. 1824
[Ordinances of the City of Schenectady,] XI. And be it further ordained, That if any person shall fire or discharge any gun, pistol, rocket, cracker, squib or other fire works, in any street, lane or alley, or in any yard, garden or other enclosure, or in any place which persons frequent to walk within the limits aforesaid, without permission of the mayor or one of the aldermen or assistants of this city, such person shall forfeit for every such offence the sum of one dollar…

Elliott Fitch Shepard, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their Authority Page 214-215, Image 214-215 (1881) available at The Making of Modern Law: Primary Sources. 1881
Carrying of Pistols, § 264. Every person except judges of the federal, state and city courts, and officers of the general, state and municipal governments authorized by law to make arrests, and persons to whom permits shall have been issued, as hereinafter provided, who shall have in his possession within the city of New York a pistol of any description concealed on his person, or not carried openly, shall be deemed guilty of a misdemeanor, and shall be punished, on conviction by a fine not exceeding ten dollars, or, in default of payment of such fine by imprisonment not exceeding ten days. § 265. Any person, except as provided in this article, who has occasion to carry a pistol for his protection, may apply to the officer in command at the station-house of the precinct where he resided, and such officer, if satisfied that the applicant is a proper and law abiding person, shall give said person a recommendation to the superintendent of police, or the inspector in command at the central office in the absence of the superintendent, who shall issue a permit to the said person allowing him to carry a pistol of any description. Any non-resident who does business in the city of New York, and has occasion to carry a pistol while in said city, must make application for permission to do so to the officer in command of the station-house of the police precinct in which his so does business, in the same manner as is required by residents of said city, and shall be subject to the same conditions and restrictions.

**App. 264**

Charles Wheeler, By-Laws of the Village of Mechanicville. Adopted by the Trustees October 18, 1881 Page 7, Image 8 (1881) available at The Making of Modern Law: Primary Sources. 1881 [Ordinances of the Village of Mechanicville, NY,] Fires and Their Prevention, Fire Arms and Fire Works, § 20. No person, except on the anniversary of our national independence, and on that day only, at such place or places as the President or Trustees shall permit, shall fire, discharge or set off, in the village, any gun, cannon, pistol, rocket, squib, cracker or fire ball, under the penalty of five dollars for each offense.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources. 1884
Carrying, Using, Etc., Certain Weapons, § 410. A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5. Fourth Edition Page 298, Image 824 (1885) available at The Making of Modern Law: Primary Sources. 1885
An Act to Limit the Carrying and Sale of Pistols and other fire arms in the cities of this state. Chap. 375, § 1. No person under the age of eighteen years shall have, carry or have in his possession in any public street, highway or place in any of the cities of this state, any pistol or other firearms of any kind, and no person shall in such cities sell or give any pistol or other fire-arms to any person under such age. § 2. Any person violating any of the provisions of this act shall be guilty of a misdemeanor, and in all trials or examinations for said offense the appearance of the person so alleged or claimed to be under the age of eighteen years shall be evidence to the magistrate or jury as to the age of such person. § 3. Nothing herein contained shall apply to the regular and ordinary transportation of pistols or fire-arms as articles of merchandise in said cities, or to the carrying of a gun or rifle through a street or highway of any city, with the intent to use the same outside the said city; nor to any person under such age carrying an pistol or firearms under license given by the mayor of said cities; but no license so given shall be in force more than one year from its date; and all such licenses may be revoked at the pleasure of the mayor, and a full complete and public record shall be kept by the mayor of said cities of all such licenses and the terms and date thereof.

Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service

Regulations Page 184, Image 185 (1885) available at The Making of Modern Law: Primary Sources. 1885

Ordinances of [the City of Syracuse,] Gunpowder, Etc. § 1. No person except when on military duty in the public service of the United States, or of this State, or in case of public celebration with permission of the mayor or common council, shall have, keep or possess in any building, or carriage, or on any dock, or in any boat or other vessel, or in any other place within the city limits, gun-powder, giant- powder, nitro-glycerine, dynamite or other explosive material, in quantity exceeding one pound, without written permission from the chief engineer of the fire department. Any person violating any of the provisions of this section shall be liable to a fine of not less than ten nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor more than three months, for each offense.

Mark Ash, The New York City Consolidation Act, as in Force in 1891: With Notes Indicating the Statutory Sources, References to Judicial Decisions, and All Laws Relating to New York City, Passed Since January 1, 1882, Together with an Appendix of the Royal English Colonial Charters of New York City Page 209, Image 233 (Vol. 1, 1891) available at The Making of Modern Law: Primary Sources. 1890

Ordinances of the City of New York, § 455. No person shall manufacture, have, keep, sell, or give away any gunpowder, blasting powder, gun-cotton, niro-glycerine, dualin, or any explosive oils or compounds, within the corporate limits of the city of New York, except in the quantities limited, in the manner, and upon the conditions herein provided, and under such regulations as the board of fire commissioners shall prescribe : and said board shall make suitable provision for the storage and safe keeping of gunpowder and other dangerous and explosive compounds or articles enumerated under this title, beyond the interior line of low water-mark in the city and county of New York. The said board may issue licenses to persons desiring to sell gunpowder or any of the articles mentioned under this section at retail, at a particular place in said city to be named in said license (provided that the same shall not be in a building used in any part thereof as a dwelling unless specially authorized by said license), and persons so licensed may on their premises, if actually kept for sale, persons so licensed may have on their premises, if actually kept for sale, a quantity not exceeding at any one time, of nitro-glycerine, five pounds; of gun-cotton, five pounds of gunpowder, fourteen pounds; blasting powder, twenty-five pounds. . .

1891 N.Y. Laws 129, 177, An Act to Revise the Charter of the City of Buffalo, ch. 105, tit. 7, ch. 2, § 209.

No person other than members of the police force, regularly elected constables, the sheriff of Erie county, and his duly appointed deputies, shall, in the city, carry concealed upon or about his person, any pistol or revolver, or other dangerous weapon or weapons, without first obtaining a permit, as hereinbefore provided; and such permit shall be produced and exhibited by any person holding the same, upon the request of a member of the police force. A violation of any of the provisions of this section shall be a misdemeanor and punishable as such; and all fines imposed and collected for such violations shall be deposited to the credit of said pension fund by the clerk of the court imposing the same.

Rules, By-Laws and Ordinances of the Village of Wappingers Falls. Adopted September 13, 1898 Page 34, Image 32.(Wappingers Falls, 1898) available at The Making of Modern Law: Primary Sources. 1898

Ordinances of Wappinger Falls. Park Ordinances. § 1. No person or persons shall fire or discharge any gun or pistol or other firearm, or any rocket torpedo, or other fireworks of any description, nor send up any balloon, nor throw stones or missiles, nor play ball within the limits of Mesier Park, without the permission obtained of the Park Commissioners at a meeting of the Board.

An Ordinance to regulate the government of parks and other public pleasure grounds of The City of New York, at 600 (1903). 1903
Be it Ordained by the Board of Aldermen of The City of New York, as follows: All persons are forbidden . . .
XXIV. No one shall fire or carry any firearm, fire cracker, torpedo or fire-works, nor make a fire, nor make any oration, nor conduct any religious or other meeting or ceremony within any of the parks, parkways, squares or places in The City of New York under the jurisdiction of the Department of Parks without special permission from the Commissioner having jurisdiction.

1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, §1.
Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: § 1897. Carrying and use of dangerous weapons. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor. . . . Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony.

1911 N.Y. Laws 443, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, §1.
Any person over the age of sixteen years, who shall have in his possession in any city, village or town of this state, any pistol, revolver or other firearm of a size which may be concealed upon the person, without a written license therefor, issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance in such city, village or town, shall be guilty of a misdemeanor.

1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2.
Such chapter is hereby amended . . . § 1914. Sale of pistols, revolvers and other firearms. Every person selling a pistol, revolver or other firearm of a size which may be concealed upon the person whether such seller is a retail dealer, pawnbroker or otherwise, shall keep a register in which shall be entered at the time of sale, the date of sale, name, age, occupation and residence

**App. 267**

of every purchaser of such a pistol, revolver or other firearm, together with the calibre [sic], make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm. Such person shall also, before delivering the same to the purchaser, require such purchaser to produce a permit for possessing or carrying the same as required by law, and shall also enter in such register the date of such permit, the number thereon, if any, and the name of the magistrate or other officer by whom the same was issued. Every person who shall fail to kep a register and enter therein the facts required by this section, or who shall fail to exact the production of a permit to possess or carry such pistol, revolver or other firearm, if such permit is required by law, shall be guilty of a misdemeanor. Such register shall be open at all reasonable hours for the inspection of any peace officer. Every person becoming the lawful possessor of such pistol, revolver or other firearm, who shall sell, give or transfer the same to another person without first notifying the police authorities, shall be guilty of a misdemeanor. This section shall not apply to wholesale dealers.

1923 N.Y. Laws 140–141, An Act to Amend the Conservation Law in Relation to Aliens, ch. 110, § 2.
2. It shall be unlawful for any unnaturalized foreign born person to hunt for, or capture or kill, in this state any wild bird or animal, either game or otherwise, of any description except in defense of person or property or except under a special license issued directly by the conservation commission; and to that end it shall be unlawful for any unnaturalized foreign born person within this state, to own or be possessed of a shotgun or rifle of any make, unless he possess such special license.


## **NORTH CAROLINA**

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation Has Ceased to Exist Page 73, Image 73 (1847) available at The Making of Modern Law: Primary Sources. 1840
Crimes and Punishments, 1840 – 1. – Ch. 30, If any free negro, mulatto, or free person of color shall wear, or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger, or bowie knife, unless he or she shall have obtained a license therefor from the Court of Pleas and Quarter Sessions of his or her county, within one year preceding the wearing, keeping or carrying thereof, he or she shall be guilty of a misdemeanor and may be indicted therefor.

1909 N.C. Sess. Laws 777, Priv. Laws, An Act for a New Charter for the City of Southport, North Carolina, ch. 345, § 23, pt. 14.
[O]n dealers in pistols, guns, dirks, bowie knives, sling shots, brass or metal knuckles or other like deadly weapons, in addition to all other taxes, a license tax not exceeding fifty dollars; on dealers in firecrackers, Roman candles, skyrockets, toy pistols or fireworks of any kind, a tax not exceeding fifty dollars.

1919 N.C. Sess. Laws 397-99, Pub. Laws, An Act to Regulate the Sale of Concealed Weapons in North Carolina, ch. 197, §§1, 5.

**App. 268**

§ 1. That it shall be unlawful for any person, firm, or corporation in this State to sell, give away or dispose of, or to purchase or receive, at any place within the State from any other place within or without the State, without a license or permit therefor shall have first been obtained by such purchaser or receiver from the clerk of the Superior Court of the county in which such purchase, sale, or transfer is intended to be made, any pistol, so-called pump-gun, bowie knife, dirk, dagger or metallic knucksn[sic]. . . § 5. That each and every dealer in pistols, pistol cartridges and other weapons mentioned in section one of this act shall keep and accurate record of all sales thereof, including the name, place of residence, date of sale, etc., of each person, firm, or corporation, to whom or which any and all such sales are made, which said record shall be open to the inspection of any duly constituted State, county or police officer, within this State.

## **NORTH DAKOTA**

1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5.
§ 1. Any person other than a public officer, who carries concealed in his clothes any instrument or weapon of the kind usually known as a black-jack, slung-shot, billy, sand club, sand bag, bludgeon, metal knuckles, or any sharp or dangerous weapon usually employed in attack or defense of the person, or any gun, revolver, pistol or other dangerous fire arm loaded or unloaded, or any person who carries concealed nitro-glycerin, dynamite, or any other dangerous or violent explosive, or has the same in his custody, possession or control, shall be guilty of a felony, unless such instrument weapon or explosive is carried in the prosecution of or to effect a lawful and legitimate purpose. § 2. The possession, in the manner set forth in the preceeding Section, of any of the weapons or explosives mentioned therein, shall be presumptive evidence of intent to use the same in violation of this act. § 3. Penalty – Any person upon conviction of violating the provisions of this Act, shall, in the discretion of the court, be imprisoned in the State Penitentiary nor more than two years, or in the county jail not more than one year, or by a fine of not more than one hundred dollars, or by both such fine and imprisonment. Provided, however, that any citizen of good moral character may, upon application to any district court, municipal, or justice of the court, be granted the permission to carry a concealed weapon upon the showing of reasonable cause. . . . § 5. Emergency. An emergency is hereby declared to exist in that professional criminals are frequently found to carry concealed about their persons, the dangerous weapons or explosives mentioned in Section 1 of this Act. And, whereas, the present law is inadequate to prevent such criminals from carrying concealed weapons or explosives; therefore, this Act shall take effect and be in force from and after its passage and approval.

1923 N.D. Laws 379, 380-82 ch. 266
Sec. 2. Commiting Crime When Armed. If any person shall commit or attempt to commit a crime when armed with a pistol or revolver, and having no permit to carry the same, he shall be in addition to the punishment provided for the crime, be punished by imprisonment for not less than ten years.
Sec. 6. Carrying Pistol Concealed. No person shall carry a pistol or revolver concealed in any vehicle or in any package, satchel, grip, suit case or carry in any way or upon his person, except in his dwelling house or place of business, without a license therefor as hereinafter provided.

**App. 269**

Violations of this section shall be punished by imprisonment for not less than one year, and upon conviction the pistol or revolver shall be confiscated or destroyed.

Sec. 8. Issue of Licenses to Carry. The justice of a court of record, the chief of police of a city or town and the sheriff of a county, or persons authorized by any of them shall upon the application of any person having a bonafide residence or place of business within the jurisdiction of said licensing authority, or of any person having a bona fide residence or place of business within the United States and license to carry a fire arm concealed upon his person issued by the authorities of any State or sub-division of the United States, issue a license to such person to carry a pistol or revolver within this State for not more than one year from date of issue, if it appears that the applicant has good reason to fear an injury to his person or property or for any other proper purpose, and that he is a suitable person to be so licensed . . .

Sec. 10. SALES REGULATED. No person shall sell, deliver, or otherwise transfer a pistol or revolver to a person who he has reasonable cause to believe either is an unnaturalized foreign born person or has been convicted of a felony against the person or property of another, or against the Government of the United States or any State or subdivision thereof, nor in any event shall he deliver a pistol or revolver on the day of the application for the purchase thereof, and when delivered, said pistol or revolver shall be securely wrapped and shall be unloaded. Before a delivery be made the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, sign and forward by registered mail one copy thereof to the Secretary of State, and one copy thereof to the chief of police of the city or town, or the sheriff of the county of which the seller is a resident, and shall retain the other copy for six years. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall be punished by a fine of not less than $100 or imprisonment for not less than one year, or by both such fine and imprisonment.

Sec. 11. DEALERS TO BE LICENSED. Whoever, without being licensed as hereinafter provided, sells, or otherwise transfers, advertises, or exposes for sale, or transfers or has in his possession with intent to sell, or otherwise transfer, pistols or revolvers, shall be punished by imprisonment for not less than two years.

Sec. 12. DEALERS' LICENSES: By WHOM GRANTED, AND CONDmoNs THEREOF.) The duly constituted licensing authorities of any city, town or subdivision of this state, may grant licenses in form prescribed by the Secretary of State, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political subdivision, pistols and revolvers, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

The business shall be carried on only in the building designated in the license.

The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

No pistol or revolver shall be delivered-

(a) On the day of the application for the purchase, and when delivered shall be unloaded and securely wrapped; nor

(b) Unless the purchaser either is personally known to the seller or shall present clear evidence of his identity; nor

**App. 270**

(c) If the seller has reasonable cause to believe that the purchaser either is an unnaturalized foreign born person or has been convicted of a felony against the person or property of another, or against the Government of the United States or any State or subdivision thereof.

A true record, in triplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Secretary of State, and shall be personally signed by the purchaser and by the person affecting the sale, each in the presence of the other, and shall include the date of sale, the caliber, make, model, and manufacturer's number of the weapon, the name, address, occupation, and nationality of the purchaser. One copy of said record shall, within seven days, be forwarded by registered mail to the Secretary of State and one copy thereof to the chief of police of the city or town or the sheriff of the county of which the seller is a resident, and the other copy retained for six years.

No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed in any part of said premises where it can readily be seen from the outside.

1925 N.D. Laws 216–17, Pistols and Revolvers, ch. 174, § 2.
§ 2 Committing Crime When Armed. If any person shall commit, or attempt to commit, a crime when armed with a pistol or revolver, and has no permit to carry the same, he may be punished by imprisonment for not more than ten years, in addition to the punishment provided for the crime. Such imprisonment, if not exceeding one year, to be in the County jail, and if exceeding one year to be in the State Penitentiary.

1931 N. D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.
§ 1. The term "machine gun, sub-machine gun or automatic rifle" as used in this act shall be construed to mean a weapon mechanism or instrument not requiring the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second. § 2. Any person who shall sell, give, loan, furnish or deliver any machine gun, sub-machine gun, automatic rifle of a caliber larger than twenty-two, or a bomb loaded with explosives or poisonous or dangerous gases to another person, or any person who shall purchase, have or possess any machine gun, sub-machine gun, automatic rifle, or a caliber larger than twenty-two or a bomb loaded with explosives or poisonous or dangerous gases, shall be guilty of a felony and shall be punished by imprisonment in the state penitentiary not to exceed ten years, or by a fine of not more than three thousand dollars, or both. Provided, that the provisions of this act shall not apply to any person who has procured and possesses a license to purchase, sell, have or possess a machine gun, sub-machine gun, automatic rifle, of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases, as hereinafter provided for, nor to the authorized agents and servants of such licensee or to the officers and members of any duly authorized military organization, nor to the officers and members of the police force of any municipality, nor to any Sheriff, deputy sheriff, nor any other officer having police powers under the laws of the State.

## OHIO

App. 271

The Act of Incorporation, and the Ordinances and Regulations of the Town of Marietta, Washington County, Ohio Page 17-18, Image 17-18 (1837) available at The Making of Modern Law: Primary Sources. 1823

[Ordinances of Marietta, Ohio; An Ordinance For Preventing the Wanton Use of Fire Arms, Etc., § 1. Be it ordained by the Town of Marietta, in Town meeting legally assembled, and by the authority thereof it is ordained and enacted , That if any person, after this ordinance takes effect, shall discharge or explode, or aid or assist in discharging or exploding any gun powder, from guns, fire arms, or by any other means, within the limits of the town plot of Marietta, where by the quiet of any of the inhabitants may be disturbed, or their lives and safety endangered (unless such firing shall by authorized by permission in writing from the town council then in office, or by the command of some military officer in discharge of his duty as such,) the person so offending may be complained of before any justice of the peace for the town and upon conviction, shall be fined by such justice not than less one dollar (sic), nor more than five dollars for the first offence, and for the second and all subsequent offences against this ordinance, such person shall be fined not less than five, nor more than ten dollars, and pay all costs, to be collected as other penalties by law are. . .

An Act Incorporating the City of Cincinnati: And a Digest of the Ordinances of Said City, of a General Nature, Now in Force, with an Appendix Page 57-58, Image 58-59 (1835) available at The Making of Modern Law: Primary Sources. 1835

Ordinances of the City of Cincinnati, An Ordinance to Regulate the Keeping of Gunpowder, § 1. Be it ordained by the City Council of the City of Cincinnati, That no person or persons in the city of Cincinnati, shall keep, have, or possess, in any house, warehouse, shop, shed, or other building, nor in any street, side walk, lane, alley, passage, way, or yard, nor in any cellar, wagon, cary, or carriage, of any kind whatever; nor in any other place, within said city, Gun Powder, in any way or manner, other than as provided for by this ordinance; nor in any quantity exceeding twenty-five pounds, to be divided into six equal parts. § 2. Be it further ordained, That it shall not be lawful for any person or persons to sell gun powder by retail within said city, without having first obtained a license from the city council for that purpose; and every person obtaining a grant for a license to sell gun powder, shall receive a certificate of such grant from the city clerk, and pay into the city treasury, a sum not exceeding one hundred dollars, nor less than ten dollars; besides fifty cents to the Mayor for issuing the same; Provided that license be granted to not more than four persons in any one ward, and so that they be separated from each other, by at least two entire blocks or squares; and all applications for such license, shall be in writing, stating the situation where such gunpowder is to be kept. § 3. Be it further ordained, That every person who obtains a license as aforesaid to retail gun powder, shall keep the same in tin canisters, well secured with good and sufficient covers; and shall place on the store or building containing the same, a sign with the words, LICENSED TO SELL GUN POWDER, Provided that nothing in this ordinance shall be so construed to prevent any person from carrying gun powder through the streets in its exportation, or to some place of deposit, without the limits of the corporation, if the same be put up in tight and well secured kegs or vessels. § 4. Be it further ordained, That it shall be the duty of the city marshal and his deputies, and any of the fire wardens, on any day, (Sundays excepted) between sun rising and setting, to enter into any house or building, or any other place within said city, where gun powder is kept or suspected to be kept, and examine the premises, and if they or either of them shall find any gun powder, contrary to the provisions of this ordinance, they or either of them shall seize such powder, together with

**App. 272**

the vessel containing the same, in the name of the city of Cincinnati; and the officer making such seizure, if he be other than the marshal, shall forthwith report such seizure to the marshal, who shall immediately take charge of the gun powder so seized, as if in case of seizure by himself; and in either case he shall immediately take charge of the gun powder so seized; to be conveyed to some safe place of deposit without the limits of the city. And the marshal shall, moreover, forthwith report such seizure to the mayor, with the name of the person in whose possession such gun powder was seized, or with the name of the owner, if his name be known, whereupon the mayor shall issue a citation against the owner, if known and within his jurisdiction, and if not, then against the person whose possession such gunpowder was seized, citing the defendant to appear on a day to be named in such citation, and show cause, if any he have, why the gun powder so seized should not be forfeited to the city, and a fine imposed agreeably to the provisions of this ordinance; upon which citation proceedings shall be had as in other cases upon the city ordinances, and if a final judgment of forfeiture be pronounced against the gun powder so seized, the marshal shall proceed to sell and dispose of the same for the benefit of said city, after having given three days notice of such sale, by advertisement in at least three public places in the city, and at one of the market houses on market day, to the highest bidder; and the net proceeds thereof shall be credited on the execution against the person fined for keeping the same contrary to the provisions of this ordinance: Provided, that, of any lot of powder seized according to the provisions of this ordinance, not more shall be sold by the marshal than will pay the fine and costs of suit and expense attending the seizure.

George W. Malambre, Laws and General Ordinances of the City of Dayton, Containing the Laws of the State upon Municipal Government; All the General Ordinances in Force August 30th, 1855; a List of the Officers of the City under the New Act of Incorporation, Together with the Amount of Taxes Levied in Each Year for General and Special Purposes, since 1851, and the Total Amount in Each Year, of Property Subject to Taxation Page 214, Image 219 (1855) available at The Making of Modern Law: Primary Sources. 1855
Ordinances of the City of Dayton. Offenses. § 38. Sec. XXXIX. If any person, or persons, shall fire any cannon, gun, or other firearms, within the bounds of the building lots, or cemetery ground in this city, or within one hundred yards of any public road, within this corporation, except by permission of council, and except in proper situations for firing salutes, or by command of a military officer in performance of military duty, every person, so offending, on conviction thereof, shall pay a fine not exceeding ten dollars, and costs.

W. H. Gaylord, Standing Rules of Order of the Cleveland City Council: With a Catalogue of the Mayors and Councils of the City of Cleveland, from Its Organization, April, 1836, to April, 1871, and Officers of the City Government for 1872 Page 101, Image 124 (1872) available at The Making of Modern Law: Primary Sources. 1856
[Ordinances of the City of Cleveland,] An Ordinance to Prevent the Firing of Guns and Fire-works, § 1. Be it ordained by the City Council of the City of Cleveland, That no person shall fire any cannon, gun, rifle, pistol, or fire-arms of any kind, or fire or explode any squib, rocket, cracker, Roman candle, or other combustible fire-works within the city. § 2. This ordinance shall not apply to any military company, when drilling under command of any officer thereof, or to the use of fire-arms in the lawful defense of the person, family or property of any person, or to the killing of any dog whose owner or possessor has not complied with the provisions of the ordinance relating to dogs. § 3. The board of city improvements may, at its discretion, give

**App. 273**

permission to any person or persons to discharge fire-arms or fire-works on the fourth day of July; such permission may be given through any public paper of the city, or otherwise. § 4. That any person violating any provision of this ordinance shall, on conviction thereof, be fined in any sum not exceeding twenty dollars.

1878 Ohio Laws 199, An Act to Amend, Revise, and Consolidate the Statutes Relating to Municipal Corporations, to Be Known as Title Twelve, Part One, of the Act to Revise and Consolidate the General Statutes of Ohio, div. 3, ch. 3, § 1, pt. 14.
To regulate the transportation and keeping of gunpowder, and other explosive and dangerous combustibles, and to provide or license magazines for the same.

M. Augustus Daugherty, Supplement to the Revised Statutes of the State of Ohio Containing All the Statutes Amendatory of or Supplementary to the Revised Statutes, Together with the Miscellaneous Acts, General or Permanent in Their Nature, In Force January 1, 1884. 3d ed. Edited by James M. Williams Page 633, Image 641 (1884) available at The Making of Modern Law: Primary Sources. 1884
Licenses, § 24. All vendors of gunpowder shall pay a license fee of fifteen (15) dollars per annum. All keepers or owners of gunpowder magazines shall pay a license fee of one hundred (100) dollars per annum.

1889 Ohio Laws 164, An Act to Amend Section 2669 of the Revised Statutes, as Amended April 22, 1885, § 1.
The council of the city or village may provide by ordinance for licensing all exhibiters of shows or performances of any kind, not prohibited by law, hawkers, peddlers, auctioneers of horses and other animals on the highways or public grounds of the corporation, venders [sic] of gun powder and other explosives, taverns and houses of public entertainment, and hucksters in the public streets or markets, and in granting such license, may extract and receive such sum of money as it may think reasonable[.]

1900 Ohio Laws 730, An Act to Provide a License on Trades, Business and Professions Carried on . . . , §§24-25.
§ 24. All keepers or owners of gun powder magazines shall pay a license fee of one hundred dollars ($100) per annum, and shall notify the chief of the fire department, in writing, of the place where the same is kept or stored; but no license shall be issued under this section without the consent of the mayor. § 25. All keepers of shooting galleries shall pay a license fee of fifty dollars ($50) per annum, or for a less period of one year at a rate of ten dollars ($10) per month, no license to be issued for a less period than one month.

1902 Ohio Laws 23, Extraordinary Sess.,  An Act to Provide for the Organization of Cities and Incorporated Villages . . . and to Repeal All Sections of the Revised Statutes Inconsistent Herewith, § 7, pt. 11.
To regulate the transportation, keeping and sale of gunpowder and other explosives or dangerous combustibles and materials and to provide or license magazines for the same.

1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

**App. 274**

That § 12819 of the General Code be supplemented . . . to read as follows:  Definitions. § 12819-3. For the purpose of this act, a machine gun, a light machine gun or a sub-machine gun shall be defined as any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading. Automatically as above used means that class of firearms which, while the trigger on the firearm is held back continues to fire successive shots. Semi-automatically means that class of firearm which discharges one shot only each time the trigger is pulled, no manual reloading operation being necessary between shots. Machine gun permit; application; bond or applicant; exceptions. § 12819-4. No person shall own, possess, transport, have custody of or use a machine gun, light machine gun or sub-machine gun, unless he first procures a permit therefor from and at the direction of the adjutant general of Ohio, who shall keep a complete record of each permit so issued. A separate permit shall be obtained for each gun so owned, possessed or used. The adjutant general shall require each applicant for such permit to give an accurate description of such weapon, the name of the person from whom it was or is to be obtained, the name of the person or persons to have custody thereof and the place of residence of the applicant and custodian. Before obtaining such permit each applicant shall give bond to the state of Ohio, to be approved by the adjutant general in the sum of five thousand dollars, conditioned to save the public harmless by reason of any unlawful use of such weapon while under the control of such applicant or under the control of another with his consent; and any person injured by such improper use may have recourse on said bond. Provided, however, that this section shall not affect the right of the national guard of Ohio, sheriffs, regularly appointed police officers of incorporated cities and villages, regularly elected constables, wardens and guards of penitentiaries, jails, prisons, penal institutions or financial institutions maintaining their own police force and such special officers as are now or may be hereafter authorized by law to possess and use such weapons when on duty.  Any person who owns, possesses or has custody of a machine gun, light machine gun or sub-machine gun at the time when this section shall become effective, shall have thirty days thereafter in which to comply with the provisions of this section. Penalty for possession, transportation, etc., without permit. § 12819-5. Whoever owns, possesses, transports or has custody of or uses a machine gun, light machine gun or sub-machine gun without a permit, as provided by section 12819-4 of the General Code, or whoever having such permit, uses or consents to the use by another of such weapon in an unlawful manner, shall be guilty of a felony and upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than ten years. [War trophies excepted].

## OKLAHOMA

General Laws Relating to Incorporated Towns of Indian Territory Page 43, Image 39 (1890) available at The Making of Modern Law: Primary Sources. 1890
Revised Ordinances of the Town of Checotah, [An Ordinance Requiring Persons Engaged in Certain Businesses or Avocations to Procure a License for so Doing and Providing of Penalty for Failure so to do, § 1. That the licenses hereinafter named shall be fixed, imposed and collected at the following rates and sums, and it shall be unlawful for any person or persons to exercise or pursue any of the following avocations or businesses within the corporate limits of Checotah without having first obtained a license therefor from the proper authority, having paid for the same in lawful money of the united States as hereinafter provided,] 29th. Pistol or shooting Gallery – For each and every pistol and shooting gallery, per month, five dollars.

**App. 275**

**OREGON**

Charter of the City of Portland, Street and Fire Department Laws, Ordinances, Regulations &C. Page 205-206, Image 206-207 (1872) available at The Making of Modern Law: Primary Sources. 1868
[Concerning Offences and Disorderly Conduct, § 2. That any person or persons who shall fire any pistol, gun or rifle, or any other species of fire-arms within the following limits: the Willamette river on the east and (10) Tenth Street on the west, Caruther's Addition on the south nd F Street on Couch's Addition on the north, shall on conviction thereof before the Recorder, be subject to a penalty of not less than five nor more than fifty dollars, or imprisonment, at the discretion of the Recorder, not exceeding twenty days. Provided that the Marshal shall permit upon the national holidays and other days of public celebration, any appropriate display of fire-arms and other instruments named in this section.]

Charter of the City of Portland, Street and Fire Department Laws, Ordinances, Regulations &C. Page 225-227, Image 226-228 (1872) available at The Making of Modern Law: Primary Sources. 1872
Ordinances of the City of Portland, To Regulate the Storage and Sale of Gunpowder, and Other Explosive Materials, § 1. No person shall keep for sale any gunpowder in any building, store or place in the City of Portland, without having first obtained a license therefor. § 2. The license for selling gunpowder shall be five dollars per quarter, to be issued as other licenses are issued under the provisions of Ordinance 984, entitled "An Ordinance to impose and regulate licenses in the City of Portland." § 3. No person shall receive, keep or store, or aid or assist any person in receiving, keeping or storing gunpowder in a larger quantity than five pounds, in or into any building, or upon any premises, unless the person receiving, keeping or storing the same is duly licensed to sell gunpowder. § 4. No person or persons duly authorized to sell gunpowder, as hereinbefore provided, shall keep, store, or have in any one place more than twenty five pounds of powder, which shall be kept in any air-tight metallic vessel marked with the word "Gunpowder," in plain Roman letters, not less than three inches in height, and of proportionate width, which vessel shall be placed or kept at all times, conspicuously in view near the entrance of the premises where kept, and convenient for removal therefrom. § 5. Upon the front of every building or premises where powder is kept in a conspicuous place a sign with the word "gunpowder" painted thereon in Roman letters, not less than three inches in height. § 6. No person shall convey, cause to be conveyed, or assist in conveying in any vehicle and gunpowder, unless the same shall be securely packed in close packages, nor unless such packages shall be securely covered while on the vehicle. § 7. No vessel shall be allowed to remain at any wharf more than twenty-four hours with gunpowder on board, except such as may be kept for ship's use, and if such vessel shall be at the wharf overnight, a watchman shall be kept on duty on board all night. All gunpowder landed or placed on a wharf, sidewalk, street or public way for forwarding or shipment shall be forwarded or shipped immediately after it shall be so landed or placed. § 8. The provisions of this Ordinance shall be deemed to apply to "giant powder" "gun cotton" or any other explosive substance having an explosive power equal to that of ordinary gunpowder. § 9. Any person or persons violating any of the provisions of this ordinance, shall be deemed guilty of a misdemeanor, and on conviction before the Police Judge, shall be fined not less than ten nor more than one hundred dollars, or by imprisonment in the city jail not less than

**App. 276**

two nor more than twenty days, or both, at the discretion of the Police Judge. § 10. The officers of the Fire Department and Police are directed to see that the provisions of this Ordinance are enforced, and to make complaint before the Police Judge for the violation of its provisions.

J.C. Moreland, Charter and Ordinances of the City of Portland and Table of Grades: Together with the Rules of Order, Reports of officers, etc. Page 207, Image 212 (1879) available at The Making of Modern Law: Primary Sources. 1879
Ordinances [of the City of Portland], Concerning Offenses and Disorderly Conduct, § 2. The City of Portland does ordain as follows… That any person or persons who shall fire any pistol, gun or rifle, or any other species of fire-arms, within the corporate limits of the city, shall, on conviction thereof before the Police Court, be fined not less than five dollars nor more than fifty dollars: Provided, That all circumstances of necessity may be plead as a defense to the offense described in this section; and, provided further, that the Chief of Police may permit upon the national holidays and other days of public celebration any appropriate display of firearms named in this section.

The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order Page 259, Image 261 (1898) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oregon | 1898
An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.
It shall be unlawful for any person to carry any sling shot, billy, dirk, pistol or any concealed deadly weapon or to discharge any firearms, air gun, sparrow gun, flipper or bean shooter within the corporate limits of the city, unless in self-defense, in protection of property or an officer in the discharge of his duty; provided, however, permission may be granted by the mayor to any person to carry a pistol or revolver when upon proper representation it appears to him necessary or prudent to grant such permission.

1913 Or. Laws 497
Section 1. It shall be unlawful for any person, firm or corporation to display for sale at retail any pocket pistol or revolver or to sell at retail, barter, give away or dispose of the same to any person whomsoever, excepting a policeman, member of the militia or peace officer of the State of Oregon, unless the purchaser or person attempting to procure the same shall have a permit for the purpose of procuring such pocket pistol or revolver signed by the municipal judge or city recorder of the city or county judge or a justice of the peace of the county wherein such person resides.
Section 2. Provided, that no judge, city recorder or justice of the peace shall issue such permit until said applicant has furnished him with an affidavit from at least two reputable freeholders as to the applicant's good moral character.
Section 3. All persons, firms or corporations engaged in the retail sale of pocket pistols or revolvers shall keep a record of the sale of such pocket pistols or revolvers by registering the name of the person or persons and the number of the pocket pistol or revolver and shall transmit same to the sheriff of the county in which purchase is made on the 1st and 15th day of each calendar month.

1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 9.

Section 1. No person shall carry in any city, town, or municipal corporation of this State any pistol, revolver or other firearm concealed upon his or her person, or of a size which may be concealed upon his or her person, without a license or permit therefor, issued to him or her by a chief of police or sheriff of such city, town or municipal corporation, or in such manner as may be prescribed by ordinance of such city, town or municipal corporation. This section, however, shall not apply to sheriffs and their deputies, constables, marshals, police officers or any other duly appointed peace officers, nor to any person or persons summoned by such officers to assist in making arrest or preserving the peace while said person or persons are engaged in assisting such officers; nor to duly authorized military organizations when parading, nor to members thereof when going to and from places of meeting of their respective organizations.

Section 3-A. Any person who violates the provisions of Section 1, Section 2, or Section 3 of this Act, shall be fined in a sum no greater than $100.00, or be imprisoned in the county jail for a term no longer than three months, or by both such fine and imprisonment.

Section 4. Any person who violates the provisions of Section 1, Section 2 or Section 3 of this Act, who theretofore has once been convicted of a violation of any of said sections, is guilty of a misdemeanor, and upon conviction thereof shall be imprisoned in a county jail or reformatory for not less than thirty days nor for more than one year.

Section 4-A. Any person who violates the provisions of Section 1, Section 2 or Section 3 of this Act, who theretofore has more than once been convicted of a violation of any of said sections, is guilty of a felony, and shall be punished by imprisonment in the State prison for a term not exceeding three years.

Section 4-B. Any person who violates any of the provisions of Section 1, Section 2 or Section 3 of this Act, who theretofore has been convicted of a felony, upon conviction thereof shall be imprisoned in the penitentiary of this State for a period not exceeding five years.

Section 4-C. For the purposes of this Act any pistol, revolver, or other firearm of a size which may be concealed upon his or her person shall be deemed a dangerous weapon.

Section 9. It shall be lawful for the sheriff of any county, chief of police, city or town marshal, or other head of the police department of any city, town or other municipal corporation of this State, upon proof before him that the person applying therefor is of good moral character, and that proper cause exists for the issuance thereof, to issue to such person a license for one year, to have and carry concealed a pistol, revolver or other firearm; provided, however, that no such license shall be issued to any person under the age of twenty-one years.

The person obtaining a permit to carry a concealed pistol or revolver shall pay to the officer issuing such permit the sum of One Dollar. Said license for carrying a concealed pistol or revolver is revocable at any time and must be immediately surrendered on demand. The license while in force entitles the holder to carry the said arm in any county in the State of Oregon.

1925 Or. Laws 468, 469-471

Section 5. Except as otherwise provided in this act, it shall be unlawful for any person within this state to carry concealed upon his person or within any vehicle which is under his control or direction any pistol, revolver or other firearm capable of being concealed upon the person without having a license to carry such firearm, as hereinafter provided in section 8 hereof. Any

**App. 278**

person who violates the provisions of this section shall be guilty of a misdemeanor, and if he has been convicted previously of any felony, or of any crime made punishable by this act, he is guilty of a felony. This section shall not be construed to prohibit any citizen of the United States, over the age of eighteen years, who resides or is temporarily sojourning within this state, and who is not within the excepted classes prescribed by section 2 hereof, from owning, possessing or keeping within his place of residence or place of business any pistol, revolver or other firearm capable of being concealed upon the person, and no permit or license to purchase, own, possess or keep any such firearm at his place of residence or place of business shall be required of any such citizen. Firearms carried openly in belt holsters shall not be deemed to be concealed within the meaning of this section.

## PENNSYLVANIA

Charter To William Penn, And Laws Of The Province Of Pennsylvania, Passed Between The Years 1682 And 1700 Page 32, Image 37 (1879) available at The Making of Modern Law: Primary Sources. 1676
Laws of the Duke of York, Indians (1676). No person shall sell give or barter directly or indirectly any gun or guns powder, bullet, shot, lead nor any vessel of burthen, or row boat canoes only excepted without license first had and obtained under the Governor's hand and Seal, to any Indian whatsoever, nor to any person inhabiting out of this government nor shall amend or repair any gun belonging to any Indian, nor shall sell any armor or weapons, upon penalty of ten pounds for every gun, armor, weapons, vessel or boat, so sold given or bartered, five pounds for every pound of shot or lead and proportionally for any greater or lesser quantity.

Pennsylvania Archives. Selected And Arranged From Original Documents In The Office Of The Secretary Of The Commonwealth, Conformably To Acts Of The General Assembly, February 15, 1851, & March 1, 1852 Page 160, Image 162 (1852) available at The Making of Modern Law: Primary Sources. 1713
Pennsylvania Archives 1713, The Act for the Better Government of the City of Philadelphia (1713), This Act inflicts 5s penalty on persons riding a gallop and 10s for persons trotting, with Drays or their Teams in the streets, and 5th for suffering a Dog or a Bitch going at large; or firing a Gun without license, or if a Negro be found in any disorderly practices or other Misbehaviors may be whipped 21 lashes for any one offence or committed to prison, which words "other misbehaviors," are very uncertain and give very arbitrary power where the punishment is great. [(Summary of Statute from Archive compilation)].

Act of 26th August 1721. 1721
[An Act of 9th of February, 1750-51, § 1. If any person or persons whatsoever, within any county, town or within any other town or borough in this province, already built and settled, or hereafter to be built and settled , not hitherto restricted nor provided for by our laws, shall set on fire their chimneys to cleanse them, or shall suffer them or any of them to take fire, and blaze out at the top, or shall fire any gun or other fire arm, or shall make or cause to be made, or sell or utter, or offer to expose to sale, and squibs, rockets, or other fire works, or shall cast, throw or fire any squibs, rockets, or other fire works within any of the said towns or boroughs without the governor's special license for the same, every such person or persons so offending shall be subject to the like penalties and forfeitures, and be recovered in like manner, as in and by an act,

**App. 279**

passed in the eighth year of the reign of king George the first, entitled 'An act for preventing accidents that may happen by fire are directed to be levied and recovered.]

John C. Lowber, Ordinances of the Corporation of the City of Philadelphia; to Which are Prefixed, the Original Charter, the Act of Incorporation, and Other Acts of Assembly Relating to the City; with an Appendix, Containing the Regulation of the Bank of the River Delaware, the Portraiture of the City, as Originally Laid Out by the Proprietor, &c. &c. Page 15-16, Image 18-19 (1812) available at The Making of Modern Law: Primary Sources. 1721
[An Act for Preventing Accidents that may Happen by Fire, § IV. And whereas much mischief may happen by shooting of guns, throwing casting and firing of squibs, serpents, rockets, and other fire-works, within the city of Philadelphia, if not speedily prevented: Be it therefore enacted, That if any person or persons, of what sex, age, degree or quality soever, from and after publication hereof, shall fire any gun or other fire-arms, or shall make, or cause to be made, or sell or utter, or offer to expose to sale, any squibs, rockets or other fire works, or shall cast, throw or or fire, any squibs, rockets, or other fire works, within the city of Philadelphia, without the governor's special license for the same, of which license due notice shall first be given to the mayor of the said city, such person or persons so offending, and being thereof convicted before any one justice of the peace of the said city, either by confession of the party so offending, or by the view of any of the said justices, or by the oath or affirmation of one or more witnesses, shall for every such offence forfeit and pay the sum of five shillings; one half to the use of the poor of the said city, and the other half to the use of him or them who shall prosecute, and cause such offender to be as aforesaid convicted; which forfeitures shall be levied by distress and sale of the offenders goods as aforesaid; and for want of such distress, if the offender refuse to pay the said forfeiture, he shall be committed to prison, for every such offence the space of two days without bail or main-prize; Provided, that such conviction be made within ten days after such offence committed [ and if such offender be a negro or Indian slave, he shall instead of imprisonment be publically whipped, at the discretion of the magistrate.]

1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries
That if any persons or persons whatsoever, within any county town, or within any other town or borough, in this province, already built and settled, or hereafter to be built and settled . .. shall fire any gun or other fire-arm, or shall make or cause to be made, or sell or utter, or offer or expose for sale, any squibs, rockets or other fire-works, … within any of the said towns or boroughs without the Governor's special license for the same, every such person or persons, so offending shall be subject to the like penalties and forfeitures, and to be recovered in like manner, as in and by an act, passed in the eighth year of the reign of King George the first, entitled, An act for preventing accidents that may happen by fire, are directed to be levied and recovered.

Ordinances of the Corporation of the District of Southwark and the Acts of Assembly Relating Thereto Page 49, Image 47 (1829) available at The Making of Modern Law: Primary Sources. 1750
[Ordinances of the District of Southwark,] An Act for the More Effectual Preventing [of] Accidents, etc. § 1. Be it enacted, That if any person shall fire any gun or other fire-arm, or shall make, or cause to be made, or sell or utter, or offer to expose to sale, any squibs, rockets or other

**App. 280**

fire-works, or shall cast, throw or fire any squibs, rockets or other fire-works, within any of the said towns or boroughs, without the Governor's special license for the same, every such person or persons, so offending, shall be subject to the like penalties and forfeitures, and to be recovered in like manner, as in and by an act, passed in the eighth year of the reign of King George the first, entitled, " An Act for Preventing Accidents, Etc

1763 Pa. Laws 319, An Act to Prohibit the Selling of Guns, Gunpowder or Other Warlike Stores to the Indians, § 1.
If any person or persons whatsoever shall directly or indirectly give to, sell barter or exchange with any Indian or Indians whatsoever any guns, gunpowder, shot, bullets, lead or other warlike stores without license . . . every such person or persons so offending, being thereof legally convicted . . . shall forfeit and pay the sum of five hundred pounds . . . and shall be whipped with thirty-nine lashes on his bare back, well laid on, and be committed to the common gaol(jail) of the county, there to remain twelve months without bail or mainprise.

An Act of Incorporation for that Part of the Northern Liberties, Lying between the Middle of Sixth Street and the River Delaware, and between Vine Street and Cohocksink Creek, with Ordinances for the Improvement of the Same Page 51, Image 52 (1824) available at The Making of Modern Law: Primary Sources. 1824
[An Ordinance for the Suppression of Nuisance, and for the regulation of drivers of carriages and horses, in and through the streets, lanes and alleys, within the incorporated part of the township of the Northern Liberties, and for enforcing useful regulations therein.] § 8. And be it further ordained and enacted by the authority aforesaid, That no person or persons shall fire, or discharge any cannon, or piece of artillery, or small arms, or prove any pistol, gun, musket barrels, or cannon, or illuminate, or cause to be illuminated, any house within the regulated parts, incorporated as aforesaid, in said township, without permission from the president of the board of commissioners, under the penalty of forfeiting and paying for every piece of cannon or other artillery, or small arms, or pistol, gun, or musket barrel so fired, or house so illuminated, the sum of two dollars.

1903 Pa. Laws 178, An Act Requiring non-resident hunters, and unnaturalized, foreign born, resident-hunters, to procure a license before hunting in the Commonwealth … §§1 and 2
§ 1. . . . every non-resident and every unnaturalized foreign-born resident of this Commonwealth shall be required to take out a license from the treasurer of the county in which he proposes to hunt. . . § 2. Possession of a gun, in the fields or in the forests or on the waters of this Commonwealth, by an unnaturalized, foreign-born resident or a non-resident of this Commonwealth, without having first secured the license required by this act, shall be prima facie evidence of a violation of its provisions; and any person so offending shall be liable to a penalty of twenty-five dollars for each offense. . .

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: §§1 and 2
§ 1. Be it enacted, etc., That the term "machine gun" as used in this act, shall mean any firearm that fires two or more shots consecutively at a single function of the trigger or firing device. § 2. It shall be unlawful for any person, copartnership, association or corporation to sell, or give, or transfer, any machine gun to any person, copartnership, association or corporation within this

**App. 281**

Commonwealth; and it shall be unlawful for any person, copartnership, association, or corporation to purchase, own or have in possession any machine gun. Any person violating any of the provisions of this section shall be guilty of a felony, and, on conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding five years. § 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall, upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence. § 4. Nothing contained in this act shall prohibit the manufacture for, and sale of, machine guns to the military forces of the United States, or of the Commonwealth of Pennsylvania, or to any police department of this Commonwealth, or of any political subdivision thereof, nor to the purchase or possession of machine guns by such governments and departments; and nothing contained in this act shall prohibit any organization, branch, camp or post of veterans, or any veteran of any war in which the United States was engaged, from owning and possessing a machine gun as a relic, if a permit for such ownership or possession has been obtained from the sheriff of the county, which permit is at all times attached to such machine gun. The sheriffs of the several counties are hereby authorized, upon application and the payment of a fee of one dollar, to issue permits for the ownership and possession of machine guns by veteran and organizations, branches, camps or posts of veterans and organizations, branches, camps or posts of veterans, upon production to the sheriff of such evidence as he may require that the organization, branch, camp or post is a bona fide organization of veterans, or that any such veteran applicant is a veteran of good moral character and reputation, and that the ownership and possession of such machine gun is actually desired as a relic.

1931 PA. Laws 498, No. 158
Sec. 4. No person who has been convicted in this Commonwealth or elsewhere of a crime of violence shall own a firearm, or have one in his possession or under his control.
Sec. 5. No person shall carry a firearm in any vehicle or concealed on or about his person, except in his place of abode or fixed place of business, without a license therefor as hereinafter provided.

## **RHODE ISLAND**

The Charter and Ordinances of the City of Providence, Together with the Acts of the General Assembly Relating to the City Page 89-96, Image 89-96 (1854) Available at The Making of Modern Law: Primary Sources. 1821
An Act Regulating the Storage, Safe Keeping and Transportation of Gunpowder in the Town of Providence, (1821) § 2. And be it further enacted, That is shall not be lawful for any person or persons to sell any gunpowder which may at the time be within the town of Providence in any quantity, by wholesale or retail, without first having obtained from the town council of said town a license to sell gunpowder; and every such license shall be written or printed, and signed by the president of said council or their clerk, on a paper upon which shall be written or printed a copy of this act; and every such license shall be in force for one year from the date thereof, unless

annulled by said council, and no longer; but such license may, prior to the expiration of that time, be renewed, by endorsement thereon, for a further term of one year, and so from year to year: provided, always, that the said town council may annul any such license, if in their opinion the person or persons licensed have forfeited the right of using the same by any violation of the law relative thereto; and every person who shall receive a license as aforesaid shall pay therefor the sum of five dollars, and on having the same renewed shall pay therefor the sum of one dollar, which shall be paid to the clerk of said council, for their use, for the purpose of defraying the expense of carrying this act into execution. § 3. And be it further enacted, That any person or persons who shall keep, have, possess or transport any gunpowder within the town of Providence, contrary to the provisions of this act, or who shall sell any gunpowder therein, without having a license therefor, then in force, shall forfeit and pay a fine of not less than twenty dollars, and not exceeding five hundred dollars, for each and every offence; and if any gunpowder kept contrary to the provisions of this act shall explode in any shop, store, dwelling-house, ware-house or other building, or in any place in said town, the occupant, tenant or owner of which has not a license in force to keep and sell gunpowder therein, or which gunpowder shall have been kept in a manner contrary to the terms and conditions of such license, such occupant tenant or owner shall forfeit and pay a fine of not less than twenty dollars nor more than five hundred dollars. . . § 6. And be it further enacted, That the said firewards, or any of them, may enter the store or place of any person or persons licensed to sell gunpowder, to examine and ascertain whether the laws relating thereto are strictly observed; and also whenever there may be an alarm or fire; and in such last case may cause the powder there deposited to be removed to a place of safety, or to be destroyed by wetting or otherwise, as the exigency of the case may require; and it shall be lawful for any one or more of the firewards aforesaid to enter any dwelling house, store, building or other place in said town to search for gunpowder which they may have reason to suspect to be concealed or unlawfully kept therein; first having obtained from some justice of the peace of said town a search warrant therefor; which warrant any one of the justices of said town is hereby respectively authorized to issue, upon the complaint of such fireward or firewards, supported by his or their oath or affirmation. . . And be it further enacted, That all persons who wish have a license to keep and sell gunpowder within the town shall make application to the town council in writing, stating the place of business and whether they wish to sell by wholesale or retail, or both; and to each person or firm who may be approbated, a certificate of license shall be granted, on payment of the fee established by law. § 14. And be it further enacted, That every person or firm who may be licensed to sell gunpowder by retail, shall be allowed to keep in the place or building designated in the license, twenty-five pounds of gunpowder, and no more, at one time, which shall always be kept in tin or copper canisters, capable of containing no more than twelve and a half pounds each with a small aperture at the top, and a tin or copper cover thereto. § 15. And be it further enacted, That every person or firm who may be licensed to sell gunpowder by wholesale, shall provide and keep a tine or copper chest, with two handles and a tight cover, furnished with a hinge, and secured with a padlock, all of tin or copper chest, with two handles and a tight cover furnished with a hinge and secured padlock, all of tin or copper; such chest shall always be kept on the lower floor, on the right side of and close to the principal door or entrance from the street into the building so licensed, except when otherwise designated by the council and shall always be kept locked, except when powder is put in or taken out; and such person or firm, so licensed shall be allowed to deposit and keep, in such tin or copper chest, a quantity of gunpowder not exceeding four casks of twenty-five pounds each; the heads of each cask not to be opened, and each cask to be kept in a strong

**App. 283**

leather bag, closely tied and marked as aforesaid. § 16. And be it further enacted, that every person or firm licensed to keep and sell gunpowder as aforesaid, by wholesale or retail, shall have and keep a signboard placed over the door or building in which such powder is kept, on which shall be painted in Roman capitals the words "Licensed to sell Gunpowder"

1902 R.I. Pub. Laws 67, An Act in addition to chapter 40 of the General Laws, Entitled "Of the Town Council": § 1.

Town councils and city councils may from time to time make and ordain all ordinances and regulations for their respective towns, not repugnant to law, which they may deem necessary for the safety of their inhabitants from the manufacture, storage, keeping, having in possession, transportation, sale, or use of gunpowder, gun-cotton, dynamite, nitro-glycerine, nitro-gelatine, lyddite, chlorate of potash, picric acid, sodium calcium carbide, acetylene gas, gasoline gas, and any and all other explosives and explosive chemicals; and may prohibit the manufacture, storage, keeping having in possession, transportation , sale , or use by any and all persons or persons of any or all said substances and gases in their respective towns, unless a license for the same shall be first obtained from the town council or board of aldermen, which license shall be for the term of one years from the date thereof unless sooner revoked by order of said town council or board of aldermen. Any person violating any provision of any such ordinance or regulation, or any such prohibition, shall be fined not less than twenty dollars nor more than one hundred dollars for each such offense.

1907 R.I. Pub. Laws 66, An Act for the Protection of Deer

§ 1. It shall be unlawful to pursue or shoot deer in this state except in accordance with the provisions of this act. § 2. Any person owning or occupying any farm or orchard and any person in his employ may, while on his own premises or the premises of his employer, kill any deer which shall be found destroying any crops, vegatables, or fruit trees belonging to such person or his employer: Provided, however, that no such person shall shoot any deer unless he has obtained from the secretary of state a permit so to do; and the secretary of state shall, upon application, issue to any responsible land owner, or his employees, a permit authorizing such person to shoot deer in accordance with the provisions of this section. No person shall pursue or shoot any deer except with a shot gun, or employ any missile larger than buck shot. § 3. Any person violating the provisions of this act shall be fined not less than one hundred dollars nor more than five hundred dollars for each offence.

1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: § § 1, 4, 5 and 6

§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend

**App. 284**

and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly.

§ 2. If any person shall commit or attempt to commit a crime of violence when armed with or having available any firearm, he may in addition to the punishment provided for such crime of violence be punished as provided in this act. In the trial of a person for committing or attempting to commit a crime of violence the fact that he was armed with or had available a pistol without license to carry the same, or was armed with or had available a machine gun, shall be prima facie evidence of his intention to commit said crime of violence.

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act. § 5. The provisions of section four shall not apply to sheriffs, deputy sheriffs, the superintendent and members of the state police, prison or jail wardens or their deputies, members of the city or town police force or other duly appointed law enforcement officers, nor to members of the army, navy or marine corps of the United States, or of the national guard, when on duty, or of organizations by law authorized to purchase or receive firearms from the United States or this state, nor to officers or employees of the United States authorized by law to carry a concealed firearm, nor to duly authorized military organizations when on duty, nor to members thereof when at or going to or from their customary places of assembly, nor to the regular and ordinary transportation of pistols as merchandise, nor to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business, or in moving goods from one place or abode or business to another. § 6. The licensing authorities of any city or town shall upon application of any person having a bona fide residence or place of business within such city or town, or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a license to such person to carry concealed upon his person a pistol within this state for not more than one years from date of issue, if it appears the applicant has good reason to fear an injury to his person or property or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed. The license shall be in triplicate, in form to be prescribed by the attorney-general and shall bear the fingerprinting, name, address, description and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent to the attorney-general and the triplicate shall be preserved for six years by the licensing authorities issuing said license. A fee of two dollars may be charged and shall be paid for each license, to the officer issuing the same. Before issuing any such permit the applicant for the same shall be required to give bond to the city or town treasurer in the penal sum of three hundred dollars, with surety satisfactory to the authority issuing such permit, to keep the peace and be of good behavior. Every such permit shall be valid for one year from the date when issued unless sooner revoked. The fee charged for the issuing of such license or permit shall be applied in accordance with the provisions of section thirty-three of chapter 401 of the general laws.

§ 7. The attorney-general may issue a permit to any banking institution doing business in this state or to any public carrier who is engaged in the business of transporting mail, money, securities or other valuables, to possess and use machine guns under such regulations as the attorney general may prescribe.

**App. 285**

§ 8. It shall be unlawful within this state to manufacture, sell, purchase or possess except for military or police purposes, any muffler, silencer or device for deadening or muffling the sound of a firearm when discharged.

## SOUTH CAROLINA

1731-43 S.C. Acts 168, § 23.  1740
It shall not be lawful for any slave, unless in the presence of some white person, to carry or make use of firearms or any offensive weapon whatsoever, unless such negro or slave shall have a ticket or license in writing from his master, mistress or overseer, to hunt and kill game, cattle, or mischievous birds or beasts of prey, and that such license be renewed once every month, or unless there be some white person of the age of 16 or upwards, in the company of such slave when he is hunting or shooting; or that such slave be actually carrying his masters arms to or from his masters plantation, by a special ticket, for that purpose, or unless such slave be found in the day time actually keeping off rice birds, or other birds within the plantation to which such slave belongs, lodging the same gun at night within the dwelling house of his master, mistress or white overseer. And provided also that no negro or other slave shall have liberty to carry any guns, cutlass, pistol or other weapon abroad form at any time between Saturday evening after sunset and Monday morning before sunrise notwithstanding a license or ticket for so doing. And in case any person shall find any slave using or carrying fire-arms, or other offensive weapons, contrary to the true intention of this act; every such person may lawfully seize and take away such fire-arms or offensive weapons; but before the property of such goods shall be vested in the person who shall seize the same, such person shall, within 48 hours next after such seizure, go before the next justice of the peace, and shall make oath of the manner of the taking; and if such justice of the peace after such oath shall be made, or upon any other examination, he shall be satisfied, that the said fire-arms or other offensive weapons, shall have been seized according to the directions and agreeable to the true intent and meaning of this act, the said justice shall, by certificate under his hand and seal, declare them forfeited, and that the property is lawfully vested in the person who seized the same. Provided that no such certificate shall be granted by any justice of the peace until the owner or owners of such fire-arms or other offensive weapons so to be seized as aforesaid, or the overseer or overseers who shall or may have the charge of such slave or slaves from, whom such fire-arms or other offensive weapons shall be taken or seized shall be duly summoned, to show cause (if any such they have) why the same should not be condemned as forfeited; or until 48 hours after the service of such summons and oath made of the service thereof before the said justice.

Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a Resolution of the Council Page 289, Image 299 (1802) available at The Making of Modern Law: Primary Sources. 1802
[Ordinances of the City of Charleston, An Ordinance for Appointing Commissioners of the Streets, Defining their Powers, and for other Purposes therein Mentioned, § 8. And be it further ordained by the authority aforesaid, That no person or persons, shall fire any squibs, crackers, or other fireworks, except at times of public rejoicing, and at such places as the intendant for the time being may permit, by license under his hand; nor burn any chips, shavings, or other combustible matters, in any of the streets, lanes, wharves, alleys, or open or enclosed lots of the

**App. 286**

city, nor fire any gun, pistol, or fire arms, within the limits of the city, except on occasion of some military parade, and then by the order of some officer having the command, under the penalty of ten dollars, for every such offense; nor shall any person or persons, raise or fly any paper or other kite, within the said city, under the said penalty of ten dollars.]

John E. Breazeale, The Revised Statutes of South Carolina, Containing the Code of Civil Procedure, and the Criminal Statutes. Also The Constitutions of the United States and of the State, and the Rules of the Supreme and of the Circuit Courts of the State Page 431, Image 529 (Vol. 2, 1894) available at The Making of Modern Law: Primary Sources. 1890 Chapter XXVIII Violations of the License Laws by Insurance and Other Companies, Emigrant Agents, owners or shows, etc., Persons Selling Pistols, etc. §490. No person or corporation within the limits of this State shall sell or offer for sale any pistol, rifle, cartridge or pistol cartridge less than .45 caliber, or metal knuckles, without first obtaining a license from the county in which such person or corporation is doing business so to do. The County Board of Commissioners of the several Counties of this State are authorized to issue licenses in their respective Counties for the sale of pistols and pistol and rifle cartridges of less than .45 caliber, and metal knuckles, upon the payment to the County Treasurer by the person or corporation so applying for said license of the sum of twenty-five dollars annually; and any person who shall sell or offer for sale any pistol, or pistol or rifle cartridge of less than .45 caliber, or metal knuckles, without having obtained the license provided in this Section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine not exceeding five hundred dollars, or by imprisonment not exceeding one year, or both, at the discretion of the court.

1893 S.C. Acts 426, An Act To Amend An Act Entitled "An Act To Provide For A License For The Sale Of Pistols Or Pistol Cartridges Within The Limits Of This State", § 2 . . . That the County Commissioners of the Several Counties of the State be, and they are herby, authorized to issue licenses in their respective Counties for the sale of pistols and pistol cartridges upon the payment to County Treasurer by the person or corporation so applying for said licenses of the sum of twenty-five dollars annually.

1923 S.C. Acts 19-20, License Tax on Ammunition — Candy — Admissions — Regulations to have force of law. That every person, firm or corporation doing business within the State of South Carolina and engaging in the business of selling at retail or in any individual instance selling to the final consumer, such articles as are named in this section, for the privilege of carrying on such business, shall be subject to the payment of a license tax which shall be measured by and graduated in accordance with the volume of sales of such person, firm or corporation as follows: (a) There shall be levied, assessed, collected and paid upon all ammunition, including shells for shotguns and cartridges for rifles, pistols, revolvers, automatic pistols, rifles and machine guns, and upon such shells and cartridges partially prepared for use but lacking powder or shot or other necessary constituent, and upon blank shells and cartridges (but not upon powder or shot or caps not prepared and not in form to use in modern firearms), when sold at retail or to the ultimate consumer, the following: Upon all shotgun or other shells, two ($2.00) dollars per thousand rounds; Upon all cartridges, twenty-five (25) caliber or greater, two ($2.00) dollars per thousand rounds. (b) The license taxes imposed upon ammunition shall be paid by stamps to be affixed and cancelled by the retailer or other final seller, and said stamps shall be affixed to the smallest

**App. 287**

container in which or from which articles are sold, as soon as the original packages are opened or broken, or if received in no other form than that in which sold, as soon as the containers are placed in the place of business of the retailer; in the case of articles inteneded for sale in the packages in which received from outside the State of South Carolina without opening or alteration of any sort, each package must be immediately marked with the date of receipt and the place from which received and no stamps need be affixed so long as such package remains unopened and unaltered.

1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns: §§ 1 to 6. § 1. "Machine gun" defined. – Be it enacted by the General Assembly of the State of South Carolina: For the purposes of this Act the word "machine gun" applies to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device. § 2. Transportation of Machine Gun. – It shall be unlawful for any person or persons in any manner to transport from one place to another in this State, or from any railroad company, or express company, or other common carrier, or any officer, agent or employee of any of them, or any other person acting in their behalf knowingly to ship or to transport form one place to another in this State in any manner or by any means whatsoever, except as hereinafter provided, any firearm as described hereinabove or commonly known as a machine gun. § 3. Storing, Keeping, and/or Possessing Machine Gun. – It shall be unlawful for any person to store, keep, possess, or have in possession, or permit another to store, keep, possess, or have in possession, except as hereinafter provided, any firearm of the type defined above or commonly known as a machine gun. § 4. Selling, Renting or Giving away Machine Gun. – It shall be unlawful for any person to sell, rent, or give away, or be interested directly or indirectly, in the sale, renting or giving away, or otherwise disposing of any firearm of the type above described or commonly known as a machine gun. § 5. Exceptions – Register Machine Guns. – The provisions of this Act shall not apply to the army, navy or marine corps of the United States, the National Guard, and organizations authorized by law to purchase or received machine guns from the United States, or from this State, and the members of such corps. National Guard and organizations while on duty or at drill, may possess, carry and transport machine guns, and, Provided, further, That any peace officer of the State, counties or political sub-division thereof. State Constable, member of the Highway patrol, railway policemen, warden, superintendents, headkeeper or deputy of any State prison, penitentiary, workhouse, county jail, city jail, or other institution for detention of persons convicted or accused of crime, or held as witnesses in criminal cases, or persons on duty in the postal service of the United States, or common carrier while transporting direct to any police department, military or naval organization, or persons authorized by law to possess or use a machine gun, may possess machine guns when required in the performance of their duties, nor shall the provisions of this Act be construed to apply to machine guns kept for display as relics and which are rendered harmless and not useable. Within thirty days after the passage of this Act every person permited by this Act to possess a machine gun or immediately after any person is elected to or appointed to any office or position which entitles such person to possess a machine gun, shall file on the office of the Secretary of State on a blank to be supplied by the Secretary of State on application therefor, an application to be properly sworn to, which shall be approved by the Sheriff of the county in which the applicant resides or has its principal place of business,

**App. 288**

which shall include the applicants name, residence and business address, description including sex, race, age weight, height, color of eyes, color of hair, whether or not ever charged or convicted of any crime, municipal, State or otherwise, and where, if so charged, and when same was disposed of. The applicant shall also give the description including the serial number and make the machine gun which he possesses or desires to possess. Thereupon the Secretary of State shall file such application in his office, registering such applicant togther with the information required in the application in a book or index to be kept for that purpose, and assign to him a number, an dissue to him a card which shall bear the signature of the applicant, and which he shall keep with him while he has such machine gun in his possession. Such registeration shall be made on the date application is received and filed iwth the Secretary of State, and shall expire on December 31, of the year in which said license is issued. § 6. Penalty – Any person violating any of the provisions of this Act shall be guilty of a felony, and, on conviction thereof shall be sentenced to pay a fine not exceeding One Thousand Dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding twenty (20) years.

## SOUTH DAKOTA

1899 S.D. Sess. Laws 112, An Act For The Protection Of Game And The Appointment Of Wardens, And The Licensing Of Hunters And Prescribing Penalties For The Violation Of Its Provisions, pt. 3
At any time kills or shoots any wild duck, goose or brant with any swivel gun or other gun, except as is commonly shot form the shoulder, or in hunting such birds makes us of any artificial light or battery. . .

## TENNESSEE

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 148-149, Image 149-150 (1863) available at The Making of Modern Law: Primary Sources. 1863 [Ordinances of the City of Memphis, Shooting Galleries, § 1. That no person or persons shall set up or use any pistol gallery, or place for the discharging of pistols, guns or other firearms in the first story of any building in the city; nor shall any gallery be used in any manner involving risk or danger to any person in the city; nor shall any person setting up or using such pistol gallery be exempt from the ordinance and penalties now in force, for discharging or shooting any pistol, gun or firearms within the city limits, until such person or persons have applied and paid for license to set up and use such pistol gallery, according to the provisions of this ordinance. § 2. That the person or persons applying for license to keep such pistol gallery, shall, at the time of obtaining such license, enter into bond with good security, to be approved by the City Register, in the sum of three thousand dollars, payable as other city bonds, conditioned that no gambling of any kind be permitted in such pistol gallery, or in the room used for such pistol gallery, or any room adjacent thereto, under the control and connected with said pistol gallery, or its proprietors or keepers; and that all shooting or discharging of firearms shall be done only with the perfect security against any harm to persons or property in the vicinity of such pistol gallery; such penalty to be recoverable for every violation of this section of this ordinance, and of the conditions of said bond. § 3. That the proprietors or persons keeping such pistol gallery shall not

**App. 289**

permit any minors to shoot in such gallery without the written consent of the lawful guardian of such minor, unless such guardian be personally present, and consenting to such shooting; nor shall the proprietors or keepers of such gallery permit any shooting in the same after eleven o'clock at night, or on Sunday, nor shall such shooting gallery be allowed to be kept open for shooting after eleven o'clock at night or on Sunday. Any violation of this ordinance is hereby declared a misdemeanor, and each offender, on conviction shall be fined in any sum not less than five nor more than fifty dollars for any violation of this ordinance, recoverable as other fines. § 4. Any person or persons shall before putting up or using such pistol or shooting gallery, first apply for, and obtain license, as other licenses are obtained, and shall pay for such license the sum of one hundred dollars per annum for each and every pistol or shooting gallery establishment under the provision of this ordinance. § 5. That the board of Mayor and Aldermen retain the power and right to, at any time, repeal this ordinance and revoke and recall any license to keep a pistol gallery, by refunding a pro rata part of the amount paid for any license then outstanding.]

1879 Tenn. Pub. Acts 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1.
It shall be a misdemeanor for any person to sell, or offer to sell, or to bring into the State for the purpose of selling, giving away, or otherwise disposing of belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol; Provided that this act shall not be enforced against any persons now having license to sell such articles until the expiration of such present license.

## **TEXAS**

Charter and Revised Ordinances of the City of Galveston, and All Ordinances in Force to April 2d, 1872 Page 94, Image 107 (1873) available at The Making of Modern Law: Primary Sources. 1872
[Ordinances of the City of Galveston, Taxes – License Tax and Ad-Valorem Tax,] Art. 418, § 26. Every keeper of a billiard or other like table, for public use, a tax of twenty dollars for each and every table so kept; and every keeper of a tenpin alley, a tax of thirty dollars for each and every alley so kept for public use. Every keeper of a pistol or rifle gallery, a tax of twenty-five dollars.

Revised Ordinances of the City of Fort Worth, Texas, 1873-1884 Page 64-65, Image 62-63 (1885) available at The Making of Modern Law: Primary Sources. 1880
Ordinances of the City of Fort Worth, An Ordinance prohibiting the shooting off, firing or discharging of Fire-arms; the firing, exploding or setting off of Squibs, Firecrackers, Torpedoes, Roman Candles, Sky-rockets or other things containing powder or other explosive matter, or the throwing of any fire balls, or making of any bon-fires in the corporate limits of the City of Fort Worth. Be it ordained by the City Council of the City of Fort Worth: § 1. It shall be unlawful for any person or persons to shoot off, fire, or discharge any gun, pistol, revolver or any firearm of any description, or to fire, explode or set off any squib, firecracker, torpedo, roman candle, sky-rocket, or other thing containing powder or other explosive matter, or to throw any fire-ball or make any bon-fire in the corporate limits of this city, and that any person or persons violating the provisions of this ordinance, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be fined in any sum not less than one dollar nor more than one hundred dollars.

**App. 290**

Provided that this shall not apply to any licensed shooting gallery nor to the shooting of dogs running at large in violation of the city ordinances

The Laws of Texas 1822-1897. Austin's Colonization Law and Contract; Mexican Constitution of 1824; Federal Colonization Law; Colonization Laws of Coahuila and Texas; Colonization Law of State of Tamaulipas; Fredonian Declaration of Indpendence; Laws and Decrees, with Constitution of Coahuila and Texas; San Felipe Convention; Journals of the Consultation; Proceedings of the General Council; Goliad Declaration of Independence; Journals of the Convention at Washington; Ordinances and Decrees of the Consultation; Declaration of Independence; Constitution of the Republic; Laws, General and Special, of the Republic; Annexation Resolution of the United States; Ratification of the Same by Texas; Constitution of the United States; Constitutions of the State of Texas, with All the Laws, General and Special, Passed Thereunder, Including Ordinances, Decrees, and Resolutions, with the Constitution of the Confederate States and the Reconstruction Acts of Congress Page 234-235, Image 734-735 (Vol. 6, 1898) available at The Making of Modern Law: Primary Sources. 1898
[An Act to Incorporate the Town of Round Top, County of Fayette, . . . Article Tenth. That from and after the passage of this act it shall be unlawful to fire any pistol, rifle, shot gun, or other kind of fire-arms, within the limits of the town of Round Top, and any person violating this act shall be guilty of a misdemeanor, and on conviction thereof shall be fined not less than five nor more than twenty-five dollars, to be collected by the mayor of the town; but this act shall not prevent any gunsmith, within the limits of the town, from discharging on the premises thereof, fire-arms made or repaired in his shop, for the purpose of training such fire-arms; provided, that none but gunsmiths shall have the privilege of being authorized to discharge fire-arms; and for that purpose each gunsmith shall build a rock wall, in front of which he shall cause a target to be placed, The mayor shall issue a permit to any gunsmith applying for the same, for the period of one year, which permit may be renewed after its expiration.]

Revised Ordinances of the City of Victoria Texas Page 75, Image 77 (1899) available at The Making of Modern Law: Primary Sources. 1899
[Ordinances of the City of Victoria,] Revised Penal Ordinances: Discharging Firearms, § 1. If any person shall discharge any gun, pistol or firearm of any description on or across any public square, street or alley, or elsewhere within the corporate limits of the City of Victoria, whether the premises on or across which such fire arm is discharged be public or private he shall be fined in any sum not to exceed ten dollars. § 2. Exceptions. The provisions of the foregoing section shall not be construed to apply to gunsmiths discharging fire arms brought to them for repairs, or to training guns or pistols of their own make, when done with the permission and at a place approved by the City Marshal; nor shall parties shooting in galleries licensed by the city come within the meaning of the preceding article. § 3. If any person shall discharge any gun, pistol or fire arm of any description as alarm for fire, or upon the discovery of any fire, or during the progress of any fire, he shall be fined in any sum not to exceed twenty-five dollars.

1919 Tex. Gen. Laws 297-98, An Act to Preserve, Propagate, Distribute, and Protect the Wild Game, Wild Birds, Wild Fowl of the State . . . , ch. 157, § 42.
It shall be unlawful for any citizen of this State to hunt outside of the county of his residence with a gun without first having procured from the Game, Fish and Oyster Commissioner or one of his deputies or from the County Clerk of the County in which he resides a license to hunt, and

for which he shall pay to the officer from whom he secures such license the sum of two ($2.00) dollars. . . Any person hunting any game or birds protected by the laws of the State, and who shall refuse to show his license herein provided for to any sheriff . . . on demand shall be deemed guilty of a violation of the provisions of this law, and any person violating any of the provisions of this Section shall be deemed guilty of a misdemeanor, and upon conviction shall be fined in a sum of not less than ten (10.00) dollars nor more than one hundred (100.00) dollars.

## UTAH

An Ordinance Prohibiting the Sale of Arms, Ammunition, or Spiritous Liquors to the Indians, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 63 (Henry McEwan 1866). 1850
"Sec. 1. Be it ordained by the General Assembly of the State of Deseret: That if any person shall hereafter trade or give any guns, rifles, pistols or any other deadly weapons, ammunition or spirituous liquors to any Indian, without having a license, he shall, on conviction thereof before any Justice of the Peace, he fined in a sum not exceeding one hundred dollars for each offense, and also forfeit all the property received from the Indian, which shall be sold and the proceeds thereof paid into the public treasury."

Revised Ordinances and Resolutions of the City Council of Salt Lake City, in the Territory of Utah, with Congressional and Territorial Laws on Townsites and Great Salt Lake City Charter, and Amendments Page 161-162, Image 196-197 (1875) available at The Making of Modern Law: Primary Sources. 1875
Ordinances of Salt Lake City, Relating to Gunpowder, Gun Cotton and Nitro-Glycerine, § 1. Be it ordained, by the City Council of Salt Lake City, that it shall not be lawful for any person or persons to keep, sell or give away, gunpowder, gun-cotton, or nitro-glycerine, in any quantity without permission of the City Council; Provided, any person may keep, for his own use, not exceeding five pounds of gun powder, one pound of gun cotton, or one ounce of nitro-glycerine. § 2. All permits , when issued , shall be registered by the Recorder, and shall state the name and place of business, and date of permit, and the same shall not be granted for a longer time than one year; and no person to whom any permits may be issued, shall have or keep, at his place of business or elsewhere, within the city, (except in such places as may be approved by the City Council), a greater quantity of gunpowder or guncotton than twenty-five pounds, and the same shall be kept in tin canisters or cases, and nitro-glycerine not to exceed five ounces, and in a situation remote from fires lighted lamps or candles. Nor shall any person sell or weigh gunpowder, gun cotton, or nitro-glycerine, after the lighting of lamps or gas in the evening , unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business, with the word gunpowder painted or printed thereon in large letters. § 3. No person shall convey or carry any gunpowder exceeding one pound in quantity through any street or alley in the city, unless the said gunpowder is secured in tight cans, kegs or cases, sufficient to prevent the same from being spilled or scattered , and in no quantity exceeding one hundred pounds, except under the direction of a police officer. § 4. A violation of any clause of this ordinance shall subject the offender to a fine, for each offence, in any sum not exceeding one hundred dollars.

**App. 292**

The Revised Ordinances of Salt Lake City, Utah, Chapter XXVI, Misdemeanors, p. 283 Sec. 14 (1888)
Dangerous and Concealed Weapons.
SEC. 14. Any person who shall carry any slingshot, or any concealed deadly weapon , without the permission of the mayor first had and obtained, shall, upon conviction, be liable to a fine not exceeding fifty dollars.

1905 Utah Laws 197, An Act for the Protection of Fish, Game, and Birds . . . , ch. 118, § 30.
It shall be unlawful for any non-resident person or for resident who is not a citizen of the United States to kill any game, animals, birds or fish in this State, without first having procured the license to do so hereinafter provided for. Any non-resident person or any resident who is not a citizen of the United States, upon the payment to the State Commissioner, of the sum of twenty-five dollars, shall be entitled to receive a license, from said commissioner, which will entitle him to hunt and kill game, animals, birds and fish, for the period of one year subject to all the laws of this State for the protection of fish and game.

## VERMONT

Act of Incorporation and By-Laws of the Village of Bradford Page 14, Image 15 (1890 ) available at The Making of Modern Law: Primary Sources. 1890
[Ordinances of the Village of Bradford] By-laws, Miscellaneous, § 6. Any person who shall fire any cannon, swivel gun, pistol, torpedo, squib, cracker, or throw any fire ball, in any street, alley or lane, except by permission of the trustees, shall be fined five dollars.

Act of Incorporation and By-Laws of the Village of Bradford. 1890 Page 12-13, Image 13-14 (1891) available at The Making of Modern Law: Primary Sources.
Ordinances of the Village of Bradford, § 11. The Trustees may grant licenses, for one year or less, to keep gun powder or gun cotton or other explosives for sale, if in their opinion the public safety is not endangered thereby. Said gun powder or gun cotton or other explosive shall be kept in close tin canisters which shall only be opened in the day time. § 12. The license shall specify the quantity allowed and the place where such gun powder or gun cotton and other explosives shall be kept, and on every building in which such gunpowder or gun cotton or other explosives is kept for sale shall be placed in a conspicuous position a sign with the words, "Licensed to sell Powder," printed or painted thereon. § 13. The Trustees may also grant licenses to store gun powder and other explosives in larger quantities in places used for no other purpose which they consider at a safe distance from other buildings. § 14. The Trustees may at any time inspect the premises where gun powder, gun cotton and other explosives are kept, in order to satisfy themselves that the regulations are complied with. § 15. Any person who shall without license keep in any building in the Village any nitro-glycerine, or more than half a pound of gun powder or two ounces of gun cotton, which shall be only for his own use, shall be fined five dollars for every day so offending. § 16. All licenses granted by the Trustees by virtue of these by-laws shall be signed by a majority of the Trustees and recorded in the office of the Clerk of the Corporation at the expense of the person licensed and shall not become valid until so recorded. § 17. The Trustees are authorized to revoke any license mentioned in these by-laws, whether granted by themselves or their predecessors in office, whenever in their opinion the public good requires it. Such revocation shall be recorded in the Clerk's office, and shall become operative

**App. 293**

whenever the Trustees shall deliver a written notice thereof to the person whose license is revoked.

Act of Incorporation and By-Laws of the Village of Northfield Page 19-20, Image 19-20 (1894) available at The Making of Modern Law: Primary Sources. 1894
Regulations for Handling Explosives, Artcle XV., § 1. No person shall at any time keep within the limits of said Village, any powder, or guncotton, without a written license, signed by a majority of the trustees, who shall have discretionary power to grant the same for retailing purposes ; not, however, exceeding twenty pounds shall be kept in any one building at a time, and that to be kept in close metal cans, or flasks, which are not to be opened except in the day time, Said license specify the building, or place where said powder or guncotton shall or may be kept, the quantity such person may keep, and shall be conditional that any Trustee may at any time make inspection of the quantity of powder or gun-cotton kept, and the manner of keeping the same; said license to be in force until revoked by a majority of the Trustees. And it shall be the duty of the person or persons so licensed to procure said license to be recorded in the records of said Village, and to put up, in some conspicuous place on every building within the limits of the Village in which he has powder or guncotton stored, a sign with the words "LICENSED TO SELL GUNPOWDER." Provided, that a majority of the Trustees may grant license for storing or keeping larger quantities, and that any person may keep not over two pounds which shall be kept in a metallic flask or a powder horn. Article XVI. PENALTY FOR VIOLATION OF ABOVE ARTICLE. § 1. If any person shall keep, without a license therefore, or as provided in the XVth article, any powder, or gun cotton, or either of said articles, or shall keep either of said articles in any buildings or places except those mentioned in his license, he shall forfeit and pay to the treasurer of said Village Five dollars for each day said powder or guncotton shall be suffered to remain within the limits of said village.

Quoted in Brief of Amicus Curiae Patrick J. Charles at App. 13, N.Y. State Rifle & Pistol Ass'n, v. City of New York (Ordinances of the City of Barre, Vermont). 1895
CHAPTER 16, SEC. 18. No person, except on his own premises, or by the consent and permission of the owner or occupant of the premises, and except in the performance of some duty required by law, shall discharge any gun, pistol, or other fire arm loaded with ball or shot, or with powder only, or firecrackers, serpent, or other preparation whereof gunpowder or other explosive substance is an ingredient, or which consists wholly of the same, nor shall make any bonfire in or upon any street, lane, common or public place within the city, except by authority of the city council.
CHAPTER 38, SEC. 7. No person shall carry within the city any steel or brass knuckles, pistol, slung shot, stilletto, or weapon of similar character, nor carry any weapon concealed on his person without permission of the mayor or chief of police in writing.

1908 Vermont Session Laws 132, § 1.
No person shall at any time hunt, shoot, pursue, take or kill any of the wild animals, wild fowl or birds of this state, nor use a gun for hunting the same, without having first procured a license therefor as hereinafter provided, and then only during the respective periods of the year when it shall be lawful, and subject to all the provisions of chapter 220 of the Public Statutes. . .

**<u>VIRGINIA</u>**

**App. 294**