No. 23-1380

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

Rocky Mountain Gun Owners and Alicia Garcia
Plaintiffs-Appellants,

v.

Jared Polis, in his official capacity as Governor of the State of Colorado,
Defendants-Appellees.

On Appeal from the United States District Court for the District of Colorado
No. 23-cv-02563-JLK, The Honorable John L. Kane

**APPELLANT'S APPENDIX VOLUME II**

Barry K. Arrington
ARRINGTON LAW FIRM
4195 Wadsworth Boulevard
Wheat Ridge, CO 80033
(303) 205-7870
E-mail: Barry@arringtonpc.com

D. Sean Nation
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
E-mail: snation@mslegal.org

*Attorneys for Plaintiffs-Appellants*

# APPENDIX INDEX

*Rocky Mountain Gun Owners and Alicia Garcia v. Jared Polis, in his official capacity as Governor of the State of Colorado*

*No. 23-1380*

CONT: Exhibit E to Spitzer Declaration – Text of License and Licensing Laws
(ECF No. 18-8) ......................................................................... App. 295

Historical Waiting Period Laws
(ECF No. 18-9) ......................................................................... App. 309

Roth Declaration
(ECF No. 18-10) ....................................................................... App. 318

Exhibit A to Roth Declaration – Roth CV
(ECF No. 18-11) ....................................................................... App. 358

The Governor's Unopposed Motion to Permit Remote Witness Testimony at Hearing on Preliminary Injunction
(ECF No. 20) ............................................................................ App. 384

Plaintiffs' Reply Brief in Support of their Request for Preliminary Injunction (Dkt. No. 2)
(ECF No. 21) ............................................................................ App. 386

Notice of Supplemental Authority in Support of Plaintiffs' Request for Preliminary Injunction (Dkt. 2)
(ECF No. 23) ............................................................................ App. 409

Declaration of Clayton Cramer
(ECF No. 24) ............................................................................ App. 411

Unified Exhibit List
(ECF No. 25) ............................................................................ App. 478

Defendant's Witness List for October 26, 2023 Hearing
(ECF No. 26) ............................................................................ App. 487

Plaintiff's Witness List
(ECF No. 27) ............................................................................ App. 490

1

Courtroom Minutes: Motion Hearing - Preliminary Injunction – Day 1
(ECF No. 28)............................................................................ App. 491

Courtroom Minutes: Motion Hearing - Preliminary Injunction – Day 2
(ECF No. 29)............................................................................ App. 494

Preliminary Injunction Hearing, Vol. 1
(ECF No.).................................................................................. App. 496

Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) available at The Making of Modern Law: Primary Sources. 1792
[An Act to Reduce into one, the Several Acts Concerning Slaves, Free Negroes, and Mulattoes (1792),] § 8. No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, but all and every gun, weapon, and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person, and upon due proof thereof made before any Justice of the Peace of the County or Corporation where such seizure shall be, shall by his order be forfeited to the seizor for his own use ; and moreover, every such offender shall have and receive by order of such Justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense. § 9. Provided, nevertheless, That every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves.

1805 Va. Acts 51, An Act Concerning Free Negroes and Mulatoes
That no free negro or mulato shall be suffered to keep or carry any firelock of any kind… without first obtaining a license from the court…

1806 Va. Acts 51, ch. 94
Required every "free negro or mulatto" to first obtain a license before carrying or keeping "any fire-lock of any kind, any military weapon, or any powder or lead."

The Charters and Ordinances of the City of Richmond, with the Declaration of Rights, and Constitution of Virginia Page 227, Image 274 (1859) available at The Making of Modern Law: Primary Sources. 1859
[Ordinances of Richmond,] Nuisances Not in Streets, § 11. If any person shall sell, or expose for sale in this city, any torpedos, popcrackers, squibs, or other fire-works, of any kind whatever, except in packages containing each at least one hundred, or shall without permission in writing from the mayor, discharge, or set off, in any street or alley of the city, any balloon, rocket, torpedo, popcracker, fireworks or any combination of gunpowder, or any other combustible or dangerous material; or if any person shall, except under the fortieth section of the ordinance concerning streets, without necessity fire or discharge in this city any cannon, gun, pistol, or other fire-arms of any kind, or shall make therein any unusual noise, whereby the inhabitants thereof may be alarmed, or raise or fly a kite in this city, or if any auctioneer shall use any bell or herald to notify the public of any sale, except of real property, every such person herein offending, shall pay a fine of not less than one nor more than twenty dollars.

1908 Va. Laws 381, An Act To Amend And Re-Enact Section 3780 Of The Code In Relation To Carrying Concealed Weapons, § 3780

**App. 295**

If any person carry about his person, hid from common observation, any pistol, dirk, bowie knife, razor, slungshot, or any weapon of like kind he shall be fined not less than twenty dollars nor more than one hundred dollars, or be committed to jail not more than thirty days, or both, in the discretion of the court, or jury, trying the case: and such pistol, dirk, bowie knife, razor, slungshot, or any weapon of like kind, shall be forfeited to the Commonwealth and may be seized by an officer as forfeited. Upon conviction of the offender the said weapon shall be sold by the officer and the proceeds accounted for and paid over as provided in section twenty-one hundred and ninety; provided, that this section shall not apply to any police officer, town or city sergeant, constable, sheriff, conservator of the peace, collecting officer while in the discharge of his official duty: provided the judge of any circuit or hustings court in term time, upon a written application and satisfactory proof of the good character and necessity of the applicant to carry concealed weapon may grant such permission for one year; the order making same shall be entered in the order book of such court.

1926 Va. Acts. 285-87, CHAP. 158-An ACT to improve a license tax on pistols and revolvers; to regulate the sale thereof and of ammunition therefor; and to provide that the proceeds of such tax shall be used for the establishment of a diseased and crippled children's hospital, §§ 1-9.
1. Be it enacted by the general assembly of Virginia, That it shall be the duty of every person residing in this State and owning a pistol or revolver therein, to pay on or before the first day of January of each year a license tax of one dollar on each pistol or revolver so owned, or in the event that such pistol or revolver shall be acquired by any such person on or after the first day of February, such license tax shall be forthwith paid thereon. The application for the license shall give the name of the owner, and the number, make and calibre [sic] of such pistol or revolver, which shall be set forth in the license. All pistol or revolver licenses shall run from the first day of January to the first day of the following January. Such license taxes shall be paid to the treasurer of the city or county whrein the said owner resides, and the said treasurer shall not receive more for handling the funds arising from the tax imposed by this act than he receives for handling other State funds. The treasurers shall not receive compensation for their services in issuing the license cards herein provided for. Upon payment of the tax provided for in this section the person paying the same shall be entitled to a license card therefor, showing the year for which the license is paid, the county or city issuing the card, the serial number of the license, and the number, calibre [sic], make and owner of the pistol or revolver. When the license card is issued the treasurer shall record the name of the owner of the pistol or revolver, and the number, calibre [sic] and make thereof with the number of the license, in a book prepared for the purpose. The license cards and book shall be furnished by the boards herein provided and shall be paid out of the funds derived from the pistol and revolver licenses. If any such card should be lost the owner of the card shall pay to the treasurer twenty-five cents for a duplicate card.
2. It shall be the duty of every retailer selling a pistol or revolver in this State, at the time of such sale, to keep a record of the name and address of the purchaser and the number, make and calibre [sic] of the pistol or revolver, and to report once a month to the treasurer of his county or city the names of such purchasers, if any, together with the number, make and calibre [sic] of each pistol or revolver purchased; and all persons receiving or having in their possession a pistol or revolver for the purpose of repairing the same shall report to the treasurer of his county or city once a month giving the name and address of the owner and the calibre [sic], make and serial number of such pistol or revolver.

**App. 296**

3. It shall be unlawful for any retailer in this State to sell ammunition for any pistol or revolver to any person unless the person desiring to make such purchase displays the license card for the current year provided for in this act.

4. Any person violating any provision of this act or using a license card not issued to him, for the purpose of purchasing ammunition, or using a license card for the purchase of pistol or revolver ammunition unless the ammunition is intended to be used for the weapon mentioned in the license card shall be guilty of a misdemeanor, and upon conviction shall be fined not less than twenty-five nor more than fifty dollars, or sentenced to the State convict road force for not less than thirty or not more than sixty days, or both, in the discretion of the tribunal trying the case.

5. The provisions of this act shall not apply to any officer authorized by law to carry a pistol or revolver nor to the pistol or revolver of such officer when such pistol or revolver is carried in discharge of his official duty, except that every officer shall list his pistol or revolver with the treasurer of his county or city annually by January first; nor to a pistol of an obsolete type kept as a souvenir, memento or relic, such as cap and ball type, etcetera, or souvenir used or captured by any person or relative in any war. But such pistol shall be registered as herein provided, upon satisfactory proof to the officer issuing such license that the pistol in question comes properly within this exception, in which case, no license tax shall be charged.

6. The tax hereby imposed shall be in lieu of all other taxes on such pistols and revolvers; but nothing in this act shall be construed to apply to such weapons in the stocks of licensed wholesaler or retailers.

7. All funds arising from pistol and revolver licenses, except as hereinbefore provided, shall be kept separate from other funds and shall be paid into the State treasury to establish a fund known as the diseased and crippled children's hospital fund, which shall be used for the purpose of establishing and maintaining within the State at such place or places as may be selected by the board hereinafter provided for, a hospital or hospitals for the care, treatment and vocational training of diseased and crippled children resident in Virginia, or for any such rehabilitation work that the board may deem wise.

Each treasurer shall between the first and fifteenth of July and between the first and fifteenth of January report to the auditor of public accounts collections, which he is required to make by this act, and shall at the same time pay into the State treasury the amount collected less the commissions which he is authorized to retain for collecting same as provided for in this act, and the auditor of public accounts shall keep said funds separate from other funds to be designated and known as "the diseased and cripple children's hospital fund."

8. The adminsitration of the aid fund shall be under the direction of a board of seven physicians to be appointed by the governor. . . . [Description of board and its functions].

9. The State treasurer shall make payments from the fund hereinabove created on warrants from the auditor of pulic accounts, issued on vouchers certified by the chairman of the board hereinabove created on authority of the board.

## WASHINGTON STATE

1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15. [T]o regulate the transportation, storage and sale of gunpowder, giant powder, dynamite, nitro-glycerine, or other combustibles, and to provide or license magazines for the same, and to prevent by all possible and proper means, danger or risk of injury or damages by fire arising from carelessness, negligence or otherwise . . . to regulate and prohibit the carrying of deadly

**App. 297**

weapons in a concealed manner; to regulate and prohibit the use of guns, pistols and firearms, firecrackers, and detonation works of all descriptions[.]

1881 Wash. Sess. Laws 93, An Act to Incorporate the City of Dayton, chap. 2, § 20.
The city of Dayton shall have power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy, and . . . to regulate the transportation, storing and keeping of gunpowder and other combustibles and to provide or license magazines for the same[.]

1881 Wash. Sess. Laws 121-22, An Act to Incorporate the City of Port Townsend, ch. 2, § 21.
The City of Port Townsend has power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy, and . . . to regulate the transportation and keeping of gunpowder, or other combustibles, and to provide or license magazines for the same[.]

1883 Wash. Sess. Laws 161, An Act to Incorporate the City of Ellensburgh, ch. 2, § 20.
The city of Ellensburg shall have power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy . . . to regulate the transportation storing and keeping of gunpowder and other combustibles and to provide or license magazines for the same[.]

Del Cary Smith, Ordinances of the City of Port Townsend, Washington, Comprising the General Ordinances of the City, Together with the Private Ordinances Now in Force Page 27, Image 28 (1890) available at The Making of Modern Law: Primary Sources. 1890
[Ordinances of Port Townsend, WA,] Division III, Offenses Against Public Safety, Convenience and Health, § 15. Whoever shall fire or discharge any cannon, gun, pistol revolver or any firearm of any description, or shall fire, or explode or set off any squib, firecracker, torpedo or other thing containing powder or other explosive material, without permission from the Mayor or common council so to do, within the city limits, shall, on conviction, be punished by a fine of not less than five nor more than twenty dollars; provided that such permission, when given, shall definitely limit the time of such firing, and may at any time be revoked. But nothing in this section shall prevent the ordinary and usual fireworks demonstration on National holidays; subject, however, to such regulation, control and orders as the City Marshal may deem proper to make for the protection of property from fire.

Albert R Heilig, Ordinances of the City of Tacoma, Washington Page 334, Image 335 (1892) available at The Making of Modern Law: Primary Sources. 1892
Ordinances of Tacoma, Defining Disorderly persons and Prescribing the Punishment for disorderly conduct within the city of Tacoma, § 1. . . . All persons (except police officers as aforesaid) who shall draw, exhibit or attempt to use any deadly weapon upon, to or against another person, in said city with intent to do bodily injury to such person; and All persons (except peace officers as aforesaid and persons practicing at target shooting in a shooting gallery duly licensed) who shall, within the city limits, fire off or discharge any gun, pistol or fire arm of any kind, or bomb, shall be deemed and are disorderly persons, and guilty of a misdemeanor.

Rose M. Denny, ed., The Municipal Code of the City of Spokane, Washington (Spokane, WA; W.D. Knight, 1896), p. 309-10, Ordinance No. A544, Sec. 1. 1895
ORDINANCE No. A544. AN ORDINANCE TO PUNISH THE CARRYING OF CONCEALED WEAPONS WITHIN THE CITY OF SPOKANE.

**App. 298**

The City of Spokane does ordain as follows:

SECTION I. If any person within the City of Spokane shall carry upon his person any concealed weapon, consisting of either a revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife ), or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars, nor more than one hundred dollars and costs of prosecution, and be imprisoned until such fine and costs are paid; provided, that this section shall not apply to police officers and other persons whose duty it is to execute process or warrants or make arrests, or persons having a special written permit from the Superior Court to carry weapons.

SECTION 2. This ordinance shall take effect and be in force ten days after its passage.

Passed the City Council January 2, 1895.

Rose M. Denny, The Municipal Code of the City of Spokane, Washington. Comprising the Ordinances of the City (Excepting Ordinances Establishing Street Grades) Revised to October 22, 1896 Page 309-310, Image 315-316 (1896) available at The Making of Modern Law: Primary Sources. 1896

Ordinances of Spokane, An Ordinance to Punish the Carrying of Concealed Weapons within the City of Spokane, § 1. If any person within the City of Spokane shall carry upon his person any concealed weapon, consisting of either a revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars, nor more than one hundred dollars and costs of prosecution, and be imprisoned until such fine and costs are paid; provided, that this section shall not apply to police officers and other persons whose duty is to execute process or warrants or make arrests, or persons having a special written permit from the Superior Court to carry weapons.

1911 Wash. Sess. Laws 303, An Act Relating to the Carrying of Firearms, Requiring Licenses of Certain Persons, and Fixing a Penalty for the Violation Thereof, ch. 52, § 1.

It shall be unlawful for any person who is not a citizen of the United States, or who has not declared his intention to become a citizen of the United States, to carry or have in his possession at any time any shot gun, rifle or other firearm, without first having obtained a license from the state auditor, and said license is not to be issued by said state auditor except upon the certificate of the consul domiciled in the State of Washington and representing the country of such alien, that he is a responsible person and upon the payment for said license of the sum of fifteen dollars ($15.00)[.]

## **WEST VIRGINIA**

J. Nelson Wisner, Ordinances and By-Laws of the Corporation of Martinsburg: Berkeley Co., West Virginia, Including the Act of Incorporation and All Other Acts of a Special or General Nature Page 25, Image 25 (1875) available at The Making of Modern Law: Primary Sources. 1875

[Ordinances of Martinsburg, An Ordinance to Prevent Certain Improper Practices Therein Specified,] § 3. If any person shall fire or discharge within such parts of the town which are or

**App. 299**

shall be laid out into lots, or within two hundred yards of said limits, any cannon, gun, pistol or fire-arms, or any cracker, squib, rocket or fire-works, except it be in case of necessity, or in the discharge of some public duty, or at a military parade by order of the officer in command, or with the permission of the Mayor or Council of the town, such person for every such offence shall forfeit any pay to the town not less than one nor more than five dollars.

J. Nelson Wisner, Ordinances and By-Laws of the Corporation of Martinsburg: Berkeley Co., West Virginia, Including the Act of Incorporation and All Other Acts of a Special or General Nature Page 76, Image 76 (1875) available at The Making of Modern Law: Primary Sources. 1876
[Ordinances of Martinsburg,] An Ordinance in Relation to Pistol Galleries, § 1. Be it ordained by the Council of the Corporation of Martinsburg, That no pistol gallery, in which air guns or pistols, or guns or pistols in which are fired powder, is used, shall be established or carried on within the limits of the Corporation of Martinsburg by any person or persons, until the person or persons desiring to establish or carry on the same shall first obtain from the Mayor, attested by the Clerk of the Corporation, a permit authorizing the person or persons therein named to prosecute said business, and designating the place at which the same is to be carried on. § 2. That the Mayor shall not issue the permit authorized by the first section of this ordinance, unless the building to be used for said pistol gallery, is so detached from adjacent or surrounding private dwellings, that the noise incident to the carrying on of said business, shall not render the said gallery a nuisance to the surrounding or adjacent dwellings. § 3. Any person or persons violating the provisions of this ordinance, shall be fined for the first offense, not less than two nor more than ten dollars, at the discretion of the Mayor, and for any subsequent offence, not less than two or more than thirty dollars, and commitment in the county jail not exceeding thirty days, either or both of said punishment, at the discretion of the Mayor.

Laws and Ordinances for the Government of the City of Wheeling, West Virginia (Wheeling, WV: W. Va. Printing 1891), p.206. 1881
An Ordinance in relation to offenses . . .
SEC. 14. It shall be unlawful for any person to carry any slung shot, colt, or knucklers of lead, brass or other metal or material, or to carry about his person, hid from common observation, any pistol, dirk , bowie knife, or weapon of the like kind, without a permit in writing from the mayor so to do. It shall also be unlawful for any person or persons to sell or give away to a person not of age, any slung shot, colt, or knuckler or knucklers of lead, brass or other metal or material, or any pistol, dirk, bowie knife or weapon of the like kind.

1909 W.Va. Acts 479-80, An Act to Amend and Re-Enact Sections . . . Relating to the Protection and Preservation of Certain Animals, Birds, and Fishes and of Forests and Streams, ch. 60, § 19. The carrying of any uncased gun in any of the fields or woods of this state, by any person not having the lawful right to hunt, pursue or kill game, birds or animals in such fields or woods shall, as to such person, other than the bona fide owner, or owners of such fields or woods, his or their child or children, tenant or tenants, lessee or lessees, be deemed prima facie evidence of a violation of this section; and any person claiming to hold a license to hunt in this state, having in his possession any gun or other hunting paraphernalia in such woods, or fields, shall, on failure to produce such license for inspection to any warden of this state or owner or agent of the owner of such woods and fields on demand, be deemed guilty of a misdemeanor and shall be punished

on conviction, as provided later in this section. Provided, however, that any resident owner, or owners, of farm lands, their resident child or children, or bona fide tenants, shall have the right to hunt, kill and pursue birds or game on such farm lands of which he, or they, are the bona fide owners or tenants, during the season when it is lawful to kill, catch or pursue birds or game, without securing such resident license; and provided, further, that the owners of adjoining lands may each have the privilege of reciprocating the non-licensed privilege, by giving each other written privilege to exchange hunting rights only, on land immediately joining each other, and upon which each party resides.

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a.

Section 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court; and it shall be the duty of the prosecuting attorney in all cases to ascertain whether or not the charge made by the grand jury is the first or second offense, and if it shall be the second offense, it shall be so stated in the indictment returned, and the prosecuting attorney shall introduce the record evidence before the trial court of said second offense, and shall not be permitted to use his discretion in charging said second offense nor in introducing evidence to prove the same on the trial; provided, that boys or girls under the age of eighteen years, upon the second conviction, may, at the discretion of the court, be sent to the industrial homes for boys and girls, respectively, of the state. Any person desiring to obtain a state license to carry any such weapon within one or more counties in this state shall first publish a notice in some newspaper, published in the county in which he resides, setting forth his name, residence and occupation, and that on a certain day he will apply to the circuit court of his county for such state license; and after the publication of such notice for at least ten days before said application is made and at the time stated in said notice upon application to said court, it may grant such person a license in the following manner, to-wit: The applicant shall file with said court his application in writing, duly verified, which said application shall show: First: That said applicant is a citizen of the United States of America. Second: That such applicant has been a bona fide resident of this state for at least one year next prior to the date of such application, and of the county sixty days next prior thereto. Third: That such applicant is over twenty-one years of age; that he is a person of good moral character, of temperate habits, not addicted to intoxication, and has not been convicted of a felony nor of any offense involving the use on his part of such weapon in an unlawful manner. Fourth: The purpose or purposes for which the applicant desires to carry such weapon and the necessity therefor and the county or counties in which said license is desired to be effective. Upon the hearing of such application the court shall hear evidence upon all matters stated in such application and upon any other matter deemed pertinent by the court, and if such court be satisfied from the proof that there is good reason and cause for such person to carry such weapon, and all of the other conditions of this act

**App. 301**

be complied with, said circuit court or the judge thereof in vacation, may grant said license for such purposes, and no other, as said a circuit court may set out in the said license (and the word "court" as used in this act shall include the circuit judge thereof, acting in vacation); but before the said license shall be effective such person shall pay to the sheriff, and the court shall so certify in its order granting the license, the sum of twenty dollars, and shall also file a bond with the clerk of said court, in the penalty of three thousand five hundred dollars, with good security, signed by a responsible person or persons, or by some surety company, authorized to do business in this state, conditioned that such applicant will not carry such weapon except in accordance with his said application and as authorized by the court, and that he will pay all costs and damages accruing to any person by the accidental discharge or improper, negligent or illegal use of said weapon or weapons. Any such license granted after this act becomes effective shall be good for one year, unless sooner revoked, as hereinafter provided, and be co-extensive with the county in which granted, and such other county or counties as the court shall designate in the order granting such license; except that regularly appointed deputy sheriffs having license shall be permitted to carry such revolver or other weapons at any place, within the state, while in the performance of their duties as such deputy sheriffs and except that any such license granted to regularly appointed railway police shall be co-extensive with the state, and all license fees collected hereunder shall be paid by the sheriff and accounted for to the auditor as other license taxes are collected and paid, and the state tax commissioner shall prepare all suitable forms for licenses and bonds and certificates showing that such license has been granted and to do anything else in the premises to protect the state and see to the enforcement of this act. The clerk of the court shall immediately after license is granted as aforesaid, furnish the superintendent of the department of public safety a certified copy of the order of the court granting such license, for which service the clerk shall be paid a fee of two dollars which shall be taxed as cost in the proceeding; within thirty days after this act becomes effective it shall be the duty of the clerks of each court in this state having jurisdiction to issue pistol licenses to certify to the superintendent of the department of public safety a list of all such licenses issued in his county. Provided, that nothing herein shall prevent any person from carrying any such weapon, in good faith and not for a felonious purpose, upon his own premises, nor shall anything herein prevent a person from carrying any such weapon (unloaded) from the place of purchase to his home or place of residence, or to a place of repair and back to his home or residence; but nothing herein shall be construed to authorize any employee of any person, firm or corporation doing business in this state to carry on or about the premises of such employer any such pistol, or other weapon mentioned in this act for which a license is herein required, without having first obtained the license and given the bond as herein provided; and, provided, further, that nothing herein shall prevent agents, messengers and other employees of express companies doing business as common carriers, whose duties require such agents, messengers and other employees to have the care, custody or protection of money, valuables and other property for such express companies, from carrying any such weapon while actually engaged in such duties, or in doing anything reasonably incident to such duties; provided, such express company shall execute a continuing bond in the penalty of thirty thousand dollars, payable unto the state of West Virginia, and with security to be approved by the secretary of state of the state of West Virginia, conditioned that said express company will pay all damages, accruing to anyone by the accidental discharge or improper, negligent or illegal discharge or use of such weapon or weapons by such agent, messenger or other employee while actually engaged in such duties for such express company, in doing anything that is reasonably incident to such duties; but the amount which may be

**App. 302**

recovered for breach of such condition shall not exceed the sum of three thousand five hundred dollars in any one case, and such bond shall be filed with and held by the said secretary of state, for the purpose aforesaid, but upon the trial of any cause for the recovery of damages upon said bond, the burden of proof shall be upon such express company to establish that such agent, messenger or other employee was not actually employed in such duties for such express company nor in doing anything that was reasonably incident to such duties at the time such damages were sustained; and, provided further, that nothing herein shall prevent railroad police officers duly appointed and qualified under authority of section thirty-one of chapter one hundred forty-five of Barnes' code or duly qualified under the laws of any other state, from carrying any such weapon while actually engaged in their duties or in doing anything reasonably incident to such duties; provided, such railroad company shall execute a continuing bond in the penalty of ten thousand dollars payable unto the state of West Virginia and with security to be approved by the secretary of state of the state of West Virginia conditioned that said railroad company will pay all damages accruing to anyone by the accidental discharge or improper, negligent or illegal discharge or use of such weapon or weapons by such railroad special police officer whether appointed in this or some other state while actually engaged in such duties for such railroad company, in doing anything that is reasonably incident to such duties, but the amount which may be recovered for breach of such condition shall not exceed the sum of three thousand five hundred dollars in any one case, and such bond shall be filed with and held by the said secretary of state for the purpose aforesaid but upon the trial of any cause for the recovery of damages upon said bond, the burden of proof shall be upon such railroad company to establish that such railroad police officer was not actually employed in such duties for such railroad company nor in doing anything that was reasonably incident to such duties at the time such damages were sustained; and provided, further, that in case of riot, public danger and emergency, a justice of the peace, or other person issuing a warrant, may authorize a special constable and his posse whose names shall be set forth in said warrant, to carry weapons for the purpose of executing a process, and a sheriff in such cases may authorize a deputy or posse to carry weapons, but the justice shall write in his docket the cause and reasons for such authority and the name of the person, or persons, so authorized, and index the same, and the sheriff or other officer shall write out and file with the clerk of the county court the reasons and causes for such authority and the name, or names of the persons so authorized, and the same shall always be open to public inspection, and such authority shall authorize such special constable, deputies and posses to carry weapons in good faith only for the specific purposes and times named in such authority, and upon the trial of every indictment the jury shall inquire into the good faith of the person attempting to defend such indictment under the authority granted by any such justice, sheriff or other officer, and any such person or persons so authorized shall be personally liable for the injury caused to any person by the negligent or unlawful use of any such weapon or weapons. It shall be the duty of all ministerial officers, consisting of the justices of the peace, notaries public and other conservators of the peace of this state, to report to the prosecuting attorney of the county the names of all persons guilty of violating this section, and any person willfully failing so to do, shall be guilty of a misdemeanor and shall be fined not exceeding two hundred dollars, and shall, moreover, be liable to removal from office for such willful failure; and it shall likewise be the duty of every person having knowledge of the violation of this act, to report the same to the prosecuting attorney, and to freely and fully give evidence concerning the same, and any one failing so to do, shall be guilty of a misdemeanor and upon conviction thereof shall be fined not exceeding one hundred dollars; provided, further, that nothing herein contained

shall be so construed as to prohibit sheriffs, their regularly appointed deputies, who actually collect taxes in each county, and all constables in their respective counties and districts, and all regularly appointed police officers of their respective cities, towns or villages, all jailors and game protectors who have been duly appointed as such, and members of the department of public safety of this state, from carrying such weapons as they are now authorized by law to carry, who shall have given bond in the penalty of not less than three thousand five hundred dollars, conditioned for the faithful performance of their respective duties, which said officers shall be liable upon their said official bond, for the damages done by the unlawful or careless use of any such weapon or weapons, whether such bond is so conditioned or not. It shall be unlawful for any person armed with a pistol, gun, or other dangerous or deadly weapon, whether licensed to carry same or not, to carry, expose, brandish, or use, such weapon in a way or manner to cause, or threaten, a breach of the peace. Any person violating this provision of this act shall be guilty of a misdemeanor, and upon conviction, shall be fined not less than fifty nor more than three hundred dollars or imprisoned in the county jail not less than thirty nor more than ninety days, or be punished by both fine and imprisonment in the discretion of the court. Any circuit court granting any such license to carry any of the weapons mentioned in this act, the governor, or the superintendent of the department of public safety, with the consent of the governor, may, for any cause deemed sufficient by said court, or by the governor or by the superintendent of the department of public safety with the approval of the governor aforesaid, as the case may be, revoke any such license to carry a pistol or other weapon mentioned in this act for which a license is required, and immediate notice of such revocation shall be given such licensee in person, by registered mail or in the same manner as provided by law for the service of other notices, and no person whose license has been so revoked shall be re-licensed within one year thereafter; provided, that the authority so revoking such license may, after a hearing, sooner reinstate such licensee.

1925 W.Va. Acts 30-31, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms . . . , ch. 3, § 7, pt. b.

(b) It shall be unlawful for any person to carry, transport, or have in his possession any machine gun, sub-machine gun, and what is commonly known as a high powered rifle, or any gun of a similar kind or character, or any ammunition therefor, except on his own premises or premises leased to him for a fixed term, until such person shall have first obtained a permit from the superintendent of the department of public safety of this state, and approved by the governor, or until a license therefore shall have been obtained from the circuit court as in the case of pistols and all such licenses together with the numbers identifying such rifle shall be certified to the superintendent of the department of public safety. Provided, further, that nothing herein shall prevent the use of rifles by bona fide rifle club members who are freeholders or tenants for a fixed term in this state at their usual or customary place of practice, or licensed hunters in the actual hunting of game animals. No such permit shall be granted by such superintendent except in cases of riot, public danger, and emergency, until such applicant shall have filed his written application with said superintendent of the department of public safety, in accordance with such rules and regulations as may from time to time be prescribed by such department of public safety relative thereto, which application shall be accompanied by a fee of two dollars to be used in defraying the expense of issuing such permit and said application shall contain the same

**App. 304**

provisions as are required to be shown under the provisions of this act by applicants for pistol licenses, and shall be duly verified by such applicant, and at least one other reputable citizen of this state. Any such permit as granted under the provisions of this act may be revoked by the governor at his pleasure upon the revocation of any such permit the department of public safety shall immediately seize and take possession of any such machine gun, sub-machine gun, high powered rifle, or gun of similar kind and character, held by reason of said permit, and any and all ammunition therefor, and the said department of public safety shall also confiscate any such machine gun, sub-machine gun and what is commonly known as a high powered rifle, or any gun of similar kind and character and any and all ammunition therefor so owned, carried, transported or possessed contrary to the provisions of this act, and shall safely store and keep the same, subject to the order of the governor.

1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b.
It shall be unlawful for any person, firm or corporation to place or keep on public display to passersby on the streets, for rent or sale, any revolver, pistol, dirk, bowie knife, slung shot or other dangerous weapon of like kind or character or any machine gun, sub-machine gun or high powered rifle or any gun of similar kind or character, or any ammunition for the same. All dealers licensed to sell any of the forgoing arms or weapons shall take the name, address, age and general appearance of the purchaser, as well as the maker of the gun, manufacturer's serial number and caliber, and report the same at once in writing to the superintendent of the department of public safety. It shall be unlawful for any person to sell, rent, give or lend any of the above mentioned arms to an unnaturalized person.

## **WISCONSIN**

Charter and Ordinances of the City of La Crosse [WI], with the Rules of the Common Council Page 202, Image 205 (1888) available at The Making of Modern Law: Primary Sources. 1888 An Ordinance in Relation to the Discharge of Firearms and firecrackers and to the use and exhibition of fireworks, § 1. No person shall fire or discharge any cannon, gun, fowling piece, pistol or firearms of any description, or fire, explode or set off any squib, cracker or other thing containing powder or other combustible or explosive material, or set off or exhibit any fireworks within the limits of the city of La Crosse, without having first obtained written permission from the mayor, which permission shall limit the time and fix the place of such firing, and shall be subject to be revoked at any time after the same may have been granted. Any violation of this ordinance shall subject the person or persons so violating the same to a fine of not less than one dollar nor exceeding twenty-five dollars; but this ordinance shall not be construed to prohibit the discharge of firearms by the chief of police or any of his subordinates or any peace officer when required or made necessary in the performance of any duty imposed by law.

Charter and Ordinances of the City of La Crosse, with the Rules of the Common Council Page 239-242, Image 242-245 (1888) available at The Making of Modern Law: Primary Sources. 1888
Ordinances of La Crosse, An Ordinance to Provide for Licensing Vendors of Gunpowder and Other Explosive Substances and to Regulate the Storing, Keeping and Conveying of all Dangerous and Explosive Materials and Substances within the City of La Crosse, and in relation

**App. 305**

to the Storage and Sale of Lime Therein, § 1. It shall be unlawful for any person to keep for sale, sell or give away any gunpowder, giant powder, nitro-glycerine, gun-cotton, dynamite or any other explosive substance of like nature or use without having first obtained a license therefor from the city of La Crosse in the manner hereinafter provided. Any person convicted of a violation of this section shall be punished by a fine of twenty-five dollars for each offense. . . § 3. It shall be unlawful for any person licensed pursuant to the foregoing sections of this ordinance to have or keep at his or her place of business an amount of gunpowder or other explosive material greater in the aggregate than fifty pounds at any one time, or to keep the same in any other than cases or canisters made of tin, or other metal holding not to exceed ten pounds each. Such gunpowder or other explosive materials shall be kept in places remote from fires and lighted lamps or candles, and where the same may be easily accessible so as to be removed in case of fire. No person shall sell any gunpowder or other explosive material after the lighting of lamps in the evening unless in sealed canisters or cases; and all places where business is carried on under any such license shall have a sign put up in a conspicuous place at or near the front door thereof with the word "gunpowder" painted thereon in large letters. Any person violating any provision of this section shall, upon conviction, be punished by a fine of not less than five dollars nor more than fifty dollars for each offense; and upon any such conviction the common council may at its discretion by resolution duly passed revoke the license of the person so convicted. This ordinance shall not be construed as to prevent persons who are not vendors of the articles mentioned in the title thereof from keeping gunpowder in quantities not exceeding one pound for their own use.

Charles H. Hamilton, ed., The General Ordinances of the City of Milwaukee to January 1, 1896: With Amendments Thereto and an Appendix (Milwaukee, WI: E. Keough, 1896), pp.692-93, Sec. 25. 1896
Chapter XX. Misdemeanors.
Section 25.  It shall be unlawful for any person except policemen, regular or special, or any officer authorized to serve process, to carry or wear concealed about his person, any pistol or colt, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or bowie -knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon, within the limits of the city of Milwaukee; provided, however, that the chief of police of said city may upon any written application to him made, issue and give a written permit to any person residing within the city of Milwaukee, to carry within the said city a pistol or revolver when it is made to appear to said chief of police that it is necessary for the personal safety of such person or for the safety of his property or of the property with which he may be entrusted, to carry such weapon; and the holding of such permit by such person shall be a bar to prosecution under this ordinance. Said chief of police shall keep the names and residences of all persons to whom he may grant such permits, in a book to be kept for that purpose, and he shall have power to revoke such permit at any time.
Said chief of police shall, upon granting each and every such permit, collect from the person to whom the same is granted, the sum of three ( 3 ) dollars, and he shall pay all moneys so collected by him upon granting such permits, into the city treasury.
Any person who shall wear or carry any such pistol , slung-shot, cross-knuckles, knuckles of brass, lead or other metal, knife, dirk or dagger, or any other dangerous or deadly weapon, within the limits of the city of Milwaukee, contrary to the provisions of this chapter, shall be liable to a penalty of not less than ten nor more than one hundred dollars for each and every offense.

**App. 306**

## WYOMING

A. McMicken, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming Page 115-116, Image 116-117 (1893) available at The Making of Modern Law: Primary Sources. 1893
[Ordinances of the] City of Rawlins, Article II, Protection of Persons and Property, § 1. If any person shall within this city fire or discharge any cannon, gun, fowling piece, pistol or firearms of any description, or fire, explode, or set off any squib, cracker, or anything containing powder or other combustible or explosive material, without permission of the Board of Trustees, or the written permission of the mayor (which permission shall limit the time of the firing and shall be subject to be revoked by the mayor or Board of Trustees at any time after the same has been granted) every such person shall, on conviction, be fined in a sum of not less than five dollars and not exceeding one hundred dollars.

1899 Wyo. Sess. Laws 32-33, An Act for the Better Protection of the Game and Fish of this State . . . , ch. 19, § 14.
Any person who is a bona fide citizen of the State of Wyoming shall, upon payment of one dollar to any Justice of the Peace of the county in which he resides, be entitled to receive from said Justice of the Peace, a gun license, which license shall permit such person to pursue, hunt and kill any of the animals mentioned in this Section, during the time allowed therefor. . . . Any person who is not a resident of the State of Wyoming, shall upon payment to any Justice of the Peace of this State of the sum of forty dollars to be entitled to receive from such Justice of the Peace a license, which license shall permit such person to pursue, hunt and kill any of the animals mentioned in this Section, during the time allowed therefor of the current year.

1913 Wyo. Sess. Laws 165, An Act . . . Relating to the Duties of the State Game Warden, Assistant and Deputy Game Wardens, and the Preservation of the Game Animals and Game Birds and Fish of the State of Wyoming . . . , ch. 121, § 38.
That Section 20 . . . be . . . amended . . . § 20. Any person who is not a bona fide elector of this state, or the child or legal ward of a bona fide elector of this state, or a soldier or sailor who is a bona fide elector of the United States, and has been stationed at a government post within this state for one year past, or non-residents having property in this state on which they pay taxes to the amount of $100.00 or over annually, but who shall be a citizen of the United States or a free-holder in this state, shall upon payment of five dollars to any Justice of the Peace . . . be entitled to receive from such officer a gunner's license, which license shall permit such person to kill any of the game birds of this state during the current season under the restrictions heretofore and hereinafter imposed.

1915 Wyo. Sess. Laws 91, An Act Relating to the Preservation of the Game Animals, Game Birds, and Fish of the State of Wyoming . . . , ch. 91, § 13.
There is hereby created a special gun and fish license for aliens. No person, not a bona fide citizen of the United States, shall own or have in his possession, in the State of Wyoming, any gun, pistol or other firearm, or any fishing tackle, without first having obtained the specified

**App. 307**

license therefor, which such special gun and fish license shall cost the owner the sum of Twenty-five Dollars[.]

1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4. § 1. All wholesalers, retailers, dealers and pawn brokers are hereby required to keep a record of all firearms which may come into their possession, whether new or second hand, which record shall be known as the Firearms Register. Such register shall contain the following information, to wit: the name of the manufacturer, person, persons, firm or corporation from whom the firearm was obtained, the date of its acquisition, its manufacturer's number, its color, its caliber, whether the same is new or second hand, whether it is automatic, a revolver, a single shot pistol, a rifle, a shot gun or a machine gun, the name of the party to whom said firearm is sold in such purchasers handwriting and the date of such sale. § 2. Every person who purchases any firearm from any retailer, pawn broker or dealer, shall sign his name or make his mark properly witnessed, if he cannot write, on said Firearm Register, at the time of the delivery to him of any firearm so purchased. § 3. The firearm register, herein required to be kept, shall be prepared by every wholesaler, retailer, pawn broker and dealer in firearms in the state of Wyoming within 30 days after this Act shall become effective and shall thereafter be continued as herein provided. It shall be kept at the place of business of said wholesaler, retailer, pawn broker or dealer, and shall be subject to inspection by any peace officer at all reasonable times. § 4. Any person, firm or corporation who shall fail or refuse to comply with the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not to exceed $100.00, or imprisoned in the County Jail for a period of not to exceed six months, or by both such fine and imprisonment.

Source: https://firearmslaw.duke.edu/repository/search-the-repository/

# 1923 Cal. Laws 695, 696, ch. 339 §§ 2, 10

*authorize, in proper cases, the granting of licenses or permits to carry firearms concealed upon the person; to provide for licensing retail dealers in such firearms and regulating sales thereunder: and to repeal chapter one hundred forty-five of California Statutes of 1917, relating to the same subject.*

[Approved June 13, 1923.]

*The people of the State of California do enact as follows:*

**Manufacture, sale, carrying, etc., certain dangerous weapons prohibited.**

SECTION 1. On and after the date upon which this act takes effect, every person who within the State of California manufactures or causes to be manufactured, or who imports into the state, or who keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any instrument or weapon of the kind commonly known as a blackjack, slung-shot, billy, sandclub, sandbag, or metal knuckles, or who carries concealed upon his person any explosive substance, other than fixed ammunition, or who carries concealed upon his person any dirk or dagger, shall be guilty of a felony and upon a conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.

**Aliens and felons must not possess certain firearms.**

SEC. 2. On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person. The terms "pistol," "revolver," and "firearms capable of being concealed upon the person" as used in this act shall be construed to apply to and include all firearms having a barrel less than twelve inches in length. Any person who shall violate the provisions of this section shall be guilty of a felony and upon conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.

**Committing felony while carrying dangerous weapon.**

SEC. 3. If any person shall commit or attempt to commit any felony within this state while armed with any of the weapons mentioned in section one hereof or while armed with any pistol, revolver or other firearm capable of being concealed upon the person, without having a license or permit to carry such firearm as hereinafter provided, upon conviction of such felony or of an attempt to commit such felony, he shall in addition to the punishment prescribed for the crime of which he has been convicted, be punishable by imprisonment in a state prison for not less than five nor for more than ten years. Such additional period of imprisonment shall commence upon the expiration or other termination of the sentence imposed for the crime of which he stands convicted and shall not run concurrently with such sentence. Upon a second conviction under like circumstances such additional period of impris-

Name of purchaser _____age_____years.
Permanent address (state name of city, town or township, street and number of dwelling)_____
__ _____ _____
Height_____feet_____inches.  Occupation _____
Color __ _____skin_____eyes_____hair_____
If traveling or in locality temporarily, give local address
_____
Signature of purchaser_____
(Signing a fictitious name or address is a misdemeanor.)  (To be signed in duplicate.)
Witness_____, salesman.
   (To be signed in duplicate.)

SEC. 10.  No person shall sell, deliver or otherwise transfer any pistol, revolver or other firearm capable of being concealed upon the person to any person whom he has cause to believe to be within any of the classes prohibited by section two hereof from owning or possessing such firearms, nor to any minor under the age of eighteen years.  In no event shall any such firearm be delivered to the purchaser upon the day of the application for the purchase thereof, and when delivered such firearm shall be securely wrapped and shall be unloaded. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer any such firearm to any other person within this state who is not personally known to the vendor.  Any violation of the provisions of this section shall be a misdemeanor. *Restrictions on transfer of certain firearms.*

SEC. 11.  The duly constituted licensing authorities of any county, city and county, city, town or other municipality within this state, may grant licenses in form prescribed by the attorney general, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said county, city and county, city, town or other municipality pistols, revolvers, and other firearms capable of being concealed upon the person, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture: *Local licenses for sale of certain firearms.*

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol or revolver shall be delivered

(a) On the day of the application for the purchase, and when delivered shall be unloaded and securely wrapped; nor

(b) Unless the purchaser either is personally known to the seller or shall present clear evidence of his identity.

4. No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed in any part of said premises where it can readily be seen from the outside.

# 1923 Conn. Laws 3707, ch. 252 § 7

thereof twenty-five cents, which fees shall be paid by the authority issuing the same to the municipality wherein issued or the state, as the case may be, and each permit issued hereunder shall be valid for one year from the date of issuance.

**Sales to be made in place of business mentioned in permit.** Sec. 5. No sale of any pistol or revolver shall be made except in the room, store or place described in the permit for the sale of pistols and revolvers, and such permit or a copy thereof certified by the authority issuing the same shall be exposed to view within the room, store or place where pistols or revolvers shall be sold or offered or exposed for sale, and no sale or delivery of any pistol or revolver shall be made unless the purchaser or person to whom the same is to be delivered shall be personally known to the vendor of such pistol or revolver or the person making delivery thereof or unless the person making such purchase or to whom delivery thereof is to be made shall provide evidence of his identity. **Vendor to keep record of sale of fire arms.** The vendor of any pistol or revolver shall keep a record of every pistol or revolver sold in a book kept for that purpose, which record shall be in such form as shall be prescribed by the superintendent of state police and shall include the date of the sale, the caliber, make, model and manufacturer's number of such pistol or revolver and the name, address and occupation of the purchaser thereof, which record shall be signed by the purchaser and by the person making the sale, each in the presence of the other, and shall be preserved by the vendor of such pistol or revolver for a period of at least six years.

**Permit to carry fire arms may be revoked.** Sec. 6. Any permit for the carrying of any pistol or revolver issued under the provisions of this act may be revoked by the authority issuing the same. The revocation of either of such permits shall be a revocation of the other and, upon the revocation of any permit, such permit shall be forthwith delivered to the authority issuing the same. Upon the revocation of any local permit, the authority issuing the same shall forthwith notify the superintendent of state police and upon the revocation of any permit issued by the superintendent of state police, said superintendent shall forthwith notify the authority issuing such local permit.

**Sale of pistols or revolvers to aliens restricted.** Sec. 7. No person, firm or corporation shall sell at retail, deliver or otherwise transfer any pistol or revolver to any alien, nor shall any person deliver any pistol or revolver at retail except upon written application therefor and no sale or delivery of any pistol or revolver shall be made upon the date of the filing or receipt of any written application for the purchase thereof, and when any pistol or revolver shall be delivered in connection with the sale or purchase, such pistol or revolver shall be enclosed in a package, the paper or wrapping of which shall be securely fastened, and no pistol or revolver when delivered on any sale or purchase shall be loaded or con-

tain therein any gunpowder or other explosive or any bullet, ball or shell. Upon the delivery of any pistol or revolver the purchaser shall sign in triplicate a receipt for such pistol or revolver which shall contain the name, address and occupation of such purchaser, the date of sale, caliber, make, model and manufacturer's number and a general description thereof. One of such triplicate receipts shall, within twenty-four hours thereafter, be forwarded by the vendor of such pistol or revolver to the superintendent of state police and one to the authority issuing the permit for the sale of such pistol or revolver and the other shall be retained by such vendor for at least six years.

SEC. 8. No person shall make any false statement or give any false information connected with any purchase, sale or delivery of any pistol or revolver, and no person shall sell, barter, hire, lend, give or deliver to any minor under the age of eighteen years any pistol or revolver.

> Giving of false information or the sale to persons under eighteen years of age prohibited.

SEC. 9. No person shall carry any pistol or revolver in or upon any vehicle or upon his person, except when such person shall be within his dwelling house or place of business, without a permit to carry the same issued as hereinbefore provided.

> Carrying of pistol or revolver without permits restricted.

SEC. 10. The provisions of section nine of this act shall not apply to the carrying of any pistol or revolver by any marshal, sheriff or peace officer, or to any soldier, sailor or marine in the service of the United States or this state when on duty or going to or from duty, or to any member of any military organization when on parade or when going to or from any place of assembly, or to the transportation of pistols or revolvers as merchandise, or to any person carrying any pistol or revolver while contained in the package in which it was originally wrapped at the time of sale and while carrying the same from the place of sale to the purchaser's residence or place of business, or to any person removing his household goods or effects from one place to another, or to any person while carrying any such pistol or revolver from his place of residence or business to a place or person where or by whom such pistol or revolver is to be repaired or while returning to his place of residence or business after the same shall have been repaired.

> When and by whom pistols and revolvers may be carried without securing a permit.

SEC. 11. No person shall change, alter, remove or obliterate the name of any maker or model or any maker's number or other mark of identification on any pistol or revolver. The possession of any pistol or revolver upon which any identifying mark, number or name shall have been changed, altered, removed or obliterated shall be prima facie evidence that the person owning or in possession of such pistol or revolver has changed, altered, removed or obliterated the same.

> Tampering with identification mark of any pistol or revolver prohibited.

**App. 314**

# 1923 N.D. Laws 379, ch. 266 § 10

Case No. 1:23-cv-02563-JLK   Document 18-9   filed 10/17/23   USDC Colorado   pg 8 of 9

shall upon the application of any persons having a bona fide residence or place of business within the jurisdiction ot said licensing authority, or of any person having a bona fide residence or place of business within the United States and a license to carry a fire arm concealed upon his person issued by the authorities of any State or sub-division of the United States, issue a license to such person to carry a pistol or revolver within this State for not more than one year from date of issue, if it appears that the applicant has good reason to fear an injury to his person or property or for any other proper purpose, and that he is a suitable person to be so licensed. The license shall be in triplicate, in form to be prescribed by the Secretary of State, and shall bear the name, address, description, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent by registered mail to the Secretary of State, and the triplicate shall be preserved for six years by the authority issuing said license.

Sec. 9.  SELLING TO MINORS.)  Any person or persons who shall sell, barter, hire, lend or give to any minor under the age of eighteen years any pistol or revolver shall be deemed guilty of a misdemeanor, and shall upon conviction thereof be fined not less than $100, nor more than $1,000, or be imprisoned not less than three months, nor more than one year, or both.

Sec. 10.  SALES REGULATED.)  No person shall sell, deliver, or otherwise transfer a pistol or revolver to a person who he has reasonable cause to believe either is an unnaturalized foreign born person or has been convicted of a felony against the person or property of another, or against the Government of the United States or any State or subdivision thereof, nor in any event shall he deliver a pistol or revolver on the day of the application for the purchase thereof, and when delivered, said pistol or revolver shall be securely wrapped and shall be unloaded. Before a delivery be made the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, sign and forward by registered mail one copy thereof to the Secretary of State, and one copy thereof to the chief of police of the city or town, or the sheriff of the county of which the seller is a resident, and shall retain the other copy for six years. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall be punished by a fine of not less than $100 or by

imprisonment for not less than one year, or by both such fine and imprisonment.

Sec. 11. DEALERS TO BE LICENSED.) Whoever, without being licensed as hereinafter provided, sells, or otherwise transfers, advertises, or exposes for sale, or transfers or has in his possession with intent to sell, or otherwise transfer, pistols or revolvers, shall be punished by imprisonment for not less than two years.

Sec. 12. DEALERS' LICENSES: BY WHOM GRANTED, AND CONDITIONS THEREOF.) The duly constituted licensing authorities of any city, town or subdivision of this state, may grant licenses in form prescribed by the Secretary of State, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political subdivision, pistols and revolvers, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol or revolver shall be delivered—
    (a) On the day of the application for the purchase, and when delivered shall be unloaded and securely wrapped; nor
    (b) Unless the purchaser either is personally known to the seller or shall present clear evidence of his identity; nor
    (c) If the seller has reasonable cause to believe that the purchaser either is an unnaturalized foreign born person or has been convicted of a felony against the person or property of another, or against the Government of the United States or any State or subdivision thereof.

4. A true record, in triplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Secretary of State, and shall be personally signed by the purchaser and by the person affecting the sale, each in the presence of the other, and shall include the date of sale, the caliber, make, model, and manufacturer's number of the weapon, the name, address, occupation, and nationality of the purchaser. One copy of said record shall, within seven days, be forwarded by registered mail to the Secretary of State and one copy thereof to the chief of police of the city or town or the sheriff of the county of which the seller is a resident, and the other copy retained for six years.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01076-PAB

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

## DECLARATION OF RANDOLPH ROTH

---

    I, Randolph Roth, declare under penalty of perjury that the following is true and correct:

    1.    I am an Arts and Sciences Distinguished Professor of History and Sociology at The Ohio State University.  I have personal knowledge of the facts set forth in this declaration, and if called upon as a witness, I could and would testify competently as to those facts.

    2.    I have been retained by the State of Colorado to render expert opinions in this case.  I am being compensated at a rate of $250 per hour.

### BACKGROUND AND QUALIFICATIONS

    3.    I received a B.A. in History with Honors and Distinction in 1973 from Stanford University, where I received the James Birdsall Weter Prize for the outstanding honors thesis in History.  I received a Ph.D. in History in 1981 from Yale University, where I received the Theron Rockwell Field Prize for the outstanding dissertation in the humanities and the George Washington Eggleston Prize for the outstanding dissertation in American history.  I have taught courses in history, the social sciences, and statistics since 1978, with a focus on criminology

and the history of crime.  A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this declaration.

4.      I am the author of *American Homicide* (The Belknap Press of the Harvard University Press, 2009), which received the 2011 Michael J. Hindelang Award from the American Society of Criminology awarded annually for the book published over the three previous years that "makes the most outstanding contribution to research in criminology over the previous three years,"[1] and the 2010 Allan Sharlin Memorial Book Award from the Social Science History Association for outstanding books in social science history.[2]  *American Homicide* was also named one of the Outstanding Academic Books of 2010 by *Choice*, and the outstanding book of 2009 by *reason.com*.  The book is an interregional, internationally comparative study of homicide in the United States from colonial times to the present.  I am a Fellow of the American Association for the Advancement of Science, and I have served as a member of the National Academy of Sciences Roundtable on Crime Trends, 2013-2016, and as a member of the Editorial Board of the *American Historical Review*, the most influential journal in the discipline. And in 2022 I received the inaugural Distinguished Scholar Award from the Historical Criminology Division of the American Society of Criminology.

5.      I am the principal investigator on the National Homicide Data Improvement Project, a project funded by the National Science Foundation (SES-1228406, https://www.nsf.gov/awardsearch/showAward?AWD_ID=1228406) and the Harry Frank Guggenheim Foundation to improve the quality of homicide data in the United States from 1959 to the present.  The pilot project on Ohio has drawn

---

[1] See American Society of Criminology, Michel J. Hindelang outstanding Book Award Recipients, https://asc41.com/about-asc/awards/michael-j-hindelang-outstanding-book-award-recipients/.

[2] See Social Science History Association, Allan Sharlin Memorial Book Award, https://ssha.org/awards/sharlin_award/.

on a wide range of sources in its effort to create a comprehensive database on homicides (including narratives of each incident) based on the mortality statistics of the Ohio Department of Health, the confidential compressed mortality files of the National Center for Health Statistics, the F.B.I.'s Supplementary Homicide Reports, death certificates, coroner's reports, the homicide case files of Cincinnati, Cleveland, and Columbus, obituaries, and newspaper accounts.

6.     I have published numerous essays on the history of violence and the use of firearms in the United States, including a) "Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence in Early America," *William and Mary Quarterly* (2002) 59: 223-240 (https://www.jstor.org/stable/3491655#metadata_info_tab_contents); b) "Counting Guns: What Social Science Historians Know and Could Learn about Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social Science History* (2002) 26: 699-708 (https://www.jstor.org/stable/40267796#metadata_info_tab_contents); c) "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019); and d) "The Opioid Epidemic and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman, in the *Journal of Research in Crime and Delinquency* (2021) (https://www.researchgate.net/publication/348513393_The_Opioid_Epidemic_and_Homicide_in_the_United_States).

7.     I am also co-founder and co-director of the Historical Violence Database.  The web address for the Historical Violence Database is: http://cjrc.osu.edu/research/interdisciplinary/hvd.  The historical data on which this

declaration draws are available through the Historical Violence Database. The Historical Violence Database is a collaborative project by scholars in the United States, Canada, and Europe to gather data on the history of violent crime and violent death (homicides, suicides, accidents, and casualties of war) from medieval times to the present. The project is described in Randolph Roth et al., "The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death." *Historical Methods* (2008) 41: 81-98 (https://www.tandfonline.com/doi/pdf/10.3200/HMTS.41.2.81-98?casa_token=PfjkfMsciOwAAAAA:1HrNKToUGfQT4T-L4wqloRc2DFsM4eRmKEc346vchboaSh-X29CkEdqIe8bMoZjBNdk7yNh_aAU). The only way to obtain reliable historical homicide estimates is to review every scrap of paper on criminal matters in every courthouse (indictments, docket books, case files, and judicial proceedings), every jail roll and coroner's report, every diary and memoir, every article in every issue of a number of local newspapers, every entry in the vital records, and every local history based on lost sources, local tradition, or oral testimony. That is why it takes months to study a single rural county, and years to study a single city.[3]

---

[3] It is also essential, in the opinion of historians and historical social scientists involved in the Historical Violence Database, to use capture-recapture mathematics, when multiple sources are available, to estimate the number of homicides where gaps or omissions exist in the historical record. The method estimates the percentage of the likely number of homicides that appear in the surviving records by looking at the degree to which homicides reported in the surviving legal sources overlap with homicides reported in the surviving non-legal sources (newspapers, vital records, diaries, etc.). A greater degree of overlap means a higher percentage in the surviving records and a tighter confidence interval. A lesser degree of overlap, which typically occurs on contested frontiers and during civil wars and revolutions, means a lower percentage and a wider confidence interval. See Randolph Roth, "American Homicide Supplemental Volume: Homicide Estimates" (2009)

(continued…)

8.      My work on data collection and my research for *American Homicide*, together with the research I have conducted for related essays, has helped me gain expertise on the causes of homicide and mass violence, and on the role technology has played in changing the nature and incidence of homicide and mass violence.  I hasten to add that the insights that my colleagues and I have gained as social science historians into the causes of violence and the history of violence in the United States stem from our tireless commitment to empiricism.  Our goal is to gather accurate data on the character and incidence of violent crimes and to follow the evidence wherever it leads, even when it forces us to accept the fact that a hypothesis we thought might be true proved false.  As my colleagues and I are fond of saying in the Criminal Justice Network of the Social Science History Association, the goal is not to be right, but to get it right.  That is the only way to design effective, pragmatic, nonideological laws and public policies that can help us address our nation's problem of violence.

9.      I have previously served as an expert witness in cases concerning the constitutionality of state and municipal gun laws, including *Miller v. Bonta*, No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 3:17-cv-1017 (S.D. Cal.); *Steven Rupp et al. and California Rifle and Pistol Association v. Bonta*, 8:17-cv-00746-JLS-JDE (CA. Central District Western Division); *Ocean State Tactical v. Rhode Island*, No. 22-cv-246 (D.R.I.); *Hanson v. District of Columbia*, No. 1:22-

---

(https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Homicide-Estimates.pdf); Roth, "Child Murder in New England," *Social Science History* (2001) 25: 101-147 (https://www.jstor.org/stable/1171584#metadata_info_tab_contents); Roth and James M. Denham,  "Homicide in Florida, 1821-1861: A Quantitative Analysis," *Florida Historical Quarterly* 86 (2007): 216-239; and Douglas L. Eckberg, "Stalking the Elusive Homicide: A Capture-Recapture Approach to the Estimation of Post-Reconstruction South Carolina Killings." *Social Science History* 25 (2001): 67-91 (https://www.jstor.org/stable/1171582#metadata_info_tab_contents).

Declaration of Randolph Roth (*RMGO v. Polis*, D. Colo. 23-cv-01076-PAB)

**App. 322**

cv02256-RC (D.C.); *State of Vermont v. Max B. Misch*, Docket No. 173-2-19 Bnrc (Superior Court, Criminal Division, Bennington Unit, VT.); *National Association for Gun Rights and Capen v. Campbell*, No. 22-cv-11431-FDS (D.MA.); *National Association for Gun Rights, and Susan Karen Goldman v. City of Highland Park, Illinois*, No. 1:22-cv-04774 (N.D. Ill. Eastern Division); *Association Of New Jersey Rifle and Pistol Clubs v. Platkin*, No. 3:18-cv-10507 (D.N.J.); *Cheeseman v. Platkin*, No. 7-:22-cv-04360 (D.N.J.); *Ellman v. Platkin*, No. 3:22-cv-04397 (D.N.J.); *Oregon Firearms Federation, et al. v. Brown and Roseblum*, No. 2:22-cv-01815-IM (D.OR.); *National Association for Gun Rights v. Brown*, No 22-cv-00404-DKW-RT (D.HI.); *National Association for Gun Rights v. Lamont*, No. 3:22-cv-01118 (D.CT.); and *Harrell v. Raoul*, 23-141-SPM (S.D. Ill.).

## OPINIONS

### I.   SUMMARY OF OPINIONS

10.   I have been asked by the State of Colorado to provide opinions on the history of homicides and mass murders in the United States, with special attention to the role that technologies have played in shaping the character and incidence of homicides and mass murders over time, and the historical restrictions that local and federal authorities have imposed in response to new technologies that they deemed particularly lethal, prone to misuse, and a danger to the public because of the ways in which they reshaped the character and incidence of homicides and mass murders.

11.   For the past thirty-five years, I have dedicated my career to understanding why homicide rates rise and fall over time, in hopes of understanding why the United States—which, apart from the slave South, was perhaps the least homicidal society in the Western world in the early nineteenth

century—became by far the most homicidal, as it remains today. I discovered that the key to low homicide rates over the past 450 years has been successful nation-building. High homicide rates among unrelated adults—friends, acquaintances, strangers—coincide with political instability, a loss of trust in government and political leaders, a loss of fellow feeling among citizens, and a lack of faith in the justice of the social hierarchy.[4] As a nation, we are still feeling the aftershocks of our failure at nation-building in the mid- and late-nineteenth century, from the political crisis of the late 1840s and 1850s through the Civil War, Reconstruction, and the rise of Jim Crow.

12.     Our nation's homicide rate would thus be high today even in the absence of modern technologies that have made firearms far more capable of injuring multiple people over a short span of time than they were in colonial and Revolutionary era. But the evidence also shows that the availability of guns and changes in firearms technology, especially the emergence of modern breech-loading firearms in the mid-nineteenth century, and of rapid-fire semiautomatic weapons and extended magazines in the late twentieth century, have pushed the homicide rate in United States well beyond what it would otherwise have been.

---

[4] See Randolph Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217 (https://journals.sagepub.com/doi/pdf/10.1177/1088767912442501?casa_token=dkP_nZZxCaYAAAAA:vL522E2inh9U2gr4X2qAhPnqRminWEjLv8nbwrNEhqNpRliTesFI_1SDY6tepvZbjwiRWPEom7M), for an introduction to the ways that social science historians can measure the feelings and beliefs that lead to successful nation-building. My research has shown that those measures have gone up and down with homicide rates among unrelated adults in the United States from colonial times to the present. In social science history, as in the non-experimental historical sciences (geology, paleontology, evolutionary biology), correlations that persist across wide stretches of time and space are not random. They reveal deep patterns that are causal.

13.     My opinion will address in turn: 1) firearms restrictions on colonists from the end of the seventeenth century to the eve of the Revolution, when homicide rates were low among colonists and firearms were seldom used in homicides among colonists when they did occur; 2) the development during the Founding and Early National periods of laws restricting the use or ownership of concealable weapons in slave and frontier states, where homicide rates among persons of European ancestry soared after the Revolution in large part because of the increased manufacture and ownership of concealable percussion cap pistols and fighting knives; 3) the spread of restrictions on carrying concealed weapons in every state by World War I, as homicide rates rose across the nation, beginning around the time of the Mexican War of 1846-1848 and lasting until World War I—a rise caused in part by the invention of modern revolvers, which were used in a majority of homicides by the late nineteenth century; 4) the difficulty that local and federal officials faced from the colonial era into the early twentieth century in addressing the threat of mass murders, which, because of the limitations of existing technologies, were carried out by large groups of individuals acting in concert, rather than by individuals or small groups; and 5) the spread of restrictions in the twentieth and early twenty-first centuries on new technologies, including rapid-fire firearms and large capacity magazines, that changed the character of mass murder, by enabling individuals or small groups to commit mass murder.

## II.   GOVERNMENT REGULATION OF FIREARMS IN RESPONSE TO HOMICIDE TRENDS

### A.   Homicide and Firearms in the Colonial Era (1688-1763)

14.     In the eighteenth century, the use and ownership of firearms by Native Americans and African Americans, enslaved and free, were heavily regulated.[5]

---

[5] Clayton E. Cramer, "Colonial Firearms Regulation" (April 6, 2016). Available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2759961.

Declaration of Randolph Roth (*RMGO v. Polis*, D. Colo. 23-cv-01076-PAB)

**App. 325**

But laws restricting the use or ownership of firearms by colonists of European ancestry were rare, for two reasons.  First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in patriotic fellow feeling within the British empire, and greater trust in government.[6]  By the late 1750s and early 1760s, the rates at which adult colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England.[7]  Violence among colonists was not a pressing problem on the eve of the Revolution.

15.     Second, the impact of firearms on the homicide rate was modest, even though household ownership of firearms was widespread.  Approximately 50 to 60 percent of households in the colonial and Founding eras owned a working firearm, usually a musket or a fowling piece.[8]  Fowling pieces, like muskets, were muzzle-loading. But unlike muskets, which were heavy, single-shot firearms used for

---

[6] Randolph Roth, *American Homicide* (Cambridge: The Belknap Press of Harvard University Press, 2009), 63, noting that "Fear of Indians and slaves, hatred of the French, enthusiasm for the new colonial and imperial governments established by the Glorious Revolution, and patriotic devotion to England drew colonists together.  The late seventeenth century thus marks the discernible beginning of the centuries-long pattern linking homicide rates in America with political stability, racial, religious, and national solidarity, and faith in government and political leaders."

[7] Roth, *American Homicide*, 61-63, and especially the graphs on 38, 39, and 91.  By way of comparison, the average homicide rate for adults in the United States from 1999 through 2016—an era in which the quality of emergency services and wound care was vastly superior to that in the colonial era—was 7 per 100,000 per year.  See CDC Wonder Compressed Mortality Files, ICD-10 (https://wonder.cdc.gov/cmf-icd10.html, accessed September 8, 2022).

[8] Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *Firearms and the Common Law: History and Memory* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116.

militia service, fowling pieces were manufactured specifically to hunt birds and control vermin, so they were designed to fire shot, primarily, rather than ball, and were of lighter construction than muskets.[9] Family, household, and intimate partner homicides were rare, and only 10 to 15 percent of those homicides were committed with guns.  In New England, the rate of family and intimate partner homicides stood at only 2 per million persons per year for European Americans and 3 per million for African Americans for the seventeenth and most of the eighteenth century, and fell to 1 per million for both European and African Americans after the Revolution.  The rates in the Chesapeake were likewise low, at 8 per million per year for European Americans and 4 to 5 per million for African Americans.[10]  And because the homicide rate among unrelated adults was low, the proportion of nondomestic homicides committed with guns was similarly low—never more than 10 to 15 percent.[11]

16.     Firearm use in homicides was generally rare because muzzle-loading firearms, such as muskets and fowling pieces, had significant limitations as murder weapons in the colonial era.[12]  They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology; and with the exception of a few double-barreled pistols, they could not fire multiple shots without reloading.[13]  They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat.  They had to be reloaded manually to enable

---

[9] *See, e.g.*, Kevin M. Sweeney, "Firearms, Militias, and the Second Amendment," in Saul A. Cornell and Nathan Kozuskanich, eds., *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (University of Massachusetts Press, 2013), 310, 327 & nn. 101-102.

[10] Roth, "Why Guns Are and Aren't the Problem," 116.

[11] Ibid., 116-119.

[12] Ibid., 117.

[13] Ibid.

Declaration of Randolph Roth (*RMGO v. Polis*, D. Colo. 23-cv-01076-PAB)

**App. 327**

the firing of another shot, which was a time-consuming process that required skill and experience.[14]  And more important, muzzle-loading firearms could not be used impulsively unless they were already loaded for some other purpose.[15]  It took at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand.[16]  The user had to pour powder down the barrel, hold it in place with wadding, and drop or ram the shot or ball onto the charge.[17]  The firing mechanism also had to be readied, often with a fresh flint.[18]  And muzzle-loading guns were difficult to keep loaded for any length of time, because black powder absorbed moisture and could corrode the barrel or firing mechanism or make the charge liable to misfire.[19]  The life of a charge could be extended by storing a gun in a warm, dry place, typically over a fireplace, but even there, moisture from boiling pots, drying clothes, or humid weather could do damage.[20]  That is why most owners stored their guns empty, cleaned them regularly, and loaded them anew before every use.[21]

17.    The infrequent use of guns in homicides in colonial America reflected these limitations.  Family and household homicides—most of which were caused

---

[14] Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783* (New York: Bramhall House, 1956), 155-225; Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* (New York: Penguin Press, 2018), 9-10; and Satia, "Who Had Guns in Eighteenth Century Britain?" in Tucker, Hacker, and Vining, *Firearms and the Common Law*, 41-44.

[15] Roth, "Why Guns Are and Aren't the Problem," 117.

[16] Ibid.

[17] Ibid.

[18] Ibid.

[19] Ibid.

[20] Ibid.

[21] Ibid.; and Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* (New York: Bonanza Books, 1959), 11-40, 180-183.

---

by abuse or fights between family members that got out of control—were committed almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives.[22]  It did not matter whether the type of homicide was rare—like family and intimate homicides—or common, like murders of servants, slaves, or owners committed during the heyday of indentured servitude or the early years of racial slavery.[23]  Guns were not the weapons of choice in homicides that grew out of the tensions of daily life.[24]

18.     When colonists anticipated violence or during times of political instability gun use was more common.  When homicide rates were high among unrelated adults in the early and mid-seventeenth century, colonists went armed to political or interpersonal disputes,[25] so the proportion of homicides committed with firearms was at that time 40 percent and rose even higher in contested areas on the frontier.[26]  Colonists also armed themselves when they anticipated hostile encounters with Native Americans, so 60 percent of homicides of Native Americans by European Americans in New England were committed with firearms.[27]  And slave catchers and posses kept their firearms at the ready, so 90 percent of runaway slaves who were killed in Virginia were shot.[28]  Otherwise,

---

[22] Roth, "Why Guns Are and Aren't the Problem," 117.

[23] Ibid.

[24] Ibid.  Contrary to popular belief, dueling was also rare in colonial America.  Roth, *American Homicide*, 45, 158.

[25] Roth, "Why Guns Are and Aren't the Problem," 118-119.

[26] Ibid., 116-117.

[27] Ibid., 118-119 (reporting that "In New England, 57 percent of such homicides were committed with guns between the end of King Phillip's War in 1676 and the end of the eighteenth century").

[28] Ibid., 118 (reporting that "Petitions to the Virginia House of Burgesses for compensation for outlawed slaves who were killed during attempts to capture them indicate that 90 percent were shot").

however, colonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training.[29]  That is why firearms had a modest impact on homicide rates among colonists.

**B.   The Rise in Violence in the South and on Contested Frontiers during the Early National Period, the Role of New Technologies and Practices, and Regulations on Concealable Weapons (1790s-1840s)**

19.    The Founding Generation was zealous in its defense of the people's rights, and so enshrined them in the Constitution.  At the same time, they recognized that some citizens could be irresponsible or motivated by evil intent and could thus threaten the security of the government and the safety of citizens.[30] The threats that such citizens posed to public safety could be checked in most instances by ordinary criminal statutes, drawn largely from British common law. But at times those threats could be checked only by statutes that placed limits on basic rights.[31]

---

[29] Ibid., 118-119.

[30] On the fears of the Founders that their republic might collapse because selfish or unscrupulous citizens might misuse their liberties, see Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969), 65-70, 282-291, 319-328, 413-425, 463-467; Drew R. McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989), 42-45; and Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003), 6-9, 60-65, 86-104, 113-114.

[31] On the Founders' belief that rights might have to be restricted in certain instances, see Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016), 1-8, on restraints on freedom of speech and the press during the administration of John Adams; Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963), 93-141, on loosening restrictions on searches and seizures during the administration of Thomas Jefferson; and Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (New York: Prometheus Books, 2018), 70-

(continued…)

Declaration of Randolph Roth (*RMGO v. Polis*, D. Colo. 23-cv-01076-PAB)

**App. 330**

20.     The Founders were aware that the rate at which civilians killed each other or were killed by roving bands of Tories or Patriots rose during the Revolution.[32]   And they recognized that more civilians, expecting trouble with neighbors, public officials, and partisans, were likely to go about armed during the Revolution, which is why the proportion of homicides of European Americans by

121, especially 108-109, as well as Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 39-70, and Jack N. Rakove, "The Second Amendment: The Highest State of Originalism," in Carl T. Bogus, ed., *The Second Amendment in Law and History: Historians and Constitutional Scholars on the Right to Bear Arms* (New York: The New Press, 2000), 74-116, on the limited scope of the Second Amendment. Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996), 291, notes that "Nearly all the activities that constituted the realms of life, liberty, property, and religion were subject to regulation by the state; no obvious landmarks marked the boundaries beyond which its authority could not intrude, *if* its actions met the requirements of law." See also Rakove, "The Second Amendment: The Highest State of Originalism," Chicago-Kent Law Review 76 (2000), 157 (https://scholarship.kentlaw.iit.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=3289&context=cklawreview): "[At] the time when the Second Amendment was adopted, it was still possible to conceive of statements of rights in quite different terms, as assertions or confirmations of vital principles, rather than the codification of legally enforceable restrictions or commands."

[32] Roth, *American Homicide*, 145-149; Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017), 308-322; Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006), 91-102; George C. Daughan, *Revolution on the Hudson: New York City and the Hudson River Valley in the American War for Independence* (New York: W. W. Norton, 2016), 137-138; John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998), 42-43, 141-145, 149-152; Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000), 25-27, 32, 64-65, 91-92, 114; and Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 1996), 3-18.

unrelated adults rose to 33 percent in Virginia and 46 percent in New England.[33]
But the surge in violence ended in New England, the Mid-Atlantic states, and the
settled Midwest once the Revolutionary crisis was over.  In those areas homicide
rates fell to levels in some instances even lower than those which had prevailed in
the early and mid-eighteenth century.  By the 1820s, rates had fallen to 3 per
100,000 adults per year in Cleveland and Philadelphia, to 2 per 100,000 in rural
Ohio, and to 0.5 per 100,000 in northern New England.  Only New York City
stood out, at 6 per 100,000 adults per year.[34]  And the proportion of domestic and
nondomestic homicides committed with firearms was correspondingly low—
between 0 and 10 percent—because people once again generally refrained, as they
had from the Glorious Revolution through the French and Indian War, from going
about armed, except to hunt, control vermin, or serve in the militia.[35]

21.     The keys to these low homicide rates and low rates of gun violence in
New England, the Mid-Atlantic states, and the settled Midwest were successful
nation-building and the degree to which the promise of the democratic revolution
was realized.  Political stability returned, as did faith in government and a strong
sense of patriotic fellow feeling, as the franchise was extended and political
participation increased.[36]  And self-employment—the bedrock of citizenship, self-
respect, and respect from others—was widespread.  By 1815, roughly 80 percent of

---

[33] Roth, "Why Guns Are and Aren't the Problem," 119-120.

[34] Roth, *American Homicide,* 180, 183-186; and Eric H. Monkkonen,
*Murder in New York City* (Berkeley: University of California Press, 2001), 15-16.

[35] For detailed figures and tables on weapons use in homicides by state, city,
or county, see Roth, "American Homicide Supplemental Volume: Weapons,"
available through the Historical Violence Database, sponsored by the Criminal
Justice Research Center at the Ohio State University
(https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Weapons-10-2009.pdf).  On
weapons use in homicides in the North, see Figures 25 through 46.

[36] Roth, *American Homicide*, 180, 183-186.

women and men owned their own homes and shops or farms by their mid-thirties; and those who did not were often white-collar professionals who also received respect from their peers.[37]  African Americans still faced discrimination and limits on their basic rights in most Northern states.  But despite these barriers, most African Americans in the North were optimistic, after slavery was abolished in the North, about earning their own living and forming their own churches and voluntary organizations.[38]

22.     That is why there was little interest among public officials in the North in restricting the use of firearms during the Early National period, except in duels.  They took a strong stand against dueling in the wake of Alexander Hamilton's death, because of the threat the practice posed for the nation's democratic polity and the lives of public men: editors, attorneys, military officers, and politicians.[39]

23.     Laws restricting the everyday use of firearms did appear, however, in the early national period in a number of slave states,[40] where violence among

---

[37] Ibid., 180, 183-186.

[38] Ibid., 181-182, 195-196; Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); and Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999).

[39] Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); and C. A. Harwell, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," *Vanderbilt Law Review* 54 (2001): 1805-1847 (https://scholarship.law.vanderbilt.edu/cgi/viewcontent.cgi?article=1884&context=vlr).

[40] Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic:*
(continued…)

Declaration of Randolph Roth (*RMGO v. Polis*, D. Colo. 23-cv-01076-PAB)

**App. 333**

citizens increased after the Revolution to extremely high levels.  Revolutionary ideas and aspirations wreaked havoc on the status hierarchy of the slave South, where homicide rates ranged from 8 to 28 per 100,000 adults per year.[41]  Poor and middle-class whites were increasingly frustrated by their inability to rise in a society that remained class-bound and hierarchical.[42]  Prominent whites were subjected to the rough and tumble of partisan politics and their position in society was threatened by people from lower social positions.[43]  African Americans despaired over the failure of the abolition movement in the South, and whites were more fearful than ever of African American rebellion.[44]  As a result, impatience with restraint and sensitivity to insult were more intense in the slave South, and during this period the region saw a dramatic increase in the number of deadly quarrels, property disputes, duels, and interracial killings.[45]  The violence spread to frontier Florida and Texas, as well as to southern Illinois and Indiana—wherever Southerners settled in the early national period.[46]  During the Early National period, the proportion of homicides committed with firearms went up accordingly,

---

*Dueling, Southern Violence, and Moral Reform* (Westport, Connecticut: Praeger, 1999); and Cornell, *Well-Regulated Militia*, 141-144.

[41] Roth, *American Homicide*, 180, 199-203.

[42] Ibid., 182.

[43] Ibid.

[44] Ibid.

[45] Ibid., 182, 199-203.

[46] Ibid., 162, 180-183, 199-203; Roth and James M. Denham, "Homicide in Florida, 1821-1861," *Florida Historical Quarterly* 86 (2007): 216-239; John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); and Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

Declaration of Randolph Roth (*RMGO v. Polis*, D. Colo. 23-cv-01076-PAB)

**App. 334**

to a third or two-fifths, as Southerners armed themselves in anticipation of trouble, or set out to cause trouble.[47]

24.     Citizens and public officials in these states recognized that concealable weapons—pistols, folding knives, dirk knives, and Bowie knives—were used in an alarming proportion of the era's murders and serious assaults.[48] They were used to ambush both ordinary citizens and political rivals, to bully or intimidate law-abiding citizens, and to seize the advantage in fist fights.  They increased the likelihood that impulsive acts of violence could turn deadly.  As the Grand Jurors of Jasper County, Georgia, stated in a plea to the state legislature in 1834 for restrictions on concealable weapons,

> The practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[49]

The justices of the Louisiana Supreme Court echoed these sentiments—"unmanly" men carried concealed weapons to gain "secret advantages" over their adversaries.[50]  These concealed weapons laws were notably difficult to enforce, however, and did not address underlying factors that contributed to rising homicide rates.  Nevertheless, these laws represent governmental efforts at that time to address the use of new weapons in certain types of crime.

---

[47] Roth, "American Homicide Supplemental Volume: Weapons," Figures 51 through 57.

[48] Roth, *American Homicide*, 218.

[49] Ibid., 218-219.  See also the concerns of the Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term.

[50] Roth, *American Homicide*, 219.

25.     The pistols of the early national period represented a technological advance.  Percussion-lock mechanisms enabled users to extend the life of a charge, because unlike flint-lock mechanisms, they did not use hydroscopic black powder in their priming pans; they used a sealed mercury-fulminate cap as a primer and seated it tightly on a small nipple (with an inner diameter the size of a medium sewing needle) at the rear of the firing chamber, which restricted the flow of air and moisture to the chamber.  Percussion cap pistols, which replaced flint-lock pistols in domestic markets by the mid-1820s, could thus be kept loaded and carried around for longer periods without risk of corrosion.[51]  The new types of knives available in this era also represented technological advances over ordinary knives because they were designed expressly for fighting.  Dirks and Bowie knives had longer blades than ordinary knives, crossguards to protect the combatants' hands, and clip points to make it easier to cut or stab opponents.[52]

26.     The violence in the slave South and its borderlands, and the technological advances that exacerbated it, led to the first prohibitions against carrying certain concealable weapons, which appeared in Kentucky, Louisiana, Indiana, Arkansas, Georgia, and Virginia between 1813 and 1838.  These laws differed from earlier laws that restricted access to arms by Native Americans or by free or enslaved African Americans, because they applied broadly to *everyone* but also applied more *narrowly* to certain types of weapons and to certain types of conduct.  Georgia's 1837 law "against the unwarrantable and too prevalent use of deadly weapons" was the most restrictive.  It made it unlawful for merchants

---

[51] Roth, "Why Guns Are and Aren't the Problem," 117.

[52] Harold L. Peterson, *American Knives: The First History and Collector's Guide* (New York: Scribner, 1958), 25-70; and Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900* (New York: Walker, 1968), 67-80.

and any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere . . . Bowie, or any other kind of knives, manufactured or sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c.

The sole exceptions were horseman's pistols—large weapons that were difficult to conceal and were favored by travelers.  But the laws in the other five states were also strict: they forbid the carrying of concealable weapons in all circumstances. Indiana made an exemption for travelers.[53]

27.    Thus, during the lifetimes of Jefferson, Adams, Marshall, and Madison, the Founding Generation passed laws in a number of states that restricted the use or ownership of certain types of weapons after it became obvious that those weapons, including certain fighting knives and percussion-cap pistols, were being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates.[54]

---

[53] Cramer, *Concealed Weapons Laws*, especially 143-152, for the texts of those laws.  Alabama and Tennessee prohibited the concealed carrying of fighting knives, but not pistols.  See also the Duke Center for Firearms Law, Repository of Historical Gun Laws (https://firearmslaw.duke.edu/search-results/?_sft_subjects=dangerous-or-unusual-weapons, accessed September 9, 2022).  Note that the Georgia Supreme Court, in *Nunn v. State*, 1 Ga. 243 (1846), held that prohibiting the concealed carry of certain weapons was valid, but that the state could not also prohibit open carry, which would destroy the right to bear arms.  That decision put Georgia in line with the five other states that had prohibited the carrying of concealable firearms.

[54] Cramer, *Concealed Weapons Laws*, 69-96; Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* (Westport, Connecticut: Praeger Publishers, 1994); Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., *Restricting Handguns: The Liberal Skeptics Speak Out* (Croton-on-Hudson, New York: North River Press, 1979), 7-30; and Philip D. Jordan, *Frontier Law and Order—10 Essays* (Lincoln: University of Nebraska Press, 1970), 1-22. Thomas Jefferson and John Adams died on July 4, 1826, John Marshall on July 6,

(continued…)

Declaration of Randolph Roth (*RMGO v. Polis*, D. Colo. 23-cv-01076-PAB)

**App. 337**

### C.   Homicide, Concealable Weapons, and Concealable Weapons Regulations from the Mexican War through the Early Twentieth Century (1846-1920s)

28.     By the early twentieth century, every state either banned concealed firearms or placed severe restrictions on their possession.[55]  They did so in response to two developments: the nationwide surge in homicide rates, from the North and South to the Trans-Mississippi West; and the invention of new firearms, especially the revolver, which enabled the firing of multiple rounds in succession without reloading and made the homicide problem worse.  Between the mid-nineteenth and the early twentieth century homicide rates fell in nearly every Western nation.[56]  But in the late 1840s and 1850s those rates exploded across the United States and spiked even higher during the Civil War and Reconstruction, not only in the South and the Southwest, where rates had already risen in the early

---

1835, and James Madison on July 28, 1836.  On the history of firearms regulations that pertained to African Americans, see Robert J. Cottrol and Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," *Georgetown Law Journal* 80 (1991): 309-361 (https://digitalcommons.law.lsu.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1283&context=faculty_scholarship); Cottrol and Diamond, "Public Safety and the Right to Bear Arms" in David J. Bodenhamer and James W. Ely, Jr., eds., *The Bill of Rights in Modern America*, revised and expanded (Bloomington: Indiana University Press, 2008), 88-107; and Cramer, *For the Defense of Themselves and the State*, 74, 83-85, 97-140.

[55] Kates, "Toward a History of Handgun Prohibition," 7-30; and Jordan, *Frontier Law and Order*, 17-22.  These sources identify laws that either banned concealed firearms or placed severe restrictions on their possession in every state except Vermont.  However, Vermont also had such a law by the early twentieth century.  *See* An Act Against Carrying Concealed Weapons, No. 85, § 1 (12th Biennial Session, General Assembly of the State of Vermont, Nov. 19, 1892) ("A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.").

[56] Roth, *American Homicide*, 297-300.

national period, but in the North.  Rates that had ranged in the North in the 1830s and early 1840s from a low of 1 per 100,000 adults per year in northern New England to 6 per 100,000 in New York City, rose to between 2 and 33 per 100,000 in the northern countryside and to between 10 and 20 per 100,000 in northern cities. In the South, rates in the plantation counties of Georgia rose from 10 per 100,000 adults to 25 per 100,000, and rates soared even higher in rural Louisiana to 90 per 100,000 and in mountain communities in Georgia and Missouri from less than 5 per 100,000 adults per year to 60 per 100,000. And in the West, the rates reached 65 per 100,000 adults per year in California, 76 per 100,000 in Texas, 119 per 100,000 in mining towns in South Dakota, Nevada, and Montana, and 155 per 100,000 in cattle towns in Kansas. Americans, especially men, were more willing to kill friends, acquaintances, and strangers.  And so, the United States became— and remains today—by far the most murderous affluent society in the world.[57]

29.    The increase occurred because America's heretofore largely successful effort at nation-building failed at mid-century.[58]  As the country struggled through the wrenching and divisive changes of the mid-nineteenth century—the crises over slavery and immigration, the decline in self-employment, and rise of industrialized cities—the patriotic faith in government that most Americans felt so strongly after the Revolution was undermined by anger and distrust.[59]  Disillusioned by the course the nation was taking, people felt

---

[57] Ibid., 199, 297-300, 302, 337, 347; and Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 173-195 (https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents).

[58] Ibid., 299-302, 384-385; and Roth, "American Homicide: Theory, Methods, Body Counts," *Historical Methods* 43 (2010): 185-192.

[59] Roth, *American Homicide*, 299-302, 384-385.  See also Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide."

increasingly alienated from both their government and their neighbors.[60]  They were losing the sense that they were participating in a great adventure with their fellow Americans.[61]  Instead, they were competing in a cutthroat economy and a combative political system against millions of strangers whose interests and values were antithetical to their own.[62]  And most ominously, law and order broke down in the wake of the hostile military occupation of the Southwest, the political crisis of the 1850s, the Civil War, and Reconstruction.[63]

30.   The proportion of homicides committed with firearms increased as well from the Mexican War through Reconstruction, as it had during previous increases in nondomestic homicides during the Revolution, in the postrevolutionary South, and on contested frontiers.[64]  Because the pistols, muskets, fowling pieces, and rifles in use in the early years of the crisis of the mid-nineteenth century were still predominantly single-shot, muzzle-loading, black powder weapons, the proportion of homicides committed with guns stayed in the range of a third to two-fifths, except on the frontier.[65]  Concealable fighting knives, together with concealable percussion-cap pistols, remained the primary murder weapons.  But in time, new technologies added to the toll in lives, because of their lethality and the new ways in which they could be used.

31.   Samuel Colt's cap-and-ball revolvers, invented in 1836, played a limited role in the early years of the homicide crisis, but they gained popularity

---

[60] Roth, *American Homicide*, 300.

[61] Ibid.

[62] Ibid.

[63] Ibid., 299-302, 332, 337, 354.

[64] Roth, "Why Guns Are and Aren't the Problem," 116-117.

[65] Roth, "American Homicide Supplemental Volume: Weapons," Figures 25 through 46, and 51 through 57.

quickly because of their association with frontiersmen, Indian fighters, Texas Rangers, and cavalrymen in the Mexican War.[66]  They retained some of the limitations of earlier firearms, because their rotating cylinders—two of which came with each revolver—had to be loaded one chamber at a time.  Users had to seat a percussion cap on a nipple at the rear of each chamber, pour powder into each chamber, secure the powder with wadding, and ram the bullet down the chamber with a rod or an attached loading lever.  Thus cap-and-ball revolvers, like muzzle-loaders, could not be loaded quickly, nor could they be kept loaded indefinitely without risk of damaging the charge or the gun.  But they were deadlier than their predecessors, because they made it possible for a person to fire five or six shots in rapid succession and to reload quickly with the second cylinder.[67]

32.    Smith and Wesson's seven-shot, .22 caliber, breech-loading, Model 1 rimfire revolver, invented in 1857, appeared on the market when the homicide crisis was already well underway.  But it had none of the limitations of percussion-cap pistols or cap-and-ball revolvers.  It could be loaded quickly and easily because it did not require powder, wadding, and shot for each round; and it could be kept loaded indefinitely because its corrosive powder was encapsulated in the bullet.[68]  And it did not require a new percussion cap for each chamber, because

---

[66] Patricia Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016).

[67] Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945* (Harrisburg, Pennsylvania: Stackpole Books, 1981), 24-28; Julian S. Hatcher, *Pistols and Revolvers and Their Use* (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927), 8-11; and Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 17-43.

[68] Roy G. Jinks, *History of Smith and Wesson* (North Hollywood: Beinfeld, 1977), 38-57.

the primer was located in a rim around the base of the bullet, set to ignite as soon as it was hit by the hammer.[69]  As Smith and Wesson noted in its advertisements,

Some of the advantages of an arm constructed on this plan are:

The convenience and safety with which both the arm and ammunition may be carried;

The facility with which it may be charged, (it requiring no ramrod, powder-flask, or percussion caps);

Certainty of fire in damp weather;

That no injury is caused to the arm or ammunition by allowing it to remain charged any length of time.[70]

33.     Smith and Wesson had created a near-perfect murder weapon.  It was lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time.[71]  Its only drawbacks were its small caliber and low muzzle velocity, which limited its ability to stop an armed or aggressive adversary on the first shot, and the difficulty and danger of reloading.  The reloading problem was remedied by Colt's development in 1889 of the first double-action commercial revolver with a swing-out cylinder and Smith and Wesson's addition in 1896 of an ejector to push out spent cartridges.[72]

---

[69] Ibid., 38-57.

[70] Ibid., 39.

[71] Ibid., 38-57.

[72] Rick Sapp, *Standard Catalog of Colt Firearms* (Cincinnati: F+W Media, 2011), 96; Jeff Kinard, *Pistols: An Illustrated History of Their Impact* (Santa Barbara: ABC-CLIO, 2003), 163; and Jinks, *History of Smith and Wesson*, 104-170.

34.     These new weapons were not the primary cause of the surge in violence that occurred in the United States from the Mexican War through Reconstruction.  But they did contribute to the later stages of the crisis, as they superseded knives and black powder handguns as the primary weapons used in interpersonal assaults, not only because of their greater lethality, but because they were used in novel ways.[73]  Easily concealed, they became the weapons of choice for men who stalked and ambushed estranged spouses or romantic partners, for suspects who killed sheriffs, constables, or police officers, and for self-styled toughs who engaged in impulsive acts of violence, such as shootouts in bars, streets, and even churchyards.[74]  And as modern, breech-loading firearms replaced the muzzle-loading and cap-and-ball gunstock from the late 1850s through World War I, the proportion of homicides committed with firearms continued to climb even when homicide rates fell for a short time, as they did at the end of Reconstruction.  By the eve of World War I, rates had fallen in the New England states to 1 to 4 per 100,000 adults per year, to 2 to 5 per 100,000 in the Prairie states, and 3 to 8 per 100,000 in the industrial states. In the West, rates had fallen to 12 per 100,000 adults per year in California, 15 per 100,000 in Colorado, and approximately 20 to 30 per 100,000 in Arizona, Nevada, and New Mexico. Homicide rates whipsawed, however, in the South.  They fell in the late 1870s and 1880s, only to rise in the 1890s and early twentieth century, to just under 20 per 100,000 adults in Florida, Kentucky, Louisiana, Missouri, and Tennessee, and 35

---

[73] Roth, "Why Guns Are and Aren't the Problem," 124-126 (recognizing that "Americans used the new firearms in ways they could never use muzzle-loading guns [. . .] The ownership of modern breech-loading [firearms] made the homicide rate worse in the United States than it would have been otherwise because it facilitated the use of *lethal* violence in a *wide variety of circumstances*.") (emphasis added).

[74] Ibid., 124-125.

per 100,000 in Virginia and North Carolina.[75]  Ominously, too, firearms invaded families and intimate relationships, so relatives, spouses, and lovers were as likely to be killed with guns as unrelated adults—something that had never happened before in America's history.[76]  That is why the proportion of homicides committed with firearms—overwhelmingly, concealed revolvers—reached today's levels by the 1920s, ranging from a median of 56 percent in New England and over 70 percent in the South and West.[77]  And that is why every state in the Union restricted the right to carrying certain concealable weapons.

35.     It is important to note that state legislators experimented with various degrees of firearm regulation, as the nation became more and more violent.  In Texas, where the homicide rate soared to at least 76 per 100,000 adults per year from June, 1865, to June, 1868,[78] the legislature passed a time-place-manner restriction bill in 1870 to prohibit the open or concealed carry of a wide range of weapons, including firearms, on social occasions;[79] and it followed in 1871 with a

---

[75] Ibid., 125-127, 388, 403-404; and Roth, "American Homicide Supplemental Volume: American Homicides in the Twentieth Century," Figures 4a and 5a.

[76] Ibid., 125.

[77] Roth, "American Homicide Supplemental Volume: Weapons," Figures 2 through 7.

[78] Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 192 (https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents).

[79] Brennan Gardner Rivas, "Enforcement of Public Carry Restrictions: Texas as a Case Study," *UC Davis Law Review* 55 (2021): 2609-2610 (https://lawreview.law.ucdavis.edu/issues/55/5/articles/files/55-5_Rivas.pdf). "Be it enacted by the Legislature of the State of Texas, That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the

(continued…)

Declaration of Randolph Roth (*RMGO v. Polis*, D. Colo. 23-cv-01076-PAB)

**App. 344**

bill banning in most circumstances the carrying, open or concealed, of small deadly weapons, including pistols, that were not designed for hunting or militia service.[80]   These laws were enforced with little or no racial bias until the 1890s,

---

people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six-shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law." An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63. See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930" (Ph.D. dissertation: Texas Christian University, 2019) (https://repository.tcu.edu/handle/116099117/26778).

[80] Rivas, "Enforcement of Public Carry Restrictions," 2610-2611.  Rivas, quoting the law, says that "The first section stated, 'That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; provided that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while

(continued…)

Declaration of Randolph Roth (*RMGO v. Polis*, D. Colo. 23-cv-01076-PAB)

**App. 345**

when white supremacists disfranchised African Americans, legalized segregation, and took firm control of the courts and law enforcement.[81]

_____

engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided, further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.'  An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25.  The third section of the act reads, 'If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than ninety days.'  Id. § 3."  The law did not apply, however, 'to a person's home or business, and there were exemptions for "peace officers" as well as travelers; lawmakers and jurists spent considerable time fleshing out who qualified under these exemptions, and how to allow those fearing an imminent attack to carry these weapons in public spaces.  Also, the deadly weapon law did not apply to all guns or firearms but just pistols.  The time-place-manner restrictions, however, applied to any "fire-arms . . . gun or pistol of any kind" and later "pistol or other firearm," as well as "any gun, pistol . . . .'"

See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930 (Ph. D. dissertation: Texas Christian University, 2019), 72-83, 124-163 (https://repository.tcu.edu/handle/116099117/26778).

[81] Rivas, "Enforcement of Public Carry Restrictions," 2609-2620.  The study draws on enforcement data from four Texas counties, 1870-1930: 3,256 total cases,

(continued…)

Declaration of Randolph Roth (*RMGO v. Polis*, D. Colo. 23-cv-01076-PAB)

**App. 346**

36.     Tennessee and Arkansas went farther than Texas to stem the tide of post-Civil War interpersonal violence.  In 1871, Tennessee flatly prohibited the carrying of pocket pistols and revolvers, openly or concealed, except for the large army and navy pistols commonly carried by members of the military, which could be carried openly, but not concealed.[82]  Arkansas followed suit in 1881.[83] Tennessee's law withstood a court challenge, and Arkansas's was never challenged.[84]  And both states moved to prevent the sale or transfer of pocket pistols or ordinary revolvers.  In 1879, Tennessee prohibited "any person to sell, or offer to sell, or bring into the State for the purpose of selling, giving away, or otherwise disposing of, belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols."[85]  Arkansas passed a similar prohibition in 1881, but went even further by prohibiting the sale of pistol cartridges as well:

of which 1,885 left a record of final adjudication.  See also Rivas, "Deadly Weapon Laws of Texas," 164-195.

[82] 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872) ("It shall not be lawful for any person to publicly carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands.").

[83] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.").

[84] See Brennan Gardner Rivas, "The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan. 20, 2022), https://firearmslaw.duke.edu/2022/01/the-problem-with-assumptions-reassessing-the-historical-gun-policies-of-arkansas-and-tennessee/.

[85] 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; *State v. Burgoyne*, 75 Tenn. 173, 173-74 (1881).

"Any person who shall sell, barter, or exchange, or otherwise dispose of, or in any manner furnish to any person any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind of whatever, except as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge for any pistol, or any person who shall keep such arms or cartridges for sale, shall be guilty of a misdemeanor."[86]

37.     California's legislature, recognizing that the homicide rate had reached catastrophic levels (over 65 per 100,000 adults per year),[87] banned concealed weapons in 1863, motivated, at least in part, by the desire to avoid the impulsive killings such weapons made more likely.  As the editor of the *Daily Alta Californian* declared,

> During the thirteen years that California has been a State, there have been more deaths occasioned by sudden assaults with weapons previously concealed about the person of the assailant or assailed, than by all other acts of violence which figure on the criminal calendar…. For many sessions prior to the last, ineffectual efforts were made to enact some statute which would effectually prohibit this practice of carrying concealed weapons.  A radical change of public sentiment demanded it, but the desired law was not passed until the last Legislature, by a handsome majority.[88]

---

[86] Acts of the General Assembly of Arkansas, No. 96 § 3 (1881).

[87] Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 183. On violence in California and across the Far West, see Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 173-195; Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); and John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* (New York: W. W. Norton, 2016); and Roth, *American Homicide*, 354.

[88] Clayton E. Cramer and Joseph Olson, "The Racist Origins of California's Concealed Weapon Permit Law," Social Science Research Network, posted August 12, 2016, 6-7 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2599851).

38.     But the legislature repealed the law in 1870, as public sentiment veered back toward the belief that the effort to make California less violent was hopeless, and that the only protection law-abiding citizens could hope for was to arm themselves.  And the legislature once again had the enthusiastic support of the editor of the *Daily Alta Californian*, which then opined, "As the sovereignty resides in the people in America, they are to be permitted to keep firearms and other weapons and to carry them at their pleasure."[89]  A number of counties dissented, however, and made it a misdemeanor to carry a concealed weapon without a permit—ordinances that they enforced.[90]  In 1917, the state made it a misdemeanor to carry a concealed weapon in incorporated cities and required that gun dealers register handgun sales and send the Dealer's Record of Sale to local law enforcement.[91]  And in 1923, the state extended the licensing requirement to unincorporated areas and prohibited non-citizens from carrying concealed weapons.[92]

39.     Other states, like Ohio, tried to have it both ways.  The Ohio legislature banned the carrying of concealable weapons in 1859, citing public safety.  But it directed jurors, in the same law, to acquit persons who carried such weapons,

> If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in

---

[89] Cramer and Olson, "Racist Origins of California's Concealed Weapon Permit Law," 7-10.

[90] Ibid., 11.

[91] Ibid., 11-13.

[92] Ibid., 13-15.  Note that the title of the Cramer and Olson essay is misleading.  It does not refer to the origins of the laws discussed here or to the ways in which they were enforced.  It refers instead to an unsuccessful effort in 1878 and a successful effort in 1923 to deny resident aliens the right to bear arms.

the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family.[93]

The burden of proof remained with the person who carried the concealed weapon.

40.     It is important to remember, however, that even when states enacted different types of firearms restrictions, the fact remains that many jurisdictions enacted statutory restrictions at that time to ensure the safety of the public and law enforcement.

## III. ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM MASS MURDERERS FROM THE REVOLUTION INTO THE EARLY TWENTIETH CENTURY

41.     The Republic faced threats not only from individual murderers, but from groups of murderers.  Mass murder has been a fact of life in the United States since the mid-nineteenth century, when lethal and nonlethal violence of all kinds became more common.  But mass murder was a group activity through the nineteenth century because of the limits of existing technologies.[94]  The only way to kill a large number of people was to rally like-minded neighbors and go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons that were

---

[93] Joseph R. Swan, *The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860* (Cincinnati: Robert Clarke & Co., 1860), 452.

[94] On the history of mob violence, including riots and popular protests that led to mass casualties, see Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996). On the Boston Massacre, see Alan Taylor, *American Revolutions: A Continental History, 1750-1804* (New York: W. W. Norton, 2016), 109-110; Eric Hinderaker, *Boston's Massacre* (Cambridge: The Belknap Press of Harvard University Press, 2017); Bernard Bailyn, *The Ordeal of Thomas Hutchinson* (Cambridge: Belknap Press of Harvard University Press, 1974), 156-163; and Alfred F. Young, *The Shoemaker and the Tea Party: Memory and the American Revolution* (Boston: Beacon Press, 1999), 36-41.

**App. 350**

certainly lethal but did not provide individuals or small groups of people the means to inflict mass casualties on their own.  Mass killings of this type were rare in the colonial, Revolutionary, and Early National eras, outside of massacres of Native Americans, irregular warfare among citizens seeking political power, or public demonstrations that turned deadly, like the Boston Massacre, in which seven soldiers opened fire on a crowd of roughly fifty men and boys, killing five and wounding six.[95]  But from the 1830s into the early twentieth century, mass killings were common.

42.    Examples include Nat Turner's rebellion in Southampton County, Virginia, in 1831, which claimed sixty-nine lives; the murder of seventeen Mormons, perpetrated by militia men and vigilantes at Haun's Mill, Missouri in 1838; Bloody Monday in Louisville, Kentucky, where an assault by nativist Protestants on Irish and German Catholics in 1855 left twenty-two people dead; and the murder of nineteen Chinese Americans by a racist mob in Los Angeles in 1871.  Because these mass killings were almost always spontaneous and loosely organized, they were difficult for government to prevent.  Worse, in some

---

[95] For examples of massacres of unarmed Native Americans, see the murder in 1623 of six Massachusetts men by a party from Plymouth Colony, led by Captain Miles Standish [Roth, *American Homicide*, 42]; and the massacre in 1782 of 96 pacifist Moravian Delaware Indians at Gnadenhutten in present-day Ohio [Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," *William and Mary Quarterly* (2007) 64: 621-644 (https://www.jstor.org/stable/25096733#metadata_info_tab_contents)]. For examples of political conflict among colonists that led to mass killings, see the confrontation in 1655 at Severn River in Maryland between opposed factions in the English Civil War [Aubrey C. Land, *Colonial Maryland: A History* (Millwood, New York: Kato Press, 1981), 49-54] and the slaughter in 1782 of rebel prisoners at Cloud's Creek, South Carolina, by Tory partisans under the leadership of William Cunningham [J. A. Chapman, *History of Edgefield County* (Newberry, South Carolina: Elbert H. Aull, 1897), 31-34]; see also Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 2008), 5-6.

incidents, such as the Haun's Mill Massacre, state and local governments were complicit; and in others, state and local governments turned a blind eye to the slaughter, as was the case in the murder of Chinese farm workers in Chico, California, in 1877.[96]

43.    The Federal government did act during Reconstruction, however, to prevent mass murder when formally organized white supremacist organizations engaged in systematic efforts to deprive African Americans of their civil rights, which had been guaranteed by the Thirteenth, Fourteenth, and Fifteenth Amendments.  The Ku Klux Klan Acts of 1870 and 1871, meant to prevent assassinations and mass shootings and lynchings by white supremacist terrorists, were effective when enforced by the federal government and the U.S. Army.[97]  But when federal troops were withdrawn, white supremacist mass killings resumed.  In New Orleans, for example, an ultimately successful effort by white-supremacist Democrats to seize control of the city's government by violent means left dozens

---

[96] David F. Almendinger, Jr., *Nat Turner and the Rising in Southampton County* (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Stephen C. LeSueur, *The 1838 Mormon War in Missouri* (Columbia: University of Missouri Press, 1987), 162-168; Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Mary Alice Mairose, "Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855" (M.A. thesis, Ohio State University, 1993); W. Eugene Hollon, *Frontier Violence: Another Look* (New York: Oxford University Press, 1974), 93-95; Faragher, *Eternity Street*, 463-480; and Sucheng Chan, *The Bitter-Sweet Soil: The Chinese in California Agriculture, 1860-1910* (Berkeley: University of California Press, 1986), 372.

[97] Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975).

of Republican officials and police officers shot dead and scores wounded.[98] And the Klan Acts did nothing to prevent mass murders by spontaneous mobs and loosely organized vigilantes.  Rioters and vigilantes remained a threat well into the twentieth century.  In 1921 more than three hundred African American citizens were murdered in the Tulsa Race Massacre in Oklahoma.[99]

## IV.  ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM MASS MURDERERS FROM THE EARLY TWENTIETH CENTURY TO THE PRESENT

44.    The character of mass murder began to change in the late nineteenth and early twentieth century with the invention and commercial availability of new technologies that gave individuals or small groups of people the power to kill large numbers of people in a short amount of time.  These technologies proved useful to criminal gangs, anarchists, and factions of the labor movement intent on killing adversaries, public officials, and law enforcement officers.  The technologies that were most widely used by criminals and terrorists were dynamite, invented by Alfred Nobel in 1866, and the Thompson submachine gun, invented in 1918 by General John T. Thompson, who improved upon a pioneering German design.

---

[98] Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889* (Baton Rouge: Louisiana State University Press, 1996), 151-158.  See also LeeAnna Keith, *The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); and Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884* (Columbus: Ohio State University Press, 2000), 67-109.

[99] On the deadly race riots of 1919-1921, see William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); and Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001).

45.     The advantage of dynamite over nitroglycerin and other explosives used in mining and construction was its power and its stability, which made accidental explosions rare.  The advantages of submachine guns over existing machine guns as weapons of war were that they were light enough to be carried and operated by a single individual, and they were capable of firing .45 caliber bullets from 20-round clips or 50- or 100-round drum magazines at a rate of 600 to 725 rounds per minute.[100]

46.     Criminals and terrorists quickly discovered how accessible and useful these new technologies were.  They could be purchased legally by private citizens. In the 1920s, Thompson submachine guns were expensive.  They sold for $175 to $225 each, at a time when a new Ford cost $440 (the rough equivalent of $2996 to $3852 today, while now a base model of the AR-15 semiautomatic rifle can be purchased for less than $400 and a 30-round magazine for as little as $10).[101]  That is why Thompsons were favored by those with resources: law enforcement, the Irish Republican Army, Sandinista rebels in Nicaragua, and bank robbers. Dynamite, however, cost only 18 cents a pound (the rough equivalent of $3.08 today), so it was favored by labor activists and anarchists.[102]  Federal, state, and

---

[100] Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); and Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* (New York: Thomas Dunne Books, 2009).

[101] Yenne, *Tommy Gun*, 86. Estimates vary on the purchasing power of 1919 dollars in today's dollars, but $1.00 in 1919 was worth roughly $17.12 today.  See the CPI Inflation Calculator (https://bit.ly/3CS5UNl), accessed October 4, 2022. The prices of AR-15 style rifles today are from guns.com (https://www.guns.com/firearms/ar-15-rifles?priceRange=%24250%20-%20%24499), accessed October 4, 2022.  The prices of 30-round magazines of .233 caliber ammunition are from gunmagwarehouse.com (https://gunmagwarehouse.com/all-magazines/rifles/magazines/ar-15-magazines), accessed October 4, 2022.

[102] Department of Commerce, Bureau of the Census, *Fourteenth Census of*
(continued…)

local officials and law enforcement officers suddenly confronted novel threats to their personal safety.  Submachine guns were used most notoriously in gangland slayings in Chicago during the Prohibition Era, such as the St. Valentine's Day Massacre and the Kansas City Massacre.[103]  Dynamite was used in a string of anarchist bombings in 1919-1920.  Those included the murder of 38 people and the wounding of 143 in an attack on Wall Street, 36 dynamite bombs mailed to justice officials, newspaper editors, and businessmen (including John D. Rockefeller), and a failed attempt to kill Attorney General A. Mitchell Palmer and his family.[104]  Dynamite was also used effectively for malicious, private ends.  For example, Osage Indians were murdered by an individual in Oklahoma in an attempt to gain their headrights and profit from insurance policies on them.[105]

_____

*the United States Manufactures: Explosives* (Washington, D.C.: Government Printing Office, 1922), 6.  Note that a pound of dynamite would be far more expensive today—potentially hundreds of thousands of dollars—because it would require the purchase of a blasting license, a storage bunker, and an isolated plot of land for the storage bunker.  See U.S Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, *ATF Federal Explosives Law and Regulations, 2012* (https://www.atf.gov/explosives/docs/report/publication-federal-explosives-laws-and-regulations-atf-p-54007/download), accessed October 4, 2022.

[103] William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); and Yenne, *Tommy Gun*, 74-78, 91-93.

[104] Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* (Princeton: Princeton University Press, 1991), 140-156, 181-195; Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* (New York: Columbia University Press, 2022), 65-110.  Consider also the bombing of the office of the *Los Angeles Times* in 1910 by two union activists, which killed 21 persons and injured 100 more, in Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931).

[105] For this and other murders of Osage people see David Grann, *Killers of*

(continued…)

Declaration of Randolph Roth (*RMGO v. Polis*, D. Colo. 23-cv-01076-PAB)

**App. 355**

47.    Because of the threats these new technologies posed for public safety, public officials widened their regulatory focus beyond concealed and concealable weapons.  States began imposing waiting period laws to prevent individuals from acquiring firearms in a fit of anger.[106] Thirteen states restricted the capacity of ammunition magazines for semiautomatic and automatic firearms between 1927 and 1934,[107] and Congress passed the National Firearms Acts of 1934 and 1938, which restricted ownership of machine guns and submachine guns (known today as automatic weapons) because of their ability to fire rapidly from large-capacity magazines.[108]  And the Organized Crime Control Act of 1970 restricted ownership of a wide range of explosives, building upon regulations that began in 1917 with the passage of the Federal Explosives Act, which restricted the distribution, storage, possession, and use of explosive materials during the time of war.[109]

---

*the Flower Moon: The Osage Murders and the Birth of the FBI* (New York, Doubleday, 2017).

[106] Law of June 13, 1923, ch. 339, §§ 2, 10, 1923 Cal. Laws 695, 696; Law of June 2, 1923, ch. 252, § 7, 1923 Conn. Laws 3707; Law of Mar. 7, 1923, ch. 266 § 10, 1923 N.D. Laws 379. Today, ten states and the District of Columbia impose a waiting period on at least some firearms purchases. Giffords Center, *Waiting Periods*, https://giffords.org/lawcenter/gun-laws/policy-areas/gun-sales/waiting-periods/.

[107] Robert J. Spitzer, "Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," *Law and Contemporary Problems* 83 (2020): 238 (https://scholarship.law.duke.edu/lcp/vol83/iss3/13).  In the same period, five additional states restricted magazine capacity for fully automatic weapons, but not semiautomatic weapons.

[108] The National Firearms Act of 1934, 48 Statute 1236 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1934.pdf); and the National Firearms Act of 1938, 52 Statute 1250 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1938.pdf).

[109] The Organized Crime Control Act of 1970, 84 Statute 922; and the Federal Explosives Act of 1917, 40 Statute 385.

## V.   CONCLUSION

48.     From the Founding Generation to the present, the people of the United States and their elected representatives have recognized that there are instances in which the security of the republic and the safety of its citizens require government-imposed restrictions.  These include restrictions on the availability of weapons to commit impulsive acts of violence.  That is why the majority of states passed and enforced laws against the carrying of concealable weapons, why the federal government passed the Ku Klux Klan Acts during Reconstruction, and why states, municipalities, and the federal government have passed and enforced laws since World War I to restrict ownership or control of modern technologies that enable criminals, terrorists, and malicious or delusional individuals to commit mass murder.  Public officials are not required to pass such laws, of course, but historically, they have always retained the ability to do so.  There is no evidence in the historical record to suggest that they took their decisions lightly when they imposed these restrictions on the availability of weapons.  Public officials today are confronting a criminological problem that did not exist in the Founding Era, nor during the first century of the nation's existence.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 27, 2023

_____

_Randolph Roth_

Randolph Roth

Randolph Roth                                                          Page 1


Curriculum Vitae

RANDOLPH ROTH

Department of History                          6987 Grandee Cliffs Drive
The Ohio State University                       Dublin, OH  43016
Columbus, OH  43210-1367
(614) 292-6843                                  (614) 889-5043
FAX:  614-292-2822
E-mail:  roth.5@osu.edu

**Table of Contents**

**Personal**                                                          2

Education                                                             2
Academic Positions                                                    2
Honorary Positions                                                    2
Professional Honors and Awards for Scholarship                        2
Professional Honors and Awards for Teaching                           3
Grants                                                                3

**Bibliography and Research**                                         4-17

**Teaching**                                                          18-20

**Service**                                                           21-26

Randolph Roth                                                        Page 2

**Personal**

     Marital Status:            Married           Allison Sweeney
     Children:                Alexander

**Education**

     1981, Ph.D. in History, Yale University (thesis, "Whence This Strange Fire? Religious and Reform Movements in Vermont, 1791-1843," David Brion Davis and Howard R. Lamar, advisors)

     1973, B.A., with honors and distinction, in History, Stanford University (thesis, "Progressive Reform and Socialism in Berkeley, California, 1877-1924," Carl Degler and Barton Bernstein, advisors)

**Academic Positions**

     1985-present, The Ohio State University: College of Arts and Sciences Distinguished Professor of History and Sociology
     1978-1985, Grinnell College: Assistant Professor of History
     1978, University of Vermont: Instructor in History
     1974-1977, Graduate Teaching Assistant, Yale University

**Honorary Positions**

     2012, Wayne N. Aspinall Visiting Chair Professor, University of Colorado Mesa

**Professional Honors and Awards for Scholarship**

     2022, Distinguished Scholar Award, Division of Historical Criminology, American Society of Criminology

     2013-2016, Member, Roundtable on Crime Trends in America, National Research Council, National Academy of Sciences

     2012, Fellow, American Association for the Advancement of Science

     2011, Michael J. Hindelang Award, American Society of Criminology, for the outstanding contribution to criminology over the previous three years

     2010, Allan Sharlin Memorial Award, Social Science History Association,

**App. 359**

Randolph Roth                                                    Page 3

for an outstanding book in social science history

2010, Outstanding Academic Books, *Choice*

1988, E. Harold Hugo Memorial Book Prize, Old Sturbridge Village
Research Society, for distinguished work in the history of rural society

1982, Theron Rockwell Field Prize, Yale University, for the outstanding
dissertation in the Humanities

1982, George Washington Eggleston Prize, Yale University, for the
outstanding dissertation in American history

1973, James Birdsall Weter Prize, Stanford University, for the outstanding
senior thesis in history

**Professional Honors and Awards for Teaching**

2017, Rodica C. Botoman Award for Distinguished Undergraduate Teaching and
Mentoring, College of Arts and Humanities

2013, Outstanding Teaching Award, College of Arts and Sciences Student
Council

2009, Ohio State University Alumni Award for Distinguished Teaching

2007, Distinguished Teaching Award, Ohio Academy of History

1995, Clio Award, Phi Alpha Theta Honor Society, for Distinguished Teaching in
History at Ohio State University

**Grants**

2013-2014, Research Grant, Harry Frank Guggenheim Foundation

2012-2015, Research Grant, National Science Foundation (SES-1228406)

2000, Fellowship for University Teachers, National Endowment for the
Humanities

1998-2000, Research Grant and Supplemental Research Grant, National Science
Foundation (SBR-9808050)

Randolph Roth                                                                                              Page 4

1992, Fellow, Workshop on the Rhetoric of Social History, University of Iowa

1989-1990, Research Fellowship, Harry Frank Guggenheim Foundation

1987, National Endowment for the Humanities, Summer Stipend

1983, Research Fellowship for Recent Recipients of the Ph.D., American Council of Learned Societies

1981, Fred Harris Daniels Fellowship, American Antiquarian Society


**Bibliography and Research**


**Books**

*American Homicide* (an interregional study of violent crime and violent death in America from colonial times to the present). The Belknap Press of Harvard University Press (2009), 655 pp.

*The Democratic Dilemma:  Religion, Reform, and the Social Order in the Connecticut River Valley of Vermont, 1791-1850*. Cambridge University Press (1987), 399 pp.


**Edited Volumes**

Co-founder and co-director, Historical Violence Database (on-line database on violent crime, violent death, and collective violence).  Web address: www.sociology.ohio-state.edu/cjrc/hvd

American Homicide Supplementary Volume (on-line supplement to *American Homicide*, including detailed appendices on methods, supplemental tables, graphs, and statistical analyses), approx. 750 pp. Web address: http://cjrc.osu.edu/researchprojects/hvd/AHsup.html


**Essays on Historical Subjects**

"Homicide and the Opioid Epidemic: A Longitudinal Analysis," co-authored with Richard Rosenfeld and Joel Wallman. *Homicide Studies* (forthcoming).

**App. 361**

"The Opioid Epidemic and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman. *Journal of Research in Crime and Delinquency* 58: 1 (2021): 1-46.

"Homicide-Suicide by Women against Intimate Partners," co-authored with Wendy C. Regoeczi, in Todd Shackelford, ed., *Sage Handbook of Domestic Violence* (Newbury Park: Sage Publications, 2020), v 1, 318-329.

"Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 113-133.

"Does Better Angels of Our Nature Hold Up as History?" *Historical Reflections* 44: 1 (2018): 91-103.

"Criminologists and Historians of Crime: A Partnership Well Worth Pursuing." *Crime, History, and Societies* 21: 2 (2017): 387-399.

"How Exceptional Is the History of Violence and Criminal Justice in the United States? Variation across Time and Space as the Keys to Understanding Homicide and Punitiveness," in Kevin Reitz, ed. *American Exceptionalism in Crime and Punishment* (Oxford University Press, 2017).

"Getting Things Wrong Really Does Help, as Long as You Keep Trying to Get Things Right: Developing Theories About Why Homicide Rates Rise and Fall" in Michael D. Maltz and Stephen Rice, eds., *Envisioning Criminology: Researchers on Research as a Process of Discovery* (Springer Verlag, 2015), 143-150.

"Roundtable on History Meets Biology: Introduction," *American Historical Review* (2014) 119: 1492-1499. Principal author and organizer of the Roundtable.

"Emotions, Facultative Adaptation, and the History of Homicide," *American Historical Review* (2014) 119: 1529-1546.

 "Gender, Sex, and Intimate-Partner Violence in Historical Perspective," in Rosemary Gartner and William McCarthy, eds., *Oxford Handbook on Gender, Sex, and Crime* (Oxford University Press, 2014), 175-190.

"The Importance of Testing Criminological Theories in Historical Context: The Civilization Thesis versus the Nation-Building Hypothesis," *Criminology* online: Presidential Session Papers from the American Society of Criminology (2014)

"Making Sense of Violence? Reflections on the History of Interpersonal Violence

in Europe," *Crime, History, and Societies* (2013) 17: 5-26. Richard McMahon, Joachim Eibach, and Randolph Roth. Introduction to a special issue solicited by the Board of Editors of *Crime, History, and Societies*, co-edited with Joachim Eibach, University of Berne, and Richard McMahon, University of Liverpool.

"Scientific History and Experimental History," *Journal of Interdisciplinary History* (2013) 43: 443-458.

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217.

"Yes We Can: Working Together toward a History of Homicide That Is Empirically, Mathematically, and Theoretically Sound," *Crime, History, and Societies* (2011) 15: 131-145.

"Biology and the Deep History of Homicide," *British Journal of Criminology* (2011) 51: 535-555.

"Homicide Rates in the Old West." *Western Historical Quarterly*. Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg (2011) 42: 173-195.

"American Homicide: Theory, Methods, Body Counts." *Historical Methods* (2010) 43: 185-192.

"The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death." *Historical Methods*. Randolph Roth, Cornelia Hughes Dayton, Kenneth Wheeler, James Watkinson, Robb Haberman, James M. Denham, and Douglas L. Eckberg (2008) 41: 81-98.

"Homicide in Florida, 1821-1861: A Quantitative Analysis." *Florida Historical Quarterly*. Randolph Roth and James M. Denham (2007) 86: 216-239.

"Guns, Murder, and Probability: How Can We Decide Which Figures to Trust?" *Reviews in American History* (2007) 35: 165-75.

"Twin Evils?  Slavery and Homicide in Early America," in Steven Mintz and John Stauffer, eds., *The Problem of Evil: Slavery, Freedom, and the Ambiguities of American Reform*. Amherst: University of Massachusetts Press (2007), 74-88.

"Rural Communities," in Feintuch, Burt and David H. Watters, eds., *Encyclopedia of New England*. Yale University Press (2005), 53-55.

"Counting Guns: What Social Science Historians Know and Could Learn about Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social Science History* (2002) 26: 699-708.

**App. 363**

Randolph Roth                                                                    Page 7

"Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence in Early America," *William and Mary Quarterly* (2002) 59: 223-240.

"Homicide in Early Modern England, 1549-1800: The Need for a Quantitative Synthesis." *Crime, History, and Societies* (2001) 5: 33-67.

"Child Murder in New England," *Social Science History* (2001) 25: 101-147.

"Spousal Murder in Northern New England, 1791-1865," in Christine Daniels, ed., *Over the Threshold: Intimate Violence in Early America, 1640-1865.* Routledge Press (1999), 65-93.

"`Blood Calls for Vengeance!': The History of Capital Punishment in Vermont," in Michael Sherman, ed., *Vermont State Government*. Vermont Secretary of State and Vermont Historical Society (1997), 10-25.

"The Generation Conflict Reconsidered," in *American Vistas*, ed. Leonard Dinnerstein & Kenneth T. Jackson. Oxford University Press (7th ed. 1995), 116-127.

"The Other Masonic Outrage: The Death and Transfiguration of Joseph Burnham," *Journal of the Early Republic* (1994) 14: 35-69.

"The First Radical Abolitionists: The Reverend James Milligan and the Reformed Presbyterians of Vermont," *New England Quarterly* (1982) 55: 540-563.

**Essays on Methods and Theory**

"'To Err Is Human': Uniformly Reporting Medical Errors and Near Misses, a Naïve, Costly, and Misdirected Goal." *Journal of the American College of Surgeons*. Charles H. Andrus, Eduardo G. Villasenor, John B. Kettelle, Randolph Roth, Allison M. Sweeney, and Nathaniel M. Matolo (2003) 196: 911-918.

"Is There a Democratic Alternative to Republicanism?  The Rhetoric and Politics of Synthesis in American History," in Jeffrey Cox and Sheldon Stromquist, eds., *Contesting the Master Narrative: Essays in Social History*. University of Iowa Press (1998), 210-256.

"Did Class Matter in American Politics? The Importance of Exploratory Data Analysis," *Historical Methods* (1998) 31: 5-25.

"Is History a Process? Revitalization Theory, Nonlinearity, and the Central

**App. 364**

Randolph Roth                                                             Page 8

Metaphor of Social Science History," *Social Science History* (1992) 16: 197-243.

"Ecological Regression and the Analysis of Voter Behavior," *Historical Methods* (1986) 19: 103-117.

## Public History Essays

"Can Faith Change the World?  Religion and Society in Vermont's Age of Reform," *Vermont History* (2001) 69: 7-18.

"Wayward Youths:  Raising Adolescents in Vermont, 1777-1815," *Vermont History* (1991) 59: 85-96.

"Why Are We Still Vermonters?  Vermont's Identity Crisis and the Founding of the Vermont Historical Society," *Vermont History* (1991) 59: 197-211.

## Works in Progress

*Child Murder in America*. An interregional study of murders of and by children from colonial times to the present (in manuscript through early 20th century)

"How Scientific Is Environmentalist History? The Rhetoric and Politics of Speaking for Nature" (essay in manuscript)

## Editorial Boards

2014-2017, *American Historical Review*
2012-2016, 1995-2005, *Historical Methods*
2011- , *Homicide Studies*
2004- , *Crime, History, and Societies*

## Invited Lectures

"Trust, Legitimacy, and the Recent Rise in Homicide in the United States," Council on Criminal Justice, Washington, D.C., October 19, 2022.

"The History of Police Involved Homicides in the United States," Mary Immaculate College & the University of Limerick, Ireland, October 26, 2021.

"Firearms and Homicide in the United States: A History," British Crime Historians Symposium, Leeds University, Great Britain, Scheduled for September

**App. 365**

Randolph Roth                                                    Page 9

2-3, 2021.

"The History of Cross-National Homicide Rates: What We Can Learn from the Available Historical Data, and Why We Have to Worry about Learning the Wrong Lessons," Bielefeld University, Germany, scheduled for April 29, 2020. Postponed.

"Inequality," Ashland University, October 16, 2019.

"The History of Gun Violence in America," Shasta Seminar, Wesleyan University, October 28, 2017.

"Why Guns Are and Aren't the Problem," Ashland University Center for the Study of Nonviolence, Ashland University, April 1, 2017.

"Firearms and Violence in American History," Aspen Institute, September 15, 2016, Washington, D.C.

"Homicide in the United States: The Long History and Recent Trends," The Donald and Margaret Sherman Violence Prevention Lecture, Jerry Lee Center of Criminology, University of Pennsylvania, April 10, 2015.

"The History of Child Murder," Andrew Young School of Public Policy, Georgia State University, January 28, 2014.

"The Causes of Homicide," National Institute of Justice, December 2, 2013.

"Biology, History, and the Causes of Homicide," School of Law, University of Buffalo, October 10, 2013.

"Bio-Historical Co-Evolution and the Biology of Social Behavior: The Prospects for a New Institute on History and the Sciences," Max Planck Institutes, Berlin, Germany, June 27, 2013.

"Deterrence, Judicial Tolerance, and the Homicide Problem in America," Robina Institute of Criminal Law and Justice, University of Minnesota, April 26, 2013

"Child Murder in America: A History," Population Studies Center and Department of History, University of Michigan, April 8, 2013

"America's Homicide Problem," Northwestern University School of Law, November 16, 2012

"American Homicide," Aspinall Lecture, Colorado Mesa University, April 5, 2012

App. 366

Randolph Roth                                                            Page 10

"Quantitative Analysis of the History of Crime and Violence: Achievements and Prospects," Keynote Address, Conference on "Making Sense of Violence," University of Bern, September 8, 2011

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences, and the Social Sciences in the Study of Violence." Conference on Emerging Disciplines, Humanities Research Center, Rice University, February 25, 2011

"American Homicide," Washington Forum, Ohio University, Athens, Ohio, May 25, 2010

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences, and the Social Sciences in the Study of Violence." Presidential Plenary Address, Southwestern Social Science Association, Houston, Texas, April 1, 2010

"Homicide on Florida's Antebellum Frontier," Robert and Rose Stahl Criminal Justice Lecture, Lawton M. Chiles Center for Florida History, Florida Southern College, Lakeland, Florida, March 25, 2010

"Homicide in the American Backcountry, 1717-1850," Keynote Address at the "From Borderland to Backcountry Conference: Frontier Communities in Comparative Perspective" at the University of Dundee, Scotland, July 7, 2009

"Research Strategies for Studying the History of Crime and Violence," Seminar on Crime and Criminal Justice, Northwestern University School of Law, Nov. 15, 2007

"American Homicide: Its History," Ohio State University at Newark, Nov. 6, 2007

"American Homicide: A Political Hypothesis" and "The Case for Social Science History," Northern Illinois University, April 4-5, 2007

"What Historians Can and Might Learn from Legal Sources." Seminar in Early American History, Northwestern University, Jan. 31, 2007

"Why Is America a Homicidal Nation? A Political Hypothesis," lecture in the Historical Approaches in the Social Sciences series, State University of New York at Binghamton, Oct. 12, 2006

"The History of American Homicide," Winter College, Ohio State University, Sarasota, Florida, February 24, 2006

"The Role of Small Arms in American History," Small Arms Working Group,

**App. 367**

Harry Frank Guggenheim Foundation, Columbia University, June 2005

"Why is the United States So Homicidal Compared to Other Western Democracies?  A Political and Psychological Hypothesis," Center for Historical Research and Documentation on War and Contemporary Societies, Belgian Ministry of Scientific Research, Brussels, Belgium, December 2004

"The History of American Homicide," Center for Law, Policy, and Social Science, Moritz College of Law, Ohio State University, November 2004

"Peaceable Kingdoms? Harmony and Hostility in the Early American Family," Plenary Session, Society of Historians of the Early American Republic, July 22, 2004

"American Homicide," Department of History, Miami University, March, 2004

"Slavery, Freedom, and the History of African-American Homicide." School of Law and Department of History, University of Chicago, January, 2003

"American Homicide," School of Law, Stanford University, February, 2003

Workshop of the Study of the History of Homicide, Department of History, Stanford University, February, 2003

"American Homicide," Social Science Faculty Seminar, Stanford University, February, 2003

"American Homicide," School of Law, Northwestern University, September, 2003

"American Homicide," School of Law, University of Chicago, November, 2002

"Twin Evils?: The Relationship between Slavery and Homicide," Department of History, Yale University, May, 2002

"The Puzzle of American Homicide," School of Law, Northwestern University, November, 2001

"Why Northern New Englanders Seldom Commit Murder:  An Interregional History of Homicide in America," and "The Historical Database Project on Crime and Violence in America," two lectures presented at the Charles Warren Center, Harvard University.  May, 2000

"Understanding Homicide in America:  An Interregional Approach," presentation to the Early American History Seminar, University of Pennsylvania, October,

Randolph Roth                                                    Page 12

1999

"Can Faith Change the World?"  Keynote address, Conference on Reform in Antebellum Vermont, Vermont Historical Society, September, 1999

"Why Northern New Englanders Seldom Commit Murder," presentation to the Center for Research on Vermont, the University of Vermont, and the Vermont Council on the Humanities.  The presentation was televised in Vermont.  It also made the evening news in Burlington and an AP wire story on my presentation was printed widely in newspapers in New Hampshire and Vermont, April, 1999

**Papers Delivered at Professional Meetings (recent)**

"The Social and Geographical Context of Child Homicides in the United States, 1989-2015," Homicide Research Working Group, June 2, 2022, Excelsior Springs, Missouri, and Social Science History Association, November 17, 2022, Chicago.

"The Difficulty of Counting the Number of Children Killed in Homicides in the United States, 1959-Present." Social Science History Association, November 23, 2019, Chicago.

"Police Involved Homicides in Ohio, 1959-1988," American Society of Criminology, November 13, 2019, San Francisco, with Wendy Regoczi and Rania Issa.

"Can Criminologists and Historians of Crime Work Together More Fruitfully in the Future?" Social Science History Association, November 3, 2017, Montreal.

"Comparing Data Sources on the Police Use of Lethal Force," American Society of Criminology, November 15, 2017, Philadelphia, with Wendy Regoczi and Rania Issa.

 "The History of Mass Murder," American Historical Association, January 6, 2017, Denver.

"The Historians' Role in Criminal Justice Research," American Society of Criminology, November 16, 2016, New Orleans

"Police and Security Guard Involved Homicides in Ohio, 1959-1988," American Society of Criminology, November 18, 2016, New Orleans

"Why History and Biology Matter to One Another: The Epigenetics of Social Behavior," American Historical Association, New York City, January 4, 2015

"The National Homicide Data Improvement Project, 1959-Present: Why Research in Multiple Sources Changes Dramatically Our Understanding of the Incidence and Character of Homicides in the United States," American Society of Criminology, San Francisco, November 19, 2014

"The Relationship between Guns, Homicides, and Suicide in American History," Organization of American Historians, Atlanta, April 4, 2014

"Situating Crime in Macro-Social and Historical Context," Presidential Panel, American Society of Criminology, Atlanta, November 22, 2013

"Has Violence Declined since the Middle Ages?" Presidential Panel, American Society of Criminology, Chicago, November 15, 2012

"The Sudden Appearance of Sexual Serial Killers in Late-Nineteenth Century America," Organization of American Historians, Houston, March 20, 2011

"The Biology of Social Behavior" at the annual conference of the Society of Historians of the Early American Republic, Philadelphia, July 15, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the American Society of Criminology meeting in Washington, D.C., November 16, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the Social Science History Association meeting in Boston, November 20, 2011

"Author Meets Critics" session on *American Homicide* at the European Social Science History conference in Ghent, Belgium, April 13, 2010. Discussants: Manuel Eisner, Peter King, and Pieter Spierenburg

"The Relationship between Guns and Homicide in American History," American Society of Criminology conference in San Francisco, November 18, 2010

"Author Meets Critics" session on American Homicide at the Social Science History Association conference in Chicago, November 20, 2010. Discussants: Richard McMahon, Douglas Eckberg, Donald Fyson, and John Carter Wood

"Does Honor Hold the Key to Understanding Violence in the Early Republic,"Society for Historians of the Early American Republic, Springfield, Illinois, July 2009.

"The Difficulty of Reconciling the Homicide Counts in the National Center for Health Statistics Mortality Data and the FBI Supplementary Homicide Reports,"

**App. 370**

Randolph Roth                                                              Page 14

Social Science History Association, Long Beach, California, November, 2009

"Homicide in American History," Ohio Academy of History, Dayton, Ohio, April 12, 2008

"Quantification and Social Theory in the Study of Crime and Violence," in the Presidential Panel on "History in the Social Science History of Association: Disciplinary Developments," Social Science History Association, Chicago, Nov. 15-18, 2007

"Are Modern and Early Modern Homicide Rates Comparable?  The Impact of Non-Emergency Medicine," Social Science History Association, Chicago, Nov. 15-18, 2007

"How Homicidal Was Antebellum Florida?" Gulf South History and Humanities Conference, Pensacola, Florida, Oct. 6, 2006

"Probability and Homicide Rates: Why We Can Be Certain the Nineteenth-Century West Was Violent."  Social Science History Association convention in Minneapolis, Nov. 2-5, 2006

"The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death."  Social Science History Association convention in Minneapolis, Nov. 2-5, 2006

"Big Social Science: What Could We Learn about Violent Crime If We Had Enough Money to Study It Properly? Possibilities for Collaborative Research Projects," Social Science History Association, Portland, Oregon, November 3-6, 2005

**Reviews**

T. Cole Jones, *Captives of Liberty: Prisoners of War and the Politics of Vengeance in the American* Revolution (American Historical Review, 2021).

Chris Murphy, *The Violence Inside Us: A Brief History of an Ongoing American Tragedy* (Criminal Law and Criminal Justice Books, 2020).

Jeffrey S. Adler, *Murder in New Orleans: The Creation of Jim Crow Policing*. (Punishment and Society, 2020).

Heidi J. Osselaer, *Arizona's Deadliest Gunfight: Draft Resistance and Tragedy at the Power Cabin, 1918*. (Western Historical Quarterly, 2020).

**App. 371**

Iain McGilchrist, *The Master and His Emissary: The Divided Brain and the Making of the Western World*. (Journal of Interdisciplinary History, 2011).

Heather Cox Richardson, *Wounded Knee: Party Politics and the Road to an American Massacre*. (*Journal of the Civil War Era*, 2011).

Bill Neal, *Sex, Murder, and the Unwritten Law: Gender and Judicial Mayhem, Texas Style*. (New Mexico Historical Quarterly, 2010).

Gordon Morris Bakken and Brenda Farrington, *Women Who Kill Men: California Courts, Gender, and the Press*. (Pacific Northwest Quarterly, 2010).

Jack D. Marietta and Gail S. Rowe, *Troubled Experiment: Crime, Justice, and Society in Pennsylvania, 1682-1800*. (William and Mary Quarterly, 2010).

Mark R. Pogrebin, Paul B. Stretesky, and N. Prabha Unnithan, *Guns, Violence, and Criminal Behavior: The Offender's Perspective*. (Criminal Justice Review, 2010)

Nicole Rafter, *The Criminal Brain: Understanding Biological Theories of Crime*. (Journal of Interdisciplinary History, 2009.)

Laura Browder, *Her Best Shot: Women and Guns in America* (Winterthur Portfolio 2007).

Paul M. Searls, *Two Vermonts: Geography and Identity, 1865-1910* (Vermont History, 2006).

Anu Koskivirta, *The Enemy Within: Homicide and Control in Eastern Finland in the Final Years of Swedish Rule, 1748-1808* (English Historical Review 2005).

Irene Quenzler Brown and Richard D. Brown, *The Hanging of Ephraim Wheeler: A Story of Rape, Incest, and Justice in Early American* (H-SHEAR, 2003).

T. D. S. Bassett, *The Gods of the Hills* (New England Quarterly, 2001).

Karen Halttunen, *Murder Most Foul: The Killer and the American Gothic Imagination* (H-SHEAR, 1999).

Charles E. Clark, *The Meetinghouse Disaster* (Journal of American History, 1999).

Nicholas N. Kittrie and Eldon D. Wedlock, Jr., *The Tree of Liberty:  A Documentary History of Rebellion and Political Crime in America* (Journal of the Early Republic, 1998).

**App. 372**

Robert E. Shalhope, *Bennington and the Green Mountain Boys: The Emergence of Liberal Democracy in Vermont, 1790-1850* (Reviews in American History, 1997).

Daniel Doan, *Indian Stream Republic: Settling a New England Frontier* (Journal of the Early Republic, 1997).

Thomas H. Jeavons, *When the Bottom Line is Faithfulness: Management of Christian Service Organizations* (American Historical Review, 1996).

N. Prabha Unnithan, *The Currents of Lethal Violence: an Integrated Model of Suicide & Homicide* (Justice Quarterly, 1995).

Edward Jarvis, *Traditions and Reminiscences of Concord, Massachusetts, 1779-1878* (Journal of the Early Republic, 1995).

Charles Hoffman and Tess Hoffman, *Brotherly Love: Murder and the Politics of Prejudice in Nineteenth-Century Rhode Island* (American Historical Review, 1994).

Richard Bushman, *The Refinement of America: Persons, Houses, Cities* (Pennsylvania History, 1994).

Michael Bellisiles, *Revolutionary Outlaws: Ethan Allen and Vermont's Struggle for Independence* (William and Mary Quarterly, 1994).

David G. Hackett, *The Rude Hand of Innovation: Religion and Social Order in Albany, New York, 1652-1836* (American Historical Review, 1992).

Nat Brandt, *The Congressman Who Got Away With Murder* (New York History, 1992).

Tamara Plakins Thornton, *Cultivating Gentlemen: The Meaning of Country Life Among the Boston Elite, 1785-1860* (American Historical Review, 1991).

George M. Thomas, *Revivalism and Cultural Change: Christianity, Nation Building, and the Market in the Nineteenth-Century United States* (Pennsylvania History, 1991).

Richard D. Brown, *Knowledge is Power: The Diffusion of Information in Early America, 1700-1865* (The History of Education Quarterly, 1990).

William J. Gilmore, *Reading Becomes a Necessity of Life: Material and Cultural Life in Rural New England, 1780-1865* (Vermont History, 1990).

Randolph Roth                                                          Page 17

Ruth Alden Doan, *The Miller Heresy, Millennialism, and American Culture* (Journal of the Early Republic, 1988).

William Lynwood Montell, *Killings:  Folk Justice in the Upper South* (International Journal of Oral History, 1987).

David R. Kasserman, *Fall River Outrage:  Life, Murder, and Justice in Early Industrial New England* (Journal of American History, 1987).

Robert J. Wilson III, *The Benevolent Diety:  Ebenezer Gay and the Rise of Rational Religion in New England* (New England Quarterly, 1985).


**Languages**

German
Spanish
French (reading)


**Quantitative Skills**

Probability and Statistics (including econometric techniques of political analysis, exploratory data analysis, and log-linear and logit analysis)
Calculus and Analytical Geometry
Linear Algebra and Nonlinear Dynamics
Differential and Series Equations
Abstract Algebra

Randolph Roth                                                                 Page 18

## Teaching

### Graduate

| | |
|---|---|
| History 7000 | Topics in American History to 1877 |
| History 7003 | Readings in the Early Republic and Antebellum America |
| History 7650 | Studies in World History |
| History 7900 | Colloquium in the Philosophy of History, Historiography, and the Historian's Skills |
| History 8000 | Seminar in Early American History |

### Undergraduate

| | |
|---|---|
| History 2001 | American Civilization, 1607-1877 (and Honors) |
| History 2015 | History of American Criminal Justice |
| History 2650 | World History since 1914 |
| History 2800 | Introduction to Historical |
| History 3164 | World History since 1914: Readings |
| History 3193 | Individual Studies / Research Internships in History |
| History 3700 | American Environmental History |
| History 4650 | History of Violence: Readings in World / Global / Transnational History |
| History 4675 | Global History of Violence: Research Seminar |
| History 5900 | Introduction to Quantitative Methods in History |
| History 598 | Religious and Reform Movements (Senior Colloquium) |
| History 598 | Research Seminar on Violent Crime and Death in the U.S. |
| History 557.02 | Jeffersonian and Jacksonian Democracy, 1800-1840 Thought |
| History 282 | American Religious History |

## Publications on Teaching

Founder and contributor to *Retrieving the American Past*, Department of History and Pearson Publishing, a flexible, problem-oriented publication for teaching classes in American History. Author of modules on "Violent Crime in Early America," "Marriage in Colonial America," and "Growing Up in Nineteenth-Century America."

## Ph.D Students Supervised

Daniel Vandersommers, "Laboratories, Lyceums, and Lords: Zoos, Zoology, and the Transformation of Humanism in Nineteenth-Century America," August 2014. Recipient of a Presidential Fellowship, 2013-2014, the most prestigious

**App. 375**

Randolph Roth                                                        Page 19

University fellowship for senior graduate students. Assistant Professor of History, University of Dayton.

Michael Alarid, ""Caudillo Justice: Intercultural Conflict and Social Change in Santa Fe, New Mexico, 1837-1853," June 2012. Assistant Professor of History, University of Nevada at Las Vegas.

Matthew Foulds, "Enemies of the State: Methodists, Secession and Civil War in Western Virginia, 1844-1865," December 2011. Former Assistant Professor of History, Shepherd University

Jeanette Davis Mantilla, "Hush, Hush Miss Charlotte: Twenty-Five Years of Civil Rights Struggles in San Francisco, 1850-1875," April 2000. Administrator in Charter School Division of the Department of Education, State of Ohio

Ken Wheeler, "The Antebellum College in the Old Northwest: Higher Education and the Defining of the Midwest," January 1999. Professor of History, Reinhardt College. Author of *Cultivating Regionalism: Higher Education and the Making of the American Midwest* (Northern Illinois University Press, 2011)

Ross Bagby, "The Randolph Slave Saga." July 1998. Librarian and independent scholar

Marianne Holdzkom, "Parody and Pastiche Images of the American Revolution in Popular Culture, 1765-1820," May 1995. Professor of Social and International Studies, Southern Polytechnic State University

David Thomas, "Religion in the Far West: Oregon's Willamette Valley, 1830-1850," November 1993. Professor of History, Union College

**Recent Senior Honors Thesis Students Supervised (recently)**

Maggie Seikel, "The Great Depression in More Ways than One: Why Do Americans Commit Suicide More Often during Economic Crises?" (Anticipated 2021).

Margo Hertzer, "Police Involved Homicides in Ohio, 1959-1988." (Anticipated 2021).

Laura Janosik, "Homicides Involving Women in Ohio, 1959-1988." (2020). Prospective applicant to graduate school in history.

Randolph Roth                                                                                     Page 20

Ben St. Angelo, "How Labor Disputes Led to Violence: Personalities, Paternalism, and Power at Republic Steel in Youngstown, Ohio: 1937." (2017). Ph.D. student in History at Ohio State University.

Sarah Paxton, "The Bloody Ould Sixth Ward: Crime and Society in Five Points, New York" (2012). Ph.D. candidate in criminal justice history J.D. candidate at the Moritz School of Law at Ohio State University (twin degree program).

Kristen Gaston, "Restoration of the Cuyahoga River" (2012). Ph.D. candidate in Environmental History at the University of Cincinnati.

Alexandra Finley, "Founding Chestnut Ridge: The Origins of Central West Virginia's Multiracial Community" (2010). Ph.D. candidate in early American history at the College of William and Mary. Recipient of the first Annual Prize at Ohio State for the outstanding senior honors thesis in the Department of History.

Randolph Roth                                                                Page 21

## Service

**Service in Professional Organizations**

2018-present, Allen Sharlin Book Prize Committee, Social Science History Association

2013-present, Grant Review Board, Harry Frank Guggenheim Foundation

2008-present, Editorial Board, *Crime, History, and Societies*.

2011-present, Editorial Board, *Homicide Studies*.

2014-2017, Board of Editors, *American Historical Review*

2014-15, 2016-17, Program Committee, American Society of Criminology

2014-2017, Research Awards Committee, Ohio Academy of History.

2011-2014, Chair, Distinguish Teaching Award Committee, Ohio Academy of History

2010-2011, Allan Sharlin Memorial Prize Committee, Social Science History Association

2010- ,Ohio Violent Death Reporting System Advisory Board

2010-2013, Advisory Board, Society for Historians of the Early American Republic

2008- , Society for the Scientific Detection of Crime, Columbus, Ohio

2009-2011, Youth Violence Prevention Advisory Board (Columbus)

2003, Nominating Committee, Social Science History Association

2002- , Co-founder and co-director, Historical Violence Database

1995-1997, ABC-Clio America:  History and Life Award Committee, Organization of American Historians

1987-1993, Chair, Methods and Theory Network, Social Science History Association

Randolph Roth                                                    Page 22

            1987, Program Committee, Social Science History Association

**Reviews of Manuscripts**

            American Historical Review
            Journal of American History
            William and Mary Quarterly
            Journal of the Early Republic
            Social Science History
            Journal of Interdisciplinary History
            Historical Methods
            Journal of Women's History
            Journal of the Family
            Crime, History, and Societies
            European Journal of Criminology
            American Journal of Sociology
            Sociological Quarterly
            Criminology
            Criminal Justice Review
            Journal of Criminal Law and Criminology
            Law and Social Inquiry
            Homicide Studies
            International Criminal Justice Review
            International Journal of Law, Crime, and Justice
            Law and Society Review
            City and Community
            Eras Review
            Western Historical Quarterly
            Canadian Journal of Sociology
            Journal of the Gilded Age

**Memberships in Professional Organizations (current)**

            American Historical Association
            Organization of American Historians
            Social Science History Association
            European Social Science History Association
            American Society of Criminology
            Homicide Studies Working Group
            American Association for the Advancement of Science

**Service at Ohio State University**

Randolph Roth                                                          Page 23

**Department**

2006-2010, 2018-present, Undergraduate Placement / Enhancement Officer

1994-2015, 2018-present, Undergraduate Teaching Committee

2017-2018, Chair of Grievance Committee

2015-2017, 1991-1993, Chair of Graduate Studies

2012-2013, Chair of Undergraduate Studies

2011-2013, Advisory Committee and Salary Committee

1987-1991, History Department Promotion & Tenure Committee

**College of Humanities**

2007-2009, Curriculum Committee, College of Humanities

2002-2005, College of Humanities Computing Advisory Committee

1996-1997, College of Humanities Committee on the Center for the Study and Teaching of Writing, 1996-7; Affiliated Faculty Member, 2000-

**College of Arts and Sciences**

2006-2009, Alternate, Arts and Sciences Faculty Senate

2006- , Advisory Board, Criminal Justice Research Center, Department of Criminology and Sociology

2004- , Fellow, Center for Law, Policy, and Social Science, Moritz College of Law

2000- , Fellow, Criminal Justice Research Center, College of Social and Behavior Sciences

**Graduate School**

2018- , Graduate Awards Review Committee

**App. 380**

Randolph Roth                                                    Page 24

**Ohio Department of Higher Education**

2020- , Transfer Assurance Guide Review Panel, Ohio Articulation and Transfer
Network

**Service at Grinnell College**

Chairman, African-American Studies Committee

Rosenfield Program on Public Affairs Committee

Faculty-Trustee Committee

**Community Service**

2001-2008, Chair, Community Services Advisory Commission, City of Dublin:
advises City Council on all matters concerning utilities, policing, transportation,
parks, recreation, waste management, etc.,

2004-present, Green Team, environmental projects volunteer organization, City of
Dublin

2003-12, Committee to create an Indian burial mound and pioneer historic park at
the Wright-Holder earthworks, City of Dublin

1997-present, Assistant Scoutmaster, Troop 299, Dublin / Citizenship Merit
Badge Counselor / Eagle Scout Association / Philmont Staff Association /
Distinguished Service Award, 2014 / Meritorious Service Award, 2006 / Bridge
Builder Award, 2002

1997-2003, Good Schools Committee, Dublin City Schools, campaign committee
for school bond and levy issues

1995-2005, President, Citizens for Dublin, city-wide association of civic
association officers and city commission members

1995-1998, Vice-Chair, Transportation Task Force, City of Dublin

1995-1997, Community Plan Steering Committee, City of Dublin

**App. 381**

Randolph Roth                                                    Page 25

    1988-present, President / Vice President / Trustee, East Dublin Civic Association

    1987-present, Nature Conservancy / Volunteer Service Awards / Volunteer Crew Leader

## Outreach / Media Appearances

    Testimony to Oversight Committee of the Ohio Senate, December 22, 2020, on so-called "Stand Your Ground" laws.

    B.R.E.A.D. (an interfaith organization dedicated to Building Responsibility Equality and Dignity), January 13, 2020, on gun violence in central Ohio.

    Testimony to Federalism Committee of the Ohio House of Representatives, June 12, 2019, on concealed carry laws.

    Worthington Senior Citizen Center, Inequality in the U.S., April 15, 2019

    Canfield Residence Hall, Discussion of History of Criminal Enterprise in the U.S. with Undergraduate Students, April 10, 2019

    "Gun Ownership in Decline," *Columbus Dispatch*, December 11, 2017.

    "How the Erosion of Trust Leads to Murders and Mass Shootings," invited editorial, *Washington Post*, October 6, 2017

    "Mass Murder in American History," CSpan-3, April 2, 2017

    All Sides with Ann Fisher, WOSU Radio, "Mass Murder and Terrorism," December 9, 2015 and June 13, 2106; "The Recent Rise in Homicide in the United States," March 14, 2017.

    Consultant for the TLC Channel, "Who Do You Think You Are Anyway?" 2013-2014

    Appeared on the CSPAN Book Channel on September 1, 2012 (http://www.c-span.org/LocalContent/Columbus/)

    Appeared on the History Channel, "Seven Deadly Sins," January 3, 2009 (A&E Home Video)

    "It's No Mystery: Why Homicide Declined in American Cities during the First Six Months of 2009," History News Network, November 22, 2009

**App. 382**

(http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%2011-22-2009%205-2010.pdf and
http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%20Further%20Thoughts%201-1-2010%205-2010.pdf)

Radley Balko, editor of reason.com, named *American Homicide* the best book of 2009 (http://reason.com/archives/2009/12/30/the-year-in-books)

"American Homicide," address to Columbus Rotary Club, October 24, 2011

Radio interviews: Execution Watch with Ray Hill on KPFT Houston, Texas, and WPFW Washington, D.C., Nov. 10, 2009; Focus 580 with David Inge, WILL, Champaign-Urbana, Illinois, December 7, 2009; RadioWest with Doug Fabrizio, KUER and XM Public Radio Channel 133, Salt Lake City, Utah, Dec. 17, 2009; The Mark Johnson Show of the Radio Vermont Group, WDEV, Waterbury, Vermont, Dec. 30, 2009; The Current with Anna Maria Tremonti on the CBC, Toronto, Canada, January 6, 2010; The Marc Steiner Show on WEAA in Baltimore, January 26, 2010; by ABC Radio, Sydney, Australia, interviewed on March 3, 2010 for broadcast the week of March 8, 2010; by the Extension with Dr. Milt Rosenberg on WGN Radio 720 AM Chicago, broadcast December 9, 2010; the Gil Gross Show, KKSF Radio 910 AM, San Francisco, July 27, 2012; and The Marc Steiner Show on WEAA in Baltimore, December 17, 2012; *American Homicide* was the subject of an editorial by op-ed writer Gregory Rodriguez in the *Los Angeles Times*, Sunday, April 12, 2010 **(http://www.latimes.com/news/opinion/commentary/la-oe-rodriguez12-2010apr12,0,3217212.column)**

*American Homicide* was the subject of an editorial by Raina Kelley in *Newsweek*, Nov. 5, 2009 (http://www.newsweek.com/id/221271).

*American Homicide* was cited favorably in the *New York Times Sunday Magazine* in an article by Jeffrey Rosen, "Prisoners of Parole," January 10, 2010; and in the *Washington Post*, Nov. 22, 2009

Newspaper articles: quoted and/or reviewed in the *Washington Post*, the *Washington Times*, the *National Review*, the *Economist*, the *Wall Street Journal*, the *Boston Globe*, the *Chicago Tribune*, the *San Francisco Chronicle*, the *Los Angeles Times*, the *New York Times*, New York *Newsday*, the *Chronicle of Higher Education*, and the *Columbus Dispatch*, which ran a front-page article on Roth's work in a Sunday edition

**App. 383**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-02563-JLK

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

     Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

     Defendant.

---

**THE GOVERNOR'S UNOPPOSED MOTION TO PERMIT REMOTE WITNESS
TESTIMONY AT HEARING ON PRELIMINARY INJUNCTION**

---

1.     A preliminary injunction hearing is currently scheduled for October 26, 2023.

2.     Two of the Governor's expert witnesses are located outside of Colorado and cannot travel to Denver for the preliminary injunction hearing on the current expedited schedule without incurring significant expense and inconvenience. Professor Randolph Roth is a Professor of History and Sociology at The Ohio State University and will be in Minnesota on October 26, attending to an important family matter. Professor Christopher Poliquin teaches at the UCLA Anderson School of Management in Los Angeles, California.

3.     The Governor seeks to have Professor Rother and Professor Poliquin testify remotely, both on direct examination and cross-examination.

4.     Plaintiffs do not oppose this request.

5.     Accordingly, the Governor respectfully requests that the Court enter an order permitting Professors Roth and Poliquin to testify by remote means on October 26. If necessary

**App. 384**

or requested, the Governor's counsel will make arrangements with courtroom staff on any

technical issues to facilitate their remote testimony.

Dated: October 20, 2023              PHILIP J. WEISER
                                      Attorney General

                                        */s/ Grant T. Sullivan*
                                        *Grant T. Sullivan*, Assistant Solicitor General
                                        *Michael T. Kotlarczyk*, Senior Assistant Attorney General
                                        *Matthew J. Worthington*, Assistant Attorney General
                                        1300 Broadway, Denver, CO 80203
                                        Telephone: (720) 508-6349; -6187; -6124
                                        Email: grant.sullivan@coag.gov;
                                        mike.kotlarczyk@coag.gov; matt.worthington@coag.gov

                                        *Attorneys for Defendant Jared Polis*
                                        *Counsel of Record

**App. 385**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No. 1:23-cv-02563-JLK**

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

**PLAINTIFFS' REPLY BRIEF**

**IN SUPPORT OF THER REQUEST FOR PRELIMINARY INJUNCTION (DKT. NO. 2)**

---

**App. 386**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ........................................................................................................ 2

A.    Plaintiffs' Constitute Part of "The People" Protected by the Second Amendment, and Possess Standing. ...................................................................................... 2

B.    A Waiting Period is a Firearms Regulation, Implicating *Bruen*'s Step 1...... 4

    (1)    C.R.S. § 18-12-115 is not presumptively lawful merely because it is triggered by commercial activity. ....................................................... 4

    (2)    C.R.S. § 18-12-115 implicates the plain text of the Second Amendment. 6

C.    There is No Historical Analogue to Colorado's 3-Day Waiting Period, So Defendant Cannot Prevail at *Bruen* Step 2........................................................................ 10

D.    Defendant's Public Policy Arguments Have No Relevance to *Bruen*'s Test of Constitutionality, and Such Arguments Should be Excluded from Evidence. 15

E.    The Other Preliminary Injunction Factors Favor Plaintiffs. .......................... 15

Conclusion ........................................................................................................... 16

App. 387

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Atkinson v. Garland*,
 70 F.4th 1018 (7th Cir. 2023) ................................................................. 11

*Awad v. Ziriax*,
 670 F.3d 1111 (10th Cir. 2012) .............................................................. 16

*Baird v. Bonta*,
 81 F.4th 1036 (9th Cir. 2023) ........................................................... 10, 11

*Connecticut Citizens Defense League, Inc. v. Thody*,
 2023 WL 2687446 (D. Conn. Mar. 28, 2023) .......................................... 7

*Defense Distributed v. Bonta*,
 2022 WL 15524977 (C.D. Cal. 2022) ....................................................... 8

*District of Columbia v. Heller*,
 554 U.S. 570 (2008) ...................................................... 8, 9, 10, 11

*Dobbs v. Jackson Women's Health Org.*,
 142 S. Ct. 2228 (2022) ............................................................................. 2

*Elrod v. Burns*,
 427 U.S. 347 (1976) .............................................................................. 16

*Ezell v. City of Chi.*,
 651 F.3d 684 (7th Cir. 2011) ................................................................... 7

*Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*,
 916 F.3d 792 (10th Cir. 2019) .......................................................... 15, 16

*Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*,
 5 F.4th 407 (4th Cir. 2021) ..................................................................... 6

*Jackson v. City & Cnty. of San Francisco*,
 746 F.3d 953 (9th Cir. 2014) ................................................................... 9

*Kev, Inc. v. Kitsap County*,
 793 F.2d 1053 (9th Cir. 1986) ................................................................. 2

*Luis v. United States*,
 578 U.S. 5 (2016) ..................................................................................... 7

**App. 388**

*McRorey v. Garland*,
   2023 WL 5200670 (N.D. Tex. Aug. 14, 2023) ................................................ 7, 15

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
   142 S. Ct. 2111 ....................................................................................*passim*

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................... 16

*Obergefell v. Hodges*,
   576 U.S. 644 (2015) ............................................................................. 7, 8

*Pavan v. Smith*,
   582 U.S. 563 (2017) ................................................................................ 7

*Planned Parenthood Arizona, Inc. v. Humble*,
   753 F.3d 905 (9th Cir. 2014) .................................................................... 2

*Rocky Mountain Gun Owners v. Polis*,
   2023 WL 5017253 (D. Colo. Aug. 7, 2023) ........................................*passim*

*Rocky Mountain Gun Owners v. Board of County Commissioners of Boulder County*,
   2022 WL 4098998 (D. Colo. Aug. 30, 2022) .............................................. 5

*Rocky Mountain Gun Owners v. Polis*,
   2023 WL 5333771 (D. Colo. Aug. 18, 2023) .......................................... 3, 11

*Silvester v. Becerra*,
   138 S. Ct. 945 (2018) .............................................................................. 7

*Teixeira v. Cnty. of Alameda*,
   873 F.3d 670 (9th Cir. 2017) .............................................................. 6, 7, 9

*Teter v. Lopez*,
   76 F.4th 938 (9th Cir. 2023) .......................................................... 4, 12, 14

*United States v. Connelly*,
   2023 WL 2806324 (W.D. Tex. Apr. 6, 2023) ........................................... 13

*United States v. Daniels*,
   77 F.4th 337 (5th Cir. 2023) .................................................................. 11

*Verlo v. Martinez*,
   820 F.3d 1113 (10th Cir. 2016) .............................................................. 16

*Vincent v. Garland*,
   80 F.4th 1197 (10th Cir. 2023) .............................................................. 10

**App. 389**

**Statutes**

C.R.S. § 18-12-115(1)(a)(I) ................................................................................................. 4, 5, 6, 8

Colo. Rev. Stats. § 18-12-112 .................................................................................................... 5

**Other Authorities**

11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 1998) ....................................................................................................................... 16

**App. 390**

Plaintiffs Rocky Mountain Gun Owners (RMGO) and Alicia Garcia (together, "Plaintiffs") submit this reply in support of their motion for Preliminary Injunction. Dkt. No. 2.

## INTRODUCTION

If Colorado had enacted a law requiring a 3-day waiting period for obtaining all books purchased from bookstores, there is little doubt that this Court would reject such a limitation as unconstitutional. Without more, this Court may determine that Plaintiffs are likely to prevail on the merits. *See New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 597 U.S. — (2022) ("This Second Amendment standard accords with how we protect other constitutional rights.") (putting Second Amendment rights on equal footing with First Amendment and Sixth Amendment rights, by example); *id.* at 2156 ("The constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.") (cleaned up).

Defendant functionally admits that there is no Founding era or 19th Century analogue to waiting period laws. And laws first enacted in the 20th century do "not provide insight into the meaning of the Second Amendment." *Bruen*, 142 S. Ct. at 2154, n. 28; *id.* at 2122 ("New York State has regulated the public carry of handguns at least since the early 20th century."). Defendant, therefore, rests it hopes almost exclusively on the idea that *Bruen* has no bearing on the question of whether the government may delay an individual's ability to obtain a firearm for self-defense, even if they have already purchased the firearm and passed a background check. For the reasons stated below, those arguments hold no water.

Separately, Defendant errs by suggesting that its interest in enforcing the underlying statute is relevant to Plaintiffs' likelihood of success on the merits. After *Bruen*, courts simply do not ask whether the government can establish an interest in regulating firearms; to be fully clear: Means-

**App. 391**

Ends scrutiny is dead after *Bruen*. *Id.* at 2125-2126 ("[T]he Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny. Today, we decline to adopt that two-part approach."); *id.* at 2127 ("[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."). To the extent that Defendant or its experts attempt to introduce such evidence, the Court should exclude it as irrelevant.

Because Defendant cannot come close to meeting its burden of establishing that a 3-day waiting period is consistent with historical tradition, Plaintiffs prevail on the most important question with respect to the preliminary injunction inquiry. And because they are constitutionally and irreparably harmed by Colorado's waiting period statute, and the balance of equities tips in their favor, this Court should grant a preliminary injunction.[1]

## ARGUMENT

**A.    Plaintiffs' Constitute Part of "The People" Protected by the Second Amendment and Possess Standing.**

Plaintiff Garcia is a responsible individual who is a law-abiding adult American citizen. Plaintiff Rocky Mountain Gun Owners is an association whose members are responsible individuals who are law-abiding adult American citizens. All plaintiffs are therefore part of "the people" protected by the Second Amendment. *See Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01077-PAB, 2023 WL 5017253, *11 (D. Colo. Aug. 7, 2023) ("[A]n interpretation of 'the

---

[1] Note that "waiting periods" on the exercise of other constitutional rights are often viewed skeptically by courts. *See, e.g.*, *Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 916 (9th Cir. 2014) (Arizona law that delayed the ability to obtain an abortion was unconstitutional) (abrogated by *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022)); *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1060 (9th Cir. 1986) (striking down a 5-day waiting period between the filing an exotic dancer's permit and the granting of a license).

**App. 392**

people' in the Second Amendment should begin with the assumption that every American is included.") ("*RMGO I*"); *accord Bruen*, 142 S. Ct. at 2134 ("It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects."). Defendant does not contest this point. And Defendant does not question that Plaintiffs are in fact responsible, law-abiding adult American citizens.

Separately, Plaintiffs maintain Article III standing to pursue their complaint and their motion for a preliminary injunction. Defendant conspicuously does not contest standing in its brief, but federal courts must nevertheless assure themselves of standing. As Plaintiff Garcia will testify at the hearing, she is a frequent purchaser of firearms, and will purchase another firearm on October 25, 2023. (Meaning that she will be within the 3-day waiting period at the time of the hearing on October 26). She will also testify regarding her planned purchase of additional firearms in the near future, including a planned purchase of a shotgun in November. Future firearms purchases are also absolutely certain to occur, given that Plaintiff Garcia is actively involved in the firearms industry as an instructor, firearms reviewer, and social media presence on Second Amendment topics.

As RMGO Director Taylor Rhodes will testify at the hearing, Plaintiff RMGO has numerous members, including members named in the complaint, who have purchased and will purchase additional firearms, subjecting themselves to the 3-day waiting period. Indeed, it is estimated that at least one RMGO member purchases at least one firearm every week. These facts, once established, are sufficient to confer standing. *Accord Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01077-PAB-NRN, 2023 WL 5333771, at *2 (D. Colo. Aug. 18, 2023) ("*RMGO II*") (noting that the plaintiffs' "intent to purchase firearms" was sufficient to establish standing at the preliminary injunction phase); *id.* at *2 (relying "on the Individual Plaintiffs' declarations to establish that they had plans to engage in conduct that violated SB23-169 for the purposes of a

**App. 393**

preliminary injunction."); *see also Teter v. Lopez*, 76 F.4th 938, 945 (9th Cir. 2023) (a limitation

on the Second Amendment-protected "ability to acquire arms" suffices to establish standing); *id.*

at 946 (exact dates for "the acquisition and possession of butterfly knives" were not required, even

in a pre-enforcement challenge).

**B.      A Waiting Period is a Firearms Regulation, Implicating *Bruen*'s Step 1.**

By enacting C.R.S. § 18-12-115, Colorado has targeted the ability of purchasers of firearms

to actually obtain those firearms, despite having already passed a background check and satisfied

all other necessary requirements. C.R.S. § 18-12-115(1)(a)(I) ("It is unlawful for any person who

sells a firearm … to deliver the firearm to the purchaser until … [t]here days after a licensed gun

dealer has initiated a background check of the purchaser that is required pursuant to state or federal

law."). In short, the law is triggered by a firearms purchase, and is a ban on the "deliver[y]" of that

firearm to an individual. Indeed, that is the point. *See, e.g.*, Dkt. No. 18-1, at 2 ("One study

estimates that mandatory waiting periods to receive firearms led to a 7 to 11 percent reduction in

suicides by firearm."); *id.* (declaring that "[d]elaying immediate access to firearms by establishing

a waiting period for receipt of firearms can help prevent impulsive acts …"); Dkt. No. 18, at 1

(conceding that the goal of the waiting period is to prevent "individuals going out and purchasing

a gun to immediately use in a moment of passion").

**(1)      C.R.S. § 18-12-115 is not presumptively lawful merely because it is triggered by commercial activity.**

First, Defendant advances the absurd proposition that a "waiting period" law that is

specifically designed to delay obtaining a firearm is actually a law merely regulating commercial

sales, as though the statute simply targets a firearm seller's right to engage in certain financial

transactions. Defendant goes so far as to suggest that all commercial regulations fall outside the

**App. 394**

scope of the Second Amendment. Dkt. No. 18, at 7 ("The Act does not regulate Plaintiff Garcia's conduct or any other firearm owner's conduct.").

The argument is silly; indeed, if accepted, it would mean that Colorado could impose 100-year waiting periods before a seller may "deliver" a firearm to its rightful owner. Or Colorado could bar sellers from delivering any firearm whatsoever to 18-20 year olds. *See contra RMGO I*, 2023 WL 5017253, *12-13 (collecting cases) ("The Court agrees with the Individual Plaintiffs that the Second Amendment includes the right to acquire firearms and, therefore, protects the Individual Plaintiffs' proposed conduct.") (emphasis added). Or suppose that all firearms sellers had to deliver a purchased firearm a minimum of 200 miles from the purchaser's primary residence. Or that sellers could sell only those magazines that hold one round each. *See contra Rocky Mountain Gun Owners v. Board of County Commissioners of Boulder County*, No. 1:22-cv-02113-CNS-MEH, 2022 WL 4098998, *1 (D. Colo. Aug. 30, 2022) (enjoining Boulder County's ordinance prohibiting the "sale and purchase of assault weapons, large capacity magazines, and trigger activators."). And *Bruen* itself would serve little purpose under Defendant's theory: states could make an end-run around the Second Amendment by simply prohibiting firearms sellers from delivering firearms, bullets, or other materiel to individuals who have concealed carry licenses.

Most recently, in *RMGO I*, this Court enjoined Colo. Rev. Stats. § 18-12-112, which states in part: "A person who is a licensed gun dealer shall not make or facilitate the sale of a firearm to a person who is less than twenty-one years of age." *See RMGO I*, 2023 WL 5017253, at *2 (emphasis added). The statute, of course, relates to a commercial transaction involving a "sale;" yet the Court in *RMGO I* nevertheless enjoined the statute, holding that the Plaintiff had established a strong likelihood of success. And C.R.S. § 18-12-115 is even more vulnerable than the statute

App. 395

that was enjoined in *RMGO I*. Indeed, the waiting period is <u>not</u> part of a commercial transaction. It targets the "delivery," of a firearm <u>after</u> a purchase, not on the underlying "sale" of that firearm. By the time that the waiting period has begun, the commercial transaction has been completed already: money has been exchanged, and ownership of a firearm has passed title. *See* C.R.S. § 18-12-115(1)(a)(I) (referring to a "background check of the <u>purchaser</u>," not at the previous point of sale) (emphasis added).

The Fourth Circuit addressed a similar argument in the context of 18-20 year olds, distinguishing laws that regulate sellers from laws whose true impact is on purchasers. *See Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 416 (4th Cir. 2021) (*vacated as moot*, 34 F.4th 14 F.4th 322). ("A condition or qualification on the sale of arms [by sellers] is a hoop someone must jump through to <u>sell</u> a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records.") (original emphasis). By contrast, restrictions that operate as a flat bar on a purchaser's right to obtain a gun are not "conditions and qualifications on the sale of arms." This Court ought to reach the same conclusion here.

### (2)   C.R.S. § 18-12-115 implicates the plain text of the Second Amendment.

Second, Defendant asserts that Plaintiffs do not have an interest covered by the Second Amendment. But that, too, is erroneous. The Second Amendment's plain text applies to "an individual's conduct" of <u>obtaining</u> a firearm. *See Bruen*, 142 S. Ct. at 2134 ("[T]he 'textual elements' of the Second Amendment's operative clause—'the right of the people to keep and bear Arms, shall not be infringed'—guarantee[s] the individual right to <u>possess</u> and carry weapons <u>in case of confrontation</u>.") (emphasis added, cleaned up). It is indisputable that the right to possess arms cannot be exercised unless individuals have the right to obtain them, in the same sense that the right to publish a newspaper is meaningless without the right to obtain paper or ink. *See*

6

**App. 396**

*Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("The core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms.") (*quoting Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011)); *Bruen*, 142 S. Ct. at 2156 ("New York's proper-cause requirement violates the Fourteenth Amendment in that <u>it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms</u>.").

Courts that have addressed this issue since *Bruen* squarely hold the same. *See, e.g.*, *McRorey v. Garland*, No. 7:23-cv-00047-O, 2023 WL 5200670, *3 (N.D. Tex. Aug. 14, 2023) ("Plaintiffs have sufficiently shown that their conduct is covered by the Second Amendment, leaving only the question of whether the Government can justify [waiting time connected to background checks] with the requisite historical analogues."); *Connecticut Citizens Defense League, Inc. v. Thody*, — F. Supp. 3d —, 2023 WL 2687446, *12 (D. Conn. Mar. 28, 2023) (plaintiffs' claim for declaratory relief that they were entitled to "obtain" a firearm was moot in light of *Bruen*, which unequivocally protected that right); *RMGO I*, 2023 WL 5017253, at *13 ("The Court has found that the Individual Plaintiffs' proposed course of conduct, purchasing firearms for self-defense in the home, is covered by the plain text of the Second Amendment."); *see also Silvester v. Becerra*, 138 S. Ct. 945 (2018) (Mem.) (Thomas, J., dissenting from denial of certiorari) (stating that a Ninth Circuit decision upholding a 10-day waiting period was "symptomatic of the lower courts' general failure to afford the Second Amendment the respect due an enumerated constitutional right.").

And it is intuitive that Constitutional rights necessarily protect "those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment); *see also Pavan v. Smith*, 582 U.S. 563, 566 (2017) (summarily reversing the

**App. 397**

Arkansas Supreme Court's conclusion that *Obergefell v. Hodges*, 576 U.S. 644 (2015), protected only same-sex marriage, but did not protect same-sex couples' rights to be named on their children's birth certificates). Under *Bruen*, obtaining a firearm is "individual conduct" that is protected by the Second Amendment, in the sense that one cannot keep or bear an arm "in case of a confrontation" that an individual does not obtain, despite having purchased it and being otherwise entitled to it.

Defendant attempts to elide this conclusion by mis-framing the individual conduct here as the right to "immediate acquisition" of a firearm. *See* Dkt. 18, at 7. But that is a sleight of hand. First, as a factual matter, the premise is off. HB23-1219 does not prevent Coloradans from purchasing arms, or "acquiring" them in the legal sense of ownership. Instead, it bars Coloradans from obtaining arms that they have already acquired legal rights to. In other words, C.R.S. § 18-12-115(1)(a)(I) states that after title to a firearm has passed to the buyer, the person who has already purchased the firearm is not entitled to take possession of her property. Instead, the statute requires the seller to maintain possession of the buyer's property during the waiting period. Second, as an analytical matter, it would be absurd to conclude that an individual may keep and bear arms "in case of a confrontation"—including in situations where a purchase knows that an imminent confrontation may occur—but has no right to obtain that firearm in the first place. The phrase "keep arms" in the Second Amendment means "possessing arms." *See District of Columbia v. Heller*, 554 U.S. 570, 583 (2008). An individual cannot possess something "in case of a confrontation" that must be held by another person. Thus, because HB23-1219 prohibits Coloradans from obtaining (*e.g.*, possessing) arms that they have already legally acquired, it burdens their Second Amendment right to keep arms.

**App. 398**

Defendant cites *Defense Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022 WL 15524977 (C.D. Cal. 2022), which holds that *Bruen* does not encompass any Second Amendment "penumbra" that extends to protecting the self-manufacture of firearms. See *Defense Distributed* at *4; *id.* at 3 ("AB 1621 has nothing to do with "keeping" or "bearing" arms."). But *Defense Distributed* involved certain milling machines, and the ancillary tools necessary to build a firearm. The court, moreover, did not hold that the text of the Second Amendment is never implicated by an individual who wants to obtain a firearm. Nor could it have. California is in the Ninth Circuit, and that Court has held on multiple occasions that the Second Amendment extends to obtaining arms. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) and *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014) ("Thus the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them.") (internal quotation marks omitted). And in *Heller*, the Court went out of its way to criticize a District of Columbia law that related to "obtaining" a gun. *See Heller*, 554 U.S. at 631 ("The District law, by contrast, far from imposing a minor fine, threatens citizens with a year in prison (five years for a second violation) for even <u>obtaining</u> a gun in the first place.") (emphasis added).

Defendant also contends that Plaintiffs' Second Amendment rights have not been infringed because the law does not apply to all arms transfers. Dkt. No. 18, at 8. The point of Defendant's argument seems to be that unless it completely obliterates a person's Second Amendment rights, it has not infringed those rights. That is not correct. *Bruen*, for instance, did not ask whether New York completely obliterated the Second Amendment right to carry a firearm. *See Bruen*, 142 S. Ct. at 2125 (describing both plaintiffs as having the right to carry a firearm for target shooting and hunting, and even noting that one plaintiff was permitted to carry a firearm to and from work, while neither was allowed to carry a firearm for general self-defense purposes).

**App. 399**

Instead, the Court asked only whether the Second Amendment's text covered "carrying handguns publicly for self- defense." *Bruen*, 142 S Ct. at 2134. Thus, even though New York did not completely bar the practice of carrying firearms, but instead subjected it to a discretionary licensing regime, the text of the Second Amendment was nevertheless implicated. In this case, the waiting period does not apply to all avenues for the acquisition of firearms, only the most important one—purchase and obtaining. *Cf. Heller*, 554 U.S. at 629 (leaving options open in one area "is no answer" to closing them in another). This burden on Plaintiffs' right to keep and bear arms thus certainly implicates the text of the Second Amendment.

**C.     There is No Historical Analogue to Colorado's 3-Day Waiting Period, So Defendant Cannot Prevail at *Bruen* Step 2.**

Because the text of the Second Amendment covers Plaintiffs' conduct, HB23-1219 is presumptively unconstitutional. *Bruen*, 142 S. Ct. at 2129-30. The burden therefore shifts to Defendant to attempt to rebut that presumption by demonstrating that its arbitrary 3-day delay— which will generally extend beyond the time necessary to conduct a background check—is consistent with the Nation's historical tradition of firearms regulation. *Id.*; *see also Vincent v. Garland*, 80 F.4th 1197, 1203 (10th Cir. 2023) (Bacharach, J., concurring) ("In determining whether historical analogues exist, we consider English views dating from the late seventeenth century, the Founders' views in the run-up to adoption of the Second Amendment, and the interpretation of the Second Amendment from its ratification through the end of the nineteenth century.").

But circuit courts have recognized that "the *Bruen* standard for identifying a closely analogous historical regulation is a demanding one." *Baird v. Bonta*, 81 F.4th 1036, 1046 (9th Cir. 2023); *see id.* at 1047 ("California must identify a historical analogue that curtails the right to peaceably carry handguns openly for self-defense to a comparable degree, with a comparable

**App. 400**

severity, and <u>with a comparable blanket enforcement</u> to California's open-carry ban.") (emphasis added). To go further, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

As just one example, statutes banning the carrying of firearms "while under the influence" have been held to not be analogous to a modern ban on carrying by "unlawful users" of intoxicants, because "there is a considerable difference between someone who is actively intoxicated and someone who is an 'unlawful user.'" *See United States v. Daniels*, 77 F.4th 337, 347 (5th Cir. 2023); *see also Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023) ("Remember what the Court itself did in *Bruen* after rejecting a means-end approach and announcing the text-and-history standard—it rolled up its sleeves and examined a wealth of laws and commentary spanning several centuries, paying close attention to the enforcement and impact of various regulations."); *RMGO II*, 2023 WL 5333771, *3 (D. Colo. Aug. 18, 2023) ("[A] prohibition on purchasing a firearm is not the same as a prohibition on discharging or possessing a firearm.").

"In some cases, [the historical] inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. In *Heller*, Washington D.C.'s flat ban on the possession of handguns was a regulation that the Founders themselves could have adopted to confront the social problem that the City identified, *i.e.* handgun violence in urban areas. *Bruen*, 142 S. Ct. at 2131. And since none of

**App. 401**

the founding era regulations identified by Washington D.C. was analogous to its ban, the ban was unconstitutional.

Undeterred by binding case law, Defendant begins its historical analysis by arguing that regulations relating to intoxicated persons are analogous to a law that prohibits every buyer from obtaining possession of their firearm, even when no reason for doing so has been identified. This is error, because *Bruen* expressly points to two metrics that are important in determining whether a historical regulation is analogous to a challenged regulation. Those are the "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33; *see also id.* at 2133 ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry."). Here, quite obviously, a law barring only intoxicated individuals from obtaining firearms while they are intoxicated is not "how" HB23-1219 works, given that the law applies to all Colorado citizens. *See, e.g., Teter*, 76 F.4th at 952 ("[T]he 'how' of the proffered state statutes is different—they regulate different conduct.").

Unsurprisingly, Defendant's reliance on regulations of intoxicated person also manifestly fails the "why" metric. Regulations of intoxicated persons are justified because those persons are obviously a danger to themselves and to others. That is the "why" justifying the regulations. But HB23-1219 deprives <u>everyone</u> of the possession of arms that they have purchased without any inquiry, much less resolution, of the question of whether a particular person poses a threat to anyone. Indeed, as noted above, Defendant does not contest that Plaintiffs are responsible, law-abiding adult American citizens, as is every person injured by HB23-1219. Indeed, the law's "why" is different because it injures those who have already passed a background check, and are therefore presumably not a threat to anyone. That is, after all, the purpose of background checks.

**App. 402**

Thus, regulations of intoxicated persons are of no relevance in this case. *Accord Bruen*, 142 S. Ct. at 2133-34 (recognizing that historical restrictions on firearms existed in "sensitive places," but nevertheless rejecting the notion that "all places of public congregation" sufficed as an analogue); *id.* at 2140 (rejecting the idea that medieval restrictions on lances could suffice as a historical analogue even to restrict daggers).

To buttress the point, in *United States v. Connelly*, NO. EP-22-CR-229(2)-KC, 2023 WL 2806324 (W.D. Tex. Apr. 6, 2023), the plaintiffs challenged a statute that prohibited users of intoxicants from possessing firearms (even when they were not actually intoxicated). The court held that the law violated the plaintiffs' Second Amendment rights. In so doing, the court rejected many of the proposed analogues advanced by Defendant in this case. The court held that the laws were not analogous because the historical laws prevented individuals from using firearms while actively intoxicated, while the challenged statute prevented users of intoxicants from possessing firearms altogether. *Id*. at *7. The court held that prohibiting someone who has used drugs in the last year from keeping arms for self-defense is not analogous to preventing people from shooting their guns while intoxicated. *Id*. *A fortiori*, a law that prevents law-abiding citizens who have done nothing wrong from possessing the arms that they have acquired is not analogous to a law that bans people from shooting guns while intoxicated.

Defendant argues that the intoxicated-person laws are analogous to HB23-1219 because the statute prevents impulsive firearms violence. And if HB23-1219 were limited to firearm purchasers for whom there was some reason to believe they might not be thinking clearly, Defendant might have a point. But is not. Instead, with respect to the overwhelming number of law-abiding citizens affected by HB23-1219, there will be no reason to think that they are impaired

**App. 403**

at all. Thus, a law specifically targeted at an obviously dangerous situation is not analogous to a law that sweeps up everyone, including a teetotaler who has never had a drink in her life.

Moreover, Defendant's own arguments undermine their position. Defendant contends that there is a long history of laws directed at "preventing impulsive acts of firearm violence." Dkt. No. 18, at 14. Yet despite the apparent long history of social concerns about "impulsive" crimes with firearms, Defendant cites no waiting period law that pre-dates 1923. Without more, this is dispositive under *Bruen*'s Step 2. *Bruen*, 142 S. Ct. at 2131 ("[I]f earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.").

As if it were relevant information, Defendant explains this deficiency by saying (1) that practical circumstances made it so that firearms were not readily obtainable anyway; and (2) that such laws only came into vogue when state actors recognized that firearms were becoming more easily obtained. Defendant does not explain how either of these arguments fits in with *Bruen*. Certainly, the Supreme Court did not announce a "practical circumstances" exception to its logic. And Defendant's concession that waiting period laws only started emerging more recently is precisely the point that Plaintiffs make—that there is no historical analogue to Colorado's current law.

Moreover, Defendant fails to advance arguments about any other "arms," which might have been more available than firearms before 1923. *Accord Teter*, 76 F.4th at 952-53 (considering the history of bans on concealed bowie knives, dirks, daggers, and other deadly weapons). Not once does Defendant point to a waiting period on any "arm" encompassed within the Second

**App. 404**

Amendment, particularly one that extends beyond the period when an individual might be intoxicated or discovered to be dangerous—like a background check works today.[2]

### D.    Defendant's Public Policy Arguments Have No Relevance to *Bruen*'s Test of Constitutionality, and Such Arguments Should be Excluded from Evidence.

The Defendant's public policy arguments are not relevant to this case. The Supreme Court specifically held in *Bruen*:

> To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, at 2126. Here, Defendant partially attempts to rely on policy arguments, on the apparent hope that it can guilt the Court into denying Plaintiffs' motion. But to the extent that Defendant or its experts intend to introduce evidence regarding the need, effectiveness, or positive results of the waiting period at issue, the evidence should be excluded as irrelevant.

### E.    The Other Preliminary Injunction Factors Favor Plaintiffs.

Because HB23-1219 violates the Second Amendment, Plaintiffs suffer irreparable injury as long as it is in place, and with every firearm that they purchase, until a preliminary injunction is granted. *See Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806

---

[2] Defendant does not cite *McRorey*, 2023 WL 5200670. Rightfully so. In that case, the District Court noted that a waiting period might be constitutional, if it merely relates to the question of whether an individual is a felon or mentally ill—information that is turned up in a background check. *See McRorey*, 2023 WL 5200670, at *4 ("The *Bruen* majority therefore seems to acknowledge the facial constitutionality of regimes requiring background checks and attendant waiting periods to ensure a potential purchaser is not prohibited from exercising Second Amendment rights."). By contrast, Colorado's law has no purpose connected to determining whether an individual is a legal purchaser of a firearm. It applies to everyone, and it applies even after the background check reveals that a purchaser is fully entitled to purchase a firearm. *Contra McRorey*, 2023 WL 5200670, *5 ("[T]he Supreme Court has also noted that some wait time is permissible to ensure that those prohibited are unable to obtain firearms.").

**App. 405**

(10th Cir. 2019) ("What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial. Any deprivation of any constitutional right fits that bill."); *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Accordingly, "[w]hen an alleged deprivation of a constitutional right is involved, ... most courts hold that no further showing of irreparable injury is necessary." *See* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 1998).

Additionally, when the government is the opposing party, the final two preliminary injunction factors—the balance of equities and the public interest—merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, protection of constitutional rights against governmental infringement on those rights is always in the public interest. *See Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[W]e agree with the district court and the Sixth Circuit that it is always in the public interest to prevent the violation of a party's constitutional rights."). And there is no possible policy argument that could outweigh the need to protect the constitutional rights of responsible, law-abiding adult American citizens. (And any attempt to introduce such evidence should be excluded). *See Bruen*, 142 S. Ct. at 2131 ("It is this balance—struck by the traditions of the American people—that demands our unqualified deference.").

### Conclusion

HB23-1219 is an innovation. In the 147 years from August 1, 1876, to August 8, 2023, no such law has appeared in Colorado's statute books. Plaintiffs do not seek to overturn a longstanding statute. Instead, they seek to prevent a newly enacted law that infringes on their constitutional rights from injuring them further. For these reasons, the Court should grant Plaintiffs' request for a preliminary injunction, pending discovery and trial.

**App. 406**

DATED this 20th day of October 2023.

Respectfully submitted,

/s/ D. Sean Nation
D. Sean Nation
Brian A. Abbas
William E. Trachman
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
Tele:: (303) 292-2021
Fax:   (877) 349-7074
Email: snation@mslegal.org
babbas@mslegal.org
wtrachman@mslegal.org
*Attorneys for Plaintiffs Rocky Mountain Gun*
*Owners and Alicia Garcia*

**App. 407**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of October 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of this filing to all counsel of record.

/s/ D. Sean Nation
D. Sean Nation

**App. 408**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 1:23-cv-02563-JLK**

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

**NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF**

**PLAINTIFFS' REQUEST FOR PRELIMINARY INJUNCTION (DKT. 2)**

---

Plaintiffs Rocky Mountain Gun Owners and Alicia Garcia submit the attached supplemental authority as Exhibit 1: *Miller v. Bonta*, — F. Supp. 3d, 2023 WL 6929336 (S.D. Cal. Oct. 19, 2023).

In *Miller*, the District Court for the Southern District of California struck down several laws enacted by the State of California, collectively titled the "Assault Weapons Control Act." The statutes imposed criminal penalties on the possession or sale of various arms defined by California as "assault weapons."

*Miller* is relevant to this matter for three reasons.

First, the District Court in *Miller* struck down the law, despite covering the "sale" of assault weapons. Contrary to Defendant's argument in this case, the *Miller* court had little difficulty concluding that the Second Amendment protects a citizen's right to obtain a firearm through normal commercial transactions. *See Miller*, 2023 WL 6929336, at *6 ("[C]riminalizing selling,

**App. 409**

lending, and manufacturing also impinges on a citizen's constitutional right to acquire these firearms for self-defense.").

Second *Miller* once again reiterated what is well known after *Bruen*: there is no government interest so weighty that it can save a statute that is otherwise unconstitutional. *Miller*, 2023 WL 6929336, at *2 ("[T]he Supreme Court has very clearly ended modern interest balancing when it comes to the Second Amendment."). Plaintiffs once again urge the Court to exclude irrelevant evidence proffered by Defendant's experts.

Last, *Miller* appropriately framed the individual right at issue: the ability to obtain a firearm for personal use. *Miller* then forcefully rejected California's argument that its state laws were constitutional because they still permitted individuals to keep and bear arms that were not the subject of the challenged laws. *Id.* at *5 ("This is not the way American Constitutional rights work. It is not permissible for a state to ban some books simply because there are other books to read, or to close synagogues because churches and mosques are open."). Similarly, the Court should reject Defendant's efforts to slice and dice the right to keep and bear arms.

Plaintiffs respectfully present this authority to the Court, to consider as it sees fit.

Respectfully submitted,

*/s/ D. Sean Nation*

D. Sean Nation
Brian A. Abbas
William E. Trachman
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
Tele: (303) 292-2021
Fax:  (877) 349-7074
Email: snation@mslegal.org
babbas@mslegal.org
*Attorneys for Plaintiffs Rocky Mountain Gun Owners and Alicia Garcia*

Word Count: 347

# App. 410

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

**Civil Action No. 1:23-cv-02563-JLK**

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

---

## DECLARATION OF CLAYTON CRAMER

---

I, Clayton Cramer, pursuant to 28 U.S.C. § 1746 do depose and state as follows:

I have been asked to render an opinion on the history of firearms waiting periods, their effectiveness, and to address the Declarations of Robert Spitzer and Randolph Roth.

This Declaration is based on my own research, knowledge, and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this Declaration.

## BACKGROUND AND QUALIFICATIONS

1.      I am currently an adjunct professor of history at College of Western Idaho after having previously taught at Boise State University. I have published numerous works regarding the Second Amendment as it was understood at the time of our nation's founding, including *For The Defense Of Themselves And The State: The Original Intent and Judicial Interpretation of the Right To Keep And Bear Arms*, and *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*, along with numerous Journal articles.

1

**App. 411**

2.      My 18 published articles (mostly in law reviews) have been cited in *D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); Miller v. Bonta (S.D.Cal. 2023); *Jones v. Bonta*, 34 F.4ᵗʰ 704 (9ᵗʰ Cir. 2022) vacated by *Jones v. Bonta*, 47 F.4ᵗʰ 1124 (9ᵗʰ Cir. 2022)(remanded to the district court for further proceedings consistent with *Bruen*); *Young v. Hawaii*, 992 F.3d 765 (9ᵗʰ Cir. 2021) cert, granted by Young v. Hawaii, 142 S.Ct. 2895 (judgment vacated and case remanded to the Ninth Circuit for further consideration in light of *Bruen*); *State v. Sieyes*, 168 Wash.2d 276 (Wash. 2010); Senna v. Florimont, 196 N.J. 469 (N.J. 2008); *Mosby v. Devine*, 851 A.2d 1031 (R.I. 2004). A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

3.      In several cases, my work has been cited in defense of laws limiting firearms ownership: *State v. Roundtree* (Wisc. 2021), *State v. Christen* (Wisc. 2021), *King v. Sessions* (E.D.Penn. 2018). My work was also cited in the *McDonald* v. *Chicago* (2010) dissent.[1]

4.      I am being compensated for services performed in the above-entitled case at an hourly rate of $250 for expert declarations. My compensation is not contingent on the results of my analysis or the substance of any testimony.

### SUMMARY OF OPINIONS

### I.      Introduction

5.      Spitzer fails to appreciate that guns were readily available for purchase in the colonial and early Republic periods. He makes much of the number of gun dealers in the U.S. with no awareness that our population is 85x larger than it was in 1790. Of course, we have a lot of gun dealers and gun manufacturers. Spitzer presents no evidence that their per capita number

---

[1] *McDonald v. Chicago,* 130 S.Ct. 3022, 3132 (Breyer, J. diss.)

**App. 412**

is larger than in 1790. The evidence from probate records, advertising and city directories is clear that guns were commonly available for purchase in the Founding Era.

6.     Spitzer makes much of Randolph Roth's data on homicide rates with no apparent awareness that Roth's data is not comparable to murder rates, making comparisons to today meaningless.

7.     Spitzer parrots Roth's claims about black powder firearms not being kept loaded because Spritzer is unfamiliar with the first-hand accounts and statutes of the period.

8.     Spitzer engages in end-means reasoning specifically rejected by *Bruen*.

9.     Spitzer misrepresents many laws that he claims prohibited being armed while drunk which do nothing of the sort. These misrepresentations are so calculated in their deception that he should be disqualified as an expert witness.

10.     Spitzer's putative armed while drunk laws are not even slightly analogous to the challenged law. They are very nearly perfect examples of what Bruen calls the "green hat" example of how *not* to argue.

11.     We are in agreement as to "… the absence of firearm purchase waiting periods early in American history…."

## II.     "Guns-R-Us"

12.     Spitzer's declaration makes claims as to why Colorado's three-day waiting period is better suited to what he calls "Guns-R-Us" retail purchases because as he directly admits on p. 4:

> Gun purchase waiting periods as they are understood and implemented today did not exist early in the country's history. Yet no special wisdom is required to discern why. Three important differences between early America and the modern era explain why.

**App. 413**

First, in the modern era, gun and ammunition purchases can be made easily and rapidly from tens of thousands of licensed gun dealers, private sales, gun shows, and through internet sales. This modern sales system was key to the enactment of waiting periods. No "Guns-R-Us" outlets existed in the 1600s, 1700s, or most of the 1800s. Rapid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get.

13.    "Gun R Us" in some form must have existed in the more settled parts of colonial America given the high ownership of firearms as measured by probate records:

Guns are found in 50- 73% of the male estates in each of the eight databases and in 6-38% of the female estates in each of the first four databases.

Gun ownership is particularly high compared to other common items. For example, in 813 itemized male inventories from the 1774 Jones national database, guns are listed in 54% of estates, compared to only 30% of estates listing any cash, 14% listing swords or edged weapons, 25% listing Bibles, 62% listing any book, and 79% listing any clothes.[2]

14.    The number of gun sellers in the modern era reflects the much larger population of the United States.  The U.S. population in 1790 was 3,929,214;[3] on January 1, 2023, the Census Bureau estimated 334,233,854 residents.[4]  That is 85x more people.  Spitzer points to a total of 59,900 "dealer licenses" and "pawnbrokers" today licensed to sell guns.  The equivalent per capita for 1790 would be 704 dealers in firearms.

15.    How many gun retailers were there?  While I have gathered data on gunsmiths and gun makers through 1840, neither I nor to my knowledge anyone else has attempted to count those who retailed guns in the pre-1791 era.  There are enough ads surviving to suggest that it

---

[2] James Lindgren and Justin L. Heather, *Counting Guns in Early America*, 43:5 WILLIAM AND MARY L.R. 1777, 1778 (2002).

[3]    U.S. Census Bureau, *1790 Fast Facts,* https://www.census.gov/history/www/through_the_decades/fast_facts/1790_fast_facts.html, last accessed October 18, 2023.

[4] Derick Moore, U.S. Census Bureau, U.*S. Population Estimated at 334,233,854 on Jan. 1, 2023*, https://www.census.gov/library/stories/2022/12/happy-new-year-2023.html, last accessed October 18, 2023.

**App. 414**

was not rare.  At least one ad offering guns for sale appears among the surviving 1720 issues of the *Boston Gazette*.  It offered goods salvaged from a wreck off the South Carolina coast, including, "Six blunderbusses… Ten muskets… Two pistols."[5]  Firearms of various sorts, some described as "fit for Guinea" (suitable for sale in West Africa, suggesting that the firearm was in very poor condition), and others described only as "Musketts" appear in three ads.[6]  Another series of issues of the *Boston Gazette*, dated November 17, 1741, through September 13, 1742, is awash in gun ads.  John Gerrish's November 17, 1741, ad is fairly typical.  Gerrish offered a variety of consumer goods, including cloth, flour, stockings, furniture, and "Fire Arms" and "Pistols" for sale.  Variations of this ad, with slightly different collections of goods, sometimes specifying "neat Fire Arms" but not pistols, and sometimes "Guns, Pistols, &c." appear in a total of sixteen ads over the next ten months.[7]  (Many issues in this series were damaged or missing, making a complete count for this period impossible.)   In six issues, there are two different vendors offering guns for sale, one of whom advertises himself as a gunsmith.[8]

16.     An online search of the *Pennsylvania Gazette* from 1728 through 1800 found far more ads for guns than there was time to catalog.  A fairly typical ad was that of a merchant named Peter Turner who, in 1741, was liquidating his inventory before returning to London.  Included among his very broad collection of consumer goods were "Rifle barrel Guns,… with several sorts of fowling Pieces…."[9]  A Robert Towers offered as part of his selection, "rifle

---

[5] *Boston Gazette*, May 30, 1720.
[6] *Boston Gazette,* March 1, 1730; Id., March 9, 1730; Id., August 14, 1730.
[7] *PETER TURNER intending for London,* Boston Gazette, November 17, 1741; December 1, 1741; Id.,December 8, 1741; Id.,December 15, 1741; Id., January 19, 1742; Id., February 2, 1742; Id., [unreadable date], 1742; Id., March [unreadable], 1742; Id., May 11, 1742; Id., May 18, 1742; Id., May 25, 1742; Id.,  July 13, 1742; Id., August 10, 1742; Id., August 24, 1742; Id., August 31, 1742; [September 13?], 1742.
[8] *Boston Gazette*, May 11, 1742; Id., May 18, 1742; Id., May 25, 1742; Id., July 13, 1742; Id., August 24, 1742; Id., August 31, 1742.
[9] *Pennsylvania Gazette,* July 30, 1741.

**App. 415**

double barrel and smooth bore guns, pistols, flints, bullet and shot molds…."[10]  A Robert Lettis Hooper offered "superfine Rifle Powder by the Quarter Cask or Pound… a Parcel of Spanish Muskets, neatly fitted with iron Rods, and small Bayonets, the Locks are large and well made, and the whole Piece very handy and convenient for common Use."[11]  Samuel Carruthers offered "a neat Assortment of birding and fowling Pieces, and a valuable Rifle Gun…."[12]  Francis & Relfe offered "rifle gun barrels and locks, gunpowder…."[13]  There are many other similar ads, as well as a large number of ads offering muskets, pistols, and gunpowder for sale, as well as parts for making guns.[14]

17.    Searching other colonial newspapers for ads offering firearms for sale produced a number of matches.  "A List of sundry Goods to be sold by Henning & Shute at their Store… Indian trading guns and cutlasses, pistols…"[15]  "In the Susannah, Capt. Gregory, and to be sold by Steel and Hume, at the Corner House… Trading Guns, Pistols…"[16]  "JUST IMPORTED in

---

[10] *Imported from Liverpool,* PENNSYLVANIA GAZETTE, September 6, 1764. 1.

[11] *To be SOLD by ROBERT LETTIS HOOPER*, PENNSYLVANIA GAZETTE, September 22, 1763, 1.

[12] *JUST landed, a select Parcel of SAWS,* PENNSYLVANIA GAZETTE, July 8, 1762, 1.

[13] PENNSYLVANIA GAZETTE, March 5, 1761, Id., *Just imported in the last Ships from London*, June 4, 1761, 1.

[14] *JUST imported from London*, PENNSYLVANIA GAZETTE, November 1, 1744, 4; Id., September 26, 1745; Id., October 3, 1745; Id., October 17, 1745; Id., February 11, 1746; Id., July 17, 1746; Id., July 30, 1747; Id., March 29, 1748; Id., May 5, 1748; Id., May 12, 1748; Id., September 15, 1748; Id., October 25, 1750; Id., November 27, 1755; Id., January 18, 1759; Id., August 2, 1759; Id., November 19, 1761; Id., February 11, 1762; Id., August 19, 1762; Id., April 14, 1763; Id., May 19, 1763; Id., February 16, 1764; Id., April 12, 1764; Id., April 19, 1764; Id., May 14, 1772; Id., May 28, 1772; Id., August 26, 1772; Id., February 17, 1773; Id., November 28, 1778; Id., December 24, 1783.

[15] *A List of sundry Goods to be sold by Henning & Shute at their Store…,* SOUTH CAROLINA GAZETTE, Nov. 8, 1735, 2.

[16] *Just Imported,* SOUTH CAROLINA GAZETTE, Dec. 22, 1739, 3.

**App. 416**

the John & Mary, … Guns & Pistols , Gun-powder, Bullets…"[17]   "IMPORTED in the Brigt. Dorothy…  two pair of very near [neat?] pistols…"[18]

18.      Some are ads for much larger quantities.  "Whereas there were 300 Muskets and Bayonets brought over from Great Britain in the Alaborough Man of War. This is to give Notice the same are to be sold by Mr. Commissary Dart, at his House, at the Rate of 12 £. Currency each Musket and Bayonet. They are fine Arms, have double Bridle Locks, and Walnut Tree Stocks."[19]

19.      Sometimes these ads include cannon for sale: "ON Monday next will be sold by publick vendue…  12 fine carriage guns, 12 swivels [a type of small cannon mounted on a swivelling stand or fork], a parcel fine blunderbusses, muskets, pistols, cutlasses, best gunpowder…"[20]  "The remaining store goods belonging to the late Captain William Grant, deceased, consisting of the following articles (in order to close the sales)…  a large parcel of muskets and bayonets…"[21]  "On Monday next, the fourth of April, will be sold at vendue… muskets …  10 carriage guns, and 6 swivel guns."[22]  "N.B. Said Howel has for sale a parcel of guns, carrying four pound shot, suitable *hand granades*, muskets, pistols…"[23] [emphasis added]

20.      A gang of robbers, having terrorized New York City, moved on to Philadelphia in 1749.  A newspaper account of their crimes reported that, "two Men, unknown, were lately at Mr. Rush's, a Gun smith, enquiring for six Pair of Pocket Pistols, to make up twelve Pair, having as

---

[17] *JUST IMPORTED in the John & Mary*, SOUTH CAROLINA GAZETTE, Nov. 29. 1735, 4.
[18] *IMPORTED in the Brigt. Dorothy*, SOUTH CAROLINA GAZETTE, Oct. 25, 1735, 3.
[19] *Whereas There Were 300 Muskets And Bayonets*…, SOUTH CAROLINA GAZETTE, Jun. 1, 1745, 2.
[20] *ON Monday next will be sold by publick vendue*, PENNSYLVANIA GAZETTE, Sep. 15, 1748, 3.
[21] *The remaining store goods belonging to the late Captain William Grant*, PENNSYLVANIA GAZETTE, Nov. 3, 1757, 3.
[22] *On Monday next, the fourth of April, will be sold at vendue,* PENNSYLVANIA GAZETTE, MAR. 29, 1748, 3.
[23] *Just imported in the Myrtilla*, PENNSYLVANIA GAZETTE, May 25, 1758, 4.

7

**App. 417**

they said, got the six Pair at some other Place."[24]   In 1772 and 1773, Heinrich Diebenberger advertised in Pennsylvania newspapers that he sold pistols,[25] as did Henry Deabarear (under several slight spelling variations), who sold "pistols for holsters and the pocket…."[26] Philadelphia merchants advertised pistols and muskets for sale repeatedly from 1744 onward.[27]

21.    In 1748 New York City, Edward Annely advertised his services as a gunsmith and dealer in imported guns.  He also advertised guns made to order: "He likewise makes guns and pistols as any gentleman shall like…."[28]   John Cookson, a Boston gun maker, advertised his wares in the April 13, 1756, BOSTON GAZETTE.[29]

22.    Into the early Republic, the evidence of common retailing of guns continues. Anthony Desverneys, Jr., of South Carolina in 1785 advertised that he "continues to make and repair all sorts of guns, Pistols and generally everything that belongs to the Gunsmith's Business."  A 1791 Philadelphia newspaper advertised a merchant as a "Pistol Maker."  A similar 1798 advertisement in the PENNSYLVANIA PACKET advertised: "Gun and Pistol Manufactory… Where Merchants, Captains of vessels, and others may be supplied with all sorts of small arms, on the lowest terms and shortest notice."  Aaron Hart, advertised in 1812 Pittsburgh his ability to furnish: "Rifles, Fowling pieces, and Pistols, equal in goodness and workmanship to any made in

---

[24] PENNSYLVANIA GAZETTE, August 31, 1749, 2.

[25] WOCHTENLICHTER PENNSYLVANISCHE STAATSBOTE, September 4, 1772; Id., September 14, 1773, translated and quoted in James Whisker, THE GUNSMITH'S TRADE 159-160 (1992).

[26] PENNSYLVANIA GAZETTE, Aug. 11, 1770, August 16, 1770, 1; Id., September 15, 1773, 1.

[27] PENNSYLVANIA GAZETTE, Jun. 26, 1746, 2; Id., Mar. 29, 1748, 3; Id., Sep. 15, 1748, 3; Id., September 15, 1748, 3; Id., Oct. 6, 1748, 3; Id., Nov. 11, 1756, 3; Id., November 27, 1755; Id., May 20, 1756, 3; Id., May 25, 1758, 4; Id., Mar. 27, 1782, 1; Id., Nov. 10, 1784, 3.

[28] THE NEW YORK GAZETTE REVIVED IN THE WEEKLY POST-BOY, August 1, 1748, quoted in Henry J. Kauffman, EARLY AMERICAN GUNSMITHS 4 (1952).

[29] BOSTON GAZETTE, April 13, 1756, quoted in Kauffman, EARLY AMERICAN GUNSMITHS 20 (1952).

App. 418

the state." Isaac King advertised in the January 8, 1818, SOMERSET [Pennsylvania] WHIG that: "He has and expects to have on hand, for sale, GUNS of all descriptions, Pistols…."[30]

23.     A November 9, 1807, letter from the Superintendent of the Springfield Armory to Secretary of War Henry Dearborn shows that pistols were being made in America for non-governmental purposes. Prescott responds to Dearborn's request for pistols: "I believe Pistols… can be made here as advantageously as in any other part of the country and I think I may venture to say better…."[31] If not being made at the government's own armory for the military, then who was the intended market?

24.     There are many surviving pistols of the early Republic, apparently *not* made under government contract, or for military purposes, including dueling pistols. Lindsay shows a number of these survivors from the first few decades of the nineteenth century, unmistakably American-made, by makers such as Silas Allen, Asa Waters, and Simeon North. While some have English-made gunlocks, the Asa Waters pistol is signed by Waters on the lockplate, suggesting that Waters made the lock, along with the rest of the pistol.[32]

25.     Robert McCormick advertised for "Lock forgers, lock filers" among other "Gun-Smiths wanted" in the *Pennsylvania Herald and York General Advertiser* of May 25, 1798. Daniel Sweitzer advertised for mechanics to work at his "Gun Lock Manufactory" in a

---

[30] Michael Bellesiles, ARMING AMERICA 378 (2000); SOUTH CAROLINA GAZETTE & PUBLIC ADVERTISER, October 13, 1785 quoted in Kauffman, EARLY AMERICAN GUNSMITHS, 23; FEDERAL GAZETTE, September 21, 1791 quoted in Kauffman, EARLY AMERICAN GUNSMITHS, 14; PENNSYLVANIA PACKET (CLAYPOOLE'S AMERICAN DAILY ADVERTISER), April 26, 1798, quoted in Kauffman, EARLY AMERICAN GUNSMITHS, 66; PITTSBURGH GAZETTE, December 18, 1812 quoted in Kauffman, EARLY AMERICAN GUNSMITHS, 45; SOMERSET [Pennsylvania] WHIG, January 8, 1818 quoted in Whisker, THE GUNSMITH'S TRADE, 155.
[31] James E. Hicks, 1 NOTES ON UNITED STATES ORDNANCE 28 (1940).
[32] Merrill Lindsay, THE NEW ENGLAND GUN: THE FIRST TWO HUNDRED YEARS 85-91 (1975).

**App. 419**

Lancaster, Pennsylvania newspaper on August 23, 1808.  One pistol with a Sweitzer gunlock survives.[33]

26.      James Haslett made muskets for Virginia but also imported pistols in Baltimore as early as 1806.  He advertised in the November 12, 1806, FEDERAL GAZETTE & BALTIMORE DAILY ADVERTISER that he offered dueling pistols for sale, some made by him, and others that were imported from London.  His pistols were apparently of very high quality, and his customers included the governors of both Maryland and Virginia.  Halbach & Sons sold imported pistols, and a number of pistols have survived from the period 1824-1833 with gunlocks stamped "McKim and Brother Baltimore."  As was common at the time, some gunlocks imported from Britain were stamped with the American importer's name.  These gunlocks were made into pistols for the civilian market after arrival in America.[34]

27.      Francis D. Poyas advertised his services as a gunsmith in 1825 Charleston, South Carolina—but Poyas apparently made pistols as well.  The Charleston Museum has a pair of percussion lock pistols stamped with Poyas' name on the frame.  It seems likely that they are his manufacture; they are not government contract pistols.[35]

28.      Debts owed to the estate of James Ross, a Steubenville, Ohio gunsmith who died in 1816, showed that along with debts for repairs of guns, and apparently for purchases of guns, there was also $45 owed by a customer named John Miller for a "pair of pistols."  S. E. Dyke's THOUGHTS ON THE AMERICAN FLINTLOCK PISTOL shows ninety-one flintlock pistols

---

[33] Kauffman, EARLY AMERICAN IRONWARE, 115; S. E. Dyke, THOUGHTS ON THE AMERICAN FLINTLOCK *Pistol*, (York, Penn.: George Shumway, 1974), 58; Whisker, THE GUNSMITH'S TRADE, 18, 31.
[34] Daniel D. Hartzler, ARMS MAKERS OF MARYLAND 61 (1977).  See *Ibid.,*65-68, for photographs of a number of surviving Haslett pistols.
[35] Kauffman, EARLY AMERICAN GUNSMITHS, 76.

**App. 420**

unquestionably of American manufacture before 1840; they do not appear to be government contract pistols.[36]

29.     J. Bolton and J. McNaught advertised in 1816 Richmond that their services included "All kinds of GUNS and PISTOLS made, altered and repaired in a perfect manner…." The inventory of James McNaught's estate in 1826 showed a "pair of dueling pistols… 6 pair small dirk pistols… 2 pair best round stock pistols with flints… 2 pair percussion pistols, plain secret triggers… 3 pair rifle barrel pistols… 5 pair secret trigger pistols…."[37]  It seems a good assumption that these were unsold inventory; the descriptions of the pistols do not sound like they were intended for military use.

30.     Jacob S. Baker advertised in WHITELY'S PHILADELPHIA ANNUAL ADVERTISER of 1820: "All orders for Rifles, Pistols, Fowling Pieces and Muskets will be punctually attended to…."  A Cleveland, Ohio gunsmith in 1823 advertised: "Rifles, Fowling pieces, and Pistols will be furnished on short notice."  While the ad is ambiguous as to whether Andrews made all of these items, or simply sold and repaired them, it is clear that he sold pistols, and considered that there was enough demand to bother listing them for sale.[38]

31.     Francis Areis advertised in 1831: "Manufacturers and Repairer of all kinds of Fire Arms; Pistols, Guns, Swords, Gunlocks."[39]  This can be read as either manufacturing or repair of pistols; either way, it appears that there was either enough demand for pistols, or enough pistols in need of repair, that Areis considered this ad worth running.  Henry A. Cargill, a Nashville merchant, advertised pistols for sale for almost two months on the front page of the NASHVILLE

---

[36] Whisker, THE GUNSMITH'S TRADE, 200; S. E. Dyke, THOUGHTS ON THE AMERICAN FLINTLOCK PISTOL 13-60 (1974).
[37] RICHMOND COMMERCIAL COMPILER, September 21, 1816,  quoted in Whisker, THE GUNSMITH'S TRADE, 163, 203-204.; Id., October 4, 1816, Id.,, 163, 203-204.
[38] WHITELEY'S PHILADELPHIA ANNUAL ADVERTISER B2 (1820); CLEVELAND HERALD, May 8, 1823, quoted in Kauffman, EARLY AMERICAN GUNSMITHS, 4.
[39] Kauffman, EARLY AMERICAN GUNSMITHS, 5.

**App. 421**

DAILY REPUBLICAN BANNER. A few months later, A. W. Spies advertised in every issue of the NEW YORK MORNING HERALD for several weeks: "Hardware, Cutlery, Guns and Pistols… 500 Guns, 300 Rifles, 2,000 pair Pistols/Gun and sporting implements of every kind/Gun materials for Gunsmiths…."[40]

33.    In the same paper, on many of the same days, S. M. Pike was advertising, "Particular Notice to Sportsmen—A choice assortment of fine double and single barrel guns, rifles and pistols…."[41]  A B. Ferguson of Huntsville, Alabama, advertised in May of 1837 that he was a "Gun and Locksmith," offering repairs as well as, "I also have on hand some Guns and Pistols for sale, and also a variety of gun and pistol locks…."[42]

33.    In Louisville, Kentucky, Fletcher & Reeves advertised in an 1837 business directory, "Dealers in Watches, Jewellery [*sic*], Silver Ware, Military Goods, Pistols, Surveyor's Compasses, Piano Fortes, Music, &c."  In St. Louis that same year, Meade & Adriance described themselves as "Importers and wholesale dealers in… *Guns, Pistols*, Cutlery, Military and Fancy Goods, generally….."[43]  [emphasis in original]

34.    Bishop's description of 1791 Pittsburgh reports that of 130 families, there were 37 engaged in some form of manufacturing, of which two were gunsmiths.[44]  About 1.5 percent of the families in what was still a frontier community were therefore making their living as gunsmiths, apparently making guns.  Cuming lists two gunsmiths in 1807 Pittsburgh.[45]  Fearon includes a table of "Manufactories in and near the city of Pittsburgh, in the State of

---

[40] *Guns, Pistols, Bowie Knives*, Nashville DAILY REPUBLICAN BANNER, October 2, 1837, through November 25, 1837, 1; NEW YORK [City] MORNING HERALD, January 1838, 1, 3-6, 9-17.

[41] NEW YORK [City] MORNING HERALD, January 1, 3, 4, 5, 6, 9, 10, 11, 12, 13, 15, 16, 17;

[42] *Gun and Locksmith*, [Huntsville, Alabama] FREE DEMOCRAT, May 23, 1837, 1.

[43] W.G. Lyford, THE WESTERN ADDRESS DIRECTORY 385, 418 (1837).

[44] *Id.,* 1:568.

[45] Fortescue Cuming, SKETCHES OF A TOUR TO THE WESTERN COUNTRY 222 (1810).

**App. 422**

Pennsylvania, in the year 1817" listing 14 men employed as "Gun-smiths, and bridlebit-makers" with a yearly value of $13,800.[46]

35.     The most complete early Republic statement of firearms manufacturing comes from the 1810 manufacturing census.  Inconsistencies in the data clearly demonstrate that this survey was haphazard and incomplete.  As an example, Massachusetts manufactured 19,095 guns classified as "other"—but listed no gun manufactories, and no gunsmiths.  Only nine of the seventeen states are listed as having made any guns at all, and there is no firearms manufacturing listed in any of the five territories, or the District of Columbia.  Only Maryland, South Carolina, and the territories of Orleans and Louisiana reported any gunsmiths.  In spite of the 1807 and 1817 data from Fearon and Cuming for Pittsburgh showing a growing community of gunsmiths there, there are *no* gunsmiths listed in Pennsylvania.  New York, at the time one of the great manufacturing states of the Union, showed no gun manufacturing or gunsmithing at all.  Even with these clearly incomplete records, however, there were 117 "Gun manufactories" in the U.S., 37 gunsmiths (a severe undercount, based on Fearon and Cuming's reports for 1807 and 1817 for Pittsburgh alone), and 42,853 firearms manufactured.[47]

36.     It is always hazardous to make comparisons between such different times as 1810 and the present.  Firearms manufactured in 1810 were far less precise than modern weapons, and they had shorter useful lifetimes as well.  During this period, "it was assumed that a musket would have a life of 12 years in the regular service or 10 years if in use by State militia."[48]

---

[46] Henry Bradshaw Fearon, SKETCHES OF AMERICA: A NARRATIVE OF A JOURNEY OF FIVE THOUSAND MILES THROUGH THE EASTERN AND WESTERN STATES. 203 (3rd ed. 1819).

[47] Albert Gallatin, A STATEMENT OF THE ARTS AND MANUFACTURES OF THE UNITED STATES OF AMERICA 11 (1814). Secretary of the Treasury Tench Coxe's admission that the manufacturing census was very incomplete can be found in Margo J. Anderson, THE AMERICAN CENSUS: A SOCIAL HISTORY 19 (1988).

[48] Berkeley R. Lewis, SMALL ARMS AND AMMUNITION IN THE UNITED STATES SERVICE, 1776-1865 47 (1956).

**App. 423**

Nonetheless, it is intriguing to compare 1810 production rates per capita with modern production rates.

37.     The *minimum* 1810 U.S. production rate was 592 guns per 100,000 people.  By comparison, in 1969, U.S. production and importation of firearms was 2,605 guns per 100,000 people.[49]  To add to the impressiveness of this per capita gun manufacturing rate, the United States in 1969 had an army that approached 1% of the total population, and was actively at war in Vietnam where guns were being used up and lost; by comparison, in the 1820s, the United States Army "fluctuated between 5,500 and 5,700 until the end of the 1820s"[50] out of a population of 13,000,000[51]—or 0.04%.  In spite of a far larger military, with an active war consuming small arms, when small arms had much longer lifetimes, the United States manufactured *no* more than 4.5 times as many small arms per capita in 1969 as it did in 1810.  The 1810 manufacturing census is unquestionably incomplete in a way that the 1969 manufacturing records are not; it is likely that the *actual* number of guns manufactured in 1810 would raise the per capita rate close to 1969 levels.

38.     Whisker gives the details of several small gun makers based on the 1820 U.S. Census of Industry.  Because the 1810 United States Census of Manufactures included only firms grossing more than $500 a year, or employing more than one person, reliance on it gives a false impression of the number of gunsmiths making guns in America, tending to underreport the one

---

[49] James D. Wright, Peter H. Rossi, and Kathleen Daly, UNDER THE GUN: WEAPONS, CRIME, AND VIOLENCE IN AMERICA 30 (1983), provides production and importation figures from which this data was calculated.

[50] Gregory J. W. Urwin, THE UNITED STATES INFANTRY: AN ILLUSTRATED HISTORY, 1775-1918 49 (1988).

[51] William G. Ouseley, REMARKS ON THE STATISTICS AND POLITICAL INSTITUTIONS OF THE UNITED STATES, WITH SOME OBSERVATIONS ON THE ECCLESIASTICAL SYSTEM OF AMERICA, HER SOURCES OF REVENUE, &C, 32 (1832).  That the U.S. Army was still only 6000 men in the 1830s is confirmed in Lorenzo de Zavala, Wallace Woolsey trans., JOURNEY TO THE UNITED STATES OF NORTH AMERICA 23 (1980).

**App. 424**

man gunmaker.  We know of at least one illiterate Virginia gunsmith, Joseph Shelton, who made guns for at least three decades starting in 1820, but who appeared only in the 1820 Census of Industry.[52]  It seems inevitable that many other small gun makers are also missing from the censuses, but this in no way indicates that they were not making guns.  Considering that new guns often sold for as little as $10, a gun maker who made a few dozen guns a year without any employees would simply not show up in the Census of Manufactures—even if every gun maker that was supposed to be counted actually was.

39.    Whisker also claims that

> Cottage industry gunsmiths supplied the militia needs of most states well through the War of 1812.  Many Civil War militia regiments were armed with sniper and common weapons made by individual gunsmiths in their small shops….  Despite the growth of large industrial facilities for the manufacture of arms in the post Civil War era, the cottage industry remained a primary source of weapons until well after 1870.[53]

40.    The Henry gun making business has left us a pile of documents establishing that they were a substantial gun manufacturer in the early Republic with many pages of items such as a November 10, 1819 ledger shows $23,359.75 in assets, and a balanced amount in cash and notes held by two banks, J. Joseph Henry, and in cash.  There is a July 8, 1813 order from the State of Maryland for 1000 muskets at $12.25 each, to be delivered in six weeks, "and will continue to take one thousand stand of muskets every six weeks till the order shall become terminated of which three weeks notice shall be given."[54]  There are many pages of such

---

[52] Felicia Deyrup, ARMS MAKERS OF THE CONNECTICUT VALLEY, 7, n. ** (1948); Whisker, *The Gunsmith's Trade*, 47-48.

[53] Whisker, THE GUNSMITH'S TRADE, 67.

[54] THE HENRY PAPERS AT THE HAGLEY MUSEUM, series 2, box 8, Folder 6 Accounts 1814-19; Ibid., Folder 8 John Joseph Henry III Business Accounts 1813-31.

**App. 425**

documents demonstrating that the Henry's firm was very busy filling orders for thousands of guns during this period.[55]

41.     These were firms large enough that they were required to report their activities in the manufacturing censuses, yet still small enough to leave few traces in other official documents.  Samuel Baum of Columbia County, Pennsylvania, reported that in the year ending June 30, 1820, he employed two workers, had a $550 capital investment, and made guns valued at $1200.   John Bayles of Georgia employed three journeymen gunsmiths during that same period.  Joseph Shelton of Lewis County, Virginia, employed two men, and made guns valued at $520.  He also made gun repairs that he valued at $150.[56]

42.     There are many other similar examples that Whisker reports of small operations that made a small number of guns—and it would appear that there were many such gun makers in America in 1820.[57]  Otho Sheets of Frankford, Virginia, employed three men and had made 90 firearms in the year previous to the census date, "each valued at $18."[58]  Whisker describes how Lancaster and Berks Counties, Pennsylvania, specialized in the manufacturing of gun barrels from the time of the Revolutionary War onward, with these barrels found on guns "made in Ohio, Kentucky, New York, Indiana, Illinois, and elsewhere."  Daniel Cryscher was one of these specialists in the making of gun barrels.  Some surviving records show that he made barrels to order for gunsmiths in other counties, and one transaction in 1830 involves an order for fifteen gun barrels, with Cryscher offering ten more if wanted.[59]

---

[55] Ibid., Series 1, Box 5, Production Records (1838).
[56] Whisker, THE GUNSMITH'S TRADE, 47-51.
[57] Whisker, THE GUNSMITH'S TRADE, 47-51.
[58] Ibid., 207.
[59] Ibid., 225-230.

**App. 426**

43.     Gun manufacturing was a well-established craft and even industry before the Revolution and remained a substantial craft and industry after the Revolution.   To claim otherwise requires destroying vast numbers of documents from the period.

44.     This is a scattered collection of ads offering pistols or muskets for sale.  In 1773, Jacob Allen, "Gun-smith" had a shop in Maiden Lane, New York City—and the only mention of his business is that another merchant's ad described his location as "between the House of Mr. Jacob Allen's, Gun-smith and Mr. John Taylor Brass-Founder."[60]  It is entirely possible that in small towns, retailers of firearms would not need to advertise; "everyone knows everyone's business in a small town" is an apt discussion of gossip but it also identifies that everyone in a town of 1000 would know who made and sold guns.  The tenth largest town in America in 1790 was Marblehead with a population of 5,661.[61]

45.     The argument could be made that many of these ads are by importers, not necessarily retailers, but if so, it implies a network of retailers buying from those importers. Were there 704 gun retailers (which would include gun manufacturers and importers who sold directly to the public) in 1791?  It is hard to use this fragmentary advertising as persuasive proof, but it does suggest that Spitzer's characterization that there were no "Guns-R-Us" equivalents in the "1600s, 1700s, or most of the 1800s" is a supposition that requires evidence.

46.     One might argue that many of these merchants sold guns as only part of their stock.  The same is true today.  If I wanted to buy a scary black rifle, there are three business within four miles of my home that stock them: Midstar Arms (a gun store); Ace Hardware; and BiMart (which sells groceries, hardware, farm supplies, electronics, and more other categories than I can immediately remember).

---

[60] THE NEW YORK JOURNAL OR GENERAL ADVERTISER, February 25 1773, quoted in Kauffman, EARLY AMERICAN GUNSMITHS, 2.
[61] U.S. Census Bureau, *1790 Fast Facts,* op cit.

**App. 427**

47.     Examining Colt Manufacturing correspondence shows that wholesalers (or Allies as Colt labeled them) were already buying pistols in considerable quantities by 1873:

> [Proposed contract] [w]ould meet the unanimous consent of the allies & in the long run be more advantageous to the Colt Pat. Fire Arms Co- The quantity should be 150 to 175 per month at the outside assorted viz.  22 cal [125]. 32 cal [30] 38 cal [5] 41 cal [15] with privilege of taking more of the larger or less of the smallest if demand required it.[62]

48.     A letter of January 24, 1874 from Colt to the Allies shows that the quantities of revolvers under discussion, and hardnosed pricing from Colt, does not suggest a problem selling Colt revolvers:

> [F]or we have between 4 & 5 thousand Pistols on hand and in the works.  The price named to the Allies (5.25 less 8%) is the lowest price we shall quote for them.   We have 1486 New Pocket BL [breech loading] Rim Fire and 408 do [ditto] do [ditto] pistols that we will sell to the Allies at 5.00 Each net 60 days. [63]

49.     A June 29, 1874, letter from the Allies to Colt:

> Please accept this order from each of the subscribers for two hundred OM [Old Model] 7 Shot Revolvers at $2.99 each, weekly for one year."[64]   Three Allies signed the letter, so this was an order for 31,200 revolvers a year.  On August 22, 1874 Colt confirmed an order from the Allies for "Ten Thousand (10000) new model 7 shot Pistols to be delivered within Twelve months from Sept 1st/74 at the net price of Five Dollars and Thirty five cents (%.35) each.  The first delivery of 1000 Pistols to be made in November 1874.[65]

50.     A December 30, 1874 letter to Colt ordered "Five thousand (5000) of the new 30 cal Revolvers."[66]  A December 29, 1874 letter asks, "How many new Pk't [Pocket] 4 ½ to 6 ½ [inch barrel length] Rev[olvers] have you all told including finished pistols & those that can be produced from parts on hand, if not over 2,000 we might be induced to take them with ½ to 2/3

---

[62] *Ibid., Colt Allies to Colt Patent Fire Arms Co.,* June 26, 1873, p. 15 of COLT PATENT FIREARMS CO. COLT COLLECTION, RG103, business file, box 11A, correspondence, Allies letter book, 1873-1880, from Hugh Harbison to Allies, October 30, 1877, p. 174 of letter book, Connecticut State Library.

[63] *Id.,* Hugh Harbison to [illegible], January 24, 1874, p. 22 of letter book.

[64] *Ibid.,* [Allies] to Colt Fire-Arms, June 29, 1874, p. 25 of letterbook.

[65] *Ibid.,* Colt Fire-Arms to [illegible], August 22, 1874, p. 31 of letterbook.

[66] *Ibid.,* Hugh Harbison to Colt Patent Fire Arms, December 30, 1874, p. 39 of letterbook.

**App. 428**

altered to metallic ctgs [cartridges] (at a price) & the balance at less the cost of altering." The

use of "induced" suggests a willingness to buy if Colt gives them a bargain.

51.    The following sentence demonstrates that demand for handguns was not limited

to Colt's products:

> We are of the opinion that it will be necessary for you to reduce the price of your
> new 38 & 41 [caliber] Rev[olvers] for they move very slow since the reduction of
> Allen and other manufacturers of 38 & 41 [caliber] Revolvers, being 40 to 50/
> [cents?] higher in price.[67]

52.    Colt's response:

> The stock of new Pocket that we have on hand and the works cannot exceed 2000
> Pistols of these about 1500 are finished. The remainder are in the works, of those
> on hand their [sic] are about an equal quantity of 4 ½, 5 ½ and 6 ½ inch [barrel
> length]. By altering them into Breech Loaders we could make them all 4 ½ inch
> [barrel length] if desired. We will let the 'Allies,' have them as they are
> (C&B[cap and ball]) at 4.00 ea. Net or we will alter them into Breech Loaders at
> 5.50 ea. Net.[68]

53.    The Allies agreed on January 5, 1875, to buy the new "Pkt [Pocket] Revolvers on

hand & in your works & which will not exceed Two thousand (2000) Revolvers."[69]

## A.    Gun Availability and Gun Laws

54.    Spitzer on pp. 4-5 claims: "The rise of handgun mail order purchasing through

such companies as Montgomery Ward and Sears in the 1870s and 1880s brought cheap handguns

to buyers' doors. When the adverse consequences of the spread of cheap handguns began to be

felt, states enacted numerous anti-gun carry restrictions in the late 1800s and early 1900s." His

claim for this causal relationship, which took at least thirty years to happen, is his own article.

One would hope that for such a fundamental claim, Spitzer could provide some evidence more

persuasive than, "Trust me."

---

[67] *Ibid.,* [Allies] to Colt Patent Fire Arms, December 29, 1874, p. 42 of letterbook.
[68] *Ibid.,* Hugh Harbison to [Allies], December 31, 1874, p. 43 of letter book.
[69] *Ibid.,* [Allies] to Colt Patent Fire Arms, January 5, 1875, p. 44 of letter book.

19

**App. 429**

55.     Furthermore, historians and most other *serious* social scientists are wary of single-factor explanations of why things happen when people are involved.  (Add sodium metal to water: causality is certain and predictable.   Societies are a bit more complex.)   What else happened in America between 1870 and 1900?  Immigration: "The third wave, between 1880 and 1914, brought over 20 million European immigrants to the United States, an average of 650,000 a year at a time when the United States had 75 million residents."[70]  Urbanization:

> Between 1880 and 1900, cities in the United States grew at a dramatic rate. Owing most of their population growth to the expansion of industry, U.S. cities grew by about 15 million people in the two decades before 1900. Many of those who helped account for the population growth of cities were immigrants arriving from around the world. A steady stream of people from rural America also migrated to the cities during this period. Between 1880 and 1890, almost 40 percent of the townships in the United States lost population because of migration.[71]

56.     The battle for labor unions:

> One result of mechanization and factory production was the growing attractiveness of labor organization. To be sure, craft guilds had been around a long time. Now, however, there were increasing reasons for workers to join labor unions. Such labor unions were not notably successful in organizing large numbers of workers in the late 19th century. Still, unions were able to organize a variety of strikes and other work stoppages that served to publicize their grievances about working conditions and wages.[72]

57.     I could go on at length examining other plausible factors explaining these laws. Spitzer's single-factor explanation would earn him a poor grade in a freshman history class, or a criminology class, or a biology class.

---

[70] *Trends in Migration to the U.S.,* https://www.prb.org/resources/trends-in-migration-to-the-u-s/, last accessed October 19, 2023.

[71] *City Life in the Late 19th Century*, Library of Congress, https://www.loc.gov/classroom-materials/united-states-history-primary-source-timeline/rise-of-industrial-america-1876-1900/city-life-in-late-19th-century/, last accessed October 19, 2023.

[72] *Work in the Late 19th Century,* Library of Congress, https://www.loc.gov/classroom-materials/united-states-history-primary-source-timeline/rise-of-industrial-america-1876-1900/work-in-late-19th-century/, last accessed October 19, 2023.

**App. 430**

**B.     The Purpose of Waiting Periods**

58.     At p. 5: "Second, no organized system of gun background checking could feasibly exist until the modern era."   Yet, background checks were instituted as early as 1923 in California.[73]

59.     Spitzer at p. 5 explains the purpose of waiting periods: "By its nature, a gun waiting period simply delays an otherwise lawful purchase for sound [*sic*] two reasons: to complete a proper background check to insure that the individual is not among those not qualified to have a gun; and to provide a cooling off period for those who seek to obtain a gun impulsively for homicidal or suicidal reasons."

60.     The first part of this claimed value is redundant to the existing national background check system:

> When a person tries to buy a firearm, the seller, known as a Federal Firearms Licensee (FFL), contacts NICS electronically or by phone. The prospective buyer fills out the ATF form, and the FFL relays that information to the NICS. The NICS staff performs a background check on the buyer. That background check verifies the buyer does not have a criminal record or isn't otherwise ineligible to purchase or own a firearm. Since launching in 1998, more than 300 million checks have been done, leading to more than 1.5 million denials.[74]

61.     The second benefit that Spitzer attributes to waiting period laws was specifically rejected by Bruen:

> In the years since, the Courts of Appeals have coalesced around a "two-step" framework for analyzing Second Amendment challenges that combines history with means-end scrutiny.
>
> Today, we decline to adopt that two-part approach. In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its

---

[73] 1923 Cal. Stats. Ch. 339 § 9 (requiring mailing of Dealer Record of Sale to law enforcement); § 10 ("In no event shall any such firearm be delivered to the purchaser upon the day of the application for the purchase thereof…").

[74] FBI, *Firearms Checks (NICS)*, https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/nics, last accessed October 19, 2023.

**App. 431**

regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

62.     At pp. 5-6 Spitzer throws out a storm of claims, each of which requires substantial refutation:

> Third, as Randall Roth reports, homicide rates in the colonies and early Federal era were generally low, and when homicides occurred, guns were seldom used because of the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy. More specifically, muzzle loading firearms were problematic as implements for murder: they did not lend themselves to impulsive use unless already loaded (and it was generally unwise to leave them loaded for extended periods because their firing reliability degraded over time). Nearly all firearms at the time were single shot weapons, meaning that reloading time rendered them all but useless if a second shot was needed in an interpersonal conflict.

### a) Roth's Homicide Rates

63.     Sprinter does not understand Roth's homicide rates, which makes Spitzer's comparison of Roth's statistics to current murder rates invalid.  Roth's homicide rates are not *murder* rates. First, Roth repeatedly indicates that he is looking at *homicides* by "unrelated adults."[75]  Many murders today are of minors or by relatives.  About 6% of murder victims in 2019 were under 18.[76]  It seems likely that murder of minors (which at that time would have included all under 21 years) would have been similarly common.  "A survey of murder cases disposed in 1988 in the courts of large urban counties indicated that 16% of murder victims were members of the defendant's family."[77]

---

[75] Randolph Roth, AMERICAN HOMICIDE 61, Figure 2.3 at p. 95 (2009).

[76] FBI, CRIME IN THE UNITED STATES 2019, Expanded Homicide Data Table 2 (2019).

[77] John M. Dawson and Patrick A. Langan, *Murder in Families*, BUREAU OF JUSTICE STATISTICS SPECIAL REPORT 1 (Jul. 1994).

**App. 432**

64.     Damaging comparability in the other direction, Roth tells us that his homicide numbers include "assaults that were legally justified or not meant to cause death."[78]  About 6% of recent civilian homicides are either initially or subsequently (as the case moves from arrest through indictment and trial) classified as justifiable or excusable.

65.     Justifiable homicides are killings of a person engaged in a felony; excusable homicide includes a variety of both unintentional killings ("committed by accident and misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent") and a surprisingly catch-all category of intentional killings: "When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner.")[79]

### b)  Black Powder Firearms Not Kept Loaded

66.     Spitzer repeats Roth's persuasive and logical argument that firearms were not kept loaded except when ready to be used.   Unfortunately, the people who lived then disagree. Massachusetts Governor Winthrop's journal reports several accidental deaths or injuries caused by colonists failing to keep their firearms unloaded:

> At a training at Watertown, a man of John Oldham's, having a musket, which had been long charged with pistol bullets, not knowing of it, gave fire, and shot three men, two into their bodies, and one into his hands; but it was so far off, as the shot entered the skin and stayed there, and they all recovered.[80]

67.     And:

> Three men coming in a shallop from Braintree, the wind taking them short at Castle Island, one of them stepping forward to hand the sail, caused a fowling

---

[78] Randolph Roth, AMERICAN HOMICIDE xii (2009).

[79] Clayton E. Cramer, *Why the FBI's Justifiable Homicide Statistics Are a Misleading Measure of Defensive Gun Use*, 27 U. FLA. J.L. & PUB. POL'Y 505 (2016).

[80] John Winthrop, James Kendall Hosmer, ed., 1 WINTHROP'S JOURNAL: "HISTORY OF NEW ENGLAND" 1630-1649 83 (1908).

**App. 433**

piece with a French lock, which lay in the boat, to go off. The whole charge went through the thigh of one man within one inch of his belly, yet missed the bone, then the shot (being goose shot) scattered a little and struck the second man under his right side upon his breast, so as above 40 shot entered his body, many into the capacity of his breast.[81]

68.     Children were not safe from these rarely loaded firearms:

It is observable that this man had gathered some providences about such as were against them, as that Mr. Winslow's horse died, as he came riding to Boston; that *his brother's son (a child of eight years old) had killed his own sister (being ten years of age) with his father's piece*, etc., and his great trouble was, least this providence which now befell him, should be imputed to their cause.[82] [emphasis added]

69.     And:

One Richard Sylvester, having three small children, he and his wife going to the assembly, upon the Lord's day, left their children at home. The eldest was without doors looking to some cattle; the middle-most, being a son about five years old, seeing his father's fowling piece, (being a very great one,) stand in the chimney, took it and laid it upon a stool, as he had seen his father do, and pulled up the cock, (the spring being weak,) and put down the hammer, then went to the other end and blowed in the mouth of the piece, as he had seen his father also do, and with that stirring the piece, being charged, it went off, and shot the child into the mouth and through his head.[83]

70.     These four incidents of firearms kept loaded when not in actual use resulting in serious misadventure are in *one* book.  How many of these loaded firearms sat quietly in their place, never accidentally discharging?  How many incidents are in colonial-era books that I have not read?

71.     Finally, there is one more piece of evidence that Americans had loaded firearms when not ready for use.  In 1782, Massachusetts passed a statute that shows firearms were kept loaded regularly enough to justify a law regulating the practice.

---

[81] Id. 2:55.
[82] Id., 2:317.
[83]  Id., 2:72.

**App. 434**

72.     The preamble "WHEREAS the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in the said town" establishes that it was a fire safety measure.

> Sect. 2. And be it further enacted by the authority aforesaid, That all canon, swivels, mortars, howitzers, cohorns, fire-arms, grenades, and iron shells of any kind, that shall be found in any dwelling-house, out-house, stable, barn, store, ware-house, shop, or other building, charged with, or having any dwelling in them any gun-powder, shall be liable to be seized by either of the Firewards of the said town… [84]

73.     You were free to keep small arms, cannon, small artillery, bombs, and grenades at home, as long as they were unloaded.  Why was there a need for such a law unless firearms (and artillery) were at least occasionally left loaded?  Would we pass a law today ordering that you not leave children unsupervised at a pool if no one ever did this?

### c) Single Shot Firearms

74.     Spitzer on p 6 makes the claim that nearly all firearms were single shot weapons. From the late 18th century, gun makers made repeating handguns called pepper-boxes.[85]  It was also the case that a person expecting trouble (or seeking to cause it) would carry a *brace of*

---

[84] Acts and Laws of the Commonwealth of Massachusetts, ch. 46 at 119-120 (1782).

[85] *Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber [sic], Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820*, ANTIQUE ASSOCIATES, https://www.aaawt.com/html/firearms/f1117.html, last accessed March 8, 2023; *An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg, London, circa 1781-87*, Bonham's, https://www.bonhams.com/auction/26792/lot/348/an-exceptional-88-bore-flintlock-seven-barrel-box-lock-pepperbox-revolver/, , last accessed March 8, 2023;

**App. 435**

*pistols* (meaning a pair)[86] and use them in succession.[87]  Thomas Jefferson bought at least two braces of pistols while in London.[88]

### d)  End-Means Reasoning

75.     The same public safety argument Spitzer advances for waiting periods would also work for ignoring the protections of freedom speech and freedom of the press (questioning government policy on vaccines *might* lead to massive refusal which *might* lead to a larger public health problem; obscene publications *might* encourage objectification of women which *might* increase rape and domestic violence), freedom of religious worship (which would allow religions, *some* of whose adherents have a poor record of confusing runways with office buildings), freedom from arbitrary searches (which *might* allow violent criminals to continue their depredations on innocent parties).  If "public safety" is the "Open Sesame" to the Bill of Rights, few civil liberties could survive a windstorm of tendentious "research."

### C.     Armed While Intoxicated as an Analog to Waiting Periods

76.     Spitzer starting at p. 6, recognizing that waiting periods have no historical basis, yet still attempts to analogize laws prohibiting being armed while drunk to waiting periods.

> That aside, the government has long imposed a wide range of regulatory measures pertaining to the adverse consequences of alcohol consumption (including but not limited to those pertaining to weapons), including "pricing and taxation measures, regulating the physical availability of alcohol, restricting alcohol marketing, education and persuasion strategies, drink driving countermeasures, modifying the drinking context, and treatment and early intervention." Interestingly, nearly all of these types of measures date back hundreds of years, despite changing social attitudes about alcohol and drinking.

---

[86] *Brace*, 1 A New English Dictionary on Historical Principles (1888).

[87] Account of the Behaviour, Confessions, and Dying Words, of the Malefactors, Who Were Executed at Kennington-Common on Thursday the 21st of This Instant August 16 (1735).

[88] M. Andrew Holowchak and Brian W. Dotts, ed., Elusive Thomas Jefferson: Essays on the Man Behind the Myths 168 (2017) describes Jefferson's purchase of two pairs of flintlock pistols while in London, negotiating a treaty).

**App. 436**

77.   Americans drank alcohol in large quantities until the 1830s:

A brief survey of American alcohol consumption from the colonial period to the present will help us put the early nineteenth century in proper perspective. As Chart 1.1 shows, during the colonial period, the annual per capita consumption of hard liquor, mostly rum, reached 3.7 gallons.[89]

78.   Rorabaugh's Chart 1.2 shows that annual consumption of alcohol in all alcoholic beverages per capita in the colonial and Revolutionary era was at least twice the rate of consumption in 1970.[90]

79.   From a historical standpoint, Colonial and early Republic practice shows that drinking while armed was widespread, even if unwise. "We met people coming from a militia muster, drunk, and staggering along the lanes and paths; these on happy souls have had their camp- meeting, and shout forth the praises of the god of strong drink: glory be to God, we have our camp-meetings too of longer continuance, and more and louder shouting of glory, and honour, and praises to the God of the armies of the earth."[91]

There is no space for a detailed examination of the charges against the courage of the Virginians of the seventeenth century and of the poor quality of the militia. There were only a few occasions when the militia was called out prior to the French and Indian War, but the service was in each case as satisfactory as a militia is apt to be. Had Mr. Wertenbaker been a reader of Dryden he would have remembered that the poet said that the chief object of militia-muster in England in his day, was to get drunk.[92]

80.   Describing an 1840 muster: "The ringing of a steamboat bell at the head of the column filled up the ranks, and the Racine Militia gallantly trained til noon, when they adjourned

---

[89] W.J. Rorabaugh, THE ALCOHOLIC REPUBLIC: AN AMERICAN TRADITION 7-9 (1979).
[90] Id.
[91] Francis Asbury, 3 THE JOURNAL OF THE REV. FRANCIS ASBURY, BISHOP OF THE METHODIST EPISCOPAL... 121 (1821).
[92] Philip Alexander Bruce and William Glover Stanard, 18 VIRGINIA MAGAZINE OF HISTORY AND BIOGRAPHY 347 (1910).

**App. 437**

to the Fulton House for dinner, where they all got so drunk they couldn't muster at all in the evening."[93]

81.     "MILITIA MUSTER DAYS. On the second Saturday of October each year there was a general muster at each county seat, when the various companies drilled in battalion or regimental formation; and each separate company met on its local muster grounds quarterly, and on the fourth of July the commanding officers met at the court house to drill . The Big Musters called most of the people together, and there was much fun and many rough games to beguile the time. Cider and ginger cakes were sold, and many men got drunk."[94]

82.     It is unclear to what years to which this refers, but other parts of the chapter reference the antebellum period.

83.     William Cullen Bryant's memoirs:

At that time there was in each township at least one company of militia, which was required to hold several meetings in the course of the year, and at these the minister was always present. The military parade, with the drums and fifes and other musical instruments, was a powerful attraction for the boys, who came from all parts of the neighborhood to the place at which the militia mustered. But on these occasions there was one respect in which the minister's presence proved but a slight restraint upon excess…. *It was, to be sure, esteemed a shame to get drunk; but, as long as they stopped short of this, people, almost without exception, drank grog and punch freely with out much fear of a reproach from any quarter. Drunkenness, however, in that demure population, was not obstreperous, and the man who was overtaken by it was generally glad to slink out of sight.* …

The afternoon was far spent, and I was going home with other boys, when we overtook a young man who had taken too much of the election toddy, and, in endeavoring to go quietly home, had got but a little way from the green, when he fell in a miry place, and was surrounded by three or four persons, who assisted in getting him on his legs again. The poor fellow seemed in great distress, and his new nankeen pantaloons, daubed with the mire of the road, and his dang ling limbs, gave him a most wretched appearance. *It was, I think, the first time I had ever seen a drunken man. As I approached to pass him by, some of the older boys*

---

[93] *Old Settlers' Society (RACINE, County of, Wisconsin),* OFFICIAL RECORD OF THE OLD SETTLERS SOCIETY OF RACINE COUNTY, WISCONSIN 43 (1871).
[94] John Preston Arthur, WESTERN NORTH CAROLINA: A HISTORY (1730-1913) 284 (1914).

**App. 438**

*said to "Do not go too near him, for if you smell a drunken man it will make you drunk."[95]* [emphases added]

84. The year is not clear, but it is in a chapter titled "Mr. Bryant's Early Life" and Bryant was born in 1797.

85. "At that time, it was less thought of, since it was the universal custom, in all regiments of the militia, with which I had any acquaintance, for the officers, on every muster day, to get gloriously drunk in their country's service."[96] The date is unclear but certainly before publication date of 1832!

> "At that period, in the region where the conversation occurred, *the officers were in the habit of distributing large quantities of rum to the soldiers*. The soldiers, on their part, were in the habit of wasting much powder to honor the officers who treated them so liberally. The Colonel readily acceded to most of the opinions of the Minister, but said he did not see how such a reform could be effected. In speaking of treating the soldiers with ardent spirits, and honoring officers by the discharge of muskets near their heads or their feet, he said he had thought his life in about as much danger on a muster day, as it would be in a field of battle; especially so after the soldiers had become inflamed by rum."[97] [emphasis added]

86. Spitzer attempts to support his claim that laws restricting firearm use in conjunction with alcohol are among the very earliest weapons regulations by citing various laws, some of which are carefully quoted out of context to misrepresent them. For example, on p. 10: "In 1636 Rhode Island enacted a measure to punish any who would engage in 'shooting out any gun . . . drinking in any tavern alehouse . . . on the first day of the week more than necessity requireth.'" The footnote is curious: "1636-1748 R.I. Pub. Laws 31, At A General Assembly Held For Rhode Island Colony At Newport 6th of May, 1679. 1636." Is 1636 the publication date for a volume that includes laws through 1748? Spitzer seems to have copied this scrambled

---

[95] William Cullen Bryant, 1 LIFE AND WORKS OF WILLIAM CULLEN BRYANT 16-17 (1883).
[96] 3 NEW-ENGLAND MAGAZINE 111 (1832).
[97] Philo Pacificus [Noah Worcester], FRIEND OF PEACE 379 (1827).

**App. 439**

citation from the Duke Repository of Gun Laws,[98] which at least had the full text, not Spitzer's

misrepresented edit. It took a while, but I found the misquoted 1679 statute:

> And bee it further enacted by the authority aforesaid, That any person or persons
> shall presume to sport, game or play at any manner of game or games, *or shooting
> on the first day of the weeke* as aforesaid, or shall sit tippling and drinking in any
> tavern, ale-house, ordinary or victualling house on the first day of the weeke,
> more than necessity requireth;[99] [emphasis added]

87.     This was a Sabbath-keeping law that prohibited sport of all variety as well as

drinking on Sundays.  It did not prohibit being armed while drunk or even drinking.  If Spitzer

looked up this statute, he has falsely represented it.  If he did not look up a law that he cited, he is

not being honest.  Either way he is no "expert."

88.     At p. 10, Spitzer continues misrepresenting colonial laws: "In 1663 Massachusetts

criminalized any on board of ships docked at any colonial harbor where those on board would

'be drunk within their vessels by day or night' and 'shoot off any gun after the daylight is past, or

on the sabbath day.'"  The actual statute:

> Sect. 4. Be it also enacted by the authority of this court,  that no masters of ships,
> or seamen, having their vessels riding  within any of our harbours in this
> jurisdiction, shall presume to drink healths, or suffer any healths to be drunk
> within their vessels by day or night, *or* to shoot off any gun after the daylight is
> past, or on the sabbath day, on penalty for every health twenty shillings, and for
> every gun so shot twenty shillings.[100] [emphasis added]

---

[98] https://firearmslaw.duke.edu/laws/1636-1748-r-i-pub-laws-31-at-a-general-assembly-held-for-rhode-island-colony-at-newport-6th-of-may-1679/, last accessed October 20, 2023.

[99] 3 RECORDS OF THE COLONY OF RHODE ISLAND, AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 31 (1858). https://books.google.com/books?id=ehxPAQAAMAAJ&newbks=1&newbks_redir=0&dq=%22That%20any%20person%20or%20persons%20shall%20presume%20to%20sport%2C%20game%20or%20play%20at%20any%20manner%20of%20game%20or%20games%22&pg=PA31#v=onepage&q=%22That%20any%20person%20or%20persons%20shall%20presume%20to%20sport,%20game%20or%20play%20at%20any%20manner%20of%20game%20or%20games%22&f=false, last accessed October 21, 2023.

[100] Colonial   Laws   of   Massachusetts   140   (1890), https://babel.hathitrust.org/cgi/pt?id=nnc1.0063787636&seq=9&q1=that+no+masters+of+ships,+or+seamen,+having+their+vessels+riding, last accessed October 21, 2023.

**App. 440**

89.     As the full statute demonstrates, this law banned *drinking* not being drunk.  A *separate* offense was shooting "after the daylight is past, or on the sabbath day…"  The term "gun" in this period often means cannon, not small arms.  As an example with a similar law, Georgia in 1759 made it unlawful to fire "any great gun or shall [*sic*] arm in the town or harbour of Savannah after Sun Set without leave or permission from the Governor…."  The "shall arm" appears to be a typo for "small arm"; the marginal description is "person firing any great Guns or small arms…"[101]  A similar statute limiting such firing can be found in Pennsylvania, and again it seems limited to cannon: "And that no master or commander of any merchant ship or vessel shall fire, or suffer to be fired, on board his vessel, any ordnance or other gun after eight o'clock in the evening, nor before daylight in the morning…."[102]

90.     Spitzer has again misrepresented a statute as prohibiting shooting while drunk that says nothing about being drunk and prohibits firing guns (likely cannon) as a separate offense not tied to drunkenness.

91.     At p. 10: 'In 1750 Pennsylvania enacted a law "For Suppressing Idleness, Drunkenness, And Other Debaucheries" that punished with "penalties and forfeitures" any who fired guns or set off fireworks without a special license to do so.'  As usual Spitzer gets the citation wrong.  He cites this as "1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries."  As both the marginal note and the last paragraph clearly state, this was a 1751 law.

92.     More importantly, Spitzer misrepresents the law:

---

[101] Chandler, 18 THE STATE RECORDS OF THE COLONY OF GEORGIA 294-5 (1759).
[102] Mitchell and Flanders, 2 STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801 420 (1896).

**App. 441**

To the end the provisions already made by our laws, for preventing accidents which may happen by fire in the city of Philadelphia, and several other boroughs and towns, within this province, may be made more generally useful, and to prevent, as much as in us lies, the growing sins of idleness, drunkenness, and other debaucheries, too frequent among us, Be it enacted, that if any person or persons whatsoever, within any county town, or within any other town or borough, in this province, already built and settled, or hereafter to be built and settled, not hitherto restricted nor provided for by our laws, shall set on fire their chimnies to cleanse them, or shall suffer them or any of them to take fire, and blaze out at the top, or *shall fire any gun or other fire-arm,* or shall make, or cause to be made, or sell or utter, or offer to expose to sale, any squibs, rockets or other fire-works, or shall cast, throw or fire any squibs, rockets or other fire-works, within any of the said towns or boroughs, without the governor's special license for the same, every such person, or persons, so offending, shall be subject to the like penalties and forfeitures, and to be recovered in like manner, as in and by an act, passed in the eighth year of the reign of king George the first, entitled, An act for preventing accidents that may happen by fire, are directed to be levied and recovered.

IV. *If any person or persons whatsoever, shall give or sell any rum, wine, or other strong liquors, at the time of any vendue,* to any person or persons attending the same, he, she, or they, so selling or giving any liquors, shall forfeit and pay for the first offence, the sum of four pounds, and for the second and every other offence, the sum of five pounds.

V. Every of the fines and forfeitures accruing or becoming due, for offences against this act, shall be paid, one half to the overseers of the poor, for the use I poor of the township within which such offence may be committed, and the other half to the use of him or them, who shall inform or sue for the same, before any justice of the peace of this province, who is hereby empowered and authorized to hear and determine the same, and to convict the offender or offenders, either on his own view, or by the legal testimony of one or more witnesses ; saving to every such offender or offenders the right of appeal in like manner as is provided in and by an act, entit"ed, " An act for the more easy and speedy recovery of small "ebts" -which fines and forfeitures shall be recovered by distress and sale of the off'nder's goods, or for want of such distress, if the offender refuses to pay, he, she, or they shall be committed to prison for every such fine, where the same is twenty shillings, the space of eight days, without bail or mainprize, and so in proportion for any of the greater fines.

VI. Provided, that every such conviction be made within one month after such offence or offences committed. Pas^ed 9th February, 1751.-1 Sm. L. p. 208.[103] [emphases added]

---

[103] GENERAL LAWS OF PENNSYLVANIA FROM THE YEAR 1700, TO APRIL 1849 Ch. 44 at 86 (2nd ed. 1849),

App. 442

93.     Shooting firearms in towns was prohibited.  This law also prohibited selling "any rum, wine, or other strong liquors…."  There was no prohibition on being armed while drunk and no prohibition on being drunk.  Spitzer either has not read his source or or is knowingly making false statement.

94.     A third possibility, no more supportive of Spitzer's claim to be an "expert," is that part of the first paragraph, with the same erroneous date, appears in the Duke Firearms Law Repository of Gun Laws,[104] where at least, there is no claim that it banned being armed while drunk.  This explanation would show that Spitzer is too lazy to look up the primary source that he cites.

95.     At p. 10: "For example, the Tennessee legislature granted a locality the authority to penalize "shooting and carrying guns" along with drinking in 1825."  The citation is immediately suspect: "1825 Tenn. Priv. Acts 306, An Act to Amend an Act Passed at Murfreesboro, October 20, 1821, Incorporating Winchester and Reynoldsburgh, ch. 292."  I was unable to find this private act; in light of his either incompetent or willful misrepresentation of his first three statutes, I am skeptical that he has accurately described it.

96.     At p. 10: "In 1865, Kansas enacted a law to punish any found to carry a deadly weapon while 'under the influence of intoxicating drink.'"  He cites this as "The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the

---

https://books.google.com/books?id=TxhRAQAAMAAJ&newbks=1&newbks_redir=0&dq=%22already%20made%20by%20our%20laws%2C%20for%20preventing%20accidents%20which%20may%20happen%20by%20fire%20in%20the%20city%20of%20Philadelphia%22&pg=PP7#v=onepage&q=%22already%20made%20by%20our%20laws,%20for%20preventing%20accidents%20which%20may%20happen%20by%20fire%20in%20the%20city%20of%20Philadelphia%22&f=false, last accessed October 21, 2023.
[104] https://firearmslaw.duke.edu/laws/1750-pa-laws-208-an-act-for-the-more-effectual-preventing-accidents-which-may-happen-by-fire-and-for-suppressing-idleness-drunkenness-and-other-debaucheries/, last accessed October 20, 2023.

**App. 443**

United States, and the Act Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources."   Again, his citation is identical to the Duke Firearms Law Repository of Gun Laws.[105]  Both have the title wrong, using the phrase "United State of Kansas": "United" is not in the actual title.

97.    Examining the actual primary source shows that Spitzer has misrepresented the statute, relying on the Duke Firearms Law Repository of Gun Laws which has the wrong text. The actual law is:

> SECTION 1. That any person who shall, directly or indirectly, sell, barter or give away any spirituous, vinous, fermented or other intoxicating liquors within the unorganized counties and territories of the state of Kansas, shall, on conviction thereof, be fined a sum of not less than one hundred [ nor] or more than one thousand dollars, or by confinement in the county jail for a term not less than four nor more than twelve months, or by both such fine and imprisonment.
>
> SEC. 2. That justices of the peace of the organized counties to which the unorganized counties or territory of this state, as set forth in section one, are attached, shall have jurisdiction of, and power to summon, try and determine cases arising under this act; and for that purpose shall have power to impannel [sic] a jury of six householders of the vicinage, who, if they find the defendant guilty, shall assess the fine to be paid by him, or the imprisonment to which he shall be subject, subject only to the provisions of this previous section.
>
> SEC. 3. That for all fines and costs assessed against any person or persons, for any violation of this act, the real estate and personal property, of every kind, without exemption, shall be liable for the payment thereof; and such fines and costs shall be a lien upon such real estate and property until paid.
>
> SEC. 4. That upon the trial for this offense, it shall not be necessary to aver the kind or the character of the liquor alleged to have been sold, bartered or given away; but it shall be sufficient if said indictment allege the liquor so sold, bartered or given away, was intoxicating. to what sum.
>
> SEC. 5. Any person who shall make complaint or give information that shall lead to conviction under this act, shall be entitled to a sum not less than fifty nor morethan two hundred dollars, to be paid out of any fines which may be collected

---

[105] https://firearmslaw.duke.edu/laws/the-general-statutes-of-the-state-of-kansas-to-which-the-constitutions-of-the-united-state-of-kansas-together-with-the-organic-act-of-the-territory-of-kansas-the-treaty-ceding-the-territory-of-loui/, last accessed October 20, 2023.

**App. 444**

under the provisions of this act. SEC. 6. This act to take effect and be in force from and after its publication in the Leavenworth Evening Bulletin.[106]

98.     There is not a word about firearms or shooting in this prohibition statute; Spitzer has clearly not even *tried* to look up the primary source or he would have at least used the actual title.

99.     Spitzer on pp. 11-12 lists several post-1868 laws which are irrelevant under the Bruen standard.

100.     At the bottom of p. 12, Spitzer returns to colonial laws:

101.     A 1679 Massachusetts law prohibited bringing or selling "any wine, strong liquor, cider, or any other inebriating drinckes, excepting beere of a penny a-quart" on and in the proximity of militia training days unless they were licensed to do so "from the hands of two magistrates" or the commanding military officer then present.

102.     The footnote provides no identifiable printed source: "Order p[ro]hibbiting retayling strong drinckes at traynings, Boston, M^{ay} 28th, 1679. Beer had a lower alcohol content than other alcoholic beverages."  I was able to find the statute and as Spitzer admits, it prohibits sale of alcohol in proximity to militia trainings.  It does not prohibit being armed while drunk or even while drinking.[107]  Spitzer then lists similar prohibitions on sale of alcohol at militia musters in New Jersey, Delaware, Maryland, and Pennsylvania.  Spitzer characterizes all of them as bans on being armed while drinking or drunk, not as bans on sale.  Also on p. 14: "These laws restricting the civilian commercial sale of alcohol all pertained to their proximity to militia/military activity."

---

[106] GENERAL STATUTES OF THE STATE OF KANSAS TO WHICH THE CONSTITUTIONS OF THE UNITED STATES AND THE STATE OF KANSAS, TOGETHER WITH THE ORGANIC ACT OF THE TERRITORY OF KANSAS, THE TREATY CEDING THE TERRITORY OF LOUISIANA TO THE UNITED STATES, AND THE ACT ADMITTING KANSAS INTO THE UNION, ARE PREFIXED 386-387 (1868).
[107] 5 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 211 (1854).

**App. 445**

103.    Spitzer claims on p. 13: "Such measures extended into the nineteenth century." "Acts & Resolves of Vermont, 25, no. 24, An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15 (1852)…."  I was unable to find this statute but case law confirmed this as a general ban on sales of alcohol "in any tent, shanty, hut, or place of any kind for selling refreshments, on or near the ground of any cattle show, agricultural exhibition, military muster, or other public occasion…"[108]   Again, it was not a ban on being armed and drunk and was not specific to militia.

104.    "An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops, §10, Acts & Resolves of the General Assembly of the State of Rhode Island (1853)…" The actual text of §10:

> SEC. 10. All cases arising under this act, whether by action , complaint or indictment , which shall come before the Court of Common Pleas , or Supreme Court, shall take precedence of all other business, except those criminal cases, in which the parties are actually confined in jail, awaiting trial.[109]

105.    §14 uses nearly identical language to the Vermont 1852 statute:

> It shall be the duty of any mayor, alderman, city marshal, city or town sergeant, constable or police officer, of any city or town, if he shall have information that any intoxicating liquors are kept or sold in any tent, shanty, hut or place of any kind for selling refreshments in any public place, on or near the ground of any cattle show, agricultural exhibition, military muster or public occasion of any kind, to search such suspected place, and ifsuch officer shall find upon the premises any intoxicating liquors, he shall seize them and apprehend the keeper or keepers of such place…

---

[108] Fenner v. State, 3 Vt. 108 (1855).

[109] An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops (1852), https://books.google.com/books?id=AWUoAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22All%20cases%20arising%20under%20this%20act%2C%20whether%20by%20action%20%2C%20complaint%20or%20indictment%20%22&pg=PP5#v=onepage&q=%22All%20cases%20arising%20under%20this%20act,%20whether%20by%20action%20,%20complaint%20or%20indictment%20%22&f=false, last accessed October 20, 2023.

**App. 446**

106.    Again, like the other statutes Spitzer cites, these are bans on sale of alcohol near militia musters *and other public events*, not bans on being armed while drunk and not specific to militia activities.

107.    Spitzer continues citing irrelevant statutes on p. 14 with laws regulating alcohol consumption while on active military duty and an 1851 Chicago ordinance that regulated storage of gunpowder and prohibited issuing permits to "any retailer of intoxicating liquors or to any intemperate person."  Again, this was not a regulation on being armed while drunk.

108.    Spitzer's entire argument analogizing waiting periods to laws banning being armed while drunk suffers serious failings: First, many of the laws he cites he has misrepresented as bans on being armed while drinking or drunk.  Second, many are bans on sale of alcohol near public events, including militia musters, not bans on being armed while drunk.  Third, a law that regulated storage of gunpowder was not specific to drunks but retailers of alcohol and those considered "intemperate."

109.    Most important of all is Spitzer's claim on p. 15:

As this account demonstrates, laws enacted to keep those who were intoxicated from weapons possession or use because of the universal understanding that the intoxicated would be much more likely to act rashly, impulsively, and with diminished judgment—i.e., in the heat of the moment. These purposes are analogous to the purpose of modern waiting periods.

110.    Here Spitzer demonstrates Bruen's claim about false analogies: "For instance, a green truck and a green hat are relevantly similar if one's metric is 'things that are green.' .… They are not relevantly similar if the applicable metric is 'things you can wear.'"

111.    What evidence is there that purchasing a firearm is done "rashly, impulsively, and with diminished judgment…"?  I know that I have never done so.  *Some* gun purchasers may do so, or they might simply be buying a gun calmly, after considerable thinking, having compared

**App. 447**

the features and benefits of several different guns.  Someone who is in fear of an angry, threatening intimate partner may not have the luxury of buying a gun today who may need to use it this afternoon in self-defense.

112.     Spitzer starting on p. 15 argues that "historical weapons licensing and permitting laws did, and do, operate in a manner similar to modern waiting periods, in that they are predicated on a process whereby a license applicant provides or submits some kind of information which is then judged to be acceptable or not."  This is not even a "green hat" mistake.  As mentioned previously, there is *already* a federal background check for firearms transfers.  Colorado's waiting period is the greater of three days or "the bureau after it has completed any background check required by state or federal law."[110]  The three-day minimum is not analogous to a licensing law's background check.

113.     Spitzer on p. 16 asserts: "In addition, licensing by its nature thwarts any ability to acquire or use firearms on demand."  Just like a waiting period does; is a criminal or terrorist o thwarted by waiting three days?

114.     On p. 17: "At least 14 states imposed licensing requirements on marginalized groups (variously including Native Americans, felons, non-citizens, non-state residents, or minors). In the pre-Civil War period, at least 12 states imposed licensing on enslaved persons or free Blacks."  Odd.  That used be the gun rights argument: gun regulatory measures have their roots in racism and nativism.  Now, what used to be a sign of systemic racism is an argument for a law.

115.     For five paragraphs on pp. 16-17, Spitzer makes claims without citations.  This is unsurprising.  He has made many of these claims in other expert declarations with citations that did not survive fact checking.  But I am paid by the hour.

---

[110] Colorado, HB 23-1219, § 2.

**App. 448**

116. "At least 26 states enacted laws to regulate firearms discharging through licensing…. At least 12 states licensed hunting with firearms from the post-Civil War period through the early 1900s. At least 21 states licensed the commercial sale, transport, or firing of weapons at locations like shooting galleries. At least 21 states licensed the possession, handling, or transport of gunpowder and other explosives. At least 15 states required those selling or otherwise providing weapons to individuals to record and keep information pertaining to the buyers of weapons…. Most weapons licensing laws pertaining to weapons carrying, discharge, commercial sales, and gunpowder licensing generally were applied to populated areas…" Colorado's waiting period law does not regulate firearms discharge, hunting, shooting ranges, gunpowder, recording or keeping information about buyers of weapons, nor pertain only to populated areas. Spitzer is in deep "green hat" territory.

117. Starting at p. 18, Spitzer lists weapons carrying or possession licensing laws. Every single law is post-1868 and thus irrelevant.

118. Starting at p. 25: "Permits for Firearms Discharge or Use of Explosives." The law in dispute does not regulate discharge or explosives.

119. On p. 28: "Commercial Licensing." The law in dispute does not add any commercial licensing requirements.

120. Starting on p. 28: "Licensing Restrictions on Gunpowder." The law in dispute does not license possession or sale of gunpowder.

121. Starting on p. 29: "Weapons Sellers Recording Purchases." The law in dispute adds no recording requirements.

122. Starting on p. 30: "Licensing Pertaining to Named Groups." The law in dispute does not discriminate based on race or enslaved status.

**App. 449**

## III.    Randolph Roth Rebuttal

### A.    American Exceptionalism

123.    In ¶11, Roth informs us:

For the past thirty-five years, I have dedicated my career to understanding why homicide rates rise and fall over time, in hopes of understanding why the United States—which, apart from the slave South, was perhaps the least homicidal society in the Western world in the early nineteenth century—became by far the most homicidal, as it remains today.

124.    What does Roth mean by homicide?  His book, AMERICAN HOMICIDE (2009) does not examine *murder* rates.  Roth repeatedly indicates that he is looking at *homicides* by "unrelated adults." [111]  "A survey of murder cases disposed in 1988 in the courts of large urban counties indicated that 16% of murder victims were members of the defendant's family."[112] About 6% of murder victims in 2019 were under 18.[113]  Roth's historical homicide data is thus non-comparable to current murder rates.

125.    His homicide numbers include "assaults that were legally justified or not meant to cause death."[114]  Roth's definition of homicides thus includes both justifiable and excusable homicides.  Justifiable homicides are killings of a person engaged in a felony; excusable homicide includes a variety of both unintentional killings ("committed by accident and misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent") and a surprisingly catch-all category of intentional killings: "When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner.")

---

[111] Randolph Roth, AMERICAN HOMICIDE 61, Figure 2.3 at p. 95 (2009).

[112] John M. Dawson and Patrick A. Langan, *Murder in Families*, BUREAU OF JUSTICE STATISTICS SPECIAL REPORT 1 (Jul. 1994).

[113] FBI, CRIME IN THE UNITED STATES 2019, Expanded Homicide Data Table 2 (2019).

[114] Randolph Roth, AMERICAN HOMICIDE xii (2009).

126.    The FBI's crime reporting system is based on original police reports.   If homicides are later determined by police, prosecutor, judge or jury to not be a criminal offense, this change is not reflected in the initial reporting.  About 6% of civilian *firearms* homicides are either initially or subsequently (as the case moves from arrest through indictment and trial) classified as justifiable or excusable. [115]

127.    If Roth means homicides in the broad definition of intentional killing of another person, then he is including deaths that while regrettable to the deceased and likely his family are really a social positive not a negative.

128.    In 2019, the U.S. had a reported murder rate of 5.0/100,000.[116]  Because 73.7% of U.S. murders are committed with firearms,[117] this suggests that the actual U.S. murder rate (after adjusting for firearms murders initially reported as, but later determined not to be, murder) is really 3.72/100,000.  Other nations may have similar overreporting of lawful firearms homicides by firearms, but it seems likely that the widespread availability of firearms and the well-recognized lawful use of firearms in self-defense may make the U.S. an outlier in this area as well.

129.    Roth does not define "Western world."  Does he mean just European nations? Does he mean nations with overwhelmingly white populations? Does he mean historically Christian nations?   Does he include Russia?   Russia's 2019 murder rate was 7.69.   Other European nations that had murder rates comparable to the U.S. after adjusting for overreporting

---

[115] Clayton E. Cramer, *Why the FBI's Justifiable Homicide Statistics Are a Misleading Measure of Defensive Gun Use*, 27 U. FLA. J.L. & PUB. POL'Y 505 (2016).
[116] FBI, Crime in the United States 2019, Table 16https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/table-16, last accessed October 22, 2023.
[117] FBI, Crime in the United States 2019, Table 7, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-7.xls, last accessed October 22, 2023.

**App. 451**

based on initial reports: Ukraine: 4.12; Latvia, 3.39; Lithuania, 3.30; Moldova, 3.89; Montenegro, 3.65.[118]

130.    The overall U.S. murder rate after adjustment of 3.72/100,000 is an average for the entire country.  In the same way that, "The average American has one testicle and one ovary," is correct, that average fails to take into account the enormous variation from state to state.

131.    To avoid making assumptions about how consistent that 6% overcount of firearms murders is from state to state, I will use only the FBI's overcounted murder rates hereafter.  The 52 entities that appear in CRIME IN THE UNITED STATES 2019 include the 50 states, the District of Columbia, and Puerto Rico.  These range from 1.5/100,000 for Maine to 23.5 for D.C.



132.    The five states at the low end, with murder rates of 2.0/100,000 or less, in the mainstream of European nations are Maine (1.5), Vermont (1.8), Iowa (1.9), South Dakota (1.9), and Idaho (2.0); an average of 1.83/100,000 summing population and raw murder counts across

---

[118] United Nations Office on Drugs and Crime, *Victims of Intentional Homicide*, Region: Europe, Sex: Total; Year: 2019; Rate Per 100,000 population; https://dataunodc.un.org/dp-intentional-homicide-victims, last accessed October 22, 2023.

App. 452

all five states).  Everytown for Gun Safety in 2023 ranked Maine and Vermont as Missing Key Laws; Iowa as Weak Systems; South Dakota and Idaho as National Failures.[119]

133.    An attentive person might wonder how states with such defective laws end up as safe as many European nations while Everytown's five National Leaders such as California (4.3), New York (2.9), Hawaii (3.4), New Jersey (2.9), and Connecticut (2.9) (averaging 3.66/100,000 summing population and raw murder counts across all five states) have murder rates collectively 100% higher than states such as my own of Idaho where a license is not required to purchase or carry openly or concealed, no waiting periods, and no state licensing of machine guns or suppressors.  I will not pretend that states with failing grades from Everytown are all at the bottom of the murder rates list, but if a lack of gun regulation is the reason for high U.S. murder rates, it is odd to see this astonishing lack of correlation.

134.    Roth does distinguish the slave South's high murder rates from the rest of antebellum America.  This has not changed.  Slavery is gone, but the average of the rates for the states that still held slaves in 1861 (Louisiana, Mississippi, South Carolina, Maryland, Arkansas, Tennessee, Alabama, Oklahoma, Georgia, North Carolina, Florida, Virginia, Texas, Kentucky, and Delaware) is 6.16/100,000, 23% higher than the national average.  Perhaps there is some other explanation for America's high murder rate besides gun laws?

135.    Prof. Roth recognizes that there are other factors in play in ¶11, but in ¶12 insists that advancements in firearms technology explains America's homicide problem.  Starting at ¶14, Roth points to low murder rates in the colonial era: "By the late 1750s and early 1760s, the rates at which adult colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England."  As previously

---

[119] Everytown for Gun Safety, *Everytown Gun Law Rankings 2023*, https://everytownresearch.org/rankings/, last accessed October 22, 2023.

**App. 453**

discussed, Roth measures homicides among unrelated adults, which undercounts murders by leaving out domestic murders and murders of minors.  This presents an artificially rosy view of murder in this period.

136.    There have been dramatic improvements in weapons: rate of fire, rifling of pistol and rifle barrels, high capacity magazines, and more powerful ammunition; in addition, today's murder rates include minors and victims related to their murderers.  The five lowest murder rates in 2019 America are only slightly higher than colonial New England and much lower than Pennsylvania and Tidewater Virginia.  Roth has an explanation in desperate need of a problem to explain.

### B.    Colonial Firearms Technology

137.    In ¶16: "Firearm use in homicides was generally rare because muzzle-loading firearms, such as muskets and fowling pieces, had significant limitations as murder weapons in the colonial era. They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology; and with the exception of a few double-barreled pistols, they could not fire multiple shots without reloading."

### a)  Firearm Accuracy

138.    Most murders in America today are at close range; with rare exceptions, shooting someone with a handgun beyond about 25 yards with a handgun is the sign of a remarkable handgun and a remarkably skilled shooter.

139.    The high accuracy of Revolutionary-era firearms is easily established.  The very bookish James Madison wrote a letter on June 19, 1775 to William Bradford in Philadelphia:

> The strength of this Colony will lie chiefly in the rifle-men of the Upland Counties, of whom we shall have great numbers.  You would be astonished at the perfection this art is brought to.  The most inexpert hands rec[k]on it an indifferent shot to miss the bigness of a man's face at the distance of 100 Yards.  I

**App. 454**

am far from being among the best & should not often miss it on a fair trial at that distance.[120]

140.    Frederick County, Maryland raised two companies of riflemen to join the army forming outside of Boston.  An eyewitness account of Captain Michael Cresap's rifle company of "upwards of 130 men" described a demonstration:

> to show the gentlemen of the town their dexterity at shooting.  A clapboard, with a mark the size of a dollar, was put up; they began to fire off-hand, and the bystanders were surprised, so few shots being made that were not close to or in the paper.

> When they had shot for a time in this way, some lay on their backs, some of their breast or side, others ran twenty or thirty steps, and, firing, appeared to be equally certain of the mark.  With this performance the company was more than satisfied, when a young man took up the board in his hand, not by the end, but by the side, and holding it up, his brother walked to the distance, and very coolly shot into the white; laying down his rifle, he took up the board, and, holding it as was held before, the second brother shot as the former had done.

> By this exercise I was more astonished than pleased.  But will you believe me, when I tell you, that one of the men took the board, and placing it between his legs, stood with his back to the tree, while another drove the center?[121]

141.    Other accounts of Cresap's company also report on their marksmanship:

> [W]e mention a fact which can be fully attested by several of the reputable persons who were eye-witnesses of it. Two brothers in the company took a piece of board five inches broad and seven inches long, with a bit of white paper, about the size of a dollar, nailed in the centre; and while one of them supported this board perpendicularly between his knees, the other, at the distance of upwards of sixty yards, and without any kind of rest, shot eight bullets through it successively, and spared a brother's thigh!

> Another of the company held a barrel stave perpendicularly in his hands with one edge close to his side, while one of his comrades, at the same distance, and in the manner before mentioned, shot several bullets through it, without any apprehension of danger on either side.

> The spectators appearing to be amazed at these feats, were told that there were upwards of fifty persons in the same company who could do the same thing; that

---

[120] James Madison, William T. Hutchinson and William M.E. Rachal, ed., 1 THE PAPERS OF JAMES MADISON 153 (1962).
[121] John Thomas Scharf, 1 HISTORY OF WESTERN MARYLAND 130 (1882).

**App. 455**

there was not one who could not plug nineteen bullets out of twenty, as they termed it, within an inch of the head of a tenpenny nail. In short, to prove the confidence they possessed in their dexterity at these kind of arms, some of them proposed to stand with apples on their heads, while others at the same distance, undertook to shoot them off; but the people who saw the other experiments declined to be witnesses of this.[122]

142.   Thatcher's military journal of August 1775, apparently referred to this same group of frontier riflemen:

They are remarkably stout and hardy men; many of them exceeding six feet in height.  They are dressed in white frocks or rifle shirts, and round hats.  These men are remarkable for the accuracy of their aim, striking a mark with great certainty at two hundred yards' distance.  At a review, a company of them, while on a quick advance, fired their balls into objects of seven inches diameter at the distance of two hundred and fifty yards.  They are now stationed on our lines, and their shot have frequently proved fatal to British officers and soldiers,… even at more than double the distance of common musket-shot.[123]

143.   John Harrower recounted a no less astonishing account of how a rifle company commander in Virginia sought to identify the best marksmen out of an overflow crowd of volunteers.  The colonel's solution was a shooting contest:

Col. Washington… made a demand of 500 Riflemen from the frontiers.  But those that insisted on going far exceeded the number wanted when in order to avoid giving offence, the commanding officer chose his company by the following method, viz. He took a board of a foot square and with chalk drew the shape of a moderate nose in the center and nailed it up to a tree at 150 yards distance and those who came nighest the mark with a single ball was to go.  But by the first 40 or 50 that fired the nose was all blown out of the board, and by the time his company was [filled] up, the board shared the same fate.[124]

144.   British Army Major George Hanger, who held in contempt the accuracy of the common soldier's musket, had a different opinion about America's riflemen.  He described being on horseback with Lieutenant Colonel Banastre Tarleton, preparing an attack on the Americans.

---

[122] *From* THE VIRGINIA GAZETTE *(1775)* quoted in Albert Bushnell Hart and Mabel Hill, CAMPS AND FIRESIDES OF THE REVOLUTION 230 (1902).

[123] 2 PENNSYLVANIA ARCHIVES 6 (1906).

[124] John Harrower. *Diary of John Harrower, 1773-1776*, 6 AMERICAN HISTORICAL REVIEW 100 (Oct. 1900).

**App. 456**

A rifleman 400 yards away fired at Hanger and Tarleton, who were less than two feet apart.  The shot killed the horse of the orderly standing between and just behind Hanger and Tarleton.

145.    Hanger became a prisoner of war at the Battle of Saratoga.  The riflemen told Hanger that, "an expert rifleman…can hit the head of a man at 200 yards.  I am certain that provided an American rifleman was to get a perfect aim at 300 yards at me standing still, he most undoubtedly would hit me, unless it was a very windy day…."[125]

### b)  Multishot Firearms

146.    From the late 18th century, gun makers made repeating handguns called pepper-boxes.  The flintlock firing mechanism made them prone to "chain fire" as flame from the first detonation would sometimes spread to the others, limiting their commercial value.[126]  The development of the percussion cap certainly made them more practical; while a percussion cap could certainly be detonated accidentally by flame, it was less likely than gunpowder in the pan of a flintlock mechanism.  On YouTube you can see examples of antique percussion pepperboxes being fired without any injuries or death to the shooter.[127]

147.    38. Pepper-boxes used multiple barrels that usually required the user to rotate the barrel assembly for each shot; at least one ad from 1838 offers what (if accurately described) would have put it ahead of Colt's early revolvers: "SELF-COCKING AND REVOLVING SIX BARREL POCKET PISTOL…. This pistol revolves the six barrels, cocks itself and discharges

---

[125] *Types of Guns That Our Forefathers Used in Colonial Days*, OUTING (Apr., 1918).

[126] *Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber [sic], Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820*, ANTIQUE  ASSOCIATES, https://www.aaawt.com/itempage?Sku=308-654, last accessed October 23, 2023; *An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John        Twigg,        London,        circa        1781-87,*        Bonham's, https://www.bonhams.com/auction/26792/lot/348/an-exceptional-88-bore-flintlock-seven-barrel-box-lock-pepperbox-revolver/, , last accessed March 8, 2023;

[127]       *Antique       Pepperbox       Pistol       1850's       Washington       Arms       Co*, https://www.youtube.com/watch?v=jiSkuUmKW5E, last accessed March 9, 2023.

**App. 457**

merely by pulling the trigger, placing a man with but one hand on an equality with six men, each with the ordinary pocket pistol."[128]  Some transitional pepperboxes built to avoid infringing on the Colt patents fit this description (double-action trigger that also indexes the barrels).[129]

### c)  Black Powder Arms Kept Unloaded

148.    In ¶16: "And muzzle-loading guns were difficult to keep loaded for any length of time, because black powder absorbed moisture and could corrode the barrel or firing mechanism or make the charge liable to misfire. The life of a charge could be extended by storing a gun in a warm, dry place, typically over a fireplace, but even there, moisture from boiling pots, drying clothes, or humid weather could do damage. That is why most owners stored their guns empty, cleaned them regularly, and loaded them anew before every use."

149.    As discussed above in the Spitzer rebuttal, the people who lived then disagree. Massachusetts Governor Winthrop's journal reports several accidental deaths or injuries caused by colonists failing to keep their firearms unloaded:

> At a training at Watertown, a man of John Oldham's, having a musket, which had been long charged with pistol bullets, not knowing of it, gave fire, and shot three men, two into their bodies, and one into his hands; but it was so far off, as the shot entered the skin and stayed there, and they all recovered.[130]

150.    And:

> Three men coming in a shallop from Braintree, the wind taking them short at Castle Island, one of them stepping forward to hand the sail, caused a fowling piece with a French lock, which lay in the boat, to go off. The whole charge went through the thigh of one man within one inch of his belly, yet missed the bone, then the shot (being goose shot) scattered a little and struck the second man under

---

[128] *Self-Cocking and Revolving Six Barrel Pocket Pistol*, [Washington, D.C.] THE MADISONIAN, Dec. 22, 1838, 1.

[129] *English Transitional Pepperbox Revolver*, FORGOTTEN WEAPONS, https://www.youtube.com/watch?v=w3MZJsnqy6E, last accessed March 9, 2023.

[130] John Winthrop, James Kendall Hosmer, ed., 1 WINTHROP'S JOURNAL: "HISTORY OF NEW ENGLAND" 1630-1649 83 (1908).

**App. 458**

his right side upon his breast, so as above 40 shot entered his body, many into the capacity of his breast.[131]

151.    Children were not safe from these rarely loaded firearms:

It is observable that this man had gathered some providences about such as were against them, as that Mr. Winslow's horse died, as he came riding to Boston; that *his brother's son (a child of eight years old) had killed his own sister (being ten years of age) with his father's piece*, etc., and his great trouble was, least this providence which now befell him, should be imputed to their cause.[132] [emphasis added]

152.    And:

One Richard Sylvester, having three small children, he and his wife going to the assembly, upon the Lord's day, left their children at home. The eldest was without doors looking to some cattle; the middle-most, being a son about five years old, seeing his father's fowling piece, (being a very great one,) stand in the chimney, took it and laid it upon a stool, as he had seen his father do, and pulled up the cock, (the spring being weak,) and put down the hammer, then went to the other end and blowed in the mouth of the piece, as he had seen his father also do, and with that stirring the piece, being charged, it went off, and shot the child into the mouth and through his head.[133]

153.    These four incidents of firearms kept loaded when not in actual use resulting in serious misadventure are in *one* book.  How many of these loaded firearms sat quietly in their place, never accidentally discharging?  How many incidents are in colonial-era books that I have not read or were not recorded?

154.    Finally, there is one more piece of evidence that Americans had loaded firearms when not ready for use.  In 1782, Massachusetts passed a statute that shows firearms were kept loaded regularly enough to justify a law regulating the practice.

155.    The preamble "WHEREAS the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in the said town" establishes that it was a fire safety measure.

---

[131] Id. 2:55.
[132] Id., 2:317.
[133] Id., 2:72.

**App. 459**

Sect. 2. And be it further enacted by the authority aforesaid, That all canon, swivels, mortars, howitzers, cohorns, fire-arms, grenades, and iron shells of any kind, that shall be found in any dwelling-house, out-house, stable, barn, store, ware-house, shop, or other building, charged with, or having any dwelling in them any gun-powder, shall be liable to be seized by either of the Firewards of the said town… [134]

156.    You were free to keep small arms, cannon, small artillery, bombs, and grenades at home, as long as they were unloaded.  Why was there a need for such a law unless firearms (and artillery) were at least occasionally left loaded?  Would we pass a law today ordering that you not leave children unsupervised at a pool if no one ever did this?

### C.    Why Homicide Rates Rose

157.    Roth in ¶20 asserts that: "But the surge in violence ended in New England, the Mid-Atlantic states, and the settled Midwest once the Revolutionary crisis was over. In those areas homicide rates fell to levels in some instances even lower than those which had prevailed in the early and mid-eighteenth century. By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England. Only New York City stood out, at 6 per 100,000 adults per year."  At least Roth admits that murder rates fell at a time when firearms technology advanced.  Percussion caps start to appear in American newspaper ads in the 1820s.[135]  Percussion caps made it possible fire guns under damp conditions such as rainstorm.  They also speeded up reloading.

158.    Starting at ¶24, Roth launches into a discussion of concealed weapon regulation.  How this applies to the challenged waiting period laws mystifies me; this new law does nothing to change concealed weapon regulation.  At ¶25, Roth puts his foot into it good with: "The new

---

[134] ACTS AND LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, ch. 46 at 119-120 (1782).
[135] *Ammunition Store*, [Newport, R.I.] RHODE-ISLAND REPUBLICAN, May 22, 1828, 3; *Haskell & Sawyer*, LANCASTER GAZETTE, Oct. 28, 1828, 3.

**App. 460**

types of knives available in this era also represented technological advances over ordinary knives because they were designed expressly for fighting. Dirks and Bowie knives had longer blades than ordinary knives, crossguards to protect the combatants' hands, and clip points to make it easier to cut or stab opponents."

159.    The name "dirk" alone should be a hint that Roth is in over his head.   The CATALOGUE OF THE NATIONAL MUSEUM OF ANTIQUITIES OF SCOTLAND, WITH ILLUSTRATIONS (1892) lists "Highland Dirks, with carved handles of interlaced work… 16 ½ in. long" that would be immediately recognized as the father of the Arkansas Toothpick, the Bowie Knife's equally feared brother.[136]

160.    In ¶¶26-27, Roth chases a bunny trail that I recognize from declarations he has made in cases where his claims were actually relevant to laws concerning the carrying of arms. For a challenge to this waiting period law, it is irrelevant.

161.    Starting at ¶28, Roth claims that "By the early twentieth century, every state either banned concealed firearms or placed severe restrictions on their possession."  This statement is false.  No state banned concealed firearms, or even placed restrictions on possession.  Concealed *carry* was heavily regulated, when not completely banned.

162.    Roth lists two sources for this claim.  "Kates, Toward a History of Handgun Prohibition'" and "Jordan, Frontier Law and Order, 17-22."  Texas attempted to discourage handgun sales by imposing a 50% tax on "gross receipts from sales of all firearms" by dealers in pistols.[137]  Kates lists several state laws such as that of Texas intended to disarm black people my making handguns expensive and a 1902 South Carolina law "banning all sales except to sheriffs

---

[136] THE CATALOGUE OF THE NATIONAL MUSEUM OF ANTIQUITIES OF SCOTLAND, WITH ILLUSTRATIONS 304 (1892).
[137] REVISED CIVIL STATUTES OF THE STATE OF TEXAS ADOPTED AT THE REGULAR SESSION OF THE THIRTY-SECOND LEGISLATURE Art. 7380 (1911).

**App. 461**

and their special deputies – i.e., company goons and the KKK."[138]  (What a persuasive argument for gun regulation.)  Kates make no claim that "every state … placed severe restrictions on their possession."  If such laws were widespread, I am amazed at how little case law they have left behind.

163.    In the footnote Roth observes: "

These sources identify laws that either banned concealed firearms or placed severe restrictions on their possession in every state except Vermont. However, Vermont also had such a law by the early twentieth century. *See* An Act Against Carrying Concealed Weapons, No. 85, § 1 (12th Biennial Session, General Assembly of the State of Vermont, Nov. 19, 1892) ("A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.").

44. What makes this claim in the footnote misleading is that the Vermont Supreme Court overturned a Rutland ordinance that banned concealed carry, while upholding the state law which required that the carrier did so "with the intent or avowed purpose of injuring a fellow man."  Without that criminal intent, the Court ruled, the Vermont Constitution's right to keep and bear arms provision took precedence over a city ordinance.[139]

164.    Roth in ¶29-33 argues that the rise in murder rates was because: "As the country struggled through the wrenching and divisive changes of the mid-nineteenth century—the crises over slavery and immigration, the decline in self-employment, and rise of industrialized cities— the patriotic faith in government that most Americans felt so strongly after the Revolution was undermined by anger and distrust."   All of these provide at least plausible multi-factorial explanations for rising murder rates.   In ¶33, discussing "Smith and Wesson's seven-shot, .22 caliber, breech-loading, Model 1 rimfire revolver": "Smith and Wesson had created a near-perfect murder weapon. It was lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time."   They had also created a near-perfect weapon of self-

---

[138] Don Kates, "Toward a History of Handgun Prohibition," 15 in Don Kates, RESTRICTING HANDGUNS: THE LIBERAL SKEPTICS SPEAK OUT (
       [139] State v. Rosenthal, 75 Vt. 295, 55 A. 610 (1903)

**App. 462**

defense.  That also describes the sidearm carried by every police officer and millions of law-abiding Americans, then and now.  Roth has just admitted his biases.

165.    Because Roth's inclusion of lawful killing in the general category of homicides, his rising rates might be in part because victims were increasingly able to respond to criminal attack with a handgun.  How much?  Roth opines but does not appear to have considered that possibility.

166.    In ¶34, Roth describes how even with all this advancing firearms technology:

> By the eve of World War I, rates had fallen in the New England states to 1 to 4 per 100,000 adults per year, to 2 to 5 per 100,000 in the Prairie states, and 3 to 8 per 100,000 in the industrial states. In the West, rates had fallen to 12 per 100,000 adults per year in California, 15 per 100,000 in Colorado, and approximately 20 to 30 per 100,000 in Arizona, Nevada, and New Mexico.

167.    Yet even though Southern states had become increasingly restrictive through high tax rates on pistol sales, or outright bans such as in South Carolina:

> Homicide rates whipsawed, however, in the South. They fell in the late 1870s and 1880s, only to rise in the 1890s and early twentieth century, to just under 20 per 100,000 adults in Florida, Kentucky, Louisiana, Missouri, and Tennessee, and 35 per 100,000 in Virginia and North Carolina.

168.    Technology does not explain rising rates in the South but falling rates elsewhere. As Roth observes, and then seemingly forgets, social factors are a much more important factor in homicide rates.  Curiously, having claimed in ¶28, that "By the early twentieth century, every state either banned concealed firearms or placed severe restrictions on their possession," in ¶34, "And that is why every state in the Union restricted the right to carrying certain concealable weapons."  Laws restricting concealed carry start in 1813, and spread after the Civil War. Somehow, falling homicide rates outside the South lead to bans on concealed carry.

169.    All in all, this entire section on firearms regulation leads to the question, "What does this have to do with waiting periods?"  None of these laws imposed waiting periods.  The

**App. 463**

first waiting period law that I have found is the 1923 California law prohibiting transfer of a handgun on the same day that the dealer sent the Dealer Record of Sale record to the local law enforcement agency.[140]

## IV.   Do Waiting Periods Work?

170.   Bruen specifically rejected balancing of interests because it allowed courts to say, "It makes us safer," as an excuse to ignore the constitutional guarantee.  The following material comes a study I wrote some years back.[141]

### A.   Previous Studies

171.   Criminologists who have performed the most sophisticated statistical analyses of the effects of waiting periods on crime rates have found that waiting periods have no statistically significant effect on murder rates, aggravated assault rates, robbery rates, rape rates, suicide rates, or fatal gun accident rates, but they do have a statistically significant impact on gun prevalence rates (what percentage of the population owns a gun).[142]  Another study examining several laws intended to promote safe storage of firearms included waiting period laws and length of waiting period, and found no statistically significant effect on rates of violent crime, murder, rape, robbery, aggravated assault, property crimes, burglary, larceny, or auto theft.[143] One recent summary of such research found "there is not a single study published in any

---

[140] Statutes of California Ch. 339 § 9 at 699 (1923).

[141] Clayton E. Cramer, *Fifty Years of Waiting For a handgun in California: Did It Work?*, Cramer, Clayton E., Fifty Years of Waiting for a Handgun in California: Did it Work? (April 28, 2015).                    Available                    at SSRN: https://ssrn.com/abstract=2600148 or http://dx.doi.org/10.2139/ssrn.2600148,                    last accessed October 23, 2023.

[142] Gary Kleck and E. Britt Patterson, The Impact of Gun Control and Gun Ownership Levels on Violence Rates, 9:3  J. Quant. Crim., (1993), 249-287, Table 3.

[143] John R. Lott and John E. Whiteley, *Safe-Storage Gun Laws: Accidental Deaths, Suicides, and Crime*, 44 J. Law & Econ. 659-89 (Oct. 2001), Table 3,

**App. 464**

academic journal which concludes waiting periods are effective."[144] If gun ownership in itself was a public safety matter, this might be an argument in favor of waiting periods, but gun ownership is not a public safety concern, but a fundamental right under the Constitution.[145]

### B.   Analysis

172.   Unfortunately, we don't have the option of comparing equivalent populations, one with waiting periods, and one without, for the simple reason that the factors that determine murder rates are not perfectly understood.  The best we can hope for is to examine the year to year changes in murder rates before and after a waiting period is created or extended.

173.   In much the same way that the populations of adjoining states are not exactly comparable, the demographics of a state change from year to year.  But while the population characteristics of two adjoining states may be dramatically different in subtle and unobvious ways, the demographics *within* a state change very slowly from year to year, as people age, change their behavior, or move in or out of the state.  As a consequence, while looking at a state's crime rates through time is still a technique with limitations, it is nowhere near as prone to problems of non-comparability as comparing different states.

174.   What result should we expect a waiting period to have?  There are two purposes usually given for firearms waiting periods: time for a background check on the purchaser; and a "cooling off" period, while passions abate.  As instant background checks become feasible, and the waiting period is no longer needed for that purpose, the argument for a handgun waiting

---

[144] David B. Kopel, Guns: Who Should Have Them 73-74 (1995),.  Kopel quotes even notably pro-gun control academics such as Philip Cook as admitting the ineffectiveness of waiting period laws for reducing murder  because "most felons and other ineligibles… find ways of circumventing the [state] screening system entirely…" at 74.

[145] D.C. v. Heller, 128 S.Ct.2783, 2798 ("By the time of the founding, the right to have arms had become fundamental for English subjects.")

**App. 465**

period relies on the claim that waiting periods save lives because of the "cooling off" of passions. What evidence does California's experience provide to judge the accuracy of such a statement?

175.   California is very nearly a perfect example of a laboratory for waiting period laws.  California is sufficiently large, and its urban populations are so remote from its borders with adjoining states, that a waiting period is enforced not only by federal law, but also by the limits of geography.  In addition to the Gun Control Act of 1968, which prohibited interstate purchases of handguns,[146] most of California's murders happen in a small number of urban counties that are at least six to eight hours driving time from other states.  Even assuming that a seller could be found *immediately* over the border in Nevada, Oregon, or Arizona, willing to break federal law, the travel time *alone* imposes a waiting period of hours to days.  In addition, California's handgun waiting period applies to private party sales, and has applied since at least 1953.[147]

176.   California has had a waiting period for handgun sales by dealers since at least 1923.  The California Legislature increased the handgun waiting period from one to three days in 1955, to five days in 1965, and to the 15 days in 1975,[148] then reduced it to 10 days effective April 1, 1997.[149]  A 10 day waiting period for non-handgun transfers was imposed starting in 1996.[150]  Figure 1, "California Handgun Waiting Periods & Murder Rates" plots the murder rate per 100,000 Californians during the period 1952 through 2012.[151]  (The use of a murder *rate*,

---

[146] 18 USC § 922.

[147] People v. Bickston, 91 Cal.App.3d Supp. 29, 154 Cal.Rptr. 409 (1979).

[148] Cal. Penal Code Ann. § 12071 (1991).

[149] SB 671 (1995).

[150] Cal. Penal Code Ann. § 12071 (1991).

[151] California murder rates for 1952-1989 in this article come from California Dept. of Justice, CRIMES REPORTED, 1952-1989, NUMBER AND RATE PER 100,000 POPULATION.  California murder rates for 1990 are from California Dept. of Justice, CALIFORNIA CRIMINAL JUSTICE PROFILE 1990, 5.  U.S. murder rates were derived from population and raw murder figures in FBI, UNIFORM CRIME REPORTS FOR THE UNITED STATES, 1952-1990.

**App. 466**

which counts murders relative to the size of the population, eliminates changes in the number of murders caused by changes in the number of people living in California.)



177.    What the graph suggests is further demonstrated by examining the Spearman's rank coefficient between waiting period in days and California's murder rate.  The correlation between handgun waiting period and murder rate is 0.84: meaning that there was a strong positive correlation between handgun waiting period and murder rates.  The longer the waiting period in days, the higher the murder rate.  The correlation between long gun waiting period and murder rate is -0.19: the longer the waiting period for long guns, the lower the murder rate; although this is not a terribly strong negative correlation; and might simply be a coincidence of California adopting a long gun waiting period at a time when U.S. murder rates began a long decline.

178.    The handgun waiting period increase from one to three days in 1955, and from three to five days in 1965, had no apparent effect on rising murder rates.  Indeed, the California murder rate went from a bit above 2/100,000 people in 1952, to over 10/100,000 by 1975.  What

**App. 467**

conclusions can we reach from the data?  Positive correlation (that two events happen together with high frequency) does *not* prove causality (that one event causes the other event).  It is also true that zero correlation between two events does not *disprove* causality — but if a positive correlation (especially a very *strong* positive correlation such as we have here) between two events can be shown, it should certainly make us skeptical that increasing A will cause B to decline.

179.    Examining characteristics of murders in the U.S. suggests that relatively few murders are likely to be affected by handgun waiting periods.  In 2013, 29.9% of murders involved non-firearms; which must therefore be outside the realm of any firearm waiting period law.  Nationally, 1.2% of murders are categorized as brawls due "to influence of" alcohol or narcotics.[152]  Since it seems most unlikely that a person who is intoxicated will be able to buy a handgun from a licensed dealer, these murders would seem unlikely to be discouraged by a waiting period.  Also, 5.9% of 2013 murders are characterized by the FBI as "gangland killings" or "juvenile gang killings"; it seems unlikely that gang members are likely to "cool off" while waiting to buy a gun; and it is most unlikely that a juvenile was obtaining any gun to commit murder in California from a licensed dealer.[153]  While some relatively rare circumstances of murder might well fit into the "crimes of passion" category such as "Romantic triangle" (0.5%) it seems most unlikely that "Child killed by babysitter" (0.24%) are in that category.

180.    Time of day is also a factor in why waiting periods seem questionable.  As the following graph of murder victim injury hour from Chicago shows:

---

[152] Id., Table 13.
[153] *Id.* Table 11.

**App. 468**



FIGURE 8: MURDER VICTIMS BY HOUR OF INJURY, 2011

181.    Murder victims are heavily concentrated in the late evening and early morning perods, when legitimate retail gun stores in the Chicago area are not typically open; but it seems likely that "non-traditional" firearms merchants who are unlikely to follow any waiting period or background check law are successfully filling market demand. The crimes of passion that waiting periods are supposed to prevent must involve either people who remain very angry for very long periods, or are not dependent on lawful purchase of a handgun.

182.    The evidence that waiting periods either do, or even can, reduce murder rates is unpersuasive.

I Declare under penalty of perjury that the foregoing is true and correct.

Executed on this 24th Day of October, 2023

Clayton Cramer

---

[154] Chicago Police Department, CHICAGO MURDER ANALYSIS, Figure 8, https://home.chicagopolice.org/wp-content/uploads/2014/12/2011-Murder-Report.pdf, last accessed October 23, 2023.

App. 469

## Table of Authorities

Cases

Fenner v. State, 3 Vt. 108 (1855). ................................................................. 36

McDonald v. Chicago, 130 S.Ct. 3022, 3132 (Breyer, J. diss.) ....................................... 2

People v. Bickston, 91 Cal.App.3d Supp. 29, 154 Cal.Rptr. 409 (1979). ..................................... 56

State v. Rosenthal, 75 Vt. 295, 55 A. 610 (1903)............................................................ 52

Statutes

18 USC § 922.............................................................................................. 56

1923 Cal. Stats. Ch. 339................................................................................... 21

3 Records of the Colony of Rhode Island, and Providence Plantations, in New England 31 (1858).................................................................................... 30

5 Records of the Governor and Company of the Massachusetts Bay in New England 211 (1854). .................................................................................. 35

An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops (1852), .... 36

Cal. Penal Code Ann. § 12071 (1991). ...................................................................... 56

Candler, 18 The State Records of the Colony of Georgia, 294-5 (1759)....................................... 31

Colonial Laws of Massachusetts 140 (1890) ................................................................. 30

Colorado, HB 23-1219...................................................................................... 38

General Laws of Pennsylvania From the Year 1700, to April 1849 Ch. 44 at 86 (2nd ed. 1849),. 32

Mitchell and Flanders, 2 Statutes at Large of Pennsylvania from 1682 to 1801 420 (1896). ...... 31

Revised Civil Statutes of the State of Texas Adopted at the Regular Session of the Thirty-Second Legislature Art. 7380 (1911). ................................................................ 51

SB 671 (1995). .......................................................................................... 56

**App. 470**

Other Authorities

. Andrew Holowchak and Brian W. Dotts, ed., Elusive Thomas Jefferson: Essays on the Man Behind the Myths 168 (2017) ................................................................................................ 26

2 Pennsylvania Archives 6 (1906). ........................................................................................... 46

3 New-England Magazine 111 (1832). ...................................................................................... 29

A List of sundry Goods to be sold by Henning & Shute at their Store…, South Carolina Gazette, Nov. 8, 1735,....................................................................................................................... 6

Account of the Behaviour, Confessions, and Dying Words, of the Malefactors, Who Were Executed at Kennington-Common on Thursday the 21st of This Instant August 16 (1735).... 26

Albert Bushnell Hart and Mabel Hill, Camps and Firesides of the Revolution 230 (1902)......... 46

Albert Gallatin, A Statement of the Arts and Manufactures of the United States of America 11 (1814 ................................................................................................................................... 13

An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg, London, circa 1781-87, Bonham's,.................................................................................... 25, 47

Antique Pepperbox Pistol 1850's Washington Arms Co,............................................................ 47

Berkeley R. Lewis, Small Arms and Ammunition in the United States Service, 1776-1865 47 (1956)................................................................................................................................... 13

Boston Gazette, April 13, 1756........................................................................................... 8

Boston Gazette, March 1, 1730.......................................................................................... 5

Boston Gazette, May 11, 1742 .......................................................................................... 5

Boston Gazette, May 30, 1720............................................................................................ 5

Brace, 1 A New English Dictionary on Historical Principles (1888). ......................................... 26

California Dept. of Justice, California Criminal Justice Profile 1990, ......................................... 56

**App. 471**

California Dept. of Justice, Crimes Reported, 1952-1989, Number and Rate per 100,000 Population ..................................................................................................... 56

Chicago Police Department, CHICAGO MURDER ANALYSIS, Figure 8, ......................................... 59

City Life in the Late 19th Century, Library of Congress, ........................................................... 20

Clayton E. Cramer, Why the FBI's Justifiable Homicide Statistics Are a Misleading Measure of Defensive Gun Use, 27 U. Fla. J.L. & Pub. Pol'y 505 (2016). ........................................... 23, 41

Cleveland Herald, May 8, 1823 ................................................................................................... 11

Colt Allies to Colt Patent Fire Arms Co., June 26, 1873, p. 15 of Colt Patent Firearms Co. Colt Collection, RG103, business file, box 11A, correspondence, Allies letter book, 1873-1880, from Hugh Harbison to Allies, October 30, 1877, p. 174 of letter book, Connecticut State Library. ................................................................................................................... 18

Daniel D. Hartzler, Arms Makers of Maryland 61 (1977 ........................................................... 10

Derick Moore, U.S. Census Bureau, U.S. Population Estimated at 334,233,854 on Jan. 1, 2023, 4

English Transitional Pepperbox Revolver, Forgotten Weapons, .................................................. 48

FBI, Crime in the United States 2019, Expanded Homicide Data Table 2 (2019) ................. 22, 40

FBI, Firearms Checks (NICS), ...................................................................................................... 21

FBI, Uniform Crime Reports for the United States, 1952-1990 ................................................... 56

Federal Gazette, September 21, 1791 ............................................................................................. 9

Felicia Deyrup, Arms Makers of the Connecticut Valley, 7, n. ** (1948) ................................... 15

Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber, Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820, Antique Associates ..................................................................................................................... 25, 47

Fortescue Cuming, Sketches of a Tour to the Western Country 222 (1810). ............................... 12

**App. 472**

Francis Asbury, 3 The Journal Of The Rev. Francis Asbury, Bishop Of The Methodist Episcopal... 121 (1821). ......................................................................................... 27

General Statutes of the State of Kansas To Which The Constitutions of the United States and the State of Kansas, Together With the Organic Act of the Territory Of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union, are Prefixed 386-387 (1868). ................................................................................. 35

Gregory J. W. Urwin, The United States Infantry: An Illustrated History, 1775-1918 49 (1988). 14

Gun and Locksmith, [Huntsville, Alabama] Free Democrat, May 23, 1837, 1 ........................... 12

Guns, Pistols, Bowie Knives, Nashville Daily Republican Banner, October 2, 1837 ................. 12

Henry Bradshaw Fearon, Sketches of America: A Narrative of a Journey of Five Thousand Miles Through the Eastern and Western States. 203 (3rd ed. 1819). ..................................................... 13

Henry J. Kauffman, Early American Gunsmiths 4 (1952). .............................................................. 8

Imported from Liverpool, Pennsylvania Gazette, September 6, 1764. 1 ........................................ 6

IMPORTED in the Brigt. Dorothy, South Carolina Gazette, Oct. 25, 1735, 3 .............................. 7

James D. Wright, Peter H. Rossi, and Kathleen Daly, Under the Gun: Weapons, Crime, and Violence in America 30 (1983) .............................................................................................. 14

James E. Hicks, 1 Notes on United States Ordnance 28 (1940). .................................................... 9

James Madison, William T. Hutchinson and William M.E. Rachal, ed., 1 The Papers of James Madison 153 (1962) ............................................................................................................... 45

James Whisker, The Gunsmith's Trade 159-160 (1992). ................................................................. 8

John Harrower. Diary of John Harrower, 1773-1776, 6 American Historical Review 100 (Oct. 1900). ...................................................................................................................................... 46

**App. 473**

John M. Dawson and Patrick A. Langan, Murder in Families, Bureau of Justice Statistics Special Report 1 (Jul. 1994) .................................................................................................. 22, 40

John Preston Arthur, Western North Carolina: A History (1730-1913) 284 (1914) .................... 28

John Thomas Scharf, 1 *History of Western Maryland* 130 (1882). .............................................. 45

John Winthrop, James Kendall Hosmer, ed., 1 Winthrop's Journal: "History of New England" 1630-1649 83 (1908).......................................................................................................... 23, 48

JUST imported from London, Pennsylvania Gazette, November 1, 1744, 4 ................................ 6

JUST IMPORTED in the John & Mary, South Carolina Gazette, Nov. 29. 1735, 4. .................... 7

Just imported in the Myrtilla, Pennsylvania Gazette, May 25, 1758, 4.......................................... 7

Just Imported, South Carolina Gazette, Dec. 22, 1739, 3.............................................................. 6

JUST landed, a select Parcel of SAWS, Pennsylvania Gazette, July 8, 1762, 1............................ 6

Kauffman, Early American Gunsmiths, 14..................................................................................... 9

Kauffman, Early American Gunsmiths, 2........................................................................................ 17

Kauffman, Early American Gunsmiths, 23..................................................................................... 9

Kauffman, Early American Gunsmiths, 4....................................................................................... 11

Kauffman, Early American Gunsmiths, 45..................................................................................... 9

Kauffman, Early American Gunsmiths, 5....................................................................................... 11

Kauffman, Early American Gunsmiths, 66..................................................................................... 9

Kauffman, Early American Gunsmiths, 76..................................................................................... 10

Lorenzo de Zavala, Wallace Woolsey trans., Journey to the United States of North America 23 (1980)........................................................................................................................................... 14

Margo J. Anderson, The American Census: A Social History 19 (1988)...................................... 13

Merrill Lindsay, The New England Gun: The First Two Hundred Years 85-91 (1975). ............... 9

App. 474

Michael Bellesiles, Arming America 378 (2000) ............................................................ 9

New York [City] Morning Herald, January 1 .............................................................. 12

New York [City] Morning Herald, January 183 .......................................................... 12

Old Settlers' Society (RACINE, County of, Wisconsin), Official Record of the Old Settlers
    Society of Racine County, Wisconsin 43 (1871). ..................................................... 28

ON Monday next will be sold by publick vendue, Pennsylvania Gazette, Sep. 15, 1748, 3.......... 7

On Monday next, the fourth of April, will be sold at vendue, Pennsylvania Gazette, Mar. 29,
    1748, 3....................................................................................................... 7

Pennsylvania Gazette, Aug. 11, 1770 ......................................................................... 8

Pennsylvania Gazette, August 31, 1749, 2................................................................... 8

*Pennsylvania Gazette,* July 30, 1741. ........................................................................ 5

Pennsylvania Gazette, Jun. 26, 1746 .......................................................................... 8

*Pennsylvania Gazette*, March 5, 1761 ......................................................................... 6

Pennsylvania Packet (Claypoole's American Daily Advertiser), April 26, 1798 ........................... 9

Philip Alexander Bruce and William Glover Stanard, 18 Virginia Magazine of History and
    Biography 347 (1910). ................................................................................... 27

Philo Pacificus [Noah Worcester], Friend Of Peace 379 (1827). ................................................. 29

Pittsburgh Gazette, December 18, 1812 ...................................................................... 9

Randolph Roth, American Homicide 61, Figure 2.3 at p. 95 (2009)..................................... 22, 40

Randolph Roth, American Homicide xii (2009) ....................................................... 23, 40

Richmond Commercial Compiler, September 21, 1816 ...........................................................11

S. E. Dyke, Thoughts on the American Flintlock Pistol 13-60 (1974). .......................................11

**App. 475**

Self-Cocking and Revolving Six Barrel Pocket Pistol [Washington, D.C.] The Madisonian, Dec. 22, 1838, 1 ................................................................................................................. 48

Somerset [Pennsylvania] Whig, January 8, 1818 ......................................................... 9

South Carolina Gazette & Public Advertiser, October 13, 1785 .................................. 9

The Catalogue of the National Museum of Antiquities of Scotland, With Illustrations 304 (1892). .......................................................................................................................... 51

The Henry Papers at the Hagley Museum, series 2, box 8, Folder 6 Accounts 1814-19; Ibid., Folder 8 John Joseph Henry III Business Accounts 1813-31 .................................. 15

The New York Gazette Revived in the Weekly Post-Boy, August 1, 1748 ..................... 8

The New York Journal or General Advertiser, February 25 1773 ................................ 17

The remaining store goods belonging to the late Captain William Grant, Pennsylvania Gazette, Nov. 3, 1757, 3 ................................................................................................ 7

To be SOLD by ROBERT LETTIS HOOPER, Pennsylvania Gazette, September 22, 1763, 1 ..... 6

Trends in Migration to the U.S., .................................................................................. 20

Types of Guns That Our Forefathers Used in Colonial Days, outing (Apr., 1918). .................... 47

U.S. Census Bureau, 1790 Fast Facts, ................................................................... 4, 17

W.G. Lyford, The Western Address Directory 385, 418 (1837). .................................. 12

W.J. Rorabaugh, The Alcoholic Republic: An American Tradition 7-9 (1979). .......................... 27

Whereas There Were 300 Muskets And Bayonets…, South Carolina Gazette, Jun. 1, 1745, 2. ..... 7

Whisker, The Gunsmith's Trade, 155 ........................................................................... 9

Whisker, The Gunsmith's Trade, 200 .......................................................................... 11

Whisker, *The Gunsmith's Trade*, 47-48 ..................................................................... 15

Whisker, The Gunsmith's Trade, 47-51 ....................................................................... 16

App. 476

Whisker, The Gunsmith's Trade, 67. ........................................................................... 15

Whiteley's Philadelphia Annual Advertiser b2 (1820) .................................................11

William Cullen Bryant, 1 Life and Works of William Cullen Bryant 16-17 (1883)..................... 29

William G. Ouseley, Remarks on the Statistics and Political Institutions of the United States, with Some Observations on the Ecclesiastical System of America, Her Sources of Revenue, &c, 32 (1832). ......................................................................................................... 14

Wochtenlichter Pennsylvanische Staatsbote, September 4, 1772 .................................................... 8

Work in the Late 19th Century, Library of Congress..................................................................... 20

**App. 477**

Exhibit A
Clayton E. Cramer

24408 Tombstone Ridge Ct.
Middleton, ID 83644
(208) 761-5916
clayton@claytoncramer.com
http://www.claytoncramer.com

EDUCATION:

|  | |
|---|---|
| | Sonoma State University, Rohnert Park, California |
| June, 1998 | M.A. in History |
| | *Master's Thesis*: "Concealed Weapon Laws of the Early Republic" |
| June, 1994 | B.A. in History |
| | *Honors*: *cum laude* and With Distinction |

AWARDS:

|  | |
|---|---|
| 1993 | Association for Education in Journalism and Mass Communication Ethics Prize |
| | First Place, Undergraduate Division |

TEACHING EXPERIENCE:

| | |
|---|---|
| Fall, 2020 - present | **Adjunct Faculty:** College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**. |
| | |
| Fall, 2014 – Spring, 2020 | Recovering from stroke. |
| | |
| Fall, 2009 – Summer, 2010 | **Adjunct Faculty:** ITT Technical Institute, Boise, teaching **State and Local Government** and **Introduction to Computers**. |
| Fall, 2003 | **Adjunct Faculty:** Boise State University, teaching **U.S. Constitutional History** |

BOOKS:

Lock, Stock, and Barrel: The Origins of American Gun Culture
Praeger Press, 2018

*Social Conservatism in An Age of Revolution: Legislating Christian Morality in Revolutionary America*
CreateSpace, 2016

*Historical Evidence Concerning Climate Change: Archaeological and Historical Evidence That Man Is Not the Cause*
CreateSpace, 2016

App. 478

*My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill*
CreateSpace, 2012

*Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie*
Nelson Current, 2006

*Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*
Praeger Press, 1999

*Black Demographic Data, 1790-1860: A Sourcebook*
Greenwood Press, 1997

*Firing Back: Defending Your Right to Keep and Bear Arms*
Krause Publishing, 1995

*For The Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*
Praeger Press, 1994

*By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine,* editor
Library Research Associates, Inc., 1990

SELECTED PUBLICATIONS:

"Assault Weapon Bans: Can They Survive Rational Basis Scrutiny?" *University of Akron ConLawNow* 8:issue 1, article 1.

Co-authored with David B. Kopel and Joseph Olson, "Knives and the Second Amendment," *University of Michigan Journal of Legal Reform*, 47:1 167-215 (2013).

"Mental Illness and the Second Amendment," 46 Conn. Law Review 4:1301 (2014).

Co-authored with David B. Kopel, "State Court Standards of Review for the Right to Keep and Bear Arms," 50 *Santa Clara Law Review* 101-208 (2010).

Co-authored with David B. Kopel, "The Keystone of the Second Amendment: Quakers, the Pennsylvania Constitution, and the

**App. 479**

Questionable Scholarship of Nathan Kozuskanich," 19 *Widener Law Journal* 277-320 (2010).

Co-authored with Nicholas J. Johnson and George A. Mocsary, "'This Right is Not Allowed by Governments that are Afraid of the People': The Public Meaning of the Second Amendment When the Fourteenth Amendment was Ratified," 17 *George Mason Law Review* 3:823-862 (2010).

Co-authored with Don B. Kates, "Second Amendment Limitations and Criminological Considerations," 61 *Hastings Law Journal* 1339-1370 (2009).

Co-authored with Joseph Edward Olson, "Gun Control: Political Fears Trump Crime Control," *Maine Law Review*, 61:1 [2009] 57-81

Co-authored with Joseph Edward Olson, "What Did "Bear Arms" Mean in the Second Amendment?" *Georgetown Journal of Law & Public Policy*, 6:2 [2008]

Co-authored with Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America." *Willamette Law Review*, 44, [2008]

"Why Footnotes Matter: Checking *Arming America*'s Claims." *Plagiary* 2006 1 (11): 1-31 [29 September 2006]

"Michael Bellesiles and Guns in the Early Republic." *Ideas on Liberty* 52:9 [September, 2002] 17-22.

"The Peaceable Kingdom?" *Books & Culture: A Christian Review*, July/August 2002, 29.

"Confiscating Guns From America's Past." *Ideas on Liberty* 51:1 [January, 2001] 23-27.

"Disarming Errors." *National Review*, October 9, 2000, 54-55.

"An American Coup d'Etat?" *History Today* [November, 1995].

"A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts." *Temple Law Review* 68:3 [Fall, 1995] 1178-1241. Co-authored with David Kopel and Scott Hattrup.

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws." *Tennessee Law Review* 62:3 [Spring, 1995] 679-757.

**App. 480**

"The Racist Roots of Gun Control." *Kansas Journal of Law & Public Policy* 4:2 [Winter, 1995] 17-25.

"Ethical Problems of Mass Murder Coverage in the Mass Media." *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

A comprehensive list of popular magazine articles would run to many pages; for a complete list see http://www.claytoncramer.com/popular/popularmagazines.htm .

CONFERENCES & EXPERT TESTIMONY:

Ohio State Senate Judiciary Committee, March 22, 1995.

Michigan House of Representatives Judiciary Committee, December 5, 1995

American Society of Criminology, San Diego, Cal., November, 1997. "Fear And Loathing In Whitehall: Bolshevism And The Firearms Act Of 1920."

American Society of Criminology, Chicago, Ill., November, 2002. "The Duty to be Armed in Colonial America."

Assisted in research and writing of Respondent's Brief and Academics for the Second Amendment and Claremont Institute amicus briefs for *D.C.* v. *Heller* (2008).

Panelist on "Up in Arms: The Second Amendment in the Modern Republic" University of Connecticut School of Law, November 15, 2013.

Baird v. Bonta (E.D.Cal. 2023)

Boland v. Bonta (S.D.Cal. 2023)

National Association for Gun Rights v. Lopez (D.Haw. 2023)

Wolford v. Lopez (D.Haw. 2023)

National Association for Gun Rights v. City of Highland Park, Ill. (N.D.Ill. 2023)

Association of New Jersey Rifle & Pistol Clubs v. Platkin (D.N.J. 2023)

Rupp v. Bonta (C.D.Cal. 2023)

**App. 481**

U.S. v. Ayala M.D.Fla. 2023)

U.S. v. Martin (E.D.Cal. 2023)

U.S. v. Kazmende (N.D.Ga. 2023)

**WORKS CITED IN COURT DECISIONS:**

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws," cited in *Pagel* v. *Franscell*, 57 P.3d 1226, 1234 (Wyo. 2002); Moody v. ARC of Howard County, Inc., Civil No. JKB-09-3228 (D.Md. 2011).

"'This Right is Not Allowed by Governments that are Afraid of the People':" cited in *McDonald* v. *Chicago* (2010); *Ezell* v. *City of Chicago* (7th Cir. 2011).

"Second Amendment Limitations and Criminological Considerations" cited in *U.S.* v. *Yancey,* 09-1138 (7th Cir. 2010); *U.S.* v. *Chester,* 628 F.3d 673 (4th Cir. 2010); *U.S.* v. *Skoien,* 587 F.3d 803 (7th Cir. 2009).

"What Did 'Bear Arms' Mean in the Second Amendment?", cited in *D.C.* v. *Heller* (2008).  In addition, significant parts of Justice Scalia's opinion are derived from amicus briefs that I helped to research and write.

*For the Defense of Themselves and the State,* cited in *Mosby* v. *Devine*, 851 A.2d 1031, 1052 (RI 2004) (Flanders, J., dissenting); *U.S.* v. *Emerson*, 46 F.Supp.2d 598 (N.D.Texas 1999); *State* v. *Sieyes* 225 P. 3d 995 (Wash. 2010).

"A Tale of Three Cities," cited in *State* v. *Mendoza*, 920 P.2d 357, 360 n. 4 (Hawaii 1996).

*Concealed Weapon Laws of the Early Republic*, cited in *Senna* v. *Florimont*, 958 A.2d 427, 433 (N.J. 2008).

"Mental Illness and the Second Amendment," cited in *In Rec EC* (N.J.App. 2015).

A comprehensive and up to date list can be found at http://claytoncramer.com/scholarly/journals.htm#citations.

**LANGUAGES:**

Very basic reading competence in German.

**OTHER SKILLS:**

**App. 482**

I have 35 years of experience as a computer software engineer, including embedded telecommunications equipment development, web page creation and maintenance.

**App. 483**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**UNIFIED EXHIBIT LIST IN CASE NO. 1:23-cv-02563-JLK**

*ROCKY MOUNTAIN GUN OWNERS, and ALICIA GARCIA v. JARED S. POLIS*

| EX NO. | DESCRIPTION | STIP. | DATE ADM. | DATE REJ. | OBJECTION | COURT USE ONLY |
|---|---|---|---|---|---|---|
| *1.* | Triple J Receipt 1 | | | | | |
| *2.* | Triple J Receipt 2 | | | | | |
| *3.* | Dragon Man Receipt | | | | | |
| *4.* | Declaration of Clayton Cramer | | | | | |
| *5.* | The Opioid Epidemic and Homicide by Roth | | | | | |
| *6.* | Figures for: "Criminologists and Historians of Crime: A Partnership Well Worth Pursuing" by Roth | | | | | |
| *7.* | Roth's Declaration in Miller v. Bonta | | | | | |
| *8.* | How Technology Shapes Mass Murder by Jeff Grabmeier, Ohio State News interview with Randolph Roth | | | | | |
| *9.* | Mass Violence in American History, American History TV, C-Span, January 7, 2017. Interview with Randolph Roth | | | | | |
| *10.* | FULL: Anti-gun professor, Randolph Roth, Ohio State History Dept., published Feb. 11, 2013. | | | | | |

App. 484

| EX NO. | DESCRIPTION | STIP. | DATE ADM. | DATE REJ. | OBJECTION | COURT USE ONLY |
|---|---|---|---|---|---|---|
| 11. | U.S. Patent Numbers: 8461X; 168; 279; 354; 364; 1,304; 1,804; 5,814; 6,945; 6,973; 8,210; 9,929; 9,701; 10,520; 10,944; 11,197; 11,470; 12,189; 12,567; 12,648; 12,649; 36,836; 47;631; 110,338; 754,637 | | | | | |
| 12. | | | | | | |
| 13. | | | | | | |
| 14. | | | | | | |
| 15. | | | | | | |
| 16. | | | | | | |
| 17. | | | | | | |
| 18. | | | | | | |
| 19. | | | | | | |
| 20. | | | | | | |
| 21. | HB 23-1219 | | | | | |
| 22. | Handgun Waiting Periods Reduce Gun Deaths | | | | | |
| 23. | Spitzer Declaration | | | | | |
| 24. | Spitzer CV | | | | | |
| 25. | Table of Intoxication/Weapons Laws | | | | | |
| 26. | Text of Intoxication/Weapons Laws | | | | | |
| 27. | Table of Weapons Licensing Laws | | | | | |
| 28. | Text of Weapons Licensing Laws | | | | | |

App. 485

| EX NO. | DESCRIPTION | STIP. | DATE ADM. | DATE REJ. | OBJECTION | COURT USE ONLY |
|---|---|---|---|---|---|---|
| *29.* | Historical Waiting Period Laws | | | | | |
| *30.* | Roth Declaration | | | | | |
| *31.* | Roth CV | | | | | |
| *32.* | Poliquin CV | | | | | |
| *33.* | Poliquin Study Supporting Information | | | | | |
| *34.* | | | | | | |
| *35.* | | | | | | |
| *36.* | | | | | | |
| *37.* | | | | | | |
| *38.* | | | | | | |
| *39.* | | | | | | |

**App. 486**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-02563-JLK-STV

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

## DEFENDANT'S WITNESS LIST FOR OCTOBER 26, 2023 HEARING

      Defendant, Jared S. Polis, in his official capacity as Governor of the State of Colorado,

submits his witness list, pursuant to Judge Kane's practice standards.

**App. 487**

_____**_Defendant's_**_____ WITNESS LIST IN CASE NO. __23-cv-2563-JLK_____

Rocky Mountain Gun Owners and Alicia Garcia v. Jared S. Polis, in his official capacity

| WITNESS | EST. TIME FOR EXAMINATION | DATE(S) TESTIFIED |
|---|---|---|
| Professor Randolph Roth | Direct: 45 min., Cross: 120 min. [2 hrs, 45 min. total] | October 26, 2023 |
| Professor Christopher W. Poliquin | Direct: 30 min., Cross: 30 min. [1 hr total] | October 26, 2023 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**App. 488**

Respectfully submitted this 24th day of October, 2023,

PHILIP J. WEISER
Attorney General

*/s/ Michael T. Kotlarczyk*

MICHAEL T. KOTLARCZYK, No. 43250*
Senior Assistant Attorney General
GRANT T. SULLIVAN, No. 40151*
Assistant Solicitor General
Public Officials Unit | State Services Section
MATTHEW J. WORTHINGTON, No. 47987*
Assistant Attorney General
Higher Education Unit | State Services Section
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO 80203
Telephone:  720.508.6187; 720.508.6349;
720.508.6124
mike.kotlarczyk@coag.gov; grant.sullivan@coag.gov;
matt.worthington@coag.gov

*Attorneys for Defendant Jared Polis, in his official
capacity as Governor of the State of Colorado*
*Counsel of Record

App. 489

**PLAINTIFF'S WITNESS LIST IN CASE NO. ___23-cv-2563-JLK___**

*Alicia Garcia and Rocky Mountain Gun Owners v. Polis*

| WITNESS | EST. TIME FOR EXAMINATION | DATE(S) TESTIFIED |
|---|---|---|
| Alicia Garcia | Direct: 30 mins., Cross: 10 mins., Total: 40 mins. | October 26, 2023 |
| Tylor Rhodes | Direct: 30 mins, Cross: 10 mins, Total: 40 mins. | October 26, 2023 |
| Professor Clayton Cramer | Direct: 90 mins, Cross: 45 mins, Total: 2 hrs, 15 mins | October 26, 2023 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**App. 490**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Senior Judge John L. Kane**

Date:   October 26, 2023
Courtroom Deputy:  Bernique Abiakam
Court Reporter: Kevin Carlin

Civil Action No.: 23-cv-02563-JLK

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,
                                                    Brian a. Abbas
                                                    D. Sean Nation

         Plaintiffs,
v.

JARED S. POLIS, *in his official capacity as the*
*Governor of the State of Colorado*,
                                                    Michael T. Kotlarczyk
                                                    Grant T. Sullivan
                                                    Matthew J. Worthington

         Defendant.

**COURTROOM MINUTES**
**Motion Hearing - Preliminary Injunction – Day 1**

**9:41 a.m.      Court in session.**

Court calls case.   Appearances of Counsel and parties.

Today's hearing regarding Doc. No. 2.

Preliminary remarks by the Court.

9:49 a.m.      Opening statement by Mr. Abbas.

9:57 a.m.      Opening statement by Mr. Kotlarczyk.

10:03 a.m.     Plaintiff, Alicia Garcia, called and sworn.

Direct examination begins by Mr. Nation.

**Plaintiffs' exhibit 1, offered and admitted.**

10:05 a.m.     Continued direct examination by Mr. Nation.

**Plaintiffs' exhibits 2 and 3, offered and admitted.**

10:12 a.m.     Continued direct examination by Mr. Nation.

**App. 491**

10:13 a.m.    Cross examination begins by Mr. Kotlarczyk.

No redirect examination.

10:19 a.m.    Witness excused.

10:20 a.m.    Plaintiffs' witness, Taylor Rhodes, called and sworn.

Direct examination begins by Mr. Abbas.

**Exhibit 12, offered and admitted.**

10:22 a.m.    Continued direct examination by Mr. Abbas.

10:27 a.m.    Cross examination begins by Mr. Kotlarczyk.

10:29 a.m.    Redirect examination begins by Mr. Abbas.

10:30 a.m.    Witness excused.

10:31 a.m.    Plaintiffs' witness, Clayton Cramer, called and sworn via VTC.

Direct examination begins by Mr. Nation.

11:10 a.m.    Cross examination begins by Mr. Sullivan

**11:55 a.m.    Court in recess.**

**1:36 p.m.    Court in session.**

Continued cross examination by Mr. Sullivan.

Discussion regarding exhibits.

**Exhibit 34 and 35 offered and admitted.**

**Exhibit 4 offered and admitted.**

**ORDERED:    For the purposes of this Preliminary Injunction hearing, all tendered exhibits are admitted.**

1:42 p.m.    Redirect examination by Mr. Nations.

1:59 p.m.    Witness excused.

2:01 p.m.    Defendant's witness, Randolph Roth, called and sworn via VTC.

Direct examination begins by Mr. Sullivan.

2:52 p.m.    Cross examination begins by Mr. Abbas.

**3:41 p.m.    Court in recess.**

**3:54 p.m.       Court in session.**

Continued cross examination by Mr. Abbas.

No redirect.

4:34 p.m.       Witness excused.

**ORDERED:  Today's Preliminary Injunction hearing shall continue on Monday, October 30, 2023, at 9:30 a.m.**

**4:35 p.m.       Court in recess.**
Hearing continued.
Total time in court: 5 hours

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Senior Judge John L. Kane**

Date:   October 30, 2023
Courtroom Deputy:  Bernique Abiakam
Court Reporter: Kevin Carlin

Civil Action No.: 23-cv-02563-JLK

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,                                                  D. Sean Nation

      Plaintiffs,
v.

JARED S. POLIS, *in his official capacity as the*
*Governor of the State of Colorado*,                    Michael T. Kotlarczyk
                                                                           Matthew J. Worthington

     Defendant.

**COURTROOM MINUTES**

**Motion Hearing - Preliminary Injunction – Day 2**

**9:33 a.m.        Court in session.**

Court calls case.    Appearances of Counsel and parties.

Today's continued hearing regarding Doc. No. 2.

9:34 a.m.        Defendant's witness, Christopher Poliquin, called and sworn.

Direct examination begins by Mr. Worthington.

10:05 a.m.      Cross examination begins by Mr. Nation.

10:14 a.m.      Witness excused.

**10:15 a.m.      Court in recess.**

**10:43 a.m.      Court in session.**

10:44 a.m.      Closing argument by Mr. Nation.

10:49 a.m.      Closing argument by Mr. Kotlarczyk.

11:05 a.m.      Rebuttal argument by Mr. Nation.

**App. 494**

**ORDERED:   Motion For Temporary Restraining Order and for Preliminary Injunction (Filed 10/1/23; Doc. No. 2) is taken UNDER ADVISEMENT.**

**11:12 a.m.   Court in recess.**
Hearing concluded.
Total time in court: 1 hour, 11 minutes

**App. 495**

1            THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3  Civil Action No. 23-cv-2563-JLK

4  ROCKY MOUNTAIN GUN OWNERS and ALICIA GARCIA,

5       Plaintiffs,

6       vs.

7  JARED S. POLIS,

8       Defendant.

9  -----------------------------------------------------------------

10                REPORTER'S TRANSCRIPT

11          Preliminary Injunction Hearing, Vol. 1

12  -----------------------------------------------------------------

13       Proceedings before the HONORABLE JOHN L. KANE, Judge,
United States District Court for the District of Colorado,

14  commencing on the 26th day of October, 2023, in Courtroom A802,
United States Courthouse, Denver, Colorado.

15

16                  APPEARANCES

For the Plaintiffs:

17  BRIAN A. ABBAS and D. SEAN NATION, Mountain States Legal
Foundation, 2596 South Lewis Way, Lakewood, CO 80227

18

19

For the Defendant:

20  MICHAEL T. KOTLARCZYK, GRANT T. SULLIVAN, and MATTHEW J.
WORTHINGTON, Colorado Attorney General's Office, 1300 Broadway,

21  Denver, CO 80203

22

23

24

Reported by KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room

25  A259, Denver, CO 80294, (303)335-2358

Proceedings reported by mechanical stenography; transcription
produced via computer.

**App. 496**

1                        I N D E X

2   Opening Statement By Mr. Abbas . . . . . . . . . . . . .7

3   Opening Statement By Mr. Kotlarczyk . . . . . . . . . . 11

4   PLAINTIFFS' WITNESSES                                 PAGE

5   ALICIA GARCIA
        Direct Examination By Mr. Nation . . . . . . . . . 15
6       Cross Examination By Mr. Kotlarczyk . . . . . . . . 23

7   TAYLOR RHODES
        Direct Examination By Mr. Abbas . . . . . . . . . 28
8       Cross Examination By Mr. Kotlarczyk . . . . . . . . 34
        Redirect Examination By Mr. Abbas . . . . . . . . 36
9
    CLAYTON CRAMER
10      Direct Examination By Mr. Nation . . . . . . . . . 38
        Cross Examination By Mr. Sullivan . . . . . . . . . 61
11      Redirect Examination By Mr. Nation . . . . . . . . 95

12  DEFENDANT'S WITNESSES                                 PAGE

13  RANDOLPH ROTH
        Direct Examination By Mr. Sullivan . . . . . . . .110
14      Cross Examination By Mr. Abbas . . . . . . . . . .136

15  EXHIBITS:

16                         Identified              Received

17      1                      17                      17
        2                      22                      22
18      3                      22                      22
        4                      88                      95
19      12                     30                      30
        26                     77                      95
20      34                     93                      94
        35                     93                      94
21

22  Reporter's Certificate . . . . . . . . . . . . . .194

23

24

25

1                    P R O C E E D I N G S

2          (Proceedings commenced at 9:41 a.m.)

3              THE COURT:  This is case 23-cv-2563.  I have the names

4    of attorneys here in front of me on a chart that has been

5    prepared by my courtroom deputy, and if I mispronounce a name, I

6    certainly don't intend to, and I would ask anyone other than

7    Mr. Sullivan and Mr. Rhodes to tell me how you want me to

8    pronounce your name before you start.  That will help.

9              The plaintiff Rocky Mountain Gun Owners is a nonprofit

10   organization that seeks to defend the right of law abiding

11   individuals to keep and bear arms.  And the plaintiff Alicia

12   Garcia is a firearm owner and frequent purchaser.  Their claims

13   are asserted against the Governor of the State of Colorado,

14   Jared Polis.  The motion for preliminary injunction was filed on

15   October 1, 2023.  Defendant's response was filed on October 17,

16   2023.  And plaintiffs' reply in support of the motion was filed

17   on October 20, 2023.  Along with his response, Governor Polis

18   included the lengthy declarations of two experts, Randolph Roth

19   and Robert Spitzer, with an article of which Christopher, and I

20   hope this is correct, Poliquin, is an author.

21             Professors Roth and Poliquin are on the Governor's

22   witness list for the hearing.  On October 20, 2023, the Governor

23   filed a motion requesting that both these witnesses be permitted

24   to testify by remote means, and I granted that motion.

25             On October 24, 2023, plaintiffs filed a 67-page

1  declaration of Clayton Cramer, who is on the witness list for

2  the hearing.  That same day, plaintiffs also filed a notice of

3  supplemental authority providing the opinion in *Miller versus*

4  *Bonta*, a case from the Southern District of California.  This is

5  a proceeding in equity, and I will talk about that for just a

6  moment.  In their reply brief, plaintiffs argued that the Court

7  should exclude as relevant evidence -- as irrelevant evidence

8  related to the, quote, need, effectiveness, or positive results

9  of the waiting period at issue.

10       But an injunction, especially a preliminary injunction,

11  is equitable in nature.  I am mindful of the language in both

12  *District of Columbia versus Heller* and *New York State Rifle and*

13  *Pistol Association versus Bruen*.  Still, I quote from the

14  Supreme Court case of *Hecht versus Bowles* at 321 U.S. at pages

15  329 and 30, and as follows:  The essence of an equity

16  jurisdiction has been the power of the chancellor to do equity

17  and to mold each decree to the necessities of the particular

18  case.  Flexibility rather than rigidity has distinguished it.

19  The qualities of mercy and practicality have made equity the

20  instrument for nice adjustment and reconciliation between the

21  public interest and private needs as well as between competing

22  private claims.

23       In constitutional adjudication, as elsewhere, equitable

24  remedies are a special blend of what is necessary, what is fair,

25  and what is workable.  And that's a quote, the last one from

1   *Lemon versus Kurtzman* at 411 U.S. 192 at page 200.

2          Moreover, this is a bench proceeding without a jury,

3   and I can discern that which is legally permissible from that

4   which is not.  Accordingly, I will consider the testimony

5   presented and the exhibits received, and I will reserve for my

6   findings the relevance of the evidence submitted and the

7   competence of the witnesses to testify as to specific matters.

8          Now, we have a problem that -- I want to begin with

9   counsel's note of this.  As a preliminary injunction, this

10  matter received as much preference on my docket as possible, but

11  I do not have an excessive amount of time, because some matters

12  that are -- that I have to attend to could not be continued.

13  So, we will go today from now until 11:55, and recess to 1:30.

14  We will adjourn at 5 o'clock this evening or before if we're

15  completed.

16         But given the scope of the numbers of witnesses and the

17  documents I've already read, I have serious doubts that we can

18  finish this matter today, and I cannot do it tomorrow.  So, if

19  we are not completed, we will reconvene on Monday, October 30,

20  beginning at 9:30 a.m., and continue on that time.  And if we

21  don't finish on Monday, we will go into Tuesday if necessary.

22         Okay.  The plaintiffs have filed a motion.  Mr. Abbas,

23  are you ready to proceed?

24         MR. ABBAS:  Yes, Judge.

25         THE COURT:  Thank you.  And defense ready to proceed?

1          MR. KOTLARCZYK:  Yes, Your Honor.  Thank you.

2          THE COURT:  Go ahead, please.

3          MR. ABBAS:  And Your Honor permits openings?

4          THE COURT:  If you care to make one.  I'm familiar

5   with what you filed, and I think I made it clear, but I'm not

6   going to have any *Daubert* kind of considerations.  I will

7   consider the weight of the experts, but I'm going to let your

8   experts testify.  This is an emergency hearing.  We don't have

9   time for else.  And they can testify remotely or here as you

10  wish.

11         MR. ABBAS:  Just really quick, Judge, essentially,

12  what we have here is we have the --

13         THE COURT:  Wait a minute.  I should have said this,

14  and I apologize for not advising you in advance.  I'm hearing

15  impaired, and I'm wearing hearing aids, and they're connected

16  with the court PA system.  And it's not out of any obsession

17  with formality, but just necessity that I ask you to use the

18  lectern.

19         The other thing I want to point out to you is that we

20  have a screen here on the bench, and you have one as well, but

21  the court reporter is using what's called realtime.  And I may

22  be looking at the screen, because the court reporter has much

23  better hearing than I do.  And I may, in order to make sure that

24  I hear everything, will be looking at the screen.  Given our

25  season record so far, you can be assured that I'm not looking at

1  a Bronco game.  So, go ahead, please.

2          MR. ABBAS:  Thank you, Judge.  So, what we're going to

3  have here today is plaintiffs Garcia and Rocky Mountain Gun

4  Owners testify as to how they've been affected by this law.  As

5  Your Honor points out, Your Honor does have some discretion in

6  this matter.  However, as to the what it takes to get a

7  preliminary injunction, the plaintiffs have to prove that we're

8  likely to succeed on the merits, that the plaintiffs suffer

9  harm, and that the balance of the equities and hardships are in

10  the plaintiffs' favor, and that the injunction is in the public

11  interest.

12          And in this case, since the defendant is the

13  Government, both the balance of the equities and the hardships

14  in the plaintiffs' favor, and injunction is in the public

15  interest is merged.  And in this case, since this is a

16  constitutional case, and we are proving that the Government is

17  restricting the plaintiffs' Second amendment rights, as we've

18  submitted to Your Honor in our filings, it's -- a violation of

19  constitutional rights trumps essentially -- violating

20  constitutional rights is against the public interest.

21          And so the biggest issue here in this case is going to

22  be whether or not the plaintiffs are likely to succeed on the

23  merits.  The plaintiffs are going to show that we are ordinary,

24  law-abiding citizens who are plainly within the meaning of the

25  Second amendment.  The plaintiffs wish to acquire firearms

1   without having to wait three days even after passing a

2   background check to prove that they are lawful purchasers,

3   conduct that is plainly covered by the text of the Second

4   amendment as covered in *Heller*, and thus it falls on the

5   Government to prove that the law is sufficiently analogous to a

6   historical restriction on the Second amendment between the Bill

7   of Rights, the passage of the Bill of Rights, and the adoption

8   of the 14th amendment between 1791 and 1868.

9         Instead, the Government in their filing suggests a

10  number of arguments that do nothing of the sort.  The Government

11  suggests a balancing test which goes directly repudiated by

12  *Bruen*, and even the analogs that they do present are irrelevant

13  or outside the timeframe allowed by *Bruen*.  The nearest analog

14  they can produce is to restrictions on intoxicated persons

15  carrying a firearm while -- intoxicated persons are already

16  prevented from possessing firearms, and so that is the analogous

17  case to any kind of laws that were on the books between 1791 and

18  1868.

19        And, moreover, a law here in Colorado presuming that

20  every Colorado citizen is under the influence, is a danger to

21  themselves or others, is repugnant to the principles enshrined

22  in the Second amendment, as well as the principles of the

23  Fourth, Fifth, Sixth, and Tenth amendments.

24        In *Bruen*, the Supreme Court says the constitutional

25  right to keep and bear arms and the public for self-defense is

1  not a second-class right.  It's subject to -- is not a

2  second-class right that is subject to an entirely different body

3  of rules than other Bill of Rights guarantees.  So, in other

4  cases such as *Rodriguez v. U.S.*, 575 U.S. 357, cops were not

5  allowed to prolong a traffic stop longer than is necessary to

6  write a ticket without further suspicion of wrongdoing, because

7  to do so would be unconstitutional, and is not covered.

8      And here in this case, we have plaintiffs that are

9  law-abiding citizens that pass a background check to show that

10  they're law-abiding citizens, that go through the hassle of

11  purchasing a firearm in a legal manner, that are prevented from

12  obtaining their firearms for a period of three days.  And when

13  it comes to restrictions allowed on the Second amendment that

14  are analogous to history, the Court in *Bruen* points to

15  historical evidence and lays out for the lower courts.

16      Throughout modern Anglo American history, the right to

17  keep and bear arms in public has traditionally been subject to

18  well-defined restrictions governing the intent for which one

19  could carry arms, the manner of carry, or the exceptional

20  circumstances under which one could carry arms.  But apart from

21  a handful of late 19th-century jurisdictions, the historical

22  record compiled by the respondents does not demonstrate a

23  tradition of broadly prohibiting public carry of commonly used

24  firearms for self-defense.

25      And here, we're talking about restrictions on every

1  firearm that's being purchased by lawful individuals.  And we've

2  also pointed out that our plaintiffs here will suffer

3  irreparable harm and will continue to suffer irreparable harm as

4  long as they are subject to the laws in this case.

5        And I'd like to point out footnote 28 in *Bruen*, which

6  the Supreme Court says we will not address any of the 20th

7  century historical evidence brought to bear by respondents or

8  their amici.  As with their late 19th-century evidence, the

9  20th-century evidence presented by respondents and their amici

10  does not provide insight in the meaning of the Second amendment

11  when it contradicts earlier evidence.

12        And also *Bruen*, footnote three, rather than begin with

13  its view of the governing legal framework, the dissent

14  chronicles in painstaking detail evidence of crimes committed by

15  individuals with firearms -- I will omit the citation.  The

16  dissent invokes all of these statistics presumably to justify

17  granting states greater leeway in restricting firearm ownership

18  and use.  But as many members of the Court have already

19  explained, the right to keep and bear arms is not only a -- is

20  not only a constitutional right that has controversial safety

21  implications.

22        And because of everything that's in *Bruen*, quite

23  frankly, all of the experts that are here today are going to --

24  are irrelevant to the legal analysis that is actually required

25  under *Bruen*.  The Supreme Court laid out the test how to apply

1    it and what historical restrictions there were at the time.  But

2    what we see here is not a reasonable restriction with a valid

3    historical analog.

4         We do not presume that every driver on the road is

5    under the influence and allow police to detain them for three

6    days for a simple speeding ticket.  We do not presume that

7    public speakers will start a riot and so must undergo a

8    three-day waiting period before giving a speech.  We do not

9    presume that defendants are guilty until they are innocent.  And

10   the same applies for the Second amendment, Judge.  Thank you.

11        THE COURT:  Thank you.  Please.

12        MR. KOTLARCZYK:  Thank you, Your Honor.  May it please

13   the Court, Michael Kotlarczyk on behalf of the Governor.  I will

14   reserve the balance of my legal argument for closings after the

15   evidence is in, but I'd like to respond to a couple -- a couple

16   things said in plaintiffs' opening, and to discuss a little bit

17   of what evidence will and will not be presented today at this

18   hearing.

19        And let me start with what the Court is not going to

20   hear today.  The Court is not going to hear any evidence

21   establishing that the generally understood meaning of the Second

22   amendment at the time it was enacted conferred a right to

23   immediately obtain firearms.  To the contrary, our evidence will

24   show that the public did not have that understanding, that in

25   colonial and early republic America, individuals did not have a

1  broad-ranging ability to obtain the firearms immediately, as the

2  Ninth Circuit has previously found.

3         The Court also won't hear any evidence that Colorado's

4  waiting period law regulates anything other than commercial

5  sales.  To the contrary, the evidence will show that is all it

6  regulates, and under *Heller*, *McDonald*, and *Bruen*, conditions and

7  qualifications on the commercial sale of arms continue to be a

8  presumptively lawful category.

9         The majority of the evidence that the Court will hear

10  today concerns the historical evidence that Courts should

11  consider at the second step of the *Bruen* analysis.  Which is --

12  which asks whether there is a historic analog to current law.

13  But the Court is going to hear very little evidence today about

14  *Bruen* step one, which is whether the plain language of the

15  Second amendment applies to the plaintiffs' conduct.  And as I

16  will address in greater detail at closing, and as is already

17  addressed in our briefs, the plaintiffs' claims fail at this

18  first step.

19         And if the Court agrees that the plaintiffs have failed

20  to show that the waiting period law implicates the plain text

21  and that Colorado's waiting period law is a presumptively lawful

22  regulatory measure, the Court doesn't even need to look at the

23  historical evidence, because the law does not run afoul of the

24  Second amendment.

25         But the historical evidence that we presented today,

1  Your Honor, provides even further support for the

2  constitutionality of the bill.  The Court will hear about the

3  very different technological and societal concerns that existed

4  in 1790s America that explain why there were no waiting period

5  laws at the time of the founding.

6      In short, as Professor Randy Roth will testify, a

7  professor of history at Ohio State University, there simply

8  wasn't a problem of impulsive gun violence at the time of the

9  founding.  The guns at the time were not frequently used in

10  crimes of passion, nor could they instantaneously be obtained in

11  much of 18th-century America with its lack of modern

12  infrastructure and mass production processes.  Waiting period

13  laws would have been addressing a problem that simply didn't

14  exist then.

15      But importantly, *Bruen* doesn't require that such laws

16  must have existed in the 18th century.  Instead, *Bruen* requires

17  Courts to reason by analogy.  When unprecedented societal

18  concerns or dramatic technological changes lead to new firearms

19  regulations -- and the Court will hear evidence about what those

20  new societal concerns and technological changes have been over

21  the course of the last 200 years.  Evidence of prior laws aimed

22  at preventing impulsive firearm violence of this type did exist

23  in 18th- and 19th-century America.  Namely those involving

24  intoxicated persons, and they were meant to address the same

25  evil that waiting period laws are aimed at preventing: impulsive

1   firearms violence by people whose reason has been overcome.

2           Now, in their remarks just a moment ago, the plaintiffs

3   suggested that this law assumes that every citizen is

4   intoxicated when they purchase a firearm, and a threat to

5   themselves and others.  The law does no such thing, Your Honor.

6   Examples of historical regulations on the use of firearms or the

7   obtaining of firearms by intoxicated persons no more assume that

8   every intoxicated person was going to commit a violent act than

9   the waiting period law does.  Both laws -- both sets of laws

10  were intended to cover the impulsive acts of violence that were

11  committed by some within that heading.

12          Finally, Your Honor, the Court will hear from Professor

13  Christopher Poliquin from UCLA, a co-author of the study that

14  the Colorado General Assembly relied on in passing the law.  In

15  addition to showing the changed societal circumstances as *Bruen*

16  instructs us to look for that exist in 21st-century America,

17  Professor Poliquin will show that waiting period laws

18  significantly reduce both firearm homicide and suicide.

19          Professor Poliquin's testimony will directly refute any

20  claim from the plaintiffs that the interests of the public are

21  best served by granting plaintiffs the extraordinary relief that

22  they seek here.

23          We want to thank the Court for its time today, and we

24  look forward to presenting our case and speaking further at the

25  close of evidence.

1          THE COURT:  Thank you very much.

2          MR. KOTLARCZYK:  Thank you.

3          THE COURT:  The plaintiffs have the burden of proof

4   and the burden of persuasion, so call your first witness,

5   please.

6          MR. NATION:  Thank you, Your Honor.  Sean Nation for

7   the plaintiffs.  Plaintiffs call plaintiff Alicia Garcia.

8          THE COURT:  If you will come forward to the witness

9   stand, and then face the courtroom deputy.  Your attention,

10  please.  Face her, please.  Thank you.

11     (The Witness is Sworn)

12          THE COURTROOM DEPUTY:  Please be seated.  State your

13  full name for the record, and spell your last name.

14          THE WITNESS:  My name is Alicia Renee Garcia, spelled

15  G-A-R-C-I-A.

16          THE COURT:  Go ahead, please.

17          MR. NATION:  Thank you, Your Honor.

18                     **DIRECT EXAMINATION**

19  BY MR. NATION

20  Q    Good morning, Ms. Garcia.  Could you please provide your

21  address for the record.

22  A    10589 Clermont Way, Thornton, Colorado, 80233.

23  Q    And you are a resident of Colorado?

24  A    Yes.

25  Q    And for how long have you been a resident of Colorado?

23-cv-2563-JLK   ALICIA GARCIA - Direct   10-26-2023

1   A    My entire life.

2   Q    And you intend to remain a resident of Colorado?

3   A    Yes.

4   Q    And what do you do for a living?

5   A    I am a firearms instructor and RSO.

6   Q    I'm sorry.  The last --

7   A    RSO.  Range safety officer.

8   Q    Thank you.  And you also have -- or generate income via

9   social media with respect to firearms; is that correct?

10  A    Yes.

11  Q    And at times you review firearms?

12  A    Yes.

13  Q    And you teach people how to safely use firearms; is that

14  correct?

15  A    Yes.

16  Q    And do you frequently acquire firearms as part of your job?

17  A    Yes.

18  Q    And when you acquire firearms, are you subject to a

19  background check?

20  A    Yes.

21  Q    And when you acquire firearms, have you always passed a

22  background check?

23  A    Yes.

24  Q    Do you know approximately how many times you've passed a

25  background check?

1  A    Probably anywhere from 10 to 20 times.

2  Q    Okay.  And have you recently purchased any firearms?

3  A    Yes.

4  Q    And have you recently purchased -- have you purchased any

5  firearms after October 1st of this year?

6  A    Yes.

7  Q    And what was your first firearm that you purchased after

8  October 1st?

9  A    I purchased a AR build kit, also on October 1st.  I also

10 purchased a firearm yesterday.  That was a shotgun.

11 Q    Can you look at tab one of the binder that's in front of

12 you.  And what does tab one reflect?

13 A    Ammunition, lower receiver, and just basically AR parts.

14 Q    So, is that the -- is that a receipt for the AR build kit

15 you were describing before?

16 A    Yes.

17       MR. NATION:  Your Honor, we would ask that Exhibit 1

18 be placed into evidence.

19       THE COURT:  It's admitted.

20       MR. NATION:  Thank you.

21 Q.   (By Mr. Nation) And when you purchased that build kit,

22 were you able to walk out of the gun store that very day with

23 it?

24 A    No.

25 Q    And to be clear, that was not a completed firearm; correct?

23-cv-2563-JLK   ALICIA GARCIA - Direct   10-26-2023

1  A    Correct.

2  Q    So, you would have to then assemble the firearm once you

3  took it home or to a shop or somewhere?

4  A    Yes.

5  Q    And what reason did the store give you for not letting you

6  take your build kit home?

7  A    That there was a 72-hour hold per the new law in the State

8  of Colorado.

9  Q    And when they told you that, had you already passed the

10  background check?

11  A    Yes.

12  Q    Your Honor -- excuse me.  Ms. Garcia, could you please look

13  at tab two of your binder.  And is that also the October 1st

14  purchase that you were mentioning before?

15  A    Yes.

16  Q    And what was that a purchase of?

17  A    A Henry Big Boy brass lever action .357/.38 Special rifle.

18  Q    And that is a rifle, not a handgun; correct?

19  A    It is a rifle.

20  Q    And did you pass a background check for that rifle as well?

21  A    Yes.

22  Q    And were you able to take that rifle home with you that

23  day?

24  A    Sadly, no.

25  Q    And I believe it was at Triple J Armory; is that correct?

1  A    Yes.

2  Q    And did they tell you why you couldn't take your rifle home

3  that day?

4  A    Because of this new law that was enforced that day.

5          MR. NATION:  Your Honor, would you like us to formally

6  move things into evidence, or are you just going to review them?

7          THE COURT:  I will review them later.  Go ahead.

8          MR. NATION:  Okay.  I guess my question, Your Honor,

9  is should I move it into evidence?

10         THE COURT:  I've admitted it.

11         MR. NATION:  Thank you, Your Honor.

12 Q.    (By Mr. Nation) And where is Triple J Armory?

13 A    It is in Littleton, Colorado.

14 Q    And approximately how far from your residence is Triple J

15 Armory?

16 A    A good hour's drive in Colorado.

17 Q    So, after purchasing that handgun -- or, excuse me.  After

18 purchasing the rifle, you then drove an hour home, had to wait

19 three days, and then drive an hour back?

20 A    Yes.

21         MR. KOTLARCZYK:  Objection.  Leading.

22         THE COURT:  It's all right.  Overruled.

23 Q.    (By Mr. Nation) You mentioned that you purchased a

24 firearm yesterday; is that correct?

25 A    Yes, I did.

1   Q   And from where did you purchase the firearm?

2   A   In Colorado Springs at Dragonman's gun range and gun shop.

3   Q   And to be clear, that's in the State of Colorado?

4   A   It is.

5   Q   Okay.  And what firearm did you purchase?

6   A   I purchased a shotgun.

7   Q   And were you able to take that shotgun home with you

8   yesterday?

9   A   Sadly, no.

10  Q   And approximately how far from your home is Dragonman's

11  firearm store?

12  A   I live in Thornton, Colorado.  Dragonman is probably 30

13  minutes out of central Colorado Springs.  So, a good

14  two-and-a-half, almost three-hour drive, depending on traffic.

15  So, it's quite a trek for me.  So, I usually spend -- I spent

16  probably five hours in commute yesterday.

17  Q   And you will have to spend another five hours to retrieve

18  your firearm in a few days?

19  A   Yes.

20  Q   And did you pass a background check when acquiring that

21  firearm?

22  A   Yes.

23  Q   Do you have any additional plans to purchase firearms in

24  the future?

25  A   Yes.

1   Q    And what are those plans?

2   A    I have an AK VEPR being shipped to me currently.

3   Q    And when you receive -- when that firearm is shipped, will

4   you be subject to a background check before --

5   A    Yes.

6   Q    -- obtaining it?

7   A    Yes.

8   Q    And do you know approximately when you will receive that

9   firearm?

10  A    Probably within the next two weeks, depending on the state

11  that it's in.

12  Q    And so how has the waiting period impacted you?

13  A    Well, I don't own a shotgun -- well, I technically do own a

14  shotgun, because I have paid for it.  I have passed the

15  background check.  It is legally mine.  I just have not taken

16  possession of it because of this.  And frankly, I have an entire

17  day of business that I couldn't conduct yesterday because I had

18  to drive to go get the gun.

19          Secondly, there is a shotgun shoot in Virginia this

20  weekend that I was booked and paid the flight and hotel and all

21  that to attend.  Sadly, I cannot shoot my shotgun, because it

22  was not given to me upon payment and passing the background

23  check.  So, I'm missing out on that.  That's actually being

24  filmed for a Guns Out TV episode which would be very, very

25  important and impactful to my career, because it's the first

23-cv-2563-JLK  ALICIA GARCIA - Direct  10-26-2023

1  time I will have something that's a very, very big production

2  with my name on it with a lot of very notariable [sic] people in

3  the industry, and it's really hindering my growth and my

4  business and being able to do what I do because of the fact that

5  I just couldn't receive the gun.

6       MR. NATION:  Thank you.  One moment, Your Honor.

7       THE COURTROOM DEPUTY:  One moment, Counsel.

8     (Pause in the proceedings.)

9       THE COURT:  Go ahead, please.

10       MR. NATION:  Your Honor, just to clarify, I would like

11  to move into evidence Exhibits 2 and 3.

12       THE COURT:  They're admitted.

13       MR. NATION:  Thank you, Your Honor.

14  Q.   (By Mr. Nation) And, Ms. Garcia, you paid for the

15  firearms even though you were not permitted to take them; is

16  that correct?

17  A    Correct.

18  Q    And did they tell you if you had acquired title to the

19  firearms?

20  A    They are my firearms.  I passed a background check.  I paid

21  for them.  It is -- they are my firearms.

22  Q    But you're not permitted to possess them?

23  A    Correct.

24       MR. NATION:  Thank you.  No further questions.

25

1                    **CROSS EXAMINATION**

2  BY MR. KOTLARCZYK

3  Q    Good morning, Ms. Garcia.

4  A    Good morning.

5  Q    You describe yourself as a Second amendment advocate;

6  right?

7  A    Yes.

8  Q    And you have a website boomstickbabe.com?

9  A    Yes.

10 Q    What's the purpose of that website?

11 A    For people to understand who I am.

12 Q    And specifically, your role as a Second amendment advocate?

13 A    Yes.

14 Q    You sell progun merchandise on that website; right?

15 A    I do.

16 Q    And you're a firearms instructor?

17 A    I am.

18 Q    And a range safety instructor, I believe you said?

19 A    Range safety officer.

20 Q    Safety officer.  Excuse me.  Guns are central to your

21 identity.  Is that fair to say?

22 A    Guns are essential to my life.

23 Q    How many guns do you own?

24       MR. NATION:  Objection.  Relevance.

25       THE COURT:  Overruled.

1        THE WITNESS:  Approximately 10 to 20.

2    Q.   (By Mr. Kotlarczyk) Before the waiting period law took

3    effect on October 1st of 2023, how many guns did you own?

4        MR. NATION:  Same objection.

5        THE COURT:  Overruled.

6        THE WITNESS:  Probably -- maybe around 15.

7    Q.   (By Mr. Kotlarczyk) Okay.  And you bought a gun on

8    October 1st of 2023; correct?

9    A    Yes.

10   Q    You've received that gun?

11   A    Yes.

12   Q    And you received that gun three days later?

13   A    Yes.

14   Q    You also bought a kit on October 4th of 2023 from Triple J

15   Armory; is that right?

16   A    I bought a AR build the same day on October 1st.  It was

17   like a -- it was additional background check.  So, that way I

18   could condense my travel to one trip rather than multiple trips.

19   Q    I see.  And you've received that build kit as well?

20   A    Yes.

21   Q    And you bought a gun in Colorado Springs yesterday;

22   correct?

23   A    Yes.

24   Q    And you expect to receive that gun in two more days?

25   A    Yes.

1   Q    Since the waiting period law went into effect, you have

2   acquired more guns, not less; right?

3   A    Not necessarily, no.

4   Q    Do you have fewer guns today than you had on

5   September 30th?

6   A    Technically, I have guns that I have not received.  So, I

7   don't really understand the question.

8   Q    The question is as of today, October 26th, you have more

9   guns than you had -- you have more guns in your possession than

10  you had on September 30th; right?

11  A    Yes.

12  Q    And since the waiting period law went into effect, you

13  haven't relinquished any of your firearms; right?

14  A    No.

15  Q    Are you in the armed forces?

16  A    No.

17  Q    Have you ever received a firearm as a gift?

18  A    No.

19  Q    Have you ever borrowed a gun from a friend?

20  A    No.

21  Q    Now, you mentioned that you drove an hour to a -- a trip to

22  Triple J Armory in Littleton; right?

23  A    Yes.

24  Q    There are closer gun stores to Thornton than Triple J

25  Armory; correct?

1   A    I'm sure there are.

2   Q    You also filed this lawsuit on October 1st; correct?

3   A    Yes.

4   Q    When you went to Triple J Armory on October 1st, you knew

5   you were going to be filing this lawsuit?

6           MR. NATION:  Objection.  Relevance.

7           THE COURT:  Overruled.

8           THE WITNESS:  I mean, I realized that October 1st was

9   the day that this law came into effect.

10  Q.   (By Mr. Kotlarczyk) And you knew you were going to file a

11  lawsuit challenging this law on that day?

12  A    Yes.

13  Q    And so that was -- your trip to Triple J Armory in

14  Littleton was the same day that you filed this lawsuit; right?

15  A    Yes.

16  Q    You paid Triple J Armory for both the build kit and the --

17  and the gun you purchased; correct?

18  A    Yes.

19  Q    In fact, you paid, all told, over $1,000 for those two

20  items; is that right?

21  A    Yes.

22  Q    Triple J Armory couldn't deliver you the gun that you

23  purchased for three days; right?

24  A    Yes.

25  Q    But when Triple J Armory did deliver the gun, it was

1  because you had paid them earlier; correct?

2  A    Yes.

3  Q    The gun you received, it wasn't a gift from Triple J

4  Armory, was it?

5  A    No.

6  Q    It was a commercial transaction between you and Triple J

7  Armory?

8  A    Yes.

9  Q    You testified on direct that you booked travel for this

10 weekend to go to a shotgun shoot in Virginia.  Did I understand

11 that right?

12 A    Yes.

13 Q    But you don't currently own any shotguns?

14 A    I do.  I paid one -- I paid for one and passed a background

15 check for one yesterday.  So, yes, I do own a shotgun.  I'm just

16 not in possession of it.

17 Q    So, other than the shotgun you purchased yesterday, you

18 don't own any shotguns?

19 A    Correct.

20 Q    You knew that this waiting period law was in effect as of

21 October 1, 2023; right?

22 A    Yes.

23 Q    But you booked a trip to go to a shotgun shoot even though

24 you didn't own any shotguns?

25 A    Yes.

1              MR. KOTLARCZYK:  Okay.  If I could have just a moment,

2     Your Honor?

3              THE COURT:  Yes.

4              MR. KOTLARCZYK:  Nothing further, Your Honor.  Thank

5     you.

6              THE COURT:  Thank you.  Any redirect?

7              MR. NATION:  No redirect, Your Honor.

8              THE COURT:  Ms. Garcia, thank you.  You may stand

9     down.  Go ahead, please.

10             MR. ABBAS:  Thank you, Judge.  The State would like --

11    or, I'm sorry.  Force of habit.  The plaintiffs would like to

12    call Taylor Rhodes to the stand.

13        (The Witness is Sworn)

14             THE COURTROOM DEPUTY:  Please be seated.  State your

15    full name for the record, and spell your last name.

16             THE WITNESS:  Taylor Rhodes, R-H-O-D-E-S.

17                        **DIRECT EXAMINATION**

18    BY MR. ABBAS

19    Q    And, Mr. Rhodes, what is your address?

20    A    1288 Royal Troon Drive, Castle Rock, Colorado, 80104.

21    Q    And are you a Colorado resident?

22    A    I am.

23    Q    How long have you been a Colorado resident?

24    A    Since the summer of 2017.

25    Q    And how long will you be a Colorado resident?

 1  A    For as long as I can stand it.

 2  Q    And so why are you here today?

 3  A    I'm here because the Government has infringed upon the

 4  rights of my members of Rocky Mountain Gun Owners.

 5  Q    Okay.  So, you work for Rocky Mountain Gun Owners?

 6  A    I do.

 7  Q    What is it that you do there?

 8  A    I'm the executive director.

 9  Q    And what does that mean?

10  A    I handle all of the executive decision-making, including

11  our lobbying practices, making decisions to file lawsuits such

12  as this one, and then the day-to-day management and operations

13  of our staff and our management of our members in some capacity.

14  Q    And how long has RMGO been around?

15  A    We are on our 28th year now.

16  Q    And how many members do you have?

17  A    Full bona fide members, we are right between 16 and 17,000.

18  Q    And where are your members located?

19  A    Across the state of Colorado.

20  Q    And how many members are affected by this law?

21  A    We have already received dozens if not hundreds of calls

22  from members attesting that they are upset of what the

23  government has done, because they cannot acquire firearms in a

24  reasonable manner.

25  Q    And how have you personally been affected by this law?

1   A    On October 1st, I attempted to buy a firearm.  I was

2   granted acceptance on the background check.  I paid the

3   purchasing price, and I did not leave with that firearm that

4   day.  Just yesterday, I tried to purchase -- I had already

5   purchased a -- another firearm, and I was not able to take

6   possession of it either.

7   Q    And where did you purchase that firearm?

8   A    Triple J Armory.

9   Q    Okay.  And you said you passed the background check?

10  A    I did.  On both.

11  Q    And if you would please open the exhibit book there to

12  Exhibit 12.

13  A    12.  Bear with me here.  Okay.

14  Q    What is that?

15  A    This is a print-off copy of my approved background check

16  from yesterday.

17           MR. ABBAS:  Thank you.  Your Honor, the plaintiffs

18  would move to admit Exhibit 12 into evidence.

19           THE COURT:  It's admitted.

20           MR. ABBAS:  Thank you.

21  Q.   (By Mr. Abbas) And, Mr. Rhodes, you own a number of

22  firearms?

23  A    I do.

24  Q    And have you always passed a background check to acquire a

25  firearm?

1   A    Never been denied.

2   Q    And what does that mean?

3   A    The denial?

4   Q    No.  What does it mean that you passed a background check?

5   A    That I'm a law-abiding citizen of the United States of

6   America.

7   Q    How are you assured of that?

8   A    I'm assured of that because I don't commit crime.

9   Q    But who conducts a background check?

10  A    The Colorado -- I believe it's CBI, in coordination with

11  NICS.

12  Q    And what do you know about those two organizations?

13  A    I know CBI has a number of agents that conducts background

14  checks.  They're normally -- my background check yesterday was

15  approved within five to fifteen minutes.  So, I don't know a

16  whole ton of details about them, but I know that there is an

17  agency here in the state that conducts those.

18  Q    And what is the NICS background check?

19  A    The NICS background check is the federal FBI background

20  check.

21  Q    So, you went through both of those background checks?

22  A    I believe that's how Colorado does it, yes.

23  Q    And you passed both of them with flying colors?

24  A    As you see in the evidence, yes.

25  Q    And the firearm is already paid for?

1    A    Yes.

2    Q    So, the only thing preventing you from acquiring that

3    firearm today is this law?

4    A    That's correct.

5    Q    And how many of your members buy firearms on a regular

6    basis?

7    A    I can't assume, but if I were to assume, I would guess most

8    of them, because they are -- they want to defend the Second

9    amendment, though there are members that have not purchased

10   firearms.  We actually got a call from a member just a few days

11   ago that had never purchased a gun before and went to Cabela's

12   to purchase a shotgun, and he was denied that opportunity.

13   Q    And how will this law continue to affect your members?

14   A    In the way it's affecting us right now with the ridiculous

15   background -- the ridiculous waiting period scheme is putting

16   a -- as we've heard from Alicia, a massive burden on certain

17   people that want to give businesses around the state business,

18   and doesn't matter where they are or how far you have to drive.

19   I know I certainly patron a handful of gun shops because they're

20   friends.

21   Q    And so you testified that you bought a firearm on

22   October 1st?

23   A    Yes.

24   Q    And you had to go back to pick it up three days later?

25   A    That's correct.

1  Q    And when you went back to the gun shop, what happened?

2  A    Well, I actually -- I actually did not pick it up three

3  days later.  It was about eight days later, because I was out of

4  town during that time, so it prolonged that waiting period.

5  When I went back to the gun shop, they certified the background

6  check, checked off that I was approved eight days before, and

7  they transferred me that firearm.

8  Q    Okay.  And when you said they certified the background

9  check, what does that mean?

10 A    It means that they attested that I am who I say that I am,

11 and that my documents match what they had on record of me

12 passing that background check.

13 Q    And nothing changed?

14 A    No.

15 Q    And you didn't have to pay any more money?

16 A    Not at that moment, no.

17 Q    And you had already had a receipt for passing the

18 background check and paying for the firearm on October 1st?

19 A    That's correct.

20 Q    So, you weren't even given a receipt eight days later when

21 you picked up the firearm?

22 A    I was not.

23 Q    Because you already had the receipt?

24 A    That's correct.

25       MR. ABBAS:  No further questions for this witness at

1    this time, Judge.

2                              **CROSS EXAMINATION**

3    BY MR. KOTLARCZYK

4    Q    Good morning, Mr. Rhodes.

5    A    Good morning.

6    Q    RMGO's purpose is to defend the right of all law-abiding

7    individuals to keep and bear arms.  Do I have that right?

8    A    Correct.

9    Q    And that's what you believe you're doing here today; right?

10   A    That's correct.

11   Q    And you believe the waiting period law, I believe you said

12   infringes upon the rights of my members?

13   A    That's correct.

14   Q    And you're bringing this lawsuit on behalf of those

15   members; right?

16   A    That's correct.

17   Q    You're not bringing this law [sic] on behalf of any

18   specific RM -- RMGO is having separate from its members?

19   A    I don't understand.

20   Q    You're not saying that the waiting period law causes RMGO

21   any harm other than the harm that the waiting period law you

22   believe causes the members of RMGO?

23   A    It certainly affects the organization in and of itself, but

24   it more so affects our members.

25   Q    Okay.  And you're not personally a plaintiff; right?

1  A    I am not.

2  Q    Are you a member of RMGO?

3  A    I am.

4  Q    You testified that on October 1st, you also purchased a

5  firearm; right?

6  A    I did.

7  Q    And you've now received that firearm?

8  A    I have.

9  Q    October 1st is also the same day that RMGO filed this

10  lawsuit; right?

11  A    Correct.

12  Q    And when you purchased that firearm on October 1st, you

13  knew that RMGO would be filing this lawsuit?

14  A    Of course.  I knew the day that it was signed into law.

15  Q    And you testified that you purchased a firearm yesterday?

16  A    That's correct.

17  Q    And you knew that you would be here testifying on this

18  preliminary injunction here today?

19  A    I did.

20        MR. KOTLARCZYK:  If I could have just a moment, Your

21  Honor?

22        THE COURT:  Yes.

23        MR. KOTLARCZYK:  Nothing further, Your Honor.  Thank

24  you.

25        THE COURT:  Thank you.  You can stand down,

1  Mr. Rhodes.

2         MR. ABBAS:  Your Honor, may I have just a brief

3  redirect?

4         THE COURT:  Oh, I'm sorry.

5         MR. ABBAS:  That's quite all right.

6         THE COURT:  Mr. Rhodes, please wait.  That was my

7  mistake.

8         THE WITNESS:  Yes, sir.

9                    **REDIRECT EXAMINATION**

10  BY MR. ABBAS

11  Q    Mr. Rhodes, so what kind of harm has RMGO experienced

12  through this?

13  A    So, on a couple of fronts.  One of the primary ways we

14  acquire new members is through gun giveaways.  We are planning

15  on purchasing a firearm for a said gun giveaway.  That will

16  certainly hurt our being able to market that gun and get more

17  members, because we can't take possession of it immediately.

18         On top of that, as you heard earlier, I've spoken to --

19  oh my gosh, at this time it's gotta be 50 to 100 members that

20  have said that they have tried to purchase a firearm.  They

21  didn't know the law was going into effect.  I don't know how,

22  because I send them emails every day, but they didn't know the

23  law was going into effect.  And they showed up at their local

24  gun shop, and they could not take possession of that firearm.

25  Q    So, you're now devoting a portion of your resources to

1   responding to complaints of your members about this?

2   A    A very high portion of our resources.  We actually have one

3   staff that is pretty much only answering the phones right now.

4            MR. ABBAS:  No further questions, Judge.  Thank you.

5            THE COURT:  Okay.  Thank you very much, Mr. Rhodes.

6   Next, please.

7            MR. NATION:  Plaintiffs call Professor Clayton Cramer

8   via teleconference.

9            THE COURT:  All right.  Mr. Cramer, I think I am

10  seeing you now on the video screen.  You're wearing a plaid tie?

11           THE WITNESS:  Yes, I am.

12           THE COURT:  All right.

13           THE WITNESS:  Can you hear me?

14           THE COURT:  Yes.  I can hear you, and I'm going to ask

15  the clerk of the court to administer an oath to you.  She will

16  be right with you.

17           THE WITNESS:  Okay.

18       (The Witness is Sworn)

19           THE COURTROOM DEPUTY:  Okay.  Please state your full

20  name for the record, and spell your last name.

21           THE WITNESS:  Clayton E. Cramer, last name spelled

22  C-R-A-M-E-R.

23           MR. NATION:  Thank you, Mr. Cramer.  And, Your Honor,

24  we are offering Mr. Cramer as an expert witness.

25           THE COURT:  Yes.  My ruling is that anyone can testify

1 as an expert where I've received a report and they've been so

2 designated by counsel.  We're not going to have a so called

3 *Daubert* hearing on each and every one of these.

4          MR. NATION:  Yes.  Thank you, Your Honor.

5                    **DIRECT EXAMINATION**

6 BY MR. NATION

7 Q    Mr. Cramer, could you please provide your current address

8 for the record.

9 A    24408 Tombstone Ridge Court, Middleton, Idaho.

10 Q    And could you briefly describe your background, your

11 education, your qualifications.

12 A    My bachelor's degree and master's degree in history are

13 from Sonoma State University.  My law review articles have been

14 cited in *DC versus Heller* and *McDonald versus Chicago* and

15 several dozen other cases in both State Supreme Courts and

16 Federal Courts of Appeal.  I have spent the last 37 years of my

17 life studying the history of weapons regulation in the United

18 States.

19 Q    And have you previously testified as an expert in court

20 before?

21 A    Yes, I have.  I would have to look at my CV to give you a

22 list of such cases, but there's been several of them.  There was

23 one in New Jersey recently.

24 Q    And are you being compensated for your testimony today?

25 A    Yes, I am.

1   Q   At what rate?

2   A   $250 per hour.

3   Q   And have you -- have you examined the waiting period law

4   that the State of Colorado passed?

5   A   Yes, I have.

6   Q   And do you have any opinions as to whether there are

7   historically analogous laws in the nation's history?

8   A   There are -- there are no analogous laws.  The earliest

9   waiting period law that I can find -- that I have been able to

10  find is a 1923 waiting period law from California, which

11  required a one-day wait after completing what was called a

12  dealer record of sale form, which was sent to the police, and

13  the [inaudible] acquisition of the firearm from the dealer.

14  Q   And what is the basis of your opinion of that?

15  A   Well, as I said, I spent more than 30 years actually going

16  through dusty old volumes at the [inaudible] law library in San

17  Francisco looking up existing case law in order to understand

18  the -- how the Courts have ruled on a variety of gun-related

19  cases.  I also spent quite a bit of time examining colonial

20  records and early republic records concerning the possession of

21  firearms and how they were acquired.

22  Q   So, to sum up, that would be -- your opinion is based on

23  your research and your review of historical documents?

24  A   Correct.

25  Q   Were firearms readily available for purchase in 1792?

1   A    Yes.  There are large numbers of ads that appear in

2   newspapers all over the U.S. offering firearms for sale.  And of

3   course Canada as well.

4   Q    And in 1792, how would a purchaser -- how would an

5   individual acquire a firearm?

6   A    In some cases there are gunsmiths who advertised that they

7   have pistols and muskets available for sale.  In other cases

8   there are vendors who have acquired firearms as part of a

9   shipment arriving from England, and they have advertised that

10  these are for sale.

11  Q    And as a general rule, could any member of the public

12  purchase a firearm in 1792?

13  A    Yes.  There were still some laws in effect that prohibited

14  free Blacks and slaves from purchasing firearms and possessing

15  them.

16  Q    But free citizens of the United States could generally

17  acquire a firearm legally?

18  A    Yes.

19  Q    And to your knowledge, what sort of restrictions were there

20  on the purchase of firearms in the 1790s?

21  A    I've not been able to find any examples of limitations on

22  purchase.

23  Q    And I believe you referenced that the first waiting period

24  of which you're aware is in 1923; is that correct?

25  A    Yes.

1      MR. NATION:  I'm not sure what -- yes.  Please silence

2  your phone.  Apologies, Your Honor.

3  Q.    (By Mr. Nation) Have you reviewed the declarations of

4  Mr. Spitzer and Mr. Roth?

5  A    Yes.  I reviewed both Professor Spitzer and Professor

6  Roth's declarations.

7  Q    And are you aware of any waiting periods they cite prior to

8  1923?

9  A    No.  In fact, Professor Spitzer, as I recall, even said --

10  admits that there are no such waiting periods.  That's what he

11  draws his rather warped analogy between laws preventing

12  possession of arms while drinking with waiting periods, which is

13  a very odd sort of attempt for that great analogy.  To give you

14  an example of the [inaudible] talks about, not everything that

15  is similar is actually an analog.  He talks about things that

16  are green.  This is one of those examples.  A waiting period is

17  really not equivalent to the --

18  Q    Mr. Cramer, our court reporter is having a hard time

19  hearing you.  Could you perhaps slow down and repeat your last

20  answer.

21  A    Okay.  I'm sorry.  I have a little bit of an acid reflux

22  problem.  It sometimes makes my speech a little less clear than

23  it ought to be.  Essentially, the Supreme Court in the *Bruen*

24  decision made the point during an analogy that not every analogy

25  actually makes sense.  They give the example that there are

23-cv-2563-JLK    CLAYTON CRAMER - Direct    10-26-2023

1  multiple things that are green, but it doesn't necessarily mean

2  that everything that is green is similar.

3        And I would say that this attempt to draw an analogy

4  between a waiting period law and laws that prohibit the

5  possession of firearms while drinking or drunk, those are --

6  they really are not a good analogy at all.

7  Q    Are you aware of any laws restricting possession of

8  firearms at the founding?

9  A    The only one I can think of is people that participated in

10 Shays' Rebellion in Massachusetts in 1786 were basically granted

11 a pardon for their treason in exchange for giving up their arms

12 for a period of three years, at the end of which those arms were

13 returned to them.

14 Q    Are you aware of any Sabbath type laws at the founding?

15 A    Yes.  One of the laws that Professor Spitzer lists as being

16 a ban on being armed while drinking is actually a Sabbath law

17 that says that you will not engage in sports, hunting, or

18 shooting or drinking on the Sabbath.  Contrary to his claim that

19 it prohibited shooting at a tavern, it did nothing of the sort.

20 The prohibition on shooting on the Sabbath is an "or" clause to

21 the other offense, which is sport or hunting or drinking on the

22 Sabbath.

23 Q    And I believe Mr. Spitzer cites a Virginia law from the

24 1660s.  Are you familiar with that law?

25 A    1655.

1   Q    Oh.  Thank you.

2   A    Yes.  I had a occasion to look it up last night, because

3   the language sounded very familiar to me, and I did not know

4   why.  The actual statute does not prohibit being armed while

5   drinking or shooting while drinking.  The actual statute

6   basically says that because the usual method for spreading alarm

7   that there was an Indian attack was multiple gunshots, that

8   except when shooting at funerals and weddings, you were not to

9   shoot while drinking.

10          And so it isn't really a prohibition on being armed

11  while drinking because of concerns that you might shoot somebody

12  by accident, but because it would make it difficult to tell

13  whether there was an Indian attack under way or not.

14  Q    Mr. Spitzer makes the claim that after the Civil War and

15  through the rise of mail-order guns, that that led to waiting

16  periods.  Are you familiar with his claim there?

17  A    I've seen the claim, but I do not recall that he ever

18  presented any evidence for a waiting period law during that

19  period.

20  Q    And do you know when mail-order firearms started rising in

21  popularity?

22  A    Certainly after the Civil War, they certainly began to show

23  up in catalogs for Sears and Montgomery Ward.  This also was a

24  time where Sears also sells houses by mail order.

25  Q    And that's the late 19th century; is that correct?

1   A    Right.  Late 19th century.

2   Q    And as you testified, the first waiting period law of which

3   you're aware is in 1923?

4   A    This is correct.  I have some confidence that this would

5   have been among the earliest, because as I said, I spent a lot

6   of time going through the case law, and something like that

7   would have definitely shown up, I'm sure.

8   Q    And so in your opinion, would that 50-year gap between the

9   rise of mail-order guns and the first waiting period indicate

10  any relationship between the two?

11  A    No.  There is, however, a law which does indicate a

12  connection.  In 1927, the congress passed something called the

13  Mail-Order Firearms Act, which prohibited the sending of

14  handguns through the U.S. mail.  Now, that law was first

15  proposed in 1923.  The guy that proposed it was a member of

16  congress who represented the area around Memphis, Tennessee, and

17  his argument was that there was a problem with the fact that

18  their attempts to keep guns out of the hands of Blacks had not

19  been successful, and that Black people were killing other Black

20  people.  And he said, it's not up to us to discourage racism

21  [inaudible] prevent this from happening.  So, he was clearly

22  seeing this as, well, all of our laws in Tennessee that was used

23  to try to keep Black people from having guns are not working,

24  because mail-order sales were making it too easy for them to get

25  ahold of handguns.

1  Q    And you raised race there.  Historically, have gun control

2  laws been based on the race of the individual?

3  A    Not in all cases, but many of them have been.  California's

4  [inaudible] weapon law was originally passed at the -- at the --

5  according to the person who persuaded the government to sign it

6  as a way of disarming Chinese and Mexicans.

7  Q    And in the post-reconstruction south, were gun control laws

8  used to disarm newly freed African Americans?

9  A    Yes.  And this is one of the things that motivates the --

10  both the passage of the Enforcement Act of 1870, and also the

11  14th amendment, is there was a realization by members of

12  congress that gun control laws were being used both to put the

13  freedmen in a position of subservience with respect to work

14  by -- because of -- because the Klansmen were not so scary once

15  they had bullet holes in their robes, and also the 14th

16  amendment was intended to protect not just the freedmen's right

17  to bear arms, but also republicans, which there were many in the

18  south who were being intimidated by the Klan and similar

19  organizations.

20  Q    So, it is your opinion that the 14th amendment was passed

21  in part to secure the Second amendment rights of disfavored

22  minorities in the post-reconstruction south?

23  A    Yes.  And in fact Senator Howard, when he is discussing in

24  language of the 14th amendment, goes ahead and proceeds to say

25  that the objective is to impose protections of the Bill of

1  Rights onto the states, and he then proceeds to read each of the

2  provisions of the first eight amendments to the Constitution,

3  including reading the right to keep and bear arms in the Second

4  amendment.

5  Q    And at the time of the passage of the 14th amendment, are

6  you aware of any laws imposing a waiting period prior to

7  acquiring a firearm?

8  A    No.

9  Q    And in fact, in the time of the 14th amendment, it would be

10  important for these newly freed men to swiftly obtain a firearm;

11  is that correct?

12          MR. SULLIVAN:  Objection.  Leading.

13          THE COURT:  Overruled.

14          MR. NATION:  I can rephrase.

15  Q.    (By Mr. Nation) At the time of the passage of the 14th

16  amendment, was there a need amongst people to promptly acquire a

17  firearm?

18  A    In some cases, yes.  There are race riots in the south on a

19  number of occasions between the close of the Civil War and

20  passage of this 14th amendment in which white supremacist mobs

21  kill large numbers of people, large numbers of freedmen.

22  Q    Are you familiar with any instances in which African

23  Americans used armed resistance to white mobs?

24  A    Yes.  The Colfax massacre.  There is a -- it was an

25  election in Louisiana where there was an attempt by white

1  supremacists to correct the voting results by taking over the

2  county courthouse where most of the ballots were being counted.

3  And the freedmen who occupied the courthouse while the voting

4  was being counted said basically, no, we're going to count the

5  ballots, and we're not going to let you guys come in and take

6  control of the situation to create a fraudulent election.

7          What happened then is the white supremacists brought in

8  a cannon and opened fire on the courthouse, and basically said

9  surrender and go on your way.  Well, they went ahead and

10 surrendered, turned over their arms, and about a hundred were

11 massacred by the white supremacists, who obviously decided it

12 was not okay for these people to have resisted.

13 Q    Moving on, Mr. Spitzer cites to an Illinois law in 1885,

14 requiring a record of purchase.  Are you familiar with the law

15 he's citing?

16 A    Yes.  I'm aware of it.

17 Q    And under *Bruen*, do you have an opinion of whether an 1885

18 law is relevant?

19 A    *Bruen* is very clear that if a law is passed between 1791

20 and 1868, it can be relevant if they corroborate pre-1791 laws,

21 but laws after 1868 are completely irrelevant.

22 Q    Do you have an opinion on whether waiting periods reduce

23 violent crime?

24 A    My opinion is that they are not effective.  There actually

25 a -- several years ago when I was doing a study of California's

1  waiting period law, I looked up the [inaudible] that have been

2  done, and -- on waiting period laws, and I did not find any

3  published work that believed that these laws have been effective

4  in reducing violent crimes.

5          In the case of California, one of the things I did is I

6  took the murder rates from the 1950s into the late 1990s, and I

7  plotted those against the changes in waiting period that took

8  place during -- over that interval, and one of the things I

9  discovered is there was a fairly strong positive correlation

10 between length of period and murder rate.

11         Basically, the longer the waiting periods got, the

12 higher the murder rates went.  Now, I'm not going to claim that

13 the increase in waiting periods caused murder rates to rise, but

14 there's not a very persuasive argument that you are going to

15 reduce murder rates by increasing waiting periods if California

16 increased waiting periods and the murder rates still rose.

17 Q   I'm sorry.  Could you repeat your last sentence?  It didn't

18 quite come through.

19 A   Okay.  It is not terribly persuasive evidence that waiting

20 periods reduce murder rates if a state like California kept

21 increasing their waiting period, and yet murder rates kept

22 rising anyway.

23 Q   And do you have an opinion as to why that might be?

24 A   Well, most firearms are acquired by felonious practices.

25 They're acquired by burglary.  They're acquired by purchase

1   from -- in some cases unscrupulous gun dealers who are actually

2   violating federal law.  In some cases they are obtained by theft

3   from commercial carriers, common carriers.  A couple years back

4   there was rather a stint when thieves had broken into rail cars

5   in LA and were managing to carry off rifles that they had

6   obtained unlawfully by breaking into box cars.

7         Weatherby, which is a big maker of rifles, used to be

8   [inaudible] southern Los Angeles County, they had a problem

9   during the Rodney King riots where rioters broke in to carry off

10  a number of their rifles.

11  Q   And maybe to state the obvious, those acquisitions that I

12  believe you referred to as felonious were not subject to a

13  background check or a waiting period?

14  A   No.  Not at all.

15  Q   Do you have an understanding of the purpose of the

16  background check -- let me rephrase.  Do you -- do you have an

17  understanding of the justification Colorado used in passing

18  their background check law -- excuse me.  Their waiting -- their

19  waiting period law?

20  A   The claim is that the waiting periods reduce murder and

21  suicide rates.  I am -- as I said, I've seen no persuasive

22  evidence that murder rates are reduced.  And suicide rates, I'm

23  suspicious that could actually help, because it turns out that

24  suicide rates by weapons other than firearms are not

25  dramatically lower than suicide rates by firearms.  People who

1  are intent on killing themselves seem to be remarkably effective

2  at finding other methods.  People hang themselves or throw

3  themselves out of buildings.  Those are also almost the same

4  effectiveness as firearm suicides.

5       There's a tendency to imagine that firearms are

6  dramatically effective for suicide that other methods are not.

7  I'm surprised.  In the research I did, I discovered that roughly

8  90 percent of suicide attempts where the person shoots themself

9  in the head are successful.  About ten percent are cases where

10 people shoot themselves in the head and live, although I suspect

11 many of them afterwards are saying, gee, you know, as bad as

12 things were, this is worse.

13 Q   Do you have an opinion as to whether cooling-off periods

14 are effective?

15       MR. SULLIVAN:  Objection.  Foundation.

16       THE COURT:  Overruled.  You may bring that out in

17 cross.

18 Q.   (By Mr. Nation) You can answer.

19 A   Okay.  I suppose if the ordinary person who commits a

20 murder is someone who is very, very short tempered, I suppose it

21 might make a difference, but I would have to see some evidence

22 that this is common.  I mean, there are an awful lot of people

23 committing murder in the United States, and they are hardly

24 typical of the general population.

25       Many big cities, Philadelphia for example, and

1   Baltimore, both have examined the criminal record of people that

2   they have arrested for murder, and they find that typically 90

3   percent [inaudible] prior criminal arrests.  I mean, nice,

4   ordinary people do not commit murder.  It's usually people who

5   have evidence -- a long history of violence and misbehavior

6   before the law who commit murder.

7   Q    Do you have an opinion as to whether a justification of a

8   cooling-off period would be allowed after the *Bruen* decision?

9   A    I would say it would not.  Simply because there was no

10  history of waiting periods in the period before 1791, and

11  there's none before 1868 either.

12  Q    And have you ever purchased a firearm yourself?

13  A    Yes.

14  Q    And were you subject to a background check?

15  A    Yes.  This would be California, where there was a 15-day

16  waiting period, as well as a background check.

17  Q    And do you recall approximately how long that background

18  check took?

19  A    Fifteen days.

20  Q    The background check.  Not the waiting period.

21  A    I'm not sure.  California combines the waiting period and

22  the background check together.  They don't tell you when the

23  background check completes.  They only just know you're going to

24  have to wait 15 days to pick up your gun.

25  Q    Since moving to Idaho, have you purchased any firearms?

1  A    Yes.

2  Q    And were you subject to a background check?

3  A    The federal background check through NICS.

4  Q    And approximately how long did that take?

5  A    I think it took about 20 -- 20 minutes.  It was quick.

6  Q    But not three days?

7  A    No.  I also have the advantage that I live in a state where

8  if you have a concealed weapon permit, you are exempt from the

9  federal background check.  The way that the NICS is written, if

10  you have a concealed weapon which is current and up to date in

11  your home state, they don't have to run a background check as

12  well.

13  Q    Are you aware of how Professor Spitzer uses Professor

14  Roth's report?

15  A    Yes.

16  Q    And do you have an opinion as to the propriety of that use?

17  A    I would say that the -- there is a problem in that

18  Professor Roth's data on homicides is all homicides, including

19  by his own admission, lawful uses of death -- force to cause

20  someone's death, and what he calls unintentional deaths.  So,

21  they're not in any way comparable to modern murder rates.  They

22  tend to -- they're higher.

23       The data that Professor Roth presents in these expert

24  declarations often specifies that these are unrelated adult

25  homicides, that they do not include deaths of minors, and they

1   do not include people that are unrelated to the murderer, which

2   means they're basically excluding pretty much all domestic

3   murders.

4   Q    Would that be correct to say that that would inflate the

5   homicide rate?

6   A    It would actually deflate the homicide rate.  Are you

7   saying that today, are murder rates going to be higher than the

8   homicide rates that Roth cites?  Yes.  Murder rates today that

9   are recorded by the FBI are going to be somewhat higher than the

10  homicide rates that Roth reports.

11  Q    Okay.  Mr. Spitzer makes a claim that black powder weapons

12  were not kept loaded.  Are you familiar with this claim?

13  A    I am familiar with this claim, which was originally made by

14  Professor Roth.

15  Q    And do you have an opinion as to that claim?

16  A    It is a very logical claim.  The problem is that the

17  documents in the period show that colonial Americans did not

18  apparently follow this logical idea.  Governor Winthrop's

19  Journal of Massachusets Colony lists at least four different

20  examples of situations where a gun was not about ready to be

21  used, was kept loaded anyway, resulting in the death of a child

22  in one case, several injuries in three other cases, all of which

23  demonstrate that either they were an exceptionally unlucky

24  bunch, or people did in fact keep black powder firearms loaded.

25          There's also a 1786 Massachusetts law which was

1   basically applied just in Boston, which said you may not keep

2   the following items loaded in your home or outhouses, and the

3   list includes muskets, firearms in general, cannon, hand

4   grenades, and various types of mortars.

5         And I would not imagine you would have passed a law

6   like that unless there was actually a problem of some sort of

7   people keeping loaded weapons in their homes.  This was passed

8   as a fire safety measure.  It was an attempt to make sure that

9   firefighters were not at risk when they tried to put out the

10  fire of a house.

11  Q    And finally, Mr. Spitzer -- or, excuse me -- Professor

12  Spitzer claims that most of the firearms at the founding were

13  single-shot black powder firearms.  Do you have an opinion as to

14  that claim?

15  A    I would say it's probably true that many or perhaps even

16  most were single-shot, but there are repeating firearms at that

17  time.  There is a type of handgun called a pepperbox, which had

18  several barrels that you usually rotate by hand to go from one

19  barrel to the next, and these are being produced and sold in the

20  United States by the end of the 18th century.  And they were

21  certainly capable of between four and sometimes seven shots

22  without reloading.

23  Q    In your report, you describe people carrying a brace of

24  pistols.  Could you tell the Court what that means.

25  A    Yes.  If you were expecting trouble or if you were looking

1   to cause trouble, I suppose, instead of carrying a single pistol

2   which would have to be reloaded after one shot, you would carry

3   a couple of pistols.  In some cases, in the case of Thomas

4   Jefferson, when he was a diplomat in London, we know that he

5   purchase three braces of pistols.

6   Q    So, six pistols all together?

7   A    Yes.  Six pistols all together.  And that's about as much

8   firepower as carrying a revolver would have been.

9   Q    Turning to Professor Roth's declaration, did you read that

10  declaration?

11  A    Yes, I did.

12  Q    And do you -- did you form opinions in reaction to

13  Mr. Roth's declaration?

14  A    Yes.  He seems to be intent on the idea that advancing

15  firearms technology explains rising homicide rates in the 19th

16  century.  However, he somehow discounts the other dramatic

17  changes that are happening during that same time.  For example,

18  urbanization, Americans moved recently from being people who

19  lived in very small towns to people who were beginning to live

20  in big cities.

21        There was also a transformation of workplace.  People

22  are working less and less self employed as farmers, and more and

23  more they're working as -- in factories and other such

24  environments.  There's also beginning to be massive immigration

25  in the middle of the 19th century.  A million and a half

1   Irishmen leave Ireland during the Great Potato Famine and move

2   to the United States, and this creates considerable chaos in

3   some of the bigger cities like New York City.

4        The failure to consider these other possible

5   explanations for rising homicide rates tells me that he's

6   looking for a single factorial explanation for something which

7   is probably at best several different factors, of which firearms

8   technology could or might be an issue, and might not.

9        I would also point out because he has excluded lawful

10  uses of firearms such as use for self-defense, that improvement

11  in firearms technology might include some number of homicides

12  which are actually because a victim shot back.

13  Q   So, how would including these factors change Professor

14  Roth's outcomes?

15  A   Well, it would mean that this rising homicide rate that he

16  sees and attributes to firearms technology might just be that

17  good people are shooting back at bad people.  And so the

18  homicide rate might be rising and without necessarily meaning an

19  increase in murder rates.

20  Q   Mr. Roth's declaration states the spread of restrictions in

21  the 20th and 21st centuries on new technologies, including

22  rapid-fire firearms and large-capacity magazines that change the

23  character of mass murder by enabling individuals or small groups

24  to commit mass murder.  Are you familiar with -- do you

25  recognize that?

1  A    Yes.  I'm familiar with his claim.

2  Q    And how would you respond to that?

3  A    Well, I've been doing a research project since 2018 where

4  I'm attempting to gather data on every mass murder that's taken

5  place in the United States starting in 1657.  So far I have

6  about 2,000 incidents.  Mass murder is actually a fairly common

7  thing in American history.

8  Q    And what was the most -- in your opinion, what would be the

9  most effective weapon of mass murder throughout U.S. history?

10  A    Well, airplanes.  I mean, the largest mass murders in U.S.

11  history involve people who flew planes into -- into office

12  buildings, which I'm sure you all remember.

13  Q    Was -- sorry.  Has mob violence been a tool of mass murder?

14  A    Yes.  Mob violence has at times -- especially in the 19th

15  century, has been a proponent of mass murder.  Lynchings, for

16  example, throughout the late 19th century and the early 20th

17  century are a very common method by which large groups of people

18  break into jails and drag out several people and murder them.

19  Q    Do you have any opinion about Roth's research on advancing

20  firearm technology?

21  A    I would say that certainly firearms technology advancing

22  does make it possible to kill more people in one setting, but

23  there are other explanations for rising problems of mass murder.

24  We had one example yesterday in Maine.  The guy that is

25  currently being sought by the police was involuntarily committed

1  to a mental hospital for two weeks during the summer, and this

2  turns out to be a major part of mass murder in American history,

3  is mental illness that was either not recognized or not properly

4  treated.

5           It started in the 1960s, a combination of well-meaning,

6  and in some cases -- well-meaning people and also idealogues

7  decided to destroy the state mental hospital system in the U.S.

8  They made involuntary commitment of people who were mentally ill

9  increasingly difficult, and one of the side effects of that is

10  that there was a pretty substantial rise in mass murders.  At

11  least I would argue that is the cause.

12           This increase in mass murders takes place in the 1960s

13  and 1970s, and to the present.  Both in a report on the subject

14  of these mass murders, as well as reports of a New York Times

15  examination in 2000, when they call -- were being called rampage

16  killers show these are disproportionately people with serious

17  mental illness problems.

18  Q    So, going back to history, were the founding fathers aware

19  of repeating firearms?

20  A    They were certainly aware of them.  There's a guy named

21  Belton who approaches congress and says, look, I've got a way to

22  make a flintlock that will fire 16 rounds without being

23  reloaded.  Congress is interested, so they go ahead and give him

24  some funding for development, but at some point congress says,

25  you know, the money it's going to cost us to actually buy these

1  repeating muskets is [inaudible] we can afford to buy a whole

2  bunch of single-shot muskets from France, and that will be a

3  more cost-effective use of our money.

4      There are also weapons like the Girardoni air rifle,

5  which is capable of firing 20 shots before we have to replace

6  the air cylinder that goes into the [inaudible] gun.

7  Q   And just to clarify, that was John Belton, and I believe

8  the 1790s; is that correct?

9  A   Actually, it was during the revolution itself.

10 Q   Oh.

11 A   So, it was in the 1780s.

12 Q   Thank you.  We've touched on this before, but what can you

13 tell us about the history of laws restricting the carrying of

14 firearms?

15 A   Well, the first laws that [inaudible] the carrying of

16 concealed weapons, the [inaudible] carrying of weapons are laws

17 certainly that ban concealed carry weapons.  The first of these

18 are passed in 1813 by Kentucky and Louisiana, and there's

19 another burst of such laws in the 1830s, many of which are

20 directed not at firearms, but are directed at Bowie knives and

21 what is called an Arkansas toothpick, which is another type of

22 big nasty fighting knife at the time.  These laws are passed at

23 a time when repeating firearms are really not very common yet.

24 They're just getting to be real common.

25 Q   And again, though, you're not aware of any laws at the

1  founding that would impose a waiting restriction on the ability

2  to acquire a firearm?

3  A    None.

4  Q    And what about at the time of the passage of the 14th

5  amendment?

6  A    I have not yet seen an example.  And I find it interesting

7  that even Professor Spitzer and Professor Roth do not ever give

8  examples of such laws.  That's why Spitzer goes off on this

9  bizarre armed while drinking analogy, because as even he admits,

10  such laws did not exist.

11  Q    And in your opinion, why is armed while drinking not

12  analogous to a waiting period?

13  A    Well, first of all, because a person who is going out to

14  buy a gun is not obviously impaired.  I mean, a person who has

15  been drinking, especially more than just a beer, if they've been

16  drinking to excess, they're probably -- they're likely to be

17  impaired.

18        Whereas the person who is going in to buy a gun is not

19  obviously impaired, and there's no reason to assume that a

20  person who seeks to buy a gun is impaired.  I may be atypical,

21  but when I -- the few times I have -- when I have gone out to

22  buy a gun, it's usually something I have spent weeks laboring

23  over, saying should I buy a gun?  The very first gun I bought

24  was about three or four weeks of my wife and I discussing this

25  before I went out and bought a gun.