No. 23-1380

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

Rocky Mountain Gun Owners and Alicia Garcia
Plaintiffs-Appellants,

v.

Jared Polis, in his official capacity as Governor of the State of Colorado,
Defendants-Appellees.

On Appeal from the United States District Court for the District of Colorado
No. 23-cv-02563-JLK, The Honorable John L. Kane

**APPELLANT'S APPENDIX VOLUME III**

Barry K. Arrington
ARRINGTON LAW FIRM
4195 Wadsworth Boulevard
Wheat Ridge, CO 80033
(303) 205-7870
E-mail: Barry@arringtonpc.com

D. Sean Nation
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
E-mail: snation@mslegal.org

*Attorneys for Plaintiffs-Appellants*

# APPENDIX INDEX

*Rocky Mountain Gun Owners and Alicia Garcia v. Jared Polis, in his official capacity as Governor of the State of Colorado*

*No. 23-1380*

CONT: Preliminary Injunction Hearing, Vol. 1
(ECF No. 30)............................................................................ App. 558

Preliminary Injunction Hearing, Vol. 2
(ECF No. 31)............................................................................ App. 692

Order Denying Motion for Preliminary Injunction (ECF No. 2)
(ECF No. 32)............................................................................ App. 737

Answer
(ECF No. 33)............................................................................ App. 779

Notice of Appeal
(ECF No. 34)............................................................................ App. 783

Letter Transmitting Notice of Appeal
(ECF No. 35)............................................................................ App. 787

Preliminary Record and Docket Sheet
(ECF No.35-1) ......................................................................... App. 788

Appeal Docketed: USCA Case Number
(ECF No.36)............................................................................. App. 838

1          MR. NATION:  Thank you.  Just a moment, Your Honor.

2   Nothing further for this witness, Your Honor.

3          THE COURT:  Cross examination, please.

4                    **CROSS EXAMINATION**

5   BY MR. SULLIVAN

6   Q    Good morning, Mr. Cramer.  Can you hear me?

7   A    Yes.  I can hear you just fine.

8   Q    My name is Grant Sullivan.  I represent Governor Polis in

9   this action.  I wanted to ask you a few questions about your

10  background.  You testified on direct that you obtained your

11  undergraduate and master's degrees in history from Sonoma State

12  University; is that correct?

13  A    Yes, it is.

14  Q    No doctorate degree after that?

15  A    No.  I looked at how poorly professors of history are paid,

16  and I said, why would I take a 60 or 80 percent drop in pay to

17  go ahead and teach at a university?

18  Q    So, no doctorate degree.  How about a law degree?

19  A    No.  Again, same issue.  Lawyers are generally not well

20  paid compared to software engineers.  It's very hard to justify

21  the investment of time and money pursuing a degree that would

22  require taking a cut in pay.

23  Q    So, you're trained as a software engineer.  Did I hear that

24  right?

25  A    Yes.  I'm not sure I would say trained.  I do not have a

1  formal degree in computer science.  But basically, back in

2  the -- when I was in high school, I learned enough about

3  software engineering on my own, and my very first job was

4  working for jet propulsion labs on the Voyager mission.

5  Q    And did you work for the Idaho Department of Corrections as

6  a software engineer?

7  A    Yes, I did.

8  Q    Do you still do that currently?

9  A    No.  I had a stroke in 2014, which has significantly

10  impaired my ability to work for prolonged periods of time, and

11  the right side of my body was paralyzed by that stroke.  And now

12  it's working, but my right hand really does not type like it

13  used to.

14  Q    So, you're on the adjunct faculty at the College of Western

15  Idaho; correct?

16  A    Correct.

17  Q    Adjunct means part-time and not tenure track; is that

18  right?

19  A    It means part-time, basically, yeah.  Not on tenure track.

20  Exactly.

21  Q    So, you're paid to teach courses, not to research; is that

22  right?

23  A    That's right.  Obviously I'm -- I mean, I do an awful lot

24  of research, as I mentioned this mass murder project I'm working

25  on, but I am -- no one pays me to do that.  I am not getting

1   paid by the College of Western Idaho to do that research.

2   Q    So, I do have a couple questions about that mass murder

3   project, but I will get to that in just a moment.  You don't

4   hold a degree in statistics; correct?

5   A    I do not, no.

6   Q    No degree in statistical analysis?

7   A    Nope.

8   Q    No formal training in statistical analysis; correct?

9   A    Right.

10  Q    And you don't teach any courses on statistics or

11  statistical analysis; correct?

12  A    I do not.

13  Q    Now, you testified on direct that you've served as an

14  expert before in other court cases.  Do you remember that

15  testimony?

16  A    Yes.

17  Q    Now, in fact, you've only testified once as an expert, and

18  that was in a California case called *Baird v. Bonta*?

19  A    *Baird v. Bonta*, and also there was a recent one in -- well,

20  I brought in expert declarations in an Oregon challenge to their

21  assault rifle ban.

22  Q    Excuse me.  But you didn't testify in court in the Oregon

23  case, did you?

24  A    No, I did not.

25  Q    And that California -- the California case --

1  A    I'm subject to --

2  Q    The California case -- I'm sorry, Mr. Cramer.  The

3  California case was a ban on -- was about a ban on open carry;

4  correct?

5  A    Yes.

6  Q    It wasn't a waiting period case, was it?

7  A    No, it was not.

8  Q    So, let me turn back for just a second to the mass murder

9  project that you've -- you testified about just a little bit

10 earlier.  Now, part of that research is funded by the NRA civil

11 rights defense fund; is that correct?

12 A    This is correct.

13 Q    Any other research that you're doing funded by the NRA or

14 wings of the NRA?

15 A    I received some funding for some of my expert declaration

16 work on the New Jersey assault weapons ban case from the NRA and

17 ILA.

18 Q    Any other -- other than the mass murder project that you

19 testified about and this New Jersey matter, any other research

20 that you've currently done -- that you're currently doing or you

21 have done funded by the NRA or wings of the NRA?

22 A    No.  I did receive a campaign contribution some years back

23 when I ran for state senator here in Idaho.  I received a

24 campaign contribution from the NRA, which of course because of

25 the bureaucracy, by the time it arrived, the election was over.

1  So, I cashed the check and wrote the check back and sent it back

2  to them.

3  Q    What office were you running for when you received that

4  campaign donation from the NRA?

5  A    I was running for state senate.

6  Q    In Idaho?

7  A    Yes.

8  Q    Okay.  Now, you had been retained by a Rhode Island

9  affiliate of the NRA; correct?

10  A    I'm trying to remember.  I know that I did some work for

11  the public defender's office in Rhode Island.  I am not aware of

12  any work I've been retained by the NRA for in Rhode Island.

13  Q    You didn't post on your blog a few weeks ago that you had

14  been retained by an affiliate of the NRA in Rhode Island?

15  A    I do not remember doing that.  I'm not aware of any --

16  certainly I have no case that I'm working on out of Rhode

17  Island.  I was contacted by an attorney in Rhode Island who was

18  interested in my help, and never heard back from him.

19  Q    Other than the NRA, any other groups or organizations that

20  have funded your research?

21  A    [Inaudible] expert declarations, I believe the Second

22  [inaudible] Foundation has provided some of the funding, and the

23  National Association for Gun Rights has provided funding for

24  several cases where I filed declarations in the Illinois assault

25  rifle ban.

1   Q    So, other than the Second Amendment Foundation and the

2   National Association of Gun Rights and the NRA, any other groups

3   that have funded your research?

4   A    I think the California Rifle and Pistol Association might

5   have been one.

6   Q    Any others that --

7   A    In some cases -- go ahead.

8   Q    Any others that come to mind?

9   A    There have been individual situations where I do not know

10  who the organization was, but I received checks from people who

11  were plaintiffs in those cases for the research I did.

12  Q    And when you say plaintiffs in those cases, you mean

13  plaintiffs in Second amendment cases who are challenging gun

14  laws?

15  A    Yes.

16  Q    Okay.  So, no universities have funded your research;

17  correct?

18  A    Right.

19  Q    No government agencies have funded your research?

20  A    Well, I mean, public -- federal public defenders I think

21  qualifies as a government agency.

22  Q    So, tell me more about that.  In what cases have the public

23  defender's office funded your research?

24  A    There's one out of Eastern District of California.  All I

25  can remember is the lawyer's name.  It was Hooton (phonetic).

1  This is a case where a guy was convicted of a misdemeanor

2  battery case, was challenging the federal law that prohibits

3  possession.  Part of it is that he had made the mistake of being

4  part of the January 6th demonstrations, and he was being charged

5  with a misdemeanor for that.  And it seemed like the federal

6  government was trying to use this threat of a federal felony

7  conviction for possession of a firearm as a way to get him to go

8  ahead and plead to a misdemeanor charge on January 6th.

9          And there was a case out of Florida where the public

10  defender's office paid me.  And in that case, an employee of the

11  post office who drove one of the big trucks they use for

12  transporting stuff from the post office distribution center, he

13  was charged with possession of a firearm on post office

14  property, so I assisted in that case.

15  Q    So, it sounds like what I'm hearing you say is in, is it

16  maybe two cases, you've been retained by defense attorneys in a

17  criminal case involving a gun charge; is that right?

18  A    Yes.  There's one out of Rhode Island as well, where the

19  public defender's office retained me on that one as well.  Oh,

20  also, the Ohio attorney general's office retained me for a case

21  where they were suing the City of Columbus.  Columbus for some

22  reason thinks that they are not subject to Ohio law, and that

23  they are allowed to -- they are not subject to [inaudible] by

24  Ohio.  And so the attorney general's office hired me to assist

25  in that case.

1   Q    So, other than these criminal cases that we're talking

2   about and the Ohio case you just mentioned, your research hasn't

3   been funded by any other government agencies; correct?

4   A    Not to my knowledge.  Although I will tell you, I've had so

5   many of these cases that I've been retained for over the last

6   year, I mean, I could easily have forgotten one.  I mean, it's

7   been astonishing.  It's been a very, very busy time.

8   Q    So, I want to switch gears, Mr. Cramer, and I want to talk

9   to you about some of your publications.  You're the author of a

10  book called Firing Back: A Clear, Simple Guide to Defending Your

11  Constitutional Right to Bear Arms; is that correct?

12  A    Yes.

13  Q    All right.  Now, this book is not listed on the first page

14  of your declaration in this case, is it?

15  A    It's possible it's not.  I mean, I was primarily listing

16  things that I've done that were primarily academic and scholarly

17  in nature.

18  Q    I want to ask you a couple questions about this book in

19  particular.  Now -- and I have it here.  May I put it on the

20  screen here?  Can you see this?

21  A    Yes.  I can see it.

22  Q    So, this is the first page of the book.  And under

23  introduction, it says, this book is for anyone interested in the

24  hotly debated issue of gun control.  Do you see that?

25  A    Yes.  I do.

1   Q    And then the next sentence says, first of all, this book is

2   a how-to for gun owners who want to become gun rights activists,

3   or the gun rights activist who thinks he needs more ammunition.

4   The way things are going, every gun owner needs to become

5   politically active, or in a few years, every current gun owner

6   will be an ex-gun owner; is that correct?

7   A    Yes.

8   Q    Okay.  So, this is an advocacy guide for those who are

9   antigun control, let's say; is that fair?

10  A    Yes.  Yes.  I would say that's an accurate description.

11  The publisher of that contacted me and said, we would like to

12  have a book intended for this purpose, and we think you're the

13  right guy to do this.

14  Q    Now, I want to flip the page to page five.  Now, on this

15  page, do you see where it says, we can't all be experts in every

16  field of the gun control debates?  Statistics, for instance,

17  isn't my field.  Do you see that?

18  A    Yes.

19  Q    Okay.  Now, in this book you give the reader a series of

20  arguments to help rebut the arguments of gun control advocates;

21  correct?

22  A    Yes.

23  Q    Now, you have one chapter, I believe it's chapter nine,

24  where you take on the argument about the social costs of gun

25  violence; is that right?

1  A   Yes.

2  Q   I want to flip to that chapter.

3  A   I am pleased to see that someone actually bought the book.

4  Q   Oh, I didn't buy it.  I checked it out from the library.

5  A   Okay.

6  Q   Now, in that chapter, you say that the same social cost

7  argument favored by gun control advocates could also be used to

8  ban homosexuality; correct?

9  A   Right.

10 Q   So, you say on this page, this is page 114, you have a

11 paragraph talking about some of the social costs of the AIDS

12 epidemic, and then you say, could the same argument about social

13 costs and benefits be used to justify banning homosexuality?  Do

14 you see that?

15 A   Yes.

16 Q   So, in your view, homosexuality has the same social costs

17 in the form of the AIDS epidemic as the social costs of gun

18 violence?

19          MR. NATION:  Objection.  Misstates.

20          THE COURT:  Overruled.

21          THE WITNESS:  I would say that I was making an

22 analogy.  I'm saying that someone who is going to make the

23 social cost argument about guns could make the same argument

24 about banning homosexuality.  I mean, the fact is that the

25 social cost and benefits argument applies to so many things that

1  people think of as guaranteed rights that the analogies there

2  are a persuasive debating technique.

3  Q.    (By Mr. Sullivan) Now, in other parts of this book you

4  give some alternative explanations other than guns for America's

5  violent crime problem; correct?

6  A    Yes.

7  Q    Now, specifically, you state in this book -- let me flip to

8  the right page.  This is page 69.  You state that African

9  Americans and Hispanics comprise, quote, most of America's

10  violent crime problem; is that correct?

11  A    Yes.

12  Q    And you also state, quote, remember also that many

13  Hispanics in the United States, especially in agricultural

14  areas, are single young men a long way from home trying to find

15  some excitement when they aren't performing backbreaking manual

16  labor; is that correct?

17  A    Yes.

18  Q    So, on that same page, you write a little bit further down,

19  what are marginalized groups?  That's liberal jargon for groups

20  that have been mistreated in the past by society and the law.

21  Those are your words?

22  A    Yes.

23  Q    So, again, this is a progun advocacy book; correct?

24  A    Yes.

25  Q    Okay.  I want to ask you a couple questions about your

1  declaration in this case.  It's about 59 pages long; is that

2  right?

3  A    Yes.

4  Q    Seventy-three pages, if you include all of the citations?

5  A    That sounds about right.

6  Q    And it's dated two days ago, October 24th; correct?

7  A    Yes.

8  Q    Are you aware that it was filed and served on my office at

9  4:17 p.m. two days ago?

10  A    I'm not at all surprised.

11  Q    So, that's about 41 hours before this hearing was scheduled

12  to start; correct?

13  A    Right.  Believe me, it takes a long time to read through

14  something like that and look for all the flaws.  I know.

15  Q    So, you have a section in your declaration called

16  Guns-R-Us; is that right?

17  A    Right.

18  Q    So, in that section, you take issue with Dr. Spitzer's

19  conclusion that guns were not as widely available during the

20  founding era as they are today.  But you acknowledge in that

21  section that you've not been able to count the number of gun

22  retailers in the pre-1791 era; is that correct?

23  A    Yes.  That's a fairly major undertaking, because you have

24  to -- advertising alone only [inaudible] part of the picture,

25  because so many people lived in small towns.  If you knew that

1 someone in your town was a seller of guns, you probably wouldn't

2 need to see an ad to know that.

3 Q   So, again, you're not able to count the number of gun

4 retailers in 1791; correct?

5 A   Yeah.  I'm not -- admittedly, I have not even tried,

6 really.  At various times I've counted the number of gunsmiths,

7 but I suppose if I had to -- I suppose if I had a month or two,

8 I could probably make some sort of a serious attempt at trying

9 to get a count.

10 Q   Well, you mentioned gunsmiths.  Let me ask you a couple

11 questions about gunsmiths.  For example, on page eight of your

12 declaration, you say that one Edward Annely advertised his

13 services as a gunsmith stating, quote, he likewise makes guns

14 and pistols as any gentlemen shall like.  Does that sound

15 correct from your declaration?

16 A   Yes.

17 Q   So, Mr. Annely is advertising that he makes guns to order;

18 correct?

19 A   Correct.

20 Q   So, the advertisement doesn't state that he sells guns

21 immediately off the shelf; right?

22 A   It does not say that he sells them immediately off the

23 shelf.

24 Q   So, if an order was placed with Mr. Annely, it would take

25 him some time to fill the order; correct?

1  A    Presumably, unless he had guns that he had already made for

2  a customer that had not actually purchased them.  So, my --

3  Q    Which we just established that his advertisement doesn't

4  say that.  So, Mr. Annely, unless he had some sort of inventory,

5  he wouldn't be able to sell a gun immediately to a customer?

6  A    Not a gun that he made custom, no.

7  Q    So, you don't know how many gun retailers in the 1790s were

8  made-to-order gunsmiths like Mr. Annely versus a retailer who

9  sold guns off the shelf, do you?

10  A    Well, I do list several ads where people are saying that

11  they have pistols for sale.

12  Q    But you don't know what percentage of those retailers are

13  smiths like Mr. Annely versus retailers who have an inventory

14  that they can sell immediately?

15  A    Well, if they advertise that they have pistols for sale,

16  then they obviously have something in inventory.

17  Q    Mr. Cramer, my question is you don't know what percentage

18  fall into the category of gunsmiths like Mr. Annely versus an

19  inventory that could be sold off the shelf.  You don't know what

20  percentage is which?

21  A    No, I do not.  As I said, that would be a fairly major

22  undertaking to research that, which I do not have time to do.  I

23  got called into this a little over a week and a half ago.

24  Q    So, you mentioned earlier on direct that people lived in

25  small towns at the time of the founding.  Do you remember that

1  testimony?

2  A    Yes.

3  Q    So, in small towns, in rural areas such as that, there

4  wouldn't be a big availability of gun retailers like, say, in a

5  big city like New York City; correct?

6  A    It's probably true that you would find them more

7  concentrated in the cities, but there's also the case that

8  there's only six cities in America that have more than 10,000

9  people at the time of the 1790 census, so most people are

10 scattered pretty widely.

11 Q    So, it would be hard for those people who are scattered

12 widely to walk into a gun store that's in one of the major

13 cities?

14 A    In a major city, yeah.  But guns are made in a fair number

15 of smaller towns as well.  You can certainly ride a horse or a

16 carriage to an adjoining village that might have a gun seller

17 [inaudible].

18 Q    So, let me ask you some questions about you testified on

19 direct that mail-order catalogs and filling orders for guns

20 through the mail, when did that start?

21 A    It certainly was present by the 1880s.  It may have been

22 present earlier.  Again, that's something I researched as to

23 when these ads start to appear.

24 Q    So, if a customer were placing an order through the mail,

25 be it in the 1880s or earlier, it would take several days for

1   that order to be filled; correct?

2   A    It probably would -- yeah.  It would take at least a couple

3   days for the order to reach the seller, and probably a couple

4   days for it to get back.

5   Q    So, the buyer would have to wait to receive their purchased

6   firearm; correct?

7   A    If they were purchasing a mail-order firearm, that would be

8   the case.  But if they were just going into a local hardware

9   store and saying, I want that one, there were no waiting

10  periods.

11  Q    But if they were ordering through the mail, they would have

12  to wait; correct?

13  A    Yes.

14  Q    Okay.

15  A    Fortunately, that's not the only way to purchase firearms

16  in that time.

17  Q    Let me ask you some questions, Mr. Cramer, about some of

18  the alcohol laws that are discussed in some of the pleadings in

19  this case.  Now, you assert that Dr. Spitzer misquotes or

20  mischaracterizes some of the historical laws involving firearms

21  and alcohol.  Now, did plaintiffs' counsel provide you with all

22  of the exhibits to Dr. Spitzer's declaration?

23  A    Yes.

24  Q    Now, one of those exhibits was a long list of state laws

25  called -- had a title at the top called intoxication slash

23-cv-2563-JLK   CLAYTON CRAMER - Cross   10-26-2023

1  weapon laws; correct?

2  A    Yes.  I'm scrolling.  I don't see the title on that.  Yes.

3  I see that.

4  Q    Flip to it real quick.  It's going to be Exhibit 26 in

5  defendant's binder.  And it's Exhibit C to Dr. Spitzer's

6  declaration; correct?

7  A    Yes.  Exhibit B.  Oh.  Hang on.  That's -- I'm [inaudible]

8  Exhibit B here for intoxication and weapon laws.

9  Q    Is the first state listed -- well, let's look just at the

10 screen, Mr. Cramer.  Do you see where --

11 A    Yes.  I see Exhibit C there.

12        MR. SULLIVAN:  And, Your Honor, it's Exhibit 26 in the

13 black binder.

14        THE COURT:  I have it.  Thank you.

15 Q.    (By Mr. Sullivan) You reviewed this document, Mr. Cramer?

16 A    I reviewed the laws that Professor Spitzer listed in his

17 declaration that were in the appropriate year range through

18 1868.  Obviously laws like the Arizona law do not apply because

19 of the date.

20 Q    So, I'm asking specifically about the document on the

21 screen that says intoxication slash weapon laws.  Did you review

22 that document?

23 A    No.  I have not reviewed Exhibit C.

24 Q    Okay.  So, it's a 36-single-spaced-page document with full

25 quotations of state laws involving alcohol and weapons.  And you

1    did not review that?

2    A    No.  Because in fact these are not full statements of the

3    laws.  If you look down at the Virginia laws --

4    Q    Mr. Cramer -- I'm sorry, Mr. Cramer.  I don't mean to

5    interrupt.  I just want to focus us on the answer to my

6    question.  So, you didn't review this document; correct?

7    A    No.

8    Q    Okay.  Now, your declaration doesn't have a similar exhibit

9    with full quotations of laws, does it?

10    A    It does have full quotations of some of the laws that

11    Professor Spitzer has misrepresented.

12    Q    But it doesn't have an exhibit similar to what we're seeing

13    here?

14    A    No.

15    Q    Now, you talked a little bit earlier about a 1655 Virginia

16    law that made it an offense to shoot any guns at drinking.  Now,

17    let me flip to that law real quick.  Do you see that -- I'm

18    sorry.  Can you see that, Mr. Cramer?

19    A    Yes, I can.

20    Q    So, this law states that it should be offense to shoot any

21    guns at drinking, marriages and funerals only excepted; correct?

22    A    Correct.

23    Q    And your position is that this law was meant to not disrupt

24    the alarm system that existed, which was shooting guns in the

25    air in the event of an ambush or something like that?

1  A    Yes.  And that was in the sentences immediately before the

2  part that -- he basically did not give you the full text of that

3  law.

4  Q    Well, the full text is here in front of us.  Let me ask --

5  A    No, it's not.  It is not in front of you.  What he's got

6  there with the Virginia law is not the full text.  And that's

7  been a recurring problem with Spitzer is he often quotes things

8  out of context like this.

9  Q    Mr. Cramer, I am asking you not about Dr. Spitzer's

10 declaration, but about this document in front of us, which you

11 said earlier you haven't reviewed.  So, let me ask you a

12 question about it.  So, this law specifically prohibits shooting

13 at drinking; correct?

14 A    Yes.

15 Q    Okay.  So, lawmakers at the time might have thought that

16 people might be more inclined to shoot guns if they're

17 intoxicated because they've been drinking; correct?

18 A    That is certainly one interpretation of it.  Certainly an

19 interpretation of it, although not for the purpose of being

20 concerned about public safety.  They were expressing concern

21 about the fact that it would be hard to tell whether there was

22 an Indian attack under way.

23 Q    But if they took the trouble to mention drinking in this

24 law, they must have thought, correct, that folks are more likely

25 to shoot guns if they've been drinking?

1    A    That's certainly one interpretation of it.

2    Q    Let me ask you some questions about your rebuttal to

3    Dr. Roth.  Now, in the California case that you served as an

4    expert in, which we talked about earlier, you actually rely on

5    Dr. Roth's research; correct?

6    A    In some cases, I do rely upon it.  I know Dr. Roth

7    [inaudible] that I regard him as generally a well-intentioned

8    person.  I do not find him to engage in the sort of intentional

9    deception that Mr. Spitzer does.

10    Q    So, you rely for example on Dr. Roth's publication,

11    Homicide Among Adults in Colonial and Revolutionary New England;

12    correct?

13    A    I relied upon it for refuting his claims, yes.

14    Q    So, Dr. Roth's publication is reliable to rely on in your

15    expert work?

16    A    Well, within the limitations of what he's saying, yes.  The

17    fact that he excludes lawful uses of -- lawful homicides says

18    quite a bit, and it's an important point that he -- claim that

19    he makes.

20    Q    Any other -- other than the California case that we've been

21    talking about, have you relied on Dr. Roth's research for any

22    other projects?

23    A    Yes.  I don't remember the immediate name of the case, but

24    Professor Roth at one point filed a surrebuttal in one of the

25    California cases where he claimed that when a mass murder takes

1  place, the deaths of children shall not be counted as part of a

2  mass murder.

3          THE COURTROOM DEPUTY:  He's going to have to slow down

4  and speak up.

5  Q.   (By Mr. Sullivan) Mr. Cramer, I'm going to ask you to

6  slow down just a little bit when you give a response, but long

7  and short of it is you rely on Dr. Roth's work when doing your

8  expert work?

9  A    Certainly when I'm doing rebuttal, I do look at his work

10 and look for inconsistencies in his claims.

11 Q    So, let me ask about some of your specific critiques of

12 Dr. Roth.  You say that Dr. Roth presents, quote, an

13 artificially rosy view of murder during the 18th century because

14 he, quote, undercounts murders by leaving out domestic murders

15 and murders of minors; is that correct?

16 A    Correct.

17 Q    Now, you read Dr. Roth's declaration; correct?

18 A    Yes, I have.

19 Q    And you're aware that Dr. Roth actually includes family,

20 household, and intimate partner homicides in his analysis;

21 correct?

22 A    However, his book, and also the figure that appears in his

23 declaration and that Professor Spitzer also relies upon does

24 indicate unrelated adult homicides.  He may well have data on

25 domestic violence homicides as well, but that [inaudible] graph

1  definitely is creating a false perception.

2  Q    Well, I'm not asking about his book, Mr. Cramer.  I'm

3  asking about his declaration in this case.  He states on the

4  page I put up on the screen that family, household, and intimate

5  partner homicides were rare, and only 10 to 15 percent of those

6  homicides were committed with guns; correct?

7  A    Right.

8  Q    So, he does take account for family and domestic homicides

9  in his analysis; correct?

10  A    He does.  The figure that he uses to demonstrate this very

11  low homicide rate does exclude unrelated -- only includes

12  unrelated adult homicides, and that graph showing this very low

13  rate of about one per hundred thousand is a little bit

14  misleading.

15  Q    But you're talking about his book; correct?

16  A    I'm talking about the figure that has appeared in a number

17  of the declarations he has filed.

18  Q    But in this declaration, he includes in his analysis family

19  and domestic homicides; correct?

20  A    This text here does.  My --

21  Q    That's the only text I'm asking about, Mr. Cramer.  So, let

22  me ask you another question.  So, you also criticize Dr. Roth's

23  analysis of firearm technology at the time.  I want to ask you a

24  couple questions about that.

25  A    Okay.

1  Q    So, for example, you criticized Dr. Roth's conclusion that

2  muzzleloading firearms of the time had limitations that made

3  them poorly suited for crimes of passion.  Do you remember that

4  criticism in your declaration?

5  A    Yes.

6  Q    Okay.  Now, you argue that revolutionary-era firearms were

7  actually highly accurate.  Is that your testimony in your

8  declaration?

9  A    Yes.  And I gave several examples that show that in fact

10 people were successfully using muskets from fairly long ranges,

11 and were therefore accurate.

12 Q    You're not suggesting that they were -- revolutionary-era

13 firearms are more accurate than today's firearms, are you?

14 A    No, I'm not.  Although they were actually pretty impressive

15 considering the technology that was being used to make them.

16 Q    So, each of the sources that you cite for this accuracy

17 issue involves rifles or riflemen; correct?

18 A    Yes.

19 Q    None involved --

20 A    Other examples were muskets were used with some high degree

21 of accuracy.

22 Q    None involved pistols or firearms that were meant to be

23 held with one hand; correct?

24 A    Yes.  Pistols in general are not terribly accurate.  Even

25 modern pistols are generally limited to about 25 yards, unless

1   you have a fairly exceptional marksman or a fairly exceptional

2   pistol.

3   Q    Let me ask you some questions about your multi-shot firearm

4   criticism.  You suggest that multi-shot firearms called

5   pepperboxes were available during the founding era; is that

6   correct?

7   A    Yes.

8   Q    You don't cite anything suggesting that pepperboxes were

9   commonly used at the time; correct?

10  A    No.  They were available.  How common, I'm not sure.

11  [Inaudible] have production figures for these things.

12  Q    In fact, one of the footnotes in your declaration says that

13  pepperboxes were, quote, likely experimental; correct?

14  A    Some of the examples that have survived are described as

15  likely experimental.  That does not necessarily mean that every

16  pepperbox was experimental.

17  Q    But the footnote that you cite, the source that you cite in

18  your footnote says, likely experimental; correct?

19  A    Yes.

20  Q    Now, you have another book called Armed America; correct?

21  A    Yes.

22  Q    Published in 2006?

23  A    Yes.

24  Q    Now, in Armed America, you have a page about pistols.  This

25  is page 241.  And I want to point you, Mr. Cramer, to the

1    sentence here that says, until the late 18th century, pistols,

2    like almost all other firearms of the period, could fire one

3    shot before reloading.  Do you see that?

4    A    Yes.

5    Q    So, firearms at the time, the ones that were commonly used,

6    could fire one shot; correct?

7    A    I was unaware of the availability of the pepperboxes in the

8    18th century when I wrote that book.

9    Q    The likely-experimental pepperboxes?

10   A    No.  Pepperboxes in general.

11   Q    So, what you wrote in 2006 is no longer accurate?

12   A    I would say I've learned additional information since then.

13   Q    So, let me ask you some questions about how guns were kept.

14   You pushed back on Dr. Roth's conclusion that firearms at the

15   time were generally kept unloaded, and you cite four examples of

16   accidental firearm discharges.  Do you remember that testimony

17   in your declaration?

18   A    Yes.

19   Q    But you don't -- you don't rely on any firearm manuals or

20   guide books that recommended keeping firearms loaded at the

21   time, do you?

22   A    No.  I think you would have a very hard time finding

23   examples of -- I mean, it isn't like the manufacturers put out

24   manuals to go with guns.

25   Q    So, you're not aware of any manuals at the time that

1  recommended keeping the firearm loaded when being stored;

2  correct?

3  A    No.  All I have is the fact that people did obviously keep

4  them loaded, and there are instances that come about because

5  they were kept loaded.

6  Q    I just want to be clear.  You're not suggesting that four

7  instances of accidental discharges establishes a general

8  practice of people keeping their firearms loaded when stored;

9  correct?

10  A    I would say that it provides evidence that people did at

11  least sometimes do so.  And the fact that one book has four such

12  incidents would suggest that it was probably not spectacularly

13  rare.

14  Q    But four such instances doesn't establish a general

15  practice, does it?

16  A    No.  But I would say the 1782 law Massachusetts passed

17  saying you cannot keep your artillery pieces and firearms loaded

18  in your house is probably a pretty good indication that there

19  was actually an issue there that they were concerned about.

20  Q    Let me ask you a little bit about how they were stored.  I

21  mean, if they have black powder in them, black powder is

22  hygroscopic; correct?  Meaning it absorbs moisture?

23  A    Right.  Yes.  I would say it would probably be -- I would

24  say it would be a bad idea to keep a black powder firearm

25  loaded, but as I said, the evidence is that clearly some people

1   were doing so.

2   Q    And the reason it would be a bad idea is because when it

3   absorbs moisture, it can corrode the barrel of the gun; correct?

4   A    Absolutely.

5   Q    And it can also corrode the firing mechanism; correct?

6   A    Yes.  This is all made out of steel, and contact with black

7   powder is going to definitely cause some rusting problems.

8   Q    So, as you said, it would be a bad idea to keep your

9   firearm with black powder loaded when not in use; correct?

10  A    Yes.  People do lots of things that are bad ideas.

11  Q    Mr. Cramer, would you agree that lawmakers generally pass

12  laws in response to societal problems that are happening at the

13  time?

14  A    Yes.  Like prohibiting the keeping of your firearms and

15  cannon loaded in your home.

16  Q    Lawmakers generally don't pass laws in response to

17  nonexistent problems; correct?

18  A    I would say that's probably true.

19  Q    Okay.  I want to turn to your waiting period analysis in

20  your declaration.  And this starts on page 54 of your

21  declaration.  Now, this part of your declaration is copied from

22  a different paper you wrote; is that correct?

23  A    Yes.

24  Q    It's copied word-for-word?

25  A    I may have adjusted a few sentences for clarity, but --

1  Q    It's a paper you wrote in 2015; correct?

2  A    Correct.

3  Q    Now, before signing your declaration in this case two days

4  ago, did you look at whether there had been any studies

5  published since 2015 about the relationship between waiting

6  periods and homicide rates?

7  A    No, I did not.

8  Q    Did you review a 2017 study titled Handgun Waiting Periods

9  Reduce Gun Deaths?

10 A    I have not seen that, no.

11 Q    Okay.  Now, your declaration on page 57 has a chart; is

12 that correct?

13 A    Yes.  I don't have that in front of me, although I probably

14 should.  There is a chart there [inaudible].

15 Q    So, this is Exhibit 4, Your Honor, in the white notebook.

16 And I will put it up for you, Mr. Cramer.  Just hold on one

17 second with me.  Is this the chart in page 57 of your

18 declaration?

19 A    Yes, it is.

20 Q    Now, your study includes just California; correct?

21 A    Just California.  Yes.

22 Q    And you didn't look at any states beyond California for

23 your study?

24 A    No, I did not.

25 Q    And the date range for your study is 1952 to 2012.  Is that

1   what we show on this chart?

2   A    Yes.

3   Q    Okay.  Your study doesn't control for any exogenous

4   variables; correct?

5   A    Right.

6   Q    You just compared the murder rate to the handgun waiting

7   period; correct?

8   A    Correct.  And I would agree that this is not a particularly

9   spectacular piece [inaudible] for I was really demonstrating

10  that if in fact there is a -- waiting period is making such a

11  big difference in murder rates, it seem to [inaudible] fairly

12  subtle.

13  Q    Let me ask you about the statement you made immediately

14  below this chart.  It's paragraph 177.  You say there's a strong

15  positive correlation between handgun waiting periods and murder

16  rates.  The longer the waiting period in days, the higher the

17  murder rate.  Do you remember that testimony?

18  A    Yes.

19  Q    But you agree that correlation does not prove causation;

20  correct?

21  A    I agree that correlation does not ever prove causation.

22  However, strong correlations make you start to ask questions

23  like is there a possible causal connection here that would be

24  worth examining?

25  Q    You didn't consider whether there might be an alternative

1  explanation for the rise in California murder rates, did you?

2  A    Well, there's a number of possible explanations.  Murder

3  rates in general in the United States rose dramatically in the

4  1970s, and began to fall fairly substantially in the 1990s.

5  Q    Well, you didn't analyze, for example, whether the national

6  murder rate was also increasing over the same period, did you?

7  A    Unfortunately, the graph that I have for that, I was unable

8  to reproduce it from the original source.  The FBI used to have

9  a nice little tool that I was able to use to [inaudible] U.S.

10  murder rates during that period.  And, yes.  They rose at

11  roughly the same rate as California, and they fell at roughly

12  the same rate as California.

13  Q    Now, your declaration also doesn't consider whether the

14  California legislature increased the declaration of its waiting

15  period because the murder rate was increasing?  You didn't

16  consider that, did you?

17  A    It's certainly a possible explanation.  Although I notice

18  that the murder -- the waiting period increases in the late

19  1950s were in response to a very small increase in murder rates.

20        THE COURT:  Mr. Sullivan -- excuse me.  I didn't mean

21  to interrupt you.  Please continue.  Please continue with your

22  answer.

23  Q.    (By Mr. Sullivan) Did you conclude your answer,

24  Mr. Cramer?

25  A    There are -- there is certainly -- there are waiting period

1   increases in 1975, I think that is, which preceded a pretty

2   dramatic increase in murder rates.

3          THE COURT:  Mr. Sullivan, I have to recess now.  We

4   will be back at 1:30.

5          (Recess at 11:55 a.m., until 1:36 p.m.)

6          THE COURT:  Please continue.

7          MR. SULLIVAN:  Thank you, Your Honor.

8   Q.    (By Mr. Sullivan) Mr. Cramer, can you hear me?

9   A    Yes.  I can hear you fine.

10  Q    Great.  So, when we broke for the lunch hour, I was asking

11  you a few questions about your study, and I have just a few

12  more.  I believe we were talking about page 57 of your

13  declaration, which has this graph that we've been talking about.

14  Can you see that okay?

15  A    Yes.

16  Q    Okay.  Well, first of all, I should back up a little bit.

17  Is your study peer-reviewed?

18  A    No.

19  Q    Okay.  So, your study, based on your declaration, it

20  doesn't analyze whether the murder rate increased in states

21  without a waiting period law; is that correct?

22  A    That's correct.  I looked at one example in California.

23  Q    And your study doesn't compare your results in California

24  to any control group of states; correct?

25  A    No, it does not.

1  Q    Your study doesn't compare your California results with any

2  state that lacks a waiting period law; correct?

3  A    Correct.  It does not.

4  Q    Now, you say in your declaration that California's waiting

5  period law dates from 1923?

6  A    Yes.

7  Q    But your analysis only goes back to 1952; correct?

8  A    Yes.  That was as far back as I could find data from

9  California.

10 Q    So, your study --

11 A    Turns out that the uniform crime reports that the FBI

12 compiles really doesn't have any particularly trustworthy data

13 before 1960 for murder.

14 Q    Okay.  So, because of that limitation, your study doesn't

15 evaluate any time period when a state went from having no

16 waiting period law to then enacting a waiting period law; is

17 that right?

18 A    This is true.

19 Q    And that's the situation in Colorado in 2023; correct?

20 A    Yes.  You're going from no waiting period to a minimum of a

21 three-day waiting period.

22 Q    Okay.  Now, your study does analyze the changes in the

23 duration of California's waiting period law; is that right?

24 A    What do you mean, the duration?

25 Q    Well, this graph here on page 57, the line that is more

1    angular is the handgun waiting period period; right?  So, it

2    starts at one day in 1952; is that right?

3    A    Yes.  1952, yes.

4    Q    And then it looks like maybe 1954, 1955, it bumps up to a

5    three-day waiting period law; right?

6    A    Correct.

7    Q    And that also correlates to when California's murder rate

8    on this graph was at its lowest point; right?

9    A    In 1952?  Yes.

10   Q    So, one conclusion that could be drawn is that a one- to

11   three-day waiting period correlates with a low murder rate;

12   correct?

13   A    Yes.  Just as accurately as saying that a 15-day waiting

14   period correlates with a very high murder rate.

15          MR. SULLIVAN:  All right.  Your Honor, could I have

16   one moment?

17          THE COURT:  Yes.

18          MR. SULLIVAN:  Your Honor, during my prior line of

19   questioning, I neglected to mark and offer a couple of exhibits.

20          THE COURT:  Yes.  I'm glad you raised that.  I was

21   going to wait, but now is a good time, because I would like the

22   exhibits that have been offered from you and also from the

23   plaintiff.  We want to clear the record on that, because it

24   isn't right now.

25          MR. SULLIVAN:  Absolutely.  Happy to make that record,

1   Your Honor.  So, I will offer as Exhibit 34, the Firing Back

2   material that I asked Mr. Cramer about.  And then Exhibit 35 is

3   the Armed America book that I also asked Mr. Cramer about.  And

4   I've given copies to counsel.  May I approach the court

5   reporter?

6           THE COURT:  Sure.  Give them to the clerk, though.

7           MR. SULLIVAN:  Very good.  May I approach the --

8           THE COURT:  Sure.

9           MR. SULLIVAN:  Your Honor, I don't have any other

10  questions for this witness.

11          THE COURT:  Okay.  Those are the exhibits that you've

12  offered so far?

13          MR. SULLIVAN:  So far.  That's correct.

14          THE COURT:  They're admitted, and then now I know that

15  the plaintiffs have offered exhibits in the past.  I want to

16  make sure -- well, I said they were admitted.  We may not have

17  gotten them in the record.  So, let's check.

18          MR. NATION:  Yes, sir.  Thank you, Your Honor.  I have

19  Exhibit 1 as a Triple J receipt.

20          THE COURT:  It's admitted.

21          MR. NATION:  Okay.  Exhibit 2 is a separate receipt

22  from Triple J.

23          THE COURT:  Yes.  It's admitted.

24          MR. NATION:  Exhibit 3, a receipt for a shotgun from

25  Dragonman.

1            THE COURT:  Yes.  It's admitted.

2            MR. NATION:  And Exhibit 4 is the declaration of

3    Clayton Cramer.

4            THE COURT:  It's admitted too.  Can we speed things up

5    with you and -- on both sides and just see what -- are there

6    exhibits that need not be admitted or that we're not going to

7    admit?  Can we just stipulate -- this is a hearing to the Court,

8    is what I'm saying.

9            MR. NATION:  Yes.  We can -- I have no problem

10   stipulating to admission for today's purposes.

11           THE COURT:  For the purposes of this hearing, this

12   preliminary injunction hearing, all the exhibits tendered are

13   admitted.

14           MR. KOTLARCZYK:  That's fine with defendant, Your

15   Honor.

16           THE COURT:  Okay.  Good.  All right.  Now, go ahead,

17   please, Mr. Nation.

18                     **REDIRECT EXAMINATION**

19   BY MR. NATION

20   Q    Professor Cramer, do you have a particular claim to fame

21   with regard to your research?

22   A    I suppose what I'm probably best known for is that back in

23   the -- in 2000, there was a professor named Michael Bellesiles,

24   who taught at Emory University.  He published a book called

25   Arming America, which made the claim that guns were very rare in

1  America before the Mexican war, that gun control was actually

2  the norm, and that most Americans were not allowed to possess

3  firearms, and that hunting was extremely rare.

4          The claims he made were very odd to me, because I had

5  just finished doing my master's thesis on the development of

6  concealed weapon regulation in the United States, and it did not

7  match up with what I had found at all.  So, I started examine --

8  looking up his footnotes and verifying that they were actual --

9  actual accurate descriptions of what were in those documents.

10          And I discovered that in fact it was a massive piece of

11  fraud.  And at the end of it all, he was fired by his

12  university, now tends a bar in some part of Connecticut, and the

13  prize that was given to him by the Columbia -- the Bancroft

14  prize, which is sort of like the Nobel Prize in American

15  history, they revoked it for the first time they've ever done

16  so, and demanded their 4,000-dollar prize money back.  His

17  publisher pulled the book back and destroyed it.  They did

18  not [inaudible] this, but destroyed it completely.

19  Q   And do you know whether Professor Bellesiles was funded by

20  Emory University?

21  A   I'm not sure who funded him.  I know that he spent a year

22  in Chicago concocting this rather bizarre story, which Courts

23  began to actually -- the Court of Appeals actually went ahead

24  and cited some of his material before attorneys pointed out to

25  them that -- pointed out to the judge who wrote the opinion that

1  no, this guy has been found out to be a fraud.

2           THE COURT:  Excuse me for a moment, but for the

3  clarity of the record, could you spell the last name of this

4  professor at Emory.

5           MR. NATION:  Yes, sir.  It is Bellesiles,

6  B-E-L-L-E-I-S-L-E-S.

7           THE WITNESS:  Excuse me.  B-E-L-L-E-S-I-L-E-S.  It's a

8  confusing name, because he has pronounced it three different

9  times during his professional life three entirely different

10  ways.

11          MR. NATION:  Well, yes.

12  Q.   (By Mr. Nation) In your experience, do universities fund

13  progun individuals?

14  A    I've not seen any evidence they've ever done so.

15  Q    Do you recall being asked about your statistical

16  background?

17  A    I remember being asked about it.  And while I've had no

18  formal training in statistics, I did, while I was working on my

19  master's degree, spend a bit of time learning about it.  And I

20  do not claim to be a statistician, but I know enough to

21  recognize the difference between correlation and causality, and

22  the techniques used for evaluating whether picker correlation is

23  significant enough that it is worth a serious consideration as

24  to possible causality.

25  Q    To your knowledge, do Professor Spitzer or Roth put forward

1  any statistical analyses in their declarations?

2  A    I cannot recall Spitzer doing so.  Spitzer is a professor

3  of political science, not a historian.  I suspect Roth probably

4  has had some training in statistics.

5  Q    Okay.  But to your knowledge, neither of them are

6  statisticians either?

7  A    To my knowledge, no.

8  Q    Do you recall being asked about Exhibit 34?  That was --

9  pardon me.  That was your book called Firing Back.

10  A    Right.

11  Q    And in it, you make some analogies between firearm

12  restrictions and HIV, AIDS.  Do you recall that?

13  A    Yes.  And a number of other analogies as well.

14  Q    And what was the purpose of those analogies?

15  A    The purpose was to demonstrate that when people try to use

16  certain types of theories to justify restricting firearms, those

17  same sort of analogy -- by analogy, the arguments for other

18  types of restrictions that the Courts have not accepted.  So,

19  there are --

20  Q    Just to be clear, you were not advocating for those things.

21  You were simply pointing out that there's no limiting principle?

22  A    Right.  Pointing out that if you are going to use this

23  argument for restricting guns, you need to be willing to admit

24  the possibility that other sorts of behavior that are generally

25  accepted might also qualify for that same sort of restriction.

1  Q    Do you recall being asked about the number of gun retailers

2  in early America?

3  A    I don't remember being asked about it.  I know that the

4  declaration -- I was asked if I had counted them up.  I have not

5  been able to count them up, just because there was not enough

6  time.  You guys contacted me fairly recently about this.

7  Q    Sure.

8  A    And it's a hard thing to measure.

9  Q    Would the number of gun retailers in early America be

10  relevant to your opinion on firearm restrictions?

11  A    Well, it would only be relevant to the fact that Professor

12  Spitzer had made this distinction for what he calls Guns-R-Us,

13  this claim that gun retailing is so widespread in America that

14  it's not at all comparable to the situation in colonial America.

15  If in fact there were 704 people selling guns in any given year

16  in colonial America, that would be comparable to the number of

17  guns that are sold in retail now.

18  Q    So, the practicalities in early America where a person

19  might have to make a trip into a city to purchase a firearm, is

20  that at all relevant to your analysis as to whether there's a

21  history and tradition of waiting periods in this country?

22  A    No.  It's not relevant, because you might not have to go to

23  a city to buy a gun.  For that matter, you might not have to go

24  into a city to be able to buy a used gun within your town.  I

25  can tell you that one of my ancestors was an expert witness at a

1  trial in Connecticut in the 1640s where one person had bought a

2  used musket, and it had gone off and took the guy's eye out.

3  And this is just an ancestor of mine who was a gunsmith in town

4  and had given -- testified in trial that he had already warned

5  the seller, this gun was too dangerous to fire.  And this was

6  used to demonstrate liability by the seller.  So, when people

7  were buying guns that used --

8  Q    If a person had to travel a number of days to acquire a

9  firearm, would they then have to wait after purchasing a firearm

10 in early America?

11 A    No.  There were no limits on how rapidly to make an

12 acquisition if you went into a store that sold them at retail,

13 and just bought it.

14 Q    And there -- at the time of the Second amendment, there

15 were general stores that would sell firearms -- or were there

16 general stores that would sell firearms?

17 A    Well, we know that there are actually -- there are not

18 specialized just single guns-only stores.  There are -- guns are

19 sold in a variety of places.  Until the 1960s, it was quite

20 common for lots of hardware stores in America to sell guns along

21 with all the other things that they sold.

22 Q    Do you recall being --

23 A    Even today -- even today there are an awful lot of places

24 that sell guns that are not gun stores.  Within four miles of

25 where I live, there are three different stores where I can go in

1   to buy a scary black rifle.  One of them is a gun store.  The

2   other two, one is a hardware store, and the other is a general

3   merchandise store that sells everything from groceries to

4   electronics.

5   Q    Thank you.  Do you recall being asked about an

6   advertisement for a gunsmith?

7   A    Yes.

8   Q    And there are bespoke firearms today, are there not?

9   A    There certainly are.  They're not quite so common.  The

10  industrialization and mass production that developed in the

11  early 19th century America has a lot to do with why guns now

12  are -- they are a commodity item.  There are differences, but

13  they're inexpensive, and they're mass produced.

14  Q    Are there any -- is there anything else about your books

15  that the State asked about that you would like to address?

16  A    I guess what I would say is that Firing Back was intended

17  as a guide to political activism.  It was not necessarily -- not

18  what I would call a scholarly work.  It was something that was

19  basically to tell people, if you want to be an activist, here

20  are some things you can do to make you more effective.

21  Q    Can you see this on the screen?

22  A    Yes, I can.

23  Q    So, this is Exhibit D to Professor Spitzer's declaration.

24  Do you see the column that says pre Civil War Blacks?

25  A    Yes.

1  Q    Do you think that laws based on racial categorization are

2  relevant to today's analysis?

3  A    I do not think so, because the 14th amendment fundamentally

4  changed the nature of the relationship that Americans have on

5  race.  It basically says that race can no longer be used as a

6  basis for making decisions.  Equal protection applies.

7           It's interesting that in many of the cases around the

8  country where states have been trying to defend their

9  restrictive gun laws, they have repeatedly pointed to laws that

10 would apply only to Blacks and to slaves as evidence that gun

11 regulation is part of the American tradition.

12 Q    I'm going to point you to the state of Alaska, and it's

13 Exhibit D.  And 1838 for pre Civil War Blacks.  Was Alaska part

14 of the United States in 1838?

15 A    No.  It was part of Russia.  And if there were any Black

16 people in Alaska during the Russian period, I would be very,

17 very surprised.

18 Q    And does that -- do you think that this error undermines

19 your confidence in any of Mr. Spitzer's conclusions?

20 A    That plus the fact that so many laws he does cite he quotes

21 out of context.

22 Q    Do you recall the -- your discussion over the law of -- I

23 believe 1655 in Virginia?

24 A    Right.

25 Q    And you claim that Mr. Spitzer did not include the entire

1   law in his exhibit?

2   A    He did not.

3   Q    And is there -- what did he omit?

4   A    If you bring up the text right here --

5   Q    Well, just generally.  You don't have to read it, but

6   generally was there more to the law?

7   A    Well, what he omitted was that the concern was that the

8   common method of warning that an Indian attack was under way was

9   people fired multiple shots into the air, and that this law

10  which prohibited shooting and drinking, with the exception of

11  marriages and wedding -- and funerals, basically created a

12  situation where it was hard to tell whether there was actually

13  an Indian attack under way or not.  It was not concerned with a

14  general hazard to others caused by people drinking and firing

15  guns, but by the fact that it could confuse people about whether

16  an Indian attack was under way.

17  Q    Do you recall the discussion of whether or not you relied

18  on Mr. Roth in previous reports?

19  A    Yes.  I remember the discussion.

20  Q    And were you relying on Mr. Roth, or were you refuting

21  Mr. Roth in your prior reports?

22  A    I was refuting Mr. Roth.

23  Q    Have you ever actually relied on an opinion of Mr. Roth in

24  forming your own opinions?

25  A    No.  In many cases, I do not know whether he is right or

1   wrong.  And if I don't have any clear evidence that he's wrong,

2   I tend to assume that he probably does know what he's talking

3   about.  Also, I did notice in one of the columns on Exhibit B

4   says gunpowder explosives licensing.  What part of this waiting

5   period law applies to explosives?

6   Q    I believe we've touched on this before, but just to

7   reiterate, were you aware of any government prohibitions on

8   acquiring firearms prior to the Civil War?

9   A    Only ones that limited Indians, Catholics, and Blacks from

10  obtaining weapons.

11  Q    But not the general public?

12  A    A free white person had nothing to worry about.  I'm not

13  even sure that indentured servants who were white had anything

14  to worry about in terms of buying weapons.  In fact, some of the

15  colonial laws actually specified that when you received your --

16  when your indentureship was up and you were a free citizen, a

17  master was required to give you a gun if you were a male.

18  Q    What is your interest in the history of firearms

19  regulation?

20  A    Well, I was -- I was in -- growing up, I was in California

21  working on my bachelor's degree in history at the time in 1989

22  when California passed the Roberti-Roos Assault Weapons Control

23  Act of 1989.  This was such a absurd law in that they were

24  responding to one particular incident with a general law that

25  applied to hundreds of thousands of Californians who were not a

1   threat of any sort.

2          And in that case, the California Department of Justice,

3   the final report on the matter admitted that the [inaudible]

4   mass shooting was the result of the fact that the person that

5   committed the mass murder was someone who had fallen through the

6   cracks of the mental health system in California, which in fact

7   was a common problem at the time.  They were chasing the

8   wrong -- wrong bird up the tree.

9   Q    Is it fair to say that you're a true believer in the Second

10  amendment, and not in this for the money?

11  A    If I were in this for the money, I would be very confused.

12  I'm independently wealthy.  I don't need any of the money that I

13  make for this.  Right now it's just paying for landscaping.  A

14  lot of it is that when I teach American history, one of the

15  things I have my students read is the part of Federalist 46

16  where James Madison explains that one of the great -- he was

17  explaining why a Bill of Rights was really not needed as part of

18  the new Constitution, because in the event that a tyrannical

19  president came into power, the population -- the armed

20  population of America so outnumbered any sort of standing army

21  that could be created that there was no -- that such a

22  government would not survive.  And I think this America that --

23  that view that a well-armed population is a restraint on a

24  tyrannical government.

25          I used to buy ice cream cones from a woman with a

1   tattoo on her arm.  It was not a very fashionable tattoo.  It

2   was just a number.  She had been tattooed in concentration

3   camps, and she's a reminder of what happens in societies where

4   there's no effective resistance to a tyrannical government.

5            MR. NATION:  Thank you, Your Honor.  Nothing further

6   from this witness.

7            THE COURT:  Thank you.

8            MR. NATION:  Thank you, Mr. Clayton [sic].

9            THE COURT:  Thank you, sir.  Your testimony is

10  completed.  Thank you very much.  Next witness, please.

11           MR. ABBAS:  Your Honor, that concludes the plaintiffs'

12  witnesses.

13           THE COURT:  All right.  That's fine.  Are you ready

14  with your first witness?

15           MR. KOTLARCZYK:  Yes, Your Honor.  One housekeeping

16  matter about defendant's case before we do that, and I think

17  this was probably just addressed by the Court admitting all of

18  the exhibits.  Professor Spitzer was not available because of a

19  preexisting commitment to be here today.  We had conferred with

20  plaintiffs ahead of time and let them know we were amenable to

21  moving the hearing if they needed cross examination, but they

22  had no objection.  So, that's the reason he's not here today,

23  Your Honor.

24           THE COURT:  Well, these things are always difficult

25  because they're rushed, and we don't have the chance, and both

1 sides -- let me just put it this way.  It's not my first rodeo.

2 I understand the shortcomings or the need to prepare more, but

3 we will do with what we have.  Okay?

4         MR. KOTLARCZYK:  Appreciated, Your Honor, and we're

5 ready to begin with our first witness.

6         MR. SULLIVAN:  The Governor calls Dr. Randolph Roth.

7         THE COURT:  There he is.

8         THE WITNESS:  Hello there.  I've got a crutch behind

9 me.  I fractured my leg.  I'm wearing a boot here, going around,

10 backpacking accident.

11         THE COURT:  All right.  You're going to be sworn by

12 the clerk of our court at this point.  So, I will let her do

13 that.  Go ahead, please.

14         THE WITNESS:  Thank you, Your Honor.

15         THE COURTROOM DEPUTY:  If you could please raise your

16 right hand.

17     (The Witness is Sworn)

18         THE COURTROOM DEPUTY:  Please state your full name for

19 the record, and spell your last name.

20         THE WITNESS:  Randolph Roth, R-O-T-H.

21         THE COURT:  Mr. Roth, before you begin your testimony,

22 you have mentioned that you hurt your leg, and that you have a

23 crutch.  If at any time you're in pain or you need to stop the

24 proceedings, just let me know, and we'll do so.

25         THE WITNESS:  Thank you very much, Your Honor.

1          THE COURT:  All right.

2          THE WITNESS:  I appreciate that.  And I have hearing

3   aids too.  I'm 72, so I understand that.  They're on.

4          THE COURT:  The picture is frozen.

5          THE WITNESS:  Yes.  I can hear you.

6          THE COURT:  Okay.  The problem is you're still on the

7   screen with your right hand raised.  Is there something --

8          THE WITNESS:  Oh, no.  I can see myself animated and

9   talking right now.  I don't know what's going on.

10         THE COURTROOM DEPUTY:  So, he's going to have to go

11  out and come back in.  It's his connection.  I don't have any

12  control over that.

13         MR. SULLIVAN:  Dr. Roth, could you do us a favor and

14  try logging out and back in, please.

15         THE WITNESS:  I will do that.  My apologies.

16         THE COURT:  No problem.

17         THE WITNESS:  Let me leave and try to come back.

18     (Pause in the proceedings.)

19         THE WITNESS:  Am I here?

20         MR. SULLIVAN:  We can hear you, but your picture is

21  still frozen.

22         THE WITNESS:  I don't know what's going on.  I'm sorry

23  about that.  You know, I really would rather be animated and

24  speak.  I don't know what's going on.

25         THE COURT:  Well, let's just go ahead.  It's an

1  unavoidable problem.  So, let's just go ahead.

2          MR. SULLIVAN:  Dr. Roth, we're going to proceed.  So,

3  you just need to speak slowly and clearly for our court

4  reporter, because he cannot see your mouth currently when you're

5  speaking.  So, answers just need to be slow and clear.  All

6  right?

7          THE WITNESS:  Okay.

8          MR. SULLIVAN:  Dr. Roth, what do you do for a living?

9          THE COURTROOM DEPUTY:  Hold on, Counsel.  I need to

10  disconnect, and then we're going to try to get him in again.

11          THE WITNESS:  I just disappeared.

12          MR. SULLIVAN:  One minute, Dr. Roth.

13     (Pause in the proceedings.)

14          THE COURT:  There we go.  You're moving.

15          THE WITNESS:  I am?  Oh, that's good.

16          THE COURT:  Okay.  I don't think the framers had this

17  problem either.

18          THE WITNESS:  No.  I'm afraid, Your Honor, that this

19  is the first time I've ever been anything but a juror.  I've

20  never done this before.  And when I heard the plaintiffs'

21  opening remarks, the attorney's opening remarks, I said to

22  myself, oh no.  He's smart.  So, I think, you know, this is

23  going to be a rough ride here.

24          THE COURT:  Go ahead.

25

1                    **DIRECT EXAMINATION**

2    BY MR. SULLIVAN

3    Q    Dr. Roth, I'm going to ask you some questions, and again, I

4    just want you to speak slowly and clearly for our court

5    reporter.  Okay?

6    A    Sure.

7    Q    Okay.  What do you do for a living, Dr. Roth?

8    A    I'm a teacher, professor of -- college professor.

9    Q    And how did you become involved in this case?

10   A    Oh, the Colorado attorney general's office asked me to

11   develop an expert opinion on the history of violence in the

12   United States, including homicides, weapons used in such crimes

13   at different points in history, and responses of voters and

14   their representatives to these changes in levels of violence and

15   the nature of weapons that are used in homicides.  I was not

16   asked -- I just should add I was not asked to address the

17   specific law at issue in this case.  My charge was to speak to

18   longterm trends.

19   Q    Let me stop you there.  Were you able to reach an expert

20   opinion?

21   A    Yes.

22   Q    Okay.  Well, before we get to that expert opinion, I want

23   to talk a little bit about what qualifies you to deliver that

24   expert opinion on the topics that you just listed.  So, let me

25   ask you, tell us about your educational background.

1  A    I received a bachelor's degree in history with honors and

2  distinction from Stanford University, where I won the prize for

3  the outstanding honors thesis in the history department.  I

4  received my PhD from Yale University with distinction, and my

5  dissertation won the field prize in -- for the outstanding

6  dissertation in humanities.

7  Q    Can you tell us about the academic posts that you've held,

8  starting with your current post.

9  A    Yes.  I am currently the college of arts and sciences

10  distinguished professor of history and sociology at The Ohio

11  State University.  The administration insists on the "The."  I

12  have been here 38 years.  Before that, I taught seven years as

13  a -- first as an instructor, and then as an assistant professor

14  at Cornell College, a wonderful liberal arts college in Iowa.

15  Immediately before that I had my first job outside of graduate

16  school as a visiting instructor at the University of Vermont,

17  where I taught Vermont history.  And before that, I was a

18  graduate teacher associate, a number of courses taught by the

19  faculty at Yale, where my duties were not only to be a grader,

20  but in each case I was a discussion section leader.

21  Q    What have been your areas of focus at your academic posts?

22  Just briefly for us.

23  A    My focus is to do anything that I was asked to do.  In

24  other words, I've taught global history, American history,

25  environmental history.  Any time we need a new topic that we

1  don't have a faculty member, I've stepped up to the plate and

2  done that.  I have chaired an African American studies program

3  at Cornell College, taught African American history, women's

4  history, history of the west, history of the south, religious

5  history, and of course most relevant here, criminal justice

6  history, course on the history of violence.  And I teach

7  statistics at the college level for graduate students and for

8  undergraduates.

9  Q    Have you authored any books or articles on homicide or

10 violence in the United States?

11 A    Yes, I have.  My book American Homicide is a study of

12 homicide among adults from colonial times to the present.  And

13 it's interregional, international comparative history, trying to

14 get at the -- how rates have changed, the causal structure of

15 homicides.

16        I'm currently working on a companion volume which is

17 called Child Murder in America, which is about homicides of or

18 by children in the United States from colonial times to the

19 present.  It's a different book, because the causal mechanisms

20 are different largely when we're talking about murders of

21 children.

22        And of course I have published quite a bit on violence,

23 on statistical methods, public, you know -- for public forums,

24 when I'm asked to write about the history of capital punishment

25 or things like that.  But I have published voluminously in

1    peer-reviewed forums.

2    Q    That was just about to be my next question.  Are your

3    publications all peer-reviewed?

4    A    Most of them are.  Sometimes my essays are for edited

5    collections where the editors of the volume are really doing the

6    peer-review, although it goes out to peer-review, so I suppose

7    actually just about everything is peer-reviewed that I do, yes.

8    Q    Can you summarize briefly for us what if any research

9    you've conducted to author the publications you mentioned on

10   homicide and violence?

11   A    Well, you know, as I've said many times, to do the kind of

12   work we do, you have to go to the county and look at every scrap

13   of paper in the courthouse.  You have to look at docket books,

14   case files, indictment records, court minutes, everything that's

15   there.  Coroners requests.

16           And then in addition to that, you have to read every

17   single issue of every local newspaper.  And most of the ones I

18   work with are not on, you know, newspapers.com.  You have to sit

19   at the local library and go through every single issue to look

20   for violent crime and violent death.  And of course, so, I am

21   looking not only at homicides.  I am looking -- taking notes on

22   every sexual assault, every arson case, attempted murder,

23   aggravated assault, every suicide I find, every accidental death

24   I find, particularly firearms accidents.  So, I have voluminous

25   notes every time I go.

1    I have to look at the bridal records, which are kept

2  usually by clerks rather than by the legal system.  I look at

3  jail records.  I look at local histories based on oral tradition

4  and oral testimony.

5    And when I have finished with that, where I have

6  multiple sources, I use capture-recapture mathematics, which I

7  can speak to if you wish, which will help me -- which allows us

8  as historians to understand the degree to which the sources

9  undercount the number of homicides that have come to the

10  attention of the public.  Of course, the dark figure of only the

11  murderer knows he poisoned someone, we can't get that, but we

12  can get a remarkably high number of those.

13  Q   Dr. Roth, let me ask, you mentioned some statistics

14  training and instruction in mathematics.  Has your research

15  involved statistical data analysis as it pertains to your focus

16  on homicide and violence?

17  A   Absolutely, it does.  And I'd like the Court to know that

18  I've been blessed with wonderful teachers and opportunities.  I

19  took advanced -- thanks to the National Science Foundation, I

20  took advanced mathematics at a local college when I was a junior

21  and senior in high school.  I studied mathematics in the honors

22  program in mathematics at Stanford.

23    And I had wonderful training in statistics -- social

24  science mathematics, with some wonderful professors in the

25  political science department and the economics department at

1  Yale.  I learned econometric techniques of analysis.  And of

2  course with my friends and self-taught, I have tried my best, as

3  my colleagues have in our field, to keep abreast of all the

4  wonderful new changes that happen in computing, the changes in

5  new statistical methods.

6         So, I try to keep current all the time.  I can't

7  program computers, but today, you know, so much is available

8  online, and I have help from some sophisticated -- I collaborate

9  with folks in the math department, computer science department.

10 So, I do get a lot of help when I work on these things.

11        If I might say one more thing, to do the kind of work

12 we do, I pride myself in unusual cases.  For instance, I just

13 want to tell Judge Kane that for instance, in the Essex County

14 courthouse, a very poor county in Northeastern Vermont, the case

15 files are in the dirt crawlspace under the -- and three-foot

16 high.  And they sent me down there for a week, and I down --

17 there was a light bulb, and I'm down there digging around trying

18 to keep the records straight.

19        This is not an easy thing.  I'm not playing around.  I

20 loved being down in that basement reading those things and

21 typing things up, but to do the kind of work that my colleagues

22 and I do in social science history, it is grunt work.  It is

23 systematic.  It is exhausting.

24        THE COURT:  That's called burrowing scholarship, I

25 think.  I think that's called burrowing scholarship.

1          THE WITNESS:  Yes.  That's true.  We -- we're willing

2    to take it for the team, you know.

3    Q.    (By Mr. Sullivan) Well, Dr. Roth, we're not going to send

4    you into any crawlspaces today, but let me ask just a couple

5    more questions about your background.

6    A     Sure.

7    Q     Have Courts recognized you as an expert in the fields that

8    we've been talking about, homicide and violence?

9    A     Yes, they have.

10   Q     How many times?

11   A     I have currently been retained -- this just started last

12   year, because of the Supreme Court decision.  So, now I think

13   I've been retained by eight states in the District of Columbia,

14   the Department of Justice, and a number of counties and local

15   municipalities in Colorado and in Illinois.

16   Q     Are you paid for your work, Dr. Roth?

17   A     Yes.  I offered to go pro bono, and I'm glad I didn't.

18   Q     Are you being paid in this case, Dr. Roth?

19   A     Yes.  I'm making the same money that Mr. Cramer is, $250 an

20   hour.

21   Q     And is your pay in any way dependent on the content of your

22   expert opinions in this case?

23   A     No.  Not at all.  No one has ever asked me to change

24   anything that I have to say.

25   Q     Dr. Roth, I sent you, I believe yesterday, Exhibit 31 from

1   our notebook binder.  Would you pull up Exhibit 31 for us.  And

2   this is in the black binder, Your Honor.  Let me know when you

3   have it, Dr. Roth.

4   A    I don't see it.  Which -- is this my vitae?

5   Q    This is your vitae, yes.

6   A    Okay.  I have my copy of the vitae.  I think I've typed it

7   up so many times that I've got it memorized.

8   Q    Is this the copy that I sent you yesterday?

9   A    Yes, it is.

10  Q    Okay.  Is it a -- do you recognize it?

11  A    Yes, I do.

12  Q    Is it a true and accurate copy?

13  A    It is a true and accurate copy.

14        MR. SULLIVAN:  Your Honor, we would move to admit

15  Exhibit 31.

16        THE COURT:  It's already in.  I have admitted all the

17  exhibits.

18        MR. SULLIVAN:  Great.  Thank you, Your Honor.

19  Q.   (By Mr. Sullivan) So, Dr. Roth, I want to ask you -- now

20  that we've kind of talked about your background, I want to dive

21  into your expert opinion.  Can we start with a high-level

22  summary?  So, what is your expert opinion on how the history of

23  homicide and violence in the United States has shaped government

24  responses to gun violence, and in particular as it relates to

25  waiting periods for gun purchases?

1  A    Well, what I really found, I guess -- it's so complicated,

2  but what I really found when we're looking at the founding

3  period -- let's focus on that, around 1791.  The late colonial

4  period right into the early national period.  What's remarkable

5  about it is how low the homicide rates were going into the

6  revolutionary crisis.  As I said -- and I gave those numbers

7  for, you know, domestic homicide, homicides with relatives,

8  homicides among unrelated adults, and they're remarkably low by

9  today's standards.

10        And we have to also think of the work of my colleagues

11  and I have done that half of those people who died would not

12  have died today with the help of modern emergency medicine,

13  modern wound care, et cetera.

14        So, when you add that in, remarkable, when you think

15  that perhaps, especially after the revolution, immediately after

16  in the north and the mountain south, the homicide rates in the

17  United States among white Americans was probably the lowest in

18  the western world.

19        And what we see through that is that when we look at

20  the founders, they are looking back to the colonial period where

21  they were a relatively nonviolent society, at least for the

22  adult colonists.  Homicide rate was starting to decline again

23  after a surge during the revolution, and they're very optimistic

24  about the future.  And so they're not focused in 1791 on

25  interpersonal violence.  They're focused on other things.

1        Foreign threats, slavery [inaudible], domestic

2   insurgency, as with the Shays' Rebellion.  And what we see is in

3   these homicides, when the homicide rate is low in the

4   muzzleloading era, black powder era, only 10 or 15 percent of

5   homicides among unrelated adults, among intimate partners, among

6   relatives are committed with firearms.  Tremendously low.

7        When you have a surge in violence as you did during the

8   revolution, you see a rise in rate at which firearms are used in

9   homicides, rise to 40 percent.  And that has happened

10  continuously, because they're going armed and prepared with

11  their guns loaded to confrontations over property, politics, et

12  cetera.  Those hostile and defensive motions, the motions go

13  through society.

14       So, I guess what I'm saying is that, you know, the

15  reason why there would be no specific laws having to do with

16  waiting periods is because impulsive homicides were extremely

17  rare, and they occurred when guns were loaded for another

18  purpose.  That is militia training and hunting.  When people got

19  drunk when they were hunting, when they got drunk at militia

20  training, they had these tiffs.  People were disrespected, and

21  boom, they were dead.  But these weapons were extremely

22  difficult to use on the spur of the moment.

23  Q    So, let me get into some -- there's a lot there to unpack.

24  Let me try to ask a couple questions about what you just said.

25  A    Sure.

1  Q   So, we talked about how the founding era, homicide rates

2  were extremely low.  How did -- those low homicide rates, how

3  did they compare to today, for example?

4  A   Well, they were fairly low by today, particularly when we

5  consider how many people would have survived today.  And

6  Mr. Cramer is citing the FBI statistics.  He doesn't realize the

7  work of Michael Mullins, my friend and colleague, his database

8  on the uniform crime reports, which is available on the

9  historical violence database, of which I am the founder, shows

10  that the level of reporting is terrible.

11         You know, there are tremendous gaps in these records,

12  and also in the supplementary homicide reports.  The FBI data

13  can't be relied on, and we're working on fixing it, but

14  especially low -- it's especially low when it comes to rural

15  areas, and low when we talk about rural townships.  They just --

16  the way the FBI does it is they ask you to fill out all these

17  forms.  It gives you no money or staff to do so, and then

18  there's no requirement that you turn it in.  What happens?  It's

19  a Swiss cheese.

20         And so you get an urban bias, which overstates the

21  degree, gives you the false impression that people of color in

22  the inner city are far more violent than rural people.  You

23  know, when I've looked at -- we have this Homicide Data

24  Improvement Project in Ohio right now, and we're finding that --

25  and I published on this.  We're finding that in the 17 -- 1970s

1  and 1980s, the homicides in rural counties in Ohio, only

2  59 percent of them were reported to the FBI.  So, what we're

3  seeing is our homicide rate is much higher than we would think.

4  Q    So, let me ask --

5  A    So, Mr. Cramer is not wrong in form.

6  Q    So, let me ask a question about specifically family and

7  intimate partner homicide at that time.  Was that category of

8  homicide also low in the founding era?

9  A    Very low.  So low that we don't do rates, can't do rates

10  per hundred thousand.  We have to do rates per million.  It's

11  such a rare thing.  Now, what we do see is the level -- because

12  these are mutually-dependent relationships, family-owned farms

13  and shops, the level of nonlethal violence is very high in the

14  colonial era, because that mutual dependence, people get angry

15  when they feel that their spouse is not pulling their weight,

16  and you see a high level of intimate partner violence, but not

17  lethal.

18      Because you can see when there are homicides, they're

19  almost always manslaughters, in which a typical abuse goes too

20  far.  And they run for help to keep their spouse alive to help

21  on the farm with the shop.  So, these are -- there's a --

22  there's a, you know, restraint there.

23  Q    So, of the rare homicide at that time amongst family

24  members, intimate partners, or the violence that you're talking

25  about, how is that typically committed?  What weapon was used,

1  if any?

2  A    These are often done impulsively on the spur of the moment,

3  and almost never done with guns.  What they were doing, they

4  pick up an ax.  They pick up a chunk of wood.  They pick up a

5  metal frying pan or pot, or they just kick one another to death

6  or beat one another to death with fists.

7  Q    And by --

8  A    Household implements.

9  Q    Why were firearms not used?

10  A    Well, you know, as I said -- and I know that --

11  respectfully disagree with Mr. Cramer on this issue.  They're

12  very hard to load spontaneously.  You need to gather your powder

13  and shot and wad.  You have to pour that powder into the

14  firearm.  You have to tamp down the wad.  You tamp down the

15  ball.  You need to change the percussion cap or sometimes put in

16  a fresh flint, and then you pull and aim.  But by the time you

17  do that, the person you're threatening should be a half mile

18  away.  And so what you will see -- and again, that's the rule.

19        I would say at this point, maybe we should put in

20  later, Mr. Cramer is wrong in saying that I never said that

21  people kept them loaded.  What we find is that when you need it

22  on the frontier, for instance, of northern New England in the

23  colonial era, when there was a constant threat from the -- of

24  attack from the French and their Native allies, people tried to

25  keep them loaded as long as they could, and they put it in the

1    dryest, warmest place they could, over the mantle, to have it

2    ready.

3         But even then, that's a risky business, because the

4    powder is hygroscopic, and so if it gets damp, the charge won't

5    fire, or else it will corrode the barrel.  So, you really had to

6    keep that firearm clean and unloaded as often as you could.

7    Q    So, Dr. Roth, other than what we've been talking about, the

8    low homicide rate at the time, and the kind of limited

9    technology, firearm technology at the time, is there anything

10   else that you attribute to the lack of waiting period laws at

11   the founding era?

12   A    Well, you know, they didn't understand that, especially --

13   and this is something I would have prepared had I had been

14   asked -- they didn't understand impulsivity to the same way that

15   we do psychologically, particularly when it comes to suicide.  I

16   have studied suicides.  I have published on suicide rates in

17   northern New England from 1784 down to 1824.  I published on

18   this with a capture-recapture analysis.  I'm 95 percent

19   confident that the suicide rate was somewhere between three and

20   5.5 per hundred thousand per year, which is a third of what it

21   is today in the United States.

22        And only 16 percent of those were committed with

23   firearms.  They hang themselves.  They cut their throats.  They

24   drown themselves.  So, and when they thought about suicide, they

25   had a very strict legal understanding of it.  Either you were

1  not culposo mentis, because you suffered from some kind of

2  melancholy or deep schizophrenia, or they said you're a felo de

3  se, you willfully killed yourself.  They had no category for

4  understanding what we do today that so many suicides, the

5  feelings are transient.  They can come and go in a single day.

6         And so this is the kind of impulsivity that the

7  founders didn't understand, and of course because suicide was

8  rare at this time, and rarely done with firearms, which is a

9  very lethal way of trying to kill yourself, they didn't see a

10  need.  They couldn't perceive it the way that the State of

11  Colorado can do today, where white male non-Hispanics in the

12  United States are now killing themselves at a rate of 30 per

13  hundred thousand a year.

14         And to put that in risk, you multiply that risk over

15  the life expectancy, which is 75.3 years.  Which means if these

16  rates that we have now, which are 50 percent higher than they

17  were in 1999 nationally, one out of every 44 white male

18  non-Hispanic Americans born in this country is going to kill

19  himself.  This is a problem they didn't have.

20  Q   Dr. Roth, let me ask -- I'm going to switch gears a little

21  bit.  I want to ask you about some of the criticisms leveled

22  against you by Mr. Cramer.  Were you listening in earlier to

23  Mr. Cramer's testimony?

24  A   I was listening, and my list was growing.  It's not that I

25  don't have great respect for Mr. Cramer, but my list was

1  growing, yeah.

2  Q    Let me ask about some of the specifics.  And I know there

3  was a lot here, but let me try to take them one by one, and we

4  will move through them.  So, one of his first criticisms of you

5  is that your book, American Homicide, looks at homicide rates

6  rather than murder rates.  How do you respond to that criticism?

7  A    Well, our goal as social sciences is to be comprehensive.

8  So, when he says unintentional homicides, what that really means

9  is manslaughters, willful assaults to harm that ended in death.

10  We look -- I look at justifiable homicides.  I look at homicides

11  by law enforcement officers and of law enforcement officers.  We

12  look at homicides of relatives, intimate partners, romantic as

13  well as marital.  We look at homicides among unrelated adults.

14        And why we do that is to see if each of these

15  distinctive kinds of homicides go up and down together.  That's

16  why we look at it.  And what Mr. Cramer does not mention is that

17  what I found is that rates of justifiable homicide among

18  unrelated adults go up and down with the unjustified homicides

19  among unrelated adults.  They're part of the same system.

20        And when the homicide rates are high, law enforcement

21  officers are more likely to be killed and to kill.  And when the

22  homicide rate is low, police officers are less likely to get

23  killed and less likely to kill.

24        So, in other words, what I wanted to do, what my

25  colleagues wanted to do is to look at every category of homicide

1  and see which ones go up and down together.  So, and he

2  misrepresented my work and ignores the fact -- he says, oh, you

3  threw these in.  They go up and down together.

4  Q    So, let me move forward in Mr. Cramer's report.  So, he's

5  got a paragraph 126 in his report where he suggests that

6  six percent of civilian firearm homicides are actually

7  justifiable, and thus not murder.  Do you have a response to

8  that?

9  A    Every case, all of my data, are online.  Every single case.

10  And I outline the ones that are by self-defense.  I understand

11  that self-defense is not murder.  But it's still a homicide;

12  right?  And so what I do is I distinctly talk about those.  They

13  are a minority of homicides today.  Among unrelated adults, they

14  were a minority of homicides back then.  So, I'd say, yeah,

15  six percent.  And I don't see how that changes these dramatic

16  swings in homicide rates where they double or triple or

17  quadruple and then drop precipitously.  That won't affect the

18  overall argument.

19  Q    So, let me move forward.  In paragraph 134 of his report,

20  Mr. Cramer takes issue with your analysis of murder rates in the

21  slave south.  Is he correct?

22  A    No.  The thing that's -- he characterizes -- he puts words

23  into my mouth and claims that I said that the homicide rate in

24  the slave south rose after the revolution because of people

25  carrying concealed weapons.  That's not what I said at all.

1   What I said is that when you have a democratic revolution, and

2   you fail to realize that promise, it's like throwing a match in

3   a can of gas.  And that was a caste and class-bound society.

4        So, what happens when enslaved people see people free

5   in the north and in Haiti?  In Haiti by violence.  They saw how

6   many enslaved people fled to freedom during the chaos of the

7   revolution.  Enslaved people became more restive, more angry,

8   more resentful.  And you will see that whites become more

9   fearful of African Americans.  So, you're going to see a lot

10  more violence.

11       What you're going to see also is from the elites,

12  especially public figures like militia captains or attorneys or

13  editors or politicians, they don't get the deference that they

14  did before the revolution, and they're constantly angry about

15  people disrespecting them.  This [inaudible] people.  And you

16  will see that middling and poor white southerners can't get

17  ahead in this caste and class-bound society that's promising

18  them freedom, that's promising them upward mobility.

19       And so you see people, the hostile, defensive emotions

20  course through that society.  People become angrier about any

21  sign of disrespect.  Do not disrespect me.  Do not try to

22  dominate me.

23       And so let me finish just one more thing.  So, what

24  happens is homicide rates go up.  And because these emotions are

25  there, people start to carry concealed weapons of all types for

1  defensive reasons and for hostile reasons and to demand respect,

2  and that allows an increase in impulsive homicides.

3        So, in other words, the concealed weapons are not the

4  fundamental cause for why homicide rates run up in the slave

5  south.  That had to do with the failure of nation-building, not

6  building a legitimate society, not building a society where

7  there is solidarity, patriotic solidarity among all people.  So,

8  that's what's driving it.  And when you throw weapons into it,

9  new uses of weapons and new kind of weapons, you make the

10 homicide rate worse than what it has been because you allow

11 impulsive violence when you are disrespected.

12 Q   Dr. Roth, that actually gets to my next question.  So, in

13 paragraph 135 of Mr. Cramer's declaration, he suggests that you

14 attribute the increase during the 19th century, the increase in

15 America's homicide rate solely to advancements in firearm

16 technology, and you're saying that's not right.  Is that what

17 you're saying?

18 A   That is a complete misrepresentation of my point.  As you

19 know from -- as he knows from my work, my latest thing is why

20 guns aren't the problem.  One of the reasons why I had such a

21 great reception in the conservative media, why reason.com named

22 my book book of the year, I got praise in the, you know,

23 Washington Standard, in gun magazines, because I made it very

24 clear that firearms are not the fundamental reason why we became

25 a violent society compared to other affluent societies.

1    It's because of our failures of nation building, our

2  political instability, our lack of faith and trust in our

3  government, our lack of fellow feeling among ourselves, which

4  blew apart during the sectional crisis, and was already growing

5  in the slave south in the ante bellum period.  And I said -- but

6  I said, guns contributed, and new kinds of technology made

7  things worse.  And the use of those weapons made things worse

8  than they would otherwise be.

9    So, what I found is that my focus is kind of a

10  Rorschach test.  If you are a gun-rights person, you see the

11  first argument, and you don't see the second.  And gun-rights

12  people say, hey, he's saying guns are important.  You know, they

13  are important.  And technology is important.  And we need to

14  have reasonable regulations.  But they ignore that that's not

15  going to be the fundamental solution to problems, because we

16  have to build a stronger nation.  And right now, we're not doing

17  that.

18    So, I'm kind of stuck in between, Grant, and I get

19  misrepresented all the time.  But guns are a problem, and to

20  claim that guns have nothing to do with it on the one hand by

21  Mr. Cramer, which is just not true, and then to claim that I'm

22  blaming guns for everything, which I've never said, what can I

23  do?  I'm a scholar.

24  Q    Let me switch gears, Dr. Roth.  I want to take us to a

25  different part of Mr. Cramer's declaration.  I want to take us

1  to where he's talking about firearm technology.

2  A    Right.

3  Q    So, he wants to kind of take issue with your description of

4  the technology at the time, how they were -- firearms were

5  muzzleloading.  They had limits on accuracy, could only fire one

6  shot, and the like.  And he first has a section that criticizes

7  the idea that firearms at the time were not accurate.  Do you

8  agree with him?

9  A    What I agree with and what -- he took that statement and

10 modified it, didn't he?  I know that rifle muskets were

11 tremendously accurate.  I've fired black powder muskets as a

12 scholar.  Those things, you can hit things from a distance.  And

13 as we know from the Civil War -- I studied the Civil War.

14 General Reynolds at the first day of battle of Gettysburg was

15 shot dead through the neck from hundreds of yards away by a

16 sharpshooter.  Officers, confederate and union officers on

17 horseback were sitting ducks, because those were so accurate.

18        But what we know from that period is that very few

19 people had actually rifled muskets.  They had mostly smoothbore

20 weapons.  And smoothbore weapons, the ball rattles out.  It

21 doesn't spin, and it could go any which way.  It's why we

22 fought -- our revolutionary army fought the way it did.  You had

23 to fire with volleys, because, you know, at distance, I can aim

24 that smoothbore musket at someone, but I don't know what I'm

25 going to hit.  But if I'm standing next to people who are also

1  firing, we're going to hit just about everyone, even though it

2  can't do much past 25 yards.

3         So, accuracy is not the question.  And these are lethal

4  at short range.  There's no question about that.  But the thing

5  is, it is just surprising to me to claim that these black powder

6  weapons could be kept loaded at all times.

7  Q    Let me stop you and ask a question about that.  So, about

8  how they are stored, either loaded or unloaded --

9  A    Yeah.

10 Q    So, he has a whole section on this in his report,

11 Mr. Cramer does, suggesting that black powder arms were actually

12 frequently kept loaded, not unloaded as you suggest.  What's

13 your opinion on that issue?

14 A    Well, all you need to do is look at section -- I think it's

15 section 32 of my declaration and look at what the arms industry

16 said.  Look at what Smith & Wesson said when they solved that

17 problem with their amazing innovation in 1857, which was the

18 five-shot repeat fire .22 caliber breechloading revolver.  And

19 in other words, they encased the black powder in a bullet so it

20 couldn't corrode the barrel, and it could be kept dry at all

21 times.

22         So, I want to read that from the Smith & Wesson.  They

23 said, some of the advantages that are constructed on this plan,

24 the convenience and safety with which both the arm and

25 ammunition may be carried, the facility with which it may be

1    charged.  It required no ramrod, powder [inaudible], or

2    percussion cap.  In other words, saying, it takes time to load a

3    cap and ball revolver, the Colt.  It takes time to do these

4    other -- to a black powder weapon.  This is easy.

5         Secondly, it says it's certain to fire in damp weather,

6    because why?  Because the charge was hygroscopic.  If you kept

7    it loaded and let the natural humidity come in, the powder

8    wouldn't explode.  And then it says that no injury is caused to

9    the arm or ammunition by allowing it to remain charged any

10   length of time.

11   Q    Let me have you --

12   A    There it is.

13   Q    Dr. Roth, I want to stop you, because I want to give the

14   court reporter time to catch up.

15   A    Sorry.  I get excited here.  I'm nervous too.

16   Q    No.  Let me ask --

17   A    And I know the plaintiffs are waiting for me.

18   Q    Just let me -- so, take a deep breath, and slow down for

19   just a second so our court reporter can catch up.

20   A    My apologies.

21   Q    That's okay.  So, I just got one or two more questions.  I

22   wanted to ask you about Mr. Cramer's suggestion that multi-shot

23   firearms were widely used at the founding.  He calls them

24   pepperboxes.  And this is really just a short question.  Do you

25   agree with his conclusion on pepperboxes?

1  A    No.  They were very rare.  And every probate citing we have

2  shows that handguns were rare.  Most people -- most probated

3  estates have long weapons.  So, if pepperboxes are a minority of

4  a minority of pistols, they're just not significant.  And in

5  fact, I can't think of a single homicide I studied that was

6  committed with a pepperbox.  I'm sure there are some, and I'm

7  sure Mr. Cramer can tell us about them, but in my systematic

8  work, I have only seen, you know, very rarely -- when there are

9  homicides with firearms or suicides with firearms, it's almost

10  always with a long weapon.

11  Q    All right.  So, one last question on Mr. Cramer.

12  Recognizing that you got his 59-page report less than two days

13  ago, any other disagreements in Mr. Cramer's report that you

14  want to highlight?

15  A    Well, you know, let me think a minute.  One of the tough

16  things here is that, you know, I did not have access to this in

17  time, and I'm a scholar.  It takes me time to think these things

18  through.  But what I would like to say, for instance, you know,

19  some of the things that Mr. Cramer said were just misleading.

20       For instance, he said in his testimony today that I

21  claim that a murder -- that this murder was not a mass murder

22  that he talked about in California.  And the point that I made

23  was quite different.  He was trying to say that you can kill as

24  many people with a knife as you could with any kind of weapon

25  today.  You can commit mass murder with it.  And the examples

1    that he picked showed that you couldn't.

2         What I said was, look, here you see multiple murders

3    over time, but the two assailants, they attacked one person or

4    two people at a time, serially.  If they tried to attack an

5    entire room full of adults as two people with knives, they would

6    have been stopped.

7         The other cases that he called mass murders, yes, they

8    were mass murders.  They were millicides, but most of the

9    victims were children.  All he proved was not that knives were

10   as deadly as modern firearms.  What he showed is that, you know,

11   children can't defend themselves against an attack by an adult

12   with any kind of weapon.

13        And so, you know, he's essentially trying to make me

14   look like I don't know what I'm doing, when in fact, I do.  And

15   the cases that he brought forward, we can go into this blaming

16   Hispanics for the crime problem when we know you account for

17   poverty, that first-generation Hispanics are less violent than

18   other Americans.  That's why El Paso and San Diego have such low

19   homicide rates.

20        Reporters there have called me and asked, why do we

21   have such low homicide rates?  Well, it's because

22   first-generation immigrants from the Caribbean, from Latin

23   America are less violent given the circumstances than

24   native-born Americans.

25        And so there's all this kind of stuff that -- he's just

1  not a criminologist.  And so it's just kind of Whac-A-Mole.  I

2  don't know how to keep responding.

3          MR. SULLIVAN:  Thank you, Dr. Roth.  Your Honor, could

4  I have one moment?

5          THE WITNESS:  And could I do one more thing, Grant?

6  One more response?

7  Q.    (By Mr. Sullivan) One more response to Mr. Cramer?

8  A    I need to, because of something he said.

9  Q    Please go ahead.  Briefly.

10  A    Yes.  He took credit for bringing down the fraud of Michael

11  Bellesiles.  Certainly Clayton deserves some credit.  I

12  corresponded with him.  We supported him.  But what he doesn't

13  mention is it requires statistical knowhow and deep immersion in

14  the probate records and in the homicide records to bring him

15  down.

16          And who did that in the Yale Law Journal?  My friend,

17  Jim Lindgren, who is a libertarian scholar, law professor at

18  Northwestern; and myself; and Gloria Main in the William and

19  Mary Quarterly.  We were the ones who brought that out.  I don't

20  want to deny credit to Mr. Cramer, but he clearly wants you to

21  believe that no one else was responsible.

22          And it's amazing to me, because I was the scholar who

23  was most responsible for bringing him down and exposing this

24  fraud.  In many cases, you know, for instance -- and I know

25  Judge Kane would be interested in this -- he found no homicides

1    in Plymouth Colony in the 17th century, and why?  Because he

2    looked at the county court records that didn't have jurisdiction

3    in felony cases.

4            So, that kind of sloppiness, yeah, but I exposed that.

5    So, again, I don't want to deny Mr. Cramer that, but I went

6    after this book, which made the outrageous claim that the arms

7    industry and guns were the sole reason why we are a homicidal

8    nation today.  That is wrong.  And the argument was based on

9    fraud, just faked statistics, and citations of records that

10   didn't exist.

11           MR. SULLIVAN:  Thank you for that clarification,

12   Dr. Roth.  I'm going to let plaintiffs' counsel ask you some

13   questions now.

14                       **CROSS EXAMINATION**

15   BY MR. ABBAS

16   Q    Hello, Mr. Roth.  Can you hear me?

17   A    Yes.  I can hear you.  How are you?

18   Q    Doing well.  How are you?

19   A    A little nervous, but I'm coping so far.  But I gave you a

20   compliment already.  I'm worried about this.

21   Q    I heard that, and I thank you for the compliment.  I can

22   definitely tell you're smart as well.  However, we might see

23   things from a different perspective.  Regardless --

24   A    I'm sure we do.

25   Q    -- I have some questions here for you.

1  A    Certainly.

2  Q    And so I'm going to ask you a series of yes or no

3  questions.  We're kind of short on time, so I need you to answer

4  in a clear yes or no for the court reporter.  Do you understand?

5  A    Yes, I do.

6  Q    All right.  And are you an expert in firearms technology?

7  Yes or no.

8  A    I know a great deal about it.

9  Q    Okay.  And what sort of firearms technology are you an

10 expert in?

11 A    I know a great deal from what I've read, from what I know,

12 people I've talked to.  So, in other words, I know a lot about

13 black powder weapons.  I know a lot about rimfire and percussion

14 cap revolvers, because I need to know that sort of thing.  But

15 certainly I do not -- I have friends who I rely on who actually

16 testify in court specifically as firearms specialists, Rodney

17 James and other people I know.  So, I do learn a lot from people

18 who know more than I do.

19 Q    And one of the premises of your opinions was essentially

20 that between the Second amendment and the 14th amendment, it was

21 that the adopters could not foresee how firearms would develop;

22 is that correct?

23 A    That is true.

24 Q    And this is the same argument you've made in other cases;

25 correct?

1    A    Yes.  It's a constant change in the way things are used.

2    There's constant change in the natures of technology, and they

3    present new challenges that over 232 years, the voters and their

4    representatives have responded to in a measured, constructive

5    way.

6    Q    And that's even though that they encompass other laws in

7    the type of law that we're here talking about today; correct?

8    A    That is true, yes.

9    Q    And on this case, you are testifying to uphold the

10    three-day waiting period; correct?

11    A    I think it is prudent, yes.

12    Q    Okay.  And you don't actually make an analysis of the

13    three-day waiting period itself in your report; correct?

14    A    No.  I have not been asked to do so, and it would take me

15    time to prepare it --

16    Q    Okay.

17    A    -- if I were asked to do so.  That was left to other

18    people.

19    Q    And your only citation is of three waiting period laws from

20    1923; correct?

21    A    Certainly, yes.  And that I got from, you know, other

22    scholars.

23    Q    And you're an expert in a number of other cases as well;

24    correct?

25    A    Yes, I am.

1  Q    And those were on your CV.  I believe there's about 15

2  other cases; correct?

3  A    Yes.  I've unfortunately become the go-to guy for history

4  since the Supreme Court made its decision based on history.

5  Q    And each time you've been an expert witness in favor of the

6  Government; correct?

7  A    Yes, I have.

8  Q    And so you've been on the side of gun control each time;

9  correct?

10 A    That would be true.

11 Q    And in many of these cases, you've given opinions against

12 what you would call large-capacity magazines; correct?

13 A    Yes.  I think that they are dangerous.

14 Q    And that's a personal belief.  You personally believe that

15 they are dangerous?

16 A    Well, you look at the statistics about the difference we

17 have when you know the firearms that are used.  Large-capacity

18 magazines, when they are used with the same kind of weapon, kill

19 and wound more people than when they're -- when these mass

20 shooters are using a ten-round magazine.  It's just a

21 statistical analysis of the data from extreme mass shootings,

22 the kind that we're really trying to deal with where you see one

23 person trying to kill a maximum number of people in a matter of

24 minutes or seconds.

25 Q    But we've had much more efficient mass murderers in history

1  that have not used firearms; correct?

2  A    When it's a group activity, but certainly with dynamite.

3  Certainly with fertilizer bombs.  Certainly with airplanes.  We

4  have seen those kinds of things with --

5  Q    Arson; correct?

6  A    -- [inaudible].  Arson, certainly, with that [inaudible]

7  killing at the school.  Certainly, you can do those sorts of

8  things.

9  Q    So, we're jumping ahead a little bit.  So, let's go back.

10  So, each time that you've testified, you've been paid by the

11  Government; correct?

12  A    Yes, I have.

13  Q    At a rate of about $250 per hour; correct?

14  A    Exactly $250 an hour.

15  Q    And you are not a lawyer; correct?

16  A    No, I am not.

17  Q    You do not possess a law degree?

18  A    No, I do not.  I got a real good score on the LSAT.

19  Q    And you're not a psychologist; correct?

20  A    I know a great deal about psychology because of -- since I

21  have to, because -- no, I don't have a PhD in psychology, but I

22  am a criminologist.

23  Q    But that's still not a degree in psychology; correct?

24  A    Oh, absolutely true.  But it doesn't mean that I don't know

25  a lot about psychology.

1   Q    So, you study homicide rates; correct?

2   A    I study all kinds of violence, violent crime and violent

3   death.  Homicide is one of my central foci.

4   Q    So, when you discuss homicide, as you stated earlier, those

5   include acts of justifiable homicide; correct?

6   A    Yes, they do.

7   Q    And justifiable homicide means acts of self-defense;

8   correct?

9   A    Absolutely.  And they're coded that way in my database.

10  Q    And you also include accidental or excusable homicides;

11  correct?

12  A    Not accidental homicides, no.  Negligent manslaughters are

13  accidental deaths caused by negligence, and they do not appear

14  in my work as homicides.  I'm very careful with that.  There's a

15  big difference between a negligent homicide and actual

16  homicides, and it's one of the problems with building a

17  comprehensive database with contemporary data, because so many

18  medical examiners classify negligent homicide, involuntary

19  manslaughter as a homicide, so you have to pull those out.

20  Q    But you're perfectly comfortable with including acts of

21  self-defense; correct?

22  A    Absolutely.  Because they are homicides, but I code them

23  separately and watch how they go up and down with other kinds of

24  homicide, which they do.  When it's dangerous, people are more

25  likely to kill in self-defense.

1  Q    So, you are aware of what a spurious correlation is;

2  correct?

3  A    Absolutely.

4  Q    And a spurious correlation is where two variables are

5  associated but not causally, due to either coincidence or a

6  third variable; correct?

7  A    That is true.

8  Q    And so for instance, an increase in justifiable homicides

9  could also be associated with an increase in other homicides,

10 but not actually caused by one another; correct?

11 A    What you see in the behavior is the confrontations that

12 lead to defensive homicides are the same kinds of confrontations

13 that are leading to willful homicides.  It's a case-by-case to

14 look at that correctly.  So, yes, it's not a spurious

15 correlation in any way.

16 Q    So --

17 A    And I have the [inaudible] narratives from there on the

18 web.  All of my data are there.  You can see it for yourself.

19 Q    So, as a historian, do you remember what the old west

20 saying was about Samuel Colt?

21 A    You know, about making people equal?

22 Q    And why was that?  Because he invented the Colt revolver;

23 correct?

24 A    That's right.  He invented the Colt revolver.

25 Q    A lot of people relied on that for self-defense; correct?

1  A    And for aggressive action, yes.  But not -- he was not the

2  major -- it was not really as mass marketed and mass produced

3  early on as many people think.  That took time.

4  Q    And, let's see.  At the start of the American Revolution in

5  1776, flintlocks were the standard firearm; correct?

6  A    Yes.

7  Q    And what we see throughout history is that wars inevitably

8  change technology; correct?

9  A    They can, absolutely.  But, you know, I don't see a

10 tremendous amount of change over the revolution.  That was a

11 brief period of time.

12 Q    And by 1833, the U.S. military adopted a percussion rifle;

13 correct?

14 A    I don't know that for a fact.  I would assume that you have

15 that fact and -- correct.

16 Q    That sounds correct to you, though?

17 A    I don't know.  I don't -- I haven't studied that.  I'm not

18 trying to doubt you.  No.  I'm sure you've done your homework.

19 Q    So, by the end of the Civil War, cartridge firearms were

20 commonplace; correct?

21 A    Cartridge firearms, what do we mean by cartridge firearms?

22 Because, you know, there were still muzzleloading weapons that

23 had a sort of cartridge.  In other words, they prepackaged the

24 powder and wad, et cetera, which increased the rate of fire

25 during the Civil War.  But when we talk about cartridge, we can

1  also talk about self-contained bullets that seal in the black

2  powder.  So, depends on what you -- I just want to know how are

3  you --

4  Q    Let's -- for these purposes, we're talking self-contained

5  cartridges.

6  A    Okay.  Yes.  They become more common, but the muzzleloading

7  black powder weapons stock is not completely replaced until

8  around 1910, around World War I.  It takes time for these

9  weapons to age out.

10 Q    Do you know what was in cartridges at that time?  What

11 powder?

12 A    What are you asking me about?

13 Q    Was it the same exact gunpowder that was used in firearms

14 that didn't take cartridges?  Yes or no.

15 A    I think it was different, but I can't remember offhand.

16 Q    And do you know what pinfire -- do you know what pinfire

17 is?

18 A    Centered rimfire versus rimfire, yes.  I understand that.

19 Q    Not center fire versus rimfire.  Do you understand what a

20 pinfire firearm is?

21 A    No.

22 Q    Well, let's go back.  Do you know what a brace of pistols

23 is?  Yes or no.

24 A    A brace of pistols?

25 Q    Yes.

1   A    Yes, I do.

2   Q    And a brace of pistols is a term for essentially a pair or

3   more of -- a pair or more of pistols, usually kept together in

4   the same holster; correct?

5   A    Yes.

6   Q    And do you know what a Puckle gun is?  Yes or no.

7   A    No.  No.

8   Q    Have you heard of a Cookson repeater?  Yes or no.

9   A    No.

10  Q    Have you heard of the Kalthoff repeater?  Yes or no.

11  A    No.

12  Q    Have you heard of Joseph Belton?  Yes or no.

13  A    No.

14  Q    Have you heard -- do you know what a pepperbox revolver is?

15  Yes or no.

16  A    Yes.

17  Q    Okay.  And those were revolvers that were popular before

18  the Civil War; correct?

19  A    I wouldn't call them popular.

20  Q    They were well known before the Civil War, though; correct?

21  A    They were well known, but they were not ubiquitous.

22  Q    And do you know what a harmonica gun is or a slide gun?

23  Yes or no.

24  A    I don't know that term.

25  Q    Okay.  Did you study the Lewis and Clark expedition?  I

1  know on your CV it says that you've taught about Thomas

2  Jefferson in particular.

3  A    You know, I have read books about it.  I know something

4  about it.  But, you know, I'm not an expert on the Lewis and

5  Clark expedition, no.

6  Q    Do you recall the 22-shot air rifle that he took on that

7  expedition?  Yes or no.

8  A    No.  I haven't studied that in any detail.

9  Q    And have you heard of a Girardoni air rifle?  Yes or no.

10 A    No.

11 Q    Do you know --

12 A    But again, I don't claim to be a firearms expert.  I defer

13 to my friends who are experts.

14 Q    You did testify here about technology and the role that

15 technology plays in firearms; correct?

16 A    But in a straightforward way, as we move from black powder

17 weapons, there are muzzleloaders or cap and ball revolvers.  And

18 as we move towards the modern breechloading revolvers, that's

19 the critical change.  And, of course, remember, I measured --

20 when I talk about the homicide rate rise that started nationwide

21 in the late 1840s and 1850s, was before those weapons were

22 available, and that surge in homicide happened without a lot

23 of -- without a majority of homicides being committed with

24 firearms.  It's when those new firearms come in that it becomes

25 a problem, and I can speak to that, why they were a problem.

1  Q    Well, before we get to that -- so, we will get to that.

2  The first -- we talked a little bit about the Colt revolvers.

3  The first Colt Walker was a revolver designed in 1846; correct?

4  A    I'm thinking 1836, but I could be wrong.

5  Q    Okay.

6  A    For the first Colt cap and ball revolver.  I thought it was

7  the 1830s.

8  Q    Well, we will get to that.  Let's see.  And by the Civil

9  War, both the north and south adopted the Colt models 1851,

10 1860, and 1861 revolvers; correct?

11 A    That is correct.  Yes.  They were using those revolvers.

12 Mm-hmm.

13 Q    And all of these Colt models had quickly replaceable

14 cylinders; correct?

15 A    Yes.  You could swap it out, and the usual kit came with

16 two cylinders.

17 Q    So, you could reload them really quickly; correct?

18 A    Yes, you could.

19 Q    In fact, there was a case about the first revolvers ever

20 patented in the U.S. around 1851; correct?

21 A    I don't know the exact date of that.  I know when Smith &

22 Wesson -- that's 1857 for their patent, and it expired in 1873.

23 I know that.

24 Q    And that's the Rollin White patent; correct?

25 A    Pardon?

1  Q    That is the Rollin White patent; correct?

2  A    That is part of -- Rollin White patented part of that

3  revolver.

4  Q    And that was a bored-through cylinder; correct?

5  A    Yes.

6  Q    Okay.  But before that, does *Colt v. Massachusetts Arms*

7  *Company*, 6 FCAS 161, from 1851 ring a bell?

8  A    No.

9  Q    Would it surprise you to know that in that court case, the

10  Court was citing revolvers as being relatively common as back

11  as [sic] 1818?

12  A    That would surprise me.

13  Q    Or at least being commonly known by 1818?  That would

14  surprise you?

15  A    Yes.  That would very much surprise me.

16  Q    Have you heard of the Volcanic Repeating Arms Company?  Yes

17  or no.

18  A    Yes, I have.

19  Q    And they manufactured high-capacity repeating pocket

20  pistols and rifles; correct?

21  A    I believe so, yes.

22  Q    And they were founded about 1855; correct?

23  A    I don't have knowledge of the exact year.

24  Q    Before the Civil War, though; correct?

25  A    Yes.  Before the Civil War.

1   Q    And are you familiar with Sharps Derringer?  Yes or no.

2   A    No.

3   Q    And you've heard of Remington Arms; correct?

4   A    Yes.

5   Q    They sold a revolver that became the 1858 Remington

6   revolver; correct?

7   A    I believe so.

8   Q    And that was also as --

9   A    And, again, I don't know these dates.  I don't know the

10  dates.  I don't have them here.

11  Q    But that was also used in the Civil War; correct?

12  A    I would not -- I don't know that.  I must plead ignorance.

13  I'm not a firearms expert, as I said.  I learn a lot from

14  others.  So, if that's what you want to say --

15  Q    Well, do you know --

16  A    -- we can just move on.

17  Q    Do you know about the Spencer repeating rifle?  Yes or no.

18  A    Yes, I do.

19  Q    And that was adopted before the end of the Civil War;

20  correct?

21  A    It was.

22  Q    And do you know about the 1860 Henry rifle?  Yes or no.

23  A    Yes, I do.

24  Q    And that was used in the Civil War; correct?

25  A    Yes, it was.

1   Q    And what did the confederate soldiers call that rifle?

2   A    I don't know.

3   Q    All right.  We will move along.  But it had a significant

4   magazine capacity; correct?

5   A    Some of those, you know, Sharps, they had large magazines,

6   yes.

7   Q    Approximately 15 to 16 shots; correct?

8   A    They were large-capacity magazines, yes.  They were lethal,

9   and killed a lot of people.

10  Q    And then in 1866, the Winchester lever-action rifle was

11  released; correct?

12  A    I believe that the Winchester lever-action rifle was about

13  that time, yes.

14  Q    About 14 rounds, correct, in that firearm?

15  A    That sounds correct to me.

16  Q    And then let's get back to the Rollin White patent.  That

17  was a patent for bore-through cylinders, as you had agreed to.

18  And that meant that revolvers could use metallic cartridges;

19  correct?

20  A    Mm-hmm.  And be breechloading, yes.

21  Q    Did you hear about something before that called a Thuer

22  cartridge conversion?  Yes or no.

23  A    No.

24  Q    And there were patent cases about the Rollin White patent,

25  because Colt desperately wanted to use cartridge revolvers back

1    in the 1850s; correct?

2    A    That is correct.  And they didn't win.

3    Q    But as soon as the patent expired, they started making

4    them; correct?

5    A    And which shows the advantage of modern breechloading

6    firearms over muzzleloading or cap and ball revolvers or

7    muzzleloading weapons.  Absolutely.  So, that makes the point.

8    Q    And you could own a cannon in the early United States;

9    correct?

10   A    I have no idea.  I imagine you could.  There was no law

11   against it.

12   Q    All right.  And so you could also own grapeshot at that

13   time; correct?

14   A    I imagine so, because there was no law that I know of

15   against it.

16   Q    Okay.  So, people at that time were still capable of

17   causing great harm; correct?

18   A    People have always been capable of causing great harm.  But

19   not the kind of harm that they can cause with dynamite,

20   airplanes, fertilizer bombs, or with a modern, you know, high

21   muzzle velocity semiautomatic weapon.

22   Q    So, metallic -- let's go back, though.  Metallic firearm

23   cartridges are practically the same as they were in the 1800s;

24   correct?

25   A    Which again?

1  Q    I said --

2  A    I'm sorry.  I didn't hear.

3  Q    Metallic firearm cartridges are practically the same as

4  they were in the 1800s; correct?

5  A    Today, they're very similar, yes.  The one big difference

6  that really occurred, and my late friend and late colleague Eric

7  Monkkonen has said one of the big innovations was

8  factory-manufactured ammunition for breechloading firearms.

9  Before then, when you had to load it yourself, people often

10 underloaded it so the bullet would just kind of go poof.  What

11 you will see is when math --

12 Q    Are you testifying here today that in the Civil War, they

13 didn't have factory-loaded cartridges?  Yes or no.

14 A    No.  I'm saying that when factory-loaded cartridges became

15 available, those weapons could be used much more effectively.

16 That's all I'm saying.

17 Q    But if cartridges have been around since essentially --

18 cartridge firearms have been around -- they've always been able

19 to get cartridges from the factory; correct?

20 A    Not necessarily.  Many people had to load their own.

21 Q    Okay.

22 A    I mean, I've loaded my own, so it still happens.

23 Q    But for the most part, you have a primer of some sort, a

24 powder, a projectile, and a case; correct?

25 A    That is what a bullet is.

1    Q    Yeah.  And many of the cartridges are actually still in use

2    today, including the .22 rimfire and .45 Colt; correct?

3    A    Absolutely.  You can still get rimfire cartridges.  That's

4    right.

5    Q    In fact, the .22 Short was used in the first model Smith &

6    Wesson, and was developed in about 1857; correct?

7    A    That is absolutely correct.  And I do know -- I am familiar

8    with that.

9    Q    So, it's safe to say that for the last 250 years, man has

10   been constantly improving firearms technology; correct?

11   A    That is absolutely true.

12   Q    And in particular, in -- the firearms technology in

13   particular that people have been obsessed with is making

14   firearms more effective; correct?

15   A    More lethal, more accurate, more deadly, yes.

16   Q    And are you aware of current developments in weapons

17   technology?  Yes or no.

18   A    I have no idea what you're referring to.  And, again, I do

19   not say that I am a firearms expert.

20   Q    I'm not talking about --

21   A    I know a lot about firearms.

22   Q    Are you aware of developments in weapons technology such as

23   laser guns, directed energy weapons, coilguns, railguns, that

24   sort of thing?  Yes or no.  Are you aware of them?

25   A    I have heard of them all, yes.  I'm not familiar with them.

1  I've never actually seen one, but I have heard of that, yes.

2  Q    Okay.  And in fact, some of those are starting to be used

3  by the military today; correct?

4  A    Yes.  They're using all kinds of new things.  Although

5  their standard weapons are still M4s, M16s, yeah.

6  Q    But one of the things they recently adopted was an electric

7  railgun; correct?

8  A    I have no knowledge of what they've done in recent years,

9  no.

10 Q    Are you aware that the first electric railgun was invented

11 in 1917?  Yes or no.

12 A    Not aware of that, no.

13 Q    Okay.  So, for coilguns, are you aware that the first

14 coilgun was patented in 1904?  Yes or no.

15 A    No.

16 Q    So, it would shock you to know that the first development

17 of that was back in 1845, then; correct?

18 A    I have no knowledge of that.

19 Q    Okay.  So, it's foreseeable that -- one day that we might

20 be debating over civilian ownership of personal laser guns,

21 coilguns, and other things that don't even use explosives;

22 correct?

23 A    I would imagine so.  Especially if they are extremely

24 deadly, lethal, yeah.

25 Q    So, wouldn't it be safe to say that it was foreseeable and

1   evident to everyone in 1868 that we would have firearms that

2   could hold multiple shots?  Correct?

3   A    Yes.  That's true.

4   Q    Including 30-round magazines; correct?

5   A    I am not sure that I know of 30-round magazines back then.

6   I have no knowledge of that.

7   Q    Do you know of something called the Gatling gun?

8   A    Oh, sure.  I know about Gatling guns.  I know about Maxim

9   guns, and they are extremely deadly.  They are fully automatic

10  weapons.

11  Q    Gatling guns were used in the Civil War; correct?

12  A    Absolutely.  And Maxim guns have been used by imperial

13  powers in Africa.

14  Q    And did gunsmiths or blacksmiths that made firearms exist

15  in 1791?  Yes or no.

16  A    Yes.  There was a handmade trade of gunsmiths making

17  firearms, absolutely.  Yes.

18  Q    And there were general stores in 1791; correct?

19  A    General stores, yes, there were.

20  Q    And they often sold firearms; correct?

21  A    I have seen the ads.  That is quite true.

22  Q    All right.  So, firearms were readily available to anybody

23  that could make it to a general store or to a blacksmith or

24  gunsmith; correct?

25  A    Readily available is hard to know.

1    Q    They weren't restricted from walking out that same day with

2    a firearm if they walked in there with cash; correct?

3    A    If one was available at the time.

4    Q    All right.  That's --

5    A    But production rates were far lower than they are today.

6    So, you might have to wait a few weeks to get it.

7    Q    But even back in 1791, a person didn't have to go out and

8    smelt their own iron or carve a stock from a tree in order to

9    have their own firearm; correct?

10   A    No.  There was an import business, and there was a domestic

11   business.  And of course very soon the federal government,

12   because of the lack of military grade firearms, had to open the

13   armories at Harpers Ferry and Springfield to try to provide the

14   arms that the militia would need nationwide to protect the

15   nation.

16   Q    And are you aware that the ATF keeps time-to-crime

17   statistics of firearms here in Colorado?  Yes or no.

18   A    I am not aware of that.

19   Q    Okay.  Are you aware that the ATF keeps time-to-crime

20   statistics?  Yes or no.

21   A    I am not aware of that, but then I have not been asked to

22   make an opinion on this, so I haven't researched it.

23   Q    Okay.  Now, let's go back to your homicide statistics in

24   modern day.  If you exclude gang-related shootings in current

25   homicide statistics, they drop dramatically; correct?

1  A    Pardon?  Again?  Could you ask me again?  I'm afraid that I

2  gotta shut my phone off.  My son just texted me and said, are

3  you done?  And I'm thinking, no.  He said, how are things going?

4  And I would have said, well, I'm being exposed for not being a

5  firearms expert, which I never claimed to be.

6  Q    Well, sorry.  I've got quite a few more questions here for

7  you.  So, if you don't mind --

8  A    Oh, I think you're doing a great job.

9  Q    So, if you exclude gang-related shootings in current

10  homicide statistics, they drop dramatically; correct?

11  A    It depends on the locale.  Certainly in -- some of them,

12  no.  Not -- it depends on the locale.  If you're looking at

13  urban homicide rates and urban homicides, yes, we're seeing an

14  increasing concentration within the small group of people in

15  gang areas.  But outside of it, when we have our homicide

16  increase of 60 percent since 2015 is a rural phenomena as well

17  as an urban phenomena, and those are not gang-related in urban

18  areas -- in rural areas.

19      So, again, you know, it's a question of where are we

20  looking at?  And then there are cities that have more

21  gang-related homicides than others.  And it's very hard, because

22  I work on these statistics, to decide what is a gang homicide,

23  and what is a simple relationship beef?  So many of these things

24  that you're calling gang homicides, when you look at the case

25  files, are about rivalries over women.  They are about shoes.

1   They're about disrespect.  They're about social media beefs.

2        And so to call them gang homicides in a blanket way

3   really doesn't help, understanding that this is the kind of work

4   I'm working on now as someone who has access to and is helping

5   the police departments of Cleveland, Columbus, and Cincinnati.

6   Q   Regardless, these individuals tend to be in a gang of some

7   sort, though; correct?

8   A   A lot of them, because, you know, this is their family.

9   This is their home, yes.  But is that the reason that they're

10  engaging in these killings?  Not necessarily so.

11  Q   In fact, a lot of these individuals would be prohibited

12  possessors just generally; correct?

13  A   A lot of them are too young to really have, you know,

14  extensive criminal records.  So, I would say, you know, it

15  depends.  Certainly by the time a number of these young people

16  are in their 20s or their late teens, yes, they have committed a

17  lot of offenses.  They have been arrested and have been

18  convicted.  But many of them have not been convicted.  It's, you

19  know, when they're arrested for some crime, it's the first time.

20  Q   And a lot of them are under age as well; correct?

21  A   Not an overwhelming amount.  You're still not getting many

22  13- or 14-year-olds committing homicides.  When you do, they

23  tend to be acting -- please let me finish.  When they do -- so,

24  I have seen that they are generally acting in concert with older

25  young men.  So, if you see a 13- or 14- or 15-year-old, my

1   research that I'm doing now -- again, this is in progress --

2   from our homicide project in Ohio, which is collaborative, but

3   what you see is that when young people get involved, it is with

4   older people.  And yeah, I guess you could say that that happens

5   to be because of gangs or these neighborhood organizations or

6   friendships, sure.

7   Q    And so their victims, even if it's just one victim, a lot

8   of time would be facing murder from a group of individuals;

9   correct?

10  A    No.  It's still mostly one-on-one.

11  Q    But you said that they act in concert with older

12  individuals; correct?

13  A    I said that when 13- and 14-year-olds get involved, very

14  often it's with older people.  That's different from saying that

15  most of these homicides are multiple people assaulting a single

16  individual or a few individuals.  It's a different issue.  I'm

17  just trying to be clear.  I don't mean to be argumentative.

18  You're asking great questions, and they're very fair questions.

19  Q    So, let's go back.  At what age is it lawful to purchase

20  and possess a pistol?

21  A    It depends on the state.

22  Q    Most states.

23  A    Mm-hmm.  Most states, it's 18.

24  Q    Eighteen, not 21?

25  A    I know a lot that are 18, yeah.  But again, I would think

1  that 21 is a more reasonable age.  I certainly think so.

2  Because of the way youth homicides have increased faster over

3  the past 50 years, while we've seen almost constant decline in

4  homicides of people over the age of 25, at least until 2015,

5  when they went up again.

6          And so I've published on that gap, and I have testified

7  about youth age restrictions in another case.  I can't bring

8  that up right now, but I certainly would be happy to share that

9  with Judge Kane and with you.

10 Q    But once again, a lot of times, even with those youth ones,

11 they tend to be gang-related in some fashion; correct?

12 A    I think I -- I said no.  A lot of them, when you get down

13 to it, are about respect.  They are about women.  They are

14 about, you know, things like that.  So, blanket argument about

15 gang violence is not quite accurate.

16         I certain -- I just wanted to add that not only do I,

17 you know, work with the Columbus Police Department, I've been

18 involved in what -- an effort called the Youth Violence

19 Prevention Advisory Board, spearheaded by my colleague Professor

20 Wilkinson working with the community.

21         And we know from that, working with community leaders,

22 church leaders, violence interrupters that it's very

23 complicated.  We make blanket statements about gangs, but

24 actually when you get down to the nitty gritty, you know, these

25 are just the kinds of old fashion typical homicides by unrelated

1  people.

2  Q    So, let's go back to random mass shootings are,

3  statistically speaking, very rare events; correct?

4  A    They're very rare, but they're traumatizing for the public

5  and traumatizing for young people.

6  Q    And they're usually carried out with advanced planning;

7  correct?  Hence why we see the manifestoes?

8  A    Yes.  Unlike most, you know, many homicides that are

9  impulsive, because of -- and don't have a lot of premeditation.

10  What we see with these planned mass shootings at synagogues and

11  churches, Hispanic people at a shopping center, of people at

12  concerts, at gay nightclubs, et cetera, there is a great deal of

13  premeditation, planning, and ideation.  In other words, a

14  doctrine of cultural scripts [inaudible] to and talking

15  themselves into doing something really heinous or trying to --

16  Q    I'm sorry.  We have a short amount of time here, and I'm

17  trying to finish before 5:00.  But no matter what, a three-day

18  waiting period would not do anything to deter these monsters;

19  correct?

20  A    No.  Not those -- not what it's designed to do.  And,

21  again, I'm not testifying to that.  It's mostly intending to

22  prevent suicides.

23  Q    And you've heard of Sears and JCPenney; correct?

24  A    Absolutely.  If they're still here.

25  Q    And these companies used to sell firearms in catalogs;

1  correct?

2  A   Oh, absolutely.  Montgomery Ward, sure.

3  Q   And they would be delivered directly to your home; correct?

4  A   Back in the old days, yes.

5  Q   And when did they stop?

6  A   I do not know.

7  Q   Would it have been about 1968?

8  A   Certainly when you think about it, that's when the Omnibus

9  Crime Bill imposed new regulations on firearms.

10  Q   So, until that time, a person could order a firearm and

11  have it delivered to their door; correct?

12  A   I imagine that you could, sure.

13  Q   And there were also no background checks at that time

14  period; correct?

15  A   I do not believe so.

16  Q   So, also --

17  A   These are all modern things to deal with the tremendous

18  rise in homicide that occurred in the '60s, '70s, and '80s.

19  Q   So, we will get there, but also, before 1968, someone could

20  walk into a hardware store and purchase a firearm there;

21  correct?

22  A   Oh, I'm sure that's true.  A lot of these waiting periods

23  are new, like Colorado's law.  They're new.  Based on new

24  insights into impulsiveness, particularly of suicides.

25  Q   And in 1968, what was the name of the law that was passed?

1   A    I think -- was it part of the Omnibus Crime Bill?

2   Q    Would it ring a bell if it were the Gun Control Act of

3   1968?

4   A    That could be it too, yeah.

5   Q    And it was one of the strictest gun control measures at the

6   time; correct?

7   A    Absolutely, it was.  And of course up until 1994 when there

8   was the ten-year ban on certain classes of semiautomatic rifles.

9   Q    And also there was another act passed in 1986; correct?

10  A    Which one are you referring to?

11  Q    The Firearm Owners Protection Act, which also included gun

12  control as well?

13  A    That one I'm not familiar with.

14  Q    Okay.  And so you've given lectures, and your book is about

15  how social upheaval increases homicide rates; correct?

16  A    It certainly is.  Well, failures of nation building.  It's

17  a complicated argument, fourfold, [inaudible] that recur time

18  and again.  This relationship is causal, because they happen

19  again and again and again.

20  Q    And so your arguments are that during times of great social

21  upheaval, essentially it's relatively easy to gather like-minded

22  people to commit violence; correct?

23  A    It used to be, yes.  Particularly in the 19th century.  But

24  today it's harder.  It's more isolated individuals committing

25  mass murder, because of their technology, et cetera.  You very

1  rarely today have the kind of mob violence, mass murders that

2  you had in the past.  It's just something that's really gone --

3  you know, we don't have many Tulsa riots of 1923 anymore or

4  Chicago riots of 1919 or mass Klan murders, white supremacist

5  murders.  We just don't have those anymore.  It's really become

6  more lone wolf or two lone wolves together committing mass

7  murder.

8  Q    Let's go back.  When you talk about those mass murders, or

9  murders created -- I guess murders by the masses, a lot of times

10 if a victim had a firearm, they could avoid being a victim;

11 correct?

12 A    Not necessarily.  African Americans armed themselves after

13 the Civil War, and they were outgunned.  Whole militias were

14 murdered by white supremacists.  The police department in New

15 Orleans in 1874 had to fight it out with white supremacists, and

16 they lost, and many of them were killed even though they were

17 armed.

18       When you have a larger group of committed white

19 supremacists, for instance, gathering together, concerted to

20 attack the police, to attack Black militia units, to attack

21 churches, yes, you can be armed and it doesn't do you any good.

22 In other words, you're going to die in larger numbers than the

23 people who are attacking you.  Absolutely.  So, I just want to

24 insist on that.  I do understand that.

25 Q    And so let's go back to there are other factors that have

1  been found to be statistically significant to homicide rates;

2  correct?

3  A    Absolutely.  And that's what -- that's what the social

4  sciences are trying to do.  You know, look at persistent

5  correlations.  We don't -- we can't perform controlled

6  experiments.  I want the judge to know that.  We're not

7  physicists or chemists, but like the historical sciences,

8  geology, cosmology, and others, excuse me, what you can see,

9  evolutionary biology, we look at lots of places over long

10  periods of time and look for persistent patterns that happen

11  time and again, such as the relationship between political

12  instability and a rise in homicides among unrelated adults.  So,

13  that's what we do.

14  Q    So, regardless, other factors such as homogeneous and

15  heterogeneous population and economic opportunity have been

16  actually statistically significant to homicide rates; correct?

17  A    Absolutely, yes.

18  Q    And do you know how many firearm suicides can be attributed

19  to mentally ill individuals?  Yes or no.

20  A    That is a very hard thing to know --

21  Q    I agree.  So --

22  A    -- with any kind of precision.  It's very hard to know, but

23  certainly if mental illness was the fundamental cause of

24  suicide, there would be millions of suicides per year, because

25  so many people are clinically depressed.  There's lots of other

1  factors there.  And as we know from the work, a lot of them

2  caused -- even if there is not an underlying deep mental

3  illness, it's a sudden loss of job, it's a sudden loss of

4  relationship, it's a death to a loved one that leads to an

5  impulsive act.

6           You know, so I think that it's important to mention

7  that we can't know -- most of these people, they haven't been in

8  treatment.  I can testify to that, you know, from personal

9  experience, people I know.  So, as I'm sure you can too.  So,

10  no.  There's no way for us to know the mindset of many of these

11  people, but we do know that a great number of them are

12  impulsive, and people go out and buy -- there still are cases

13  where people go out and buy a firearm and kill themselves

14  impulsively.

15  Q   So, Mr. Roth, the State is going to have an opportunity to

16  ask you questions after I'm done, so they get to do what we call

17  rehabilitation of you.  So, I'm going to ask that you just

18  answer the question instead of going off on a tangent.  Once

19  again, I apologize, but we have a limited amount of time here,

20  and I am trying to conclude with your cross before 5:00 if we

21  can.

22  A   I'm a scholar.

23  Q   I understand it's difficult.  I can get on a tangent

24  myself, but I just ask if you answer the question and that we

25  move forward.  Okay?

1    A    Okay.

2    Q    All right.  Thank you.  So, do you believe that gun control

3    decreases homicide rates?  Yes or no.

4    A    Yes.

5    Q    And you never specifically state that gun control decreases

6    homicide rates; correct?

7    A    I wasn't asked to speak to that.

8    Q    Okay.  And --

9    A    We generally leave that in these cases to people like John

10    Donohue and Philip Cook, who have done that primary quantitative

11    research on the efficacy of gun control laws.  And as you know,

12    the next witness for the defense is going to speak to that.  So,

13    it's not my job.

14    Q    Do you have the exhibits there in front of you, Mr. Roth?

15    A    I can't see an exhibit, and the exhibits that you said

16    you'd present, I haven't seen them.  They were never sent to me.

17    I saw the list, but it was never sent to me.  So, I have to -- I

18    have to respond without knowledge of some of those things, but

19    my own --

20    Q    Luckily for you, it should be easy.  They're your sources.

21    A    Okay.  That's great.

22    Q    So, do you recall this paper, for instance --

23              MR. SULLIVAN:  I'm sorry, Counsel.  What document are

24    you --

25              MR. ABBAS:  This is --

1          THE WITNESS:  Yes.  I understand this.  I wrote

2    this --

3          MR. ABBAS:  I'm sorry, Mr. Roth.  Just one moment,

4    please.  This is State Exhibit Number 6.  Or, sorry.

5    Plaintiffs' Exhibit Number 6.

6          MR. SULLIVAN:  Thank you.

7    Q.    (By Mr. Abbas) So, but you recall this document,

8    Mr. Roth?  Yes?

9    A    Certainly, yes.

10   Q    What do we have here?

11   A    That is the aggregate homicide rate in the United States.

12   The aggregate --

13   Q    One moment.

14   A    It's not just by age.

15         MR. SULLIVAN:  And, Counsel, can you direct me to a

16   page?

17         MR. ABBAS:  The first page.

18         MR. SULLIVAN:  So, first page I have on Exhibit 6 does

19   not resemble what you have.

20         THE COURT:  Can we -- let's give the reporter a quick

21   break.

22         THE WITNESS:  I can see that this is not from the

23   published version of the --

24         MR. ABBAS:  I'm sorry Mr. Roth.  One moment.

25         THE COURT:  We're going to declare a brief recess, and

1    come back in about ten minutes.

2         (Recess at 3:41 p.m., until 3:52 p.m.)

3              THE COURT:  Go ahead, please.

4              MR. ABBAS:  Thank you, Judge.

5    Q.    (By Mr. Abbas) So, Mr. Roth, I'm not going to show you

6    what I was going to show you, because we had a mixup, and I

7    don't think it would be fair.  However, do you know what was

8    happening with murder rates in 1934 and the next couple years

9    after?  Yes or no.

10   A    We have the mortality statistics of the United States.  And

11   at that point, what we know is that all of the states in the

12   union as of 1933 met the requirements for being in the death

13   registration area.  In other words, at least 90 percent of the

14   deaths that occurred in their states were reported to the Bureau

15   of Statistics.  So, what we do know by 1934, five, six, we have

16   a good grasp of homicide rates across the nation.

17        Before 1933, we have an increasing number of states

18   that were not involved yet in the DRA.  So, we retrodict those

19   homicide rates of using the techniques that my colleague Doug

20   Eckberg uses to try to figure out how to get an accurate idea of

21   homicide rates before then, yes.

22   Q    Okay.  But essentially from the periods before to the

23   period to about 1936 or later, the homicide rate was relatively

24   steady in the United States; correct?

25   A    It started to drop 1934, five, six.

1  Q   Okay.  And then in 1968, the homicide rate in the United

2  States after having dipped down a few years before, started

3  increasing significantly; correct?

4  A   That is true.

5  Q   And it stayed high until the '90s; correct?

6  A   Until the early '90s.  And it started to drop around '94,

7  five, six.

8  Q   Okay.  And it crested at about '92; correct?

9  A   It crested about '92, although there were spikes in '88,

10 you know, that were very close.  '72, spikes that were very,

11 very close.

12 Q   Regardless, the gun control passed in 1968 had no effect on

13 the homicide rate; correct?

14 A   That is not an accurate statement, because it's not based

15 on social scientific research.  Lots of things are driving -- I

16 am saying that you can't say that, because you don't know if the

17 homicide rate will have been higher without that gun control

18 act.

19 Q   Let me rephrase the question.  There is no evidence that

20 that gun control act did anything to affect the murder rate;

21 correct?

22 A   I haven't studied the multicausal phenomena at the state

23 level as to how these were [inaudible].  So, I would have to say

24 that we don't know yet if the homicide rate would have been even

25 worse without that act.

1        Again, what you're saying -- you're forcing us to make

2    an experimental statement like, oh, I changed one thing when

3    everything else is changing, and then you can say, oh, well, the

4    other things didn't change, therefore this is nothing.  That's

5    not the way we engage in this kind of work.

6    Q    Regardless, do you recall sometime in 2012 or 2013 talking

7    at the Michael Moritz College of Law at The Ohio State

8    University?  Yes or no.

9    A    Oh, absolutely.

10   Q    And you were discussing your recently-published book;

11   correct?

12   A    Among other things.  I was asked to comment on the tragedy

13   that happened in December of 2012.

14   Q    Okay.  And you admitted there that you're a self-avowed

15   pacifist at that lecture; correct?

16   A    I am not sure what phrase I said.  What I said, I'm sure

17   that I was speaking ironically, but what I'm saying is I really,

18   really hate it when people hurt people.  And that's why I'm a

19   criminologist.  It really upsets me when people are raped, when

20   people are beaten, when people are murdered.  So, I was speaking

21   loosely.  I think I was making a joke.  And, again, I hope that

22   I can get Judge Kane the full video of that.  I tried to find

23   the link -- hmm?

24   Q    We've provided it to him.

25   A    Okay.  Well, that's great.  So, you can see when I'm

1    joking, when I'm speaking off the cuff.  This was supposed to be

2    a friendly gathering of people.  The audience, it turned out,

3    was far more hostile than we anticipated.  And they doctored the

4    videos on YouTube to say that I didn't say the things that I

5    didn't say.  So, this was a really rough, rough crowd.

6    Q    But at that lecture, you did mention that you wish that we

7    could all go back to muzzleloading firearms; correct?

8    A    I said I would love to do an experiment.  I remember that.

9    And if I could perform one controlled experiment, I would

10   disinvent modern breechloading firearms, force us all to have

11   black powder weapons, muzzleloaders, and see what would happen

12   to the homicide rate.  I don't know what would happen, but I can

13   guess what would happen.  We would be safer.

14   Q    And you also stated that you wanted all repeating firearms

15   to be treated as machine guns; correct?

16   A    No.  That -- I can't believe that I said something that

17   foolish.

18   Q    Okay.  Well, I -- no.  Do you recall giving a talk to

19   American History TV in 2017?  Yes or no.

20   A    Oh.  Yes, I do remember.  [Inaudible], yes.

21   Q    And in that interview, you discussed the relationship

22   between law enforcement and criminal behavior; correct?

23   A    I don't remember the interview offhand.  I remember we were

24   talking about mass murder, I think.  Is that correct?  Sort of a

25   C-SPAN thing?

1  Q    It was a C-SPAN thing.

2  A    Okay.  C-SPAN 3 or something like that.  Yes.  Mm-hmm.

3  Q    Would it be something that you would do would be to --

4  well, do you remember discussing that criminals always find new

5  ways and strategies to break the law, and they always will?  Yes

6  or no.

7  A    Oh, that is absolutely true.  And it's a constant war of

8  wills, property crime, electronic crime.  That's absolutely

9  true.  So, we constantly have to adapt our laws.  We constantly

10 have to adapt our law enforcement strategies, because criminals

11 aren't stupid.  When you stop one kind of thing, something else

12 is going to happen.  It's a constant of human nature.  And so

13 that is an accurate statement.  And I will stand by it.

14 Q    And you also cite that during civil wars and civil unrest,

15 individual violence increases across the board; correct?

16 A    That is true.  I have demonstrated that time and again, and

17 so have my colleagues.

18 Q    And that includes robberies, murders, and other crimes;

19 correct?

20 A    And rapes, yes.  In other words, everything when law and

21 order breaks down, when the state cannot protect lives and

22 property, when you have hostile frontiers, you know, hostile

23 military conquests, contested frontiers, revolutions, civil

24 wars, terrible, but there are other kinds of political

25 instability that can be just as deadly and dangerous and create

1   such things, which I am writing about more now.

2   Q    Just a few moments ago, you had discussed your abhorrence

3   to violence, and I don't disagree.  However, in this interview

4   that you gave in American History, you also discussed how you

5   went into your career for pacifistic reasons; correct?

6   A    "Pacifistic" would be a loose way of describing it if I did

7   that.  But what I said is I was trying to figure out -- I went

8   into this trying to figure out why some Americans were not

9   homicidal, which is why I studied northern New England.  And I

10  found out that their homicide rate jumped during the Civil War,

11  just as I had -- and I didn't anticipate that when I started to

12  study it, that they were caught up in these things too.  And so,

13  but yes.  My hope is that we can find a way to not be as violent

14  a society.  I plead guilty.

15  Q    All right.  And you also stated that you see most violence

16  as dysfunctional; correct?

17  A    Oh, you know, most times, when you're angry, you kill your

18  own; right?  In other words, you're angry at the world.  You're

19  angry at other people, at your fellow Americans, and you kill

20  your friends, neighbors, and acquaintances.  That's what happens

21  so often.

22  Q    Once again, Mr. Roth, I'm sorry.  We're on a little bit of

23  time -- I think we have like an hour left, and I don't even

24  think we're going to get to the -- we're going to get back today

25  to the Government's attorney.  So, once again, I ask that if you

1  can just limit your answers as much as possible to the question

2  that I'm asking so that we can try to finish by 5:00.  And so

3  would that include self-defense?  Yes or no.

4  A    Oh, no.  I have said repeatedly that I understand why

5  people who live in dangerous neighborhoods and who have

6  dangerous occupations wish to have firearms.  I've said that

7  when I testified at the Ohio legislature recently under oath.  I

8  absolutely understand that.  And I respect the right to

9  self-defense.  Absolutely.  And I understand why in a violent

10  society many Americans are armed.

11  Q    And, let's see.  So, do you recall an interview for Ohio

12  State News in 2019, how technology shapes mass murder?

13  A    You know, not offhand.  I talk to a lot of media, our local

14  people, yes.  But refresh my memory.  I'm sure you've got it

15  there.  You've done your homework.  I congratulate you.

16  Q    So, in that, it attributes to you the language, the

17  founding fathers, who guaranteed the right to bear arms in an

18  era of muzzleloading technology, could not foresee the dangers

19  of semiautomatic firearms, machine guns, large-capacity

20  magazines, and bump stocks?

21  A    That is true.  I said that, and I stand by it.

22  Q    Even after 1868?

23  A    Even after 1968 -- 1868, yes.  That's true.

24  Q    All right.  And so you claim that those that adopted the

25  14th amendment would have been unable to foresee any of those

1  firearms; correct?

2  A   I think that many of those firearms they could not foresee.

3  That's true.  You know, we can't see the future.  But I respect

4  the right of the Court, and respect the right of the Court to

5  make a decision about 1868.  Judge Kane and his peers have the

6  right to say what the [inaudible] date is.  As a historian -- I

7  simply am saying as a historian, we can't foresee the future.

8  They couldn't see the destructive power of things like dynamite,

9  airplanes, et cetera.  They just couldn't foresee it.  And so

10  when it became threats, you know --

11  Q   In your declaration, you describe mass killings of people

12  by groups of armed men; correct?

13  A   Yes.  By groups of armed men, which was the way most of

14  these mass murders were carried out through the early 1920s.

15  Q   And you say it's mostly a thing of the past; correct?

16  A   It is mostly a thing of the past.  We very rarely see

17  dozens of people killed by a mob.

18  Q   Okay.  And so if someone -- someone who is facing mob

19  violence, they would be happy to have a large-capacity magazine,

20  wouldn't they?

21  A   You wouldn't necessarily need one.  And if you did have one

22  and they had a bigger large-capacity magazine, you'd be dead

23  anyway.  So, it's a question of firepower.  One person armed

24  against a mob that's armed, that ends badly.  So, you know,

25  you're suggesting that you have a mob that has no firearms with

1  it is going against a single individual with a firearm, you

2  know, that could happen, and I would agree in that rare case,

3  that someone --

4  Q     Did you see the Rooftop Koreans in 1992?  Yes or no.

5  A     Which one?

6  Q     The Rooftop Koreans in 1992?  Yes or no.

7  A     I am not familiar with that term, and I'm having trouble

8  hearing it.  Could you tell me what that was?

9  Q     Korean business owners in LA in 1992.  Did you do a case

10 study on them?

11 A     No, I did not.

12 Q     What happened in LA in 1992?

13 A     I did not do a study of that.

14 Q     Do you have any idea?

15 A     But I do know that that's the Rodney King riots is what

16 we're talking about; right?

17 Q     So, mass riots in LA; correct?

18 A     That is right.

19 Q     So, would it surprise you to know that a large number of

20 business owners actually protected their businesses and their

21 lives with what you would term assault rifles and high-capacity

22 magazines?  Yes or no.

23 A     They could have done the same with revolvers, handguns, and

24 simple rifles.

25 Q     Do you own a modern firearm?  Yes or no.

 1   A    No.

 2              MR. SULLIVAN:  I'm going to object on relevance.

 3              THE COURT:  Overruled.

 4   Q.   (By Mr. Abbas) I'm sorry.  Your answer, Mr. Roth?

 5   A    No.  No, I do not.

 6   Q    And you are against all semiautomatic firearms; correct?

 7   A    No.  I understand semiautomatic handguns are legitimate,

 8   and I know that there are many semiautomatic rifles that are --

 9   don't have rapid fire, you know, with the capacity to be a

10   military-style weapon with a fire rate making 40 rounds per

11   minute or more.  So, it's a -- but I have no objection to people

12   defending themselves with nine-millimeter semiautomatic

13   handguns.  Although an inexperienced user should be using a

14   revolver, and not a semiautomatic handgun.

15   Q    So, semiautomatic firearms, though, are widely used across

16   this nation; correct?

17   A    They certainly are.

18   Q    Both rifles and handguns?  Yes or no, sir.

19   A    More handguns.  More handguns than semiautomatic rifles.

20   They are widely owned, yes.  That's true.

21   Q    Thank you.  And they often carry large-capacity magazines;

22   correct?  Or what you would term large-capacity magazines?

23   A    Yes.  Many of the handguns have a 33-round clip, and many

24   of the AR-15 type rifles have 30-round clips.  That's correct.

25   Q    And in your studies, have you studied the best ways to

                                Kevin P. Carlin, RMR, CRR   **App. 675**

1  counteract mass violence?  Yes or no.

2  A    I have studied motivation.  I have studied, you know,

3  weaponry.  And you can see in statistics there are, you know,

4  the greater the firepower that a mass shooter has in these mass

5  shooting events, the more likely more people are to be wounded

6  or killed.  It's simple --

7  Q    Once again, sir, I apologize, but we don't have a lot of

8  time.

9  A    I answered your question.  I don't mean to be combative,

10 but I answered your question.

11 Q    So, you have no idea what tactics police officers should

12 employ when dealing with mass shooters, for instance; correct?

13 A    I know that they should do it with a [inaudible],

14 absolutely.  Although single officers have to rush in at great

15 risk to themselves.  They have to rush in.  Incredible bravery.

16 We have had those incidents in Columbus.

17 Q    Let's talk about your most recent publication.  The -- I

18 apologize.  The Opioid --

19 A    The Opioid Epidemic and Homicide Rate.

20 Q    Do you recall that publication?  Yes or no.

21 A    Yes.  Very well.

22 Q    And in that publication, you discuss that the opioid

23 epidemic has contributed to a rise in homicides; correct?

24 A    That is absolutely correct, yes.

25 Q    And we are currently at the heights of the opioid epidemic;

1  correct?

2  A   It's been very bad recently.  Our data that we could get

3  was through 2015.  We'd like to extend that study in the future.

4  Q   Okay.  And your publication cites approximately six

5  overdose deaths per 1,000 people in 2016; correct?

6  A   Correct.

7  Q   And that doesn't include those killed in gang and cartel

8  violence; correct?

9  A   Let's see.  You know, we're looking at all homicides.

10  We're looking at all homicides from the national center for

11  statistics data on the confidential compressed mortality

12  statistics that have county identifiers.

13  Q   Let me rephrase the question.  So, you don't include those

14  six deaths per 100,000 in homicide statistics; correct?

15  A   The deaths from opioid overdoses, no.  Those are drug

16  deaths.

17  Q   So, they're drug deaths, even though the death was a direct

18  result of somebody's unscrupulous activities; correct?

19  A   Oh, absolutely.  You know, the opioid epidemic is very

20  closely related to the overprescription -- you know,

21  geographically, overprescription of opioids at the county level.

22  So, there's a very high correlation there.

23  Q   Yet we still have a opioid problem; correct?

24  A   Oh, we certainly do.

25  Q   And a gang and cartel violence problem; correct?

1   A    Yes, we do.

2   Q    Especially if it's helping boost the murder rate in the

3   United States; correct?

4   A    What we see is looking at this, yeah.

5   Q    Because criminals still commit crime; correct?

6   A    What you see, note in this, you know, higher levels of gun

7   ownership at the county level also contribute to the higher

8   homicide rate.  It's about poverty, it's about drugs, and it's

9   about guns, the availability of guns that lead to these kinds of

10  deaths.  And I know in southern -- you know, in southern Ohio,

11  Appalachia, this isn't drug cartels.  This is one-off kind of

12  stuff.  Yes, a lot involve drug dealers.  We're working on this.

13  But a lot, you know, is just random homicides.

14  Q    All right.  And so let's go back to the questioning that

15  the -- I believe it was Mr. Sullivan?  That Mr. Sullivan was

16  doing with you.  You never did a peer-reviewed study on the

17  effectiveness of waiting periods; correct?

18  A    I didn't claim that I did.

19  Q    I understand.  I'm just going through and clarifying some

20  things.  So, you never addressed --

21  A    Sure.  That's fair.

22  Q    -- the statistical analysis of the study that this law was

23  based on; correct?

24  A    No, I have not.  I have not been asked to do that.

25  Q    Okay.  So, you cannot confirm that the study itself is

1  actually correct; right?

2  A    The study that I was being cited by other experts in this

3  case?

4  Q    Correct.

5  A    I was just told about that two days ago.  So, I haven't

6  even had time to read it, because I've been working on my own

7  work.  Certainly I could have a professional opinion in a week

8  or two, but I can't do it now.  And of course unless I have the

9  data and I can [inaudible] it with my analysis, I won't know the

10  answer.

11  Q    Well, they're paying you, so I will leave it up to them.

12  A    Okay.  But just don't -- please don't say that I was hired

13  to do things I wasn't hired to do.

14  Q    I'm just clarifying some things here that they had the

15  opportunity -- and so you teach --

16  A    You're doing great.

17  Q    -- and study statistics; correct?  Or at least you have?

18  A    Extensively, yes.  I'm a math guy.  That's my reputation.

19  Q    But that was not something that the State had hired you

20  for; correct?

21  A    No.  They did not ask me to use my expertise to take a look

22  at that stuff.

23  Q    And this is not an attack on you, but the peer review

24  process within the last decade has been heavily criticized for

25  being a rubber-stamping process; correct?

1  A    People have said that, but I have been a peer reviewer, and

2  nothing gets rubber stamped that I see.

3  Q    I believe it, sir.  And like I said, it wasn't an attack on

4  you.

5  A    It's important to note that I was a member of the most

6  important editorial board in the entire field of history, the

7  American Historical Review.

8  Q    So, I want to go back to some of your statistics.  If back

9  in the day of some of the cases you had looked at, if around the

10 turn of the century, if -- or, I guess the -- in the 1800s, if

11 an individual defendant himself -- so, if a Black individual

12 defended himself against a white man in the early 1800s South

13 Carolina, would that be considered a murder or a homicide?

14 A    In terms of, you know, I would consider that in my own

15 coding self-defense.

16 Q    Okay.

17 A    But how the legal process which was controlled by white

18 supremacists would have called it, they would have called it a

19 murder.  So, I don't follow necessarily the way that the white

20 supremacist court would define an act of violence.

21 Q    Thank you.  That's what I was looking for.  And, let's see.

22 Just one thing I want to ask you is what happens when new laws

23 are passed -- new criminal laws are passed?  Does that create --

24 A    Judge Kane gets to decide whether they get to stand; right?

25 Q    Well, so that creates new criminals; correct?

1  A    You know, they define new laws for new kinds of criminal

2  acts.  The law is always changing, ever-changing, defining new

3  acts.  Whenever we think about electronic crime, when we think

4  about internet crime, it's all new.  So, yes, the law has to

5  adapt to changes in technology, changes in behavior, new

6  strategies by criminals.  Absolutely.  I agree with you

7  100 percent.

8  Q    Yeah.  And so when you talk about lower homicide rates in

9  the colonial era, there were a number of factors that were just

10 entirely different from the world we live in today; correct?

11 A    Oh, certainly so.

12 Q    So, including population density; correct?

13 A    Population density doesn't really define it, because the

14 early and mid 17th century was --

15        ELECTRONIC SYSTEM:  I'm sorry.  Your session is ending

16 now.  Please hang up.

17        THE COURT:  What was that?

18        THE WITNESS:  We were told to hang up, Your Honor.

19        THE COURT:  Let's not do what we're told.

20        THE WITNESS:  Population density doesn't seem to be a

21 driver of homicide rates.

22 Q.    (By Mr. Abbas) But cohesive identity does; correct?

23 A    Absolutely.  Cohesive identity, you know, and there's a lot

24 of hate speech.  There's a lot of anger and frustration,

25 political polarization, which I've written about in other

1  avenues, yes.  You can have really intense homicide rates.

2  Q    And other factors; correct?

3  A    There are many factors that I talk about.

4  Q    And so when you had talked about some of the research that

5  you had done about finding some of the murder rates in colonial

6  America and the time period thereafter, you had talked about how

7  you obtained the records; correct?

8  A    How I look at the records, yes.  Every scrap of paper.

9  Q    And there's a chance you missed some; correct?

10 A    No.

11 Q    Not one paper?  Everything survived since 1792?

12 A    Oh.  Now you're putting words in my mouth.  That's why I

13 use capture-recapture mathematics, which helps estimate the

14 number of records that are missing, have been lost, and also

15 underreporting.  So, what you see is that suicides are heavily

16 underreported.  Homicides among adults are heavily reported, and

17 firearms accidents are somewhere in between.  The mathematics

18 are very intelligent.  And so we don't just go from the raw

19 data.  We use statistical methods that are well tried and use

20 [inaudible] world to try to figure out what to do for

21 fragmentary records.

22 Q    And you had talked about current reporting of murders, and

23 a number of cities also refuse to report as well; correct?

24 A    A lot for the National Center of Health Statistics are just

25 late, and they won't accept new data after 18 months for the

1  calendar year.  So, there's all kinds of reasons why these

2  things happen.

3  Q    But in -- on another note, in your report, you do cite to

4  Mr. Cramer a couple times; correct?

5  A    Oh, absolutely.

6  Q    And that's because --

7  A    I think his first book was very good.

8  Q    Thank you.  And if you give me one moment here.  Ah.  So,

9  most murders that we see either tend to be well planned or spur

10  of the moment; correct?

11  A    Yup.  There's stuff in between, but yeah.  We see a lot of

12  impulsive, and we see a lot of planned, premeditated, certainly.

13  Q    And in fact, we also see -- well, are you familiar with

14  current murder statistics?  Yes or no.

15  A    Actually, right down to 2021, I've looked at them at the

16  national level.  I have looked at them by age distribution.

17  Yes.  But again, you know, just starting to work on those, and I

18  haven't got the county level data to -- really past 2015.

19  Q    And have you --

20  A    I have to get the new -- new protocol to get those data,

21  which I plan to do when I finish --

22  Q    And have you looked at the murders based on weapon?  Yes or

23  no.

24  A    I do look at that.  In fact, I looked at suicide rates with

25  the CDC WONDER just the other night, taking a look at how many

1  suicides were committed from the National Center of Health

2  Statistics, which has gotten better in recent years since 1999.

3  Q    And there's a number of murders with blunt weapons;

4  correct?

5  A    That is available on CDC WONDER.  I looked primarily to

6  look at firearms, non-firearms, because that's what I've been

7  asked to do recently.  But I could take a look at all of that,

8  sure.  It's really handy.

9  Q    You don't even look at the other individual weapons?  You

10  only looked at firearms, is what you're testifying here today;

11  correct?

12  A    You know, the data from 2018 to 2021 are just available.

13  I've done all that work on my own work.  I'm doing all that work

14  in Ohio, but yeah.  If you want me to do that, I can do that.

15  Q    Well, let me ask you this:  You are significantly more

16  likely to be murdered by blunt force trauma from somebody else

17  than somebody's rifle today; correct?

18  A    That's because handguns are the primary way that people are

19  killed from firearms.  And I've never, never said that people

20  should be deprived of their rifles or shotguns, nor their

21  handguns.  I am not antigun.

22  Q    Okay.  What about assault rifles?  Assault rifles are

23  rifles, are they not?

24  A    They are a particular category of rifle with a muzzle

25  velocity of 3,200 feet per second.  That don't just tear flesh.

1  They liquefy it.  These are very dangerous weapons.  They're

2  military weapons, and yes, the military uses them in a

3  semiautomatic way.  They very seldom -- you're not supposed to

4  use full automatic bursts unless in a situation of desperation.

5  So, these are military weapons.

6  Q    Are you a ballistic expert?

7  A    I never claimed to be a ballistics expert, but I do know

8  about liquefying.  I know the muzzle velocity, and I know what

9  they do to flesh.

10  Q    And there was a constant threat of attack in early America;

11  correct?

12  A    Not in Pennsylvania.  Of Native American attack?  No.  They

13  lived peacefully.  Rhode Island, they lived peacefully.

14  Maryland, up until 1675, lived peacefully with their Native

15  American neighbors.

16  Q    Well, eventually, there were some wars, though; correct?

17  A    Oh, there's no question that there were some wars.  And I

18  spoke about those.  The constant wars in northern New England

19  and the effect that they had on the psychology of people and the

20  cost of life was terrible for Native people, French, the English

21  colonists.

22  Q    Wouldn't it be logical for people to keep firearms ready in

23  their homes?

24  A    I said explicitly that those -- on the frontier, where it's

25  contested, people did try to keep their firearms loaded at all

1   times.  You know, they would have to regularly clean them.

2   They'd have to regularly reload them, but they were keeping them

3   in the dryest, the warmest place to try to avoid the humidity

4   that would damage the gun, and it would render the powder

5   useless.

6          So, I've never said that nobody ever kept it load --

7   always kept it unloaded.  There were dangerous situations in

8   which you would try to extend that period in which they were

9   loaded, yes.

10  Q   And in your studies, you haven't specifically designed any

11  studies to look at self-defense; correct?

12  A   I always look at self-defense.

13  Q   As an ancillary issue; correct?

14  A   It's a fundamental issue, and that's why every act of

15  self-defense that I can find is coded that way in my database,

16  and is defined that way in the case narratives which are all

17  available online.  I take self-defense very seriously, and I

18  recognize the common law right.  I recognize the statutory right

19  to defend your life.

20         And I'm not against concealed carry today with a

21  permitting system and training and firearms accuracy tests.

22  Although I know that the more concealed weapons we have, the

23  higher the murder rate.  So, I understand why people feel the

24  need for it.  Both the studies [inaudible] John Donohue have

25  shown that the more guns we put out there, the more people end

1  up dead.

2  Q    So, we're trying to get out of here before 5:00, so I

3  apologize, but I'm going -- and I'm going back to address some

4  of the things that the Government has elicited from your

5  testimony.  But during the Civil War, do you recall something

6  called the Minié ball?  Or Minié ball?

7  A    Yeah.

8  Q    What was that?

9  A    It's a very deadly small projectile, yes.

10 Q    Okay.  And it was a technology used to make muzzleloading

11 rifles more accurate; correct?

12 A    There was an effort for that, so it would fit more tightly

13 into the barrel, right.  So, a smoothbore weapon would not --

14 you know, it wouldn't rattle around.  That's what the Minié ball

15 was designed to do.

16 Q    And, let's see.

17 A    So, it would perform more like a muzzleloading rifle.

18 Q    So, when the Government hired you today, they didn't hire

19 you to find historically analogous law to their waiting period

20 law; correct?

21 A    No.  They hired me to show that it wouldn't have crossed

22 the minds of the founders to pass such a law.

23 Q    And yet you don't specifically state that in your opinion,

24 do you?

25 A    I was asked to state it, and it's a corollary of my

1  opinion.  Yes.  You can see it from the data there.

2  Q    And in your book, you attribute homicide mostly to feelings

3  people have towards their government, the degree to which people

4  identify with their communities, and the opportunities they have

5  to earn respect without resorting to violence; correct?

6  A    That is absolutely correct.  That's the fundamental

7  reason -- drivers of homicide.

8  Q    And when you were looking at your homicide figures, have

9  you looked at any -- or how many homicides are a result of or a

10  direct result of intoxication?  Yes or no.

11  A    Oh, absolutely.  And I take a look at -- everything is

12  coded.  But very often, you don't know from the sources whether

13  people are inebriated.  So, I can say that when I see evidence

14  of intoxication is there, but you don't always see.  But the

15  fact that there is no testimony about intoxication does not

16  necessarily mean that they weren't under the influence of

17  alcohol.

18  Q    And throughout your life, you've studied what interests

19  you; correct?

20  A    I have studied pressing social issues of our time.  And as

21  those new issues come about, I try as a scholar to address them.

22  That's why I ended up teaching African American history, why I

23  teach about race, why I teach about global history today,

24  threats to democracy around the world.  I respond to reality.

25  It's not just something that I do for my own amusement.

1   Q    So, have you studied how guns save lives?  Yes or no.

2   A    Oh, certainly.  There are cases in which that happens, and

3   I don't deny that.

4   Q    And they're relatively frequent; correct?

5   A    No.  They're not relatively frequent.  That -- the studies

6   overstate that.  But the fact is there are defensive gun uses.

7   There are -- and I think Philip Cook has done a very good job of

8   talking about the level of that.  It's the best work out there.

9   Q    So, the CDC also did their own independent studies of

10  firearms used for self-defense; correct?

11  A    I haven't read that.

12  Q    So, it would surprise you to learn that they did similar

13  studies between 1994 and 1997?

14  A    I'm not familiar with those, no.  Because at that time, I

15  was working on the 19th and 18th and 17th centuries,

16  intensively.

17          MR. ABBAS:  One moment, Mr. Roth.

18          THE WITNESS:  Judge Kane, may I ask you a question?

19          THE COURT:  Yes.

20          THE WITNESS:  I know we were talking about coming back

21  on Monday, and we're going to be on the road.  We have to go

22  back home.

23          THE COURT:  I don't think you'll have to.  I think

24  he's almost through, and the redirect isn't going to take much.

25  You will be through today.

1            THE WITNESS:  Oh.  Thank you.  That's merciful.

2            THE COURT:  Sorry to have you worried about that.  Go

3  ahead.

4            MR. ABBAS:  I will conclude now, Your Honor.

5            THE COURT:  All right.  See, you're through with cross

6  examination.  Now we will have redirect.

7            MR. SULLIVAN:  Your Honor, I don't have any redirect.

8            THE COURT:  There is no redirect.  You are finished

9  with your testimony, sir.  And you may travel as you wish,

10  because you're excused from further proceedings in this case.

11  Thank you very much for your time.

12            THE WITNESS:  Thank you, Judge Kane, and thank you to

13  the plaintiff.  You asked excellent questions.  And to the

14  defense.  Thank you so much.

15            THE COURT:  Thank you all.  I think it's probably too

16  late to start the next one.

17            MR. KOTLARCZYK:  I think that's right, Your Honor.

18            THE COURT:  All right.  Let's be here at 9:30 on

19  Monday morning.

20            MR. KOTLARCZYK:  Very good, Your Honor.  Thank you.

21        (Proceedings concluded at 4:35 p.m.)

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3

4          I, KEVIN P. CARLIN, Official Court Reporter for the

5    United States District Court for the District of Colorado, a

6    Registered Merit Reporter and Certified Realtime Reporter, do

7    hereby certify that I reported by machine shorthand the

8    proceedings contained herein at the time and place

9    aforementioned and that the foregoing pages constitute a full,

10   true, and correct transcript.

11          Dated this 8th day of November, 2023.

12

13

14

15

16                              _____
                                Kevin P. Carlin, RMR, CRR
17                              Official Court Reporter

18

19

20

21

22

23

24

25

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3    Civil Action No. 23-cv-2563-JLK

4    ROCKY MOUNTAIN GUN OWNERS and ALICIA GARCIA,

5          Plaintiffs,

6          vs.

7    JARED S. POLIS,

8          Defendant.

9    ----------------------------------------------------------------

10                    REPORTER'S TRANSCRIPT

11          Preliminary Injunction Hearing, Vol. 2

12   ----------------------------------------------------------------

13          Proceedings before the HONORABLE JOHN L. KANE, Judge,
     United States District Court for the District of Colorado,
14   commencing on the 30th day of October, 2023, in Courtroom A802,
     United States Courthouse, Denver, Colorado.
15

16                        APPEARANCES
     For the Plaintiffs:
17   D. SEAN NATION, Mountain States Legal Foundation, 2596 South
     Lewis Way, Lakewood, CO 80227
18

19

20   For the Defendant:
     MICHAEL T. KOTLARCZYK and MATTHEW J. WORTHINGTON, Colorado
21   Attorney General's Office, 1300 Broadway, Denver, CO 80203

22

23

24
     Reported by KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room
25   A259, Denver, CO 80294, (303)335-2358

     Proceedings reported by mechanical stenography; transcription
                     produced via computer.

**App. 692**

23-cv-2563-JLK    Preliminary Injunction Hearing   10-30-2023

1                        I N D E X

2    DEFENDANT'S WITNESSES                                PAGE

3    CHRISTOPHER POLIQUIN
         Direct Examination By Mr. Worthington . . . . . . .197
4        Cross Examination By Mr. Nation . . . . . . . . . .214

5

6    Closing Argument by Mr. Nation . . . . . . . . . . . .221

7    Closing Argument by Mr. Kotlarczyk . . . . . . . . . .224

8    Rebuttal Argument by Mr. Nation . . . . . . . . . . . .235

9    Reporter's Certificate . . . . . . . . . . . . . . . 239

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2        (Proceedings commenced at 9:33 a.m.)

3             THE COURT:  Next witness, please?

4             MR. WORTHINGTON:  Good morning, Your Honor.  Matthew

5   Worthington on behalf of the defendant.  We would like to call

6   Professor Christopher Poliquin.

7             THE COURT:  Sir, you're going to be sworn in by the

8   courtroom deputy.  I think if you –– can you see her now?

9             THE WITNESS:  I can.  Thank you.

10             THE COURT:  All right.  Go ahead, please.

11        (The Witness is Sworn)

12             THE COURTROOM DEPUTY:  Please state your full name for

13   the record, and spell your last name.

14             THE WITNESS:  My full name is Christopher William

15   Poliquin.  My last name is spelled P-O-L-I-Q-U-I-N.

16             THE COURT:  Can you turn down the volume a bit,

17   please.  Go ahead, please.

18                    **DIRECT EXAMINATION**

19   BY MR. WORTHINGTON

20   Q    Good morning, Professor Poliquin.  Can you please describe

21   your educational background.

22   A    Yes.  So, I am currently an assistant professor at UCLA.

23   And before that I received a doctorate in business

24   administration from the Harvard Business School.  And then

25   before that, I did my undergraduate degree at the University of

1   Pennsylvania.

2   Q    And what are your primary areas of research?

3   A    My primary areas of research are really on the topics of

4   business and public policy.  I have one stream of research that

5   focuses on gun control and the political economy of gun policy.

6   And then I have other kind of strings of research that are more

7   oriented towards business, where I largely study human capital

8   organizations.

9   Q    And have you published any -- have any of your -- have you

10  published any research articles?

11  A    Yes.  Several.  So, on the topics of gun control and gun

12  policy, I have published two peer-reviewed papers, one on the

13  effects of waiting period policies on gun violence, and another

14  that is on basically how state legislatures change gun policy

15  following mass shootings.

16  Q    And do you have experience in performing quantitative

17  research?

18  A    Yes.  Almost all of my research is empirical, quantitative

19  work.

20  Q    And do you have experience in designing quantitative

21  research studies?

22  A    Yes.  Most of my educational kind of background in terms of

23  empirics relates to the design and execution of quantitative

24  studies.

25  Q    And where did you learn how to perform those empiric

1  studies?

2  A    So, during graduate school while I was doing my doctorate,

3  I completed course work at Harvard in econometrics, which is

4  basically what economists call statistics, and took other

5  classes in economics.  Specifically labor economics, industrial

6  organization.  And those fields are kind of heavily quantitative

7  and heavily empirical, so a good portion of those classes also

8  deal with the design of quantitative studies.

9  Q    And you may have answered this, but do you have experience

10  in performing statistical analyses?

11  A    Yes.  Almost -- as I mentioned, all of my research

12  basically deals with kind of statistical empirical studies.

13  Q    Do you have experience in performing statistical analyses

14  on public policy?

15  A    Yes.  So, one of the papers that I published that is

16  Exhibit 2 is an analysis of handgun waiting periods.  So, you

17  know, that is an example of a public policy that I have kind of

18  analyzed using quantitative methods.

19  Q    Okay.  And, Professor Poliquin, I would like to actually

20  just start with the document that was previously admitted as

21  Exhibit 32.  Do you have that document in front of you?

22  A    Yes.  That would be my CV.

23  Q    Okay.  Is this -- this is a true and correct copy of your

24  CV?

25  A    It is, yes.

1    Q    And then I'd like to turn to the exhibit that was marked

2    as -- or previously admitted as Exhibit 22.

3    A    Yes.

4    Q    And do you have that in front of you?

5    A    I do.  This is my published paper on handgun waiting

6    periods.

7    Q    And then I'd like to also turn you to Exhibit -- what's

8    been admitted as Exhibit 33.  Do you have that in front of you?

9    A    I do, yes.  This would be the appendix to the published

10   paper on handgun waiting periods.

11   Q    So, going back to Exhibit 22, your paper, where was this

12   paper published?

13   A    This paper was published in the proceedings of the National

14   Academy of Sciences.

15   Q    And was this paper subject to peer review?

16   A    It was, yes.

17   Q    Professor Poliquin, have you ever testified as an expert

18   witness in a legal case before?

19   A    No, I have not.

20   Q    Have you ever been offered as an expert witness where the

21   Court refused to accept you as an expert?

22   A    No.

23   Q    So, Professor Poliquin, I'd like to talk to you about your

24   research study at Exhibit 22, and can you begin just generally

25   telling me what research you studied in this paper?

1  A    Yeah.  Absolutely.  So, this is a analysis of how handgun

2  waiting period policies affect gun violence, specifically gun

3  homicides and gun suicides.  And kind of what we do with this

4  paper is we take 45 years of data from 1970 to 2014 across all

5  50 states and the District of Columbia, and we analyze how

6  changes in waiting period policies that impose a delay between

7  the purchase and receipt of a handgun affect outcomes of

8  interests related to gun violence, gun homicides, and gun

9  suicides.

10 Q    All right.  I think you answered a couple of my questions.

11 Did your study find any relationship between waiting period laws

12 and gun homicides?

13 A    We do.  So, we find that basically, imposing a handgun

14 waiting period results in about a 17 percent reduction in gun

15 homicides, and a 7 to 11 percent reduction in gun suicides.  The

16 result for homicides, that 17 percent reduction in gun homicides

17 turns out to be kind of statistically significant across a range

18 of models and time periods in the paper.  The 7 to 11 percent

19 reduction in gun suicides is statistically significant in some

20 models, and insignificant in other models.

21 Q    And would you describe that impact -- was your study

22 evaluating a correlation or a causation of these policies?

23 A    Our study aims to provide causal estimates.  So, what that

24 just means is we aim to kind of go beyond sort of correlational

25 analysis and provide evidence on the causal impact of waiting

1  periods.  So, can we attribute a decline in gun violence to a

2  waiting period policy?

3  Q    And I think you mentioned you found that there was a

4  17 percent reduction in gun homicides when a waiting period was

5  imposed?

6  A    Yes.  That's right.

7  Q    In terms of the number -- can you provide an estimate of

8  like the number of annual homicides in a state that would amount

9  to?

10 A    Yeah.  So, for a state with kind of a sort of average

11 number of gun deaths, that would basically result in about 36

12 fewer gun homicides per year.  And that's per state that has

13 these policies.

14      So, we think that if you kind of look at the sort of

15 states -- all of the states that have waiting periods,

16 collectively, we think those states avoid, you know, maybe about

17 750 gun homicides a year thanks to their waiting period

18 policies.

19 Q    All right.  Professor Poliquin, what -- I wanted to talk a

20 little bit about the methodology of your study.  Can you please

21 describe the framework you used to compare waiting periods and

22 gun deaths.

23 A    Yes.  So, the methodology we use in this study is commonly

24 referred to as difference-in-differences.  And what that means

25 is we look longitudinally over time within states that implement

1  waiting period policies, and we look at how gun violence changes

2  in these states pre and post waiting period policy.  And we

3  compare those changes in the states that are adopting waiting

4  periods to the same changes, the same difference between

5  pre-post in the states that did not adopt waiting period

6  policies.

7        So, you're basically comparing changes in gun violence

8  over time in states that do adopt waiting periods to a control

9  group of states that did not adopt waiting periods.

10 Q   So, as part of your study, you also looked at states that

11 did not adopt a waiting period?

12 A   Absolutely.  So, those states are critical for providing

13 essentially what researchers would call counterfactual.  So, we

14 use these states that did not adopt waiting period policies to

15 essentially assess how gun violence would have changed in states

16 that did adopt waiting periods absent the waiting period; right?

17 So, it's sort of a way of saying, hey, what would have happened

18 in these states that enacted waiting periods if they hadn't done

19 so?  And that's the importance of looking at that control group.

20 Q   And is a difference-in-difference framework commonly used

21 in your field?

22 A   It is.  It's probably the most -- it's probably the most or

23 certainly among kind of the top two or three methodologies that

24 are used in economics to assess the impacts of public policies.

25 Sort of the reason being that, you know, we cannot kind of

1   randomize which states have which policies, and so we need kind

2   of methods like this, these difference-in-differences methods to

3   assess the causal impact of the policies.

4   Q    All right.  And as part of your study, did you rule out any

5   other variables that could have been impacting homicide rates?

6   A    Indeed we did.  So, we control in several of our models for

7   demographic social factors that prior studies suggest may be

8   related to trends in gun violence.  And so that includes things

9   like alcohol consumption, poverty rates, median income, the

10  percentage of the population that lives in urban areas, the

11  percentage of the population that is Black, and then seven

12  different age groups, you know, from kind of different bands of

13  age, the percentage of the population that is in those age

14  bands.

15          And what we find is that after controlling for and

16  adjusting for all of these demographic variables that have been

17  used in prior research, that we still find statistically

18  significant reductions in gun homicide thanks to these waiting

19  period policies.

20  Q    All right.  Professor Poliquin, if we can look at page

21  three of Exhibit 22, your study.  There's a table two at the

22  bottom of the page.  Do you see that?

23  A    Yes.

24  Q    Can you explain to me what information is being displayed

25  in table two.

1  A    Yes.  So, each of these numbers in table two is an estimate

2  of the effect, basically, of the policy that's on that -- in

3  that first column on a specific outcome.  So, if we look at,

4  say, the part of that table that says gun homicide, we see under

5  that there's two policies.  There's the waiting period, and then

6  there's the background check.

7         And then, again, these numbers, each of these columns

8  with numbers corresponds to a different model that we estimated,

9  and the number tells you essentially what the -- roughly what

10 the percentage reduction is in that outcome for that policy.

11        So, for a waiting period, we see in column three, for

12 example, about a -- it ends up being kind of roughly an

13 18 percent reduction in gun homicides.  The reason we say

14 17 percent reduction in the paper is that you need to make some

15 adjustments to the estimates for the precision of the estimate,

16 but you can think of these numbers as kind of roughly the

17 percentage reduction in gun violence thanks to these policies

18 for each outcome.

19 Q    And for table two, what time period is covered by table

20 two?

21 A    This would be the period 1990 to 1998, which is one of the

22 periods of interest in our paper, because it's a period of time

23 corresponding to implementation -- enactment and implementation

24 of the Brady handgun bill.

25 Q    And why did you look at that period specifically?

1  A    Yeah.  So, we look at kind of two periods in broad periods

2  in the paper.  One, 1970 kind of onward, and then we

3  specifically zoom in on this Brady period, when the Brady

4  handgun bill was enacted, because that bill, it's very -- it's

5  an interesting bill, because what congress did was they imposed

6  a background check requirement for dealer firearms sales.  And

7  in order to make -- to give states time to implement the

8  background checks, they imposed a five-day waiting period,

9  because we did not have an instant computerized background check

10  system in the early 1990s.

11       And so what happened was you basically had a bunch of

12  states, 19 states, in fact, in the early '90s that the federal

13  government just imposed waiting periods on them, whether they

14  wanted them or not.  And so we can kind of use this Brady period

15  as a natural experiment, where almost half of states got waiting

16  periods, even if they kind of didn't want them and then

17  basically all of the other states already had waiting periods,

18  and so we wouldn't expect kind of any changes from the federal

19  waiting period policy in those states.

20       And so what we can do is we can compare how violence

21  changed in those states that the federal government imposed

22  waiting periods on.  We can kind of compare how violence changed

23  in those states to how violence changed in the states that long

24  had -- already had waiting periods, and we can assess using this

25  kind of quasi-natural experiment what the impact of the waiting

1    period was on violence.

2          And what we find is that very similar to the results

3    using our full sample period, there's about a 17 percent

4    reduction in gun homicides, and about a seven percent reduction

5    in gun suicides during this Brady period.

6    Q    All right.  Professor Poliquin, I'd like to go to -- back

7    to Exhibit 33.  And if we look at the second page of Exhibit 33

8    near the top, there's a chart with state abbreviations.  Do you

9    see that?

10   A    Yes.

11   Q    Can you explain to me what's being displayed in this

12   graphic.

13   A    Yeah.  So, what we're doing in this graphic is we are

14   essentially taking our statistical models, and we're

15   reestimating them after eliminating each state from our data

16   set.  And then we are plotting here the effect of the waiting

17   period policy for gun homicides and gun suicides after you

18   remove -- you delete each state from the data set.  And then

19   these vertical bars are giving you kind of an estimate of the

20   uncertainty in our estimates.

21         And the reason to kind of do this is to make sure that

22   the results that we're finding in the main study are not driven

23   by, you know, one state; right?  Or maybe like one large state

24   that is kind of dominating the data.  And so we drop each state

25   individually, and what we show is that, you know, when you do

1  that, you get very, very similar estimates, even after

2  eliminating each state sequentially.

3  Q    And I'd like to look at -- it says page five of Exhibit 33.

4  And it's the chart at the -- table S5, the chart at the bottom

5  of the page.  Do you see that?

6  A    Yes.

7  Q    Can you explain to me what information is being displayed

8  in this chart.

9  A    Yes.  So, this is a table that modifies our main

10  statistical model to instead of just saying, you know, what is

11  the impact of the waiting period, kind of post -- all post

12  waiting period years, estimate the impact of the waiting period

13  policy in each year following the policy, but also estimate what

14  the difference is -- was in gun violence between states with

15  waiting periods and not waiting periods prior to implementation

16  of the policy.

17        And the reason to do that is because you want to know,

18  you know, is it the case that these states that have waiting

19  periods, you know, they were already kind of seeing lower

20  homicide or lower suicide rates even before they -- the waiting

21  period took effect?  And what we see in this chart is that the

22  estimates for the kind of quote/unquote effect of the waiting

23  period policy prior to its enactment are not statistically

24  significant.

25        So, prior to enactment of the waiting period policy,

1  there's no statistically significant difference between states

2  with and without waiting periods.  And then what we see is that

3  it's only after states enact these waiting period policies in

4  the year, two years, three years after implementation of these

5  policies that we see the reductions in gun homicides and gun

6  suicides.

7  Q    All right.  And if we turn to page six, just the next page,

8  in Exhibit 33, there's table S6.  Do you see that table?

9  A    Yes.

10  Q    Can you explain to me what the purpose of this table is.

11  A    Yeah.  So, the purpose of this table is that when states

12  enact a gun policy like a waiting period, sometimes there are

13  other gun policies that are changing at the same time as part of

14  the same law.

15       And so one of the things that we're doing here is we

16  are basically controlling for the implementation of other gun

17  policies in addition to the waiting period and background check

18  policies.

19       And what we find is that if we do that, we continue to

20  find statistically significant reductions in gun homicide and

21  gun suicide in response to the waiting period policy.  And so

22  even after adjusting for other gun policies that these states

23  have.

24  Q    All right.  Switching gears a little bit, Professor

25  Poliquin, did you have an opportunity to look at the declaration

23-cv-2563-JLK    CHRISTOPHER POLIQUIN - Direct    10-30-2023

1   of Professor Clayton Cramer before today's hearing?

2   A    I did, yes.

3   Q    And specifically, that's previously been admitted as

4   Exhibit 4.  Do you have that document in front of you?

5   A    I do, yes.

6   Q    Give me one second.  And did you have an opportunity to

7   review Professor Cramer's analysis starting on page 54 of the

8   declaration?

9   A    I did, yes.

10  Q    And did you form any opinions based on reviewing that --

11  Professor Cramer's declaration?

12  A    I did, yeah.

13  Q    And what is your reaction to Professor Cramer's analysis?

14  A    So, the kind of analysis that Professor Cramer undertakes

15  to assess the impact of a waiting period policy cannot be used

16  to draw causal inferences about the effects of that policy.

17       And there's sort of several reasons for that.  One of

18  the big and first problems with this analysis is that it's

19  purely correlational.  So, in order to assess how a waiting

20  period causally affects gun violence, we need to construct a

21  counterfactual for what gun violence would look like absent the

22  waiting period policy.

23       Professor Cramer's analysis can't do this, because he

24  only uses data on California, one state with a waiting period.

25  And so he has no control group or kind of no model --

1  statistical model that allows him to construct a counterfactual

2  for what gun violence would have looked like in California

3  absent the waiting period policy.

4        Another sort of major shortcoming with this analysis is

5  that California has a waiting period for handgun purchases at

6  all periods in his analysis.  So, if we look at his figure on

7  page 57, we see that there's actually no time in his data set in

8  which California did not have a waiting period.  And the reason

9  that's potentially problematic, especially for the question at

10  issue here in this case, is that the duration of a waiting

11  period might be much less important than whether a state has a

12  waiting period or doesn't have a waiting period.

13        And because Professor Cramer has kind of no variation

14  of that kind in his data, he really has no basis for estimating

15  the effects of a state going from no waiting period to

16  implementing a waiting period.

17  Q   All right.  And in your opinion, did Professor Cramer use a

18  reliable methodology to evaluate the effectiveness of waiting

19  periods?

20  A   No.  And so, you know, one of kind of the major

21  shortcomings here is that sort of what Professor Cramer says is

22  that, you know, if -- if gun violence kind of increases after

23  you increase the length of a waiting period; right?  It must be

24  the case that the waiting period was ineffective.  But we don't

25  actually -- we don't know what murder rates would have been

1   absent implementation of that waiting period policy.

2          And you cannot just say from a positive correlation

3   that something was causal.  You know, likewise, you can't say

4   that something is kind of noncausal just because of a

5   correlation.  In fact, whether two things are positively

6   correlated, negatively correlated, or not correlated at all need

7   not have any particular relationship to whether there is a

8   causal effect of one variable on another variable.

9   Q    Professor Poliquin, I would like to now move to Exhibit 21,

10  the document that was previously admitted as Exhibit 21.  Do you

11  have that in front of you?

12  A    I do, yes.  This is the house bill that was enacted.

13  Q    And do you understand that this bill created a three-day

14  waiting period for firearm purchases in Colorado?

15  A    Yes.  Indeed it will.

16  Q    And I'd like to look at -- it's paragraph F under the

17  legislative declaration.  It's on the second page.

18  A    Yes.

19  Q    Do you see paragraph F?

20  A    I do, yes.

21  Q    Would you be able to read it?

22  A    Yeah.  It says one study estimates that mandatory waiting

23  periods to receive firearms led to a 7 to 11 percent reduction

24  in suicides by firearm.  The study also suggests that delaying

25  the purchase of firearms by a few days reduces firearm homicides

1   by approximately 17 percent.

2   Q    And were those the results of your research study?

3   A    They were exactly the results of my study.

4   Q    And were you aware that the Colorado General Assembly

5   referenced your study in the legislative declaration of House

6   Bill 23-1219?

7   A    I was aware that the legislature as they were considering

8   this bill was aware of my study, because several reporters

9   contacted me for comment while this bill was pending.  I was not

10  aware that the results of the study made it specifically into

11  the legislative declaration.

12  Q    And based on your research and your opinion, will

13  Colorado's adoption of a three-day waiting period result in a

14  reduction of gun homicide deaths in Colorado?

15  A    It will, yes.  Based on my study, I would predict a

16  reduction in gun homicides in Colorado.

17  Q    And based on your study, would you predict a reduction in

18  gun-related suicide deaths in Colorado?

19  A    I would.  I would expect a reduction in gun-related

20  suicides, although I'm slightly less confident in that

21  prediction based on the results of my study.

22  Q    Okay.  And based on your study, did waiting periods have

23  any impact on -- did they have any impact on increasing

24  non-gun-related homicides?

25  A    No.  So, when we look at non-gun homicides in our study, we

1  find no statistically significant effects on non-gun homicide.

2         MR. WORTHINGTON:  Give me one second.

3  Q.    (By Mr. Worthington) Professor Poliquin, previously you

4  discussed some results on your -- some results in your study as

5  it related to suicide deaths were insignificant.  Do you recall

6  that?

7  A    Yes, I do.

8  Q    Can you explain what you mean by "insignificant."

9  A    Yeah.  So, whether an effect is statistically significant

10  or insignificant is just a way of saying whether no effect,

11  zero, is consistent with the data.

12         MR. WORTHINGTON:  All right.  Thank you.

13         THE WITNESS:  Thank you.

14                    **CROSS EXAMINATION**

15  BY MR. NATION

16  Q    Good morning, Professor Poliquin.  My name is Sean Nation,

17  Mountain State Legal Foundation.  You're not offering any

18  opinions on whether there are historical analogs to waiting

19  periods, are you?

20  A    No.  At least not before 1970.

21  Q    And you're not offering any opinion on the history or

22  tradition of waiting periods with respect to the Second

23  amendment?

24  A    No.

25  Q    You're only here to testify about the effects of the law;

1   is that correct?

2   A    Correct.  Yeah.  Since 1970.

3   Q    And are you familiar with the Supreme Court's decision in

4   *Bruen*?

5   A    Vaguely familiar, yes.

6   Q    Okay.  And do you have an opinion as to whether it's

7   appropriate to consider the effects of the law in light of the

8   Supreme Court's decision in *Bruen*?

9   A    I can't speak to that.  I don't have a law degree, and

10  wouldn't speak to that, no.

11  Q    Okay.  So, turning to your study, you're considering all

12  homicides, regardless of effect; is that correct?

13  A    We break it down by all homicides, gun homicides, and

14  non-gun homicides.  We look at all three.

15  Q    But you don't separate out justifiable homicides; is that

16  correct?

17  A    We do not, no.

18  Q    And do you measure the effect of either background checks

19  or waiting periods on other crimes, such as, you know, rape or

20  aggravated assault?

21  A    No.

22  Q    And with respect to your control variables, do you control

23  for the overall crime rate?

24  A    We do not, no.

25  Q    And/or incarceration rates?

1   A    No, we do not.

2   Q    Do you control for policing, number of police officers in a

3   given area?

4   A    We do not -- to the extent that that changes over time

5   within the state, no, we do not control for that.

6   Q    Looking at your table one, scenario two, for non-gun

7   homicide, does that indicate a statistically significant

8   increase in non-gun homicides with relation to background

9   checks?

10  A    It does, yes.  That .153 coefficient, yes.  That's

11  statistically significant.

12  Q    And for all suicides, it would indicate that background

13  checks increase suicides by 11.3 percent?

14  A    Roughly 11.3 percent, yes.  That result is not

15  statistically significant at conventional levels, but it's sort

16  of marginally statistically significant.

17  Q    And at the bottom line, background checks would increase

18  non-gun suicides by 19.9 percent.  Is that at a statistically

19  significant level?  Correct?

20  A    Roughly 19 percent, yes.

21  Q    How does that make any sense, that a background check would

22  increase all suicides and non-gun suicides?

23  A    So, you know, one thing that I would say about the

24  coefficients on the background check, and it relates to

25  something I said earlier, is that when you analyze a policy like

1  this, you sort of want to, you know, attempt to figure out how

2  gun violence, you know, might have been trending differently

3  prior to implementation of the policy.  Because if states are on

4  different trends, time trends with respect to violence prior to

5  implementation of the policy, then what's happening in states

6  that do not implement the policy is not a good basis for

7  constructing a counterfactual for what's happening in states

8  that do implement the policy.

9          And so one of the things that we do in the appendix,

10  Exhibit 33, for waiting periods, we look at whether there's

11  evidence of differences in trends prior to implementation of the

12  waiting period policy.  And we find that there is no evidence of

13  different trends for the waiting period policy.  We do not look

14  at whether there are differences in trends for the background

15  check policy.

16          And so one potential interpretation of what's happening

17  here is that potentially states were on different trends with

18  respect to background checks and with respect to violence around

19  the times of implementing background checks.  And indeed, there

20  is some evidence for that in table S4 of Exhibit 33, where we

21  add state-specific time trends to our analysis.  And once we

22  account for these differences in trends, we see that the

23  background check effects that you just described completely

24  vanish, and are no longer statistically significant.

25  Q    So, if I understand you correctly, none of your studies

1  show any statistically significant benefit to background checks,

2  then?

3  A    Correct.  My study does not find any effects of background

4  checks sort of on gun violence.  That's right.  I would say my

5  study, and there's actually some other studies with similar

6  conclusions.

7  Q    Are you familiar with any story or news article where a

8  person purchases a gun, passes a background check, and uses it

9  for violence within three days?

10 A    Ooh.  There have been a couple mass shootings that are of

11 that type.  I would have to kind of go back into some -- you

12 know, for another paper of mine and get you details on that.

13 It's rare among mass shootings, for sure.  It's very rare.

14 There are a couple instances on it.

15 Q    You mentioned the Brady period.  Are you aware that the

16 Brady bill was ruled to be -- was held to be unconstitutional?

17 A    That would be *Printz v. United States*, I believe.

18 Q    Yes.

19 A    Yeah.  Aspects of it, yeah.

20 Q    Do you have any opinion as to the constitutionality of a

21 three-day waiting period?

22 A    I don't.  My understanding, though, is that the

23 unconstitutionality of parts of the Brady bill in *Printz v.*

24 *United States* had nothing to do with the fact that it

25 implemented a waiting period, but I could be wrong on that.

1  Q    And did your study focus on -- your study focused on

2  handguns; is that correct?

3  A    Correct.  Yeah.  We looked at handgun waiting periods.

4  Q    And are you -- do you have an opinion as to whether a

5  waiting period with effect to long guns would have any effect

6  whatsoever?

7  A    I don't have -- no.  I don't have any opinions on that

8  based on my study.

9  Q    And do you have any opinions as to the rate of violence

10  used by either rifles or shotguns?

11  A    I'm familiar with Department of Justice statistics showing

12  that roughly 70 to 80 percent of homicides are committed with

13  handguns.

14  Q    And are you familiar with the ATF statistics from time --

15  purchase to time-to-crime in the State of Colorado?

16  A    Those would be the gun trace statistics.  Yeah.  I'm

17  somewhat familiar with those.

18  Q    And would you disagree with the ATF that the time-to-trace

19  statistics is over six years between acquisition and

20  time-to-trace?

21  A    There's a large distribution of time-to-crime for recovered

22  guns.  So, you know, my understanding is that there are 10 to

23  20 percent of traced guns are actually -- the time-to-crime is

24  less than three months.

25           The other thing is we cannot use ATF's trace statistics

1  to draw inferences about the population of firearms that are

2  used in crime or even the population of firearms that are

3  recovered at crime scenes.  So, this is something the ATF itself

4  says about time-to-crime and gun trace statistics, that they

5  should not be used to make inferences about the population of

6  guns used in crime.

7  Q    But you don't disagree that the trace statistics put it at

8  six -- roughly six and a half years from the ATF?

9  A    Put what at six and a half years?  The average?

10  Q    Yes.  The time-to-crime -- or the time-to-trace.

11  A    The average time-to-crime conditional on having a trace

12  return a time, presumably.

13  Q    Yes.

14  A    Yeah.  I actually don't know what the average is, so I

15  don't have any opinion on that.

16         MR. NATION:  Okay.  Nothing further, Your Honor.

17         THE COURT:  Thank you.  Redirect?

18         MR. WORTHINGTON:  Nothing further, Your Honor.

19         THE COURT:  All right.  Professor, you should be

20  advised that before you testified, I made a ruling that the

21  experts testifying in this case were qualified as experts, and

22  so you may amend your resumé henceforth to say that you have

23  been qualified and testified as an expert in a federal case.

24         THE WITNESS:  Thank you for that.

25         THE COURT:  Thank you.  All right.  You're excused.

1  Next, please?

2          MR. KOTLARCZYK:  That concludes our witness testimony,

3  Your Honor.

4          THE COURT:  Okay.  Do we want to have closings?  You

5  want to take a recess and get your thoughts together a little

6  bit, and then we will come back with that?

7          MR. KOTLARCZYK:  That would be great, Your Honor.

8  Thank you.

9          THE COURT:  Okay.  Let's take a recess.  Let me know.

10  About 20 minutes, I think would do it.

11      (Recess at 10:15 a.m., until 10:43 a.m.)

12          THE COURT:  I'd like to hear from the plaintiffs

13  first, and then from the defense, and then plaintiffs can have a

14  final say.

15          MR. NATION:  Thank you, Your Honor.  Sean Nation for

16  the plaintiffs, Alicia Garcia and Rocky Mountain Gun Owners.

17  The evidence has clearly established that they are part of the

18  people that the Second amendment is designed to protect.  They

19  are law abiding individuals who frequently purchase firearms.

20  They passed background checks.  Rocky Mountain Gun Owners

21  members frequently purchase firearms, and again, pass background

22  checks.

23      We are not challenging any time it takes for a

24  background check to be completed, whether that's 20 minutes or

25  two or three days.  You know, federal firearms licensees have

1  that in place to make sure that the people to whom they are

2  selling are not prohibited purchasers.

3       The waiting period is clearly a firearms regulation

4  that implicates *Bruen*'s step one.  It's not simply a commercial

5  regulation.  As Chief Judge Brimmer ruled in the first RMGO case

6  that we cite in our brief, the Court agrees with the individual

7  plaintiffs that the Second amendment includes the right to

8  acquire firearms.  That was the case that enjoined the State's

9  law against long arms for 18- to 21-year-olds.

10       This case -- this regulation, this waiting period is

11  not presumptively constitutional under *Bruen*.  It is clearly

12  implicated in the right of the Second amendment.

13       The text of the waiting period also implicates the

14  plain text of the Second amendment.  Unlike what the defendants

15  argue, this is not an issue of immediate access.  The background

16  check may take time and may ultimately reveal that a person is a

17  prohibited possessor, and we think that's a good thing.  It is

18  simply, though, that the arbitrary three-day waiting period is

19  not -- is not consistent with the history of tradition of

20  firearms regulations in this country.  That is *Bruen* step two.

21       The closest the State comes is possessing while

22  intoxicated, but that's not the same as an arbitrary waiting

23  period for everyone.  In fact, the evidence shows that the first

24  waiting period was in 1923 that applied to concealable arms only

25  in California, and only for one day.  And that is far too late

1   to be consistent with the history of firearms regulations at the

2   time of the founding, at the time -- or at the time the 14th

3   amendment was passed.

4        The State's main evidence is means and testing, that

5   it's a good policy.  And it may be a good policy, but not every

6   good policy is constitutional, and not every bad policy is

7   unconstitutional.  In this case, the only evidence the State

8   puts forward is the effectiveness of a three-day waiting period,

9   and even that is questionable given the study's other findings.

10        The Supreme Court in *Bruen* instructs that the effects

11   of the law are not to be considered.  That's both in terms of

12   its constitutionality, and I would say the natural implication

13   is when you're balancing the equities that is also -- the

14   means-end of the policy, the effectiveness of the policy is not

15   to be considered.

16        The factors for an injunction are the likelihood of

17   success on the merits, which we believe we have demonstrated

18   that this law is clearly unconstitutional, that it

19   irreparably -- it ends in irreparable harm, and any deprivation

20   of rights is -- any deprivation of any constitutional rights

21   fits that bill.  That's the Tenth amendment -- or, excuse me,

22   the Tenth Circuit decision in the *Free the Nipple* case in 2019.

23        And finally, the last two factors, when the Government

24   is the opposing party, they merge, the balance of the equities

25   and the public interest.  That's the *Nken v. Holder* case from

1  the Supreme Court.

2       The protection of the constitutional rights against

3  government infringement is always in the public interest.

4  That's the Tenth Circuit's command in the 2012 case of *Awad v.*

5  *Ziriax.*

6       So, for those reasons, Your Honor, we suggest that Your

7  Honor issue an order enjoining the law, and have that take

8  immediate effect.  Thank you.

9       THE COURT:  Thank you.  Go ahead, please.

10      MR. KOTLARCZYK:  Thank you, Your Honor.  May it please

11 the Court, Michael Kotlarczyk on behalf of Governor Polis.

12 After over a day of evidence, the plaintiffs have not met their

13 burden justifying the extraordinary remedy they are asking for

14 from this Court, enjoining Colorado's new waiting period law on

15 the basis of a preliminary record.

16      And I'd like to start more or less where the plaintiffs

17 left off, which is to discuss the standard that the Court has to

18 apply in determining whether plaintiffs are entitled to

19 preliminary injunction.  The primary purpose of a preliminary

20 injunction is to preserve the status quo until the Court can

21 reach a final decision on the merits.

22      The plaintiffs have not in their papers or here today

23 denied that they are seeking to disrupt the status quo, which

24 makes this a disfavored preliminary injunction.  And the Tenth

25 Circuit has said that when a plaintiff is seeking a disfavored

1  preliminary injunction, not only do they have to meet all the

2  regular criteria of a preliminary injunction, including

3  likelihood of success, irreparable harm, and the public interest

4  slash balance of equities, they have to make a strong showing on

5  the likelihood of success and the balance of the harms

6  categories.  That's the *Fish* case, Your Honor, among others.

7          The plaintiffs can't meet their burden under any of

8  these factors, and importantly, they have to make their showing

9  on all these factors.  And they especially can't do so under the

10  heightened burden that applies here.

11          I'd like to touch on three -- on each of the three

12  factors briefly this morning, Your Honor, starting with the

13  likelihood of success.  Now, the likelihood of success, we agree

14  this is a *Bruen* analysis, which is a two-step analysis.  And we

15  start at step one by looking at the plain text of the Second

16  amendment and asking, does the individual's conduct here come

17  within the plain text of the Second amendment?  And for two

18  reasons, Your Honor, it does not.

19          First is the presumptively lawful category that

20  continues to apply to gun regulations.  Six Justices in the

21  *Bruen* decision recognized that this category, which was first

22  articulated in *Heller*, continues to have viability.  And the

23  Tenth Circuit just last month relied on this category in

24  upholding the ban on felons in possession in the *Vincent* case.

25          Relevant here, this category includes, quote,

1    conditions and qualifications on the commercial sale of arms.

2    And that's exactly what HB 23-1219, the waiting period law is.

3    It only regulates sellers.  And in fact we know this because as

4    the Court is aware, this isn't the first lawsuit these

5    plaintiffs have brought against the waiting period law.  In an

6    earlier case that was in front of Judge Brimmer, Judge Brimmer

7    denied the preliminary injunction because that was a

8    preenforcement challenge, and in the preenforcement standing

9    context found that they did not have standing to bring the

10   challenge, because there was no credible threat of enforcement

11   against the plaintiffs.

12        Why was there no credible threat of enforcement against

13   the plaintiffs?  Because none of them were sellers of firearms.

14   So, we know that this is a regulation that only targets sellers.

15   It doesn't regulate purchasers.  It doesn't regulate the

16   plaintiffs here.  It doesn't regulate noncommercial transfers.

17   It only regulates commercial sales.

18        Therefore, Your Honor, it is a presumptively lawful

19   regulation, and the plaintiffs importantly have not presented

20   any argument as to why that presumption would be overcome here.

21        And the Tenth Circuit in the *Vincent* case, after

22   finding that the felon in possession ban fell within the

23   presumptively lawful category, stopped its analysis there.  It

24   went no further.  The Court here can do the same as to

25   likelihood of success.

1           But there's a second reason why plaintiffs cannot

2    prevail on step one of *Bruen*, and that's that the Second

3    amendment's plain text doesn't cover the plaintiffs' conduct

4    here.  The Second amendment covers two things.  It covers

5    bearing and keeping of arms.  Now, bearing is not really what's

6    at issue here.  This isn't about carry.  This is about, if

7    anything, the keeping of arms.

8           But the plaintiffs here can keep all their firearms.

9    We heard from plaintiff Garcia that she has, she's not sure

10   exactly how many, but double-digit firearms.  None of her

11   possessory interest in any of those firearms is in any way

12   compromised by the waiting period law.  She can keep them all,

13   unaffected by this law.

14          What the law does is it slightly delays the acquisition

15   of new firearms, but the plaintiffs have not shown that the

16   meaning of "keep" includes her rights to immediately acquire

17   firearms.  And I understand plaintiffs are saying, well, there's

18   still the background check.  I believe there was testimony from

19   Mr. Rhodes, and his background check is now in the record, that

20   background checks often -- not always, but often happen very

21   quickly.

22          So, the -- it's important to note the Court is not

23   being asked to decide whether the Second amendment generally

24   includes some right to acquire firearms.  This is about

25   immediate possession, whether there's a right to near

1  instantaneous possession, about guns on demand.  And

2  historically, there just has been no such right, Your Honor.

3  Practically, it wasn't possible for many Americans in the 18th

4  century, as Professor Spitzer testified, as the Ninth Circuit in

5  the *Silvester* case found.

6          So, that was not a right that the plaintiffs had shown

7  was historically understood to be included within the text of

8  the Second amendment.  And therefore, plaintiffs fail at step

9  one of *Bruen* for that additional reason.

10         Moving on to *Bruen* step two, is the law consistent with

11  the nation's historic tradition of firearm regulation?  And for

12  this step, Your Honor, the burden shifts to the defendant, to

13  the Government.  And it's important to note that if we win on

14  step one, there is no need to go here.  And, again, I would

15  direct the Court to the *Vincent* decision for that.

16         But if the Court finds we have to move on to step two,

17  the Government can carry its burden there as well.  And it's

18  important to note that *Bruen* emphasized when conducting this

19  historical analysis, Courts don't look for a historical twin;

20  right?  So, there's been testimony about 1923 being the first

21  waiting period law.  That's a historical twin, Your Honor.  That

22  is not the standard that the Government has to meet under *Bruen*

23  step two.

24         Instead, the Government needs to show a historic

25  analog.  And the analog can be because of, quote, unprecedented

1  societal concerns and dramatic technological changes -- that's

2  what *Bruen* said -- that pose different regulatory challenges in

3  21st-century America than existed in 1791 or 1868.

4       And when looking at historic analogs, you look at the

5  how and the why, is what *Bruen* instructed Courts to do.  Now,

6  the general assembly here identified in their legislative

7  declaration what the why of the waiting period law is.  It's to

8  prevent -- curtail impulsive firearm violence.

9       Professor Roth testified that this was just not a

10  problem at the time of the founding.  Guns were a poor choice,

11  and not frequently used in a homicide back then.  They were hard

12  to load.  They could only fire one shot.  They were not easily

13  accessible to many.  So, this concern about going out and buying

14  a firearm to be used in a crime of passion did not exist in

15  18th-century America the way it does today.  The waiting period

16  laws simply would have made no sense in this environment, Your

17  Honor.  They would have addressed a nonexistent problem.

18       But there was some concern over impulsive firearm

19  violence in 18th- and 19th-century America, not from going out

20  and immediately purchasing firearms, not in a historical twin

21  sense, but in the intoxicated person statutes the Court has

22  heard testimony about, and many of which are attached to our

23  brief.

24       The why of those statutes is the same as the why here.

25  It's avoiding firearm violence by those whose reason is

1  temporarily overcome.  Now, does that mean that every

2  intoxicated person is a threat with a firearm?  No.  Not

3  necessarily.  Some people can hold their liquor better than

4  others, and we're certainly not saying that everybody who is

5  subject to a waiting period law is a threat to themselves or

6  others.  But some subset of them are, Your Honor, and that's the

7  violence that the general assembly sought to prevent.

8        So, we see the same why in those analogous laws.  The

9  how varies from law to law, but in some cases, it was the same

10 how as we have here.  In the Mississippi statute we cite in our

11 brief, for example, the Mississippi law provided for no sale to

12 intoxicated persons.  Once you're no longer intoxicated, you can

13 purchase your firearm, but while intoxicated, you couldn't.

14 Again, a commercial regulation on sales.

15       Some statutes -- some of the historical statutes went

16 even further and said no public carry at all while intoxicated.

17 That's going even further than a waiting period law, which

18 doesn't impose any burden on the right to bear arms at all.  So,

19 Your Honor, we think that if the Court were to proceed to *Bruen*

20 step two, the Government has carried its burden of establishing

21 a historic analog.

22       So, that's the likelihood of success factor.  I want to

23 turn briefly to the irreparable injury, Your Honor.  We heard

24 from the plaintiffs, both Ms. Garcia and Mr. Rhodes, that the

25 plaintiffs purchased guns on October 1st, the same day they

1  filed this lawsuit; and on October 25th, one day before they

2  came in to testify.

3      Put simply, Your Honor, those purchases were

4  manufactured to justify this lawsuit and the injunction hearing.

5  Now, that might be fine if we're talking about standing, but

6  we're not making a standing argument here.  We're talking about

7  the equitable factor of does this waiting period cause

8  irreparable injury to the plaintiffs?  And it simply doesn't,

9  Your Honor.  For one thing, nothing could be more repairable

10  than a waiting period that expires on its own terms.

11      Excuse me.  One moment, Your Honor.

12      So, Your Honor, we don't believe they have met the

13  second factor either of irreparable injury.  And before moving

14  on to the final factor of the public interest, which I agree

15  with plaintiffs is blended here with the balance of the harms

16  factor, since the Government is the defendant, I want to just

17  pause for a moment on the issue of experts.

18      I didn't hear it in plaintiffs' closing, but they

19  certainly emphasized in their opening and in their papers that

20  the Court should disregard the defendant's experts, I think

21  largely because it's -- there's a reliance on historic laws.

22  But *Bruen* itself defeats that argument, Your Honor.

23      *Bruen* in footnote six says that the Courts should not

24  conduct the historical inquiry in the abstract, and instead

25  Courts must rely on, quote, various evidentiary principles,

1  including the principle of party presentation.  And this is

2  again quoting from footnote six, Courts are entitled to decide a

3  case based on the historical record compiled by the parties.

4      That's what we've done here with the declarations of

5  Professor Roth and Professor Spitzer.  Professor Roth was highly

6  credible.  He is non-ideological.  He -- despite plaintiffs'

7  many efforts to get him to say that he thought guns were the

8  sole driver of violence, he did not say that.  He said they were

9  a factor that guns can make things worse, which is what his

10 career spent studying the issue has indicated.

11     Mr. Cramer, on the other hand, is a political activist,

12 which is fine.  He's certainly entitled to that, but he's

13 literally written a book about how to advance public policy in

14 the direction of further gun rights.  And particularly, with

15 respect to his statistical study, he admits that he has no

16 training in statistics.  We heard this morning from Professor

17 Poliquin about the inadequacy of his statistical study.  So, his

18 study is entitled to no weight.

19     So, turning, finally, Your Honor, to the public

20 interest factor.  The plaintiffs really don't want the Court to

21 consider the public interest here.  We heard just a moment ago

22 we shouldn't consider the policy effects, I believe, of this

23 public policy when looking at the public interest, because

24 that's a backdoor way to means-end scrutiny.

25     But, Your Honor, we're here because the plaintiffs are

1  asking for preliminary relief.  There's no Second amendment

2  exception to the Court's equity jurisprudence, to the Court's

3  equity docket.  And it's not surprising the plaintiffs don't

4  want the Court to consider this factor, because it's just not

5  even close, Your Honor.  Professor Poliquin this morning

6  testified that waiting periods can reduce homicides by up to

7  17 percent and suicides from 7 to 11 percent.

8        The general assembly relied on this study, and it's

9  clear why.  As the general assembly notes in other parts of its

10  legislative declaration, Colorado is seeing high rates of

11  firearm homicides.  2021 was the highest number of homicides

12  since 2000.  And suicide, Colorado ranks seventh-highest in

13  firearm suicides in the entire country.

14        If you apply Professor Poliquin's analysis to these

15  numbers that are contained in the legislative declaration, Your

16  Honor, this would translate to over 100 lives saved.  Thinking

17  again about the posture we're here before the Court on, in a

18  preliminary injunction, at some point there will be a trial on

19  the merits of this case, Your Honor.  It could be 12 months, 18

20  months, depending on a number of factors, as the Court is well

21  aware, but if we assume just 12 months, the public -- the

22  evidence that's been presented to the Court shows that 100 lives

23  will be saved during the course of the time the injunction would

24  otherwise be in effect.

25        And it's not just those hundred lives themselves, Your

1  Honor, that the Court should consider when considering where the

2  public interest lies.  It's the countless friends and family of

3  those who are impacted by firearm violence, be it homicide or

4  suicide, who will still have their loved ones by denying this

5  injunction.

6        Now, the plaintiffs said in their reply brief that

7  we're trying to guilt the Court into denying the injunction

8  here.  But again, Your Honor, they're the ones that are asking

9  for a preliminary injunction, which requires the Court to

10 consider the public interest.  These aren't just numbers on a

11 page, as we heard today from Professor Poliquin.  The evidence

12 here shows that this act will save lives.

13       The plaintiffs ask the Court to ignore these lives

14 saved, these lives that are altered by gun violence, and to

15 instead enjoin the law without there even being a full record,

16 because they want to do something, acquire firearms without

17 delay, that was unavailable to those in the 1790s.  They cannot

18 meet any standard of showing that the public interest supports

19 this injunction, Your Honor, let alone the heightened standard

20 they must meet for disrupting the status quo.

21       So, in short, Your Honor, this law will save lives, and

22 for that reason alone, plaintiffs can't meet their burden to

23 preliminarily enjoin it, and their motion should be denied.

24 Unless the Court has any questions?

25       THE COURT:  No, I don't.  Thank you.

1          MR. KOTLARCZYK:  Thank you very much, Your Honor.

2          MR. NATION:  Your Honor, *McDonald*, *Heller*, and *Bruen*

3   clearly show that the Second amendment is not a second-class

4   right.  And rights delayed are rights denied.  At the end of the

5   day, individuals in this country who are not prohibited

6   possessors have the right to acquire firearms after they

7   purchase a background check.  In the 1790s, they could go to a

8   general store or a gunsmith and acquire a firearm that was for

9   sale.

10         The Government cannot meet their burden to show that

11  there is a historical analog that would save this law.  The

12  *Bruen* standard for identifying a closely-analogous historical

13  regulation is a demanding one.  That's *Baird v. Bonta* from the

14  Ninth Circuit.  The dispossession of intoxicated persons or the

15  ban on intoxicated persons carrying is simply not analogous to a

16  three-day waiting period.

17         The Government argues that the preliminary injunction

18  that disrupts the status quo is subject to a heightened

19  standard, and it might be.  But this is not the -- the status

20  quo is not a regime where there is a waiting period.  That's

21  only been in effect for 30 days.  The status quo was the

22  pre-waiting-period time where a person could pass a background

23  check and receive their firearm once they passed that background

24  check.

25         The plain text of the Second amendment talks -- gives

1  individuals a right both to keep and to bear arms, and a waiting

2  period implicated both the right to keep and the right to bear a

3  firearm.  They may not -- a person may not do so for three days

4  after acquiring title and after passing a background check.

5           The felons in possession laws that the *Vincent* case

6  discusses really aren't analogous at all.  That's simply a

7  longstanding tradition that those who were a danger to the

8  community could not possess a firearm.

9           The regulation clearly regulates purchasers by not

10 allowing possession for those three days.  It's not just a

11 burden on the sellers.  It's also a burden on the purchasers,

12 because they would have to -- they have to go back.  As

13 Ms. Garcia testified, it's going to take her several hours to

14 retrieve her firearm from Dragonman in Colorado Springs.  It's

15 going to take Mr. Rhodes several hours to acquire his firearm

16 from Triple J Armory.

17           As the Court -- excuse me.  As Judge Brimmer held, the

18 Second amendment right to keep and bear arms includes the

19 acquisition of firearms, and that they have other firearms is

20 really of no moment.  The firearms uses are -- are useful for

21 different things, and, you know, if we were to analogize to say

22 the First amendment, the fact that some newspapers exist or you

23 have access to other newspapers doesn't mean that the Government

24 could shut down a particular newspaper.

25           The Government argues that the practicalities at the

1  founding were limited, but even Professor Roth agreed that if

2  there was a general store that had a firearm, you could go and

3  purchase it and acquire it that same day.  It is not analogous

4  to a three-day waiting period.

5       And discussing the experts, and looking at *Bruen* -- or,

6  excuse me.  The Government attempts to argue that Professor Roth

7  is nonideological.  I of course encourage you to watch his

8  interviews that we submitted, and to keep in mind that he was

9  referring to gangs as neighborhood organizations.  He is -- he

10  is an ideologue.  He is a pacifist, and God bless him, but that

11  should be taken into account as well as Mr. Cramer's activism.

12  Yes, he is an activist, but he has done the research, and he has

13  put in the work that the earliest waiting period was the 1923

14  California regulation from one day for easily-concealable

15  firearms.

16       The Government argues that the intoxicated person

17  statutes are analogous, and that some subset of people may do

18  harm to themselves or others, but just because some subset does

19  not trump the constitutional right to keep and bear arms under

20  the Second amendment.  We came to that agreement at the

21  founding.  We balanced the public interest at that point in

22  time, and nothing that the State does can disrupt that balance.

23       That some lives may be saved for a three-day waiting

24  period, though we disagree that the State's evidence is as

25  clear, does not overcome the right of the people to possess

1  firearms, to keep and bear arms.  Much like a law regulating

2  hate speech would be unconstitutional, because you have the

3  right to speak.  It may be in the public interest to do so, but

4  it's still forbidden under our Constitution.  And here, it is

5  forbidden under our Constitution for the State to deny you the

6  right to possess your firearms after you've passed a background

7  check.  Thank you, Your Honor.

8         THE COURT:  Thank you very much.  Preliminary

9  injunctions take precedent on the Court's docket, according to

10  the rules.  And I have the exhibits, the arguments of counsel,

11  and the testimony.  I will get a decision out on this as soon as

12  I can.

13         MR. NATION:  Thank you, Your Honor.

14         THE COURT:  Thank you very much.  We'll be in recess.

15     (Proceedings concluded at 11:12 a.m.)

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3

4            I, KEVIN P. CARLIN, Official Court Reporter for the

5    United States District Court for the District of Colorado, a

6    Registered Merit Reporter and Certified Realtime Reporter, do

7    hereby certify that I reported by machine shorthand the

8    proceedings contained herein at the time and place

9    aforementioned and that the foregoing pages constitute a full,

10   true, and correct transcript.

11           Dated this 8th day of November, 2023.

12

13

14

15

16                        _____
                          Kevin P. Carlin, RMR, CRR
17                        Official Court Reporter

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-02563-JLK

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 2)**

---

Kane, J.

      In this suit based on the Second Amendment to the United States Constitution, Plaintiffs Rocky Mountain Gun Owners and Alicia Garcia challenge a newly effective Colorado statute regulating the commercial sale of firearms. The statute mandates that sellers wait a minimum of three days between initiating a background check and delivering a firearm to a purchaser, with certain exceptions. *See* Colo. Rev. Stat. § 18-12-115. Presently before me is Plaintiffs' Motion for Preliminary Injunction (ECF No. 2), seeking an order preliminarily enjoining enforcement of that statute.[1] I find Plaintiffs have failed to demonstrate they are entitled to the extraordinary relief requested and, therefore, deny their Motion.

---

[1] Plaintiffs' Motion originally sought a Temporary Restraining Order and Preliminary Injunction. However, I previously found that Plaintiffs had not demonstrated an ex parte temporary restraining order was warranted and ordered that we would proceed on Plaintiffs' request for a preliminary injunction alone. *See* Order Re: Mot. for Temporary Restraining Order at 2, ECF No. 11.

**App. 737**

# I. BACKGROUND

## A. The Second Amendment

The Second Amendment to the U.S. Constitution was ratified in 1791. In full, it states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment was made applicable to the states with the ratification of the Fourteenth Amendment in 1868. *See McDonald v. City of Chi.*, 561 U.S. 742, 750 (2010).

Fifteen years ago, in *District of Columbia v. Heller*, the Supreme Court announced that "the Second Amendment conferred an individual right to keep and bear arms," of which a "central component" is self-defense.[2] 554 U.S. 570, 595, 599, 628 (2008). Based on that conclusion, the Court held "that the District[ of Columbia's] ban on handgun possession in the home violate[d] the Second Amendment." *Id.* at 635. The Court clarified that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or *laws imposing conditions and qualifications on the commercial sale of arms*." *Id.* at 626–27 (emphasis added). The Court described these measures as "presumptively lawful." *Id.* at 627 n.26; *see also id.* at 635 (referring to "those regulations of the right that [it] describe[s] as permissible" and indicating that "there will be time enough to expound upon the historical justifications for the exceptions [it] ha[s] mentioned"). It "repeat[ed] those assurances" two years later in *McDonald v. City of Chicago*, 561 U.S. at 786.

---

[2] Despite the use of the term "conferred," the Court in *Heller* determined that the Second Amendment codified a preexisting right. *Heller*, 554 U.S. at 592 ("We look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right."); *id.* at 599, 603; *see also Bruen*, 142 S. Ct. at 2127, 2130, 2135, 2138, 2145.

**App. 738**

Last year, in *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Court built on its holding in *Heller* and declared that the "Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home" as well. 142 S. Ct. 2111, 2122 (2022). At issue in *Bruen* was the constitutionality of New York State's "may-issue" licensing regime, which required applicants to demonstrate a special need for self-defense in order to publicly carry a handgun. *Id.* at 2122-24.

Before resolving that question, *Bruen* imparted the test courts should apply in determining whether a firearm regulation is permissible under the Second Amendment. The *Bruen* test is "rooted in the Second Amendment's text, as informed by history." *Id.* at 2127. The Court explained: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30. And the court must consider "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.* at 2131-32 (quoting *Heller*, 554 U.S. at 631). This inquiry "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.* at 2133.

Following that standard, the Court conducted a lengthy review of the historical record compiled in the case and concluded there was no historical "tradition of broadly prohibiting the public carry of commonly used firearms for self-defense" nor one "limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense." *Id.* at 2138. The Court consequently held that New York State's licensing regime violated the Constitution. *Id.* at 2122, 2156. Significantly, three of the justices from the majority indicated that the decision was

**App. 739**

not disturbing what was stated in *Heller* regarding presumptively lawful regulatory measures. *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring); *id.* at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*, 554 U.S. at 626−627, and n.26); *see also id.* at 2189 (Breyer, J., dissenting, joined by Sotomayor and Kagan, J.J.).

**B. The Colorado Statute**

On April 28, 2023, Defendant Jared Polis, the Governor of the State of Colorado, signed into law House Bill 23-1219, An Act Concerning Establishing A Minimum Three-Day Waiting Period Prior to the Delivery of a Purchased Firearm (the "Act" or "Waiting-Period Act"). The Act became effective on October 1, 2023. In passing the Act, the General Assembly declared that "[d]elaying immediate access to firearms by establishing a waiting period for receipt of firearms can help prevent impulsive acts of firearm violence, including homicides and suicides." H.B. 23-1219, 74th Gen. Assemb., Reg. Sess. (Colo. 2023). Pursuant to that purpose, the Act makes it illegal for any person who sells a firearm "to deliver the firearm to the purchaser until the later in time occurs:

(I)  Three days after a licensed gun dealer has initiated a background check of the purchaser that is required pursuant to state or federal law; or

(II)  The seller has obtained approval for the firearm transfer from the bureau after it has completed any background check required by state or federal law.

Colo. Rev. Stat. § 18-12-115(1)(a). The waiting period does not apply to:

(1)  The sale of antique firearms;

(2)  A sale by a person in the armed forces, who is soon to be deployed outside the United States, to a member of his or her family, as defined in the statute; or

(3)  "A firearm transfer for which a background check is not required pursuant to state or federal law."

**App. 740**

*Id.* § 18-12-115(2). Violation of the Act by a firearm seller constitutes a civil infraction for which a fine may be imposed. *Id.* § 18-12-115(1)(b).

**C. Plaintiffs**

Plaintiff Rocky Mountain Gun Owners ("RMGO') is a nonprofit organization that seeks to defend the right of "law-abiding" individuals to keep and bear arms. At least one of its members, its executive director, Taylor Rhodes, has been affected by the Act. Prelim. Inj. Hr'g Tr. at 29-30, 35. Mr. Rhodes purchased two firearms recently, and because he was out of town when the waiting period expired for one of them, he was unable to pick up that firearm until about eight days later. *Id.* at 30-33.

Plaintiff Alicia Garcia is a firearms instructor and range safety officer and frequently acquires firearms. *Id.* at 16. She reviews firearms and teaches people how to use them safely via social media. *Id.* She has recently purchased multiple firearms and had to spend additional hours driving because she had to return to stores after the waiting periods expired. *Id.* at 17-20. She also hoped to attend an out-of-state shotgun shoot, which would have provided her with business opportunities, but she was unable to obtain a shotgun in time for the event due to the waiting period. *Id.* at 19-22.

Before the Waiting-Period Act took effect on October 1, 2023, Plaintiffs filed a separate case asserting the same claims as they do here. *See RMGO v. Polis*, No. 23-cv-01076-PAB-NRN, ECF No. 1. In ruling on Plaintiffs' Motion for Preliminary Injunction in that case, Chief Judge Brimmer found Plaintiffs lacked standing to move to enjoin the Act before it was enforced. *RMGO v. Polis*, No. 23-cv-01076-PAB-NRN, 2023 WL 5017257, at *5 (D. Colo. Aug. 7, 2023). Specifically, Chief Judge Brimmer concluded RMGO had not identified any individual members

5

**App. 741**

of the organization who were affected by the Act and thus had not met their burden to establish standing. *Id.* at *3. As for Ms. Garcia, he determined that she could not show a credible threat of prosecution, which was necessary for her to have standing to challenge the Act before it took effect. *Id.* at *4.

The Governor here does not contest Plaintiffs' standing. However, like Chief Judge Brimmer, I must ensure that jurisdiction is proper. Federal courts lack jurisdiction when plaintiffs cannot meet their burden to establish standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559-561 (1992). For plaintiffs to meet that burden, they must first demonstrate that they have suffered an "injury in fact," that is "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (citation and quotation marks omitted). Then, plaintiffs must show a causal connection between the injury and the challenged conduct and a likelihood that the injury will be redressed by a favorable decision. *Id.* at 560-61. Ms. Garcia testified that she has, on two occasions, had to make additional trips to obtain firearms and has missed out on business opportunities. Prelim. Inj. Hr'g Tr. at 19-22. She has been impacted by the Act's waiting period and will be in the near future. *Id.* at 17-22. She has shown an injury in fact that is fairly traceable to implementation of the Act and that would likely be redressed by a favorable decision here. Therefore, Ms. Garcia has established that she has standing to seek the relief requested. Because I find Ms. Garcia has standing, I need not consider whether RMGO does. *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986).[3]

---

[3] I note, however, that RMGO's case for standing is less developed. The organization is clear that it "asserts representational standing" on behalf of its members. Mot. for Prelim. Inj. at 2, ECF No. 2. The Complaint and Motion for Preliminary Injunction allege that three members of RMGO have or will be affected by the Act. Compl. ¶ 1, ECF No. 1; Mot. for Prelim. Inj. at 2. Those individuals are identified by their initials alone "for the sake of their privacy." *Id.*; Compl. ¶ 1. Plaintiffs make no effort to demonstrate that those individuals' privacy interests outweigh the public's interest in proceedings that are public and open. Nor do Plaintiffs provide affidavits or

**App. 742**

The Governor, against whom Plaintiffs' claims are asserted, contends that he is entitled to immunity in this case under the Eleventh Amendment to the U.S. Constitution but agrees to waive his immunity "for the purpose of defending the Act from Plaintiffs' claims for declaratory and injunctive relief . . . only in this case, only in his official capacity, and only for prospective relief." Resp. to Mot. for Prelim. Inj. at 4 n.2, ECF No. 18. That waiver is sufficient for these proceedings, so I do not analyze whether the Eleventh Amendment applies.

## D. Expert Opinions

With his Response to Plaintiffs' Motion for Preliminary Injunction, the Governor filed the declarations of two experts—Randolph Roth (ECF No. 18-10) and Robert Spitzer (ECF No. 18-3), who both provided opinions on the Nation's history of regulating firearms. The Governor's Response also included an article titled "Handgun Waiting Periods Reduce Gun Deaths" that was co-authored by Christopher Poliquin (ECF No. 18-2). I held a two-day hearing on Plaintiffs' Motion at which Clayton Cramer[4] testified as an expert witness for Plaintiffs and Professors Roth and Poliquin testified as experts for the Governor. I indicated at the hearing that I would allow the witnesses' testimony and later determine what weight to give their opinions.

Professor Roth received his bachelor's degree in History from Stanford University in 1973 and his doctorate degree in History from Yale University in 1981. He has taught courses in history, the social sciences, and statistics and is presently an Arts and Sciences Distinguished

---

testimony from those RMGO members, as is customarily required for representational standing. *See, e.g., Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Additionally, there are no allegations that any identified member of RMGO, including Mr. Rhodes, will suffer harm during the period when a preliminary injunction would be in effect.

[4] I note that Professor Cramer's 67-page Declaration (ECF No. 24) was not filed with Plaintiffs' Motion or Reply in Support of their Motion. It, along with Plaintiffs' Witness List, was filed two-days before the preliminary-injunction hearing.

**App. 743**

Professor of History and Sociology at The Ohio State University. He has written a book, American Homicide, and has published essays on the history of violence and the use of firearms in the United States. Most of his work has been peer-reviewed. Prelim. Inj. Hr'g Tr. 112-13. He has "dedicated [his] career to understanding why homicide rates rise and fall over time, in hopes of understanding why the United States—which, apart from the slave South, was perhaps the least homicidal society in the Western world in the early nineteenth century—became by far the most homicidal, as it remains today." Roth Decl. ¶ 11, ECF No. 18-10. In this case, he was asked to provide "opinions on the history of homicides and mass murders in the United States, with special attention to the role that technologies have played in shaping the character and incidence of homicides and mass murders over time, and the historical restrictions that local and federal authorities have imposed in response to new technologies that they deemed particularly lethal, prone to misuse, and a danger to the public." *Id.* ¶ 10.

In his Declaration, Professor Roth opined that "[p]ublic officials today are confronting a criminological problem that did not exist in the Founding Era, nor during the first century of the nation's existence." *Id*. ¶ 48. He described how homicide rates were relatively low early on in our Nation's history and that "the impact of firearms on the homicide rate was modest, even though household ownership of firearms was widespread." *Id.* ¶¶ 14-15; Prelim. Inj. Hr'g Tr. at 118, 120. Professor Roth believes "the evidence . . . shows that the availability of guns and changes in firearms technology, especially the emergence of modern breechloading firearms in the mid-nineteenth century, and of rapid-fire semiautomatic weapons and extended magazines in the late twentieth century, have pushed the homicide rate in United States well beyond what it would otherwise have been." Roth Decl. ¶ 12. Yet, he clarified that "firearms are not the fundamental reason why we became a violent society compared to other affluent societies."

**App. 744**

Prelim. Inj. Hr'g Tr. at 128. Professor Roth's research has shown the fundamental reasons are "our failures of nation building, our political instability, our lack of faith and trust in our government, [and] our lack of fellow feeling among ourselves." *Id.* at 129.

I find the opinions Professor Roth provided to be thoughtful and reliable. He did not oversell the role of firearms in the history of homicide in the United States, and he was committed to precision and accuracy.

Professor Spitzer received his doctorate degree in Government from Cornell University in 1980. He is a Distinguished Service Professor of Political Science, Emeritus at the State University of New York at Cortland and was a visiting professor at Cornell University for thirty years. He has written six books and more than 100 articles, papers, and essays on gun policy. In this case, the Governor asked him "to render an opinion on the history of firearms restrictions as they pertain to modern waiting periods." Spitzer Decl. at 1, ECF No. 18-3. Professor Spitzer provided a Declaration containing his opinions but did not testify at the preliminary injunction hearing.

In his Declaration, Professor Spitzer noted that "[g]un purchase waiting periods as they are understood and implemented today did not exist early in the country's history." *Id.* at 4. According to Professor Spitzer, this is because, in addition to the low rates of homicide and seldom use of firearms for homicide in the Federal era, "[r]apid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century" and "no organized system of gun background checking could feasibly exist until the modern era." *Id.* at 4-5. As an analogue for waiting-period laws, Professor Spitzer pointed to historical regulations pertaining to firearms and intoxication, based on the theory that these regulations "avoided or thwarted 'heat of the moment' gun acquisition or use by the intoxicated, when they would be much more likely to act

**App. 745**

rashly, impulsively, and with diminished judgment." *Id.* at 6. For another analogue, he looked to historical laws for weapons licensing and permitting, opining that they "operate in a similar manner to modern waiting periods" since "licensing contemplates the passage of some period of time (even if brief) between the time the application or permission to do something is submitted . . . and the license or permission is granted." *Id.* at 15-16. Professor Spitzer reviewed relevant laws in the United States from the early 1600s through the early 1900s and included as two exhibits to his Declaration the text of the intoxication laws and the licensing laws he discusses. *See* Exhibit C: Intoxication/Weapons Laws, ECF No. 18-6; Exhibit E: License & Licensing Laws, ECF No. 18-8.

Professor Spitzer is certainly qualified to provide the opinions set out in his Declaration. I find his presentation of the relevant laws to be helpful in evaluating the Nation's historical tradition of firearm regulation, and I consider his explanation for the absence of waiting-period laws earlier in American history along with the evidence from the other experts.

Christopher Poliquin is an assistant professor of strategy at the University of California at Los Angeles. Poliquin has a doctorate in Business Administration from Harvard Business School and an undergraduate degree in Philosophy, Politics, and Economics from the University of Pennsylvania. He has also served as a teaching fellow in the economic analysis of public policy at Harvard's John F. Kennedy School of Government. His background is in empirical, statistical analysis of public policy. One such area of research led him to co-author the article mentioned above, "Handgun Waiting Periods Reduce Gun Deaths," a quantitative, multivariable assessment of American handgun waiting period laws. This study, published in the Proceedings of the National Academy of Sciences, a peer-reviewed multidisciplinary scientific journal, found that waiting-period laws had a statistically significant causal effect on reducing homicides (by 17%)

**App. 746**

and suicides (by 7 to 11%). The Governor called Professor Poliquin to testify on this research and its results. I find his testimony on this topic to be salient and completely credible.

Professor Cramer has undergraduate and master's degrees in History from Sonoma State University. While his trade has been software engineering, he has written numerous books on firearms, both historical and advocacy based. Professor Cramer has been an adjunct professor at Boise State University and ITT Technical Institute in Boise and currently is an adjunct professor teaching history courses at the College of Western Idaho. Plaintiffs called Professor Cramer to testify on the historical treatment of firearms, specifically firearm technology, availability, and regulation.

I do not give any weight to Professor Cramer's opinions regarding legal standards or application of the law, as he is not qualified to provide these opinions.[5] I likewise do not consider his many opinions that are irrelevant to the present facts, that are unsupported, or that relate to opinions not provided by Professors Roth and Spitzer in this case. Otherwise, I assess Professor Cramer's criticism of the opinions of Professors Roth and Spitzer.[6] Although it might be

---

[5] Although he is not a lawyer, Professor Cramer commented repeatedly on the legal meaning and application of precedent. *See, e.g.*, Prelim. Inj. Hr'g Tr. at 47 (offering opinions on the legal relevance of post-1868 statutes); *id.* at 51 (speaking to the propriety of considering the regulatory purpose of the Waiting-Period Act). Professor Poliquin, on the other hand, was appropriately reluctant to do so. *See id.* at 215 ("Q. And do you have an opinion as to whether it's appropriate to consider the effects of the law in light of the Supreme Court's decision in *Bruen*? A. I can't speak to that. I don't have a law degree, and wouldn't speak to that, no.").

[6] Another observation I make about Professor Cramer's Declaration is the prevalence of ad hominem attacks aimed at Professor Spitzer. *See, e.g.*, Cramer Decl. ¶ 55, ECF No. 24 ("[H]istorians and most other *serious* social scientists are wary of single-factor explanations of why things happen when people are involved."); *id.* ¶ 57 (claiming that Professor Spitzer's work would "earn him a poor grade in a freshman history class, or a criminology class, or a biology class"); *id.* ¶ 87 (asserting that Professor Spitzer is "no 'expert'"); *id.* ¶ 94 (insinuating that Professor Spitzer is "lazy"). Those attacks make Professor Cramer's opinions less persuasive, not more. Like his ad hominem attacks, his other antagonistic and inflammatory language undermines his credibility. *See, e.g., id.* ¶ 46 ("If I wanted to buy a scary black rifle . . . ."); *id.* ¶ 75 ("The same public safety argument Professor Spitzer advances for waiting periods would also

**App. 747**

reasonable to question whether Professor Cramer is sufficiently qualified under Federal Rule of

Civil Procedure 702 to provide that criticism, the Supreme Court has relied on his historical

analysis on multiple occasions. *See McDonald*, 561 U.S. at 773; *Heller*, 554 U.S. at 588. With

respect, I find his testimony had significant shortcomings in persuasiveness and credibility.

## II. PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*

*v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 24 (2008). When presented with a motion for a

preliminary injunction, courts in the Tenth Circuit consider whether: (1) the movant is

substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the

injunction is denied; (3) the threatened injury to the movant outweighs the injury facing the

opposing party under the injunction; and (4) the injunction is adverse to the public interest.

*Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009).

It is the movant's burden to establish by a preponderance of the evidence that these factors weigh

in favor of an injunction. *Citizens Concerned for Separation of Church & State v. City of*

*Denver*, 628 F.2d 1289, 1299 (10th Cir. 1980).

The Tenth Circuit has instructed that "injunctions that disrupt the status quo are

disfavored and 'must be more closely scrutinized to assure that the exigencies of the case support

the granting of a remedy that is extraordinary even in the normal course.'" *Beltronics*, 562 F.3d

at 1070 (quoting *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005)). The status

---

work for ignoring the protections of . . . freedom of religious worship (which would allow
religions, *some* of whose adherents have a poor record of confusing runways with office
buildings) . . . .").

**App. 748**

quo[7] is the "last peaceable uncontested status existing between the parties before the dispute developed." *Id.* at 1070-71 (quoting *Schrier*, 427 F.3d at 1260). When the plaintiff seeks a preliminary injunction that disrupts that status quo, the district court may not grant it "unless the plaintiff 'make[s] a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms.'" *Id.* at 1071 (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004) (en banc)). The Governor is correct that, because Plaintiffs seek to enjoin a law that is in effect, the injunction they seek would disrupt the status quo and is thus disfavored. Nevertheless, I find, even if the injunction were not disfavored, the applicable factors would weigh against granting it.

## III. ANALYSIS

### A. Likelihood of Success on the Merits

After examining the language of the Second Amendment using the Supreme Court's analysis in *Heller*, I find, for the purposes of Plaintiffs' Motion, that the plain text does not cover the waiting period required by the Act. This conclusion is bolstered by the fact that the Act is a regulation on the commercial sale of firearms and thus is presumptively permissible. However, even if the waiting period implicated the plain text of the Second Amendment, the evidence before me establishes that the Act is consistent with the Nation's historical tradition of firearm regulation. Plaintiffs, therefore, have not carried their burden to show they are likely to succeed on the merits of their claims.

---

[7] "Status quo" in this sense is short for "status quo ante bellum," or "the state of things before the war." *Status quo*, Black's Law Dictionary (4th ed. 1951). The "ante bellum" is generally omitted and, as a result, sometimes forgotten. But what is relevant is the status quo before the war began, or for these purposes, before the lawsuit was filed. Immediately before Plaintiffs filed their suit, the Waiting-Period Act was in effect, and so that is the status quo ante bellum.

**App. 749**

1. **Plain Text of the Second Amendment**

The first consideration under the *Bruen* test is whether the "plain text" of the Second Amendment covers the particular conduct such that the Constitution presumptively provides protection. *See Bruen*, 142 S. Ct. at 2126, 2129-30. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them . . . ." *Heller*, 554 U.S. at 634-35. As a result, the analysis is "focused on the 'normal and ordinary' meaning of the Second Amendment's language" at the relevant time. *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 576–77, 578). The "[n]ormal meaning . . . excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation." *Heller*, 554 U.S. at 576–77.

Plaintiffs contend that the words "keep" and "bear" in the Second Amendment are implicated by the waiting period required by the Act. In *Heller*, the Supreme Court examined the "normal meaning" of those words at the time of the Nation's founding, reviewing definitions from contemporaneous dictionaries. As the Court explained, the 1773 edition of Samuel Johnson's Dictionary of the English Language "defined 'keep' as, most relevantly, '[t]o retain; not to lose,' and '[t]o have in custody.'" *Id.* at 582 (quoting 1 Dictionary of the English Language 1095 (4th ed.) (reprinted 1978)). And Webster's 1828 American Dictionary of the English Language "defined it as '[t]o hold; to retain in one's power or possession.'" *Id.* (quoting N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)). Based on those definitions, the Court concluded "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id.* The Court then turned to the word "bear" and determined that it means to "carry." *Id.* at 584. The Court clarified that, when "bear" is "used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose—confrontation."

**App. 750**

*Id.* So, putting all the pieces together, the Court found that the text of the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

From this reading of the plain text, it is clear the relevant conduct impacted by the waiting period—the receipt of a paid-for firearm without delay—is not covered. Still, Plaintiffs attempt to equate the words "obtain" and "possess." Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 11 ("The Second Amendment's plain text applies to 'an individual's conduct' of obtaining a firearm. *See Bruen*, 142 S. Ct. at 2134 ('[T]he "textual elements" of the Second Amendment's operative clause—"the right of the people to keep and bear Arms, shall not be infringed"—guarantee[s] the individual right to possess and carry weapons in case of confrontation.') (emphasis added, cleaned up)."). But these terms are not equivalent. To "keep," under the definitions provided in *Heller*, meant to retain an object one already possessed. It did not mean to receive a newly paid-for item, and it certainly did not mean to receive that item without delay. Likewise, "hav[ing] weapons" indicates the weapons are already in one's possession, not that one is receiving them.

Under Plaintiffs' theory, the Waiting-Period Act prevents people "from obtaining possession of their firearm that they have already acquired." Mot. for Prelim. Inj. at 6; *see also* Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 13 ("In other words, C.R.S. § 18-12-115(1)(a)(I) states that after title to a firearm has passed to the buyer, the person who has already purchased the firearm is not entitled to take possession of her property."); *id.* ("HB23-1219 prohibits Coloradans from obtaining (e.g., possessing) arms that they have already legally acquired . . . ."). Plaintiffs advocate that, "[b]y the time that the waiting period has begun, the commercial transaction has been completed already: money has been exchanged, and ownership

**App. 751**

of a firearm has passed title." *Id.*, ECF No. 21 at 11; *see also* Mot. for Prelim. Inj. at 3.[8]

Plaintiffs' interpretation of the commercial transaction is incorrect. The Colorado Uniform

Commercial Code provides that a "'sale' consists in the passing of title from the seller to the

buyer for a price," Colo. Rev. Stat. § 4-2-106, and "[u]nless otherwise explicitly agreed, title

passes to the buyer at the time and place at which the seller completes his performance with

reference to the physical delivery of the goods." *Id.* § 4–2–401. Thus, absent any agreement or

term to the contrary, purchasers do not acquire title until they receive possession of the subject

firearm.[9] Up to that point, the sale is inchoate, and purchasers have not "acquired" the firearm.

Plaintiffs additionally argue that "when a person has been deprived of possession of a

firearm they have acquired, they cannot carry it." Mot. for Prelim. Inj. at 6. This argument fails

for the same reasons.

The relevant conduct is, therefore, not covered by the plain meaning of the terms "keep"

or "bear" in the Second Amendment. Seemingly recognizing this fact, Plaintiffs contend that

"[t]he right to 'keep' arms necessarily implies the right to possess arms one has acquired." *Id.* at

5. But the purchase and delivery of an object (here, a firearm) is not an integral element of

keeping (i.e., having) or bearing (i.e., carrying) that object. Rather, purchase and delivery are one

means of creating the opportunity to "have weapons." The relevant question is whether the plain

text covers that specific means. It does not.

---

[8] Plaintiffs imply that purchasers must wait at least three days after paying to purchase a firearm. However, nothing in the record indicates whether a purchaser can initiate a background check before commencing the purchase of or paying for a firearm.

[9] Only once the property is delivered can a purchaser evaluate the condition of the property and seek a refund or substitution if it is damaged, broken, or otherwise defective. This illustrates that a sale cannot be complete until a purchaser receives the property and has the opportunity to inspect it.

**App. 752**

Even if purchasing a firearm could be read into the terms "keep" or "bear," receipt of a firearm *without any delay* could not be, as the Founders would not have expected instant, widespread availability of the firearm of their choice. The parties dispute this fact, but I find the expert opinions of Professors Spitzer and Roth on this topic to be convincing.

In his Declaration, Professor Spitzer asserted that "No 'Guns-R-Us' outlets existed in the 1600s, 1700s, or most of the 1800s." Spitzer Decl. at 4. He explained that "[r]apid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get." *Id.* Consistent with Professor Spitzer's observations, Professor Roth testified that, in 1792, "production rates [of firearms] were far lower than they are today," so individuals might have had "to wait a few weeks to get [a firearm]." Prelim. Inj. Hr'g Tr. at 156.

In an effort to disprove those opinions, Professor Cramer surveyed excerpts from various advertisements for gunsmiths and gun retailers from 1728 to 1837. Cramer Decl. ¶¶ 15-22, 25-33. Professor Cramer did not, however, undertake to count the number of gun retailers in the United States in 1791, Prelim. Inj. Hr'g Tr. at 72-73, and he acknowledged that "[i]t is hard to use th[e] fragmentary advertising as persuasive proof." Cramer Decl. ¶ 45. The advertisements show that guns were being made and sold during the period addressed. But they also indicate that oftentimes a wait would be involved, for example, when guns were being imported and would arrive at irregular intervals, when firearms were being sold on a single date in the future, or a gunsmith was offering to fabricate firearms for purchasers. *See, e.g.*, *id.* ¶¶ 17, 19, 21-22, 29. For the stores with inventory in stock, no conclusion can be drawn regarding the general quantity, type, or desirability of the available firearms.

**App. 753**

Professor Cramer also pointed to the 1810 "haphazard and incomplete" manufacturing census, showing that there were "117 'Gun manufactories' in the U.S., 37 gunsmiths (a severe undercount . . .), and 42,853 firearms manufactured." *Id.* ¶ 35. His analysis of this data states that "[t]he *minimum* 1810 U.S. production rate was 592 guns per 100,000 people" and, "[b]y comparison, in 1969, U.S. production and importation of firearms was 2,605 guns per 100,000 people." *Id.* ¶ 37. Without additional evidence, he goes on to state: "The 1810 manufacturing census is unquestionably incomplete in a way that the 1969 manufacturing records are not; it is likely that the *actual* number of guns manufactured in 1810 would raise the per capita rate close to 1969 levels." *Id.* ¶ 37. I find this latter opinion to be unsupported, only marginally relevant, and inconsistent with the record, including the statement from Professor Cramer's own Declaration that, "[d]espite the growth of large industrial facilities for the manufacture of arms in the post Civil War era, the cottage industry remained a primary source of weapons until well after 1870." *Id.* ¶ 39 (quoting James Whisker, The Gunsmith's Trade 67 (1992)). Ultimately, the opinions of Professors Spitzer and Cramer are credible and establish that individuals in the Founding Era would not have understood the purchase of firearms to include a right to receive a firearm without any delay.

Plaintiffs point to a handful of cases they claim support their argument that the purchase of a firearm is covered by the Second Amendment. These decisions predate *Bruen*, rely on cases predating *Bruen*, and/or conduct no analysis of the text. *See, e.g.*, *Miller v. Bonta*, No. 19-cv-01537 BEN (JLB), 2023 WL 6929336, at *6, 8 (S.D. Cal. Oct. 19, 2023) (relying on *Renna v. Becerra*, 535 F. Supp. 3d 931, 940 (S.D. Cal. 2021), and *Teixeira v. Cnty. of Alameda*, 837 F.3d 670, 677 (9th Cir. 2017 (en banc), but later concluding: "Plaintiffs are law-abiding citizens who want to possess (or keep) and carry (or bear), firearms like the AR-15 rifle that are commonly-

**App. 754**

owned for lawful purposes. The conduct is covered by the plain text of the Second Amendment."); *McRorey v. Garland*, No. 7:23-cv-00047-O, 2023 WL 5200670, *3 (N.D. Tex. Aug. 14, 2023) (finding "Plaintiffs have sufficiently shown that their conduct is covered by the Second Amendment" without performing an analysis of the plain text); *Connecticut Citizens Def. League, Inc. v. Thody*, No. 3:21-cv-1156 (OAW), 2023 WL 2687446, *12 (D. Conn. Mar. 28, 2023) (dismissing as moot the plaintiffs' claim for "declaratory judgment confirming that they have an individual right to 'obtain, possess, and carry firearms'" because, "[i]n *Bruen*, the Supreme Court held that the Second Amendment's plain text guarantees to individuals a right to carry a firearm in public for self-defense," and "grant[ing] a declaratory judgment confirming an individual right to carry would be to reiterate what the Supreme Court of the United States already has found"). Moreover, the Supreme Court has made clear that "[c]ourts are . . . entitled to decide a case based on the historical record compiled by the parties." *Bruen*, 142 S. Ct. at 2130 n.6

The record presently in front of me conclusively shows that the plain text of the Second Amendment does not cover the conduct at issue, and consequently, Plaintiffs have not demonstrated they are likely to succeed on the merits of their claims.

### 2. Presumptive Lawfulness of Commercial Sale Regulations

This conclusion is reinforced by the fact that the Waiting-Period Act regulates the commercial sale of firearms. As stated in *Heller*, "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful." *Heller*, 554 U.S. at 626–27 and n. 26; *see also McDonald*, 561 U.S. at 786 (confirming that it was not casting doubt on these regulatory measures); *Bruen*, 142 S Ct. at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.)

**App. 755**

(quoting *Heller*, 554 U.S. at 626−627, and n.26). The Court, in *Heller*, indicated that there is a historical justification for that presumption. *Heller*, 554 U.S. at 635. It is not immediately clear whether that historical justification would be based on a determination that the plain text of the Second Amendment does not cover the conduct or on a finding that laws imposing conditions or qualifications on the commercial sale of firearms are consistent with the Nation's historical tradition of firearm regulation. Some courts have understood the presumption to be warranted because the conduct is not covered by the plain text of the Second Amendment. *See, e.g.*, *United States v. Price*, 635 F. Supp. 3d 455, 459 (S.D. W. Va. 2022) ("This makes sense because commercial regulations that apply only to manufacturers and sellers do not implicate an individual's right of possession."); *United States v. Marique*, 647 F. Supp. 3d 382, 385 (D. Md. 2022) (quoting *Price*, 635 F. Supp. 3d at 459). I am inclined to agree and, for that reason, view the presumption as supporting my analysis of the plain text above.

*Bruen* did not call into question that some regulatory measures are presumptively lawful, as first indicated in *Heller*. In fact, in *Bruen*, the Court adopted similar guidance for "shall-issue" licensing regimes, noting that nothing in its "analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which a general desire for self-defense is sufficient to obtain a [permit]." 142 S. Ct. at 2138 n.9 (internal quotation marks and citation omitted). The Court reasoned:

> Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry. [*Heller*, 554 U.S. at 635]. Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' *Ibid*. . . . That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry."

**App. 756**

*Id.* The Court implied these "shall-issue" regimes are constitutional unless they are abusive, which resembles the presumption articulated in *Heller*.

The Tenth Circuit's recent opinion in *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023), also lends support for the conclusion that *Heller*'s presumptively lawful measures withstood *Bruen*. In *Vincent*, the Tenth Circuit found *Bruen* "didn't appear to question the constitutionality of longstanding prohibitions on possession of firearms by convicted felons." *Id.* at 1201. The Tenth Circuit ultimately held in *Vincent*, *id.* at 1202, that "*Bruen* did not indisputably and pellucidly abrogate" its earlier precedential opinion in *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009), which concluded that the federal ban on felons' possession of firearms was constitutional based on the language in *Heller*.[10] The assessment in *Vincent* applies equally to the other categories of presumptively lawful regulations identified in *Heller*, including laws imposing conditions and qualifications on the commercial sale of arms.

Colorado's Waiting-Period Act regulates only the sale, and specifically sellers, of firearms. *See* Colo. Rev. Stat. § 18-12-115(1). The Act does not apply to anyone who does not "sell[] a firearm." *See* Resp. to Mot. for Prelim. Inj. at 8 (quoting Colo. Rev. Stat. § 18-12-115(1)(a)). Because it imposes a condition on the commercial sale of a firearm, the Act is presumptively lawful under *Heller*,[11] and as explained above, Plaintiffs have failed to rebut that

_____

[10] In his concurrence in *McCane*, Judge Tymkovich explained that language in *Heller*, although dicta, is binding. *McCane*, 573 F.3d at 1047 (Tymkovich, J., concurring).
[11] Plaintiffs find this to be "silly" and an "absurd proposition." Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 9-10. They posit that, if waiting-period laws constitute regulations on the commercial sale of firearms that are presumptively lawful, states would be authorized to enact 100-year waiting periods. *Id.*, ECF No. 21 at 10. But, by "presumptively lawful," the connotation is plain: it is a presumption, not a guarantee. Abusive regulations may still be subject to constitutional challenges.

**App. 757**

presumption by demonstrating that the plain text of the Second Amendment covers the immediate receipt of a purchased firearm.

### 3.  Nation's Historical Tradition of Firearm Regulation

Even if the plain text of the Second Amendment were implicated, however, I find, on the record before me, that the Waiting-Period Act would not violate the Constitution. When the Second Amendment covers the at-issue conduct, the state must justify the regulation "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. As Plaintiffs repeatedly emphasized and the Supreme Court has made clear, the constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 2156 (quoting *McDonald*, 561 U.S. at 780). Instead, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626); *see also Heller*, 554 U.S. at 595 ("Of course the right was not unlimited, just as the First Amendment's right of free speech was not.").[12]

---

[12] As Judge Wood explained in comparing limitations on the First Amendment in her dissent in *Atkinson v. Garland*:

> The Second Amendment's history and tradition are steeped in a rich regulatory background. For what it is worth, I would say exactly the same thing about the First Amendment, which the Court has often equated to the Second Amendment. Although Justice Hugo Black was famous for taking a strict view of the First Amendment, insisting that the words "NO LAW" with which it begins meant literally "NO LAW," the truth is that the First Amendment has always been circumscribed by limiting principles. The Supreme Court understands that a person cannot shout "FIRE" in a crowded theater, see *Schenck v. United States*, 249 U.S. 47 (1919); that "fighting words" are not protected, see *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942); that a person who credibly issues a verbal threat to kill the President may be prosecuted, see *Rankin v. McPherson*, 483 U.S. 378 (1987); that obscenity and child pornography do not qualify as protected speech,

Because, as the parties agree, no law requiring a waiting period was enacted in the United States until 1923, I must consider "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Bruen*, 142 S. Ct. at 2131-32 (quoting *Heller*, 554 U.S. at 631). *Bruen* explained this inquiry as follows:

> In some cases, [it] will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

> * * *

> [O]ther cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution—and a Second Amendment— "intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch v. Maryland*, 4 Wheat. 316, 415, 4 L.Ed. 579 (1819) (emphasis deleted). Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.

> * * *

> [H]istory guide[s] our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a

---

see *Miller v. California*, 413 U.S. 15 (1973) (obscenity), *New York v. Ferber*, 458 U.S. 747 (1982) (child pornography); and that the First Amendment did not totally displace common-law libel and slander, see *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).

70 F.4th 1018, 1029–30 (7th Cir. 2023) (Wood, J., dissenting).

**App. 759**

distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar." C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993). And because "[e]verything is similar in infinite ways to everything else," *id.*, at 774, one needs "some metric enabling the analogizer to assess which similarities are important and which are not," F. Schauer & B. Spellman, Analogy, Expertise, and Experience, 84 U. Chi. L. Rev. 249, 254 (2017). For instance, a green truck and a green hat are relevantly similar if one's metric is "things that are green." See *ibid.* They are not relevantly similar if the applicable metric is "things you can wear."

While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense. As we stated in *Heller* and repeated in *McDonald*, "individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald*, 561 U.S. at 767, 130 S.Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783); see also *id.*, at 628, 128 S.Ct. 2783 ("the inherent right of self-defense has been central to the Second Amendment right"). Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are " '*central*' " considerations when engaging in an analogical inquiry. *McDonald*, 561 U.S. at 767, 130 S.Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783).

To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson*, 9 F.4th 217, 226 (CA3 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* at 2131-33 (footnote omitted).[13]

---

[13] While I perform the analysis as instructed, I have reservations that turning to a particular historical era should dispositively determine how we conceive of and defend certain rights. The first is practical; I am a judge and not an historian. *See Atkinson*, 70 F.4th at 1028–29 (Wood, J., dissenting) ("Only a professional historian would know how to evaluate often-conflicting claims about the social, cultural, and legal landscape of an earlier period, and that person likely would not jump to any conclusions without devoting significant time to an evaluation of original sources."). The second is that this approach can be self-defeating. Since *Bruen* instructs me to consider the historical evidence the parties present and argue, it is not inconceivable that the parties would present historical accounts inconsistent with the holdings of *Bruen*, *Heller*, or

**App. 760**

*An Unfamiliar Problem*

Plaintiffs argue that this is a straightforward case like *Heller* and *Bruen* since "the problem of impulsive gun violence dates from the invention of guns." Mot. for Prelim. Inj. at 8. They claim that the "complete absence of similar Founding-era regulations addressing a problem that was familiar to the Founders means the []Act is 'inconsistent with the Second Amendment.'" *Id.* at 9 (quoting *Bruen*, 142 S. Ct. at 2131). The Governor has shown, however, that impulsive gun homicide was not prevalent during the Founding Era or Early National Period and that instituting waiting periods would not have been a logical measure until at least the end of the nineteenth century.

Professor Roth persuasively opined that "[p]ublic officials today are confronting a criminological problem that did not exist in the Founding Era, nor during the first century of the nation's existence." Roth Decl. ¶ 48. Professor Roth explained:

> In the eighteenth century, . . . . laws restricting the use or ownership of firearms by colonists of European ancestry were rare, for two reasons. First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in

───────────────

*McDonald. See Bruen*, 142 S. Ct. at 2130 n.6 ("Courts are . . . entitled to decide a case based on the historical record compiled by the parties."); *see also* Stephen R. Munzer and James W. Nickel, *Does the Constitution Mean What It Always Meant?*, 77 Colum. L. Rev. 1029, 1033 (1977) ("[I]t should be noted that there is a special danger in allowing a controversial case to turn on an historical claim if the claim is not beyond dispute. Since good historical research is not within the competence of most judges, the antecedent probability of mistakes is high. This increases the chances that professional historians will challenge and refute the Court's reading of history, thus undermining the basis, or ostensible basis, for the decision."). There are other reasons to disfavor this approach, but the last I will note is that it presupposes the success—let alone consensus—that the Founders held during America's fledgling years as a new nation. *See* Larry D. Kramer, *The Supreme Court 2000 Term Foreword: We the Court*, 115 Harv. L. Rev. 4, 12 (2001) ("The American people learned a great deal during the early years of their Republic--including that many of their most cherished beliefs and firmly held ideas were either wrong or unworkable (which makes one wonder why any sensible person, even a lawyer, would privilege the speculative writings of the 1780s over the hard-earned experience of subsequent decades."). With those concerns in the background, I don my historian hat and endeavor to follow the standard as prescribed.

**App. 761**

> patriotic fellow feeling within the British empire, and greater trust in government.
> . . . Second, the impact of firearms on the homicide rate was modest, even though
> household ownership of firearms was widespread.

*Id.* ¶¶ 14-15 (footnotes omitted). Regarding waiting-period laws specifically, Professor Spitzer

reasoned that they did not exist because, in addition to the low homicide rates and use of firearms

for homicide in the colonies, "[r]apid, convenient gun sales processes did not exist in the U.S.

until the end of the nineteenth century," and "no organized system of gun background checking

could feasibly exist until the modern era." Spitzer Decl. at 4-5.

The Governor emphasizes that waiting-period laws were unnecessary before the early

twentieth century "because a waiting period inherent in the acquisition of firearms already

existed for many Americans." Resp. to Mot. for Prelim. Inj. at 16.  As was discussed above, I

find the opinions of Professors Roth and Spitzer on the availability of firearms for purchase

throughout the Nation's history to be compelling. Even after ordering firearms via postal mail

became possible in the 1870s and 1880s, purchasers still had to wait several days before

receiving them. *See* Spitzer Decl. at 4-5; Prelim. Inj. Hr'g Tr. at 75-76. In contrast, "in the

modern era, gun and ammunition purchases can be made easily and rapidly from tens of

thousands of licensed gun dealers, private sales, gun shows, and through internet sales." Spitzer

Decl. at 4, ECF No. 18-3 (footnote omitted).

I am likewise persuaded by Professor Roth's research on homicide rates and his opinion

that homicide rates during the late Colonial Period into the early National Period were fairly low

compared to today's rates. Prelim. Inj. Hr'g Tr. at 118, 120. Professor Cramer challenged

Professor Roth's conclusions. However, his discussion was based on data from Professor Roth's

**App. 762**

book or his submissions in other cases, not his Declaration in this case. *See* Cramer Decl. ¶¶ 63-

64, 124-25, 135; Prelim. Inj. Hr'g Tr. at 52-53.[14]

Of the relatively small number of homicides committed in the late Colonial Period into

the early National Period, Professor Roth determined that only 10 to 15 percent of both domestic

and nondomestic homicides were committed with a firearm. Roth Decl. ¶ 15; Prelim. Inj. Hr'g

Tr. at 119. He offered an explanation for why this was the case:

> Firearm use in homicides was generally rare because muzzle-loading firearms, such
> as muskets and fowling pieces, had significant limitations as murder weapons in
> the colonial era. They were lethal and accurate enough at short range, but they were
> liable to misfire, given the limits of flintlock technology; and with the exception of

---

[14] Professor Cramer additionally sought to undermine Professor Roth's opinion that the United
States has become by far the most homicidal society in the Western world since the nineteenth
century. In his Declaration, Professor Cramer stated: "In 2019, the U.S. had a reported murder
rate of 5.0/100,000. Because 73.7% of U.S. murders are committed with firearms, this suggests
that the actual U.S. murder rate (after adjusting for firearms murders initially reported as, but
later determined not to be, murder) is really 3.72/100,000." Cramer Decl. ¶ 128. Professor
Cramer indicated that his calculation is of the adjusted "U.S. murder rate" and then compared his
calculated rate to the rates from certain European countries (including Ukraine, Latvia,
Lithuania, Moldova, and Montenegro). *Id.* ¶¶ 128-29. Professor Cramer did not show his work,
but from the information he provided, his analysis seems unsound. There are three variables in
his equation for adjusted "U.S. murder rate": the 2019 U.S. reported murder rate (5.0/100,000),
the 2019 percentage of those homicides in which firearms were used (73.7%), and a 1989
percentage of the firearms-related homicides that were "justifiable or excusable" (6%). If one
multiplies these anachronistic values, the result is the supposed rate of justifiable, firearms-
related homicides, or 0.22 per 100,000 people. If that number is subtracted from the U.S.
reported murder rate, the result is the actual U.S. murder rate (with all weapons or means and not
including justifiable, firearms-related homicides), or 4.78 murders per 100,000 people. That
number could be used to compare with the murder rates in other countries (although it would still
contain justifiable or excusable murders perpetrated without a firearm). In contrast, if one is
seeking the U.S. firearms-related murder rate (not including justifiable, firearms-related
homicides), one would multiply the first two inputs above together, but instead of using 6% for
the third, would substitute 94%. The result would be 3.68 murders per 100,000 people. Absent
some showing of arithmetic or other methodology, I cannot ascertain how Professor Cramer
arrived at a "U.S. murder rate" of 3.72 per 100,000 people or how he determined that
representation is analogous to the overall murder rate from other countries. It appears he did not
compare apples to apples, and this discrepancy, among others, calls into question his opinions.
Additionally, Professor Roth explained that the Federal Bureau of Investigation statistics cited by
Professor Cramer are unreliable because there are "tremendous gaps" in the reporting records.
Prelim. Inj. Hr'g Tr. at 120.

**App. 763**

a few double-barreled pistols, they could not fire multiple shots without reloading. They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat. They had to be reloaded manually to enable the firing of another shot, which was a time-consuming process that required skill and experience. And more important, muzzle-loading firearms could not be used impulsively unless they were already loaded for some other purpose. It took at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand.

Roth Decl. ¶ 16 (footnotes omitted); *see also* Prelim. Inj. Hr'g Tr. at 122-23. Professor Roth described how, in certain periods and locations in the U.S., homicide rates increased and the proportion of homicides committed with firearms increased as well. Roth Decl. ¶ 18 ("When homicide rates were high among unrelated adults in the early and mid-seventeenth century, colonists went armed to political or interpersonal disputes, so the proportion of homicides committed with firearms was at that time 40 percent and rose even higher in contested areas on the frontier." (footnotes omitted)). He clarified that homicides of Native Americans and enslaved persons also frequently occurred with firearms. *Id.* But Professor Roth stated: "Otherwise, . . . colonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training." *Id.*

Professor Roth commented that weapons were often kept unloaded, but he qualified this general trend by noting that people who lived on the frontier where there was a constant threat of attack "tried to keep [firearms] loaded as long as they could, and they put [them] in the driest, warmest place they could, over the mantle, to have [them] ready." Prelim. Inj. Hr'g Tr. at 122-23. Professor Cramer disagreed that individuals generally kept firearms unloaded. He cited anecdotal evidence of four people who died accidentally from firearms being kept loaded, as well as a 1782 Massachusetts fire-prevention statute that provided any loaded firearms kept inside could be seized. Cramer Decl. ¶¶ 66-73, 149-56. The statute cuts both ways. It seems to indicate that in

28

**App. 764**

some locales, individuals were required to keep their firearms unloaded, and thus were less likely to use them for impulsive homicides. In any event, Professor Cramer's scant evidence is insufficient to call into doubt Professor Roth's well-reasoned opinion.

Professor Cramer also sought to contradict Professor Roth's opinions regarding the availability of repeating firearms and the accuracy of firearms during the Founding Era. Professor Cramer stressed that pepperboxes, an early multi-shot firearm, existed by the end of eighteenth century, and individuals would carry a brace of pistols, meaning a pair of pistols, that they could use in succession. *Id.* ¶¶ 74, 146; Prelim. Inj. Hr'g Tr. at 54-55, 58. He could not provide information on how common pepperboxes were, though. *Id.* at 84. Professor Roth testified that they were very rare and that he could not think of a single homicide he had studied that was committed with a pepperbox. *Id.* at 132-33. Regarding the accuracy of firearms at the time, Professor Cramer pointed to the capabilities of riflemen in the Revolutionary era. Cramer Decl. ¶¶ 139-145. Professor Roth did not deny the accuracy of rifled muskets but noted that few people actually had them. Prelim. Inj. Hr'g Tr. at 130. He acknowledged, though, that the firearms generally possessed were accurate enough to be lethal at short range. *Id.* at 131.

Overall, the evidence shows that firearms were not as readily available for purchase and that impulsive gun homicides were much less prevalent at the time of the founding and in the century that followed. Thus, it is logical that waiting-period laws were not adopted during that period. Professors Roth and Spitzer also make a strong case that, as firearm technology and production progressed and gun violence increased, laws regulating firearms, including waiting-period laws, were enacted in response.[15]

---

[15] *See* Roth ¶ 34 ("[T]he proportion of homicides committed with firearms—overwhelmingly, concealed revolvers—reached today's levels by the 1920s, ranging from a median of 56 percent in New England and over 70 percent in the South and West. And that is why every state in the

**App. 765**

Since the Waiting-Period Law is a "modern regulation[] that w[as] unimaginable at the founding," I must reason by analogy and "determin[e] whether a historical regulation is a proper analogue" for, or "relevantly similar" to, the Act. *Bruen*, 142 S. Ct. at 2133. In doing so, I focus on "how and why the regulations burden a law-abiding citizen's right to armed self-defense," and look for a "historical analogue"—not a "twin." *Id.* The Governor and Professor Spitzer point to two types of historical analogues: laws involving intoxicated persons and licensing regimes.

*Laws Related to Intoxication as Analogues*

The aim of the Waiting-Period Act is to "help prevent impulsive acts of firearm violence, including homicides and suicides." H.B. 23-1219, 74th Gen. Assemb., Reg. Sess. (Colo. 2023). The Governor alleges that "[s]tates have long regulated the possession, use, and sales of arms to intoxicated persons, laws which are designed to avoid such impulsive violence." Resp. to Mot. for Prelim. Inj. at 14. Professor Spitzer opined that "old intoxication laws avoided or thwarted 'heat of the moment' gun acquisition or use by the intoxicated, when they would be much more likely to act rashly, impulsively, and with diminished judgment" and those purposes "mimic the purpose of modern waiting periods." Spitzer Decl. at 6.[16] In Professor Spitzer's view, laws

---

Union restricted the right to carrying certain concealable weapons."); *id.* ¶ 47 ("Because of the threats these new technologies posed for public safety, public officials widened their regulatory focus beyond concealed and concealable weapons. States began imposing waiting period laws to prevent individuals from acquiring firearms in a fit of anger."); Spitzer Decl. at 4-5 ("The rise of handgun mail order purchasing through such companies as Montgomery Ward and Sears in the 1870s and 1880s brought cheap handguns to buyers' doors. When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous anti-gun carry restrictions in the late 1800s and early 1900s.).

[16] Professor Cramer calls the comparison between intoxication regulations and the Act a "warped analogy." Prelim. Inj. Hr'g Tr. at 41. He takes issue with Professor Spitzer's insinuation that gun purchasers might act "rashly, impulsively, and with diminished judgment." Cramer Decl. ¶¶ 109-11. Professor Cramer asks: "What evidence is there that purchasing a firearm is done 'rashly, impulsively, and with diminished judgment . . .'? I know that I have never done so." *Id.* ¶ 111.

30

**App. 766**

pertaining to firearms and intoxication mimicked waiting periods because they "interrupt[ed] gun access only temporarily, as is the case with waiting periods." *Id.*

The Governor, through Professor Spitzer, provided the following laws as relevant, historical examples of regulations pertaining to firearms and intoxication.[17]

- In 1623, 1631, and 1632, Virginia enacted measures "directing that '[n]o commander of any plantation, shall either himself or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments.'" *Id.* at 9; Exhibit C: Intoxication/Weapons Laws at 34.

- In 1655, a Virginia law made individuals subject to fines for "'shoot[ing] any guns at drinking,' though the law carved out two special occasions for regulatory exemption: 'marriages and funerals only excepted.'" Spitzer Decl. at 9-10; Exhibit C: Intoxication/ Weapons Laws at 34.[18]

- In 1868, Kansas passed a law stating:

> Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other

---

But Professor Cramer misunderstands Professor Spitzer's argument. It is not about an individual's state of mind when the gun is purchased; it is about his or her state of mind if or when the firearm is later used. Similarly, the implication is not that an intoxicated individual impulsively purchases a firearm; it is that the intoxicated individual would impulsively use the firearm.

[17] Professor Cramer generally criticizes Professor Spitzer for not including the full text of the statutes referenced and for inaccurately citing them, *see* Cramer Decl. ¶¶ 86, 88, 91, 95, 96, but Professor Spitzer included as exhibits to his Declaration lists of the text of the statutes he references, *see* Exhibit C: Intoxication/Weapons Laws; Exhibit E: License & Licensing Laws. Professor Cramer admits he did not review the exhibit to Professor Spitzer's Declaration containing the intoxication and weapons laws. Prelim. Inj. Hr'g Tr. at 77-78.

[18] Professor Cramer testified that the 1655 law was related to protecting the colonists' system for warning of attacks by Native Americans, Prelim. Inj. Hr'g Tr. at 43, but I do not see how that undercuts the fact that the law regulates the use of firearms in circumstances in which individuals were thought to be more disposed to shoot their guns.

**App. 767**

deadly weapon, shall be subject to arrest upon the charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.

*Id.* at 6.[19]

- In 1878,[20] Mississippi enacted a measure making it unlawful to "sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described [pistols, various knives etc.], or any pistol cartridge . . . ." *Id.* at 10-11. The state enacted similar laws in 1880 and 1908. *Id.* at 11-12.

- In 1883, a Wisconsin law made it "unlawful for any person in a state of intoxication to go armed with any pistol or revolver." *Id.* at 35-36.

- In 1879, Missouri passed a law stating:

    "If any person . . . shall have or carry [any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon] upon or about his person when intoxicated or under the influence of intoxicating drinks, . . . he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

---

[19] Professor Cramer claims in relation to the Kansas statute that "[e]xamining the actual primary source shows that Spitzer has misrepresented the statute." Cramer Decl. ¶ 97. Professor Cramer points instead to an 1865 Kansas prohibition statute and emphasizes that it is not about firearms. *Id.* ¶¶ 97-98. But Professor Cramer is the one who misrepresents the statute. Professor Spitzer's text is correct, and it is a statute criminalizing the carrying of a pistol or other deadly weapon while under the influence of intoxicating drink. *See An Act to prevent the carrying of Deadly Weapons*, 7th Legislature, Reg Session 25, § 2 (Kan. 1867).

[20] Although Professor Cramer insists that all post-1868 evidence is irrelevant under *Bruen, see, e.g.*, Cramer Decl. ¶ 99; Prelim. Inj. Hr'g Tr. at 47, the Supreme Court has instructed that this evidence may be considered unless it conflicts with earlier evidence, *see Bruen*, 142 S. Ct. at 2127-2128; 2136-37, 2154, and n.28. Nothing in the record indicates the later regulations here conflict with any earlier tradition.

**App. 768**

*Id.* at 13. The state enacted a similar statute in 1883, *id.* at 14, and several other like regulations were adopted by counties, cities, and towns in Missouri before the turn of the century, *id.* at 13-16; Spitzer Decl. at 12.

- In 1888, a law in Maryland provided:

> Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, . . . and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found . . . .

Exhibit C: Intoxication/Weapons Laws at 7.

- In 1893, Rhode Island enacted a similar statute that made a person subject to fines and penalties if arrested "for being drunk or disorderly" and found to "have concealed upon his person any of the weapons mentioned." *Id.* at 32.[21]

These measures are sufficient to show that our Nation had a historical tradition of regulating the carrying and use of firearms by intoxicated individuals. Plaintiffs do not seem to dispute this determination, but instead focus on whether those regulations are "relevantly similar" to the Waiting-Period Act. *See Bruen*, 142 S. Ct. at 2132. For the purposes of this proceeding, I hold that they are.

Plaintiffs contend the "why" justifying those regulations and "how" their aims are accomplished differ from those of the Waiting-Period Act. Plaintiffs assert: "[E]very person to

---

[21] The Governor also cites measures limiting the sale of alcohol near armed militiamen that he alleges were enacted "to avoid impulsive violence by armed men." Resp. to Mot. for Prelim. Inj. at 14. I am not persuaded that these regulations are proper analogues because they do not involve the regulation of firearms.

33

**App. 769**

whom the Act applies has *passed* a background check and is therefore presumably not a threat to anyone. That is, after all, the purpose of background checks." Mot. for Prelim. Inj. at 9. Plaintiffs' assumption is not a given. Indeed, in this case, there was testimony that pre-purchase background checks for firearms may have no statistically significant effect on reducing gun violence. *See* Prelim. Inj. Hr'g Tr. at 217-18. I am not suggesting that all individuals who seek to purchase a firearm are a threat. But the Waiting-Period Act and the intoxication laws both work to prevent individuals in a temporary impulsive state from irresponsibly using a firearm. They "impose a comparable burden on the right of armed self-defense." *Bruen*, 142 S. Ct. at 2133.

Plaintiffs are adamant that "a law specifically targeted at an obviously dangerous situation is not analogous to a law that sweeps up everyone." Mot. for Prelim. Inj. at 10; Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 19. Perhaps the state could impose a more narrowly tailored requirement, but that is not the inquiry here. The intoxication laws prevented *all* individuals from becoming intoxicated and engaging in the prohibited conduct. They did not apply only to those people who would have certainly used a firearm irresponsibly while intoxicated. Despite Plaintiffs' arguments, the "how" and the "why" of the intoxication laws and the Waiting-Period Act are sufficiently similar to demonstrate that the Act is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

*Licensing as an Analogue*

In addition, Professor Spitzer details the longstanding history of firearm licensing regimes in the United States and contends "historical licensing and permitting laws did, and do, operate in a manner similar to modern waiting periods." Spitzer Decl. at 15. I find that, although these licensing laws are not implemented in the same way that a waiting period is, they are a

**App. 770**

secondary, but proper, analogue because they support that the Founders and Reconstruction generation would have accepted a modest delay on the delivery of a firearm in order to ensure that those receiving a firearm are law-abiding, responsible citizens.

Because the Supreme Court in *Bruen* indicated that there is a sufficient historical basis for "shall-issue" licensing regimes, I do not detail the history of the Nation's licensing laws here. *See* 142 S. Ct. at 2138 n.9. Waiting periods are similar to "shall-issue" licensing regimes in that they require that an action be taken—delivery of the purchased firearm—after a defined requirement is met—the passage of at least three days. Additionally, waiting-period laws, like "shall-issue" licensing laws, "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right[s]." *Id.* (quoting *Heller*, 554 U.S. at 635). The Court in *Bruen*, noted that "shall-issue" licensing regimes are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). That is the purpose of Colorado's Waiting-Period Act. The Act provides time for a background check to be completed. *See* Colo. Rev. Stat. § 18-12-115(1)(a) (defining the waiting period as the longer of "[t]hree days after a licensed gun dealer has *initiated* a background check" or until "[t]he seller has obtained approval for the firearm transfer from the bureau after it has completed any background check required by state or federal law" (emphasis added)). And the waiting period works to ensure that the individual to whom the firearm is delivered is a "responsible citizen." *See, e.g.*, Prelim. Inj. Hr'g Tr. at 201 (evincing that "imposing a handgun waiting period results in about a 17 percent reduction in gun homicides, and a 7 to 11 percent reduction in gun suicides").

The Court in *Bruen* did not rule out "constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny

**App. 771**

ordinary citizens their right to public carry." *Bruen*, 142 S. Ct. at 2138 n.9. The record is devoid of any evidence that the waiting period here is being "put toward abusive ends." 142 S. Ct. at 2138 n.9.

In *Bruen*, the Court "acknowledge[d] that 'applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins.'" 142 S. Ct. at 2134 (quoting *Heller*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). This is not a straightforward case—during the Founding Era and the century that followed, firearm access and technology, along with violent crime, was drastically different and a waiting period for firearm purchases would have been unnecessary. With that in mind, evaluation of the analogues presented is unsurprisingly difficult. Nonetheless, I find the Governor has provided a sufficient record to conclude that our Nation's historical tradition of firearm regulation is consistent with the Waiting-Period Act.

In sum, Plaintiffs have failed to show that they are likely to succeed on the merits of their claims because the record before me establishes the Second Amendment does not cover the at issue conduct, the Act is presumptively lawful, and even if the Act implicated the Second Amendment, the Nation's historical tradition of firearm regulation would permit it.

**B. Irreparable Harm**

Plaintiffs also fail to demonstrate that they will experience irreparable harm if the injunction is denied. Because I find they have not shown they are likely to succeed on the merits

**App. 772**

of their claims, the potential violation of their Second Amendment rights does not establish they will be irreparably harmed absent issuance of the injunction.[22]

Regarding specific harms, the named individual Plaintiff—Ms. Garcia—testified that the firearm waiting period impacted her in two ways. First, she was unable to conduct her business as a firearms instructor and range safety officer because she spent the better part of a day driving to a specific firearms vendor several hours away.[23] Second, she reserved and paid for travel and lodging for a shotgun shoot in Virginia, which she is now not going to attend because she could not obtain a new shotgun in time. Prelim. Inj. Hr'g Tr. at 21. The event would have been "very, very important and impactful to [her] career" because it would have been the first time a big production would have had her name on it and would have given her exposure to people in the industry. *Id*. at 21-22. Taylor Rhodes, the Executive Director of RMGO, echoed Ms. Garcia that the waiting period imposes a "massive burden on certain people that want to give businesses around the state business." *Id*. at 32. He also described how he, a member of RMGO, had recently purchased a firearm, and because he was traveling when the waiting period expired, he was unable to pick up his firearm for about eight days. *Id.* at 30-33. Neither Ms. Garcia nor Mr. Rhodes testified that they or any RMGO members would be unable to defend themselves due to

---

[22] I recognize that the Tenth Circuit has, in recent history, used broad language presuming irreparable harm when any constitutional violation is found. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019) ("What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial. Any deprivation of any constitutional right fits that bill."). And, while at least one Court of Appeals has specifically found irreparable harm should be presumed for Second Amendment violations as it often is for First Amendment violations, *see Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011), I am not so sure, especially where, as here, the record is not clear on the extent to which the "central component" of the Second Amendment—self-defense—would be implicated, *see Bruen*, 142 S. Ct. at 2133.

[23] On cross-examination, Plaintiff Garcia disclosed the probable existence of alternative, closer firearms vendors. Prelim. Inj. Hr'g Tr. at 25-26.

**App. 773**

the waiting period. Ms. Garcia's possession of numerous other firearms (ten to twenty by her account) supports the inference that her ability to defend herself with a firearm would not be hampered by the waiting period. *See id.* at 23-24.

As the Supreme Court has repeatedly emphasized, "individual self-defense is 'the central component' of the Second Amendment." *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. at 767); *see also Heller*, 544 U.S. at 599. Plaintiffs have alleged no harm associated with the right of self-defense.[24] The harm alleged by Ms. Garcia pertains only to her time and business opportunities. Here, those are quintessential compensable harms, i.e, not irreparable. Plaintiffs have not demonstrated they will suffer irreparable injury if the injunction is denied.

## C. Balance of Harms and the Public Interest

The last factors to be considered in evaluating a request for a preliminary injunction are the so-called "balance of harms"—whether the threatened injury to the movant outweighs the injury facing the opposing party under the injunction—and the public interest. Generally, when the government opposes a motion for a preliminary injunction, the public interest and the harm to the government merge such that the harms to be balanced are the threatened injury to the plaintiff and the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

In its Motion, Plaintiffs' analysis of the balance of harms and public interest focuses exclusively on how the State does not have any "interest in enforcing a law that is likely

---

[24] Plaintiffs' Reply in Support of their Motion cites hypothetical "situations where a purchase [sic] knows that an imminent confrontation may occur" to justify interpreting the Second Amendment to require that individuals be able to obtain firearms without delay. Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 13.  Plaintiffs presented no evidence that related harm would exist or the extent to which it would exist as a consequence of the waiting period being in place.

38

**App. 774**

constitutionally infirm." Mot. for Prelim. Inj. at 15 (quoting *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010)). Plaintiffs' approach has two problems. The first is that I already found Plaintiffs have failed to demonstrate the Waiting-Period Act is constitutionally infirm. The second is that it is a reductive interpretation of the law[25] and allots me no discretion to observe how the parties might be affected by the granting or absence of urgent court intervention.[26]

Conversely, the Governor made efforts to illustrate the concrete public interest at stake: citizens' lives. He presented expert testimony from Professor Poliquin based on an empirical study he authored that was published in a peer-reviewed journal.[27] Professor Poliquin's study

---

[25] Reducing the analysis for preliminary injunctions into a simple inquiry on the merits is antithetical to the equitable nature of such relief. As I quoted at the hearing:

> "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims."

*Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944), *see also Lemon v. Kurtzman* 411 U.S. 192, 200 (1973) ("In constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable."); *Brown v. Board of Education*, 349 U.S. 294, 300 (1955) ("Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.")

[26] In *Bruen*, the Supreme Court stated: "The Second Amendment 'is the very product of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 142 S. Ct. at 2118 (quoting *Heller*, 554 U.S. at 635). On first glance, it might seem that statement dictates the outcome for any balance of harms analysis where a violation of the Second Amendment is likely. The specific language, however, indicates that the right to use arms *for self-defense* must be implicated, and again, Plaintiffs have presented no related evidence. Moreover, in proceedings in equity, the public interest consideration is that of today's public, not the frozen-in-time interest of the very different society that existed at the time of our Nation's founding.

[27] The value of submitting research for peer review before other specialists in the same field is not lost on me. Indeed, it is an explicit factor in *Daubert* hearings that has helped define the scope of presumed expertise for a proffered witness. *See, e.g.*, *Arkansas River Power Auth. v. Babcock & Wilcox Power Co.*, No. 14-cv-00638-CMA-NYW, 2016 WL 9734684, at *4 (D.

**App. 775**

concluded that "imposing a handgun waiting period results in about a 17 percent reduction in gun homicides, and a 7 to 11 percent reduction in gun suicides," which the Governor argued "would translate to over 100 lives saved" during the applicability of a preliminary injunction in this case. Prelim. Inj. Hr'g Tr. at 201, 233. Professor Poliquin's study accounted for multiple different factors, including policy changes across multiple states and demographic variance.

Plaintiffs responded to this evidence through expert testimony of their own.[28] Professor Cramer opined that, based on his review of California crime statistics and state-implemented adjustments to firearm waiting periods, either no causality should be inferred from the correlative increase of murder rate with length of waiting period, or the causal relationship does exist but flows in the opposite direction to what Professor Poliquin concludes. While Professor Cramer admits he is not a statistician and has not received formal training as such, he nevertheless insists that his analysis of California's murder rate against handgun waiting-period length undermines— or "it should certainly make us skeptical" of—claims that a reduction in homicides can be causally attributed to the existence or increased length of firearm waiting periods. Cramer Decl. ¶ 178. Professor Poliquin correctly explained that there are at least two immediate methodological errors made in reaching this conclusion. *See* Prelim. Inj. Hr'g Tr. at 210-12. First, there is no control group used to show the effects of a community adopting a waiting period after not having one. *See id.* at 210-11. And, second, there is no attempt to reckon with other factors that may

---

Colo. Oct. 24, 2016) (noting lesser reliability of "calculations [that] were self-generated and had not been peer -reviewed").

[28] The specific analysis of the Governor's witness, Professor Poliquin, is not directly rebutted by Professor Cramer since the latter did not review the former's work. *See* Prelim. Inj. Hr'g Tr. at 88. However, Professor Cramer did present his analysis on California's waiting period, which he believes suggests a contrary conclusion. *See* Cramer Decl. ¶¶ 176-82.

**App. 776**

influence murder rates in California during the observed period (e.g. national criminal trends) or to quantitatively explain why these factors are not present. *See id.* at 211-12.[29]

Professor Cramer further critiques Professor Poliquin's study by claiming that suicide reduction would be an unlikely result from instituting a waiting period because people intent on killing themselves would find an alternate means if they could not legally procure a firearm. Professor Poliquin testified that, although he "would expect a reduction in gun-related suicides," he was "slightly less confident in that prediction based on the results of [his] study." *Id*. at 213. Nevertheless, the statistical certainty with which Professor Poliquin makes that qualified prediction can be measured, tested, and verified. By contrast Professor Cramer does not support his skepticism with any specific evidence.

With a statistically rigorous study quantifiably illustrating the public safety benefits of a firearm waiting period, I weigh this against the purported harms the Plaintiffs would suffer. Even accepting the harm Plaintiffs describe as entirely true, it is not remotely close. For the sake of

---

[29] Professor Cramer suggests that California is "very nearly a perfect example of a laboratory for waiting period" because interstate firearms trafficking is illegal under 18 U.S.C. § 922 and violence is largely concentrated in urban areas that are far from the state's borders. *See* Cramer Decl. ¶ 175. Again, there are at least two problems here. The first is that he provides no discussion or evidence of how enforcement of anti-trafficking laws has prevented the illegal import of firearms into California. By contrast, his testimony that "most firearms are acquired by felonious practices," such as theft or sales by "unscrupulous gun dealers who are actually violating federal law" would seem to suggest illegal firearm sales pervade America despite legal restrictions. Prelim. Inj. Hr'g Tr. at 48-49. In any event, Professor Cramer cites no data for this contrary proposition either. He does, however, refer to a single incident of mass firearm theft, which ironically took place in Los Angeles County, California. *Id*. at 49. The second problem is that Professor Cramer baldly opines that "most of California's murders happen in a small number of urban counties that are at least six to eight hours driving time from other states," without any further development or corroboration. Cramer Decl. ¶ 175. I am left not knowing if a bare majority of crime occurs in these far-flung urban areas, leaving comparably—albeit measurably less—homicidal rural areas with easy access to out-of-state firearms.

**App. 777**

clarity, saving approximately one hundred people in Colorado this year outweighs the aggregate harm of minimal expenditures of time and sacrificed business opportunities.

## V. CONCLUSION

Accordingly, Plaintiffs have failed to show the applicable factors weigh in favor of preliminarily enjoining enforcement of the Waiting-Period Act. Their Motion for Preliminary Injunction (ECF No. 2) is, therefore, DENIED.

DATED this 13th of November, 2023.

_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE

**App. 778**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-02563-JLK

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

      Defendant.

---

**ANSWER**

---

      Defendant Jared S. Polis, in his official capacity as Governor of the State of Colorado,

answers the allegations in the Complaint as follows:

**INTRODUCTION**

      Admit the first and second sentences. Deny the third sentence and affirmatively state that

the act speaks for itself. Deny the fourth sentence.

**PARTIES**

      1.     The Governor is without sufficient knowledge to admit or deny the allegations in

paragraph 1 and so denies them.

      2.     The Governor is without sufficient knowledge to admit or deny the allegations in

paragraph 2 and so denies them.

      3.     Admit the first and second sentences. Admit that the third sentence accurately

quotes the Colorado Constitution. Deny the remaining allegations in the paragraph. Deny that the

Governor has direct authority to enforce HB 23-1219. Affirmatively state that the Governor has

**App. 779**

waived his Eleventh Amendment immunity, for this case only and only for prospective equitable relief, to allow this matter to proceed against him.

4.      Deny.

## JURISDICTION AND VENUE

5.      Admit that, if Plaintiffs have standing (which the Governor does not concede at this stage), the cited provisions of law confer subject matter jurisdiction on the Court.

6.      Admit that the cited provisions of law authorize Plaintiffs to request declaratory and injunctive relief and attorney's fees. Deny that Plaintiffs are entitled to such relief.

7.      Admit that venue is proper in this judicial district.

## GENERAL ALLEGATIONS

8.      Admit that paragraph 8 quotes part of the Second Amendment. Deny all other allegations in paragraph 8, if any.

9.      Admit that *McDonald v. City of Chicago* makes the Second Amendment applicable to the states through the Fourteenth Amendment.

10.      Admit that paragraph 10 accurately quotes part of HB 23-1219.

11.      Admit that paragraph 11 accurately quotes from *New York State Rifle & Pistol Association, Inc. v. Bruen*.

12.      The Governor is without sufficient knowledge to admit or deny the allegations in the first sentence and so denies them. The Governor denies all remaining allegations in paragraph 12.

13.      Deny.

14.      Deny.

**App. 780**

## FIRST CLAIM FOR RELIEF

15.     The Governor incorporates his prior responses.

16.     Deny.

17.     Deny.

18.     Deny.

19.     Deny.

20.     Deny.

## PRAYER FOR RELIEF

The Governor admits Plaintiffs request the listed relief. The Governor denies Plaintiffs

are entitled to any relief.

## GENERAL DENIAL

The Governor denies any allegations not specifically admitted above.

## AFFIRMATIVE DEFENSES

(1) Plaintiffs lack standing.

(2) The complaint fails to state a claim for which relief can be granted.

(3) Plaintiffs cannot satisfy the factors required for a preliminary or permanent
    injunction.

(4) The Governor enjoys sovereign immunity against Plaintiffs' claims, except that he
    has waived his sovereign immunity, only in this case, only in his official capacity,
    and only for prospective equitable relief.

(5) The Governor reserves the right to raise additional affirmative defenses.

App. 781

Dated: December 4, 2023                PHILIP J. WEISER
                                       Attorney General

                                       */s/ Michael T. Kotlarczyk*
                                       _____
                                       *Michael T. Kotlarczyk*, Senior Assistant Attorney General
                                       *Matthew J. Worthington*, Assistant Attorney General
                                       1300 Broadway, Denver, CO 80203
                                       Telephone: (720) 508-6187; -6124
                                       Email: mike.kotlarczyk@coag.gov;
                                       matt.worthington@coag.gov

                                       *Attorneys for Defendant Jared Polis*
                                       *Counsel of Record

**App. 782**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 23-cv-2563-JLK**

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

_____

**NOTICE OF APPEAL**

_____

      Plaintiffs Rocky Mountain Gun Owners and Alicia Garcia, through undersigned

counsel, hereby appeal, pursuant to 28 U.S.C. § 1292(a)(1), to the United States Court of

Appeals for the Tenth Circuit from the Order of the District Court entered on November 13,

2023 (Doc. 32) denying Plaintiffs' motion for preliminary injunction.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

*Attorney for Plaintiffs*

App. 783

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record:

*/s/ Barry K. Arrington*
_____
Barry K. Arrington

**App. 784**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 23-cv-2563-JLK**

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

_____

**NOTICE OF APPEAL**
_____

      Plaintiffs Rocky Mountain Gun Owners and Alicia Garcia, through undersigned

counsel, hereby appeal, pursuant to 28 U.S.C. § 1292(a)(1), to the United States Court of

Appeals for the Tenth Circuit from the Order of the District Court entered on November 13,

2023 (Doc. 32) denying Plaintiffs' motion for preliminary injunction.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

*Attorney for Plaintiffs*

**App. 785**

**CERTIFICATE OF SERVICE**

I hereby certify that on December 4, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record:

*/s/ Barry K. Arrington*
_____
Barry K. Arrington

**App. 786**



**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**OFFICE OF THE CLERK**

Alfred A. Arraj
United States Courthouse
901 19th Street
Denver, Colorado 80294
www.cod.uscourts.gov

Jeffrey P. Colwell
*Clerk*

Phone: (303) 844-3433

Date: 12/5/2023

USA or other
☐ Pro Se    ☒ Retained    ☐ CJA    ☐ FPD    ☐ Federal Agency
                                                    (Appeal Fee Exempt)

Case No: <u>23-cv-02563-JLK</u>              ☐ Amended Notice of Appeal
                                            ☐ Other pending appeals
Date Filed: <u>12/4/2023</u>                ☐ Transferred Successive
        Plaintiffs Alicia Garcia, Rocky          §2254 or §2255
Appellant: <u>Moun</u>tain Gun Owners        ☐ Supplemental Record

Pro Se Appellant:
        ☐ IFP forms mailed/given    ☐ Motion IFP pending    ☐ Appeal fee paid
                                    ☐ IFP denied             ☐ Appeal fee not paid

Retained Counsel:
        ☒ Appeal fee paid    ☐ Appeal fee not paid    ☐ Motion IFP filed

The Preliminary Record on Appeal is hereby transmitted to the Tenth Circuit Court of
Appeals.  Please refer to the forms, procedures, and requirements for ordering
transcripts, preparing docketing statements and briefs, and designations of the record
that are found on the Tenth Circuit's website, www.ca10.uscourts.gov.

If not already completed, either an appeal fee payment for filing this case or filing of a
motion to proceed *in forma pauperis* will be made to this District Court.

The transcript order form must be filed in the District Court as well as the Court of Appeals
within 14 days after the notice of appeal was filed with the District Court.

If you have questions, please contact this office.

                        Sincerely,

                        JEFFREY P. COLWELL, CLERK

                by:   s/<u>A. Garcia Garcia</u>
                        Deputy Clerk

cc:    Clerk of the Court, Tenth Circuit Court of Appeals

Rev. 8/17/2017

# App. 787

APPEAL,JD1,jlklc1

# U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: <u>1:23–cv–02563–JLK</u>

Rocky Mountain Gun Owners et al v. Polis
Assigned to: Judge John L. Kane
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 10/01/2023
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**<u>Plaintiff</u>**

**Rocky Mountain Gun Owners**     represented by   **Brian A. Abbas**
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227
303–292–2021
Email: babbas@mslegal.org
*ATTORNEY TO BE NOTICED*

**Donald Sean Nation**
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227
303–292–2021
Email: snation@mslegal.org
*ATTORNEY TO BE NOTICED*

**William Edward Trachman**
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227
303–292–2021
Fax: 303–292–1980
Email: wtrachman@mslegal.org
*ATTORNEY TO BE NOTICED*

**Barry Kevin Arrington**
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, CO 80033
303–205–7870
Email: barry@arringtonpc.com
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Alicia Garcia**     represented by   **Brian A. Abbas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Donald Sean Nation**

**App. 788**

1

(See above for address)
*ATTORNEY TO BE NOTICED*

**William Edward Trachman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Barry Kevin Arrington**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Jared S. Polis**
*in his official capacity as Governor of the*
*State of Colorado*

represented by **Grant T. Sullivan**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720−508−6349
Fax: 720−508−6038
Email: grant.sullivan@coag.gov
*ATTORNEY TO BE NOTICED*

**Matthew John Worthington**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720−508−6124
Email: matt.worthington@coag.gov
*ATTORNEY TO BE NOTICED*

**Michael T. Kotlarczyk**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720−508−6187
Fax: 720−508−6041
Email: mike.kotlarczyk@coag.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/01/2023 | 1 | COMPLAINT against Jared S. Polis (Filing fee $ 402,Receipt Number ACODC−9322326)Attorney Barry Kevin Arrington added to party Alicia Garcia(pty:pla), Attorney Barry Kevin Arrington added to party Rocky Mountain Gun Owners(pty:pla), filed by Rocky Mountain Gun Owners, Alicia Garcia.(Arrington, Barry) (Entered: 10/01/2023) |

**App. 789**

2

| 10/01/2023 | 2 | MOTION for Temporary Restraining Order by Plaintiffs Alicia Garcia, Rocky Mountain Gun Owners. (Attachments: # 1 Ex A Act, # 2 Garcia Declaration, # 3 Rhodes Declaration, # 4 Proposed Order (PDF Only))(Arrington, Barry) (Entered: 10/01/2023) |
|---|---|---|
| 10/01/2023 | 3 | NOTICE OF CASE ASSOCIATION by Barry Kevin Arrington on behalf of Alicia Garcia, Rocky Mountain Gun Owners (Arrington, Barry) (Entered: 10/01/2023) |
| 10/01/2023 | 4 | SUMMONS REQUEST as to Jared S. Polis re 1 Complaint, by Plaintiffs Alicia Garcia, Rocky Mountain Gun Owners. (Arrington, Barry) (Entered: 10/01/2023) |
| 10/01/2023 | 5 | Case assigned to Judge John L. Kane and drawn to Magistrate Judge Scott T. Varholak. Text Only Entry (ccuen, ) (Entered: 10/02/2023) |
| 10/02/2023 | 6 | SUMMONS issued by Clerk. (ccuen, ) (Entered: 10/02/2023) |
| 10/02/2023 | 7 | NOTICE of Entry of Appearance by Michael T. Kotlarczyk on behalf of Jared S. PolisAttorney Michael T. Kotlarczyk added to party Jared S. Polis(pty:dft) (Kotlarczyk, Michael) (Entered: 10/02/2023) |
| 10/02/2023 | 8 | NOTICE of Entry of Appearance by Grant T. Sullivan on behalf of Jared S. PolisAttorney Grant T. Sullivan added to party Jared S. Polis(pty:dft) (Sullivan, Grant) (Entered: 10/02/2023) |
| 10/03/2023 | 9 | MINUTE ORDER. On October 1, 2023, Plaintiffs filed a Notice of Related Case 3 , listing two cases in front of Chief Judge Brimmer (Nos. 23–cv–01076–PAB–NRN & 23–cv–01077–PAB–NRN). In those related cases, Defendant previously filed a Notice of Three Related Cases, which includes an additional case before Judge Gallagher (No. 22–cv–01866–GPG–SKC). When this case was assigned to me, I followed the procedure set out in D.C.COLO.LCivR 3.2(d). Based on the requisite conferral and the present filings in the implicated cases, it was determined that the facts and claims of the cases are not sufficiently related to warrant special assignment or transfer of this case. Ordered by Judge John L. Kane on 10/3/2023. Text Only Entry (jlksec) (Entered: 10/03/2023) |
| 10/04/2023 | 10 | NOTICE of Entry of Appearance by William Edward Trachman on behalf of Alicia Garcia, Rocky Mountain Gun OwnersAttorney William Edward Trachman added to party Alicia Garcia(pty:pla), Attorney William Edward Trachman added to party Rocky Mountain Gun Owners(pty:pla) (Trachman, William) (Entered: 10/04/2023) |
| 10/04/2023 | 11 | ORDER re: 2 Motion for Temporary Restraining Order and for Preliminary Injunction. Plaintiffs' request for a temporary restraining order is **DENIED**, and we will proceed on Plaintiffs' Motion for a preliminary injunction alone. Governor Polis is **DIRECTED** to file a Response to Plaintiffs' Motion for Preliminary Injunction on or before **October 17, 2023**. Any Reply in Support of the Motion is due on or before **October 20, 2023**. A preliminary injunction hearing is set for two days beginning at **9:30 a.m. on October 24, 2023** in Courtroom A 802. By Judge John L. Kane on 10/4/2023. (jtorr, ) (Entered: 10/04/2023) |
| 10/04/2023 | 12 | NOTICE of Entry of Appearance by Matthew John Worthington on behalf of Jared S. PolisAttorney Matthew John Worthington added to party Jared S. Polis(pty:dft) (Worthington, Matthew) (Entered: 10/04/2023) |
| 10/04/2023 | 13 | WAIVER OF SERVICE Returned Executed by Rocky Mountain Gun Owners, Alicia Garcia. Jared S. Polis waiver sent on 10/4/2023, answer due 12/4/2023. (Arrington, Barry) (Entered: 10/04/2023) |

**App. 790**

| 10/05/2023 | 14 | Joint MOTION to Continue *and Reschedule Preliminary Injunction Hearing* by Plaintiffs Alicia Garcia, Rocky Mountain Gun Owners. (Arrington, Barry) (Entered: 10/05/2023) |
|---|---|---|
| 10/05/2023 | 15 | ORDER granting 14 Joint Motion to Reschedule Preliminary Injunction Hearing. The preliminary injunction hearing set to begin October 24, 2023, is VACATED AND RESET to October 26, 2023, at 9:30 a.m. before Judge John L. Kane in Courtroom A802 on the 8th Floor of the Alfred A. Arraj U.S. Courthouse, 901 19th Street, Denver, Colorado. Ordered by Judge John L. Kane on 10/5/2023. Text Only Entry(jlksec) (Entered: 10/05/2023) |
| 10/05/2023 | 16 | NOTICE OF CASE ASSOCIATION *of Related Case* by Grant T. Sullivan on behalf of Jared S. Polis (Sullivan, Grant) (Entered: 10/05/2023) |
| 10/11/2023 | 17 | NOTICE of Entry of Appearance by Brian A. Abbas on behalf of Alicia Garcia, Rocky Mountain Gun OwnersAttorney Brian A. Abbas added to party Alicia Garcia(pty:pla), Attorney Brian A. Abbas added to party Rocky Mountain Gun Owners(pty:pla) (Abbas, Brian) (Entered: 10/11/2023) |
| 10/17/2023 | 18 | BRIEF in Opposition to 2 MOTION for Temporary Restraining Order *and for Preliminary Injunction* filed by Defendant Jared S. Polis. (Attachments: # 1 Exhibit 1, HB 23–1219, # 2 Exhibit 2, Handgun Waiting Periods Reduce Gun Deaths, # 3 Exhibit 3, Spitzer Declaration, # 4 Exhibit 4, Ex. A to Spitzer Dec: CV, # 5 Exhibit 5, Ex. B to Spitzer Dec: Table of Intoxication/Weapons Laws, # 6 Exhibit 6, Ex. C to Spitzer Dec: Text of Intoxication/Weapons Laws, # 7 Exhibit 7, Ex. D to Spitzer Dec: Table of Weapons Licensing Laws, # 8 Exhibit 8, Ex. E to Spitzer Dec: Text of License and Licensing Laws, # 9 Exhibit 9, Historical Waiting Period Laws, # 10 Exhibit 10, Roth Declaration, # 11 Exhibit 11, Ex. A to Roth Dec: CV)(Kotlarczyk, Michael) (Entered: 10/17/2023) |
| 10/18/2023 | 19 | NOTICE of Entry of Appearance by Donald Sean Nation on behalf of All Plaintiffs Attorney Donald Sean Nation added to party Alicia Garcia(pty:pla), Attorney Donald Sean Nation added to party Rocky Mountain Gun Owners(pty:pla) (Nation, Donald) (Entered: 10/18/2023) |
| 10/20/2023 | 20 | Unopposed MOTION for Leave to *Testify Remotely at Hearing on Preliminary Injunction* by Defendant Jared S. Polis. (Sullivan, Grant) (Entered: 10/20/2023) |
| 10/20/2023 | 21 | REPLY to Response to 2 MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Plaintiffs Alicia Garcia, Rocky Mountain Gun Owners. (Nation, Donald) (Entered: 10/20/2023) |
| 10/23/2023 | 22 | ORDER granting 20 The Governor's Unopposed Motion to Permit Remote Witness Testimony at Hearing on Preliminary Injunction. The witnesses will be allowed to testify via remote means. Counsel are directed to contact my Courtroom Deputy via email (Bernique_Abiakam@cod.uscourts.gov) for instructions on how to proceed with the VTC and to test the equipment prior to the hearing. The attached instructions as well as tips should be reviewed prior to the hearing. Ordered by Judge John L. Kane on 10/23/2023. (Attachments: # 1 Tips for Remote Log In)(jlksec) (Entered: 10/23/2023) |
| 10/24/2023 | 23 | NOTICE of Supplemental Authorities re: 2 MOTION for Temporary Restraining Order by Plaintiffs Alicia Garcia, Rocky Mountain Gun Owners (Attachments: # 1 Exhibit 1 Decision in Miller v. Bonta)(Nation, Donald) (Entered: 10/24/2023) |

**App. 791**

| 10/24/2023 | 24 | DECLARATION of *Clayton Cramer* by Plaintiffs Alicia Garcia, Rocky Mountain Gun Owners. (Nation, Donald) (Entered: 10/24/2023) |
| 10/24/2023 | 25 | Exhibit List *Unified Exhibit List* by Plaintiffs Alicia Garcia, Rocky Mountain Gun Owners. (Nation, Donald) (Entered: 10/24/2023) |
| 10/24/2023 | 26 | Witness List *for October 26, 2023 Hearing* by Defendant Jared S. Polis. (Kotlarczyk, Michael) (Entered: 10/24/2023) |
| 10/24/2023 | 27 | Witness List *Plaintiffs' Witness List* by Plaintiffs Alicia Garcia, Rocky Mountain Gun Owners. (Nation, Donald) (Entered: 10/24/2023) |
| 10/26/2023 | 28 | MINUTE ENTRY for Motion Hearing proceedings held before Judge John L. Kane on 10/26/2023. ORDERED: Todays Preliminary Injunction hearing shall continue on Monday, October 30, 2023, at 9:30 a.m. Court Reporter: Kevin Carlin. (babia) (Entered: 10/26/2023) |
| 10/30/2023 | 29 | MINUTE ENTRY for Motion Hearing proceedings held before Judge John L. Kane on 10/30/2023 re 2 MOTION for Temporary Restraining Order filed by Rocky Mountain Gun Owners, Alicia Garcia. Taking under advisement 2 Motion for TRO. Court Reporter: Kevin. (babia) (Entered: 10/30/2023) |
| 11/08/2023 | 30 | TRANSCRIPT of Preliminary Injunction Hearing held on 10/26/2023 before Judge Kane. Pages: 1–194.<br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br>Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (kcarl, ) (Entered: 11/08/2023) |
| 11/08/2023 | 31 | TRANSCRIPT of Preliminary Injunction Hearing held on 10/30/2023 before Judge Kane. Pages: 195–239.<br> **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br>Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (kcarl, ) (Entered: 11/08/2023) |
| 11/13/2023 | 32 | ORDER Denying 2 Motion for Preliminary Injunction. Plaintiffs have failed to show the applicable factors weigh in favor of preliminarily enjoining enforcement of the Waiting–Period Act. Their Motion for Preliminary Injunction (ECF No. 2 ) is, therefore, DENIED. ORDERED by Judge John L. Kane on 11/13/2023.(angar, ) (Entered: 11/13/2023) |
| 12/04/2023 | 33 | |

**App. 792**

| | | ANSWER to <u>1</u> Complaint, by Jared S. Polis.(Kotlarczyk, Michael) (Entered: 12/04/2023) |
|---|---|---|
| 12/04/2023 | <u>34</u> | NOTICE OF APPEAL as to <u>32</u> Order on Motion for TRO, by Plaintiffs Alicia Garcia, Rocky Mountain Gun Owners (Filing fee $ 605, Receipt Number ACODC–9423913) (Arrington, Barry) (Entered: 12/04/2023) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-02563-JLK

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

     Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado,

     Defendant.

---

### ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 2)

---

Kane, J.

     In this suit based on the Second Amendment to the United States Constitution, Plaintiffs Rocky Mountain Gun Owners and Alicia Garcia challenge a newly effective Colorado statute regulating the commercial sale of firearms. The statute mandates that sellers wait a minimum of three days between initiating a background check and delivering a firearm to a purchaser, with certain exceptions. *See* Colo. Rev. Stat. § 18-12-115. Presently before me is Plaintiffs' Motion for Preliminary Injunction (ECF No. 2), seeking an order preliminarily enjoining enforcement of that statute.[1] I find Plaintiffs have failed to demonstrate they are entitled to the extraordinary relief requested and, therefore, deny their Motion.

---

[1] Plaintiffs' Motion originally sought a Temporary Restraining Order and Preliminary Injunction. However, I previously found that Plaintiffs had not demonstrated an ex parte temporary restraining order was warranted and ordered that we would proceed on Plaintiffs' request for a preliminary injunction alone. *See* Order Re: Mot. for Temporary Restraining Order at 2, ECF No. 11.

**App. 794**

## I. BACKGROUND

### A. The Second Amendment

The Second Amendment to the U.S. Constitution was ratified in 1791. In full, it states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment was made applicable to the states with the ratification of the Fourteenth Amendment in 1868. *See McDonald v. City of Chi.*, 561 U.S. 742, 750 (2010).

Fifteen years ago, in *District of Columbia v. Heller*, the Supreme Court announced that "the Second Amendment conferred an individual right to keep and bear arms," of which a "central component" is self-defense.[2] 554 U.S. 570, 595, 599, 628 (2008). Based on that conclusion, the Court held "that the District[ of Columbia's] ban on handgun possession in the home violate[d] the Second Amendment." *Id.* at 635. The Court clarified that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or *laws imposing conditions and qualifications on the commercial sale of arms*." *Id.* at 626–27 (emphasis added). The Court described these measures as "presumptively lawful." *Id.* at 627 n.26; *see also id.* at 635 (referring to "those regulations of the right that [it] describe[s] as permissible" and indicating that "there will be time enough to expound upon the historical justifications for the exceptions [it] ha[s] mentioned"). It "repeat[ed] those assurances" two years later in *McDonald v. City of Chicago*, 561 U.S. at 786.

---

[2] Despite the use of the term "conferred," the Court in *Heller* determined that the Second Amendment codified a preexisting right. *Heller*, 554 U.S. at 592 ("We look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right."); *id.* at 599, 603; *see also Bruen*, 142 S. Ct. at 2127, 2130, 2135, 2138, 2145.

Last year, in *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Court built on its holding in *Heller* and declared that the "Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home" as well. 142 S. Ct. 2111, 2122 (2022). At issue in *Bruen* was the constitutionality of New York State's "may-issue" licensing regime, which required applicants to demonstrate a special need for self-defense in order to publicly carry a handgun. *Id.* at 2122-24.

Before resolving that question, *Bruen* imparted the test courts should apply in determining whether a firearm regulation is permissible under the Second Amendment. The *Bruen* test is "rooted in the Second Amendment's text, as informed by history." *Id.* at 2127. The Court explained: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30. And the court must consider "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.* at 2131-32 (quoting *Heller*, 554 U.S. at 631). This inquiry "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.* at 2133.

Following that standard, the Court conducted a lengthy review of the historical record compiled in the case and concluded there was no historical "tradition of broadly prohibiting the public carry of commonly used firearms for self-defense" nor one "limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense." *Id.* at 2138. The Court consequently held that New York State's licensing regime violated the Constitution. *Id.* at 2122, 2156. Significantly, three of the justices from the majority indicated that the decision was

3

**App. 796**

not disturbing what was stated in *Heller* regarding presumptively lawful regulatory measures. *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring); *id.* at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*, 554 U.S. at 626−627, and n.26); *see also id.* at 2189 (Breyer, J., dissenting, joined by Sotomayor and Kagan, J.J.).

## B. The Colorado Statute

On April 28, 2023, Defendant Jared Polis, the Governor of the State of Colorado, signed into law House Bill 23-1219, An Act Concerning Establishing A Minimum Three-Day Waiting Period Prior to the Delivery of a Purchased Firearm (the "Act" or "Waiting-Period Act"). The Act became effective on October 1, 2023. In passing the Act, the General Assembly declared that "[d]elaying immediate access to firearms by establishing a waiting period for receipt of firearms can help prevent impulsive acts of firearm violence, including homicides and suicides." H.B. 23-1219, 74th Gen. Assemb., Reg. Sess. (Colo. 2023). Pursuant to that purpose, the Act makes it illegal for any person who sells a firearm "to deliver the firearm to the purchaser until the later in time occurs:

    (I)    Three days after a licensed gun dealer has initiated a background check of the purchaser that is required pursuant to state or federal law; or

    (II)    The seller has obtained approval for the firearm transfer from the bureau after it has completed any background check required by state or federal law.

Colo. Rev. Stat. § 18-12-115(1)(a). The waiting period does not apply to:

    (1)    The sale of antique firearms;

    (2)    A sale by a person in the armed forces, who is soon to be deployed outside the United States, to a member of his or her family, as defined in the statute; or

    (3)    "A firearm transfer for which a background check is not required pursuant to state or federal law."

4

**App. 797**

*Id.* § 18-12-115(2). Violation of the Act by a firearm seller constitutes a civil infraction for which a fine may be imposed. *Id.* § 18-12-115(1)(b).

**C. Plaintiffs**

Plaintiff Rocky Mountain Gun Owners ("RMGO') is a nonprofit organization that seeks to defend the right of "law-abiding" individuals to keep and bear arms. At least one of its members, its executive director, Taylor Rhodes, has been affected by the Act. Prelim. Inj. Hr'g Tr. at 29-30, 35. Mr. Rhodes purchased two firearms recently, and because he was out of town when the waiting period expired for one of them, he was unable to pick up that firearm until about eight days later. *Id.* at 30-33.

Plaintiff Alicia Garcia is a firearms instructor and range safety officer and frequently acquires firearms. *Id.* at 16. She reviews firearms and teaches people how to use them safely via social media. *Id.* She has recently purchased multiple firearms and had to spend additional hours driving because she had to return to stores after the waiting periods expired. *Id.* at 17-20. She also hoped to attend an out-of-state shotgun shoot, which would have provided her with business opportunities, but she was unable to obtain a shotgun in time for the event due to the waiting period. *Id.* at 19-22.

Before the Waiting-Period Act took effect on October 1, 2023, Plaintiffs filed a separate case asserting the same claims as they do here. *See RMGO v. Polis*, No. 23-cv-01076-PAB-NRN, ECF No. 1. In ruling on Plaintiffs' Motion for Preliminary Injunction in that case, Chief Judge Brimmer found Plaintiffs lacked standing to move to enjoin the Act before it was enforced. *RMGO v. Polis*, No. 23-cv-01076-PAB-NRN, 2023 WL 5017257, at *5 (D. Colo. Aug. 7, 2023). Specifically, Chief Judge Brimmer concluded RMGO had not identified any individual members

**App. 798**

of the organization who were affected by the Act and thus had not met their burden to establish standing. *Id.* at *3. As for Ms. Garcia, he determined that she could not show a credible threat of prosecution, which was necessary for her to have standing to challenge the Act before it took effect. *Id.* at *4.

The Governor here does not contest Plaintiffs' standing. However, like Chief Judge Brimmer, I must ensure that jurisdiction is proper. Federal courts lack jurisdiction when plaintiffs cannot meet their burden to establish standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559-561 (1992). For plaintiffs to meet that burden, they must first demonstrate that they have suffered an "injury in fact," that is "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (citation and quotation marks omitted). Then, plaintiffs must show a causal connection between the injury and the challenged conduct and a likelihood that the injury will be redressed by a favorable decision. *Id.* at 560-61. Ms. Garcia testified that she has, on two occasions, had to make additional trips to obtain firearms and has missed out on business opportunities. Prelim. Inj. Hr'g Tr. at 19-22. She has been impacted by the Act's waiting period and will be in the near future. *Id.* at 17-22. She has shown an injury in fact that is fairly traceable to implementation of the Act and that would likely be redressed by a favorable decision here. Therefore, Ms. Garcia has established that she has standing to seek the relief requested. Because I find Ms. Garcia has standing, I need not consider whether RMGO does. *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986).[3]

---

[3] I note, however, that RMGO's case for standing is less developed. The organization is clear that it "asserts representational standing" on behalf of its members. Mot. for Prelim. Inj. at 2, ECF No. 2. The Complaint and Motion for Preliminary Injunction allege that three members of RMGO have or will be affected by the Act. Compl. ¶ 1, ECF No. 1; Mot. for Prelim. Inj. at 2. Those individuals are identified by their initials alone "for the sake of their privacy." *Id.*; Compl. ¶ 1. Plaintiffs make no effort to demonstrate that those individuals' privacy interests outweigh the public's interest in proceedings that are public and open. Nor do Plaintiffs provide affidavits or

6

**App. 799**

The Governor, against whom Plaintiffs' claims are asserted, contends that he is entitled to immunity in this case under the Eleventh Amendment to the U.S. Constitution but agrees to waive his immunity "for the purpose of defending the Act from Plaintiffs' claims for declaratory and injunctive relief . . . only in this case, only in his official capacity, and only for prospective relief." Resp. to Mot. for Prelim. Inj. at 4 n.2, ECF No. 18. That waiver is sufficient for these proceedings, so I do not analyze whether the Eleventh Amendment applies.

## D. Expert Opinions

With his Response to Plaintiffs' Motion for Preliminary Injunction, the Governor filed the declarations of two experts—Randolph Roth (ECF No. 18-10) and Robert Spitzer (ECF No. 18-3), who both provided opinions on the Nation's history of regulating firearms. The Governor's Response also included an article titled "Handgun Waiting Periods Reduce Gun Deaths" that was co-authored by Christopher Poliquin (ECF No. 18-2). I held a two-day hearing on Plaintiffs' Motion at which Clayton Cramer[4] testified as an expert witness for Plaintiffs and Professors Roth and Poliquin testified as experts for the Governor. I indicated at the hearing that I would allow the witnesses' testimony and later determine what weight to give their opinions.

Professor Roth received his bachelor's degree in History from Stanford University in 1973 and his doctorate degree in History from Yale University in 1981. He has taught courses in history, the social sciences, and statistics and is presently an Arts and Sciences Distinguished

---

testimony from those RMGO members, as is customarily required for representational standing. *See, e.g., Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Additionally, there are no allegations that any identified member of RMGO, including Mr. Rhodes, will suffer harm during the period when a preliminary injunction would be in effect.

[4] I note that Professor Cramer's 67-page Declaration (ECF No. 24) was not filed with Plaintiffs' Motion or Reply in Support of their Motion. It, along with Plaintiffs' Witness List, was filed two-days before the preliminary-injunction hearing.

**App. 800**

Professor of History and Sociology at The Ohio State University. He has written a book, American Homicide, and has published essays on the history of violence and the use of firearms in the United States. Most of his work has been peer-reviewed. Prelim. Inj. Hr'g Tr. 112-13. He has "dedicated [his] career to understanding why homicide rates rise and fall over time, in hopes of understanding why the United States—which, apart from the slave South, was perhaps the least homicidal society in the Western world in the early nineteenth century—became by far the most homicidal, as it remains today." Roth Decl. ¶ 11, ECF No. 18-10. In this case, he was asked to provide "opinions on the history of homicides and mass murders in the United States, with special attention to the role that technologies have played in shaping the character and incidence of homicides and mass murders over time, and the historical restrictions that local and federal authorities have imposed in response to new technologies that they deemed particularly lethal, prone to misuse, and a danger to the public." Id. ¶ 10.

In his Declaration, Professor Roth opined that "[p]ublic officials today are confronting a criminological problem that did not exist in the Founding Era, nor during the first century of the nation's existence." Id. ¶ 48. He described how homicide rates were relatively low early on in our Nation's history and that "the impact of firearms on the homicide rate was modest, even though household ownership of firearms was widespread." Id. ¶¶ 14-15; Prelim. Inj. Hr'g Tr. at 118, 120. Professor Roth believes "the evidence . . . shows that the availability of guns and changes in firearms technology, especially the emergence of modern breechloading firearms in the mid-nineteenth century, and of rapid-fire semiautomatic weapons and extended magazines in the late twentieth century, have pushed the homicide rate in United States well beyond what it would otherwise have been." Roth Decl. ¶ 12. Yet, he clarified that "firearms are not the fundamental reason why we became a violent society compared to other affluent societies."

8

Prelim. Inj. Hr'g Tr. at 128. Professor Roth's research has shown the fundamental reasons are "our failures of nation building, our political instability, our lack of faith and trust in our government, [and] our lack of fellow feeling among ourselves." *Id.* at 129.

I find the opinions Professor Roth provided to be thoughtful and reliable. He did not oversell the role of firearms in the history of homicide in the United States, and he was committed to precision and accuracy.

Professor Spitzer received his doctorate degree in Government from Cornell University in 1980. He is a Distinguished Service Professor of Political Science, Emeritus at the State University of New York at Cortland and was a visiting professor at Cornell University for thirty years. He has written six books and more than 100 articles, papers, and essays on gun policy. In this case, the Governor asked him "to render an opinion on the history of firearms restrictions as they pertain to modern waiting periods." Spitzer Decl. at 1, ECF No. 18-3. Professor Spitzer provided a Declaration containing his opinions but did not testify at the preliminary injunction hearing.

In his Declaration, Professor Spitzer noted that "[g]un purchase waiting periods as they are understood and implemented today did not exist early in the country's history." *Id.* at 4. According to Professor Spitzer, this is because, in addition to the low rates of homicide and seldom use of firearms for homicide in the Federal era, "[r]apid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century" and "no organized system of gun background checking could feasibly exist until the modern era." *Id.* at 4-5. As an analogue for waiting-period laws, Professor Spitzer pointed to historical regulations pertaining to firearms and intoxication, based on the theory that these regulations "avoided or thwarted 'heat of the moment' gun acquisition or use by the intoxicated, when they would be much more likely to act

9

**App. 802**

rashly, impulsively, and with diminished judgment." *Id.* at 6. For another analogue, he looked to historical laws for weapons licensing and permitting, opining that they "operate in a similar manner to modern waiting periods" since "licensing contemplates the passage of some period of time (even if brief) between the time the application or permission to do something is submitted . . . and the license or permission is granted." *Id.* at 15-16. Professor Spitzer reviewed relevant laws in the United States from the early 1600s through the early 1900s and included as two exhibits to his Declaration the text of the intoxication laws and the licensing laws he discusses. *See* Exhibit C: Intoxication/Weapons Laws, ECF No. 18-6; Exhibit E: License & Licensing Laws, ECF No. 18-8.

Professor Spitzer is certainly qualified to provide the opinions set out in his Declaration. I find his presentation of the relevant laws to be helpful in evaluating the Nation's historical tradition of firearm regulation, and I consider his explanation for the absence of waiting-period laws earlier in American history along with the evidence from the other experts.

Christopher Poliquin is an assistant professor of strategy at the University of California at Los Angeles. Poliquin has a doctorate in Business Administration from Harvard Business School and an undergraduate degree in Philosophy, Politics, and Economics from the University of Pennsylvania. He has also served as a teaching fellow in the economic analysis of public policy at Harvard's John F. Kennedy School of Government. His background is in empirical, statistical analysis of public policy. One such area of research led him to co-author the article mentioned above, "Handgun Waiting Periods Reduce Gun Deaths," a quantitative, multivariable assessment of American handgun waiting period laws. This study, published in the Proceedings of the National Academy of Sciences, a peer-reviewed multidisciplinary scientific journal, found that waiting-period laws had a statistically significant causal effect on reducing homicides (by 17%)

and suicides (by 7 to 11%). The Governor called Professor Poliquin to testify on this research and its results. I find his testimony on this topic to be salient and completely credible.

Professor Cramer has undergraduate and master's degrees in History from Sonoma State University. While his trade has been software engineering, he has written numerous books on firearms, both historical and advocacy based. Professor Cramer has been an adjunct professor at Boise State University and ITT Technical Institute in Boise and currently is an adjunct professor teaching history courses at the College of Western Idaho. Plaintiffs called Professor Cramer to testify on the historical treatment of firearms, specifically firearm technology, availability, and regulation.

I do not give any weight to Professor Cramer's opinions regarding legal standards or application of the law, as he is not qualified to provide these opinions.[5] I likewise do not consider his many opinions that are irrelevant to the present facts, that are unsupported, or that relate to opinions not provided by Professors Roth and Spitzer in this case. Otherwise, I assess Professor Cramer's criticism of the opinions of Professors Roth and Spitzer.[6] Although it might be

---

[5] Although he is not a lawyer, Professor Cramer commented repeatedly on the legal meaning and application of precedent. *See, e.g.*, Prelim. Inj. Hr'g Tr. at 47 (offering opinions on the legal relevance of post-1868 statutes); *id.* at 51 (speaking to the propriety of considering the regulatory purpose of the Waiting-Period Act). Professor Poliquin, on the other hand, was appropriately reluctant to do so. *See id.* at 215 ("Q. And do you have an opinion as to whether it's appropriate to consider the effects of the law in light of the Supreme Court's decision in *Bruen*? A. I can't speak to that. I don't have a law degree, and wouldn't speak to that, no.").

[6] Another observation I make about Professor Cramer's Declaration is the prevalence of ad hominem attacks aimed at Professor Spitzer. *See, e.g.*, Cramer Decl. ¶ 55, ECF No. 24 ("[H]istorians and most other *serious* social scientists are wary of single-factor explanations of why things happen when people are involved."); *id.* ¶ 57 (claiming that Professor Spitzer's work would "earn him a poor grade in a freshman history class, or a criminology class, or a biology class"); *id.* ¶ 87 (asserting that Professor Spitzer is "no 'expert'"); *id.* ¶ 94 (insinuating that Professor Spitzer is "lazy"). Those attacks make Professor Cramer's opinions less persuasive, not more. Like his ad hominem attacks, his other antagonistic and inflammatory language undermines his credibility. *See, e.g., id.* ¶ 46 ("If I wanted to buy a scary black rifle . . . ."); *id.* ¶ 75 ("The same public safety argument Professor Spitzer advances for waiting periods would also

reasonable to question whether Professor Cramer is sufficiently qualified under Federal Rule of Civil Procedure 702 to provide that criticism, the Supreme Court has relied on his historical analysis on multiple occasions. *See McDonald*, 561 U.S. at 773; *Heller*, 554 U.S. at 588. With respect, I find his testimony had significant shortcomings in persuasiveness and credibility.

## II. PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 24 (2008). When presented with a motion for a preliminary injunction, courts in the Tenth Circuit consider whether: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the threatened injury to the movant outweighs the injury facing the opposing party under the injunction; and (4) the injunction is adverse to the public interest. *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). It is the movant's burden to establish by a preponderance of the evidence that these factors weigh in favor of an injunction. *Citizens Concerned for Separation of Church & State v. City of Denver*, 628 F.2d 1289, 1299 (10th Cir. 1980).

The Tenth Circuit has instructed that "injunctions that disrupt the status quo are disfavored and 'must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course.'" *Beltronics*, 562 F.3d at 1070 (quoting *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005)). The status

---

work for ignoring the protections of . . . freedom of religious worship (which would allow religions, *some* of whose adherents have a poor record of confusing runways with office buildings) . . . .").

12

quo[7] is the "last peaceable uncontested status existing between the parties before the dispute developed." *Id.* at 1070-71 (quoting *Schrier*, 427 F.3d at 1260). When the plaintiff seeks a preliminary injunction that disrupts that status quo, the district court may not grant it "unless the plaintiff 'make[s] a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms.'" *Id.* at 1071 (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004) (en banc)). The Governor is correct that, because Plaintiffs seek to enjoin a law that is in effect, the injunction they seek would disrupt the status quo and is thus disfavored. Nevertheless, I find, even if the injunction were not disfavored, the applicable factors would weigh against granting it.

## III. ANALYSIS

### A. Likelihood of Success on the Merits

After examining the language of the Second Amendment using the Supreme Court's analysis in *Heller*, I find, for the purposes of Plaintiffs' Motion, that the plain text does not cover the waiting period required by the Act. This conclusion is bolstered by the fact that the Act is a regulation on the commercial sale of firearms and thus is presumptively permissible. However, even if the waiting period implicated the plain text of the Second Amendment, the evidence before me establishes that the Act is consistent with the Nation's historical tradition of firearm regulation. Plaintiffs, therefore, have not carried their burden to show they are likely to succeed on the merits of their claims.

---

[7] "Status quo" in this sense is short for "status quo ante bellum," or "the state of things before the war." *Status quo*, Black's Law Dictionary (4th ed. 1951). The "ante bellum" is generally omitted and, as a result, sometimes forgotten. But what is relevant is the status quo before the war began, or for these purposes, before the lawsuit was filed. Immediately before Plaintiffs filed their suit, the Waiting-Period Act was in effect, and so that is the status quo ante bellum.

**App. 806**

1. **Plain Text of the Second Amendment**

The first consideration under the *Bruen* test is whether the "plain text" of the Second Amendment covers the particular conduct such that the Constitution presumptively provides protection. *See Bruen*, 142 S. Ct. at 2126, 2129-30. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them . . . ." *Heller*, 554 U.S. at 634-35. As a result, the analysis is "focused on the 'normal and ordinary' meaning of the Second Amendment's language" at the relevant time. *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 576–77, 578). The "[n]ormal meaning . . . excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation." *Heller*, 554 U.S. at 576–77.

Plaintiffs contend that the words "keep" and "bear" in the Second Amendment are implicated by the waiting period required by the Act. In *Heller*, the Supreme Court examined the "normal meaning" of those words at the time of the Nation's founding, reviewing definitions from contemporaneous dictionaries. As the Court explained, the 1773 edition of Samuel Johnson's Dictionary of the English Language "defined 'keep' as, most relevantly, '[t]o retain; not to lose,' and '[t]o have in custody.'" *Id.* at 582 (quoting 1 Dictionary of the English Language 1095 (4th ed.) (reprinted 1978)). And Webster's 1828 American Dictionary of the English Language "defined it as '[t]o hold; to retain in one's power or possession.'" *Id.* (quoting N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)). Based on those definitions, the Court concluded "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id.* The Court then turned to the word "bear" and determined that it means to "carry." *Id.* at 584. The Court clarified that, when "bear" is "used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose—confrontation."

14

**App. 807**

*Id.* So, putting all the pieces together, the Court found that the text of the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

From this reading of the plain text, it is clear the relevant conduct impacted by the waiting period—the receipt of a paid-for firearm without delay—is not covered. Still, Plaintiffs attempt to equate the words "obtain" and "possess." Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 11 ("The Second Amendment's plain text applies to 'an individual's conduct' of <u>obtaining</u> a firearm. *See Bruen*, 142 S. Ct. at 2134 ('[T]he "textual elements" of the Second Amendment's operative clause—"the right of the people to keep and bear Arms, shall not be infringed"—guarantee[s] the individual right to <u>possess</u> and carry weapons <u>in case of confrontation</u>.') (emphasis added, cleaned up)."). But these terms are not equivalent. To "keep," under the definitions provided in *Heller*, meant to retain an object one already possessed. It did not mean to receive a newly paid-for item, and it certainly did not mean to receive that item without delay. Likewise, "hav[ing] weapons" indicates the weapons are already in one's possession, not that one is receiving them.

Under Plaintiffs' theory, the Waiting-Period Act prevents people "from obtaining possession of their firearm that they have already acquired." Mot. for Prelim. Inj. at 6; *see also* Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 13 ("In other words, C.R.S. § 18-12-115(1)(a)(I) states that after title to a firearm has passed to the buyer, the person who has already purchased the firearm is not entitled to take possession of her property."); *id.* ("HB23-1219 prohibits Coloradans from obtaining (e.g., possessing) arms that they have already legally acquired . . . ."). Plaintiffs advocate that, "[b]y the time that the waiting period has begun, the commercial transaction has been completed already: money has been exchanged, and ownership

**App. 808**

of a firearm has passed title." *Id.*, ECF No. 21 at 11; *see also* Mot. for Prelim. Inj. at 3.[8]

Plaintiffs' interpretation of the commercial transaction is incorrect. The Colorado Uniform

Commercial Code provides that a "'sale' consists in the passing of title from the seller to the

buyer for a price," Colo. Rev. Stat. § 4-2-106, and "[u]nless otherwise explicitly agreed, title

passes to the buyer at the time and place at which the seller completes his performance with

reference to the physical delivery of the goods." *Id.* § 4–2–401. Thus, absent any agreement or

term to the contrary, purchasers do not acquire title until they receive possession of the subject

firearm.[9] Up to that point, the sale is inchoate, and purchasers have not "acquired" the firearm.

Plaintiffs additionally argue that "when a person has been deprived of possession of a

firearm they have acquired, they cannot carry it." Mot. for Prelim. Inj. at 6. This argument fails

for the same reasons.

The relevant conduct is, therefore, not covered by the plain meaning of the terms "keep"

or "bear" in the Second Amendment. Seemingly recognizing this fact, Plaintiffs contend that

"[t]he right to 'keep' arms necessarily implies the right to possess arms one has acquired." *Id.* at

5. But the purchase and delivery of an object (here, a firearm) is not an integral element of

keeping (i.e., having) or bearing (i.e., carrying) that object. Rather, purchase and delivery are one

means of creating the opportunity to "have weapons." The relevant question is whether the plain

text covers that specific means. It does not.

---

[8] Plaintiffs imply that purchasers must wait at least three days after paying to purchase a firearm. However, nothing in the record indicates whether a purchaser can initiate a background check before commencing the purchase of or paying for a firearm.

[9] Only once the property is delivered can a purchaser evaluate the condition of the property and seek a refund or substitution if it is damaged, broken, or otherwise defective. This illustrates that a sale cannot be complete until a purchaser receives the property and has the opportunity to inspect it.

**App. 809**

Even if purchasing a firearm could be read into the terms "keep" or "bear," receipt of a firearm *without any delay* could not be, as the Founders would not have expected instant, widespread availability of the firearm of their choice. The parties dispute this fact, but I find the expert opinions of Professors Spitzer and Roth on this topic to be convincing.

In his Declaration, Professor Spitzer asserted that "No 'Guns-R-Us' outlets existed in the 1600s, 1700s, or most of the 1800s." Spitzer Decl. at 4. He explained that "[r]apid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get." *Id.* Consistent with Professor Spitzer's observations, Professor Roth testified that, in 1792, "production rates [of firearms] were far lower than they are today," so individuals might have had "to wait a few weeks to get [a firearm]." Prelim. Inj. Hr'g Tr. at 156.

In an effort to disprove those opinions, Professor Cramer surveyed excerpts from various advertisements for gunsmiths and gun retailers from 1728 to 1837. Cramer Decl. ¶¶ 15-22, 25-33. Professor Cramer did not, however, undertake to count the number of gun retailers in the United States in 1791, Prelim. Inj. Hr'g Tr. at 72-73, and he acknowledged that "[i]t is hard to use th[e] fragmentary advertising as persuasive proof." Cramer Decl. ¶ 45. The advertisements show that guns were being made and sold during the period addressed. But they also indicate that oftentimes a wait would be involved, for example, when guns were being imported and would arrive at irregular intervals, when firearms were being sold on a single date in the future, or a gunsmith was offering to fabricate firearms for purchasers. *See, e.g., id.* ¶¶ 17, 19, 21-22, 29. For the stores with inventory in stock, no conclusion can be drawn regarding the general quantity, type, or desirability of the available firearms.

17

**App. 810**

Professor Cramer also pointed to the 1810 "haphazard and incomplete" manufacturing census, showing that there were "117 'Gun manufactories' in the U.S., 37 gunsmiths (a severe undercount . . .), and 42,853 firearms manufactured." *Id.* ¶ 35. His analysis of this data states that "[t]he *minimum* 1810 U.S. production rate was 592 guns per 100,000 people" and, "[b]y comparison, in 1969, U.S. production and importation of firearms was 2,605 guns per 100,000 people." *Id.* ¶ 37. Without additional evidence, he goes on to state: "The 1810 manufacturing census is unquestionably incomplete in a way that the 1969 manufacturing records are not; it is likely that the *actual* number of guns manufactured in 1810 would raise the per capita rate close to 1969 levels." *Id.* ¶ 37. I find this latter opinion to be unsupported, only marginally relevant, and inconsistent with the record, including the statement from Professor Cramer's own Declaration that, "[d]espite the growth of large industrial facilities for the manufacture of arms in the post Civil War era, the cottage industry remained a primary source of weapons until well after 1870." *Id.* ¶ 39 (quoting James Whisker, The Gunsmith's Trade 67 (1992)). Ultimately, the opinions of Professors Spitzer and Cramer are credible and establish that individuals in the Founding Era would not have understood the purchase of firearms to include a right to receive a firearm without any delay.

Plaintiffs point to a handful of cases they claim support their argument that the purchase of a firearm is covered by the Second Amendment. These decisions predate *Bruen*, rely on cases predating *Bruen*, and/or conduct no analysis of the text. *See, e.g.*, *Miller v. Bonta*, No. 19-cv-01537 BEN (JLB), 2023 WL 6929336, at *6, 8 (S.D. Cal. Oct. 19, 2023) (relying on *Renna v. Becerra*, 535 F. Supp. 3d 931, 940 (S.D. Cal. 2021), and *Teixeira v. Cnty. of Alameda*, 837 F.3d 670, 677 (9th Cir. 2017 (en banc), but later concluding: "Plaintiffs are law-abiding citizens who want to possess (or keep) and carry (or bear), firearms like the AR-15 rifle that are commonly-

18

owned for lawful purposes. The conduct is covered by the plain text of the Second

Amendment."); *McRorey v. Garland*, No. 7:23-cv-00047-O, 2023 WL 5200670, *3 (N.D. Tex.

Aug. 14, 2023) (finding "Plaintiffs have sufficiently shown that their conduct is covered by the

Second Amendment" without performing an analysis of the plain text); *Connecticut Citizens Def.*

*League, Inc. v. Thody*, No. 3:21-cv-1156 (OAW), 2023 WL 2687446, *12 (D. Conn. Mar. 28,

2023) (dismissing as moot the plaintiffs' claim for "declaratory judgment confirming that they

have an individual right to 'obtain, possess, and carry firearms'" because, "[i]n *Bruen*, the

Supreme Court held that the Second Amendment's plain text guarantees to individuals a right to

carry a firearm in public for self-defense," and "grant[ing] a declaratory judgment confirming an

individual right to carry would be to reiterate what the Supreme Court of the United States

already has found"). Moreover, the Supreme Court has made clear that "[c]ourts are . . . entitled

to decide a case based on the historical record compiled by the parties." *Bruen*, 142 S. Ct. at

2130 n.6

      The record presently in front of me conclusively shows that the plain text of the Second

Amendment does not cover the conduct at issue, and consequently, Plaintiffs have not

demonstrated they are likely to succeed on the merits of their claims.

### 2.  Presumptive Lawfulness of Commercial Sale Regulations

      This conclusion is reinforced by the fact that the Waiting-Period Act regulates the

commercial sale of firearms. As stated in *Heller*, "laws imposing conditions and qualifications on

the commercial sale of arms" are "presumptively lawful." *Heller*, 554 U.S. at 626–27 and n. 26;

*see also McDonald*, 561 U.S. at 786 (confirming that it was not casting doubt on these regulatory

measures); *Bruen*, 142 S Ct. at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.)

**App. 812**

(quoting *Heller*, 554 U.S. at 626−627, and n.26). The Court, in *Heller*, indicated that there is a historical justification for that presumption. *Heller*, 554 U.S. at 635. It is not immediately clear whether that historical justification would be based on a determination that the plain text of the Second Amendment does not cover the conduct or on a finding that laws imposing conditions or qualifications on the commercial sale of firearms are consistent with the Nation's historical tradition of firearm regulation. Some courts have understood the presumption to be warranted because the conduct is not covered by the plain text of the Second Amendment. *See, e.g.*, *United States v. Price*, 635 F. Supp. 3d 455, 459 (S.D. W. Va. 2022) ("This makes sense because commercial regulations that apply only to manufacturers and sellers do not implicate an individual's right of possession."); *United States v. Marique*, 647 F. Supp. 3d 382, 385 (D. Md. 2022) (quoting *Price*, 635 F. Supp. 3d at 459). I am inclined to agree and, for that reason, view the presumption as supporting my analysis of the plain text above.

*Bruen* did not call into question that some regulatory measures are presumptively lawful, as first indicated in *Heller*. In fact, in *Bruen*, the Court adopted similar guidance for "shall-issue" licensing regimes, noting that nothing in its "analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which a general desire for self-defense is sufficient to obtain a [permit]." 142 S. Ct. at 2138 n.9 (internal quotation marks and citation omitted). The Court reasoned:

> Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry. [*Heller*, 554 U.S. at 635]. Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' *Ibid.* . . . That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry."

**App. 813**

*Id.* The Court implied these "shall-issue" regimes are constitutional unless they are abusive, which resembles the presumption articulated in *Heller*.

The Tenth Circuit's recent opinion in *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023), also lends support for the conclusion that *Heller*'s presumptively lawful measures withstood *Bruen*. In *Vincent*, the Tenth Circuit found *Bruen* "didn't appear to question the constitutionality of longstanding prohibitions on possession of firearms by convicted felons." *Id.* at 1201. The Tenth Circuit ultimately held in *Vincent*, *id.* at 1202, that "*Bruen* did not indisputably and pellucidly abrogate" its earlier precedential opinion in *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009), which concluded that the federal ban on felons' possession of firearms was constitutional based on the language in *Heller*.[10] The assessment in *Vincent* applies equally to the other categories of presumptively lawful regulations identified in *Heller*, including laws imposing conditions and qualifications on the commercial sale of arms.

Colorado's Waiting-Period Act regulates only the sale, and specifically sellers, of firearms. *See* Colo. Rev. Stat. § 18-12-115(1). The Act does not apply to anyone who does not "sell[] a firearm." *See* Resp. to Mot. for Prelim. Inj. at 8 (quoting Colo. Rev. Stat. § 18-12-115(1)(a)). Because it imposes a condition on the commercial sale of a firearm, the Act is presumptively lawful under *Heller*,[11] and as explained above, Plaintiffs have failed to rebut that

---

[10] In his concurrence in *McCane*, Judge Tymkovich explained that language in *Heller*, although dicta, is binding. *McCane*, 573 F.3d at 1047 (Tymkovich, J., concurring).

[11] Plaintiffs find this to be "silly" and an "absurd proposition." Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 9-10. They posit that, if waiting-period laws constitute regulations on the commercial sale of firearms that are presumptively lawful, states would be authorized to enact 100-year waiting periods. *Id.*, ECF No. 21 at 10. But, by "presumptively lawful," the connotation is plain: it is a presumption, not a guarantee. Abusive regulations may still be subject to constitutional challenges.

**App. 814**

presumption by demonstrating that the plain text of the Second Amendment covers the immediate receipt of a purchased firearm.

### 3. Nation's Historical Tradition of Firearm Regulation

Even if the plain text of the Second Amendment were implicated, however, I find, on the record before me, that the Waiting-Period Act would not violate the Constitution. When the Second Amendment covers the at-issue conduct, the state must justify the regulation "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. As Plaintiffs repeatedly emphasized and the Supreme Court has made clear, the constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 2156 (quoting *McDonald*, 561 U.S. at 780). Instead, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626); *see also Heller*, 554 U.S. at 595 ("Of course the right was not unlimited, just as the First Amendment's right of free speech was not.").[12]

---

[12] As Judge Wood explained in comparing limitations on the First Amendment in her dissent in *Atkinson v. Garland*:

> The Second Amendment's history and tradition are steeped in a rich regulatory background. For what it is worth, I would say exactly the same thing about the First Amendment, which the Court has often equated to the Second Amendment. Although Justice Hugo Black was famous for taking a strict view of the First Amendment, insisting that the words "NO LAW" with which it begins meant literally "NO LAW," the truth is that the First Amendment has always been circumscribed by limiting principles. The Supreme Court understands that a person cannot shout "FIRE" in a crowded theater, see *Schenck v. United States*, 249 U.S. 47 (1919); that "fighting words" are not protected, see *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942); that a person who credibly issues a verbal threat to kill the President may be prosecuted, see *Rankin v. McPherson*, 483 U.S. 378 (1987); that obscenity and child pornography do not qualify as protected speech,

**App. 815**

Because, as the parties agree, no law requiring a waiting period was enacted in the United States until 1923, I must consider "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Bruen*, 142 S. Ct. at 2131-32 (quoting *Heller*, 554 U.S. at 631). *Bruen* explained this inquiry as follows:

> In some cases, [it] will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

> * * *

> [O]ther cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution—and a Second Amendment— "intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch v. Maryland*, 4 Wheat. 316, 415, 4 L.Ed. 579 (1819) (emphasis deleted). Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.

> * * *

> [H]istory guide[s] our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a

---

see *Miller v. California*, 413 U.S. 15 (1973) (obscenity), *New York v. Ferber*, 458 U.S. 747 (1982) (child pornography); and that the First Amendment did not totally displace common-law libel and slander, see *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).

70 F.4th 1018, 1029–30 (7th Cir. 2023) (Wood, J., dissenting).

distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar." C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993). And because "[e]verything is similar in infinite ways to everything else," *id.*, at 774, one needs "some metric enabling the analogizer to assess which similarities are important and which are not," F. Schauer & B. Spellman, Analogy, Expertise, and Experience, 84 U. Chi. L. Rev. 249, 254 (2017). For instance, a green truck and a green hat are relevantly similar if one's metric is "things that are green." See *ibid.* They are not relevantly similar if the applicable metric is "things you can wear."

While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense. As we stated in *Heller* and repeated in *McDonald*, "individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald*, 561 U.S. at 767, 130 S.Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783); see also *id.*, at 628, 128 S.Ct. 2783 ("the inherent right of self-defense has been central to the Second Amendment right"). Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are " '*central*' " considerations when engaging in an analogical inquiry. *McDonald*, 561 U.S. at 767, 130 S.Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783).

To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson*, 9 F.4th 217, 226 (CA3 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* at 2131-33 (footnote omitted).[13]

---

[13] While I perform the analysis as instructed, I have reservations that turning to a particular historical era should dispositively determine how we conceive of and defend certain rights. The first is practical; I am a judge and not an historian. *See Atkinson*, 70 F.4th at 1028–29 (Wood, J., dissenting) ("Only a professional historian would know how to evaluate often-conflicting claims about the social, cultural, and legal landscape of an earlier period, and that person likely would not jump to any conclusions without devoting significant time to an evaluation of original sources."). The second is that this approach can be self-defeating. Since *Bruen* instructs me to consider the historical evidence the parties present and argue, it is not inconceivable that the parties would present historical accounts inconsistent with the holdings of *Bruen*, *Heller*, or

*An Unfamiliar Problem*

Plaintiffs argue that this is a straightforward case like *Heller* and *Bruen* since "the problem of impulsive gun violence dates from the invention of guns." Mot. for Prelim. Inj. at 8. They claim that the "complete absence of similar Founding-era regulations addressing a problem that was familiar to the Founders means the []Act is 'inconsistent with the Second Amendment.'" *Id.* at 9 (quoting *Bruen*, 142 S. Ct. at 2131). The Governor has shown, however, that impulsive gun homicide was not prevalent during the Founding Era or Early National Period and that instituting waiting periods would not have been a logical measure until at least the end of the nineteenth century.

Professor Roth persuasively opined that "[p]ublic officials today are confronting a criminological problem that did not exist in the Founding Era, nor during the first century of the nation's existence." Roth Decl. ¶ 48. Professor Roth explained:

> In the eighteenth century, . . . . laws restricting the use or ownership of firearms by colonists of European ancestry were rare, for two reasons. First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in

_____

*McDonald. See Bruen*, 142 S. Ct. at 2130 n.6 ("Courts are . . . entitled to decide a case based on the historical record compiled by the parties."); *see also* Stephen R. Munzer and James W. Nickel, *Does the Constitution Mean What It Always Meant?*, 77 Colum. L. Rev. 1029, 1033 (1977) ("[I]t should be noted that there is a special danger in allowing a controversial case to turn on an historical claim if the claim is not beyond dispute. Since good historical research is not within the competence of most judges, the antecedent probability of mistakes is high. This increases the chances that professional historians will challenge and refute the Court's reading of history, thus undermining the basis, or ostensible basis, for the decision."). There are other reasons to disfavor this approach, but the last I will note is that it presupposes the success—let alone consensus—that the Founders held during America's fledgling years as a new nation. *See* Larry D. Kramer, *The Supreme Court 2000 Term Foreword: We the Court*, 115 Harv. L. Rev. 4, 12 (2001) ("The American people learned a great deal during the early years of their Republic--including that many of their most cherished beliefs and firmly held ideas were either wrong or unworkable (which makes one wonder why any sensible person, even a lawyer, would privilege the speculative writings of the 1780s over the hard-earned experience of subsequent decades."). With those concerns in the background, I don my historian hat and endeavor to follow the standard as prescribed.

25

patriotic fellow feeling within the British empire, and greater trust in government.
. . . Second, the impact of firearms on the homicide rate was modest, even though
household ownership of firearms was widespread.

*Id.* ¶¶ 14-15 (footnotes omitted). Regarding waiting-period laws specifically, Professor Spitzer

reasoned that they did not exist because, in addition to the low homicide rates and use of firearms

for homicide in the colonies, "[r]apid, convenient gun sales processes did not exist in the U.S.

until the end of the nineteenth century," and "no organized system of gun background checking

could feasibly exist until the modern era." Spitzer Decl. at 4-5.

The Governor emphasizes that waiting-period laws were unnecessary before the early

twentieth century "because a waiting period inherent in the acquisition of firearms already

existed for many Americans." Resp. to Mot. for Prelim. Inj. at 16.  As was discussed above, I

find the opinions of Professors Roth and Spitzer on the availability of firearms for purchase

throughout the Nation's history to be compelling. Even after ordering firearms via postal mail

became possible in the 1870s and 1880s, purchasers still had to wait several days before

receiving them. *See* Spitzer Decl. at 4-5; Prelim. Inj. Hr'g Tr. at 75-76. In contrast, "in the

modern era, gun and ammunition purchases can be made easily and rapidly from tens of

thousands of licensed gun dealers, private sales, gun shows, and through internet sales." Spitzer

Decl. at 4, ECF No. 18-3 (footnote omitted).

I am likewise persuaded by Professor Roth's research on homicide rates and his opinion

that homicide rates during the late Colonial Period into the early National Period were fairly low

compared to today's rates. Prelim. Inj. Hr'g Tr. at 118, 120. Professor Cramer challenged

Professor Roth's conclusions. However, his discussion was based on data from Professor Roth's

**App. 819**

book or his submissions in other cases, not his Declaration in this case. *See* Cramer Decl. ¶¶ 63-64, 124-25, 135; Prelim. Inj. Hr'g Tr. at 52-53.[14]

Of the relatively small number of homicides committed in the late Colonial Period into the early National Period, Professor Roth determined that only 10 to 15 percent of both domestic and nondomestic homicides were committed with a firearm. Roth Decl. ¶ 15; Prelim. Inj. Hr'g Tr. at 119. He offered an explanation for why this was the case:

> Firearm use in homicides was generally rare because muzzle-loading firearms, such as muskets and fowling pieces, had significant limitations as murder weapons in the colonial era. They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology; and with the exception of

_____

[14] Professor Cramer additionally sought to undermine Professor Roth's opinion that the United States has become by far the most homicidal society in the Western world since the nineteenth century. In his Declaration, Professor Cramer stated: "In 2019, the U.S. had a reported murder rate of 5.0/100,000. Because 73.7% of U.S. murders are committed with firearms, this suggests that the actual U.S. murder rate (after adjusting for firearms murders initially reported as, but later determined not to be, murder) is really 3.72/100,000." Cramer Decl. ¶ 128. Professor Cramer indicated that his calculation is of the adjusted "U.S. murder rate" and then compared his calculated rate to the rates from certain European countries (including Ukraine, Latvia, Lithuania, Moldova, and Montenegro). *Id.* ¶¶ 128-29. Professor Cramer did not show his work, but from the information he provided, his analysis seems unsound. There are three variables in his equation for adjusted "U.S. murder rate": the 2019 U.S. reported murder rate (5.0/100,000), the 2019 percentage of those homicides in which firearms were used (73.7%), and a 1989 percentage of the firearms-related homicides that were "justifiable or excusable" (6%). If one multiplies these anachronistic values, the result is the supposed rate of justifiable, firearms-related homicides, or 0.22 per 100,000 people. If that number is subtracted from the U.S. reported murder rate, the result is the actual U.S. murder rate (with all weapons or means and not including justifiable, firearms-related homicides), or 4.78 murders per 100,000 people. That number could be used to compare with the murder rates in other countries (although it would still contain justifiable or excusable murders perpetrated without a firearm). In contrast, if one is seeking the U.S. firearms-related murder rate (not including justifiable, firearms-related homicides), one would multiply the first two inputs above together, but instead of using 6% for the third, would substitute 94%. The result would be 3.68 murders per 100,000 people. Absent some showing of arithmetic or other methodology, I cannot ascertain how Professor Cramer arrived at a "U.S. murder rate" of 3.72 per 100,000 people or how he determined that representation is analogous to the overall murder rate from other countries. It appears he did not compare apples to apples, and this discrepancy, among others, calls into question his opinions. Additionally, Professor Roth explained that the Federal Bureau of Investigation statistics cited by Professor Cramer are unreliable because there are "tremendous gaps" in the reporting records. Prelim. Inj. Hr'g Tr. at 120.

a few double-barreled pistols, they could not fire multiple shots without reloading. They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat. They had to be reloaded manually to enable the firing of another shot, which was a time-consuming process that required skill and experience. And more important, muzzle-loading firearms could not be used impulsively unless they were already loaded for some other purpose. It took at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand.

Roth Decl. ¶ 16 (footnotes omitted); *see also* Prelim. Inj. Hr'g Tr. at 122-23. Professor Roth described how, in certain periods and locations in the U.S., homicide rates increased and the proportion of homicides committed with firearms increased as well. Roth Decl. ¶ 18 ("When homicide rates were high among unrelated adults in the early and mid-seventeenth century, colonists went armed to political or interpersonal disputes, so the proportion of homicides committed with firearms was at that time 40 percent and rose even higher in contested areas on the frontier." (footnotes omitted)). He clarified that homicides of Native Americans and enslaved persons also frequently occurred with firearms. *Id.* But Professor Roth stated: "Otherwise, . . . colonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training." *Id.*

Professor Roth commented that weapons were often kept unloaded, but he qualified this general trend by noting that people who lived on the frontier where there was a constant threat of attack "tried to keep [firearms] loaded as long as they could, and they put [them] in the driest, warmest place they could, over the mantle, to have [them] ready." Prelim. Inj. Hr'g Tr. at 122-23. Professor Cramer disagreed that individuals generally kept firearms unloaded. He cited anecdotal evidence of four people who died accidentally from firearms being kept loaded, as well as a 1782 Massachusetts fire-prevention statute that provided any loaded firearms kept inside could be seized. Cramer Decl. ¶¶ 66-73, 149-56. The statute cuts both ways. It seems to indicate that in

28

**App. 821**

some locales, individuals were required to keep their firearms unloaded, and thus were less likely to use them for impulsive homicides. In any event, Professor Cramer's scant evidence is insufficient to call into doubt Professor Roth's well-reasoned opinion.

Professor Cramer also sought to contradict Professor Roth's opinions regarding the availability of repeating firearms and the accuracy of firearms during the Founding Era. Professor Cramer stressed that pepperboxes, an early multi-shot firearm, existed by the end of eighteenth century, and individuals would carry a brace of pistols, meaning a pair of pistols, that they could use in succession. *Id.* ¶¶ 74, 146; Prelim. Inj. Hr'g Tr. at 54-55, 58. He could not provide information on how common pepperboxes were, though. *Id.* at 84. Professor Roth testified that they were very rare and that he could not think of a single homicide he had studied that was committed with a pepperbox. *Id.* at 132-33. Regarding the accuracy of firearms at the time, Professor Cramer pointed to the capabilities of riflemen in the Revolutionary era. Cramer Decl. ¶¶ 139-145. Professor Roth did not deny the accuracy of rifled muskets but noted that few people actually had them. Prelim. Inj. Hr'g Tr. at 130. He acknowledged, though, that the firearms generally possessed were accurate enough to be lethal at short range. *Id.* at 131.

Overall, the evidence shows that firearms were not as readily available for purchase and that impulsive gun homicides were much less prevalent at the time of the founding and in the century that followed. Thus, it is logical that waiting-period laws were not adopted during that period. Professors Roth and Spitzer also make a strong case that, as firearm technology and production progressed and gun violence increased, laws regulating firearms, including waiting-period laws, were enacted in response.[15]

---

[15] *See* Roth ¶ 34 ("[T]he proportion of homicides committed with firearms—overwhelmingly, concealed revolvers—reached today's levels by the 1920s, ranging from a median of 56 percent in New England and over 70 percent in the South and West. And that is why every state in the

29

**App. 822**

Since the Waiting-Period Law is a "modern regulation[] that w[as] unimaginable at the founding," I must reason by analogy and "determin[e] whether a historical regulation is a proper analogue" for, or "relevantly similar" to, the Act. *Bruen*, 142 S. Ct. at 2133. In doing so, I focus on "how and why the regulations burden a law-abiding citizen's right to armed self-defense," and look for a "historical analogue"—not a "twin." *Id.* The Governor and Professor Spitzer point to two types of historical analogues: laws involving intoxicated persons and licensing regimes.

*Laws Related to Intoxication as Analogues*

The aim of the Waiting-Period Act is to "help prevent impulsive acts of firearm violence, including homicides and suicides." H.B. 23-1219, 74th Gen. Assemb., Reg. Sess. (Colo. 2023). The Governor alleges that "[s]tates have long regulated the possession, use, and sales of arms to intoxicated persons, laws which are designed to avoid such impulsive violence." Resp. to Mot. for Prelim. Inj. at 14. Professor Spitzer opined that "old intoxication laws avoided or thwarted 'heat of the moment' gun acquisition or use by the intoxicated, when they would be much more likely to act rashly, impulsively, and with diminished judgment" and those purposes "mimic the purpose of modern waiting periods." Spitzer Decl. at 6.[16] In Professor Spitzer's view, laws

---

Union restricted the right to carrying certain concealable weapons."); *id.* ¶ 47 ("Because of the threats these new technologies posed for public safety, public officials widened their regulatory focus beyond concealed and concealable weapons. States began imposing waiting period laws to prevent individuals from acquiring firearms in a fit of anger."); Spitzer Decl. at 4-5 ("The rise of handgun mail order purchasing through such companies as Montgomery Ward and Sears in the 1870s and 1880s brought cheap handguns to buyers' doors. When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous anti-gun carry restrictions in the late 1800s and early 1900s.).

[16] Professor Cramer calls the comparison between intoxication regulations and the Act a "warped analogy." Prelim. Inj. Hr'g Tr. at 41. He takes issue with Professor Spitzer's insinuation that gun purchasers might act "rashly, impulsively, and with diminished judgment." Cramer Decl. ¶¶ 109-11. Professor Cramer asks: "What evidence is there that purchasing a firearm is done 'rashly, impulsively, and with diminished judgment . . .'? I know that I have never done so." *Id.* ¶ 111.

**App. 823**

pertaining to firearms and intoxication mimicked waiting periods because they "interrupt[ed] gun access only temporarily, as is the case with waiting periods." *Id.*

The Governor, through Professor Spitzer, provided the following laws as relevant, historical examples of regulations pertaining to firearms and intoxication.[17]

- In 1623, 1631, and 1632, Virginia enacted measures "directing that '[n]o commander of any plantation, shall either himself or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments.'" *Id.* at 9; Exhibit C: Intoxication/Weapons Laws at 34.

- In 1655, a Virginia law made individuals subject to fines for "'shoot[ing] any guns at drinking,' though the law carved out two special occasions for regulatory exemption: 'marriages and funerals only excepted.'" Spitzer Decl. at 9-10; Exhibit C: Intoxication/ Weapons Laws at 34.[18]

- In 1868, Kansas passed a law stating:

  > Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other

_____

But Professor Cramer misunderstands Professor Spitzer's argument. It is not about an individual's state of mind when the gun is purchased; it is about his or her state of mind if or when the firearm is later used. Similarly, the implication is not that an intoxicated individual impulsively purchases a firearm; it is that the intoxicated individual would impulsively use the firearm.

[17] Professor Cramer generally criticizes Professor Spitzer for not including the full text of the statutes referenced and for inaccurately citing them, *see* Cramer Decl. ¶¶ 86, 88, 91, 95, 96, but Professor Spitzer included as exhibits to his Declaration lists of the text of the statutes he references, *see* Exhibit C: Intoxication/Weapons Laws; Exhibit E: License & Licensing Laws. Professor Cramer admits he did not review the exhibit to Professor Spitzer's Declaration containing the intoxication and weapons laws. Prelim. Inj. Hr'g Tr. at 77-78.

[18] Professor Cramer testified that the 1655 law was related to protecting the colonists' system for warning of attacks by Native Americans, Prelim. Inj. Hr'g Tr. at 43, but I do not see how that undercuts the fact that the law regulates the use of firearms in circumstances in which individuals were thought to be more disposed to shoot their guns.

**App. 824**

deadly weapon, shall be subject to arrest upon the charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.

*Id.* at 6.[19]

- In 1878,[20] Mississippi enacted a measure making it unlawful to "sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described [pistols, various knives etc.], or any pistol cartridge . . . ." *Id.* at 10-11. The state enacted similar laws in 1880 and 1908. *Id.* at 11-12.

- In 1883, a Wisconsin law made it "unlawful for any person in a state of intoxication to go armed with any pistol or revolver." *Id.* at 35-36.

- In 1879, Missouri passed a law stating:

    "If any person . . . shall have or carry [any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon] upon or about his person when intoxicated or under the influence of intoxicating drinks, . . . he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

---

[19] Professor Cramer claims in relation to the Kansas statute that "[e]xamining the actual primary source shows that Spitzer has misrepresented the statute." Cramer Decl. ¶ 97. Professor Cramer points instead to an 1865 Kansas prohibition statute and emphasizes that it is not about firearms. *Id.* ¶¶ 97-98. But Professor Cramer is the one who misrepresents the statute. Professor Spitzer's text is correct, and it is a statute criminalizing the carrying of a pistol or other deadly weapon while under the influence of intoxicating drink. *See An Act to prevent the carrying of Deadly Weapons*, 7th Legislature, Reg Session 25, § 2 (Kan. 1867).

[20] Although Professor Cramer insists that all post-1868 evidence is irrelevant under *Bruen, see, e.g.*, Cramer Decl. ¶ 99; Prelim. Inj. Hr'g Tr. at 47, the Supreme Court has instructed that this evidence may be considered unless it conflicts with earlier evidence, *see Bruen*, 142 S. Ct. at 2127-2128; 2136-37, 2154, and n.28. Nothing in the record indicates the later regulations here conflict with any earlier tradition.

32

*Id.* at 13. The state enacted a similar statute in 1883, *id.* at 14, and several other like regulations were adopted by counties, cities, and towns in Missouri before the turn of the century, *id.* at 13-16; Spitzer Decl. at 12.

- In 1888, a law in Maryland provided:

  > Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, . . . and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found . . . .

  Exhibit C: Intoxication/Weapons Laws at 7.

- In 1893, Rhode Island enacted a similar statute that made a person subject to fines and penalties if arrested "for being drunk or disorderly" and found to "have concealed upon his person any of the weapons mentioned." *Id.* at 32.[21]

These measures are sufficient to show that our Nation had a historical tradition of regulating the carrying and use of firearms by intoxicated individuals. Plaintiffs do not seem to dispute this determination, but instead focus on whether those regulations are "relevantly similar" to the Waiting-Period Act. *See Bruen*, 142 S. Ct. at 2132. For the purposes of this proceeding, I hold that they are.

Plaintiffs contend the "why" justifying those regulations and "how" their aims are accomplished differ from those of the Waiting-Period Act. Plaintiffs assert: "[E]very person to

---

[21] The Governor also cites measures limiting the sale of alcohol near armed militiamen that he alleges were enacted "to avoid impulsive violence by armed men." Resp. to Mot. for Prelim. Inj. at 14. I am not persuaded that these regulations are proper analogues because they do not involve the regulation of firearms.

**App. 826**

whom the Act applies has *passed* a background check and is therefore presumably not a threat to anyone. That is, after all, the purpose of background checks." Mot. for Prelim. Inj. at 9. Plaintiffs' assumption is not a given. Indeed, in this case, there was testimony that pre-purchase background checks for firearms may have no statistically significant effect on reducing gun violence. *See* Prelim. Inj. Hr'g Tr. at 217-18. I am not suggesting that all individuals who seek to purchase a firearm are a threat. But the Waiting-Period Act and the intoxication laws both work to prevent individuals in a temporary impulsive state from irresponsibly using a firearm. They "impose a comparable burden on the right of armed self-defense." *Bruen*, 142 S. Ct. at 2133.

Plaintiffs are adamant that "a law specifically targeted at an obviously dangerous situation is not analogous to a law that sweeps up everyone." Mot. for Prelim. Inj. at 10; Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 19. Perhaps the state could impose a more narrowly tailored requirement, but that is not the inquiry here. The intoxication laws prevented *all* individuals from becoming intoxicated and engaging in the prohibited conduct. They did not apply only to those people who would have certainly used a firearm irresponsibly while intoxicated. Despite Plaintiffs' arguments, the "how" and the "why" of the intoxication laws and the Waiting-Period Act are sufficiently similar to demonstrate that the Act is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

*Licensing as an Analogue*

In addition, Professor Spitzer details the longstanding history of firearm licensing regimes in the United States and contends "historical licensing and permitting laws did, and do, operate in a manner similar to modern waiting periods." Spitzer Decl. at 15. I find that, although these licensing laws are not implemented in the same way that a waiting period is, they are a

34

secondary, but proper, analogue because they support that the Founders and Reconstruction generation would have accepted a modest delay on the delivery of a firearm in order to ensure that those receiving a firearm are law-abiding, responsible citizens.

Because the Supreme Court in *Bruen* indicated that there is a sufficient historical basis for "shall-issue" licensing regimes, I do not detail the history of the Nation's licensing laws here. *See* 142 S. Ct. at 2138 n.9. Waiting periods are similar to "shall-issue" licensing regimes in that they require that an action be taken—delivery of the purchased firearm—after a defined requirement is met—the passage of at least three days. Additionally, waiting-period laws, like "shall-issue" licensing laws, "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right[s]." *Id.* (quoting *Heller*, 554 U.S. at 635). The Court in *Bruen*, noted that "shall-issue" licensing regimes are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). That is the purpose of Colorado's Waiting-Period Act. The Act provides time for a background check to be completed. *See* Colo. Rev. Stat. § 18-12-115(1)(a) (defining the waiting period as the longer of "[t]hree days after a licensed gun dealer has *initiated* a background check" or until "[t]he seller has obtained approval for the firearm transfer from the bureau after it has completed any background check required by state or federal law" (emphasis added)). And the waiting period works to ensure that the individual to whom the firearm is delivered is a "responsible citizen." *See, e.g.*, Prelim. Inj. Hr'g Tr. at 201 (evincing that "imposing a handgun waiting period results in about a 17 percent reduction in gun homicides, and a 7 to 11 percent reduction in gun suicides").

The Court in *Bruen* did not rule out "constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny

**App. 828**

ordinary citizens their right to public carry." *Bruen*, 142 S. Ct. at 2138 n.9. The record is devoid

of any evidence that the waiting period here is being "put toward abusive ends." 142 S. Ct. at

2138 n.9.

In *Bruen*, the Court "acknowledge[d] that 'applying constitutional principles to novel

modern conditions can be difficult and leave close questions at the margins.'" 142 S. Ct. at 2134

(quoting *Heller*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). This is not a

straightforward case—during the Founding Era and the century that followed, firearm access and

technology, along with violent crime, was drastically different and a waiting period for firearm

purchases would have been unnecessary. With that in mind, evaluation of the analogues

presented is unsurprisingly difficult. Nonetheless, I find the Governor has provided a sufficient

record to conclude that our Nation's historical tradition of firearm regulation is consistent with

the Waiting-Period Act.

In sum, Plaintiffs have failed to show that they are likely to succeed on the merits of their

claims because the record before me establishes the Second Amendment does not cover the at

issue conduct, the Act is presumptively lawful, and even if the Act implicated the Second

Amendment, the Nation's historical tradition of firearm regulation would permit it.


**B. Irreparable Harm**

Plaintiffs also fail to demonstrate that they will experience irreparable harm if the

injunction is denied. Because I find they have not shown they are likely to succeed on the merits

**App. 829**

of their claims, the potential violation of their Second Amendment rights does not establish they will be irreparably harmed absent issuance of the injunction.[22]

Regarding specific harms, the named individual Plaintiff—Ms. Garcia—testified that the firearm waiting period impacted her in two ways. First, she was unable to conduct her business as a firearms instructor and range safety officer because she spent the better part of a day driving to a specific firearms vendor several hours away.[23] Second, she reserved and paid for travel and lodging for a shotgun shoot in Virginia, which she is now not going to attend because she could not obtain a new shotgun in time. Prelim. Inj. Hr'g Tr. at 21. The event would have been "very, very important and impactful to [her] career" because it would have been the first time a big production would have had her name on it and would have given her exposure to people in the industry. *Id*. at 21-22. Taylor Rhodes, the Executive Director of RMGO, echoed Ms. Garcia that the waiting period imposes a "massive burden on certain people that want to give businesses around the state business." *Id*. at 32. He also described how he, a member of RMGO, had recently purchased a firearm, and because he was traveling when the waiting period expired, he was unable to pick up his firearm for about eight days. *Id.* at 30-33. Neither Ms. Garcia nor Mr. Rhodes testified that they or any RMGO members would be unable to defend themselves due to

---

[22] I recognize that the Tenth Circuit has, in recent history, used broad language presuming irreparable harm when any constitutional violation is found. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019) ("What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial. Any deprivation of any constitutional right fits that bill."). And, while at least one Court of Appeals has specifically found irreparable harm should be presumed for Second Amendment violations as it often is for First Amendment violations, *see Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011), I am not so sure, especially where, as here, the record is not clear on the extent to which the "central component" of the Second Amendment—self-defense—would be implicated, *see Bruen*, 142 S. Ct. at 2133.
[23] On cross-examination, Plaintiff Garcia disclosed the probable existence of alternative, closer firearms vendors. Prelim. Inj. Hr'g Tr. at 25-26.

**App. 830**

the waiting period. Ms. Garcia's possession of numerous other firearms (ten to twenty by her account) supports the inference that her ability to defend herself with a firearm would not be hampered by the waiting period. *See id.* at 23-24.

As the Supreme Court has repeatedly emphasized, "individual self-defense is 'the central component' of the Second Amendment." *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. at 767); *see also Heller*, 544 U.S. at 599. Plaintiffs have alleged no harm associated with the right of self-defense.[24] The harm alleged by Ms. Garcia pertains only to her time and business opportunities. Here, those are quintessential compensable harms, i.e, not irreparable. Plaintiffs have not demonstrated they will suffer irreparable injury if the injunction is denied.

## C. Balance of Harms and the Public Interest

The last factors to be considered in evaluating a request for a preliminary injunction are the so-called "balance of harms"—whether the threatened injury to the movant outweighs the injury facing the opposing party under the injunction—and the public interest. Generally, when the government opposes a motion for a preliminary injunction, the public interest and the harm to the government merge such that the harms to be balanced are the threatened injury to the plaintiff and the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

In its Motion, Plaintiffs' analysis of the balance of harms and public interest focuses exclusively on how the State does not have any "interest in enforcing a law that is likely

---

[24] Plaintiffs' Reply in Support of their Motion cites hypothetical "situations where a purchase [sic] knows that an imminent confrontation may occur" to justify interpreting the Second Amendment to require that individuals be able to obtain firearms without delay. Reply in Supp. of Mot. for Prelim. Inj., ECF No. 21 at 13. Plaintiffs presented no evidence that related harm would exist or the extent to which it would exist as a consequence of the waiting period being in place.

38

constitutionally infirm." Mot. for Prelim. Inj. at 15 (quoting *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010)). Plaintiffs' approach has two problems. The first is that I already found Plaintiffs have failed to demonstrate the Waiting-Period Act is constitutionally infirm. The second is that it is a reductive interpretation of the law[25] and allots me no discretion to observe how the parties might be affected by the granting or absence of urgent court intervention.[26]

Conversely, the Governor made efforts to illustrate the concrete public interest at stake: citizens' lives. He presented expert testimony from Professor Poliquin based on an empirical study he authored that was published in a peer-reviewed journal.[27] Professor Poliquin's study

---

[25] Reducing the analysis for preliminary injunctions into a simple inquiry on the merits is antithetical to the equitable nature of such relief. As I quoted at the hearing:

> "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims."

*Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944), *see also Lemon v. Kurtzman* 411 U.S. 192, 200 (1973) ("In constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable."); *Brown v. Board of Education*, 349 U.S. 294, 300 (1955) ("Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.")

[26] In *Bruen*, the Supreme Court stated: "The Second Amendment 'is the very product of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 142 S. Ct. at 2118 (quoting *Heller*, 554 U.S. at 635). On first glance, it might seem that statement dictates the outcome for any balance of harms analysis where a violation of the Second Amendment is likely. The specific language, however, indicates that the right to use arms *for self-defense* must be implicated, and again, Plaintiffs have presented no related evidence. Moreover, in proceedings in equity, the public interest consideration is that of today's public, not the frozen-in-time interest of the very different society that existed at the time of our Nation's founding.

[27] The value of submitting research for peer review before other specialists in the same field is not lost on me. Indeed, it is an explicit factor in *Daubert* hearings that has helped define the scope of presumed expertise for a proffered witness. *See, e.g.*, *Arkansas River Power Auth. v. Babcock & Wilcox Power Co.*, No. 14-cv-00638-CMA-NYW, 2016 WL 9734684, at *4 (D.

concluded that "imposing a handgun waiting period results in about a 17 percent reduction in gun homicides, and a 7 to 11 percent reduction in gun suicides," which the Governor argued "would translate to over 100 lives saved" during the applicability of a preliminary injunction in this case. Prelim. Inj. Hr'g Tr. at 201, 233. Professor Poliquin's study accounted for multiple different factors, including policy changes across multiple states and demographic variance.

Plaintiffs responded to this evidence through expert testimony of their own.[28] Professor Cramer opined that, based on his review of California crime statistics and state-implemented adjustments to firearm waiting periods, either no causality should be inferred from the correlative increase of murder rate with length of waiting period, or the causal relationship does exist but flows in the opposite direction to what Professor Poliquin concludes. While Professor Cramer admits he is not a statistician and has not received formal training as such, he nevertheless insists that his analysis of California's murder rate against handgun waiting-period length undermines— or "it should certainly make us skeptical" of—claims that a reduction in homicides can be causally attributed to the existence or increased length of firearm waiting periods. Cramer Decl. ¶ 178. Professor Poliquin correctly explained that there are at least two immediate methodological errors made in reaching this conclusion. *See* Prelim. Inj. Hr'g Tr. at 210-12. First, there is no control group used to show the effects of a community adopting a waiting period after not having one. *See id.* at 210-11. And, second, there is no attempt to reckon with other factors that may

---

Colo. Oct. 24, 2016) (noting lesser reliability of "calculations [that] were self-generated and had not been peer -reviewed").

[28] The specific analysis of the Governor's witness, Professor Poliquin, is not directly rebutted by Professor Cramer since the latter did not review the former's work. *See* Prelim. Inj. Hr'g Tr. at 88. However, Professor Cramer did present his analysis on California's waiting period, which he believes suggests a contrary conclusion. *See* Cramer Decl. ¶¶ 176-82.

**App. 833**

influence murder rates in California during the observed period (e.g. national criminal trends) or to quantitatively explain why these factors are not present. *See id.* at 211-12.[29]

Professor Cramer further critiques Professor Poliquin's study by claiming that suicide reduction would be an unlikely result from instituting a waiting period because people intent on killing themselves would find an alternate means if they could not legally procure a firearm. Professor Poliquin testified that, although he "would expect a reduction in gun-related suicides," he was "slightly less confident in that prediction based on the results of [his] study." *Id.* at 213. Nevertheless, the statistical certainty with which Professor Poliquin makes that qualified prediction can be measured, tested, and verified. By contrast Professor Cramer does not support his skepticism with any specific evidence.

With a statistically rigorous study quantifiably illustrating the public safety benefits of a firearm waiting period, I weigh this against the purported harms the Plaintiffs would suffer. Even accepting the harm Plaintiffs describe as entirely true, it is not remotely close. For the sake of

---

[29] Professor Cramer suggests that California is "very nearly a perfect example of a laboratory for waiting period" because interstate firearms trafficking is illegal under 18 U.S.C. § 922 and violence is largely concentrated in urban areas that are far from the state's borders. *See* Cramer Decl. ¶ 175. Again, there are at least two problems here. The first is that he provides no discussion or evidence of how enforcement of anti-trafficking laws has prevented the illegal import of firearms into California. By contrast, his testimony that "most firearms are acquired by felonious practices," such as theft or sales by "unscrupulous gun dealers who are actually violating federal law" would seem to suggest illegal firearm sales pervade America despite legal restrictions. Prelim. Inj. Hr'g Tr. at 48-49. In any event, Professor Cramer cites no data for this contrary proposition either. He does, however, refer to a single incident of mass firearm theft, which ironically took place in Los Angeles County, California. *Id.* at 49. The second problem is that Professor Cramer baldly opines that "most of California's murders happen in a small number of urban counties that are at least six to eight hours driving time from other states," without any further development or corroboration. Cramer Decl. ¶ 175. I am left not knowing if a bare majority of crime occurs in these far-flung urban areas, leaving comparably—albeit measurably less—homicidal rural areas with easy access to out-of-state firearms.

clarity, saving approximately one hundred people in Colorado this year outweighs the aggregate

harm of minimal expenditures of time and sacrificed business opportunities.

## V. CONCLUSION

Accordingly, Plaintiffs have failed to show the applicable factors weigh in favor of

preliminarily enjoining enforcement of the Waiting-Period Act. Their Motion for Preliminary

Injunction (ECF No. 2) is, therefore, DENIED.


DATED this 13th of November, 2023.

_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE

**App. 835**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No. 23-cv-2563-JLK**

ROCKY MOUNTAIN GUN OWNERS, and
ALICIA GARCIA,

      Plaintiffs,

v.

JARED S. POLIS, in his official capacity as Governor of the State of Colorado

      Defendant.

_____

### NOTICE OF APPEAL
_____

      Plaintiffs Rocky Mountain Gun Owners and Alicia Garcia, through undersigned

counsel, hereby appeal, pursuant to 28 U.S.C. § 1292(a)(1), to the United States Court of

Appeals for the Tenth Circuit from the Order of the District Court entered on November 13,

2023 (Doc. 32) denying Plaintiffs' motion for preliminary injunction.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com

*Attorney for Plaintiffs*

**App. 836**

**CERTIFICATE OF SERVICE**

I hereby certify that on December 4, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record:

*/s/ Barry K. Arrington*
_____
Barry K. Arrington

2

**App. 837**

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert                                                    Jane K. Castro
Clerk of Court                                                        Chief Deputy Clerk

December 06, 2023

Brian A. Abbas
Donald Sean Nation
William Edward Trachman
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
80033
Denver, CO 80210

**RE:**      **23-1380, Rocky Mountain Gun Owners, et al v. Polis**
            Dist/Ag docket: 1:23-CV-02563-JLK

Dear Counsel:

Your appeal has been docketed, and the appeal number is above.

**Within 14 days** from the date of this letter, Appellant's counsel must electronically file:

- **An entry of appearance and certificate of interested parties** per 10th Cir. R. 46.1(A) and (D).
- **A docketing statement** per 10th Cir. R. 3.4.
- **A transcript order form or notice that no transcript is necessary** per 10th Cir. R. 10.2. This form must be filed in **both** the district court and this court.

**In addition, all counselled entities** that are required to file a Federal Rule of Appellate Procedure 26.1 disclosure statement must do so **within 14 days of the date of this letter**. All parties must refer to Federal Rule of Appellate Procedure 26.1 and Tenth Circuit Rule 26.1 for applicable disclosure requirements. All parties required to file a disclosure statement must do so even if there is nothing to disclose. Rule 26.1 disclosure statements must be promptly updated as necessary to keep them current.

**App. 838**

**Also within 14 days**, Appellee's counsel must electronically file an entry of appearance and certificate of interested parties. **Attorneys that do not enter an appearance within the specified time frame will be removed from the service list.**

The Federal Rules of Appellate Procedure, the Tenth Circuit Rules, and forms for the aforementioned filings are on the court's website. The Clerk's Office has also created a set of quick reference guides and checklists that highlight procedural requirements for appeals filed in this court.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court


cc:     Michael Kotlarczyk
        Grant Sullivan
        Matthew John Worthington


CMW/jm

**App. 839**