23-1380

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

ROCKY MOUNTAIN GUN OWNERS and ALICIA GARCIA,

Plaintiffs – Appellants,

v.

JARED POLIS, in his official capacity as Governor of the State of Colorado,

Defendant – Appellee,

On Appeal from the United States District Court, District of Colorado
The Honorable John L. Kane
Senior District Judge
District Court Case No. 23-cv-02563-JLK

**APPELLEE'S ANSWER BRIEF**

PHILIP J. WEISER
Attorney General
MICHAEL T. KOTLARCZYK *
Assistant Solicitor General
MATTHEW J. WORTHINGTON*
Assistant Attorney General

Colorado Department of Law
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone: 720-508-6187
E-Mail: mike.kotlarczyk@coag.gov;
matt.worthington@coag.gov
*Counsel of Record

*Attorneys for Governor Polis*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................1

STATEMENT OF THE ISSUES..........................................................2

STATEMENT OF THE CASE..............................................................2

    A. The Waiting Period Act. .........................................................2

    B. Procedural background. ..........................................................4

SUMMARY OF THE ARGUMENT ....................................................8

ARGUMENT ..................................................................................11

  I. Plaintiffs face a heavy burden to reverse the district court's denial of their preliminary injunction. ...............................................................11

  II. The district court did not abuse its discretion when it held RMGO was unlikely to succeed on the merits under *Bruen*. ..........................................14

    A. The plain text of the Second Amendment does not confer a right to immediately acquire firearms. ............................................................16

    B. The Waiting Period Act is a "presumptively lawful" regulation on the commercial sale of arms. ....................................................................23

    C. If the Court reaches the second step of *Bruen*, the Waiting Period Act is analogous to historic regulations of firearms intended to prevent impulsive acts of gun violence...............................................................29

      1. New "societal concerns" and "dramatic technological changes" have created different regulatory challenges the Waiting Period Act is intended to address. .............................................................30

      2. The nation has a long history of regulations targeted at preventing impulsive acts of firearm violence. ....................................................35

  III. The district court did not abuse its discretion in concluding that the other preliminary injunction factors did not support issuing a preliminary injunction...................................................................41

A.   A three-day waiting period does not cause RMGO any irreparable harm. ...................................................................................41

B.   RMGO is not entitled to a preliminary injunction because the public interest is strongly opposed to one. .....................................................43

CONCLUSION...........................................................................................44

STATEMENT REGARDING ORAL ARGUMENT .............................................44

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Am. C.L. Union of Kan. & W. Mo. v. Praeger*,
815 F. Supp. 2d 1204 (D. Kan. 2011)....................................................13

*Attorney Gen. of Okla. v. Tyson Foods, Inc.*,
565 F.3d 769 (10th Cir. 2009) ............................................................12

*Bevis v. City of Naperville, Ill.*,
85 F.4th 1175 (7th Cir. 2023) .............................................................42

*Conn. Citizens Def. League, Inc. v. Thody*,
664 F. Supp. 3d 235 (D. Conn. 2023)..................................................21

*Denver Homeless Out Loud v. Denver*,
32 F.4th 1259 (10th Cir. 2022) ...........................................................41

*District of Columbia v. Heller*,
554 U.S. 570 (2008).................................... 15, 16, 17, 23, 24, 25, 26, 27, 28, 40

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)............................................................................28

*Golan v. Holder*,
609 F.3d 1076 (10th Cir. 2010) ..........................................................12

*Harmon v. City of Norman*,
981 F.3d 1141 (10th Cir. 2020) ..........................................................14

*Knight v. City of N.Y.*,
2024 WL 1096991 (S.D.N.Y. Mar. 13, 2024)....................................18

*Knight v. City of N.Y.*,
2024 WL 1126309 (S.D.N.Y. Jan. 17, 2024) ............................... 17, 18

*McDonald v. City of Chicago*,
561 U.S. 742 (2010)...................................................... 15, 23, 24, 25

*McRorey v. Garland*,
2023 WL 5200670 (N.D. Tex. Aug. 14, 2023)...................... 20, 21, 22

iv

*McRorey v. Garland*,
  2024 WL 1825398 (5th Cir. Apr. 26, 2024) ..................................... 20, 24, 26, 27

*Md. Shall Issue, Inc. v. Montgomery Cnty., Md.*,
  680 F. Supp. 3d 567 (D. Md. 2023) ....................................................................44

*Nat'l Endowment for the Arts v. Finley*,
  524 U.S. 569 (1998) ...........................................................................................12

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
  597 U.S. 1 (2022) ..... 6, 8, 9, 14, 15, 16, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30,
                          34, 35, 36, 38, 40, 41, 42, 43, 44

*Nken v. Holder*,
  556 U.S. 418 (2009) ...........................................................................................12

*Rocky Mountain Gun Owners v. Polis*,
  2023 WL 5017257 (D. Colo. Aug. 7, 2023) ......................................... 4, 5, 13, 25

*Silvester v. Harris*,
  843 F.3d 816 (9th Cir. 2016) ........................................................................ 27, 33

*State v. Christen*,
  958 N.W.2d 746 (Wis. 2021) ..............................................................................38

*State v. U.S. EPA*,
  989 F.3d 874 (10th Cir. 2021) ...................................................................... 11, 13

*United States v. Marique*,
  647 F. Supp. 3d 382 (D. Md. 2022) ...................................................................25

*United States v. Roberts*,
  2024 WL 50889 (D. Alaska Jan 4, 2024) ...........................................................24

*United States v. Tilotta*,
  2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) ....................................................25

*Vincent v. Garland*,
  80 F.4th 1197 (10th Cir. 2023) ...........................................................................24

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ......................................................................................... 11, 44

## STATUTES

2 Gen. Stats. of Kan. 353 (1868) ...................................................................37

720 Ill. Comp. Stat. 5/24-3 ..........................................................................4

1655 Va. Acts 401 .......................................................................................36

1878 Gen. Laws Miss. 175 ...........................................................................36

1883 Mo. Laws 76 .......................................................................................37

1884 City of Baltimore Code, § 742 .............................................................37

1893 R.I. Pub. Laws 231 ..............................................................................38

Cal. Penal Code § 26815(a) ...........................................................................4

Colo. Rev. Stat. § 4-2-401 ...........................................................................22

Colo. Rev. Stat. § 18-12-112 .....................................................................3, 26

Colo. Rev. Stat. § 18-12-115 .......................................................... 2, 3, 25, 40

D.C. Code § 22-4508 .....................................................................................4

Fla. Stat. § 790.0655 .....................................................................................4

Haw. Rev. Stat. § 134-2 .................................................................................4

H.B. 1219, 74th Gen. Assemb., 1st Reg. Sess. (Colo. 2023) .................................2, 3

Md. Code Ann., Pub. Safety, § 5-123 .............................................................4

Md. Gen. Assembly, L.H.J. Liber No. 48, May 22, 1756 .......................................36

Minn. Stat. § 624.7132 ...................................................................................4

N.J. Stat. Ann. § 2c:58-2 ...............................................................................4

R.I. Gen. Laws § 11-47-35 .............................................................................4

Vt. Stat. Ann. tit. 13, § 4019a ........................................................................4

Wash. Rev. Code § 9.41.092 ...........................................................................4

**CONSTITUTION**

U.S. Const. amend. II ... 1, 2, 6, 7, 8, 9, 10, 11, 14, 15, 16, 17, 18, 20, 21, 23, 24, 29, 33, 38, 40, 42, 44

U.S. Const. amend XIV .......................................................................................38

**RELATED CASES**

*Rocky Mountain Gun Owners, et al. v. Polis*, 23-1251 (10th Cir.)

**INTRODUCTION**

Colorado's Waiting Period Act will save approximately 100 lives over the next year. By requiring firearm sellers to wait three days before delivering a newly purchased weapon, the law provides a cooling off period for those with homicidal or suicidal intentions. Plaintiffs offered no credible evidence to refute that the law will have this life-saving impact and do not challenge that finding on appeal. Instead, they seek to enjoin Colorado's law, based on a preliminary record, under their cramped interpretation of the Second Amendment. They have not met the high burden necessary to obtain such an extraordinary remedy.

Colorado's law does not infringe on Plaintiffs' rights to "keep and bear Arms." The original understanding of that Amendment did not include a right to immediately acquire firearms—a factual impossibility in most of colonial America—and so the Second Amendment does not protect the conduct Plaintiffs wish to engage in. Additionally, because the Waiting Period Act regulates only commercial transactions, it falls into a category of laws that the Supreme Court has held are "presumptively lawful." And even if the Act implicated the Second Amendment, it is constitutional because it is analogous to historical regulations aimed at preventing impulsive firearm violence in the early years of the Nation. This Court should affirm the district court's denial of their preliminary injunction.

## STATEMENT OF THE ISSUES

I.      Did the district court abuse its discretion when it held that the Act does not infringe Plaintiffs' right to "keep and bear Arms" under the plain language of the Second Amendment?

II.     Did the district court abuse its discretion when it held that the Act, which only regulates commercial transactions, was a presumptively lawful regulation on the commercial sale of arms?

III.    Did the district court abuse its discretion when it held that the Act is consistent with the Nation's history and tradition of firearms regulation?

IV.     Did the district court abuse its discretion when it held that Plaintiffs do not face any irreparable harm from the continued enforcement of the Act?

V.      Did the district court abuse its discretion when it held that the public interest favored denying the preliminary injunction?

## STATEMENT OF THE CASE

### A.      The Waiting Period Act.

The Governor signed House Bill 23-1219 into law in April 2023. *See* App. Vol. 1 at 74 (codified at Colo. Rev. Stat. § 18-12-115 (2023)). The Act makes it "unlawful for any person who sells a firearm" to deliver it for three days or until the required background checks are complete, whichever is later. *Id.* § 18-12-

115(1)(a). A seller who delivers the firearm before the waiting period expires

commits a civil infraction that carries a fine but no imprisonment. *Id.* § 18-12-

115(1)(b). The Act does not regulate purchasers.

By regulating firearm sellers, the Act applies only to commercial firearm

transfers. Additionally, the Act contains several exceptions, including for sales of

antique firearms and sales by military personnel about to be deployed overseas. *Id.*

§ 18-12-115(2)(a), (b). Firearm transfers "for which a background check is not

required pursuant to state or federal law" also are not subject to a waiting period.

*Id.* § 18-12-115(2)(c). This includes, among other things, gifts between immediate

family members and certain temporary firearm transfers. *See id.* § 18-12-112(6).

In the Act's legislative declaration, the Colorado General Assembly found

that "[d]elaying immediate access to firearms by establishing a waiting period for

receipt of firearms can help prevent impulsive acts of firearm violence, including

homicides and suicides." App. Vol. 1 at 71. The General Assembly recognized that

Colorado has recently seen peaks in firearm-related homicides and that Colorado

ranks seventh nationally in suicide by firearm. *Id.* The Act cites a study finding

that mandatory waiting periods have led to a 7 – 11% reduction in firearm-related

suicides and a 17% reduction in firearm homicides. *Id.*

3

Eleven other states impose waiting periods for commercial firearms sales.
Colorado's three-day waiting period is the shortest for any state that has a waiting
period. Florida, Illinois, and Vermont also have three-day waiting periods.[1] Seven
states and the District of Columbia have longer waiting periods.[2]

## B.    Procedural background.

Plaintiffs Alicia Garcia and Rocky Mountain Gun Owners (collectively,
"RMGO") filed a prior lawsuit before the Act's effective date. *See Rocky Mountain
Gun Owners v. Polis*, No. 23-cv-1076-PAB-NRN, 2023 WL 5017257 (D. Colo.
Aug. 7, 2023). The district court denied their motion for preliminary injunction,
concluding that neither plaintiff had shown they possessed "standing to move to
enjoin HB 23-1219 before it is enforced" because they had neither a present injury
nor a credible threat of future enforcement since the law only proscribes the

---

[1] *See* Fla. Stat. § 790.0655(1)(a); 720 Ill. Comp. Stat. 5/24-3(A)(g); Vt. Stat. Ann.
tit. 13, § 4019a.

[2] *See* Minn. Stat. § 624.7132 (eff. 8/1/23) (30 days for handguns, assault weapons);
Haw. Rev. Stat. § 134-2(a), (e) (14 days for all firearms); Wash. Rev. Code
§ 9.41.092(2) (10 business days for semiautomatic rifles); Cal. Penal Code
§ 26815(a) (10 days for all firearms); D.C. Code § 22-4508 (10 days for all
firearms); R.I. Gen. Laws § 11-47-35(a)(1), -35.2(a) (7 days for all firearms); Md.
Code Ann., Pub. Safety, § 5-123(a) (7 days for regulated firearms); N.J. Stat. Ann.
§ 2c:58-2(a)(5)(a) (7 days for handguns).

conduct of sellers, not purchasers. *Id.* at *5. Plaintiffs voluntarily dismissed their

complaint a few days later. App. Vol. 1 at 53.

Plaintiffs then filed this lawsuit on October 1, the day the law went into

effect. *Id.* at 7. They moved for an ex parte temporary restraining order, which the

court denied, and a preliminary injunction, which the court set for hearing. *Id.* at

15, 43-44. At the hearing, Plaintiffs called Ms. Garcia and Taylor Rhodes,

RMGO's executive director. App. Vol. 2 at 491-92. Plaintiffs also called Clayton

Cramer, an adjunct history professor at the College of Western Idaho, who has

written historical and advocacy-based books about firearms. App. Vol. 3 at 747.

The Governor called three experts: Randolph Roth, a history professor at the Ohio

State University, who testified about his research on the history of violence in the

United States; Robert Spitzer, Distinguished Service Professor of Political Science,

Emeritus at the State University of New York at Cartland, who has written

numerous books and articles on gun policy and testified about historical gun laws[3];

and Christopher Poliquin, an assistant professor of strategy at the University of

California at Los Angeles, who conducted a peer-reviewed study about the

effectiveness of waiting period laws. *See id.* at 745-47.

---

[3] By agreement of the parties, Professor Spitzer testified by declaration. *See* App.
Vol. 2 at 603.

After a two-day hearing, the district court denied the preliminary injunction. App. Vol. 3 at 737. Applying the test set forth in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), the court concluded, first, that the "plain text" of the Second Amendment "does not cover the waiting period required by the Act." *Id.* at 749. The court found that this conclusion was "bolstered by the fact that the Act is a regulation on the commercial sale of firearms and thus is presumptively permissible." *Id.* And, even if the Act fell within the Amendment's plain text, the district court concluded that "the evidence before me establishes that the Act is consistent with the Nation's historical tradition of firearm regulation." *Id.* Accordingly, Plaintiffs did not "carr[y] their burden to show they are likely to succeed on the merits of their claims." *Id.*

In weighing the evidence, the court assessed the credibility of the expert witnesses. The court noted numerous flaws with RMGO's expert, Professor Cramer, finding him unqualified to give opinions about legal standards; finding that "many" of his opinions were "irrelevant to the present facts [or] unsupported"; and concluding that "his testimony had significant shortcomings in persuasiveness and credibility." *Id.* at 747-48. By contrast, the court found Professor Roth's opinions "to be thoughtful and reliable" and "committed to precision and accuracy"; Professor Spitzer to be "qualified" and his presentation of historical

laws "to be helpful in evaluating the Nation's historical tradition of firearm regulation"; and Professor Poliquin's testimony concerning his waiting period study to be "salient and completely credible." *Id.* at 745-47.

The district court further held that the other preliminary injunction factors—irreparable harm and the public interest—did not weigh in RMGO's favor. The court found no irreparable harm because, first, it had not shown a likelihood that their Second Amendment rights were violated; second, it did not identify any "harm associated with the right of self-defense," which is the "central component of the Second Amendment"; and third, any harms resulting from delays caused by waiting period laws are compensable, rather than irreparable. *Id.* at 772-74.

Finally, in considering the public interest, the district court considered expert testimony from both sides about the public safety impact of waiting period laws. The court identified serious methodological flaws in RMGO's analysis but found the Governor's peer-reviewed study was reliable, which concluded that "imposing a handgun waiting period results in about a 17 percent reduction in gun homicides, and a 7 to 11 percent reduction in gun suicides." *Id.* at 776. The court thus concluded "it is not remotely close. . . . [S]aving approximately one hundred people in Colorado this year outweighs the aggregate harm of minimal expenditures of time and sacrificed business opportunities." *Id.* at 777-78.

## SUMMARY OF THE ARGUMENT

RMGO identified five issues for appeal. To reverse the district court's order, they must prevail on all five. But they cannot prevail on any, particularly under the high burdens that apply when seeking to reverse a district court's denial of a preliminary injunction.

The district court did not abuse its discretion when it held that RMGO is unlikely to succeed on the merits. Under *Bruen*, a plaintiff must establish, first, that the conduct they wish to engage in is protected by the plain language of the Second Amendment, as originally understood. But the Waiting Period Act does not infringe on anyone's right to "keep" or to "bear" Arms. Coloradans can possess the same weapons they could before the Act was passed and they have the same rights of public carry. RMGO instead argues that they also have a right—unenumerated in the Second Amendment's text—to immediately acquire firearms without delay. Such a right is not found in the Amendment's text and would have been unknown to the Founders' generation. As testimony at the hearing established, those living in 1790s America did not have immediate access to firearm sellers where they could, in a moment of passion, acquire a gun to use in a homicide or suicide. RMGO thus fails the *Bruen* test at the very first step.

Additionally, the Waiting Period Act is a "condition and qualification on the sales of arms," a category of firearm regulation that the Supreme Court has recognized is presumptively lawful. The Act does not regulate noncommercial transfers and only regulates part of the commercial transaction itself—the delivery of the firearm. It qualifies the purchase by requiring three days to pass before the firearm transfer is effectuated. Such laws are presumptively lawful and RMGO has not overcome that presumption of lawfulness.

But even if the Waiting Period Act did implicate rights protected by the Second Amendment, RMGO is still unlikely to succeed on the merits because the Act is analogous to historical regulations intended to prevent impulsive firearm violence. When there have been significant social and technological changes, *Bruen* instructs courts to look not for perfect analogues from American history, but to regulations that are sufficiently similar. Here, numerous changes between the 18th and 21st centuries—including the increased prevalence of firearm-related homicide and suicide, improvements to supply chains that made firearms more readily accessible, and technological innovations that increased the utility of firearms for homicide and suicide—mean that the Governor need not identify an identical statute from the 18th or 19th centuries for the Act to be constitutional.

But laws from those eras do demonstrate a concern with impulsive firearm violence, as many states made armed intoxication illegal. The risk posed by impulsive firearm violence in the 1790s was not that someone could go to the store and buy a gun to use in violence directed at themselves or others—such stores were few and far between. Instead, lawmakers then regulated impulsive firearm violence by regulating armed intoxication. These laws, like the Waiting Period Act, imposed temporary restrictions on people's rights to possess and carry their weapons. These historic laws show that the Second Amendment does not hamstring lawmakers seeking to address impulsive firearm violence. The nature of the risks has changed today, but the government's approach is consistent with how it has historically sought to protect public safety.

Finally, the district court did not abuse its discretion in concluding that the two remaining preliminary injunction factors required denying the injunction. RMGO's only claim of irreparable harm is based on its assertion that there is a constitutional violation, which there is not. But even if there was, far from causing irreparable harm, the Act works only to temporarily delay firearm acquisition. As the district court recognized, the only harm Plaintiffs alleged from this delay was to Plaintiff Garcia's business interests as a social media influencer in the firearms industry, which is a quintessentially compensable harm. And because Plaintiff

10

Garcia already owns more than a dozen guns, the waiting period does not implicate her right to self-defense, the central component of the Second Amendment.

As to the public interest, the district court correctly found that this factor is not even close. The Governor presented credible evidence that the Waiting Period Act will save about 100 Coloradans over the next year. These lives saved more than outweigh any inconvenience Plaintiffs may undergo from waiting three days for a new gun.

## ARGUMENT

### I.    Plaintiffs face a heavy burden to reverse the district court's denial of their preliminary injunction.

Plaintiffs face several heightened burdens to reverse the district court's order denying their preliminary injunction. First, the standard to obtain a preliminary injunction is high. A "preliminary injunction is an extraordinary remedy never awarded as of right," so the plaintiff "must make a clear and unequivocal showing it is entitled to such relief." *State v. U.S. EPA*, 989 F.3d 874, 883 (10th Cir. 2021) (quotations omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, . . . and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also*

11

*Nken v. Holder*, 556 U.S. 418, 435 (2009) (the balance of equities and public interest factors "merge when the Government is the opposing party.").

Second, the district court here denied the preliminary injunction, and this Court "review[s] the denial of a preliminary injunction under an abuse of discretion standard." *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 775 (10th Cir. 2009). A district court abuses its discretion only if it "commits an error of law or makes clearly erroneous factual findings." *Id.* (quotations omitted). This Court's "review of a district court's exercise of discretion is narrow, and [it] consider[s] the merits of the case only as they affect that exercise of discretion." *Id.* at 776. An abuse of discretion is "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Id.* (quotations omitted).

Third, Plaintiffs bring a facial challenge to the Waiting Period Act's constitutionality. "Facial challenges to statutes are generally disfavored as 'facial invalidation is, manifestly, strong medicine that has been employed by the Supreme Court sparingly and only as a last resort.'" *Golan v. Holder*, 609 F.3d 1076, 1094 (10th Cir. 2010) (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998)). Accordingly, "plaintiffs bear a 'heavy burden' in raising a facial constitutional challenge." *Id.* (quoting *Finley*, 524 U.S. at 580).

Fourth, certain injunctions are "disfavored" and require a movant to "make a strong showing both on the likelihood of success on the merits and on the balance of the harms." *EPA*, 989 F.3d at 884 (quotations omitted). The district court held that RMGO seeks a disfavored injunction because it would disrupt the status quo by "enjoin[ing] a law that is in effect." App. Vol. 3 at 749. RMGO disputes this in two ways. First, it argues that it tried to bring a pre-enforcement challenge. But Plaintiffs voluntarily dismissed that lawsuit after the district court noted they lacked standing to bring it. *See Rocky Mountain Gun Owners*, 2023 WL 5017257, at *5. The present lawsuit was not brought until the law went into effect, and a voluntarily dismissed lawsuit over which the district court lacked subject matter jurisdiction is irrelevant to determining the status quo for this lawsuit. Second, RMGO argues that the status quo for a challenge to a newly enacted statute should be "that which existed prior to the challenged statute taking effect." Opening Br. 10-11 (quoting *Am. C.L. Union of Kan. & W. Mo. v. Praeger*, 815 F. Supp. 2d 1204, 1208 (D. Kan. 2011)). But as the district court noted here, the "status quo ante bellum" was with the Waiting Period Act in effect. App. Vol. 3 at 749 n.7. And given the extraordinary nature of preliminary injunctions generally, it is appropriate that, when plaintiffs do not or cannot mount a pre-enforcement challenge, they should have to make a strong showing of likely success before they

13

can prevent a state from enforcing a democratically-enacted law based on a preliminary record.

In any event, this standard of review was not determinative for the district court, as it held that "even if the injunction were not disfavored, the applicable factors would weigh against granting it." *Id.* at 749. The Governor agrees that RMGO cannot succeed on this appeal under any applicable standard.

This Court reviews the district court's factual findings for clear error and its legal conclusions de novo. *See Harmon v. City of Norman*, 981 F.3d 1141, 1146 (10th Cir. 2020) (citation omitted).

## II.    The district court did not abuse its discretion when it held RMGO was unlikely to succeed on the merits under *Bruen*.

RMGO's claim arises under the Second Amendment. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has established a two-step framework to resolve Second Amendment claims. *See Bruen*, 597 U.S. at 1. At the first step, the Court considers whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24. If it does not, the law does not infringe on Second Amendment rights. If the plain text does apply to the plaintiff's conduct, the analysis is not over. *Id.* The burden then falls on the government at the second step

14

to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

The right protected by the Second Amendment is "not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). "[I]ndividual self-defense is 'the central component' of the Second Amendment right." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599) (emphasis omitted). Accordingly, the *Heller* Court stated that it should not be read to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sales of arms." *Heller*, 554 U.S. at 626-27; *accord McDonald*, 561 U.S. at 786. Such laws are "presumptively lawful regulatory measures." *See Heller*, 554 U.S. at 627 n.26.

RMGO argues that the district court abused its discretion in three ways when applying the *Bruen* test. First, RMGO argues that the plain text of the Second Amendment covers a right to take possession of a firearm without delay. Second, RMGO argues the Act is not a presumptively lawful regulation on the commercial sales of arms. Finally, RMGO contends that the district court erroneously found

that the Waiting Period Act is consistent with the Nation's history and tradition of firearm regulation. RMGO is mistaken on all three grounds.

### A.    The plain text of the Second Amendment does not confer a right to immediately acquire firearms.

At *Bruen*'s first step, courts must determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. Accordingly, this Court must decide whether having to wait three days to acquire a commercially sold firearm "infringe[s]" RMGO's right "to keep and bear Arms." U.S. Const. amend. II. It does not.

If "the challenged law regulates activity falling outside the scope of the right as originally understood . . . the analysis can stop there; the regulated activity is categorically unprotected." *Bruen*, 597 U.S. at 18. This approach is "rooted in the Second Amendment's text, as informed by history." *Id.* at 19. A court must therefore give the Second Amendment's text its "[n]ormal meaning . . . [as] known to ordinary citizens in the founding generation." *Heller*, 554 U.S. at 576-77.

The Waiting Period Act does not implicate the plain text of the Second Amendment. First, the Act does not plausibly infringe RMGO's right to "bear Arms." That phrase "has a meaning that refers to carrying for a particular purpose—confrontation." *Heller*, 554 U.S. at 584; *see also Bruen*, 597 U.S. at 32 (holding the word "'bear' naturally encompasses public carry"). The Act plainly

does not affect this right. Second, the Act does not infringe RMGO's right to "keep Arms." Historically, "'[k]eep arms' was simply a common way of referring to possessing arms[.]" *Heller*, 554 U.S. at 583. Unlike the laws at issue in *Heller* and *McDonald*, which precluded individuals from possessing handguns in their homes, the Act does not make possession of any weapon illegal. No Coloradans will be deprived of their firearms by the Act. It places no limits or regulations on the firearms that are kept by an individual. Instead, it merely delays delivery of commercially sold firearms.

Another recent case involving a far lengthier waiting period reached a similar conclusion. In *Knight v. City of New York*, the plaintiff challenged a city regulation that required handgun purchasers to wait 90 days before purchasing a second handgun. No. 22-CV-3215 (VEC)(VF), 2024 WL 1126309, at *6 (S.D.N.Y. Jan. 17, 2024). The court concluded that the text of the Second Amendment did not cover this waiting period. *Id.* The waiting period neither limited "an individual's ability to carry a firearm in public for self-defense," nor did it "place any restrictions on possession of a handgun in the home." *Id.* It thus did not concern "the core conduct protected by the Second Amendment"—

17

possessing firearms for self-defense—and so did not implicate the Second Amendment. *Id.*[4]

RMGO presented no historical evidence that the plain text of the Second Amendment was originally understood to guarantee a right to immediately acquire purchased firearms. The district court's factual findings on this point are controlling, as RMGO makes no argument that the court clearly erred.

The district court found, based on the expert testimony adduced at the hearing, that "the Founders would not have expected instant, widespread availability of the firearm of their choice." App. Vol. 3 at 753. The court cited the Governor's expert, Professor Sptizer, who explained, "No 'Guns-R-Us' outlets existed in the 1600s, 1700s, or most of the 1800s," as "[r]apid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap prolific, reliable,

---

[4] *Knight* was a report and recommendation of a United States magistrate judge. The district court judge adopted the report's conclusion that plaintiff lacked standing and so did not address the magistrate judge's alternative holding that the complaint failed to state a claim. *See Knight v. City of N.Y.*, No. 22-CV-3215 (VEC), 2024 WL 1096991 (S.D.N.Y. Mar. 13, 2024).

18

and easy to get." *Id.* "This modern sales system was key to the enactment of waiting periods." App. Vol. 1 at 82.

Professor Roth testified similarly that due to low production rates, "individuals might have had 'to wait a few weeks to get [a firearm].'" App. Vol. 3 at 753 (quoting *id.* at 653). Even RMGO's own expert relied on 18th century advertisements that "indicate[d] that oftentimes a wait would be involved, for example, when guns were being imported and would arrive at irregular intervals, when firearms were being sold on a single date in the future, or a gunsmith was offering to fabricate firearms for purchasers." *Id.* So in addition to the plain meaning of the words "keep and bear Arms," individuals living in the 1790s had no expectation that they could obtain guns on demand.

Furthermore, many states and localities enacted licensing requirements for owning or discharging firearms in the 18th and 19th centuries. "[L]icensing by its nature thwarts any ability to acquire or use firearms on demand." App. Vol. 1 at 94. According to Professor Spitzer, at least 29 states adopted licensing requirements for weapons ownership (17 of which were in the 1800s), and 26 states had licensing requirements for discharging firearms (13 of which were between the 1700s and 1860s). *Id.* Record historical evidence thus undermines

RMGO's argument that the original meaning of the Second Amendment precluded governments from imposing any wait time before a citizen could acquire a firearm.

*Bruen* itself recognized that the Second Amendment does not protect a right to immediate firearm acquisition. The Court there stated that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes . . . which often require applicants to undergo a background check or pass a firearms safety course." *Bruen*, 597 U.S. at 38 n.9. Although the Court left the door open to "shall-issue regimes where, for example, lengthy wait times in processing license applications . . . deny ordinary citizens their right to public carry," RMGO has not argued that the three-day waiting period is "lengthy." *Id.* Instead, RMGO maintains that any waiting period is unconstitutional. But *Bruen* "seems to acknowledge the facial constitutionality of regimes requiring background checks and attendant waiting periods . . . , so long as the waiting periods are not 'lengthy.'" *McRorey v. Garland*, 23-cv-00047-O, 2023 WL 5200670, at *5 (N.D. Tex. Aug. 14, 2023) (rejecting constitutional challenge to "potential ten-business-day waiting period"), *aff'd* --- F.4th ---, 2024 WL 1825398 (5th Cir. Apr. 26, 2024). *Bruen* itself thus rejects that RMGO has a right to acquire firearms on demand.

20

Rather than meet the text-and-history test demanded by *Bruen*, RMGO argues that the Second Amendment implies a right to acquire firearms because "the right to possess arms cannot be exercised unless individuals have the right to obtain them." Opening Br. 17. But this is a red herring—the Waiting Period Act does not prevent any individual from acquiring any firearm. Instead, the Act delays when a gun purchaser can take possession of their newly purchased weapon.

RMGO cites several cases supposedly in support of its proposition, but those cases do not help it. *See id.* at 18. One of those cases rejected that wait times associated with acquiring firearms violate clearly established Second Amendment rights. *See Conn. Citizens Def. League, Inc. v. Thody*, 664 F. Supp. 3d 235, 253 (D. Conn. 2023). That court found no case "hold[s] that a seven-month (or even a two-year) delay in obtaining a firearm permit violates the Constitution" and held there is no clearly established right "to obtain a firearm within a specific timeframe." *Id.*

RMGO's other cases that supposedly establish a freestanding implied right to acquire firearms without delay fare no better. Only one concerned a waiting period at all, and the court there provided no analysis for its conclusion that "Plaintiffs have sufficiently shown that their conduct is covered by the Second Amendment" because it concluded that the waiting period was a presumptively lawful measure. *McRorey*, 2023 WL 5200670, at *3. That court emphatically

21

rejected "that *any* waiting period is unconstitutional," because "the Supreme Court has [] noted that some wait time is permissible to ensure that those prohibited are unable to obtain firearms." *Id.* at *5 (citing *Bruen*, 597 U.S. at 38 n.9).

RMGO contends that the district court "mis-framed" their right as one to acquire firearms without delay, Opening Br. 22, and that the Waiting Period Act actually implicates their right to "obtain[] a firearm," *id.* at 12. But it was RMGO's own complaint that characterizes their injury as "arbitrarily *delay[ing]* the right of law-abiding citizens to purchase arms even if they immediately pass all required background checks." App. Vol. 1 at 13 (emphasis added). The court thus properly identified the injury alleged by RMGO in this lawsuit.

Finally, RMGO devotes several pages of its opening brief to arguing that title of a firearm passes upon payment, not delivery. *See* Opening Br. 22-24. RMGO's argument is both wrong as a legal matter and beside the point. It is wrong because Colorado law provides: "Unless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods." Colo. Rev. Stat. § 4-2-401(2). Here, Plaintiffs cite no explicit agreement between any Plaintiff and any seller to transfer title absent delivery, so these Plaintiffs did not have title to any of their guns before they received them.

22

But even if they did, the Second Amendment's scope does not change based on application of the Uniform Commercial Code. Whenever title passes under state law, the question is the same: does the Second Amendment's guarantee of the right to "keep and bear Arms" create a right to take possession of a firearm on demand? The plain text of the Amendment makes clear it does not.

### B.    The Waiting Period Act is a "presumptively lawful" regulation on the commercial sales of arms.

The Court should also affirm for the independent reason that the Waiting Period Act is presumptively lawful. Because "individual self-defense is 'the central component' of the Second Amendment right," *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599) (emphasis omitted), the Supreme Court has stressed that *Heller*'s holding should not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sales of arms." *Heller*, 554 U.S. at 626-27; *accord McDonald*, 561 U.S. at 786. Such laws are "presumptively lawful regulatory measures." *See Heller*, 554 U.S. at 627 n.26.

Three justices concurred specifically in *Bruen* to emphasize the continuing validity of this presumptively lawful category of regulatory measures, including "laws imposing conditions and qualifications on the commercial sale of arms." *See*

23

*Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*, 554 U.S. at 626-27); *see also id.* at 72 (Alito, J., concurring) (*Bruen* did not "disturb[] anything that we said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns") (citation omitted). The Tenth Circuit affirmed that *Bruen* did not implicitly overturn the presumptively lawful category and that presumptively lawful regulations are valid without having to consider the historical tradition of firearm regulation. *Vincent v. Garland*, 80 F.4th 1197, 1201-02 (10th Cir. 2023) (affirming law barring felons from possessing firearms); *accord United States v. Roberts*, 23-cr-00057-TMB-KFR-1, --- F. Supp. 3d ---, 2024 WL 50889, at \*5 (D. Alaska Jan 4, 2024) ("[T]he *Bruen* court did not repudiate—and indeed preserved—*Heller*'s list of "'presumptively lawful' firearm regulations.").[5]

---

[5] Following *Bruen*, there is some uncertainty as to whether the presumptively lawful category exists at the first step of the *Bruen* analysis—in other words, that commercial regulations are presumptively lawful because they do not address conduct covered by the plain text of the Second Amendment. The district court adopted that approach. App. Vol. 3 at 756. Other courts have analyzed the presumptively lawful category separate and apart from *Bruen*'s two-step framework, upholding regulations that fit within the categories without further analyzing the Second Amendment's plain text or historical laws. *See, e.g.*, *McRorey*, 2024 WL 1825398, at \*3. Under either approach, the Waiting Period Act is presumptively lawful.

24

The Waiting Period Act is a presumptively lawful commercial regulation. "*Bruen*, *McDonald*, and *Heller* preserved the idea that the government could '[impose] conditions and qualifications on the commercial sale of arms.'" *United States v. Marique*, 647 F. Supp. 3d 382, 385 (D. Md. 2022) (quoting *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring)); *see also United States v. Tilotta*, No. 3:19-cr-04768-GPC, 2022 WL 3924282, at *6 (S.D. Cal. Aug. 30, 2022) ("the natural reading of 'keep and bear arms' does not include the ability to sell or transfer firearms unrestricted"). The Act does not regulate RMGO's conduct or any other firearm owners' conduct. Instead, the Act applies only to those who "sell[] a firearm," making it a civil infraction for the *seller* to deliver a firearm before the waiting period expires. Colo. Rev. Stat. § 18-12-115(1). It does not apply to anyone who does not sell a firearm. In fact, the absence of any regulations in the Act for those who already own or who purchase firearms is why Plaintiffs (who are not firearms sellers) lacked standing to bring their pre-enforcement challenge to the Act. *See Rocky Mountain Gun Owners*, 2023 WL 5017257, at *5.

The Act also exempts non-commercial transactions from the waiting period. These exemptions include a "firearm transfer for which a background check is not required pursuant to state or federal law," (Colo. Rev. Stat. § 18-12-115(2)(c)), such as:

25

- A bona fide gift between immediate family members (*id.* § 18-12-112(6)(b));

- An intestate transfer or transfer through a will (*id.* § 18-12-112(6)(c));

- A temporary transfer in the transferee's home if needed for self-protection (*id.* § 18-12-112(6)(d));

- A temporary transfer while hunting (*id.* § 18-12-112(6)(e)(III));

- A temporary transfer of up to 72 hours (*id.* § 18-12-112(6)(h)).

The Fifth Circuit recently upheld a background check law that imposes an expanded waiting period as a presumptively lawful regulation. In *McRorey*, the Fifth Circuit considered a challenge to a federal law providing for enhanced background checks for firearm purchasers under 21, which can create a waiting period of up to 10 days before delivering a firearm. 2024 WL 1825398, at *2. The court upheld the denial of a preliminary injunction against the law, finding that it "falls into that category" of presumptively lawful regulations. *Id.* at *3. "In *Heller*, the Court described conditions and qualifications on the commercial sale of arms as presumptively lawful. *Bruen* did nothing to disturb that part of *Heller*." *Id.* (quotations and citations omitted). The Fifth Circuit concluded by acknowledging that "there is some point at which a background check becomes so lengthy that it is

26

'put towards abusive ends' or subject to *Bruen*'s historical framework as a *de facto* prohibition on possession. But a period of 10 days does not qualify." *Id.* at *6.

Similarly, in a pre-*Bruen* challenge to California's ten-day waiting period, one Ninth Circuit judge found the waiting period was presumptively lawful: "As a longstanding qualification on the commercial sale of arms under [*Heller*], a ten-day waiting period is presumptively lawful." *Silvester v. Harris*, 843 F.3d 816, 829 (9th Cir. 2016) (Thomas, C.J., concurring). Chief Judge Thomas noted that "[o]n its face, California's waiting period law is a condition or qualification on the sale of guns: It imposes a brief delay—to permit compliance with background check requirements and provide a 'cooling off' period—as a prerequisite to acquiring a gun." *Id.* at 830.[6] The same is true here.

RMGO argues the Act is not a commercial regulation because it is primarily concerned with the effects on the purchaser. But so are background checks, the constitutionality of which RMGO does not appear to dispute. *See* Opening Br. 22; *see also McRorey*, 2024 WL 1825398, at *5 ("Background checks . . . are

---

[6] The Ninth Circuit panel upheld California's waiting period law under the intermediate scrutiny standard courts applied before *Bruen*, after "assum[ing], without deciding, that the regulation . . . is not the type of regulation that must be considered presumptively valid." *Id.* at 826-27. Accordingly, the opinion for the court did not address the presumptively lawful category.

presumptively lawful."). In any event, the presumptively lawful category does not apply based on whether the regulations are targeted at sellers, but rather to "conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 627. Requiring purchasers in a commercial transaction—but no other firearm transferees—to wait three days before taking possession of a purchased firearm is a condition on that commercial sale.

RMGO also argues that treating the Waiting Period Act as a presumptively lawful regulation would lead to a slippery slope where a 100-year waiting period or a ban on the sale of bullets could be upheld. But this misunderstands how presumptions work. Of course, presumptions can be rebutted. *See, e.g.*, *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811 (2011) ("[T]he presumption was just that, and could be rebutted by appropriate evidence."). *Bruen* itself suggested how presumptively lawful regulations—such as "shall issue" licensing regimes that involve some wait time—may nevertheless be shown to be unconstitutional if the regulation is "put to abusive ends," like "lengthy wait times" or "exorbitant fees." 597 U.S. 38 n.9. A three-day waiting period—the shortest waiting period imposed by a state—does not constitute an abusive practice rebutting the presumption of lawfulness.

**C.    If the Court reaches the second step of *Bruen*, the Waiting Period Act is analogous to historic regulations of firearms intended to prevent impulsive acts of gun violence.**

The Court need not address whether the government carried its burden on the second step of *Bruen* because the plain language of the Second Amendment does not implicate the Act and because the Act is a presumptively lawful commercial regulation. But if the Court does proceed to this step of the analysis, Plaintiffs are not likely to succeed on their challenge because the Waiting Period Act "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

To meet its burden at this stage, the government does not need to identify a historic law that is a "dead ringer." *Id*. at 30. Due to "unprecedented societal concerns" and "dramatic technological changes," "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 27. Accordingly, the Governor must demonstrate only that the Act has "a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30.

29

1. **New "societal concerns" and "dramatic technological changes" have created different regulatory challenges the Waiting Period Act is intended to address.**

This case presents a clear example of both "unprecedented societal concerns" and "dramatic technological changes" that have altered the "regulatory challenges" from what "preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 27. The district court quoted Professor Roth in finding that "public officials today are confronting a criminological problem"—widespread use of guns in homicide and suicide—"that did not exist in the Founding Era, nor during the first century of the nation's existence." App. Vol. 3 at 761. Professor Roth identified both social and technological reasons for this: first, homicide rates in the colonies were low compared to today; second, limitations on firearms technology of the era meant that firearms played a generally small role in the homicide rate, with firearms used in only 10-15% of homicides. *Id.* at 761-63. Colonial-era firearms were generally muzzle-loading, required a great deal of labor to load, often misfired, and could only shoot one shot without reloading. *Id.* at 763-64. Reloading itself took at least 30 seconds and a great deal of skill and experience. *Id.* Homicide was thus much more frequently committed "with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives." App. Vol. 2 at 329.

30

Accordingly, the district court concluded that "[t]he Governor has shown []
that impulsive gun homicide was not prevalent during the Founding Era or Early
National Period and that instituting waiting periods would not have been a logical
measure until at least the end of the nineteenth century." App. Vol. 3 at 761. This
is the precise societal problem Colorado's Waiting Period Act seeks to combat. As
the Act's legislative declaration makes plain, "[d]elaying immediate access to
firearms by establishing a waiting period for receipt of firearms can help prevent
impulsive acts of firearm violence." App. Vol. 1 at 71. Unlike in the Founding Era,
where firearm violence was the exception, firearm violence is now one of the five
leading causes of death for people ages 1 to 44 in the United States. *Id.* at 70. In
Colorado specifically, more people die from firearms than from car crashes or
opioid overdoses. *Id.* at 71. The increased risks posed today by impulsive firearm
violence constitutes a changed social circumstance that *Bruen* recognized could
require a different regulatory approach than existed at the Founding.

The record also demonstrates analogous changes around firearm suicide.
Professor Roth testified to his research showing a suicide rate from the Founding
Era and early republic of somewhere between 3 and 5.5 per hundred thousand,
one-third of the current suicide rate in the United States. App. Vol. 3 at 620:12-21.
And firearms were only used in 16 percent of those suicides. *Id.* at 620:22-23. This

31

contrasts starkly to today—in 2021 alone, there were 740 suicides by firearm in Colorado, more than half of all suicides in the state. App. Vol. 1 at 71. As Professor Roth succinctly stated: "one out of every 44 white male non-Hispanic Americans born in this country is going to kill himself. This is a problem they didn't have" at the Founding. App. Vol. 3 at 621:17-19.

Another problem they didn't have in the Founding Era was a means to immediately acquire firearms for the small number of homicides and suicides that used such weapons. As discussed above, firearms were not universally available on demand in the 1790s. "Rapid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get." App. Vol. 1 at 82. Thus, in the Founding Era, a three-day waiting period would have made no sense because waiting was already inherent in firearm purchases. App. Vol. 3 at 762. These societal conditions are vastly different today, where "gun and ammunition purchases can be made easily and rapidly from tens of thousands of licensed gun dealers, private sales, gun shows, and through internet sales." *Id.*

As the Ninth Circuit recognized: "There is . . . nothing new in having to wait for the delivery of a weapon. Before the age of superstores and superhighways,

32

most folks could not expect to take possession of a firearm immediately upon deciding to purchase one. As a purely practical matter, delivery took time." *Silvester*, 843 F.3d at 827; *accord id.* at 831 (Thomas, C.J., concurring) ("Though delay has not always been associated with government regulation, the ability to immediately exercise Second Amendment rights has no foundation in history.").

RMGO challenges the district court's finding that impulsive gun homicide was not prevalent around the Second Amendment's adoption. Opening Br. 31-33. According to RMGO, "it belies reason to suggest that impulsive gun violence was so non-existent that Americans had no conception of it." *Id.* at 32. But the district court said no such thing. To the contrary, the district court found that 10-15% of homicides in that era were committed with firearms, far from being "non-existent" as RMGO's strawman argument contends. App. Vol. 3 at 763. RMGO points to no evidence in the record that contradicts the district court's finding.

Nor does RMGO properly characterize the societal ill the Waiting Period Act addresses. The Act does not prevent anyone from using a firearm they already own in an impulsive act of violence. Instead, the Act prevents someone from going out and acquiring a firearm in the heat of passion and using that newly acquired firearm to commit homicide or suicide. That is the unprecedented societal concern the district court found exists here.

The district court's finding was thus not based on impulsive firearm violence being nonexistent. Instead, the district court cited testimony and expert reports to support two related factual conclusions: first, "that firearms were not as readily available for purchase," and second, "that impulsive gun homicides were much less prevalent at the time of the founding and in the century that followed." *Id.* at 765. These findings made it "logical that waiting-period laws were not adopted during that period." *Id.* Instead, "as firearm technology and production progressed and gun violence increased, laws regulating firearms, including waiting-period laws, were enacted in response." *Id.* These factual findings are not clearly erroneous.

RMGO fundamentally misunderstands *Bruen*. According to RMGO, "the government gets no special deference under *Bruen* because technology has changed over time." Opening Br. 41. But the Supreme Court has instructed courts to consider whether "dramatic technological changes" justify gun regulations unknown at the time of the Founding. *Bruen*, 597 U.S. at 27. This is critical because "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 28.

These findings support the conclusion, under *Bruen*, that "unprecedented societal concerns or dramatic technological changes" justify a different regulatory response in 2024 than in 1793. *Id.* at 27. RMGO argues that Professor Roth's

34

testimony that a waiting period law "wouldn't have crossed the minds of the Founders" is a "fatal" concession. Opening Br. 33. But if waiting periods never crossed the Framers' minds, that only proves what *Bruen* recognized, that the "regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27. Then, unlike today, impulsive firearm violence was not a major societal concern, and to the extent it was, waiting periods would have been an ineffective way to address it because people generally could not go out and purchase a firearm in a state of passion and use it to commit homicide or suicide. In other words, the societal problem sought to be addressed by the Waiting Period Act—firearms violence committed in the heat of passion with a newly purchased firearm—was simply not a societal concern in the 1790s.

> **2.    The nation has a long history of regulations targeted at preventing impulsive acts of firearm violence.**

In light of the vastly changed societal and technological circumstances surrounding impulsive acts of firearm violence, it is unsurprising there is no "dead ringer" for a waiting period law from the 1790s or 1860s.[7] Given the delays that

---

[7] Waiting period laws themselves have been around for 100 years. *See, e.g.*, App. Vol. 2 at 309-17 (1923 Cal. Laws 695, 696, ch. 339 §§ 2, 10; 1923 Conn. Laws 3707, ch. 252, § 7; 1923 N.D. Laws 379, ch. 266 § 10).

attended the ordinary acquisition of firearms and the scarcity of firearm violence in the early republic, such laws would have served little practical purpose. People going out to immediately purchase a gun to use in a violent act was simply not a major concern of the time.

But laws in the early republic period do show that the government was concerned with the impulsive firearm violence that did exist: the possession, use, and sales of arms to intoxicated persons. As far back as 1655, Virginia made it an offense to "shoot any guns at drinking." App. Vol. 3 at 767 (1655 Va. Acts 401, Acts of Mar. 10, 1655, Act XII). Much of the firearms regulation of the Revolutionary era focused on militias, and states frequently imposed limitations on the availability of alcohol near armed militiamen to avoid impulsive violence by armed men. *See, e.g.*, App. Vol. 1 at 165 (An Act for Establishing a Militia in this Government (Del., 1756) (barring officers from holding company meetings within "half a mile of any Inn or Tavern")); *id.* at 170 (An Act for Regulating the Militia of the Province of Maryland (Md. Gen. Assembly, L.H.J. Liber No. 48, May 22, 1756) (barring the sale of liquor near militia training grounds)).[8]

---

[8] The district court found that the militia regulations were not "proper analogues because they do not involve the regulation of firearms." App. Vol. 3 at 769 n.21. These laws are nevertheless relevant to show the Founding-era concern with armed

In the 19th century, laws addressing the dangers of impulsive firearm violence by intoxicated persons proliferated. Some laws barred the sales of firearms to intoxicated persons. *See id.* at 173 (1878 Gen. Laws Miss. 175 ("[I]t shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any [concealable] weapon . . . , or any pistol cartridge.")). Like a waiting period, an intoxicated individual could purchase a new firearm only after waiting some period of time.

Other jurisdictions went even farther and banned not just the sale but the carrying of firearms while intoxicated, directly implicating the right to "bear arms." *See, e.g.*, *id.* at 169 (2 Gen. Stats. of Kan. 353 (1868) ("[A]ny person under the influence of intoxicating drink . . . who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk, or other deadly weapon, shall be subject to arrest[.]")); *id.* at 177 (1883 Mo. Laws 76 (making it a criminal offense "[i]f any person . . . shall have or carry any such [deadly or dangerous] weapon upon or about his person when intoxicated or under the influence of intoxicating drinks")); *id.* at 170 (1884 City of Baltimore Code, § 742) (making it an additional offense for a person arrested "for being drunk and disorderly" to have

---

intoxication and that later evidence is not "*inconsistent* with the original meaning of the constitutional text." *Bruen*, 597 U.S. at 36 (quotations omitted).

concealed "any pistol" or "other deadly weapon"); *id.* at 195 (1893 R.I. Pub. Laws 231) (similar). Notably, the Kansas law was passed in 1868, the same year the Fourteenth Amendment was ratified. *See State v. Christen*, 958 N.W.2d 746, 766 (Wis. 2021) (Hagerdon, J., concurring). "The temporal connection between this prohibition on armed intoxication and the Fourteenth Amendment's ratification is strong evidence that the Second Amendment, particularly as incorporated against the states, was not originally understood to preclude states from criminalizing armed intoxication." *Id.*

Based on these laws, the district court concluded "that our Nation had a historical tradition of regulating the carrying and use of firearms by intoxicated individuals." App. Vol. 3 at 769. The court then turned to considering whether such laws were sufficiently analogous to the Waiting Period Act. In considering these historic analogues, the Court should look at "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. The "why" for these laws targeting arms and intoxication are aimed at the same evil targeted by waiting period laws—"that the intoxicated would be much more likely to act rashly, impulsively and with diminished judgment—i.e., in the heat of the moment. These purposes are analogous to the purpose of modern waiting periods." App. Vol. 1 at 93. As the Act states, "establishing a waiting period for

38

receipt of firearms can help prevent impulsive acts of firearm violence." App. Vol.
1 at 71. And the "how" of these laws are either the same as waiting period laws—
targeting sales of such arms—or are even more directly targeted at the bearing of
arms by making any such carrying while intoxicated a crime. Thus, while the laws
around arms and intoxication are not historical twins for waiting periods, they were
animated by the same rationale and are analogous.

For these reasons, the district court held that the "'how' and the 'why' of the
intoxication laws and the Waiting-Period Act are sufficiently similar to
demonstrate that the Act is consistent with the Nation's historical tradition of
firearm regulation." App. Vol. 3 at 770. RMGO argues that the district court
assumed "every purchaser of a firearm is in a 'temporary impulsive state' that is
similar to being intoxicated." Opening Br. 35. The court actually stated the
opposite: "I am not suggesting that all individuals who seek to purchase a firearm
are a threat." App. Vol. 3 at 770. Instead, the court recognized that "the Waiting-
Period Act and the intoxication laws both work to prevent individuals in a
temporary impulsive state from irresponsibly using a firearm." *Id.* Even though not
all intoxicated persons will use a firearm irresponsibly, "[t]he intoxication laws
prevented *all* individuals from becoming intoxicated and engaging in the
prohibited conduct." *Id.* So, too, with the Waiting Period Act—even though not all

gun purchasers pose an immediate threat to themselves or others, some do. Just like the intoxication laws, the Waiting Period Act thus does not "apply only to those people who would . . . certainly use[] a firearm irresponsibly." *Id.*

The district court also concluded that the historical licensing laws discussed above, *supra* II.C.2., are analogous to modern waiting period laws. *Id.* at 772. *Bruen* recognized the constitutionality of shall-issue licensing regimes, which "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *See Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635). That is also the purpose of the Waiting Period Act, which provides time for a background check to be completed. *See* Colo. Rev. Stat. § 18-12-115(1)(a) (setting the waiting period as equal to the longer of three days or the completion of all required background checks). These licensing laws thus further "support that the Founders and Reconstruction generation would have accepted a modest delay on the delivery of a firearm in order to ensure that those receiving a firearm are law-abiding, responsible citizens." App. Vol. 3 at 771.

These historical laws show that the Second Amendment was never understood to prohibit governments from taking measures to avoid firearm violence. In the 1790s and early republic, these regulations were more concerned with the use of firearms by intoxicated persons, as firearms were difficult to

40

rapidly obtain in the heat of passion. Today, that is not the case. As the societal

problem posed by impulsive firearms violence has changed, so, too, has the means

governments have chosen to combat it. Therefore, if the Court reaches the second

step of the *Bruen* analysis, RMGO is not likely to succeed on the merits because

the Governor has demonstrated the Waiting Period Act is analogous to historic

firearm regulations.

**III.    The district court did not abuse its discretion in concluding that the other preliminary injunction factors did not support issuing a preliminary injunction.**

"An injunction can issue only if each factor is established." *Denver*

*Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277 (10th Cir. 2022). The district

court here concluded that not only was RMGO unlikely to succeed on the merits,

but it also failed to show irreparable harm or that the public interest favored the

injunction. The court did not abuse its discretion, and the denial of the preliminary

injunction can be affirmed on these alternate bases.

**A.    A three-day waiting period does not cause RMGO any irreparable harm.**

RMGO principally relies on its alleged constitutional injury to establish

irreparable harm. Opening Br. 42-43. It thus cannot show irreparable harm for all

the reasons given above as to why there is no likelihood of success on the merits.

41

But even if RMGO could establish a likelihood of success, it still cannot

show irreparable harm from a three-day waiting period. *See Bevis v. City of*

*Naperville, Ill.*, 85 F.4th 1175, 1202-03 (7th Cir. 2023) (saving "for another day"

the question of "whether an alleged Second Amendment violation gives rise to a

presumption of irreparable harm, and if so, whether any such presumption is

rebuttable or ironclad"). The Second Amendment is principally concerned with

individual self-defense. *See Bruen*, 597 U.S. at 29. The district court correctly

found that "Plaintiffs have alleged no harm associated with the right of self-

defense." App. Vol. 3 at 774. No witness "testified that they or any RMGO

members would be unable to defend themselves due to the waiting period." *Id.* at

773-74. To the contrary, Plaintiff Garcia testified that she presently owned around

15 guns and had acquired even more since the Waiting Period Act went into effect.

App. Vol. 2 at 519:2-6; 520:8-11. Similarly, the only member of RMGO who

testified at the hearing also testified that he had received the firearm he purchased

on October 1, the day the Act went into effect. *Id.* at 530:4-8. Instead, Plaintiff

Garcia—a social media influencer who makes money from posting about firearms

(*id.* at 511:8-10)— identified only harm "to her time and business opportunities,"

which are "quintessential compensable harms, i.e., not irreparable." App. Vol. 3 at

774. Therefore, the district court did not abuse its discretion when it concluded

Plaintiffs could not establish irreparable harm from having to wait three days to acquire additional guns.

### B. RMGO is not entitled to a preliminary injunction because the public interest is strongly opposed to one.

The district court concluded that the Waiting Period Act would "sav[e] approximately one hundred people in Colorado this year," which "outweighs the aggregate harm of minimal expenditures of time and sacrificed business opportunities." *Id.* at 778. The court relied on testimony and research from Professor Poliquin that found that "imposing a handgun waiting period results in a 17 percent reduction in gun homicides, and a 7 to 11 percent reduction in gun suicides." *Id.* at 776.

RMGO does not dispute these factual findings, let alone contend they amount to clear error. The district court emphatically rejected RMGO's expert—who is untrained as a statistician—in his attempts to do so, and RMGO does not seek to rehabilitate its expert here. *See id.* at 776-77. Instead, RMGO argues that looking at lives saved by the Act "is precisely the sort [of] means-ends justification that *Bruen* forbade." Opening Br. 44. But the Supreme Court has never said that courts deciding constitutional questions should ignore the equitable requirements for an injunction. To the contrary, the Supreme Court has emphasized that "courts of equity should pay particular regard for the public consequences in employing

43

the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. *Bruen* itself arose

on a motion to dismiss and did not alter the longstanding equitable factors required

for a preliminary injunction. In other words,

> *Bruen* expressly prevents a Court from considering the public interest
> . . . in assessing whether a firearm restriction is unconstitutional under
> the Second Amendment. Whether a preliminary injunction should be
> entered relating to the time period before a final determination on
> constitutionality is made, however, is a different question for which the
> public interest must expressly be considered.

*See Md. Shall Issue, Inc. v. Montgomery Cnty., Md.*, 680 F. Supp. 3d 567, 594 (D.

Md. 2023).

It is little wonder that RMGO does not want courts to consider evidence of

the public interest here. As the district court found, "it is not remotely close." App.

Vol. 3 at 777. The public interest in saving the lives of 100 Coloradans while this

case is fully litigated far outweighs the individual interest in being able to acquire

firearms without delay.

## CONCLUSION

The Court should affirm the district court's order denying a preliminary

injunction.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested because this appeal involves a constitutional

challenge to a state statute.

Dated: May 1, 2024.

PHILIP J. WEISER
Attorney General

/s/ Michael T. Kotlarczyk
*Michael T. Kotlarczyk*, Assistant Solicitor General\*
*Matthew J. Worthington*, Assistant Attorney General\*
1300 Broadway, 6th Floor
Denver, CO 80203
Telephone: (720) 508-6187
Email: mike.kotlarczyk@coag.gov;
matt.worthington@coag.gov
*Attorneys for Governor Jared S. Polis*
\*Counsel of Record

45

**Word Count and Typeface**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) (excluding items listed under Fed. R. App. P. 32(f)) because

      this brief contains 10,016 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

      this brief has been prepared in a proportionally spaced typeface (fourteen-point Times New Roman) using Microsoft Word.

Date: May 1, 2024.

                    *s/ Michael T. Kotlarczyk*
                    MICHAEL T. KOTLARCZYK
                    Senior Assistant Attorney General