No. 23-1380

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

ROCKY MOUNTAIN GUN OWNERS, *et al.*,
PLAINTIFFS-APPELLANTS,

V.

JARED S. POLIS, in his official capacity as
Governor of the State of Colorado,
DEFENDANT-APPELLEE.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
No. 1:23-CV-2563, Hon. John L. Kane

**BRIEF FOR THE DISTRICT OF COLUMBIA, CALIFORNIA, CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, WASHINGTON, AND THE NORTHERN MARIANA ISLANDS AS AMICI CURIAE IN SUPPORT OF DEFENDANT-APPELLEE**

BRIAN L. SCHWALB
Attorney General for the
District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

RUSSELL C. BOGUE
Assistant Attorney General

MARCELLA COBURN
Assistant Attorney General

Office of the Attorney General for the
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 674-0753
marcella.coburn@dc.gov

# TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICI CURIAE.....................................1

SUMMARY OF ARGUMENT .................................................................2

ARGUMENT .......................................................................................4

I.     States May Implement Reasonable Firearm Regulations To Protect The Health And Safety Of Their Residents .............................................4

II.     Waiting Periods Are Commonly Used Firearm Regulations That Save Lives...........................................................................................9

      A.     Waiting periods help to ensure that only law-abiding, responsible individuals will keep or bear arms ......................................10

      B.     At least 13 other jurisdictions enforce explicit waiting periods, and even more require prospective gun buyers to wait to pass a background check or acquire a purchase permit ................................15

      C.     Waiting periods reduce gun deaths ....................................18

CONCLUSION ....................................................................................21

# TABLE OF AUTHORITIES

*Cases*

*District of Columbia v. Heller*,
554 U.S. 570 (2008)................................................ 1, 4, 5, 6, 7, 8, 9, 11, 12, 13, 20

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ......................................................... 7

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ....................................... 2, 5, 6

*McRorey v. Garland*,
--- F.4th ----, 2024 WL 1825398 (5th Cir. Apr. 26, 2024) ................................. 13

*Medtronic Inc. v. Lohr*, 518 U.S. 470 (1996) ........................................................... 4

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111 (2022).................................... 1, 4, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) ........................................... 12

*New York v. Arm or Ally*,
--- F. Supp. 3d. ----, 2024 WL 756474 (S.D.N.Y. Feb. 23, 2024)......................12

*United States v. Morrison*, 529 U.S. 598 (2000) .......................................................5

*Constitutions and Statutes*

U.S. Const. amend. II................................................................................................ 12

18 U.S.C. § 922 ........................................................................................................ 17

Pub. L. No. 103-159, 107 Stat. 1536 (1994)............................................................ 15

Cal. Penal Code § 26815.......................................................................................... 16

Colo. Rev. Stat. § 18-12-115 ..................................................................................... 3

Conn. Gen. Stat. § 29-33 .......................................................................................... 18

Del. Code tit. 11, § 1448A ........................................................................................ 18

D.C. Code § 22-4508 ................................................................................................ 16

Fla. Const. art. I, § 8 ........................................................... 16

Haw. Rev. Stat. § 134-2 ...................................................... 16

720 Ill. Comp. Stat. 5/24-3 ................................................ 16

Md. Code Ann., Pub. Safety § 5-123 ................................. 16

Me. Rev. Stat. Ann. tit. 25, § 2015 .................................... 16

Mich. Comp. Laws § 28.422 ............................................... 17

Minn. Stat. § 624.7132 ....................................................... 16

N.J. Rev. Stat. § 2C:58-2 .................................................... 16

N.M. Stat. Ann. § 30-7-7.3 ................................................. 16

Neb. Rev. Stat. §§ 69-2403 to 69-2407 ............................. 17

Nev. Rev. Stat. § 202.2547 ................................................. 17

Ore. Rev. Stat. § 166.505 .................................................... 17

18 Pa. Cons. Stat. Ann. § 6111 .......................................... 18

R.I. Gen. Laws § 11-47-35 .................................................. 16

Va. Code Ann. § 18.2-308.2:2 ............................................ 17

Vt. Stat. Ann. tit. 13, § 4019a .......................................... 16

Wash. Rev. Code § 9.41.092 ............................................... 16

### Other

Michael D. Anestis et al., *Handgun Legislation and Changes in Statewide Overall Suicide Rates*, 107 Am. J. Pub. Health 579 (2017) ............................... 20

Catherine W. Barber & Matthew J. Miller, *Reducing A Suicidal Person's Access to Lethal Means of Suicide: A Research Agenda*, 47 Am. J. Prev. Med. S264 (2014) ....................................................................19

Crim. Just. Info. Servs. Div., FBI, *2019 NICS Operations Report* (2020)..............17

Edward Helmore, *Walmart Shooter Purchased Handgun Legally the Same Day, Authorities Say*, Guardian (Nov. 25, 2022)................................................18

Gene Johnson, *Tulsa Shooting Renews Debate on Waiting Periods for Gun Buyers*, PBS (June 4, 2022) ...............................................................................18

Michael Luca et al., *Handgun Waiting Periods Reduce Gun Deaths*, 114 Proc. of the Nat'l Acad. Scis. of the U.S. 12162 (2017) ......................16, 19

Stephen D. Oliphant, *Effects of Wisconsin's Handgun Waiting Period Repeal on Suicide Rates*, 28 Inj. Prevention 580 (2022)....................................20

Lindsay Whitehurst, *8 Dead in Atlanta Spa Shootings, With Fears of Anti-Asian Bias*, N.Y. Times (Mar. 26, 2021)....................................................18

**INTRODUCTION AND INTEREST OF AMICI CURIAE**

Amici the District of Columbia, California, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and the Northern Mariana Islands (collectively, "Amici States") submit this brief in support of defendant-appellee Jared S. Polis pursuant to Federal Rule of Appellate Procedure 29(a)(2).

As independent sovereigns, Amici States have a responsibility to protect the health, safety, and welfare of their communities, which includes protecting their residents from the harmful effects of gun violence and promoting the safe and responsible use of firearms. Amici States have historically fulfilled this responsibility by exercising their police powers to regulate firearms, including through measures like waiting periods and background checks that ensure guns are used in a "law-abiding, responsible" manner. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2138 n.9 (2022). Those regulations do not conflict with the Second Amendment. As the Supreme Court has consistently recognized, the Second Amendment does not encompass the "'right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Id.* at 2128 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008)). Rather, it leaves states with the policy flexibility they need to protect their communities while

ensuring that law-abiding and responsible persons can exercise their constitutional rights.

Indeed, the Second Amendment permits states to enact a variety of regulations to combat the misuse of firearms and enables "solutions to social problems that suit local needs and values." *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010). This flexibility is an essential element of our federalist system, ensuring that firearm regulations appropriately address the specific concerns in each locality. Here, the Colorado Legislature reasonably determined that a brief, uniform waiting period for firearm purchases would protect public safety by reducing the risk of heat-of-the-moment homicides and suicides. Amici States have taken different approaches to the issue of gun violence within their borders, but all wish to maintain their authority to address firearm-related issues through legislation that is consistent with historical tradition and responsive to the unique circumstances in their communities. The district court's decision permits Colorado to do just that, and its order denying the preliminary injunction should be affirmed.

## SUMMARY OF ARGUMENT

In 2023, Colorado enacted House Bill 21-1219 (the "Waiting-Period Act"), which became effective on October 1, 2023. Op. 4.[1] The Waiting-Period Act makes

---

[1]     Citations to "Op." refer to the district court decision denying the request for preliminary injunctive relief, included as Attachment 1 of Appellants Brief.

it illegal for any firearm dealer "to deliver the firearm to the purchaser until the later in time occurs": either 3 days elapse since the dealer initiated a background check, or the dealer obtains approval to transfer the firearm after completing any background checks required by state or federal law. Colo. Rev. Stat. § 18-12-115(1)(a). Plaintiffs challenged the law under the Second Amendment and requested a preliminary injunction against its enforcement. Op. 1. The district court denied that motion. Op. 42. The court held that the Waiting-Period Act was a presumptively valid regulation of the commercial sale of firearms that was not covered by the text of the Second Amendment, *see* Op. 15-16, 19-22, and that it was in any event consistent with this Nation's historical tradition of firearm regulation, *see* Op. 22-36.

Amici States agree with Colorado that this Court can uphold the Waiting-Period Act as a presumptively valid regulation of the commercial sale of firearms. *See* Appellee Br. 23-29. This brief, however, focuses on an alternative basis the district court provided for denying the preliminary injunction—states' historical and present practice of ensuring that arms are used in a lawful and responsible manner.

The Supreme Court's Second Amendment precedents leave ample room for states to implement measures that restrict arms-bearing to law-abiding, responsible adults. Reasonable waiting periods fall squarely in this category. In addition to allowing states to conduct adequate background checks, they impose a prophylactic

"cooling off" period between firearm purchase and acquisition that can—like background checks—help to ensure that guns will not be used for unlawful or irresponsible purposes. For that reason, at least 13 other jurisdictions enforce explicit waiting periods for firearm acquisition. And the available evidence shows that such delays can save lives. Because waiting periods sit well within the boundaries of constitutional firearm regulation, and because saving lives advances the public interest, the district court's denial of the preliminary injunction should be affirmed.

## ARGUMENT

I.   **States May Implement Reasonable Firearm Regulations To Protect The Health And Safety Of Their Residents.**

Since the Founding, states have enacted restrictions on who may bear arms, where arms may be brought, and the manner in which arms may be carried. *See Bruen*, 142 S. Ct. at 2145; *Heller*, 554 U.S. at 626-27. The Waiting-Period Act is one in a long line of state regulations designed to protect the public by ensuring that guns are used only for lawful and responsible purposes.

States have "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (internal quotation marks omitted). Those powers include enacting locally tailored measures to promote public safety. Indeed, there is "no better example of the police power, which the Founders denied the

National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000).

The Supreme Court has repeatedly affirmed states' authority in this area, even as it has defined the scope and import of the rights conferred by the Second Amendment. In each of its major Second Amendment opinions—*Heller*, 554 U.S. 570, *McDonald*, 561 U.S. 742, and *Bruen*, 142 S. Ct. 2111—the Court expressly acknowledged the important role states play in setting their own local policies to minimize the risk of gun violence, consistent with our Nation's historical tradition.

In *Heller*, the Court made clear that the right to keep and bear arms is "not unlimited." 554 U.S. at 626. Although states may not completely ban the possession of handguns by law-abiding, responsible adults or impose similarly severe burdens, they still possess "a variety of tools" to combat the problem of gun violence in a way that is responsive to the needs of their communities. *Id.* at 636. States may, for example, presumptively prohibit "felons and the mentally ill" from possessing firearms, ban "the carrying of firearms in sensitive places," and impose "conditions and qualifications on the commercial sale of arms." *Id.* at 626-27.

The Court then reiterated in *McDonald* that the Second Amendment "by no means eliminates" a state's ability to regulate firearms to promote public safety. 561 U.S. at 785; *see id.* at 802 (Scalia, J., concurring) ("No fundamental right—not even

the First Amendment—is absolute.").  Recognizing that "conditions and problems differ from locality to locality," *id.* at 783 (plurality), the Court made clear that "state and local experimentation with reasonable firearms regulations" could and should continue "under the Second Amendment," *id*. at 785 (brackets and internal quotation marks omitted).

*Bruen* reaffirmed these principles.  There, the Court explicitly stated that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of provisions "designed to ensure only that those bearing arms . . . are, in fact, 'law-abiding, responsible citizens,'" such as requiring a background check and training in firearms to receive a license to carry.  142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635).  And the Court acknowledged that, while historical practice should inform the analysis of any gun laws, "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132.

These decisions make clear that states retain significant power to enact laws to protect their residents.  Those laws need not be uniform:  states are free to select "solutions to social problems that suit local needs and values," ensuring that firearm regulations effectively address the specific circumstances in each state. *McDonald*, 561 U.S. at 785.  In other words, the Second Amendment is not a "regulatory straightjacket." *Bruen*, 142 S. Ct. at 2133.  On the contrary, states are permitted to

enact a wide range of firearm regulations. *See id.* at 2162 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (quoting *Heller*, 554 U.S. at 636)).

Nor must these state laws be frozen in time. Rather, *Bruen* instructs that governments must "identify a well-established and historical *analogue*" for modern firearm regulations that implicate the Second Amendment, "not a historical *twin*." *Id.* at 2133 (majority opinion). Thus, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* For example, courts may use analogies to historical prohibitions on bringing firearms into legislative assemblies, polling places, and courthouses to determine the permissibility of modern restrictions in "*new* and analogous sensitive places." *Id.*

In short, although the Supreme Court has defined the outer bounds of permissible regulations, it has not "abrogate[d]" states' "core responsibility" of "[p]roviding for the safety of citizens within their borders." *Kolbe v. Hogan*, 849 F.3d 114, 150 (4th Cir. 2017) (en banc) (Wilkinson, J., concurring) (quoting *Heller*, 554 U.S. at 635), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. States retain not only the freedom, but also the fundamental responsibility, to implement targeted measures designed to respond to the needs of their communities and to protect their residents from the harms associated with gun violence.

In particular, using their police powers, local jurisdictions may limit who can possess or carry guns to ensure their lawful and responsible use. That is because, as *Bruen* itself makes clear, the "people whom the Second Amendment protects" are "ordinary, law-abiding, adult citizens," 142 S. Ct. at 2134 (citation omitted)—and not, for instance, felons or the mentally ill, *see Heller*, 554 U.S. at 626, or those who might otherwise engage in violent or irresponsible acts.

For example, the *Bruen* majority cited with approval the "shall-issue" licensing regimes of 43 states in effect at the time of the decision. *Bruen*, 142 S. Ct at 2138 n.9. According to the majority, these licensing regimes may include requirements "to undergo a background check or pass a firearms safety course" because such guardrails "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635); *see id.* at 2162 (Kavanaugh, J., concurring) (approving of "fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements"). As long as these measures permit ordinary citizens to exercise "their Second Amendment right to public carry," the Court explained, they are presumptively constitutional. *Id.* at 2138 n.9 (majority opinion).

The Supreme Court in *Bruen* thus endorsed the proposition that states may deploy measures with "narrow, objective, and definite standards" to ensure guns are

used lawfully and responsibly. *Id.* Licensing is one permissible way to achieve that goal. But other measures that accomplish the same ends, while respecting the rights of ordinary citizens to acquire and carry firearms in case of confrontation, *see Heller*, 554 U.S. at 592; *Bruen*, 142 S. Ct at 2127, are likewise constitutional. That is especially true of regulations that do not rely on either the demonstration of some "special need" for a gun, the exercise of "open-ended" discretion by state authorities, or other features that may deny law-abiding, responsible citizens the right to acquire or carry firearms for self-defense. *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). Colorado's waiting period is one such "objective" and "definite" measure that helps ensure firearms will be used lawfully and responsibly by encouraging purchasers who might otherwise be a danger to themselves or others to "cool off" before taking possession of a firearm.

## II. Waiting Periods Are Commonly Used Firearm Regulations That Save Lives.

Like background checks and firearms-training requirements, waiting periods are limited tools designed to ensure that firearms are used in lawful and responsible ways. They thus do not "infringe" any Second Amendment rights, and they sit well within the constitutional boundaries that *Bruen* drew. Indeed, it is common to require prospective gun purchasers to wait some period of time before receiving a firearm so that authorities can ensure the firearm will not be used unlawfully or irresponsibly. Multiple jurisdictions, like Colorado, currently enforce explicit

waiting periods, and still more build in de facto waiting periods for state authorities to conduct background checks or issue purchase permits. Moreover, waiting periods have been shown to save lives by reducing the rate of gun homicides and suicides. The district court's denial of plaintiffs' request to enjoin this crucial public-safety measure should therefore be affirmed.

### A.      Waiting periods help to ensure that only law-abiding, responsible individuals will keep or bear arms.

Waiting periods delay the acquisition of a firearm to ensure that individuals intend to act in a law-abiding and responsible manner when they take possession of the weapon. That purpose, as even appellants concede, is a constitutional one: acknowledging that "[b]ackground checks take time," appellants disavow that they support "immediate acquisition of firearms." Appellants Br. 22 (internal quotation marks omitted). Instead, they rest their case against Colorado's three-day waiting period on the asserted right "to obtain a firearm without being unconstitutionally and arbitrarily delayed." Appellants Br. 22.

Even assuming that asserted interest is valid, it does not help them. Waiting periods do not "arbitrarily" delay the acquisition of firearms. Instead, they afford adequate time to complete background checks and help to reduce the possibility that the gun will be used in crime of passion or suicide—*i.e.*, unlawfully or irresponsibly. *See infra* Part II.C. That is precisely the sort of purpose that appellants appear to accept as legitimate. As a uniform requirement, waiting periods also deploy the

"narrow, objective, and definite" standards that the Supreme Court approved of in *Bruen*. 142 S. Ct. at 2138 n.9. And they do not impose more than a de minimis burden on the right of law-abiding, responsible individuals to acquire and carry firearms for self-defense.

Indeed, it has been long established that states and the federal government may restrict arms-bearing by violent felons or the mentally ill, *see Heller*, 554 U.S. at 626, and institute requirements like training in firearms or the use of force, *see Bruen*, 142 S. Ct. at 2161-62 (Kavanaugh, J., concurring), in order to ensure that firearms are used safely and lawfully. Background checks accomplish this goal by verifying that the license applicant or gun purchaser does not have a history that predicts unlawful or irresponsible use of firearms. Firearms training likewise reduces irresponsible use by guaranteeing that all arms-bearers have a baseline level of knowledge about the safe operation of firearms. Both requirements can delay firearm acquisition. Waiting periods serve the same ends through the delay itself— by ensuring that individuals seeking a gun when enraged or suicidal have time to reconsider, *see infra* Part II.C, and by giving governments breathing room to conduct adequate background checks on purchasers.

That is why appellants' repeated analogies (Appellants Br. 11, 12 n.5, 26) to other constitutional rights, like the First Amendment, miss the mark. The function of a waiting period in the Second Amendment context is to ensure that guns are used

lawfully and responsibly, not simply to delay arbitrarily the exercise of constitutional rights. Because only law-abiding and responsible adult citizens have Second Amendment rights, measures that limit arms-bearing to that population—as long as those measures are not overly burdensome for the average citizen—are acceptable. *See Bruen*, 142 S. Ct. at 2138 n.9. Indeed, appellants fail to acknowledge the inconsistency of their own position: the Constitution would not tolerate a shall-issue licensing regime or background checks just to speak, either. *See N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971). But these measures are constitutional in the Second Amendment context because, among other things, they serve to identify "'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134 (citing *Heller*, 554 U.S. at 580).

Moreover, creating a brief delay between the desire to acquire a handgun and taking physical possession of it does not "infringe" any Second Amendment right. The requirement that the right to keep and bear arms "shall not be infringed," which is clearly stated in the Second Amendment's text, serves to filter out minimal burdens from judicial second-guessing. U.S. Const. amend. II. Laws that do not actually *infringe* the right to bear arms "do not trigger Second Amendment scrutiny." *New York v. Arm or Ally*, --- F. Supp. 3d. ----, 2024 WL 756474, at *13 (S.D.N.Y. Feb. 23, 2024). Thus, the *Bruen* Court invalidated New York's "broad[] prohibit[ion] [on] the public carry of commonly used firearms for personal defense,"

142 S. Ct. at 2156, but left most licensing regimes across the country undisturbed, *see id.* at 2138 n.9. And the *Heller* Court acknowledged that the Second Amendment permits a "variety" of firearm regulations, even though it forbids an "*absolute prohibition* of handguns held and used for self-defense in the home." 554 U.S. at 636 (emphasis added).

Appellants are therefore wrong to claim that the state's logic permits Colorado to impose a "100-year" waiting period without provoking Second Amendment scrutiny. Appellants Br. 26. While the Supreme Court in *Bruen* acknowledged that excessively long or "abusive" wait times may pose a constitutional issue, it accepted that delays of some length would be permissible as states impose measures with "narrow, objective, and definite standards" to ensure the safe and lawful use of firearms. 142 S. Ct. at 2138 n.9; *see McRorey v. Garland*, --- F.4th ----, 2024 WL 1825398, at *6 (5th Cir. Apr. 26, 2024) ("Our law is plain as can be that some amount of time for background checks is permissible."). And appellants have come nowhere close to demonstrating that Colorado's three-day waiting period—the equivalent of a holiday weekend—qualifies as "abusive" under this standard.

Appellants also miss the mark in arguing that the Waiting-Period Act's applicability to "all Colorado citizens, regardless of whether they pose any danger," Appellants Br. 35, causes particular constitutional concern. Indeed, the Supreme Court itself has already rejected the requirement of individualized treatment for

making gun-suitability determinations. For instance, licensing regimes that require background checks and firearms-training courses as prerequisites to carrying firearms are prophylactic violence-prevention measures applicable to *every* adult citizen seeking to carry arms in public. Much like waiting periods, they "prohibit[] all people from" carrying or possessing weapons until they have met certain requirements. Appellants Br. 35. Yet the Court went out of its way to approve of such generally applicable regulations. *See Bruen*, 142 S. Ct. 2138 n.9; *id.* at 2162 (Kavanaugh, J., concurring). Moreover—contrary to appellants' incorrect assertion—waiting periods mirror these measures by ensuring that those purchasing firearms do not possess "traits that pose[] a specific danger," Appellants Br. 39, such as an immediate propensity to do harm to others, *see infra* Part II.C. The relevant inquiry is not whether a firearm regulation requires individualized treatment, but whether the regulation uses "narrow, objective, and definite" standards to "ensure . . . that those bearing arms in the jurisdiction are, in fact, law abiding and responsible citizens." *Bruen*, 142 S. Ct. at 2138 n.9 (internal quotation marks omitted). Waiting periods do just that.

As both Colorado and the district court agree, a robust historical tradition supports such laws. *See* Appellee Br. 35-41; Op. 22-36. That tradition includes both more individualized tools—such as laws against firearm possession while intoxicated, *see* Appellee Br. 36-39; Op. 30-34—and more uniform ones, such as

licensing laws, *see* Appellee Br. 40-41; Op. 34-36.  Because the Waiting-Period Act is "relevantly similar" to these historical regulations both in "how and why" it burdens "a law-abiding citizen's right to armed self-defense," *Bruen*, 142 S. Ct. at 2132-33, it passes constitutional muster.

**B.**  **At least 13 other jurisdictions enforce explicit waiting periods, and even more require prospective gun buyers to wait to pass a background check or acquire a purchase permit.**

The Waiting-Period Act is no outlier.  Explicit waiting periods have been a common regulatory tool for the past several decades.  For instance, the Brady Handgun Violence Prevention Act of 1994 initially imposed a five-day waiting period for handguns purchased from licensed gun dealers in states without robust background-check procedures.  Pub. L. No. 103-159, § 102(a), 107 Stat. 1536, 1537-38.  In part because of this interim measure—which expired in 1998, when the National Instant Criminal Background Check System became available, *see id.* § 103, 107 Stat. at 1541—at least 44 states and the District "had a waiting period for at least some time between 1970 and 2014," Michael Luca et al., *Handgun Waiting Periods Reduce Gun Deaths*, 114 Proc. of the Nat'l Acad. Scis. of the U.S. 12162, 12162 (2017), https://tinyurl.com/4b2fnx72 (admitted in the trial court as Exhibit 2).

Currently, at least 12 other states and the District have instituted explicit waiting periods.  In some states, the waiting period applies to any firearm purchase or purchase-permit application (with certain exceptions, *e.g.*, for concealed-carry

licensees or law-enforcement officers). These waiting periods range in duration from 3 to 14 days. *See* 720 Ill. Comp. Stat. 5/24-3 (3 days); Me. Rev. Stat. Ann. tit. 25, § 2015 (3 days) (effective 90 days after adjournment of the Second Regular Session of the 131st Maine Legislature); Vt. Stat. Ann. tit. 13, § 4019a(a) (3 to 7 days); N.M. Stat. Ann. § 30-7-7.3 (7 days) (effective May 15); D.C. Code § 22-4508 (10 days); Cal. Penal Code § 26815(a) (10 days); Wash. Rev. Code § 9.41.092(2) (10 days); Haw. Rev. Stat. § 134-2(e) (14 days from date of application for a purchase permit; handgun permits last 30 days, while shotgun and rifle permits last a year). In other states, the waiting period applies only to certain firearms like handguns or assault weapons. These periods range in duration from 3 to 30 days. *See* Fla. Const. art. I, § 8(b) (3 days, handguns); Md. Code Ann., Pub. Safety § 5-123(a) (7 days, handguns and assault weapons); N.J. Rev. Stat. § 2C:58-2(a)(5)(a) (7 days, handguns); R.I. Gen. Laws § 11-47-35(a)(1) (7 days, pistols and revolvers); Minn. Stat. § 624.7132, subdiv. 4 (30 days, handguns and assault weapons).

Immediate acquisition of a firearm upon the completion of a purchase is therefore not the right baseline. On the contrary, many prospective gun buyers are required to wait *some* period of time in order to pass a background check or receive a permit to purchase a handgun—de facto "waiting periods" that appellants appear not to contest. *See* Appellants Br. 22. For instance, federal law currently requires a background check, which may take up to 3 days, for purchases of firearms from

licensed gun sellers.  *See* 18 U.S.C. § 922(t).  Although most checks are completed instantaneously, approximately 10% take longer than that.  *See* Crim. Just. Info. Servs. Div., FBI, *2019 NICS Operations Report* ii (2020), https://tinyurl.com/mrjtxu95.  That minor delay is not a constitutional issue.

Many other states independently require background checks or separate purchase permits in order to acquire certain firearms, which can also have the effect of building in de facto waiting periods.  *See, e.g.*, Neb. Rev. Stat. §§ 69-2403 to 69-2407 (with some exceptions, individuals must apply for a permit to purchase a handgun; chief of police has up to 3 days to complete background check; certificates last 3 years); Ore. Rev. Stat. § 166.505 (individuals must apply for a permit to purchase a firearm; permit agent has up to 30 days to issue the permit, following a background check and firearms-safety training; permits last 5 years); Mich. Comp. Laws § 28.422 (with some exceptions, individuals must apply for a permit to purchase a handgun; licensing authority must act "with due speed and diligence"; permits expire after 30 days).  Other states augment the federal background check conducted at the point of sale with additional, sometimes lengthier, state background-check requirements.  *See, e.g.*, Nev. Rev. Stat. § 202.2547 (all gun sales must go through federal background check, not just sales from federally licensed dealers); Va. Code Ann. § 18.2-308.2:2 (up to 5 days to complete state background

check); 18 Pa. Cons. Stat. Ann. § 6111 (up to 10 days); Del. Code tit. 11, § 1448A

(up to 25 days); Conn. Gen. Stat. § 29-33(c) (no time limit indicated).

In short, states employ a variety of limited, targeted regulations on the transfer

of firearms to purchasers—all of which can delay the delivery of firearms—in order

to fulfill their lawful duty of ensuring possession only by law-abiding, responsible

citizens. Colorado's Waiting-Period Act falls squarely within this range of common

practices.

### C.    Waiting periods reduce gun deaths.

Delaying the acquisition of a firearm can be a crucial tool in reducing gun

violence. A cooling-off period may prevent a disturbed individual from carrying out

his plans to harm others. For instance, the gunman who targeted Asian-American

businesses around Atlanta in 2021 acquired his gun the same day he went on his

rampage. *See* Lindsay Whitehurst, *8 Dead in Atlanta Spa Shootings, With Fears of

Anti-Asian Bias*, N.Y. Times (Mar. 26, 2021), https://tinyurl.com/nw4se653. So,

too, did the disgruntled employee who murdered his coworkers in a Walmart in

Chesapeake, Virginia. *See* Edward Helmore, *Walmart Shooter Purchased Handgun

Legally the Same Day, Authorities Say*, Guardian (Nov. 25, 2022),

https://tinyurl.com/46cu5y2j. And before 19-year-old Allen Ivanov opened fire on

his ex-girlfriend and others at a house party, he "sat in his car outside the party and

studied the owner's manual" because the gun had been purchased so recently. Gene

Johnson, *Tulsa Shooting Renews Debate on Waiting Periods for Gun Buyers*, PBS (June 4, 2022), https://tinyurl.com/32ybfsw4. In all of these tragic shootings, a waiting period could have delayed the acquisition of the firearm long enough for the danger of violence to subside.

Wait times can also prevent suicides. When individuals contemplating suicide "cannot readily obtain a highly lethal method," they "either attempt with a method less likely to prove fatal or do not attempt at all." Catherine W. Barber & Matthew J. Miller, *Reducing A Suicidal Person's Access to Lethal Means of Suicide: A Research Agenda*, 47 Am. J. Prev. Med. S264, S264 (2014), https://tinyurl.com/mrypu665. Suicidal crises are often short-lived, and the method used depends on its ready availability. *See id.* Among the common methods of attempting suicide, firearms are the most lethal. *See id.* Briefly delaying access to a firearm can thus mean the difference between life and death. That's particularly true because 90% of those who survive a nonfatal suicide attempt will not go on to die by suicide thereafter. *See id.* at S265. And focusing on firearms in particular makes good sense for another reason: in the United States, "more suicides are completed with a firearm than by all other methods combined." *Id.* at S266.

Empirical evidence demonstrates the effectiveness of waiting periods. One study has found that waiting periods were associated with a 17% reduction in gun homicides and a 7 to 11% decrease in gun suicides. Luca et al., *supra*, at 12163.

Another study found "significant" reductions in the suicide rate in states with mandatory waiting periods "relative to states without such laws." Michael D. Anestis et al., *Handgun Legislation and Changes in Statewide Overall Suicide Rates*, 107 Am. J. Pub. Health 579, 579-80 (2017), https://tinyurl.com/bdctjahk. And a third study has found that, after Wisconsin in 2015 repealed its 48-hour waiting period for handgun purchases, its suicide rate increased by 1.14 deaths per 100,000, "which translates to 66 additional handgun suicides per year." Stephen D. Oliphant, *Effects of Wisconsin's Handgun Waiting Period Repeal on Suicide Rates*, 28 Inj. Prevention 580, 581 (2022), https://tinyurl.com/4ff7n9n5. In addition, suicides in the state were "more likely to involve handguns" after the waiting-period repeal than before. *Id.* at 582. That study concludes: "Consistent with prior research examining waiting periods, the estimated 7% increase in firearm suicides following the repeal of a handgun waiting period suggests that firearm purchase delays are an effective form of temporary lethal means restriction to reduce suicide." *Id.* at 582.

Waiting periods can be a critical tool to reduce gun deaths while still preserving the rights of law-abiding, responsible citizens to carry firearms for self-defense. As the district court properly concluded, allowing this public-safety measure to go into effect promotes the public interest. And nothing in the Constitution requires depriving states of this life-saving measure.

## CONCLUSION

The Court should affirm the decision below.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for
the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

RUSSELL C. BOGUE
Assistant Attorney General

/s/ Marcella Coburn
MARCELLA COBURN
Assistant Attorney General

Office of the Attorney General for the
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 674-0753
marcella.coburn@dc.gov

May 2024

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 North French Street
Wilmington, DE 19801

ANNE E. LOPEZ
*Attorney General*
*State of Hawaii*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 South LaSalle Street
Chicago, Illinois 60603

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther
King Jr. Boulevard
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
Richard J. Hughes
Justice Complex
25 Market Street
Trenton, NJ 08625

RAÚL TORREZ
*Attorney General*
*State of New Mexico*
408 Galisteo Street
Santa Fe, New Mexico 87501

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

MICHELLE A. HENRY
*Attorney General*
*Commonwealth of Pennsylvania*
Strawberry Square, 16th Floor
Harrisburg, PA 17120

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

EDWARD E. MANIBUSAN
*Attorney General*
*Commonwealth of the*
*Northern Mariana Islands*
Caller Box 10007, Capitol Hill
Saipan, MP 96950

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. of App. P. 29(a)(4)(G) and 32(g), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(C) because it contains 4,783 words, excluding the parts of the brief exempted by Fed. R. App. P. 29(a)(5) and 32(a)(7).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Times New Roman font using Microsoft Word.

/s/ Marcella Coburn
Marcella Coburn

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on May 8, 2024, I electronically filed the foregoing Brief of Amici Curiae the District of Columbia et al. with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Marcella Coburn
Marcella Coburn