No. 23-1380

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
_____

ROCKY MOUNTAIN GUN OWNERS and ALICIA GARCIA,

*Plaintiffs-Appellants*,

v.

JARED POLIS, in his official capacity as Governor of the State of Colorado,

*Defendant-Appellee.*
_____

On Appeal from the United States District Court
for the District of Colorado
No. 23-cv-02563-JLK
Hon. John L. Kane
_____

## BRIEF OF EVERYTOWN FOR GUN SAFETY
## AS AMICUS CURIAE IN SUPPORT OF
## DEFENDANT-APPELLEE AND AFFIRMANCE
_____

<div style="margin-left:50%">

Freya Jamison
Everytown Law
P.O. Box 14780
Washington, DC 20044
(202) 517-6620
fjamison@everytown.org

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Ave, P.O. Box 4184
New York, NY 10163

</div>

May 8, 2024

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................1

ARGUMENT ...............................................................................3

   I.   Plaintiffs Have Not Met Their Burden to Establish that the Second Amendment's Plain Text Covers Their Conduct .........................................3

   II.   The Correct Historical Analysis Centers on the Reconstruction Era and Encompasses Consistent 20th-Century Regulations ...................................6

   III.   This Court Should Consider Historical Context in Evaluating the Historical Tradition under a "More Nuanced" Analysis ...........................16

CONCLUSION.............................................................................23

# TABLE OF AUTHORITIES

## *Cases*

*Antonyuk v. Chiumento*,
 89 F.4th 271 (2d Cir. 2023), *petition for cert. filed*, No. 23-910 (U.S. Feb. 20, 2024)
 ...............................................................................................4, 8, 16, 21

*Bevis v. City of Naperville*,
 85 F.4th 1175 (7th Cir. 2023), *petitions for cert. filed*, Nos. 23-877, 23-878, 23-879,
 23-880 (U.S. Feb. 12, 2024)................................................................................4

*District of Columbia v. Heller*,
 554 U.S. 570 (2008) ................................................................................2, 5, 15

*Dobbs v. Jackson Women's Health Org.*,
 597 U.S. 215 (2022)............................................................................................21

*Ezell v. City of Chicago*,
 651 F.3d 684 (7th Cir. 2011) ............................................................................11

*Heller v. District of Columbia*,
 670 F.3d 1244 (D.C. Cir. 2011)........................................................................17

*Kanter v. Barr*,
 919 F.3d 437 (7th Cir. 2019) ............................................................................22

*Kipke v. Moore*,
 No. 1:23-cv-01293, 2023 WL 6381503 (D. Md. Sept. 29, 2023)........................9

*Lara v. Commissioner Pennsylvania State Police*,
 91 F.4th 122 (3d Cir. 2024) ..............................................................................10

*McCullen v. Coakley*,
 573 U.S. 464 (2014)............................................................................................21

*McDonald v. City of Chicago*,
 561 U.S. 742 (2010)..............................................................................................8

*McIntyre v. Ohio Elections Comm'n*,
 514 U.S. 334 (1995)............................................................................................16

*McRorey v. Garland*,
   --- F.4th ---, No. 23-10837, 2024 WL 1825398 (5th Cir. Apr. 26, 2024)
   .................................................................................................2, 4, 5, 6

*Md. Shall Issue v. Moore*,
   86 F.4th 1038 (4th Cir. 2023), *vacated on grant of reh'g en banc*, 2024 WL 124290
   (4th Cir. Jan. 11, 2024) ................................................................................6

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
   680 F. Supp. 3d 567 (D. Md. July 6, 2023), *appeal docketed*, No. 23-1719 (4th Cir.
   July 10, 2023)................................................................................................9

*Nat'l Rifle Ass'n v. Bondi*,
   61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th
   Cir. 2023)...................................................................................................9, 11

*New York State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1 (2022).........................................1, 2, 3, 7, 8, 10, 12, 13, 14, 15, 16, 20

*Rupp v. Bonta*,
   No. 8:17-cv-00746, 2024 WL 1142061 (C.D. Cal. Mar. 15, 2024), *appeal docketed*,
   No. 24-2583 (9th Cir. Apr. 24, 2024) ................................................................10

*Silva v. Am. Fed'n of State, Cnty., & Municipal Emps.*,
   23 F. App'x 975 (10th Cir. 2001) ......................................................................20

*Silvester v. Harris*,
   843 F.3d 816 (9th Cir. 2016) .............................................................................5

*United States v. Libertad*,
   No. 1:22-cr-00644, 2023 WL 4378863 (S.D.N.Y. July 7, 2023) ...........................6

*United States v. Meyer*,
   No. 4:22-cr-10012, 2023 WL 3318492 (S.D. Fla. May 9, 2023)...........................13

*United States v. Perez-Garcia*,
   96 F.4th 1166 (9th Cir. 2024) ......................................................................20, 22

*United States v. Reyna*,
   No. 3:21-cr-00041, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022), *appeal docketed*,
   No. 23-1231 (7th Cir. Feb. 7, 2023) ...................................................................5

*United States v. Rowson*,
652 F. Supp. 3d 436 (S.D.N.Y. 2023) ...............................................................20

*Vincent v. Garland*,
80 F.4th 1197 (10th Cir. 2023), *petition for cert. filed*, No. 23-683 (U.S. Dec. 21, 2023) .........................................................................................................................10

*We the Patriots, Inc. v. Lujan Grisham*,
No. 1:23-cv-00773, 2023 WL 6622042 (D.N.M. Oct. 11, 2023), *appeal docketed*, No. 23-2166 (10th Cir. Oct. 20, 2023) ...................................................................9

## Statutes and Rules

Colo. Rev. Stat. § 18-12-115(1)(a) ...........................................................................6

## Other Authorities

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ...............13, 14

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (July 20, 2021)..............................................................15

Brief for the United States, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023), 2023 WL 5322645 ..........................................................................................22

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018)...............................................................................15

Eric Ruben, *Scientific Context, Suicide Prevention, and the Second Amendment After* Bruen, 108 Minn. L. Rev. (forthcoming 2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4710807 ...............18, 19

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022)....12

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) .......................................................11, 12

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ....................................................................................12, 13, 14

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) ........................................................12

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) ........................................................12

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008) ...............................11

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021)........................................................11

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with over ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Colorado's law establishing a three-day waiting period for commercial firearm sales is constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), for the reasons stated in the State's opening brief, Doc. 010111041938 ("State Br.").[2] Everytown

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

[2] This amicus brief addresses only aspects of Plaintiffs-Appellants' Second Amendment claim. The Court should affirm for all the reasons the State set out.

submits this amicus brief to expand on three points. *First*, on the initial, textual inquiry of *Bruen*'s framework, Plaintiffs have the burden to establish that the law's requirements infringe their right to keep and bear arms, and they have not met that burden. Rather, as the Fifth Circuit recently explained, such "ancillary firearm regulations" do not fall within the scope of the Second Amendment's plain text at all, but instead are presumptively lawful "conditions and qualifications on the commercial sale of arms." *See McRorey v. Garland*, --- F.4th ---, No. 23-10837, 2024 WL 1825398, at *3-6 (5th Cir. Apr. 26, 2024) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008)) (affirming denial of motion for preliminary injunction against federal law that established up to 10-business-day wait before federally-licensed dealer may transfer firearm to individual under age 21). *Second*, if this Court were to reach the historical inquiry of the *Bruen* framework—which asks whether a law is "consistent with the Nation's historical tradition of firearm regulation," 597 U.S. at 24—it should center its analysis on 1868, when the Fourteenth Amendment was ratified, not 1791. Moreover, 1868 is neither a starting-line nor a cutoff; under *Bruen* and *Heller*, both earlier and later history are also relevant. *Third*, *Bruen* also requires consideration of the historical context within which states and localities chose to legislate (or not to legislate)—and where, as here, a challenged law implicates "unprecedented societal concerns or dramatic technological changes," a "more nuanced" approach to the historical analysis is

2

warranted. 597 U.S. at 27. We illustrate this point through the specific example of suicide and suicide prevention.

## ARGUMENT

### I. Plaintiffs Have Not Met Their Burden to Establish that the Second Amendment's Plain Text Covers Their Conduct

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. A court first must ask whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. If so, the court then asks whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.* If not, the inquiry ends. *See generally id.* at 31-38 (separating application of test into Part III.A (text) and Part III.B (history)).

The burden to satisfy the initial, textual inquiry is on the plaintiff challenging a law. *Bruen* makes this clear by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See id.* at 24, 44 n.11. The burden shifts to the government only after this threshold analysis. If the burden were on the government throughout—in what would be an unusual departure from ordinary principles of constitutional litigation—the Court would have said so. Instead, *Bruen* discusses the government's burden only at the historical step. *See, e.g.*, *id.* at 33-34 ("[T]he burden falls on [the government] to show that [the challenged restriction] is consistent with this Nation's historical tradition of firearm regulation."). Multiple courts—including the

Second and Seventh Circuits—have thus correctly read *Bruen* to place the burden on the plaintiff to establish that the Second Amendment's plain text covers their conduct. *See, e.g.*, *Antonyuk v. Chiumento*, 89 F.4th 271, 383 (2d Cir. 2023) (explaining that plaintiffs were "required to show" that proposed conduct "was within the plain text of the Second Amendment"), *petition for cert. filed*, No. 23-910 (U.S. Feb. 20, 2024); *Bevis v. City of Naperville*, 85 F.4th 1175, 1194 (7th Cir. 2023) (noting that "plaintiffs ... have the burden" on *Bruen*'s textual inquiry), *petitions for cert. filed*, Nos. 23-877, 23-878, 23-879, 23-880 (U.S. Feb. 12, 2024).

Plaintiffs have not met their textual burden. As the district court explained, "it is clear" that the Second Amendment's plain text, which provides a right to "keep" and "bear" arms, does not cover "the relevant conduct impacted by the waiting period—the receipt of a paid-for firearm *without delay*." App. Vol. III at 807-08 (emphasis added). The Fifth Circuit recently reached a similar conclusion in rejecting a preliminary injunction against a federal law under which individuals under the age of 21 purchasing firearms from federally-licensed dealers faced up to a 10-business-day wait for completion of a background check. *McRorey*, 2024 WL 1825398, at *3-6. *McRorey* observed that the Second Amendment's "plain text covers plaintiffs' right 'to keep and bear arms,'" and "on its face 'keep and bear' does not include purchase—let alone without background check." *Id.* at *4; *see also id.* at *6 (rejecting plaintiffs' contention that the Second Amendment protects a

right to "*immediate* access to firearms" (emphasis added)).[3]

Plaintiffs seek to sidestep their burden by describing their proposed conduct simply as "obtaining a firearm." Doc. 010110992629 ("Pls. Br.") 12, 16. But that cannot be the relevant conduct for the step-one analysis because Colorado's law does not prevent Plaintiffs from acquiring firearms. *See, e.g.*, *United States v. Reyna*, No. 3:21-cr-00041, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022) ("For Step One to have any meaning, the regulated conduct must be defined specifically enough that it can [be] meaningfully compare[d] to the Second Amendment's plain text—a plain text that is more complex than mere possession."), *appeal docketed*, No. 23-1231 (7th Cir. Feb. 7, 2023). And while "regulations on purchase so burdensome that they act as *de facto* prohibitions on acquisition" would almost certainly be captured by the Second Amendment's text and be "subject to *Bruen*'s historical framework," *McRorey*, 2024 WL, at *5 n.18, *6, that is not this case here, and Plaintiffs do not claim otherwise.

Rather, a Coloradan wishing to purchase a firearm from a licensed gun

---

[3] This "ancillary firearm regulation[]," the Fifth Circuit found, did not fall within the scope of the Second Amendment's textual protection, but was instead a presumptively lawful "condition[] and qualification[] on the commercial sale of arms." *McRorey*, 2024 WL 1825398, at *3-6 (citing *Heller*, 554 U.S. at 626-27 & n.26); *see also Silvester v. Harris*, 843 F.3d 816, 829-30 (9th Cir. 2016) (Thomas, C.J., concurring) (explaining, pre-*Bruen*, that California's 10-day waiting period falls into this category of permissible regulation). The same is true of Colorado's waiting-period law. *See* State Br. 23-28.

dealer need only wait for three days (or the time needed to complete state and federal background checks, if longer than three days) to obtain that weapon. Colo. Rev. Stat. § 18-12-115(1)(a). Plaintiffs have offered no evidence that these minimal requirements infringe the right to keep and bear arms. *See McRorey*, 2024 WL 1825398, at \*6 (holding that a waiting "period of 10 days" does not constitute "a *de facto* prohibition on possession" of a firearm, and thus does not fall within the scope of the Second Amendment's text); *see also, e.g.*, *Md. Shall Issue v. Moore*, 86 F.4th 1038, 1056 (4th Cir. 2023) (Keenan, J., dissenting) (finding that the Supreme Court "has provided clear guidance that an 'infringement' of an individual's Second Amendment rights would require a greater impediment than a simple processing delay, firearms training, or the imposition of an administrative fee"), *vacated on grant of reh'g en banc*, 2024 WL 124290 (4th Cir. Jan. 11, 2024); *United States v. Libertad*, No. 1:22-cr-00644, 2023 WL 4378863, at \*3 (S.D.N.Y. July 7, 2023) (noting that "any number of regulations may incidentally, minimally, or not substantially burden the exercise of a right without being considered to actually 'infringe' it").

In sum, Plaintiffs have not carried their textual burden, and this Court may affirm on that basis alone.

## II. The Correct Historical Analysis Centers on the Reconstruction Era and Encompasses Consistent 20th-Century Regulations

Plaintiffs' claim fails under *Bruen*'s textual inquiry, and that should end the

case. However, if the Court proceeds to inquire whether Colorado's waiting-period law is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 17, it may confront the question of whether the most relevant time period for that inquiry centers on the Reconstruction era, and the ratification of the Fourteenth Amendment in 1868, or the founding era, and the ratification of the Second Amendment in 1791. Plaintiffs erroneously assert that "*Bruen* instructs courts to look to the Founding Era for historical analogues." Pls. Br. 31. But that is not so. *Bruen* expressly left open the question "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868" or when the Bill of Rights was ratified in 1791. 597 U.S. at 37.

Here, this Court need not decide which period is more important because the State has demonstrated that its law is entirely consistent with the American tradition of firearms regulation regardless of which period this Court considers. *See* State Br. 19-20, 35-41; *infra* pp. 21-22; *see also, e.g.*, *Bruen*, 597 U.S. at 38 (reserving the timeframe question because relevant history was consistent between 1791 and 1868). If, however, the Court finds it necessary to decide the question, it should conclude that the most relevant time period centers around 1868. And it should further conclude that the historical inquiry extends thereafter—including into the 20th century—to encompass consistent later restrictions, given the "dramatic

technological changes" and "unprecedented societal concerns" present in this case. *See Bruen*, 597 U.S. at 27; *infra* Section III.

To begin, because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," *Bruen*, 597 U.S. at 34, focusing on 1868 in a case against a state is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? The Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; as *Bruen* correctly observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Id.* Moreover, applying the 1791 public understanding of the right to keep and bear arms against the states would not make sense given the Supreme Court's lengthy analysis in *McDonald* of the understanding around 1868. *See McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010) (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). "It would be incongruous to deem the right to keep and bear arms fully applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk*, 89 F.4th at 305.

Multiple courts since *Bruen*, faced with challenges to state laws, have concluded that Reconstruction-era evidence is at least as important as founding-era evidence. *See, e.g.*, *Antonyuk*, 89 F.4th at 305, 318 n.27 (observing that

"evidence from Reconstruction regarding the scope of the right to bear arms incorporated by the Fourteenth Amendment is at least as relevant as evidence from the Founding Era"); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023) (explaining that where the understanding of the right differs between founding and Reconstruction eras, "the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment"), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023);[4] *Md. Shall Issue, Inc. v. Montgomery Cnty.*, 680 F. Supp. 3d 567, 582  (D. Md. 2023) (concluding that "historical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment"), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023); *Kipke v. Moore*, No. 1:23-cv-01293, 2023 WL 6381503, at *6 (D. Md. Sept. 29, 2023) (agreeing with *Maryland Shall Issue*); *We the Patriots, Inc. v. Lujan Grisham*, No. 1:23-cv-00773, 2023 WL 6622042, at *8 (D.N.M. Oct. 11, 2023) (agreeing with *Bondi* and *Maryland Shall Issue* that "that historical sources from … 1868 are more probative of the scope of the Second Amendment's right to bear arms than those from the Founding Era"), *appeal docketed*, No. 23-2166 (10th Cir. Oct.

---

[4] Although *Bondi* has been vacated for rehearing en banc, it remains persuasive because its reasoning and authorities are robust.

20, 2023); *Rupp v. Bonta*, No. 8:17-cv-00746, 2024 WL 1142061, at \*9, 31-32

(C.D. Cal. Mar. 15, 2024) (concluding that "ratification of the Fourteenth

Amendment is the operative period from which to discern the public

understanding of the Second Amendment"), *appeal docketed*, No. 24-2583 (9th

Cir. Apr. 24, 2024); *see also Vincent v. Garland*, 80 F.4th 1197, 1203 (10th Cir.

2023) (Bacharach, J., concurring) (noting that, in conducting the *Bruen* analysis,

courts should consider history "through the end of the nineteenth century"),

*petition for cert. filed*, No. 23-683 (U.S. Dec. 21, 2023).[5]

The conclusion that the 1868 understanding of the Second Amendment

should apply in a case against a state is far from radical. When asked by Justice

Thomas about the correct time period during oral argument in *Bruen*, counsel

---

[5] This Court should not follow the Third Circuit's focus on 1791 in *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024). Instead of engaging with originalist principles, the Third Circuit based its conclusion on the "general assumption" in several Supreme Court cases cited by *Bruen*. *See id.* at 133-33 (citing *Bruen*, 597 U.S. at 37). But those cases did not address the significance of the Fourteenth Amendment's ratification for the question of which time period is most relevant to the historical inquiry and cannot have resolved the question that *Bruen* expressly left open. *See Bruen*, 597 U.S. at 37-38. At the very least, because it relied on an assumption and cannot be squared with originalist principles, *Lara* is not persuasive. *See Rupp*, 2024 WL 1142061, at \*32 (declining to follow *Lara* because, "[r]ather than elevate an assumption to a holding, the Court thinks it best to address the issue from first principles and … the Court is persuaded that Reconstruction-era practice provides the most probative evidence of the Second Amendment's meaning").

for New York's NRA affiliate responded with the Reconstruction era.[6] It is also

the position of leading scholars of originalism. "Many prominent judges and

scholars—across the political spectrum—agree that, at a minimum, 'the Second

Amendment's scope as a limitation on the States depends on how the right was

understood when the Fourteenth Amendment was ratified.'" *Bondi*, 61 F.4th at

1322 n.9 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011)); *see,*

*e.g.*, Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or*

*Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear*

*Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52 (2010) (explaining that 1868 is

"the proper temporal location for applying a whole host of rights to the states"

and that interpreting the Second Amendment "as instantiated by the

Fourteenth Amendment—based on the original public meaning in 1791—thus

yields an inaccurate analysis"); Steven G. Calabresi & Sarah E. Agudo, *Individual*

*Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868:*

*What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7,

115-16 & 116 n.485 (2008); Evan D. Bernick, *Fourteenth Amendment Confrontation*,

---

[6] *See* Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843) ("[If] the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.").

51 Hofstra L. Rev. 1, 23 (2022).[7] In sum, originalist analysis compels applying the 1868 understanding of the right in a case challenging a state law.[8]

This conclusion raises the question (not directly presented here) as to the correct temporal focus in cases challenging *federal* laws. If the public understanding of the Bill of Rights changed between ratification in 1791 and incorporation in 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* seemed to reject the possibility of different standards for the state and federal governments. *See* 597 U.S. at 37. Accordingly, it appears that

---

[7] *See also, e.g.,* Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008); Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008).

[8] To be clear, we do not suggest that each of these scholars also believe that 1868 is the correct focus for analyzing the public meaning of the right to keep and bear arms in cases against the *federal* government. Professors Blackman and Shapiro, for example, maintain that 1868 is the correct focus for cases against a state and 1791 is correct for cases against the federal government. *See* Blackman & Shapiro, *supra*, at 51. As discussed below, because *Bruen* subsequently seemed to reject the possibility of different standards for the state and federal governments, it appears that originalists must choose one period or the other, and the weight of authority and analysis favors 1868. *See infra* pp. 12-14.

originalists must justify applying either the 1868 understanding or the 1791 understanding (if they conflict) in all cases.

Existing doctrine does not resolve this choice: *Bruen* noted only that prior decisions had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id*. If the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open whether 1868 or 1791 is the relevant focus, referencing "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id*. at 37-38. The Court then cited works by two scholars supporting the 1868 view, Professors Akhil Amar and Kurt Lash, and none supporting the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)); *see also, e.g.*, *United States v. Meyer*, No. 4:22-cr-10012, 2023 WL 3318492, at *2 n.4 (S.D. Fla. May 9, 2023) (noting that "Justice Thomas, writing

for the majority in *Bruen*, signaled an openness to the feedback-effect theory of the Fourteenth Amendment").

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning as to the federal government.[9] In Professor Lash's words—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, *supra*, manuscript, at 2; *see Bruen*, 597 U.S. at 38. On this view, 1868 meanings bind both the states and the federal government.

The 1868 view is also consistent with *Bruen*'s explication of historical methodology through the example of sensitive-places restrictions. There, the Court indicated that "18th- *and 19th-century*" laws contained adequate restrictions on the possession of guns in legislative assemblies, polling places, and courthouses to satisfy the historical analysis, 597 U.S. at 30 (emphasis added)—an incomprehensible

---

[9] *See* Amar, *The Bill of Rights*, *supra*, at xiv (noting that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

statement if the Court believed the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, *see id.*, all the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[10]

In addition to concluding that 1868, rather than 1791, should be the focus of the historical analysis, this Court should also recognize that 1868 is neither a starting line nor a cutoff, and that consistent later history is also highly relevant. *Heller* and *Bruen* both examined history preceding even 1791, *see Heller*, 554 U.S. at 592-93; *Bruen*, 597 U.S. 34-35, 44-50, and *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation," 554 U.S. at 605 (second emphasis added); *see also Bruen*, 597 U.S. at 20 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 597 U.S. at 36, 66 n.28. But it emphasized that, conversely, "a regular course of

---

[10] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 35-36 (cleaned up) (quoting decision quoting James Madison).[11] After all, it is "implausible" that "public understanding would promptly dissipate whenever [one] era gave way to another." *See Antonyuk*, 89 F.4th at 304*; see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) ("Principles of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness."). Thus, regardless of which period this Court determines to be the most relevant, it should look to historical sources and "practice" thereafter, including waiting-period laws from the early 20th century, *see* State Br. 35 n.7, to "settle" the meaning of the right and demonstrate that Colorado's waiting-period law is constitutional.

### III. This Court Should Consider Historical Context in Evaluating the Historical Tradition under a "More Nuanced" Analysis

If this Court proceeds to *Bruen*'s historical step, it should recognize the importance of historical context for that analysis. *Bruen* counsels that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to the historical inquiry. 597 U.S. at 27;

---

[11] As such, the district court was correct to consider regulatory practices from "before, during, and even *after* the founding," App. Vol. III at 816 (quoting *Bruen*, 597 U.S. at 27) (emphasis added); *see also id.* at 824-29 (discussing 17th-, 18th-, 19th-, and 20th-century practices).

*see also Heller v. District of Columbia*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that "constitutional principles … must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution's Framers"). That is precisely the situation here. *See* State Br. 30-41.

The district court focused in particular on two aspects of the relevant historical context that help explain why specific waiting-period laws like Colorado's did not arise earlier—and why a "more nuanced" Second Amendment historical analysis is thus warranted in this case. *See* App. Vol. III at 818-23. First, waiting periods already existed in practice in early America; as Professors Roth and Spitzer explained, limited manufacturing capability made it such that purchasers routinely had to wait several days to receive firearms by mail. App. Vol. III at 819, 822; *see also* App. Vol. I at 82-83 (Spitzer Declaration). Second, legislatures from the founding through the first century of the nation's existence were less concerned about the heat-of-the-moment firearm homicides that waiting periods address than modern legislatures are because, as Professor Roth explained, technical limitations made early firearms impractical murder weapons. App. Vol. III at 818-23 (quoting Professor Roth's testimony and noting that colonial American muzzle-loading shotguns "had significant limitations as murder weapons" due to their tendency to misfire and inability to fire more than one round without cumbersome reloading);

17

*see* App. Vol. III at 615-16, 618-19 (Roth testimony); *see also* App. Vol. II at 326-29, 357 (Roth Declaration). The State details these social and technological conditions, and their impact on *Bruen*'s historical inquiry, in its brief and through its expert submissions before the Court. *See* State Br. 30-41.

Another piece of the historical context, raised below but not focused on by the district court, also supports a "more nuanced" historical analysis here—*i.e.*, the significant changes both in the means and methods of suicide and in the evolving societal understandings of and approaches to suicide prevention. While guns are the most common means of committing suicide in the United States today, *Suicide Data & Statistics*, *Data Table: Method of Suicide*, Centers for Disease Control and Prevention (2023), https://www.cdc.gov/suicide/suicide-data-statistics.html, as the State notes, *see* State Br. 31-32, they were rarely used for that purpose in early America. Professor Roth testified that the suicide rate in New England from 1784 to 1824 was "a third of what it is today in the United States," and that only 16% of those deaths were caused by firearms. App. Vol. III at 620. Other methods of suicide, including drowning and hanging, were much more common. *Id.*; *see also* Eric Ruben, *Scientific Context, Suicide Prevention, and the Second Amendment After* Bruen, 108 Minn. L. Rev. (forthcoming 2024) (manuscript at 150), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4710807 (estimating that

drowning, poisoning, and hanging accounted for about half of all suicides during this period).

Moreover, early Americans did not conceive of suicide as a symptom of psychological conditions that could be addressed by delaying access to lethal means. Instead, they often attributed suicide to the devil, and responded to it with religious rituals and criminalization. *See* Ruben, *supra*, at 135-40. By the early 19th century, some prominent thinkers began to understand "melancholy" as a physical illness, treatable by interventions including bloodletting and "purges" (induced diarrhea or vomiting). *See id.* at 143-46 (describing the then-pioneering 1812 work of doctor and Declaration of Independence signatory Benjamin Rush). It was not until the late 1800s and early 1900s that researchers like Sigmund Freud "beg[a]n to acknowledge the *psychological* determinants of suicidal behavior." *Id.* at 148 (emphasis added). And the modern understanding that restricting the immediate availability of highly lethal means of suicide is an effective approach to suicide prevention did not arise until the mid- to late-20th century. *Id.* at 116-19. We now know that "many suicidal crises are fleeting" and that limiting access to lethal arms during such crises results in reducing deaths by suicide. *Id.* at 119-20 (cataloguing numerous empirical studies and emphasizing that "the risk of suicide is more than four times greater for those living in homes with guns"). Without the benefit of these scientific advances, the founding generations "had no category for

understanding" that suicidal feelings may be transient and "can come and go in a single day," App. Vol. III at 620-21 (Roth testimony), and thus no reason to think that a waiting period would be effective at preventing suicide.

Under these circumstances, a "more nuanced approach" to history, *Bruen*, 597 U.S. at 27, including "a broader search for historical analogies," is fully warranted, *United States v. Rowson*, 652 F. Supp. 3d 436, 470 (S.D.N.Y. 2023). And, as the Ninth Circuit recently explained, in all cases, the historical evidence should be examined "as a whole" to ascertain "whether it establishes a tradition of permissible regulation." *United States v. Perez-Garcia*, 96 F.4th 1166, 1191 (9th Cir. 2024). A contrary "divide-and-conquer approach"—*i.e.*, one that "isolate[s] each historical precursor and asks if it differs from the challenged regulation in some way"—would contravene *Bruen*'s admonition that the government need not "identify a 'historical twin.'" *Id.* (citation omitted).

The lack of a "dead ringer," *Bruen*, 597 U.S. at 30, for Colorado's waiting-period law before the 20th century should not give this Court pause in affirming the district court's decision for another reason as well: the well-recognized danger of inferring any meaning from legislative inaction. *See, e.g., Silva v. Am. Fed'n of State, Cnty., & Municipal Emps.*, 23 F. App'x 975, 977 (10th Cir. 2001) ("[L]egislative silence is at best a tenuous guide to legislative intent[.]") As the Second Circuit recently cautioned, "[r]easoning from historical silence is … risky; it is not

necessarily the case that, if no positive legislation from a particular place is in the record, it must be because the legislators there deemed such a regulation inconsistent with the right to bear arms." *Antonyuk*, 89 F.4th at 301; *cf. Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253 (2022) (observing that "the fact that many States in the late 18th and early 19th century did not criminalize pre-quickening abortions does not mean that anyone thought the States lacked the authority to do so"). A state may choose not to regulate for a variety of reasons. For example, "lawmakers are not moved to forbid behavior that is governed by custom, universal practice, or private warning." *Antonyuk*, 89 F.4th at 301-02. Nor would a state be expected to "regulate for problems that do not exist" in their jurisdiction. *McCullen v. Coakley*, 573 U.S. 464, 481(2014) (quoting *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality op.)); *see* App. Vol. I at 109-10; *supra* pp. 17-20 (explaining why early Americans would not have thought to address suicide by delaying access to firearms).

Here, as the State's brief makes clear, Colorado's waiting-period law is consistent with the "long history of regulations targeted at preventing impulsive acts of firearm violence," including (i) historical laws addressing armed intoxication from as early as 1655, State Br. 35-41; *see* App. Vol. I at 84-93 (Spitzer Declaration); App. Vol. III at 823-27 (discussing that tradition and finding Colorado's waiting-period law "sufficiently similar"), (ii) 18th-,19th-, and early

20th-century licensing laws, State Br. 19-20, 40; *see* App. Vol. I at 96-103 (Spitzer Declaration); App. Vol. III at 827-29 (deeming licensing laws another "proper" analogue to Colorado's waiting period), and (iii) waiting-period laws from the early 20th century, State Br. 35 n.7. And it is likewise a constitutional continuation of the similarly long historical tradition of disarming irresponsible individuals "whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others." *Perez Garcia*, 96 F.4th at 1189.[12]

---

12  *See, e.g.*, *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns."); *see also* Br. for the United States, *United States v. Rahimi*, No. 22-915, 2023 WL 5322645, at *10-27 (U.S. Aug. 14, 2023) (explaining that history establishes an "enduring principle" that the "Second Amendment allows [legislatures] to disarm individuals who are not law-abiding, responsible citizens").

# CONCLUSION

This Court should affirm the district court's order denying Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

Dated: May 8, 2024

/s/ Freya Jamison
Freya Jamison

Freya Jamison
Everytown Law
P.O. Box 14780
Washington, D.C. 20044
(202) 517-6620
fjamison@everytown.org

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163

*Counsel for amicus curiae*
*Everytown for Gun Safety*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

This motion complies with the word limit of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 5,503 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface (fourteen-point Baskerville font) using Microsoft Word.

Respectfully submitted,

/s/Freya Jamison
Freya Jamison


**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2024, I filed the foregoing via the CM/ECF filing system, which caused all counsel of record to be served by electronic means.

Respectfully submitted,

/s/Freya Jamison
Freya Jamison