No. 23-1380

---

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

ROCKY MOUNTAIN GUN OWNERS, et al.,
*Plaintiffs-Appellants,*

v.

JARED S. POLIS, in his official capacity as Governor
of the State of Colorado,
*Defendant-Appellee,*

---

On Appeal from the U.S. District Court for the District of
Colorado (No. 1:23-cv-2563)
The Honorable John L. Kane

---

## BRIEF OF AMICI CURIAE BRADY CENTER TO PREVENT GUN
## VIOLENCE AND GIFFORDS LAW CENTER TO PREVENT GUN
## VIOLENCE IN SUPPORT OF APPELLEES

---

CROWELL & MORING LLP
Nicholas W. Dowd
Amy M. Pauli
1601 Wewatta St., Suite 815
Denver, CO 80202
Phone: (303) 524-8660
Fax: (303) 524-8650

Joshua Sohn
375 Ninth Ave, Suite 4500
New York, NY 10001
Phone: (212) 223-4000
Fax: (212) 223-4134

## CORPORATE DISCLOSURE STATEMENT

*Amici* Brady Center to Prevent Gun Violence and Giffords Law Center to Prevent Gun Violence state that each organization does not have parent organizations. *Amici* do not issue stock and therefore no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ................................................................ 1

SUMMARY OF ARGUMENT ............................................................... 2

ARGUMENT ........................................................................................ 4

    I.    THE WAITING PERIOD ACT DOES NOT IMPLICATE THE PLAIN TEXT OF THE SECOND AMENDMENT. ....................................................................... 4

    II.    THE WAITING PERIOD ACT ADDRESSES THE UNPRECEDENTED PUBLIC HEALTH CATASTROPHE OF FIREARM SUICIDES AND IMPULSIVE FIREARM KILLINGS .................................... 8

        A.    SUICIDE AND IMPULSIVE KILLING BY FIREARM IS A MODERN PHENOMENON ............. 11

        B.    THE FOUNDERS AND ENSUING GENERATIONS DID NOT CONFRONT THIS CRISIS ........................................................................ 13

    III.    ANALOGOUS WAIT-CENTRIC REGULATIONS PROVIDE AMPLE HISTORICAL PRECEDENT FOR THE WAITING PERIOD ACT ........................................... 18

        A.    GUN LICENSING ........................................................ 19

        B.    SURETY LAWS ........................................................... 20

        C.    RESTRICTIONS ON THE INTOXICATED .............. 21

    IV.    SUICIDE AND IMPULSIVE ACTS OF FIREARM VIOLENCE ARE A GRAVE PUBLIC CONCERN, WHICH THE WAITING PERIOD ACT EFFECTIVELY ADDRESSES ........................................... 23

        A.    WAITING PERIODS REDUCE FIREARM SUICIDES ................................................................. 24

        B.    WAITING PERIODS REDUCE FIREARM HOMICIDES ............................................................. 28

CONCLUSION ................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ........................................................................ 4, 6

*Hanson v. Dist. of Columbia,*
671 F. Supp. 3d. 1 (D.D.C. 2023) ....................................... 10

*Jones v. Bonta,*
2023 WL 8530834 (S.D. Cal. Dec. 8, 2023) ......................... 23

*McDonald v. City of Chicago, Ill.,*
561 U.S. 742 (2010) ................................................................. 4

*New York State Rifle & Pistol Assn, Inc. v. Bruen,*
597 U.S. 1 (2022) ..................................................................... 3

*Ocean State Tactical, LLC v. Rhode Island,*
646 F. Supp. 3d 368 (D.R.I. 2022) ..................................... 23

*Oregon Firearms Fed'n, Inc. v. Brown,*
644 F. Supp. 3d 782 (D. Or. 2022) ....................................... 5

*Rocky Mountain Gun Owners v. Polis,*
2023 WL 8446495 (D. Colo. Nov. 13, 2023) ......................... 6

*Second Amendment Found., Inc. v. Bureau of Alcohol,*
*Tobacco, Firearms & Explosives,*
2023 WL 7490149 (N.D. Tex. Nov. 13, 2023) ..................... 23

*Silvester v. Harris,*
843 F.3d 816 (9th Cir. 2016) ................................................. 8

*Tracy Rifle & Pistol LLC v. Harris,*
118 F. Supp. 3d 1182 (E.D. Cal. 2015) ............................... 24

*United States v. Alaniz,*
68 F.4th 1124 (9th Cir. 2023) ............................................. 10

iii

*United States v. Austin*,
  2024 WL 1580079 (S.D.N.Y. Apr. 11, 2024) .........................................5

*Vincent v. Garland*,
  80 F.4th 1197 (10th Cir. 2023) ..................................................... 4, 5

**Statutes**

C.R.S. § 18-12-115 ................................................................. 6, 20

**Other Authorities**

Allen C. Guelzo, *Our Ancient Faith: Lincoln, Democracy and
  the American Experiment* (Knopf 2024) ..............................................7

Andrew Conner, et al., *Suicide Case-Fatality Rates in the
  United States, 2007 to 2014: A Nationwide Population-
  Based Study,* 171 Ann. Intern. Med., 885 at 887 (2019).............. 24, 26

CDC Leading Causes of Death Visualization Tool,
  https://wisqars.cdc.gov/lcd ................................................... 12

CDC, Suicide Data and Statistics,
  https://www.cdc.gov/suicide/suicide-data-statistics.html
  (last visited April 30, 2024) ........................................... 11, 12

David M. Studdert et al., *Handgun Ownership and Suicide
  in California*, 382 New Eng. J. Med. 2220 (2020)..............................25

German Lopez, *What Many People Get Wrong About Suicide* ...............25

*Gun Violence: Purchase Waiting Periods*, Nat'l All. on Mental
  Illness
  https://www.nami.org/Advocacy/Policy-
  Priorities/Stopping-Harmful-Practices/Gun-Violence-
  Purchase-Waiting-Periods (last visited Apr. 14, 2024)......................26

Jennifer Tucker, Barton C. Hacker, and Margaret Vining,
  eds., *Firearms and the Common Law: History and
  Memory*, Washington, D.C.: Smithsonian Institution
  Scholarly Press, 117 (2019) ........................................... 16, 17

DCACTIVE-76456745.9

Kevin Sweeney, *An Eighteenth-Century Gun Culture Shaped by Constraints*, Duke Center for Firearms Law (Sept. 6, 2023) ............................................................................... 15

Lisa A. B. Shields, et al., *Trends of Suicide in the United States During the 20th Century*, Forensic Pathology Reviews, vol. 3. Humana Press, (2005) ............................................. 14

Michael Luca, Deepak Malhotra, and Christopher Poliquin, *Handgun Waiting Periods Reduce Gun Deaths*, Proceedings of the National Academy of Sciences 114, no. 46 (2017) ...................................................................... 28, 29

Matthew Miller et al., *Household Firearm Ownership and Rates of Suicide Across U.S. States*, 62 J. of Trauma 1029 (2007) .............................................................................. 25

Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies: Making Sense of Limits on the Right to Keep and Bear Arms in the Founding Era*, 51 Fordham Urb. L. J. 25, 38 (2023) ............................................................... 13, 16

Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 Fordham Urb. L. J. 1695, 1713 (2012) ......................... 15

*Suicide Rates and State Laws Regulating Access and Exposure to Handguns*, AM. J. Pub. Health https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4566524/ (Oct. 2015) ...................................................................... 28

United States. CDC, Suicide Rates by State, https://www.cdc.gov/suicide/suicide-rates-by-state.html (last visited April 24, 2024) ............................................... 12

*What Many People Get Wrong About Suicide*, Vox https://www.vox.com/2015/7/30/9068255/suicide-impulsive-gun-control (Sep. 17, 2015) ................................ 25

v

*Which States Require a Waiting Period Before Gun Purchases?*, Everytown for Gun Safety Support Fund, https://everytownresearch.org/rankings/law/waiting-periods/ (Jan. 4, 2024).........................................................................27

DCACTIVE-76456745.9

## STATEMENT OF INTEREST

Amicus curiae Brady Center to Prevent Gun Violence ("Brady") is the nation's oldest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, legal advocacy, and political action. Brady works across Congress, courts, and communities, uniting gun owners and non-gun owners alike to take action to prevent gun violence. Brady has a substantial interest in ensuring that the Constitution is construed to allow democratically elected officials to address the Nation's gun-violence epidemic, and to safeguard the interest of every American in living safe and secure lives in their homes and communities.

Amicus curiae Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun-violence survivors, and others who seek to reduce gun violence. Founded in 1993 after a gun massacre at a San Francisco law firm, the organization was renamed Giffords Law Center in October 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords. Today, through partnerships with gun violence researchers, public-

health experts, and community organizations, Giffords Law Center researches, drafts, and defends laws, policies, and programs proven to effectively reduce gun violence.[1]

## SUMMARY OF ARGUMENT

In 2023, Colorado's 73rd General Assembly sought to blunt a contemporary crisis plaguing the State. Between 2016 and 2021, over 5,000 Coloradans died from injuries caused by a firearm. Some of those deaths were homicides—and as many as *three-quarters* were suicides. This calamity is not endemic to Colorado, nor is it familiar historically in this nation. A relatively new crisis, suicide-by-firearm at the frequency Colorado faces today, would have been inconceivable to the Founders. And a new crisis sometimes calls for new tools. The General Assembly decided as much, and took a modest step to reduce firearm-related suicides and homicides. It passed House Bill 23-1219, a law that regulates firearm sellers and imposes a three-day waiting period before

---

[1] Plaintiffs-Appellants and Defendant-Appellee have both consented to *amici* filing this brief. *See* Fed. R. App. P. 29(a)(2). Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence submit this brief in support of Defendant-Appellee. No counsel for a party authored this brief in whole or in part. No person other than *amici* or their counsel contributed money to fund this briefs preparation or submission.

they may deliver a firearm to a purchaser (the "Waiting Period Act"). The Waiting Period Act is a lawful and tailored response to the staggering number of firearm-related deaths in Colorado, and in particular, the sharp rise in firearm-related suicides.

The district court was correct in finding the Waiting Period Act to be consistent with the Second Amendment. As explained in Part I, the Waiting Period Act's narrow regulation of certain firearm sales does not implicate the plain text of the Second Amendment and is therefore constitutional. Any *Bruen* analysis of the Act must consider that the ills the law addresses—a crisis of deaths by firearm—did not exist when the Founders ratified the Second Amendment or in the ensuing decades. Part II addresses the reality of this crisis. *New York State Rifle & Pistol Assn, Inc. v. Bruen*, 597 U.S. 1, 27 (2022). Part III demonstrates that, in any event, the Waiting Period Act fits within a long line of historical analogues of firearm regulation, and with the common sense reality that immediacy in obtaining purchased items was not customary or expected in the Founding era.[2] Part IV shows that the district court rightly found,

---

[2] As a regulation governing the *sale* of firearms, rather than the conditions under which they may be kept, carried, or used, the Waiting
(Continued…)

when weighing the public interest of the requested injunction only after determining the law is constitutional, that the Waiting Period Act is a narrow and sensible means of curbing firearm-related deaths and promoting public health and safety.

The Court should affirm the district court's opinion denying Plaintiffs' motion for preliminary injunction.

## ARGUMENT

## I. The Waiting Period Act Does Not Implicate the Plain Text of the Second Amendment.

"Like most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Courts must therefore begin Second Amendment analysis by determining whether a challenged regulation restricts a right covered by the Amendment's "plain text." *Bruen*, 597 U.S. at 24; *Vincent v. Garland*, 80 F.4th 1197, 1200 (10th Cir. 2023) ("In *Bruen*, the Supreme Court created

---

Period Act falls within the category of commercial regulations that the Supreme Court has deemed "presumptively lawful." *See District of Columbia v. Heller*, 554 U.S. 570, 626-27 n. 26 (2008); *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010); *Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring). The district court recognized the Waiting Period Act as a commercial regulation and concluded that Appellants failed to rebut its presumptive lawfulness. *See RMGO*, 2023 WL 8446495, at *10-11. *Amici* agree with this analysis.

a test requiring consideration of two questions: 1. Does the Second Amendment's plain text cover an individual's conduct? 2. If the answer is yes, has the government justified the ban by showing that it's consistent with the nation's 'historical tradition of firearm regulation'?"). If the regulated conduct falls outside the original scope of the Second Amendment's plain text, it is "categorically unprotected" and the constitutional challenge fails. *Bruen*, 597 U.S. at 18; *see also Vincent*, 80 F.4th at 1203 (10th Cir. 2023) (Bachman, J., concurring) ("Under *Bruen*, the threshold issue is whether the plain text of the Second Amendment covers the individual's conduct."); *United States v. Austin*, 2024 WL 1580079, at *7-8 (S.D.N.Y. Apr. 11, 2024) (constitutional challenge to law prohibiting unlicensed commercial firearm sales failed because the plain text of the Second Amendment does not encompass a right to commercially deal firearms); *Oregon Firearms Fed'n, Inc. v. Brown*, 644 F. Supp. 3d 782, 799 (D. Or. 2022) (denying preliminary injunction motion given plaintiff's "fail[ure] to show that magazines capable of accepting more than ten rounds of ammunition are covered by the plain text of the Second Amendment"), *appeal docketed*, *sub nom. Fritz v. Rosenblum*, No. 23-35478 (9th Cir. July 17, 2023).

5

Besides not protecting commercial dealing in firearms, the plain text of the Second Amendment includes no right to instantaneously obtain a firearm. Nor has the Supreme Court ever said or suggested otherwise. Instead, the Supreme Court has merely held that the Second Amendment protects an individual's right to "keep" or "bear" arms for self-defense. *Bruen*, 597 U.S. at 17; *Heller*, 554 U.S. at 581 (the "substance of the right" protected by the Second Amendment is "to keep and bear Arms"). These terms must be given their "normal and ordinary" meaning. *Heller*, 554 U.S. at 576-77. The Supreme Court has construed "keep Arms" to mean "have weapons," *id.* at 582, and "bear" to mean "carry." *Id.* at 584.

The Waiting Period Act does not impair an individual's right to "have weapons" or to "carry" them. It prohibits no one from possessing or using firearms, and bars no one from purchasing them. The Waiting Period Act instead imposes a short delay on firearm sellers before they can convey a firearm. C.R.S. § 18-12-115(1)(a). The district court thus correctly concluded that the Act does not regulate conduct protected by the plain text of the Second Amendment and that Plaintiffs' claims were unlikely to succeed. *See Rocky Mountain Gun Owners v. Polis*, __ F. Supp.

6

3d __, No. 23-CV-02563-JLK, 2023 WL 8446495, at *7-8 (D. Colo. Nov. 13, 2023) (hereafter referenced as "*RMGO*").

Even supposing, for argument's sake, that the right to "keep" or "bear" arms were expanded beyond the "plain text" to include the right to "acquire" a firearm, the Founders, and Americans of their times, would not have understood the Second Amendment to guarantee an individual's ability to obtain a firearm *instantaneously*. This is demonstrated, as shown in Part III, by comparable regulations at the time inhibiting immediate acquisition. It also is demonstrably true because in 1791, and throughout much of the nineteenth century, delay in delivery of purchased goods was a practical reality of the country's commerce. It is easy to forget that, even as late as Abraham Lincoln's birth in 1809, an American could move no faster than horse or sail or river flow; much of the country had little to no currency to speak of; and the economy in much of the country was still primarily agricultural. Allen C. Guelzo, *Our Ancient Faith: Lincoln, Democracy and the American Experiment,* at 50-51 (Knopf 2024). Put simply, times were slower—well slower than the Waiting Period Act's three days of waiting.

The district court correctly found as much, recognizing that "[e]ven if purchasing a firearm could be read into the terms 'keep' or 'bear,' receipt of a firearm *without any delay* could not be, because the Founders would not have expected instant, widespread availability of the firearm of their choice." *RMGO*, 2023 WL 8446495, at *8 (italics in original). So have others. *See, e.g.*, *Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016) ("Before the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one. . . . Delays of a week or more were not the product of governmental regulations, but such delays had to be routinely accepted as part of doing business."), *cert. denied sub nom. Silvester v. Becerra*, 583 U.S. 1139 (2018).

Because the Waiting Period Act does not implicate the plain text of the Second Amendment and the context in which that text was adopted, it is constitutional.

## II.  The Waiting Period Act Addresses The Unprecedented Public Health Catastrophe Of Firearm Suicides And Impulsive Firearm Killings.

The Waiting Period Act's brief delay in the commercial transfer of firearms is consistent with our nation's historical tradition of firearm

regulation, and is therefore constitutional even were the Act somehow found to implicate conduct expressly covered by the Second Amendment.

In *Bruen*, the Supreme Court established the prevailing test for determining whether a firearm regulation that implicates conduct covered by the Second Amendment is nevertheless constitutional. Under this test, the government "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 17. This approach is grounded in the notion that the content and scope of the Second Amendment can often be surmised from historical analysis of how gun rights were understood around the time the Second and Fourteenth Amendments were ratified. *See id.* at 20-21.

In articulating this test, the *Bruen* Court drew a sharp and important distinction between, on the one hand, "a challenged regulation address[ing] a general societal problem that has persisted since the 18th century," 597 U.S. at 267, and, on the other hand, "other cases implicating unprecedented societal concerns or dramatic technological changes" that were not present or anticipated at the time the Second Amendment was ratified. *Id.* at 27. For the first category of cases, "when a challenged regulation addresses a general societal problem that has

persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment[.]" *Id.* at 26. But for the second category of cases, the Court recognized that a "more nuanced approach" was required by drawing and relying on "historical analogies." *Id.* at 27-. This is because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.*[3]

The Waiting Period Act comes within the second category: it is intended to address the unprecedented societal scourge of gun suicides

---

[3] *See also United States v. Alaniz*, 68 F.4th 1124, 1129-30 (9th Cir. 2023) (affirming constitutionality of sentencing enhancement for possession of a handgun at the time of a felony drug offense because "[i]llegal drug trafficking is a largely modern crime . . . animated by unprecedented contemporary concerns regarding drug abuse and is not closely analogous to founding-era smuggling crimes, which primarily focused on punishing importers who evaded customs duties"); *see also Hanson v. Dist. of Columbia*, 671 F. Supp. 3d. 1, 18 (D.D.C. 2023) (explaining that "[large-capacity magazines] are the object of 'dramatic technological changes' and implicate 'unprecedented societal concerns,' and thus its ban requires 'nuanced' consideration") (quoting Bruen, 597 U.S. at 27), *appeal filed*, No. 23-7061 (D.C. Cir. 2023).

and impulsive violence—calamities not prevalent during the Founding and Reconstruction Eras.

## A.    Suicide and Impulsive Killing by Firearm Is A Modern Phenomenon

The Waiting Period Act confronts the relatively recent phenomenon of individuals being able to instantaneously acquire a new firearm to engage in acts of self-harm or impulsive violence against others. *See* HB 23-1219 § 2(a), 74th Gen. Assemb., Reg. Sess. (Colo. 2023) ("Delaying immediate access to firearms by establishing a waiting period for receipt of firearms can help prevent impulsive acts of firearm violence, including homicides and suicides.").

Across modern American society, firearms have become a pervasive cause of death by suicide, posing a contemporary problem the Founders could not have envisioned. According to the Centers for Disease Control and Prevention, suicide is "one of the leading causes of death in the United States." CDC, Suicide Data and Statistics, https://www.cdc.gov/suicide/suicide-data-statistics.html (last visited

11

April 30, 2024) ("CDC Suicide Statistics").[4] In 2021, more than 48,000 people in the United States died by suicide. *Id.* Firearms were used in over half of those suicide deaths. *Id.* In fact, firearms are by far the most common cause of suicide deaths, representing 55% of all suicide deaths—more than double the next most common method (suffocation). *Id.*

Firearm-related suicides are matters of grave concern in Colorado, where the statistics are grimmer still. In 2021, Colorado had the sixth highest number of suicide deaths per capita in the United States. CDC, Suicide Rates by State, https://www.cdc.gov/suicide/suicide-rates-by-state.html (last visited April 24, 2024). Despite having nearly 14 million fewer residents, Colorado trailed New York by only 276 in total number of suicides in 2021. *Id.* Consistent with national trends, over half of all deaths by suicides in Colorado in 2021 resulted from use of a firearm. *Id.*

The use of firearms in acts of homicide also remains a matter of profound concern. As the General Assembly recognized, Colorado

---

[4] For the 10-14 age group, suicide is the second most common cause of death after accidental injury. *See* CDC Leading Causes of Death Visualization Tool, https://wisqars.cdc.gov/lcd. For the 15-24 age group, suicide is the third most common cause of death, after accidental injury and homicide. *Id.* And for the 25-34 age group, suicide is the second most common cause of death, followed by homicide. *Id.*

suffered 274 homicides by firearm in 2021 (a twenty-year high), with individuals between the ages of 15 and 24 bearing the brunt of the violence. HB 23-1219 § 1(c), 74th Gen. Assemb., Reg. Sess. (Colo. 2023) (finding that "the age group with the highest rate of firearm homicide victims was people ages 15 to 24, with 74 deaths").

### B.    The Founders and Ensuing Generations Did Not Confront This Crisis

The present, dire threat of firearm suicides and impulsive killings was not one confronting the Framers or Reconstruction-era legislators. "Gun homicide, mass shootings, and suicide, the three forms of gun violence that dominate the modern gun debate, were simply not problems for those who enacted the Second Amendment." Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies: Making Sense of Limits on the Right to Keep and Bear Arms in the Founding Era*, 51 Fordham Urb. L. J. 25, 38 (2023).

There is scant historical evidence to suggest, much less establish, that the present epidemic of firearm suicides was an issue the Founders would have recognized. Rather, firearm-related suicides appear to have been a distinct rarity in the Founding and Reconstruction eras, and remained so until the twentieth century. While statistics are sparse,

13

what data are available suggest that firearms became a common tool for self-inflicted killing only within the last century or so. Early statistical data on suicide methods in the United States are found in the federal government's census of 1860. *See* Lisa A. B. Shields, et al., *Trends of Suicide in the United States During the 20th Century,* Tsokos, NJ. (eds) Forensic Pathology Reviews, vol. 3. Humana Press, 2 (2005). Even as late as 1860, after firearm technology began to evolve beyond the cumbersome muzzle-loaded weapons of the 1790s, firearms remained an uncommon method of suicide. At that time, the most common methods of suicide in the United States were hanging or strangulation, followed by poisoning. *Id.* According, again, to census data, firearms became the second-most common method of suicide in 1900, before becoming the most common method in 1910 – more than a century after the Second Amendment was ratified. *Id.* After surpassing other causes of death in 1910, firearms have remained the predominant method of suicide in the United States in each decade since. *See id.*

Similarly, impulsive homicides, facilitated by immediate access to new firearms, were not the significant societal concern in the Founding Era that they are today. "Interpersonal violence, including gun violence,

simply was not a problem in the Founding era that warranted much attention and therefore produced no legislation." Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 Fordham Urb. L. J. 1695, 1713 (2012).

Founding times also did not feature widespread impulsive firearm killings. Practical realities suggest why, beginning with "the economic and technological constraints associated with the fabrication and distribution of firearms during the eighteenth-century." Kevin Sweeney, *An Eighteenth-Century Gun Culture Shaped by Constraints*, Duke Center for Firearms Law (Sept. 6, 2023), https://firearmslaw.duke.edu/2023/09/an-eighteenth-century-gun-culture-shaped-by-constraints. Eighteenth-century America had limited means of producing new firearms—building a musket from scratch could take a week or more. *Id.* Most new firearms thus had to be imported from England, while American gunsmiths typically focused on repairing firearms. For example, "[a] rare surviving account book of an inland gunsmith, John Partridge Bull of Deerfield, Massachusetts, indicates that he made only three new guns over a period of 20 years from 1768 to 1788, while performing 452 repairs on existing firearms." *Id.* Import

15

statistics suggest that "the number of newly made firearms available for sale during the later eighteenth century would have been modest in comparison to the size of the growing population." *Id.*

Beyond the impracticability of immediately obtaining a firearm, homicides committed with guns were a relative rarity in the Colonial period, attributable at least in part to the fact that the types of weapons then available were poor options for impulsive killings. As Professor Randolph Roth has explained, "[b]lack powder, muzzle-loading weapons, were too unreliable and took too long to load to make them effective tools of homicide and most crimes of passion." Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies,* 51 Fordham Urb. L. J. at 38. "Given this fact it is easy to understand why modern discussions of guns and individual self-defense were so rare in Founding-era public debate." *Id.* Professor Roth's studies have shown that homicides "were committed almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives"—not firearms. Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *Firearms*

*and the Common Law: History and Memory,* Washington, D.C.: Smithsonian Institution Scholarly Press, 117 (2019). Simply put, "[g]uns were not the weapons of choice in homicides that grew out of the tensions of daily life." *Id.* Moreover, for obvious reasons, it would have been physically challenging to use an eighteenth-century musket or long rifle in an unassisted suicide attempt.

The district court, having studiously examined the historical record, was thus correct in finding that the problem now facing Colorado "was not prevalent during the Founding Era or Early National Period and that instituting waiting periods would not have been a logical measure until at least the end of the nineteenth century." *RMGO*, 2023 WL 8446495, at *14; *id.* at *15 ("Of the relatively small number of homicides committed in the late Colonial Period into the early National Period . . . only 10 to 15 percent of both domestic and nondomestic homicides were committed with a firearm."). As the district court observed, muzzle-loading firearms, the gun type of the colonial era, "had significant limitations as murder weapons . . . [as] they were liable to misfire, . . . and [generally] they could not fire multiple shots without reloading." *Id.* More importantly, and as the district court accurately

observed, "muzzle-loading firearms could not be used impulsively unless they were already loaded for some other purpose" and "weapons were often kept unloaded[.]" *Id.* It was only "as firearm technology and production progressed and gun violence increased, laws regulating firearms, including waiting-period laws, were enacted in response." *Id.* at *16.

## III. Analogous Wait-Centric Regulations Provide Ample Historical Precedent for the Waiting Period Act.

The Waiting Period Act's modest and temporary restrictions on firearm sales are "consistent with the Second Amendment's test and historical understanding," as required under *Bruen.* 597 U.S. at 26. To analyze this point, *Bruen* instructs courts to look for "analogous" regulations in the historical record, and specifies that a "historical twin" is not required. *Id.* at 30. Moreover, when dealing with a regulation aimed at addressing a problem of "unprecedented societal concern[],"a flexible and "nuanced" examination of historical analogues is in order. *Bruen*, 597 U.S. at 27-28.

At least three categories of longstanding gun regulations confirm that the Waiting Period Act aligns with the Nation's historical tradition of firearm regulation, and is therefore constitutional. Licensing and

storage regimes, surety laws, and intoxication regulations each reflect a centuries-old tradition of temporarily impeding immediate access to firearms for the purpose of protecting public safety.

### A.    Gun Licensing

Shall-issue licensing regulations, which *Bruen* specifically recognized as constitutionally permissible, are analogous to the Waiting Period Act. *See Bruen*, 597 U.S. at 38 n.9 ("nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes"). Shall-issue licensing requirements "do not require applicants to show an atypical need for armed self-defense" and "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *Id.* (citation omitted). Constitutional shall-issue requirements merely mandate that "applicants to undergo a background check or pass a firearms safety course" before owning a firearm. *Id.*

The Waiting Period Act is an apt analogue—it, like a background check or safety course, does not prevent or even speak to gun ownership or gun purchase. It merely delays for a set and short time when a firearms seller may deliver a firearm to a purchaser contingent upon a

19

background check. The seller cannot deliver the firearm to the purchaser "until the later in time occurs: (I) three days after a licensed gun dealer has initiated a background check of the purchaser . . . or (II) the seller has obtained approval for the firearm transfer from the Bureau after it has completed any background check." C.R.S. § 18-12-115.

### B.    Surety Laws

Surety laws were initially enacted in this country in or around the 1830s. *See, e.g.*, Of Proceedings to Prevent the Commission of Crimes, ch. 134, § 16, in THE REVISED STATUTES OF THE COMMONWEALTH OF MASSACHUSETTS, 748, 750 (Boston, Dutton & Wentworth 1836). These laws required individuals who were "likely to 'breach the peace'" to "post bond before carrying weapons in public." *Bruen*, 597 U.S. at 55-56. The posted bond "would be forfeited if [the individual] breached the peace or injured others." *Id.* at 56-57. Thus, while surety laws created a restriction intended to discourage dangerous use of firearms, they "did not *prohibit* public carry." *Id.* at 56 (emphasis in original). Accordingly, the Supreme Court has held that surety laws did not impose "a substantial burden on public carry." *Id.* at 50. And because they were intended "merely for prevention and not meant as any degree of

20

punishment," courts have found surety laws to be a constitutional means of protecting public health and safety. *See id.* at 57 (internal quotations omitted).

The Waiting Period Act is "relevantly similar." *Id.* at 29. Like surety laws, the brief waiting period the Act sets is intended to preserve public health and safety, and does so in a narrow, tailored way that avoids imposing any "substantial burden" on protected Second Amendment rights. *Id.* at 50. Like the need to post bond, the Waiting Period Act does not prohibit anyone from owning or carrying firearms or permanently prevent anyone from acquiring firearms. If anything, the Act is less restrictive of Second Amendment rights than historical surety laws, given that the latter imposed financial obstacles to firearm use that may have been prohibitive for some individuals.

## C.    Restrictions on the Intoxicated

Our Nation has a history stretching back centuries of barring the use of firearms while drinking. *See, e.g.*, 1655 Va. Acts 401, Act of March 10, 1655, Act XII ("What persons or persons soever shall, after publication hereof, shoot any guns at drinking . . . that such person or persons so offending shall forfeit 100 lb. of tobacco to be levied"); *see also*

21

1825 Tenn. Priv. Acts 306, ch. 292 § 3 ("That said mayor and aldermen may, and shall, have power and authority to make any rules and laws regulating the police of said town . . . to restrain and punish drinking . . . shooting and carrying guns, and enact penalties and enforce the same . . . ."); Supplement to the Revised Statutes of the State of Wisconsin, 848, CH. 181, § 4397B(3) (A.L. Sanborn & J.R. Berryman EDS., 1883) ("It shall be unlawful for any person in a state of intoxication to go armed with any pistol or revolver. Any person violating the provisions of the act shall be punished by imprisonment.").

And what is an intoxication-based regulation if not a waiting regulation, akin to Colorado's Waiting Period Act? Its very point and purpose is: "wait until you become sober." Such historical restrictions reflect a well-established understanding at the time of the Founding that the government may regulate firearm access or use to prevent harm from individuals caught up in a dangerous but transient state of mind. Like the Waiting Period Act, this wait would not have been forever. Like the Waiting Period Act, it merely inhibits impulsive, mindless killing by firearm. It promotes public safety, like the Waiting Period Act. These historic laws are of a piece with the Waiting Period Act.

**IV.    Suicide and Impulsive Acts of Firearm Violence Are A Grave Public Concern, Which the Waiting Period Act Effectively Addresses.**

It is no small point, in closing, that the Waiting Period Act was enacted to advance a crucial state goal: protecting the health and safety of "law-abiding citizens" by reducing firearm-related suicides and other deaths. *See* HB 23-1219 § 2(a), 74th Gen. Assemb., Reg. Sess. (Colo. 2023) ("The establishment of a waiting period is a matter of mixed state and local concern because the state has an interest in preventing suicides and homicides . . . ."). Barring enforcement of the Waiting Period Act, even temporarily, will prevent the State from achieving that laudable goal. A court may consider these potential harms to the State and the public interest when determining whether to preliminarily enjoin a law implicating Second Amendment rights, as courts have found in wake of *Bruen. See, e.g.*, *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 401 (D.R.I. 2022) *aff'd* 95 F.4th 38 (1st Cir. 2024); *Jones v. Bonta*, __ F. Supp. 3d. __, 2023 WL 8530834, at *11-12 (S.D. Cal. Dec. 8, 2023); *Second Amendment Found., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, __ F. Supp. 3d. __, 2023 WL 7490149, at *19 (N.D. Tex. Nov. 13, 2023), *appeal filed*, No. 23-11157 (5th Cir. No. 14, 2023).

The district court below was correct to do so here. *RMGO*, 2023 WL 8446495, at *20-22. As another district court put it, "[t]he costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime, violence, and suicide, would be grave." *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193 (E.D. Cal. 2015), *aff'd*, 637 F. App'x 401 (9th Cir. 2016).

### A.    Waiting Periods Reduce Firearm Suicides

There is an indisputable public interest in preventing suicide deaths in Colorado and blocking enforcement of the Waiting Period Act— a demonstrably effective means of reducing suicide deaths—poses a serious risk of harm.

Firearms are by far the most lethal method of suicide. A 2019 national study found that while only 8.5% of all suicidal acts between 2007 and 2014 were fatal, 89.6% of suicidal acts with a firearm resulted in death. Andrew Conner, et al., *Suicide Case-Fatality Rates in the United States, 2007 to 2014: A Nationwide Population-Based Study*, 171 Ann. Intern. Med., 885 at 887 (2019).

Studies have also found that places where firearms are more readily accessible have higher suicide rates than places where firearms

are less prevalent. *See, e.g.*, Matthew Miller et al., *Household Firearm Ownership and Rates of Suicide Across U.S. States*, 62 J. of Trauma 1029 (2007).

And research shows that suicide is typically the result of a temporary crisis, rather than an act planned far in advance. David M. Studdert et al., *Handgun Ownership and Suicide in California*, 382 New Eng. J. Med. 2220 (2020); *see also* German Lopez, *What Many People Get Wrong About Suicide*, Vox (Sept. 17, 2015), ("[T]he majority of suicide attempts are within three hours of people deciding to kill themselves.").[5]

Based on what is known about firearms and suicide—that firearms are the most deadly method of suicide, that access to firearm increases instances of suicide, and that suicidal urges are usually transitory— waiting periods serve as narrowly-tailored, but effective means of suicide reduction. Waiting periods interpose a "cooling off" period, during which a transitory suicidal crisis may pass. Because suicidal crises often escalate quickly and suddenly, "limiting access to means of suicide can play a significant role in prevention." *Gun Violence: Purchase Waiting*

---

[5] https://www.vox.com/2015/7/30/9068255/suicide-impulsive-gun-control

(Continued…)

25

*Periods*, Nat'l All. on Mental Illness, (last visited Apr. 14, 2024).[6] Even if a waiting period does not deter an individual from attempting suicide entirely, merely redirecting the individual to a different method can potentially prevent a loss of life. The next-most lethal methods of suicide, drowning and hanging, are significantly less deadly, ending in death 56.4% and 52.7% of the time, respectively, compared with the nearly 90% fatality rate for firearms. *See* Andrew Conner, et al., *Suicide Case-Fatality Rates in the United States, 2007 to 2014: A Nationwide Population-Based Study*, 171 Ann. Intern. Med., 885 at 887 (2019). Other methods are even less lethal—for instance, drug poisoning accounted for 59.4% of suicidal acts but only 13.5% of deaths. *Id.* at 885.

Numerous studies substantiate the view that waiting periods are effective in reducing suicide deaths. In enacting the Waiting Period Act, Colorado joins eleven other states that impose a waiting period for firearm purchases. *See Which States Require a Waiting Period Before Gun Purchases?*, Everytown for Gun Safety Support Fund, (Jan. 4,

---

[6] https://www.nami.org/Advocacy/Policy-Priorities/Stopping-Harmful-Practices/Gun-Violence-Purchase-Waiting-Periods

(Continued…)

2024).[7] One study of states that have already implemented waiting periods for gun purchases found that waiting periods led "to a 7-11% reduction in gun suicides . . . which is equivalent to 22-35 fewer gun suicides per year for the average state." Michael Luca, Deepak Malhotra, and Christopher Poliquin, Handgun Waiting Periods Reduce Gun Deaths, Proceedings of the National Academy of Sciences 114, no. 46 (2017): 12162–12165. Another recent study concluded that background checks and mandatory waiting periods were correlated with lower firearm-related suicide rates in states that implemented such laws as compared with states that did not. *See* Bradley Kawano, et al., *Restrictive Firearm Laws and Firearm-Related Suicide*, 236 J. Am. College of Surgeons 37 (2023).

Conversely, states that have removed mandatory waiting periods have seen increased numbers of suicide deaths. In the year following South Dakota's repeal of its 48-hour waiting period requirement, the state's overall suicide rate increased by 7.6% compared to the much smaller 3.3% increase seen across the United States as a whole. *See* Michael Anestis & Joye Anestis, *Suicide Rates and State Laws*

---

[7] https://everytownresearch.org/rankings/law/waiting-periods/

*Regulating Access and Exposure to Handguns*, Am. J. Pub. Health (Oct. 2015).[8] And between 2010 and 2013, that number climbed even higher—South Dakota's overall suicide rate increased by 8.9%. *See id.*

Individual cases help to illustrate the kinds of tragedies the Waiting Period Act is intended to help prevent. In November 2008, a 21-year-old man named Ryan Frazier shot himself with a handgun soon after filing a lawsuit against a priest who had molested him as a teenager. Madeline Drexler, Harvard Public Health, Guns & Suicide: The Hidden Toll (Spring 2013). The day he died, Ryan went to a gas station five minutes from his home, bought a semiautomatic handgun, and was found dead in his car at an abandoned railroad station. *Id.* According to his wife, Emily Frazier, Ryan had never before used a gun. *Id.*

## B.    Waiting Periods Reduce Firearm Homicides

Waiting-period laws are also demonstrably effective in reducing firearm-related homicides. Studies of states that have implemented waiting period laws show that waiting periods have "a large and robust effect" on reducing homicides. *See* Luca et al., supra. Based on an analysis of 45 years' worth of data, researchers found that waiting periods of only

---

[8] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4566524/

a few days "reduce gun homicides by roughly 17%." *Id.* The 17% reduction in firearm homicides equates to approximately 36 "fewer gun homicides per year for a state with an average number of gun deaths." *Id.* If every state without waiting period requirements enacted legislation like the Waiting Period Act, the United States could avoid approximately "910 gun homicides per year." *Id.*

A post-Hurricane Katrina study bolsters the finding that waiting periods reduce homicides. La Valle, James M., "Rebuilding at Gunpoint: A City-Level Re-Estimation of the Brady Law and RTC Laws in the Wake of Hurricane Katrina." The study explored the impact of waiting periods in regions recovering from the hurricane. It found that a five-day waiting period law—The Brady Handgun Violence Prevention Act or the Brady Law—accounted for "statistically significant (using a 'one-tailed' test) reductions in both total homicide rates and gun-homicide rates." *Id.*

Given these considerations, the district court correctly concluded that there were demonstrable public safety benefits of a firearm waiting period and that "saving approximately one hundred people in Colorado this year outweighs the aggregate harm of minimal expenditures of time and sacrificed business opportunities." *RMGO*, 2023 WL 8446495, at *22.

# CONCLUSION

The Court should affirm the district court's decision.

CROWELL & MORING LLP

s/ *Nicholas W. Dowd*
Nicholas W. Dowd
Amy M. Pauli
1601 Wewatta St., Suite 815
Denver, CO 80202
Phone: (303) 524-8660
Fax: (303) 524-8650
ndowd@crowell.com
apauli@crowell.com

Joshua Sohn
375 Ninth Ave, Suite 4500
New York, NY 10001
Phone: (212) 223-4000
Fax: (212) 223-4134
jsohn@crowell.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation contained in Fed. R. App. P. 32(a)(7) because, excluding the portions exempted by Rule 32(f), this brief contains 5,771 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Schoolbook.

s/ *Nicholas W. Dowd*
Nicholas W. Dowd

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing brief:

(1) all required privacy redactions have been made pursuant to 10th Cir. R. 25.5;

(2) if required to file additional hardcopies, that this ECF submission is an exact copy of those documents;

(3) this digital submission has been scanned for viruses with the most recent version of Microsoft Defender, version 1.411.31.0, and according to the program is free of viruses.

*/s/ Nicholas W. Dowd*
Nicholas W. Dowd

## CERTIFICATE OF SERVICE

I certify that on May 8, 2024, I electronically filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Tenth Circuit through the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Nicholas W. Dowd*
Nicholas W. Dowd