**No. 23-1380**

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

Rocky Mountain Gun Owners, *et al.,*
*Plaintiffs-Appellants*,

v.

Jared S. Polis, in his official capacity
as Governor of the State of Colorado,
*Defendant-Appellee*,

Appeal from the United States District Court
for the District of Colorado
No. 1:23-cv-2563-JLK (Hon. John L. Kane)

**APPELLANTS' REPLY BRIEF**

Oral Argument Requested

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Phone: (303) 205-7870
Email: barry@arringtonpc.com

D. Sean Nation
Michael D. McCoy
Mountain States Legal
Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
Phone: (303) 292-2021
Email: snation@mslegal.org

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS ............................................................ i

TABLE OF AUTHORITIES ..................................................... iii

INTRODUCTION................................................................... 1

I.    APPELLEE DOES NOT DISPUTE THIS COURT'S JURISDICTION OR APPELLANTS' STANDING.......... 2

II.   AN INJUNCTION IS NOT DISFAVORED IN THIS CONTEXT. ....................................................................... 3

III.  APPELLANT SATISFIES BRUEN STEP 1.................... 6

    A.   The Plain Text of the Second Amendment Covers Appellants' Conduct. ................................................ 6

    B.   Appellee Repeats Its Error of Mis-framing the Right at Issue as the "Immediate" Access to Firearms. ....... 7

IV.  THE WAITING PERIOD ACT IS NOT A PRESUMPTIVELY LAWFUL COMMERCIAL REGULATION. .................... 10

V.   THE DISTRICT COURT ERRED BY RELYING ON SUPPOSED PRACTICALITIES IN ACQUIRING ARMS. 12

VI.  THE DISTRICT COURT ERRED IN RULING THAT THE ACT IS IN LINE WITH THE HISTORY AND TRADITION OF FIREARMS REGULATION............................................. 19

    A.   Intoxication laws are a poor analogy to the Waiting Period Act. ............................................................... 22

    B.   Licensing regimes are not a historical analogue to the Waiting Period Act. ................................................ 23

C.    Firearms were common at the Founding, Yet There
      Were No Waiting Period Laws.................................    25

VII.  IF THE COURT FINDS THE HISTORICAL RECORD TO BE
      INDETERMINATE, THE PLAINTIFF HAS DEMONSTRATED
      A LIKELIHOOD OF SUCCESS ON THE MERITS. ......    28

VIII. APPELLANTS ARE SUFFERING IRREPARABLE HARM,
      AND THE BALANCE OF HARMS AND PUBLIC INTEREST
      FACTORS SUPPORT ENTRY OF INJUNCTIVE RELIEF.    29

      A.    Appellants are suffering irreparable harm due to the
            Waiting Period Act. .................................................    29

      B.    The balance of harms and public interest factors support
            entry of injunctive relief.........................................    32

IX.   THE DISTRICT COURT FAILED TO FAITHFULLY APPLY
      BRUEN...........................................................................    34

CONCLUSION .......................................................................    36

CERTIFICATE OF COMPLIANCE..........................................    38

CERTIFICATE OF ELECTRONIC FILING ............................    39

CERTIFICATE OF SERVICE..................................................    40

# TABLE OF AUTHORITIES

**Case**                                                              **Page(s)**

*Antonyuk v. Chiumento,*
    89 F.4th 271 (2d. Cir. 2023) ....................................................    12

*Baird v. Bonta,*
    81 F.4th 1036 (9th Cir. 2023) ...............................................    32

*Bevis v. City of Naperville, Ill.,*
    657 F. Supp. 3d 1052 (N.D. Ill. 2023) ....................................    29

*Connecticut Citizens Defense League, Inc. v. Thody,*
    664 F.Supp.3d 235 (D. Conn. 2023) .......................................    9

*D.C. v. Heller,*
    554 U.S. 570 (2008) ..............................................................    5, 6, 11

*Elrod v. Burns,*
    427 U.S. 347 (1976) ..............................................................    32

*Ezell v. City of Chi.,*
    651 F.3d 684 (7th Cir. 2011) .................................................    31

*Hill v. Colorado,*
    530 U.S. 703 (2000) ..............................................................    8, 31

*In Chamber of Com. of U.S. v. Edmondson,*
    594 F.3d 742 (10th Cir. 2010) ...............................................    33

*League of Women Voters of North Carolina v. North Carolina,*
    769 F.3d 224 (4th Cir. 2014) .................................................    4

*Luis v. United States,*
    578 U.S. 5 (2016) ..................................................................    7

*McDonald v. City of Chicago, Ill.,*
    561 U.S. 742 (2010) ..............................................................    11

*McRorey v. Garland,*
  2023 WL 5200670 (N.D. Tex. 2023) ....................................... 9

*Miller v. Bonta,*
  2023 WL 6929336 (S.D. Cal. 2023) ....................................... 28

*Minneapolis Star and Tribune Co. v. Minnesota Com'r of Revenue,*
  460 U.S. 575 (1983) .................................................. 7, 11

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
  597 U.S. 1 (2022) ........................................ 1, 6, 12, 20, 21, 22, 28, 35

*Rocky Mountain Gun Owners v. Polis,*
  2023 WL 5017253 (D. Colo. 2023) ....................................... 7

*Schrier v. University of Colorado,*
  427 F.3d 1253 (10th Cir. 2005) ........................................ 4

*Silvester v. Beccera,*
  138 S. Ct. 945 (2018) ................................................ 8

*Teixeira v. Cnty. of Alameda,*
  873 F.3d 670 (9th Cir. 2017) .......................................... 31

*U.S. v. Spigner,*
  416 F.3d 708 (8th Cir. 2005) .................................. 15, 17, 18

*United States v. Duarte,*
  2024 WL 2068016 (9th Cir. 2024) ............................. 20, 21, 24

*United States v. Marique,*
  647 F.Supp.3d 382 (D. Md. 2022) ...................................... 11

*United States v. Price,*
  635 F.Supp.3d 455 (S.D. W.V. 2023) ................................ 11, 21

*Utah Licensed Beverage Ass'n v. Leavitt,*
  256 F.3d 1061 (10th Cir. 2001) ........................................ 33

*Western Watersheds Project v. Michael,*
  869 F.3d 1189 (10th Cir. 2017) ................................................. 7

**Statutes**

C.R.S. § 18-12-106 ...................................................... 23

**Rules**

Fed. R. App. P. 27(d) ................................................... 38

Fed. R. App. P. 32(a)(5) ................................................ 38

Fed. R. App. P. 32(a)(6) ................................................ 38

## INTRODUCTION

It is indisputable that a waiting period law burdens the right to keep and bear arms. *See, e.g.*, Answer Br. at 1 (the purpose of the Colorado Waiting Period Act is "a cooling off period" for the purchaser of a firearm—thus burdening the right to keep and bear arms). It is also indisputable that waiting period laws did not exist at the Founding or for 150 years after the Founding. *Id.* at 42 n. 7 ("Waiting period laws themselves have been around for 100 years."). Other than these two facts, everything else is window-dressing.

This Court may credit the experts below, or the *amici* here, with the argument that a waiting period law will save some number of lives. Indeed, the Court will notice that Appellee emphasizes that argument above all others. *Id.* at 8 (beginning its brief with the doctrinally irrelevant statement that "Colorado's Waiting Period Act will save approximately 100 lives over the next year."). That reliance is telling, because even a cursory reading of *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), rejects such logic as a means to save Colorado's Waiting Period Act. *Id.* at 24 ("In sum, the

1

Courts of Appeals' second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny.").[1]

Separately, the fact that the parties disagree about history is unsurprising. But after *Bruen*, courts do not weigh historical records against each other. Rather, the government either meets or fails its burden under *Bruen* to establish a relevant historical analogue. If, at the end of the day, the history is does not resolve the question before the Court, the plaintiff wins.

In sum, this Court should reverse the District Court, and enter a preliminary injunction until a decision on the merits is reached below.

## I.    APPELLEE DOES NOT DISPUTE THIS COURT'S JURISDICTION OR APPELLANTS' STANDING.

Appellee does not dispute Appellants' standing to bring this matter, or this Court's jurisdiction on appeal. Nor could it. Both Alicia

---

[1] The three *amici*, Everytown for Gun Safety, Brady Center to Prevent Gun Violence and Giffords Law Center to Prevent Gun Violence, and a Coalition of states and the District of Columbia themselves engage in the forbidden means-end reasoning. They offer no unique arguments not advanced by Appellee.

Garcia and members of Rocky Mountain Gun Owners have purchased firearms, obtained title to those firearms, and yet could not leave the transferring Federal Firearms Licensee ("FFL") with their newly acquired firearm, solely due to the Waiting Period Act. And the same unconstitutional burden will fall on them time and again, with future purchases of other firearms.

These basic facts establish that Appellants' Second Amendment rights are burdened by the Act. *Accord* Opening Br. at 10-11 ("Ms. Garcia's unchallenged testimony is that her business is impacted as a firearms instructor and range safety officer, who regularly purchases firearms."); *id.* at 11 ("Taylor Rhodes, Executive Director of Rocky Mountain Gun Owners, testified that RMGO's members, himself included, were burdened by the Waiting Period Act."). Thus, the Court may entertain this dispute, and it possesses jurisdiction under Article III to resolve the matter in Appellants' favor.

## II. AN INJUNCTION IS NOT DISFAVORED IN THIS CONTEXT.

Appellee has no response to the argument that an injunction based on a constitutional challenge to a law, sought on the effective date

3

of the law, does not truly disrupt the status quo. Appellee lacks authority to the contrary, merely citing to the District Court's opinion, which recognized the truism that this suit was filed on the Waiting Period Act's effective date, which was October 1, 2023.

But this is not responsive to Appellants' reliance on *Schrier v. University of Colorado*, 427 F.3d 1253 (10th Cir. 2005), where the Tenth Circuit held that a request to be reinstated as a Chair of a university department "preserved," rather disturbed the status quo, because it placed the parties in their last uncontested state. Nor does Appellee contend with the argument that its logic would mean that every appeal of a denial of a preliminary injunction would be disfavored, because the relevant laws at issue would go into effect during the pendency of the litigation.

Thus, while obtaining a preliminary injunction certainly requires that Appellants establish the relevant elements, their request in the instant matter is not disfavored. *Cf. League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (where group filed a challenge "on the very same day" that same-day voter

4

registration was eliminated, the court held that "[w]ithout doubt, this is the language and stuff of a prohibitory injunction seeking to maintain the status quo.").

Second, Appellee relies on a series of First Amendment challenges (mostly in the overbreadth context) for the proposition that facial challenges generally are disfavored. Answer Br. at 12. In addition to offering no analysis as to how these cases apply in the context of motion for a preliminary injunction—particularly against a law which applies uniformly to almost all firearm transfers in Colorado—the cases are intuitively inapposite. Appellants Garcia and RMGO seek to enjoin the Waiting Period Act so that they can exercise their own, personal constitutional rights under the Second Amendment. Their challenge is no more disfavored than those in *D.C. v. Heller*, 554 U.S. 570 (2008), or *Bruen* itself. *Accord Heller*, 554 U.S. at 581 ("We start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans."). The Court should thus approach this dispute without any "disfavoring" the preservation of Appellants' constitutional rights.

## III.   APPELLANT SATISFIES *BRUEN* STEP 1.

### A.   The Plain Text of the Second Amendment Covers Appellants' Conduct.

Appellants were denied the ability to take possession of firearms that they purchased for lawful purposes—including self-defense in their homes. The Waiting Period Act prohibited Appellants from doing so without being subjected to an arbitrary, unnecessary, burdensome, and useless delay.

The right to "keep" arms necessarily implies the right to obtain arms. After all, "keep" means to possess or "have weapons." *Heller*, 554 U.S. 570, 582 (2008). By the Waiting Period Act's very terms, it prevents individuals from taking "possession" of their firearms. Therefore, because the Second Amendment's plain text covers Appellants' conduct – i.e., possessing bearable arms – "the Constitution *presumptively* protects that conduct." *Id.*, 597 U.S. at 24 (emphasis added). Appellants have met their burden under *Bruen*, and the Waiting Period Act is presumptively unconstitutional.

B.     Appellee Repeats Its Error of Mis-framing the Right at Issue as the "Immediate" Access to Firearms.

"The right of the People to keep and bear Arms, shall not be infringed." Both the keeping and the bearing of arms necessarily implies the right to obtain arms, and therefore implicates the text of the Second Amendment. *See Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01077-PAB, 2023 WL 5017253 (D. Colo. Aug. 7, 2023), *12-13 (collecting cases) ("The Court agrees with the Individual Plaintiffs that the Second Amendment includes the right to acquire firearms and, therefore, protects the Individual Plaintiffs' proposed conduct.") (emphasis added); *cf. Minneapolis Star and Tribune Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575 (1983) (tax on the use of ink and paper directed at newspapers violated the First Amendment); *Western Watersheds Project v. Michael*, 869 F.3d 1189, 1194 (10th Cir. 2017) (collecting data on public lands was protected by First Amendment). Indeed, all rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring). The right to keep and bear arms obviously implies the right of acquisition.

Appellee's response is that the Waiting Period Act doesn't take away anyone's firearms, so it does not deny anyone the right to keep or bear arms, or even implicate the Second Amendment; but Appellee offers no response to Appellants point that this logic would never carry the day in the context of a First Amendment challenge. For example, a mandatory 3-day delay on offering a political stump speech—to avoid a candidate engaging in impulsive rhetoric—does not "take away" anyone's right to speak, it *just* delays it. *Cf. Hill v. Colorado*, 530 U.S. 703, 745 (2000) (Scalia, J., dissenting) ("The strictures of the First Amendment cannot be avoided by regulating the act of moving one's lips; and they cannot be avoided by regulating the act of extending one's arm to deliver a handbill, or peacefully approaching in order to speak.").

Yet there is little doubt that courts would look askance at such efforts to thwart constitutional rights—certainly, no court would say that such a prohibition does not implicate the First Amendment at all. *Cf. Silvester v. Beccera*, 138 S. Ct. 945, 951-52 (2018) (Thomas, J., dissenting from denial of certiorari) (noting how eager courts would be

to strike down a 10-day waiting period on racist speech or, pre-*Dobbs*, abortion).[2]

Both the District Court and Appellee mis-frame the right as one of "immediate acquisition." Not so. Appellants do not challenge the time it takes for an FFL to conduct a background check in order to ensure that a purchaser is not a prohibited possessor. That is why Appellants relied on the *McRorey v. Garland*, 23-cv-00047-O, 2023 WL 5200670, at *5 (N.D. Tex. Aug. 14, 2023) case in their Opening Brief. That case noted that waiting periods implicate the Second Amendment, but that a

---

[2] The Court ought to take notice that Appellee's position is apparently that the Second Amendment doesn't protect the right to obtain a firearm within any defined time period at all. *See* Answer Br. at 28 (referring to a 7-month long or 2-year long waiting period to obtain a firearm). If the Court rejects Appellants' challenge on the logic that the Second Amendment does not guarantee that an individual may obtain a firearm within any given time period, there is no fairly-drawn limiting principle to that conclusion.

Also, to be clear, Appellee's references to 7-month and 2-year waiting periods in *Connecticut Citizens Defense League, Inc. v. Thody*, 664 F.Supp.3d 235 (D. Conn. 2023), are not conclusions related to the Second Amendment—although Appellee misleadingly suggests that they are. Instead, they are references to the fact that before *Bruen*, there were no cases clearly establishing that such waiting periods are unconstitutional, solely for qualified immunity purposes.

waiting period associated with a background check is consistent with the nation's historical tradition of firearms regulation. It did <u>not</u> hold that the Second Amendment said nothing about waiting periods. That would be a truly dangerous conclusion.

Any right can be defined so narrowly as to read it out of the Constitution. But the Court should not allow itself to be manipulated in this way. To be clear, Appellants have never suggested that "immediate acquisition" of firearms is the right at issue in this case; indeed, some delay will always exist while a background check happens. Appellants instead challenge the imposition of an arbitrary delay in exercising their Second Amendment rights that continues *even after successfully completing a background check*. At a minimum, that delay burdens Appellants' Second Amendment rights, and thus survives *Bruen* Step 1.

## IV.  THE WAITING PERIOD ACT IS NOT A PRESUMPTIVELY LAWFUL COMMERCIAL REGULATION.

The District Court held that the Waiting Period Act is a "commercial regulation" that was presumptively lawful. It is not. Its very purpose is to impose a burden on the exercise of the individual right to keep and bear arms, and the Court should reject the effort as

10

trickery by the Appellee and the Colorado legislature. *Cf. United States v. Price*, 635 F.Supp.3d 455, 460 (S.D. W.V. 2023) ("[A] blatant prohibition on possession" of a firearm is not a commercial regulation."); *United States v. Marique*, 647 F.Supp.3d 382, 385 (D. Md. 2022) (commercial regulations are those that do not intrinsically "implicate an individual's right of possession").

To be sure, the *Heller* plurality stated that true commercial regulations on the sale of firearms were still "presumptively lawful." *District of Columbia v. Heller*, 554 U.S. 570, 627, n.26 (2008). In that context, the *Heller* Court referred to "laws imposing conditions and qualifications on the commercial sale of arms." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010). Notably, the footnote had the votes of only four Justices, and is thus not binding precedent on this or any other Court. Nevertheless, even crediting the point, the logic of the District Court and Appellee is that because the law imposes sanctions on the merchant and not the purchaser, it must be a commercial regulation. But affirming this reductive logic would open a pandora's box of new restrictions on the right to keep and bear arms.

Though the law may impose penalties on sellers, it imposes a "burden on the right of armed self-defense," as conceded by the District Court. App. Vol. III at 770. That concession, and the obvious burden that the Waiting Period Act places on an enshrined Constitutional right, moves the law past *Bruen's* step one.

Moreover, Appellee does not adequately respond to the argument that even a "commercial regulation" is not presumptively constitutional if it is merely a pretext for burdening an individual right to keep and bear arms. Appellee asserts without evidence that a three-day waiting period is not abusive, because it is the shortest in the country. But that is a non-sequitur. A pretextual law is *per se* abusive. *Antonyuk v. Chiumento*, 89 F.4th 271, 316 (2d. Cir. 2023).

## V.    THE DISTRICT COURT ERRED BY RELYING ON SUPPOSED PRACTICALITIES IN ACQUIRING ARMS.

Appellee cites no case for the proposition that courts applying *Bruen* must take account of practically analogous circumstances where an individual was similarly unable to defend himself because it took time to obtain an arm. Instead, *Bruen* takes account only of legal analogues, not factual or practical ones. *See Bruen*, 597 U.S. at 24 ("The

government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm <u>regulation</u>.") (emphasis added); *id.* at 28 ("Following the course charted by *Heller*, we will consider whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of <u>regulation</u>.") (emphasis added); *id.* at 28-29 ("[D]etermining whether a <u>historical regulation</u> is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "'relevantly similar.'") (emphasis added); *id.* at 29 ("[W]e do think that *Heller* and *McDonald* point toward at least two metrics: how and why the <u>regulations</u> burden a law-abiding citizen's right to armed self-defense.") (emphasis added).

It is not even clear why Appellee advances its argument based on practical circumstances—Appellants are aware of no court, other than the District Court below, that thought it appropriate to address all historical circumstances, rather than those specifically laid out and delineated by *Bruen*.

In any event, both the District Court and the Appellee make a fundamental factual error that firearms were not available for purchase at the time of the Founding. App. Vol. II at 412. The uncontroverted evidence in the record shows that an individual could indeed go to a merchant and purchase a firearm.[3] There is no evidence rebutting the availability of firearms at the Founding, or the fact that no state or municipality imposed a waiting period.

As examples, Benjamin Franklin's Pennsylvania Gazette published advertisements of firearms for sale throughout its history:

---

[3] *See* App. Vol. II at 415-23 (collecting advertisements of firearms from sale as early as 1728 and continuing after the Founding).

*JUST imported from* London,
in the Brigantine *Argyle*, John Seymour, *Commander, and to be fold by* Hufton *and* Campbell, *at their Store, in Front-ftreet, oppofite to* Samuel Hafel, *Efq*; *for Ready Money or fhort Credit, Variety of European Goods, viz.*

Cordage of different fizes, ruffia duck, gun powder, privateering mufkets, trading Guns, musket balls, lead, and fmall fhot, oznabrigs, gariix, filetias, diaper and damask table cloths, lawns, kentings, cambricks, printed callieoes, coffees, china and perfian taffatys, irifh and fcotch linnens, checks, filk, cotton and linnen bandkerchiefs, fuftians, camblets, ticking, fhort cloaks, fuperfine broad cloth in fuits, with genteel trimmings, german ferges, ready made furtout coats, carradary's, tobines and Indiana's for women's gowns, women's calimanco, damask and filk fhoes, tavern pipes, mobogeny looking glaffes and fconces, pewter, green and bohea teas, pepper, worfted and thread hofe, Houghton and daffy's elixirs, hungary water, the famous turlington's balfam of life, with fundry haberdafhery, cutlary, ftationary and ironmongry ware, too tedious to mention.

*Figure 1,* Nov 1, 1744, p. 4 advertising "gunpowder, privateering muskets, trading guns, musket balls, lead and small shot" amongst various other household goods. App. Vol. III 416 n14.[4]

---

[4] "[T]he appellate record includes all district court filings and exhibits as well as transcripts of district court proceedings." *U.S. v. Spigner*, 416 F.3d 708, 711-12 (8th Cir. 2005). While these advertisements were referenced below by Appellants' expert witness, the images themselves are not printed in the record. However, they are included here as illustrative of the testimony in the record.

The remaining store-goods belonging to the late Captain *William Grant*, deceased, consisting of the following articles (in order to close the sales) are now to be sold at the lowest rates for ready money, at THOMAS BOURNE's store, near the Market-street wharff, viz.

PADUASOYS, India and English taffeties, white persian alamode, damasks, black, scarlet and crimson breeches patterns, black silk stockings, cloth colour'd mittens and gloves, silk laces, a variety of silk handkerchiefs, plain and figured ribbons, baladine sewing silk, siverets, rich spangles, crapes, grizets, Irish stuffs, a fine assortment of cambices, camblettees, fine saggathies, double and single alopeens Venetians, striped calimancoes, florettas, yd. wd. plains, corded and plain poplins, double and single worsted damasks, wadding, haircloths, printed cottons, linens, fine and coarse chints, calicoes, cotton curtain patterns, counterpanes, gloves, mitts, flowered demity and cotton gowns, a large parcel of mens and womens gloves, Irish linens, tandems, bag hollands, cambricks and lawns in pieces and patches, damask and diaper table-cloths, barnagoze, cotton and printed handkerchiefs, tapes, bobbins, laces, gartering, qualities, horsehair and Leghorn hats, coarse cap lace, black lace, a fine assortment of fans, umbrelloes, necklaces, pins, needles, temple and young green spectacles, table matts, mahogony framed looking glasses, a curious assortment of pictures, many of them quite new, Scots, nuns and coloured threads, vest and shirt buttons, bed bunts, stay cord and braid, blank books, paper hangings, a very large quantity of ironmongery, copper, tin, brass, and cutlery, lead, window glass, cloves, Flavell's and Peatfall's works, a large parcel of muskets and bayonets, &c.

WHEREAS all Persons indebted to the Estate of Captain William Grant deceased, have been repeatedly desired to pay the same, and many have neglected to comply with said Request; the Executors are now obliged to give Notice to every one so indebted (as if particularly named) that unless they make immediate Payment, they may expect to be sued without further Notice. MARY GRANT, SAMUEL SMITH, THOMAS BOURNE, JOHN WALLACE.

*Figure 2*, Nov. 3, 1757, p. 3, advertising "a large parcel of muskets and bayonets" alongside household goods. App. Vol. III 417 n. 20.

To be S O L D by
ROBERT LETTIS HOOPER, jun.
At his Store in Water-ftreet, three Doors above Chcftnut-ftreet,
Wholefale and Retail,

THE beft Bourdeaux Claret, bottled and packed in Hogfheads, that contain about eight Dozen each, good old Brandy in Anchors, fuperfine Rifle Powder by the Quarter Cafk or Pound, Tea, Coffee, 6, 8, 10, 12 and 20d. Nails; alfo Flour, Barr and Lath Nails, in fmall Kegs, that contain from 60 to 80 Pounds each, Window Glafs, Salt, Albany Peafe, and Indian Corn, by the Bufhel, Irifh Beef, Mackrel, Pork and Flour by the Barrel; and a Parcel of Spanifh Mufkets, neatly fitted with Iron Rods, and fmall Bayonets, the Locks are large, and well made, and the whole Piece very handy and convenient for common Ufe. Theif.

THOMAS FITZSIMONS

*Figure 3*, Sept. 22, 1763, pg. 1 advertisement for retail purchase of "Spanish Muskets neatly fitted with iron rods, and small bayonets, the Locks are large and well made and the whole Piece very handy and convenient for common use." App. Vol. III 416 n. 11.

Imported from Liverpool, and to be fold for prime Coſt, at
R O B E R T    T O W~E R S's,
Between the Preſbyterian Meeting and Strawberry Alley, in
Market-ſtreet,

NAPS, worſted and thread mens and womens hoſe, worſted breeches patterns, felt hats, a variety of ſhoe and knee buckles, ſleeve buttons and ſtuds, metal coat and veſt buttons, ditto inlaid with ſteel, double gilt ditto, and a variety of horn ditto, claſp and penknives, ſciſſars, ſnuff-boxes, thimbles, watch chains, ink-pots, boot garters, handſaws, augers, chiſſels, gouges, hammers, trowels, ſpades, axes, hoes, cuttting knives, traces, rat-traps, rifle double ba rel and ſm oth bore guns, piſtols, flints, bullet and ſhot molds, with a variety of other things.

The ſubſcribers have provided a veſſel for fetching H O U S E F L O O R    S A N D, of the beſt ſort, and a team to haul it; thoſe who pleaſe to favour us with their Cuſtom, by leaving or ſending an order to either of us, ſhall be ſupplied without delay, at the uſual price.    R bert Towers, John Towers.

*Figure 4* September 6, 1764, pg. 1 ad for retail purchase "rifle double barreled, smooth bore guns, pistols, flints, bullets, and shot molds" alongside other household goods. App. Vol. III 416 n.10.

These advertisements show that near the time of the Founding, firearms were commonly available, and were lumped in with things like shoes, buckles, pepper, and cloth. They were not separated out and treated differently than any other household item. None other than Benjamin Franklin implicitly endorsed this view by allowing these ads in his Pennsylvania Gazette.

18

The District Court did not meaningfully engage with this evidence. Instead, the District Court essentially dismissed Appellant's expert due to his lack of a Ph.D., ignoring the many books and peer-reviewed articles that Mr. Cramer produced throughout his career, including multiple citations by Courts. The District Court then held that the Waiting Period Act was merely a "commercial regulation" that was presumptively lawful. As outlined above, it is not. It imposes a burden on the exercise of the God-given right to keep and bear arms recognized in the Bill of Rights. The Waiting Period Act prevents "the People" (and there is no question that Plaintiff-Appellants are among "the People" the Second Amendment protects) from "keeping" and "bearing" arms for an arbitrary length of time. It therefore implicates the text of the Second Amendment.

## VI. THE DISTRICT COURT ERRED IN RULING THAT THE ACT IS IN LINE WITH THE HISTORY AND TRADITION OF FIREARMS REGULATION.

The District Court held that even if it reached *Bruen* Step 2, the Waiting Period Act is in line with the history and tradition of the nation's firearms regulation. It is not. It is undisputed that the first

waiting period enacted in the United States was in California in 1923 for handguns alone. App. Vol. II at 463-64. Colorado was a state for almost 150 years before the Waiting Period Act came into law. To get around the clear lack of a historical tradition of imposing arbitrary waiting periods, the State and the District Court turn to ill-fitting analogies in an effort to justify the unconstitutional law.

It is the government's burden to identify a "well-established and representative historical analogue." *Bruen*, 597 U.S. at 30. Appellee and the District Court start from the aggressive position that "impulsive gun violence" is a new societal harm, which was not even a "general" societal problem at the Founding. Nonsense. *United States v. Duarte*, No. 22-50048, — F.4th —, 2024 WL 2068016, at *14 (9th Cir. May 9, 2024). But according to its own argument, firearms were used in 10-15% of homicides at the Founding. Similarly, gun violence was rampant during the Reconstruction Era leading to the Ku Klux Klan Act of 1871. Yet even then, in an era where many in the south had been disarmed by the federal government, no waiting period was imposed on the acquisition of firearms. App. Vol. II at 541.

Rather than being an "unprecedented societal concern", firearm violence is neither new nor novel. It existed at the time of the Founding and in every year thereafter. *Id.*; *Duarte*, 2024 WL 2068016, at *14 (*citing Bruen*, 597 U.S. at 26, 27); *cf. Price*, 635 F.Supp.3d at 463 (where a regulation is directed at stopping "crime" or "crimes involving firearms," "[i]t is difficult to imagine that this societal problem did not exist at the founding."). It certainly existed at the time of the Fourteenth Amendment in 1868.[5]

Even with this "societal problem" in full existence at the time of the Founding, the Founders understood the importance of the people having the right to keep and bear arms for their defense and the defense of Liberty. *See* James Madison *The Federalist Papers*, No. 46, January 29, 1788.

---

[5] The Supreme Court has not clarified the extent to which the 14th Amendment is relevant to the historical analysis.

A.    <u>Intoxication laws are a poor analogy to the Waiting Period Act.</u>

The state and the District Court decided to rely on pre-Founding and Founding-era laws regulating intoxication and firearm usage. App. Vol. III at 823-24. Those laws are particularly poor analogies because they did not, as the Waiting Period Act does, assume that everyone is always intoxicated, and must wait 72 hours after passing a background check to sober up. Appellee simply has no adequate response to this. Indeed, Appellee never reflects long enough to recognize that there are numerous reasons "why" public officials would want prevent intoxicated individuals from obtaining firearms—the likelihood of careless and negligent discharge, the suspicious nature of anyone becoming intoxicated and only then seeking to purchase a gun, and of course, that intoxicated people—impulsive or no—often make bad decisions, even if they have plenty of time to consider their actions.

The laws that Appellee and the District Court cite to, such as the 1655 Virginia law that banned "shoot[ing] guns at drinking," had little to do with the "how" and "why" that *Bruen* commands be analogous. *Bruen*, 597 U.S. at 29. The record shows that banning stray gun shots

22

while drinking related to collective security. Firing warning shots was how early Virginians alerted each other to Native American attacks. App. Vol. II at 538. So, the "how" and "why" had little to do with impulsive violence, instead focusing on common defense. While the District Court hand-waved that inconvenient fact away, the state never countered that there was a different motivating cause. States enacted laws that restricted drinking and using firearms throughout the latter half of the Nineteenth Century, but those only applied to an individual. They did not apply to the entire population of the states. App. Vol. III at 767-69. The intoxication laws might be good analogies to modern laws such as C.R.S. § 18-12-106 that bans the possession of a firearm while a person is under the influence of an intoxicating liquor, but not to the Waiting Period Act.

B.   <u>Licensing regimes are not a historical analogue to the Waiting Period Act.</u>

Appellee and the District Court argue that various licensing requirements are analogies to the Waiting Period Act. But there is no such analogy. The first licensing regime in the United States was the notoriously odious Sullivan Act in New York in 1911, entirely too late to

be an analogy from the Founding. Moreover, the Sullivan Act only required licensing for concealed carry. The first federal licensing was enacted in 1938, the National Firearms Act, requiring sellers of firearms to receive a federal license.

While Appellee and the District Court relied on a compilation of laws gathered by Professor Robert Spitzer, it is clear that the "licensing" laws that he's collected are of a different kind than at issue here. For instance, states both north and south had requirements for free blacks and Native Americans to get a license from an official to possess a firearm. Others required permission to fire shots within city limits or during certain times. *See* App. Vol. I at 200 *et seq*. They were not universal licensing regimes. Instead, they were regimes rooted in racism and bias regarding disfavored racial groups. *Id*., *Duarte*, 2024 WL 2068016, at *20-26 (rejecting race- and religious-based licensing as a proper analogue). Nearly every true licensing system came into being in the twentieth century. As such, they are too distant from the Founding to be relevant to the analysis. Moreover, the "how" and "why"

of licensing regimes have no historical analogous from the Founding period.

C.    <u>Firearms were common at the Founding, Yet There Were No Waiting Period Laws.</u>

Appellee and the District Court simply err by asserting that firearms – the obtaining or use of them – were not part of general American society at the time of the Founding. They were. As shown above, firearms were freely available for purchase at shops. In addition to this, the Militia Act of 1792 required every "free able-bodied white male citizen" to be enrolled in the state militia. Those militiamen were required to acquire a firearm:

> That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball: or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear, so armed, accoutred [sic] and provided, when called out to exercise, or into service, except, that when called out on company days to exercise only, he may appear without a knapsack.

Public Acts of the Second Congress, 1st Session, Chapter 33.

25

It cannot be true that every adult male between 18 and 45 was required to possess a musket, firelock, or rifle and at the same time that firearms were rare. There is no universe where those two claims can co-exist.

It is important to understand the historical context that led to the Militia Act of 1792. The Founders had just come out of the American Revolution, where famously the Minutemen had used their own firearms to engage in combat with the British Army. Even after the ultimate defeat of the British Empire, concern over maintaining a standing army led to the disbandment of most of the Continental Army in 1783. In its place, the founding generation relied on militias for collective defense until the First World War. App. Vol. III at 602. Imposing an arbitrary waiting period for those seeking to acquire firearms so that they could defend themselves and their states and country would have been seen as anathema to the Founders.

Early America saw several armed rebellions: Shay's Rebellion, the Whiskey Rebellion, Fries's Rebellion, the 1838 Mormon War, Bleeding Kansas, Dorr's Rebellion, John Brown's Revolt, the Utah War, and

multiple armed confrontations with Native Americans. All off these events occurred between the Founding and the ratification of the Fourteenth Amendment. The Founders knew and understood that firearms could be used for violent purposes. Yet they imposed no waiting period to acquire a firearm.

The state and the District Court made much of the supposed practical difficulty in acquiring a firearm. Not so. As the record shows, ads for firearms from gunsmiths and hardware stores show availability for a person to walk in, purchase a firearm, and walk out. Even if an early U.S. citizen was made to wait for a firearm to be shipped or delivered, the government imposed no conditions on the sale of firearms, except based on disfavored racial groups. App. Vol. III at 599. Although the state's expert, Professor Roth, referenced laws in the South in the Founding period that restricted the rights of Freedmen and Enslaved African Americans alike from owning or possessing firearms, he could cite no laws that applied to free people of any age. App. Vol. II at 333-34.

## VII. IF THE COURT FINDS THE HISTORICAL RECORD TO BE INDETERMINATE, THE PLAINTIFF HAS DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.

"The constitutional imperative is on the government to not infringe the right to keep and bear arms. The correct starting orientation is that no arm may be prohibited." *Miller v. Bonta*, — F. Supp. 3d — 2023 WL 6929336, *36 (S.D. Cal. Oct. 19, 2023) (quotation marks omitted). In other words, the fact that history may be contradictory or indeterminate leads to a clear doctrinal result—the constitutional challenge succeeds. *See Bruen*, 597 U.S. at 26 ("The Second Amendment is the very product of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense. It is this balance—struck by the traditions of the American people—that demands our <u>unqualified deference</u>.") (emphasis added and cleaned up); *id.* at 34 ("[T]he burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation.").

The Second Amendment context is no different than other areas of law where constitutional rights are squarely at issue—unless the government can persuade the Court that it has met its burden, it hasn't. *Accord Bevis v. City of Naperville, Ill.*, 657 F. Supp. 3d 1052, 1066 n.6 (N.D. Ill. 2023) ("Bruen indicates that judges, not party elected experts, will assess the Second Amendment's history."). Thus, to the extent that the Court is unsure as to whether Appellee has satisfied its onerous burden under *Bruen* Step 2, the appropriate next step is to find that Appellants are likely to succeed on the merits, because the government has in fact failed to meet its heavy burden.

## VIII. APPELLANTS ARE SUFFERING IRREPARABLE HARM, AND THE BALANCE OF HARMS AND PUBLIC INTEREST FACTORS SUPPORT ENTRY OF INJUNCTIVE RELIEF.

### A. Appellants are suffering irreparable harm due to the Waiting Period Act.

In their Answer Brief, Appellee argues that Appellant RMGO has failed to establish that either it as an organization, or any of its members, have suffered irreparable harm. But this assertion is factually inaccurate. Taylor Rhodes, the Executive Director of the RMGO, testified at the Preliminary Injunction hearing that since the

Act went into effect, RMGO, whose organizational mission is to defend the Second Amendment rights of its membership, has had to devote "a very high portion of [its] resources" to assist its approximately 16,000 members with understanding and navigating the Act. App. Vol. II at 532.

Mr. Rhodes testified that in the first three weeks of the Waiting Period Act's implementation, RMGO had already received approximately 100 calls from members who experienced difficulties acquiring firearms. App. Vol. II at 524. Thus, RMGO members continue to be impacted by an unconstitutional and arbitrary waiting period.

Mr. Rhodes also testified at the Preliminary Injunction Hearing that the Waiting Period Act "infringed upon the rights of members of Rocky Mountain Gun Owners." App. Vol. II at 524. Mr. Rhodes went on to testify that his members were "upset . . . because they [could] not acquire firearms in a reasonable manner." App. Vol. II at 524. Mr. Rhodes provided additional testimony about one RMGO member who had called just a few days before to relay that he (the member) "had never purchased a gun before", but recently "went to Cabela's to

purchase a shotgun and was denied the opportunity" due to the Waiting Period Act. App. Vol. II at 527. As was the case for Appellant Garcia, the arbitrary three-day waiting period has imposed a limitation on this RMGO member's Second Amendment rights to keep and bear arms. Moreover, because of Appellant Garcia's profession, the Waiting Period Act will cause her injury again and again. RMGO can thus establish harm on behalf of its members as well.

Mr. Rhodes is also a member of RMGO in addition to being its executive director. App. Vol. II at 530. He testified that he purchased a firearm after passing a background check, acquired title to it, but was unable to possess it for three days due to the Waiting Period Act.  App. Vol. II at 525.

It is indisputable that the right to possess arms cannot be exercised unless individuals have the right to obtain them. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("The core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms.") (quoting *Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011).   Any time that Appellant

Garcia, Mr. Rhodes, or any other member of Appellant RMGO attempts to purchase a firearm in Colorado in the future, they will be denied possession of those firearms, even if they have cleared a background check and rendered full payment for them. It is irrelevant to the discussion of harm that the denial of this basic Constitutional right is temporary. As discussed in the Opening Brief, even a brief violation of constitutional rights constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (loss of constitutional freedom "for even minimal periods of time" unquestionably constitutes irreparable injury).

B.    The balance of harms and public interest factors support entry of injunctive relief.

It is not only the Appellants' Second Amendment rights that have been violated by the Waiting Period Act, but also those of all law-abiding Coloradans seeking to purchase a firearm. Because of that, the balance of equities in this case weighs in favor of granting a preliminary injunction. "[P]ublic interest concerns are implicated when a constitutional right has been violated, [and] all citizens have a stake in upholding the Constitution." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (internal citation and quotation marks omitted; cleaned up).

In *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010), the Tenth Circuit held that when applying these factors, courts must be mindful that even if a state is pursuing a legitimate goal (in that case, deterring illegal immigration), it has no interest in doing so by unconstitutional means, because a state "does not have an interest in enforcing a law that is likely constitutionally infirm." *Id*. "Moreover, the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law." *Id*. (internal quotation marks and citation omitted). *See also Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001) (public interest favors preliminarily enjoining state statutes likely to be held unconstitutional).

In the present case, the District Court held that because there was an important government interest advanced by the Waiting Period Act (namely, reducing impulsive gun violence), the balance of harm tipped in the state's favor. But in reaching this conclusion, the District Court employed the type of backdoor means-end test that has been rejected by *Bruen*. 142 S. Ct. at 2129 (rejecting means-end scrutiny in Second Amendment cases). "[T]he government may not simply posit that the

33

regulation promotes an important interest [such as public safety]. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*, 142 S. Ct. 2126.

Appellee now invites this Court to employ the exact same impermissible means-end test by suggesting that the number of people who may be "save[d]" by the Waiting Period Act is relevant to the constitutionality of the Act. But again, the Supreme Court explicitly forbade consideration of the proposed outcome of laws that implicate the Second Amendment. And it is easy to see why. The state could just as easily enact a law that the delayed release of news critical of the state would save lives and find an expert to opine on the result; or delaying the right to an attorney; or to peaceably assemble, and on, and on until the right itself was watered down to nonexistence.

## IX. THE DISTRICT COURT FAILED TO FAITHFULLY APPLY *BRUEN*.

In *Bruen*, the Court elaborated exactly how Second Amendment jurisprudence must proceed. Most importantly, recognizing the unqualified command of the Second Amendment's text, the Court in

*Bruen* held that lower courts may not use "means-ends" logic. Instead, lower courts must evaluate history—as they often do in other contexts involving public-meaning originalism—and decide questions regarding historical precedents:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 597 U.S. at 24. The District Court resisted *Bruen*'s emphasis on looking to historical precedents regarding firearms regulations, even if it acknowledged that it was bound by it. It offered a prologue to its judicial analysis, wringing its hands that it had "reservations" about *Bruen*'s methodology:

> While I perform the analysis as instructed, I have reservations that turning to a particular historical era should dispositively determine how we conceive of and defend certain rights. The first is practical; I am a judge and not an historian. … The second is that this approach can be self-defeating. Since *Bruen* instructs me to consider the historical evidence the parties present and argue, it is not inconceivable that the parties would present historical accounts inconsistent with the holdings of *Bruen*, *Heller*, or *McDonald*.

App. Vol. III at 760, n.13.

This faux modesty should be met with heavy skepticism, and trigger probing scrutiny from this Court. When judges unnecessarily express their personal disagreement or frustration with binding precedent—whether *Bruen* or otherwise—it naturally leads to skepticism among the public that the proper historical analysis was correctly applied, *ab initio*. This Court can help rebut that skepticism by closely scrutinizing the District Court's reasoning,

## CONCLUSION

The Waiting Period Act is an unconstitutional burden on the exercise of law-abiding Coloradans' Second Amendment rights. Appellants brought this case to prevent the infringement on the right of all Coloradans to keep and bear arms. It would be troubling to let these

violations continue to occur until final judgment can be entered in the case. This Court should reverse, and enter a preliminary injunction in favor of Appellants.

DATED this 22nd day of May 2024.

<div style="margin-left: 40%">

Respectfully submitted,

D. Sean Nation
Michael D. McCoy
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
Phone: (303) 292-2021
Email: snation@mslegal.org

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Phone: (303) 205-7870
Email: barry@arringtonpc.com

*Counsel for Appellants*

</div>

## CERTIFICATE OF COMPLIANCE

This motion complies with the requirements of the Fed. R. App. P. 27(d) and Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 6,285 words.

This motion also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

DATED this 22nd day of May 2024:

*/s/ D. Sean Nation*
D. Sean Nation

## CERTIFICATE OF ELECTRONIC FILING

In accordance with this Court's CM/ECF User's Manual and Local Rules, I hereby certify that the foregoing has been scanned for viruses with Sentinel One, updated May 22, 2024, and is free of viruses according to that program.

In addition, I certify that all required privacy redactions have been made and the electronic version of this document is an exact copy of the written document to be filed with the Clerk.

DATED this 22nd day of May 2024.

/s/ D. Sean Nation
D. Sean Nation

## CERTIFICATE OF SERVICE

I certify that on May 22, 2024, I caused the foregoing to be filed through the Court's CM/ECF system, with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit through the Court's CM/ECF system.  I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system and that a PDF copy of this motion will be emailed to opposing counsel immediately after it is filed.

DATED this 22nd day of May 2024.

*/s/ D. Sean Nation*
D. Sean Nation

*Counsel for Appellants*