23-1380
IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

ROCKY MOUNTAIN GUN OWNERS and ALICIA GARCIA,

Plaintiffs – Appellants,

v.

JARED POLIS, in his official capacity as Governor of the State of Colorado,

Defendant – Appellee.

On Appeal from the United States District Court, District of Colorado
The Honorable John L. Kane
Senior District Judge
District Court Case No. 23-cv-02563-JLK

**APPELLEE'S SUPPLEMENTAL BRIEF FOLLOWING *UNITED STATES V. RAHIMI*, NO. 22-915**

PHILIP J. WEISER
Attorney General
MICHAEL T. KOTLARCZYK *
Assistant Solicitor General
MATTHEW J. WORTHINGTON*
Assistant Attorney General

Colorado Department of Law
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone:  720-508-6187
E-Mail:  mike.kotlarczyk@coag.gov;
matt.worthington@coag.gov
*Counsel of Record

*Attorneys for Governor Polis*

I. **Introduction**

Pursuant to this Court's July 3, 2024 Order, this supplemental brief addresses the impact of United States Supreme Court's decision in *United States v. Rahimi,* 144 S. Ct. 1889, 2024 WL 3074728 (U.S. June 21, 2024), on Plaintiff-Appellants' challenge to Colorado's Waiting Period Act, § 18-12-115, C.R.S. (2023). In *Rahimi*, the Court held that 18 U.S.C. § 922(g)(8), a federal law prohibiting firearm possession by individuals subject to certain domestic violence orders, did not violate the Second Amendment. In doing so, the Court broadly construed the second step of the analysis from *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), emphasizing that it "involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition" and does not require the government to identify a founding-era "'dead ringer' or a 'historical twin.'" *Rahimi*, 144 S. Ct. at 1898 (emphasis added) (quoting *Bruen*, 597 U.S. at 30). Because the Court's analysis and the revised *Bruen-Rahimi* test support the approach advanced in the Governor's earlier briefing, the Governor stands by his arguments and reiterates that the Waiting Period Act is constitutional.

II. ***United States v. Rahimi***

Defendant Zackey Rahimi was charged with violating section 922(g)(8) after police found firearms in his possession during a search in connection with separate offenses. *Rahimi*, 144 S. Ct. at 1895. At the time, Rahimi was subject to a protection order resulting from domestic violence incidents involving the mother of his child, including one in which he fired a gun and threatened to shoot her if she reported it. *Id.* at 1895. The order included findings that Rahimi had committed "family violence," that such violence was "likely to

1

occur again," and "that Rahimi posed a credible threat to the physical safety" of his child and the mother. *Id.* (quotation marks omitted). Rahimi challenged section 922(g)(8), arguing that it violated the Second Amendment. *Id.* at 1896. The Fifth Circuit agreed, reasoning under *Bruen*'s second step that section 922(g)(8) "does not fit within our tradition of firearm regulation." *Rahimi*, 144 S. Ct. at 1896.

The Supreme Court reversed. *Id.* at 1896-97. It summarized its Second Amendment jurisprudence and clarified the second step of the *Bruen* test. *Rahimi*, 144 S. Ct. at 1897-98. The Court reaffirmed the principle that although "the right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty,'" it "is not unlimited." *Id.* at 1897 (first quoting *McDonald v. Chicago*, 561 U.S. 742, 778 (2010), then quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* at 1898 (emphasis added). To that end, under *Bruen*'s second step, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'applying faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29 & n.7). Central to this analysis are "[w]hy and how the regulation burdens" the Second Amendment right. *Id.*

The Court rejected a narrow historical analysis in favor of this principles-based approach: "[w]hen a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.* (quoting *Bruen*, 597 U.S. at 30). Indeed, "[t]he law must comport with the principles underlying the

2

Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 597 U.S. at 30). Criticizing courts for applying *Bruen*'s second step too narrowly, it explained, "some courts have misunderstood the methodology of our recent Second Amendment cases. These precedents were not meant to suggest a law trapped in amber." *Rahimi*, 144 S. Ct. at 1897. Such a narrow reading of *Bruen*, which the Fifth Circuit followed, "forces 21st-century regulations to follow late-18th-century policy choices, giving us 'a law trapped in amber'" and rests on the "flawed" assumption that "founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority." *Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring). Instead, *Bruen*'s second step "demands a wider lens: Historical regulations reveal a principle, not a mold." *Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring). Thus, despite the mistaken methodologies advanced by some courts and plaintiffs, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897-98.

Applying this revised framework, the Court concluded that section 922(g)(8) does not violate the Second Amendment. *Id.* at 1896-97. In so concluding, the Court analogized section 922(g)(8) to historic surety laws and going-armed laws. Surety laws "authorized magistrates to require individuals suspected of future misbehavior to post a bond . . . [or] be jailed." *Id.* at 1900. "If the individual did post a bond and then broke the peace, the bond would be forfeit." *Id.* Going-armed laws "punish[ed] those who had menaced others with firearms" with "forfeiture of the arms and imprisonment." *Id.* at 1900-01 (quotation marks and alteration omitted). These prohibitions "were incorporated into American

3

jurisprudence through the common law" and were codified by at least four states. *Id.* at 1900.

In the majority's view, section 922(g)(8) is "relevantly similar" to surety and going-armed laws in both the "why" and the "how." *Id.* at 1901-02. As to the "why," these laws all "restrict[] gun use to mitigate demonstrated threats of physical violence." *Id.* at 1901. Likewise, the "how"—or the "burden that Section 922(g)(8) imposes on the right to bear arms"—aligns with surety and going-armed laws in that they all require "judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id.* at 1902. And as with surety laws, section 922(g)(8)'s burden is limited in duration. *Id.*

The Court also clarified its precedent regarding facial challenges: "when legislation and the Constitution brush up against each other, a court's task is to seek harmony, not to manufacture conflict." *Id*. at 1903 (quoting *United States v. Hansen*, 599 U.S. 762, 781 (2023)). Criticizing the Fifth Circuit's misapplication of that precedent, the Court explained, "[r]ather than consider the circumstances in which section 922(g)(8) was most likely to be constitutional, the panel instead focused on hypothetical scenarios where section 922(g)(8) might raise constitutional concerns." *Id*. A facial challenge is "the most difficult challenge to mount successfully because it requires [the party challenging the regulation] to establish that no set of circumstances exists under which the [regulation] would be valid." *Id.* at 1898.

### III. Plaintiffs cannot show a likelihood of success under the revised *Rahimi-Bruen* test.

This Court should affirm the denial of a preliminary injunction on the Waiting Period Act following *Rahimi*. The Court has revised the two-step test for Second Amendment challenges. At the first step, a court considers whether the plain text of the Second Amendment covers the plaintiff's conduct. *Bruen*, 597 U.S. at 24; *Rahimi*, 144 S. Ct. at 1907 (Gorsuch, J., concurring), 1931 (Thomas, J., dissenting). If the conduct is covered, the court proceeds to the second step and asks "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. To find these "principles underlying the Second Amendment[,]" a court looks at "relevantly similar . . . laws that our tradition is understood to permit." *Id.* However, modern regulation "does not need to be" identical to past laws. *Id.* at 1901.

#### A. Plaintiffs failed to demonstrate that their conduct is covered by the Second Amendment's text.

In *Rahimi*, the Court did not substantively address the first step of *Bruen*, in which a plaintiff must prove that "the Second Amendment's plain text" covers the conduct proscribed by the relevant regulation. *Bruen*, 597 U.S. at 24. The Governor stands by his argument that the Waiting Period Act does not implicate the plain text of the Second Amendment because the Second Amendment does not confer a right to immediately acquire firearms, and that the Waiting Period Act does not infringe on Coloradans' right to keep and bear arms. Answer Br. at 17. However, aspects of *Rahimi* nonetheless help inform how to apply the test's first step to this case.

5

First, unlike Plaintiffs' conduct here, the Second Amendment covered Mr. Rahimi's conduct because he challenged a law—section 922(g)(8)—prohibiting "possessing or using virtually any firearm" by those subject to a restraining order. *Rahimi*, 144 S. Ct. at 1932 (Thomas, J., dissenting). But here, the Waiting Period Act does not prohibit possession, carry, or acquisition of firearms. Instead, it merely regulates one method of acquisition (commercial sales) by prohibiting immediate acquisition, while not regulating others, such as transfers between immediate family members. Thus, the Waiting Period Act does not implicate the text of the Second Amendment because it does not involve a ban on the possession or carrying of firearms as *Rahimi* and *Bruen* did.

Second, *Rahimi* provides no support for Plaintiffs' implied rights approach to the Second Amendment. The Plaintiffs have not argued that the plain text covers their conduct. Instead, they argued only that "the right to obtain a firearm therefore necessarily implicates the text of Second Amendment" and that *Heller*'s language regarding the use of arms in case of confrontation implies a right to the immediate acquisition of firearms. Opening Br. at 12. However, *Rahimi* confirms we look to the historical meaning of the text, rather than creating new rights by implication. *Rahimi*, 144 S. Ct. at 1897 ("The scope of the right beg[ins] with constitutional text and history." (quotation marks omitted)). That is because "the right was never thought to sweep indiscriminately" and "[a]t the founding, the bearing of arms was subject to regulations." *Id.* Implying rights without historical context fails to get to this nuanced historical understanding of the pre-existing right. *Id.* at 1912 (Kavanaugh, J., concurring) ("[H]istory helps ensure that judges do not simply create constitutional meaning 'out of whole cloth.'"). Plaintiffs have not met their burden by

asking this Court to imply a right without presenting any historical evidence of the right's scope.

*Third*, *Rahimi* reconfirmed *Heller*'s categories of presumptively lawful gun regulations. *Rahimi*, 144 S. Ct. at 1901. The majority wrote that the presumptively lawful language in *Heller* was an important limitation on the scope of the decision and what is covered by the Second Amendment. *Rahimi*, 144 S. Ct. at 1901. They demonstrate that *Heller* "never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home." *Rahimi*, 144 S. Ct. at 1901. Colorado's law is presumptively lawful because it is imposes "conditions and qualifications on the commercial sale of arms[,]" a category expressly carved out in *Heller*. 554 U.S. at 570. Plaintiffs have not overcome this presumption at the first step of the analysis by demonstrating Colorado's law is being "put toward abusive ends[.]" *Bruen*, 597 U.S. at 39 n.9.

Because Plaintiffs cannot prove that the plain text of the Second Amendment covers the right to immediately acquire firearms, the Court should reject Plaintiffs' challenge at the first step of *Bruen* without needing to reach the second step.

**B.     Colorado's law is consistent with our Nation's historical principle of preventing impulsive acts of firearm violence.**

If the Court does reach the second step of *Bruen*, however, the Supreme Court's analysis and instruction in *Rahimi* further support the Governor's argument that the Waiting Period Act is consistent with the Nation's tradition of firearms regulation. In *Rahimi*, the Court observed that "some courts have misunderstood the methodology" laid out in *Bruen*

and *Heller*, and that "these precedents were not meant to suggest a law trapped in amber." *Rahimi*, 144 S. Ct. at 1897. In considering whether a challenged regulation is consistent with the nation's history and tradition, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id*. at 1897-98. Thus, the government need not demonstrate the challenged regulation is a "'dead ringer'" or a "'historical twin,'" but rather only that "the challenged regulation is consistent with the *principles that underpin* our regulatory tradition." *Id.* (citations omitted) (emphasis added). The analysis necessarily requires a higher level of generality. These "principles" are derived by looking at past laws "[t]aken together," *id.* at 1901, rejecting the dissent's view that the government must show "a single historical law has both a comparable burden and justification[,]" *id.* at 1944 (Thomas, J., dissenting).

Applying *Rahimi's* clarification of the historical analogue test here supports the District Court's finding that the Governor's proffered historical analogues are "sufficiently similar to demonstrate that the Act is consistent with the Nation's historical tradition of firearms regulation." *Rocky Mountain Gun Owners, et. al., v. Polis*, 24-cv-02563-JLK, 2023 WL 8446495, *19 (D. Colo Nov. 13, 2023). The District Court found that the historical analogues identified by the Governor—laws regulating the carrying and use of firearms by intoxicated individuals—and the Waiting Period Act "both work to prevent individuals in a temporary impulsive state from irresponsibly using a firearm." *Id.* at *18. Despite some differences, the Waiting Period Act and the intoxication laws both sought to curb the impulsive use of firearms—the "why"—by addressing the sale of such firearms—the "how". The District Court's analysis is thus in keeping with *Rahimi*'s instruction that

8

courts should consider "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898.

In contrast, Plaintiffs' arguments on appeal—that the founders "imposed no waiting period to acquire a firearm" and that the intoxication laws are not sufficiently identical to the Waiting Period Act, Reply Br. at 22-23, 27 —fail in the face of *Rahimi*'s clear instruction that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 144 S. Ct. at 1897-98. The record below showed that the particular mechanism—waiting periods—may not have occurred to our founders. Unlike today, there were no retail stores in 1791 where one could immediately buy firearms. Waiting days to acquire a firearm was the norm. Yet, by adopting intoxication laws, our founders clearly understood the principle that impulsive purchase and use of firearms could be regulated consistent with the Second Amendment.

Plaintiffs further argue that the intoxication laws are not persuasive analogues because they applied to an individual, not entire populations. But again, this insistence on a "dead ringer" is far narrower than the methodology explained in *Bruen* and refined in *Rahimi*. There, the Court found surety regimes to be a persuasive analogue to section 922(g)(8), even though the challenged statute was "by no means identical to these founding era regimes." *Rahimi*, 144 S. Ct. at 1901. The same is true here. The Waiting Period Act is not designed in the exact same manner that the intoxication laws, "but it does not need to be," and the Governor offered robust historical evidence detailing how the law is "'relevantly similar'" to founding era regulations "in both why and how it burdens the Second Amendment right." *Id.* (quoting *Bruen*, 597 U.S. at 29).

### C. *Rahimi* confirms that the District Court properly concluded that Plaintiffs' facial challenge to the Waiting Period Act was unlikely to succeed on the merits.

To succeed on their facial challenge to Colorado's Waiting Period Act, Plaintiffs must show that there are no circumstances under which the Act could be constitutional. *Rahimi*, 144 S. Ct. at 1898. The district court denied Plaintiffs' motion for preliminary injunction, concluding that they failed to show that they are entitled to such extraordinary relief. *Rahimi*'s discussion of facial challenges supports that conclusion, and, if anything, raises the bar for Plaintiffs. As explained in Sections III(A) and (B), Plaintiffs fail to demonstrate a likelihood of success on the merits. But this conclusion is bolstered by *Rahimi*'s instruction that, to succeed on their facial challenge, Plaintiffs must demonstrate Colorado's Waiting Period Act is unconstitutional under any set of circumstances.

## IV. Conclusion

For the above reasons, this Court should affirm the district court's denial of a preliminary injunction following *Rahimi*.

Dated: July 24, 2024

        PHILIP J. WEISER
        Attorney General

        */s/ Matthew J. Worthington*
        *Michael T. Kotlarczyk*, Assistant Solicitor General*
        *Matthew J. Worthington*, Assistant Attorney General*
        1300 Broadway, 6th Floor
        Denver, CO 80203
        Telephone: (720) 508-6124
        Email: mike.kotlarczyk@coag.gov;
        matt.worthington@coag.gov
        *Attorneys for Governor Jared S. Polis*
        *Counsel of Record